UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

M.G., P.C., C.J., M.J., J.R., and D.R., individually and on
behalf of all similarly situated,

                                    Plaintiffs,

                 -against-

ANDREW CUOMO, in his official capacity as the Governor
of the State of New York, the NEW YORK STATE OFFICE
OF MENTAL HEALTH, ANN MARIE T. SULLIVAN, in
her official capacity as the Commissioner of the New York
State Office of Mental Health, the NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION, ANTHONY J.
ANNUCCI, in his official capacity as the Acting
Commissioner of the New York State Department of
Corrections and Community Supervision, ANNE MARIE
MCGRATH, in her official capacity as Deputy
Commissioner of the New York State Department of
Corrections and Community Supervision,

                                     Defendants.
---------------------------------------------------------------------- x

**FIRST AMENDED
CLASS ACTION
COMPLAINT**

7:19-cv-00639 (CS) (LMS)

## INTRODUCTION

    1.      Plaintiffs, individuals with serious mental illness who are indigent, bring this

action to challenge their institutionalization in state prison. Because Defendants have failed to

make available community-based housing and supportive services that Plaintiffs require upon

release, Defendants hold Plaintiffs in state prison past their lawful release dates.

    2.      Plaintiffs bring this action on behalf of a class of people with serious mental

illness whom Defendants hold in secure prisons past their release dates—including the end of

their prison sentences, approved conditional release dates, and open dates for parole release—

due to the inadequate capacity of community-based mental health housing programs (the "General Class").

3.      Plaintiffs also bring this action on behalf of a subclass of those General Class members who have been incarcerated past the maximum expiration dates of their court-imposed prison sentences (the "RTF Subclass").

4.      While claiming to have released RTF Subclass members to Residential Treatment Facilities ("RTF"), in fact, Defendants continue to hold Plaintiffs in the same prison settings and under the same conditions as their court-imposed prison sentences.

5.      In effect, Defendants' practices administratively lengthen Plaintiffs' terms of imprisonment, undermining the most basic principle undergirding the criminal justice system: that a criminal sentence, once imposed by a judge, means what it says.

6.      While residing in prison pending a vacancy in a community-based mental health housing program, Plaintiffs are not free to come and go or participate in community life.

7.      Plaintiffs are locked in secure prison facilities, have no autonomy and no privacy, and continue to be treated as prisoners.

8.      Plaintiffs, the General Class, and the RTF Subclass, remain in state prison waiting for community-based mental health housing for months, and in some cases over two years.

9.      While confining Plaintiffs, Defendants subject them to prison rules, impose solitary confinement, and may even revoke approved release status in response to reported violations of prison rules, without that person having ever stepped outside prison walls.

10.      Defendants need not isolate Plaintiffs in prisons. Defendants can make available within the existing mental health services system the integrated community-based mental health

housing and supportive services appropriate for Plaintiffs' needs that Defendants require for their release from prison.

11.    Plaintiffs bring this action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794 ("Section 504"), to remedy Defendants' failure to provide services to Plaintiffs in the most integrated setting.

12.    On behalf of the RTF Subclass, Plaintiffs also bring this action under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments to the U.S. Constitution, to remedy the deprivation of RTF Subclass members' fundamental liberty interests and their rights not to be subject to prolonged incarceration or criminalization of their status as individuals with mental illness who are homeless or at risk of homelessness.

13.    Plaintiffs seek declaratory and injunctive relief for the unconstitutional and discriminatory practices to which they are subject.

14.    Plaintiffs do not seek an order requiring their release from prison. Rather, Plaintiffs ask that Defendants make release possible by developing the community-based mental health housing programs that Defendants have imposed as a precondition for Plaintiffs' discharge from prison, and by creating an effective plan for community integration.

15.    For those Plaintiffs whose prison sentences have expired, Plaintiffs seek an end to the punitive conditions of their confinement while they await release to their communities.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

17.     Declaratory and injunctive relief are sought under 28 U.S.C. §§ 1343, 2201, and 2202.

18.     Venue is laid within the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this district.

## THE PARTIES

I.    **The General Class Representatives**

A.    M.G.

19.     Plaintiff M.G. is a 56-year-old man incarcerated at Auburn Correctional Facility, a maximum-security prison in Auburn, New York.

20.     M.G. has a diagnosis of borderline personality disorder.

21.     He has also struggled with depression and engaged in self-harm, particularly after the deaths of his daughter, father, and mother.

22.     The New York State Office of Mental Health ("OMH") has determined M.G. to be an individual with serious mental illness.

23.     He is currently housed in a windowless cell in the Intermediate Care Program at Auburn, a unit designated exclusively for incarcerated people with serious mental illness.

24.     The New York Parole Board granted him an open date for parole release of May 10, 2017.

25.     M.G. has been approved for release to Dutchess County.

26.     M.G. will be homeless or at risk of homelessness once released from prison.

27.     OMH assessed M.G. as requiring and being appropriate for community-based mental health housing.

28.    Anticipating his own needs, M.G. had requested that he receive counseling and mental health housing upon his release from prison when meeting with his OMH discharge planner and the Parole Board.

29.    M.G.'s OMH discharge planner has submitted applications for mental health housing in Dutchess County.

30.    Upon reaching his open date for parole release, prison staff informed M.G. that he would not be timely released due to a determination that he can be released only to community-based mental health housing.

31.    M.G. is currently on a waiting list for a bed after being informed that there are no available beds in the community-based mental health housing that he requires.

32.    M.G. remains at a correctional facility solely because he requires community-based mental health housing and supports that Defendants have not made available.

33.    M.G.'s mental health has deteriorated as a result of his continued incarceration at Auburn.

34.    The stress of his continued stay and uncertainty as to duration has also disrupted his sleep and has caused him to have seizures.

35.    His prolonged institutionalization also strained his marriage. When he was not released on his approved date, M.G.'s wife assumed incorrectly that it was due to some infraction or wrongdoing. M.G. and his wife have since divorced.

36.    In or around April 2019, OMH staff at Auburn informed M.G. that OMH was considering releasing him to a crisis residence, a form of short-term housing that is not community-based housing.

37.    M.G. desires to reside and receive programs and services in community-based mental health housing.

B.  P.C.

38.    Plaintiff P.C. is a 49-year-old man incarcerated at Sullivan Correctional Facility, a maximum-security prison in Fallsburg, New York.

39.    P.C. has a diagnosis of schizophrenia.

40.    He has also been diagnosed with mild intellectual disability.

41.    OMH has determined P.C. to be an individual with serious mental illness.

42.    He is currently housed in the Special Needs Unit at Sullivan.

43.    The Special Needs Unit at Sullivan where P.C. is housed is designated exclusively for incarcerated individuals with developmental or intellectual disabilities and adaptive behavior deficits, and houses people who are additionally diagnosed with serious mental illness.

44.    The New York Parole Board granted him an open date for parole release of December 19, 2017.

45.    P.C. has been approved for release to Nassau County.

46.    P.C. will be homeless or at risk of homelessness once released from prison.

47.    OMH assessed P.C. as requiring and appropriate for community-based mental health housing upon his discharge.

48.    OMH staff submitted mental health housing applications on P.C.'s behalf to Nassau County.

49.    Subsequently, OMH staff informed P.C. that they would seek housing for him in Suffolk County instead, since no beds are available in Nassau.

50.     Prison staff have informed P.C. that he will not be released because appropriate community-based mental health housing is unavailable.

51.     P.C. remains at a correctional facility solely because he requires community-based mental health housing and supports that Defendants have not made available.

52.     After the filing of the original Complaint, OMH staff at Sullivan told P.C. that "Albany" had recently taken over planning for his release from the facility's discharge planner.

53.     P.C. desires to reside and receive programs and services in community-based mental health housing.

II.    **Representatives of Both the General Class and the RTF Subclass**

A.    C.J.

54.     Plaintiff C.J. is a 32-year-old man, whom Defendants held in state prison for 502 days past his maximum expiration date, a date that marks the end of his court-imposed prison sentence.

55.     C.J. has a diagnosis of bipolar II disorder.

56.     OMH determined C.J. to be an individual with serious mental illness.

57.     C.J.'s maximum expiration date was September 28, 2017, as calculated by the Department of Corrections and Community Supervision ("DOCCS").

58.     DOCCS claims to have released C.J. on his maximum expiration date to a "residential treatment facility," first at Fishkill Correctional Facility and then at Green Haven Correctional Facility.

59.     In fact, C.J. was housed in prison units designated exclusively for incarcerated people with serious mental illness.

60.    C.J. has been sentenced to five years of post-release supervision in the community.

61.    Prior to C.J.'s release date, DOCCS placed him in Sing Sing Correctional Facility's Community Orientation and Re-entry Program ("CORP"), a program for people with serious mental illness who are nearing release from prison.

62.    CORP is designed to prepare people with serious mental illness for community integration and a component of the program is focused on securing housing.

63.    On July 21, 2017, C.J.'s OMH discharge planner completed a discharge summary for C.J., which noted that C.J. would be homeless and would require community-based mental health housing and supports upon release from prison.

64.    On August 1, 2017, C.J.'s OMH discharge planner submitted an application for community-based mental health housing and services in Orange County on C.J.'s behalf.

65.    Specifically, the application identified a supportive treatment apartment or individual supported housing as appropriate for C.J. Both models of housing allow residents to live in integrated community settings.

66.    While enrolled in CORP, C.J.'s OMH counselor informed C.J. that he would not be released at the end of his prison sentence and would be held past his maximum expiration date.

67.    In September 2017, C.J. was directed to sign papers related to "residential treatment facility" status.

68.    C.J. was transferred to Fishkill Correctional Facility following the end of his prison sentence and placed in the prison's Intermediate Care Program and Transitional Intermediate Care Program.

69.    Subsequently, DOCCS transferred C.J. to the Green Haven Correctional Facility and placed him in single cells in the prison's Transitional Intermediate Care Program and Intermediate Care Program.

70.    Despite his nominal "release" status, C.J. was housed in prison and subject to prison conditions for the entirety of time following his maximum expiration date until his release.

71.    C.J. remained at correctional facilities solely because he required community-based mental health housing and supports that Defendants had not made available.

72.    OMH staff told C.J. that there were few resources in the community for him and he needed to be patient.

73.    C.J. earned a GED and vocational certificate in prison and planned to search for a job upon release. Due to his delayed release, he was unable to act on those plans.

74.    C.J. experienced serious psychiatric harm due to his prolonged incarceration. C.J. repeatedly engaged in self-harm and expressed his desire to die rather than remain in prison.

75.    C.J. was admitted to a crisis observation cell and was repeatedly placed on suicide watch, including when his birthday approached and he informed prison staff that he had lost hope of going home.

76.    C.J. wanted to return to Orange County, where his family and support system reside.

77.    As a result of his prolonged incarceration, his family relationship suffered. C.J. was due to be released shortly before his young daughter's birthday, and he expected to celebrate with her for the first time in a decade.  Since his release date was in early fall, he also planned to spend the holidays with family.

78.    On January 30, 2019, seven days after Plaintiffs filed this action, OMH staff at Green Haven completed a revised discharge plan for C.J. Under this plan, C.J.'s proposed release address was changed to the Middletown Transitional Residence in Middletown, New York.

79.    The Middletown Transitional Residence is operated by OMH, and is located on the campus of the Rockland Psychiatric Center – Middletown Campus. It is intended to be temporary housing and is not the community-based mental health housing identified as appropriate for C.J.

80.    On February 7, 2019, C.J.'s OMH pre-release coordinator at Green Haven completed a revised application for mental health housing and services in Orange County. Though C.J. was still held at Green Haven at that time, the application listed his address as the Middletown Transitional Residence.

81.    Like the 2017 application, the February 2019 application identified individual supported housing as appropriate for C.J. This model of housing allows residents to live independently in integrated settings in the community.

82.    Parole staff approved C.J.'s discharge to the Middletown Transitional Residence on February 8, 2019.

83.    On or about February 11, 2019, an OMH discharge planner called C.J. to her office. At this meeting, the discharge planner informed C.J. that she had received an urgent email from "Albany" and directed C.J. to complete his discharge paperwork.

84.    On February 12, 2019, C.J. was released to the Middletown Transitional Residence.

85.    C.J. was incarcerated at Green Haven past his maximum expiration date on residential treatment facility status as of January 23, 2019, the date that the original Complaint in this action was filed.

86.    C.J. could not predict the length of his prolonged incarceration.

87.    After the filing of the original Complaint, the timing of C.J.'s discharge was within Defendants' discretion.

88.    C.J. has not received the community-based housing that OMH identified as appropriate for him.

89.    C.J. desires to reside and receive programs and services in community-based mental health housing.

B.  M.J.

90.    Plaintiff M.J. is a 33-year-old man, whom Defendants held in state prison for 246 days past his maximum expiration date.

91.    M.J. has a diagnosis of bipolar disorder.

92.    OMH determined M.J. to be an individual with serious mental illness.

93.    M.J.'s maximum expiration date—signaling the end of his court-imposed prison sentence—was June 18, 2018, as calculated by DOCCS.

94.    DOCCS claims to have released him on his maximum expiration date to a "residential treatment facility," first at Fishkill Correctional Facility and then at Green Haven Correctional Facility.

95.    In fact, M.J. was housed in prison units designated exclusively for incarcerated people with serious mental illness.

96.     M.J. has been sentenced to five years of post-release supervision in the community.

97.     Prior to June 18, 2018, M.J. was housed in Great Meadow Correctional Facility's Intermediate Care Program.

98.     At Great Meadow, M.J. met with an OMH discharge planner assigned to the Intermediate Care Program and completed government benefits applications.

99.     M.J.'s OMH discharge planner confirmed that M.J. will be homeless or at risk of homelessness once released from prison, and requires and is appropriate for community-based mental health housing.

100.    In April 2018, M.J.'s OMH discharge planner submitted an application for community-based mental health housing and services in Orange County on M.J.'s behalf.

101.    The application identified a supervised community residence as appropriate for M.J. This model of mental-health housing provides on-site services and supervision for residents, typically in private living units. The application also requested that M.J. receive Assertive Community Treatment services.

102.     Instead of releasing M.J. on his maximum expiration date, DOCCS informed M.J. that he would be admitted to a "residential treatment facility," and DOCCS directed M.J. to sign papers related to residential treatment facility status.

103.    M.J. was transferred to the Fishkill Correctional Facility's Intermediate Care Program on or about the maximum expiration date of his prison sentence.

104.    Subsequently, DOCCS transferred M.J. to the Green Haven Correctional Facility's Intermediate Care Program.

105.    Despite his nominal "release" status, M.J. was housed in prison and subject to prison conditions for the entirety of time following his maximum expiration date until his release.

106.    M.J. was informed that limited community-based mental health housing in Newburgh contributed to the delay of his release to Orange County.

107.    M.J. remained at correctional facilities solely because he required community-based mental health housing and supports that Defendants had not made available.

108.    Even though segregated confinement is known to be harmful to people with serious mental illness, Defendants placed M.J. in punitive segregated confinement twice while on "residential treatment facility" status, placing M.J. at risk of harm from psychiatric decompensation.

109.    M.J. wanted to return to Orange County, where he grew up and where his family support system resides.

110.    On January 30, 2019, seven days after Plaintiffs filed this action, OMH staff at Green Haven completed a revised discharge plan for M.J. Under this plan, M.J.'s proposed release address was changed to the Middletown Transitional Residence in Middletown, New York.

111.    On February 13, 2019, M.J.'s OMH discharge planner at Green Haven completed a revised application for mental health housing and services in Orange County. Though M.J. was still held at Green Haven at that time, the application listed his address as the Middletown Transitional Residence.

112.    The application identified individual supported housing as appropriate for M.J. This model of mental-health housing allows residents to live independently in integrated settings

in the community. Unlike the prior application, the February 2019 application did not request Assertive Community Treatment services for M.J.

113.    On February 19, 2019, M.J. was released to the Middletown Transitional Residence, one week after Plaintiff C.J. was released to this same location.

114.    M.J. was incarcerated at Green Haven past his maximum expiration date on residential treatment facility status as of January 23, 2019, the date that the original Complaint in this action was filed.

115.    M.J. could not predict the length of his prolonged incarceration.

116.    After the filing of the original Complaint, the timing of M.J.'s discharge was within Defendants' discretion.

117.    M.J. has not received the community-based housing that OMH identified as appropriate for him.

118.    M.J. desires to reside and receive programs and services in community-based mental health housing.

C.  <u>J.R.</u>

119.    Plaintiff J.R. is a 35-year-old man, whom Defendants held in state prison for 284 days past his maximum expiration date.

120.    J.R. has diagnoses of depressive disorder and post-traumatic stress disorder.

121.    OMH determined J.R. to be an individual with serious mental illness.

122.    J.R. has attempted self-harm on multiple occasions.

123.    J.R.'s maximum expiration date—signaling the end of his court-imposed prison sentence—was June 7, 2018, as calculated by DOCCS.

124.    He has been sentenced to three years of post-release supervision in the community.

125.    DOCCS claims to have released him on his maximum expiration date to the nominal "residential treatment facility" at Fishkill.

126.    In fact, J.R. was housed with individuals serving a sentence of imprisonment at the prison.

127.    J.R. received an approved conditional release date of November 9, 2017.

128.    On his conditional release date, J.R.'s prison counselor informed him that he would not be released on that day.

129.    Months before the expiration of J.R.'s prison sentence, J.R.'s OMH discharge planner submitted an application on J.R.'s behalf for community-based mental health housing and services in Dutchess County, where J.R. lived before his incarceration.

130.    DOCCS issued a memorandum on or about June 4, 2018 advising J.R. that, pursuant to a condition established by the Parole Board, he would be transferred to a "residential treatment facility" upon the expiration of his sentence for a period not to exceed six months.

131.    On June 7, 2018, the maximum expiration date of J.R.'s prison sentence, he was not released from prison.

132.    J.R.'s counselor informed him that he would not be released because he has serious mental illness and requires community-based mental health housing, which neither DOCCS nor OMH had secured for him.

133.    J.R.'s counselor also directed J.R. to sign documents that were presented to him as "release papers."

134.    His counselor informed J.R. that DOCCS no longer considered him an "inmate," but rather a "parolee."

135.    DOCCS continued to hold J.R. in the same housing unit, under the same conditions, where he had been incarcerated up to that time.

136.    Despite his nominal "release" status, J.R. was housed in prison and subject to prison conditions for the entirety of time following his maximum expiration date until his release.

137.    During this time, J.R. proposed the addresses of several family members, including his sister and cousin, as residences to which he could be released.  DOCCS did not approve these residences as suitable for his release.

138.    J.R. participated in several interviews with providers of community-based mental health housing.

139.    Several providers could not admit J.R. to their program because they lack available beds.

140.    J.R. remained at a correctional facility solely because he required community-based mental health housing and supports that Defendants had not made available.

141.    On March 18, 2019, J.R. was released to the Rockland Psychiatric Center's Alliance House in Poughkeepsie, New York.

142.    Alliance House is not the community-based housing that OMH identified as appropriate for him.

143.    In fact, Alliance House is a crisis residence operated by OMH, which offers short-term housing for up to 21 days. According to the state's website, the crisis residence is "not intended as a substitute for housing."

144.    J.R. was incarcerated at Fishkill past his maximum expiration date on residential treatment facility status as of January 23, 2019, the date that the original Complaint in this action was filed.

145.    J.R. could not predict the length of his prolonged incarceration.

146.    After the filing of the original Complaint, the timing of J.R.'s discharge was within Defendants' discretion.

147.    J.R. desires to reside and receive programs and services in community-based mental health housing.

D.    D.R.

148.    Plaintiff D.R. is a 36-year-old man, whom Defendants held in state prison for 411 days past his maximum expiration date.

149.    D.R. has a diagnosis of bipolar disorder.

150.    OMH determined D.R. to be an individual with serious mental illness.

151.    D.R.'s maximum expiration date—signaling the end of his court-imposed prison sentence—was December 29, 2017, as calculated by DOCCS.

152.    He has been sentenced to post-release supervision in the community to last until March 4, 2021.

153.    DOCCS claims to have released D.R. on his maximum expiration date to the "residential treatment facility" at Fishkill Correctional Facility.

154.    In fact, D.R. was housed in a dormitory at the prison, primarily with people who have been convicted of sex offenses despite the fact that D.R. does not have any convictions for sex offenses.

155.    In late December 2017, while D.R. was still confined at Mid-State Correctional Facility, DOCCS and OMH staff presented D.R. with "release papers" and directed D.R. to sign them.

156.    On or about December 29, 2017, D.R.'s counselor informed him that he would be transferred to Fishkill.

157.    OMH staff also informed D.R. that he would not be released to the community upon the expiration of his prison sentence.

158.    D.R. received a memorandum dated May 29, 2018 from Defendant McGrath, noting that he would continue to be placed in a "residential treatment facility" because "an approved residence [for his release] has not yet been identified."  This memorandum explained that he would remain at the residential treatment facility "until such time as you have proposed and DOCCS has approved a suitable residence."

159.    D.R. continued to be incarcerated in prison and subject to prison conditions at Fishkill after receiving this memorandum.

160.    Both before and after the maximum expiration date of his prison sentence, D.R. met with discharge planners to discuss his history of homelessness and need for community-based mental health housing and supportive services, such as case management.

161.    D.R.'s discharge planner submitted an application for community-based mental health housing and services on D.R.'s behalf to Nassau County.

162.    D.R. participated in multiple interviews with providers of community-based mental health housing.

163.    Despite his nominal "release" status, D.R. was housed in prison and subject to prison conditions for the entirety of time following his maximum expiration date until his release.

164.    During this time, D.R. was placed in segregated confinement at the prison as punishment for disciplinary infractions, even after the expiration of his prison sentence.

165.    D.R. proposed that he be released to his aunt's home. This address was not approved as suitable for his release.

166.    D.R. remained at a correctional facility solely because he required community-based mental health housing and supports that Defendants had not made available.

167.    D.R.'s mental health significantly deteriorated as a result of his prolonged incarceration. He also experienced periods of frustration and sadness regarding his prolonged incarceration.

168.    D.R.'s OMH counselor indicated that he was exhibiting symptoms of "paranoia."

169.    D.R. expected that after he was released at the end of his prison sentence, he would study to take a GED exam and find employment.

170.    D.R. also expected that after he was released at the end of his prison sentence, he would spend time with his family, particularly during holidays.

171.    On February 13, 2019, D.R. was released to the Pilgrim Crisis Residence in Brentwood, New York.

172.    Pilgrim Crisis Residence is not the community-based housing that OMH identified as appropriate for him.

173.    In fact, Pilgrim Crisis Residence is short-term housing located on the grounds of Pilgrim Psychiatric Center, which is a state psychiatric hospital. According to the state's website, the crisis residence is "not intended as a substitute for housing."

174.    On information and belief, Pilgrim Crisis Residence is intended to serve patients ready for discharge from the psychiatric hospital.

175.    D.R. was incarcerated at Fishkill past his maximum expiration date on residential treatment facility status as of January 23, 2019, the date that the original Complaint in this action was filed.

176.    D.R. could not predict the length of his prolonged incarceration.

177.    After the filing of the original Complaint, the timing of D.R.'s discharge was within Defendants' discretion.

178.    D.R. desires to reside and receive programs and services in community-based mental health housing.

## III.    Defendants

### A.    Governor Andrew Cuomo

179.    Defendant Andrew Cuomo is the Governor of the State of New York, a public entity covered by the ADA and Section 504. N.Y. Const. Art. 4, § 1.

180.    Defendant Cuomo is responsible for supervising and controlling DOCCS and OMH, seeking and expending funds to implement the programs and deliver the services of those agencies, and taking care that the laws of the State of New York are faithfully executed. N.Y. Const. Art. 4, § 3; Art. 5, § 4; Art. 7, § 2.

181.    Defendant Cuomo appoints the commissioners of OMH and DOCCS, who serve at his pleasure. N.Y. Const. Art. 5, § 4; Art. 13, § 2.

182.    Defendant Cuomo oversees inter-agency coordination between OMH and DOCCS.

183.    Defendant Cuomo oversees, directs, and funds New York State's efforts to provide community-based mental health housing and supportive services to people with serious mental illness released from prison.

184.    Defendant Cuomo receives reports on the mental health system and is involved in developing policies to address the needs of people with mental illness and to encourage their full participation in society. N.Y. Mental Hyg. Law §§ 5.07, 7.07(b); N.Y. Exec. Law § 164.

185.    In 2012, Defendant Cuomo established an Olmstead Cabinet pursuant to Executive Order No. 84, appointed the Cabinet's Chair, and charged the Cabinet with providing recommendations to him for development, implementation, and coordination of an Olmstead Plan to meet the requirements of the ADA.

186.    Defendant Cuomo appoints members to and receives reports from New York State's Most Integrated Setting Coordinating Council, which is required to ensure that individuals with disabilities receive services in the most integrated setting appropriate to their needs. N.Y. Exec. Law §§ 702; 703(1), (4).

187.    Defendant Cuomo is sued in his official capacity.

B.  New York State Office of Mental Health

188.    Defendant OMH is charged by statute with the "responsibility for seeing that mentally ill persons are provided with care and treatment, that such care, treatment and rehabilitation is of high quality and effectiveness, and that the personal and civil rights of persons receiving care, treatment and rehabilitation are adequately protected." N.Y. Mental Hyg. Law § 7.07(c).

21

189.    Defendant OMH is required to develop a comprehensive, integrated system that ensures people with mental illness receive services in their communities whenever possible and that sparingly utilizes institutions to provide care.

190.    Defendant OMH enforces the laws and regulations applicable to mental health units within the DOCCS system and is responsible for developing, implementing and overseeing New York State's community-based mental health housing programs and supportive services.

191.    Defendant OMH is a public entity covered by the ADA and Section 504.

C.    Commissioner Ann Marie T. Sullivan

192.    Defendant Ann Marie T. Sullivan is the Commissioner of OMH, a public entity covered by the ADA and Section 504.

193.    Defendant Sullivan is responsible for the administration and operation of OMH, including the provision of services to individuals with mental illness who are incarcerated and discharged from prison. She is responsible for establishing standards for operating and funding a continuum of community-based mental health housing. N.Y. Mental Hyg. Law § 41.44; N.Y. Correct. Law §§ 401, 404.

194.    Defendant Sullivan is also responsible for determining what services to provide, in what setting to provide them, and how to allocate funds for each program and where to allocate such funds. N.Y. Mental Hyg. Law § 7.15.

195.    Defendant Sullivan oversees OMH's coordination and planning with local governments to ensure that care, treatment, and rehabilitation may be received in people's home communities. N.Y. Mental Hyg. Law §§ 7.01, 7.07(a).

196.    Defendant Sullivan is sued in her official capacity.

22

D. New York State Department of Corrections and Community Supervision

197. Defendant DOCCS enforces the laws and regulations applicable to New York State prisons.

198. Defendant DOCCS is statutorily responsible for the confinement and habilitation of individuals placed in state correctional facilities and for their programming, supervision, and the conditions of their confinement.

199. Defendant DOCCS is also responsible for the management of individuals released to community supervision.

200. Defendant DOCCS is a public entity covered by the ADA and Section 504.

E. Commissioner Anthony J. Annucci

201. Defendant Anthony J. Annucci is the Acting Commissioner of DOCCS, a public entity covered by the ADA and Section 504.

202. Defendant Annucci is responsible for the administration and operation of DOCCS, including the care, custody, parole, and post-release supervision of individuals with mental illness who are incarcerated and discharged from prison. N.Y. Correct. Law § 201.

203. Defendant Annucci is charged with the "management and control of persons released on community supervision" and inquiring "into all matters connected with said community supervision." N.Y. Correct. Law § 112(2).

204. Defendant Annucci is sued in his official capacity.

F. Deputy Commissioner Anne Marie McGrath

205. Defendant Anne Marie McGrath is a Deputy Commissioner of DOCCS, a public entity covered by the ADA and Section 504.

206.     Defendant McGrath is responsible for managing the inmate population, including all movement and transportation of incarcerated people and the transfer and placement of incarcerated people in residential treatment facilities.

207.     Defendant McGrath is sued in her official capacity.

## FACTUAL ALLEGATIONS

I.     **Defendants are Responsible for Ensuring that Plaintiffs are Discharged to Community-Based Mental Health Housing Programs on the Date of their Release from State Prison.**

208.     Defendants are responsible for planning for the release from New York State prisons of people with serious mental illness who are homeless or at risk of homelessness.

209.     Defendants are responsible for making available adequate community-based mental health housing programs for this population.

A.     The Integration Mandate of the ADA and Section 504

210.     Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibit discrimination against individuals with disabilities, including those with mental illness.

211.     The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

212.     Similarly, Section 504 states that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

213.     Implementing regulations for the ADA and Section 504 require public entities to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(d); *see also* 45 C.F.R. § 84.4(b)(2).  An integrated setting is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. part 35, App. B. These statutes and regulations are often referred to collectively as the "integration mandate."

214.     In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the U.S. Supreme Court held that a state's failure to place a person with mental illness in the most integrated setting appropriate for his or her needs constitutes discrimination on the basis of disability, in violation of the integration mandate of the ADA.

B.  New York State's Community-Based Mental Health Housing Programs

215.     OMH is responsible for developing community-based mental health housing programs for people who are released from state prisons and for ensuring that people with serious mental illness who are homeless or at risk of homelessness upon release receive assistance with obtaining housing that addresses their individualized needs.

216.     Community-based mental health housing for this population encompasses a continuum of housing models that provide different levels of supervised treatment and care coordination tailored to residents' needs.

217.     People who need greater supervision or assistance developing independent living skills generally reside in a more service-intense housing model, such as an apartment treatment program.  These programs are intended to be transitional, allowing people to progress to a model that affords greater independence.

218.    People with greater independent living skills generally reside in a single room occupancy residence or scattered-site supported housing.  Both models are considered permanent housing.

219.    While OMH community-based housing models vary in terms of capacity, services, and location, each offers significantly greater opportunities to participate in the community than prisons, which afford no such opportunities.

## II.    New York Has a Comprehensive Scheme for Release of Individuals with Serious Mental Illness from Prison.

220.    Defendants are responsible for discharging Plaintiffs from state prison to community-based mental health housing that meets their mental health needs in the most integrated setting.

### A.  Categories of Release to Community Supervision

221.    People serving indeterminate sentences—sentences with minimum and maximum terms of imprisonment—may be released to parole after completing their minimum term of imprisonment.

222.    The New York State Board of Parole—an independent, quasi-judicial body within DOCCS—is authorized to grant or deny parole in its discretion, subject to certain criteria provided in state law and regulations.

223.    If parole is granted, the Parole Board sets an "open date for parole release."

224.    A person who receives an open date for parole release is known as a "parole grantee."

225.    If a person is not released on parole, they may next be released on their "conditional release" date if they have earned statutory "good time." Conditional release is not available to people sentenced to life.

226.    Each DOCCS prison's Time Allowance Committee meets approximately four months before an individual's presumptive conditional release date to approve the release date based on good behavior and program participation.

227.    DOCCS will not discharge from prison any person who had been granted parole or conditional release until DOCCS approves an anticipated community residence for that person.

228.    A person not released to parole or conditional release will remain in prison until their "maximum expiration date," the last day of their sentence.

229.    On the maximum expiration date, DOCCS loses legal authority to incarcerate the person pursuant to their sentence.

230.    DOCCS calculates and records each person's parole eligibility, conditional release, and maximum expiration dates upon admission to DOCCS custody.

231.    In 1998, the New York State Legislature passed "Jenna's Law," which required courts to impose a period of "post-release supervision" after a determinate sentence (a sentence with a single term of imprisonment).

232.    Like parole, post-release supervision is a form of "community supervision" that subjects the individual to DOCCS's oversight after release from prison.

233.    According to the legislative history for Jenna's Law, post-release supervision was intended to ensure that offenders will be successfully reintegrated into society.

234.    Post-release supervision terms "commence upon the person's release from imprisonment to supervision." N.Y. Penal Law § 70.45(5).

235.    DOCCS identifies individuals released from prison to community supervision— whether on parole, conditional release, or post-release supervision—as "releasees."

236.    The Parole Board is responsible for setting conditions of release for releasees.

237.    Certain general conditions apply to all releasees, such as prohibitions on the possession of drug paraphernalia and firearms.

238.    The Parole Board may also impose so-called "special conditions." These conditions may include a requirement to cooperate with mental health evaluation referrals and treatment as directed by the parole officer, a prohibition on communication with certain individuals, a requirement to abide by curfews, and requirements to engage in substance abuse, alcohol abuse, and anti-aggression counseling.

B.    Preparing People with Serious Mental Illness for Release from Prison

239.    OMH and DOCCS share responsibility for discharging people with serious mental illness from prison, including by planning for, assessing, and approving housing in the community to which they may be released.

240.    Annually, approximately 2,050 people with serious mental illness are discharged from New York State prisons to the community.

241.    OMH identifies people with serious mental illness by assigning them an "S-designation" or an OMH "Level 1" or "Level 2" classification.

242.    OMH is required to provide a comprehensive discharge plan to every person with serious mental illness who is preparing to return to the community from prison.

243.    As part of the discharge planning process, OMH counselors are required to meet with people with serious mental illness at least six months prior to their scheduled release date to assess their needs upon release, including housing needs.

244.    OMH must prepare and submit a Single Point of Access application to secure for the individual the community-based mental health housing and any other necessary services in the county to which they will return.

245.     If a person with serious mental illness will be homeless upon release, is at risk of homelessness, or otherwise requires mental health housing, OMH staff must apply for housing using the Single Point of Access application.

246.     OMH's preparation of a Single Point of Access application for housing reflects its assessment that the person is eligible and appropriate for community-based mental health housing.

247.     DOCCS staff collaborate with OMH in planning for a person's housing needs and developing a release plan that includes suitable housing in the community.

248.     As part of that collaboration, DOCCS counselors ask each person with serious mental illness to propose a residence to which he or she can be released.

249.     DOCCS parole staff are responsible for investigating the proposed residence.

250.     DOCCS has the final authority to approve or reject the proposed residence.

251.     Pursuant to OMH policy, an individual is deemed homeless or at risk of homelessness if he or she has submitted a proposed address that DOCCS has rejected.

252.     As many incarcerated people lack housing and financial resources, many propose a local homeless shelter as their residence.

253.     Defendants often reject shelters, however, as not suitable for people with serious mental illness.

254.      Because their proposed residence is often rejected, indigent people with serious mental illness are often left with only one suitable housing option upon release from prison—the community-based mental health housing OMH deemed them eligible and appropriate for.

255.     Plaintiffs are individuals forced by Defendants to remain incarcerated in prison beyond their open dates for parole release, approved conditional release dates, and maximum

expiration dates when no community-based mental health housing is available at the time they legally should be free.

C. <u>The "Release" of People with Serious Mental Illness to State Prison on RTF Status</u>

256.    New York law authorizes DOCCS to transfer individuals who are released to post-release supervision status, having reached their maximum expiration dates, to an RTF.

257.    New York law defines RTFs as community-based placements that promote a person's reintegration into society:

> "Residential treatment facility" [is a] correctional facility consisting of a community based residence in or near a community where employment, educational and training opportunities are readily available for persons who are on parole or conditional release and for persons who are or who will soon be eligible for release on parole who intend to reside in or near that community when released.

N.Y. Correct. Law § 2(6).

258.    The New York Correction Law further requires DOCCS to secure education, employment, rehabilitation, and reintegration services for individuals placed in RTFs.

259.    A releasee placed in an RTF "may be allowed to go outside the facility during reasonable and necessary hours to engage in any activity reasonably related to his or her rehabilitation and in accordance with the program established for him or her." N.Y. Correct. Law § 73.

260.    Two New York statutes authorize DOCCS to place an individual who is released to post-release supervision in an RTF.

261.    Penal Law § 70.45(3) provides that the Parole Board may require a time-limited RTF placement as a special condition of community supervision:

> [T]he board of parole may impose as a condition of post-release supervision that for a period not exceeding six months immediately following release from the underlying term of imprisonment the person be transferred to and participate in the programs of a residential treatment facility as that term is defined in subdivision six of section two of the correction law [as quoted in paragraph 257 above].

262.    If the Parole Board imposes RTF placement as a condition of post-release supervision, DOCCS, not the Board, is responsible for selecting the specific RTF to which the individual will be transferred and for supervising the individual while placed there.

263.    Correction Law § 73(10) separately provides that:

The commissioner [of DOCCS] is authorized to use any residential treatment facility as a residence for persons who are on community supervision. Persons who reside in such a facility shall be subject to conditions of community supervision imposed by the board.

264.    Therefore, even if the Parole Board does not impose RTF placement as a condition of release, the Correction Law authorizes DOCCS to transfer an individual on post-release supervision to an RTF placement.

265.    Pursuant to Correction Law § 70, DOCCS commissioners have designated 13 correctional facilities, spread across the state, to function as RTFs: Green Haven, Wende, Fishkill, Woodbourne, Orleans, Mohawk, Mid-State, Hudson, Albion, Rochester, Queensboro, and Lincoln Correctional Facilities, as well as Edgecombe Residential Treatment Facility.  These 13 facilities also function as general correctional facilities for incarcerated individuals serving their sentences.

266.    The majority of facilities designated as RTFs are medium or maximum security level prisons.

267.    There are no separate "residential treatment facilities" in the prison compounds where Plaintiffs are incarcerated.

268.    Plaintiffs are subjected to the same conditions and restrictions of prison confinement as they have been since they began their sentences.  Even though Plaintiffs are labelled "releasees," in reality they remain prisoners in every respect.

III.    **Defendants Fail to Place Plaintiffs in the Most Integrated Setting Appropriate to their Needs.**

269.    Defendants confine Plaintiffs in prison past their open dates for parole release, approved conditional release dates, and maximum expiration dates because there is inadequate capacity in the community-based mental health housing described in Section I(B) above.

A.    Defendants Fail in their Mandate to Serve the Housing Needs of People with Serious Mental Illness Released from State Prison.

270.    Defendants Cuomo, Sullivan, and OMH are responsible for providing necessary community-based mental health housing programs for Plaintiffs as they are people with serious mental illness.

271.    The stated goal of OMH's housing programs is to provide integrated housing, enabling residents to live independently, to succeed in the community, and to interact with non-disabled persons to the fullest extent possible.

272.    OMH has repeatedly recognized the importance of providing community-based mental health housing to members of this population who would otherwise be homeless upon their release.

273.    OMH has systematically failed to address the foreseeable need for adequate capacity in community-based mental health housing programs to meet the demands of this population.

274.    OMH knows of and has failed to respond to counties' local needs for an adequate number of community-based mental health housing beds generally and specifically for people with serious mental illness released from prison.

275.    County personnel who process Single Point of Access applications for incarcerated people report back to OMH staff about the availability of community-based mental health housing beds.

276.    Recognizing the importance of collaboration among state and local agencies, Defendant Cuomo established the Council on Community Re-Entry and Reintegration (the "Re-Entry Council") in 2014 to provide recommendations regarding the reentry of people into the community from prison. Members of the Governor's Office sit on this council.

277.    Defendant Cuomo has adopted recommendations by the Re-Entry Council regarding the need to create additional community-based mental health housing for people released from prison.

278.    Defendant Cuomo's adoption of these recommendations led to the development of some community-based mental health housing for people released from prison.

279.    The number of beds created for people released from prison has been inadequate to meet discharge planning needs.

280.    Across the state, counties have continued to describe their lack of capacity to meet the need for mental health housing in reports to OMH.

281.    Defendant Cuomo has directed funding to local agencies to coordinate services for people with serious mental illness who are released from prison, but he has done so for approximately only one-third of New York's counties.

282.    As a result, there are inadequate services for people with serious mental illness re-entering the community from prison.

283.    Although Defendant Cuomo and OMH have announced initiatives to develop housing for vulnerable populations, including scattered-site supported housing specifically for people released from prison, these initiatives are insufficient in light of the annual number of people being released from prison who need community-based housing.

284.    Plaintiffs routinely remain on waiting lists for community-based mental health housing for months, and they remain institutionalized in prison, in some cases over two years.

285.    As a result of inadequate capacity in mental health housing programs throughout the state, Plaintiffs remain in prison beyond their open dates for parole release, approved conditional release dates, and maximum expiration dates.

B.    Defendants Institutionalize Plaintiffs in Segregated and Punitive Prison Conditions Inappropriate for Individuals with Serious Mental Illness Approved for Release to the Community.

286.    Prison is a segregated setting.

287.    In prison, Plaintiffs have no meaningful ability to engage in mainstream society.

288.    Plaintiffs are held in rural, geographically isolated regions, with no nearby public transportation and far from the communities to which they will return.

289.    Defendants do not allow Plaintiffs to leave the prison at any time, even when they demonstrate good behavior and there has been no finding that they pose a threat to the safety or welfare of the community.

290.    Plaintiffs are unable to attend job interviews, visit their home towns or cities, or pursue education in the community.

291.    While in prison, Plaintiffs are often housed in separate specialized units for people with serious mental illness and other disabilities.

292.    While these units provide services to help incarcerated people with disabilities manage a secure environment, Plaintiffs have few opportunities to interact with non-disabled people.

293.    Even when not housed in specialized units in prison, Plaintiffs have fewer opportunities to interact with non-disabled people than they would in the community due to the high prevalence of disabilities in state prison.

34

294.     Plaintiffs are housed in cells or dorms.

295.     Cells are locked with a metal-barred door and may not have a window to the out-of-doors.

296.     In dorms, people are assigned to a "cube" consisting of their bed and a small area for their possessions.

297.     Prison rules restrict the quantity and type of personal property Plaintiffs may possess.

298.     Plaintiffs are afforded no autonomy or choice in their daily life activities.

299.     Plaintiffs are required to wear prison uniforms.

300.     Plaintiffs are not permitted to pursue hobbies, programs, or activities according to their interests and personal goals.

301.     If they need to purchase anything, Plaintiffs may do so only from the prison commissary or private vendors, or rely on family or friends to send a care package that complies with prison rules.

302.     Plaintiffs' day and night are determined by Defendants according to the prison schedule. They eat, sleep, shower, and exercise only as dictated by DOCCS's schedule and rules.

303.     Plaintiffs have no freedom of movement in the facility.

304.     Plaintiffs must abide by rigid rules on escort and movement procedures, such as standing at painted markings on the floors of the prison that direct prisoners where to pause or walk.

305.     Plaintiffs are subject to prison rules and procedures related to shackles and restraints.

306.    In fact, Plaintiffs who have experienced mental health crises have been required to wear shackles when escorted outside their observation cells.

307.    Security considerations, prison protocol and rules, and the availability of prison resources restrict Plaintiffs' mental health treatment.

308.    Plaintiffs who exhibit suicidal or self-injurious behavior, for example, may be placed in stark observation cells, tantamount to solitary confinement, where they are stripped naked, required to wear tear-proof smocks, and held for prolonged periods of time.

309.    Plaintiffs are subject to prison discipline for as long as they remain in prison.

310.    Despite the well-known risk of serious harm to psychiatric condition, prison staff frequently subject Plaintiffs to disciplinary segregated confinement, including for minor infractions.

311.    In addition, Plaintiffs may receive disciplinary sanctions depriving them of telephone calls, visits, and packages from friends and family.

312.    DOCCS may even rely on rule violations to revoke Plaintiffs' open dates for parole release, parole status, conditional release, or post-release supervision, all without the individual having ever left prison.

313.    Some Plaintiffs are so fearful of receiving disciplinary "tickets" from prison staff that they refuse to leave their cell or avoid interactions with other individuals.

314.    Plaintiffs are subject to the prisons' rigid rules on visits from family and loved ones.

315.    Family members must plan visits only on certain days, travel to the prison (for some, many hours away from their home), go through invasive security checks, and have time-limited visits in crowded and noisy visiting areas while being monitored by corrections officers.

316. Family connections become strained, and even lost, as Plaintiffs remain in prison past their release dates.

317. Plaintiffs are also subject to the stigma of continued incarceration. An individual's support network may not understand why their loved one remains in prison and assume it is because of some wrongdoing or unknown infraction.

318. Plaintiffs are subject to prison rules limiting confidential communications with their attorneys.

319. Prisons provide no meaningful opportunity for people with mental illness to learn to re-enter the community.

320. In this segregated security environment, Plaintiffs have no opportunities to obtain basic life skills—such as how to use a cell phone, how to add money to a public transportation fare card, how to manage a limited budget to care for personal needs, or how to use the internet to find doctors, housing, and services.

321. Plaintiffs could develop skills integral to functioning independently and reintegrating into modern society in community-based mental health housing.

C. Plaintiffs Are People with Disabilities Who Are Qualified to Receive Services in a More Integrated Setting.

322. Plaintiffs and class members are people with mental illnesses, such as bipolar disorder, schizophrenia, depressive disorder, post-traumatic stress disorder, and others, which substantially limit one or more major life activities, including but not limited to caring for oneself, speaking, learning, concentrating, thinking, communicating, and sleeping.

323. Plaintiffs are qualified for community-based mental health housing upon their release from prison based on their current mental illness diagnosis and substantial limitations.

324.    Plaintiffs belong to the target population for community-based mental health housing developed through housing initiatives supported by Defendant Cuomo.

325.    Additionally, Plaintiffs belong to at least two priority populations identified by OMH for community-based mental health housing: the forensic population (namely individuals released from jails and prisons) and individuals who are homeless.

326.    In accordance with OMH policy, Defendants identified Plaintiffs' need for community-based mental health housing through discharge planning, periodic meetings, and assessments, and then prepared referrals to community-based services, including housing, case managers, and mental health treatment providers.

327.    OMH also submitted Single Point of Access applications to the counties to which Plaintiffs will be released.

328.    Nonetheless, Plaintiffs did not receive the community-based services for which they are qualified because they were instead kept in prison.

329.    Plaintiffs' confinement in prison is not based on Defendants' determination that such placement is clinically necessary.

330.    Plaintiffs are confined solely because the Defendants have failed to provide sufficient housing and supportive services in more integrated settings.

331.    After the initial Complaint in this action was filed on January 23, 2019, Defendants released some Plaintiffs to temporary settings, contrary to Defendants' prior decision to hold Plaintiffs in prison until there was a bed available in community-based mental health housing determined appropriate for their needs.

332.    On information and belief, Defendants completed a revised discharge plan for C.J. on January 30, 2019, completed a revised application for mental health housing and services for

38

C.J. on February 7, 2019, and released C.J. to Middletown Transitional Residence on February 12, 2019 in part in response to this litigation.

333.    On information and belief, Defendants completed a revised discharge plan for M.J. on January 30, 2019, completed a revised application for mental health housing and services for M.J. on February 13, 2019, and released M.J. to Middletown Transitional Residence on February 19, 2019 in part in response to this litigation.

334.    On information and belief, Defendants released J.R. to the Rockland Psychiatric Center's Alliance House on March 18, 2019 in part in response to this litigation.

335.    On information and belief, Defendants released D.R. to the Pilgrim Crisis Residence on February 13, 2019 in part in response to this litigation.

336.    Defendants discharged these Plaintiffs to settings that are located on the grounds of a psychiatric institution, are short-term, and/or are intended for a different patient population.

D.    Plaintiffs Want to Receive Services in a More Integrated Setting.

337.    Plaintiffs want to be free from prison. They want to live in a more integrated setting, such as community-based mental health housing.

338.    Plaintiffs demonstrated this desire by engaging in the housing application process, by participating in video-teleconference interviews with local housing providers, and by repeatedly expressing to DOCCS and OMH staff their wishes to be discharged to community housing.

339.    The desire for integrated housing has also led Plaintiffs to request other alternatives to institutionalization in prison.

340.    Some Plaintiffs have proposed that they be released to family members.

341.    Defendants have not released Plaintiffs to these environments.

342.    With proper supportive services in these environments, people with incarceration histories can be successful in the community. Supportive services include Forensic Assertive Community Treatment ("FACT") and Assertive Community Treatment ("ACT"), which provide multidisciplinary team approaches that are responsive to individual needs.

343.    Defendants have not, however, developed supportive services adequately to meet the needs of the mental health population. Only 12 FACT teams exist in the state. ACT teams exist in only 28 counties and operate at high capacity. As a result, people referred to FACT and ACT teams are placed on waiting lists for services.

E.    Plaintiffs Can Be Reasonably Accommodated in Integrated Settings.

344.    Defendants can reasonably accommodate Plaintiffs' need to receive services in an integrated community setting.

345.    New York already has a continuum of residential services to integrate people with serious mental illness who are being released from prison into the mainstream community.

346.    Defendants have recognized the value of community-based mental health housing as a critical initiative for this population.

347.    However, existing programs and services have been developed and administered in a manner and on a scale that are inadequate for Plaintiffs' needs, resulting in unlawful, unconstitutional, and unnecessary institutionalization in state prisons.

348.    Defendants could develop capacity in existing community-based mental health housing programs and support services without unreasonable costs.

349.    Defendants could redirect available funds to provide services to people in integrated community settings and/or expand capacity in existing community-based housing programs and mental health support services.

350.     Redirection of funds used to incarcerate people to provide services in integrated community settings would achieve cost savings for the state.

## IV.     Defendants Hold Members of the RTF Subclass in Punitive Prison Conditions Past Their Maximum Expiration Dates.

351.     Defendants have a policy and practice of placing individuals with serious mental illness in state prisons, and subjecting them to conditions that amount to punishment, after they have reached their maximum expiration dates.

352.     Each member of the RTF Subclass is being held in state prison.

353.     These RTF Subclass members are not held in pretrial detention, are not subject to post-release supervision revocation proceedings, and are not being held pursuant to applicable civil commitment laws.

354.     Instead, Defendants use state prisons to house RTF Subclass members who have nominally been "released" to community supervision because there is inadequate housing that can meet their mental health needs in the community.

355.     Defendants know that Plaintiffs' sentences of imprisonment end on their maximum expiration dates, that those dates have passed, that Plaintiffs are homeless or at risk of homelessness, and that Plaintiffs require community-based mental health housing.

356.     Further, Defendants know that Plaintiffs will remain in prison barring actions by Defendants.

357.     When DOCCS determines that there are no appropriate mental health housing beds available at the expiration of RTF Subclass members' sentences, DOCCS begins the administrative process of transferring these individuals to RTFs based in state prisons.

358.     DOCCS staff have petitioned the Parole Board to impose RTF placement as a condition of their post-release supervision.

359.     Defendants Annucci or McGrath approve all transfers of individuals on RTF status to state prison.

360.     On their maximum expiration dates, Defendants claim to discharge members of the RTF Subclass to community supervision but in fact continue to incarcerate them in a state prison.

361.     In some cases, members of the RTF Subclass are "released" to the very same prison they lived in while serving their prison sentence to live under the same conditions and restrictions.

362.     Members of the RTF Subclass are not, however, serving a sentence of imprisonment.

363.     DOCCS policies classify RTF Subclass members as "releasees" on community supervision, notwithstanding their incarceration in state prison.

364.     Some DOCCS records and staff also refer to RTF Subclass members as "parolees."

365.     Plaintiffs subject to a Parole Board-imposed condition of RTF placement (under Penal Law § 70.45) receive a memorandum known as Special Condition 37, which states that:

> Pursuant to the authority conferred upon the New York State Board of Parole under Section 70.45(3) of the New York Penal Law to impose conditions of release upon an individual serving a determinate sentence who is to be released to serve a period of post-release supervision, as a condition of your post-release supervision, you shall be transferred to, and participate in, the programs of a residential treatment facility, as that term is defined by Correction Law Section 2(6) for a period not exceeding six (6) months from the date of your release to post-release supervision.

366.     While the Parole Board may impose RTF placement as a condition of release, the Board is not responsible for selecting the specific RTF—namely, a state prison—in which the releasee will be placed.

367. Instead, Defendants Annucci and McGrath and DOCCS staff are wholly responsible for designating facilities to serve as RTFs, keeping these individuals in state prison while on RTF status, and subjecting them to punitive conditions.

368. Plaintiffs whose RTF confinement is not authorized under Penal Law § 70.45 and who are not subject to Special Condition 37 are placed on RTF status on the DOCCS Commissioner's purported authority under Correction Law § 73.

369. Defendant Annucci has designated Defendant McGrath as the official responsible for placing individuals on post-release supervision in an RTF pursuant to Correction Law § 73.

370. DOCCS has claimed the authority to place people on RTF status in state prisons indefinitely.

371. Named Plaintiff D.R., who was assigned to RTF status under the Correction Law, for example, received a memorandum from Defendant McGrath explaining the indefinite nature of this placement:

> Since an approved residence has not yet been identified, I am invoking my authority as Associate Commissioner of the New York State Department of Corrections & Community Supervision (DOCCS) under section 73(10) of the Correction Law. Pursuant to such authority, you will remain in a Residential Treatment Facility until such time as you have proposed and DOCCS has approved a suitable residence.

372. While Defendants employ euphemistic terms to describe RTF placements, the reality for RTF Subclass members is that they never left prison.

373. Defendants treat members of the RTF Subclass as inmates and subject them to punitive conditions just as if they were serving a prison sentence.

374. DOCCS does not use community-based "residential treatment facilities" to house Plaintiffs.

375. Further, there are no separate "RTF" units within state prisons that are used to house Plaintiffs and that meet the state law definition in Correction Law § 2.

376.    As of July 2018, all RTF Subclass members assigned to an RTF were held in either medium or maximum security facilities.

377.    The majority of the RTF Subclass are incarcerated at Green Haven Correctional Facility (a maximum-security prison) and Fishkill Correctional Facility (a medium-security prison) because these facilities are used to incarcerate individuals with serious mental illness.

378.    Plaintiffs suffer severe psychological and emotional harms as a result of their *de facto* incarceration while on RTF status in state prison.

379.    After learning they will be held past their maximum expiration date for an indefinite period, members of the RTF Subclass have attempted suicide and expressed suicidal intentions, engaged in self-harm, experienced depression and hopelessness, and have suffered exacerbated symptoms of their mental illnesses.

380.    RTF Subclass members have spent months or even more than one year in state prisons before being released to the community.

381.    For example, Plaintiff C.J. spent over 16 months in state prison past his maximum expiration date.

382.    Plaintiffs need not be incarcerated. Defendants employ other substantially less restrictive methods that would allow for Plaintiffs' re-entry into the community and support Plaintiffs in integrated independent settings.

383.    These methods include housing combined with supports and services, such as ACT, FACT, and mobile crisis services, which already exist but have not been adequately developed or administered by Defendants.

384.    Defendants have placed members of the RTF Subclass in a limbo over which they have no control. At the end of their maximum sentence, these individuals are "released" to serve

a period of community supervision in a state prison solely because they have a disability and require an approved OMH community-based housing placement and supports that do not exist.

## CLASS ALLEGATIONS

385.    Plaintiffs properly maintain this action as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and similarly situated individuals in a general class and subclass.

386.    The General Class consists of all persons (1) housed or who will be housed in a state prison, (2) with serious mental illness, (3) whose open dates for parole release, approved conditional release dates, or maximum expiration dates have passed, (4) who are not subject to residency restrictions under the Sexual Assault Reform Act, and (5) who are appropriate for integrated, community-based housing programs.

387.    Plaintiffs also maintain this action on behalf of a subclass comprising members of the General Class whom Defendants incarcerate past their maximum expiration date in "residential treatment facilities" pursuant to Penal Law § 70.45 or Correction Law § 73. Specifically, the RTF Subclass consists of all persons (1) housed or who will be housed in a state prison pursuant to Penal Law § 70.45 or Correction Law § 73, (2) who have serious mental illness, (3) whose maximum expiration dates have passed, (4) who are not subject to residency restrictions under the Sexual Assault Reform Act, and (5) who are appropriate for integrated, community-based housing programs.

388.    The General Class and RTF Subclass are each sufficiently numerous such that joinder of all members is impracticable. Each year, thousands of individuals receiving mental health treatment are discharged from prison, with hundreds requiring community-based mental

health housing upon release.  On information and belief, there are over 20 members at any given time in the RTF Subclass.

389.    The compositions of the General Class and RTF Subclass are necessarily fluid as Defendants discharge Plaintiffs from prison at their discretion and new Plaintiffs enter each class as their release dates pass.

390.    Moreover, joinder is impracticable as members of the General Class and RTF Subclass are geographically diverse, placed in prisons across the state, and their incarceration, mental illness, and lack of financial resources make bringing individual suits nearly impossible.

391.    Among other relief, Plaintiffs seek prospective injunctive relief on behalf of future, unknown General Class and RTF Subclass members, further making joinder impracticable.

392.    Plaintiffs raise questions of fact and law that are common to each of the General Class and RTF Subclass.

393.    Common questions raised as to the General Class include, but are not limited to:

    a.    Whether Defendants institutionalize in prison individuals with serious mental illness to address their housing needs, rather than provide appropriate residential placements and services in more integrated community settings;

    b.    Whether Defendants fail to provide, fund, and effectively utilize community-based mental health housing programs and services so that persons with serious mental illness who have been approved for discharge from state prisons may be placed in more integrated community settings;

    c.    Whether Defendants' failure to provide programs, services, and supports in more integrated community settings violates the integration mandate of the Americans with Disabilities Act and the Rehabilitation Act; and

    d.    Whether Plaintiffs are entitled to declaratory and injunctive relief to vindicate their statutory rights.

394.    Common questions raised as to the RTF Subclass additionally include, but are not limited to:

a.  Whether Defendants have a policy or practice of housing individuals with serious mental illness past their maximum expiration dates;

b.  Whether Defendants have a policy or practice of subjecting members of the RTF Subclass to punitive conditions in state prison;

c.  Whether Defendants have a policy or practice of criminalizing RTF Subclass members' status as individuals with serious mental illness who are homeless or at risk of homelessness by punishing them with prison confinement;

d.  Whether Defendants' actions and inaction violate the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution; and

e.  Whether Plaintiffs are entitled to declaratory and injunctive relief to vindicate their constitutional rights.

395.  The Named Plaintiffs' claims are typical of the General Class and RTF Subclass. Their claims arise from the same policies and practices as the proposed class and subclass, respectively, and are based on the same legal theories.

396.  The Named Plaintiffs are capable of fairly and adequately protecting the interests of the General Class and RTF Subclass. There are no conflicts that exist among the Named Plaintiffs and members of either class.

397.  Plaintiffs are represented by attorneys employed by Disability Rights New York, the Prisoners' Rights Project of The Legal Aid Society, and Paul, Weiss, Rifkind, Wharton and Garrison LLP. The undersigned counsel has ample experience in litigating complex litigation, including class actions and civil rights cases, in particular involving the rights of people with mental illness and incarcerated people.

398.  Defendants have acted and refused to act on grounds generally applicable to the General Class and the RTF Subclass. Injunctive and declaratory relief is appropriate respecting the class and subclass as a whole.

## **FIRST CAUSE OF ACTION**

**(Americans with Disabilities Act by All Plaintiffs and the General Class against All Defendants)**

399.    Title II of the ADA prohibits Defendants from discriminating against individuals with disabilities in programs and services. 42 U.S.C. § 12132.

400.    Title II also requires that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

401.    Plaintiffs are individuals with serious mental illness. They have mental impairments that substantially limit one or more major life activity.

402.    Plaintiffs are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104.

403.    Plaintiffs are qualified to receive services in more integrated community-based settings that meet their mental health needs.

404.    Serving Plaintiffs in the most integrated settings appropriate to their needs can be reasonably accommodated and would not fundamentally alter Defendants' programs and services.

405.    Defendants DOCCS and OMH are public entities covered by Title II of the ADA. 42 U.S.C. § 12131(1)(A) and (B).

406.    Defendants Cuomo, Annucci, Sullivan, and McGrath are responsible for the operation of public entities covered by Title II of the ADA.  42 U.S.C. §§ 12131(1)(A) and (B).

407.    Defendants are obligated under the ADA to administer state programs in a manner that enables Plaintiffs to receive services in the most integrated setting appropriate to their needs.

408.    Defendants have failed to meet this obligation. Defendants have caused Plaintiffs to be institutionalized and segregated in state prisons, rather than provide adequate residential placements in the most integrated setting appropriate to their needs.

409.    Defendants' actions and inactions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations, 28 C.F.R. Part 35.

## SECOND CAUSE OF ACTION

**(Rehabilitation Act by All Plaintiffs and the General Class against All Defendants)**

410.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be the denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

411.    Section 504 also requires that:

> For purposes of this part, aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs.

45 C.F.R. § 84.4(b)(2).

412.    Plaintiffs are individuals with serious mental illness. They have mental impairments that substantially limit one or more major life activity.

413.    Plaintiffs are qualified individuals with disabilities within the meaning of 29 U.S.C. § 705(20) and 45 C.F.R. § 84.3(1).

414.    Plaintiffs are qualified to participate in and receive services in more integrated settings appropriate to their needs.

415.    Defendants can reasonably accommodate Plaintiffs in the most integrated settings appropriate to their needs.

416.    Defendants DOCCS and OMH are programs and conduct activities which receive federal financial assistance.

417.    Defendants Cuomo, Annucci, Sullivan, and McGrath are responsible for programs and activities receiving federal financial assistance.

418.    Defendants are obligated under Section 504 to administer programs and services for individuals with mental illness that provide the opportunity to receive services in the most integrated setting appropriate to their needs.

419.    Defendants have failed to meet this obligation. Defendants' unlawful activities and omissions have caused Plaintiffs to receive programs and services in the institutionalized and segregated setting of state prisons, rather than the most integrated setting appropriate to their needs.

420.    Defendants' failure to administer services, programs, and activities in the most integrated setting appropriate to the needs of Plaintiffs constitutes discrimination in violation of Section 504.

## **THIRD CAUSE OF ACTION**

### **(42 U.S.C. § 1983: Substantive Due Process by Plaintiffs C.J., M.J., J.R., D.R. and the RTF Subclass against Defendants Annucci, Sullivan, and McGrath)**

421.    The Fourteenth Amendment protects against government conduct that infringes on fundamental rights and liberties. U.S. Const. amend. XIV.

422.    Members of the RTF Subclass have fundamental liberty interests protected by the Due Process Clause that include, but are not limited to, freedom from bodily restraint and release from prison upon serving the maximum term of their court-imposed prison sentence.

423.    Defendants have a policy and practice that deprives members of the RTF Subclass of their fundamental liberty interests by incarcerating them in state prisons following their

maximum expiration dates, without court order, and by subjecting them to punitive conditions of confinement.

424.    Defendants are deliberately indifferent to Plaintiffs' indefinite detention in punitive conditions past their maximum expiration date.

425.    Defendants assign RTF Subclass members to state prison while on RTF status, and subject them to punishment, despite the fact that they know, or should know, that these individuals require mental health housing, that there is an inadequate capacity in community-based mental health housing programs, that their maximum expiration dates have passed, and that the legal authority to hold them in punitive conditions has ended. This conduct is not narrowly tailored to serve any compelling state interest, nor is it reasonably and necessarily related to any legitimate penological interest.

426.    Plaintiffs' continued incarceration in punitive conditions shocks the contemporary conscience.

## <u>FOURTH CAUSE OF ACTION</u>

**(42 U.S.C. § 1983: Eighth Amendment by Plaintiffs C.J., M.J., J.R., D.R. and the RTF Subclass against Defendants Annucci, Sullivan, and McGrath)**

427.    The Eighth Amendment, as applied to states through the Fourteenth Amendment, prohibits the imposition of cruel and unusual punishment by incarcerating individuals past their prison sentence and by criminalizing their status. U.S. Const. amend. VIII.

428.    Defendants have a policy and practice of confining members of the RTF Subclass in state prisons, in punitive conditions, for significant periods of time past their maximum expiration dates because of a lack of adequate housing in the community.

429.    Defendants are deliberately indifferent to Plaintiffs' indefinite detention in punitive conditions past their maximum expiration date.

430.    Plaintiffs' prolonged incarceration results from Defendants' policy and practice of assigning individuals with serious mental illness to state prison pursuant to Penal Law § 70.45 or Correction Law § 73 and, while in these prisons, subjecting them to the same punitive conditions as if they were serving a prison sentence.

431.    Defendants know that members of the RTF Subclass remain in prison past their maximum expiration date due to a lack of mental health housing and that they are suffering unwarranted punishment. Defendants have failed to address this unconstitutional practice.

432.    Defendants subject RTF Subclass members to cruel and unusual punishment by criminalizing their status as individuals with serious mental illness who are homeless or at risk of homelessness.

433.    Defendants criminalize RTF Subclass members' inability to secure the community-based mental health housing that Defendants impose as a precondition for release and which Defendants have not made available.

434.    By imposing prison confinement solely because RTF Subclass members cannot satisfy a precondition for release that is involuntary and inseparable from their status, Defendants criminalize RTF subclass members' status.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court:

    a)   Certify, pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure:

          i.   A General Class defined as: All persons (1) housed or who will be housed in a state prison, (2) with serious mental illness, (3) whose open dates for parole release, approved conditional release dates, or maximum expiration dates have passed, (4) who are not subject to residency restrictions under the Sexual Assault Reform Act, and (5) who are appropriate for integrated, community-based housing programs; and

      ii.   An RTF Subclass defined as: All persons (1) housed or who will be housed in a state prison pursuant to Penal Law § 70.45 or Correction Law § 73, (2) who have serious mental illness, (3) whose maximum expiration dates have passed, (4) who are not subject to residency restrictions under the Sexual Assault Reform Act, and (5) who are appropriate for integrated, community-based housing programs.

b)  Appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

c)  Pursuant to Rule 57 of the Federal Rules of Civil Procedure, enter an order declaring Defendants' conduct as alleged herein unconstitutional and unlawful under the Eighth and/or Fourteenth Amendments to the U.S. Constitution, the Americans with Disabilities Act, and the Rehabilitation Act.

d)  Enter a permanent injunction requiring Defendants to promptly take the following steps that are necessary to serve Plaintiffs in the most integrated setting appropriate to their needs:

      i.   Developing and implementing an effective plan for providing care and treatment in the most integrated setting appropriate to the needs of individuals with serious mental illness who are being discharged from state prison, who are qualified to receive mental health services in integrated settings, and who want mental health services in a more integrated setting; and

      ii.   Promptly making available sufficient community-based care and treatment opportunities, including OMH-funded mental health housing, to ensure that the most integrated appropriate care and treatment is provided without undue delay to those qualified individuals being discharged from state prison who want community-based care and treatment.

e)  Enjoin Defendants Annucci, Sullivan, and McGrath from subjecting the RTF Subclass to punitive conditions in state prison.

f)  Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a, and other applicable law.

g)  Order such other relief as the Court deems appropriate.

Dated: June 3, 2019
      New York, New York

DISABILITY RIGHTS NEW YORK

/s/ Elena Landriscina

  Elena Landriscina (elena.landriscina@drny.org)
  Joshua Rosenthal (joshua.rosenthal@drny.org)
  Betsy Sterling (betsy.sterling@drny.org)
  25 Chapel Street, Suite 1005
  Brooklyn, New York 11201
  (518) 432-7861

The LEGAL AID SOCIETY
Janet E. Sabel, Attorney-in-Charge

/s/ Stefen R. Short

Stefen R. Short (sshort@legal-aid.org)
Robert Quackenbush (rquackenbush@legal-aid.org)
Veronica Vela (vvela@legal-aid.org)
Mary Lynne Werlwas (mlwerlwas@legal-aid.org)
Prisoners' Rights Project
199 Water Street, 6th Floor
New York, New York 10038
(212) 577-3530

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

/s/ Walter G. Ricciardi

Walter G. Ricciardi (wricciardi@paulweiss.com)
Emily A. Vance (evance@paulweiss.com)
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3350

*Attorneys for Plaintiffs*