UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
M.G., P.C., C.J., M.J., J.R., and D.R., individually :
and on behalf of all similarly situated, :
                                                                           Plaintiffs, :
                    -against- :
                                                   : 7:19-cv-00639 (CS) (LMS)
ANDREW CUOMO, in his official capacity as the :
Governor of the State of New York, the NEW :
YORK STATE OFFICE OF MENTAL HEALTH, :
ANN MARIE T. SULLIVAN, in her official :
capacity as the Commissioner of the New York :
State Office of Mental Health, the NEW YORK :
STATE DEPARTMENT OF CORRECTIONS :
AND COMMUNITY SUPERVISION, ANTHONY :
J. ANNUCCI, in his official capacity as the Acting :
Commissioner of the New York State Department :
of Corrections and Community Supervision, ANNE :
MARIE MCGRATH, in her official capacity as :
Deputy Commissioner of the New York State :
Department of Corrections and Community :
Supervision, :
                                                     Defendants. :
----------------------------------------------------------------X

## DEFENDANTS' MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS' SUR-REPLY

                                                   LETITIA JAMES
                                                   Attorney General of the State of New York
                                                 *Attorney for Defendants*
                                                 28 Liberty Street
                                                 New York, NY 10005
                                                 Tel.:  (212) 416-6133/6185

JANE R. GOLDBERG
JEB HARBEN
Assistant Attorneys General
    of Counsel

PRELIMINARY STATEMENT

In an effort to salvage a lawsuit that has been made moot by DOCCS's issuance of its December 16, 2019 policy memorandum ("The Memorandum"), which addresses the concerns raised by the Court during the May 13, 2019 conference,[1] as well as those originally pleaded by Plaintiffs, concerning delays in releasing a small number inmates diagnosed with serious mental illness ("SMI"),[2] Plaintiffs' Sur-Reply ("S.R.") makes a number of baseless and unavailing arguments, most of which are not limited to the scope of the effect of The Memorandum. This is critical because the effect of The Memorandum was the sole issue Plaintiffs requested permission to brief. Plaintiffs were not granted permission to elaborate on matters that should have been addressed in their Opposition. Therefore, any arguments in the Sur-Reply that deviate from discussing whether claims in this lawsuit are mooted by the issuance of The Memorandum should be rejected by the Court. Moreover, Plaintiffs' relevant arguments in the Sur-Reply fail to rebut Defendants' assertions that the issuance of The Memorandum moots claims in this lawsuit.

MATTERS OUTSIDE THE PROPER SCOPE OF THE SUR-REPLY

Plaintiffs' argument that "Defendants tried to evade this lawsuit by releasing five of the six Named Plaintiffs in an attempt to moot their claims" (S.R. at 1) is outside the proper scope of the

---

[1] May 13, 2019 Tr. at 8-9 (ECF No. 100).

[2] In discovery, Plaintiffs have sought to shift the focus of this lawsuit from SMI inmates being temporarily held past their release dates due to lack of mental health or other non-shelter housing (presumably because The Memorandum has ended the challenged conduct) to unpleaded claims that the release of any homeless SMI inmates to a shelter, would violate the ADA. It appears that this Sur-Reply attempts to do the same despite no mention of this in Plaintiffs' Opposition ("Opposition") (ECF No. 82), much less in the pleadings. To date, Judge Smith has rejected these efforts to expand the lawsuit in this manner. See, e.g., Feb. 27, 2020 and March 23, 2020 minute entries sustaining Defendants' objections to responding to certain interrogatories and requests to produce concerning release to homelessness.

1

Sur-Reply. As these releases occurred before Plaintiffs submitted their Opposition, they are in no way related to the Memorandum, and it is therefore improper to raise them in the Sur-Reply.[3]

Plaintiffs also argue that for the Named Plaintiffs who were released, Defendants failed to "serve them in the most integrated setting appropriate to their needs upon their lawful prison release dates and . . . maintain sufficient capacity in community-based mental health housing to meet the needs of Plaintiffs," id. at 2, and that "[i]nsufficient capacity in community-based mental health housing continues . . . demonstrated in part by the release of Named Plaintiffs to inappropriate transitional placements." Id. Again, this has nothing to do with The Memorandum and is inappropriate here. Indeed, in their Opposition, Plaintiffs did not even address Defendants' arguments that the named Plaintiffs were released to sufficiently integrated settings, or that Defendants are not obligated to find housing for released inmates, just assist in their search (Def. Mem. at 12, 22); nor did they argue that release to transitional housing demonstrates insufficient state-wide mental health housing capacity. Having failed to raise these arguments in their Opposition, they should be deemed to have waived them and not be allowed to raise them here. See Volunteer Fire Ass'n of Tappan v. Rockland Co., No. 09 Civ. 4622, 2010 U.S. Dist. LEXIS 125394, at *23 (S.D.N.Y. Nov. 24, 2010) (discussing claim abandonment).

Similarly outside the scope of what was permitted on their Sur-Reply, Plaintiffs repeatedly conflate the submission of a SPOA application—which seeks to determine the availability of community based housing for an SMI individual—with a clinical determination that mental health

---

[3] While it is true that five of the six named Plaintiffs were released early in this litigation, Plaintiffs' argument that Defendants "tried to evade this lawsuit" by doing so is baseless. Their release was the culmination of continued efforts to place these individuals in transitional housing, which began before their initial scheduled release dates. Plaintiffs have never denied this, they have simply argued Defendants' efforts were insufficient. For Plaintiffs M.G., J.R., and D.R., placement in transitional housing was successful, and now each lives independently. Unfortunately, for Plaintiffs M.J. and C.J., even closer supervision in a transitional setting did not prevent them from violating the conditions of their supervision, and they are now, again, in custody.

2

housing is required or "appropriate;" when that is not the case. See Sullivan Response to Interrog. 13 (Rosenthal Decl. Ex. 104). To support this theory, Plaintiffs' Sur-Reply provides a tortured interpretation of CNYPC Policy # 8.13 (Rosenthal Decl. Ex. 111), claiming that it mandates that OMH provide community based mental health housing to all SMI inmates. S.R. at 10. No explanation is provided as to why this argument was not made in Plaintiffs' Opposition. Regardless, the policy clearly contemplates the release of SMI inmates to shelters if other types of housing are not available or clinically required. The policy requires that an application for housing (a SPOA application) be submitted if an inmate is at risk of homelessness, but it does not mandate that the housing be provided. In fact, Policy # 8.13 only mandates that for non-NYC SMI inmates who are released to homelessness, OMH "staff should work with the County SPOA Coordinator, care coordination team, ORC and Field Parole staff to develop appropriate plans." (emphasis added).[4] Therefore, nothing in the policy precludes release to a shelter or requires that OMH provide community based mental health housing.

Further, while Plaintiffs claim in their Sur-Reply (but not their pleadings) that releasing SMI inmates to shelters violates Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999), there is no controlling law to support that argument. States are not obligated to provide individual apartments or other community based mental health housing to all released SMI inmates, and Plaintiffs have not cited a single decision supporting that assertion. Instead, the State must serve individuals in "the most integrated setting appropriate[,]" which is the "setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." Davis v. Shah, 821 F.3d 231, 242 (2d Cir. 2016). As shelters allow the disabled and non-disabled to fully interact, they are "integrated" for purposes of Olmstead, and it is undisputed that DOCCS and OMH assist SMI inmates released to shelters in obtaining mental health treatment in the community. Enright Decl. ¶¶7, 13; Vogel Decl. ¶

---

[4] Policy # 8.13 indicates that the NYC Department of Homeless Services should be alerted if an SMI inmate released to NYC will be homeless.

5. While Plaintiffs may want the State of New York to provide mental health housing for every SMI inmate released from prison, such an outcome is unfeasible, and there exists no such obligation under the law. Instead, clinicians must determine which SMI inmates clinically require mental health housing, and which can be appropriately released to shelters and receive services in the community. As the Olmstead court noted, "[c]ourts normally should defer to the reasonable medical judgments of public health officials." Olmstead, 527 U.S. at 602.

Finally, Plaintiffs' Sur-Reply references several documents that are irrelevant to whether The Memorandum moots claims in this action and are thus inappropriate here. For example, Rosenthal Decl. Ex. 108 is an e-mail from June 5, 2018 discussing the placement of SMI inmates in RTF status. Plaintiffs cite this e-mail to argue that there was a delay in issuing The Memorandum. S.R. at 9. This is irrelevant to both the motion and the Sur-Reply, which addresses whether The Memorandum, issued on December 16, 2019, sufficiently ended the challenged conduct. Whether The Memorandum could have, or even should have, been issued earlier is irrelevant. Similarly inapplicable, Rosenthal Decl. Ex. 109 is an e-mail from September 18, 2017 discussing that there were six non-SARA SMI inmates in RTFs (clearly showing that the challenged practice only impacted a handful of inmates at any given time). The e-mail fails to mention any reasons why these inmates were in RTF status. It is disingenuous for Plaintiffs to infer that the absence of a discussion of why these inmates were in RTF status contradicts the veracity of the Enright Declaration. S.R. at 9, n. 7. Indeed, the e-mail instead focused on monitoring, what more could be done to locate mental health housing for these individuals, and whether individuals were being misidentified as inmates subject to SARA. Regardless, this 2018 e-mail is irrelevant to the issuance of The Memorandum in December of 2019.

For the foregoing reasons, The Court should not consider Plaintiffs' arguments that fall outside the limited scope of the Sur-Reply.

## THE MEMORANDUM PERMANENTLY CEASES THE CHALLENGED PRACTICE

As the Court was previously advised, The Memorandum was broadly distributed among relevant DOCCS personnel. See Enright Decl. ¶ 4; see also Rosenthal Decl. Ex. 103 (Response to Interrog. 11).[5] Plaintiffs offer only speculation to rebut Defendants' position that the challenged conduct has "in fact, ceased" and there is "no reasonable expectation that the alleged violation will recur." Am. Freedom Defense Initiative v. Metro. Transp. Auth., 815 F.3d 105, 109 (2d Cir. 2016). To support this argument, Plaintiffs repeatedly reference the fact that The Memorandum is not a Directive or Regulation, but they cannot dispute that it has the same impact on DOCCS personnel, who are required to follow it. See Rosenthal Decl. 103 (Interrog. Response 12). Indeed, under similar circumstances, this Court dismissed an action for injunctive relief against DOCCS officials when policy memoranda clearly outlined that the conduct complained of had ceased. See Inside Connect, Inc. v. Fischer, No. 13 Civ. 1138, 2014 WL 2933221, at **8-9 (S.D.N.Y. June 30, 2014) (Seibel, J.). In Inside Connect, this Court did not require "publication" of the policy memoranda in question beyond its distribution to relevant personnel, as occurred here. There is no reason for the instant situation to be treated any differently.[6] Moreover, it is respectfully submitted that the filing of The Memorandum

---

[5] Response to Interrog. 11 states that The Memorandum was distributed to "all correctional facility Superintendents, correctional facility Deputy Superintendents of Programming, correctional facility Senior Offender Rehabilitation Coordinators, correctional facility Offender Rehabilitation Coordinators, parole Regional Directors, parole Assistant Regional Directors, parole Bureau Chiefs, Senior Parole Officers, and Parole Officers." It is estimated that nearly 1,000 DOCCS employees received The Memorandum. Rosenthal Decl. Ex. 116 (Interrog. 24-25).

[6] Plaintiffs argue that a "memorandum from authorized DOCCS staff modifies existing DOCCS directives when, among other things, the Bureau of Internal Controls ("BIC") is notified," noting that Defendants did not indicate whether The Memorandum was sent to the BIC. S.R. at 7, n. 5. However, issuance of The Memorandum did not require BIC notification, as the case-by-case practice addressed by The Memorandum was never codified in a directive.

5

on this Court's docket, and its distribution to approximately 1,000 DOCCS employees (see Rosenthal Decl. Ex. 116 (Interrog. 24-25)), constitutes sufficient "publication."

In addition, while acknowledging that a memorandum of this type is normally sufficient to demonstrate that a challenged practice has ceased, Plaintiffs argue that the Enright Declaration's reference to "unforeseen circumstances" that may temporarily delay release makes The Memorandum—which has no such language—equivocal, and thus does not meet this Court's requirements as noted in Inside Connect. S.R. at 8. This argument is unavailing. The "unforeseen circumstances" referenced in the Enright Decl. do not affect the policy and only include events that temporarily delay release, such as "unexpected medical issues, transportation problems, extreme weather, a severe psychiatric episode that requires observation, and a temporary delay in housing availability (such as a fire or other event)." Rosenthal Decl. Ex. 103 (Interrog. No. 28).

Moreover, while Plaintiffs may assert that there are some SMI inmates at risk of homelessness upon release, whose releases have been delayed because their physical or intellectual status renders release to a shelter unsafe, this small population is not what this lawsuit has ever been about. Those inmates' releases are not delayed because of their SMI diagnosis, but rather because of their physical health and other reasons.[7] In addition, while Plaintiffs make speculative inferences that DOCCS may be avoiding the impact of The Memorandum by claiming inmates waived their releases (S.R. at 4-5), they have offered only general speculation that any putative class members are improperly designated

---

[7] While Plaintiffs point to P.C. as not having been impacted by The Memorandum, his situation is unique as he has, in the past, declined mental health housing (see Rosenthal Decl. Ex. 106 at OMH-00010059 ("stating that he did not want mental health housing"), currently refuses release to live with his family (see, e.g., id. at OMH-00010059, 10074), and DOCCS and OMH have unsuccessfully sought to place him in OPWDD housing, Id.; see also Enright Decl. ¶ 12; Rosenthal Decl. Ex. 107. Moreover, even if the Court agrees that P.C.'s claims are not moot —although, as previously argued, they should be dismissed on other grounds— the claims of the other named Plaintiffs must be dismissed as moot. Given the unique circumstances regarding P.C.'s delayed release, which Plaintiffs do not contest are unique, he cannot possibly represent a class of Plaintiffs.

6

as having waived their releases or having otherwise declined housing. Such speculation is insufficient.[8] See Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007) (speculation insufficient to defeat motion).[9]

Furthermore, despite Plaintiffs' groundless accusations regarding the alleged convenient timing of The Memorandum, it is perfectly appropriate for a district court to "exercise its discretion if appropriate by giving prison officials time to rectify" an alleged violation of prisoners' rights "before issuing an injunction." Farmer v. Brennan, 511 U.S. 825, 845 (1994). Plaintiffs cite Mhany Management, Inc. v. County of Nassau, 819 F.3d 581 (2d Cir. 2016) for the proposition that a case is not moot where a defendant's efforts to rectify an alleged harm "appear to track" the development of the litigation. However, the facts of Mhany are inapposite. In Mhany, the defendants retreated from their promised course of action once their litigation prospects appeared to improve, causing the Court to question whether they were merely "temporarily altering questionable behavior." Id. at 603-4. No similar issue exists here. Contrary to Plaintiffs' assertions, Defendants' statements that there were legitimate reasons for retaining certain inmates, on a case-by-case basis, past their scheduled release dates, are irrelevant to the question of whether The Memorandum effectively ends the challenged conduct. At the onset of this litigation, the Court indicated to Defendants' counsel that the practice appeared problematic (see infra n. 1); thus, it is hardly "suspicious" that DOCCS endeavored to end the practice in the following months. Under Plaintiffs' twisted logic, a defendant could never moot a claim by changing their challenged conduct without providing an acknowledgment of wrongdoing. That is not the law.

Finally, the Sur-Reply also disingenuously attempts to infer that The Memorandum and DOCCS's decision to discontinue the challenged conduct prior to the issuance of The Memorandum

---

[8] Plaintiffs also argue that the Board of Parole is not bound by The Memorandum (as it is an independent entity) and could impose conditions contrary to The Memorandum. S.R. at 7-8. Plaintiffs' argument is highly speculative as there is no basis to believe that the Board of Parole would impose, or has ever imposed, such conditions sua sponte without a recommendation from DOCCS, which The Memorandum now precludes. See Rosenthal Decl. Ex. 103 (Interrog. No. 34).

[9] See also March 27, 2020 Declaration of Jeb Harben at ¶¶ 3-9.

7

resulted in "the release of hundreds of individuals with [SMI] in the last year alone to homeless shelters." S.R. at 2. Again, the release of SMI inmates to shelters is not part of this lawsuit. See infra n. 2. Regardless, as has been previously noted, every year hundreds of inmates with SMI are released to shelters when OMH has not determined that mental health housing is clinically required. Enright Decl. ¶ 13. At most, the policy guidance in The Memorandum may result in a handful of additional SMI inmates being released to shelters.[10] This is why its issuance has not required additional "coordinat[ion] with the local municipalities" (S.R. at 2), as it will presumably only impact a few individuals who may have not otherwise been released to shelters.[11]

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' First Amended Class Action Complaint with prejudice.

Dated: New York, New York
March 27, 2020

LETITIA JAMES
Attorney General, State of New York
Attorney for Defendants

By: ____/s/ Jane R. Goldberg_____
Jane R. Goldberg
Jeb Harben
Assistant Attorneys General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6133/ 6185
Fax: (212) 416-6009
Jane.goldberg@ag.ny.gov

---

[10] Rosenthal Decl. Ex. 116 (Interrog. Nos. 25 ("infrequently" sought mental health housing for SMI inmates otherwise deemed eligible for shelter) and 27 ("vast majority" eligible for shelter).

[11] Plaintiffs make several arguments at the end of their Sur-Reply referencing, out of context, e-mails from January 25, 2019 and May 31, 2018, concerning database entry issues that may have impacted the monitoring of inmates awaiting release. See S.R. at 10 (citing Rosenthal Decl. Ex. 112-113). Plaintiffs appear to be arguing that because DOCCS may have imperfectly inputted data in the past, it cannot be trusted to effectively comply with The Memorandum. Plaintiffs also appear to be arguing that the Court should assume these database entry issues were never corrected, well over a year after they were discussed internally. These arguments are completely speculative and equally unavailing.