UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H.,
individually and on behalf of all similarly situated,

Plaintiffs,

-against-

ANDREW CUOMO, in his official capacity as the Governor
of the State of New York, the NEW YORK STATE OFFICE
OF MENTAL HEALTH, ANN MARIE T. SULLIVAN, in
her official capacity as the Commissioner of the New York
State Office of Mental Health, the NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION, ANTHONY J.
ANNUCCI, in his official capacity as the Acting
Commissioner of the New York State Department of
Corrections and Community Supervision, ANNE MARIE
MCGRATH, in her official capacity as Deputy
Commissioner of the New York State Department of
Corrections and Community Supervision,

Defendants.
------------------------------------------------------------------------ x

**SECOND AMENDED
CLASS ACTION
COMPLAINT**

7:19-cv-00639 (CS) (LMS)

## INTRODUCTION

1.      Plaintiffs, individuals with serious mental illness who are indigent, bring this action to challenge Defendants' failure to serve them in appropriate and integrated settings when they reach their lawful prison release dates.

2.      Defendants hold Plaintiffs in prison past their lawful release dates or shuffle them through a revolving door of homeless shelters, state-operated institutions, and hospitals, and subject them to reincarceration, because Defendants fail to make available the necessary community-based mental health housing and supportive services for which Plaintiffs are eligible.

3.      For months or years after reaching their lawful release dates, Defendants leave Plaintiffs to languish in segregated settings, or place Plaintiffs at a serious risk of future institutionalization.

4.      Defendants deprive Plaintiffs of opportunities to integrate into their communities by relying on segregated settings—including prisons and various forms of temporary housing—to deliver mental health services or by outright depriving Plaintiffs of the services they need to transition to the community successfully.

5.      Plaintiffs bring this action on behalf of a class of people with serious mental illness whom Defendants hold or will hold in secure prisons past their release dates—including the end of their prison sentences, approved conditional release dates, and open dates for parole release—due to the inadequate capacity of community-based mental health housing programs (the "General Class").

6.      Plaintiffs also bring this action on behalf of a subclass of those General Class members who have been or will be incarcerated past the maximum expiration dates of their court-imposed prison sentences (the "RTF Subclass").

7.      While claiming to have released RTF Subclass members to Residential Treatment Facilities ("RTFs"), Defendants developed a practice of holding Plaintiffs in the same prison settings and under the same conditions as their court-imposed prison sentences.

8.      In effect, Defendants' practices administratively lengthen Plaintiffs' terms of imprisonment, undermining the most basic principle undergirding the criminal justice system: that a criminal sentence, once imposed by a judge, means what it says.

9.      While residing in prison pending a vacancy in a community-based mental health housing program, Plaintiffs are not free to come and go or participate in community life.

10.    While awaiting placement in mental health housing, Plaintiffs are locked in secure prison facilities, have no autonomy and no privacy, and continue to be treated as prisoners.

11.    Plaintiffs, the General Class, and the RTF Subclass remain in state prison waiting for community-based mental health housing for months, and in some cases over two years.

12.    While confining Plaintiffs, Defendants subject them to prison rules, impose solitary confinement, and may even revoke approved release status in response to reported violations of prison rules, without that person having ever stepped outside prison walls.

13.    In addition, Plaintiffs bring this action on behalf of a class of people with serious mental illness whom Defendants unnecessarily segregate or place at serious risk of institutionalization upon their release from prison because Defendants fail to provide the community-based mental health housing and supportive services that Plaintiffs need (the "Discharge Class").

14.    Defendants determine that Discharge Class members require and are eligible for community-based mental health housing and supportive services.

15.    Despite these determinations, Defendants rely on state-operated, segregated settings to deliver the necessary services, or on a patchwork of homeless shelters, hotels, motels, and shelter-like Department of Corrections and Community Supervision ("DOCCS") parole housing facilities, all devoid of the essential services that support community living and prevent unnecessary hospitalization and reincarceration.

16.    Like the General Class and RTF Subclass, Discharge Class members remain in limbo on lengthy waiting lists for community-based mental health housing and supportive services.

17.     In short, Defendants administer and fund their programs in a manner that relies on prisons, jails, state-run facilities, halfway houses, and the homeless shelter system to warehouse Plaintiffs rather than provide the community-based mental health housing and supportive services proven to be critical for successful reintegration into the community.

18.     Defendants need not isolate Plaintiffs in prisons or other segregated settings or expose Plaintiffs to a serious risk of institutionalization. Defendants have developed a continuum of mental health housing and supportive services models and can make available within the existing mental health services system the integrated community-based mental health housing and supportive services appropriate for Plaintiffs' needs.

19.     Plaintiffs bring this action on behalf of the General Class and Discharge Class under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794 ("Section 504"), to remedy Defendants' failure to provide services to Plaintiffs in the most integrated setting and Defendants' actions that place Plaintiffs at risk of institutionalization.

20.     On behalf of the RTF Subclass, Plaintiffs also bring this action under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments to the U.S. Constitution, to remedy the deprivation of RTF Subclass members' fundamental liberty interests and their rights not to be subject to prolonged incarceration or criminalization of their status as individuals with mental illness who are homeless or at risk of homelessness.

21.     Plaintiffs seek declaratory and injunctive relief for the unconstitutional and discriminatory practices to which they are subject.

22.     For members of the General Class and RTF Subclass, Plaintiffs do not seek an order requiring their release from prison. Rather, Plaintiffs ask that Defendants make release

possible by developing the community-based mental health housing programs that Defendants have imposed as a precondition for Plaintiffs' discharge from prison, and by creating an effective plan for community integration.

23.    For RTF Subclass members, Plaintiffs seek an end to the punitive conditions of their confinement while they await release to their communities.

24.    For the Discharge Class, Plaintiffs ask that Defendants make available sufficient community-based mental health housing and supportive services necessary to reside and remain in the community, rather than release Discharge Class members to segregated settings or other settings where the lack of mental health services places them at a serious risk of institutionalization.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

26.    Declaratory and injunctive relief are sought under 28 U.S.C. §§ 1343, 2201, and 2202.

27.    Venue is laid within the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this district.

## THE PARTIES

I.    **The General Class Representatives**

   A.    M.G.

28.    Plaintiff M.G. is a 57-year-old man, whom Defendants incarcerated for 769 days past his open date for parole release.

5

29.     M.G. has a diagnosis of borderline personality disorder.

30.     He has also struggled with depression and engaged in self-harm, particularly after the deaths of his daughter, father, and mother.

31.     The New York State Office of Mental Health ("OMH") determined M.G. to be an individual with serious mental illness.

32.     Prior to his release, M.G. was incarcerated at Auburn Correctional Facility, a maximum-security prison in Auburn, New York.

33.     He was housed in a windowless cell in the Intermediate Care Program ("ICP") at Auburn, which is a general population program exclusively for people with serious mental illness who require additional mental health support to avoid decompensation and poor outcomes within the prison environment.

34.     The New York Parole Board granted him an open date for parole release of May 10, 2017.

35.     M.G. was approved for release to Dutchess County.

36.     OMH determined that M.G. would be homeless or at risk of homelessness once released from prison.

37.     OMH assessed M.G. as requiring and being appropriate for community-based mental health housing.

38.     Anticipating his own needs, M.G. had requested that he receive counseling and mental health housing upon his release from prison when meeting with his OMH discharge planner and the Parole Board.

39.     M.G.'s OMH discharge planner submitted applications for mental health housing in Dutchess County.

40.     Upon reaching his open date for parole release, prison staff informed M.G. that he would not be timely released due to a determination that he can be released only to community-based mental health housing.

41.     M.G. remained on a waiting list for a bed after being informed that there are no available beds in the community-based mental health housing that he requires.

42.     M.G. remained at a correctional facility solely because he required community-based mental health housing and supports that Defendants had not made available.

43.     M.G.'s mental health deteriorated as a result of his continued incarceration at Auburn.

44.     The stress of his continued stay and uncertainty as to duration also disrupted his sleep and caused him to have seizures.

45.     His prolonged institutionalization also strained his marriage. When he was not released on his approved date, M.G.'s wife assumed incorrectly that it was due to some infraction or wrongdoing. M.G. and his wife have since divorced.

46.     After the filing of the original Complaint in this action, OMH determined that, with respect to mental health housing for M.G., "there is no vacancy in sight with no estimated timeframe."

47.     In or around April 2019, OMH staff at Auburn informed M.G. that OMH was considering releasing him to a crisis residence, a form of short-term housing that is not community-based housing.

48.     In the spring of 2019, M.G. was informed that the "head of OMH" had contacted Dutchess County to arrange for his release.

49.    In early June 2019, DOCCS located a bed in a halfway house called Hillcrest House, and approved M.G.'s release from prison.

50.    On or about June 14, 2019, M.G. was informed for the first time that he would be released the following week.

51.    Defendants released M.G. to Hillcrest House on June 18, 2019.

52.    M.G. was told that he could remain at Hillcrest House for four months.

53.    Hillcrest House is not the community-based mental health housing for which OMH determined M.G. eligible and appropriate.

54.    Hillcrest House is a halfway house, also known as DOCCS parole housing, funded through DOCCS' Community Based Residential Program.

55.    Hillcrest House houses up to 60 people.

56.    Hillcrest House is a single facility that contains a homeless shelter on one end of the building and transitional rooms, including those devoted to DOCCS parole housing, on the other.

57.    Hillcrest House provides only temporary housing and has no on-site medical or mental health care staff.

58.    DOCCS had previously determined that Hillcrest House was an inappropriate housing location for formerly incarcerated people who require mental health housing.

59.    After decades of incarceration and years of participating in a residential mental health program in prison, M.G. had no mental health counselor on site to assist him with his transition to the community.

60. Upon his arrival at Hillcrest House, M.G. learned that OMH had failed to arrange for his Supplemental Security Income and Medicaid benefits despite an earlier representation that it would do so.

61. While at Hillcrest House, M.G. was subjected to institutional conditions. He was subject to security monitoring, shared a hall bathroom, did not have access to a kitchen, and ate his meals in a shared dining room.

62. M.G. was incarcerated at Auburn past his open date for parole release as of January 23, 2019, the date that the original Complaint in this action was filed.

63. M.G. could not predict the length of his prolonged incarceration.

64. After the filing of the original Complaint, the timing of M.G.'s discharge was within Defendants' discretion.

65. M.G. desires to reside and receive programs and services in community-based mental health housing.

B. P.C.

66. Plaintiff P.C. is a 50-year-old Black man, whom Defendants held in state prison for 861 days past his open date for parole release.

67. P.C. has a diagnosis of schizophrenia.

68. He has also been diagnosed with a mild intellectual disability.

69. OMH determined P.C. to be an individual with serious mental illness.

70. Prior to his release, P.C. was incarcerated at Sullivan Correctional Facility, a maximum-security prison in Fallsburg, New York.

71. He was housed in the Special Needs Unit ("SNU") at Sullivan.

72.     The SNU is designated exclusively for incarcerated individuals with developmental or intellectual disabilities and adaptive behavior deficits. The SNU houses many people who are additionally diagnosed with serious mental illness.

73.     The New York Parole Board granted P.C. an open date for parole release of December 19, 2017.

74.     P.C. was approved for release to Nassau County.

75.     OMH determined that P.C. would be homeless or at risk of homelessness once released from prison.

76.     OMH assessed P.C. as requiring and appropriate for community-based mental health housing upon his discharge.

77.     OMH staff submitted mental health housing applications on P.C.'s behalf to Nassau County.

78.     Subsequently, OMH staff informed P.C. that they would seek housing for him in Suffolk County instead, since no beds were available in Nassau.

79.     Prison staff informed P.C. that he would not be released on his open date for parole release because appropriate community-based mental health housing was unavailable.

80.     P.C. remained at a correctional facility solely because he required community-based mental health housing and supports that Defendants had not made available.

81.     After the filing of the original Complaint, OMH staff at Sullivan told P.C. that "Albany" had recently taken over planning for his release from the facility's discharge planner.

82.     On or about April 27, 2020, the Sullivan discharge planner informed P.C. for the first time that he would be released from prison.

83.    On April 28, 2020, Defendants released P.C. to a state-operated community residence ("SOCR") facility in West Brentwood, New York, in Suffolk County.

84.    P.C. did not learn to where he would be discharged, or the type of housing in which he would live, until he was being driven from prison to the SOCR.

85.    The SOCR facility is operated by OMH and is on the campus of the Pilgrim Psychiatric Center. The facility consists of large, older buildings that house approximately 10 people on each floor and in which meals are served and residents congregate in common areas, medication is administered on site, and residents share bathrooms. In the building in which P.C. was placed, there is a computer lab but it does not have any computers.

86.    P.C. did not hear from his case manager or know the agency providing case management for more than a week after his discharge, despite being told that his case manager would be responsible for securing permanent housing and benefits for him.

87.    P.C. was incarcerated at Sullivan past his open date for parole release as of January 23, 2019, the date that the original Complaint in this action was filed.

88.    P.C. could not predict the length of his prolonged incarceration.

89.    After the filing of the original Complaint, the timing of P.C.'s discharge was within Defendants' discretion.

90.    P.C. desires to reside and receive programs and services in community-based mental health housing.

## II.    Representatives of Both the General Class and the RTF Subclass

A. C.J.

91.    Plaintiff C.J. is a 33-year-old Black man, whom Defendants held in state prison for 502 days past his maximum expiration date, a date that marks the end of his court-imposed prison sentence.

92.    C.J. has a diagnosis of bipolar II disorder.

93.    OMH determined C.J. to be an individual with serious mental illness.

94.    C.J.'s maximum expiration date was September 28, 2017, as calculated by DOCCS.

95.    DOCCS claims to have released C.J. on his maximum expiration date to a "residential treatment facility," first at Fishkill Correctional Facility and then at Green Haven Correctional Facility.

96.    In fact, C.J. was housed in prison units designated exclusively for incarcerated people with serious mental illness.

97.    C.J. has been sentenced to five years of post-release supervision in the community.

98.    Prior to C.J.'s release date, DOCCS placed him in Sing Sing Correctional Facility's Community Orientation and Re-entry Program ("CORP"), a program for people with serious mental illness who are nearing release from prison.

99.    CORP is designed to prepare people with serious mental illness for community integration and a component of the program is focused on securing housing.

100.    On July 21, 2017, C.J.'s OMH discharge planner completed a discharge summary for C.J., which noted that C.J. would be homeless and would require community-based mental health housing and supports upon release from prison.

101.    On August 1, 2017, C.J.'s OMH discharge planner submitted an application for community-based mental health housing and services in Orange County on C.J.'s behalf.

102.    Specifically, the application identified both a supportive treatment apartment and individual supported housing as appropriate for C.J. Both models of housing allow residents to live in integrated community settings.

103.    While enrolled in CORP, C.J.'s OMH counselor informed C.J. that he would not be released at the end of his prison sentence and would be held past his maximum expiration date.

104.    In September 2017, C.J. was directed to sign papers related to "residential treatment facility" status.

105.    C.J. was transferred to Fishkill Correctional Facility following the end of his prison sentence and placed in the prison's ICP and Transitional Intermediate Care Program ("TrICP").

106.    Subsequently, DOCCS transferred C.J. to Green Haven Correctional Facility and placed him in single cells in the prison's TrICP and ICP.

107.    Despite his nominal "release" status, C.J. was housed in prison and subject to prison conditions for the entirety of time following his maximum expiration date until his release.

108.    C.J. remained at correctional facilities solely because he required community-based mental health housing and supports that Defendants had not made available.

13

109.    OMH staff told C.J. that there were few resources in the community for him and he needed to be patient.

110.    C.J. earned a GED and vocational certificate in prison and planned to search for a job upon release. Due to his delayed release, he was unable to act on those plans.

111.    C.J. experienced serious psychiatric harm due to his prolonged incarceration. C.J. repeatedly engaged in self-harm and expressed his desire to die rather than remain in prison.

112.    C.J. was admitted to a crisis observation cell and was repeatedly placed on suicide watch, including when his birthday approached and he informed prison staff that he had lost hope of going home.

113.    C.J. wanted to return to Orange County, where his family and support system reside.

114.    As a result of his prolonged incarceration, his family relationship suffered. C.J. was due to be released shortly before his young daughter's birthday, and he expected to celebrate with her for the first time in a decade.  Since his release date was in early fall, he also planned to spend the holidays with family.

115.    On January 30, 2019, seven days after Plaintiffs filed this action, OMH staff at Green Haven completed a revised discharge plan for C.J. Under this plan, C.J.'s proposed release address was changed to the Middletown Transitional Residence in Middletown, New York.

116.    The Middletown Transitional Residence is operated by OMH, and is located on the campus of the Rockland Psychiatric Center – Middletown Campus. It is intended to be temporary housing and is not the community-based mental health housing identified as appropriate for C.J.

117.    On February 7, 2019, C.J.'s OMH pre-release coordinator at Green Haven completed a revised application for mental health housing and services in Orange County. Though C.J. was still held at Green Haven at that time, the application listed his address as the Middletown Transitional Residence.

118.    Like the 2017 application, the February 2019 application identified individual supported housing as appropriate for C.J. This model of housing allows residents to live independently in integrated settings in the community.

119.    Parole staff approved C.J.'s discharge to the Middletown Transitional Residence on February 8, 2019.

120.    On or about February 11, 2019, an OMH discharge planner called C.J. to her office. At this meeting, the discharge planner informed C.J. that she had received an urgent email from "Albany" and directed C.J. to complete his discharge paperwork.

121.    On February 12, 2019, C.J. was released to the Middletown Transitional Residence.

122.    C.J. was incarcerated at Green Haven past his maximum expiration date on residential treatment facility status as of January 23, 2019, the date that the original Complaint in this action was filed.

123.    C.J. could not predict the length of his prolonged incarceration.

124.    After the filing of the original Complaint, the timing of C.J.'s discharge was within Defendants' discretion.

125.    C.J. has not received the community-based housing that OMH identified as appropriate for him.

126.    C.J. desires to reside and receive programs and services in community-based

mental health housing.

B.  M.J.

127.    Plaintiff M.J. is a 34-year-old Black man, whom Defendants held in state prison

for 246 days past his maximum expiration date.

128.    M.J. has a diagnosis of bipolar disorder.

129.    OMH determined M.J. to be an individual with serious mental illness.

130.    M.J.'s maximum expiration date—signaling the end of his court-imposed prison

sentence—was June 18, 2018, as calculated by DOCCS.

131.    DOCCS claims to have released him on his maximum expiration date to a

"residential treatment facility," first at Fishkill Correctional Facility and then at Green Haven

Correctional Facility.

132.    In fact, M.J. was housed in prison units designated exclusively for incarcerated

people with serious mental illness.

133.    M.J. has been sentenced to five years of post-release supervision in the

community.

134.    Prior to June 18, 2018, M.J. was housed in Great Meadow Correctional Facility's

ICP.

135.    At Great Meadow, M.J. met with an OMH discharge planner assigned to the ICP

and completed government benefits applications.

136.    M.J.'s OMH discharge planner confirmed that M.J. will be homeless or at risk of

homelessness once released from prison, and requires and is appropriate for community-based

mental health housing.

137.    In April 2018, M.J.'s OMH discharge planner submitted an application for community-based mental health housing and services in Orange County on M.J.'s behalf.

138.    The application identified a supervised community residence as appropriate for M.J. This model of mental-health housing provides on-site services and supervision for residents, typically in private living units. The application also requested that M.J. receive specialized services known as Assertive Community Treatment ("ACT"), which is a mobile multi-disciplinary team of mental health professionals providing support 24 hours per day.

139.    Instead of releasing M.J. on his maximum expiration date, DOCCS informed M.J. that he would be admitted to a "residential treatment facility," and DOCCS directed M.J. to sign papers related to residential treatment facility status.

140.    M.J. was transferred to the Fishkill Correctional Facility's ICP on or about the maximum expiration date of his prison sentence.

141.    Subsequently, DOCCS transferred M.J. to the Green Haven Correctional Facility's ICP.

142.    Despite his nominal "release" status, M.J. was housed in prison and subject to prison conditions for the entirety of time following his maximum expiration date until his release.

143.    M.J. was informed that limited community-based mental health housing in Newburgh contributed to the delay of his release to Orange County.

144.    M.J. remained at correctional facilities solely because he required community-based mental health housing and supports that Defendants had not made available.

145.    Even though segregated confinement is known to be harmful to people with serious mental illness, Defendants placed M.J. in punitive segregated confinement twice while

on "residential treatment facility" status, placing M.J. at risk of harm from psychiatric decompensation.

146.    M.J. wanted to return to Orange County, where he grew up and where his family support system resides.

147.    On January 30, 2019, seven days after Plaintiffs filed this action, OMH staff at Green Haven completed a revised discharge plan for M.J. Under this plan, M.J.'s proposed release address was changed to the Middletown Transitional Residence in Middletown, New York.

148.    On February 13, 2019, M.J.'s OMH discharge planner at Green Haven completed a revised application for mental health housing and services in Orange County. Though M.J. was still held at Green Haven at that time, the application listed his address as the Middletown Transitional Residence.

149.    The application identified individual supported housing as appropriate for M.J. This model of mental-health housing allows residents to live independently in integrated settings in the community. Unlike the prior application, the February 2019 application did not request ACT services for M.J.

150.    On February 19, 2019, M.J. was released to the Middletown Transitional Residence, one week after Plaintiff C.J. was released to this same location.

151.    M.J. was incarcerated at Green Haven past his maximum expiration date on residential treatment facility status as of January 23, 2019, the date that the original Complaint in this action was filed.

152.    M.J. could not predict the length of his prolonged incarceration.

153.    After the filing of the original Complaint, the timing of M.J.'s discharge was within Defendants' discretion.

154.    M.J. has not received the community-based housing that OMH identified as appropriate for him.

155.    M.J. desires to reside and receive programs and services in community-based mental health housing.

C.    J.R.

156.    Plaintiff J.R. is a 36-year-old Hispanic man, whom Defendants held in state prison for 284 days past his maximum expiration date.

157.    J.R. has diagnoses of depressive disorder and post-traumatic stress disorder.

158.    OMH determined J.R. to be an individual with serious mental illness.

159.    J.R. has attempted self-harm on multiple occasions.

160.    J.R.'s maximum expiration date—signaling the end of his court-imposed prison sentence—was June 7, 2018, as calculated by DOCCS.

161.    He has been sentenced to three years of post-release supervision in the community.

162.    DOCCS claims to have released him on his maximum expiration date to the nominal "residential treatment facility" at Fishkill.

163.    In fact, J.R. was housed with individuals serving a sentence of imprisonment at the prison.

164.    J.R. received an approved conditional release date of November 9, 2017.

165.    On his conditional release date, J.R.'s prison counselor informed him that he would not be released on that day.

166.    Months before the expiration of J.R.'s prison sentence, J.R.'s OMH discharge planner submitted an application on J.R.'s behalf for community-based mental health housing and services in Dutchess County, where J.R. lived before his incarceration.

167.    DOCCS issued a memorandum on or about June 4, 2018 advising J.R. that, pursuant to a condition established by the Parole Board, he would be transferred to a "residential treatment facility" upon the expiration of his sentence for a period not to exceed six months.

168.    On June 7, 2018, the maximum expiration date of J.R.'s prison sentence, he was not released from prison.

169.    J.R.'s counselor informed him that he would not be released because he has serious mental illness and requires community-based mental health housing, which neither DOCCS nor OMH had secured for him.

170.    J.R.'s counselor also directed J.R. to sign documents that were presented to him as "release papers."

171.    His counselor informed J.R. that DOCCS no longer considered him an "inmate," but rather a "parolee."

172.    DOCCS continued to hold J.R. in the same housing unit, under the same conditions, where he had been incarcerated up to that time.

173.    Despite his nominal "release" status, J.R. was housed in prison and subject to prison conditions for the entirety of time following his maximum expiration date until his release.

174.    During this time, J.R. proposed the addresses of several family members, including his sister and cousin, as residences to which he could be released. DOCCS did not approve these residences as suitable for his release.

175.    J.R. participated in several interviews with providers of community-based mental health housing.

176.    Several providers could not admit J.R. to their program because they lack available beds.

177.    J.R. remained at a correctional facility solely because he required community-based mental health housing and supports that Defendants had not made available.

178.    On March 18, 2019, J.R. was released to the Rockland Psychiatric Center's Alliance House in Poughkeepsie, New York.

179.    Alliance House is not the community-based housing that OMH identified as appropriate for him.

180.    In fact, Alliance House is a crisis residence operated by OMH, which offers short-term housing for up to 21 days. According to the state's website, the crisis residence is "not intended as a substitute for housing."

181.    J.R. was incarcerated at Fishkill past his maximum expiration date on residential treatment facility status as of January 23, 2019, the date that the original Complaint in this action was filed.

182.    J.R. could not predict the length of his prolonged incarceration.

183.    After the filing of the original Complaint, the timing of J.R.'s discharge was within Defendants' discretion.

184.    J.R. desires to reside and receive programs and services in community-based mental health housing.

D. D.R.

185.    Plaintiff D.R. is a 37-year-old Black man, whom Defendants held in state prison for 411 days past his maximum expiration date.

186.    D.R. has a diagnosis of bipolar disorder.

187.    OMH determined D.R. to be an individual with serious mental illness.

188.    D.R.'s maximum expiration date—signaling the end of his court-imposed prison sentence—was December 29, 2017, as calculated by DOCCS.

189.    He has been sentenced to post-release supervision in the community to last until March 4, 2021.

190.    DOCCS claims to have released D.R. on his maximum expiration date to the "residential treatment facility" at Fishkill Correctional Facility.

191.    In fact, D.R. was housed in a dormitory at the prison, primarily with people who have been convicted of sex offenses despite the fact that D.R. does not have any convictions for sex offenses.

192.    In late December 2017, while D.R. was still confined at Mid-State Correctional Facility, DOCCS and OMH staff presented D.R. with "release papers" and directed D.R. to sign them.

193.    On or about December 29, 2017, D.R.'s counselor informed him that he would be transferred to Fishkill.

194.    OMH staff also informed D.R. that he would not be released to the community upon the expiration of his prison sentence.

195.    D.R. received a memorandum dated May 29, 2018 from Defendant McGrath, noting that he would continue to be placed in a "residential treatment facility" because "an

22

approved residence [for his release] has not yet been identified." This memorandum explained that he would remain at the residential treatment facility "until such time as you have proposed and DOCCS has approved a suitable residence."

196.    D.R. continued to be incarcerated in prison and subject to prison conditions at Fishkill after receiving this memorandum.

197.    Both before and after the maximum expiration date of his prison sentence, D.R. met with discharge planners to discuss his history of homelessness and need for community-based mental health housing and supportive services, such as case management.

198.    D.R.'s discharge planner submitted an application for community-based mental health housing and services on D.R.'s behalf to Nassau County.

199.    D.R. participated in multiple interviews with providers of community-based mental health housing.

200.    Despite his nominal "release" status, D.R. was housed in prison and subject to prison conditions for the entirety of time following his maximum expiration date until his release.

201.    During this time, D.R. was placed in segregated confinement at the prison as punishment for disciplinary infractions, even after the expiration of his prison sentence.

202.    D.R. proposed that he be released to his aunt's home. This address was not approved as suitable for his release.

203.    D.R. remained at a correctional facility solely because he required community-based mental health housing and supports that Defendants had not made available.

204.    D.R.'s mental health significantly deteriorated as a result of his prolonged incarceration.  He also experienced periods of frustration and sadness regarding his prolonged incarceration.

205.    D.R.'s OMH counselor indicated that he was exhibiting symptoms of "paranoia."

206.    D.R. expected that after he was released at the end of his prison sentence, he would study to take a GED exam and find employment.

207.    D.R. also expected that after he was released at the end of his prison sentence, he would spend time with his family, particularly during holidays.

208.    On February 13, 2019, D.R. was released to the Pilgrim Crisis Residence in Brentwood, New York.

209.    Pilgrim Crisis Residence is not the community-based housing that OMH identified as appropriate for him.

210.    In fact, Pilgrim Crisis Residence is short-term housing located on the grounds of Pilgrim Psychiatric Center, which is a state psychiatric hospital. According to the state's website, the crisis residence is "not intended as a substitute for housing."

211.    On information and belief, Pilgrim Crisis Residence is intended to serve patients ready for discharge from the psychiatric hospital.

212.    D.R. was incarcerated at Fishkill past his maximum expiration date on residential treatment facility status as of January 23, 2019, the date that the original Complaint in this action was filed.

213.    D.R. could not predict the length of his prolonged incarceration.

214.    After the filing of the original Complaint, the timing of D.R.'s discharge was within Defendants' discretion.

215.     D.R. desires to reside and receive programs and services in community-based mental health housing.

## III.     Representatives of the Discharge Class

### A.  S.D.

216.     S.D. is a 47-year-old Black man who was released from state prison on May 17, 2019, his approved conditional release date. He will be on post-release supervision until May 17, 2024.

217.     S.D. has a diagnosis of schizophrenia.

218.     When S.D. was incarcerated, OMH determined him to be an individual with serious mental illness.

219.     In prison, OMH designated S.D. a mental health service level of 1-S, which denotes the highest level of mental health need in the state prison system.

220.     S.D. has long been prescribed mental health medications, including antipsychotics. Upon his release from prison, he was prescribed Haldol and Seroquel, as well as Benadryl.

221.     S.D. experienced multiple mental health crises while he was incarcerated. During a four-year period, he was on four separate occasions placed on crisis observation—a status involving observation and monitoring of patients who are psychiatrically unstable. On two of those occasions, OMH continued crisis observation status for periods of 20 and 21 consecutive days.

222.     During his incarceration, OMH determined that S.D.'s mental health needs rendered him unsuitable for a general prison population placement.

223.    S.D. was instead housed in units designated exclusively for incarcerated individuals with serious mental illness, including the ICP.

224.    Immediately prior to his release, S.D. was housed in the ICP at Auburn Correctional Facility.

225.    Prior to his release from Auburn, OMH determined S.D. eligible and appropriate for community-based mental health housing and supportive services. These services would be necessary to ensure that S.D. successfully re-entered the community and remained in the community, and to prevent his deterioration and potential institutionalization.

226.    OMH determined that S.D.'s necessary supportive services upon release included case management, ACT, and extensive psychiatric and therapy services.

227.    OMH completed a housing referral for S.D. that recommended mental health housing if it was available.

228.    OMH submitted an application for housing in an integrated setting on or about March 7, 2019, by transmitting the application to New York City's Re-entry Coordination System.

229.    On March 20, 2019, OMH also applied for his placement at a Transitional Living Residence or Transitional Placement Program.

230.    OMH submitted care coordination referrals on May 8 and May 10, 2019.

231.    Prior to his release from Auburn, S.D. had a video-teleconference interview with Promesa, a New York City-based provider of community-based mental health housing.

232.    Promesa accepted S.D. into their apartment treatment program and added S.D. to a waiting list for placement into the program.

233.    Notwithstanding this acceptance, S.D. did not receive housing on his conditional release date.

234.    On May 17, 2019, S.D. was discharged to the 30th Street Men's Shelter, which is a homeless shelter in Manhattan that functions as an intake center for people who are entering the shelter system. DOCCS approved this housing placement.

235.    Defendants decided to release S.D. to a homeless shelter notwithstanding OMH's prior determination that he could not function in a general prison population.

236.    DOCCS did not provide S.D. with his Social Security card when he was released. S.D.'s benefits were inactive and S.D. needed to rely on loved ones to assist him in the immediate period after release.

237.    S.D. was transferred to NAICA East Tremont Transitional Housing Program ("East Tremont").

238.    East Tremont is a mental health shelter in the Bronx, New York. The shelter houses up to 154 men with mental illness. It is located in a predominantly Black and Latinx neighborhood that has suffered from decades of governmental disinvestment and neglect.

239.    After years of incarceration, the experience of homelessness was very difficult for S.D.

240.    Shelter conditions were "horrible" and caused S.D. extreme stress.

241.    S.D. feared conflict and altercations with other residents at East Tremont. A resident stole the linens that were provided to S.D.

242.    Residents at East Tremont are housed in a group setting.

243.    S.D. shared a room with six people, was subject to a nightly curfew, and was expected each night to sign up for his bed.

244.    East Tremont provided neither the services that S.D. would receive in an integrated, community-based mental health housing program, nor the opportunities to forge ties to non-disabled persons in the community.

245.    S.D. was not offered any rehabilitative programs at the shelter.

246.    S.D. did not receive appropriate care for his needs at the shelter, such as activities of daily living ("ADL") support, supervision with medications, and monitoring symptoms.

247.    East Tremont staff secure residents' medications in a locker in the reception area and dispense the medication to residents.

248.    Residents are required to go to the reception area to obtain their medications.

249.    While at East Tremont, S.D. did not have a sufficient supply of mental health medications to bridge him until the next available appointment with his doctor.

250.    Shelter staff did not detect the insufficient medications or provide adequate support to S.D. to assist him with obtaining needed medications. These supportive services would have been available in integrated, community-based mental health housing.

251.    Because S.D. did not have enough medications, S.D. began to ration his medications and missed doses for multiple medications.

252.    After missing the doses of his mental health medications, S.D.'s mental health deteriorated and he became very sick.

253.    S.D. experienced stomach upset, confusion, dizziness, and increased anxiety.

254.    When S.D. spoke to his godmother by phone, S.D.'s godmother observed that S.D. sounded unwell and believed that S.D.'s mental health was deteriorating.

255.    Concerned about S.D.'s deteriorating condition, S.D.'s godmother encouraged S.D. to obtain emergency assistance from his Forensic ACT team, which is an ACT team serving people who have been involved in the criminal justice system.

256.    On June 12, 2019, S.D.'s Forensic ACT team brought S.D. to the emergency room of NYC Health + Hospitals/Harlem, where he was admitted for psychiatric treatment to address severe symptoms, including auditory hallucinations and suicidal ideation.

257.    On September 9, 2019, NYC Health + Hospitals/Harlem transferred S.D. to Manhattan Psychiatric Center for voluntary inpatient treatment.

258.    Following his inpatient admission, S.D. described to hospital staff his depression resulting from the discomfort and fright of experiencing auditory hallucinations. He relayed that he felt depressed due to the hospitalization and the inability to live independently and described not having adequate support following his release from prison in May.

259.    Hospital staff found that S.D. was decompensated at his admission to Manhattan Psychiatric Center.

260.    They noted S.D.'s long period of incarceration, that he was deeply institutionalized, and that after his prison discharge, S.D. had minimal support living in the shelter system and was unable to manage his care needs, maintain his medication regimen or refill his medications. Hospital staff noted that as a result of not maintaining his treatment and the pressures of his psychiatric needs and the social environment, S.D. decompensated and was hospitalized shortly after his release from prison.

261.    Nursing staff further noted S.D.'s difficulties maintaining his health related to his extended incarceration, residence in a shelter, and minimal living support, and led to medication non-compliance and hospitalization.

262.    S.D.'s hospitalization requires S.D. to re-apply for community-based mental health housing and supportive services.

263.    OMH's failure to provide appropriate community-based mental health housing and supportive services caused S.D.'s deterioration and unnecessary segregation and has delayed S.D. from re-integrating into his community.

264.    OMH's continued failure to provide community-based mental health housing and supportive services places S.D. at risk of further unnecessary segregation.

265.    Hospital staff have determined that Level II supportive housing is appropriate for S.D. to assist with medication monitoring.

266.    In July 2020, S.D. deteriorated while receiving inpatient care at Manhattan Psychiatric Center.

267.    Due to S.D.'s deterioration, OMH staff placed S.D. on a one-to-one watch for multiple days.

268.    OMH initiated procedures to retain S.D. for "continued hospitalization pursuant to Mental Hygiene Law Section 9.27" for a limited period of approximately two months, in the event S.D. was released during a criminal proceeding.

269.    A few days later, however, police arrested S.D for allegedly injuring another patient at Manhattan Psychiatric Center, and S.D. was remanded to jail on July 25, 2020.

270.    On information and belief, due to severe decompensation while at the jail, S.D. was not arraigned and, instead, was referred for a fitness examination pursuant to New York Criminal Procedure Law § 730. S.D. is currently at Bellevue Hospital.

271.    Despite his pretrial detention, S.D. remains eligible and appropriate for community-based mental health housing and supportive services. For example, S.D. continues to receive ACT services.

272.    When S.D.'s pending criminal proceeding is resolved, S.D. will remain eligible for release to a community-based placement.

273.    The ongoing inadequacy of appropriate community-based services continues to place S.D. at serious risk of institutionalization.

274.    S.D. is currently harmed by inadequate community-based mental health housing and services. Pursuant to OMH's guidelines, the lack of "stable housing and/or other community supports" negatively impacts S.D.'s opportunity to receive competency restoration services in the community. Due to Defendants' failure to provide adequate community-based mental health housing and services, S.D. is likely to be placed in an institution for any necessary competency restoration.

275.    The availability of sufficient community-based care and treatment opportunities would have reduced the serious risk of S.D.'s institutionalization at the time of his release from state prison in May 2019 and thereafter.

276.    S.D. wishes to complete his college education.

277.    S.D. desires integrated community-based mental health housing and supportive services.

B.  W.P.

278.    Plaintiff W.P. is a 50-year-old Black man who was released from state prison on May 17, 2019, his approved conditional release date. He will be on post-release supervision until May 17, 2024.

279.    W.P. has a diagnosis of schizoaffective disorder, bipolar type.

280.    He has also been diagnosed with anti-social personality disorder.

281.    When W.P. was incarcerated, OMH determined him to be an individual with serious mental illness.

282.    In prison, OMH designated W.P. a mental health service level of 1-S, which denotes the highest level of mental health need in the state prison system.

283.    W.P. has long been prescribed mental health medications, including antipsychotics. Upon his release from prison, he was prescribed Olanzapine, Abilify, Cogentin, and Depakote. He was also prescribed Metoprolol Succinate.

284.    While he was incarcerated, W.P. experienced serious suicidal ideation, was placed on suicide watch, and was hospitalized at the inpatient psychiatric hospital for individuals incarcerated in state prison, Central New York Psychiatric Center.

285.    OMH repeatedly determined that W.P. was not suitable for a general prison population placement, finding that he could not maintain psychiatric health without the mental health services provided in a residential prison program.

286.    In the years leading up to his release, W.P. was housed in units designated exclusively for incarcerated individuals with serious mental illness, including the ICP.

287.    Immediately prior to his release, W.P. was housed in the ICP at Sing Sing Correctional Facility, a maximum-security prison in Ossining, New York.

288.    Prior to his release from Sing Sing, OMH determined W.P. eligible and appropriate for community-based mental health housing and supportive services. These services would be necessary to ensure that W.P. successfully re-entered the community and remained in the community, and to prevent his deterioration and potential institutionalization.

289.    OMH determined that W.P.'s necessary supportive services upon release included case management, a specialized service known as Forensic ACT, and extensive psychiatric and therapy services.

290.    OMH also determined W.P. eligible and appropriate for community-based mental health housing upon release. This housing was another necessary service to ensure W.P.'s successful transition to and participation in the community.

291.    OMH completed a housing referral for W.P. that recommended mental health housing if it was available.

292.    OMH submitted a housing application for him on January 11, 2019, by transmitting the application to New York City's Re-entry Coordination System.

293.    On April 4, 2019, OMH also applied for his placement at a Transitional Living Residence or Transitional Placement Program.

294.    The New York City Human Resources Administration confirmed W.P.'s eligibility for community-based mental health housing, conditionally approved W.P. for Level II supportive housing, and determined him eligible for placement into NY/NY I, II housing for people with serious mental illness.

295.    The doctor who screened W.P. as part of his community-based mental health housing application determined that W.P. was at a "chronically elevated risk" and thus required ongoing monitoring and support to ensure his safety in the community.

296.    OMH attempted to secure W.P.'s placement with New York City-based provider of community-based mental health housing, Project Renewal.

297.    OMH, however, then informed W.P. that he would be discharged to the 30th Street Men's Shelter. DOCCS approved this housing placement.

298.    Defendants decided to release W.P. to a homeless shelter notwithstanding OMH's prior, and repeated, determinations that while incarcerated he could not function in an environment that does not provide adequate mental health supportive services—namely, the general prison population.

299.    W.P. feared that the 30th Street Men's Shelter was not equipped to meet his mental health treatment needs. The shelter does not provide the on-site mental health supportive services that OMH had determined were necessary to ensure W.P.'s safe reentry.

300.    The 30th Street Men's Shelter also is not the community-based mental health housing for which OMH determined W.P. eligible and appropriate.

301.    DOCCS discharged W.P. to the 30th Street Men's Shelter on May 17, 2019.

302.    At 30th Street, W.P. was housed in a dorm setting with six other people. The conditions were filthy and the mental health support he required was not provided.

303.    On June 27, 2019, W.P. was transferred to Delta Manor Shelter in the Bronx, New York.

304.    Delta Manor is a mental health shelter. There are case managers, doctors, and nurses on site at certain hours, but unlicensed staff is responsible for providing residents their medication in the evenings. Delta Manor is located in a predominantly Black and Latinx neighborhood that has suffered from decades of governmental disinvestment and neglect.

305.    Delta Manor provides neither the services that W.P. would receive in an integrated, community-based mental health housing program nor the opportunities to forge ties to non-disabled persons in the community.

306.    Residents at Delta Manor are housed in a group setting, with dorms ranging from five to fourteen beds.

307.     According to its website, Delta Manor houses "an average of 200 homeless men with mental illnesses each year."

308.     Residents and visitors to Delta Manor are subjected to security procedures before they enter, including stepping through a metal detector. There are stringent curfews and all property is subject to search.

309.     OMH has never rescinded its determination that W.P. is eligible and appropriate for community-based mental health housing and supportive services. Despite this, W.P. has spent well over a year in the New York City homeless shelter system.

310.     Level II supportive housing and NY/NY I, II housing constitutes the integrated, non-institutional environment W.P. needs to prevent his deterioration and future segregation.

311.     Since June 2019, Delta Manor staff has continued to search for appropriate housing for W.P., but such housing remains unavailable.

312.     On or about May 29, 2020, in response to the COVID-19 pandemic, City officials temporarily relocated residents of Delta Manor, including W.P., and shelter staff to a hotel in Manhattan so that the shelter could be sanitized.

313.     The residents of Delta Manor still reside together in this hotel.

314.     The move has disrupted W.P.'s meetings with his case worker who had been attempting to locate community-based mental health housing for W.P.

315.     W.P. has been told that he will be returned to Delta Manor by the Fall of 2020.

316.     W.P.'s mental health has deteriorated during his time in the shelter system. While in the homeless shelter system, W.P. has been deprived of privacy and lives with residents with significantly impaired abilities to maintain hygiene and control symptoms of their illness. W.P. witnesses fights among residents and has little recourse to feel safe other than self-isolation.

These unstable conditions greatly exacerbate his anxiety, intensify his feeling of needing to be constantly vigilant, and make him fear for his safety.

317.    The shelter placement greatly increases the risk that W.P. will suffer a mental health crisis resulting in hospitalization, or an episode that endangers his parole status.

318.    While at Delta Manor, W.P. complained about the housing conditions at the shelter to his parole officer and requested to be relocated. His parole officer rejected this request, leaving W.P. to feel trapped at the shelter.

319.    W.P. remains in the homeless shelter system solely because he requires community-based mental health housing that Defendants have not made available.

320.    OMH's failure to provide appropriate community-based mental health housing and supportive services causes long waiting lists for such programs and services and has caused W.P.'s prolonged stay in the homeless shelter system.

321.    The longer W.P. remains in the homeless shelter system, the greater likelihood his mental health will deteriorate further, resulting in institutionalization or reincarceration.

322.    W.P. desires to reside and receive programs and services in community-based mental health housing.

C.    D.H.

323.    Plaintiff D.H. is a 29-year-old Black man who was released from state prison on or about June 22, 2020. He will be on post-release supervision until March 14, 2021. He is a resident of Orange County.

324.    D.H. has diagnoses of schizoaffective disorder bipolar type and anti-social personality disorder.

325.    D.H. has long been prescribed mental health medications, including antipsychotics.

326.    D.H. also has a history of using alcohol, cocaine, and marijuana. OMH has classified D.H.'s substance usage as a disorder.

327.    When D.H. was in DOCCS custody, OMH determined him to be an individual with serious mental illness.

328.    In prison, OMH designated D.H. a mental health service level of 1-S, which denotes the highest level of mental health need in the state prison system.

329.    D.H. experienced multiple mental health crises while he was incarcerated and required placement on crisis observation status—a status involving observation and monitoring of patients whom OMH determine are psychiatrically unstable.

330.    Defendants have repeatedly offered D.H. the prospect of community re-integration, only to quickly return him to prison after his release.

331.    In the last two years, Defendants released D.H. four times and re-incarcerated him three times. In each case, Defendants did not provide D.H. necessary community-based mental health housing and supportive services upon release. When D.H. deteriorated as a result of Defendants' failure to provide these services, Defendants pursued parole violation charges against him, including for minor violations such as relapsing into substance use and failing to complete mental health and recovery day programs. In effect, Defendants have subjected D.H. to a vicious cycle of prison, inadequate mental health care, psychiatric harms, and reincarceration.

332.    Ahead of each of D.H.'s open dates for parole release, OMH determined him eligible and appropriate for community-based mental health housing and supportive services.

These services were necessary to ensure that D.H. remained in the community, and to prevent his deterioration and potential institutionalization.

333.    OMH submitted applications for community-based mental health housing and supportive services five times on D.H.'s behalf: on March 29, 2018, December 10, 2018, April 11, 2019, August 14, 2019, and May 5, 2020. Not once, however, did D.H. receive appropriate housing and services when released from prison.

334.    In 2018, D.H. met one of Orange County's highest priority categories for housing. However, Defendants held D.H. in prison for months merely because housing was unavailable; placed D.H. on a waiting list for housing; and released D.H. on December 19, 2018 to DOCCS parole housing in Newburgh, New York, operated by Bridges of New York.

335.    In 2019, OMH advised D.H. that housing would not actually be available on his May 19, 2019 release date, and DOCCS again released D.H. to Bridges of New York.

336.    The parole housing to which DOCCS released D.H. is located in a city that is predominantly Black and Latinx and has suffered from decades of governmental disinvestment and neglect.

337.    Bridges of New York provides temporary shelter for up to 14 adult men "transitioning out of the New York State Department of Corrections and Community Supervision."

338.    Bridges of New York does not provide medical or mental health services on site and has no full- or part-time medical or mental health practitioners on staff.

339.    After another period of reincarceration, DOCCS released D.H. in the early Fall of 2019, without placing him into community-based mental health housing. D.H. was released to his grandmother's home.

340.     During his two releases to the community in 2019, OMH did not provide necessary supportive services to assist D.H. with remaining in the community following his release to parole housing or to his grandmother's residence. For example, D.H. did not receive assistance reinstating benefits and had to navigate that process on his own.

341.     Furthermore, OMH did not assist D.H. with obtaining individualized behavioral health home and community-based supportive services, such as a peer support, educational, vocational and employment services, family support, and recovery-oriented rehabilitative services.

342.     The absence of housing and supportive services greatly exacerbated D.H.'s stress and impaired D.H.'s ability to manage his needs and cope with the demanding requirements of his DOCCS parole officer.

343.     D.H. believes that having someone to turn to for support would have aided his re-integration and to overcome day-to-day challenges.

344.     DOCCS most recently re-incarcerated D.H. on March 2, 2020.

345.     Despite OMH's submission of a new application for community-based mental health housing for D.H.'s release in the summer of 2020, DOCCS again explored releasing D.H. to Bridges of New York.

346.     On or about June 22, 2020, DOCCS transferred D.H. to the Intensive Treatment Unit located within Rockland Psychiatric Center.

347.     On July 23, 2020, D.H.'s parole officer asked D.H. to sign release papers.

348.     D.H. remains on a waiting list for community-based mental health housing, with no prospective date for his receipt of services.

349.     Defendants have repeatedly implored D.H. to be "patient" while waiting for the services he desires and requires.

350.     By depriving D.H. of community-based mental health housing and supportive services he requires, Defendants place D.H. at risk of again relapsing, deteriorating, and returning to jail, prison, or another segregated setting.

351.     Defendants' actions and inactions have already caused D.H.'s segregation multiple times in the last two years and resulted in D.H. being denied any meaningful opportunity to obtain an education, get a job, and support his family.

352.     In D.H.'s own words, Defendants "keep playing with my freedom."

353.     D.H. desires to reside and receive programs and services in integrated community-based settings.

**IV.    Defendants**

A.    Governor Andrew Cuomo

354.     Defendant Andrew Cuomo is the Governor of the State of New York, a public entity covered by the ADA and Section 504. N.Y. Const. Art. 4, § 1.

355.     Defendant Cuomo is responsible for supervising and controlling DOCCS and OMH, seeking and expending funds to implement the programs and deliver the services of those agencies, and taking care that the laws of the State of New York are faithfully executed. N.Y. Const. Art. 4, § 3; Art. 5, § 4; Art. 7, § 2.

356.     Defendant Cuomo appoints the commissioners of OMH and DOCCS, who serve at his pleasure. N.Y. Const. Art. 5, § 4; Art. 13, § 2.

357.     Defendant Cuomo oversees inter-agency coordination between OMH and DOCCS.

358.    Defendant Cuomo oversees, directs, and funds New York State's efforts to provide community-based mental health housing and supportive services to people with serious mental illness released from prison.

359.    Defendant Cuomo receives reports on the mental health system and is involved in developing policies to address the needs of people with mental illness and to encourage their full participation in society. N.Y. Mental Hyg. Law §§ 5.07, 7.07(b); N.Y. Exec. Law § 164.

360.    In 2012, Defendant Cuomo established an Olmstead Cabinet pursuant to Executive Order No. 84, appointed the Cabinet's Chair, and charged the Cabinet with providing recommendations to him for development, implementation, and coordination of an Olmstead Plan to meet the requirements of the ADA.

361.    Defendant Cuomo appoints members to and receives reports from New York State's Most Integrated Setting Coordinating Council, which is required to ensure that individuals with disabilities receive services in the most integrated setting appropriate to their needs. N.Y. Exec. Law §§ 702; 703(1), (4).

362.    Defendant Cuomo is sued in his official capacity.

B.  New York State Office of Mental Health

363.    Defendant OMH is charged by statute with the "responsibility for seeing that mentally ill persons are provided with care and treatment, that such care, treatment and rehabilitation is of high quality and effectiveness, and that the personal and civil rights of persons receiving care, treatment and rehabilitation are adequately protected." N.Y. Mental Hyg. Law § 7.07(c).

364.    Defendant OMH is required to develop a comprehensive, integrated system that ensures people with mental illness receive services in their communities whenever possible and that sparingly utilizes institutions to provide care.

365.    Defendant OMH enforces the laws and regulations applicable to mental health units within the DOCCS system and is responsible for developing, implementing and overseeing New York State's community-based mental health housing programs and supportive services.

366.    Defendant OMH is a public entity covered by the ADA and Section 504.

C.    Commissioner Ann Marie T. Sullivan

367.    Defendant Ann Marie T. Sullivan is the Commissioner of OMH, a public entity covered by the ADA and Section 504.

368.    Defendant Sullivan is responsible for the administration and operation of OMH, including the provision of services to individuals with mental illness who are incarcerated and discharged from prison. She is responsible for establishing standards for operating and funding a continuum of community-based mental health housing. N.Y. Mental Hyg. Law § 41.44; N.Y. Correct. Law §§ 401, 404.

369.    Defendant Sullivan is also responsible for determining what services to provide, in what setting to provide them, and how to allocate funds for each program and where to allocate such funds. N.Y. Mental Hyg. Law § 7.15.

370.    Defendant Sullivan oversees OMH's coordination and planning with local governments to ensure that care, treatment, and rehabilitation may be received in people's home communities. N.Y. Mental Hyg. Law §§ 7.01, 7.07(a).

371.    Defendant Sullivan is sued in her official capacity.

D.  New York State Department of Corrections and Community Supervision

372.    Defendant DOCCS enforces the laws and regulations applicable to New York State prisons.

373.    Defendant DOCCS is statutorily responsible for the confinement and habilitation of individuals placed in state correctional facilities and for their programming, supervision, and the conditions of their confinement.

374.    Defendant DOCCS is also responsible for the management of individuals released to community supervision.

375.    Defendant DOCCS is a public entity covered by the ADA and Section 504.

E.  Commissioner Anthony J. Annucci

376.    Defendant Anthony J. Annucci is the Acting Commissioner of DOCCS, a public entity covered by the ADA and Section 504.

377.    Defendant Annucci is responsible for the administration and operation of DOCCS, including the care, custody, parole, and post-release supervision of individuals with mental illness who are incarcerated and discharged from prison. N.Y. Correct. Law § 201.

378.    Defendant Annucci is charged with the "management and control of persons released on community supervision" and inquiring "into all matters connected with said community supervision." N.Y. Correct. Law § 112(2).

379.    Defendant Annucci is sued in his official capacity.

F.  Deputy Commissioner Anne Marie McGrath

380.    Defendant Anne Marie McGrath is a Deputy Commissioner of DOCCS, a public entity covered by the ADA and Section 504.

381.    Defendant McGrath is responsible for managing the inmate population, including all movement and transportation of incarcerated people and the transfer and placement of incarcerated people in residential treatment facilities.

382.    Defendant McGrath is sued in her official capacity.

## FACTUAL ALLEGATIONS

I.    **Defendants are Responsible for Ensuring that Plaintiffs Receive Community-Based Mental Health Housing and Supportive Services on the Date of their Release from State Prison.**

383.    Defendants are responsible for planning for the release from New York State prisons of people with serious mental illness who are homeless or at risk of homelessness.

384.    Defendants are responsible for making available adequate community-based mental health housing programs and supportive services for this population.

A.    The Integration Mandate of the ADA and Section 504

385.    Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibit discrimination against individuals with disabilities, including those with mental illness.

386.    The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

387.    Similarly, Section 504 states that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

388.    Implementing regulations for the ADA and Section 504 require public entities to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(d); *see also* 45 C.F.R. § 84.4(b)(2). An integrated setting is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. part 35, App. B. These statutes and regulations are often referred to collectively as the "integration mandate."

389.    In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the U.S. Supreme Court held that a state's failure to place a person with mental illness in the most integrated setting appropriate for his or her needs constitutes discrimination on the basis of disability, in violation of the integration mandate of the ADA.

390.    The Supreme Court declared that states could not satisfy the integration mandate simply by "mov[ing] institutionalized patients into an inappropriate setting, such as a homeless shelter." *Olmstead*, 527 U.S. at 605.

391.    Since *Olmstead*, courts have held that the ADA and Section 504 also prohibit states from placing people with mental illness "at serious risk of institutionalization or segregation," even if they reside in the community. *E.g.*, *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016); *see United States v. Mississippi*, 400 F. Supp. 3d 546, 553 (S.D. Miss. 2019) (collecting decisions).

B.  New York State's Community-Based Mental Health Housing Programs and Supportive Services

392.    OMH is responsible for developing community-based mental health housing programs and supportive services for people who are released from state prisons and for ensuring that people with serious mental illness who are homeless or at risk of homelessness upon their

release receive assistance with obtaining housing and supportive services that address their individualized needs.

393.    Community-based mental health housing is a program of safe and stable housing combined with individualized supportive services that promote health and independence.

394.    Community-based mental health housing encompasses a continuum of housing models that provide different levels of supervised treatment and care coordination tailored to residents' needs.

395.    People who need greater supervision or assistance developing independent living skills generally reside in a more service-intense housing model, such as an apartment treatment program.  These programs are intended to be transitional, allowing people to progress to a model that affords greater independence.

396.    People in an apartment treatment program receive services within their apartments, including counseling, ADL skill development, crisis intervention, case management, socialization, and medication monitoring services. Staff visits residents multiple days per week and are on-call 24 hours a day.

397.    People with greater independent living skills generally reside in a single room occupancy residence or scattered-site supported housing.  Both models are considered permanent housing.

398.    People in a single room occupancy residence or scattered-site supported housing receive regular face-to-face contact with support staff and a support plan; assistance applying for benefits; appropriate referrals; orientation to their local community; and education and skill development to remain stably housed.

399.     While OMH community-based housing models vary in terms of capacity, services, and location, each offers significantly greater opportunities to participate in the community than prisons, homeless shelters, Transitional Living Residences, and other OMH facilities, all of which are segregated settings.

400.     Community-based mental health supportive services are clinical, social, and rehabilitative services that enhance community living skills while preventing unnecessary hospitalization.

401.     Services include clinic treatment, care coordination, on-site rehabilitation, crisis services, outreach, screening and prevention, and consultation and education related to individuals' mental health needs.

402.     Care coordination provides linkages to necessary services, goal-monitoring, and case specific advocacy, and is intended to improve health outcomes and support the successful community living of people with serious mental illness.

403.     Care coordination is particularly necessary at the critical point of an individual's re-entry to the community after incarceration.

404.     People re-entering the community after incarceration (for some, many years of incarceration) may confront changes to technology, public services, and methods of accessing social services, which further heightens their need for support at re-entry.

405.     For these reasons, individuals reentering the community who are indigent and coping with serious mental illness require the assistance of a care coordinator to secure immediate needs, such as emergency cash assistance, clothing, and re-activation of Medicaid coverage, and to identify the specific types of supports for their long-term needs.

406.    New York has a number of distinct intensive care coordination services for people with complex needs, including people at risk of homelessness or those with criminal justice history.

407.    Care coordination may be provided by forensic intensive case management services, typically for a transitional period following release from prison; by ACT teams; or by a Medicaid Health Home or Health Home Plus.

408.    The most robust of these service models is ACT, which is an evidence-based practice shown to reduce hospitalizations, housing instability, and involvement in the criminal justice system.

409.    ACT teams, including Forensic ACT and Shelter ACT teams, are mobile multi-disciplinary teams of mental health professionals, available 24-hours per day, seven days a week, that provide treatment, care coordination, and support services to an individual with serious mental illness with a long-term or a high need for services.

410.    ACT services are designed to promote an individual's recovery by improving psychiatric symptoms, preventing relapse, teaching skills, providing direct assistance, and securing community resources for success in the community.

411.    Priority populations for ACT are people with diagnoses of schizophrenia, other psychotic disorders, bipolar disorder, and/or major or chronic depression; people with continuous high service needs that have not been met in traditional service settings, including people with criminal justice history or at risk of homelessness; and individuals subject to court-ordered treatment, known as Assisted Outpatient Treatment.

412.    Forensic ACT or Shelter ACT provide ACT services adapted specifically to people with criminal justice history or people in the homeless shelter system.

413.     Recipients of Medicaid who become suitable for discharge from ACT and intensive case management services may receive care coordination through a New York State Health Home, with some individuals eligible for more intensive care coordination services available with Health Home Plus. Because of waiting lists for ACT, OMH often refers individuals to a Health Home or Health Home Plus pending availability for ACT.

414.     An ACT team or Health Home care coordinator is responsible for directly assisting eligible recipients with securing behavioral health home and community-based services, available through a Health and Recovery Plan. The services are flexible, rooted in person-centered care planning, and aimed at supporting an individual's needs and unique goals in the community.

415.     While New York has an array of community-based mental health housing and supportive services, the capacity in these programs is outstripped by the need and programs are inadequately administered.

416.     Counties across the state are forced to maintain long waiting lists for community-based mental health housing.

417.     In 2019, for example, Westchester County reported a waitlist for mental health housing of 1,561 people, Monroe County reported their "shortest waitlist being about 3-6 months for a community residence and over 2 years now for supported housing," Nassau County reported a waitlist of over 500 people, Niagara reported a waitlist of between 50 and 100 people "at any given time" with "average wait times of 30 months or more" for supported housing, which "remains a critical unmet need," Ulster County reported a waitlist of 159 people, Rockland County reported that "the availability of both OMH licensed residences and OMH Supportive Housing does not match the scope or pace of the need," Schenectady County

summarized that "[t]he need for safe and affordable housing . . . is at a critical level," and in Orange County, where Plaintiffs' C.J., M.J., and D.H. require housing, average daily waitlists were over 158 people for apartment treatment beds and over 474 people for supported housing apartments—making the placement of people with disabilities in affordable housing, according to the county, "near impossible."

418.    Similarly, counties across the state report long waitlists for supportive services, such as ACT. One county, for example, wrote in 2019 that mental health clinics "continue to show signs of distress" in providing services, with one such clinic reporting "a waitlist in the hundreds of individuals requesting intake appointments for the initiation of supportive clinical services."

419.    Finally, despite New York State's promise to greatly expand access to behavioral health home and community-based services, poor implementation has resulted in people with serious mental illness not receiving needed services that support community living.

## II.    New York Has a Comprehensive Scheme for the Release of Individuals with Serious Mental Illness from Prison.

420.    Defendants are responsible for discharging Plaintiffs from state prison to community-based mental health housing and ensuring that they receive supportive services that meet their mental health needs in the most integrated setting.

A.  Categories of Release to Community Supervision

421.    People serving indeterminate sentences—sentences with minimum and maximum terms of imprisonment—may be released to parole after completing their minimum term of imprisonment.

422.    The New York State Board of Parole—an independent, quasi-judicial body within DOCCS—is authorized to grant or deny parole in its discretion, subject to certain criteria provided in state law and regulations.

423.    If parole is granted, the Parole Board sets an "open date for parole release."

424.    A person who receives an open date for parole release is known as a "parole grantee."

425.    If a person is not released on parole, they may next be released on their "conditional release" date if they have earned statutory "good time." Conditional release is not available to people sentenced to life.

426.    Each DOCCS prison's Time Allowance Committee meets approximately four months before an individual's presumptive conditional release date to approve the release date based on good behavior and program participation.

427.    DOCCS will not discharge from prison any person who had been granted parole or conditional release until DOCCS approves an anticipated community residence for that person.

428.    A person not released to parole or conditional release will remain in prison until their "maximum expiration date," the last day of their sentence.

429.    On the maximum expiration date, DOCCS loses legal authority to incarcerate the person pursuant to their sentence.

430.    DOCCS calculates and records each person's parole eligibility, conditional release, and maximum expiration dates upon admission to DOCCS custody.

431.    In 1998, the New York State Legislature passed "Jenna's Law," which required courts to impose a period of "post-release supervision" after a determinate sentence (a sentence with a single term of imprisonment).

432.    Like parole, post-release supervision is a form of "community supervision" that subjects the individual to DOCCS's oversight after release from prison.

433.    According to the legislative history for Jenna's Law, post-release supervision was intended to ensure that offenders will be successfully reintegrated into society.

434.    Post-release supervision terms "commence upon the person's release from imprisonment to supervision." N.Y. Penal Law § 70.45(5).

435.    DOCCS identifies individuals released from prison to community supervision—whether on parole, conditional release, or post-release supervision—as "releasees."

436.    The Parole Board is responsible for setting conditions of release for releasees.

437.    Certain general conditions apply to all releasees, such as prohibitions on the possession of drug paraphernalia and firearms.

438.    The Parole Board may also impose so-called "special conditions."  These conditions may include a requirement to cooperate with mental health evaluation referrals and treatment as directed by the parole officer, a prohibition on communication with certain individuals, a requirement to abide by curfews, and requirements to engage in substance abuse, alcohol abuse, and anti-aggression counseling.

B.    Preparing People with Serious Mental Illness for Release from Prison

439.    OMH and DOCCS share responsibility for discharging people with serious mental illness from prison, including by planning for, assessing, and approving housing and supportive

services and for providing for continuity of care in the community to which they may be released.

440. Annually, approximately 2,050 people with serious mental illness are discharged from New York State prisons to the community.

441. OMH identifies people with serious mental illness by assigning them an "S-designation" or an OMH "Level 1" or "Level 2" classification.

442. OMH is required to provide a comprehensive discharge plan to every person with serious mental illness who is preparing to return to the community from prison.

443. OMH is responsible for providing individuals returning to the community with an adequate supply of psychiatric medications and an appointment at a mental health clinic for ongoing treatment needs.

444. As part of the discharge planning process, OMH counselors are required to meet with people with serious mental illness at least three months prior to their scheduled release date to assess their needs upon release, including housing needs.

445. OMH must prepare and submit a Single Point of Access application to secure for the individual the community-based mental health housing and any other necessary services in the county to which they will return.

446. If a person with serious mental illness will be homeless upon release, is at risk of homelessness, or otherwise requires mental health housing, OMH staff must apply for housing using the Single Point of Access application.

447. OMH's preparation of a Single Point of Access application for housing reflects its assessment that the person is eligible and appropriate for community-based mental health housing.

448.    OMH is required to apply for and secure necessary care coordination services.

449.    DOCCS staff collaborate with OMH in planning for a person's housing needs and developing a release plan that includes suitable housing in the community.

450.    As part of that collaboration, DOCCS counselors ask each person with serious mental illness to propose a residence to which he or she can be released.

451.    DOCCS parole staff are responsible for investigating the proposed residence.

452.    DOCCS has the final authority to approve or reject the proposed residence.

453.    Pursuant to OMH policy, an individual is deemed homeless or at risk of homelessness if he or she has submitted a proposed address that DOCCS has rejected.

454.    As many incarcerated people lack housing and financial resources, many propose a local homeless shelter as their residence.

455.    Defendants have historically rejected shelters, however, as not suitable for people with serious mental illness.

456.     Because their proposed residence is often rejected, indigent people with serious mental illness are often left with only one suitable housing option upon release from prison—the community-based mental health housing OMH deemed them eligible and appropriate for.

457.    As long as individuals remain on community supervision, DOCCS has the authority to approve or reject where they reside.

458.    Plaintiffs are individuals forced by Defendants to remain incarcerated in prison beyond their open dates for parole release, approved conditional release dates, and maximum expiration dates, or face discharge without critical mental health care, when no community-based mental health housing or supportive services are available.

C.  The "Release" of People with Serious Mental Illness to State Prison on RTF Status

459.    New York law authorizes DOCCS to transfer individuals who are released to post-release supervision status, having reached their maximum expiration dates, to an RTF.

460.    New York law defines RTFs as community-based placements that promote a person's reintegration into society:

> "Residential treatment facility" [is a] correctional facility consisting of a community based residence in or near a community where employment, educational and training opportunities are readily available for persons who are on parole or conditional release and for persons who are or who will soon be eligible for release on parole who intend to reside in or near that community when released.

N.Y. Correct. Law § 2(6).

461.    The New York Correction Law further requires DOCCS to secure education, employment, rehabilitation, and reintegration services for individuals placed in RTFs.

462.    A releasee placed in an RTF "may be allowed to go outside the facility during reasonable and necessary hours to engage in any activity reasonably related to his or her rehabilitation and in accordance with the program established for him or her." N.Y. Correct. Law § 73.

463.    Two New York statutes authorize DOCCS to place an individual who is released to post-release supervision in an RTF.

464.    Penal Law § 70.45(3) provides that the Parole Board may require a time-limited RTF placement as a special condition of community supervision:

> [T]he board of parole may impose as a condition of post-release supervision that for a period not exceeding six months immediately following release from the underlying term of imprisonment the person be transferred to and participate in the programs of a residential treatment facility as that term is defined in subdivision six of section two of the correction law [as quoted in paragraph 460 above].

465.    If the Parole Board imposes RTF placement as a condition of post-release supervision, DOCCS, not the Board, is responsible for selecting the specific RTF to which the individual will be transferred and for supervising the individual while placed there.

466.    Correction Law § 73(10) separately provides that:

The commissioner [of DOCCS] is authorized to use any residential treatment facility as a residence for persons who are on community supervision. Persons who reside in such a facility shall be subject to conditions of community supervision imposed by the board.

467.    Therefore, even if the Parole Board does not impose RTF placement as a condition of release, the Correction Law authorizes DOCCS to transfer an individual on post-release supervision to an RTF placement.

468.    Pursuant to Correction Law § 70, DOCCS commissioners have designated 12 correctional facilities, spread across the state, to function as RTFs: Green Haven, Wende, Fishkill, Woodbourne, Orleans, Mohawk, Mid-State, Hudson, Albion, Rochester, and Queensboro, as well as Edgecombe Residential Treatment Facility. These 12 facilities also function as general correctional facilities for incarcerated individuals serving their sentences.

469.    The majority of facilities designated as RTFs are medium or maximum security level prisons.

470.    There are no separate "residential treatment facilities" in the prison compounds where Plaintiffs are incarcerated.

471.    Plaintiffs are subjected to the same conditions and restrictions of prison confinement as they have been since they began their sentences.  Even though Plaintiffs are labelled "releasees," in reality they remain prisoners in every respect.

III.    **Defendants Fail to Serve Plaintiffs in the Most Integrated Setting Appropriate to their Needs.**

472.    Defendants use segregation as a substitute for the community-based mental health housing and supportive services that people with serious mental illness need and are appropriate for when they reach their lawful release date from prison.

473.    Defendants segregate Plaintiffs in prison past their open dates for parole release, approved conditional release dates, and maximum expiration dates, or alternatively in a range of institutional and segregated settings or settings that are inappropriate and inadequate to meet their mental health needs, because there is inadequate capacity in the community-based mental health housing described in Section I(B) above.

A.    <u>Defendants Fail in their Mandate to Serve the Community-Based Mental Health Housing and Supportive Service Needs of People with Serious Mental Illness Released from State Prison.</u>

474.    Defendants Cuomo, Sullivan, and OMH are responsible for providing necessary community-based mental health housing and supportive services for Plaintiffs and putative class members, as Plaintiffs and putative class members are people with serious mental illness.

475.    The stated goal of OMH's housing programs is to provide integrated housing, enabling residents to live independently, to succeed in the community, and to interact with non-disabled persons to the fullest extent possible.

476.    OMH has repeatedly recognized the importance of providing community-based mental health housing to members of this population who would otherwise be homeless upon their release.

477.    OMH has systematically failed to address the foreseeable need for adequate capacity in community-based mental health housing programs to meet the demands of this population.

57

478.    OMH knows of and has failed to respond to counties' local needs for an adequate number of community-based mental health housing beds generally and specifically for people with serious mental illness released from prison.

479.    OMH knows that large numbers of people with serious mental illness are discharged from prison to the shelter system despite their need for intensive mental health services and housing.

480.    County personnel who process Single Point of Access applications for incarcerated people report back to OMH staff about the availability of community-based mental health housing beds.

481.    Recognizing the importance of collaboration among state and local agencies, Defendant Cuomo established the Council on Community Re-Entry and Reintegration (the "Re-Entry Council") in 2014 to provide recommendations regarding the reentry of people into the community from prison. Members of the Governor's Office sit on this council.

482.    Defendant Cuomo has adopted recommendations by the Re-Entry Council regarding the need to create additional community-based mental health housing for people released from prison.

483.    Defendant Cuomo's adoption of these recommendations led to the development of some community-based mental health housing for people released from prison.

484.    The number of beds created for people released from prison has been inadequate to meet discharge planning needs.

485.    Across the state, counties have continued to describe their lack of capacity to meet the need for mental health housing in reports to OMH.

486.    OMH recognizes the need for supportive services for people with serious mental illness, in particular the "priority" populations OMH has identified, which includes people with recent criminal justice history or risk of criminal justice involvement, and people at risk of homelessness.

487.    Defendants Cuomo and OMH, however, have failed to develop adequate capacity in supportive services proportionate to this recognized need.

488.    For example, there is limited capacity for ACT, resulting in waiting lists even for people in identified priority categories. Due to this limited capacity, OMH has implemented a triage approach, rationing ACT services based on *ad hoc* determinations of how someone's need compares to other applicants.

489.    Many individuals with serious mental illness, despite being eligible for ACT, do not receive such support at the critical juncture of release from prison.

490.    The lack of adequate supportive services harms people's health and ability to remain in the community.

491.    Defendant Cuomo has directed funding to local agencies to coordinate services for people with serious mental illness who are released from prison, but he has done so for approximately only one-third of New York's counties.

492.    As a result, there are inadequate services for people with serious mental illness re-entering the community from prison.

493.    Although Defendant Cuomo and OMH have announced initiatives to develop housing for vulnerable populations, including scattered-site supported housing specifically for people released from prison, these initiatives are insufficient in light of the annual number of people being released from prison who need community-based housing.

494.    Plaintiffs routinely remain on waiting lists for community-based mental health housing, and they remain institutionalized in prison, for months and sometimes years.

495.    If released from prison, Plaintiffs routinely remain on waiting lists for community-based mental health housing for months or in many cases over a year.

B.    Defendants Institutionalize Members of the General Class and RTF Subclass in Segregated and Punitive Prison Conditions Inappropriate for Individuals with Serious Mental Illness Approved for Release to the Community.

496.    Prison is a segregated setting.

497.    In prison, Plaintiffs have no meaningful ability to engage in mainstream society.

498.    Plaintiffs are held in rural, geographically isolated regions, often without nearby public transportation and far from the communities to which they will return.

499.    Defendants do not allow Plaintiffs to leave the prison at any time, even when they demonstrate good behavior and there has been no finding that they pose a threat to the safety or welfare of the community.

500.    Plaintiffs are unable to attend job interviews, visit their home towns or cities, or pursue education in the community.

501.    While in prison, Plaintiffs are often housed in separate specialized units for people with serious mental illness and other disabilities.

502.    While these units provide services to help incarcerated people with disabilities manage a secure environment, Plaintiffs have few opportunities to interact with non-disabled people.

503.    Even when not housed in specialized units in prison, Plaintiffs have fewer opportunities to interact with non-disabled people than they would in the community due to the high prevalence of disabilities in state prison.

504.    Plaintiffs are housed in cells or dorms.

505.    Cells are locked with a metal-barred door and may not have a window to the out-of-doors.

506.    In dorms, people are assigned to a "cube" consisting of their bed and a small area for their possessions.

507.    Prison rules restrict the quantity and type of personal property Plaintiffs may possess.

508.    Plaintiffs are afforded no autonomy or choice in their daily life activities.

509.    Plaintiffs are required to wear prison uniforms.

510.    Plaintiffs are not permitted to pursue hobbies, programs, or activities according to their interests and personal goals.

511.    If they need to purchase anything, Plaintiffs may do so only from the prison commissary or private vendors, or rely on family or friends to send a care package that complies with prison rules.

512.    Plaintiffs' day and night are determined by Defendants according to the prison schedule. They eat, sleep, shower, and exercise only as dictated by DOCCS's schedule and rules.

513.    Plaintiffs have no freedom of movement in the facility.

514.    Plaintiffs must abide by rigid rules on escort and movement procedures, such as standing at painted markings on the floors of the prison that direct prisoners where to pause or walk.

515.    Plaintiffs are subject to prison rules and procedures related to shackles and restraints.

516.    In fact, Plaintiffs who have experienced mental health crises have been required to wear shackles when escorted outside their observation cells.

517.    Security considerations, prison protocol and rules, and the availability of prison resources restrict Plaintiffs' mental health treatment.

518.    Plaintiffs who exhibit suicidal or self-injurious behavior, for example, may be placed in stark observation cells, tantamount to solitary confinement, where they are stripped naked, required to wear tear-proof smocks, and held for prolonged periods of time.

519.    Plaintiffs are subject to prison discipline for as long as they remain in prison.

520.    Despite the well-known risk of serious harm to their psychiatric condition, prison staff frequently subject Plaintiffs to disciplinary segregated confinement, including for minor infractions.

521.    In addition, Plaintiffs may receive disciplinary sanctions depriving them of telephone calls, visits, and packages from friends and family.

522.    DOCCS may even rely on rule violations to revoke Plaintiffs' open dates for parole release, parole status, conditional release, or post-release supervision, all without the individual having ever left prison.

523.    Some Plaintiffs are so fearful of receiving disciplinary "tickets" from prison staff that they refuse to leave their cell or avoid interactions with other individuals.

524.    Plaintiffs are subject to the prisons' rigid rules on visits from family and loved ones.

525.    Family members must plan visits only on certain days, travel to the prison (for some, many hours away from their home), go through invasive security checks, and have time-limited visits in crowded and noisy visiting areas while being monitored by corrections officers.

526.    Family connections become strained, and even lost, as Plaintiffs remain in prison past their release dates.

527.     Plaintiffs are also subject to the stigma of continued incarceration. An individual's support network may not understand why their loved one remains in prison and assume it is because of some wrongdoing or unknown infraction.

528.     Plaintiffs are subject to prison rules limiting confidential communications with their attorneys.

529.     Prisons provide no meaningful opportunity for people with mental illness to learn to enter the community after incarceration.

530.     In this segregated security environment, Plaintiffs have no opportunities to obtain basic life skills—such as how to use a cell phone, how to add money to a public transportation fare card, how to manage a limited budget to care for personal needs, or how to use the internet to find doctors, housing, and services.

531.     Plaintiffs could develop skills integral to functioning independently and integrating into modern society in community-based mental health housing and with mental health supportive services.

C.    Members of the Discharge Class Are Unnecessarily Segregated or Placed at a Serious Risk of Institutionalization Upon Their Release from Prison.

532.     Defendants subject Plaintiffs who are released from prison to a vicious cycle of segregation from the community, psychiatric decompensation, and reincarceration because of Defendants' failure to develop adequate community-based mental health housing and supportive services.

i. Discharges to the Homeless Shelter System

533.     Plaintiffs in the Discharge Class are routinely released from prisons to the homeless shelter system—including homeless shelters, hotels and motels that house people experiencing homelessness, and shelter-like "DOCCS parole housing" facilities—due to

inadequate capacity in the integrated, community-based mental health housing and supportive service programs for which they are eligible.

534.    New York State has long had a homelessness crisis.

535.    New York State has the highest rate of homelessness in the United States, experienced the largest rise in the homeless population over the past decade, and has the second largest population of people experiencing homelessness.

536.    Homeless shelters and DOCCS parole housing facilities are frequently located in majority Black and Latinx neighborhoods and neighborhoods that face the highest rates of poverty due to generations of governmental disinvestment and neglect.

537.    Though constituting only approximately 17% of the state's population, Black people constitute the overwhelming majority (nearly 70% or approximately 65,000 people) of unhoused people in the state, meaning that Black people disproportionately experience the harmful effects of deficient and discriminatory policies related to homelessness.

538.    Defendants contribute to the rising homeless population by releasing individuals from state prisons directly to the homeless shelter system.

539.    In a January 2020 report, the New York City Council reported that the majority of people returning to the City from state prisons were discharged to homeless shelters.

540.    The New York City Council concluded in its report that "State prisons too often release parolees directly to City shelters instead of assisting them with adequate reentry planning and housing placements" and that as a result of this "pipeline into City homelessness . . . formerly incarcerated individuals often do not have a place to call home, despite the State's legal responsibility to conduct discharge planning." The report urged corrective action by the State and the creation of additional housing and supportive services for those leaving prison.

541.     The advocacy group Coalition for the Homeless similarly reported in March 2020 that the majority of single adults entering the homeless shelter system in New York City from institutional settings (approximately 57% or 3,466 people) had been released from state prison. The group described "[t]he lack of housing for individuals released from State prison [as] the largest contributor to homelessness among formerly institutionalized populations."

542.     Defendants routinely release individuals with serious mental illness from state prisons to homeless shelters, hotels, motels, and DOCCS parole housing.

543.     Further, Defendants establish gatekeeping criteria for programs that contribute to the homelessness of individuals with serious mental illness, such as allowing entry to some community-based mental health housing only after a year-long stay in a homeless shelter (or on the streets), even while community-based mental health housing for people just released from DOCCS is regularly over capacity.

544.     Through such gatekeeping criteria, Defendants further marginalize people discharged from prison—the majority of whom are Black or Latinx and poor—by confining them to the neighborhoods in which homeless shelters are generally sited, and that experience high rates of poverty, policing, and other methods of state surveillance.

545.     Between January 23, 2019 and January 31, 2020, Defendants released over 300 individuals with serious mental illness from state prisons to homeless shelters across the state.

546.     During this timeframe, Defendants released dozens of individuals with serious mental illness to hotels and motels used to house people experiencing homelessness.

547.     By comparison, over this same period, only about 150 people leaving state prison entered supported housing programs and roughly 8 went to apartment treatment programs, the two most integrated models of community-based mental health housing.

548.    In the vast majority of cases in which individuals with serious mental illness were released from state prisons to homeless shelters, motels, or hotels (335 of 364 releases between January 23, 2019 and January 31, 2020), Single Point of Access applications had been submitted on their behalf. Most often, these applications for community-based mental health housing and supportive services were pending for at least a month, if not months, before the individuals' release.

549.    Defendants also release individuals with serious mental illness to shelter-like facilities across the state that are operated by private providers and that contract with DOCCS to house individuals on community supervision. These facilities include halfway houses and so-called "Community Based Residential Programs," sometimes referred to as DOCCS housing or "parole housing."

550.    Between April and August 2019, Defendants referred over 50 people with serious mental illness, who were approaching release, to DOCCS parole housing across the state.

551.    Some Plaintiffs remain in homeless shelters and DOCCS parole housing for months while waiting for permanent housing.

552.    Homeless shelters and DOCCS parole housing are segregated settings.

553.    Plaintiffs in homeless shelters and DOCCS parole housing have fewer opportunities to interact with non-disabled persons than they would in integrated, community-based settings.

554.    As of January 28, 2019, 15,400 people experiencing homelessness in New York State had serious mental illness.

555.    People with disabilities represent a disproportionate percentage of the population of people experiencing homelessness.

556.    In January 2019, for example, the non-profit CARES of NY, Inc. reported that, over the previous federal fiscal year, nearly three-fourths of the people accessing emergency shelters in Albany County had a disability.

557.    In March 2020, Coalition for the Homeless similarly reported that approximately 67% of single adults in the New York City shelter system have a disabling condition impacting capacity, while 52% have a mental health condition.

558.    Opportunities to interact with non-disabled people are especially limited in mental health shelters, which house a significant number of people with serious and chronic mental illness.

559.    Homeless shelters, including mental health shelters, may house up to hundreds of residents in a single facility.

560.    DOCCS parole housing too may house dozens of residents and some DOCCS parole housing units share buildings with homeless shelters.

561.    Homeless shelters and DOCCS parole housing restrict Plaintiffs' autonomy and choices that govern their daily life activities.

562.    Plaintiffs in homeless shelters and DOCCS parole housing often share rooms or live in dormitory settings.

563.    Plaintiffs in these settings also share with other residents their living spaces, including bathrooms, common areas, kitchens, and dining areas.

564.    Plaintiffs released to homeless shelters or DOCCS parole housing must abide by rules beyond the conditions of their community supervision, including curfews, limits on personal property, and restrictions on visitors.

565.    Homeless shelters and DOCCS parole housing place security restrictions on entering and exiting the facilities and residents may be subject to strict monitoring, including through security cameras and on-site inspections by DOCCS' staff.

566.    Plaintiffs discharged to homeless shelters, DOCCS parole housing, and hotels or motels are deprived of stable living arrangements necessary to ensure successful reintegration into the community.

567.    Many homeless shelters, for example, may require residents to move to a different shelter with little notice.

568.    Homeless shelters, DOCCS parole housing, and hotels and motels do not provide the mental health services that Plaintiffs require to transition successfully to the community and maintain psychiatric stability. Instead, Plaintiffs are often left to fend for themselves.

569.    Plaintiffs often have no one to contact if they experience a mental health crisis, are unable to secure public benefits, require assistance with psychiatric medications, or need counseling.

570.    M.G., for example, was initially released from a prison mental health program to Hillcrest House, a DOCCS parole housing facility. Hillcrest House does not provide the individualized mental health supportive services available in programs such as community-based mental health housing, nor did M.G. receive ACT services, leaving him to struggle to manage a difficult transition, after decades of incarceration, on his own.

571.    Mental health shelters are not intended to provide long-term care and do not provide the integrated mental health care for which Plaintiffs are eligible.

572.    Defendants' reliance on the homeless shelter and DOCCS parole housing system also exposes Plaintiffs to risks of physical harms, including dangerous housing conditions and physical abuse and assault.

573.    In March 2020, for example, the Office of the New York State Comptroller ("OSC") reported that conditions at 60% of the shelters it inspected "posed significant health and safety risks to the State's homeless population," including by exposing residents at some shelters to "squalid living conditions." Of the 40% that did not pose health and safety risks, OSC clarified that the conditions, "while substandard by other measures," were merely "reasonably acceptable in the short term as an alternative to homelessness."

574.    Defendant DOCCS recognizes the risks of releasing individuals with serious mental illness to the shelter system.

575.    In 2014, DOCCS issued guidance to its parole staff stating that no individuals with serious mental illness would be "approved for placement in a [Department of Homeless Services] (NY City) or [Department of Social Services] (Upstate) shelter, until further notice."

576.    According to a sworn declaration provided in this litigation in December 2019, the DOCCS Deputy Commissioner for Parole Operations and Reentry Services stated that, before DOCCS changed its practices in late 2019, DOCCS would not approve shelter releases for individuals with serious mental illness determined (by DOCCS) to require mental health housing. The Deputy Commissioner explained that DOCCS would not approve such releases, in part, "because of the safety risks to the inmate." (ECF 92 at ¶ 9.)

577.    For example, prior to the filing of this lawsuit, DOCCS rejected shelter releases for Named Plaintiffs M.G., P.C., C.J., M.J., J.R., and D.R.

578.    On December 16, 2019, Defendant DOCCS issued a memorandum stating that, if OMH determines that an individual with serious mental illness "may be released from DOCCS custody to a shelter setting, DOCCS will allow such release on their scheduled release date."

579.    DOCCS has not recanted its rationale that release to a shelter poses safety risks to at least some individuals with serious mental illness, but rather, according to Defendant Annucci, DOCCS reversed its position merely "to address concerns raised by the Court in this action and Plaintiffs' counsel" despite its "safety concerns."

580.    The 2019 DOCCS memorandum does not have the force of law, policy, or a DOCCS directive.

581.    The memorandum does not cover individuals with serious mental illness who are dually diagnosed with other disabilities as well; it has not resulted in any changes at OMH; DOCCS has not provided any training to staff to implement the memorandum; Defendants have not coordinated with counties, municipalities, or housing providers regarding the memorandum; and the memorandum can be reversed or changed at any time.

582.    Notwithstanding the 2019 DOCCS memorandum, Defendants continue to claim the authority to place and hold Plaintiffs in state prisons on RTF status pursuant to the N.Y. Correction Law and N.Y. Penal Law.

583.    Without the creation of additional community-based mental health housing, the December 2019 memorandum has resulted, and will continue to result, in a greater number of individuals with serious mental illness exiting prison to the homeless shelter system.

*ii. Risks of Decompensation and Institutionalization*

584.    When Defendants release Plaintiffs in the Discharge Class to the homeless shelter system, DOCCS parole housing, or even the community without community-based mental health

housing and supportive services, Defendants expose them to serious risks of psychiatric harms and decompensation.

585.    In effect, by releasing these Plaintiffs to the homeless shelter system, Defendants suddenly cut off the bulk of mental health services that Plaintiffs had been receiving while incarcerated.

586.    OMH is responsible for all mental health services that Plaintiffs receive in state prison.

587.    Mental health services within the prison include screening, assessment, treatment, nursing, treatment plan review, medication monitoring, crisis treatment, rehabilitative programs, and discharge planning.

588.    During the admissions process into DOCCS, OMH assesses the nature of each individual's treatment needs, determines the mental health service level appropriate to those needs, and decides what program and housing is needed to support the individual's psychiatric stability and safety. These determinations may change as individuals' needs change or when the individual returns from inpatient hospitalization.

589.    Defendants also account for the severity of people's mental health needs by placing people with serious mental illness at select DOCCS prisons that have a greater capacity to provide mental health services.

590.    OMH operates several residential programs, including the ICP and TrICP programs, for people with serious mental illness incarcerated in state prisons that provide structured, daytime programming, as well as clinic services.

591.    Prison-based residential programs are for people with serious mental illness who experience, or may experience, difficulty coping in the general prison population due to the severity of their illness.

592.    Individuals in these programs, including the ICP and TrICP, require heightened mental health services and multi-disciplinary treatment beyond that available in a general population environment. These services include clinic services, case management, crisis intervention, adaptive skills training, and peer support, as well as structured programming related to self-advocacy, socialization, habilitation, symptom management, and self-regulation.

593.    OMH also operates re-entry programs for people with serious mental illness designed to establish connections to community providers and ease transition to the community.

594.    The CORP at Sing Sing Correctional Facility is one such program for people who are approaching release to the five boroughs of New York City, Nassau, Suffolk, Westchester, Rockland, Putnam, Dutchess, and Orange Counties.

595.    The successful reintegration of people with serious mental illness, many of whom have required these heightened mental health services while incarcerated, depends on adequate planning for and delivery of necessary services in the community.

596.    Release without community-based mental health housing and supportive services needlessly exposes individuals with serious mental illness to heightened risks of reincarceration in jails and prisons.

597.    The Center on Budget and Policy Priorities, for example, has summarized the numerous studies that show that lacking stable housing can exacerbate mental illness and, conversely, that community-based mental health housing allows people with disabilities to

maintain stability in the community, ensures that people with disabilities receive appropriate services, and reduces reliance on costly hospitalization and incarceration systems.

598.    A study authored by OMH officials (including the current and former associate commissioners for the OMH Division of Forensic Services and then-Executive Director of the Central New York Psychiatric Center) similarly found that the provision of community-based mental health housing and services reduces negative outcomes, such as re-arrest, and that "psychiatric stability subsequent to release may well influence the success in the community of this population."[1]

599.    Yet Plaintiffs in the Discharge Class are routinely released from prison-based mental health residential programs or re-entry programs without the continuity of mental health care that they require to maintain psychiatric health.

600.    Of the 364 releases of people with serious mental illness from state prisons to homeless shelters, hotels, or motels between January 23, 2019 and January 31, 2020, at least 342 involved individuals who had been receiving mental health services in a state prison designated to incarcerate individuals with the highest designated mental health service needs. Further, there were 67 releases of people from prison-based mental health treatment programs, such as the ICP, and 27 releases from the Sing Sing CORP mental health re-entry program directly to the homeless shelter system.

601.    By releasing Plaintiffs in the Discharge Class without community-based mental health housing and supportive services, Defendants create serious risks that these individuals will

---

[1] Donna L. Hall, Richard P. Miraglia, Li-Wen G. Lee, Deborah Chard-Wierschem and Donald Sawyer, *Predictors of General and Violent Recidivism Among SMI Prisoners Returning to Communities in New York State*, 40 Journal of the American Academy of Psychiatry & the Law 221 (2012), http://jaapl.org/content/40/2/221 (last accessed August 8, 2020).

suffer psychiatric harms and, as a result, face unnecessary segregation in psychiatric hospitals or units, Transitional Living Residences, or other institutional settings.

*iii. Release to Segregated Settings*

602.    Defendants also release some members of the Discharge Class from prison directly to segregated and institutional placements affiliated with OMH psychiatric hospitals, despite these Plaintiffs' eligibility to be served in more integrated settings.

603.    For example, Defendants release Plaintiffs to Transitional Living Residences, Transitional Placement Programs, Crisis Residences, and State-Operated Community Residences.

604.    At times, OMH uses the term Transitional Living Residences as an umbrella term to refer to "all state operated residences," including Transitional Placement Programs, Crisis Residences, and State-Operated Community Residences.

605.    Defendant Sullivan explained in March 2020 that "when OMH is notified by DOCCS that [an] inmate patient is releasing, and OMH has made a clinical determination that the inmate patient requires mental health housing upon release from DOCCS custody, OMH will recommend placing the inmate in a Transitional Living Residence in the event that no other appropriate community-based mental health housing is available as of the time of the inmate's release date . . . ."

606.    Transitional Living Residences are not integrated community-based mental health housing.

607.    These releases to Transitional Living Residences include Plaintiffs who were or would have been held past their lawful release dates.

608.     Referrals to Transitional Living Residences are handled by OMH officials in the agency's central office.

609.     OMH pre-release coordinators at state prisons are instructed to continue to seek more integrated mental health housing, even if an individual with serious mental illness approaching release has been approved for placement in a Transitional Living Residence.

610.     Defendants routinely refer individuals with serious mental illness leaving state prison to Transitional Living Residences, while most often concurrently submitting applications for community-based mental health housing.

611.     Between January and July 2019, for example, Defendants referred 164 individuals with serious mental illness to Transitional Living Residences, including Transitional Placement Programs, or assisted living residences, despite the fact that OMH determined the vast majority of these individuals to be eligible for, and referred them to, community-based mental health housing.

612.     Between August 1, 2019 and January 29, 2020, at least 20 individuals with serious mental illness were released from prison to Transitional Living Residences, the majority of which were on the campus of OMH psychiatric hospitals.

613.     Some Plaintiffs have remained at Transitional Living Residences for months while waiting for placements in community-based mental health housing.

614.     Between January and July 2020, the median length of stay for individuals in Transitional Living Residences ranged from over three months to many years, depending on the facility.

615.    Of the 20 individuals with serious mental illness released from prisons to Transitional Living Residences between August 1, 2019 and January 29, 2020, the length of stay varied and included a stay of "216 days and continuing."

616.    Transitional Living Residences, including Transitional Placement Programs, Crisis Residences, and State-Operated Community Residences are segregated settings.

617.    These settings provide limited opportunities for Plaintiffs to interact with non-disabled individuals as they exclusively serve individuals with serious mental illness.

618.    Each Transitional Living Residence typically houses dozens of individuals.

619.    Individuals in Transitional Living Residences are subject to house rules, including curfews, for both residents and visitors, and room checks by staff.

620.    There is limited privacy in Transitional Living Residences. For example, staff maintain keys to individuals' bedrooms and lockboxes.

621.    Individuals often share a bedroom with at least one other resident.

622.    Individuals share a common dining area for meals, and are prohibited from eating outside of designated areas.

623.    Individuals share toilets and showers with multiple residents.

624.    Defendants released both C.J. and M.J. to the Middletown Transitional Living Residence, for example, because the community-based mental health housing for which they were eligible was not available. While at Middletown, C.J. and M.J. were supervised at all times; were allowed to have meals only in the common dining room; and were housed among patients who were low functioning, or had higher service needs, and who had been discharged primarily from OMH psychiatric centers. Both C.J. and M.J. suffered psychiatric harms from being placed in such a restrictive environment.

625.    One resident of a Transitional Living Residence described the conditions there as closely resembling an inpatient psychiatric hospital unit—noting that "only the furniture is different."

626.    Discharging individuals with serious mental illness to shelters, DOCCS parole housing, Transitional Living Residences, and other group living now poses the added risk of infection with COVID-19, as these settings have been particularly hard hit by this deadly virus. In June 2020, for example, Coalition for the Homeless issued a report that found that people in New York City homeless shelters were dying from COVID-19 at a rate 61% higher than that of the general population.

627.    Defendants have discharged people with serious mental illness to shelters despite the risk of COVID-19 infection. For example, in March 2020, following a period of incarceration for a parole violation, C.J. met with an OMH discharge planner and DOCCS staff in preparation for his discharge from state prison. Defendants rejected C.J.'s proposal to reside with an aunt who he identified as a support system. Defendants, instead, decided to release C.J. to the homeless shelter system despite C.J.'s proposal to be with supportive family and his expressed fear about his well-being in the shelter. Defendants also informed C.J. that due to the COVID-19 pandemic he would not receive in-person supportive services from a care manager. Defendants then released CJ without addressing the obstacles the pandemic posed to immediate care needs, including obtaining clothing, food, or transportation to mental health clinic appointments.

628.    Because Defendants fail to administer mental health services in integrated settings, Plaintiffs in the Discharge Class face two unwinnable scenarios: (1) release without adequate mental health care and face serious risks of psychiatric decompensation and

77

segregation, or (2) release to a facility that provides mental health treatment in a segregated setting, despite their eligibility to be served in a community-based housing.

D.  Plaintiffs Are People with Disabilities Who Are Qualified to Receive Services in a More Integrated Setting.

629.    Plaintiffs and class members are people with mental illnesses, such as bipolar disorder, schizophrenia, depressive disorder, post-traumatic stress disorder, and others, which substantially limit one or more major life activities, including but not limited to caring for oneself, speaking, learning, concentrating, thinking, communicating, and sleeping.

630.    Plaintiffs are qualified for community-based mental health housing and supportive services upon their release from prison based on their current mental illness diagnosis and substantial limitations.

631.    Plaintiffs belong to the target population for community-based mental health housing developed through housing initiatives supported by Defendant Cuomo.

632.    Additionally, Plaintiffs belong to at least two priority populations identified by OMH for community-based mental health housing: the forensic population (namely individuals released from jails and prisons) and individuals who are homeless.

633.    In accordance with OMH policy, Defendants identified Plaintiffs' need for community-based mental health housing through discharge planning, periodic meetings, and assessments, and then prepared referrals to community-based services, including housing, case managers, and mental health treatment providers.

634.    OMH submitted Single Point of Access applications to the counties to which Plaintiffs will be released.

635.    OMH also identifies Plaintiffs' mental health service needs through their assessments and treatment of Plaintiffs while they are incarcerated and through the discharge planning process.

636.    Nonetheless, Plaintiffs did not receive the community-based services for which they are qualified because they were instead kept in prison or released without the community-based mental health housing and supportive services necessary for them to reside and remain in the community.

637.    Plaintiffs' confinement in prison, or release to homeless shelters, DOCCS parole housing, hotels or motels, or state-run institutional placements, such as Transitional Living Residences, is not based on Defendants' determination that such placements are clinically necessary.

638.    Plaintiffs are confined in or released to these inappropriate placements solely because Defendants have failed to provide sufficient housing and supportive services in more integrated settings.

639.    After the initial Complaint in this action was filed on January 23, 2019, Defendants released some Plaintiffs to temporary settings, contrary to Defendants' prior decision to hold Plaintiffs in prison until there was a bed available in community-based mental health housing determined appropriate for their needs.

640.    On information and belief, Defendants completed a revised discharge plan for C.J. on January 30, 2019, completed a revised application for mental health housing and services for C.J. on February 7, 2019, and released C.J. to Middletown Transitional Residence on February 12, 2019 in part in response to this litigation.

641.    On information and belief, Defendants completed a revised discharge plan for M.J. on January 30, 2019, completed a revised application for mental health housing and services for M.J. on February 13, 2019, and released M.J. to Middletown Transitional Residence on February 19, 2019 in part in response to this litigation.

642.    On information and belief, Defendants released J.R. to the Rockland Psychiatric Center's Alliance House on March 18, 2019 in part in response to this litigation.

643.    On information and belief, Defendants released D.R. to the Pilgrim Crisis Residence on February 13, 2019 in part in response to this litigation.

644.    On information and belief, Defendants released M.G. to Hillcrest House on June 18, 2019 in part in response to this litigation.

645.    Defendants discharged these Plaintiffs to settings that are located on the grounds of a psychiatric institution, are short-term, and/or are intended for a different patient population until more integrated housing became available.

E.    Plaintiffs Want to Receive Services in a More Integrated Setting.

646.    Plaintiffs want to live in a more integrated setting, such as community-based mental health housing. For Plaintiffs who remain incarcerated, they want to be free from punitive conditions.

647.    Plaintiffs demonstrated this desire by engaging in the housing application process, by participating in video-teleconference interviews with local housing providers, and by repeatedly expressing to DOCCS staff, including parole officers, OMH staff, and staff at the segregated settings to which they were discharged their wishes to reside in community housing.

648.    For Plaintiffs in the General Class and RTF Subclass, the desire for integrated housing has also led Plaintiffs to request other alternatives to institutionalization in prison.

649.    Some Plaintiffs have proposed that they be released to family members.

650.    Defendants did not release these Plaintiffs to these environments.

651.    With proper supportive services in these environments, people with incarceration histories can be successful in the community. Supportive services include Forensic ACT and ACT and behavioral health home and community-based services.

652.    Defendants have not, however, developed supportive services adequately to meet the needs of the mental health population. Only approximately 12 Forensic ACT teams exist in the state. ACT teams exist in only 29 counties and operate at high capacity. As a result, people referred to Forensic ACT and ACT teams are placed on waiting lists for services.

F.    Plaintiffs Can Be Reasonably Accommodated in Integrated Settings.

653.    Defendants can reasonably accommodate Plaintiffs' need to receive services in an integrated community setting.

654.    New York already has a continuum of residential services to integrate people with serious mental illness who are being released from prison into the mainstream community.

655.    Defendants have recognized the value of community-based mental health housing and supportive services as critical initiatives for this population.

656.    However, existing programs and services have been developed and administered in a manner and on a scale that are inadequate for Plaintiffs' needs, resulting in unlawful, unconstitutional, and unnecessary institutionalization and risk of institutionalization—in state prisons, segregated placements such as Transitional Living Residences and homeless shelters, and otherwise in settings where the lack of mental health services places them at a serious risk of segregation.

657.    Defendants could develop capacity in existing community-based mental health housing programs and supportive services without unreasonable costs.

658.    Defendants could redirect available funds to provide services to people in integrated community settings and/or expand capacity in existing community-based mental health housing programs and supportive services.

659.    For example, rather than expend significant funds to empower the corrections system to be a provider of housing (including over $12 million on DOCCS parole housing), Defendants could expand capacity in the OMH-funded housing that Plaintiffs require.

660.    Redirection of funds used to incarcerate people to provide services in integrated community settings, and to prevent risks of institutionalization and reincarceration, would achieve cost savings for the state.

## IV.    Defendants Hold Members of the RTF Subclass in Punitive Prison Conditions Past Their Maximum Expiration Dates.

661.    Defendants have a policy and practice of placing individuals with serious mental illness in state prisons, and subjecting them to conditions that amount to punishment, after they have reached their maximum expiration dates.

662.    Each member of the RTF Subclass is being held in state prison.

663.    These RTF Subclass members are not held in pretrial detention, are not subject to post-release supervision revocation proceedings, and are not being held pursuant to applicable civil commitment laws.

664.    Instead, Defendants use state prisons to house RTF Subclass members who have nominally been "released" to community supervision because there is inadequate housing that can meet their mental health needs in the community.

665.     Defendants know that Plaintiffs' sentences of imprisonment end on their maximum expiration dates, that those dates have passed, that Plaintiffs are homeless or at risk of homelessness, and that Plaintiffs require community-based mental health housing.

666.     Further, Defendants know that Plaintiffs will remain in prison barring actions by Defendants.

667.     When DOCCS determines that there are no appropriate mental health housing beds available at the expiration of RTF Subclass members' sentences, DOCCS begins the administrative process of transferring these individuals to RTFs based in state prisons.

668.     DOCCS staff have petitioned the Parole Board to impose RTF placement as a condition of their post-release supervision.

669.     Defendants Annucci or McGrath approve all transfers of individuals on RTF status to state prison.

670.     On their maximum expiration dates, Defendants claim to discharge members of the RTF Subclass to community supervision but in fact continue to incarcerate them in a state prison.

671.     In some cases, members of the RTF Subclass are "released" to the very same prison they lived in while serving their prison sentence to live under the same conditions and restrictions.

672.     Members of the RTF Subclass are not, however, serving a sentence of imprisonment.

673.     DOCCS policies classify RTF Subclass members as "releasees" on community supervision, notwithstanding their incarceration in state prison.

674.     Some DOCCS records and staff also refer to RTF Subclass members as "parolees."

675.     Plaintiffs subject to a Parole Board-imposed condition of RTF placement (under Penal Law § 70.45) receive a memorandum known as Special Condition 37, which states that:

> Pursuant to the authority conferred upon the New York State Board of Parole under Section 70.45(3) of the New York Penal Law to impose conditions of release upon an individual serving a determinate sentence who is to be released to serve a period of post-release supervision, as a condition of your post-release supervision, you shall be transferred to, and participate in, the programs of a residential treatment facility, as that term is defined by Correction Law Section 2(6) for a period not exceeding six (6) months from the date of your release to post-release supervision.

676.     While the Parole Board may impose RTF placement as a condition of release, the Board is not responsible for selecting the specific RTF—namely, a state prison—in which the releasee will be placed.

677.     Instead, Defendants Annucci and McGrath and DOCCS staff are wholly responsible for designating facilities to serve as RTFs, keeping these individuals in state prison while on RTF status, and subjecting them to punitive conditions.

678.     Plaintiffs whose RTF confinement is not authorized under Penal Law § 70.45 and who are not subject to Special Condition 37 are placed on RTF status on the DOCCS Commissioner's purported authority under Correction Law § 73.

679.     Defendant Annucci has designated Defendant McGrath as the official responsible for placing individuals on post-release supervision in an RTF pursuant to Correction Law § 73.

680.     DOCCS has claimed the authority to place people on RTF status in state prisons indefinitely.

681.     Named Plaintiff D.R., who was assigned to RTF status under the Correction Law, for example, received a memorandum from Defendant McGrath explaining the indefinite nature of this placement:

Since an approved residence has not yet been identified, I am invoking my authority as Associate Commissioner of the New York State Department of Corrections & Community Supervision (DOCCS) under section 73(10) of the Correction Law. Pursuant to such authority, you will remain in a Residential Treatment Facility until such time as you have proposed and DOCCS has approved a suitable residence.

682.    While Defendants employ euphemistic terms to describe RTF placements, the reality for RTF Subclass members is that they never left prison.

683.    Defendants treat members of the RTF Subclass as inmates and subject them to punitive conditions just as if they were serving a prison sentence.

684.    DOCCS does not use community-based "residential treatment facilities" to house Plaintiffs.

685.    Further, there are no separate "RTF" units within state prisons that are used to house Plaintiffs and that meet the state law definition in Correction Law § 2.

686.    Since 2016, all RTF Subclass members assigned to an RTF were held in either medium or maximum security facilities.

687.    The majority of the RTF Subclass are incarcerated at Green Haven Correctional Facility (a maximum-security prison) and Fishkill Correctional Facility (a medium-security prison) because these facilities are used to incarcerate individuals with serious mental illness.

688.    Plaintiffs suffer severe psychological and emotional harms as a result of their *de facto* incarceration while on RTF status in state prison.

689.    After learning they will be held past their maximum expiration date for an indefinite period, members of the RTF Subclass have attempted suicide and expressed suicidal intentions, engaged in self-harm, experienced depression and hopelessness, and have suffered exacerbated symptoms of their mental illnesses.

690.    RTF Subclass members have spent months or even more than one year in state prisons before being released to the community.

691.    For example, Plaintiff C.J. spent over 16 months in state prison past his maximum expiration date.

692.    Plaintiffs need not be incarcerated. Defendants employ other substantially less restrictive methods that would allow for Plaintiffs' re-entry into the community and support Plaintiffs in integrated independent settings.

693.    These methods include housing combined with supports and services, such as ACT, FACT, and mobile crisis services, which already exist but have not been adequately developed or administered by Defendants.

694.    Defendants have placed members of the RTF Subclass in a limbo over which they have no control. At the end of their maximum sentence, these individuals are "released" to serve a period of community supervision in a state prison solely because they have a disability and require an approved OMH community-based housing placement and supports that do not exist.

## CLASS ALLEGATIONS

695.    Plaintiffs properly maintain this action as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and similarly situated individuals in the General Class, RTF Subclass, and the Discharge Class.

696.    The General Class consists of all persons (1) housed or who will be housed in a state prison, (2) with serious mental illness, (3) whose open dates for parole release, approved conditional release dates, or maximum expiration dates have passed, (4) who are not subject to residency restrictions under the Sexual Assault Reform Act, and (5) who are appropriate for integrated, community-based housing programs.

697.    Plaintiffs also maintain this action on behalf of a subclass comprising members of the General Class whom Defendants incarcerate past their maximum expiration date in

"residential treatment facilities" pursuant to Penal Law § 70.45 or Correction Law § 73. Specifically, the RTF Subclass consists of all persons (1) housed or who will be housed in a state prison pursuant to Penal Law § 70.45 or Correction Law § 73, (2) who have serious mental illness, (3) whose maximum expiration dates have passed, (4) who are not subject to residency restrictions under the Sexual Assault Reform Act, and (5) who are appropriate for integrated, community-based housing programs.

698.    In addition, Plaintiffs maintain this action on behalf of a class of individuals who, upon their release from prison, are deprived of the community-based mental health housing and supportive services that will allow them to live in integrated settings. The Discharge Class consists of all persons (1) with serious mental illness, (2) who are or will be appropriate for and desire community-based mental health housing and supportive services upon their release from state prison, (3) who, upon their release, do not receive such services, and (4) who reside in segregated setting or who are at serious risk of becoming institutionalized.

699.    The General Class, the RTF Subclass, and the Discharge Class are each sufficiently numerous such that joinder of all members is impracticable. Each year, thousands of individuals receiving mental health treatment are discharged from prison, with hundreds requiring community-based mental health housing upon release. Defendants have held at least 82 people with serious mental illness on RTF status since 2016 and, as of August 2019, 155 people were held past approved conditional release dates or open dates for parole release for reasons other than SARA housing restrictions, and 29 people with serious mental illness were incarcerated past their release dates with applications pending for mental health housing. Each year, Defendants release hundreds of individuals with serious mental illness to homeless shelters, motels or hotels, DOCCS parole housing, or state-operated, segregated facilities such as

Transitional Living Residences without the integrated, community-based mental health housing and supportive services for which they are eligible.

700.     The compositions of the General Class, the RTF Subclass, and the Discharge Class are necessarily fluid as Defendants discharge Plaintiffs from prison at their discretion, new Plaintiffs enter each class as their release dates pass, and Plaintiffs released from prison cycle through a series of inappropriate discharge locations, segregated settings, and reincarceration.

701.     Moreover, joinder is impracticable as members of the General Class, the RTF Subclass, and the Discharge Class are geographically diverse, placed in prisons, or otherwise reside in cities and towns across the state, and their incarceration, criminal justice histories, DOCCS community supervision restrictions, mental illness, and lack of financial resources make bringing individual suits nearly impossible.

702.     Among other relief, Plaintiffs seek prospective injunctive relief on behalf of future, unknown General Class, RTF Subclass, and Discharge Class members, further making joinder impracticable.

703.     Plaintiffs raise questions of fact and law that are common to each of the General Class, RTF Subclass, and Discharge Class.

704.     Common questions raised as to the General Class include, but are not limited to:

    a.  Whether Defendants institutionalize in prison individuals with serious mental illness to address their housing needs, rather than provide appropriate residential placements and services in more integrated community settings;

    b.  Whether Defendants fail to provide, fund, and effectively utilize community-based mental health housing programs and services so that persons with serious mental illness who have been approved for discharge from state prisons may be placed in more integrated community settings;

    c.  Whether Defendants' failure to provide programs, services, and supports in more integrated community settings violates the integration mandate of the Americans with Disabilities Act and the Rehabilitation Act; and

d. Whether Plaintiffs are entitled to declaratory and injunctive relief to vindicate their statutory rights.

705. Common questions raised as to the RTF Subclass additionally include, but are not limited to:

a. Whether Defendants have a policy or practice of housing individuals with serious mental illness past their maximum expiration dates;

b. Whether Defendants have a policy or practice of subjecting members of the RTF Subclass to punitive conditions in state prison;

c. Whether Defendants have a policy or practice of criminalizing RTF Subclass members' status as individuals with serious mental illness who are homeless or at risk of homelessness by punishing them with prison confinement;

d. Whether Defendants' actions and inaction violate the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution; and

e. Whether Plaintiffs are entitled to declaratory and injunctive relief to vindicate their constitutional rights.

706. Common questions raised as to the Discharge Class include, but are not limited to:

a. Whether Defendants segregate and institutionalize, or place at serious risk of segregation and institutionalization, individuals with serious mental illness who are released from prison, rather than provide appropriate mental health housing, programs and supportive services in integrated community settings;

b. Whether Defendants fail to provide, fund, and effectively utilize community-based mental health housing programs and supportive services so that persons with serious mental illness who are discharged from state prisons may be placed in integrated community settings;

c. Whether Defendants administer their mental health system in a manner that discriminates against people with serious mental illness who are released from prison;

d. Whether Defendants' failure to provide programs, services, and supports in integrated community settings violates the integration mandate of the Americans with Disabilities Act and the Rehabilitation Act; and

e. Whether Plaintiffs are entitled to declaratory and injunctive relief to vindicate their statutory rights.

707.    The Named Plaintiffs' claims are typical of the General Class, the RTF Subclass, and the Discharge Class. Their claims arise from the same policies and practices as the proposed class and subclass, respectively, and are based on the same legal theories.

708.    The Named Plaintiffs are capable of fairly and adequately protecting the interests of the General Class, the RTF Subclass, and the Discharge Class. There are no conflicts that exist among the Named Plaintiffs and members of any class.

709.    Plaintiffs are represented by attorneys employed by Disability Rights New York, the Prisoners' Rights Project of The Legal Aid Society, and Paul, Weiss, Rifkind, Wharton and Garrison LLP. The undersigned counsel has ample experience in litigating complex litigation, including class actions and civil rights cases, in particular involving the rights of people with mental illness and incarcerated people.

710.    Defendants have acted and refused to act on grounds generally applicable to the General Class, the RTF Subclass, and the Discharge Class. Injunctive and declaratory relief is appropriate respecting the class and subclass as a whole.

## **FIRST CAUSE OF ACTION**

**(Americans with Disabilities Act by Plaintiffs M.G., P.C., C.J., M.J., J.R., D.R. and the General Class against All Defendants)**

711.    Title II of the ADA prohibits Defendants from discriminating against individuals with disabilities in programs and services. 42 U.S.C. § 12132.

712.    Title II also requires that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

713.    Plaintiffs are individuals with serious mental illness. They have mental impairments that substantially limit one or more major life activity.

714.    Plaintiffs are qualified individuals with disabilities within the meaning of 42

U.S.C. § 12131(2) and 28 C.F.R. § 35.104.

715.    Plaintiffs are qualified to receive services in more integrated community-based

settings that meet their mental health needs.

716.    Serving Plaintiffs in the most integrated settings appropriate to their needs can be

reasonably accommodated and would not fundamentally alter Defendants' programs and

services.

717.    Defendants DOCCS and OMH are public entities covered by Title II of the ADA.

42 U.S.C. § 12131(1)(A) and (B).

718.    Defendants Cuomo, Annucci, Sullivan, and McGrath are responsible for the

operation of public entities covered by Title II of the ADA.  42 U.S.C. §§ 12131(1)(A) and (B).

719.    Defendants are obligated under the ADA to administer state programs in a manner

that enables Plaintiffs to receive services in the most integrated setting appropriate to their needs.

720.    Defendants have failed to meet this obligation. Defendants have caused Plaintiffs

to be institutionalized and segregated in state prisons, rather than provide adequate residential

placements in the most integrated setting appropriate to their needs.

721.    Defendants' actions and inactions constitute discrimination in violation of Title II

of the ADA, 42 U.S.C. § 12132.

## SECOND CAUSE OF ACTION

### (Rehabilitation Act by Plaintiffs M.G., P.C., C.J., M.J., J.R., D.R. and the General Class against All Defendants)

722.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides:

> No otherwise qualified individual with a disability in the United States . . . shall,
> solely by reason of her or his disability, be excluded from the participation in, be
> the denied benefits of, or be subjected to discrimination under any program or
> activity receiving Federal financial assistance . . . .

91

723.     Section 504 also requires that:

> For purposes of this part, aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs.

45 C.F.R. § 84.4(b)(2).

724.     Plaintiffs are individuals with serious mental illness. They have mental impairments that substantially limit one or more major life activity.

725.     Plaintiffs are qualified individuals with disabilities within the meaning of 29 U.S.C. § 705(20) and 45 C.F.R. § 84.3(1).

726.     Plaintiffs are qualified to participate in and receive services in more integrated settings appropriate to their needs.

727.     Defendants can reasonably accommodate Plaintiffs in the most integrated settings appropriate to their needs.

728.     Defendants DOCCS and OMH are programs and conduct activities which receive federal financial assistance.

729.     Defendants Cuomo, Annucci, Sullivan, and McGrath are responsible for programs and activities receiving federal financial assistance.

730.     Defendants are obligated under Section 504 to administer programs and services for individuals with mental illness that provide the opportunity to receive services in the most integrated setting appropriate to their needs.

731.     Defendants have failed to meet this obligation. Defendants' unlawful activities and omissions have caused Plaintiffs to receive programs and services in the institutionalized and

segregated setting of state prisons, rather than the most integrated setting appropriate to their needs.

732.    Defendants' failure to administer services, programs, and activities in the most integrated setting appropriate to the needs of Plaintiffs constitutes discrimination in violation of Section 504.

## THIRD CAUSE OF ACTION

**(42 U.S.C. § 1983: Substantive Due Process by Plaintiffs C.J., M.J., J.R., D.R. and the RTF Subclass against Defendants Annucci, Sullivan, and McGrath)**

733.    The Fourteenth Amendment protects against government conduct that infringes on fundamental rights and liberties. U.S. Const. amend. XIV.

734.    Members of the RTF Subclass have fundamental liberty interests protected by the Due Process Clause that include, but are not limited to, freedom from bodily restraint and release from prison upon serving the maximum term of their court-imposed prison sentence.

735.    Defendants have a policy and practice that deprives members of the RTF Subclass of their fundamental liberty interests by incarcerating them in state prisons following their maximum expiration dates, without court order, and by subjecting them to punitive conditions of confinement.

736.    Defendants are deliberately indifferent to Plaintiffs' indefinite detention in punitive conditions past their maximum expiration date.

737.    Defendants assign RTF Subclass members to state prison while on RTF status, and subject them to punishment, despite the fact that they know, or should know, that these individuals require mental health housing, that there is an inadequate capacity in community-based mental health housing programs, that their maximum expiration dates have passed, and that the legal authority to hold them in punitive conditions has ended. This conduct is not

narrowly tailored to serve any compelling state interest, nor is it reasonably and necessarily related to any legitimate penological interest.

738.    Plaintiffs' continued incarceration in punitive conditions shocks the contemporary conscience.

## FOURTH CAUSE OF ACTION

### (42 U.S.C. § 1983: Eighth Amendment by Plaintiffs C.J., M.J., J.R., D.R. and the RTF Subclass against Defendants Annucci, Sullivan, and McGrath)

739.    The Eighth Amendment, as applied to states through the Fourteenth Amendment, prohibits the imposition of cruel and unusual punishment by incarcerating individuals past their prison sentence and by criminalizing their status. U.S. Const. amend. VIII.

740.    Defendants have a policy and practice of confining members of the RTF Subclass in state prisons, in punitive conditions, for significant periods of time past their maximum expiration dates because of a lack of adequate housing in the community.

741.    Defendants are deliberately indifferent to Plaintiffs' indefinite detention in punitive conditions past their maximum expiration date.

742.    Plaintiffs' prolonged incarceration results from Defendants' policy and practice of assigning individuals with serious mental illness to state prison pursuant to Penal Law § 70.45 or Correction Law § 73 and, while in these prisons, subjecting them to the same punitive conditions as if they were serving a prison sentence.

743.    Defendants know that members of the RTF Subclass remain in prison past their maximum expiration date due to a lack of mental health housing and that they are suffering unwarranted punishment. Defendants have failed to address this unconstitutional practice.

744.     Defendants subject RTF Subclass members to cruel and unusual punishment by criminalizing their status as individuals with serious mental illness who are homeless or at risk of homelessness.

745.     Defendants criminalize RTF Subclass members' inability to secure the community-based mental health housing that Defendants impose as a precondition for release and which Defendants have not made available.

746.     By imposing prison confinement solely because RTF Subclass members cannot satisfy a precondition for release that is involuntary and inseparable from their status, Defendants criminalize RTF subclass members' status.

## FIFTH CAUSE OF ACTION

**(Americans with Disabilities Act by Plaintiffs S.D., W.P., D.H. and the Discharge Class against Defendants Cuomo, Annucci, Sullivan, DOCCS and OMH)**

752.     Title II of the ADA prohibits Defendants from discriminating against individuals with disabilities in programs and services. 42 U.S.C. § 12132.

753.     Title II also requires that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

754.     Plaintiffs are individuals with serious mental illness. They have mental impairments that substantially limit one or more major life activity.

755.     Plaintiffs are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104.

756.     Plaintiffs are qualified to receive services in more integrated community-based settings that meet their mental health needs.

757.    Serving Plaintiffs in the most integrated settings appropriate to their needs can be reasonably accommodated and would not fundamentally alter Defendants' programs and services.

758.    Defendants DOCCS and OMH are public entities covered by Title II of the ADA. 42 U.S.C. § 12131(1)(A) and (B).

759.    Defendants Cuomo, Annucci, and Sullivan are responsible for the operation of public entities covered by Title II of the ADA. 42 U.S.C. §§ 12131(1)(A) and (B).

760.    Defendants are obligated under the ADA to administer services, programs, and activities in a manner that enables Plaintiffs to receive services in the most integrated setting appropriate to their needs.

761.    Defendants have failed to meet this obligation.

762.    Defendants have discriminated against Plaintiffs by needlessly placing Plaintiffs in segregated settings to receive necessary mental health housing and services, or by putting Plaintiffs at serious risk of placement in such segregated settings.

747.    Defendants' actions and inactions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132.

### SIXTH CAUSE OF ACTION

**(Rehabilitation Act by Plaintiffs S.D., W.P., D.H. and the Discharge Class against Defendants Cuomo, Annucci, Sullivan, DOCCS, and OMH)**

763.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides:

No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be the denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

764.    Section 504 also requires that:

> For purposes of this part, aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs.

45 C.F.R. § 84.4(b)(2).

765.    Plaintiffs are individuals with serious mental illness. They have mental impairments that substantially limit one or more major life activity.

766.    Plaintiffs are qualified individuals with disabilities within the meaning of 29 U.S.C. § 705(20) and 45 C.F.R. § 84.3(1).

767.    Plaintiffs are qualified to participate in and receive services in more integrated settings appropriate to their needs.

768.    Defendants can reasonably accommodate Plaintiffs in the most integrated settings appropriate to their needs.

769.    Defendants DOCCS and OMH are programs and conduct activities which receive federal financial assistance.

770.    Defendants Cuomo, Annucci, and Sullivan are responsible for programs and activities receiving federal financial assistance.

771.    Defendants are obligated under Section 504 to administer programs and services for individuals with mental illness that provide the opportunity to receive services in the most integrated setting appropriate to their needs.

772.    Defendants have failed to meet this obligation.

773.    Defendants' unlawful activities and omissions have caused Plaintiffs to be needlessly placed in segregated settings to receive necessary mental health housing and

supportive services, or have placed Plaintiffs at serious risk of placement in such segregated settings.

774.    Defendants' failure to administer services, programs, and activities in the most integrated setting appropriate to the needs of Plaintiffs constitutes discrimination in violation of Section 504.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a) Certify, pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure:

    i. A General Class defined as: All persons (1) housed or who will be housed in a state prison, (2) with serious mental illness, (3) whose open dates for parole release, approved conditional release dates, or maximum expiration dates have passed, (4) who are not subject to residency restrictions under the Sexual Assault Reform Act, and (5) who are appropriate for integrated, community-based housing programs; and

    ii. An RTF Subclass defined as: All persons (1) housed or who will be housed in a state prison pursuant to Penal Law § 70.45 or Correction Law § 73, (2) who have serious mental illness, (3) whose maximum expiration dates have passed, (4) who are not subject to residency restrictions under the Sexual Assault Reform Act, and (5) who are appropriate for integrated, community-based housing programs; and

    iii. A Discharge Class defined as: All persons (1) with serious mental illness, (2) who are or will be appropriate for and desire community-based mental health housing and supportive services upon their release from state prison, (3) who, upon their release, do not receive such services, and (4) who reside in a segregated setting or who are at serious risk of becoming institutionalized.

b) Appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

c) Pursuant to Rule 57 of the Federal Rules of Civil Procedure, enter an order declaring Defendants' conduct as alleged herein unconstitutional and unlawful under the Eighth and/or Fourteenth Amendments to the U.S. Constitution, the Americans with Disabilities Act, and the Rehabilitation Act.

d) Enter a permanent injunction requiring Defendants to promptly take the following steps that are necessary to serve Plaintiffs in the most integrated setting appropriate to their needs:

    i. Developing and implementing an effective plan for providing care and treatment in the most integrated setting appropriate to the needs of individuals with serious mental illness who are being discharged from state prison, who are qualified to receive mental health services in integrated settings, and who want mental health services in a more integrated setting; and

    ii. Promptly making available sufficient community-based care and treatment opportunities, including OMH-funded mental health housing, to ensure that the most integrated appropriate care and treatment is provided without undue delay to those qualified individuals being discharged from state prison who want community-based care and treatment.

e) Enjoin Defendants Annucci, Sullivan, and McGrath from subjecting the RTF Subclass to punitive conditions in state prison.

f) Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a, and other applicable law.

g) Order such other relief as the Court deems appropriate.

Dated: August 27, 2020  
    New York, New York

DISABILITY RIGHTS NEW YORK

/s/ Elena Landriscina

Elena Landriscina (elena.landriscina@drny.org)  
Joshua Rosenthal (joshua.rosenthal@drny.org)  
25 Chapel Street, Suite 1005  
Brooklyn, New York 11201  
(518) 432-7861

The LEGAL AID SOCIETY  
Janet E. Sabel, Attorney-in-Charge

/s/ Stefen R. Short

Stefen R. Short (sshort@legal-aid.org)  
Robert M. Quackenbush (rquackenbush@legal-aid.org)  
Veronica Vela (vvela@legal-aid.org)  
Prisoners' Rights Project  
199 Water Street, 6th Floor  
New York, New York 10038  
(212) 577-3530

PAUL, WEISS, RIFKIND, WHARTON  
& GARRISON LLP

/s/ Walter G. Ricciardi

Walter G. Ricciardi (wricciardi@paulweiss.com)  
Emily A. Vance (evance@paulweiss.com)  
Sam Margolis (smargolis@paulweiss.com)  
1285 Avenue of the Americas  
New York, New York 10019  
(212) 373-3350

*Attorneys for Plaintiffs*