UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P.,   :
and D.H., individually and on behalf of all   :
similarly situated,   :
                             Plaintiffs,  :
   :
           -against-   :
   :   7:19-cv-00639 (CS) (AEK)
ANDREW CUOMO, in his official capacity as the   :
Governor of the State of New York, the NEW   :
YORK STATE OFFICE OF MENTAL HEALTH,   :
ANN MARIE T. SULLIVAN, in her official capacity   :
as the Commissioner of the New York State Office of:
Mental Health, the NEW YORK STATE   :
DEPARTMENT OF CORRECTIONS AND   :
COMMUNITY SUPERVISION, ANTHONY  J.   :
ANNUCCI, in his official capacity as the Acting   :
Commissioner of the New York State Department of :
Corrections and Community Supervision, ANNE   :
MARIE MCGRATH, in her official capacity as   :
Deputy Commissioner of the New York State   :
Department of Corrections and Community   :
Supervision,   :
                       Defendants.  :
------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

                                       LETITIA JAMES
                                       Attorney General State of New York
                                       *Attorney for Defendants*
                                       28 Liberty Street
                                       New York, NY 10005
                                       Tel.: (212) 416-6133/6185

JANE R. GOLDBERG
JEB HARBEN
Assistant Attorneys General
    of Counsel

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT .........................................................................................1

STATEMENT OF THE CASE ...........................................................................................3

Relevant Procedural History ..............................................................................................3

The Parties ..........................................................................................................................4

A.       Proposed Discharge Class Plaintiffs ..................................................................4

B.       Defendants ..........................................................................................................5

Overview of New York's Public Mental Health System ...................................................5

Overview of DOCCS's Role in Community Mental Health Services ...............................8

STANDARD OF REVIEW ................................................................................................11

ARGUMENT .....................................................................................................................12

I.       THE PROPOSED DISCHARGE CLASS LACKS STANDING ...........................12

    A.  The Discharge Class Plaintiffs Do Not Allege a Certainly Impending Injury ..................13

    B.  Plaintiffs' Risk of Institutionalization is Not Traceable to Defendants' Actions ..............16

II.      THE PROPOSED DISCHARGE CLASS FAILS TO STATE A CLAIM FOR
       VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT OR
       SECTION 504 OF THE REHABILITATION ACT ...................................................18

    A.  The Discharge Class Plaintiffs Do Not Plausibly Allege That They Were Denied Services
        to Which they Were Legally Entitled Under the ADA or Rehab Act ..................19

    B.  The Discharge Class Plaintiffs Do Not Plausibly Allege They Have Been Placed in
        Unlawfully Segregated Settings ..................22

CONCLUSION ..................................................................................................................25

## TABLE OF AUTHORITIES

CASES                                                                                    Page(s)

*APWU v. Potter,*
    343 F.3d 619 (2d Cir. 2003) .................................................................................11

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...........................................................................................11

*Baker v. N.Y. State Dep't of Corr. and Comm. Super.,*
    No. 17 Civ. 1270 (GTS), 2018 WL 357297 (N.D.N.Y. Jan. 10, 2018) ...............22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................................11

*Ciaramella v. Zucker,*
    18-CV-6945 (JPO), 2019 WL 4805553 (S.D.N.Y. Sept. 30, 2019) .....................19

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .......................................................................................13-15

*Davis v. Jackson,*
    No. 15 Civ. 5359 (KMK), 2016 WL 5720811 (S.D.N.Y. Sept. 30, 2016) .............9

*Davis v. Shah,*
    821 F.3d 231 (2d Cir. 2016) .....................................................................14, 16, 19

*Dhinsa v. Krueger,*
    917 F.3d 70 (2d Cir. 2019) .................................................................................12

*Disabled in Action v. Bd. of Elections in N.Y.,*
    752 F.3d 189 (2d Cir. 2014) ..........................................................................12, 18

*E.B. ex rel. M.B. v. Cuomo,*
    No. 16-CV-735 (LJV), 2020 WL 3893928 (W.D.N.Y. July 11, 2020) ...........14, 19, 22

*Eaves v. Designs for Finance, Inc.,*
    785 F. Supp. 2d 229 (S.D.N.Y. 2011) ..................................................................7

*Fernandez v. Zoni Language Ctr., Inc.,*
    No. 15-CV-5055 (PKC), 2016 WL 2903274 (S.D.N.Y. May 18, 2016) ...............5

*Franza v. Stanford,*
    No. 16 Civ. 7625 (KMK), 2018 WL 914782 (S.D.N.Y. Feb. 14, 2018) ...............22

*Gonzalez v. Annucci,*
    32 N.Y.3d 461 (2018) .......................................................................................21

*Henrietta D. v. Bloomberg*,
   331 F. 3d 261 (2d Cir. 2003) ................................................................................... 12, 18

*Hesse v. Godiva Chocolatier*,
   463 F. Supp. 3d 453 (S.D.N.Y. 2020) .............................................................................5

*Jenkins v. New York City Dep't of Homeless Services*,
   643 F. Supp. 2d 507 (S.D.N.Y. 2009), *aff'd* 391 Fed. App'x 81 (2d Cir. 2010) ...............................24

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..........................................................................................13, 16-17

*McElwee v. County of Orange*,
   700 F.3d 635 (2d Cir. 2012) ................................................................................. 12, 18

*McNiece v. Connecticut*,
   692 Fed. App'x 655 (2d Cir. 2017) .............................................................................18

*Mental Hygiene Legal Serv. on Behalf of Oliviah CC. v. Delaney*,
   176 A.D.3d 24 (2019), *leave to appeal granted sub nom. Mental Hygiene Legal Serv. v. Delaney*, 35 N.Y.3d 912 (2020) ....................................................................................20

*Morrison v. Nat'l Australia Bank Ltd.*,
   547 F.3d 167 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010) ...............................................11

*Nielsen v. Rabin*,
   746 F.3d 58 (2d Cir. 2014) ........................................................................................11

*Olmstead v. L.C.*,
   527 U.S. 581 S. S. Ct. 2176 (1999) ....................................................................*passim*

*Phelan v. Zenzen*,
   No. 10 Civ. 6704, 2012 WL 5420423 (W.D.N.Y. Nov. 6, 2012) .......................................9

*Spavone v. New York State Dep't of Corr. Servs.*,
   719 F.3d 127 (2d Cir. 2013) .........................................................................................9

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .............................................................................................12

*Steimel v. Wernert*,
   823 F.3d 902 (7th Cir. 2016) ....................................................................................23

*Waskul v. Washtenaw Cty. Cmty. Mental Health*,
   979 F.3d 426 (6th Cir. 2020) ....................................................................................23

*Weiss v. Inc. Vill. of Sag Harbor*,
   762 F. Supp. 2d 560 (E.D.N.Y. 2011) ..........................................................................7

*Williams v. Fisher*,
  No. 11 Civ. 379 (NAM), 2015 WL 1137644 (N.D.N.Y. Mar. 11, 2015) ........................................... 9

*Woods v. Tompkins Cty.*,
  No. 16-CV-0007 (LEK) (TWD), 2019 WL 1409979 (N.D.N.Y. Mar. 28, 2019),
  *aff'd*, 804 F. App'x 94 (2d Cir. 2020) ........................................................................................ 18, 20

## CONSTITUTIONS

Eighth Amendment ...................................................................................................................... 3

Fourteenth Amendment ............................................................................................................... 3

U.S. Const.
  art. III, § 2 ........................................................................................................................... 12
  Article III .......................................................................................................................... *passim*

## FEDERAL STATUTES

29 U.S.C. § 504, 749 (a), 794 ........................................................................................... 2, 12, 18

Americans with Disabilities Act Title II, 42 U.S.C.

  § 12132 ................................................................................................................... 2, 12, 18, 20

## FEDERAL RULES

Federal Rules of Civil Procedure
  Rule 12(b)(1) .................................................................................................................. 1, 11
  Rule 12(b)(6) .................................................................................................................. 1, 11
  Rule 41(a)()(A)(i) .................................................................................................................. 1

Federal Rules of Evidence
  Rule 201 ................................................................................................................................ 5

## FEDERAL REGULATIONS

28 C.F. R.
  § 35.130(b)(6) ....................................................................................................................... 20

## STATE STATUTES

New York Mental Hygiene Law
  § 1.03(52) ........................................................................................................................... 1, 7
  § 5.07 ..................................................................................................................................... 5
  § 41.13 .................................................................................................................................. 20
  § 404(4) ............................................................................................................................. 9, 10

N.Y. Correction Law
§ 71(a)............................................................................................................9
§ 137 (6) (e) ..................................................................................................8
§ 201(5) ................................................................................................. 10, 21
§ 401.1............................................................................................................8

N.Y. Executive Law
§ 259-i(2)(b)..................................................................................................9

N.Y. Penal Law
§§ 70.40 and 70.45 (McKinney 2009 & Supp. 2019) ................................9

**STATE REGULATIONS**

14 N.Y.C.R.R. 527.2 (g) ......................................................................................8

Defendants, New York State Office of Mental Health ("OMH"), Ann Marie T. Sullivan, in her official capacity as the Commissioner of OMH, the New York State Department of Corrections and Community Supervision ("DOCCS"), Anthony J. Annucci, in his official capacity as the Acting Commissioner of DOCCS, and Anne Marie McGrath, in her official capacity as Deputy Commissioner of DOCCS,[1] respectfully submit this memorandum of law, together with the accompanying Declaration of Jeb Harben ("Harben Decl.") and the exhibits annexed thereto, in support of their partial motion to dismiss the Second Amended Class Action Complaint ("SAC") (ECF No. 134) pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

In the SAC, Plaintiffs radically altered the scope of this lawsuit, effectively bringing an entirely new set of claims with a substantially new proposed class. Previously, the principal issue in dispute was whether certain inmates diagnosed with Serious Mental Illness ("SMI"), as defined by New York Mental Hygiene Law ("MHL") § 1.03(52), who were not subject to housing restrictions based on their status as sex offenders, were being improperly held in State prisons past their scheduled release dates when they anticipated either completing their sentences or being placed on parole or post-release supervision (collectively, "parole supervision"). A secondary issue previously in dispute was whether a sub-set of those SMI inmates were appropriately placed in structured temporary housing such as Transitional Living Residences ("TLR") upon their release, which had been done to allow them to more easily transition to live in the community after sometimes lengthy periods of incarceration, because such temporary housing was, allegedly, too restrictive and not sufficiently integrated.

The claims now asserted in the SAC on behalf of a proposed "Discharge Class" are far broader, as three additional Plaintiffs ("Discharge Class Plaintiffs") assert that Defendants have

---

[1] Plaintiffs voluntarily dismissed Governor Andrew M. Cuomo as a Defendant, pursuant to Fed. R. Civ. P. 41(a), on December 7, 2020. (ECF No. 149).

violated their rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA") and the Rehabilitation Act, 29 U.S.C. § 794 ("Rehab Act") by releasing them to community housing that they deem not sufficiently integrated and/or not timely providing the care and treatment that they allegedly require. The SAC effectively argues that the State is statutorily obligated to provide all SMI parolees who may be homeless with their own apartments at State expense and that the failure to do so constitutes a violation of the ADA and Rehab Act. Such a requirement clearly goes beyond the State's statutory obligations as interpreted in *Olmstead v. L.C.*, 527 U.S. 581, 119 S. S. Ct. 2176 (1999), and its progeny. Contrary to the holding in *Olmstead*, the SAC also seeks to nullify the clinical judgment of professionals who have determined that specific outpatient treatment of SMI parolees is clinically appropriate and, instead, impose outpatient treatment requirements such as the provision of Assertive Community Treatment ("ACT") teams to all SMI parolees, a process that is currently reserved for the most severe cases of SMI.[2] None of the complaints by the Discharge Class Plaintiffs amount to violations of the ADA or Rehab Act.

As demonstrated below, the Discharge Class Plaintiffs do not have standing to bring such claims as they fail to allege any certainly impending injury from their release to community shelters while waitlisted for other housing. (*See* Point I, *infra*). To the contrary, their claims are premised on an attenuated and speculative chain of inferences of the kind that the U.S. Supreme Court has rejected as a basis for standing. Furthermore, their risk of institutionalization claims are not traceable to Defendants' actions, but rather to the actions of third parties or to Plaintiffs' own conduct. Moreover, the Discharge Class Plaintiffs cannot plausibly allege that they were denied housing and/or services to which they were legally entitled to under the ADA or Rehab Act, nor can they plausibly allege they

---

[2] *See* Utilization Management (UM) Guidelines for New York State Medicaid Managed Care Organizations (MMCO) and Health and Recovery Plans (HARP) regarding Assertive Community Treatment (ACT), available at https://omh.ny.gov/bho/policy-guidance/nys_act_um_guidance.pdf.

were confined to unlawfully segregated settings in violation of the integration mandate. (*See* Point II, *infra*). Neither the ADA nor the Rehab Act creates a legal entitlement to community-based mental health housing. Here, it is undisputed that the Discharge Class Plaintiffs were released to the community, provided shelter, and waitlisted for housing, SAC ¶¶ 232, 320, 334—a result that reflects clinical determinations as to their ability to function in the community and does not violate the ADA or Rehab Act. Their complaints about the temporary placements to which they were assigned, such as "limited privacy" and shared facilities, demonstrate that the Discharge Class Plaintiffs believe that they are entitled to their own apartments at State expense, a result clearly not contemplated by the narrow holding of *Olmstead*.

The claims of the proposed Discharge Class Plaintiffs should therefore be dismissed.

## STATEMENT OF THE CASE

### Relevant Procedural History

This case commenced with the filing of a Complaint (ECF No. 1) on January 23, 2019, brought by six SMI inmates who alleged that their terms of incarceration were prolonged in violation of the ADA and Rehab Act. Four of the Plaintiffs, who had begun terms of post release supervision, also claimed that their constitutional rights under the Eighth and Fourteenth Amendments had been violated. Following a pre-motion conference on May 13, 2019, Plaintiffs filed an Amended Complaint (ECF No. 47), and subsequently a Second Amended Complaint (ECF No. 134), on behalf of the original six Plaintiffs and three additional Plaintiffs.[3]

---

[3] On September 25, 2020, the Court granted, in part, Defendants' motion to dismiss the First Amended Complaint as to Plaintiffs' Fourteenth Amendment substantive due process claim and dismissed Governor Cuomo as a defendant (ECF No. 149). As previously noted, on December 7, 2020, Plaintiffs filed a Notice of Voluntary Dismissal of Governor Cuomo as a defendant, which was so-ordered by the Court (ECF Nos. 148-149).

**The Parties**

**A. Proposed Discharge Class Plaintiffs**

The SAC incorporates the allegations set forth in the First Amended Complaint and, as relevant to the instant motion, adds allegations on behalf of a new putative class of SMI parolees who have been or will be released from prison to homeless shelters, hotels, motels and DOCCS parole housing. SAC ¶ 542. Three of the named Plaintiffs are representatives of this new putative class.[4] This proposed Discharge Class, which appears to include even sex offenders who require SARA-compliant housing, is defined as follows:

> The Discharge Class consists of all persons (1) with serious mental illness, (2) who are or will be appropriate for and desire community-based mental health housing and supportive services upon their release from state prison, (3) who, upon their release, do not receive such services, and (4) who reside in segregated setting or who are at serious risk of becoming institutionalized.

SAC ¶ 698. The Discharge Class Plaintiffs allege that Defendants have discriminated against them in violation of the ADA and Rehab Act, SAC ¶¶ 752-774, and contend that their releases to shelters were not based "on Defendants' determination that such placements [were] clinically necessary." SAC ¶ 637. They further allege that Defendants have the responsibility for developing community-based mental health housing programs and supportive services for them, as well as responsibility for preparing inmates with SMI for their release from prison, SAC ¶¶ 18, 420, 439. They claim that the release of individuals from prison to the shelter system without housing or supportive services exposes the putative class to a serious risk of psychiatric harm and decompensation, putting them at risk of

---

[4] The Plaintiffs are identified as S.D., W.P. and D.H. The specific allegations concerning them are set forth in the SAC at ¶¶ 216-277 (S.D.), 278-322 (W.P.) and 323-353 (D.H.), and are too prolix to be detailed here. By way of example, however, D.H. was reincarcerated and released several times, including once to his grandmother's residence and once to parole housing. SAC ¶¶ 336, 339. The allegation is that OMH failed to provide necessary support services to him while in the community. SAC ¶¶ 430-41, thus impairing D.H.'s ability to manage his needs and "cope with the demanding requirements of his DOCCS parole officer." *Id.* ¶ 342.

institutionalization. Plaintiffs also allege that discharges to the shelter system segregates them from the community. SAC ¶¶ 532-628. Plaintiffs similarly criticize the release of inmates with serious mental illness to Transitional Living Residences ("TLRs") or Crisis Centers as not being integrated settings. SAC ¶¶ 602-628. Plaintiffs allege that Defendants "can reasonably accommodate Plaintiffs need to receive services in an integrated community setting" without unreasonable costs by reallocating funding from DOCCS to OMH. SAC ¶¶ 653-659. Plaintiffs seek permanent injunctive relief.

**B. Defendants**

Ann Marie T. Sullivan is the Commissioner of the New York State Office of Mental Health ("OMH"). Anthony J. Annucci is the Acting Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"). Anne Marie McGrath is Deputy Commissioner of DOCCS.

**Overview of New York's Public Mental Health System**

OMH oversees New York's public mental health system, which includes all mental health programs that are licensed, regulated, operated, funded, or approved by OMH. *See* OMH's Statewide Comprehensive Plan 2016-2020 ("Statewide Plan"), available at https://omh.ny.gov/omhweb/planning/docs/507-plan.pdf.[5] OMH provides services and support to more than 700,000 New Yorkers. OMH's mission to promote the mental health of all New Yorkers requires the provision of a vast array of inpatient and outpatient services in collaboration and coordination with local government entities (57 counties and New York City) and other agencies as required by MHL § 5.07.[6] Over the past several years, OMH and other New York State health care

---

[5] The Court may properly take judicial notice of the facts set forth in the Statewide Plan pursuant to Rule 201 of the Federal Rules of Evidence, as well as other information contained on State agency websites referenced herein "where the authenticity of the site has not been questioned." *See Hesse v. Godiva Chocolatier*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020) (citing *Fernandez v. Zoni Language Ctr., Inc.*, No. 15-CV-5055 (PKC), 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016)).

[6] MHL § 5.07 requires OMH to develop a comprehensive plan for the provision of services. This is

agencies, have transformed the delivery of health care services, including mental health services, to a system of managed care. *See* OMH's Transformation Plan, available at https://omh.ny.gov/omhweb/transformation/. As of November 2019, this transformation resulted in a 15% increase in Medicaid-covered individuals receiving OMH-licensed outpatient services and a 7% increase in OMH funded and/or operated housing beds.[7]

Most people are served by voluntary programs, including those that are county-operated (Statewide Plan p. 5), of which there are approximately 2600 unlicensed programs (Statewide Plan p. 11).[8] There are also approximately 2,000 licensed programs. (Statewide Plan p. 10). OMH operates and regulates approximately 800 outpatient programs, including Assertive Community Treatment ("ACT") teams, Personalized Recovery Oriented Services ("PROS") programs, Article 31 clinics and Day Treatment. (Statewide Plan p. 12). OMH's ACT Guidelines make clear that ACT is reserved for individuals with serious mental illness ("SMI") whose needs have not been met by other approaches. OMH requires all referrals to be reviewed and assigned by a county Single Point of Access ("SPOA") entity under contract with the local governmental entity.[9] As of November 2019, OMH had expanded the ACT program to 108 teams statewide.[10] As of December 2020, over six thousand individuals were

---

done in part together with two other agencies, the New York State Office of Addiction Services and Supports ("OASAS") and the New York State Office for People with Developmental Disabilities ("OPWDD"), by analyzing local service plans developed by each county and New York City pursuant to planning guidelines issued by the three agencies. (Statewide Plan p. 17).

[7] *See* OMH Statewide Town Hall November 19, 2019 Presentation ("Town Hall Mtg.") pp. 10-12, available at https://omh.ny.gov/omhweb/planning/507/2019townhallpresentation.pdf.

[8] These unlicensed programs include care coordination, crisis services, education, forensic, general support, housing, self-help, vocational and some emergency programs. (Statewide Plan p. 11).

[9] *See* Utilization Management (UM) Guidelines for New York State Medicaid Managed Care Organizations (MMCO)and Health and Recovery Plans (HARP) regarding Assertive Community Treatment (ACT), available at https://omh.ny.gov/bho/policy-guidance/nys_act_um_guidance.pdf.

[10] *See* Town Hall Mtg. p. 11.

enrolled in ACT statewide.[11]

OMH funds or operates more than 40,000 units of housing for people in the public mental health system.[12] As of November 2019, there were over 2,200 units in the pipeline. (Town Hall Mtg. p. 12). Types of housing includes supportive housing, of which there are several types including scattered-site supportive housing, single-site supportive housing, and supportive single-room-occupancy housing.[13] OMH's target population for supportive housing is individuals with a primary diagnosis of SMI *and* one of the following: SSI or SSDI due to mental illness; extended impairment in functioning due to mental illness; or reliance on psychiatric treatment, rehabilitation and supports.[14]

Within the State prison system, among other things, OMH provides mental health care and treatment and pre-release planning for individuals who are approaching release from prison. The discharge planning process is summarized by Commissioner Sullivan as follows:[15]

> [T]he CNYPC Pre-Release Services staff conducts a multi-tier level of review within 90 days of release to determine if an individual inmate with Serious Mental Illness ("SMI"), as defined by MHL § 1.03(52), who is at risk of homelessness, is psychiatrically stable for community release, and if release to community mental health housing is clinically necessary or if they can be released to other types of housing, including shelters.

---

[11] Data concerning the provision of ACT services is annexed to the Harben Decl. as Exhibit A and available at https://omh.ny.gov/omhweb/ tableau/act.html.

[12] The statistics showing the numbers of each type of housing is set forth in the Statewide Summary of Residential Program Indicators annexed to the Harben Decl. as Exhibit B and available at https://omh.ny.gov/omhweb/statistics/index.html.

[13] Descriptions of OMH's adult housing may be found on OMH's website and is available at https://my.omh.ny.gov/analytics/saw.dll?dashboard&PortalPath=%2Fshared%2FAdult%20Housing%2F_portal%2FAdult%20Housing&nquser=BI_Guest&nqpassword=Public123#metric

[14] *See* OMH's 2019 Supportive Housing Guidelines p. 30, available at https://omh.ny.gov/omhweb/adults/supportedhousing/supportive_housing_guidelines.pdf

[15] As Plaintiffs' pleadings refer to matters already disclosed through limited discovery in this case—e.g., SAC ¶ 605, which quotes a partial supplementary response to an interrogatory—Defendant Sullivan's sworn answer to an interrogatory is permissibly quoted here. *See Eaves v. Designs for Finance, Inc.*, 785 F. Supp. 2d 229, 244 (S.D.N.Y. 2011) (quoting *Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011).

This review begins in the correctional facility with the designation of a Pre-Release Coordinator who works individually with inmate patients to discuss their discharge needs, housing, treatment options, as well as assist with their anticipated release to the community. The inmate patient also continues to work with his or her assigned multidisciplinary corrections-based treatment team to address his or her behavioral health needs. There is a continuous clinical assessment of mental status, suicidal thoughts and/or behavior, risk for violence to self and/or others and level of psychiatric care and housing required when transitioning out of an institutional setting.

Additionally, CNYPC has another level of centralized clinical review conducted by Albany Pre-Release Services staff and CNYPC clinical leadership for all inmate patients who have an S designation, as defined at Correction Law Section 137 (6) (e), in the DOCCS system as their release approaches. This review includes review of past psychiatric history, previous hospitalizations, treatment compliance, presentation and behavior during incarceration, prior criminal behavior and arrests, criteria for Assisted Outpatient Treatment (AOT), and current psychiatric stability, all to inform the discharge plan. During this review, the Albany Pre-Release Service staff continues to receive input and updates from the treatment team at the correctional facility that is currently treating the patient, concerning the patient's clinical needs and stability. During this review, the need for inpatient treatment is considered.

Finally, all of these formulated inmate patient discharge plans undergo a management level review at Albany Pre-Release Services. If it is determined that an individual appears appropriate for AOT, then the individual's plan will be reviewed by a specific AOT committee. Furthermore, individual discharge plans where a clinical professional has determined that there is a risk of mental health decompensation upon release of the individual to the community, and a decision has not yet been reached whether to pursue AOT, will undergo a more intensive review by the Specialized Review Committee, consisting of the Pre-Release Services Unit Chief and the Medical Director of the Division of Forensic Services.

At this time, final recommendations and determinations for level of care and treatment upon release to the community are made and are discussed with the corrections-based treatment team to ensure appropriate referrals and interviews with community providers. This will include the determination that the inmate patient is psychiatrically stable for community release even if that includes release to a shelter.

*See* Harben Decl., Exhibit C.

## Overview of DOCCS's Role in Community Mental Health Services

DOCCS and OMH share responsibility for the appropriate care and treatment of inmates with mental illness who do not require hospitalization. N.Y. Corr. Law § 401.1; 14 N.Y.C.R.R. 527.2 (g). Consistent with the goal of providing appropriate care and treatment, DOCCS develops an individualized case management plan for each inmate to promote his or her rehabilitation. These plans

may be developed in consultation with OMH, if the inmate utilizes mental health services, or other state agencies, depending on the inmate's needs. N.Y. Corr. Law § 71(a). Inmates who have received mental health treatment within three years of their anticipated release receive mental health discharge planning, and, if needed, an appointment with a mental health professional in the community, and sufficient medication to bridge the period between discharge and the assumption of care by a mental health professional in the community. *Id.* § 404(4). For such inmates, OMH provides discharge planning in collaboration with DOCCS, pursuant to a Memorandum of Understanding ("MOU"), which has been produced to Plaintiffs.[16]

For individuals who have been paroled, conditionally released or released to post-release supervision from a DOCCS facility or an institution under the jurisdiction of OMH, DOCCS retains legal custody until the expiration of the maximum period of their sentence or period of post-release supervision.[17] N.Y. Exec. Law § 259-i(2)(b). DOCCS has trained and assigned staff to work on discharge planning and collaborating with Community Supervision (parole officers). *See* Directive 9000 annexed to Harben Decl. as Exhibit D. In addition, DOCCS's Bureau of Mental Health and Health Services have DOCCS staff assigned to work on coordinating services in the community for those being released to the community, including parole officers with special training in supervising persons with mental illness.[18] *Id.* Parole officers prepare for the release of inmates with mental illness

---

[16] *See Spavone v. New York State Dep't of Corr. Servs.,* 719 F.3d 127, 130 (2d Cir. 2013) for a description of the MOU.

[17] Inmates may, under statutorily specified circumstances, be released on parole, conditional release or post-release supervision. *See* N.Y. Penal Law §§ 70.40 and 70.45. Such released individuals are subject to conditions of release and post-release supervision imposed by the Board of Parole and remain under the supervision of DOCCS for the unserved portion of their prison term or period of post-release supervision. *Id.*

[18] Judicial notice of DOCCS directives is proper here. For example, in *Davis v. Jackson*, No. 15 Civ. 5359 (KMK), 2016 WL 5720811, at *1, n.3 (S.D.N.Y. Sept. 30, 2016), the Court took judicial notice of DOCCS Directive 4002, citing to it on the DOCCS website. *See also Williams v. Fisher*, No. 11 Civ. 379 (NAM), 2015 WL 1137644, at * 4, n.7 (N.D.N.Y. Mar. 11, 2015) (judicial notice taken of DOCCS Directive 4202); *Phelan v. Zenzen* (CJS), No. 10 Civ. 6704, 2012 WL 5420423, at *4 (W.D.N.Y. Nov. 6,

by reviewing all available relevant materials, "including any discharge plan," and when an inmate has been released, their parole officer "will confirm that the parolee has been released with any prescribed medications, prescriptions and a Medication Grant Program (MGP) card, if applicable" and "review any Assisted Outpatient Treatment (AOT) order in the case and will confirm with the parolee the requirements of any such order." *See* DOCCS Directive 9230 IV(A)(1)(a), (g), and (h), annexed to Harben Decl. as Exhibit E. The parole officer will complete an Individualized Supervision Plan "within 10 business days of release" and review that plan with any treatment provider included in the plan and other relevant persons. *Id.* at (j) and (l).

In addition to assistance with post-release mental health treatment, DOCCS assists inmates eligible for or on community supervision with securing housing. N.Y. Corr. Law § 201(5). Assigned parole officers work with DOCCS re-entry staff, who assist in securing housing, enrolling in treatment (including mental health treatment), accessing skills programs, and in finding employment. *See* Harben Decl. Exhibit C and DOCCS Re-Entry Services, available at https://doccs.ny.gov/re-entry-services. Re-entry staff also work with the New York State Department of Criminal Justice Services' ("DCJS") County Re-Entry Task Force, county governments, other state agencies, and community-based organizations in securing housing referrals, mental health counseling, and many other services. *Id.* Ultimately, however, an inmate is also expected to make efforts to secure their own housing in addition to any assistance provided by DOCCS and other entities. *See* DOCCS Community Supervision Handbook  p. 16 ("What Is Community Preparation And An Inmate's Role In It?"), available at https://doccs.ny.gov/community-supervision-handbook.

An individual's assigned parole officer "must approve any residence where the inmate or the parolee proposes to reside and will conduct an investigation of that residence to make sure it is a

---

2012) (judicial notice taken of DOCCS Directive 4421).

suitable place, does not violate any of the conditions of release, and will not impede the parolee's ability to successfully complete parole or the period of post-release supervision." *Id.* at p. 18 ("What Happens If An Inmate Is Released And Cannot Find A Permanent Residence?"). The role of the assigned parole officer "is to assist the parolee with transitioning to community supervision, to monitor compliance with the conditions of release, and to ensure the safety of crime victims and the general public." *Id.* at p. 18 ("What Are the Responsibilities of a PO?").

## STANDARD OF REVIEW

State Defendants move to dismiss the SAC, in part, for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. On a motion under Rule 12(b)(1), Plaintiffs have the burden of demonstrating by a preponderance of the evidence that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd,* 561 U.S. 247 (2010). The court accepts all factual allegations as true, but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003). In determining a Rule 12(b)(1) motion, therefore, the court "has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Id.* at 627.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter [] to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Defendants bear the burden of showing failure to state a claim and the court must accept as true all of the factual allegations contained in the complaint. However, the court is not required to credit conclusory allegations or legal conclusions as factual. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

**ARGUMENT**

The Discharge Class Plaintiffs purport to bring two causes of action – one under Title II of the ADA and one under Title V of the Rehab Act. Although there are "subtle differences between the [A]cts," the purpose of both statutes is to prevent discrimination based upon disability and, as a result, courts generally apply the same legal standards for claims arising under Title II of the ADA and Title V of the Rehab Act. *Disabled in Action v. Bd. of Elections in N.Y.*, 752 F.3d 189, 196 (2d Cir. 2014); *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012); *Henrietta D. v. Bloomberg*, 331 F. 3d 261, 271 (2d Cir. 2003). The Discharge Class Plaintiffs contend that their alleged entitlement to State-funded housing and services of their own preference is derived from Title II of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity," 42 U.S.C. § 12132, and the Rehab Act, which contains a similar provision, 29 U.S.C. § 749 (a). The seminal case interpreting these statutory provisions is *Olmstead v. L.C.*, 527 U.S. at 602, in which the Supreme Court made clear that in considering the appropriateness of community-based placement, the State may rely on the assessment of its own professionals.

## I.    THE PROPOSED DISCHARGE CLASS LACKS STANDING

Article III of the Constitution "limits the federal courts' power to the resolution of 'Cases' and 'Controversies.'" *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019) (citing U.S. Const. art. III, § 2). A litigant who invokes federal jurisdiction therefore "must demonstrate standing to sue," consisting of three elements: "the individual initiating the suit 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Standing "evaluates a litigant's personal stake as of the outset of litigation." *Id.* (internal quotation omitted).

The injury in fact requirement may only be satisfied by an injury that is "concrete, particularized, and actual or imminent[.]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal citation omitted). Where "there is no actual harm, . . . its imminence (though not its precise extent) must be established." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992). The "threatened injury must be *certainly impending* to constitute injury in fact," and, thus, "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (internal quotation marks and citations alterations omitted) (emphasis in original). Nor may a plaintiff proceed based on allegations that rely on an "attenuated chain of inferences necessary to find harm[.]" *Clapper*, 568 U.S. at 414. The plaintiff "bear[s] the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm," and may not "rely on speculation about 'the unfettered choices made by independent actors not before the court.'" *Id.* (quoting *Lujan*, 504 U.S. at 562).

Here, the Discharge Class Plaintiffs allege two speculative injuries. First, they allege that Defendants have failed to immediately provide them with the specific community mental health services they have requested, which they claim "create[s] serious risks that [the Discharge Class Plaintiffs] will suffer psychiatric harms and, as a result, face unnecessary segregation in psychiatric hospitals" or other institutional settings. SAC ¶ 601. Second, they allege that Defendants have injured them by offering community housing in settings that are allegedly "segregated and institutional." *Id.* ¶ 602.

As demonstrated below, Plaintiffs' alleged risk of institutionalization injury does not satisfy Article III standing. First, the Discharge Class Plaintiffs' predictions regarding a possible risk of future institutionalization are not a "certainly impending" injury. Second, the alleged risk of institutionalization is not traceable to Defendants' conduct.

### A. The Discharge Class Plaintiffs Do Not Allege a Certainly Impending Injury

The Discharge Class Plaintiffs' first theory of injury is that the Defendants have not

immediately provided them with the particular community services they have requested, which they claim injures them by creating a risk that they might decompensate and subsequently require further care in an institutional setting. SAC ¶¶ 584-86. This theory fails Article III's injury in fact requirement.

The Discharge Class Plaintiffs primarily rely on the Second Circuit's holding in *Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016) in support of their risk of institutionalization theory of injury. SAC ¶ 391. In *Davis*, the plaintiffs were individuals with disabilities who challenged New York's coverage restrictions on certain medical services provided under its Medicaid plan. New York had "restrict[ed] coverage" of certain medical services, providing coverage only to individuals with "a narrow set of medical conditions." *Id.* at 261. Disabled persons, including the plaintiffs, who did not "happen to suffer from those enumerated ailments are thus denied access to medically necessary assistance directly on the grounds of their disabling conditions." *Id.* The Second Circuit found that it was "undisputed that at least some of the plaintiffs suffer from disabilities, which could be ameliorated by the services New York now denies to them, and that, without those services, *would lead to their institutionalization.*" *Id.* (emphasis added). Given the undisputed allegation that the coverage restriction "would lead" to institutionalization, the Second Circuit found that the plaintiffs had alleged "an injury sufficient to carry plaintiffs' integration mandate claim." *Id.* at 263-64.

While *Davis* holds that the "risk of institutionalization" can form the basis for an ADA claim, Article III standing principles still control. A plaintiff who alleges a risk of future institutionalization may not avoid the constitutional requirement of showing that the injury is "actual or imminent," "*certainly impending,*" and not based on an "attenuated chain of inferences." *Clapper*, 568 U.S. at 409, 414 (emphasis in original). The Western District of New York recently considered precisely this issue in *E.B. ex rel. M.B. v. Cuomo*, No. 16-CV-735 (LJV), 2020 WL 3893928 (W.D.N.Y. July 11, 2020). In that case, the plaintiffs were individuals with developmental disabilities who alleged that they were living in the community with family or other caregivers. *Id.* at *1. The plaintiffs alleged that New York

14

State had denied them access to supported, community-based residential placements, which allegedly "violate[d] the integration mandate because it place[d] [the plaintiffs] at unacceptable risk of institutionalization." *Id.* at *5. While the court acknowledged the holding in *Davis*, it found that the plaintiffs' allegations of possible future institutionalization were "too tenuous to establish standing." *Id.* at *6. That was because the plaintiffs had merely alleged a chain of inferences: "that their caregivers may become unable to provide care; that they then may not receive one of the 1,500 available supported, community-based residential placements. . .; and that their health and welfare then may deteriorate to such a level that they require institutional care." *Id.* Because this "hypothetical chain of events [fell] short of demonstrating a 'certainly impending' risk of injury," the court found that the plaintiffs did not have Article III standing. *Id.*

Likewise, the Discharge Class Plaintiffs have failed to allege a certainly impending injury. They instead rely on speculation that by not receiving the requested services immediately upon release from prison, they *may* face some increased chance of future hospitalization or incarceration. The SAC repeatedly uses hedged, conditional language to describe the likelihood of this speculative future injury, referring variously to a "serious risk[]" of injury or merely a "heightened risk[]." SAC ¶¶ 584, 596, 601. In support of this claim, the Plaintiffs cite studies that allegedly show that the absence of the requested services "*can* exacerbate mental illness," may "*reduce[]* negative outcomes," and "*may well* influence the success in the community of this population." *Id.* ¶¶ 597-98 (emphasis added). These vague and cautious statements amount to mere "[a]llegations of *possible* future injury" that "are not sufficient" to establish standing. *Clapper*, 568 U.S. at 409 (emphasis in original).

The allegations of Plaintiff W.P. demonstrate this deficiency. W.P. alleges that he has been provided with housing at a mental health shelter while he is waiting for a different housing placement. SAC ¶¶ 303-11. While W.P. has access to case managers, doctors, and nurses, he alleges that his current housing "greatly increases the risk that [he] will suffer a mental health crisis resulting in hospitalization,

15

or an episode that endangers his parole status." *Id.* ¶¶ 304, 317. *See also id.* ¶ 321 (alleging that his current housing causes a "greater likelihood that [W.P.'s] mental health will deteriorate further, resulting in institutionalization or reincarceration"). Because W.P. alleges the mere possibility of future injury—some unquantified "greater likelihood" of harm—rather than an injury that is "certainly impending," he does not have standing to bring such claims.

### B. Plaintiffs' Risk of Institutionalization is Not Traceable to Defendants' Actions

In addition to the Discharge Class Plaintiffs' failure to allege a concrete and certainly impending injury, the harm they allege is not traceable to Defendants' conduct. To satisfy Article III standing, a plaintiff must show "a causal connection between the injury and the conduct complained of—the injury has to be fairly trace[able] to the challenged action of the defendant, and not th[e] result [of] the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citation omitted).

The Discharge Class Plaintiffs have not met the traceability requirement. Indeed, they allege that each Plaintiff has a long history of serious mental illness and institutionalization, predating the events at issue here. SAC ¶¶ 218-21, 283-84, 325-29. Because they cannot plausibly allege that Defendants created the risk that their illness may lead to some future hospitalization or incarceration, they instead contend that by failing to immediately provide the specific services they demand, Defendants have "heightened" this preexisting risk. SAC ¶ 596. But the SAC does not explain how much of the alleged risk of harm is due to Defendants' purported conduct, as opposed to the baseline risk of institutionalization caused by Plaintiffs' serious mental illnesses and other factors. The allegations here are thus distinguishable from those in *Davis*, where it was undisputed that the defendants' decision not to cover the requested services "would lead" directly to the plaintiffs' injury. 821 F.3d at 261.

This pleading deficiency precludes the claims of S.D. and D.H., the two proposed Discharge

Class representatives who allege that they have already been injured because they decompensated upon release from prison and no longer reside in the community. SAC ¶¶ 269-72, 346. By their own account, however, each alleges that their decompensation was caused by factors that are not traceable to Defendants. SAC ¶¶ 269, 331.

S.D. alleges that after his discharge from prison, he was provided housing and services at a mental health shelter, in addition to support from an ACT team. SAC ¶¶ 238, 256. He alleges, however, that he lacked a sufficient supply of medications, and that while staff at the shelter were assigned to help administer his medications, they inadvertently failed to detect the issue, leading him to miss doses and subsequently decompensate. *Id.* ¶¶ 249-252. He is currently receiving treatment at Bellevue Hospital. *Id.* ¶ 270. Plaintiffs allege in conclusory fashion that this staff medication error would not have occurred had S.D. been placed in integrated, community-based mental health housing, *id.* ¶ 250, but they provide no basis for that conclusion or any other plausible claim that Defendants caused S.D.'s decompensation. Rather, the alleged decompensation appears to be attributable to "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

Similarly, D.H. alleges that since his release from prison, he has been provided with housing at the Bridges of New York shelter and with his grandmother. *Id.* ¶¶ 335, 339. He alleges that he "relaps[ed] into substance use" and "fail[ed] to complete mental health and recovery day programs" that were offered to him. *Id.* ¶ 331. Since these actions constituted parole violations, he was subsequently incarcerated again, and he is currently receiving inpatient treatment in the Intensive Treatment Unit at Rockland Psychiatric Center. *Id.* ¶ 346. Because D.H. concedes that he was re-institutionalized due to his own decision not to participate in the mental health treatment services that were offered to him in the community, he has not plausibly alleged that the Defendants caused his decompensation.

In both cases, because the Discharge Class Plaintiffs allege that actions by third parties or the

Plaintiffs themselves led to their institutionalization, their alleged injuries are not traceable to Defendants' conduct. *See Woods v. Tompkins Cty.*, No. 16-CV-0007 (LEK) (TWD), 2019 WL 1409979, at *9-10 (N.D.N.Y. Mar. 28, 2019), *aff'd*, 804 Fed. App'x 94 (2d Cir. 2020) (dismissing "risk of institutionalization" claim where "[p]laintiff's own behavior" and "not any discriminatory methods of administration on the part of [d]efendant" led to her alleged increased risk of institutionalization). Thus, they lack standing to bring the proposed Discharge Class claims.

## II. THE PROPOSED DISCHARGE CLASS FAILS TO STATE A CLAIM FOR VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT OR SECTION 504 OF THE REHABILITATION ACT.

To establish a claim under Title II of the ADA or the Rehab Act, a plaintiff must show that: (1) he or she is a qualified individual with a disability; (2) the defendant is "subject to one of the Acts"; and (3) the plaintiff was "denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of" her disability. *Disabled in Action*, 752 F.3d at 196–97 (quoting *McElwee*, 700 F.3d at 640); *Henrietta D.*, 331 F.3d at 273. A plaintiff must allege, among other things, that the defendant denied meaningful access to services, programs or activities to which they were legally entitled. *See McNiece v. Connecticut*, 692 Fed. App'x 655, 656 (2d Cir. 2017).

Central to this action are the "integration regulations" of the ADA and Rehab Act. In *Olmstead*, the Supreme Court concluded that the "integration mandate" of the ADA and Rehab Act requires a public entity to administer its Medicaid program in a manner that does not result in the "unjustified segregation or isolation" of individuals with disabilities. 527 U.S. at 607. Under *Olmstead*, the State is "required to provide community-based treatment for persons with mental disabilities" when three conditions are satisfied: (1) the State's "treatment professionals determine that such placement is appropriate"; (2) "affected persons do not oppose such treatment"; and (3) "placement can be reasonably accommodated, taking into account the resources available to the State and the needs of

others with mental disabilities." 527 U.S. at 607.

Here, the Discharge Class Plaintiffs allege a "risk of institutionalization" theory as well as an unlawful segregation theory. SAC ¶ 601-02. However, as demonstrated below, Plaintiffs fail to plausibly state an integration mandate claim under either theory. First, they were not "denied" services they were legally entitled to under the ADA or Rehab Act. Second, their release to certain temporary housing situations does not constitute "segregation" from the community.

### A. The Discharge Class Plaintiffs Do Not Plausibly Allege That They Were Denied Services to Which they Were Legally Entitled Under the ADA or Rehab Act

The Discharge Class Plaintiffs cannot state a plausible claim that they are at risk for institutionalization merely because they were released to community shelters and are on waitlists for other kinds of housing. In asserting their integration mandate claims, Plaintiffs once again rely on the Second Circuit's holding in *Davis v. Shah*, 821 F.3d 231. However, the alleged risk of institutionalization complained of in the SAC does not stem from an affirmative denial of services by Defendants, as what occurred in *Davis* and its progeny.

In *Davis*, the Second Circuit found that the State's amendments to its Medicaid Plan, which limited coverage for orthopedic footwear and compression stockings to those with certain medical conditions—ultimately denying plaintiffs the requested services—put plaintiffs at risk of institutionalization in violation of the ADA and Rehab Act. *Id.* at 263; *accord Ciaramella v. Zucker*, 18-CV-6945 (JPO), 2019 WL 4805553, at *11 (S.D.N.Y. Sept. 30, 2019) (denial of dental benefit could create risk of institutionalization); *E.B.*, 2020 WL 3893928, at *3 (finding plaintiffs had plausibly stated a risk of institutionalization claim on theory that plaintiffs had been "den[ied] . . . access to OPWDD's supported, community-based residential placements").

Here, there is no such affirmative denial of services. Instead, the Discharge Class Plaintiffs do not allege that they have been denied their desired housing situation, but that they have been placed on waitlists. SAC ¶¶ 232, 320, 334. The existence and use of such waitlists is *specifically* contemplated

in *Olmstead* and Plaintiffs placement on such a list does not plausibly allege a violation of the ADA or Rehab Act. 527 U.S. at 606 (recognizing that "it is reasonable for the State to ask someone to wait until a community placement is available").

The Discharge Class Plaintiffs also complain that the alleged lack of mental health services in the community puts them at serious risk of institutionalization. SAC ¶¶ 117-19. But, once OMH makes a clinical determination that an individual can be released into the community with certain services, whatever risk may result from not receiving adequate mental health care and treatment is not attributable to OMH or to DOCCS, as it is the local government, i.e. the county (or New York City) to which the individual has been released, that is responsible for providing those services. *See, e.g.,* MHL § 41.13 (requiring development of local service programs). Nor can the Discharge Class Plaintiffs plausibly sustain claims against Defendants to the extent that those services are provided by private entities contracted by the local government. Private entities are not covered by Title II of the ADA. *See Woods*, 804, Fed. App'x at 96 (quoting 28 C.F. R. § 35.130(b)(6) and the DOJ's ADA Technical Assistance Manual ("A state is not accountable for discrimination in the practices of a licensee if those practices are not the result of requirements or policies established by the state."); *see also Mental Hygiene Legal Serv. on Behalf of Oliviah CC. v. Delaney*, 176 A.D.3d 24, 26, (2019), *leave to appeal granted sub nom. Mental Hygiene Legal Serv. v. Delaney*, 35 N.Y.3d 912, (2020) (the absence of private providers to deliver expanded services to qualified individuals in the community did not establish a violation of the ADA against the State).

The Discharge Class Plaintiffs' claims that they have been denied services that they are legally entitled to and are thus being served in inappropriately segregated settings appears to be based on a theory that OMH's preparation of a SPOA application constitutes a clinical determination that certain community-based mental health housing is clinically necessary or appropriate upon an SMI parolees' release to the community. SAC ¶¶ 445-47. These allegations are conclusory and inaccurate, as

Commissioner Sullivan's detailed explanation of the pre-release process makes clear. *See supra* pp. 7-8.

Thus, neither the ADA nor Rehab Act create a legal entitlement to community-based mental health housing premised solely on the submission of a SPOA application to the county to which the inmate will be released. Nor is there an obligation to provide housing because Plaintiffs are on post-release supervision. Although DOCCS has an obligation to assist inmates in securing housing, *see* N.Y. Corr. Law § 201(5), that is the extent of its obligation. *See Gonzalez v. Annucci*, 32 N.Y.3d 461, 474-76 (2018) (rejecting argument that "substantial assistance" must be provided).

Here, following OMH's pre-release planning process, the Discharge Class Plaintiffs were released from prison to the counties from which they were convicted and placed on waitlists for other housing. All three are currently on post-release supervision. SAC ¶¶ 216, 234, 278. Two of the Plaintiffs, S.D. and W.P., were released to the 30th Street Men's Shelter, which is operated by New York City, and then transferred to specialized shelters.[19] SAC ¶¶ 234-37, 299, 303, 323. The third Plaintiff, D.H., was initially released to Orange County and, following re-incarceration, he was released to Bridges of New York, a private residential center for men with substance abuse problems located in Newburgh, New York.[20] SAC ¶ 234. At one point in time, D.H. had been released to his family. SAC ¶ 340. These release plans were determined to be clinically appropriate at the time of their release and services were to be provided by the counties.

Moreover, allegations that "Plaintiffs in the Discharge Class are routinely released from prisons to the homeless shelter system," SAC ¶¶ 533, 542, 599, are conclusory and inaccurate, intended no doubt to bolster Plaintiffs' equally conclusory claims of "warehousing." SAC ¶ 17. As demonstrated

---

[19] NAICA East Tremont Transitional Housing Program provides intensive supportive case services, housing services, recreation and other services. *See* https://www.naicany.org/. Delta Manor is operated by the Center for Community Services ("CUCS"), which is the housing SPOA for New York City. *See* https://www.cucs.org/delta-manor/.

[20] *See* http://www.bridgesofnewyork.org/newburgh.html.

above, OMH and DOCCS have well-settled statutory and policy requirements with respect to providing appropriate care and treatment of inmates with mental illness upon their release from prison. *See Franza v. Stanford*, No. 16 Civ. 7625 (KMK), 2018 WL 914782, at *1 n.1 (S.D.N.Y. Feb. 14, 2018*); Baker v. N.Y. State Dep't of Corr. and Comm. Super.*, No. 17 Civ. 1270 (GTS), 2018 WL 357297, at *3 n.4 (N.D.N.Y. Jan. 10, 2018). Further, the lengthy pre-release planning process that Defendants undertake in evaluating the treatment needs of inmates with mental illness[21] belies the Discharge Class Plaintiffs' claims that putative class members are "routinely" released to the shelter system and left to "fend for themselves." As such, the Discharge Class Plaintiffs cannot plausibly allege that Defendants have denied them services to which they are legally entitled under the ADA or Rehab Act.

### B.  The Discharge Class Plaintiffs Do Not Plausibly Allege They Have Been Placed in Unlawfully Segregated Settings

The Discharge Class Plaintiffs further allege that Defendants have violated the ADA and Rehab Act by offering them housing in allegedly "segregated" settings. SAC ¶¶ 602-28. But they have failed to plausibly allege specific facts in support of this conclusory assertion of injury.

In *Olmstead*, the Supreme Court explained that segregation occurs where an individual suffers "confinement in an institution," which "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Olmstead*, 527 U.S. at 601. The hallmark of impermissible segregation is that individuals seeking treatment must "relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice." *Id.*

"[N]either the Supreme Court nor the Second Circuit has ever decided whether the integration mandate applies outside the context of institutionalization." *E.B.*, 2020 WL 3893928, at *8. In *E.B.*,

---

[21] *See supra* pp. 7-11.

where the plaintiffs alleged that their community placements amounted to impermissible segregation, the court found that although such a claim was "not implausible as a matter of law," the plaintiffs had done no more than provide "conclusory assertions" that could not survive a motion to dismiss. *Id.* at *12. While some Circuits have held that a plaintiff may be injured by an allegedly segregated community placement, those cases have largely involved claims of severe restrictions on the plaintiff's freedom to leave the residence and interact with the community. *See Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 462 (6th Cir. 2020) (plaintiff "can be outside his home a maximum of forty hours a week"); *Steimel v. Wernert*, 823 F.3d 902, 918 (7th Cir. 2016) (finding unjustified isolation where state program allowed persons with disabilities to leave their homes only 12 hours each week).

The Discharge Class Plaintiffs do not allege that they have been confined in an institution that requires them to relinquish participation in community life or that severely restricts their ability to leave their residence. Instead, they allege that while they are waiting for a more permanent placement in mental health housing, Defendants have provided interim housing options *in the community* that include Transitional Living Residences, Transitional Placement Programs, Crisis Residences,[22] and State-Operated Community Residences, SAC ¶ 603—none of which "require the residents to relinquish participation in community life they could enjoy given reasonable accommodations." *Olmstead*, 527 U.S. at 601.

The Discharge Class Plaintiffs somehow conclude that these settings are "segregated," *id.* ¶ 616, but their specific allegations concerning these interim placements do not support that claim. Their specific grievances with these temporary housing placements appear to be that: (1) the residences "exclusively serve individuals with serious mental illness," *id.* ¶ 617; (2) they "typically house[] dozens

---

[22]    *See, e.g.,*    https://omh.ny.gov/omhweb/bho/docs/adult-crisis-residence-benefit-and-billing-guidance.pdf (providing rules for Crisis Residences allowing residents to leave and return from the residence as needed, offering flexibility to maintain employment and accomplish other daily tasks to the greatest extent possible).

of individuals," *id.* ¶ 618; (3) residents are "subject to house rules, including curfews, for both residents and visitors, and room checks by staff," *id.* ¶ 619; (4) there is "limited privacy" because "staff maintain keys to individuals' bedrooms and lockboxes," *id.* ¶ 620; (5) residents must "often share a bedroom," *id.* ¶ 621; (6) residents "share a common dining area for meals, and are prohibited from eating outside of designated areas," *id.* ¶ 622; and (7) residents "share toilets and showers with multiple residents," *id.* ¶ 623. None of these features is in any way equivalent to the type of harmful and impermissible segregation discussed in *Olmstead*. Indeed, this Court has held that release to a mental health shelter is not *per se* isolation or segregation. *See Jenkins v. New York City Dep't of Homeless Services*, 643 F. Supp. 2d 507, 517-18 (S.D.N.Y. 2009) (deferring to the "reasonable medical judgments of public health officials" as articulated in *Olmstead* and therefore finding no ADA violation of plaintiff's placement in a mental health shelter rather than a general shelter), *aff'd* 391 Fed. App'x 81, 83 (2d Cir. 2010). Because the Discharge Class Plaintiffs cannot plausibly allege that they were released to unlawfully segregated settings, they fail to state a violation of the integration mandate.

24

**CONCLUSION**

For all the foregoing reasons, Defendants respectfully request that the Court dismiss the claims

of the Discharge Class Plaintiffs in Plaintiffs' Second Amended Complaint.

Dated:  New York, New York
        January 8, 2021

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*

By: _____ */s/ Jane R. Goldberg* _____
        Jane R. Goldberg
        Jeb Harben
        Assistant Attorneys General
        28 Liberty Street
        New York, NY 10005
        Tel.: (212) 416-6133 (JRG)
        Tel.: (212) 416-6185 (JH)
        Jane.Goldberg@ag.ny.gov
        Jeb.Harben@ag.ny.gov