UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H.,
individually and on behalf of all similarly situated,

                                  Plaintiffs,

                -against-

ANDREW CUOMO, in his official capacity as the Governor
of the State of New York, the NEW YORK STATE OFFICE
OF MENTAL HEALTH, ANN MARIE T. SULLIVAN, in
her official capacity as the Commissioner of the New York
State Office of Mental Health, the NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION, ANTHONY J.
ANNUCCI, in his official capacity as the Acting
Commissioner of the New York State Department of
Corrections and Community Supervision, ANNE MARIE
MCGRATH, in her official capacity as Deputy
Commissioner of the New York State Department of
Corrections and Community Supervision,

                                  Defendants.

7:19-cv-0639 (CS) (AEK)

------------------------------------------------------------------------ x

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 2

LEGAL STANDARDS ............................................................................................................ 4

ARGUMENT .......................................................................................................................... 5

I.   The Court Should Disregard the Extraneous Material Defendants Improperly Rely On in Support of Their Rule 12(b)(6) Motion and Any Arguments Arising Therefrom. ............. 5

II.  Plaintiffs S.D., D.H., and W.P. Have Standing to Bring Risk of Institutionalization Claims. ......................................................................................................................... 7

    A.   Plaintiffs' allegations satisfy the "injury-in-fact" requirement. ............................ 7

    B.   Plaintiffs allege a sufficient causal connection between Defendants' conduct and their injuries. ................................................................................................... 11

III. Plaintiffs Adequately Allege *Olmstead* Claims under the ADA and § 504 ..................... 15

    A.   Defendants misstate the *Olmstead* legal standards. ............................................. 15

    B.   Plaintiffs are people with disabilities who are eligible for, do not oppose, but do not receive community-based mental health housing and services. ..................... 19

    C.   Defendants place Plaintiffs at serious risk of institutionalization. ........................ 21

    D.   Plaintiffs adequately allege that they are held in segregated settings. .................. 24

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................4

*Ball by Burba v. Kasich*,
244 F. Supp. 3d 662 (S.D. Ohio 2017) ..........................................................16, 22

*Baur v. Veneman*,
352 F.3d 625 (2d Cir. 2003) ................................................................................9

*Brantley v. Maxwell-Jolly*,
656 F. Supp. 2d 1161 (N.D. Cal. 2009) .............................................................18

*Chase Grp. All. LLC v. City of New York Dep't of Fin.*,
620 F.3d 146 (2d Cir. 2010) ................................................................................4

*Chevron Corp. v. Donziger*,
833 F.3d 74 (2d Cir. 2016) ................................................................................11

*Ciaramella v. Zucker*,
No. 18-CV-6945, 2019 WL 4805553 (S.D.N.Y. Sept. 30, 2019) ...........................23

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .............................................................................................8

*Clinton L. v. Delia*,
No. 10-CV-123, 2012 WL 5381488 (M.D.N.C. Oct. 31, 2012) .............................23

*Conn. Office of Prot. & Advoc. for Persons with Disabilities v. Connecticut*,
706 F. Supp. 2d 266 (D. Conn. 2010) .......................................................7, 8, 17, 19

*Cortlandt St. Recovery Corp. v. Hellas Telecomm., S.À.R.L.*,
790 F.3d 411 (2d Cir. 2015) ................................................................................4

*Davis v. Shah*,
821 F.3d 231 (2d Cir. 2016) ........................................................................ passim

*Day v. D.C.*,
894 F. Supp. 2d 1 (D.D.C. 2012) ....................................................................17, 21

*Disability Advocates, Inc. v. Paterson*,
598 F. Supp. 2d 289 (E.D.N.Y. 2009) ...................................................17, 20, 21, 24

*Disability Advocates, Inc. v. Paterson*,
653 F. Supp. 2d 184 (E.D.N.Y. 2009) .................................................................21

*E.B. v. Cuomo,*
No. 16-CV-375, 2020 WL 3893928 (W.D.N.Y. July 11, 2020) ..................................8, 10, 24

*Eaves v. Designs for Fin., Inc.,*
785 F. Supp. 2d 229 (S.D.N.Y. 2011)..................................................................................4, 6

*Fisher v. Okla. Health Care Auth.,*
335 F.3d 1175 (10th Cir. 2003) ...............................................................................13, 15, 22

*Gonzalez v. Annucci,*
32 N.Y.3d 461 (2018) ..........................................................................................................19

*Guggenberger v. Minnesota,*
198 F. Supp. 3d 973 (D. Minn. 2016)................................................................................8, 12

*Henrietta D. v. Bloomberg,*
331 F.3d 261 (2d Cir. 2003)..................................................................................................17

*Hesse v. Godiva Chocolatier, Inc.,*
463 F. Supp. 3d 453 (S.D.N.Y. 2020)......................................................................................5

*Hunter on of A.H. v. D.C.,*
64 F. Supp. 3d 158 (D.D.C. 2014) ........................................................................................17

*Jenkins v. New York City Dep't of Homeless Services,*
643 F. Supp. 2d 507 (S.D.N.Y. 2009)....................................................................................25

*Joseph S. v. Hogan,*
561 F. Supp. 2d 280 (E.D.N.Y. 2008) ......................................................................17, 21, 25

*Kreisler v. Second Ave. Diner Corp.,*
731 F.3d 184 (2d Cir. 2013)..................................................................................................11

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)............................................................................................................7, 11

*M.J. v. District of Columbia,*
401 F. Supp. 3d 1 (D.D.C. 2019) ..................................................................................9, 10, 14

*M.R. v. Dreyfus,*
663 F.3d 1100 (9th Cir. 2011) ................................................................................................8

*M.R. v. Dreyfus,*
697 F.3d 706 (9th Cir. 2012) ................................................................................................15

*Makarova v. United States,*
201 F.3d 110 (2d Cir. 2000)....................................................................................................4

*McClean v. County of Westchester*,
  No. 17-CV-4492, 2018 WL 6329420 (S.D.N.Y. Dec. 3, 2018) ..................................................5

*Mental Hygiene Legal Service v. Delaney*,
  176 A.D.3d 24 (N.Y. App. Div. 2019) ..................................................................................19

*United States v. Mississippi*,
  400 F. Supp. 3d 546 (S.D. Miss. 2019).......................................................................... passim

*Murphy v. Minn. Dep't of Human Servs.*,
  260 F. Supp. 3d 1084 (D. Minn. 2017)...................................................................7, 21, 24

*Olmstead v. L.C.*,
  527 U.S. 581 (1999)...............................................................................................15, 16, 20

*Parrales v. Dudek*,
  No. 15-CV-424, 2015 WL 13373978 (N.D. Fla. Dec. 24, 2015) ...........................9, 11, 12, 13

*Pashby v. Delia*,
  709 F.3d 307 (4th Cir. 2013) ...................................................................................15

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013)..................................................................................11, 13

*Schine v. N.Y. State Office for People with Dev. Disabilities*,
  No. 15-CV-5870, 2019 WL 2177004 (E.D.N.Y. May 20, 2019) ...........................................23

*Sira v. Morton*,
  380 F.3d 57 (2d Cir. 2004)......................................................................................6

*Steimel v. Wernert*,
  823 F.3d 902 (7th Cir. 2016) ...................................................................................24

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)...............................................................................................7

*Vailette v. Lindsay*,
  No. 11-CV-3610, 2014 WL 4101513 (E.D.N.Y. Aug. 18, 2014)............................................4

*Villanueva v. Wells Fargo Bank, N.A.*,
  No. 13-CV-5429, 2017 WL 11539677 (S.D.N.Y. Jan. 25, 2017) ...........................................9

*Warth v. Seldin*,
  422 U.S. 490 (1975)...............................................................................................8

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
  979 F.3d 426 (6th Cir. 2020) ..................................................................9, 15, 22, 24

*Woods v. Tompkins County*, No. 16-CV-7, 2019 WL 1409979 (N.D.N.Y. Mar. 28, 2019) .................................................................................................................12, 18, 23

*Woods v. Tompkins County*, 804 F. App'x 94 (2d Cir. 2020).................................................12, 19


**STATUTES**

42 U.S.C. § 12101(a)(2), (3) ...............................................................................................13

Mental Hygiene Law § 7.01 ................................................................................................18

Americans with Disabilities Act ................................................................................... passim

Americans with Disabilities Act Title II ...................................................................... passim

MHL § 7.07(c) ......................................................................................................................18

Rehabilitation Act ...............................................................................................................17

Rehabilitation Act Section 504 ..................................................................................... passim

**OTHER AUTHORITIES**

28 C.F.R. § 35.130(d) ..........................................................................................................15

28 C.F.R. § 41.51(d) ............................................................................................................15

45 C.F.R. § 84.4(b)(2)..........................................................................................................15

Federal Rule of Civil Procedure 12(b)(1) ...........................................................................4, 14

Federal Rule of Civil Procedure 12(b)(6) ...............................................................4, 5, 23, 25

Federal Rules of Evidence Rule 201 .....................................................................................4

U.S. Dep't of Justice, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.*, Questions 6, 9 (June 22, 2011), http://www.ada.gov/olmstead/q&a_olmstead.htm..................................................................16

U.S. Dep't of Justice, *The Americans with Disabilities Act, Title II Technical Assistance Manual*, https://www.ada.gov/taman2.html#II-3.7200...........................................18

**PRELIMINARY STATEMENT**

Homelessness is a predictable, preventable, and devastating outcome for people with serious mental illness who are leaving incarceration. On paper, New York has a continuum of mental health services for this population. The reality, however, is much uglier. Hundreds of indigent people with serious mental illness leave prison each year only to be trapped in a vicious cycle: prisons-to-shelters, shelters-to-institutions, institutions-to-jails, jails-to-prisons, over and over again. This cycle exists because of Defendants' systemic failure to create adequate capacity in the existing community-based housing and supportive services programs that many people with disabilities need. Defendants are legally bound under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("§ 504") to administer systems that do not result in the unnecessary isolation of people with disabilities, but they have failed to do so.

In violation of the *Olmstead* integration mandate, Defendants segregate Plaintiffs from the community and place them at serious risk of institutionalization. Defendants relegate Plaintiffs to temporary housing that disproportionately serves people with serious mental illness and lacks needed supports. Some temporary housing is even located on the grounds of psychiatric centers and provides nearly identical living conditions. Plaintiffs face unnecessary isolation and—with diagnoses such as schizophrenia and bipolar disorder—predictably deteriorate when placed in inappropriate settings like the shelter system. Defendants, who supervise Plaintiffs and are charged with overseeing and managing the mental health system, fail to make available the community-based services necessary to prevent the risk of decompensation and institutionalization—in essence, setting Plaintiffs up for failure.

Named Plaintiffs S.D., W.P., and D.H., individually and on behalf of the putative Discharge Class, bring the Fifth and Sixth Causes of Action of the Second Amended Complaint ("SAC"), Dkt. 134, against the New York State Office of Mental Health ("OMH"), Commissioner

Ann Marie T. Sullivan, the New York State Department of Corrections and Community Supervision ("DOCCS"), Acting Commissioner Anthony Annucci, and Deputy Commissioner Anne Marie McGrath.[1] Plaintiffs allege that Defendants' failure to make available community-based mental health housing and supportive services results in two distinct violations of the *Olmstead* integration mandate: (1) unjustified isolation and segregation and (2) a serious risk of institutionalization. SAC ¶¶ 752-74.

Minimizing the control they exert over Plaintiffs' lives, Defendants move to dismiss Plaintiffs' claims arguing that they lack standing and fail to state a cause of action. Defendants' arguments, however, misrepresent Plaintiffs' allegations, contort the applicable law, and would, if adopted, strip away core protections for people with disabilities. Contrary to Defendants' misstatements, Plaintiffs have Article III standing and allege sufficient facts to state claims under the ADA and § 504. Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

Named Plaintiffs S.D., W.P., and D.H. are indigent people with serious mental illness released from prison without the community-based mental health housing and supportive services for which they are eligible. Each was determined by Defendants to be appropriate for an integrated setting, and Defendants applied for community-based mental health housing and services appropriate to each Plaintiff's needs. Because of woefully inadequate capacity in Defendants' mental health system, however, the Named Plaintiffs, like hundreds of members of the putative Discharge Class each year, were placed in segregated settings and at serious risk of institutionalization upon their discharge from state prison. Defendants house Plaintiffs in segregated settings, including homeless shelters, mental health shelters, Transitional Living

---

[1] Plaintiffs voluntarily dismissed the claims asserted against Governor Cuomo. Dkt. 148.

Residences, Crisis Residences, and DOCCS parole housing, while Plaintiffs wait indefinitely for community-based mental health housing and supportive services.

Plaintiffs filed the SAC on August 27, 2020 to address *Olmstead* violations that harm a class of people with serious mental illness who are released from prison without the services Defendants determined were appropriate for them. *E.g.*, SAC ¶¶ 13, 14, 532-628, 698. The injuries to the new proposed Discharge Class are caused by the same lack of community-based mental health housing and supportive services injuring the putative General Class and RTF Subclass. *E.g.*, *id.* ¶¶ 24, 415-19, 474-95. The putative Discharge Class, represented by Plaintiffs S.D., W.P., and D.H., are people with serious mental illness who were or will be discharged into inadequate temporary housing situations that place them at risk of institutionalization and subject them to unjustified segregation. *Id.* ¶¶ 13, 216-353, 698. D.H. and S.D. were institutionalized while waiting for unavailable community-based mental health housing and supportive services, with no end date in sight. *Id.* ¶¶ 234-77, 301-22. By the time of the filing of the SAC, W.P. was in a homeless shelter a year and three months post-discharge, the majority of that time spent in a facility that serves exclusively men with mental illness. *Id.* ¶ 301, 303-07, 319. All three Plaintiffs deteriorated in health and remain at risk of further decline due to Defendants' failure to make available mental health services. *Id.* ¶¶ 249-70, 273-74, 299, 316-17, 321, 331, 342, 346, 350.

Plaintiffs seek a declaratory judgment that Defendants' conduct is discriminatory and a permanent injunction requiring Defendants to take the necessary steps to ensure that Plaintiffs are housed in the most integrated setting appropriate to their needs and are not placed at risk of institutionalization. *Id.* ¶¶ 19, 21, 24. For the reasons stated below, Defendants' meritless motion to dismiss should be denied and Plaintiffs' claims should proceed.

**LEGAL STANDARDS**

Federal Rule of Civil Procedure 12(b)(1) applies to Defendants' standing argument. *See Cortlandt St. Recovery Corp. v. Hellas Telecomm., S.À.R.L.*, 790 F.3d 411, 416-17 (2d Cir. 2015). Under Rule 12(b)(1), the Court should not dismiss a claim unless it determines that it "lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In determining whether a plaintiff has satisfied his burden to "alleg[e] facts that affirmatively and plausibly suggested that [he] has standing to sue," the Court must "accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party." *Cortlandt St. Recovery Corp.*, 790 F.3d at 417 (alterations and citations omitted).

When assessing Defendants' Rule 12(b)(6) arguments, the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chase Grp. All. LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010). The Court should dismiss the complaint only if it fails to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). Courts "generally may not consult evidence outside the pleadings" when deciding Rule 12(b)(6) motions. *Vailette v. Lindsay*, No. 11-CV-3610, 2014 WL 4101513, at *3 (E.D.N.Y. Aug. 18, 2014). Rather, in adjudicating such motions, the Court may only consider (1) "facts alleged in the complaint and documents . . . incorporated in it by reference," (2) "documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference," (3) "documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint," and (4) "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229,

244 (S.D.N.Y. 2011) (quoting *Weiss v. Incorporated Village of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011)).

**ARGUMENT**

I.      **The Court Should Disregard the Extraneous Material Defendants Improperly Rely On in Support of Their Rule 12(b)(6) Motion and Any Arguments Arising Therefrom.**

All of the documents Defendants cite in their moving papers fall outside the narrow categories of documents the Court may properly consider in deciding a Rule 12(b)(6) motion. Defendants incorrectly assert that the Court may take judicial notice of the facts set forth in myriad publicly available documents and webpages. *See* Dkt. 156 ("Defs. Mem.") at 5 n.5,  9 n.18. Although courts may, at times, take judicial notice of documents at the motion-to-dismiss stage, such documents "may be used only for 'determining what the documents state,' and may not be used to 'prove the truth of their contents.'" *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)). Because Defendants rely on the documents cited for their truth,[2] the Court should disregard Defendants' arguments to the extent they require the Court to accept as true the contents of the cited documents. *See, e.g.*, *McClean v. County of Westchester*, No. 17-CV-4492, 2018 WL 6329420, at *5 n.6 (S.D.N.Y. Dec. 3, 2018).

Defendants also improperly invite the Court to consider written discovery that Defendants have provided in this case—namely, Defendant Sullivan's February 12, 2020 response to Plaintiffs' tenth interrogatory, Dkt. 157-3 ("Harben Decl. Ex. C")—because one paragraph of Plaintiffs' SAC quotes a portion of Defendant Sullivan's *March 2020 supplemental* response to a

---

[2] For example, Defendants cite various information on the DOCCS and OMH websites to provide a purported "Overview of New York's Public Mental Health System." Defs. Mem. at 5-7.

different interrogatory. *See* Defs. Mem. at 7 n.15; SAC ¶ 605.[3] But Plaintiffs' "mere notice or possession" of a document "is not enough" to enable a Defendant to rely upon it at the motion to dismiss stage. *Eaves*, 785 F. Supp. 2d at 244 (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)). Because nothing in the document or the SAC indicates that Plaintiffs relied on the February 2020 interrogatory responses in drafting the SAC, and Plaintiffs do not concede the accuracy of the information reflected in the portion of the February 2020 interrogatory responses on which Defendants rely, the Court may not consider the document in deciding Defendants' motion to dismiss. *Id.* at 244-46 (document may be considered at motion-to-dismiss stage only if "Plaintiffs relied on [it]" and it is clear that no dispute exists regarding the accuracy of the document). Even if the single sentence in ¶ 605 of the SAC came from the same document upon which Defendants rely, the Court's consideration of the document also would be improper, as "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004). Moreover, the Court should not permit Defendants—who have long objected to providing discovery concerning the discharge of individuals to shelters—to rely on material extraneous to the SAC that Defendants have selectively and strategically decided to produce in this action. *Compare* Harben Decl. Ex. C at 5-7 (demonstrating that discovery on which Defendants now rely was provided in response to Plaintiffs' request for information concerning how OMH assessed whether people being released from DOCCS custody "were suitable for

---

[3] SAC ¶ 605 states in full as follows: "Defendant Sullivan explained in March 2020 that 'when OMH is notified by DOCCS that [an] inmate patient is releasing, and OMH has made a clinical determination that the inmate patient requires mental health housing upon release from DOCCS custody, OMH will recommend placing the inmate in a Transitional Living Residence in the event that no other appropriate community-based mental health housing is available as of the time of the inmate's release date . . . .'"

release to a homeless shelter"), *with, e.g.*, Dkt. 119 (objecting to Plaintiffs' request for information

concerning discharge of people with serious mental illness to homeless shelters); Minute Entry,

*M.G. v. Cuomo*, No. 7:19-cv-0639 (S.D.N.Y. Nov. 12, 2020).

## II.   Plaintiffs S.D., D.H., and W.P. Have Standing to Bring Risk of Institutionalization Claims.

Defendants' argument that the Court lacks subject matter jurisdiction misapplies standing

doctrine and well-settled *Olmstead* precedent. To establish Article III standing, Plaintiffs must

demonstrate "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the

conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable

decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (alteration omitted)

(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). At the pleading stage,

"general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*,

504 U.S. at 561. Contrary to Defendants' arguments, Plaintiffs' factual allegations support each

prong of standing, including the "injury-in-fact" and "causal connection" prongs.[4]

### A.   Plaintiffs' allegations satisfy the "injury-in-fact" requirement.

Plaintiffs plead a sufficient "injury-in-fact" to support their integration mandate claims

under a risk-of-institutionalization theory.[5] To satisfy the injury-in-fact requirement, the injury

---

[4] Defendants do not contest the third *Lujan* prong. Defs. Mem. 12-18.

[5] Defendants do not present any argument to challenge Plaintiffs' standing to seek relief under an unlawful segregation theory, as they fail to develop their perfunctory claim that Plaintiffs' injuries arising from their segregation are "speculative." Defs. Mem. at 13. Regardless, Defendants do not dispute Plaintiffs' allegations that W.P. was released to homeless shelters, *e.g.*, SAC ¶¶ 301, 303-04, that S.D. was released to homeless shelters and later hospitalized, *e.g.*, *id.* ¶¶ 234, 237-38, 256-57, 270, or that D.H. was re-incarcerated and later hospitalized, *e.g.*, *id.* ¶¶ 331-46. These allegations are sufficient to plead an "injury-in-fact," *see, e.g.*, *Murphy v. Minn. Dep't of Human Servs.*, 260 F. Supp. 3d 1084, 1101 (D. Minn. 2017) (risk of segregation sufficiently concrete and particularized to establish standing), and the Court must accept these allegations as true at this stage, *Conn. Office of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp.

must be "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Ignoring Plaintiffs' detailed facts about *current* injuries, Defendants mischaracterize Plaintiffs' allegations as mere "predictions regarding a possible risk of future" institutionalization, and rely incorrectly on the "certainly impending" standard, Defs. Mem. at 13, which only applies where the injury is "imminent," but not "actual" or ongoing, *see Clapper*, 568 U.S. at 409. Because Plaintiffs allege actual, current harm, Defendants' arguments must be rejected. *Conn. Office of Prot. & Advoc. for Persons with Disabilities*, 706 F. Supp. 2d at 284.

Risk of institutionalization claims are concerned with current injuries, not future ones. Contrary to Defendants' position, a risk of institutionalization plaintiff is not required to show imminent institutionalization to satisfy injury-in-fact, or even to prevail on the merits. *See Warth v. Seldin*, 422 U.S. 490 (1975) (standing turns on "nature . . . of the claim asserted").[6] Rather, a plaintiff must allege only that a defendant's failure to provide services creates a current, serious risk of institutionalization. *See Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 991-92 (D. Minn. 2016) (injury-in-fact satisfied where plaintiff "alleges that he or she is currently lacking necessary supports and services" and "this lack of services is presently causing specific tangible harms"). That is, the inadequate provision of services—which Plaintiffs allege here—is itself an injury sufficient for the "injury-in-fact" prong of Article III standing. *See, e.g.*, *E.B. v. Cuomo*, No. 16-CV-375, 2020 WL 3893928, at *6 (W.D.N.Y. July 11, 2020) (failure to provide services "*now*,"

---

2d 266, 278-79, 284 (D. Conn. 2010) (quoting *Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006)).

[6] To hold otherwise would depart from the binding precedent governing the elements needed to prevail on a risk of institutionalization claim. It is well established that no showing of imminent institutionalization is required to succeed on the merits. *See Davis v. Shah*, 821 F.3d 231, 262-63 (2d Cir. 2016); *M.R. v. Dreyfus*, 663 F.3d 1100, 1116-17 (9th Cir. 2011), *as amended on denial of rehearing en banc*, 697 F.3d 706 (9th Cir. 2012); *see also infra* Section III.

making institutionalization more likely, satisfies injury-in-fact); *see also Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 441-42 (6th Cir. 2020) (allegation of defendant's ongoing failure to budget appropriately to ensure full implementation of services satisfied injury-in-fact); *Parrales v. Dudek*, No. 15-CV-424, 2015 WL 13373978, at *4 (N.D. Fla. Dec. 24, 2015) (alleged "arbitrary delays, denials, or insufficient provision of services" satisfied injury-in-fact).

Indeed, the Second Circuit and this Court have recognized in other contexts that conduct that creates a "*present*, *immediate* risk of exposure to [harm]" satisfies the injury-in-fact requirement. *Cf. Baur v. Veneman*, 352 F.3d 625, 635, 640-41 (2d Cir. 2003) (holding in the food safety context that conduct that creates a risk of harm may satisfy injury-in-fact where there is "a tight connection between the type of [alleged] injury" and "the fundamental goals of the statutes which [the plaintiff] sues under"); *Villanueva v. Wells Fargo Bank, N.A.*, No. 13-CV-5429, 2017 WL 11539677, at *5 (S.D.N.Y. Jan. 25, 2017) (finding injury-in-fact in the real property context where alleged conduct "presents a risk of real harm to [a] concrete interest"). That rationale applies with equal force to claims under the ADA and § 504.

Defendants' argument that Plaintiffs' allegations are vague ignores the detailed allegations in the SAC. As noted below in Section III, Plaintiffs allege in detail that Defendants fail to make available the community-based mental health housing and supportive services that are necessary for Plaintiffs to remain in integrated settings, and that this failure has placed, and continues to place, Plaintiffs at serious risk of institutionalization. S.D. and D.H. have already been re-institutionalized and W.P.'s already fragile mental health worsened. *E.g.*, SAC ¶¶ 225-60, 263-64, 273-75, 290-99, 316-17, 320-21, 331-43, 345-48, 350-51. These allegations show actual injuries. *See M.J. v. District of Columbia*, 401 F. Supp. 3d 1, 9 (D.D.C. 2019) (alleged lack of services leading to hospitalizations sufficient for injury-in-fact); *United States v. Mississippi*, 400 F. Supp.

3d 546, 553-55 (S.D. Miss. 2019) (alleged ongoing lack of services after hospital discharge created risk of re-institutionalization sufficient for injury-in-fact). Consequently, Defendants' argument that Plaintiffs lack an injury-in-fact has no merit.

Defendants' attempt to analogize *E.B. v. Cuomo* is also unavailing. In *E.B.*, the plaintiffs challenged the state's failure to develop adequate supportive housing, which resulted in the provision of supportive housing only to people with disabilities who experienced acute crisis. But, the court found, the plaintiffs were not *then* at risk. 2020 WL 3893928, at *6 (plaintiffs had not alleged "the state's failure to immediately provide them with supported, community-based residential placements *now* 'will *likely*' result in their institutionalization in the future"). Rather, the court determined that the plaintiffs alleged a more attenuated injury that would arise *if* plaintiffs' caregivers became unable to provide care, *if* at that point community-based residential placements were then unavailable, and then only *if* the plaintiffs' health and welfare had deteriorated "to such a level that they require institutional care." *Id*.

Unlike *E.B.*, Plaintiffs are *now* experiencing the harm they challenge—that is, a serious risk of institutionalization. Plaintiffs adequately allege that inadequate services already caused them to decline in health and welfare. *E.g.*, SAC ¶¶ 245-64, 273-75, 316-21, 331, 346, 350-51; *see M.J.*, 401 F. Supp. 3d at 9 (pleading that insufficient services led to disrupted education and hospitalizations sufficient for injury-in-fact). Further, they allege that they remain at risk of segregation due to inadequacy of housing and services and Defendants' policy to discharge people to inappropriate settings. *E.g.*, SAC ¶¶ 584-601. These allegations show current, actionable harm.

*Davis* also does not support Defendants' challenge to Plaintiffs' standing. As an initial matter, the Second Circuit did not resolve a standing issue, and Defendants ignore the different posture of *Davis*. The portions of *Davis* quoted by Defendants relate to the *prima facie* elements

and evidence submitted at summary judgment. Defs. Mem. at 14; *see* 821 F.3d at 263-64. Moreover, Defendants offer a contorted view of *Davis* as precedent that Article III requires parties to have no dispute over whether the denial of services would lead to institutionalization. Defs. Mem. at 14, 16. Neither *Davis* nor any other precedent stands for this extreme view.

B.   Plaintiffs allege a sufficient causal connection between Defendants' conduct and their injuries.

Plaintiffs sufficiently allege that their serious risk of institutionalization is fairly traceable to Defendants' conduct and thus satisfy the causation prong of the standing inquiry. To satisfy Article III's traceability requirement, a plaintiff must plead "a causal connection between the injury and the defendant[']s conduct." *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013). While the injury must be "fairly traceable" to a defendant's actions and "not the result of the independent action of some third party not before the court," *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted), the "fairly traceable" standard is "relatively modest," requiring something "lower than proximate cause." *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) (internal quotation marks and citations omitted); *Parrales*, 2015 WL 13373978, at *4. Even when a "defendant's conduct may be only an 'indirect' cause [it] is 'not necessarily fatal to standing.'" *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976)).

Plaintiffs' detailed facts are sufficient to show that their injuries are causally connected to Defendants' actions. Plaintiffs allege that Defendants administer the mental health system and are responsible for developing adequate integrated services, determining funding, and coordinating and planning with local governments regarding community-based care, *e.g.*, SAC ¶¶ 363-65, 368-70, 392-414, 442-48; that Defendants are responsible for approving Plaintiffs' release locations, developing and implementing discharge plans, and securing appropriate services, *e.g.*, SAC

11

¶¶ 374, 377-78, 427, 442-57, 575-78, 586-87; and that Defendants fail to adequately administer and develop an integrated system of services, and instead discharge Plaintiffs to inappropriate settings that do not meet their needs while simultaneously exercising authority over where they live. *E.g.*, SAC ¶¶ 234-35, 237, 244-46, 249, 250, 297, 318, 415-19, 457, 473. Plaintiffs therefore plead that their lack of adequate services and the resulting risk of institutionalization are causally connected to Defendants' conduct. *See Guggenberger*, 198 F. Supp. 3d at 992 (allegations of defendants' responsibility to administer waiver program, defendants' mismanagement of program, and plaintiffs' need for and lack of waiver program services sufficient to show causal connection); *Parrales*, 2015 WL 13373978, at *2 (allegations of defendant's administration, oversight, and failure to provide program guidance sufficient to show causation).[7]

Defendants' specious and ableist standing arguments would, if accepted, eviscerate the disability rights statutes. Defendants argue that because Plaintiffs' long history of disability "predat[es] the events at issue here," Plaintiffs have a "baseline risk of institutionalization," and they lack standing because they fail to quantify "how much" risk is due to Defendants' conduct as compared to their disability. Defs. Mem. at 16. Defendants also blame providers' staff and Plaintiffs themselves for their injuries. *Id.* at 17-18.

As an initial matter, Defendants' "baseline risk" argument cannot be squared with *Davis*, which recognizes integration mandate claims by people who are appropriate to receive services in integrated settings and yet are vulnerable to institutionalization due to insufficient services. *See*

---

[7] As discussed further below, *Woods v. Tompkins County*, No. 16-CV-7, 2019 WL 1409979, at *1 (N.D.N.Y. Mar. 28, 2019), *aff'd*, 804 F. App'x 94 (2d Cir. 2020), does not support Defendants' arguments. *Woods* is a liability decision made on a factual record, does not address Article III causation standards, and is factually distinguishable. *Id.* at *10; *see also Woods v. Tompkins County*, 804 F. App'x 94, 96-97, (2d Cir. 2020) (noting lack of allegations of defendant's role in the unlawful conduct).

821 F.3d at 263-64. Defendants cannot in good faith argue that people with significant psychiatric and institutional histories fall outside the ADA and § 504, and Defendants cite no case supporting this view. Courts have repeatedly recognized risk of institutionalization claims on behalf of people with disabilities with significant institutional histories. *E.g.*, *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1179 (10th Cir. 2003) (describing prior hospitalizations of plaintiffs); *Mississippi*, 400 F. Supp. 3d at 567, 569 (summarizing evidence related to earlier hospitalizations). This is precisely the population whose rights are vindicated by the ADA and § 504. *See, e.g.*, 42 U.S.C. § 12101(a)(2), (3). *Davis* does not support Defendants' "baseline risk" argument.

Moreover, although Defendants argue that Plaintiffs fail to show causation because they do not explain *how much* of the risk is attributable to Defendants, Article III does not require Plaintiffs to quantify Defendants' role in creating their injuries in relation to their serious mental illness. *See, e.g.*, *Rothstein*, 708 F.3d at 93 (reasoning that absence of specific description of the "scale" of defendants' alleged conduct did not preclude finding of traceability); *Parrales*, 2015 WL 13373978, at *4 (finding no requirement to show defendant is sole cause of risk of institutionalization). Article III requires only that Plaintiffs allege a *connection*, which they have done. Defendants themselves concede that Plaintiffs allege a connection between the risk of institutionalization and Defendants' conduct. *See* Defs. Mem. at 16 ("they instead contend that by failing to immediately provide the specific services they demand, Defendants have 'heightened' this preexisting risk").

Defendants also mischaracterize S.D.'s and D.H.'s detailed allegations concerning their injuries. *Id.* at 17. To the extent Defendants argue that S.D.'s decompensation in the shelter is not fairly traceable to Defendants because of actions or inactions of shelter staff, precedent forecloses that argument. *See, e.g.*, *Rothstein*, 708 F.3d at 92 ("[A]n intervening cause of the plaintiff's injury

. . . is not necessarily a basis for finding that the injury is not 'fairly traceable' to the acts of the defendant."). Further, Plaintiffs allege S.D.'s ongoing risk of institutionalization is directly traceable to Defendants' failure to provide adequate housing and supportive services, which resulted in S.D. not being admitted to an apartment treatment program and his discharge instead to the shelter system that lacks necessary services. SAC ¶¶ 225-75.

Defendants also incorrectly argue that D.H. has not shown "traceability" sufficient to support his risk claim. Defendants hypothesize that D.H.'s prior institutionalization resulted from his "own decision not to participate in . . . services that were offered." Defs. Mem. at 17. This argument ignores key allegations.[8] Plaintiffs allege that the services Defendants provided to D.H. in the past were inadequate, leading to a cycle of segregation. *See* SAC ¶¶ 331-35, 339-42. After identifying D.H.'s significant needs and the services he required to remain in the community, Defendants repeatedly discharged him without these services, such as to parole housing that lacks on-site services. *Id.* ¶ 338. Defendants imply the services were adequate, but this self-serving opinion does not defeat D.H.'s standing. *See M.J.*, 401 F. Supp. 3d at 9 (rejecting defendant's argument that plaintiff's alleged refusal of less intensive, "short-term backstop[]" services, which plaintiff alleged were inadequate, precluded injury-in-fact). Further, Defendants do not argue that D.H. is currently declining services; thus, Defendants' argument is not relevant to traceability for D.H.'s risk of institutionalization. These allegations are sufficient for Rule 12(b)(1) purposes.

In short, Plaintiffs sufficiently allege actual, ongoing injuries—namely, Plaintiffs' serious risk of institutionalization—that are fairly traceable to Defendants' failure to provide adequate

---

[8] Defendants' argument also sounds in discredited "culture of poverty" rhetoric that attributes social harm to individuals' lapsed responsibility and not system failures. This discourse has long demonized Black, Indigenous, and people of color to obscure government policies that produce racial inequality. *See generally* Keeanga-Yamahtta Taylor, *Race for Profit: How Banks and the Real Estate Industry Undermined Black Homeownership* (2019).

services. For these reasons, Plaintiffs have standing to bring integration mandate claims under a risk-of-institutionalization theory.

**III.    Plaintiffs Adequately Allege *Olmstead* Claims under the ADA and § 504.**

    A.    <u>Defendants misstate the *Olmstead* legal standards.</u>

Defendants offer a constricted interpretation of *Olmstead* that disregards decades of controlling law and, if adopted, would strip away core protections for people with disabilities. To establish a Title II or § 504 claim, plaintiffs must show that (1) they are qualified individuals with disabilities, (2) they were excluded from participation in a public entity's services, programs, or activities or were otherwise discriminated against by a public entity, and (3) such exclusion or discrimination was due to their disability. *Davis*, 821 F.3d at 259. The ADA and § 504 require states to administer their mental health programs "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Olmstead v. L.C.*, 527 U.S. 581, 592 (1999); 28 C.F.R. § 35.130(d); *see* 28 C.F.R. § 41.51(d); 45 C.F.R. § 84.4(b)(2). Under this "integration mandate," plaintiffs state an *Olmstead* claim when they allege that (1) treatment professionals have determined that community-based services are appropriate, (2) the plaintiffs do not oppose such services, and (3) the services can be reasonably accommodated. *Davis*, 821 F.3d at 262.

Public entities also violate the ADA and § 504 when their conduct poses "a serious risk of institutionalization for disabled persons." *Id.* at 263. The Second Circuit, like its sister circuits to address the issue,[9] has held that *Olmstead* is violated where plaintiffs demonstrate that a public

---

[9] *See, e.g.*, *Waskul*, 979 F.3d at 461 (holding plaintiffs pleaded *Olmstead* claim by alleging that "the current budget methodology caused them to have to substantially rely on family members incapable of providing sustained, long-term care, thus placing them at risk of institutionalization"); *Pashby v. Delia*, 709 F.3d 307, 321-22 (4th Cir. 2013) (affirming finding of likelihood of success on merits of at-risk claim, citing declarations that lack of in-home care made independent living unsafe and facility admission more likely); *M.R. v. Dreyfus*, 697 F.3d 706, 720 (9th Cir. 2012) (holding plaintiffs "have shown that reduced access to personal care services will place them at serious risk of institutionalization"); *Fisher*, 335 F.3d at 1178, 1181-82 (holding *Olmstead* does

entity's failure to provide community-based services "will *likely* cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Id.* (internal quotation marks and citations omitted); U.S. Dep't of Justice, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and* Olmstead v. L.C., Questions 6, 9 (June 22, 2011) ("DOJ *Olmstead* Statement"), http://www.ada.gov/olmstead/q&a_olmstead.htm (last accessed Feb. 4, 2021).[10]

No precedent supports Defendants' argument that plaintiffs bringing an *Olmstead* claim must demonstrate an "affirmative denial" of services that leads to the risk of institutionalization. Defs. Mem. at 19; *see* DOJ *Olmstead* Statement, Question 2 (noting that public entity violates the integration mandate when it "(1) directly or indirectly operates facilities and or/programs [sic] that segregate individuals with disabilities; (2) finances the segregation of individuals with disabilities in private facilities; and/or (3) through its planning, service system design, funding choices, or service implementation practices, promotes or relies upon the segregation of individuals with disabilities in private facilities or programs"). Rather, courts have repeatedly held that the ADA and § 504 provide a cause of action to challenge a state's failure to administer, operate, and fund services consistent with the integration mandate and in a manner that results in a risk of segregation. *See, e.g.*, *Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 681 (S.D. Ohio 2017) (plaintiffs in private nursing facilities stated integration mandate claim based on failures in administration, management, and funding of service system, including lack of program capacity);

---

not require plaintiffs to be institutionalized to challenge state policy that "imperil[s them] with segregation"); *see also Mississippi*, 400 F. Supp. 3d at 553 (collecting cases).

[10] "Because the [DOJ] is the agency directed by Congress to issue regulations implementing Title II, its views warrant respect." *Olmstead*, 527 U.S. at 597-98; *see Davis*, 821 F.3d at 263-64 (citing and adopting DOJ interpretation as "controlling").

*Day v. D.C.*, 894 F. Supp. 2d 1, 22-23 (D.D.C. 2012) (plaintiffs not required to allege that District made a specific decision to place them in segregated settings, and instead that the District provides, administers, and/or funds the existing service system); *Conn. Office of Prot. & Advoc.*, 706 F. Supp. 2d at 276-78 (administration of state's mental health system, including failures in discharge planning and lack of promptness in providing services); *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 319 (E.D.N.Y. 2009), *vacated on other grounds sub nom.*, *Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012) (failures in planning, funding and administration of existing mental health service system); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 293 (E.D.N.Y. 2008) (plaintiffs not required to show the state was specifically responsible for their placement in nursing facilities, but rather to allege systemic failure of mental health system to provide housing in least restrictive environment). In short, an *Olmstead* violation exists where the "descriptions of the services . . . do not match the reality of service delivery, in terms of what is actually provided and where it is provided." *Mississippi*, 400 F. Supp. 3d at 557.

Even more stunning is Defendants' assertion that they may not be held liable because local actors are responsible for the alleged violations. Defs. Mem. at 20. This argument must be rejected because Plaintiffs state a claim against Defendants based on their statewide failures in administering services, and further because Defendants' disavowal of responsibility for *Olmstead* compliance is not supported by law. "New York State is also liable to guarantee that those it delegates to carry out its programs satisfy the terms of its promised performance, including compliance with the Rehabilitation Act." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 286 (2d Cir. 2003); *see also Hunter on behalf of A.H. v. D.C.*, 64 F. Supp. 3d 158, 169-70 (D.D.C. 2014) (collecting cases). "Given th[e] public administration" of the state's mental health system, "Title

II applies" and "[i]t is immaterial that Plaintiff[s] receive[] the actual services via private agencies." *See Woods*, 2019 WL 1409979, at *10.[11] Defendants' position would create a dangerous precedent, is contrary to law, and must be rejected. *See Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1174 (N.D. Cal. 2009) (admonishing state defendants for their "arguably cavalier approach" of placing full responsibility for identifying and securing alternative services on individual programs).

Defendants' effort to shift the blame fails in light of the undisputed role they play in administering the systems at issue in this case. OMH is responsible for developing, funding, and administering a system of community-based mental health housing and supportive services. *E.g.*, SAC ¶¶ 363-70, 384, 392-419, 439-49, 474-80, 485-88, 758-60, 769-71. Under Mental Hygiene Law ("MHL") § 7.01, for example, OMH and its commissioner are required to:

> plan and work with local governments, voluntary agencies and all providers and consumers of mental health services in order to develop an effective, integrated, comprehensive system for the delivery of all services to the mentally ill and to create financing procedures and mechanisms to support such a system of services to ensure that mentally ill persons in need of services receive appropriate care, treatment and rehabilitation close to their families and communities.

*See also* MHL § 7.07(c) (requiring OMH to ensure protection of civil rights of service recipients). OMH is also responsible for mental health services in prison. *E.g.*, SAC ¶¶ 586-93, 602-28. DOCCS, in turn, maintains legal custody and supervision of people on parole and post-release supervision until the maximum expiration of their community supervision and must approve all

---

[11] Defendants mischaracterize DOJ's ADA Technical Assistance Manual. It explains that "a public entity may not establish requirements for the programs or activities of licensees that would result in discrimination against qualified individuals with disabilities," and "[a]lthough licensing standards are covered by title II, the licensee's activities themselves are not covered." U.S. Dep't of Justice, *The Americans with Disabilities Act, Title II Technical Assistance Manual*, https://www.ada.gov/taman2.html#II-3.7200 (last accessed Feb. 5, 2021). Under Title II, regardless of whether a state is liable for a shelter's failures, it is discriminatory for the state to fail to administer systems to prevent unnecessary isolation.

residences. *E.g.*, SAC ¶¶ 234, 297, 318, 346, 374-78, 420, 439, 449-52, 457, 574-82, 627.[12]

DOCCS also funds the parole housing system to which certain Plaintiffs are released. SAC ¶¶ 54, 334-35, 549-50, 659. Under Defendants' flawed and absurd theory, DOCCS and OMH could determine someone needs mental health services, discharge that person to segregated settings or without needed mental health housing and services, and then bear no responsibility for *Olmstead* compliance because of the role counties play in processing service applications. Federal law offers no such loophole. Defendants' failure to fund sufficient community-based mental health housing for indigent people with serious mental illness who are leaving incarceration is sufficient ground on which to state claims under the ADA and § 504. Even if the consequences of that failure were exacerbated by the conduct of third parties or Plaintiffs themselves, it does not deprive Plaintiffs of the right to seek a remedy against Defendants. *Conn. Office of Prot. & Advoc.*, 706 F. Supp. 2d at 277.

*Woods v. Tompkins County* does not save Defendants' argument. There, the plaintiff's lack of services was undisputedly caused by her conflicts with private providers, rather than any alleged action by the defendant. *Woods*, 804 F. App'x at 97. Reliance on *Mental Hygiene Legal Service v. Delaney*, 176 A.D.3d 24, 26 (N.Y. App. Div. 2019), *perm. app. granted*, *Mental Hygiene Legal Serv. v. Delaney*, 35 N.Y.3d 912 (2020), similarly fails because it was dismissed for pleading deficiencies regarding the state's involvement.

    B.    <u>Plaintiffs are people with disabilities who are eligible for, do not oppose, but do not receive community-based mental health housing and services.</u>

S.D., W.P., and D.H. allege that they and the putative Discharge Class are people with disabilities who desire and have been determined eligible for community-based mental health

---

[12] *Gonzalez v. Annucci*, 32 N.Y.3d 461 (2018), relied on by Defendants, is inapplicable, as Plaintiffs do not challenge the steps required of DOCCS to locate housing.

housing and supportive services upon their release from prison (*e.g.*, SAC ¶¶ 217-32, 265, 271-72, 277, 279-96, 309-11, 322, 324-34, 345, 348, 353, 548, 629-35, 646-49, 698, 754-56, 765-67) and that Plaintiffs can be reasonably accommodated in integrated settings (*e.g.*, *id.* ¶¶ 393-406, 653-60, 757, 768). Due to woefully inadequate capacity, however, Defendants do not make these community-based housing and supportive services available for Plaintiffs. *E.g.*, SAC ¶¶ 233-35, 245-46, 260-64, 297-99, 311, 319-20, 333-34, 340-42, 345, 348, 415-19, 477-95, 542-51, 570, 605, 611, 636-38, 651-52, 698-99. Defendants do not, and cannot, challenge the inadequate availability of these programs upon Plaintiffs' discharge from prison. Instead, Defendants simply rely on *Olmstead*'s reference to waitlists and take the Court's discussion out of context. Defs. Mem. at 19. The Court in *Olmstead* referred specifically to waitlists "that move[] at a reasonable pace." 527 U.S. at 605-06. The reasonableness of waitlists is a factual issue relevant to a fundamental alteration defense that cannot be decided in the absence of a record. *See Paterson*, 598 F. Supp. 2d at 335, 337. Further, the months- and years-long waits that Plaintiffs endure while waiting for critical mental health housing and services are not objectively reasonable. *E.g.*, SAC ¶¶ 416-18; *Mississippi*, 400 F. Supp. 3d at 554 ("[T]he ADA and *Olmstead* protect persons trapped in a snail's-pace deinstitutionalization.").

In short, Plaintiffs sufficiently allege that they were appropriate for release to the community and have not received the services for which Defendants deemed them eligible.[13] Defendants in fact agree that Plaintiffs were appropriate for release to the community. *See* Defs. Mem. at 20 (describing OMH's "clinical determination that an individual can be released into the

---

[13] The services at issue are not merely "the specific community mental health services that [Plaintiffs] have requested." Defs. Mem. at 13; *see id.* at 14-15. Rather, the services at issue are those that OMH determined were "necessary" and "appropriate." *E.g.*, SAC ¶¶ 225, 288, 332.

community with certain services"). And Defendants agree that they identified services appropriate

for Plaintiffs to receive upon release. *See id.* at 21 ("Plaintiffs were . . . placed on waitlists for other

housing"). Defendants now argue *post hoc*, however, that the failure to actually provide the

services they determined were appropriate is justified by a medical judgment. *Id.* But it is

Defendants' determination that Plaintiffs were appropriate for the services in the first instance that

is relevant to the *Olmstead* claim.[14] Defendants' resource-based decision to place individuals on a

waitlist is an administrative decision, not a medical one, and does not rescind Defendants' earlier

determination of Plaintiffs' appropriate services. To the extent Defendants claim that the decision

not to provide adequate housing and supportive services and to use waitlists somehow reflects a

medical judgment, this is a factual dispute not capable of resolution at this stage. *Cf. Joseph S.*,

561 F. Supp. 2d at 291 (rejecting "defendants' argument that *Olmstead* requires that the state's

mental health professionals be the ones to determine what an individual needs"); *see also Day*, 894

F. Supp. 2d at 23-24 (collecting cases and observing appropriateness for community-based

services is a factual question not dependent on state determinations).

        C.      <u>Defendants place Plaintiffs at serious risk of institutionalization.</u>

Defendants place Plaintiffs and the putative Discharge Class at serious risk of

institutionalization by releasing them without needed supportive services and appropriate

community-based housing. Plaintiffs offer detailed allegations to support this claim:

- Hundreds of members of the putative Discharge Class who are released each year to
  shelters, hotels, motels, parole housing, and even the community are placed at serious risks

---

[14] Courts have held that a plaintiff may state an *Olmstead* claim even if a state treatment professional has not made a determination. *See Murphy*, 260 F. Supp. 3d at 1116 (holding plaintiffs' failure to allege facts relating to state treatment professional determination not fatal to claim where defendants' alleged actions prevented evaluations for community-based services); *Disability Advocates, Inc. v. Paterson*, 653 F. Supp. 2d 184, 258-59 (E.D.N.Y. 2009), *vacated on other grounds*, *Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012) (finding that state medical professional determination of appropriateness not necessarily required to state *Olmstead* claim).

of institutionalization as they will likely decline in mental health, safety, and welfare due to the absence of mental health housing and supportive services. *E.g.*, SAC ¶¶ 415-19, 495, 532-33, 538-51, 566-79, 584-601, 626-28.

- Defendants are aware of the Plaintiffs' extensive mental health treatment histories, their high-level support needs, and the serious risk of institutionalization they face without needed services, and Plaintiffs are accordingly among the priority population for mental health housing and supportive services. *E.g.*, *id.* ¶¶ 217-30, 235, 265, 274, 279-96, 324-29, 332-34, 411, 478-81, 486, 493, 548, 574-79, 584-601, 631-36.

- Defendants determined S.D. eligible for a community-based apartment treatment program, with medication monitoring, and extensive supportive mental health services upon his discharge from prison. Instead, he was placed in a mental health shelter in the Bronx with horrible conditions and without even a Social Security card. Due to the lack of supports and poor conditions in the facility, he did not receive medications (preventable with appropriate services) and deteriorated. He was hospitalized less than three months after his discharge from prison, then institutionalized shortly thereafter. Defendants' own staff attributed his decompensation to residing in a shelter without needed supports. *E.g.*, *id.* ¶¶ 216-77.

- W.P. also did not receive the needed community-based housing and services he is eligible for. Instead, he was sent to a mental health shelter in the Bronx, where his mental health continues to deteriorate and conditions exacerbate his symptoms. *E.g.*, *id.* ¶¶ 278-322.

- D.H. was in a vicious cycle of release and re-incarceration for years, each time being released without the mental health housing and supportive services he needs to succeed. He was released to a shelter with no mental health services at all once, and then again to his grandmother's house without needed benefits or individualized supportive services that he requires. He was institutionalized in the summer of 2020. *E.g.*, *id.* ¶¶ 323-53.

Courts have found that individuals are unlawfully placed at risk when deprived of necessary services. *See Davis,* 821 F.3d at 263-64 (restrictions on coverage of orthopedic footwear and compression stockings); *Ball by Burba*, 244 F. Supp. 3d at 678 (administration failure creating lack of program capacity); *Waskul*, 979 F.3d at 461 (state's budget methodology caused lack of support services for independent community living); *Fisher*, 335 F.3d at 1182 (reduction of prescription benefits). Defendants' argument that these allegations are "conclusory" is therefore simply not credible.

While Defendants seemingly blame the indigent Plaintiffs for their suffering in the shelter system, Defs. Mem. at 18, Plaintiffs allege in detail that the risks they face are attributable to

Defendants' conduct. For example, Plaintiffs allege that OMH determined S.D. was eligible and appropriate for community-based mental health housing and supportive services, including case management, ACT, and extensive psychiatric care. SAC ¶¶ 225-26. Rather than be placed into the proper housing and receive these services, S.D. was released to a homeless shelter— notwithstanding OMH's prior determination that he could not function in a general prison population—and without his Social Security card or activated benefits. *Id.* ¶¶ 233-36. Plaintiffs allege staff at the homeless shelter did not detect the insufficient medications or provide adequate support to S.D. to assist him with obtaining needed medications, which would have been available in integrated, community-based mental housing, ultimately resulting in S.D. rationing and then missing doses and in his eventual decompensation and re-institutionalization. *Id.* ¶ 250-64. Plaintiffs also allege in detail the risks that Defendants placed the other Named Plaintiffs in, *id.* ¶¶ 288-90, 297-305, 309, 316-22 (W.P.); ¶¶ 330-35, 338, 340-48, 350-53 (D.H.), and the Discharge Class members generally, *e.g.*, *id.* ¶¶ 1-4, 13-18, 24, 383-84, 392-419, 439-58, 474-93, 538-50, 571-628, 654-60, 758-74. Defendants suggest their conduct does not pose a serious risk of institutionalization because they assert that Plaintiffs' release plans were "clinically appropriate." Defs. Mem. at 21. But the parties' positions regarding risk and medical necessity are fact-intensive inquiries that cannot be resolved on a Rule 12(b)(6) motion. *Schine v. N.Y. State Office for People with Dev. Disabilities*, No. 15-CV-5870, 2019 WL 2177004, at *7 (E.D.N.Y. May 20, 2019); *Woods*, 2019 WL 1409979, at *9; *Clinton L. v. Delia*, No. 10-CV-123, 2012 WL 5381488, at *4 (M.D.N.C. Oct. 31, 2012); *see also Ciaramella v. Zucker*, No. 18-CV-6945, 2019 WL 4805553, at *11 (S.D.N.Y. Sept. 30, 2019) (likelihood of risk is a question of fact). With all facts assumed to be true for Rule 12(b)(6) purposes, Plaintiffs state plausible *Olmstead* claims for serious risk of institutionalization.

D.     Plaintiffs adequately allege that they are held in segregated settings.

Defendants' arguments concerning Plaintiffs' *Olmstead* claims under an unlawful segregation theory likewise fail. Defendants offer a narrow interpretation of "segregation" that subverts the case law governing ADA and § 504 claims. Defs. Mem. at 23. Courts routinely describe the "expansive reach of the integration mandate." *See, e.g.*, *E.B.*, 2020 WL 3893928, at *8, *id*. at *10 (holding that the "expansive theory of integration fits comfortably with the 'familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes'") (quoting *Henrietta D.*, 331 F.3d at 279). While "[n]either the ADA nor its regulations specifically define the word 'setting,'" the "word denotes an environment or situation rather than any particular physical structure." *Steimel v. Wernert*, 823 F.3d 902, 912 (7th Cir. 2016). The Department of Justice has similarly defined "segregation" under *Olmstead* broadly:

> Integrated settings are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible.
>
> By contrast, segregated settings often have qualities of an institutional nature. Segregated settings include, but are not limited to: (1) congregate settings populated exclusively or primarily with individuals with disabilities; (2) congregate settings characterized by regimentation in daily activities, lack of privacy or autonomy, policies limiting visitors, or limits on individuals' ability to engage freely in community activities and to manage their own activities of daily living; or (3) settings that provide for daytime activities primarily with other individuals with disabilities.

DOJ *Olmstead* Statement, Question 1; *see Murphy*, 260 F. Supp. 3d at 1094, 1117 (denying motion to dismiss where plaintiffs alleged limited contact with people without disabilities and little control over roommates, schedules, and socialization); *Waskul*, 979 F.3d at 462-63 (holding unnecessary home isolation violates integration mandate); *Paterson*, 598 F. Supp. 2d at 330-31 (denying summary judgment to defendants where genuine issues were raised regarding regimentation of

adult homes); *Joseph S.*, 561 F. Supp. 2d at 291-92 (denying motion to dismiss where residents alleged restricted freedoms and shared residence exclusively with people with mental illness).

Plaintiffs allege in detail their release to segregated settings—including homeless shelters, DOCCS parole housing, and state-operated Transitional Living Residences—the characteristics of which amount to segregation under the governing ADA and § 504 standards:

- settings populated exclusively or disproportionately with individuals with disabilities that often house dozens or even hundreds of individuals and do not enable Plaintiffs to interact with nondisabled people to the fullest extent possible, *e.g.*, SAC ¶¶ 234, 237-38, 244, 256-57, 269-70, 300-05, 307, 313, 337, 346, 542-43, 545-46, 552-60, 602-06, 612, 616-18, 624-25;

- regimentation in daily activities, including security procedures, curfews, limits on individuals' ability to manage their activities of daily living, and rules on possessions, meals, movement, and visitors, *e.g.*, *id.* ¶¶ 61,  243, 247-48, 308, 561, 564-65, 619; and

- lack of privacy or autonomy, including shared rooms and facilities, *e.g.*, *id.* ¶¶ 61, 242-43, 302, 306, 316, 562-65, 620-25.

Meanwhile, integrated, community-based mental health housing remains out of reach.

Defendants' reliance on *Jenkins v. New York City Dep't of Homeless Services*, 643 F. Supp. 2d 507 (S.D.N.Y. 2009), is unavailing. In *Jenkins*, the court found that the plaintiff insufficiently alleged eligibility for a general shelter. *Id.* at 516. Here, by contrast, Plaintiffs provide detailed allegations regarding their eligibility for community-based mental health housing and supportive services—allegations that Defendants have not disputed. Even if eligibility were disputed, this would be an issue of fact not resolvable on a Rule 12(b)(6) motion.

## **CONCLUSION**

For the reasons above, Defendants' motion should be denied in its entirety.

Dated: February 5, 2021
       New York, New York

DISABILITY RIGHTS NEW YORK

/s/ Elizabeth Woods
Joshua Rosenthal
Elizabeth Woods
25 Chapel Street, Suite 1005
Brooklyn, New York 11201
Telephone:   (518) 432-7861
E-mail:      joshua.rosenthal@drny.org
              elizabeth.woods@drny.org

THE LEGAL AID SOCIETY
Janet E. Sabel, Attorney-in-Charge

/s/ Elena M. Landriscina
Elena M. Landriscina
Stefen R. Short
Robert M. Quackenbush
Veronica Vela
199 Water Street, 6th Floor
New York, New York 10038
Telephone:   (212) 577-3530
E-mail:      elandriscina@legal-aid.org
              sshort@legal-aid.org
              rquackenbush@legal-aid.org
              vvela@legal-aid.org

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

/s/ Walter G. Ricciardi
Walter G. Ricciardi
Emily A. Vance
Crystal Parker
Samuel Margolis
Chantalle Hanna
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:   (212) 373-3000
E-mail:      wricciardi@paulweiss.com
              cparker@paulweiss.com
              evance@paulweiss.com
              channa@paulweiss.com
              smargolis@paulweiss.com

*Attorneys for Plaintiffs*