UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| M.G., P.C., C.J, M.J, J.R., D.R., S.D., W.P., and D.H, individually and on behalf of all similarly situated,<br><br>Plaintiffs,<br><br>- v -<br><br>ANDREW CUOMO, in his official capacity as the Governor of the State of New York, *et al.*,<br><br>Defendants. | 19 Civ. 639 (CS) (AEK) |

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**

AUDREY STRAUSS
United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: 212-637-2810
Facsimile: 212-637-2786
*Attorney for the United States of America*

ANTHONY J. SUN
Assistant United States Attorney
  *Of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND........................................................... 2

THE DISCHARGE CLASS MEMBERS' ALLEGATIONS....................................................... 4

DISCUSSION ............................................................................................................................ 7

    I.   INDIVIDUALS WHO PLAUSIBLY ALLEGE THAT THEY ARE AT SERIOUS RISK OF UNNECESSARY INSTITUTIONALIZATION OR SEGREGATION HAVE STANDING TO BRING A TITLE II CLAIM........................................................ 7

    II.  ALLEGATIONS THAT A PUBLIC ENTITY ADMINISTERS ITS SERVICES IN A DISCRIMINATORY MANNER STATE A CLAIM UNDER TITLE II OF THE ADA ................................................................................................................... 11

CONCLUSION........................................................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**

*Conn. Off. of Prot. & Advocacy for Persons with Disabilities v. Connecticut*,
706 F. Supp. 2d 266 (D. Conn. 2010) ................................................................................... 13

*Cruz v. Dudek*,
No. 10-cv-23088, 2010 WL 4284955 (S.D. Fla. Oct. 12, 2010) ............................................. 9

*Davis v. Shah*,
821 F.3d 231 (2d Cir. 2016) ............................................................................................ passim

*Disability Advocates, Inc. v. N.Y. Coal. For Quality Assisted Living, Inc.*,
675 F.3d 149 (2d Cir. 2012) .................................................................................................. 12

*Disability Advocates, Inc. v. Paterson*,
598 F. Supp. 2d 289 (E.D.N.Y. 2009) ............................................................................. 12, 13

*E.B. ex rel. M.B. v. Cuomo*,
No. 16 Civ. 735, 2020 WL 3893928 (W.D.N.Y. July 11, 2020) ....................................... 9, 10

*Fisher v. Okla. Health Care Auth.*,
335 F.3d 1175 (10th Cir. 2003) ............................................................................................. 10

*Georges v. United Nations*,
834 F.3d 88 (2d Cir. 2016) ...................................................................................................... 1

*Haddad v. Arnold*,
784 F. Supp. 2d 1284 (M.D. Fla. 2010) .................................................................................. 9

*Long v. Benson,*
No. 4:08-cv-26, 2008 WL 4571903 (N.D. Fla. Oct. 14, 2008) ............................................... 9

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................................................................ 7

*M.A.C. v. Betit*,
284 F. Supp. 2d 1298 (D. Utah 2003) ................................................................................... 12

*Martin v. Taft*,
222 F. Supp. 2d 940 (S.D. Ohio 2002) .................................................................................. 13

*Mary Jo C. v. N.Y. State & Local Ret. Sys.*,
707 F.3d 144 (2d Cir. 2013) .................................................................................................. 12

*Olmstead v. L.C.*,
   527 U.S. 581 (1999) .................................................................................................... passim

*Rolland v. Celluci*,
   52 F. Supp. 2d 231 (D. Mass. 1999) ...................................................................................... 13

*Waskul v. Washtenaw Cty. Cmty. Mental Health*,
   979 F.3d 426 (6th Cir. 2020) .................................................................................................. 9

**Statutes**

28 U.S.C. § 517 ................................................................................................................................ 1

29 U.S.C. § 794 ................................................................................................................................ 1

42 U.S.C. § 12101 ...................................................................................................................... 1, 2

42 U.S.C. § 12131 ......................................................................................................................... 2

42 U.S.C. § 12132 ...................................................................................................................... 1, 2

42 U.S.C. § 12134 ......................................................................................................................... 2

**Regulations**

28 C.F.R. § 35.130 ................................................................................................................. passim

28 C.F.R. Part 35, App. B ................................................................................................................ 2

**Other Authorities**

Statement of the Department of Justice on Enforcement of the Integration Mandate of
   Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* ............................... passim

## PRELIMINARY STATEMENT

The United States of America (the "United States" or the "Government") respectfully submits this Statement of Interest in accordance with 28 U.S.C. § 517[1] to provide its views regarding the applicable pleading requirements for a violation of Title II of the Americans with Disabilities Act ("ADA"),[2] 42 U.S.C. § 12132, on account of a public entity's alleged failure to accommodate the needs of indigent individuals with serious mental illness upon their release from prison. Title II and its implementing regulation require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The United States has a strong interest in ensuring the correct and consistent interpretation and application of Title II and its implementing regulation, in accordance with the Congress's intent to create "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities," and to "reserve a central role" for the Government in enforcing the standards established in the ADA. *See* 42 U.S.C. § 12101(b)(2), (3). The United States respectfully submits that Plaintiffs in this action have sufficiently pled a violation of Title II with respect to the Discharge Class members, and thus, Defendants' motion to dismiss should be denied.

---

[1] Congress has authorized the Attorney General to send "any officer of the Department of Justice . . . to any . . . district in the United States to attend to the interests of the United States in a suit pending in a court of the United States." 28 U.S.C. § 517; *see Georges v. United Nations*, 834 F.3d 88, 91 & n.10 (2d Cir. 2016).

[2] Plaintiffs also raise claims under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, but "[b]ecause the standards imposed by Title II on public entities are generally equivalent to those of § 504," § 504 is not separately addressed in this Statement of Interest. *See Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016).

## STATUTORY AND REGULATORY BACKGROUND

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). It found that, "historically, society has tended to isolate and segregate individuals with disabilities," and that "individuals with disabilities continually encounter various forms of discrimination, including . . . segregation." 42 U.S.C. §§ 12101(a)(2) and (5). Congress determined that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, *independent living*, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(7) (emphasis added).

Title II of the ADA prohibits disability discrimination in public services: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Pursuant to Congress's directive, 42 U.S.C. § 12134(a), the Attorney General promulgated a regulation to implement Title II. *See* 28 C.F.R. Part 35 (Nondiscrimination on the Basis of Disability in State and Local Government Services). Relevant to this action, Title II's regulation requires public entities (as that term is defined in 42 U.S.C. § 12131(1)) to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities" — the "integration mandate." 28 C.F.R. § 35.130(d). The "most integrated setting" is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. Part 35, App. B, at 711 (2020). The regulation requires public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications

2

would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

Under Title II and its implementing regulation, "unjustified institutional isolation of persons with disabilities is," in and of itself, a prohibited "form of discrimination." *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999). The *Olmstead* court reasoned that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* The Court also reasoned that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601. The Court concluded that individuals with disabilities are entitled to community-based services "when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities." *Id.* at 607 (plurality opinion).

Since *Olmstead*, the Department of Justice has issued guidance regarding Title II's integration mandate. *See* Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* ("DOJ *Olmstead* Statement"), https://www.ada.gov/olmstead/q&a_olmstead.htm (last updated Feb. 25, 2020). The Second Circuit has found the Department's "interpretation of *Olmstead* both consistent with the integration mandate and well-reasoned," and it expressly "adopt[ed] it as [its] own." *Davis v. Shah*, 821 F.3d 231, 262 (2d Cir. 2016). Thus, it is controlling precedent in the Second Circuit that "a plaintiff may state a valid claim for disability discrimination by demonstrating that the defendant's

3

actions pose a serious risk of institutionalization for disabled persons," rejecting the argument that institutionalization is a prerequisite to enforcement of the integration mandate. *Davis*, 821 F.3d at 263 (noting that Title II's protections would be "meaningless" if segregation was required before bringing a challenge). "[I]ndividuals need not wait until the harm of institutionalization or segregation occurs or is imminent" to assert a claim for violation of Title II's integration requirement. *Id.* at 262 (quoting DOJ *Olmstead* Statement at Q & A No. 6). Rather, "a plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services . . . will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Davis*, 821 F.3d at 262–63 (quoting DOJ *Olmstead* Statement at Q & A No. 6).

## **THE DISCHARGE CLASS MEMBERS' ALLEGATIONS**

Plaintiffs allege that the Discharge Class members are "people with serious mental illness whom Defendants unnecessarily segregate or place at serious risk of institutionalization upon their release from prison because Defendants fail to provide the community-based mental health housing and supportive services that Plaintiffs need." Second Am. Compl. ("SAC") ¶ 13. Plaintiffs allege that Defendants themselves have "determine[d] that Discharge Class members require and are eligible for community-based mental health housing and supportive services," but Defendants nevertheless rely on a variety of segregated settings and/or shelter-like parole housing facilities that are "devoid of the essential services that support community living and prevent unnecessary hospitalization and reincarceration," and Discharge Class members "remain . . . on lengthy waiting lists for community-based mental health housing and supportive services." SAC ¶¶ 14–16. The capacity of community-based mental health housing and supportive services programs is allegedly

4

"outstripped by the need and programs are inadequately administered" by Defendants. SAC ¶¶ 392, 415.

Plaintiffs allege that, upon their release, Discharge Class members are subjected to a "vicious cycle of segregation from the community, psychiatric decompensation, and reincarceration because of Defendants' failure to develop adequate community-based mental health housing and supportive services." SAC ¶ 532. Specifically, Defendants allegedly "routinely" release members of the Discharge Class from prison to the homeless shelter system "due to inadequate capacity in the community-based mental health housing and supportive service programs for which the Discharge Class members are eligible." SAC ¶ 533. Moreover, Plaintiffs allege that Defendants establish "criteria for programs that contribute to the homelessness of individuals with serious mental illness, such as allowing entry to some community-based mental health housing only after a year-long stay in a homeless shelter (or on the streets), even while community-based mental health housing for people just released from prison is regularly over capacity." SAC ¶ 543. Between January 2019 and January 2020, Defendants allegedly released over 300 individuals to the shelter system (plus another 50 to parole housing), but only about 150 to the two most integrated models of community-based mental health housing. SAC ¶¶ 547, 550.

Both the shelter system and parole housing are alleged to be segregated settings whose "residents have fewer opportunities to interact with non-disabled persons than they would in integrated, community-based settings." SAC ¶ 552, 553–58. Both are alleged to provide housing that "restrict Plaintiffs' autonomy and choices that govern their daily life activities" in a manner that "deprives [them] of stable living arrangements" and "mental health services" necessary to "ensure successful reintegration into the community" and "maintain psychiatric stability." SAC ¶¶ 561–69. Plaintiffs allege that Defendants recognize these risks. SAC ¶¶ 574–76.

Plaintiffs allege that "[w]hen Defendants release Plaintiffs in the Discharge Class to the homeless shelter system, DOCCS parole housing, or even the community without community-based mental health housing and supportive services, Defendants expose them to serious risks of psychiatric harms and decompensation" because "[t]he successful reintegration of people with serious mental illness, many of whom have required these heightened mental health services while incarcerated, depends on adequate planning for and delivery of necessary services in the community" SAC ¶¶ 584–95. Thus, Plaintiffs allege, "[r]elease without community-based mental health housing and supportive services needlessly exposes individuals with serious mental illness to heightened risks of reincarceration in jails and prisons." SAC ¶ 596–98.

Some Discharge Class members are allegedly released "from prison directly to segregated and institutional placements affiliated with OMH psychiatric hospitals" — which "are not integrated community-based mental health housing" — "despite these Plaintiffs' eligibility to be served in more integrated settings." SAC ¶ 602–06. Plaintiffs allegedly remain in these segregated and institutional placements for months to years, depending on the facility. SAC ¶¶ 613–16. These settings, similar to the shelter system and parole housing, "provide limited opportunities for Plaintiffs to interact with nondisabled individuals as they exclusively serve individuals with serious mental illness." SAC ¶ 617.

Because of Defendants' failure to provide mental health services in integrated settings, and their failure to develop adequate community-based mental health housing and supportive services, Plaintiffs allege that members of the Discharge Class are presented with a choice between "(1) release without adequate mental health care and face serious risks of psychiatric decompensation and segregation, or (2) release to a facility that provides mental health treatment

in a segregated setting, despite their eligibility to be served in a community-based housing." SAC ¶ 628.

## DISCUSSION

I. **INDIVIDUALS WHO PLAUSIBLY ALLEGE THAT THEY ARE AT SERIOUS RISK OF UNNECESSARY INSTITUTIONALIZATION OR SEGREGATION HAVE STANDING TO BRING A TITLE II CLAIM**

To make out a Title II "integration mandate" claim at the pleading stage, Plaintiffs need only allege facts that, when accepted as true, plausibly show that a public entity's actions have placed them at a serious risk of unnecessary institutionalization, even when institutionalization is not imminent. Although Defendants acknowledge that Plaintiffs allege such a serious risk, they incorrectly conclude that Plaintiffs lack standing because institutionalization is not "certainly impending." *Cf.* Defs.' Mem. of Law In Supp. of Partial Mot. to Dismiss Second Am. Compl. ("Defs.' Br."), Docket No. 158, at 13. Defendants fundamentally misconstrue the standing inquiry for an at-risk claim: the injury-in-fact is the lack of necessary mental health services resulting in a serious risk of institutionalization. Plaintiffs' at-risk claim thus satisfies all of the requirements for standing, including an injury-in-fact, because it alleges (1) an actual injury from a present denial of services, (2) caused by the Defendants, (3) that would be redressed if the Defendants' actions were enjoined. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (to satisfy the "injury in fact" requirement for standing, a plaintiff must identify an injury that is "actual or imminent, not conjectural or hypothetical"). Plaintiffs need not demonstrate that they are about to require institutionalization, as Defendants seem to argue.[3] Instead, Plaintiffs need only allege that they are

---

[3] Defendants' argument that institutionalization is too speculative has no application as to those members of the Discharge Class who, while eligible to receive services in a community-based setting, are released to unnecessarily segregated institutional settings upon discharge, where they remain segregated for months to years. SAC ¶¶ 613–17, 628.

7

"at serious risk of institutionalization or segregation," and they "need not wait until the harm of institutionalization or segregation occurs or is imminent." *Davis*, 821 F.3d at 262 (quoting DOJ *Olmstead* Statement at Q & A No. 6). Plaintiffs have alleged a serious risk of unnecessary institutionalization resulting from Defendants' failure to provide necessary community-based mental health services to the members of the Discharge Class.

Plaintiffs have alleged that members of the Discharge Class are released to a variety of settings, including the homeless shelter system and/or shelter-like parole housing facilities, instead of the community-based mental health housing and supportive services for which Defendants themselves have "determine[d] that Discharge Class members require and are eligible for." SAC ¶¶ 14–15, 533. Plaintiffs have made detailed allegations as to how and why these settings deprive Discharge Class members of the "stable living arrangements" and "mental health services" necessary to "ensure successful reintegration into the community" and "maintain psychiatric stability." SAC ¶¶ 552, 553–58, 561–69, 602–17. Thus, Plaintiffs allege, "[r]elease without community-based mental health housing and supportive services needlessly exposes individuals with serious mental illness to heightened risks of reincarceration in jails and prisons." SAC ¶¶ 596–98. In other words, it is the Defendants' alleged placements and lack of mental health services, in and of themselves, that are Plaintiffs' injuries-in-fact. These allegations are sufficient to plead a serious risk of institutionalization and confer standing.

Defendants misread *Davis* and contend that a plaintiff must show that the public entity's action would lead to "actual or imminent" or "certainly impending" institutionalization. Defs.' Br. at 14. Not so. The injury is the public entity's alleged failure to provide necessary services that "put[s] [plaintiffs] at a substantial risk of requiring institutional care," as opposed to the imminent institutionalization that Defendants seem to demand. *Davis*, 821 F.3d at 264. As the Second Circuit

8

noted, Title II's protections would be "meaningless" if a plaintiff was required to be institutionalized before bringing a challenge, *id.* at 263, and Title II does not require that a plaintiff be on the brink of institutionalization either. *See id.* at 262 (quoting DOJ *Olmstead* Statement, Q&A No. 6 ("Individuals need not wait until the harm of institutionalization or segregation occurs or is imminent.")).

Defendants' reliance on *E.B. ex rel. M.B. v. Cuomo* is misplaced. No. 16 Civ. 735, 2020 WL 3893928, at *1, *6 (W.D.N.Y. July 11, 2020). In that case, the court reasoned that plaintiffs' alleged risk was too far removed to establish standing because plaintiffs had caregivers "provid[ing] housing, care, and services," and they therefore were not facing a "substantial risk of institutionalization." As an initial matter, the court in *E.B.* applied an incorrect standard for risk of institutionalization. *Compare id.*, at *3 (finding that "the Residents have not plausibly alleged that they are at imminent risk of institutionalization"), *with Davis*, 821 F.3d at 262 (rejecting argument that a plaintiff must wait until segregation "is imminent" to state an at-risk claim). Moreover, unlike the court's characterization of the plaintiffs' allegations in *E.B.*,[4] in this case there is nothing

---

[4] Numerous courts have held that individuals currently receiving community-based care can successfully allege serious risk of institutionalization under *Olmstead* where facts are alleged about the unsustainability or insufficiency of that care. *See, e.g.*, *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 461 (6th Cir. 2020) (finding that plaintiffs who, because of defendants' budgeting methodology, had to rely on natural supports "incapable of providing sustained, long-term care" plausibly alleged a serious risk of institutionalization, which "could happen at any moment that Plaintiffs are unable to sustain their own care"); *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1291, 1295 (M.D. Fla. 2010) (holding that the plaintiff, who was on a wait list for home- and community-based services, was likely to succeed on the merits of her *Olmstead* claim because allegations that her volunteer family caregivers were "unable to provide . . . services to Plaintiff indefinitely" described "a real and immediate threat of future injury" "purportedly caused by the Defendants' actions."); *Cruz v. Dudek*, No. 10-cv-23088, 2010 WL 4284955, at *11–12 (S.D. Fla. Oct. 12, 2010) (holding that plaintiff on a wait list for home- and community-based services who relied on the support of friends and family to remain at home showed a likelihood of success on his at-risk *Olmstead* claim); *Long v. Benson,* No. 4:08-cv-26, 2008 WL 4571903 (N.D. Fla. Oct. 14, 2008), *aff'd*, 383 F. App'x 930 (11th Cir. 2010).

9

hypothetical about the Discharge Class's alleged injury and resulting risk: its members are alleged to be subjected to a serious risk of institutionalization because they are released to shelter-like facilities that utterly lack proper housing, care and services for their serious mental illness. *Cf. E.B.*, 2020 WL 3893928, at *6 (plaintiffs at risk only if their caregivers became unable to provide adequate services); *see also Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1184–85 (10th Cir. 2003) (public entity placed plaintiffs "at high risk for premature entry" to an institution by leading many of them to remain in their homes "until their health ha[d] deteriorated," leading them "eventually [to] end up in a nursing home" (internal quotation marks omitted)). This alleged ongoing failure to provide necessary community-based mental health services is itself an injury-in-fact sufficient to establish standing as a serious risk of institutionalization.

Finally, Defendants' contention that Plaintiffs lack standing because their alleged serious risk of institutionalization is not traceable to Defendants' actions is spurious at best because it invokes the discriminatory and pernicious stereotypes that the ADA prohibits by blaming the individuals with disabilities for having the very disabilities that put them at risk for institutionalization. *See* Defs.' Br. at 16 ("each Plaintiff has a long history of serious mental illness and institutionalization"), 17–18 ("actions by . . . the Plaintiffs themselves led to their institutionalization"). However, as Plaintiffs allege, Defendants administer their services in a manner that denies "the community-based mental health housing and supportive services that Plaintiffs need" to avoid institutionalization. *See, e.g.*, SAC ¶¶ 13, 363–65, 374. Like the plaintiffs in *Davis*, Plaintiffs have disabilities which can be treated by the services allegedly denied to them and, without those services, are at serious risk of institutionalization. 821 F.3d at 262.

Put simply, allegations that a public entity's failure to provide necessary community-based mental health services places an individual with disabilities at serious risk of institutionalization or

segregation is sufficient to state a claim under Title II and the integration mandate, even when institutionalization is not imminent.

## II. ALLEGATIONS THAT A PUBLIC ENTITY ADMINISTERS ITS SERVICES IN A DISCRIMINATORY MANNER STATE A CLAIM UNDER TITLE II OF THE ADA

The manner in which a public entity administers, operates, and funds services may give rise to a violation of Title II when services, programs, and activities are not delivered "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). When a public entity administers its programs in a manner that results in unjustified segregation of persons with disabilities, the public entity engages in discrimination in violation of Title II. *Id*. § 35.130(b)(3) and (d); *see Olmstead*, 527 U.S. at 600. Thus, "a plaintiff establishes a sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services" is "likely [to] cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Davis*, 831 F.3d at 262–63 (quoting DOJ *Olmstead* Statement, at Q & A No. 6).

Defendants nevertheless contend that, by being placed on waitlists, Plaintiffs were not affirmatively denied services to which they were legally entitled, and thus cannot state a claim for relief. However, a waitlist is little more than an ongoing constructive denial of services, and consequently, Defendants' contention that they have not denied services is inaccurate.[5] *See, e.g.*,

---

[5] Moreover, Defendants' assertion that there can be no violation of Title II because waitlists were contemplated in *Olmstead* is simply wrong. Not only was the discussion in *Olmstead* about "a waiting list that moved at a reasonable pace" — which Plaintiffs specifically allege is not the case here, SAC ¶ 417 — but importantly, it was in the context of a "cost-based" fundamental-alteration defense. *Olmstead*, 527 U.S. at 604–05. Defendants bear an affirmative burden to establish such a defense. DOJ *Olmstead* Statement, at Q&A 10; *see also* 28 C.F.R. § 35.130(b)(7)(i) (public entity must "demonstrate" the modifications would fundamentally alter the nature of the service, program, or entity). As such, the adequacy of this defense is not capable of resolution on the basis of the pleadings alone. *See Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 153 (2d Cir.

*M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1309 (D. Utah 2003) (denying motion to dismiss and holding that "placement of Plaintiffs on the [home- and community-based services] waiver waiting list threatens Plaintiffs with institutionalization because it forces Plaintiffs to choose between staying in the community without any services or entering an institution in order to receive services."). Defendants themselves concede that Plaintiffs are on waitlists instead of being provided the community-based services they seek and are eligible for. Defs.' Br. at 19–20. The ADA does not require that Defendants affirmatively deny the community-based mental health housing and supportive services; it is sufficient for Plaintiffs to allege that Defendants' failure to administer its mental health system in a manner that comports with the "integration mandate."

Defendants next contend that because local governments are responsible for providing services once an individual is released into the community, and private licensees actually provide those services, Plaintiffs fail to state a Title II claim. Defs.' Br. at 20. But Title II prohibits discriminatory "methods of administration," 28 C.F.R. § 35.130(b)(3), which include the "statutory and regulatory framework governing the administration, funding, and oversight of [a State's mental health services]." *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 317–18 (E.D.N.Y. 2009), *vacated on other grounds sub nom.*, *Disability Advocates, Inc. v. N.Y. Coal. For Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012). Plaintiffs allege that Defendants "inadequately administer" and "poorly implement" their mental health service system such that the Discharge Class members cannot access necessary community-based services that they are

---

2013) ("It is a factual issue whether a plaintiff's proposed modifications amount to 'reasonable modifications' which should be implemented, or 'fundamental alterations,' which the state may reject." (alterations & citations omitted)); *Disability Advocates*, 598 F. Supp. 2d at 335 (whether relief constitutes a "fundamental alteration" is a "complex, fact-intensive" inquiry that is "particularly inappropriate" for summary judgment); *cf. Olmstead*, 527 U.S. at 587, 594 (case was at the summary judgment stage, and Court remanded for further consideration of the state's fundamental alteration defense).

12

eligible for.[6] SAC ¶¶ 415–19. The fact that local or private entities have a role in the system that the State administers does not absolve its affirmative responsibility to comply with Title II. *See Olmstead*, 527 U.S. at 607 (holding that Title II's integration mandate applies to states' provision of services and not on particular privately owned facilities); *Disability Advocates, Inc.*, 598 F. Supp. 2d at 318 ("The State cannot evade its obligation to comply with the ADA by using private entities to deliver some of [the services in its system]"); *see also Conn. Off. of Prot. & Advocacy for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 276–77 (D. Conn. 2010) (denying motion to dismiss where defendant state financed services in private nursing homes); *Martin v. Taft*, 222 F. Supp. 2d 940, 981 (S.D. Ohio 2002) (holding that liability "does not hinge upon whether the setting in question is owned or run directly by the State."); *Rolland v. Celluci*, 52 F. Supp. 2d 231, 237 (D. Mass. 1999) (finding it immaterial to a motion to dismiss that plaintiffs resided in private nursing facilities).

Where, as here, Plaintiffs allege that a public entity administers its service system in a manner that fails to provide adequate community-based mental health housing and supportive services and exposes them to a serious risk of institutionalization, *see, e.g.*, SAC ¶¶ 415–19, that is sufficient to state a claim under Title II and the integration mandate.

---

[6] Indeed, Defendants have themselves outlined their many administration, funding, and oversight roles in the State's mental health system. *See, e.g.*, Defs.' Br. at 5–9 ("OMH oversees New York's public mental health system which includes all mental health programs licensed, regulated, operated, funded or approved by OMH. . . . OMH funds or operates 40,000 units of housing. . . . DOCCS [coordinates] services in the community for those being released to the community"). Thus, Defendants decide what services to fund, what settings to license, how to allocate resources among services, and how much capacity to provide.

13

## **CONCLUSION**

For the foregoing reasons, the Court should hold that allegations that a public entity created a serious risk of institutionalization are sufficient to state a Title II violation of the integration mandate. The Court should thus deny Defendants' motion to dismiss the claims of the Discharge Class Plaintiffs in the Second Amended Complaint.

Dated: February 12, 2021
      New York, New York

                                  Respectfully submitted,

                                  AUDREY STRAUSS
                                  United States Attorney
                                  Southern District of New York
                                  *Attorney for the United States of America*

By:    s/ Anthony J. Sun
          ANTHONY J. SUN
          Assistant United States Attorney
          86 Chambers Street, 3rd Floor
          New York, New York 10007
          Tel.: 212-637-2810
          anthony.sun@usdoj.gov