UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
M.G., P.C., C.J., M.J., J.R., D.R., D.H., S.D., and W.P., individually and on behalf of all similarly situated,

                                          Plaintiffs,

                -against-                  7:19-cv-00639 (CS) (AEK)

ANDREW CUOMO, in his official capacity as the Governor of the State of New York, the NEW YORK STATE OFFICE OF MENTAL HEALTH, ANN MARIE T. SULLIVAN, in her official capacity as the Commissioner of the New York State Office of Mental Health, the NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, ANTHONY J. ANNUCCI, in his official capacity as the Acting Commissioner of the New York State Department of Corrections and Community Supervision, ANNE MARIE MCGRATH, in her official capacity as Deputy Commissioner of the New York State Department of Corrections and Community Supervision,

                                          Defendants.
-------------------------------------------------------------X

## DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR PARTIAL MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

                                      LETITIA JAMES
                                      Attorney General of the State of New York
                                      *Attorney for Defendants*
                                      28 Liberty Street
                                      New York, NY 10005
                                      Tel.: (212) 416-6133/6185

JANE R. GOLDBERG
JEB HARBEN
Assistant Attorneys General
    *of* Counsel

Defendants the New York State Office of Mental Health ("OMH"), Ann Marie T. Sullivan, in her official capacity as the Commissioner of OMH, the New York State Department of Corrections and Community Supervision ("DOCCS"), Anthony J. Annucci, in his official capacity as the Acting Commissioner of DOCCS, and Anne Marie McGrath in her official capacity as Deputy Commissioner of DOCCS, respectfully submit this reply memorandum of law in further support of their partial motion to dismiss the Second Amended Class Action Complaint ("SAC").[1]

## I. THE COURT MAY TAKE JUDICIAL NOTICE OF DEFENDANTS' STATEMENT OF THE CASE

Fed. R. Evid. 201 permits the Court to take judicial notice at any stage of the proceedings and does not prohibit the Court from taking notice of items in the public record. *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (on a 12(b) motion to dismiss, the Court may take judicial notice of items in the public record). Such information may include background information as well as website statistics. *See Canadian St. Regis Band of Mohawk Indians v. State of New York*, Nos. 5:82–CV–0783, 5:82–CV–1114, 5:89–CV–0829 (LEK/TWD), 2013 WL 3992830, at *12 (N.D.N.Y. July 23, 2013) (discussing judicial notice of census figures) (citations omitted); *Basank v. Decker*, 449 F. Supp. 3d 205, 211 (S.D.N.Y. 2020) (taking judicial notice of background information regarding COVID-19 from CDC website). Moreover, Fed. R. Evid. 902(5) provides that official publications are self-authenticating and has been interpreted to include internet publications. *See* 5 Weinstein's Federal Evidence § 902.07[1] n1. This is precisely the kind of background information that Defendants included in their Memorandum and of which the Court may properly take judicial notice.[2]

---

[1] This Reply is also intended to respond to the Department of Justice Memorandum filed February 12, 2021 (ECF No. 161), as that Memorandum appears to mirror Plaintiffs' Memorandum.

[2] The inclusion of Defendant Sullivan's complete February 2020 interrogatory response in Defendants' Memorandum was provided to give the Court additional context to Plaintiffs' *partial* inclusion of Defendant Sullivan's interrogatory response cited at ¶ 605 of the SAC.

## II.     THE PROPOSED DISCHARGE CLASS LACKS STANDING

Plaintiffs attempt to circumvent well-settled standing requirements that they must demonstrate to invoke this Court's jurisdiction by characterizing their "risk of institutionalization" claim as a "current injury." Pls.' Mem. at 8. In so doing, Plaintiffs mischaracterize the risk of institutionalization cases on which they appear to rely, claiming that because their alleged injury has been found to satisfy the "injury-in-fact" element, they have therefore alleged a "current injury" as opposed to an impending future injury that would require a showing of imminence. *Id.* However, none of the cited cases stand for Plaintiffs' proffered proposition or override the requirement that Plaintiffs must allege a certainly impending injury to establish standing for their risk of institutionalization claim.

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). *See also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). As discussed in Defendants' Memorandum, it is well-settled that the threatened injury must be "*certainly impending*" and not merely a possible future injury. Defs.' Mem. at 14 (quoting *Clapper*, 568 U.S. at 409). Plaintiffs' argument that the nature of their claim somehow vitiates this requirement is based on a self-serving theory that attempts to conflate purported future harm (the risk of institutionalization) with an alleged present injury (unnecessary institutionalization). *See Davis v. Shah*, 821 F.3d 231, 262 (2d Cir. 2016) (discussing the Supreme Court's interpretation of the Integration Mandate in *Olmstead*[3] as intended to protect disabled individuals from the *injury* of unjustified isolation in institutionalized care facilities). However, an ADA plaintiff cannot demonstrate standing simply by alleging, as Plaintiffs do here, that their current level of services puts them at some risk of future institutionalization, without regard to whether the risk is remote or certainly impending. *See* Defs.' Mem. at 14-15 (discussing *E.B. ex rel.*

---

[3] 527 U.S. 581, 597 (1999).

2

*M.B. v. Cuomo*, No. 16-CV-735 (LJV), 2020 WL 3893928 (W.D.N.Y. July 11, 2020)).

In this respect, Plaintiffs' reliance on various out-of-circuit cases and the Second Circuit's decision in *Davis* is misguided. First, although *Davis* does not resolve a standing issue, the Second Circuit recognized an ADA violation where the plaintiffs' denial of certain services would "*likely* cause a decline in health . . . that *would* lead to the individual's eventual placement in an institution," 821 F.3d at 262-63 (internal citation omitted) (emphasis in original and added). Thus, the alleged risk of institutionalization injury in *Davis* was a future injury that satisfied the "certainly impending" requirement for Article III standing. *See* Defs.' Mem. at 14. Plaintiffs' contention that Defendants' reading of *Davis* is an "extreme view," Pls.' Mem. at 11, mischaracterizes Defendants' argument that a risk of institutionalization claim must be premised on something other than an "attenuated chain of inferences" such as exists here. *See* Defs.' Mem. at 14 (citing *Clapper*, 568 U.S. at 409). For example, Plaintiff W.P.'s allegations point to the hypothetical nature of his claims—the mere possibility of future injury rather than one that is "certainly impending." *See* Defs.' Mem. at 15 (citing SAC ¶¶ 303-311, 317). The conjectural series of events that would have to occur for the alleged injury to materialize does not satisfy the certainly impending requirement as set out in *Clapper* and identified in *Davis*, which Plaintiffs must satisfy to establish standing.

Plaintiffs attempt to distinguish *E.B. ex rel. M.B. v. Cuomo*, No. 16-CV-735 (LJV), 2020 WL 3893928 (W.D.N.Y. July 11, 2020) is even more unavailing. Plaintiffs argue that, unlike the *E.B.* plaintiffs, they are "*now* experiencing the harm they challenge." Pls.' Mem. at 10 (emphasis added). However, their alleged injury—that Defendants' failure to provide them with their preferred level of housing and/or services places them at risk of future institutionalization—is no different than what the plaintiffs alleged in *E.B.*, in which the Court applied *Clapper* to determine that their allegations of possible future injury were insufficient to state a claim for risk of institutionalization. *Id.*, 2020 WL 3893928, at **5, 6. Here, just like the plaintiffs in *E.B.*, Plaintiffs' allegations are largely speculative as

3

they are based on vague, conditional language and various conjectural studies that purport to support their view.[4] *See* Defs.' Mem. at 14-16.

Plaintiffs' traceability argument is similarly flawed. Reduced largely to *ad hominem* attacks, Plaintiffs' opposition mischaracterizes Defendants' argument regarding the Plaintiffs' baseline risk of institutionalization, contending that Defendants seek to blame Plaintiffs for the symptoms of their disability. *See* Pls.' Mem at 12-13. This is clearly not Defendants' position, which instead seeks to distinguish Plaintiffs' allegations from the cases on which they rely because Plaintiffs in this case are on parole or post release supervision and are at risk of institutionalization—specifically reincarceration—if they violate the conditions of their parole. *See* Defs.' Mem. at 16. Contrary to Plaintiffs' assertions, Defendants do not "blame" Plaintiffs for their illness or contend that the ADA does not apply to individuals with serious mental illness leaving prison. *Id.* Rather, Defendants only seek to highlight that while a plaintiff may allege a long history of institutionalization including incarceration, to satisfy the requirements of Article III standing, they must still also allege a causal link with respect to their purported risk of future institutionalization. *Id.*

By contrast, Plaintiffs essentially allege that *any* violation of the conditions of their parole, resulting in their reincarceration, is attributable to Defendants' failure to provide Plaintiffs with their preferred level of services and/or housing, even while living with family as D.H. did. *See* SAC at ¶¶ 331-35, 339-42. Such a conclusion cannot satisfy *Clapper's* traceability requirement. For that reason, this case is markedly distinguishable from cases which, like *Davis*, concern a risk of institutionalization from Medicaid funding denials that are directly traceable to the defendants' actions alone. *See, e.g. Waskul v. Washtenaw County Community Mental Health,* 979 F.3d 426 (6th Cir. 2020); *Parrales v. Dudek*,

---

[4] As argued in Defendants' Memorandum, Plaintiffs cite studies that allegedly show that the absence of the requested services "*can* exacerbate mental illness," may "*reduce*[] negative outcomes," and "*may* well influence the success in the community of this population." *See* SAC at ¶¶ 597, 598 (emphasis added).

4

4:15-CV-424-(RH/CAS), 2015 WL 13373978 (N.D. Fla. Dec. 24, 2015).

By their own account, S.D. and D.H., the proposed Discharge Class representatives, allege that their decompensation was caused by intervening factors that are not traceable to Defendants. *See* Defs.' Mem. at 16-18. In opposition, Plaintiffs argue that "precedent forecloses that argument," Pls.' Mem. at 13, but that supposition is based on a misinterpretation of the Second Circuit's decision in *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013), which states only that an intervening cause "is not *necessarily*" a basis for a finding that the injury is not "fairly traceable" to a defendant. *Id.* (emphasis added). Notably, *Rothstein* does not eliminate the requirement that a plaintiff must "demonstrate a causal nexus between the defendant's conduct and the injury.'" *Rothstein*, 708 F.3d at 91 (quoting *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992). *See also Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016). Here, Plaintiffs merely speculate that had Defendants provided them with their preferred housing and/or services, they would not have relapsed. *See* Defs.' Mem. at 16-17.

S.D.'s circumstances are also instructive. He alleges that he decompensated due to a third party's failure to provide him with sufficient medication, and as a result was taken to Harlem Hospital by his Forensic ACT team (reflecting that Defendants were already providing S.D. with a very high level of care in the community).[5] SAC ¶¶ 255-56. Subsequently, while voluntarily receiving care at Manhattan Psychiatric Center ("MPC"), S.D. was arrested for allegedly injuring another patient. SAC ¶¶ 257, 269-71. Certainly, S.D.'s hospitalization at MPC and conduct during his stay—resulting in his reincarceration—cannot be attributed to Defendants. Yet that appears to be Plaintiffs' intent as they speculate that the medication error would not have occurred if S.D. had been released to his preferred setting. *See* Pls.' Mem. at 14. Plaintiffs provide no basis for that conclusion. SAC ¶ 274. In reality, S.D.'s alleged decompensation appears to be attributable to "the independent action of some third party not before the court," and cannot be attributed to the Defendants. *See Lujan*, 504 U.S. at 560.

---

[5] *See* Defs.' Mem. at 6.

S.D.'s community service provider's failure to make available sufficient medications is in no way attributable to Defendants' policies, nor have Plaintiff's alleged the same. *See Woods v. Tompkins County*, 5:16-CV-0007 (LEK/TWD), 2019 WL 1409979, at * 10 (Mar. 28, 2019), *aff'd* 804 F. App'x 94 (2d Cir. 2020) ("Defendant cannot be held responsible under Title II for actions of private actors themselves unless discrimination by those private actors is the result of the state's policies," citing 28 C.F.R. § 35.130(b)(6) and Dep't of Justice, ADA Technical Assistance Manual II-3.7200).

Similarly, D.H. conceded that he was institutionalized due to *his* decision not to participate in the mental health treatment services that were offered to him in the community. Defs.' Mem. at 17-18. Plaintiffs' argument that D.H.'s failure to participate in treatment under these circumstances is akin to refusing allegedly inadequate services is unavailing. *See* Pls.' Mem. at 14, citing *M.J. v. District of Columbia*, 401 F. Supp. 3d 1, 9 (D.D.C. 2019). The circumstances in *M.J.* are markedly distinguishable. In *M.J.*, the Plaintiff had declined services that she alleged were inadequate and then requested similar services that she alleged were more intensive, the absence of which, she alleged, resulted in unnecessary institutionalizations. *Id.* at 9. The Court found that even though the plaintiff had turned down certain services of a similar type, she still had standing to bring her claim. Here, unlike M.J, D.H. was not institutionalized because he chose to "decline" certain services that he deemed inadequate. Pls.' Mem. at 14. Instead, he was reincarcerated for violating his parole, which required him to participate in certain mental health treatment and to comply with restrictions on his movement. SAC ¶ 331. D.H. has not and cannot plausibly allege that Defendants' actions caused him to violate the conditions of his parole, resulting in his reincarceration. *Cf. Purkey v. Simmons*, 29 F. App'x 546, 547 (10th Cir. 2002) (finding that the State has "no duty to a parolee to prevent him or her from committing further crimes and being sent back to prison"); *Hughes v. Colorado* Dep't of Corr., 594 F. Supp. 2d 1226, 1243 (D. Colo. 2009) (applying *Purkey* to dismiss Title II ADA claim based on state's revocation of parole for plaintiff's disability-caused conduct).

6

### III.  THE PROPOSED DISCHARGE CLASS FAILS TO STATE A CLAIM UNDER THE ADA OR REHAB ACT.

Plaintiffs argue that Defendants "offer a constrictive interpretation of *Olmstead*," Pls.' Mem. at 15, a mischaracterization that is evident from the broad brush they use in describing provided services as "inadequate." Pls.' Mem. at 8, 10, 20. Plaintiffs further argue that they need not demonstrate an "affirmative denial" of services that leads to a risk of institutionalization but rely primarily on cases in which plaintiffs are already in institutionalized settings. *See* Pls.' Mem. at 16-17. These cases are distinguishable, among other reasons, because they do not concern individuals in the community. Plaintiffs appear to seek to expand *Olmstead* beyond its intended reach with conclusory allegations about how the State administers its mental health system, while merely alleging specific instances where the services provided to Plaintiffs S.D., D.H., and W.P. fell below expectation or were not flawlessly delivered by non-parties to this action. In this regard, Plaintiffs' reliance on *Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003), Pls.' Mem. at 17, is misplaced. As the Second Circuit explained in *Reynolds v. Giuliani*, 506 F.3d 183, 194 (2d Cir. 2007), "[t]hat case (*Henrietta D*) merely held that supervisory liability was a permissible basis for suit against a state and did not purport to establish a standard to govern its imposition on that basis." In this vein, Plaintiffs incorrectly assert that Defendants' reliance on *Mental Hygiene Legal Service v. Delaney*, 176 A.D.3d 24 (2019) is misplaced, even though the Court expressly stated that "[t]he state may not be held liable for the actions of private agencies delivering state services when, as here, there is no claim that the agencies engaged in discrimination resulting from the state's policies" (citing *Woods*; 28 CFR 35.130[b][6]).

Further, Plaintiffs do not even assert that any particular services prescribed by their treaters were denied and seem to claim that they are not required to do so. *See* Pls.' Mem. at 16. Plaintiffs' allegations concerning a few instances when services were not delivered optimally should not be the predicate for the extremely broad class-wide relief sought here. Nor, should Plaintiffs' conclusory and inaccurate theory of entitlement to community-based mental health housing, based on preparation of

7

a SPOA application, provide the basis for such class-wide relief.

Plaintiffs seemingly argue that any administrative or other error that might temporarily impact treatment, such as temporarily running out of medication or a delay in receipt of a Social Security card, *see* Pls.' Mem. at 2, should be deemed a violation of the ADA or Rehab Act and attributed to Defendants, rather than the local governmental or private entity responsible, effectively requiring flawless execution of treatment plans both by the State Defendants and participating providers in the community. Not only do Plaintiffs incorrectly argue that these violate federal law, but their largely conclusory and speculative allegations provide no basis for a vast overhaul of what is already a comprehensive system of care. Moreover, Federal law does not impose *de facto* strict liability on government agencies under these circumstances as Plaintiffs suggest. *See, e.g., Segal v. Metropolitan Council,* No. 18 Civ. 2333, 2020 WL 7027870, at * 6 (D. Minn. Nov. 30, 2020) (no strict liability under the ADA; ADA "does not require perfection on the part of public entities"); *Scalara v. Electrograph Systems*, 848 F. Supp. 2d 352, 360 (E.D.N.Y. 2012) (no strict liability under ADA and, in particular, no strict liability for the actions of non-parties). *See Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 373 (D. Md. 2011) (ADA "cannot be read to impose strict liability on public entities that neither caused plaintiffs to be excluded nor discriminated against them.") (quoting *Bacon v. City of Richmond*, 475 F.3d 633, 639-40 (4th Cir. 2007)).

Plaintiffs have not been denied services, as in *Davis*, for example, but rather that they simply want more or different services. Plaintiffs complain, for example, that S.D. was eligible for an ACT team, when he did in fact have an ACT team to assist him. Pls.' Mem. at 23; SAC ¶¶ 255-56. Plaintiffs also allege that S.D. was eligible for "extensive psychiatric care" and therapy, but never allege that S.D. did not receive those services. *Id.*; Pls.' Mem. at 23.

Plaintiffs also fail to provide any support for their claim that Defendants have violated the ADA and Rehab Act by offering them temporary housing in allegedly "segregated" settings. SAC ¶¶

8

602-28. For example, Plaintiffs claim that S.D. "was placed in a mental health shelter in the Bronx with horrible conditions." Pls.' Mem. at 22. However, Plaintiffs' specific factual allegations, *see* SAC ¶ 240; Pls.' Mem. at 22, describe a setting that is a far cry from the type of long-term institutional housing discussed in the cases that Plaintiffs use to support their claims, such as *Conn. Office of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266 (D. Conn. 2010) and *Ball by Burba v. Kasich*, 244 F. Supp. 3d 662 (S.D. Ohio 2017). *See* Pls.' Mem. at 19, 22.

As previously argued, the hallmark of impermissible segregation is that individuals seeking treatment must "relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice." Defs.' Mem. at 22; *Olmstead*, 527 U.S. at 601. The very restrictions that Plaintiffs allege, such as curfews, room checks, communal eating, shared sleeping quarters, and shared bathrooms, SAC ¶¶ 616-623, are applicable, however, to all residents of the facilities in question (and shelters in general) and are not based on any person's SMI status. To the extent there may be restrictions or rules that residents must abide by, they are applicable to all such persons, not just disabled ones. As such, the settings which form the basis of Plaintiffs' segregation claims do not satisfy *Olmstead's* definition.

While Plaintiffs reference rules that residents of temporary housing may be subject to, whether SMI or not, there are no factual allegations that any of the named Plaintiffs were, for example, not free to leave their temporary housing and function within the community during non-curfew hours, even at TLRs, and most certainly not at the shelters, motels, and other temporary housing complained about by Plaintiffs, as was the case in, for example, *Waskul*, 979 F.3d at 462 (Plaintiffs confined in their homes), *Murphy v. Minnesota Dept. Human Services*, 260 F. Supp. 3d 1084, 1094 (D. Minn. 2017) (highly restrictive residential setting that allowed for little community involvement), and *Joseph v. Hogan*, 561 F. Supp. 2d 280, 291 (E.D.N.Y. 2008) (placement in restrictive nursing home), relied upon by

9

Plaintiffs. *See* Pls.' Mem. at 24-25. To the contrary, Defendants' goal for putative Discharge Class plaintiffs is for them to integrate in the community, find employment, become more self-sufficient, and transition to their own permanent housing and not for them to remain "segregated" at shelters or other temporary housing. *See, e.g., Knox v. Khan*, No. 16-CV-1281, 2019 WL 1099952, at * 1 (E.D.N.Y. March 1, 2019) (discussing parole conditions requiring parolee to "seek, obtain, and maintain employment and/or an academic/vocational program").

Furthermore, regardless of the minor restrictions that might be imposed by the settings at issue, the proposed Discharge Class is composed primarily of parolees and others on supervised release. As such, they remain subject to "special parole restrictions." *Morrissey v. Brewer,* 408 U.S. 471, 480 (1972); *see also Griffin v. Wisconsin,* 483 U.S. 868, 8741 (1987). A parolee is "neither physically imprisoned nor free to move at will." *United States v. Polito,* 583 F.2d 48, 54 (2d Cir.1978). Accordingly, a parolee "does not have a protected liberty interest in being free from special conditions." *Pena v. Travis,* No. 01 Civ. 8534, 2002 WL 31886175, at *13 (S.D.N.Y. Dec. 27, 2002) (citing 9 N.Y.C.R.R., § 8000.3). The proposed Discharge Class will thus typically have curfews imposed on them as part of their parole conditions, so there is nothing intrinsically violative of the ADA or Rehab Act if shelters or other community housing also have curfews. *See, e.g., Pollard v. U.S. Parole Condition*, 693 Fed. Appx. 8, 12 (2d Cir. 2017) (dismissing challenge to special condition imposing a curfew); *Cusamano v. Alexander*, 691 F. Supp. 2d 312, 318-319 (N.D.N.Y. 2009) (same); *Knox*, 2019 WL 1099952, at *1. While, of course, special parole conditions must not violate the ADA, and an individual's disabilities should be reasonably accommodated under any special parole condition, the ADA and Rehab Act do not exempt members of the Discharge Class from special parole conditions, particularly standard ones such as curfews.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court partially dismiss Plaintiffs' Second Amended Class Action Complaint with prejudice.

Dated: New York, New York
March 5, 2021

                                                LETITIA JAMES
Attorney General of the State of New York
*Attorney for Defendants*

By: *Jane R. Goldberg*
      Jane R. Goldberg
      Jeb Harben
      Assistant Attorneys General
      28 Liberty Street
      New York, NY 10005
      Tel.: 1-(212) 416-6133/6185
      Jane.Goldberg@ag.ny.gov
      Jeb.Harben@ag.ny.gov