UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and
D.H., individually and on behalf of all similarly
situated,

                         Plaintiffs,

    - against -

NEW YORK STATE OFFICE OF MENTAL
HEALTH, ANN MARIE T. SULLIVAN, in her
official capacity as the Commissioner of the New
York State Office of Mental Health, the NEW
YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, ANTHONY J. ANNUCCI, in his
official capacity as the Acting Commissioner of the
New York State Department of Corrections and
Community Supervision, ANNE MARIE
MCGRATH, in her official capacity as Deputy
Commissioner of the New York State Department
of Corrections and Community Supervision,

                         Defendants.
------------------------------------------------------------x

**OPINION & ORDER**

No. 19-CV-639 (CS)

<u>Appearances</u>:

Joshua Rosenthal
Elizabeth Woods
Disability Rights New York
Brooklyn, New York

Elena M. Landriscina
Stefen R. Short
Robert M. Quackenbush
Veronica Vela
The Legal Aid Society
New York, New York

Walter G. Ricciardi
Emily A. Vance
Crystal Parker

Samuel Margolis
Chantalle Hanna
Paul, Weiss, Rifkind, Wharton, & Garrison LLP
New York, New York
*Counsel for Plaintiffs*

Jane R. Goldberg
Jeb Harben
Assistant Attorneys General
Office of the Attorney General of the State of New York
New York, New York
*Counsel for Defendants*

Anthony J. Sun
Assistant United States Attorney
Southern District of New York
New York, New York
*Counsel for Interested Party United States of America*

Seibel, J.

 This opinion serves to memorialize the Court's September 29, 2021 decision from the

bench, (*see* Minute Entry dated Sept. 29, 2021), which DENIED Defendants' partial motion to

dismiss Plaintiffs' Second Amended Complaint, (ECF Nos. 155-56).

I.    **BACKGROUND**

A.    **Facts**

        For the purposes of the instant motion, I accept as true the facts, but not the conclusions,

alleged in the Second Amended Complaint.  (ECF No. 134 ("SAC").)  Plaintiffs, formerly

incarcerated individuals with serious mental illness who are indigent, brought this lawsuit to

challenge their institutionalization in New York State's prison system and the subsequent failure

of the state to provide community-based mental health housing and supportive services upon

their release.  Defendants include the New York State Office of Mental Health ("OMH"), Ann

Marie T. Sullivan, in her official capacity as OMH Commissioner, the New York State

Department of Corrections and Community Supervision ("DOCCS"), Anthony Annucci, in his

official capacity as the Acting Commissioner of DOCCS, and Anne Marie McGrath, in her official capacity as deputy director of DOCCS.[1]

Plaintiffs wish to represent three classes. The first is a "General Class" of people with serious mental illness whom Defendants hold in prison past their release dates – including their approved conditional release dates, open dates for parole release, and even the end of their prison sentences – due to the inadequate capacity of state community-based mental health housing programs. (SAC ¶ 5.) The second is an "RTF Subclass," made up of General Class members who Defendants purport to have released to Residential Treatment Facilities ("RTFs") upon the maximum expiration dates of their court-imposed prison sentences, but who in fact are held in prisons where they are treated just like prisoners.[2] (*Id.* ¶¶ 6-7, 10.)

The third proposed class is a "Discharge Class." This group consists of "people with serious mental illness whom Defendants unnecessarily segregate or place at serious risk of institutionalization upon their release from prison because Defendants fail to provide the community-based mental health housing and supportive services that Plaintiffs need." (*Id.* ¶ 13; *see id.* ¶ 698.) Discharge Class members are evaluated by Defendants and are determined to require and be eligible for community-based mental health housing and supportive services, (*id.*

---

[1] Plaintiffs originally included then-Governor Andrew Cuomo as a defendant in his official capacity. I previously dismissed all claims against the Governor because Plaintiffs failed to allege his "connection with the enforcement of the act" that Plaintiffs argue is in violation of federal law, as required under *Ex Parte Young*. 209 U.S. 123, 157 (1908); *see In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 372-73 (2d Cir. 2005). (See Minute Entry dated Sept. 25, 2020; ECF No. 149.)

[2] The factual allegations concerning the General Class and the RTF Subclass were part of the First Amended Complaint and raised in Defendants' first motion to dismiss, (ECF No. 79), which I largely denied in a decision from the bench on September 25, 2020, (see Minute Entry dated Sept. 25, 2020.) As these allegations are not relevant to the instant motion, I will not describe them in detail.

¶ 14), but instead of providing the Discharge Class Plaintiffs with those services in that setting, Defendants rely on state-operated, segregated settings to deliver these services, or, alternatively, release these individuals to a hodgepodge of hotels, motels, homeless shelters, and shelter-like parole housing facilities that lack the essential services these individuals require, (*id.* ¶¶ 15, 542-44).  Plaintiffs allege that of the 364 people with serious mental illness released from state prisons to homeless shelters, hotels, or motels between January 23, 2019 and January 31, 2020, at least 342 were individuals who had been receiving mental health services in a state prison designated for individuals with the highest mental health needs, (*id.* ¶ 600), and that the housing to which they are released lacks the mental health services necessary for these individuals to transition to the community and maintain psychiatric stability, (*id.* ¶¶ 568-69).  Some of these individuals remain in these settings for months while waiting for permanent housing.  (*Id.* ¶ 551.)

For example, named Plaintiff S.D., who has a diagnosis of schizophrenia, (*id.* ¶ 217), was discharged from prison to a homeless shelter and then transferred to a "mental health shelter" after being placed on a waiting list for the community-based mental health housing and supportive services that were deemed appropriate for him, (*id.* ¶¶ 225, 231-32, 234, 237-38). These shelters were unable to provide appropriate mental health care, manage S.D.'s care needs, maintain his medication regimen, or refill his medications for him, resulting in his rationing his medication, suffering mental health episodes, and ultimately being institutionalized.  (*See id.* ¶¶ 244-275.)

Similarly, Defendants released named Plaintiff W.P., who has been diagnosed with schizoaffective disorder, bipolar type and anti-social personality disorder, (*id.* ¶¶ 279-80), to a homeless shelter, despite "prior, and repeated, determinations that while incarcerated he could not function in an environment [like the general prison population] that does not provide

adequate mental health supportive services," (*id.* ¶ 298). The shelters in which W.P. was living did not provide "the services that W.P. would receive in an integrated, community-based mental health housing program." (*Id.* ¶ 305.) W.P. was transferred between shelters and later to a hotel room at the start of the COVID-19 pandemic, which disrupted his ability to meet with his case worker. (*Id.* ¶¶ 301, 303, 312-14.) During his time in the shelter system, W.P.'s mental health has deteriorated, and the condition of his housing "greatly increases the risk that W.P. will suffer a mental health crisis resulting in hospitalization." (*Id.* ¶¶ 316-17.)

Named Plaintiff D.H., who has been diagnosed with schizoaffective disorder, bipolar type and anti-social personality disorder, was also determined to be an eligible and appropriate candidate for community-based mental health housing and supportive services. (*Id.* ¶¶ 324, 332.) Despite this determination, D.H. remains on a waitlist for such services, and each time he has been discharged from prison, it has been either to parole housing or to his grandmother's house. (*Id.* ¶¶ 334-40.) D.H. did not receive supportive services at either of his release locations. (*Id.* ¶¶ 338, 340.) "The absence of housing and supportive services greatly exacerbated D.H.'s stress and impaired D.H.'s ability to manage his needs and cope with the demanding requirements of his DOCCS parole officer." (*Id.* ¶ 342.) D.H. was most recently re-incarcerated on March 2, 2020 and on June 22, 2020 was transferred to an Intensive Treatment Unit located within Rockland Psychiatric Center to await community-based mental health housing, which segregates him from the community and risks deterioration and relapse. (*Id.* ¶¶ 344-51.)

Plaintiffs allege that because Defendants fail to adequately fund and administer state programs that provide community-based housing and supportive services, Discharge Class members such as S.D., W.P., and D.H. must stay on lengthy waiting lists for the housing and

supportive services they need and for which they are eligible, causing them to remain in

segregated settings and/or placing them at an increased risk for institutionalization in violation of

the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA").  (*See id.* ¶¶ 16-18,

601-604, 613, 752-74.)

B.    **Procedural History**

Plaintiffs filed their original complaint on January 23, 2019.  (ECF No. 1.)  On May 13,

2019, I held a pre-motion conference regarding Defendants' anticipated motion to dismiss, at

which I gave Plaintiffs leave to amend, (Minute Entry dated May 13, 2019), and Plaintiffs filed

their First Amended Complaint, (ECF No. 47 ("FAC")), on June 3, 2019.  On August 2, 2019, I

referred the case to Magistrate Judge Lisa Margaret Smith, who has since retired, for general

pretrial supervision.  (ECF No. 52.)  After Defendants filed and the parties fully briefed the

motion to dismiss, (ECF No. 79), Plaintiffs requested and obtained from Judge Smith permission

to amend the FAC, principally to add the "Discharge Class" of Plaintiffs referenced above, (ECF

Nos. 125, 126, 129, 130, 131, 132).  Plaintiffs filed the SAC on August 27, 2020.  (ECF No.

134.)

On September 25, 2020, I granted in part and denied in part Defendants' motion to

dismiss the FAC.  (*See* Minute Entry dated Sept. 25, 2020).[3]  After the ruling, Defendants

---

[3] Of note, I allowed the Eighth Amendment claims of the RTF subclass to proceed, agreeing with the logic of Judge Kendall's well-reasoned decision in *Murphy v. Raoul*, 380 F. Supp. 3d 731 (N.D. Ill. 2019).  Plaintiffs alleged facts sufficient to proceed under a prolonged incarceration theory, because Plaintiffs had alleged that "[t]he defendants knew of [a] problem and the risk that they were inflicting unwarranted punishment," that "they failed to act or took ineffectual action" to address that problem, and "their response caused the unjustified detention" because "they chose to confine the[] individuals past their release date," which plausibly "amounts to a reckless disregard of constitutional rights."  *Murphy*, 380 F. Supp. 3d at 765. While noting that it seemed like a steeper climb, I also allowed Plaintiffs to proceed under a criminalization of status theory, because they had plausibly shown that Defendants kept them

requested another pre-motion conference in anticipation of a motion to dismiss the portions of

the SAC pertaining to the Discharge Class.  (ECF No. 141.)  Plaintiffs responded, (ECF No.

144), and the Court held a pre-motion conference on November 12, 2020, (Minute Entry dated

Nov. 12, 2020).  This motion followed.  (ECF Nos. 155, 156.)[4]  On September 29, 2021, I denied

Defendants' motion in a decision from the bench, for the reasons stated herein.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

"A federal court has subject matter jurisdiction over a cause of action only when it has

authority to adjudicate the cause pressed in the complaint." *Arar v. Ashcroft*, 532 F.3d 157, 168

(2d Cir. 2008) (cleaned up), *rev'd en banc on other grounds*, 585 F.3d 559 (2d Cir. 2009).

"Determining the existence of subject matter jurisdiction is a threshold inquiry, and a claim is

properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district

court lacks the statutory or constitutional power to adjudicate it." *Id.* (cleaned up).  "When

jurisdiction is challenged, the plaintiff bears the burden of showing by a preponderance of the

evidence that subject matter jurisdiction exists, and the district court may examine evidence

outside of the pleadings to make this determination." *Id.* (cleaned up).  "The court must take all

facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but

jurisdiction must be shown affirmatively, and that showing is not made by drawing from the

---

locked up due to their status as seriously mentally ill individuals, coupled with the fact that they
had no adequate housing to which they could be released.  *See id.* at 764-65 (inmates' failure to
secure housing for release was "not voluntary conduct merely related to, or derivative of, the
status of homelessness, but is entirely involuntary conduct that is inseparable from their status of
homelessness.") (cleaned up).

[4] In addition to the parties' submissions, the U.S. Department of Justice ("DOJ") filed a
Statement of Interest urging the Court to allow the Discharge Plaintiffs' claims to proceed.  (ECF
No. 161.)

pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547

F.3d 167, 170 (2d Cir. 2008) (cleaned up), *aff'd on other grounds*, 561 U.S. 247 (2010).

When a defendant moves to dismiss both for lack of subject matter jurisdiction and on

other grounds such as failure to state a claim upon which relief can be granted, the Court must

address the issue of subject matter jurisdiction first. *See Rhulen Agency, Inc. v. Alabama Ins.*

*Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).

**B.** **Motion to Dismiss for Failure to State a Claim**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do." *Twombly*, 550 U.S. at 555 (cleaned up). While Federal Rule of Civil Procedure 8

"marks a notable and generous departure from the hypertechnical, code-pleading regime of a

prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more

than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the

court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not

entitled to the assumption of truth," and then determines whether the remaining well-pleaded

factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679.

Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (cleaned up) (quoting Fed. R. Civ. P. 8(a)(2)).

## III.   DISCUSSION

Defendants move to dismiss the claims of the Discharge Class Plaintiffs based on two arguments:  first, that these Plaintiffs do not have standing to bring their claims, and second, that they fail to state a plausible claim under the ADA or RA.  I address each argument in turn.[5]

---

[5] Before addressing the substance of the motion, I address the issue of the statements, policies, and regulations that Defendants cite in their memorandum of law, (ECF No. 158 ("Ds' Mem.") at 5-11), because Plaintiffs argue that it is improper for the Court to consider them on this motion to dismiss, (ECF No. 159 ("Ps' Mem.") at 5-7).  Federal Rule of Evidence 201 allows courts to "take judicial notice of publicly available documents on a motion to dismiss" under Rule 12(b)(6), but "a court should generally take judicial notice to determine what statements the documents contain[,] not for the truth of the matters asserted." *Continental Cas. Co. v. Marshall Granger & Co., LLP*, 921 F. Supp. 2d 111, 117 (S.D.N.Y. 2013) (collecting cases).  Therefore, I take judicial notice of the publicly available government documents, such as the state websites, policies, and regulations, but this notice is limited to what they say, and only for the fact of what is said.  At this stage, what these documents say is not particularly relevant, as the crux of Plaintiffs' allegations is that Defendants' implementation of those policies is flawed, and that the stated policies are not the actual policies the state follows in practice.  I also do not consider a February 12, 2020 interrogatory response cited by Defendants, because Plaintiffs did not rely on that response in framing the SAC, *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2002) (permitting consideration of document on Rule 12(b)(6) motion where complaint "relies heavily upon its terms and effect," rendering it "integral" to the complaint) (cleaned up), but even if I did consider it, it is not particularly relevant for essentially the same reason.  On a motion to dismiss under Rule 12(b)(1), I can consider evidence outside the pleadings, *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015), but the same logic dictates that while I can consider what the state's documents say, I cannot presume that these policies are followed as a factual matter, given Plaintiffs' factual allegations to the contrary.

A.    **Standing**

Article III of the Constitution limits a federal court's jurisdiction to actual "Cases" and "Controversies."  U.S. Const. art. III, § 2; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992).  "Constitutional standing is the threshold question in every federal case, determining the power of the court to entertain the suit."  *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001) (cleaned up).  "[W]hether a plaintiff has standing to assert a claim in federal court depends on the nature and source of the claim asserted" and "is determined by whether the constitutional or statutory provision on which the claim rests properly can be understood as granting . . . a right to judicial relief."  *E.M. v. N.Y.C. Dept. of Educ.*, 758 F.3d 442, 450 (2d Cir. 2014) (cleaned up).  There are three constitutional standing requirements that every plaintiff must satisfy to invoke the jurisdiction of the federal courts:  "(1) an injury in fact (*i.e.*, a concrete and particularized invasion of a legally protected interest); (2) causation (*i.e.*, a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)."  *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008) (cleaned up).

These minimum requirements to invoke jurisdiction exist in all cases, separate and apart from whatever statutory standing requirements may exist in the laws under which a plaintiff has filed suit.  *See All. for Env't. Renewal v. Pyramid Crossgates Co.*, 436 F.3d 82, 85-86 (2d Cir. 2006).  The party invoking federal jurisdiction bears the burden of establishing that it has standing to do so.  *Lujan*, 504 U.S. at 561.

Defendants argue that Plaintiffs have not met the injury in fact or traceability requirements, at least to the extent that Plaintiffs' theory is that Defendants' actions violate the

ADA's and RA's prohibition against the "unjustified institutional isolation of persons with disabilities," *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016), by putting them at risk of institutionalization.  Defendants do not seem to dispute that Plaintiffs have standing to the extent their theory is that their unjustified placements in segregated or isolated settings violate the statutes' mandate that states "shall administer" their mental health programs "in the most integrated setting appropriate to the needs of qualified individuals with disabilities," *Olmstead v. L.C.*, 527 U.S. 581, 592 (1999) (cleaned up).

### 1.    Injury in Fact

"[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).  To establish injury in fact, a plaintiff must show "an invasion of a legally protected interest which is concrete and particularized." *Lujan*, 504 U.S. at 560 (cleaned up).  A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Id.* at 560 n.1.  A "concrete" injury is one that is "real" and not "abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).

Constitutional standing "requires a concrete injury even in the context of a statutory violation." *Id.* at 341.  The risk of real harm can satisfy the requirement of concreteness in certain circumstances. *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)). Defendants argue that Plaintiffs' asserted injuries under their risk-of-institutionalization theory – namely, that they were released to shelter-like facilities that lack proper care, housing, and mental health services that exacerbated their mental health conditions, which caused an increased risk of institutionalization – are speculative, not sufficiently imminent, and require the Court to follow an attenuated chain of inferences.

I disagree with Defendants' framing.  Contrary to Defendants' assertions, the Second

Circuit has explained that "a plaintiff need not wait until the harm of institutionalization or

segregation occurs or is imminent in order to bring a claim under the ADA."  *Davis*, 821 F.3d at

262 (cleaned up).  While *Davis* did not consider the issue of standing, I find its analysis

instructive, particularly because the Court of Appeals would have been obligated to raise the

issue on its own motion had it had doubts as to standing and subject matter jurisdiction.  *See,*

*e.g.*, *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 82 (2d Cir. 1996); *Schwartz v. HSBC Bank*

*USA, N.A.*, No. 14-CV-9525, 2017 WL 95118, at *4 (S.D.N.Y. Jan. 9, 2017), *aff'd*, 750 F. App'x

34 (2d Cir. 2018).  In *Davis* the Circuit held that where "a public entity's failure to provide

community services will *likely* cause a decline in health, safety, or welfare that would lead to the

individual's eventual placement in an institution," a Plaintiff properly pleads an ADA claim.

*Davis*, 821 F.3d at 262-63 (cleaned up) (emphasis in original).[6]  *Davis* means that in this

context, the injury in fact is not actual or imminent institutionalization, but rather the failure to

receive services, resulting in Plaintiffs' increased likelihood of institutionalization.  This is in

keeping with the principle that "[w]hile the injury-in-fact requirement is a hard floor of Article

III jurisdiction that cannot be removed by statute, it has long been recognized that a legally

protected interest may exist solely by virtue of statutes creating legal rights, the invasion of

which creates standing, even though no injury would exist without the statute."  *Donoghue v.*

*Bulldog Investors Gen. Partnership*, 696 F.3d 170, 175 (2d Cir. 2012) (cleaned up).  Because the

Second Circuit defined as an actionable right under the ADA a public entity's failure to provide

---

[6] The Second Circuit was quoting a DOJ Statement on the integration mandate, adopting
the DOJ's interpretation as the Second Circuit standard because the integration mandate "is a
creature of the DOJ's own regulations," meaning that DOJ's interpretation of that provision is
"controlling unless plainly erroneous or inconsistent with the regulation." *Id.* (cleaned up).

necessary services that puts "plaintiffs at a substantial risk of requiring institutionalized care,"

*Davis*, 821 F.3d at 259, and because Plaintiffs have alleged just that, I find that Plaintiffs'

allegations also satisfy the Article III requirement for a concrete and particularized injury.

Other courts have agreed that "currently lacking necessary supports and services that

could enable [plaintiffs] to live independently in the community," causing "an exacerbation of . .

. their disabilities," satisfies the injury-in-fact requirement.  *Guggenberger v. Minnesota*, 198 F.

Supp. 3d 973, 991-92 (D. Minn. 2016) (emphasis added*); cf. Rogers by and Through Rogers v.

Cohen*, No. 18-CV-193, 2019 WL 938874, at *4 (E.D.N.C. Feb. 25, 2019) (no injury in fact

where plaintiffs had not alleged they were "presently lacking any supports or services").  And

while Defendants argue that the reasoning in *E.B. ex rel. M.B. v. Cuomo*, No. 16-CV-735, 2020

WL 3893928, at *1, *6 (W.D.N.Y. July 11, 2020) should control here, I find that case

inapplicable, for two reasons.  First, the court in that case applied the "imminent risk of

institutionalization" standard that Defendants urge here, which, respectfully, I do not think is

proper in light of *Davis*.  Second, the facts in *E.B.* are distinguishable, as the court in that case

reasoned that the plaintiffs' alleged risk was too far removed to establish standing because the

plaintiffs had caregivers "provid[ing] housing, care, and services," *id.* at *1, and Plaintiffs

therefore were not facing a "substantial risk of institutionalization" because they would only

*hypothetically* be institutionalized if their caregivers *hypothetically* could no longer provide for

them.  *E.B.*, 2020 WL 3893928, at *6 (plaintiffs at risk only if their caregivers became unable to

provide adequate services).  Here, in contrast, there is nothing hypothetical about the proposed

Discharge Class's alleged injury:  Plaintiffs allege that they were released to shelters and shelter-

like facilities that utterly lack the proper housing, care, and services for their serious mental

illnesses, and that this lack of care and services exacerbates their mental health conditions and

results in an increased likelihood of institutionalization. In other words, in *Davis* the injury was the lack of services that would likely lead to decline and then institutionalization. In *E.B.* the lack of services would not likely lead to decline and institutionalization because the Plaintiffs were in fact receiving the services (albeit from their families rather than the state) and the prospect of losing them was hypothetical. Here Plaintiffs allegedly are not getting the services, so – putting aside *E.B.*'s application of the wrong standard – this case on the alleged facts is like *Davis*, not *E.B.*

In sum, Plaintiffs have plausibly alleged they are being deprived of services that result in "a serious risk of institutionalization," which "establishes an injury sufficient to carry plaintiffs' integration mandate claim." *Davis*, 821 F.3d at 262-63. They have thus pleaded an injury-in-fact for purposes of Article III standing.

## 2.    Traceability/Causation

To satisfy the traceability requirement, a plaintiff must plead "a causal connection between the injury and the defendant[']s conduct." *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013). While the injury must be "fairly traceable" to a defendant's actions and "not the result of the independent action of some third party not before the court," *Lujan*, 504 U.S. at 560 (cleaned up), the "fairly traceable" standard is "relatively modest," requiring something "lower than proximate cause," *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) (cleaned up). "Article III requires no more than *de facto* causality." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (cleaned up).

Plaintiffs here allege, and Defendants seem to concede, that Defendants administer the mental health system in New York State and are responsible for developing integrated services, coordinating and planning with local governments regarding community-based care, and

determining funding and conducting oversight for the same.  (SAC ¶¶ 363-65, 368-70, 392-414, 442-48; Ds' Mem. at 5-10.)  Further, the SAC contends that Defendants are responsible for developing and implementing plans for post-prison discharge, (*e.g.*, SAC ¶¶ 374, 377-78, 442-57, 575-78, 586-87), including approving prisoners' proposed residences, (*id.* ¶¶ 234, 297, 427, 452, 457).  Plaintiffs' allegations, which I must construe as true at this stage, are that Defendants carry out these functions in a manner that denies "the community-based mental health housing and supportive services that Plaintiffs need" to avoid institutionalization.  (SAC ¶ 13, 374; *see id.* ¶¶ 363-65.)   To support these claims, Plaintiffs plead detailed facts about how Defendants' alleged failures to make available the community-based mental health housing and related supportive services Plaintiffs need to remain in integrated settings place Plaintiffs at serious risk of institutionalization.  (*E.g.*, SAC ¶¶ 225-64, 273-75, 290-99, 316-17, 320-21, 331-51.)  Plaintiffs have therefore satisfied the traceability requirement.  *See Guggenberger*, 198 F. Supp. 3d at 992 (allegations of defendants' responsibility to administer waiver program, defendants' mismanagement of program, and plaintiffs' need for and lack of waiver program services sufficient to show causal connection).

Defendants argue that the injuries are not traceable to their conduct because Plaintiffs' long history of disability "predat[es] the events at issue here," Plaintiffs have a "baseline risk of institutionalization," and they lack standing because they fail to quantify "how much" risk is due to Defendants' conduct.  (Ds' Mem. at 16.)  I fail to see how this argument can be squared with *Davis*, which recognized integration mandate claims by people with preexisting conditions who could receive the necessary services in integrated settings and yet were at risk for institutionalization because they were not getting the services.  Contrary to Defendants' suggestion, (ECF No. 165 at 4-5), Plaintiffs at this stage do not have to show that any future

possible reincarceration would be the result only of the lack of services, or rule out that any future possible reincarceration would be based on something other than the lack of services, to show traceability for standing purposes.  I agree with Plaintiffs that they need not quantify how much of the risk is attributable to Defendants, let alone show that it is wholly attributable to Defendants, as long as they sufficiently show some reasonable connection between Defendants' conduct and their harm, which they have done through their allegations that the lack of services likely will lead to decompensation and reinstitutionalization.  *See Rothstein*, 708 F.3d at 93 (finding traceability where Defendant's conduct contributed to harm, even though Plaintiff had not alleged Defendant's conduct to be the primary or a significant cause).[7]

Further, to the extent that Defendants argue that Plaintiffs' injuries are more directly caused by deficiencies on the part of the private or municipal organizations and staff that provide the care coordinated by Defendants, "the fact that there is an intervening cause of the plaintiff's injury may foreclose a finding of proximate cause but is not necessarily a basis for finding that the injury is not 'fairly traceable' to the acts of the defendant," *Rothstein*, 708 F.3d at 92, and traceability is not cut off by "the predictable effect of Government action on the decisions of third parties," *Dep't of Com.*, 139 S. Ct. at 2566.  Standing under Article III requires only that Plaintiffs allege a connection between Defendants' conduct in failing to provide for sufficient

---

[7] I do not think the New York Attorney General's office intended their argument to be "ableist," as Plaintiffs suggest, (Ps' Mem. at 12-13), and in reply it disclaims any suggestion that any future reinstitutionalization would be Plaintiffs' own fault, (ECF No. 165 at 4).  But their argument came close to suggesting that that any future reinstitutionalization would be the result of Plaintiffs' illnesses rather than of any failing by the state.  I do not think, if the allegation were that the state was failing to provide chemotherapy, that the state would argue that a plaintiff's death was the fault of the baseline cancer rather than of any lapse by the state.  I do not mean to suggest that Plaintiffs here are entitled to relief; I mean only that for purposes of standing, they have sufficiently described a connection between the state's alleged failing and their injury.

community-based care and the alleged injury, which they have done.  *See Parrales v. Dudek*, No. 15-CV-424, 2015 WL 13373978, at *4 (N.D. Fla. Dec. 24, 2015) (rejecting state's traceability argument that any failings in delivery of services were the fault of managed-care organizations, because state was responsible for administering program and even harms that flow indirectly from the Defendant's action can suffice for traceability).

**B.**     **Americans with Disabilities Act/Rehabilitation Act**

Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Section 504 of the RA similarly states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  To state a claim for discrimination under either the ADA or § 504 of the RA, a plaintiff must plausibly allege that (1) they were a "qualified individual with a disability;" (2) they were "excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by the public entity;" and (3) "such exclusion or discrimination was due to [their] disability."  *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (cleaned up).[8]  Both Title II and § 504 are to be construed broadly to effectuate the remedial nature of the statutes.  *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003).

---

[8] "As the standards for actions under . . . the ADA and the [RA] are generally equivalent, [courts in this Circuit] analyze such claims together."  *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015); *see Rodriguez v. City of N.Y.*, 197 F.3d 611, 618 (2d Cir. 1999) (assessing ADA and Section 504 claims together); *Scruggs v. Meriden Bd. of*

"[T]he unjustified institutional isolation of persons with disabilities is, in and of itself, a prohibited form of discrimination."  *Davis*, 821 F.3d at 260 (cleaned up).  Thus, the ADA and RA require states to administer their mental health programs "in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  *Olmstead v. L.C.*, 527 U.S. 581, 592 (1999); 28 C.F.R. § 35.130(d); *see* 28 C.F.R. § 41.51(d); 45 C.F.R. § 84.4(b)(2).  Under this standard, commonly known as the "integration mandate," plaintiffs properly plead an *Olmstead* claim when they allege that (1) treatment professionals have determined that community-based services are appropriate, (2) the plaintiffs do not oppose such services, and (3) the services can be reasonably accommodated.  *Davis*, 821 F.3d at 262.  The ADA and RA provide individuals with a cause of action to challenge a state's failure to administer, operate, or fund services consistent with the integration mandate, which failure results in segregation or a risk of segregation.  *See Siino v. City of N.Y.*, No. 14-CV-7217, 2020 WL 3807451, at *15-16 (E.D.N.Y. Feb. 27, 2020) (collecting cases).

As summarized earlier, I find that Plaintiffs state a claim based on Defendants' alleged failures in administering and implementing community-based mental health services and housing.  Plaintiffs allege that Defendants, while controlling where Plaintiffs live as parolees or post-release supervisees, unnecessarily place them in segregated settings or fail to provide needed community-based housing and services, thus putting them at risk for institutionalization in a segregated setting.  In other words, even though Defendants recognize that Plaintiffs could function with community-based services, Defendants do not provide sufficient such services, so

*Educ.*, No. 03-CV-2224, 2007 WL 2318851, at *16 (D. Conn. Aug. 10, 2007) (same).  The primary difference between the two statutes is that the RA requires the plaintiff to plead that the defendant receives federal funding, and the ADA does not.  Defendants do not challenge that they receive such funding, so the two statutes are appropriately analyzed together here.

Plaintiffs either receive services in a segregated setting or receive inadequate services likely to lead to decompensation and reentry to a segregated setting.  As noted earlier, *Davis* makes clear that both an unjustified placement in a segregated setting and a placement creating a serious risk of institutionalization or segregation are sufficient to make out a violation, *Davis*, 821 F.3d at 261-62, and on the latter prong all a plaintiff must allege is that "a public entity's failure to provide community services will *likely* cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution."  *Id.* at 263 (emphasis in original) (cleaned up); *see Edelson v. Chapel Haven, Inc.*, No. 15-cv-1862, 2017 WL 810274, at *9 (D. Conn. Mar. 1, 2017.)  Plaintiffs have plausibly alleged a violation of the integration mandate.

The arguments advanced by Defendants – that their filing of a Single Point of Access application to Plaintiffs' county of release does not really reflect a determination that Plaintiffs need housing or mental health services,[9] that local governments and private licensees are the entities actually failing to provide the services in question, that the settings in which Plaintiffs were placed were not in fact segregated, or that its waitlists are sufficiently reasonable to be permitted under *Olmstead* – all raise factual issues and are better reserved for summary judgment on a fully developed record.

For these and other reasons laid out in Plaintiffs' and DOJ's memoranda, I find that Plaintiffs have stated valid ADA and RA claims.[10]

---

[9] Defendants explicitly rely on their interrogatory response in making this argument, (Ds' Mem. at 20-21), and, as stated earlier, it is inappropriate for me to consider this response on this motion to dismiss.

[10] *Davis* noted that DOJ's interpretation of the integration mandate is ordinarily controlling.  I do not think the same is true of DOJ's application of its interpretation to the allegations in a particular complaint, so I do not regard DOJ's brief as "controlling," but I find it well reasoned and persuasive.

IV.     **<u>CONCLUSION</u>**

For the foregoing reasons, Defendants' motion is DENIED.

**SO ORDERED.**

Dated:  November 15, 2021
        White Plains, New York

_____
        CATHY SEIBEL, U.S.D.J.