1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  --------------------------------x
3  M.G., et al.,
4           Plaintiffs,
5        v.                              19 CV 639(CS)(LMS)
6                                    TELEPHONE CONFERENCE
7  ANDREW CUOMO, et al.,
8           Defendants.
9  --------------------------------x
10                                  United States Courthouse
                                    White Plains, New York
11                                  August 25, 2020
12
13
14
15  Before:  THE HONORABLE LISA MARGARET SMITH, Magistrate Judge
16
17
18                          APPEARANCES
19
   DISABILITY RIGHTS ADVOCATES
20       Attorney for Plaintiffs
   JOSHUA MORRIS ROSENTHAL
21
22  LETITIA JAMES
        Attorney General for the State of New York
23  JEB HARBEN
        Assistant Attorney General
24
25  *Proceeding recorded via digital recording device.

1          THE DEPUTY CLERK:  In the matter of M.G., et

2     al. v. Cuomo, et al.

3          Counsel, please note your appearance for the record.

4          MR. ROSENTHAL:  Joshua Rosenthal, Disability Rights

5     New York, for the plaintiffs.

6          MR. HARBEN:  Jeb Harben, New York Attorney General,

7     for defendants.

8          THE COURT:  Good afternoon, counsel.

9          I had hoped to be able to rule on the motion to amend

10    today, and I do expect to rule very shortly, but I wanted to

11    ask some questions that may help to further elucidate the

12    circumstances.

13         So, Mr. Rosenthal, there's a reference to recent

14    developments in the litigation as the reason for seeking to

15    file a second amended complaint.  Can you be more definitive

16    about what those particular developments are and how they

17    combine to lead to the necessity for a second amended complaint

18    in your view.

19         MR. ROSENTHAL:  Of course, your Honor.  And if I may,

20    I think walking through the time line of how this case has

21    developed over the past several months will very clearly show

22    that not only have plaintiffs been diligent, but that there

23    hasn't been any undue delay.

24         As your Honor is aware, in mid-December, on December

25    16th, for the first time defendants claim to have made an about

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    face in this litigation when DOCCS issued its memorandum

2    together with its reply brief to the motion to dismiss stating

3    that it will longer hold certain class members past their

4    release dates, thereby paving the way for additional shelter

5    relief.

6              Just one week after defendants issued that

7    memorandum, plaintiffs sought permission for your Honor in a

8    status conference to take additional discovery relevant to this

9    apparent change in defendants' litigation strategy, and

10   plaintiffs did serve those additional interrogatories that your

11   Honor authorized in mid January, on the 17th.

12             Plaintiffs and defendants then needed to confer on

13   some deficiencies and defendants' initial response, and then

14   for the first time then, in early March, on March 6th,

15   plaintiffs received discovery that demonstrated, among other

16   things, that, over the prior year, defendants had released 364

17   people with serious mental illness from state prison to the

18   homeless shelter system and that the vast majority of those

19   people, 335 of those people, had been assessed as eligible and

20   appropriate for community based mental health (INDISCERNIBLE).

21             Also, on March 6th, plaintiffs received a

22   supplemental interrogatory response from Commissioner Sullivan

23   in which she acknowledged that OMH institutionalizes people in

24   TLRs, in these transitional living residences simply when no

25   community based mental health housing is available for these

1    people's release dates, on their release dates.

2              Now, between March and August 2020, plaintiffs

3    diligently investigated these claims.  Now, your Honor, I won't

4    belabor the unprecedented challenges that plaintiffs have --

5    all of us have faced during the pandemic.  Defendants' counsel

6    themselves cited these challenges when, for months, their

7    production of discovery ground to a halt.  In fact, actually,

8    production of discovery only restarted again on August 13th,

9    three days after plaintiffs moved to amend.  But, nonetheless,

10   in the midst of a pandemic, plaintiffs' counsel then

11   investigated these practices, obtained and reviewed the

12   necessary evidence that would support amendment, that would

13   support the details on the allegations they've included in the

14   second amended complaint, and they located and investigated the

15   claims of potential named plaintiffs, all of whom are living in

16   settings that have been particularly and horrifically

17   devastated by the spread of COVID-19.

18             Now, in any year, plaintiffs' position is that this

19   time frame would not amount to undue delay, but this year in

20   particular, we believe there's no grounds to find that

21   plaintiffs delayed in any way that would warrant a denial of

22   leave to amend to bring these new claims; I should say these

23   new claims that arise from the same unlawful conduct that

24   plaintiffs have been challenging since the outset of this

25   litigation.

1          THE COURT:  All right.  Can you give me some idea of

2     the timing of when you began seeking potential named plaintiffs

3     for the proposed discharge class and at what point you had

4     gained sufficient facts to draft the second amended complaint.

5     What does the time line look like?

6          MR. ROSENTHAL:  The time line -- and candidly, your

7     Honor, I don't have all of the meetings with the named

8     plaintiffs, those dates in front of me, but the time line was

9     this spring and into the summer.  Plaintiffs -- for obvious

10    reasons, plaintiffs faced challenges in not only meeting with

11    our clients, but undertaking review of documents on their

12    behalf to assess their claims, to draft the second amended

13    complaint, because frequently, as is our practice, we would be

14    reviewing those documents very often on site, in the facility

15    that plaintiffs were now, after March, either prohibited

16    because of restrictions around visitors -- understandable

17    restrictions around visitors or because of the shear safety

18    concerns.  So it was in the spring and into the summer that

19    plaintiffs were required to not only be speaking with our

20    clients and investigating their claims, but also seeking

21    documents that would be relevant to support the allegations

22    that we include in the second amended complaint; namely, their

23    eligibility for community-based mental health housing and the

24    failures that have led them to be warehoused either in homeless

25    shelters or in institutional transitional living residences.

1           I should add, your Honor, you know, defendants have

2    claimed that plaintiffs should have known about these facts in

3    the second amended complaint at the outset, from long ago.

4    It's unclear what this is based on.  First, it was defendants

5    themselves that claimed to change the discharge practices

6    during the pendency of this case and in response to this case,

7    but moreover, your Honor, what plaintiffs did know is that,

8    dating back to 2014, as is alleged in the second amended

9    complaint, defendants had a blanket policy that prohibited

10   release of any people with serious mental illness from

11   homeless -- from -- excuse me -- from prisons to the homeless

12   shelter system.  Now, the named plaintiffs themselves in this

13   case had not been approved by DOCCS for release to the homeless

14   shelter system.  It's not credible for defendants to now argue

15   that plaintiffs should somehow have been aware of these

16   discharge practices that generally are not made publicly

17   available.  These are not systems that operate in the daylight.

18           THE COURT:  And at what point did you glean enough

19   facts to be able to go forward with the second amended

20   complaint?

21           MR. ROSENTHAL:  I would say in -- over the summer,

22   and particularly in July, the plaintiffs were preparing the

23   second amended complaint.

24           As the Court may be aware, the parties had a

25   settlement call on July 21st, and on that call, actually,

1    plaintiffs advised defendants of our intent to move to amend

2    the complaint and provided a general outline of what those

3    amendments would encompass.  And then, again, plaintiffs had to

4    prepare the second amended complaint that were based on these

5    facts that we had been undertaking while dealing with the

6    challenges and restrictions posed by COVID over the spring and

7    then in particular into the summer.

8         THE COURT:  Do plaintiffs have a response to the

9    contention that's been made by defendants that the discharge

10   class does not include an exception from the class for inmates

11   who are subject to the Sexual Assault Reform Act housing

12   restrictions, which is included in the definitions of the

13   general RTF subclasses?  Any response to that argument by

14   defendants?

15        MR. ROSENTHAL:  Yes, your Honor.

16        It's unclear, I guess, what the import of that

17   argument was.  Now, plaintiffs have met the standards under

18   Rule 20 and 21 for joinder of these plaintiffs, including the

19   discharge class members together with the general class and the

20   RTF subclass in a single case in particular because the claims

21   of all three classes are arising out of the same unlawful

22   conduct by defendants; namely, the State's failure to make

23   available community based mental health housing and supportive

24   services for people who are eligible for these services who

25   either are or should be leaving state prison.

1          Now, for purposes of Rule 23, plaintiffs have

2     proposed three classes, but there is a single underlying

3     question that underlies all three.  Are defendants

4     administering their mental health system in a manner such that,

5     when people reach their lawful release, they can be put into

6     integrated settings or not at a place of serious risk of

7     institutional invasion, as is required by the integration

8     mandate, and the answer, plaintiffs say, is no.  Whether that's

9     prolonged incarceration, as is the case for the general class

10    and the RTF subclass or whether that's being warehoused in

11    institutional settings or being left to decompensate in chaotic

12    and segregated homeless shelters, they all arise from the same

13    unlawful conduct that plaintiffs have been challenging since

14    the beginning.

15         Your Honor, also, if I can just add one other thing.

16    I can say specifically that records for one of the named

17    plaintiffs who we're proposing be joined in this case we

18    received only in early August.  I believe August 7th was the

19    date that we finally received those records that could allow us

20    to fully assess the claims of that plaintiff.

21         THE COURT:  And do you have a response -- defendants

22    have cited to an opinion by Judge Seibel in a case called

23    Volunteer Fire Association of Tappan, Incorporated against

24    County of Rockland, a 2010 opinion, for the proposition that

25    Rule 16 is the proper standard for reviewing the motion rather

1    than Rule 15.  Do you have a response to their argument?

2              MR. ROSENTHAL:  Yes, your Honor.

3              Defendants are misstating the proper standards here.

4    Plaintiffs' motion does not trigger the good-cause showing

5    under Rule 16 not only because the Court has yet to issue a

6    Rule 16 scheduling order, but also because there's simply no

7    deadline that plaintiffs -- deadlines set by either your Honor

8    or Judge Seibel that plaintiffs either didn't meet or that

9    plaintiffs are now asking to modify.

10             Now, in the case that defendants e-mailed just this

11   morning, it's easily distinguishable from the case at hand.

12   There, Judge Seibel had issued a deadline for plaintiffs in

13   that case to file a first amended complaint that would be

14   responsive to a premotion letter regarding a motion to dismiss

15   by the defendants in that case.  There, though, plaintiffs

16   simply missed that deadline.  They did file the first amended

17   complaint and only afterwards attempted to file the first

18   amended complaint together with their opposition briefing,

19   which, of course, would require the Court to then modify that

20   order.

21             Here, your Honor, Judge Seibel set a deadline for

22   plaintiffs to file a first amended complaint also in response

23   to defendants' concerns that were raised in their premotion

24   letter, and plaintiffs met that deadline.  The Court didn't

25   otherwise set any deadlines either for the joinder of parties

1    or for further amendments or for discovery or trial -- excuse

2    me -- for the close of discovery or trial.  And so plaintiffs

3    argue that defendants' discussion regarding good cause in much

4    of the case, while they cite it, simply isn't relevant.

5            Regardless, though, plaintiffs have satisfied that

6    good-cause showing that is required by Rule 16 because they

7    acted with diligence in bringing these claims, because there's

8    no undue prejudice that defendants have been able to establish

9    at this early stage of the case.  And defendants themselves

10   introduced these issues in the litigation through that December

11   memorandum over six months after plaintiffs' initial deadline

12   to file a first amended complaint.

13           I should also add, your Honor, that the discovery

14   that has not only been taken in this case, but the discovery

15   going forward in this case will significantly overlap

16   particularly between the general class and the discharge class,

17   and discovery will concern whether there's adequate capacity in

18   defendants' mental health system for which the plaintiffs are

19   eligible.

20           THE COURT:  Mr. Harben, are you able to give me a

21   more specific and definitive statement of the additional burden

22   that you're arguing would be faced for proceeding with

23   discovery under the second amended complaint.

24           (Pause)

25           THE COURT:  Mr. Harben?  We don't hear you.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1          MR. HARBEN:  Can I respond to some of the statements

2     before I get to that that Mr. Rosenthal made that I think are

3     not accurate?

4          THE COURT:  No.

5          Mr. Harben, Mr. Harben, I'm going to give you a

6     chance to respond --

7          MR. HARBEN:  Okay.

8          THE COURT:  -- but, right now, I would like you to

9     answer my question.

10          MR. HARBEN:  Well, we've already reviewed enormous

11     numbers of documents, designated many nonresponsive, that may

12     very well have dealt with some of the issues that would be

13     created by this new lawsuit, so we would have to review all of

14     that again.

15          And really this is -- as we discussed in the letter,

16     this vastly expands the scope of this case.  It's almost a

17     complete about face of -- you know, it's a humungous -- it's a

18     huge class of people that is much bigger than the 20, 25 people

19     who were being held past their release date a year before.  Now

20     we're dealing with hundreds and hundreds of SMI inmates who are

21     getting released each year who have been going to homeless

22     shelters.  And that has been the case for years.  And the

23     discovery shows that.  This is not a new phenomenon, and the

24     plaintiffs are well aware of that.

25          I think -- I cannot believe that Mr. Rosenthal is

1    claiming that nobody was getting released to homeless shelters

2    before December or before last year.  That's simply -- that's

3    refuted by the documents.  The documents, to my understanding,

4    were produced well before the December memo that basically say

5    where the population's being released to every year.  There's

6    summary documents that show it's three to five hundred or so

7    SMI inmates being released to shelters every year.  As

8    explained repeatedly in our papers, the few -- there were only

9    a few SMI inmates every year that some parole officials decided

10   that person should not go to a shelter, we need to find some

11   mental health housing.  It was a clinical decision.  That was

12   perhaps five percent of the total, eight percent of the total.

13   The rest were being released to shelters.  And I find it very

14   difficult to believe that plaintiffs' counsel was not aware

15   that many -- hundreds of SMI inmates were being released to

16   shelters every year, that this is somehow a revelation.

17            And frankly, you know, on a letter brief, we're not

18   really there putting in enormous numbers of documents, but,

19   honestly, I think I've seen it in plaintiffs' production, this

20   summary data, which was produced in the middle of last year.

21   And so this is not new.

22            But it will be a huge undertaking, huge undertaking,

23   to produce whatever -- I don't -- you know, I don't know what

24   their request will be, but we're dealing with hundreds and

25   hundreds of inmates every year released to homeless shelters

1    who are qualified as SMI.  So you not only have that data, but

2    they're also claiming they're not getting adequate care.

3            How many files -- how many -- how would they ever

4    prove that without enormous discovery into hundreds, dozens, of

5    class members?  The fact that three people claim that they

6    didn't like the care they got.  By the way, one of them was

7    released to their grandmother at some point, so apparently it's

8    not just homeless shelters.  They didn't feel that the

9    grandmother was a sufficient -- family was not sufficient in

10   that case.  And the discovery of providing hundreds and

11   hundreds of apartments to all these people, it probably

12   increases this tenfold, you know, in terms of discovery.  And

13   we've already reviewed hundreds -- you know, I don't know

14   exactly how many documents we've decided were not responsive to

15   the actual complaint and is put to the side and now we're going

16   to have to look at them again, researching e-mails, pulling

17   more e-mails.

18           It's an enormous expansion and it's really an about

19   face of the complaint.  I think they realized that we're no

20   longer holding the small group of people every year out and

21   they're sort of conceding that their claims are mooted in their

22   initial lawsuit, so they're basically just now filing a new

23   lawsuit.

24           It's understanding that it's harder to find

25   plaintiffs during this time, but they never indicated any

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    indication after your Honor read the complaint to them.

2    There's no claim about people being released to homeless

3    shelters here as part of the lawsuit, which you found twice

4    during discovery conferences.  They never wrote to the Court

5    and said, you know, even though our deadline has passed to

6    amend and we already amended once, we would like another crack

7    at it.  And who knows?  If Judge Seibel decides the motion, she

8    may give them leave to amend again.  She already set one

9    deadline.

10          And I don't think the case that we forwarded or any

11    of the other cases are particularly distinguishable.  In Judge

12    Seibel's case, she said, you know, my oral deadline is the same

13    thing as a scheduling order for the purposes of this case.  And

14    in fact, she cites to another case, Footridge, where, in fact,

15    they did amend within the time of the deadline and then they

16    wanted to amend again, just like here.  She said that

17    disapprovingly.  So I don't think the Volunteer Fire

18    Association case or any of the other cases we cited is

19    distinguishable.  They cite the Second Circuit case Vilanti,

20    which had absolutely nothing to do with this.  It didn't deal

21    with an amendment of the pleadings or anything like that.  It

22    just said what a Rule 16 scheduling order was.

23          So the discovery obligations, the expanded discovery

24    obligations, the redoing of work is going to be enormous here.

25    You know, we already had a team of attorneys going through

1    many, many e-mails.  And if it was just about released -- you

2    know, releasing to homeless shelters or whatever and wasn't

3    really responsive to the claims in the case, we would probably

4    have not deemed that responsive, you know, especially since

5    your Honor issued discovery rulings saying all this broad

6    discovery on releases to homeless shelters is not relevant to

7    the actual claims that were pleaded.  So that's our view on

8    that.

9          You know, I could dig through the production and find

10   the documents that give summaries of how many mentally ill --

11   seriously mental ill inmates have been getting released over

12   the years, but believe me, your Honor, this December memo that

13   came out does not significantly impact that number.  It's a few

14   people a year possibly that are going to shelters that were not

15   before.  It has always been hundreds of people a year

16   regardless of what some e-mail that they've dug up said about

17   that.  There were not hundreds of people -- the people getting

18   released to the shelters were seriously mentally ill for years

19   and years and years.  Some of them may have been a little bit

20   more scrutinized, but that's about it.

21         THE COURT:  Mr. Harben, there were some other things

22   that you wanted to comment upon.

23         MR. HARBEN:  Well, I think I wrapped all that up in

24   what I've just said here, that this is not a new revelation,

25   your Honor.  My understanding is it was in discovery we

1   produced last year.  And I'm digging through plaintiffs'

2   production because I think I saw these documents first in their

3   production which they produced in the summer of last year that

4   give the summaries of where seriously mentally ill inmates are

5   released to.  This is not a new revelation at all.

6           THE COURT:  All right, Mr. Rosenthal, I'll give you

7   the last word.

8           MR. ROSENTHAL:  Yes, your Honor.

9           If I can -- let me first respond on prejudice here.

10  As this Court has held, prejudice is evaluated by looking at

11  the overall progress of the litigation and, here, the parties

12  are still at the pleadings stage.  There's no deadline for the

13  close of discovery.  There's no deadline for trial.  Document

14  discovery is ongoing.  A lot of that discovery is still

15  outstanding.  And depositions haven't even begun.

16          For a number of reasons, defendants are greatly

17  overstating the effect these amendments are going to have on

18  the proceedings thus far.  First, the amendments don't alter

19  the claims of the general class, of the RTF subclass, and will

20  not impact the resolution of the pending motion.  Second, as I

21  stated earlier, much of the discovery that's been requested

22  today as well as the discovery that will be going forward

23  overlaps between the general class and the discharge class;

24  namely, discovery concerning whether defendants have

25  capacity -- have adequate capacity in their mental health

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    programs.

2         The case law is clear that merely needing to engage

3    in additional discovery or even additional briefing does not

4    demonstrate undue prejudice.  To the contrary.  In this case,

5    granting plaintiffs' leave to file the second amended complaint

6    will preserve judicial economy, will preserve defendants' own

7    resources by allowing the parties to litigate these

8    interrelated -- these overlapping claims.

9         Respectfully, I believe that defendants' counsel is

10   very much misrepresenting what your Honor held at the status

11   conference in the spring.  At that time, plaintiffs had been

12   seeking discovery related to discharges to homeless shelters,

13   arguing that that discovery was related to the general class,

14   relevant to the general class, and the RTF subclass.  Your

15   Honor, my recollection is that there was no engagement at that

16   time about the merits of any claims regarding shelter

17   discharges.  And there's no support for defendants' argument

18   that we're drastically altering the true nature of this case.

19        The data chart that plaintiffs received in early

20   March showed not only the numbers, not only how many people

21   were being released to homeless shelters, but how many of those

22   people had SPOA applications, had community -- applications for

23   community based care submitted on their behalf, which was the

24   vast majority.  That was also the first time that Commissioner

25   Sullivan, again, as I said, acknowledged that defendants are

1    using TLRs not only, as plaintiffs have argued, to moot out the

2    claims of our named plaintiffs, but to warehouse all -- a

3    number -- dozens of people who are being released to --

4    released from prison who don't have adequate community based

5    housing on their behalf.

6         Again, defendants have also raised the issue of I

7    believe D.H. being released to his grandmother and they seem

8    to, in their papers and here today, be completely ignoring that

9    plaintiffs are bringing not only claims for unnecessary

10   institutionalization, but, as the Second Circuit recognized in

11   Davis v. Shaw, claims for being placed and the serious risk of

12   institutionalization, including by being released to homeless

13   shelters, in D.H.'s case to his grandmother, without mental

14   health services in the community that they need to succeed.

15        THE COURT:  All right, counsel.  I very much

16   appreciate -- my last question, Mr. Rosenthal, is, if the Court

17   finds that the proposed amendment does affect the general and

18   RTF subclass, should the amendment nevertheless be allowed?  If

19   the Court makes that finding.

20        MR. ROSENTHAL:  Yes, your Honor.

21        As the Court may have noticed and as the defense may

22   have noticed, there were instances in the second amended

23   complaint where there were some minor edits to, for example,

24   M.G.'s and P.C.'s paragraphs, who are both general class

25   representatives, simply to update those allegations.  But,

1    nevertheless, under Rule 15 and even under Rule 16, plaintiffs

2    have met the liberal standards that govern amendment in this

3    case.  And most importantly, defendants' counsel seem to have

4    admitted to practices of placing people with serious mental

5    illness at a severe risk of institutionalization.

6           So granting amendment in this case will save the

7    Court -- will save defendants and will save plaintiffs the

8    burden of litigating these same issues in different pieces of

9    litigation.  So, yes, your Honor, regardless, plaintiffs would

10   argue that the motion to amend should be granted.

11          THE COURT:  Mr. Harben, I'll give you a chance to

12   answer that same question.

13          MR. HARBEN:  Your Honor, we have not admitted that

14   placing inmates in homeless shelters creates a substantial risk

15   of reinstitutionalization at all, but, you know, our view is

16   that, you know, under the standards of Rule 16, and even Rule

17   15, this amendment should not be allowed.

18          The delays here, the prejudice here, the entirely new

19   claims, your Honor, we gave you the -- we put forward the first

20   transcript, the initial conference before Judge Seibel, who was

21   only -- who was concerned that certain inmates were getting

22   held past their release dates for whatever reason.  That's what

23   this case is about, not about releasing inmates to homeless

24   shelters and not about giving them all apartments.  In fact,

25   some of -- two or three -- at least two out of the six

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    initially named plaintiffs, as we pointed out in the openly

2    extensively briefed motion to dismiss with sur-replies and so

3    forth, did short stints in transitional living residences to

4    get ready for the outside world and went out and are

5    functioning; got jobs, got their own places.  The notion that

6    hundreds and hundreds of inmates who have received SMI need to

7    get apartments at state expense, and really the logic would

8    apply to everybody who's SMI in the state, which is a huge

9    number of people, or who are at risk of homelessness or who are

10   staying with grandmothers that they don't feel are meeting

11   their needs and so forth, this is a huge fundamental alteration

12   of what services are available now.  It's just -- I can't say

13   this again.  It's an entirely new lawsuit and really it's --

14   you know, we've stated our position that this amendment is

15   totally inappropriate, particularly at this stage of the

16   litigation.

17           THE COURT:  But, Mr. Harben, if the motion to amend

18   is denied, I think the handwriting is on the wall that they

19   would simply file a new lawsuit, and so how does that

20   perpetuate the notion that it's not going to be more work for

21   defendants?  Isn't that going to happen anyway?

22           MR. HARBEN:  Well, I don't know if they're going to

23   file another lawsuit.  They may.  Discovery may be stayed in

24   that lawsuit while those claims are hashed out, as normally

25   they are.  The huge burden -- that could be said for any

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    amendment, that they're raising new claims, they could just

2    file another lawsuit, and courts deny those thought-after

3    amendments, too, you know, for all the reasons in Rule 16 and

4    even Rule 15.

5          THE COURT:  All right.  I anticipate issuing a

6    decision very shortly in this.  And I will -- depending on what

7    decision is reached, which does not have to be by report and

8    recommendation, I will nevertheless be consulting with Judge

9    Seibel as to next steps; whether it's necessary and appropriate

10   for us to have a conference in short order, whether that should

11   be put off pending whatever action Judge Seibel's going to

12   take.  I will confer with her and we will do our best to -- if

13   we do set a new date, to set a date with sufficient advance

14   notice so that all counsel can participate.

15          In the event that I haven't mentioned it, I retire as

16   of September 30.  I expect my successor to take his seat

17   October 1st.  If his security clearance has not come through by

18   that date, then I will continue on in what is called recall

19   status.  I will really be baby-sitting the cases until the new

20   magistrate judge comes on board.  But there will always be

21   someone for you to reach and communicate with in the event that

22   issues arise about the case.  So I think that's the current

23   status.

24          I'm going to adjourn the matter without date, and you

25   should be hearing from us shortly.

20208pm gcr

 1              MR. ROSENTHAL:  Thank you, your Honor.

 2              MR. HARBEN:  Thank you, your Honor.

 3              THE COURT:  Thank you.  We are adjourned.

 4
                              ----
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                          (914)390-4103