```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  M.G., et al.,

 4                              Plaintiffs,

 5                                       7:19-CV-00639 (CS)(AEK)
        -vs-
 6                                       STATUS CONFERENCE

 7
    ANDREW CUOMO, et al.,
 8
                                Defendants.
 9  ------------------------------------x

10
        *Proceedings recorded via digital recording device*
11

12                              United States Courthouse
                                White Plains, New York
13
                                Wednesday, June 29, 2022
14

15  B e f o r e:

16                              HONORABLE ANDREW E. KRAUSE
                                Magistrate Judge
17

18  A P P E A R A N C E S:

19
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
20      Attorneys for Plaintiffs
    BY: SAMUEL MARGOLIS, ESQ.,
21      JOSH ROSENTHAL, ESQ.,

22
    NYS OFFICE OF THE ATTORNEY GENERAL
23      Attorneys for Defendants
    BY: OWEN T. CONROY, ESQ.,

24

25
```

 1          THE DEPUTY CLERK:  Good morning, all.  This is the

 2  matter of M.G. v. Cuomo, Docket No. 19-CV-639.  The Honorable

 3  Andrew Krause presiding.

 4          Will Counsel note your appearance for the record,

 5  starting with Plaintiff's Counsel.

 6          MR. MARGOLIS:  Thank you, Your Honor.  Sam Margolis on

 7  behalf of Plaintiffs.

 8          THE COURT:  Good morning.

 9          MR. ROSENTHAL:  Good morning, your Honor.  Josh

10  Rosenthal on behalf of Plaintiffs.

11          THE COURT:  Good morning, Mr. Rosenthal.

12          MR. CONROY:  Owen Conroy from the New York State

13  Office of the Attorney General on behalf of the defendants.

14          Good morning, your Honor.

15          THE COURT:  Good morning.

16          Are you folks in the back there planning to

17  participate or...just observing for now?

18          UNIDENTIFIED SPEAKER:  Just observing.

19          THE COURT:  Okay.  If you need to come up and be on

20  the record, just make sure to introduce yourself if you do.

21          Mr. Conroy, you didn't bring...

22          MR. CONROY:  Just me.

23          THE COURT:  Just you.  I know where Ms. Cha is because

24  I'm supposed to speak to her on a different matter at

25  eleven-thirty, and I know that she's preparing for trial unless

1  we have a successful conversation at eleven-thirty, so we'll see

2  how that goes.  Okay.

3          Thank you, all, for being there.  It's nice to meet

4  you all in person, I think for the first time, after many, many

5  phone and video conferences.  I do think it was worthwhile to be

6  together here in person for this discussion because we're

7  obviously at an important stage of the case as we figure out how

8  the ESI process is going to proceed from here.  I also did

9  review your letters on the senses issue, so I want to talk about

10  both of those things today.

11          Let's start with the ESI issues.

12          I will say I was just saying to my staff that I

13  realize that in some ways, I artificially...heh, cut short the

14  negotiations here by requiring that we have this conference

15  today instead of letting things play out further, but I think

16  there was good reason for that, too, because in my experience,

17  these kinds of negotiations can go on forever and ever without

18  any end point unless, unless one is imposed.

19          So I've reviewed the letters and I see the search-term

20  hit reports.  Obviously, we're talking about a large volume of

21  documents here no matter how we proceed, but I am...sensitive to

22  the, the concern that the Plaintiffs have raised, particularly

23  with respect to the percentage of documents in the defendant's

24  proposal that actually were...hits on the search terms.

25          So the defendant's proposal had, according to the

1  letters, approximately 211,000 documents.  It's a little

2  confusing because the...the hit report that was attached to the

3  plaintiff's letter that was supposed to be the defendant's hit

4  report, I thought, reflected a somewhat larger number?  But we

5  can talk about that as well.  But both -- heh, both sides

6  represented in their letters that the defendant's total volume

7  was approximately 210,000 or 211,000 documents, so I -- we'll

8  work with that number.

9          As I understood it, though, from the plaintiff's

10  letter, that 211,000-document volume included only about 44,000

11  documents that were hits on the requested search terms.  That,

12  by my math, came out to about 21 percent of the total volume

13  that were hits on the terms.  The plaintiff's proposal ended up

14  with approximately 500,000 documents with 160,000 documents with

15  hits that came out to approximately a 32 percent rate of

16  documents with hits, so it's a pretty substantial difference

17  between the parties'...volume and, and hit volume there.

18          I am...I am sensitive to the concerns, though, that

19  were raised by the defendants in terms of the volume of the

20  review that -- the volume of the potential review, whether it's

21  the 211,000 documents, which is still a pretty hefty number for

22  the defense team to go through, even if they were able to bring

23  on contract attorneys.  A 500,000-document volume is...is a

24  pretty extreme number in a case like this, even though the needs

25  of the case, the significance of the issues, and the complexity

1  of the claims do warrant a substantial ESI production.  I think

2  we're already in the realm of everybody agreeing that there's

3  going to be a substantial ESI review and production process,

4  it's just a matter of figuring out how substantial it's going to

5  be.

6       So those are some preliminary thoughts that I have.

7  I'd like to hear any supplemental thoughts you have.  Again,

8  I've read the letters, you don't need to, to recap the letters

9  in any more detail, but thoughts about how we proceed from here.

10      One suggestion from the plaintiffs, which I think may

11 make some sense, is to see if there is a revised proposal that

12 defendants could make that would address some of these concerns,

13 particularly tweaking some of the terms or, or accepting some of

14 the proposed terms from the plaintiffs that might increase the

15 volume of hits as a percentage of the total volume of documents,

16 while recognizing that I'm not necessarily suggesting that the

17 total volume of documents needs to come all the way up to

18 500,000, because I think that's going to be...likely overly

19 burdensome within the confines of this case, but I would like to

20 see if there's a way of meeting in the middle, not

21 mathematically necessarily, but addressing some of the concerns

22 about trying to get the documents that are most...relevant based

23 on hits on the terms as opposed large numbers of, of family

24 attachments which may be of lesser relevance.

25      So the suggestion that perhaps we build in a little

Stat. Conf.                    M.G. v. Cuomo                         6

1  bit more time to allow for a counterproposal and some further

2  exchanges about that, maybe there's an agreement that can be

3  reached or at least maybe there's something that I can then rule

4  on based on some further refinement.  I'm inclined to go in that

5  direction, but I'd like to hear from you a little bit first.

6           Mr. Margolis, do you want to address that one?

7           MR. MARGOLIS:  Yes, your Honor.  Thank you.

8           That's a reasonable solution to plaintiffs.  The other

9  issue that I wanted to raise with defendant's proposal, as we

10 addressed in the letter, is it did not address certain requests

11 for production that we believe are...required for our discovery

12 and for making our case here.

13          We do believe that there is further negotiations to

14 have on these search terms, as we said.  Even in our proposal,

15 there are also some search strings which still have an outsized

16 number of family members which could reduce this...total burden

17 down through negotiations.

18          THE COURT:  Okay.  I mean, I have noticed in, in

19 looking at these, these reports that there were a couple of

20 terms in particular that had generated a lot of unique hits.  I

21 don't know how crucial those terms are to the plaintiff's

22 proposals.  I mean, there are lot of terms there that obviously

23 are resulting in a lot of overlapping documents, so they're not

24 unique hits, but I did notice that the -- I think two or three

25 terms in particular that resulted in a large number of unique

1  hits also had a large number of documents with hits and

2  documents with hits including families.

3          So, you know, on, on page...well, the way it's

4  formatted here, it's page 13 of sixteen of document 223-2.  I'm

5  not going to read that entire search string because it's got

6  thirty words in it, but it, it resulted in 40,000 unique hits,

7  which was an extraordinary number relative to the unique hit

8  counts in the remainder of the plaintiff's counterproposal.

9  Similarly, on the last page of ECF no. 223-2, there's a -- the

10 final term in the entire report resulted in almost 13,000 unique

11 hits, 65,000 documents with hits including family, so, you know,

12 there are several of these.

13         And to your point, Mr. Margolis, there are a number of

14 other documents that had extremely large numbers of family

15 members, even where the terms themselves weren't generating a

16 tremendous number of hits.  There's one on page 10 of sixteen of

17 that same 223-2 that has 90,000 documents with -- including the

18 family members, but only 2,000 documents with hits, and another

19 one there with 1,800 hits and 50,000 or so family members,

20 so...right.

21         I'm not exactly sure how it would work if you were to

22 take these terms and just...cut a few of them?  Maybe that would

23 get you to where you needed to be.  Alternatively, the

24 defendants might be able to add some of the things that you were

25 requesting and, and sort of achieve some of the objectives that

1  I've referenced, so, Mr. Conroy, let me hear from you a little

2  bit.

3          You know, I understand that the iterative process of

4  running these reports and tweaking the numbers and getting

5  things loaded, I, I know that that's not a simple process, but I

6  think if we do a little bit more work on the front end, we can

7  get a review set that, that addresses some of the plaintiff's

8  concerns without going, perhaps, as far as they're looking to go

9  in terms of the volume.

10          MR. MARGOLIS:  Understood, your Honor, and if that's

11  how you'd like to proceed, we'll certainly prepare something to

12  send them, but just to respond on a few of these points --

13          THE COURT:  Yes.

14          MR. CONROY:  -- to give context to the discussion...

15          So on the large families, I mean, I do think both

16  proposals have this issues, I mean, there is -- so I counted in

17  our proposal, it was, like, a 4.7-times jump from 44,000 to 210,

18  and their's is a 3.1-times jump, so it's -- it...it does happen

19  in both.  I think -- it seems to be from our perspective the

20  nature of this data set, that there are just a lot of big

21  families with some zip files and some meeting invitations that

22  have a lot of attachments to it.

23          We did look when we were having this discussion about

24  whether there are certain search term strings that are

25  correlated with the biggest families and we didn't see a great

1  correlation.  There wasn't one or two search strings where we

2  were, like, okay, there's zip files and we can propose cutting

3  that one.  What our folks told us is that they were looking for

4  families with a hundred-plus documents.  There are 19 different

5  search term strings that implicate those big families, so it's,

6  it's...not as simple as just cutting one or two of the search

7  terms.

8        THE COURT:  Right.  That's why I was -- I understand

9  that, and your point is well taken, Mr. Conroy.  I mean, when I

10 said -- I did the math a little bit differently.  You did it

11 with the multiplier version, I did it with a percentage version,

12 and it's the same...same idea of the calculation.  And it's

13 worth noting, as I did, that the plaintiff's proposal is only

14 showing up with a hit rate of 32 percent, right?  You know, of

15 the total document -- total number of the documents, only 32

16 percent of them are actual hits on the terms, as opposed to 21

17 percent for yours, so I think they have to acknowledge and

18 accept the reality that that's going to be the case no matter

19 what.

20        Even if you were to take their proposal, they'd have

21 to accept that dynamic, but, again, that -- it's a significant

22 enough difference that I think if we can increase the rate of

23 documents that are actual hits on the search terms, that will

24 hopefully, and at least theoretically, increase the,

25 the...accuracy of the collection in the sense that it's at least

1  capturing what the, the plaintiffs are truly requesting, which

2  is, you know, documents that hit on these terms.

3          So -- again, it's not going to be perfect.  I realize

4  that we're talking about an incremental change, but, you know,

5  in a volume this large, that incremental change is still going

6  to be significant and will refine the overall data set in a way

7  that hopefully will increase the likelihood of getting the

8  documents that are of greatest interest.

9          MR. CONROY:  And that -- so just one other point to

10 make about that, you know, I think we can definitely take a look

11 and see if we can target another counterproposal in that way.  I

12 think it would involve...cutting back on some of our terms,

13 right, and then maybe some (inaudible) that we would incorporate

14 some of the terms in plaintiff's most recent proposal, but in

15 order to avoid getting back to 500,000, obviously we're going to

16 have to be cutting as well as adding.

17          So that's...it's something we can definitely take a

18 look at, but that would be the approach, I think.

19          THE COURT:  All right, I think that makes sense, and

20 I'll hear from you, Mr. Margolis, if you have thoughts on that,

21 too.  I think it that makes sense.

22          I don't think that 210,000 has to be a hard cap.  I do

23 think that 500,000, you know, could -- trying to come in, you

24 know, substantially below that is, is a reasonable approach, so

25 there may be some number in the middle there, and I don't mean

Stat. Conf.                    M.G. v. Cuomo

1  in the middle, like, the exact midpoint, but some number between

2  those two that might be...acceptable to everybody.

3         I will say, though, that I am sensitive to the

4  concerns that defendants have raised about the burden of a

5  review that is 500,000 documents, and, frankly, I think the

6  plaintiffs...have an understandable interest, and I'm sure the

7  defendants have this interest, too, at some level, to move this

8  case along.  It's a 2019 case, it's a complicated case, it's an

9  important case, and it is just a reality for any defendant, but

10 particularly for a government defendant that when you're talking

11 about a review of this size, it's going to take longer, so there

12 are, there are tradeoffs to be made there in terms of the volume

13 of documents potentially to be received versus the speed with

14 which they can be received.  I, I know you're aware of that and

15 you are thinking about that as well, so...I mean, it's just

16 different in terms of the resources that can be thrown at it,

17 and not only in terms of the number of attorneys, but the time

18 that they spend.

19        I mean, I'm not kidding when I say that Ms. Cha has a

20 trial next week, unless I can help settle that case at

21 eleven-thirty, which is not only a good outcome for Ms. Cha --

22 it's not my case, it's my colleague's case, but there's a lot

23 going on and it's, it's just not possible for the AG's office to

24 take these four assistant attorneys general and assign them

25 exclusively to this case, even if they might find that more

1  interesting than some of their other cases, who's to say, but

2  that's just not possible, so...I understand your point, Mr.

3  Conroy, and I think you all are aware of the issues enough that

4  you can figure out how best to, to go about it.

5         I don't want this to last forever.  If you can't get

6  to an outcome, then I will rule one way or the other, and I'm

7  happy to do that, I just think that there's some potential room

8  for further negotiation and compromise?  It may only serve to

9  narrow the scope of the dispute and if that's the case, then you

10 come back to me and I'll make a ruling.  I'm not going to go

11 through this iterative process for...too much longer.  I do want

12 to get you moving on the actual review and processing, but

13 rather than pick between these two points, I wanted to give you

14 some feedback on it to see if there might be some further

15 adjustments that either will be satisfactory to both sides or

16 will at least bring you closer together so that I can then pick

17 between the two options.

18        So...go ahead, Mr. Conroy.  You might have had some

19 other points.  I keep interrupting you.

20        MR. CONROY:  No, thank you, Judge.

21        Yeah, I just wanted to respond to one other particular

22 point in the plaintiff's letter to clarify something.

23        There was a point made about how defendants are

24 uniquely well positioned to know which terms and connectors are

25 responsible for the excessive hits and that, you know, I took it

 1  that they feel...we're, you know, keeping the secret data or

 2  something from them.  That is not the case.  And this is

 3  something that we had talked about early in the process when we

 4  got their first proposal, which is that the way plaintiff's

 5  terms -- I'm sorry, search-term strings are structured is they

 6  tend to be a series of terms separated by 'or' so, like, A or B

 7  or C, and then a connector like an 'and' or 'within five or ten'

 8  and then on the other side of that another parentheses with

 9  another series of terms separated by or's, so X or Y or Z.

10          What our technologies group flagged for us and what we

11  flagged for the plaintiffs is that when a search term string is

12  structured that way, you can't really tell which of the A, B, C,

13  D or X, Y, Z is causing the inflation in hits --

14          THE COURT:  Meaning which of the, the numerous terms

15  on one side of the conjunction is, is responsible for it.

16          MR. CONROY:  Exactly.  Exactly.

17          THE COURT:  Okay.

18          MR. CONROY:  So we spoke with plaintiffs about this,

19  we flagged the issue, and what we suggested is that if they

20  wanted to see term-specific unique hit counts, they'd have to

21  disaggregate their proposed search and provide it in the form of

22  A and, you know, X and then A and Y and A and Z and then B and

23  X, so you -- in other words -- I mean, it would...be a lot, but

24  --

25          THE COURT:  Right.

1         MR. CONROY:  -- it would break it down and provide

2  those numbers.

3         So we, we let them know about that.  They told us they

4  didn't want to reformat it in that way, which I -- heh, I

5  certainly understand...

6         THE COURT:  Right.

7         MR. CONROY:  But that is how you would tell which are

8  the specific terms that are causing problems.

9         So, you know, that -- when this came up again, you

10  know, we remind them of that conversation.  There was a

11  suggestion that defendants, you know, could sort of perform a

12  cursory review of the 11 million documents in the, in the first

13  hit and we just didn't see a way that that would be, you know, a

14  reasonable approach, you know, in terms of looking for whether

15  there's a signature block or a certain document within the 11

16  million that are causing problems.

17         You know, I think our view is when you have an 11

18  million...eleven million hits in the result, the first step is

19  just to start cutting terms and to get to something more

20  reasonable.

21         THE COURT:  Well, look, and we've got -- and we will

22  pass the 11 million point, thankfully, now, but -- I understand

23  the point, Mr. Conroy, but...yeah, look, I was actually kind of

24  amazed that these search terms were runnable in this way,

25  they're very complicated terms, and it's, it's good that they

Stat. Conf.                M.G. v. Cuomo

```
 1  could be run that way.  I understand the point about the
 2  technology limitations, and I also understand the challenge of
 3  doing that cursory review.
 4          You know, part of the problem, I imagine, on the
 5  defense side here would be the time associated with loading
 6  those documents for review separate and apart from actually
 7  doing the review and, you know, once the resources start getting
 8  devoted to the review, I imagine it would be the strong
 9  preference of the defense team to only have to review those
10  documents once rather than do the multi-layer review that is
11  contemplated.
12          It's a suggestion, Mr. Margolis, I am very familiar
13  with, it's not an unreasonable suggestion conceptually, but I
14  think in this case, it might not be the, the most efficient use
15  of resources to go about it that way, and it does seem that
16  you've been able to, to make some significant headway in sort of
17  narrowing the scope.  I mean, here, there's still a significant
18  difference between the parties' overall volumes, but it's
19  within...sight, heh, it's within the same universe at least of
20  numbers, and so I commend you for getting it down to that point,
21  especially if you were starting out at over 11 million.  That's
22  obviously not a tenable proposition in just about any case,
23  really.
24          So I think that continuing to try to make adjustments
25  using the, the tools that you have and using the reports that
```

1  you have hopefully will be sufficient.  I mean, the hit reports

2  and particularly the unique term category, which I've always

3  thought of as, perhaps, the most valuable way to assess what's

4  going to pull out the largest number of documents, if you're

5  able to cut terms entirely or at least scale them back

6  significantly, hopefully will have a meaningful impact on the

7  numbers, and if there are some specific terms, Mr. Margolis,

8  that you feel really need to be included in order to capture the

9  requests that you feel haven't been captured, then you should

10 point those out if you haven't already and, you know, see how

11 some of these things work together.

12         And it may require...a couple of layers of steps on

13 the defense side, not necessarily loading the documents and

14 reviewing them, but running different combinations and

15 permutations to see how they result in terms of the overall

16 volume and the percentage with hits to see if that gets you

17 somewhere closer to where...you could both live with the outcome

18 or, again, just to narrow the scope of it to present to me.

19         I've read the letters now and I've immersed myself in

20 this enough that if it comes back to me with letter submissions,

21 I'll be able to just pick one and go with it.  I think that,

22 that should be easy enough to do.

23         Just on this discrepancy in terms of the numbers, you

24 both seem to agree that the number in the defendant's proposal

25 is 210,000 or 211,000 documents.

1          Is that right, Mr. Margolis?

2          MR. MARGOLIS:  Your Honor, I believe we might have

3 submitted a search report or a hit report that was provided by

4 defendants that actually was in error and they provided us an

5 updated one.

6          THE COURT:  Okay.

7          MR. MARGOLIS:  We might have submitted the wrong

8 report.

9          THE COURT:  That, that's fine.  I mean, as long as

10 you're in agreement, and you seem to be in the letters, you're

11 both using the same numbers, it just wasn't, it wasn't the

12 Exhibit A that I had, so...that's fine.  I mean, it's close

13 enough that I understood those to be generally what you were,

14 what you were talking about.

15          All right, anything else that you'd like to add on

16 this, Mr. Margolis?  I mean, we need to fix a time frame for

17 dealing with all of this, but anything else you wanted to just

18 add for my consideration at this point?

19          MR. MARGOLIS:  Yes, your Honor, two brief points.  I

20 don't want to belabor them too much.

21          On the, on the modification of search terms, we were

22 not asking defendants to provide this, you know, hit-by-hit,

23 granular report as suggested.  What we were hoping is that in

24 formulating a reasonable counterproposal, defendants could do

25 things like looking at one search term and removing one of the

1  'or' connectors and seeing if that was leading to this high, uh,

2  high families or anything else and working through them and

3  modifying them to come up with a reasonable counterproposal.  We

4  just have not yet received one and I think we will based on the

5  outcome of this conversation, and we're comfortable with that.

6          THE COURT:  Okay.  I mean, I understand that point.

7          I think what Mr. Conroy is saying is it turns out to

8  be just somewhat guesswork on his part if he's picking terms to

9  pull out.  I mean, you could do the same thing.  I mean, you

10 could suggest pulling out terms also.  I mean, you're sort of --

11 I understand in theory defendants are in a better position to

12 know what's going to result in changes, but that would assume

13 that they're actually looking at the documents as opposed to

14 just working with the, the...hit reports and trying to

15 manipulate them that way.

16         I mean, in some ways, it's just easy for you to

17 suggest which terms to pull out based on things that you think

18 are most important to you in what you might receive.

19         MR. MARGOLIS:  Your Honor, I don't think that's

20 exactly right, just because we're not able to run these searches

21 live.  We don't have access to the relatively platform and the

22 same type of things.  The documents are already loaded in the

23 review platform for defendants.  Just, the searches have to be

24 run.  That might still take time, but it doesn't take...the day

25 that it takes for new search hit reports to get back to us.

Stat. Conf.                    M.G. v. Cuomo

1          THE COURT:  Okay.  Well, look, I'm...was there

2    anything else you wanted to add?

3          MR. MARGOLIS:  No, that's it, your Honor.

4          THE COURT:  Okay.

5          Mr. Conroy, anything else that you would like to add?

6          MR. CONROY:  No.  No, your Honor.

7          THE COURT:  Okay.

8          I think what makes sense to do next -- and I'm not

9    going to tell you exactly how to do it, there are a couple of

10   different ways you could go about it, but I think what makes

11   sense to do next is to have defendants make a revised proposal.

12   The defense proposal should take into account everything we've

13   talked about today in terms of the volume, in terms of the

14   percentage of terms with hits, and also in terms of the

15   plaintiff's concern that the proposal from the defendants

16   doesn't actually capture potentially responsive documents to all

17   of the demands, so on that point, Mr. Margolis, I'd like you to

18   provide Mr. Conroy with specific terms that you think need to be

19   included in some form in order to make sure you capture what

20   needs to be captured.

21         I didn't look at every single term side by side, so I

22   don't know if the defendant's proposal just reflects a...scaling

23   back of the plaintiff's proposal or if the defendant's proposal

24   is, really, an entirely different set of terms.  I mean, are we

25   comparing apples and oranges here, or is it comparing...a bushel

1  of apples with a pack of apples, if you will.

2          I mean, are they essentially the same terms, just not

3  all of them are in there, or are they fundamentally different

4  terms, Mr. Margolis?

5          MR. MARGOLIS:  Your Honor, Exhibit B to defendant's

6  letter is helpful for this.  That's ECF 222-2.  It's a

7  side-by-side comparison of defendant's proposal and plaintiff's

8  counterproposal.  We're talking apples to apples here for the

9  most part.

10          THE COURT:  Okay.

11          MR. MARGOLIS:  If you can see on the last page is

12  where plaintiffs added terms to address some deficiencies and

13  breakouts, some search strings as needed to fit the technical

14  requirements, and also added search strings to address some of

15  the missing requests for production.

16          THE COURT:  Okay, that is helpful.  I mean, it's

17  helpful both...overall that you're working with a generally

18  similar set of terms, and -- thank you for pointing this out.  I

19  had looked at this, but I wasn't quite sure what to make of it,

20  so that's, that is helpful.

21          And, again, you obviously have all done a good amount

22  of work here, both in terms of the negotiation and in terms of

23  the technical work, so I do appreciate that, I recognize that,

24  and it's partly because of that that I think another round of

25  discussion here might be helpful.

1          I often have cases, too often, where the parties can

2    barely communicate with each other and it would be a complete

3    waste of your time and, and the Court's time to ask you to go

4    back and have further discussions.  I'm not saying you all agree

5    on everything, you obviously don't, but you at least seem to be

6    able to talk to one another, and that's much appreciated,

7    so...perhaps no good deed goes unpunished, that's why I'm going

8    to ask you to do more talking to each other, but I do think that

9    that has the greatest potential to lead to an outcome that's at

10   least...mostly acceptable to both sides, so I'm going to give

11   you a little bit more room to try to do that, and then if I have

12   to come in and make a final determination, I'll, I'll certainly

13   do that.

14          So, you know, I think it makes sense, Mr. Margolis,

15   for you to, to transmit to Mr. Conroy whatever specific concerns

16   you have about...terms that were left out or terms that you feel

17   really need to be included in order to capture...document

18   demands that you think are not currently captured by the

19   defendant's proposal, so -- and then I'd like the defendants to

20   consider that, consider all the other things we've talked about

21   here, and come up with a counterproposal.  I'd like all of that

22   to happen by the end of next week if at all possible.

23          Mr. Margolis, that would require you to get

24   information to Mr. Conroy by the end of this week or, you know,

25   within the next day or two.  Is that something that you can do?

1          MR. MARGOLIS:  Yes, your Honor.  I'd, I'd actually --

2 I'd hope that we can resolve this even quicker than that in the

3 interest of moving the case forward.

4          THE COURT:  Yeah, I'd be happy to have that happen as

5 well, but I think realistically, you know, you have to make the

6 first move, Mr. Conroy's going to have to then, you know, go

7 back and forth.

8          When I say by the end of next week, I'm not

9 necessarily suggesting that it will just be one proposal by

10 then, hopefully you can have a little bit of an exchange between

11 now and then, but, you know, at least some response to -- and

12 Monday's a holiday, I recognize, and, you know, response

13 to...some, some further iterative response from the defendants

14 by, say, a week from today, which would then give plaintiffs an

15 opportunity to review that, perhaps come back and say what about

16 X, Y, or Z, and the defendants can respond to that again, if

17 necessary.

18          And we'll just say by two weeks from today, you can

19 either let me know that you've reached an agreement on all of

20 this, or you can let me know that you haven't and you can send

21 me...a sort of revised update on these letters, at which point I

22 will just rule on it.  On the papers.  You know, it doesn't need

23 to be much more than what you've said here.  I mean, the letter

24 will just essentially be an update.

25          Again, these letters were fine.  They teed up the

Stat. Conf.                    M.G. v. Cuomo

1  issues in a way that was succinct.  It didn't bog me down with

2  all of the details about every single search term, which is

3  ultimately not all that helpful.  You are so much deeper into

4  the weeds on this than I will ever be that I think the way you

5  presented it here is fine and that having the hit reports was

6  also useful.

7          So...basically we'll give it two weeks from today to,

8  to play out, with an understanding that by no later than one

9  week from today, Mr. Conroy, you'll provide a revised search

10 term proposal.  In an ideal world, we'll all be happy with that,

11 but in a realistic world, I'm sure there will be a little bit

12 more back and forth with an understanding that by two weeks from

13 today, you will provide either a joint letter or separate

14 letters letting me know where things stand, and we'll get a

15 ruling on the books on that very shortly thereafter if

16 necessary.

17         MR. CONROY:  Your Honor, can I just make one brief

18 point about the timing?

19         That all sounds fine and we will certainly, especially

20 if we get plaintiff's perspective on which terms are most

21 important by the end of this week, to then turn around something

22 for them by the 6th.  I just wanted to let the Court know and

23 everyone know, it's not an instantaneous search process, I mean,

24 especially as we're going back and forth.  Our experience has

25 been it does take a...not a whole day, but somewhat close to it,

1  especially because we're doing this threading analysis on the

2  results, and our experience has been that takes several more

3  hours than we would hope to generate that report and get it over

4  to everyone.

5        So, you know, certainly a week from today is, is

6  definitely doable, but I just wanted to let everyone know that

7  it's not instantaneous to return these reports.

8        THE COURT:  Understood, and, you know, I think that

9  just puts the onus on you a little bit, Mr. Margolis, and your

10 team to just try to generate your...feedback if there's

11 feedback, first of all, today or tomorrow to get your

12 information over to Mr. Conroy so that they can...get that

13 process going maybe as soon as Friday, that would be ideal,

14 because otherwise, you wait till Tuesday, the holiday, and then

15 you might run up into problems, so the sooner the better.  And

16 then if there's feedback on a new proposal that comes in on

17 Wednesday, if you can get that turned around in a day.

18       I know that puts a little bit more pressure on you,

19 but you're...reactive here and so there is a little bit less to

20 do.  You still need to analyze it, talk to all of the

21 stakeholders on your side, I'm not minimizing that, but I think

22 you are in a position a little bit to turn around your feedback

23 faster so that it builds in enough time to get the reports back

24 on the defense side.

25       MR. MARGOLIS:  Yep.  Appreciate it, your Honor.

Stat. Conf.                          M.G. v. Cuomo

1          THE COURT:  Good.  So I think we're in agreement on

2  that, and the plan will be for me to know one way or the other

3  whether this has been worked out or whether there's further need

4  for a ruling.  That will be by two weeks from today, which is

5  the 13th of July.  And what you can and should do with those

6  proposals is -- I realize the other piece of this is what the

7  schedule should be, once we set the...the universe of documents,

8  and so what you did in this set of letters was helpful.  Again,

9  there was the plaintiff's proposal and the defendant's

10  side-by-side counterproposal, so you should include something

11  similar to that in the July 13th submission as well.

12          There, I don't expect that you're actually to reach an

13  agreement because, you know, you just sort of have a fundamental

14  disconnect about how much time it's going to take to do the

15  review no matter what the volume is, the disconnect will only

16  grow the greater the volume gets, but I understand that

17  fundamentally, there will be a little bit of a difference of

18  opinion as to what the schedule should be and so just lay that

19  out.  It may be the same as you've done here, but if there are

20  tweaks to it, lay that out for me and I'll take care of ruling

21  on that as well.  There's a very good chance that I will come

22  out somewhere in the middle.

23          I do understand, again, the burden and volume of

24  review that's at play here.  I appreciate that the AG's office

25  is looking into the availability of contract attorneys.  I don't

1  know what effect, if any, a formal scheduling order from the

2  Court will have on that, but it certainly seems possible that

3  that might increase the chances of, of getting those additional

4  resources.  Again, I'm not...looking to impose that necessarily,

5  but the reality is, it's going to take a long time to get all of

6  this done, whether it's the four AAGs, additional AAGs, that can

7  be thrown at the problem or bringing in contract attorneys.  No

8  matter how you slice it, it's going to take months, not weeks to

9  review all of these documents, so, you know, the idea of having

10 that process scheduled to take four or five or six months is

11 troubling because inevitably there are delays and other

12 commitments and we extend the deadlines and then we're getting

13 into an even longer period of time.  That said, there are

14 legitimate resource constraints and, you know, I do intend to

15 provide a reasonable amount of time to get all of that work

16 done.

17          So -- and I'm also sensitive to the fact that there a

18 lot of other overlapping elements of discovery in this case,

19 including the next one that we're going to talk about which I'm

20 going to ask for further submissions on, so, you know, it's,

21 it's a constant process, but it still needs to push forward, so

22 I'll look at that as part of the submissions on the 13th.  And I

23 recognize even if you are able to agree on the search terms, you

24 probably won't agree on that, so I'll be ruling on something one

25 way or the other come that July 13th submission.

Stat. Conf.                    M.G. v. Cuomo

1          This, this now dovetails into the next issue a little

2   bit and there are a couple of points I want to talk about when

3   we come to the lists of names or the census documents, but

4   before we do that, is there anything else we should talk about

5   on the ESI front?  I think we're we've wrapped that up, but let

6   me just confirm.

7          Mr. Margolis?

8          MR. MARGOLIS:  No, your Honor.

9          THE COURT:  Mr. Conroy?

10         MR. CONROY:  No, your Honor.

11         THE COURT:  Very good, all right.  Let's turn, then,

12  to the question of the...census documents.

13         One point that I actually did find interesting --

14  there are a lot of points that I found interesting, that's why

15  I'm going to ask you to do submissions, because as you all know,

16  I do try to resolve as many of these disputes as possible on the

17  record at status conferences.  It's more efficient that way.

18  I'm not looking to add to your already considerable burdens of

19  work on this case, but when it comes to privilege issues, in

20  particular, the ones like this that are

21  not...necessarily...familiar to the Court, I always -- well, you

22  typically take additional time to consider the submissions and,

23  and look at the cases and, you know, you've each given me an

24  introduction to these issues, but I'd like to have a little bit

25  more in the way of, of formal briefing to be able to resolve the

1   issue.  It also doesn't seem like this issue needs to be

2   resolved immediately, you know, class certification briefing is

3   months away at least, so that's, that's something that I'm going

4   to take under advisement further.

5          But one of the points struck me in particular in the

6   defendant's letter, one of the arguments for why...the

7   production may not be necessary, meaning that if we were to

8   apply the Mental Hygiene Law standard at least, there's no

9   argument here that the interests of justice significantly

10  outweigh the privacy rights of the patients who are not parties

11  to this lawsuit, I'm looking at page 2 of the defense letter, is

12  that certification of a class is not necessary where the named

13  plaintiff seeks injunctive relief against the State.

14         That's an interesting point, an interesting argument,

15  that I hadn't really thought about specifically here and, heh,

16  it, it made me wonder whether there is some sort of possibility

17  of any kind of stipulation that could obviate the need of the

18  class-certification phase of this case entirely.

19         Now, it may be that the answer to that is no because

20  there are reasons why having a certified class is particularly

21  important to the plaintiffs to ensure that they are able to

22  pursue the relief that they're intending to pursue.  It may be

23  that the defendants didn't mean to go quite that far in making

24  that point, but it's an interesting point, and if there is a way

25  to streamline the overall volume of work in this case, for the

1  parties and for the Court, by potentially...disposing of the

2  need for class certification, if that's something that the

3  defendants are willing to concede, then it's something that I

4  wanted to at least explore with you and, and encourage you to

5  explore with each other.

6          Mr. Margolis, do you have any preliminary thoughts on

7  that?

8          MR. MARGOLIS:  I'll defer to my colleague, Mr.

9  Rosenthal.

10         THE COURT:  Sure, Mr. Rosenthal.

11         MR. ROSENTHAL:  Good morning, your Honor.

12         I mean, any, any efficiencies, certainly, that we can

13 build in this case are most welcome and that's something, I

14 think, plaintiffs can talk about more internally, about the idea

15 of some sort of stipulation.

16         You know, the *Brooks* decision that defendants cite

17 which, in turn, relies on something sometimes called the *Galvan*

18 doctrine is something that corr --

19         THE COURT:  Say that again?  What doctrine?

20         MR. ROSENTHAL:  The *Galvan* doctrine, G-A-L-V-A-N.

21 It's a Second Circuit decision.

22         THE COURT:  Thank you.

23         MR. ROSENTHAL:  And obviously we can brief this

24 further...

25         THE COURT:  Sure.

1           MR. ROSENTHAL:  It's, it's a doctrine that courts,

2  including Judge Seibel, have repeatedly rejected in cases like

3  this, at least as grounds to deny discovery.  There's certain

4  kind of narrow criteria where courts have found that the *Galvan*

5  doctrine applies, namely that defendants have very clearly

6  stated that they will withdraw the challenge practices, and here

7  we're talking about, obviously, not only about prolonged

8  incarceration, but this kind of statewide Olmstead class-action

9  piece and that defendants have made affirmative statements that

10 they'll apply relief across the class as a whole.  I don't feel

11 that we have in any meaningful way seen that here.

12          And then courts also look at the kinds of relief that

13 plaintiffs are seeking, and so sometimes applying the *Galvan*

14 doctrine where it's very simple, declaratory, kind of

15 prohibitory relief and not -- potentially more complex relief,

16 as we probably see particularly around the Olmstead claims --

17          THE COURT:  And, look, I just -- you know, this may be

18 a little bit too tangential for purposes of this specific

19 dispute because I hear what you're saying, Mr. Rosenthal,

20 about...about the scope of discovery, perhaps, more broadly in

21 accordance with this doctrine.  I don't necessarily understand

22 the defendants to be making that type of argument.  We're

23 talking about...they're about to undertake a review of hundreds

24 of thousands of documents, whether -- whichever proposal we end

25 up with, so it's not like they're really sitting here saying

 1  that we don't want to engage in discovery because of the fact

 2  that this might be a simplifiable set of issues.

 3           I just wonder here, in light of this particular

 4  dispute -- because this, this dispute, really, as far as I

 5  understand it, is pretty narrowly focused on a class

 6  certification point as it pertains to numerosity.  I'm sure

 7  there are other reasons why it would be beneficial for the

 8  plaintiffs to have these documents and that may be, then, some

 9  other basis to seek production of the documents with the names

10  unredacted, but at least as it pertains to class certification,

11  it, it led me to want to ask you this question, because if there

12  is any possibility that you could somehow reach some stipulation

13  that would, as I said before, obviate the need for

14  class-certification briefing, then that would be to the good for

15  everybody, it would seem.

16           But, Mr. Conroy, maybe you didn't mean to go that far

17  in this letter?

18           MR. CONROY:  Well, your Honor, I think certainly

19  coming at it from the angle of a stipulation is something we

20  would have to discuss with our clients.

21           THE COURT:  Of course.

22           MR. CONROY:  It's, it's certainly an interesting idea,

23  and, you know, I think our perspective is that the relief the

24  plaintiffs are asking for is, is quite broad in this case.  I

25  mean, we had particular plaintiffs, but they're, they're asking

1  -- they're not asking for just, you know, a placement for the

2  plaintiff, they're asking for something more than that, and

3  that's where I think this idea comes in that an injunctive class

4  may sort of just be hypothetical in that type of situation, that

5  the Court, even just with respect to the plaintiff in front of

6  it, may be ordering relief that is broader than, than just

7  placing this particular individual in a particular setting.

8        THE COURT:  Okay.  Look, I don't want to bog you down

9  with lots of additional negotiations and discussions if, if it's

10 a dead end.  Again, I'm not trying to force anything here.  I

11 just was intrigued by that reference and thought that if there

12 might be some way to streamline things, it's worth exploring

13 further, so I'll encourage you to explore that further,

14 but...but not to...overdo it, you know.

15       If you go back to your clients or you speak internally

16 with your team and decide that it's just not something that

17 really can be done and you don't want to waste resources

18 pursuing some sort of ephemeral idea that the Judge happened to

19 mention, don't do it on my account, but just give it a little

20 bit of thought to see if there's, if there's a relatively

21 straightforward way to, to simplify things.

22       If there is, great, and if not, then we'll just pursue

23 -- we'll resolve this issue and we'll go through class

24 certification and whatever needs to be done, okay.  Again, I

25 just don't want you to get distracted with that if it really has

1   no chance of success, but just take it under consideration for

2   at least a little bit of time to see if, if there's something

3   there that can be done.

4           Let's talk about a little bit about the merits of this

5   dispute.

6           I know I've looked at some of the cases that you have

7   cited here.  Mr. Rosenthal, I'll turn to you.  Again, I've read

8   your letter, so I understand the general position.  Can you tell

9   me a little bit more about these documents?  I would as part of

10  the further submission like to see some examples of them so I

11  have a better sense.

12          When you say 'census documents,' that puts something

13  in my mind about what they might be, but I -- it would be

14  helpful, Mr. Conroy, when you make your submission to provide

15  those documents.  You can file them under seal on ECF with --

16  for Court's eyes only so I can take a look at them that way.

17          But Mr. Rosenthal?

18          MR. ROSENTHAL:  Thank you, Your Honor, and we can

19  certainly provide the Court with examples of the kind of

20  redacted versions.

21          THE COURT:  Right.

22          MR. ROSENTHAL:  The redactions range, I'll say

23  sometimes it's just names and identifying information, sometimes

24  it's pages, and so we can certainly provide the Court with that.

25          There, there are a number of different types of

1  censuses, but, really, the censuses reflect the number of people

2  with mental illness who are being held past certain release

3  dates or the end of their court sentences.

4          There are censuses that list incarcerated or

5  formerly-incarcerated people who have been found eligible for

6  the types of mental health housing and services that are at

7  issue in this case.  There are people who are approaching --

8  lists of people approaching release dates who have mental

9  illness which would also kind of go to the class size here and

10  the need to build out that mental health housing and supports in

11  the community.  And then there are list of people who are

12  released to homelessness and who have mental illness and

13  sometimes have pending applications for mental health housing

14  and services.

15          And so having access to that unredacted -- the

16  redacted information is really critical and in particular,

17  around -- in three ways.

18          One, it would allow plaintiffs to know the true class

19  sizes that we're talking about, so a number of the documents at

20  issue are these so-called priority release charts, which as of

21  specific -- our understanding is as of specific dates, provide

22  lists of people with mental illness who are held past a parole

23  or conditional release date, certain types of lawful release

24  dates, but the way that they have been produced, we can't

25  compare across time, so it could be the same people listed on

1  these charts again and again and again at these specifics points

2  in time, it could be new people being held past their release

3  dates...

4          THE COURT:  Right.

5          MR. ROSENTHAL:  Secondly, having the unredacted

6  information would allow us to compare across censuses, so, for

7  example, one chart would say this person was held past their

8  release chart -- release date, another chart would say then tell

9  us if that person after being held past their release date was

10 then released to a homeless shelter without mental health

11 housing, and it would allow us to either confirm or a law

12 concerns we have about data quality.

13         We have, for example, a number of charts that show the

14 population of people on RTF status, namely those people held

15 past their maximum expiration dates at the end of their court

16 sentences, but those numbers vary, including based -- between

17 charts we had from DOCCS and OMH and so having unredacted

18 information would let us and a data analyst we've discussed this

19 with kind of get into those data-quality concerns that we have.

20         THE COURT:  Okay.

21         And can we just briefly address -- I will say I've

22 seen in here that the plaintiffs have tried to propose a variety

23 of ways to address the defendant's concerns about

24 confidentiality and privacy issues.  None of those have been

25 satisfactory from the defense point of view.

1          Look, the idea of using unique identifiers as a

2    creative solution, I can understand why that is something the

3    defendants are reluctant to do given the volume of documents

4    involved, even though it's not...you know, so many documents in

5    the grand scheme of things with the discovery in this case,

6    there are a lot of moving pieces to it, and...I can understand

7    the reluctance to, to go about it that way.

8          I mean, typically the type of protective order that we

9    have in place in this case would be sufficient to ensure the

10   confidentiality and privacy of this type of information.  I

11   understand the concern about the sensitivity of the information

12   and the potential applicability of the Mental Hygiene Law, but

13   from what I've read in these cases, the better argument seems to

14   be that, that HIPAA applies and that the Mental Hygiene Law does

15   not apply.  You know, again, I'd like to hear more from the

16   parties on that.

17          If, if the defendants in particular have case law that

18   is to the contrary, I'm not sure that I've seen it in this

19   letter.  There's, there's sort of a declaration in footnote 1

20   that -- of the defendants letter that the Mental Hygiene Law

21   does apply because of this particular provision of the CFR

22   relating to HIPAA and the interplay between HIPAA and state law,

23   but...you know, there are a number of cases out there that have

24   looked at this a little bit more precisely with respect to the

25   Mental Hygiene Law and HIPAA in cases involving federal claims

1  and found that the HIPAA standard applies, so -- and the...the

2  plaintiffs have cited to those cases.

3          So if there's contrary law, Mr. Conroy, I haven't seen

4  it yet.  I haven't conducted exhaustive research on that and

5  maybe you have some cases to point to.  I realize this is a

6  short submission and we're teeing up the issues, but that's part

7  of the reason, I'm going to give everybody the opportunity to

8  brief it in a little more detail.

9          I will say that based on my preliminary review and

10 assessment of this, it does seem like the plaintiffs have the

11 stronger of the argument on the applicability of Mental Hygiene

12 Law versus the applicability of HIPAA, and nowhere, really, in

13 the defense letter does it really address how to analyze this

14 question if HIPAA applies, so that's something I'd like to

15 understand from the defendant's perspective as well.

16         Obviously, the plaintiff's perspective is HIPAA

17 applies and the information can be produced because it's -- it

18 meets the standard, especially when there's a protective order

19 in place.  Again, I don't think that the defendants have really

20 addressed...the, the analysis for how I should consider this if

21 HIPAA and not the Mental Hygiene Law is the applicable standard

22 to apply.

23         So -- okay, Mr. Rosenthal, is there anything else that

24 you'd like to add in light of that?  I mean, that's the other

25 major point here, but I kind of understand the plaintiff's

 1  position on it.

 2          MR. ROSENTHAL:  Just very quickly, your Honor...

 3          THE COURT:  Sure.

 4          MR. ROSENTHAL:  As you said, we do believe that the

 5  Mental Hygiene Law does not apply here.  Even if it did,

 6  however, we do believe that the standard that the statute there

 7  lays out has been met, namely that the interests of justice

 8  significantly outweigh the protection -- I'm sorry, the need for

 9  confidentiality, especially given the protections we already

10  have through the protective order, so I just wanted to...add

11  that.

12          THE COURT:  Right.

13          And as far as this notion of a qualified protective

14  order, is it -- can you tell me a little bit more about what you

15  have in mind there in terms of what additional layers of

16  protection that would provide beyond what is already in place in

17  the protective order that we have for this case?

18          MR. ROSENTHAL:  Under, under the HIPAA regulation as I

19  understand it, I think what we would -- a new qualified

20  protective order would have to add this piece that

21  confidentiality -- confidential discovery exchanged during the

22  course of discovery at the end of the case, which I think could

23  also include any settlement monitoring as well, would either

24  have to be returned or destroyed.

25          THE COURT:  And is that not in the regular protective

Stat. Conf.                    M.G. v. Cuomo

1  order?  I mean, that's in a lot of regular protective orders,

2  including my standard protective order, but I don't think we

3  have my standard protective order in place in this case.

4          MR. ROSENTHAL:  Unfortunately, it's not in this

5  particular protective order --

6          THE COURT:  I see, okay.

7          MR. ROSENTHAL:  -- but I think that's really the kind

8  of one element of those HIPAA regulations that would be needed

9  to be included that would give us that QP -- that qualified

10  protective order piece.

11          THE COURT:  Okay, well, that's helpful, and so if I

12  were to grant the application for discovery, it could be with a

13  modification to the protective order either generally or

14  specifically with respect to these documents.

15          MR. ROSENTHAL:  Yes, your Honor.

16          THE COURT:  Okay.

17          All right, Mr. Conroy, again, I, I...I'm happy to hear

18  from you now if you have thoughts in response to anything that

19  Mr. Rosenthal has said or any of the remarks that I have made.

20  I'm also happy to wait and see your response in writing if you'd

21  rather do it that way.  Or both.

22          So let me turn it over to you.

23          MR. CONROY:  Thank you, Judge.  I think -- yes, I'm

24  not prepared today to give you cases on the particular point we

25  raised, but we certainly will focus on that in the coming

1   submissions.

2          And just to say, you know, generally on this topic, I

3   think the client agencies feel quite strongly, they're used to

4   having some very sensitive data for the individuals that they

5   deal with, and so, you know, absent a court-ordered, they feel

6   quite strongly that they can't voluntarily agree to turn it

7   over.

8          THE COURT:  I do understand that, that part of it may

9   be that...heh, I'm putting words in your mouth here.  You didn't

10  say any of this in case anyone looks at the transcript.  I mean,

11  they can confirm this.

12         I understand that part of this may be that this is

13  just not something that these agencies can stipulate to, in part

14  for precedential reasons and part for institutional control

15  reasons, that -- obviously if I order them to be produced,

16  they'll be produced, you know, they're not going to fight the

17  court order, but I do understand that there are circumstances.

18  It happens with government agencies, with some frequency, that

19  there are just certain things that they're going to require to

20  be ordered to do and not voluntarily do, even if the arguments

21  are understandable, and that's just the way it is sometimes, so

22  I get that.

23         MR. CONROY:  And that's all I have, Judge.  Thank you.

24         THE COURT:  Okay.  And, and that's why it would also

25  be helpful for me to see the documents, in part because I do

Stat. Conf.                    M.G. v. Cuomo

1  understand the heightened sensitivity that comes with mental

2  health records in all different kinds of contexts.

3         Of course, my general understanding because these are

4  referred to as census-type documents is that these are not going

5  to be treatment notes or psychotherapy records or things of that

6  nature.  I'm not minimizing the significance of an OMH-level

7  indication on the census, which represents a certain category of

8  diagnosis, right?  If someone's an OMH level one, it indicates a

9  certain level of serious of mental health illness that would be

10 discernible if that were to get outside the confines of the

11 litigation and, and that diagnostic information is highly

12 sensitive.  I, I don't mean to minimize that, but oftentimes

13 when we were looking at the...the privilege issues surrounding

14 mental health records, there's particular concern and it often

15 comes up in a personal injury case or civil rights case where

16 someone is seeking access to treatment notes, and, you know,

17 there's a lot of case law that talks about the particular

18 sensitivity of that type of information in light of the need to

19 preserve the integrity of the psychotherapist/patient

20 relationship.

21        I don't think that those interests are implemented in

22 exactly the same way here or at least I would think that they

23 wouldn't be because of the nature of the documents, but, again,

24 I do realize that there would be some diagnostic information

25 that would be discernible from the documents, but that's why I'd

1  like to look like at the documents.

2          Mr. Conroy, anything to add on that?

3          MR. CONROY:  Just the thought that occurred to me as

4  you said that is I think that's right about these particular

5  census documents that we are discussing, but I, I...my thought

6  is, the implication of an order is it applies to the review

7  we're about to conduct with the ESI documents, to the extent

8  we're coming across clinical charts or notes about a particular

9  third-party individual, I can see us running into that issue

10  of...you know, do we produce these with redactions or without

11  redactions.

12          THE COURT:  Well, that's an interesting point, and

13  maybe that's something you can address in your submissions as

14  well, along the lines of -- and...the defense argument can

15  certainly be couched in, in a way that suggests that if your

16  Honor is inclined to grant this production, it should be limited

17  to X, Y, and Z and it shouldn't be construed to apply more

18  broadly, you know, however you would want to see that framed,

19  because I think that's a reasonable point.

20          I wouldn't be prejudging the issue necessarily, only

21  that whatever...ruling if I were to rule in plaintiff's favor on

22  this particular set of documents, would be limited to this set

23  of documents with the understanding that we might need to

24  revisit the issue in the future with other types of documents

25  that may present other issues.

1          Mr. Rosenthal, do you have any thoughts on that?

2          MR. ROSENTHAL:  We can give that thought as well.

3          I think, you know, if, if these were to be disclosed

4  pursuant, for example, to the HIPAA regulations, that

5  limitation, I think HIPAA would require that in any case, that

6  kind of specificity.

7          THE COURT:  Right.

8          MR. ROSENTHAL:  To, you know, just to the point that

9  Mr. Conroy raised earlier, again, we do believe that while

10  mental hygiene law -- or the Mental Hygiene Law doesn't apply,

11  we know that even in other cases, defendants have asked that

12  Mental Hygiene Law 33.13 language be included in proposed orders

13  just to give the agencies some comfort that there was that

14  finding, and so we'd be...happy to consider that as well.

15          THE COURT:  Okay.

16          And, again, I realize this is not something where

17  you're likely to reach an agreement for a variety of reasons

18  including what I mentioned before about the agencies just having

19  an institutional concern about agreeing to release mental health

20  records or information containing...Mental Hygiene Law-protected

21  information without a court order, so I, I do fully acknowledge

22  that and understand that I will rule on this issue.  I just

23  would like to have a more complete record both in terms of

24  seeing some exemplar documents and understanding if the

25  defendants have any other law to point to to counter some of the

Stat. Conf.                    M.G. v. Cuomo                    44

1  points that the plaintiffs raised in their letter.

2          So I'd like to set this for a relatively short

3  schedule to get this resolved because there's no need to delay,

4  especially after I've engaged witness to some extent, but I also

5  don't want to jam you unnecessarily to get this done because I

6  don't think it's absolutely essential that it be done right

7  away, so...this is essentially a motion to compel and we should

8  treat it that way, so...Mr. Rosenthal, you'll go first.

9          I don't want a 25-page brief on this.  You know,

10  let's, let's call it ten pages.  And you don't have to use all

11  ten, but let's call it a ten-page submission, maximum of

12  ten-page submission.

13          When would you like to have until?

14          MR. ROSENTHAL:  And we would have to intention of

15  trying to...

16          THE COURT:  I know.  It should be said, though,

17  because...you'd be surprised.

18          MR. ROSENTHAL:  Even a week-and-a-half, your Honor, I

19  think.

20          THE COURT:  So by next Friday?

21          MR. ROSENTHAL:  Yeah.

22          THE COURT:  That's July 8th?

23          MR. ROSENTHAL:  July 8th I think we can put it

24  together.

25          THE COURT:  Okay.

Stat. Conf.                    M.G. v. Cuomo

1              Mr. Conroy, can you do two weeks after that?

2              MR. CONROY:  That's fine, Judge.

3              THE COURT:  The 22nd?  And, again, no more than ten

4    pages.

5              MR. CONROY:  Understood.

6              THE COURT:  And you can talk to each other.  I don't

7    need you to both submit exemplar documents.  In fact, it's

8    probably best just to receive them from the defendant, Mr.

9    Rosenthal, because they'll be able to provide the unredacted

10   versions of them.

11             If you are referring to documents -- if for whatever

12   reason in your argument you wanted to refer to specific

13   documents and explain why it's so important that you have the

14   information, if you want to provide a redacted version of some

15   document to illustrate your point, that's perfectly fine, I'm

16   not trying to stop you from doing in that, but don't need to --

17   I think defendants can be responsible for providing the

18   exemplars that I've referred to here because I'll be able to see

19   the documents a little more clearly.

20             MR. ROSENTHAL:  That makes sense, your Honor.

21             THE COURT:  Okay.

22             And, look, if they do decide to include some specific

23   examples, you could provide me -- you don't have to, but you

24   could provide me with the unredacted version of those documents,

25   that's helpful sometimes, but if there are other exemplars that

1   you think better illustrate your points, that's fine, too.

2   Again, I don't need every -- you know, there's 180 documents,

3   but I don't need all of them, just a couple to, to understand

4   exactly what we're talking about and recognize what the need is

5   from the plaintiff's side and what the concern is from the

6   defense side.

7          All right, I think what we should do in terms of the

8   next conference is wait until we set the schedule based on your

9   July 13th submissions.  That way, we'll understand what the next

10  rolling set of deadlines is going to be in terms of the

11  production and when it would make sense to come back for a

12  conference.

13         As always, if you have issues that need to be resolved

14  and we don't have a conference on the books, just let me know

15  and we can always bring you back for a conference sooner, but we

16  will have a conference and we will have a control date as we

17  always do because this is a big, complicated case and issues are

18  almost certain to come up, but I don't want to set that now

19  because it'll feel a little arbitrary without knowing what the

20  schedule is going to be.

21         So we'll just make a note to ourselves internally to

22  make sure to schedule this for a conference once we set a

23  schedule for the remainder of discovery, which we'll be able to

24  do in a couple of weeks, and I would expect that we would be

25  back for a conference some time in September or October, maybe

Stat. Conf.                     M.G. v. Cuomo

1  October/November, again, depending on what the schedule is and,

2  and what's going to happen between now and then.

3         Okay, I think that covers everything that we needed

4  address for today.  We will put all of these deadlines in the

5  minute entry from today's proceeding.  I see that Ms. Stanzo's

6  (ph) has been taking notes as we've been going, which is good,

7  so we'll be able to capture all of those items, and we'll get a

8  decision turned around as quickly as possible on the privilege

9  issue and even faster on the discovery issue so that things can

10 get moving and we'll go from there.

11        Mr. Margolis, Mr. Rosenthal, anything further we

12 should address today from the plaintiff's perspective?

13        MR. MARGOLIS:  No, your Honor.

14        THE COURT:  Very good.

15        Mr. Conroy, from the defense perspective?

16        MR. CONROY:  No, your Honor.  Thank you.

17        THE COURT:  Okay, we'll stand adjourned for today.

18        Enjoy the summer, everybody.  Stay safe and stay

19 healthy.  Take care.  Thank you.

20        MR. MARGOLIS:  Thank you.

21        MR. CONROY:  Thank you.

22

23 Certified to be a true and accurate

24 transcript of the digital electronic

25 recording to the best of my ability.

Stat. Conf.                         M.G. v. Cuomo

 1  _____

 2  Tabitha R. Dente, RPR, RMR, CRR

 3  U.S. District Court

 4  Official Court Reporter

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25