UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H.,
individually and on behalf of all similarly situated,

                                  Plaintiffs,

               -against-

ANDREW CUOMO, in his official capacity as the Governor
of the State of New York, the NEW YORK STATE OFFICE
OF MENTAL HEALTH, ANN MARIE T. SULLIVAN, in
her official capacity as the Commissioner of the New York
State Office of Mental Health, the NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION, ANTHONY J.
ANNUCCI, in his official capacity as the Acting
Commissioner of the New York State Department of
Corrections and Community Supervision, ANNE MARIE
MCGRATH, in her official capacity as Deputy
Commissioner of the New York State Department of
Corrections and Community Supervision,

                                Defendants.

------------------------------------------------------------------------ x

          7:19-cv-0639 (CS) (AEK)

## **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**

# <u>TABLE OF CONTENTS</u>

Table of Authorities ...................................................................................................... iii

I.    Preliminary Statement ............................................................................................ 1

II.   Factual Background ................................................................................................. 2

      A.  Defendants Are Responsible for Timely Discharging from Prison Members of the
          Classes and Making Community-Based Mental Health Housing and Supportive
          Services Available to Them Upon Release.................................................................. 2

      B.  OMH Is Responsible for Maintaining an Array of CBMHHSS to Meet the Mental
          Health Housing and Service Needs of Members of the Classes. ............................... 4

      C.  Defendants Fail to Make Available to Class Members the CBMHHSS For Which They
          Are Eligible and Appropriate. ................................................................................... 7

      D.  Rather than Provide CBMHHSS, Defendants Segregate, Place at Serious Risk of
          Institutionalization, and Prolong the Incarceration of Class Members. ................... 9

      E.  Each Named Plaintiff Was Denied Adequate CBMHHSS Leading to Unjustified
          Segregation, Prolonged Incarceration, and/or a Serious Risk of Institutionalization .... 15

III.  The General Class, RTF Subclass, and Discharge Class Should Each Be Certified Under
      Rule 23(b)(2)........................................................................................................ 19

      A.  The General Class, RTF Subclass and Discharge Class are Each so Numerous that
          Joinder of all Members is Impracticable. ............................................................... 20

          1.  Joinder of Each Class is Impracticable. ............................................................ 21

          2.  Each Class Satisfies the Count Threshold for Numerosity. ............................... 21

      B.  Commonality Exists for the General Class, RTF Subclass and Discharge Class .......... 26

      C.  The Claims of Named Plaintiffs Are Typical of the Claims of the Class ..................... 33

      D.  Named Plaintiffs Will Fairly and Adequately Protect Members' Interests ................. 36

      E.  Members of the General Class, RTF Subclass, and Discharge Class are Readily
          Ascertainable. ........................................................................................................ 37

      F.  Class Certification and Injunctive Relief Under Rule 23(b)(2) are Appropriate. .......... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdi v. Duke,*
323 F.R.D. 131 (W.D.N.Y. 2017)......................................................................22, 24

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)...........................................................................................19, 38

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
568 U.S. 455 (2013)...............................................................................................20

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
222 F.3d 52 (2d Cir. 2000)................................................................................36, 37

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg,*
290 F.R.D. 409 (S.D.N.Y. 2012) ...........................................................................37

*Bruce v. Christian,*
113 F.R.D. 554 (S.D.N.Y. 1986) ...........................................................................22

*Butler v. Suffolk County,*
289 F.R.D. 80 (E.D.N.Y. 2013) .............................................................................29

*Casale v. Kelly,*
257 F.R.D. 396 (S.D.N.Y. 2019) ...........................................................................19

*Cent. States Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.,*
504 F.3d 229 (2d Cir. 2007)..............................................................................20, 22

*Clarkson v. Coughlin,*
783 F. Supp. 789 (S.D.N.Y. 1992).........................................................................21

*Cortigiano v. Oceanview Manor Home for Adults,*
227 F.R.D. 194 (E.D.N.Y. 2005) ...........................................................................34

*Damassia v. Duane Reade, Inc.,*
250 F.R.D. 152 (S.D.N.Y. 2008) ...........................................................................26

*Dean v. Coughlin,*
107 F.R.D. 331 (S.D.N.Y. 1985) ...........................................................................21

*In re Dig. Music Antitrust Litig.,*
321 F.R.D. 64 (S.D.N.Y. 2017) .............................................................................38

iii

*In re District of Columbia*,
   792 F.3d 96 (D.C. Cir. 2015) ........................................................................19, 20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009) ....................................................................................34

*Frank v. Eastman Kodak Co.*,
   228 F.R.D. 174 (W.D.N.Y. 2005) ..........................................................................22

*Grant v. Sullivan*,
   131 F.R.D. 436 (M.D. Pa. 1990) ...........................................................................22

*Gulino v. Bd. of Educ.*,
   201 F.R.D. 326 (S.D.N.Y. 2001) ...........................................................................34

*Hilton v. Wright*,
   235 F.R.D. 40 (N.D.N.Y. 2006) .............................................................................22

*Hurd v. Fredenburgh*,
   984 F.3d 1075 (2d Cir. 2021) ..................................................................................3

*Christina A. ex rel. Jennifer A. v. Bloomberg*,
   197 F.R.D. 664 (D.S.D. 2000) ...............................................................................24

*Johnson v. Nextel Comms. Inc.*,
   780 F.3d 128 (2d Cir. 2015)..............................................................................26, 27

*People ex rel. Johnson v. Superintendent, Adirondack Corr. Facility*,
   163 N.E.3d 1041 (N.Y. 2020) ................................................................................25

*M.F. v. N.Y.C. Dep't of Educ.*,
   162 F. Supp. 3d 216 (S.D.N.Y. 2016) ....................................................................38

*M.F. v. N.Y.C. Dep't of Educ.*,
   2019 WL 2511874 (E.D.N.Y. Jun. 18, 2019) ........................................................19

*People ex rel. McCurdy v. Warden, Westchester Cnty. Corr. Facility*,
   163 N.E.3d 1087 (N.Y. 2020) ................................................................................25

*Murray v. Goord*,
   801 N.E.2d 385 (N.Y. 2003)....................................................................................4

*N.B. v. Hamos*,
   26 F. Supp. 3d. 756 (N.D. Ill. 2014) ......................................................................26

*Nicholson v. Williams*,
   205 F.R.D. 92 (E.D.N.Y. 2001) .............................................................................33

*Odom v. Haden Transp., Inc.*,
    275 F.R.D. 400 (W.D.N.Y. 2011)........................................................................22

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017)..............................................................................37

*Raymond v. DOCCS*,
    579 F. Supp. 3d 327 (N.D.N.Y. 2022)..............................................................21

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)..............................................................20, 21, 34

*Rolland v. Cellucci*,
    1999 WL 34815562 (D. Mass. Feb. 2, 1999) ..................................................21

*Steward v. Janek*,
    315 F.R.D. 472 (W.D. Tex. 2016) ....................................................................26

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)..............................................................................20

*Thorpe v. D.C.*,
    303 F.R.D. 120 (D.D.C. 2014)..........................................................................30

*Kenneth R. ex rel. Tri–Cnty. CAP, Inc./GS v. Hassan*,
    293 F.R.D. 254 (D.N.H. 2013) .........................................................21, 30, 36, 39

*V.W. by & through Williams v. Conway*,
    236 F. Supp. 3d 554 (N.D.N.Y. 2017)..........................................................28, 29

*Valdez v. MichPat & Fam, LLC*,
    2022 WL 950450 (E.D.N.Y. Mar. 30, 2022).....................................................20

*Vargas v. Howard*,
    324 F.R.D. 319 (S.D.N.Y. 2018) ......................................................................20

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012).........................................................................37

*Westchester Indep. Living Ctr., Inc. v. State Univ. of New York, Purchase Coll.*,
    331 F.R.D. 279 (S.D.N.Y. 2019) ............................................................ *passim*

**Statutes, Regulations & Rules**

Americans with Disabilities Act of 1990................................................................ *passim*

Fed. R. Civ. P. 23 ................................................................................................... *passim*

N.Y. Comp. Codes R. & Regs. tit. 7, § 100 .................................................................11

N.Y. Comp. Codes R. & Regs. tit. 7, § 280.5(b) .................................................................4

N.Y. Comp. Codes R. & Regs. tit. 9, § 8003 et seq. .............................................................4

N.Y. Comp. Codes R. & Regs. tit. 14, § 575.8 ....................................................................4

N.Y. Comp. Codes R. & Regs. tit. 14, § 595.1 ..................................................................14

N.Y. Comp. Codes R. & Regs. tit. 14, § 595.8(a) .............................................................14

N.Y. Correct. Law § 70................................................................................................11

N.Y. Correct. Law § 73....................................................................................1, 10, 25

N.Y. Correct. Law § 201..............................................................................................4

N.Y. Correct. Law § 404..............................................................................................3

N.Y. Mental Hyg. Law § 41.01....................................................................................4

N.Y. Mental Hyg. Law § 41.04....................................................................................4

N.Y. Mental Hyg. Law § 41.13....................................................................................4

N.Y. Mental Hyg. Law § 41.44....................................................................................4

N.Y. Mental Hyg. Law § 41.47....................................................................................4

N.Y. Penal Law § 70.45....................................................................................1, 10

Section 504 of the Rehabilitation Act of 1973...................................................... *passim*

## I.    **Preliminary Statement**

The Named Plaintiffs, individually, and on behalf of the proposed classes, challenge the widespread and systematic failure of Defendants New York State Office of Mental Health ("OMH") and the Department of Corrections and Community Supervision ("DOCCS") to sufficiently fund and maintain community-based mental health housing and supportive services ("CBMHHSS") for individuals with criminal legal histories. Due to insufficient amounts of CBMHHSS, people with serious mental illness are held in prison past their release dates solely because housing is unavailable, placed in other segregated settings, or released without the necessary CBMHHSS and therefore placed at serious risk of institutionalization, including incarceration and hospitalization.

Plaintiffs move for certification of the following classes:

1.  The General Class, which consists of all persons (1) housed or who will be housed in a state prison, (2) with serious mental illness, (3) whose open dates for parole release, approved conditional release dates, or maximum expiration dates have passed, (4) who are not subject to residency restrictions under the Sexual Assault Reform Act, and (5) who are eligible and appropriate for CBMHHSS.

2.  The RTF Subclass of the General Class, which consists of all persons (1) housed or who will be housed in a state prison pursuant to Penal Law § 70.45 or Correction Law § 73, (2) who have serious mental illness, (3) whose maximum expiration dates have passed, (4) who are not subject to residency restrictions under the Sexual Assault Reform Act, and (5) who are eligible and appropriate for CBMHHSS.

3.  The Discharge Class, which consists of all persons (1) with serious mental illness, (2) who are or will be appropriate for and desire community-based mental health housing and supportive services upon their release from state prison, (3) who, upon their release, do not receive such services, and (4) who reside in segregated settings or who are at serious risk of becoming institutionalized.

Defendants administer and fund their programs in a manner that relies on prisons, jails, state-run facilities, halfway houses, the homeless shelter system, and psychiatric hospitals to

warehouse class members rather than provide the CBMHHSS proven to be critical for successful reintegration, in violation of Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act ("ADA").

Because the proposed Classes and Subclass, who bring this action for injunctive and declaratory relief, satisfy the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2), and because class certification is essential to the fair and efficient adjudication of this action, Plaintiffs' motion for class certification should be granted.

## II.    Factual Background

### A.    Defendants Are Responsible for Timely Discharging from Prison Members of the Classes and Making Community-Based Mental Health Housing and Supportive Services Available to Them Upon Release.

DOCCS and OMH share responsibility for releasing people with serious mental illness ("SMI") from prison to the community on their release dates.[1] DOCCS and OMH release hundreds of people with SMI from prison annually.[2] A person is typically released from prison upon reaching one of three release dates: open date for parole release ("open date"), conditional release date, or maximum expiration date.[3]

The New York State Board of Parole, an independent, quasi-judicial body within DOCCS, is authorized to grant or deny parole in its discretion, subject to certain criteria provided in state laws and regulations. If parole is granted, the Parole Board sets an "open date" for parole release.[4]

With the exception of people sentenced to a life term, people who are denied an open date

---

[1] *See* Declaration of Crystal Parker Ex. 1 at DOCCS-00006992; Ex. 2. Unless otherwise specified, citations to "Ex. __" refer to the exhibits to the Declaration of Crystal Parker filed herewith.

[2] In 2018 and 2019, respectively, Defendants released 1,047 and 1,107 people classified as OMH Level 1, 1s, or 2s. *See* Ex. 3; Ex. 4. This data undercounts the number of releases of people with SMI because it does not include individuals with SMI classified as OMH Level 2. *See* Ex. 5 (explaining that Ex. 3 includes people with OMH Level 1, 1s, and 2s classifications).

[3] Ex. 6 at DOCCS-00007096–98, -7100.

[4] *Id.* at DOCCS-00007097.

may next be released on their "conditional release" date provided that they have earned statutory "good time."[5] Each DOCCS prison has a Time Allowance Committee that meets approximately four months before an individual's presumptive conditional release date to approve the conditional release date based on good time.[6]

A person not released to parole or conditional release will likely remain in prison until their "maximum expiration date," the last day of their court-imposed sentence.[7] There is no constitutional authority for DOCCS to extra-judicially alter maximum expiration dates, as the Second Circuit has held that the "unauthorized detention of just one day past an inmate's mandatory release date qualifies as a harm of constitutional magnitude under the first prong of the Eighth Amendment analysis." *Hurd v. Fredenburgh*, 984 F.3d 1075, 1085 (2d Cir. 2021).

OMH is required to conduct discharge planning for people with SMI prior to their release.[8] OMH pre-release coordinators ("PRCs") must begin discharge planning at least 90 days before individuals' release dates.[9] As part of discharge planning, OMH assesses a person with SMI's housing and service needs and PRCs submit Single Point of Access ("SPOA") applications for such community-based housing and services.[10] For people returning to New York City, OMH submits applications through the Reentry Coordination System ("RCS").[11]

SPOA and RCS applications reflect Defendants' determination that class members are eligible and appropriate for CBMHHSS (although failure of OMH to submit an application does

---

[5] *See id.* at DOCCS-00007090–96.
[6] *See id.*
[7] *See id.* at DOCCS-00007096.
[8] *See* N.Y. Correct. Law § 404; *see also* Ex. 7 at 6–7.
[9] *See* Ex. 2; Ex. 7 at 6–7.
[10] *See* Declaration of Wendy Vogel, ECF No. 91 ¶ 3; Ex. 7 at 6–7; Ex. 8 at 4–6; Ex. 9; Ex. 10.
[11] *See* Ex. 10; Ex. 11 at D-00002714.

3

not necessarily mean that someone is ineligible).[12] DOCCS is responsible for releasing class members on their release dates and supervising them after their release, including supervising parole and post-release supervision conditions.[13] DOCCS must approve all class members' release locations and requested changes of address.[14]

### B. OMH Is Responsible for Maintaining an Array of CBMHHSS to Meet the Mental Health Housing and Service Needs of Members of the Classes.

OMH must maintain an adequate array of CBMHHSS to meet class members' varying needs and ensure their successful integration.[15] Although OMH provides CBMHHSS through coordination with local mental health departments and providers, OMH is ultimately responsible for developing and maintaining an array of services and making CBMHHSS available.[16]

---

[12] *See* Ex. 10 (describing CNYPC policy that people with SMI "should be assessed for an appropriate housing plan upon release" and CNYPC staff should submit a SPOA or RCS if "inmate-patient expects to be homeless or is at risk of homelessness . . . or requires mental health supportive housing"); Ex. 11 at D-00002714 (explaining that SPOA and RCS applications are a "[c]entralized referral system for Housing, Case Management and Outpatient Clinic Services for individuals with SMI getting released to the community"); Ex. 12 at OMH-00068152 ("An application for mental health housing should be completed for all patients who are SMI by community standard, irrespective of whether they have proposed addresses.").

[13] *See* N.Y. Correct. Law § 201; N.Y. Comp. Codes R. & Regs. tit. 9, § 8003 et. seq.; N.Y. Comp. Codes R. & Regs. tit. 7, § 280.5(b); Ex. 6 at DOCCS-00007086–87; Ex. 13; *see also Murray v. Goord*, 801 N.E.2d 385, 387 (N.Y. 2003) ("[P]rison officials are *conclusively bound* by the contents of commitment papers accompanying a prisoner.") (cleaned up).

[14] N.Y. Correct. Law § 201; N.Y. Comp. Codes R. & Regs. tit. 9, § 8003 et. seq; *see, e.g.*, Ex. 6 at DOCCS-00007103; Ex. 14 (showing DOCCS's approval of an address for release); Ex. 15 (same); Ex. 16 at DOCCS-00002251 ("DOCCS will not be approving [D.R.'s release] to shelter").

[15] *See* Declaration of Melodie J. Peet, Exhibit 1, Expert Report of Melodie J. Peet, M.P.H. ("Peet Report") at p. 12 ("If there is not enough CBMHHSS to meet the needs of the people eligible for these services . . . then OMH has failed in its responsibility, as the [State Mental Health Authority], to ensure effective operation of the public mental health system."); Ex. 17 at MG-Class00034822–23 ("OMH now funds and licenses more than 2,500 mental health programs serving 700,000 people annually."); Ex. 18 ("The Executive Budget demonstrates Governor Hochul's commitment to enhancing and expanding OMH community services to ensure people have access to the most appropriate and cost-effective community setting").

[16] *See* N.Y. Mental Hyg. Law §§ 41.01, 41.04, 41.13, 41.44, 41.47; N.Y. Comp. Codes R. & Regs. tit. 14, § 575.8; Peet Report at p. 6–7; Ex. 19 at D-00062600; Ex. 20 at OMH-00018469–70; Ex. 21 at D-00042075–76; Ex. 22 at R-OMH-00010634 ("Should we have a c[o]nference call about

Community-based mental health housing encompasses a continuum of housing models that provide different levels of supervised treatment and care coordination tailored to residents' needs.[17] People who need greater supervision or assistance developing independent living skills generally need a more service-intense housing model, such as an apartment treatment program where residents receive services within their apartments, including counseling, activities of daily living skill development, crisis intervention, case management, socialization, and medication monitoring services.[18] People with greater independent living skills, on the other hand, are appropriate for a single room occupancy residence ("SRO") or scattered-site supported housing, where they receive regular face-to-face contact with support staff and a support plan, assistance applying for benefits, appropriate referrals, orientation to their local community, and education and skill development to remain stably housed.[19]

Community-based mental health supportive services include a multitude of services that help people with SMI successfully integrate and thrive in the community.[20] For instance, care coordination provides linkages to necessary services and assistance in securing immediate needs (such as clothing and re-activation of Medicaid coverage) in order to improve health outcomes and to support the successful community living of people with SMI.[21] Care coordination may be

---

specifically where this person should be referred. If we as a state are unable to serve him then we can not then expect a community provider to serve him.").

[17] *See* Ex. 23; Ex. 24; Ex. 25; Ex. 26.

[18] *See* Ex. 26 at MG-Class0003288; Ex 27 at D-00055610.

[19] *See* Ex. 26 at MG-Class0003290–91; Ex. 27 at D-00055613.

[20] *See* Ex. 28 at MG-Class0003232–35. These services include clinic treatment, care coordination, on-site rehabilitation, crisis services, outreach, screening and prevention, and consultation and education related to individuals' mental health needs. *See* Peet Report at p. 44 (indicating the need to "[e]ngage in 'cross system coordination between and among multiple services' to manage referrals to critical community-based services"); Declaration of Robert Factor, Exhibit 1, Expert Report of Robert M. Factor, MD, PhD ("Factor Report") § IV(A)(1).

[21] *See* Ex. 29; Ex. 30 at MG-Class00039419–20; Ex. 31 at MG-Class00034134; Ex. 32 at MG-Class00034001.

provided by forensic intensive case management services, typically for a transitional period following release from prison.[22]

The most robust of these service models is Assertive Community Treatment ("ACT"), an evidence-based approach to care for people with SMI shown to reduce hospitalizations, housing instability, and involvement in the criminal justice system.[23] ACT teams are community-based multidisciplinary teams of mental health professionals available 24/7 that provide treatment, care coordination, and support services directly to individuals with SMI with a long-term or high need for services.[24] Specialized Forensic ACT ("FACT") teams provide services adapted to people with criminal justice histories.[25]

Other service models include Medicaid Health Home and Health Home Plus. Medicaid recipients who are preparing for discharge from ACT and intensive case management services may receive care coordination through a New York State Health Home,[26] with some individuals eligible for more intensive care coordination services available through Health Home Plus.[27] Individuals on waiting lists for ACT may be referred to Health Home Plus pending availability of ACT.[28] Many people with complex needs, however, may not be so referred or approved and are

---

[22] *See* Peet Report at 16–21 (summarizing the delivery of safety net services necessary to support the transition from prison and other institutions into the community); *see also* Ex. 33.

[23] *See* Ex. 29 at OMH-00062561; Ex. 34 at MG-Class00010595; Ex. 35 at MG-Class00035014-20; Factor Report ¶¶ 22–25; Peet Report at p. 19 ("For over 50 years, the ACT model has been the gold standard for effective support for people returning to the community from institutions.")

[24] *See* Ex. 34. ACT is particularly beneficial for people with SMI being released from prison who are homeless or at risk of homelessness. *See* Peet Report at p. 9.

[25] *See* Ex. 36; Factor Report ¶ 39 n.7; Peet Report at p. 9.

[26] *See* Ex. 37.

[27] *See* Ex. 31.

[28] *See* Ex. 39 (providing that "Individuals [with SMI] placed on an ACT waitlist who would benefit from enhanced care coordination while awaiting placement with ACT services" may be eligible for HH+ services based on clinical discretion).

consequently poorly served by a Health Home rather than Health Home Plus.[29]

### C. Defendants Fail to Make Available to Class Members the CBMHHSS For Which They Are Eligible and Appropriate.

Defendants have a widespread practice of failing to meet their responsibility to ensure that people with SMI who are released from state prison receive CBMHHSS on their lawful release dates. Class members who are eligible and appropriate for CBMHHSS often wait months or years for the housing and services that they need to succeed after release from incarceration.[30] As Commissioner McGrath has stated, "As an agency, we [DOCCS] need to do something to find appropriate housing. This is a huge risk continue [sic] to hold these individuals, *not to mention a disservice to them as they have earned release*."[31]

A properly functioning mental health system requires that CBMHHSS—"particularly supported housing, ACT and FACT, crisis services, and medication management—must be available in sufficient quantities to meet the needs of the relevant population, especially during the

---

[29] *See* Peet Report at pp. 26, 31 (citing to counties' complaints that under Health Home care management "there are still many individuals who do not meet criteria for that level of service, because of diagnosis or past uses of inpatient care, who would benefit from more support than the current design allows," and that "[t]he loss of the targeted case management program and transition into the Medicaid Health Home Care Management has resulted in adults and children receiving less adequate services for their needs . . . . [T]he setup of the Medicaid Health Home encourages higher caseloads and fewer contacts with each individual, depending on their acuity scores. The program focuses on coordination of services versus actual case management services.") (internal citations omitted).

[30] *See, e.g.*, Ex. 40 at MG-Class00030410 ("H[o]using services continue to be a top priority, and increasing need, for individuals living with behavioral health/serious mental illness and often co-occurring issues in Westchester County. . . . In 2018, there were 1,108 eligible individuals referred for residential services, and SPOA were only able to place 107 of these individuals. This number is down from 1,218 referrals and 125 placements the previous year. The referrals are down as many indivdiuals [sic] in the county are already on a waitlist. Westchester currently has 1,561 individuals on the waitlist for placement."); Declaration of D.H. ("D.H. Decl.") ¶¶ 2, 10, 17-20, 25, 34–35, 45; Declaration of S.D. ("S.D. Decl.") ¶¶ 10–14; Declaration of W.P. ("W.P. Decl.") ¶¶ 2, 10–24.

[31] Ex. 41 at D-00070635 (referring in part to an individual held in RTF from at least August 2016 to February 2018) (emphasis added).

high-risk periods of transition from institutional to community care."[32] Melodie Peet, MPH, a mental health systems expert who, among other things, served as the Commissioner of Maine's mental health administration and more recently as an expert witness and mental health systems consultant for the United States Department of Justice,[33] reports that Defendants fail in their shared responsibility to ensure that individuals with SMI are adequately provided the CBMHHSS for which they are eligible and appropriate at the time of their release.[34]

Specifically, Peet reports that DOCCS fails in its responsibility to ensure the "continuum of care" for the relevant population, which includes ensuring that the population is provided the CBMHHSS for which each individual is eligible on their release date.[35] Peet further reports that OMH ultimately fails to adequately plan, develop, and fund the necessary CBMHHSS for the relevant population.[36] The systemic failure to provide sufficient CBMHHSS is, in part, reflected in counties' Local Services Plans which demonstrate OMH's "repeated refusal to adequately address the chronic patterns of deficits in both housing and intensive levels of clinical and case management capacity."[37] Because of this failure to provide sufficient CBMHHSS, even when counties report these issues, the population of people with serious mental illness is "limited in its ability to successfully transition to community living."[38]

---

[32] *See* Peet Report at p. 21.
[33] *See id.* at pp. 3–4.
[34] *See id.* at pp. 13 (noting that, according to a Memorandum of Understanding, "OMH and DOCCS recognize that they are strategic partners with the shared goals of ensuring that . . . inmate-patients are linked to mental health care upon entry into the community"); *id.* at p. 43.
[35] *Id.* at p. 43.
[36] *Id.*
[37] *Id.* at p. 31; *see also id.* at pp. 23–31.
[38] *Id.* at p. 41; *see also* Declaration of David Condliffe ("Condliffe Decl.") (describing how class members based in Syracuse, New York, do not have sufficient access to appropriate transitional housing).

### D.    Rather than Provide CBMHHSS, Defendants Segregate, Place at Serious Risk of Institutionalization, and Prolong the Incarceration of Class Members.

Deprived of needed CBMHHSS, Class members are segregated in prisons, shelters, halfway houses, transitional facilities, and similar settings or, when released to the community, placed at serious risk of institutionalization.

Defendants segregate members of the General Class in state prison past their release dates even though they are eligible and appropriate to receive services in more integrated settings.[39] This practice of prolonged incarceration is due to the lack of available CBMHHSS.[40] Prisons are segregated settings under the definition of the ADA and the Rehabilitation Act. Guidance from the U.S. Department of Justice defines "segregated settings" to include "congregate settings characterized by regimentation in daily activities, lack of privacy or autonomy, policies limiting visitors, or limits on individuals' ability to engage freely in community activities and to manage their own activities of daily living" and "congregate settings populated exclusively or primarily with individuals with disabilities."[41]

Prisons are segregated settings on both accords. As is the case with all incarcerated

---

[39] Records indicate that since January 2018, "102 people with SMI were held in prison past their release dates even though they had a SPOA or RCS application submitted for them." Declaration of Seth Crider in support of Plaintiffs' Motion for Class Certification ("Crider Decl.") ¶ 18. Moreover, this count may be underinclusive because it is OMH policy to "prepare a SPOA application for *all* inmates with SMI who are at risk of homelessness" and approaching their release date, even though the data provided by defendants did not indicate a SPOA or RCS for each inmate. ECF No. 91 ¶ 3 (emphasis added).

[40] *See* Declaration of Ana Enright, ECF No. 92 ¶ 10; Crider Decl. ¶¶ 3, 19–20 (demonstrating at least 99 putative General Class members were held in prison past their release dates because of their SMI, including through 2022); Ex. 42 at 10 (indicating two non-SARA individuals with SMI were held past their release date due to their OMH levels as of March 2022); Ex. 43 at R-OMH00021401 (stating that it "[c]ould be weeks, months, years. There is no way to know" when community housing would be available for M.G.); Ex. 44 (stating M.G. "will be held past his Open Date *until there is some sort of mental health housing available*") (emphasis added); Ex. 45; Declaration of D.R. ("D.R. Decl.") ¶¶ 3, 11-17; Declaration of P.C. ("P.C. Decl.") ¶¶ 2, 9–13; Declaration of M.G. ("M.G Decl.") ¶¶ 10–14; Declaration of C.J. ("C.J. Decl.") ¶¶ 16–19.

[41] Ex. 46 at MG-Class00039555.

9

individuals, General Class members' days are highly regimented and members are deprived of autonomy and privacy in prison.[42] Further, Defendants house many General Class members in Residential Mental Health Treatment Units and other segregated settings like Sing Sing Corp, which are separate units for people with SMI and other disabilities, leaving them with few opportunities to interact with non-disabled individuals.[43]

Like the General Class as a whole, Defendants hold members of the RTF Subclass in prison past their release dates when needed CBMHHSS is unavailable for their release. But, unlike other members of the General Class, RTF Subclass members are held beyond their maximum expiration dates.[44] Defendants held RTF Subclass members in prison because of their SMI, for an average of 128 days (and as long as 908 days).[45] Defendants claim to "release" these individuals on or just before their maximum expiration date and transfer them to a "Residential Treatment Facility" ("RTF"), invoking Penal Law § 70.45(3) and Correction Law § 73(10) as their authority to do so.[46]

However, people in RTF "still resid[e] in prison."[47] Defendants confine RTF Subclass

---

[42] *See, e.g.*, Ex. 47.

[43] P.C. Decl. ¶¶ 5–6; M.G. Decl. ¶¶ 6–8, 10; C.J. Decl. ¶¶ 8, 15; Crider Decl. ¶¶ 16–17; Ex. 48 (describing restrictions that may be imposed on individuals in prison mental health programs, such as loss of privileges, limits on the number of showers, and restrictions on out-of-cell programming); DOCCS Directive No. 0056 (Aug. 30, 2021), available at https://doccs.ny.gov/system/files/documents/2021/08/0056.pdf (stating Sing Sing CORP "provides a treatment and discharge planning program to OMH level 1 and 2 incarcerated individuals," representing a mental-health specific unit).

[44] *See* D.R. Decl. ¶ 9; C.J. Decl. ¶¶ 3, 9; Declaration of M.J. ("M.J. Decl.") ¶ 3.

[45] Crider Decl. ¶ 23; Ex. 49.

[46] *See* Responses to Plaintiffs' Second Set of Interrogatories on Defendant Anthony J. Annucci, ECF No. 110-2 at 18–19; Ex. 50; Ex. 51 at DOCCS-00037976–79.

[47] Ex. 52 at OMH-00076860; *see also* Ex. 53 at DOCCS-00008378 (acknowledging that some non-SARA individuals may be kept at a prison that is not a designated RTF facility for "continuity of care"); Ex. 54 (illustrating that some non-SARA individuals may remain at the prison where they were held prior to their maximum expiration date); Ex. 55 (noting J.R. would "remain at Fishkill" on RTF status).

members to a prison cell or dorm in medium- or maximum-security facilities,[48] and they subject them to prison conditions, including 22 to 24-hour disciplinary confinement.[49] This practice concerned DOCCS Commissioner McGrath, who wrote in September 2017 that she was "becoming increasingly concerned about the number of parolees being held in RTF pending housing due to their mental health status."[50]

In addition, Defendants segregate members of the Discharge Class in homeless shelters, halfway houses, hotels, and motels, and programs located in OMH psychiatric hospital centers. Homeless shelters and halfway houses are segregated settings.[51] Residents of these facilities, including Named Plaintiffs W.P. and S.D., are placed in settings that primarily house people with disabilities.[52] The prevalence of disability in the New York City homeless shelter system, 68% of all adults,[53] greatly exceeds the prevalence of disability in the general population, which is estimated as 21%.[54] Residents of homeless shelters and halfway houses live in congregate settings[55] and restrictive rules govern everything from nighttime curfews to the number of toilet paper rolls one is permitted to receive.[56] They are deprived of privacy and autonomy, including

---

[48] Twelve prisons are designated as RTFs, including Green Haven and Fishkill, where most RTF Subclass members were held. N.Y. Correct. Law § 70; N.Y. Comp. Codes R. & Regs. tit. 7, § 100; *see also* Ex. 49. DOCCS records for the Named Plaintiffs detail which prisons and cells each was held in while on RTF status. *See, e.g.*, Ex. 56 at DOCCS-00004403; Ex. 57 at DOCCS-00040721.

[49] *See* Ex. 58; Ex. 59 at DOCCS-00077017; Ex. 60 at D-00076997; Ex. 94; D.R. Decl. ¶ 9.

[50] Ex. 61.

[51] DOCCS acknowledges that "[p]lacement in emergency housing or a shelter is not a preferred residence program." Ex. 6 at DOCCS-00007103. Nevertheless, DOCCS continues to release class members to shelters. *See* Crider Decl. ¶¶ 28–34; Ex. 62; Ex. 63; Ex. 64.

[52] After they entered the shelter system, W.P. and S.D. were assigned to mental health shelters. W.P. Decl. ¶ 17; S.D. Decl. ¶¶ 16–17.

[53] Ex. 65 at MG-Class00039584.

[54] Ex. 66.

[55] Declaration of Deborah B. Diamant ("Diamant Decl.") ¶¶ 10–20; W.P. Decl. ¶¶ 29–30; S.D. Decl. ¶ 18; Ex. 67 at MG-Class00031055–56 (indicating DOCCS parole housing, Bridges of New York, housed twelve men and consisted of "multiple living units").

[56] *See* W.P. Decl. ¶ 27.

basic decisions about where to live, with whom to live, and how many possessions to keep.[57]

Defendants place Discharge Class members released to homeless shelters, DOCCS parole housing (a.k.a. a halfway house), hotels, and motels at serious risk of institutionalization. These settings may lack robust, on-site mental health supports.[58] When released to these settings, many Discharge Class members abruptly lose the mental health services they received in prison.[59] For instance, while D.H. received mental health care while incarcerated, he did not feel like he was getting the mental health help he needed upon his release, and his case manager was more focused on rehabilitative support services focused on his drug use.[60] Similarly, S.D. was concerned that East Tremont shelter did not have adequate mental health services available on site, including on-site medication management.[61] Being homeless, often for months and even years while waiting for supportive housing, also exacerbates Discharge Class members' stress and undermines their stability following their release from incarceration.[62] W.P. remains homeless 44 months after his

---

[57] *Id*. ¶¶ 27–29; Ex. 67 at MG-Class00031063 (stating residents of Bridges of New York may be subject to "routine cell checks").

[58] *See, e.g.*, Ex. 67 at MG-Class00031053 (reporting that Bridges of New York lacks on-site medical and mental health services); Ex. 14 at OMH-00079841 (describing Bridges of New York as a "halfway house" in internal DOCCS communications).

[59] *Compare* Ex. 69 (describing myriad mental health services in prison); Ex. 70 (describing OMH policy for referrals to special programs for individuals with SMI who are in DOCCS custody); Ex. 71 (describing OMH policy to "ensure that inmates referred for mental health services will receive a thorough mental health screening"); Ex. 72 (describing OMH policy to develop a Treatment Plan for every individual in DOCCS custody admitted for mental health services); Ex. 73 (describing OMH policy for mandatory follow-up with individuals in DOCCS custody who miss mental health appointments, including rescheduling and cell-side visits), *with* Ex. 2 at OMH-00068109 ("Halfway Houses are not appropriate placements for inmate-patients with a community standard SMI diagnosis. If Parole approves a Halfway House, CNYPC staff should notify the Pre-Release Services Department."); Peet Report at p. 1.

[60] *See* D.H. Decl. ¶¶ 10, 14-15, 23-27, 30-31, 45; Ex. 95 at 37:7-25, 46:19-47:15, 61:19-24.

[61] S.D. Decl. ¶¶ 13–21; Ex. 74 at P-MEDICAL0007914–15; Ex. 96 at 63:12–69:17.

[62] *See* Factor Report at ¶¶ 77, 89, 98; Diamant Decl. ¶¶ 13–17; W.P. Decl. ¶¶ 25–34; S.D. Decl. ¶¶ 18–21, 28; D.H. Decl. ¶¶ 42–43; *see also* Ex. 75 at P-MEDICAL-0007665 (noting W.P.'s current risk factors include "unstable housing (shelter)").

2019 release from prison, and D.H. has been "homeless consistently" since his release from prison in 2018.[63]

Ensuring an adequate array of CBMHHSS is a minimum threshold requirement for an effective mental health system that meets the needs of people with serious mental illness who are homeless and/or at risk of homelessness and reaching their release dates from prison (and those recently released). CBMHHSS, including supported housing, ACT/FACT, crisis services, and medication management, must be available in a sufficient quantity to ensure that this population is able to meaningfully integrate into the community and successfully remain out of institutions.[64] Moreover, the lack of stable housing and/or community-based supportive services creates a serious risk of institutionalization for formerly incarcerated people with serious mental illness.[65] Dr. Robert Factor, M.D., Ph.D., a leading expert in community-based mental health services and a Professor Emeritus of Psychiatry at the University of Wisconsin School of Medicine and Public Health, reviewed over 60 studies regarding CBMHHSS in connection with his expert report. He reports that studies show that homelessness and incarceration increase the risk of each other,[66] and that developing feelings of security and independence in housing arrangements is beneficial, particularly during the reentry process.[67] Likewise, studies show that engagement with community-based mental health programming reduces criminal justice involvement.[68] Nonetheless, Defendants have failed to provide Discharge Class Named Plaintiffs and the putative class members with stable housing and sufficient supportive services upon release, thereby placing

---

[63] W.P. Decl. ¶ 2; D.H. Decl. ¶ 2.
[64] *See* Peet Report at pp. 12, 16–21.
[65] *See* Factor Report at ¶ 61; *see also id.* § IV.
[66] *See, e.g.*, Factor Report at ¶ 34.
[67] *See, e.g.*, Factor Report at ¶ 55.
[68] *See, e.g.*, Factor Report at ¶ 43.

them at risk of institutionalization.[69]

Deborah B. Diamant, Director of Government Relations and Legal Affairs at Coalition for the Homeless, acknowledged the challenges faced by individuals with SMI released to homeless shelters, including the restrictive institutional nature of such settings and the negative impact such settings have on class members' sleep, agency, and autonomy.[70] Similarly, David Condliffe, Esq., Executive Director of the Center for Community Alternatives ("CCA"), described how emergency shelter programs that limit stays to 45 days or less are often insufficient for successful reentry, and that New York needs longer-term transitional housing options that provide supportive services in order to support effective reentry and integration.[71]

Other members of the Discharge Class are released to segregated settings that are on the grounds of OMH psychiatric centers, including transitional living residences ("TLR"),[72] transitional placement programs ("TPP"), crisis residences,[73] and state-operated community residences ("SOCR"). These settings are segregated because they overwhelmingly, if not exclusively, house persons with SMI.[74] Defendants release Discharge Class members to such

---

[69] *See* Factor Report § V.

[70] Diamant Decl. ¶¶ 10, 14, 20.

[71] Condliffe Decl. ¶¶ 5, 17.

[72] TLRs are temporary housing in a congregate living facility operated or licensed and regulated by OMH typically located on the grounds of OMH psychiatric hospitals. TLRs normally house people who were recently discharged from the inpatient units of the psychiatric center, or those being diverted from inpatient care. N.Y. Comp. Codes R. & Regs. tit. 14, § 595.1; Ex. 8 at 8 (listing TLRs and TPPs, including numerous psychiatric facilities, in response to interrogatory 24); *see, e.g.*, Ex. 76 (stating Manhattan Psychiatric Center has a Crisis Residence and two TLRs).

[73] Crisis residences are intended to provide short-term housing to individuals experiencing a psychiatric crisis and are not permanent housing. *See* Ex. 76.

[74] *See* N.Y. Comp. Codes R. & Regs. tit. 14, § 595.8(a) (listing a mental illness diagnosis as a requirement for eligibility to OMH residential programs); *see, e.g.*, Ex. 77 (showing TPPs require a mental health diagnosis for eligibility); Ex. 78 (same for TLRs); Ex. 79 (same for SOCRs); Ex. 80 at OMH-00080169-72 (same for Crisis Residences).

settings because CBMHHSS is unavailable.[75]

The lack of CBMHHSS also is the common thread subjecting all members of the Discharge Class to segregation or placement at serious risk of institutionalization. All three of these Named Plaintiffs remain homeless: W.P. and S.D. were both released into the shelter system in 2019,[76] and D.H. was discharged to the Bridges Program,[77] which resembles a halfway house.[78] Further, all three of them were denied the supportive services they needed upon release to the community, including but not limited to: D.H. did not receive ACT support; D.H. and S.D. did not receive necessary substance abuse treatment; none of them had Supplemental Security Income reinstated immediately upon release; and none of them received peer support.[79] Defendants' failures to provide CBMHHSS have placed all three at risk of institutionalization and continue to do so after each release.[80] The lack of CBMHHSS is the common thread subjecting the General Class and Subclass to prolonged incarceration.[81]

E.  **Each Named Plaintiff Was Denied Adequate CBMHHSS Leading to Unjustified Segregation, Prolonged Incarceration, and/or a Serious Risk of Institutionalization**

Plaintiffs are people who were held in a segregated setting—namely state prison—past their open date or conditional release date (General Class members) or maximum expiration date

---

[75] ECF No. 91 ¶ 6 (stating that OMH's practice is to release individuals with SMI to state operated residences, including TLRs and TPPs, if they are "stable for community release but require[] access to community mental health housing as an added layer of support"); Ex. 64 (demonstrating 22 people released to TLR/TPP/Crisis from 2020 through 2021 who were referred in the first instance to housing through a SPOA or RCS application); Ex. 81 at 4–5 (showing, on average, 38 people were released annually to TLR/TPP/Crisis settings from 2016 through 2021).

[76] W.P. Decl. ¶ 2; S.D. Decl. ¶ 2.

[77] D.H. Decl. ¶ 23.

[78] *See* Factor Report ¶¶ 89–90; Ex. 14 at OMH-00079841 (describing Bridges of New York as a halfway house).

[79] *See* Factor Report § V.

[80] *See id.* ¶ 72.

[81] *See* Crider Decl. ¶¶ 19–20

(RTF Subclass members), or who were placed in segregated settings and/or at serious risk of becoming institutionalized (Discharge Class members) because Defendants failed to provide the CBMHHSS for which they were deemed eligible and appropriate. Defendants' conduct and the resulting harms affect hundreds of people across the state.[82] These Named Plaintiffs[83] serve as representatives of each Class and the common harms they have faced:

M.G., a General Class representative, was held for 769 days past his open date, despite being deemed eligible and appropriate for CBMHHSS, because CBMHHSS was unavailable for him.[84] M.G. was finally released[85] to Hillcrest House, a DOCCS parole housing facility (or "halfway house"), which provides only temporary housing and had no on-site medical or mental health care services.[86]

P.C., a General Class representative, was held for 861 days past his open date despite being deemed eligible and appropriate for CBMHHSS because the county to which DOCCS planned to release him had no available community-based mental health housing.[87]

C.J., a General Class and RTF Subclass representative, was placed on RTF status and held for 502 days past his maximum expiration date.[88] During this time, C.J. experienced severe

---

[82] *See* Crider Decl. ¶¶ 20, 23, 28, 34.

[83] Plaintiffs have submitted declarations from 8 Named Plaintiffs. These people are adequate class representatives for the reasons discussed below. Unfortunately, Plaintiffs' counsel has been unable to contact J.R. about this motion in spite of substantial efforts to do so, illustrating how vulnerable this population is.

[84] M.G. Decl. ¶ 3.

[85] Defendants released M.G., P.C., D.R., and C.J. *after* the filing of the original complaint, seemingly in response to this lawsuit. M.G. Decl. ¶¶ 17–18; P.C. Decl. ¶ 14–16; D.R. Decl. ¶ 17; C.J. Decl. ¶¶ 20–21. After Defendants moved to dismiss the First Amended Complaint, the Court ruled that Plaintiffs' release did not moot their claims because of their inherently transitory nature. Ex. 82 at 22:8–31:23.

[86] M.G. Decl. ¶¶ 18–21.

[87] P.C. Decl. ¶¶ 10, 13.

[88] C.J. Decl. ¶ 3.

decompensation and had to be admitted to a crisis observation cell and placed on suicide watch.[89] He was unsure when he was getting out of prison.[90] When C.J. was finally released, he was placed in a temporary TLR.[91] Over three and a half years later, C.J. has still has not received CBMHHSS.[92] This lack of stability and support has contributed to C.J. being reincarcerated multiple times in the three years since his release.[93]

M.J., a representative of the General Class and RTF Subclass, was placed on RTF status and held for approximately 246 days past his maximum expiration date despite being deemed appropriate for CBMHHSS.[94] While on RTF status, M.J. was placed in segregated confinement multiple times.[95] Upon being released, M.J. was placed in an OMH TLR located on the campus of the Rockland Psychiatric Center and informed that it could take up to three years before he would be placed in an apartment.[96] He has since experienced re-incarceration.[97] M.J. remains homeless.[98]

D.R., a General Class and RTF Subclass representative, was placed on RTF status and held for 411 days past his maximum expiration date due to the lack of appropriate housing.[99] He deteriorated as a result of this prolonged incarceration.[100] He was placed in segregated confinement for disciplinary infractions, even after the expiration of his sentence.[101] He was finally released to

---

[89] *Id.* ¶¶ 11, 13.
[90] *Id.* ¶ 19.
[91] *Id.* ¶ 23.
[92] *Id.* ¶ 39.
[93] *Id.* ¶¶ 26, 36–38.
[94] M.J. Decl. ¶¶ 3–4.
[95] *Id.* ¶ 12.
[96] *Id.* ¶¶ 18, 22.
[97] *Id.* ¶¶ 24–25, 28.
[98] *Id.* ¶ 30.
[99] D.R. Decl. ¶ 3; *see also* Ex. 93 at DOCCS-00039747, DOCCS-00039759.
[100] D.R. Decl. ¶ 15.
[101] *Id.* ¶ 9.

an OMH crisis residence on the grounds of Pilgrim Psychiatric Center.[102]

S.D., a Discharge Class representative, was deemed eligible and appropriate for CBMHHSS.[103] Despite this, Defendants released S.D. to a New York City homeless shelter.[104] S.D. deteriorated in this inappropriate setting and was subsequently hospitalized, first at a local hospital and then at OMH's Manhattan Psychiatric Center.[105] After being placed there, S.D. had an incident with another patient and was reincarcerated.[106]

W.P., a Discharge Class representative, was deemed eligible and appropriate for CBMHHSS, and yet DOCCS and OMH released him to a New York City homeless shelter. He has been placed in various shelters without supportive services, including at times without access to a doctor.[107] Conditions in the shelter exacerbate W.P.'s symptoms of paranoia.[108] After an altercation with another shelter resident, W.P. was detained in jail for about two months.[109] W.P. remains homeless due to lack of the community-based mental health housing that he requires for over three years since leaving prison.[110]

D.H., a Discharge Class representative, has been in a cycle of prison and unsupported housing due to inadequate mental health care and housing. In 2018, he was held in prison past his open date due to DOCCS not approving his housing.[111] In the two years prior to the Second Amended Complaint, D.H. was released four times and reincarcerated three times, including for

---

[102] *Id.* ¶ 18.
[103] S.D. Decl. ¶ 10.
[104] *Id.* ¶ 13.
[105] *Id.* ¶¶ 22–24.
[106] *Id.* ¶ 24.
[107] *Id.* ¶¶ 16–19.
[108] *Id.* ¶ 29.
[109] *Id.* ¶ 31.
[110] *Id.* ¶ 2.
[111] D.H. Decl. ¶¶ 16–23.

minor parole violations.[112] Defendants have never released D.H. to CBMHHSS; instead, DOCCS and OMH have placed him in parole housing and at a psychiatric center, or released him to his grandmother's house without supportive services.[113] This vicious cycle of reincarceration and unavailable CBMHHSS has contributed to D.H.'s deterioration and, at times, despair.[114]

## III.     The General Class, RTF Subclass, and Discharge Class Should Each Be Certified Under Rule 23(b)(2)

Under Rule 23(a), certification of a class or subclass is proper if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition, some courts have recognized an "implied requirement of ascertainability," which requires that the class definition be definite enough that it is "administratively feasible for the court to determine whether a particular individual is a member." *Casale v. Kelly*, 257 F.R.D. 396, 406 (S.D.N.Y. 2019) (cleaned up).

The class must also satisfy one of the three criteria set forth in Rule 23(b). Here, Plaintiffs seek certification pursuant to 23(b)(2), which allows certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Civil rights actions alleging class-based discrimination are "prime examples" of Rule 23(b)(2) class action cases. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).[115]

---

[112] *Id.* ¶¶ 28–43.

[113] *Id*.

[114] *Id.* ¶¶ 43, 45–47.

[115] *See M.F. v. N.Y.C. Dep't of Educ.*, 2019 WL 2511874, at *6 (E.D.N.Y. Jun. 18, 2019) ("Because plaintiffs here seek injunctive and declaratory relief with respect to the class as a whole, this action satisfies the condition set forth in Rule 23(b)(2)."); *In re District of Columbia*, 792 F.3d 96, 102

"[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the class certification stage. Merits question may be considered to the extent— but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Traditionally, Rule 23 is "given liberal rather than restrictive construction." *Vargas v. Howard*, 324 F.R.D. 319, 324 (S.D.N.Y. 2018) (cleaned up); *see also Valdez v. MichPat & Fam, LLC*, 2022 WL 950450 (E.D.N.Y. Mar. 30, 2022) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)).

A.    **The General Class, RTF Subclass and Discharge Class are Each so Numerous that Joinder of all Members is Impracticable.**

Numerosity is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244–45 (2d Cir. 2007). "Relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) (citations omitted). The Classes and Subclass each satisfy this requirement.

---

(D.C. Cir. 2015) ("*Olmstead* held there is a common civil right to non-segregation . . . . Rule 23(b)(2) was intended for civil rights cases.").

1.    Joinder of Each Class is Impracticable.

Joinder here is impracticable for the General Class, RTF Subclass, and Discharge Class. All members are people with SMI who are also indigent and homeless or at risk of homelessness. Individuals with disabilities who are confined to institutions are unlikely to have the ability to initiate separate actions for injunctive relief on their own behalf. *Rolland v. Cellucci*, 1999 WL 34815562, at *3 (D. Mass. Feb. 2, 1999) (collecting cases); *see, e.g.*, *Kenneth R. ex rel. Tri–Cnty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 265 (D.N.H. 2013) (disability considered in determining impracticability of joinder of class of people with SMI challenging institutionalization under *Olmstead*). Indeed, "the class action device is particularly well-suited in actions brought by prisoners due to the 'fluid composition' of the prison population . . . [and] generally tend[s] to be the norm in actions such as this." *Clarkson v. Coughlin*, 783 F. Supp. 789, 797 (S.D.N.Y. 1992). Members of the Classes are geographically dispersed throughout the state in different prisons, and Discharge Class members were released to dozens of different counties.[116] *See Robidoux*, 987 F.2d at 936; *Raymond v. DOCCS*, 579 F. Supp. 3d 327, 337 (N.D.N.Y. 2022); *Dean v. Coughlin*, 107 F.R.D. 331, 332–33 (S.D.N.Y. 1985). Even if a small number of members could somehow bring individual claims, judicial economy favors class certification to avoid a multiplicity of lawsuits that may result in inconsistent holdings.

2.    Each Class Satisfies the Count Threshold for Numerosity.

Even if the Court finds the equitable factors alone do not satisfy numerosity, each Class is sufficiently large enough to warrant class treatment. While classes of over 40 members are presumptively numerous, "there is no magic minimum number that establishes numerosity, and courts have certified classes with as few as 14 members." *Westchester Indep. Living Ctr., Inc. v.*

---

[116] Ex. 49 (showing owning facilities for people held on RTF status); Ex. 64 (showing 60 different counties of release for people with SMI); Ex. 83.

*State Univ. of New York, Purchase Coll.*, 331 F.R.D. 279, 288 (S.D.N.Y. 2019).[117] "[T]he Second Circuit has relaxed the numerosity requirement" for putative classes "seek[ing] injunctive and declaratory relief." *Id*. The rule only requires that "the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States*, 504 F.3d at 244–45.

In this case, the number of members for numerosity purposes includes those who satisfy the Class and Subclass definitions from the time of filing to the present, notwithstanding Defendants' efforts to moot Plaintiffs' prolonged incarceration claims by releasing Plaintiffs and putative class members after the Complaint was filed. *See Abdi v. Duke*, 323 F.R.D. 131, 140 (W.D.N.Y. 2017). Additionally, a reasonable future projection of class members must be counted because injunctive relief is being sought. *See Westchester Indep.*, 331 F.R.D. at 288. The inclusion of people who were or who may be subjected to an allegedly ceased policy is appropriate in the numerosity analysis where, as here, the voluntary cessation and/or inherently transitory exceptions to the mootness doctrine apply. *See, e.g.*, *Hilton v. Wright*, 235 F.R.D. 40, 51 (N.D.N.Y. 2006).[118]

**General Class.** The General Class is sufficiently numerous under Rule 23(a). At the time of filing, DOCCS's priority release lists (PRLs) indicate there were around 48 General Class members held.[119] This estimate may be low because, shortly after this litigation was filed, DOCCS realized that 121 individuals being held past their release dates were missing from the priority

---

[117] *See, e.g.*, *Odom v. Haden Transp., Inc.*, 275 F.R.D. 400, 407 (W.D.N.Y. 2011) (16 members); *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 181 (W.D.N.Y. 2005) (28 members); *Bruce v. Christian*, 113 F.R.D. 554, 557 (S.D.N.Y. 1986) (16 members); *Grant v. Sullivan*, 131 F.R.D. 436, 446 (M.D. Pa. 1990) (noting a court "may certify a class even if it is composed of as few as 14 members").

[118] On September 25, 2020 the prolonged incarceration claims were deemed not moot under the voluntary cessation and inherently transitory exceptions. Ex. 82 at 31:19-23; 37:16-25. The circumstances undergirding the Court's decision have not changed since the Court's ruling. *See* Ex. 49 at 7, 9 (rows 81, 140, and 147 describe the same individual, but after the lawsuit was filed, "OMH 1SY" was dropped from reason for RTF explanation, leaving it just as "OPWDD").

[119] *See* Crider Decl. ¶ 15; Ex. 84; Ex. 85.

release lists.[120] More broadly, these PRLs demonstrate that there were at least 393 individuals with SMI who were not subject to SARA or another sex offender status, who were held past their release dates from January 2018 through September 2022.[121] Of these, at least 102 people were held in prison even though Defendants submitted a SPOA or RCS application for them, evidencing eligibility and appropriateness for CBMHHSS.[122] And that is likely under-inclusive because nearly all members of the Discharge Class should have a SPOA or RCS application filed, as it is OMH policy "to prepare a SPOA application for all inmates with SMI who are at risk of homelessness and who are approaching their scheduled release date."[123]

Moreover, OMH Special Condition Residency reports demonstrate that 99 people were held in prison past their release dates because of their SMI, and 59 were specifically held due to their OMH levels under parole Special Residency Conditions 29 and 30, from April 2018 through March 2022.[124] And there are over 200 people with SMI not subject to SARA or other sex offense restrictions who reach release dates every year without securing CBMHHSS who are in danger of prolonged incarceration because there is no permanent prohibition.[125] The General Class is thus well over 40 members and is presumptively numerous.

**RTF Subclass.** The RTF Subclass is also sufficiently numerous to merit class treatment. In January 2019, the month this action was filed, 13 subclass members were being detained in

---

[120] *See* Ex. 86 at D-00071967–68; Ex. 87 (indicating 50 people without SARA restrictions who have SMI currently held past either a conditional release date or open date for parole shortly after the complaint was filed).
[121] Crider Decl. ¶ 15.
[122] *Id.* ¶ 18.
[123] ECF No. 91 ¶ 3.
[124] Crider Decl. ¶ 20.
[125] *See* Ex. 92.

RTFs because of their SMI, and an additional 23 individuals were held through December 2019.[126]

Consideration of future putative class members also is appropriate here. In *Christina A. ex rel. Jennifer A. v. Bloomberg*, 197 F.R.D. 664, 669 (D.S.D. 2000), for example, the court determined that a putative subclass of girls challenging the conditions of a juvenile detention unit that was closed at the time of class certification (meaning no people *currently* detained) was nevertheless sufficiently numerous because the defendant had not permanently closed the unit and the subclass included any females to be detained in the unit in the future. *See also Abdi v. Duke*, 323 F.R.D. 131, 140 (W.D.N.Y. 2017) ("[S]maller classes are less objectionable where the plaintiff is seeking injunctive relief on behalf of future class members as well as past and present members.").

Similarly here, because Defendants have failed to permanently end the use of RTFs challenged in this litigation, there remains a reasonable likelihood that Defendants will resume RTF use in the future and return to pre-filing levels, resulting in future RTF Subclass members. Indeed, Defendants' practice of using RTFs for non-SARA status individuals with SMI awaiting CBMHHSS was on an upward trajectory in the two years prior to the filing of this lawsuit.[127] Importantly, Defendants continue to detain other disabled people under RTF status as a solution to the unavailability of specialized housing such as disability-focused residences or nursing homes, and have vigorously defended their authority to use RTF status as a housing solution for hard-to-place people in over a dozen lawsuits in the last five years.[128]

---

[126] Crider Decl. ¶ 23; Ex. 49. As discussed above, this is sufficient to certify a class given the equitable factors at play. *See, e.g.*, *Ireland*, 2016 WL 7324104, at *14.
[127] *See* Crider Decl. ¶ 24.
[128] *See* Ex. 49 at 9–10 (showing five persons held in RTF for "Medical" and two for "OPWDD" after issuance of the Enright Memorandum, ECF No. 92-1); ECF No. 110-2 at 17 (Nos. 32, 33); *see, e.g.*, *Alcantara v. Annucci*, 166. N.Y.S.3d 288 (App. Div. 2022), *leave to appeal granted*, 39 N.Y.3d 906 (2023) (challenging DOCCS practice of holding individuals with SARA residency

**Discharge Class.** The Discharge Class is well over a presumptive threshold of forty people. Though Defendants' poor recordkeeping makes tracking releases across data sets difficult, every source examined supports a clear finding of numerosity. One document demonstrates that from February 2020 through December 2021, 347 people who had a SPOA or RCS application filed by OMH were released to homeless shelters, mental health shelters, hotels/motels, or Departments of Social Services.[129] Another document shows that 686 people with SMI were released to such locations between February 2019 and April 2021.[130]

Additionally a document generated by OMH to track housing locations upon release in 2020 and 2021 along with the types of care coordination received and the housing referrals that were submitted also supports a finding that the Discharge Class is numerous.[131] This document demonstrates that during this time period, Defendants released 388 individuals with SMI to shelters or hotels/motels; of this group, only 69 received some form of ACT, whereas 160 received a form of Health Home and 136 received transitional forensic services.[132] Moreover, many individuals did not receive community-based mental health housing despite OMH's submission of SPOA or RCS applications. According to the first housing referral reported in this spreadsheet, even after seeking community-based mental health housing, Defendants released 249 people with

---

restrictions past their maximum expiration dates in RTFs); *see also People ex rel. McCurdy v. Warden, Westchester Cnty. Corr. Facility*, 163 N.E.3d 1087 (N.Y. 2020) (challenging DOCCS's practice of holding people with residency restrictions charged with violations of post-release supervision in an RTF under Correction Law § 73(10)); *People ex rel. Johnson v. Superintendent, Adirondack Corr. Facility*, 163 N.E.3d 1041 (N.Y. 2020) (challenging constitutionality of DOCCS practice of holding individuals with residency restrictions in RTF while they remain on a waiting list for a homeless shelter).

[129] *See* Crider ¶ 28; Ex. 62.
[130] *See* Crider ¶ 31; Ex. 63.
[131] *See* Ex. 64.
[132] *See* Crider Decl. ¶ 33; Ex. 64.

SMI to shelters, 50 to hotels/motels, and 41 to parole (i.e., halfway) housing.[133] Additionally, Defendants released 22 people to TLRs, TPPs, or crisis residences despite submission of SPOA or RCS applications for those individuals.[134] The lack of community-based mental health housing leading to this inappropriate matching of services and housing locations in such great numbers warrants class certification.

### B.    Commonality Exists for the General Class, RTF Subclass and Discharge Class

Members of each Class seek resolution of common questions capable of a common solution that can be achieved in "one stroke" through an injunction: creation of adequate CBMHHSS. Commonality requires "questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), and is satisfied where "plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment." *Westchester Indep.*, 331 F.R.D. at 291. It exists where defendants engage in a "general course of conduct" that causes a common injury to the class. *Id.* at 293. "Commonality does not mean that all issues must be identical as to each member." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008).

A question of law or fact is common to the class if it is "capable of class-wide resolution— which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Johnson v. Nextel Comms. Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (cleaned up) (quoting *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 350 (2011)).[135] A policy or

---

[133] *See* Crider Decl. ¶ 34; Ex. 64.

[134] *See* Crider Decl. ¶ 34; Ex. 64.

[135] Differences in types of SMI or type of housing and services needs do not preclude a finding of commonality as "every plaintiff is suffering the same injury as a result of a general policy of the State—even if the services recommended for each patient vary among the class members." *N.B. v. Hamos*, 26 F. Supp. 3d 756, 773 (N.D. Ill. 2014). "Moreover, although the State's failures may be unique to each individual class member, the failures can also be quantified and remedied by the Court in ways that are common across the class." *Steward v. Janek*, 315 F.R.D. 472, 482 (W.D. Tex. 2016).

practice of discrimination applied against class members generally satisfies commonality in cases seeking injunctive relief. *See, e.g.*, *Westchester Indep.*, 331 F.R.D. at 292.

Defendants harm each Class by failing to adequately plan, develop, and fund sufficient capacity in an array of CBMHHSS. Each Class raises the legal question of whether the ADA and Rehabilitation Act require Defendants to ensure that people with SMI who are homeless and/or at risk of homelessness are released from state prison into the most integrated settings appropriate to their needs (i.e., CBMHHSS) upon reaching their release dates. Additionally, each Class raises the factual question of whether Defendants fail to adequately fund and administer the existing CBMHHSS system so that persons with SMI who are scheduled for release from state prisons may be placed in the most integrated community setting appropriate for their needs upon their release dates. Class members allege common injuries derived from Defendants' unitary policies and/or patterns and practices and present common answers apt to drive the resolution of the litigation.[136]

The claims of each Class can be resolved "in one stroke." *Johnson*, 780 F.3d at 137. As described in the Second Amended Complaint (ECF No. 134 ¶¶ 26, 702–706), the Classes seek the same resolution to protect them from the same harms—that is, a permanent injunction requiring Defendants to provide adequate CBMHHSS and to develop and implement an effective state-wide plan, including meaningful oversight, for providing CBMHHSS in the most integrated setting appropriate to the needs of individuals with SMI who are scheduled for release from state prison, and to enable release to the most integrated setting appropriate to their needs promptly upon reaching a release date.

---

[136] *See, e.g.*, ECF No. 110-2 at 8 (No. 16, "The vast majority of inmates diagnosed with [SMI] have been, and are, deemed appropriate for placement in a shelter if other options are not available"; No. 26, describing DOCCS's decision that individuals' mental illness warranted release to a "suitable residence, and not a shelter" "were based on public safety concerns, including concerns about the inmate's safety in the community").

**General Class.** Systemic deficiencies in the CBMHHSS system, as discussed in the Peet report,[137] universally cause prolonged incarceration in prison beyond a release date when members of the General Class should be in the community. Both the General Class and RTF Subclass raise the question of whether Defendants have a policy or practice of holding people with SMI in prison past their lawful release dates in segregated settings due to deficiencies in CBMHHSS.

As discussed, members of the General Class suffer the common harm of incarceration past lawful release dates due to Defendants' failure to provide adequate CBMHHSS. Defendants admit that at the commencement of this litigation, people with SMI were being detained in state prisons when CBMHHSS were unavailable.[138] That practice persists today.[139]

**RTF Subclass.** Members of the RTF Subclass were (or will be) universally subjected to confinement in medium- and maximum-security state prisons past the end of their judicially imposed sentences because CBMHHSS were, or will be, unavailable at on their maximum expiration dates.[140] Common questions are raised as to whether Defendants' policy and practice of "releasing" people with SMI to "RTF status" in prison past their maximum date violates the Eighth Amendment due to deliberate indifference or criminalization of status as indigent persons with SMI. Courts have found commonality in cases where incarcerated people were subject to the same challenged policies and conduct. *See, e.g.*, *V.W. by & through Williams v. Conway*, 236 F. Supp.

---

[137] *See* Peet Report at pp. 1–2, 14–44.

[138] *See* ECF No. 92 ¶¶ 8–10; ECF No. 110-2 at 3–4, 7–8 (Nos. 11, 16).

[139] Since December 10, 2019, at least 273 people with SMI who do not have SARA restrictions have been held past their lawful release date, and at least two were subject to this prolonged incarceration in 2022. Crider Decl. ¶¶ 15, 20; Ex. 42; *see also* Ex. 90 (confirming 2022 DOCCS policy still allows people to be held past open dates for parole and conditional release dates if mental health prevents approval of a residence).

[140] *See, e.g.*, Ex. 91 at 30 (listing reason for hold for a non-SARA individual as "no housing"); Crider Decl. ¶ 23 (demonstrating 66 non-SARA individuals with SMI were held in RTFs past their maximum expiration date).

3d 554, 575 (N.D.N.Y. 2017) (finding commonality where juveniles challenged practice of solitary confinement in detention facility) (collecting cases); *Butler v. Suffolk County*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013) (granting class certification in Eighth Amendment challenge where common question was whether government defendant was aware of and deliberately indifferent to the conditions at a correctional facility).

While C.J. and D.R. were incarcerated on RTF status, they remained in state prisons subject to prison conditions and rules and were not allowed to leave.[141] As discussed above, all members of the RTF Subclass suffer the common harm of being subjected to punitive conditions in prison past their maximum expiration dates. While incarcerated, all RTF Subclass members are unable to leave the prison and are subject to prison rules and discipline (including solitary confinement), deprived of all privacy, and have no access to the community.

Defendants admit, and evidence shows, that at the time this litigation commenced, people with SMI were held in prison past their maximum expiration dates in prisons on "RTF status" when CBMHHSS was unavailable, and the reason listed for their hold was their OMH level.[142] As discussed above, there is no permanent or comprehensive prohibition on prolonged incarceration, including prolonged incarceration under the guise of "release" to RTF status. This policy and practice presents a common harm to RTF Subclass members, including future members who need the protection of permanent injunctive relief.

**Discharge Class.** Discharge Class members are all similarly harmed when CBMHHSS necessary for them to remain in the community are unavailable on their prison release dates. Common questions include: whether DOCCS and OMH have a policy or pattern and practice of

---

[141] D.R. Decl. ¶ 9; C.J. Decl. ¶¶ 10, 12.
[142] Crider Decl. ¶ 23; ECF No. 92 ¶¶ 9–10; Ex. 86 at D-00071966 (acknowledging that people held in RTF include those considered "SMI in need of an OMH structured setting").

placing people with SMI at serious risk of institutionalization, including incarceration and hospitalization, by releasing them from prison to inappropriate and segregated settings such as homeless shelters, crisis residences, TLRs, and TPPS,[143] and if so whether this is in violation of the ADA and Rehabilitation Act.

*Kenneth R.* is instructive. There, the court certified a class of persons with SMI who were unnecessarily institutionalized or at serious risk of unnecessary institutionalization in state treatment facilities by defendants who relied on excessively institutional care to treat mental illness rather than appropriate community-based care programs. 293 F.R.D. at 267.[144] Upon reviewing "the State's own reports" and the reports of the plaintiffs' experts, which demonstrated "a dearth of available community-based services within New Hampshire's mental health system" caused by "the way the State manages the system," the court concluded that "[s]ubstantial evidence suggest[ed] that the State's policies and practices ha[d] created a systemic deficiency in the availability of community-based mental health services, and that that deficiency [was] the source of the harm alleged by all class members." 293 F.R.D. at 267. The court further found that "the evidence suggest[ed] a causal connection between that systemic condition and the harm experienced by all class members: a serious risk of unnecessary institutionalization, which includes a serious risk of continued unnecessary institutionalization." *Id.* Common questions therefore included "whether there [was] a systemic deficiency in the availability of community-based services, and whether that deficiency follow[ed] from the State's policies and practices." *Id.*

---

[143] *See* Crider Decl. ¶¶ 33–34; Ex. 64.

[144] *See also Thorpe v. D.C.*, 303 F.R.D. 120, 146–47 (D.D.C. 2014) (holding class of persons receiving Medicaid services alleging unnecessary segregation in nursing facilities for lack of an effective system of transition assistance met commonality requirement based on common questions about existence of deficiencies and whether the deficiencies cause unnecessary segregation).

Likewise here, as discussed above, Defendants' own records demonstrate hundreds of people with SMI released into homelessness every year and dozens released into institutional settings such as TLRs and crisis residences.[145] Similar to *Kenneth R.*, the reports of Plaintiffs' experts demonstrate that members of the Discharge Class experience the common harms of unjustified segregation and/or being subjected to a serious risk of institutionalization as a direct result of Defendants' systemic failure to provide adequate CBMHHSS to eligible people with SMI upon their release from state prison. A functioning mental health system requires an adequate array of and sufficient capacity in CBMHHSS, along with proper administration and oversight.[146] OMH is well aware of this need, but New York falls far short of its mandate to serve this population due to myriad failures in funding, resource allocation, administration and oversight.[147] It is well established that supportive services such as ACT and supportive housing are necessary to avoid a serious risk of institutionalization for persons with SMI who are homeless or at risk of homelessness.[148] By failing to adequately fund and administer the CBMHHSS system in New York, Defendants subject Plaintiffs to a vicious cycle of segregation from the community, psychiatric decompensation, incarceration and hospitalization, on repeat. Ultimately, the question of whether there is a systemic deficiency of CBMHHSS that follows from the State's policies and practices, will be answered similarly for every class member.

Diamant details the harrowing conditions that members of the Discharge Class face in the NYC shelter system, including large crowded congregate shelters where people lack privacy, stability and dignity.[149] Many residents are forced to manage their mental illness while they are

---

[145] *See* Ex. 64.
[146] *See* Peet Report at pp. 7, 21, 44–46.
[147] *See id.* at pp. 1–2, 43–47.
[148] *See* Factor Report § IV.
[149] Diamant Decl. ¶¶ 10, 11.

unable to obtain restful sleep.[150] They are exposed to airborne illnesses, inadequate climate control, and subpar housing conditions.[151] Diamant details how people with mental illness in the NYC shelter system who are in need of support are segregated by being assigned to mental health specific shelters where the majority of, if not all, other residents are also other people with disabilities.[152]

Condliffe describes the class members' urgent need for community-based mental health housing. CCA is a community-based alternatives-to-incarceration organization which offers, among other things, emergency and transitional housing services.[153] According to Condliffe, effective supportive housing enables people with SMI who have been incarcerated to reenter the community and reduces the likelihood of recidivism.[154] Short-term emergency housing programs alone are not as successful as transitional housing programs.[155] Transitional housing programs provide "on-site supportive services designed to help people build the skills they need to live independently."[156] Condliffe maintains that CCA's experience as a service provider "proves New York State must develop expanded funding for transitional housing services for people released from incarceration."[157]

An abundance of peer-reviewed studies evidence that comprehensive mental health supportive services, such as ACT, and stable supportive housing are critical basic needs for people with SMI.[158] As Dr. Factor confirms, people with SMI reentering the community as homeless are

---

[150] *Id.* ¶¶ 14–15, 17.
[151] *Id.* ¶¶ 11–13, 15.
[152] *Id.* ¶¶ 9, 13.
[153] Condliffe Decl. ¶¶ 2–4.
[154] *Id.* ¶ 6.
[155] *Id.* ¶ 14.
[156] *Id.* ¶ 8.
[157] *Id.* ¶ 17.
[158] *See* Factor Report § IV.

placed at serious risk of institutionalization, including hospitalization or incarceration, if they are not provided with the CBMHHSS that they need to succeed.[159]

The experiences of Named Plaintiffs S.D., W.P. and D.H. illustrate the struggles that members of the Discharge Class face if they do not have both comprehensive mental health services and supportive housing. All three of these Named Plaintiffs were denied CBMHHSS upon release, and all three have been reincarcerated at some point in the last few years.[160] Two have been hospitalized.[161] All three remain homeless, and in the four years since this lawsuit began, none of these Named Plaintiffs have yet received community-based mental health housing. Dr. Factor concluded, based on his review of the record and interviews with the Discharge Class Named Plaintiffs, that S.D., W.P., and D.H. have increased risks of institutionalization because of Defendants' failure to provide stable housing and necessary supportive services; the risk was realized by these recent incarcerations and hospitalizations, and renewed upon each release.[162]

## C.    The Claims of Named Plaintiffs Are Typical of the Claims of the Class

Rule 23(a)(3) requires that named plaintiffs have claims typical of the claims of proposed class members. This requirement is clearly satisfied for two reasons.

*First*, where, as here, the proposed classes seek injunctive and declaratory relief, there is a presumption that typicality is present. *See Westchester Indep.*, 331 F.R.D. at 293; *Nicholson v. Williams*, 205 F.R.D. 92, 100 (E.D.N.Y. 2001) ("[T]he very nature of the relief sought, namely, an injunction and a declaration, is ample basis for finding that the claims of the named plaintiffs are typical of those of the proposed class."). The presumption is particularly strong here because the relief sought, which would enjoin the various policies responsible for Plaintiffs' harms, would

---

[159] *Id.*
[160] D.H. Decl. ¶ 37; S.D. Decl. ¶¶ 25–26; W.P. ¶ 31.
[161] D.H. Decl. ¶ 43; S.D. Decl. ¶¶ 24–25.
[162] Factor Report ¶ 4.

benefit all members of the General Class, RTF Subclass, and Discharge Class. *See Gulino v. Bd. of Educ.*, 201 F.R.D. 326, 332 (S.D.N.Y. 2001) ("[N]amed plaintiffs satisfy the typicality requirement when all members of the class would benefit from the named plaintiffs' action."); *Cortigiano v. Oceanview Manor Home for Adults*, 227 F.R.D. 194, 206 (E.D.N.Y. 2005) ("That all members of the class would benefit from the named plaintiffs' action demonstrates that the typicality requirement is met."). It is well established in the medical literature that there are significantly improved outcomes for persons with SMI provided CBMHHSS, and conversely a significant risk of institutionalization for those not provided CBMHHSS.[163] Moreover, a functioning mental health system must meet the needs of people with SMI who are homeless or at risk of homelessness by providing an adequate array of and capacity in CBMHHSS, especially for people returning to the community from incarceration who are particularly vulnerable.[164]

*Second*, the claims of the Named Plaintiffs and the proposed class members for each Class and Subclass arise from the same course of conduct by Defendants. Courts have recognized that typicality exists where "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)); *see Westchester Indep.*, 331 F.R.D. at 293 (internal quotation marks omitted). To make this showing, plaintiffs may demonstrate either the existence of "a unitary policy that resulted in all of the class members' injuries" or "that Defendants engaged in 'general practices,' which, taken together, can be construed as a single course of conduct giving rise to the claims of all class members." *Westchester Indep.*, 331 F.R.D. at 294. Here, the Named Plaintiffs

---

[163] *See id.* at ¶¶ 20, 39, 61; *see also id.* § IV.
[164] *See* Peet Report at pp. 1–2, 9, 21, 31-32, 37.

have shown precisely that, as the same course of conduct underlies each Class. Specifically, Defendants failed to provide adequate CBMHHSS for people with SMI upon their release from state prison, leading to unjustified segregation and/or a serious risk of institutionalization.

The General Class claims arise from Defendants' policy and practice of institutionalizing class members in segregated settings in state prison instead of releasing them by their release date. Because of Defendants' conduct, M.G., M.J., P.C., C.J., and D.R., as well as the putative General Class members—all people with SMI who were approved for release from state prison to the community—were held in prison, a segregated setting, rather than released on their release date.

The same is true for the claims of the RTF Subclass, all of which are based on Defendants' policy and practice of institutionalizing individuals with SMI in state prisons and subjecting them to punitive conditions after they complete court-imposed sentences of imprisonment due to the lack of CBMHHSS. That policy and practice by Defendants caused C.J., D.R., M.J., and the putative RTF Subclass members—all people with SMI who were approved for release from state prison to the community—to instead be held in state prisons and subjected to conditions that amount to punishment after they reached their maximum expiration date.

The Discharge Class claims also rely on a unitary course of conduct: Defendants' policy and practice of placing people with SMI who are or will be appropriate for CBMHHSS in segregated settings or at serious risk of becoming institutionalized. Because of Defendants' conduct, S.D., W.P., and D.H. and putative Discharge Class members—all of whom are people with SMI who were released from state prison without the CBMHHSS for which they were deemed appropriate—were instead placed in segregated settings and/or at serious risk of becoming institutionalized.[165]

---

[165] *See* Factor Report § V.

Because Named Plaintiffs representing each Class have experienced the same harm, share identical legal theories, and seek the same injunctive and declaratory relief as the class members they seek to represent, the proposed General Class, RTF Subclass, and Discharge Class all satisfy the Rule 23(a)(3) typicality requirement.

### D.    Named Plaintiffs Will Fairly and Adequately Protect Members' Interests

Rule 23(a)(4) requires that plaintiffs seeking to certify a class demonstrate that they will fairly and adequately protect the interests of the class. Proposed class representatives are generally considered to be adequate if: (1) their interests coincide with the interests of the class; and (2) they and their attorneys are able to prosecute the action vigorously and competently. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000); *Westchester Indep.*, 331 F.R.D. at 298. Both elements are easily satisfied here.

*First*, there are no actual or potential conflicts of interest between the Named Plaintiffs and the other class members. To the contrary, their interests are entirely coextensive. Likewise, all will benefit from a favorable judgment in this case, and it is in every General Class and Discharge Class member's interest to ensure that Defendants comply with their obligations under the ADA and the Rehabilitation Act. *See, e.g.*, *Kenneth R.*, 293 F.R.D. at 270 ("The court has determined that all class members, as defined and without regard to current preferences, have an abiding interest in securing the availability of community-based services options sufficient to preclude unnecessary institutionalization."). It is likewise in every RTF Subclass member's interest to ensure that Defendants comply with the Eighth Amendment. *See id.*

*Second*, Named Plaintiffs and their counsel have the ability to pursue this action vigorously and competently. Named Plaintiffs, many of whom have been actively pursuing these claims for four years, are dedicated to representing the interests of the putative Classes they seek to

represent.[166] Named Plaintiffs' decision to seek only system-wide injunctive and declaratory relief underscores their commitment to vigorously pursue class members' claims in addition to their own.[167] Further, Named Plaintiffs have retained counsel with extensive experience in complex class action litigation in federal and state courts, and particularly in litigation concerning the rights of people with SMI and the rights of people who are incarcerated in state prison.[168] Counsel will continue to prosecute this action vigorously and competently. As such, they are "qualified, experienced and able to conduct the litigation." *Donaldson*, 222 F.3d at 60.

### E. Members of the General Class, RTF Subclass, and Discharge Class are Readily Ascertainable

The Second Circuit has acknowledged an "implicit threshold requirement that the members of a proposed class be readily identifiable," or ascertainable. *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017). However, this requirement "is less important in a Rule 23(b)(2) class, since a chief objective of this rule is to provide broad injunctive relief to large and amorphous classes not capable of certification under Rule 23(b)(3)." *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 116 (E.D.N.Y. 2012) (cleaned up). Indeed, "[i]t is not clear that the ascertainability requirement applies to Rule 23(b)(2) class actions . . . as notice is not obligatory and the relief sought is injunctive rather than compensatory." *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 419 n.3 (S.D.N.Y. 2012). Thus, it may not be necessary to consider ascertainability in deciding whether to certify these Classes, as no monetary relief is sought.

Regardless, the class members' identities are readily ascertainable. The ascertainability inquiry "is not a demanding one; it is 'designed only to prevent the certification of a class whose

---

[166] *See* P.C. Decl. ¶¶ 14, 21–26; M.G. Decl. ¶¶ 16, 30–35; D.R. Decl. ¶¶ 26-31; C.J. Decl. ¶¶ 41–46; M.J. Decl. ¶¶ 16, 32–37; D.H. Decl. ¶¶ 48–53; S.D. Decl. ¶¶ 29–34; W.P. Decl. ¶¶ 35–40.
[167] *See* P.C. Decl. ¶¶ 21–26 ; D.R. Decl. ¶¶ 26–31; M.J. ¶¶ 32–37; D.H. Decl. ¶¶ 48–53; S.D. Decl. ¶¶ 29–34; W.P. Decl. ¶¶ 35–40.
[168] *See* Declaration of Elizabeth S. Woods; Declaration of Stefen R. Short; Parker Decl. ¶¶ 4–8.

membership is truly indeterminable.'" *In re Dig. Music Antitrust Litig.*, 321 F.R.D. 64, 89 (S.D.N.Y. 2017) (quoting *Ebin v. Kangadis Food, Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014)). Defendants themselves oversee the processes relevant to this litigation.[169] They have an affirmative obligation to develop discharge plans, monitor release dates, and ensure that individuals with SMI are matched with appropriate services and housing.[170] Defendants are thus uniquely situated to identify the members of each Class, and discovery has revealed that Defendants in fact maintain census data on releases and discharge plans for incarcerated individuals in New York.[171] Therefore, under any standard, class members are readily ascertainable.

### F.    Class Certification and Injunctive Relief Under Rule 23(b)(2) are Appropriate.

Injunctive class wide relief to remedy the ongoing civil rights violations by Defendants against Plaintiffs in each respective Class is the only appropriate remedy that can sufficiently address Defendants' conduct. Here, Plaintiffs seek certification pursuant to Rule 23(b)(2), which allows certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Systemic violations . . . present a classic case for Rule 23(b)(2) certification." *M.F. v. N.Y.C. Dep't of Educ.*, 162 F. Supp. 3d 216, 242 (S.D.N.Y. 2016). Civil rights actions alleging class-based discrimination are "prime examples" of Rule 23(b)(2) class action cases. *Amchem*, 521 U.S. at 614 (1997).

As discussed above, Plaintiffs challenge pervasive patterns of unconstitutional and illegal

---

[169] *See, e.g.*, Ex. 86 (noting DOCCS employees responsible for RTF and priority release lists).

[170] *See, e.g.*, Ex. 2; Ex. 9; Ex. 10; Ex. 12; Ex. 13.

[171] *See* Crider Decl. (analyzing class members based on priority release lists, special residency condition reports, RTF lists, and other DOCCS and OMH censuses); *see also* Ex. 49 (listing non-SARA individuals held in RTF past their maximum expiration date because of SMI); Ex. 62 (listing people with SMI discharged to shelters); Ex. 92 (same); Ex. 64 (listing SMI releases by housing location, care coordination, and housing referrals).

policies regarding deficiencies in how Defendants administer, operate, and fund their mental health system. Declaratory and injunctive relief is necessary to remedy these system-wide violations of Plaintiffs' and class members' rights, as only systemic changes can create the CBMHHSS needed to remedy these violations. *Kenneth R.* is instructive. There, the court held that Rule 23(b)(2) was satisfied because "all class members share[d] a strong common interest in enhanced options for community treatment," and "[i]njunctive relief prohibiting a discriminatory lack of community service options would, therefore, benefit all class members." 293 F.R.D. at 271. Here, Defendants' described patterns of conduct apply to all incarcerated and formerly incarcerated people with SMI who are either eligible for release and/or have been released into institutional/segregated settings, and for whom Defendants have failed to ensure that appropriate CBMHHSS are readily available to avoid prolonged incarceration or inappropriate discharges that leave class members at risk of institutionalization or unjustifiably segregated from the community. Certification under Rule 23(b)(2) is accordingly appropriate.

## **CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Class Certification.


Dated: February 8, 2023          DISABILITY RIGHTS NEW YORK
      New York, New York          Elizabeth Woods (elizabeth.woods@drny.org)
                                              Sabina Khan (sabina.khan@drny.org)
                                              279 Troy Road, Ste 9
                                              PMB 236
                                              Rensselaer, NY 12144
                                              (518) 432-7861

                                              The LEGAL AID SOCIETY
                                              Elena Landriscina (elandriscina@legal-aid.org)
                                              Stefen R. Short (sshort@legal-aid.org)
                                              Robert M. Quackenbush (rquackenbush@legal-aid.org)
                                              Sophia A. Gebreselassie (sgebreselassie@legal-aid.org)

199 Water Street, 6th Floor
New York, New York 10038
(212) 577-3530

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

*/s/ Crystal L. Parker*
Crystal L. Parker (cparker@paulweiss.com)
Walter G. Ricciardi (wricciardi@paulweiss.com)
Emily A. Vance (evance@paulweiss.com)
Chantalle Hanna (channa@paulweiss.com)
Samuel Margolis (smargolis@paulweiss.com)
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Named Plaintiffs and the Proposed
General Class, RTF Subclass, and Discharge Class*