# EXHIBIT 6



**NEW YORK STATE** | **Corrections and Community Supervision**

# COMMUNITY SUPERVISION HANDBOOK

## Questions and Answers

### Concerning

## Release and Community Supervision

DOCCS-00007085

## INTRODUCTION

### 1.    WHAT IS THE HISTORY OF PAROLE?

The former Division of Parole was established in the Executive Department on July 1, 1930. At that time, a full-time Board of Parole comprised of three members was created and paroling functions for all the State prisons were transferred from the Department of Corrections to the Division of Parole. The training schools, correctional institutions for mentally disabled prisoners, and the women's reformatory maintained separate parole systems until 1945 when parole was consolidated throughout the state.

In 1967, the New York State legislature passed legislation, which established authority for the Board of Parole to grant conditional release on parole to persons under definite sentences and to persons incarcerated in local reformatories. This Legislation also provided for the transfer of duties and functions of the New York City Parole Commission to the New York State Division of Parole.

On January 1, 1971, the Division of Parole was consolidated with the Department of Corrections to form the Department of Correctional Services (DOCS). This merger was based on the premise that a coordinated effort of institutional and community supervision of convicted offenders would be more effective in reducing recidivism. Parole remained part of DOCS until January 1, 1978, when the Division was once again placed in the Executive Department as a separate agency through the Parole Reform Act of 1977. In addition to reestablishing the Division as a separate agency, the 1977 legislation mandated the formal adoption of Parole Guidelines designed to structure the Parole Board's decisions concerning the minimum period of imprisonment and the granting or denying of parole release. In 1978, as a result of the Juvenile Offender Law, the Division of Parole also became responsible for the release decision for juveniles convicted of certain serious felonies and for their post-release community supervision.  On April 1, 2011, the Department of Correctional Services and the New York State Division of Parole were again merged to form the Department of Corrections and Community Supervision (DOCCS).

### 2.    WHAT IS COMMUNITY SUPERVISION WITHIN DOCCS?

The Department's Community Supervision staff members are responsible for the reintegration of inmates released from prison by action of the Parole Board, conditional release, release to a period of post-release supervision as well as those individuals sentenced directly to community supervision.

Facility assigned Offender Rehabilitation Coordinators are responsible for parole and post-release supervision orientation, identification of needs and targeted services, the pre-release application process under the Interstate Compact, completion of the pre-Board interview, development of the supervision plan, and community preparation and case assignment. Offender Rehabilitation Coordinators complete pre-Parole Board interviews and community preparation interviews for all inmates appearing before the Board of Parole (indeterminate sentences) and for all inmates released by operation of law (determinate sentences).   Offender Rehabilitation Coordinators assigned to the DOCCS facilities complete a core report known as the *"Parole Board Report"*, in preparation for all discretionary release appearances and case reviews. The *Parole Board Report* is a comprehensive case management report and evaluation of case-specific data that is utilized by the Board of Parole in the discretionary release decision-making process and by Field and Re-Entry Services staff during the community preparation investigation phase.    Offender

- 1 -

Rehabilitation Coordinators provide assistance to inmates with regard to completion of the COMPAS Risk and Needs Assessment instrument.

The Offender Rehabilitation Coordinators guide and counsel inmates during their period of incarceration in an effort to prepare them for eventual release to the community. The duties of an Offender Rehabilitation Coordinator (ORC) include: (1) helping inmates develop positive attitudes and behavior; (2) motivating their participation in appropriate programs; and (3) preparing inmates for their Parole Board interviews and eventual release to the community. The Parole Officer assigned to a bureau field office is responsible for the supervision of the parolee in the community setting. Parole Officers employed by DOCCS are peace officers who are trained and certified by the Municipal Police Training Council under the auspices of the NYS Division of Criminal Justice Services.

Community Supervision day to day operations are supported by DOCCS Administrative Services, Support Operations, and Research units. Counsel's Office provides legal assistance on Department (DOCCS) policy and authors and interprets legislation. Administrative Law Judges administer due process hearings for alleged parole violators. The Executive Clemency Bureau processes and investigates applications for pardons and commutations of sentence as well as applications for Certificates of Relief from Disabilities and Certificates of Good Conduct. The Office of Victim Assistance works with the New York State Crime Victims Board, local district attorneys and crime victims to help ensure that victims are aware of their rights with regard to the parole process and are afforded an opportunity to be heard in connection with the possible release of an inmate. The Department maintains contact with crime victims and, at their request, keeps them apprised of Parole Board interview dates, decisions, and release dates. The Office of Victim Assistance also coordinates Victim Impact statement meetings between victims and/or their survivors and the Board of Parole.

## 3.    WHAT IS THE BOARD OF PAROLE?

The Board of Parole is a quasi-judicial body possessing the powers and duties specified in Section 259-c of the New York State Executive Law. The Board consists of up to nineteen (19) members appointed by the Governor with the advice and consent of the Senate. The term of office for each member of the Board is normally six years. However, any member chosen to fill a vacancy other than by expiration of term is appointed for the remainder of the unexpired term of the member whom he or she is to succeed.

## 4.    WHAT ARE THE DUTIES OF THE BOARD OF PAROLE?

The duties of the Board of Parole include the following: (1) determining which inmates serving indeterminate sentences of imprisonment may be released to supervision, the date of release, and establishing conditions of post-release supervision; (2) mandating the conditions of release of any person who may be presumptively released or conditionally released under an indeterminate or determinate sentence of imprisonment; (3) establishing written procedures for use in making parole decisions; (4) revoking the parole, presumptive release, post-release supervision or conditional release of any parolee and authorizing the issuance of a warrant for the retaking of such person; and (5) reporting to the Governor, when requested, the facts, circumstances, histories, social, physical, psychiatric, and criminal records of offenders under consideration by the Governor for executive clemency. In addition, the Board of Parole can grant

- 2 -

medical parole to eligible inmates according to Chapter 56 of the Laws of 2009, Part J, amended Section 259-r and enacted Section 259-s of the Executive Law.

## 5.    WHAT IS THE JOB OF A PAROLE OFFICER (PO)?

Parole Officers have dual responsibilities. As peace officers, they protect the community and are responsible for monitoring parolee compliance with the conditions of community supervision. As caseworkers, they must also respond to each parolee's need for services, treatment, and assistance to increase the likelihood that the parolee will succeed in the community.  The Parole Officer's role is key to facilitating a successful completion of the sentence or period of community supervision.  Parole Officers work in the community and coordinate the delivery of services, help to motivate and guide parolees under supervision through evidence based practices, accepted casework techniques, and also report on parolee progress. If a parolee demonstrates behavior, which indicates an unwillingness to comply with the conditions of community supervision, the Parole Officer (PO) will intervene to promote the parolee's success and may initiate actions which may ultimately result in a revocation of release and return to prison.

No person shall be eligible for the position of Parole Officer (PO) who is under twenty-one years of age or who does not possess a baccalaureate degree  conferred  by  a  post-secondary institution  accredited  by an accrediting agency recognized by the United States office of education, or who is not fit physically, mentally and morally. The Parole Officer (PO) selection shall be based on definite qualifications as to character, ability and training with an emphasis on capacity and ability to provide a balanced approach to influencing human behavior and to use judgment in the enforcement of the rules and regulations of community supervision. Parole Officers shall be persons likely to exercise a strong and helpful influence upon persons placed under their supervision while retaining the goal of protecting society. -- Correction [§10(1)(2)].

## 6.    WHAT IS THE JOB OF AN OFFENDER REHABILITATION COORDINATOR (ORC)?

The Offender Rehabilitation Coordinators help inmates develop positive attitudes and behavior, arrange for their participation in programs for self-improvement, and prepare inmates for release to the community.  The Offender Rehabilitation Coordinator (ORC) is responsible for compiling all relevant case specific information, completing risk and needs assessments, and guiding the development of supervision plans for inmates who are granted parole or released to a period of post-release supervision by operation of law.  The ORC assists inmates throughout the period of incarceration and the ORC provides support and guidance during the Parole Board appearance and community preparation processes.  The ORC is primarily responsible for the preparation of the Parole Board Report.

## SECTION ONE - ISSUES REGARDING THE SERVING OF AN INMATE'S SENTENCE

## 1.    WHO IS RESPONSIBLE FOR SENTENCE TIME CALCULATIONS?

The Inmate Records Coordinator (IRC) at each DOCCS correctional facility is responsible for sentence time calculations. When an inmate is received by DOCCS, the IRC at the facility will determine the amount of pre-commitment jail time credit to be applied to their sentence and determine their earliest possible release date, merit and conditional release dates, if applicable, and the maximum expiration date of their sentence.

Confidential
DOCCS-00007088

## 2. TIME COMPUTATION QUESTIONS

Inmates – Inmates who have questions about their time computation must first address their questions and concerns with the Inmate Records Coordinator (IRC) at the correctional facility where they are incarcerated. If the issue is specific to the amount of sentence jail time being applied to their sentence, the inmate must write to the sentencing court or local jail where they were incarcerated and attempt to correct the matter by securing documentation that authenticates the amount of jail time credit that is to be applied to their sentence. Any information or documentation received by the inmate must be provided to the IRC for purposes of review and verification. If a change in the amount of sentence jail credit is warranted, the IRC will make the necessary changes and update the inmate's official time computation.

Parolees – Parolees who have questions or concerns about their pre-commitment jail time credit must also contact the sentencing court or local jail where they were incarcerated prior to their admission to DOCCS and attempt to correct the matter by securing documentation that authenticates the amount of sentence jail time credit that is to be applied to their sentence. Any information or documentation received by the parolee must be provided to the assigned Parole Officer (PO) for purposes of review and verification. If a change in the amount of sentence jail credit is warranted, the Parole Officer (PO) will provide the information to the appropriate Inmate Records Coordinator (IRC) for purposes of seeking a modification in the amount of pre-commitment jail time credit. Questions and concerns regarding general time computation issues should be referred to the DOCCS Office of Sentencing Review.

Inmates or parolees who have specific questions or concerns about the amount of parole jail time credit received, the established delinquency date, or the time assessment imposed following a revocation of community supervision, should contact the Supervising Offender Rehabilitation Coordinator (SORC) at the DOCCS facility where the inmate is presently confined or the Senior Parole Officer (SPO) assigned to the case when the inmate was last supervised in the community. The SORC or SPO will look into the matter and, if necessary, take appropriate action with regard to parole jail time credit, the date of delinquency, or the revocation time assessment.

## 3. WHAT IS AN INDETERMINATE SENTENCE AND A DETERMINATE SENTENCE?

An indeterminate sentence is one in which the sentencing court has established the minimum period of imprisonment and maximum term of imprisonment. After an inmate completes the minimum period of incarceration, they become eligible to appear before the Board of Parole for discretionary release consideration. If the Parole Board grants parole, the inmate will be subject to a period of community supervision until the completion of their sentence.

A determinate sentence, or "flat" sentence, is one in which the sentencing court is authorized to set a maximum term of incarceration in whole or half years. Under Chapter 1 of the Laws of 1998 (Jenna's Law), determinate sentences must also include a separate period of post-release supervision (see Section Two). The Board of Parole has no discretionary authority with regard to release on a determinate sentence. An inmate is released by operation of law and is required to serve a period of post-release supervision. The applicable period of post-release supervision is imposed by the sentencing court.

Confidential

## 4.    WHAT IS GOOD TIME?

Section 70.40 of the New York State Penal Law states that an inmate may earn time allowances (good time) off his or her maximum term of imprisonment for good institutional behavior. A good time allowance is granted by the Department (DOCCS) under Section 803 of the Correction Law.

## 5.    WHAT IS TEMPORARY RELEASE?  WHAT IS COMMUNITY SUPERVISION'S ROLE IN TEMPORARY RELEASE?

Temporary Release is a program under which eligible and approved inmates (participants) are granted the privilege of leaving correctional facilities to participate in work release, day reporting, furloughs, furloughs involving alcohol and substance abuse treatment, educational release, industrial training leave, community service leave, and leave of absence.  Information regarding the Temporary Release Program may be obtained from the Offender Rehabilitation Coordinator (ORC) or the Supervising Offender Rehabilitation Coordinator (SORC) at the facility of confinement.  The ORC and the SORC are in the best position to provide information regarding eligibility, the application process, and the requirements of the program.

The Temporary Release Committee (TRC) comprised of DOCCS personnel is responsible for determining which inmates will be recommended for participation in the program.  If approved for participation, the participant will be supervised by a Parole Officer in the community setting.

## 6.    WHAT ARE THE TYPES OF RELEASE FOR INMATES?

The following are ways inmates may be released from prison:

      A. Discretionary release by the Board of Parole (Initial or Reappearance Interviews)
      B. Merit Time Release
      C. Completion of the Shock Incarceration Program
      D. Presumptive Release
      E. Limited Credit Time Allowance
      F. Early Conditional Parole for Deportation Only/Conditional Parole for Deportation Only
      G. Medical Parole
      H. Conditional Release (CR)
      I.  Maximum expiration (reaching the maximum expiration date of sentence)

A. **Discretionary Release or "Parole"** – is a type of release granted by the Board of Parole as a matter of discretion after an inmate has served the statutory minimum of their indeterminate or mixed sentence.  An inmate's first appearance before the Board, where the earliest release date is the court-imposed minimum (parole eligibility date) is called an Initial appearance.  Any subsequent appearance is referred to as a Reappearance as it is past the parole eligibility date (PED).

B. **Merit Time** – Inmates serving sentences for certain non-violent crimes may receive merit time allowances against their sentences provided they have achieved defined programmatic objectives, have not committed any serious disciplinary infractions, and have not filed any frivolous lawsuits.  Merit time allowances enable indeterminately sentenced inmates to appear before the Board of Parole for possible early release on parole on their merit eligibility dates and certain determinately sentenced inmates may also receive merit

- 5 -

DOCCS-00007090

time allowances against their sentences allowing for early release to community supervision.

Merit Time Eligibility:

1. Crime and Sentence Criteria:
   a. An inmate cannot be presently serving a sentence for an A-I felony other than an A-I felony defined in Article 220 of the Penal Law or a violent felony offense (includes any sentence imposed for a violent felony offense in another state).
   b. An inmate cannot be presently serving a sentence for any of the following or any attempt thereof:
      i. Manslaughter 2nd;
      ii. Vehicular Manslaughter 1st or 2nd;
      iii. Criminally Negligent Homicide;
      iv. Incest;
      v. Any offense defined in Article 130 of the Penal Law (sex offenses);
      vi. Any offense defined in Article 263 of the Penal Law (use of a child in a sex performance); or
      vii. Aggravated Harassment of a DOCCS employee by an inmate.
   c. An inmate cannot be presently serving an indeterminate sentence of imprisonment authorized for an A-I felony other than an A-I felony defined in Article 220 of the Penal Law.
   d. An inmate must be serving a sentence of one year or more.

2. Disciplinary criteria:
   An inmate must not commit any serious infraction.  A serious disciplinary infraction is defined as behavior which results in criminal or disciplinary sanctions as follows:
   a. Any conviction for a State or Federal crime that was committed after the inmate was committed to DOCCS;
   b. A final disposition at a Tier II or Tier III hearing of violation of any of the rules as described in 7 NYCRR Section 270.2 or any violations for serious misconduct as described in the "Standards of Inmate Behavior" (inmate rule book);
   c. Receipt of a disciplinary sanction at a Tier III hearing which includes 60 or more days of SHU and/or Keeplock time, if the time served was 60 days or more on the particular penalty; or
   d. Receipt of any recommended loss of good time as a disciplinary sanction at a Tier III hearing.

3. Frivolous Lawsuit:
   An inmate must not have filed an action, proceeding, or claim against a State Agency Officer or employee that was found to be frivolous pursuant to:
   a. Section 8303-a of the Civil Practice Law and Rules, or
   b. Rule 11 of the Federal Rules of Civil Procedure.

4. Program criteria:
   a. An inmate must successfully perform and pursue his or her most recently assigned Earned Eligibility Plan or Program Plan; and
   b. Subsequent to the date of the most recently assigned Earned Eligibility Plan or Program Plan, the inmate must undertake and complete one of the following:

Confidential

    i.    Earn a General Equivalency Diploma (GED);
    ii.   Receive an alcohol and substance abuse treatment certificate;
   iii.   Receive a vocational trade certificate following at least six (6) months of programming in that program; or
   iv.   Perform 400 hours or more of service as part of a community work crew or outside assignment.

An Earned Eligibility Plan is a work and treatment program applicable to an inmate serving a minimum term of not more than eight years. A Program Plan is a work and treatment program applicable to an inmate serving a minimum term that exceeds eight years.

An inmate is not eligible for merit time if he or she failed to successfully complete the Shock Incarceration program for any reason other than an intervening circumstance beyond their control. Inmates who refuse the Shock Incarceration program at reception are deemed ineligible for merit time consideration for six (6) months from the refusal date or after the graduation date of the platoon in which the inmate would have joined while in the program.

An inmate is not eligible for merit time if he or she was removed from a temporary release program for any reason other than an intervening circumstance beyond their control.

An inmate is also not eligible for merit time if placed in a relapse program.

5. Effect on the Sentence:

   a.  Indeterminate sentences: the merit time allowance is one-third of the minimum term or period imposed by the court for an inmate convicted of an A-I felony under Article 220 of the Penal Law and one-sixth of the minimum term or period imposed by the court for an inmate convicted of any other eligible offense. An inmate serving a sentence for any A-II through E felony drug offense may earn supplemental merit time in the amount of an additional one-sixth of the minimum portion of the sentence imposed for the drug felony if he or she has either:
      i.  Completed two or more of the four possible merit program objectives listed in 4, b, i – iv above; or
     ii.  Completed one of the four program objectives and also successfully maintained employment in a work release program or other continuous temporary release program for a period of not less than three months.

   b.  Determinate sentences: the merit time allowance is an additional one-seventh of the determinate term imposed by the court for an eligible offense.

C. **Shock Incarceration** – Shock incarceration is a program under the jurisdiction of the Department (DOCCS) in which selected, eligible inmates participate in a structured six-month program at a Shock Incarceration facility. Generally, participants who successfully complete the program are issued a Certificate of Earned Eligibility and are immediately eligible for release consideration prior to completing the minimum period of the court-imposed sentence.

Confidential

DOCCS-00007092

D. **Presumptive Release** – In 2003, Section 806 of the Correction Law was amended to enable the Department to grant Presumptive Release to an eligible inmate upon serving a prescribed term of their indeterminate sentence. If eligible, inmates may be entitled to Presumptive Release at the expiration of five-sixths of the minimum term or aggregate minimum term.

To be eligible for Presumptive Release inmates must meet the criteria for Merit Time as noted above, and may not be <u>currently serving</u> or <u>previously convicted</u> of any of the following:

- An A-I felony offense
- A Penal Law Sec. 70.02 violent felony offense
- Manslaughter 2nd degree
- Vehicular Manslaughter 1st and 2nd degree
- Criminal Negligent Homicide
- Penal Law Article 130 or 263 offenses
- Incest

Presumptive Release may be withheld if, while incarcerated, an inmate commits a serious disciplinary infraction, files a frivolous lawsuit or had sanctions imposed against them under Rule 11 of the Federal Rules of Civil Procedure for litigation they have commenced against the State or its employees.

The Department of Corrections and Community Supervision (DOCCS), under the authority of the Commissioner, is responsible for granting approval for Presumptive Release. Although the Board of Parole is not the releasing authority, the Board is required to impose conditions of release. Inmates granted Presumptive Release will be under the supervision and jurisdiction of the Department until they are discharged from their sentence.

E. **Limited Credit Time Allowance (LCTA)** – Certain inmates serving either a determinate or indeterminate sentence for a crime that is not a Merit eligible offense as defined in Correction Law Section 803, may be eligible to earn a six-month Limited Credit Time Allowance (LCTA) against their sentences pursuant to Correction Law Section 803-B, provided that they have achieved certain significant programmatic accomplishments, have not committed a serious disciplinary infraction or maintained an overall poor institutional record, and have not filed any frivolous lawsuits. In the case of an inmate serving a sentence with a maximum term of LIFE for an eligible A-1 felony, the six-month LCTA benefit is subtracted from the minimum period to establish the inmate's LCTA date. In the case of all other LCTA eligible offenses, the LCTA benefit is subtracted from the conditional release date to establish the inmate's LCTA date.

To be eligible for LCTA, an inmate must <u>NOT</u> be serving a sentence for any of the following offenses:

- Murder 1st degree
- An offense defined in Article 130 of the Penal Law
- An Attempt or Conspiracy to commit such offense

Confidential

DOCCS-00007093

Qualifying Offenses are as follows:

- Indeterminate for a non-drug A-1 felony
- Determinate or indeterminate sentence for a violent felony offense as defined in subdivision 1 of Penal Law 70.02
- Determinate or indeterminate sentence for an offense defined in Article 125 of the Penal Law

Program criteria: an inmate must successfully pursue the recommended Earned Eligibility Plan (EEP) and Program Plan and must successfully complete at least one of twelve significant program accomplishments.

One or more of the following must be completed during the current period of incarceration:

1. A minimum of two (2) years successful participation in college programming to include of an Associates or Bachelor's Degree or earning a minimum of twenty-four (24) credits and a minimum of four (4) semesters participation.

2. Successful completion of a Masters of Professional Studies Degree (Sing Sing CF).

3. Two (2) years successful participation as an Inmate Program Associate (IPA).

4. Receipt of certification from the NYS Department of Labor for successful participation in an apprenticeship program.

5. Two (2) years successful work as an Inmate Hospice Aide.

6. Two (2) years successful participation in the Puppies Behind Bars Program.

7. Receipt of certification as an Optician from the American Board of Opticianry with two (2) years successful work in the Division of Correctional Industries Optical Program.

8. Receipt of an Asbestos Handling Certificate from the Department of Labor with a minimum of eighteen (18) months of work in the Division of Correctional Industries Asbestos Abatement Program as a Hazardous Materials Removal Worker or a Hazardous Materials Removal Group Leader.

9. Successful completion of the course curriculum and passing the minimum competency screening process performance exam for Sign Language Interpreter and a minimum of one (1) year of work as a Sign Language Interpreter for deaf inmates.

10. Two (2) consecutive years of participation in the Vocational Culinary Arts Program/Food Service, earning of a Culinary Arts Program/Food Service job title, a passing grade on the National Restaurant Association's ServSafe examination, and the receipt of a ServSafe Certificate.

Confidential

11. Successful completion of the 490 hour training program in the Department of Motor Vehicles Call Center, work for an additional period of at least twenty one (21) months in an Industries Worker assignment, and earning of the job title, Customer Service Representative.

12. Successful completion of a minimum of 800 hours training in the Food Production Center in one of the seven established job titles, earning of a Food Production Center program certificate, and work for an additional period of at least eighteen (18) months at the Food Production Center.

Inmates granted release under LCTA will be under the supervision and jurisdiction of the Department until they are discharged from their sentence.

F. **Early Conditional Parole for Deportation Only (ECPDO) and Conditional Parole for Deportation Only (CPDO)** – Section 259-I (2)(d)(i) of the New York State Executive Law permits "Conditional Parole for Deportation Only" (CPDO), which is a type of release decision granted by the Board of Parole to an inmate who has been issued a Final Order of Deportation by an Immigration and Customs Enforcement (ICE) Judge, and who has waived or exhausted their right to appeal the ICE Judge's order.

Inmates sentenced to both determinate and indeterminate terms of incarceration are eligible for ECPDO/CPDO, provided that they also meet the following criteria:

1. ECPDO Eligibility:
   - May not be convicted of an A-1 felony (except for Penal Law Article 220 drug felony)
   - May not be convicted of a Violent Felony Offense as defined in Penal Law 70.02
   - Must have served at least one-half (1/2) of the minimum indeterminate sentence or one-half (1/2) of the determinate CR

2. CPDO Eligibility:
   - Inmates are eligible on or after they have reached their parole eligibility or conditional release date
   - There are no disqualifying crimes

3. The Board may:
   - Deny release and grant CPDO
   - Grant release
   - Deny release and deny CPDO

An inmate or their attorney who believes they meet the criteria for ECPDO eligibility should contact the facility SORC/ORC who will verify their eligibility and calendar them for a Board appearance.

G. **Medical Parole** – Chapter 56 of the Laws of 2009, Part J, amended Section 259-r and enacted Section 259-s of the Executive Law to allow for medical parole for those inmates suffering both terminal and significant and permanent non-terminal condition, disease or syndrome, as well as inmates who are cognitively incapable of presenting a danger to society. Under these sections of the law, the Board of Parole may grant an eligible inmate

Confidential

release to medical parole for a period of six (6) months provided the inmate is not serving a sentence for Murder 1st or attempt or conspiracy to commit Murder 1st.

An inmate must have served one-half (1/2) of the minimum period of an indeterminate sentence or one-half (1/2) of their conditional release date for a determinate sentence if they are serving a sentence for:

- Murder 2nd
- Manslaughter 1st
- Any offense as defined in Article 130 of the Penal Law
- An attempt to commit any of these offenses

Such release shall be granted only after the Board considers whether, in light of the inmate's medical condition, there is a reasonable probability that the inmate if released, will live and remain at liberty without violating the law, and that such release is incompatible with the welfare of society and will not so deprecate the seriousness of the crime as to undermine respect for the law.

At any time during an inmate's sentence, the inmate or someone acting on their behalf, or a Department employee may make a request to be considered for medical parole.

H. **Conditional Release (CR)** – All inmates, except those serving Life sentences, have a conditional release date which is equal to either one-third (1/3) off their maximum sentence for indeterminate sentences and one-seventh (1/7) off their maximum sentence for determinate sentences. A Time Allowance Committee (TAC) will review an inmate's good time approximately four (4) months prior to the CR date at which time the CR date will either be certified or changed based upon whether there is a loss of good time.

Conditional Release is a statutory type of release that the Board of Parole does not have discretion to grant or deny. The following conditions must be met in order to be eligible for Conditional Release:

- An inmate must apply for conditional release; and
- An inmate must agree in writing to abide by the conditions of community supervision until the expiration of their maximum term, or post-release supervision maximum expiration date.

I. **Maximum Expiration** – Inmates who reach the court imposed maximum expiration date of their sentence while incarcerated will be released from prison and discharged. Discharge upon reaching the maximum expiration of sentence may occur in response to an inmate's loss of all available good time or in response to an inmate's refusal to agree to the terms and conditions of conditional release.

Parole violators who receive a time assessment of "Hold to Maximum Expiration" will be discharged at the expiration of their sentence unless they are eligible for good time and can be released upon reaching their conditional release (CR) date.

Parolees under supervision who reach the maximum expiration of their sentence to parole supervision will be discharged from their sentence.

Confidential

**SECTION TWO - PAROLE AND PAROLE BOARD ACTIVITIES IN STATE CORRECTIONAL FACILITIES**

**1.    DOES AN INMATE HAVE TO SUBMIT AN APPLICATION FOR PAROLE BOARD RELEASE CONSIDERATION?**

An inmate does not have to file an application for parole consideration.  An Offender Rehabilitation Coordinator (ORC) or Supervising Rehabilitation Coordinator (SORC) will schedule an interview with the inmate approximately four (4) months prior to the inmate's earliest release eligibility date. There is no application requirement for parole consideration.   Interviews before a panel of the Board of Parole are scheduled based on the inmate's earliest release date.

**2.    HOW CAN AN INMATE PREPARE FOR THE PAROLE BOARD INTERVIEW?**

Approximately four (4) months prior to the scheduled Parole Board appearance/review, an ORC/SORC will interview an inmate in order to prepare the *"Parole Board Report"* for the appearance or case review before a panel of the Board of Parole.  This report will include a description of the inmate's involvement in the instant offense, legal history, and a description of the inmate's overall institutional adjustment and program participation.  Inmates may wish to bring copies of any program certificates of completion to the interview.

The report will also contain information about an inmate's plans including where they want to live and work.  It is helpful if an inmate has a letter of reasonable assurance to include in the case folder indicating a prospective job offer upon being released.  Inmates may also request that any letters of support be made available in the case folder for review by the panel of the Parole Board. It is also encouraged that the inmate prepare a parole release packet for the Parole Board members to review at the time of the interview.  The packet of documents should be given to the ORC/SORC well in advance of the interview to ensure that the information is available for review by the panel.   These packets typically contain information concerning an inmate's program participation and accomplishments while incarcerated and reasonable assurance of housing and employment.

Inmates may seek the guidance of the ORC/SORC in preparing for their Board appearance and may also seek assistance with regard to the interview and release processes.

Inmates should be prepared to discuss their involvement in the instant offense and also be prepared to answer questions about their prior criminal activity, custodial record, program participation, future goals and release plans.

**3.    WHAT IS THE PURPOSE OF THE INITIAL PAROLE BOARD APPEARANCE?**

Inmates are scheduled for an Initial Parole Board appearance approximately four (4) months prior to the expiration of their court imposed minimum, also known as the parole eligibility date (PED). For mixed cases (indeterminate and determinate sentences), the parole eligibility date is also the conditional release (CR) date, however, in such cases the Board of Parole has discretionary authority to grant release.  If the Board grants release, this is known as an "open date." This date is contingent upon the inmate receiving an approved residence in accordance with established

- 12 -

DOCCS-00007097

residency restrictions and local laws. The open date may not be established in advance of the parole eligibility date (PED), unless the inmate has received a Merit certificate and has also been approved for Merit release by the Parole Board.

## 4.    WHO WILL BE PRESENT AT THE PAROLE BOARD INTERVIEW?

Discretionary parole interviews are conducted by a panel of two or three members of the Parole Board. Facility staff including an ORC/SORC and a stenographer are also present for the interview by the panel. The stenographer will record what is said during the interview and an inmate may later request a copy of the transcript.

## 5.    MAY AN INMATE APPEAR BEFORE THE PAROLE BOARD FOR A RELEASE INTERVIEW WITH AN ATTORNEY?

No. Counsel may not be present during discretionary release interviews.

## 6.    WHAT IF FAMILY, FRIENDS, EMPLOYERS OR OTHER INDIVIDUALS WISH TO SEND LETTERS IN SUPPORT OF AN INMATE'S RELEASE FOR REVIEW BY THE PAROLE BOARD?

All letters of support should be sent to the ORC at the correctional facility in which the inmate is confined. Additionally, any written statement the inmate wishes to make should be submitted to the ORC in advance of their Parole Board interview. Letters and documents received by ORC will be placed in the case folder and provided to the Parole Board at the time of appearance. In addition, letters in support or opposition can be submitted online.

Letters should not be sent directly to the Board of Parole. The folders are maintained at the facility and it is important that any documents submitted on an inmate's behalf be directed to the attention of the SORC. Sending materials to the SORC is the best way to ensure that all letters, documents, and statements will be placed in the case folder for the Board's review.

**Letters should be addressed as:**
Correctional Facility Name
Supervising Offender Rehabilitation Coordinator (SORC)
Correctional Facility Mailing Address

## 7.    WHAT ASSISTANCE IS AVAILABLE IN PLANNING FOR RELEASE IF AN INMATE HAS SPECIAL NEEDS?

ORC's are responsible for making case-specific program and treatment recommendations, identifying special needs, referring inmates to community-based services, and initiating the community preparation investigation process. ORC's, PO's, and Re-entry Services staff work together to develop an appropriate supervision plan that targets special needs and confirms the availability of community-based resources. ORC's also provide assistance and support with applications for public benefits and emergency assistance. Applications for public benefits must be supported by medical evidence and/or appropriate documentation of a disability, impairment, or qualifying condition or illness. It is important that the inmate fully participate in the development of the release plan so that their transition from prison to the community is seamless and consistent with the requirements of release.

- 13 -

8.    **WHAT IS CONTAINED IN THE PAROLE BOARD REPORT?**

The *Parole Board Report* reflects the following information:

- Crimes of conviction and sentence (criminal history)
- Description of the present offense and prior legal history
- Personal characteristics: identification information
- Inmate statement: comments and attitude regarding the offense which resulted in the conviction or adjudication, as well as statements regarding the legal history
- Institutional adjustment information: a summary of program and treatment participation, as well as disciplinary history
- Release plan: place of residence, employment, educational and treatment plans upon release

9.    **IS A RISK AND NEEDS ASSESSMENT COMPLETED FOR THE PAROLE BOARD APPEARANCE?**

Yes.  Indeterminately sentenced inmates undergo a risk and needs assessment prior to the interview before a panel of the Board of Parole and determinately sentenced inmates also undergo a risk and needs assessment prior to the case review by a panel of the Board of Parole. The "Re-Entry" risk and needs assessment is completed at approximately the same time the inmate participates in the pre-Parole Board interview with the ORC or SORC.  The risk and needs assessment instrument utilized by the Department (DOCCS) is used to support the re-entry process and decision making regarding the supervision level, treatment and program participation, and case-specific interventions.  The risk and needs assessment is particularly important to the development of the supervision plan.

Following release, parolees are subject to reassessments performed by the Parole Officer (PO) and the risk and needs information is used to guide and modify, as necessary, the case supervision plan throughout the period of community supervision.

10.    **DO VICTIMS HAVE ANY INPUT INTO THE PAROLE BOARD'S DECISION?**

Yes. It has always been the policy of the Board of Parole to consider any statement made by a victim or representative of the victim as part of the parole release decision-making process. In fact, legislation adopted in 1985 mandated that victim impact statements be considered by the Board of Parole.

Victims and/or survivors of certain violent crimes may make requests in accordance with the Board of Parole procedures for the purpose of personally submitting their victim impact statements to a member of the Parole Board. The personal meeting provides a setting that permits confidentiality in a suitable environment.  A transcript of this meeting is then provided to the panel making the release determination.

In lieu of meeting with a Parole Board member, victims or representative are also allowed to submit their sentiments regarding the release of an inmate by written statement, audiotape or videotape. Any and all information submitted or provided by a victim is always afforded the utmost confidentiality.

Confidential

New York State Criminal Procedure Law §440.50 provides that upon the request of the victim of a crime that is defined in section 70.02 of the Penal Law as a violent felony offense or a felony defined in Article in 125 of the Penal Law, the victim may submit a written, audiotaped, or videotaped victim impact statement to the Board of Parole. The victim also has the right to meet personally with a member of the Board of Parole to provide a victim impact statement prior to each parole release interview between the members of the Board of Parole and the inmate. Criminal Procedure Law §380.50(4)(5) provides that a crime victim may submit a written application to be informed of an inmate's parole, conditional release, release to post-release supervision, or transfer of custody to the Office of Mental Health pursuant to Article 10 of the Mental Hygiene Law. The victim will also be informed of any discharge, parole, conditional release, release to a period of post-release supervision, or release from an Office of Mental Health facility under Article 10 of the Mental Hygiene Law.

## 11.  WHEN AND HOW DOES THE PAROLE BOARD INFORM AN INMATE OF ITS INTERVIEW DECISION?

A written notification of the release decision will be given to the inmate within two weeks of completion of the interview before a panel of the Board of Parole. If approved for release, the Parole Board Release Decision Notice will identify the release date and the conditions of supervision. If denied release, this form will detail the reasons for the denial and the form will also note the next available date of eligibility for discretionary release consideration.

## 12.  IF THE BOARD OF PAROLE GRANTS RELEASE, WHAT HAPPENS NEXT?

If granted discretionary release, the Board of Parole will establish an "open date" and the proposed residence, employment program, and any other community-based programs will be subject to investigation by the assigned PO working in collaboration with the ORC/SORC.

## 13.  WHAT IS AN OPEN DATE?

An "open date" is a parole status granted by the Board of Parole. To receive an open date, an inmate must be serving an indeterminate sentence. In order to be released to community supervision, the Department (DOCCS) must verify that the inmate has a suitable place to live and employment or other appropriate means of financial support. Inmates are encouraged to participate in the development of the supervision plan and it is important that they fully understand the requirements of supervision and that they are fully aware of the need to comply with the conditions of release as established by the Board of Parole and their Parole Officer.

## 14.  IF AN OPEN DATE IS GRANTED, WHEN WILL THE INMATE BE RELEASED?

An open date is the earliest possible release date. The approval occurs after the PO has completed an investigation of the release program and submitted the results of the community preparation investigation to the SPO and the Bureau Chief (BC). The assigned field team must approve the release program (supervision plan) before an inmate can be released. The ORC will process the release upon being notified of the approved supervision plan. The supervision plan typically consists of the residence verification, employment confirmation or reasonable assurance of employment, educational or vocational training program, chemical dependence treatment, or other case-specific treatment need.

Confidential
DOCCS-00007100

**15.    WHAT HAPPENS IF AN INMATE IS DENIED RELEASE?**

If denied release following the Parole Board interview, an inmate will receive a copy of the Parole Board Decision Notice that will contain the reasons for the denial. The Board of Parole will set a date for the reappearance. The reappearance date cannot exceed twenty-four (24) months from the date of the current appearance. The inmate may submit an administrative appeal from the Parole Board's decision. The ORC can assist with information regarding the appeal process and requirements related to the submission of the appropriate documentation.

**16.    WHAT IS COMMUNITY PREPARATION AND AN INMATE'S ROLE IN IT?**

Where an inmate will live, work or go to school is extremely important.  It is essential that they take an active role in the development of their release plan (supervision plan). Prior to their scheduled release date, they will be asked to provide Department (DOCCS) staff with information about where they plan to live and work in the community. This is an important matter that an inmate should be planning for long before the anticipated release date.  The information provided by the inmate will be given to a PO who will investigate the proposed residence or housing program, employment, vocational or educational programs, and treatment programs. If the release plans change or require modification, the inmate must immediately contact the ORC.  If an inmate is having difficulty with identifying a potential residence or is in need of emergency housing assistance upon release, the ORC and PO can assist the inmate by developing a housing plan that may include temporary placement in a shelter, halfway house, or a transitional residential facility.

**17.    HOW CAN AN INMATE LOOK FOR EMPLOYMENT WHILE STILL IN THE FACILITY?**

An important part of the supervision plan is employment. Independently, inmates should do the following:

- Contact former and prospective employers
- Ask for help from relatives and friends
- Contact ex-offender resource groups
- Write letters to businesses and other organizations where they plan to live
- Utilize all pre-release resources and information available at the correctional facility

**18.    CAN COMMUNITY SUPERVISION HELP A PAROLEE FIND A PROGRAM?**

The Department wants all parolees to complete their period of supervision or post-release supervision successfully, that is, with no new arrests, rule violations, or behavior that would compromise their safety or the safety of others. The Department expects that parolees will gradually become more and more self-sufficient, responsible, and independent. Parolees may require assistance to break the cycle of addiction or to address their history of chemical dependence, control their anger, manage personal finances, pursue education, obtain employment, and pay debts such as child support, restitution and other mandated fees. Parolees may be required to attend a treatment program or participate in other targeted services as a condition of community supervision or period of post-release supervision. The Department's Re-entry Services Unit provides assistance with securing such services, and the PO can also help the parolee access these types of services in the community.

Confidential

**19.  IF AN INMATE HAS AN OUTSTANDING WARRANT, CAN THEY STILL BE CONSIDERED FOR PAROLE RELEASE?**

Yes.  If the Board believes that discretionary release is appropriate, an inmate will receive an "open date" decision. The jurisdiction responsible for issuing the warrant will be notified that the inmate is scheduled for release, and arrangements will be made so that the warrant may be enforced once released.  If the warrant is recalled or if the charges are dismissed, the inmate would be released to the community as soon as their release program (supervision plan) is approved.  If the warrant or commitment detainer is eventually vacated, removed or lifted for any reason, the parolee is expected to report to their assigned PO and remain under the supervision of DOCCS until the expiration of their sentence or period of post-release supervision.

**20.  WHAT IS EARNED ELIGIBILITY?**

The Commissioner of the Department of Corrections and Community Supervision or his or her designee, may issue a Certificate of Earned Eligibility to an inmate who has shown progress in an assigned institutional program. The Parole Board will review this as part of the institutional record. The possession of an Earned Eligibility Certificate is viewed as a positive factor in release consideration.

**21.  WHAT IS A RESCISSION HEARING?**

Once an inmate is granted a release date and is in community preparation status (having been granted a release date but prior to actual release), the ORC and other DOCCS staff, if necessary, must review any serious violation of facility rules including escape or absconding from a temporary release program or change in their mental condition that would indicate that their release at the present time would not be in their best interest or that of society. The ORC and other DOCCS staff, if necessary, must also review any new information not available to the Board at the time of the interview.  After completing an investigation, the SORC may issue a temporary suspension of an inmate's parole release date. If a temporary suspension is issued, the SORC and ORC will forward a report to the Board of Parole. A Board member will then review the report and decide whether or not a rescission hearing should be conducted by the Parole Board to reconsider the earlier Board decision.

If a rescission hearing is ordered, the inmate will be provided with a written notice of the alleged violations of behavior or changes in status in advance of the hearing.  At the hearing, evidence will be presented by the SORC or ORC and the inmate will have an opportunity to present witnesses and the documentary evidence, as well as confront and cross-examine adverse witnesses.  Although there is no provision for court-appointed counsel at this time, inmates have a right to retain counsel to represent them at the hearing at their own cost. The burden of proof at such a hearing is upon the Department. The Board of Parole will prepare a written decision that either rescinds the release decision or restores the release date previously granted. If the release date is rescinded, the Parole Board decision will indicate the evidence relied upon, the reasons for rescission and a reappearance date will be established.

**SECTION THREE – COMMUNITY SUPERVISION**

Confidential

1.    **WHAT HAPPENS IF AN INMATE IS RELEASED AND CANNOT FIND A PERMANENT RESIDENCE?**

The Department may assist in locating programs that may be available to provide a temporary place to live if a parolee becomes homeless, resides in an unstable living situation, or needs a more structured environment. Programs of this nature may also provide other services, such as substance abuse treatment, job development, and employment training.

The PO must approve any residence where the inmate or the parolee proposes to reside and will conduct an investigation of that residence to make sure it is a suitable place, does not violate any of the conditions of release, and will not impede the parolee's ability to successfully complete parole or the period of post-release supervision. Placement in emergency housing or a shelter is not a preferred residence program, and so, the PO will help identify possible residences with family or friends if the inmate has nowhere to live. An inmate or parolee may also be referred to programs that may be able to assist in finding housing or emergency residential services.

2.    **AFTER AN INMATE IS RELEASED, TO WHOM AND WHEN DO THEY REPORT?**

Upon release, unless otherwise instructed, a parolee must report in person with their Certificate of Release agreement within twenty-four (24) hours to the bureau or reporting station listed on their release agreement. The parolee's compliance with the arrival report is extremely important. If the PO who will supervise the parolee is not available at this time, a PO on duty will conduct the arrival report and make arrangements with the parolee to return to the office for the first full interview with their assigned PO. During the arrival report, the rules of community supervision and the parolee's responsibilities under supervision will be carefully explained. Special conditions will also be thoroughly discussed. The parolee should ask any questions they might have about these rules and conditions. It is very important that they completely understand their reporting requirements and overall responsibilities. The PO will examine the release agreement, discuss the residence and programs with the parolee, establish a reporting schedule, and confirm the date and time of the next report.

3.    **WHAT ARE THE RESPONSIBILITIES OF A PO?**

The Parole Officer's job is to assist the parolee with the transition to community supervision, to monitor compliance with the conditions of release, and to ensure the safety of crime victims and the general public. When released from a correctional facility, the parolee may experience difficulties with the transition from prison to residing in the community. Parolees may have trouble finding a job or a place to live. Parolees may also have difficulty re-establishing relationships with family and friends, or abstaining from the use of drugs or alcohol. The PO's job is to counsel, refer a parolee to appropriate services, and to assist in developing positive ways of solving problems to promote the likelihood of the parolee's success under supervision. The type of assistance to be provided will depend on the needs of the parolee and the parolee's willingness to comply with the efforts of the PO. The PO is also responsible for ensuring that individuals under community supervision are obeying the laws of society and the rules of supervision. A PO is statutorily authorized to conduct investigations, search parolees, apprehend parole absconders, and to make arrests.

Confidential                                                                                                          DOCCS-00007103

## 4.    WHAT ARE THE GENERAL CONDITIONS OF COMMUNITY SUPERVISION?

The conditions of supervision are rules that must be followed while under community supervision. Conditions are furnished in writing to the parolee and are explained by the ORC and the PO. Parolees should ask their ORC or PO if they have any questions about the conditions of release. Parolees are required to sign the conditions to acknowledge that they have received a copy, that they understand the conditions of release and understand that they are required to comply with each condition imposed. If interpreter or translation services are required in order to communicate with the PO, including understanding the conditions of supervision, such services and assistance will be provided.

The general conditions of release as per Title 9 NYCRR §8003.2 are:

1. I will proceed directly to the area to which I have been released and, within twenty-four (24) hours of my release, make my arrival report to the Community Supervision Office indicated on my release agreement, unless other instructions are designated on the agreement.
2. I will make office and/or written reports as directed.
3. I will not leave the State of New York or any other state to which I am released or transferred, or any area defined in writing by my Parole Officer without permission.
4. I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence, property. I will discuss any proposed changes in my residence, employment, or program status with my Parole Officer. I understand that I have an immediate and continuing duty to notify my Parole Officer of any changes in my residence, employment, or program status when circumstances beyond my control make prior discussion impossible.
5. I will reply promptly, fully, and truthfully to any inquiry of or communication by my Parole Officer or other representative of the Department of Corrections and Community Supervision.
6. I will notify my Parole Officer immediately any time I am in contact with or arrested by any law enforcement agency. I understand that I have a continuing duty to notify my Parole Officer of such contact or arrest.
7. I will not be in the company of or fraternize with any person I know to have a criminal record or whom I know to have been adjudicated a Youthful Offender except for accidental encounters in public places, work, school, or in any other instance without the permission of my Parole Officer.
8. I will not behave in such a manner as to violate the provisions of any law to which I am subject which provide for a penalty of imprisonment, nor will my behavior threaten the safety or well-being of myself or others.
9. I will not own, possess, or purchase any shotgun, rifle, or firearm of any type without the written permission of my Parole Officer. I will not own, possess, or purchase any deadly weapon as defined in the Penal Law or any dangerous knife, dirk, razor, stiletto, or imitation pistol. In addition, I will not own, possess or purchase any instrument readily capable of causing physical injury without a satisfactory explanation for ownership, possession or purchase.
10. In the event that I leave the jurisdiction of the State of New York, I hereby waive my right to resist extradition to the State of New York from any state in the Union and from any territory or country outside the United States. This waiver shall be in full force and effect until I am discharged from Parole or Conditional Release. I fully understand that

Confidential                                                              DOCCS-00007104

I have the right under the Constitution of the United States and under law to contest any effort to extradite me from another state and return me to New York, and I freely and knowingly waive this right as a condition of my Parole or Conditional Release.

11. I will not use or possess any drug paraphernalia or use or possess any controlled substance without proper medical authorization.

12. Special Conditions: (as specified by the Board of Parole, Parole Officer or other authorized representative of DOCCS).

13. I will fully comply with the instructions of my Parole Officer and obey such special additional written conditions as he or she, a member of the Board of Parole, or an authorized representative of the Department of Corrections and Community Supervision, may impose.

## 5.    WHAT ARE SPECIAL CONDITIONS OF SUPERVISION?

Although the general conditions of supervision apply to all parolees under community supervision, the Board of Parole or the PO may impose additional conditions that apply specifically to a parolee and their situation.   The ORC will make recommendations regarding case-specific special conditions of release for consideration by the Board of Parole and the PO prior to release.  Special conditions of release may include a curfew, a prohibition against drinking or associating with specific individuals, or a prohibition against being in a specific area.  A special condition may also be imposed regarding residence requirements intended to provide for the safety of a crime victim or a vulnerable person or population.  If the Board of Parole imposes a special condition, only the Board can remove it. If the PO imposes a special condition, then he or she can remove it with the approval of the SPO.  Special conditions, whether imposed by the Board of Parole or a PO, must be obeyed in the same manner as the general conditions of supervision.

## 6.    WHAT DOES THE DEPARTMENT (DOCCS) DO ABOUT DOMESTIC VIOLENCE?

Parolees under community supervision, should be aware that any act of domestic violence will not be tolerated. Parole Officers are trained to identify, investigate and respond to incidences of domestic violence and allegations of domestic violence involving parolees. If a parolee becomes involved in domestic violence, the PO will hold them accountable, as this behavior is both a crime and a violation of the conditions of release.  If, while under supervision, a parolee is a victim of domestic violence, the parolee should seek immediate assistance from their PO.

The Department (DOCCS) provides support, assistance and service referrals to victims and survivors of domestic violence.

## 7.    WHAT IS THE SEX OFFENDER REGISTRATION ACT AND DOES IT APPLY TO PAROLEES?

New York State's Sex Offender Registration Act applies to individuals who committed certain sex offenses on or after 1-21-96. It also applies to individuals who committed an offense before 1-21-96 if that individual was still serving a sentence of probation, parole or incarceration for a specified offense when the law went into effect.

If a parolee was convicted of a registerable crime, the parolee will be instructed to sign a Sex Offender Registration Form. This form explains the parolee's responsibility to register their address with the Division of Criminal Justice Services (DCJS) on an annual basis, to provide

- 20 -

written notice of any change of address within ten (10) days of the change, and to comply with any other obligations under the law that pertain to the parolee.

A Court will determine the risk level under section 168-d of the Correction Law, which controls the amount of information that can be made available about a parolee. The Court's designation also determines the length of time and how often they must register as a sex offender.

If a parolee moves to another state, they may be required to register as a sex offender in the other state. Their duties to New York State under the Sex Offender Registration Act (SORA) continue.

## 8.    WHAT ARE SEX OFFENDER RISK LEVELS AND DESIGNATIONS, AND WHAT DO THEY MEAN?

If a parolee has been convicted of a registerable crime, one of the following risk levels will be assigned:

- Level 1 – low risk of repeat offense
- Level 2 – moderate risk of repeat offense
- Level 3 – high risk of repeat offense and a threat to public safety exists

If the assigned risk Level is 1, confirmation of the registration is available to the public. If assigned a risk level of 2 or 3, all registration information including the address of the registrant is available to the public.

Additionally, the Court is responsible for making the determination regarding the designation of a sexual predator, a sexually violent offender, or a predicate sex offender. The Court will advise the registrant regarding how long they are required to register.

If assigned a risk Level 3 or designated a sexual predator, the registrant must personally verify their address every ninety (90) days with the local law enforcement agency with jurisdiction over their place of residence.

## 9.    WHAT HAPPENS IF A PAROLEE FAILS TO REGISTER OR VERIFY THEIR ADDRESS OR OTHER REQUIRED INFORMATION WITH THE SEX OFFENDER REGISTRY?

Failure to register or verify a new address with the Registry can result in new criminal charges and a conviction for a Class E felony.   A second or subsequent offense will result in a conviction for a Class D felony.  Failure to register or verify may also be the basis for revoking a parolee's release status.

## 10.    ARE THERE ANY OTHER REQUIREMENTS SPECIFICALLY FOR SEX OFFENDERS?

The Sexual Assault Reform Act (SARA) applies to certain sex offender cases. A mandatory condition of release applies if the parolee is a Level 3 sex offender or was released to the community on or after February 1, 2001 and is serving one or more sentences for a specified sex offense, and the victim was under the age of 18 at the time of the offense. The parolee will not be allowed to live near or enter upon any school grounds or any other facilities or institutions primarily used for the care and treatment of persons under the age of 18, unless they meet certain criteria and have the written permission of their PO.

Confidential    DOCCS-00007106

11.    **IF SERVING A SENTENCE FOR A SEX OFFENDER REGISTRY CRIME, HOW DOES A PAROLEE KNOW IF THEIR ELECTRONIC SECURITY AND TARGETING OF ONLINE PREDATORS (E-STOP) ACT MANDATORY CONDITION WILL APPLY AND IF IT DOES, WHAT WILL THE IMPACT BE?**

Parolees are eligible for the E-STOP condition if currently serving a sentence for a Sex Offender Registry crime and meet ONE of the following criteria:

- The victim of the offense was under the age of eighteen (18) at the time of the offense
- They have been designated a Sex Offender Registry Level 3 sex offender
- The internet was used to facilitate the commission of the crime

If imposed, the E-STOP condition will require the parolee not to use the internet for certain purposes, such as communicating with minors or accessing pornographic material or social networking sites unless certain conditions are met. These conditions should be discussed with the PO.

12.    **WHAT ARE A PAROLEE'S RESPONSIBILITIES WHILE UNDER SUPERVISION?**

Parolees are required to adhere to all requirements of their sentence (including compliance with any restitution orders, orders of protection, and the payment of fees, fines, etc.). Parolees must comply with the standard conditions of release, Parole Board imposed conditions, and conditions imposed by their PO. Generally, parolees must obey all laws, refrain from the use of any controlled substances, and communicate with their PO in a truthful, cooperative and open manner. The PO will assist the parolee with resolving problems, assist with treatment and service referrals, and provide support throughout the period of community supervision. Ongoing communication between the parolee and the PO is extremely important to the parolee's successful transition to the community and completion of the sentence or period of post-release supervision.

13.    **WHAT IS "REPORTING"?**

Reporting is when a parolee meets with their PO either at the assigned bureau (office) or at another established report location where the PO meets with parolees on his or her caseload. Upon release to community supervision, the parolee will be required to report to their PO on a weekly basis. The frequency of the office reports will be modified over time in response to the parolee's supervision level and adjustment to supervision.

Parolees are required to make office reports throughout the period of community supervision. Failure to report as directed may result in a revocation of release and re-incarceration. It is the responsibility of the parolee to contact their PO in the event there is an emergency or there are unforeseen circumstances that may potentially impact the parolee's ability to report to the bureau (office) or other report location. The parolee must make sure that he or she communicates with their PO by phone to discuss any emergency circumstances and follow the instructions of their PO. It is important that the parolee have available the certificate of release to supervision in order to ascertain the address of the bureau and contact information for the PO and Bureau Chief. If the assigned PO is not available, the parolee must speak with the PO's supervisor or the duty officer, and follow their instructions.

Confidential
DOCCS-00007107

## 14.    WHAT ARE HOME VISITS?

The PO is required to routinely visit a parolee's home in an effort to monitor compliance with the conditions of release. The PO will speak with the parolee, parolee's family members, homeowner, and head of household to see how the parolee is adjusting to the residence and the community. If a parolee is residing at a residential treatment center, half-way house, or emergency housing location, the PO must visit the parolee and with the individuals responsible for operating and managing the facility.  Home visits to residential treatment facilities will also involve contact with treatment professionals, counselors, and program intake personnel. Home visits are unscheduled and may involve visits in the evening, at night, and on the weekends to monitor compliance with established curfews.  The parolee is expected to comply with the instructions of the PO during all home visits and visits to residential facilities.

## 15.    WILL THE PO VISIT A PAROLEE AT THEIR JOB?

Yes.    The PO will verify employment by visiting the place of employment or business establishment, by telephone contact with the employer or supervisor, and by inspecting paystubs and earnings statements.

## 16.    WHAT HAPPENS IF A PAROLEE CANNOT FIND A JOB OR NEEDS JOB TRAINING?

The Department (DOCCS) hopes that the parolee has taken full advantage of educational and vocational training programs and opportunities during the period of incarceration.  All parolees, if able to work, are expected to obtain employment as soon as possible after release and to maintain employment.  Supervision of the parolee in the community is intended to support and encourage law abiding behavior and self-sufficiency.  Obtaining and maintaining employment is one of the most important ways to successfully transition to life in the community.  The Department can assist parolees by referring them to potential employers, employment services, and by assisting with enrollment in employment and vocational training programs.

## 17.    DOES THE DEPARTMENT (DOCCS) PERFORM DRUG AND ALCOHOL TESTING?

Yes. The Department considers drug and alcohol testing to be an important component of the community supervision process.  Testing methods are used to identify parolees with drug and alcohol problems, to refer parolees to treatment providers, and to respond to violations of the conditions of release.  Parolees may be required to comply with substance abuse testing at the time of their office reports or when the PO visits them at their residence.  Drug testing allows the PO to determine whether or not the individual is using illegal or unauthorized controlled substances. A positive test may result in a referral to substance abuse treatment or, in some cases, may constitute a violation of community supervision.

The PO has the authority and an obligation to respond to the use and possession of illicit substances as required under New York State law and in accordance with Department policy and procedures.

## 18.    WHAT ASSISTANCE IS AVAILABLE IF THE PAROLEE HAS PROBLEMS WITH DRUG OR ALCOHOL USE?

Confidential                                                                                                DOCCS-00007108

If there is a substance or alcohol abuse problem, the parolee may be referred by the PO to either a residential or outpatient treatment program. If referred to a treatment provider, the parolee will be assessed and if treatment is recommended he or she will be admitted to either an outpatient program or a residential program. There are a number of community-based treatment resources available for the treatment of the chemically dependent and the PO will initiate the referral and monitor the parolee's admission and participation. The parolee will likely receive a special condition to enter and complete the treatment program.

## 19. IF A PAROLEE VIOLATES SUPERVISION BY USING DRUGS OR ALCOHOL, WILL THEY BE SENT BACK TO PRISON?

The Department (DOCCS) has a number of programs and resources dedicated to addressing relapse and drug dependence. Where appropriate and consistent with the interests of public safety, the Department offers alternatives to incarceration and provides parolees with the opportunity to participate in Parole Diversion Programs (PDP) operated and staffed by DOCCS personnel. Parolees are also provided with the opportunity to participate in community-based treatment programs. Community-based diversions such as outpatient, residential, detox, and day treatment services are available and may be considered by staff where deemed appropriate. If there is a revocation of release, an alternative disposition of admission to the Willard Drug Treatment Campus (WDTC) or to a PDP is possible provided the parolee meets the program admission criteria. However, if a parolee demonstrates that they are unable to remain sober or remain drug free while in the community, the parolee may be charged with a violation of the conditions of release and re-incarcerated if found to have violated the conditions of release in an important respect.

## 20. HOW LONG WILL A PAROLEE REMAIN UNDER SUPERVISION?

As a general rule, parolees will remain under community supervision until they are discharged from their sentence. If they meet certain crime and sentence criteria, parolees may be considered for merit termination or mandatory termination of sentence after one (1), two (2) or three (3) years of unrevoked supervision. If eligible, the PO will submit the case to the Board Parole, pursuant to Executive Law 259 (j) for three-year or five-year discharge consideration. Otherwise, a parolee will be discharged when he or she has reached the maximum expiration date of their sentence or has completed the court imposed period of post-release supervision.

## 21. WHAT IS A MERIT TERMINATION AND MANDATORY TERMINATION OF SENTENCE?

Certain parolees may qualify for a merit termination of sentence granted by the Department (DOCCS) prior to the maximum expiration date of the sentence. This means that the particular sentence is terminated and the parolee will no longer be under the jurisdiction of the Department.

Generally, non-violent felony offenders who meet the requirements under Section 205 of the Correction Law may be eligible for a merit termination of sentence. All violent felony offenders, a majority of sex offenders and those convicted of other offenses are not eligible for a merit termination of sentence.

The merit termination of sentence may be granted only when it has been determined that it is in the best interest of society to do so and that the parolee has made a good faith effort to comply

- 24 -

with any restitution order and/or pay any mandatory court surcharge. The PO can answer questions and discuss the particulars of a merit termination of sentence anytime throughout their period of community supervision.

A mandatory termination of sentence must be granted by the Department when a parolee has served either two or three years of unrevoked community supervision for a felony conviction under Articles 220 or 221 of the Penal Law. For parolees serving indeterminate sentences for Class A felony drug offenses, they must complete three (3) years of unrevoked supervision before this type of discharge can be granted. For all other parolees serving indeterminate sentences for Class B or less than Class B felony drug offenses, two (2) years of unrevoked community supervision must be completed in order to obtain this type of discharge.

## 22.    WHAT IS A THREE-YEAR DISCHARGE?

Except where a determinate sentence was imposed for a felony other than a felony defined in Article 220 or Article 221 of the New York State Penal Law, if the Board of Parole is satisfied that an absolute discharge from presumptive release, parole, conditional release, or release to a period of post-release supervision is in the best interests of society, the Board may grant discharge prior to the expiration of the full term or maximum term to any parolee who has been on unrevoked presumptive release, parole, conditional release, or release to post-release supervision for at least three (3) consecutive years. Discharge will not be granted unless the Board of Parole is satisfied that the parolee has made good faith efforts to comply with any order of restitution, payment of mandatory surcharges, payment of any applicable sex offender registration fee, or DNA databank fee imposed by the court. A three-year discharge is granted by the Board of Parole and is a discretionary decision for which there is no right to an administrative appeal.

## 23.    IF A PAROLEE WANTS TO VISIT OR MOVE TO ANOTHER AREA WITHIN New York STATE, WILL HE OR SHE BE ASSIGNED A NEW PO?

If a parolee wishes to move to another area, the parolee must first seek permission from their current PO. A request must be submitted to the Community Supervision Bureau in the area in which the parolee wants to reside. An investigation of the proposed residence will be conducted by the receiving bureau. If the residence and program are approved, supervision will be transferred to a PO in the receiving bureau. If a parolee desires to travel outside the geographic boundaries of the Region (or any geographic boundaries imposed by the PO) for a temporary visit, the parolee must request and obtain approval for a travel permit.

## 24.    CAN A PAROLEE LEAVE THE STATE TO VISIT?

Yes, if the request to travel is approved prior to the date of departure. Out-of-state travel requires the permission of the PO and Senior Parole Officer (SPO). A parolee must request a travel pass by providing the following information:  1) why and when the parolee plans to leave, 2) how they plan to travel, 3) with whom they plan to travel, 4) where they plan to stay, 5) and when and how they plan to return. Initially, no visit can be approved for a period of over two weeks. Longer stays involve at least some supervision by the parole authorities in the state being visited. It is always helpful to give the PO as much advance notice as possible regarding a planned trip so that he or she can have the necessary paperwork completed in sufficient time. An out-of-state travel permit requires the approval of the SPO.

Confidential

## 25.    WHAT HAPPENS IF A PAROLEE IS ARRESTED?

Parolees must report any arrests or contacts with law enforcement officers or agencies to their PO.  The PO will complete an investigation of the incident.  If circumstances warrant, violation charges may occur after the investigation is completed.  A violation warrant may be issued and the parolee may be arrested and lodged at a local (county) correctional pending the completion of a preliminary and final revocation hearing.

## 26.    WHY IS THE DEPARTMENT CHARGING A MONTHLY SUPERVISION FEE?

New York State has enacted a law (Correction Law, Section 201 [9]) requiring every parolee to pay a monthly supervision fee. Generally, parolees are expected to pay thirty dollars ($30) per month. Your PO will discuss the supervision fee with you, how the fee is to be paid, and in certain circumstances, where individuals may be able to obtain a temporary or permanent waiver due to disability, financial circumstances, unemployment, or other qualifying financial hardship.

## 27.    DOES THE DEPARTMENT (DOCCS) HAVE A PAROLEE GRIEVANCE PROGRAM?

Yes.  A parolee may file a grievance, in writing, with the Senior Parole Officer (SPO).  The grievance must be filed using the required form and the parolee must specify the reason(s) for the grievance.  The grievance form must be submitted to the attention of the SPO via U.S. Mail to the appropriate Community Supervision Bureau.  Forms are available in every Community Supervision Bureau.  Parolees are encouraged to resolve issues and complaints with their Parole Officer (PO) before submitting a formal written grievance.

The parolee must file the grievance within thirty (30) days of the alleged occurrence or issue. Upon receipt the grievance form, the complaint will be reviewed and logged in as received.  The SPO is responsible for reviewing the matter and rendering a written decision.  The written decision will be provided to the parolee.  If the parolee believes that the decision of the SPO does not address the complaint or grievance, the matter may be appealed to the Bureau Chief.  The parolee may raise the matter to the attention of the Regional Director via the appeal guidelines.  All decisions at the level of Regional Director shall be considered final.

A parolee may request information and assistance regarding matters and issues that may be addressed via the grievance program from the Parole Officer, Senior Parole Officer, Bureau Chief, Deputy Regional Director, or Regional Director.

## SECTION FOUR - REVOCATION PROCESS

## 1.    WHAT HAPPENS IF A VIOLATION OCCURS?

If the PO has reasonable cause to believe that a parolee under supervision by the Department has lapsed into criminal ways or has violated one or more of the conditions of their release in an important respect, the PO will conference the case with a supervisor at which time a warrant may be issued.  The warrant will remain in effect with no right to bail throughout the violation process.

Confidential                                                                                                     DOCCS-00007111

For individuals lodged in New York State, the alleged violator (parolee) will be served with a Notice of Violation within three (3) days of the warrant being lodged.  The Notice of Violation describes the hearing process and the parolee's rights with respect to the revocation process.  The parolee is also provided a copy of the Violation of Release Report that lists the violation charges.  For cases lodged out of state, the parolee must be served within five (5) days of becoming available to the warrant.  The parolee may choose to waive or have their Preliminary Hearing.  If a parolee chooses to have the Preliminary Hearing, it will be held within fifteen (15) days of the lodging of the parole warrant.  If a parolee chooses to waive their Preliminary Hearing, a Final Hearing will be held within ninety (90) days of the waiver of the hearing.

## 2.    WHAT IS A PRELIMINARY HEARING?

A Preliminary Hearing is a hearing conducted for the purpose of determining whether there is probable cause (PC) to believe that the parolee has violated one (1) or more of their conditions of release in a significant respect.  In most cases, the preliminary hearing is held in a county jail near the community where the alleged violative behavior occurred or where the parolee was taken into custody.

Although a violator may obtain their own attorney, there is no absolute right to counsel at the Preliminary Hearing.  If the parolee does not plead guilty to one of the charges, it is incumbent upon the Department (DOCCS) to present its case through the presentation of evidence and testimony.  Upon completion of the hearing, the Preliminary Hearing Officer (PHO) will either find probable cause or not find probable cause. The parole violator will receive a copy of his/her decision following the hearing.

If there is a finding of Probable Cause, the violation will proceed to the Final Hearing stage.  If there is a finding of No Probable Cause, the hearing officer will order the warrant be lifted and the parolee will be restored to supervision.

If a parolee is arrested and convicted of a new misdemeanor, there will be no preliminary hearing. Upon conviction for a misdemeanor offense the matter will proceed to the Final Hearing phase. If convicted of a felony in New York State and sentenced to an indeterminate or determinate term, supervision is revoked by operation of law without the need for either a Preliminary or Final Hearing and the parole violator will be returned as a PVNT (parole violator with a new term).  If the new Felony conviction results in a sentence other than a new state term of incarceration, the Department (DOCCS) will proceed with the Final Hearing.

## 3.    WHAT DOES BEING DECLARED DELINQUENT MEAN?

A parolee may be declared delinquent in any of the following situations:

- When there is reasonable cause to believe that a parolee has absconded from supervision
- After  a finding of probable cause at a Preliminary Hearing
- Upon a waiver of a Preliminary Hearing
- If a parolee is convicted of a new crime while under supervision

The date of delinquency is the earliest date that a violation of release is alleged to have occurred. A declaration of delinquency interrupts the sentence as of the established date of delinquency.

- 27 -

## 4.    WHAT IS A FINAL REVOCATION HEARING?

A Final Revocation Hearing shall be scheduled to take place within ninety (90) days of the determination of probable cause or waiver of the preliminary hearing. A parole violator is entitled to be represented by an attorney who shall file a notice of appearance with the Parole Violation Unit in the bureau located in the jurisdiction where the parolee is incarcerated.

The Administrative Law Judge (ALJ) or a member of the Parole Board will conduct the hearing, will administer oaths, may entertain applications for an adjournment, will direct the presentation of evidence, and will make a determination as to which charges have been sustained by a preponderance of the evidence.

The Department is represented by a Parole Revocation Specialist (PRS) who will present evidence and examine witnesses to testify to the charges in the violation of release report. The alleged parole violator may secure his/her own attorney or request to have the public defender/ legal aid represent him at the Final Hearing. The parole violator may present evidence and witnesses to refute or to mitigate the charges.

If no violation charges are sustained by a preponderance of the evidence, the ALJ will dismiss the charges and order the warrant lifted. If one or more charges are sustained, a delinquency date will be established based on the earliest proven date of the violative behavior.

The attorney for the parolee and the PRS representing the Department will make recommendations with regard to the disposition and such final dispositions may involve a time assessment, admission to a diversion program such as the Willard DTC or other programs, or a decision to revoke release and restore to supervision in the community. The parolee will receive a copy of his/her final decision after the ALJ considers the recommendations and makes a final determination.

An appeal may be filed within thirty (30) days of receipt of the final revocation decision and the appeal submission must be perfected within one-hundred and twenty (120) days.

If a parole violator has pending felony charges, he/she may request to be put on the "K Calendar" for an indefinite period and until such time as the pending felony charges are disposed of or the parole violator wishes to proceed with the Final Hearing.

## 5.    WHAT ARE PAROLE REVOCATION GUIDELINES?

In January 1997, the Board of Parole adopted guidelines governing the revocation process. Under the amended regulations, revocation outcomes reflect a guideline structure that considers criminal history, crime of conviction, number of prior violations, and current violative behavior. The guidelines are structured to ensure that those violators with a history of violent behavior receive the most severe penalties and those with substance abuse problems receive the necessary treatment.

## 6.    HOW DO THE REVOCATION GUIDELINES WORK?

- 28 -

Under the guidelines, most violators fall into one of three categories which result in a certain sanction or range of sanctions. The three major categories are described below:

Category 1 cases include the following violators:
- Conditionally released on a violent felony offense as defined under Penal Law Section 70.02
- Paroled or conditionally released on an A-1 felony offense
- Paroled or conditionally released on any felony offense under Article 125, 130, 135, 263 or Section 255.25 of the Penal Law
- Paroled on any violent felony offense or youthful offender adjudication involving the use, or threatened use, of a deadly weapon or dangerous instrument or the infliction of physical injury
- Current violative behavior involving the use, or threatened use of a deadly weapon or dangerous instrument or the infliction or attempted infliction of physical injury, or possession of a firearm, or threats toward Department (DOCCS) staff
- A criminal record that includes either a violent felony conviction, or youthful offender adjudication that occurred within the 10-year period preceding the commission of the felony on which the current sentence is based and involved the use or threatened use of a deadly weapon or dangerous instrument or the infliction of physical injury. Any period of time during which the person was incarcerated shall be excluded in calculating the 10-year period preceding the act.

The time assessment imposed on sustained Category 1 cases can be no less than 15 months; however, the Department may grant a mitigating reduction of up to three months. Potential Category 1 cases may also be restored to the Willard Drug Treatment Center (WDTC).

Category 2 cases include the following violators:
- The current conviction is for a felony, other than A-1, defined by Article 220 or 221 of the Penal Law and the sustained violation is for other than a felony committed while under supervision
- The current sentence is based on a conviction other than Penal Law Article 220 or 221 offense which is neither a violent felony offense or a Class A felony and the current violation charge is sustained on Rule 8 drug or marijuana charge, Rule 11 charge or special condition prohibiting the use of alcohol.

All Category 2 violators are revoked and restored to Willard DTC. However, a violator may be exempted from mandatory participation in Willard DTC (and moved to Category 3) when one of the following circumstances applies:
- Time remaining on sentence as of warrant lodge date is less than nine months
- Felony charges are pending as of Final Hearing date
- Medical or psychiatric ineligibility

Category 3 cases include violators that do not fall under Categories 1 or 2.

The time assessment imposed on a Category 3 violator whose crime of conviction is a violent felony offense as defined in Penal Law Section 70.02 is the time spent in custody (at the time of the Final Hearing) plus six months. For a violator with a non-violent felony offense as a crime of conviction, the time assessment is time spent in custody plus three months.

Confidential                                                                 DOCCS-00007114

Persistent Violators are Category 2 or 3 cases with two prior sustained violations, who upon receiving a third violation (or more), may receive a time assessment not to exceed 12 months.

Certain types of parole violators do not fall into Category 1, 2, 3 and do not receive an established sanction. In these cases, a time assessment or revocation decision is imposed by an Administrative Law Judge or by the Board of Parole. These include:

- Those sentenced to Willard under Section 410.91 of the Criminal Procedure Law (Judicially Sanctioned)
- Those restored to Willard who fail to successfully complete the 90-day program
- Under the guidelines, graduates of the Shock Incarceration Program may be revoked and restored to Willard. However, if shock graduates receive a time assessment, the time assessment shall be at least for a period of time equal to the minimum period of imprisonment imposed by the court.

Mitigating Circumstances Under the new regulations there are five sets of mitigating circumstances which, if demonstrated, allow for a departure from the mandatory penalties imposed on Category 1, 2, and 3 violators. The mitigating circumstances are:

- The violator is the custodial parent of a minor child, and has been the actual primary caregiver for at least 12 months, or since birth or adoption prior to incarceration on the warrant. If restored, the violator has a stable residence and means of support so that he or she would continue to care for the child
- The violator's parole supervision prior to the conduct for which the warrant was issued is deemed acceptable by the Department and has a stable residence and prior employment
- The violator has voluntarily returned to supervision after absconding
- The violator has a new pending criminal charge and the new charge is being disposed of by referral to any alternatives to incarceration program (ATI). Restoration to supervision is conditioned only upon the successful completion of the ATI program
- The violator who would otherwise be a Category 2 violator but whose medical or psychiatric needs cannot be met at Willard

If one or more mitigating circumstances apply, violators can be revoked and restored to supervision if the Department has found that:

- The violator's program needs could be adequately addressed in the community with supervision; and
- That restoration to supervision would not have an adverse effect on public safety

## 7.    IF PAROLE IS REVOKED, CAN THE PAROLEE BE RELEASED AGAIN?

Yes. After serving a mandated period of re-imprisonment following a final hearing (i.e. time assessment), the parolee is eligible for re-release from state prison. Depending on the nature of the sentence they are serving, this release may occur following Parole Board review or by operation of law.

## 8.    WHAT HAPPENS IF A PAROLEE IS REVOKED AND RESTORED TO THE WILLARD DRUG TREATMENT CAMPUS?

Confidential

The Willard Drug Treatment Campus is a ninety (90) day residential drug and alcohol treatment program operated by the Department. Parolees with a substance abuse history or whose violation involves substance abuse may be revoked and restored to Willard through the revocation process. Once they have completed the Willard program, they will be released back to their assigned bureau to resume their supervision.

## 9.   HOW DOES "GOOD TIME" WORK IF PAROLE HAS BEEN REVOKED?

Violators serving indeterminate sentences who are returned to a State correctional facility owing more than one year may earn good time equaling up to one-third of the remaining sentence. In other words, if they are returned owing fifteen months on supervision on an indeterminate sentence, they may receive five months good time and be eligible for conditional release ten months after being returned. Violators returned to incarceration from a period of post-release supervision are not eligible for good time or a new conditional release date.

## SECTION FIVE - SENTENCING REFORM ACTS

## 1.   WHAT ARE THE SENTENCING REFORM ACTS OF 1995 AND 1998?

The Sentencing Reform Act of 1995, and the Sentencing Act of 1998, which is known as Jenna's Law, mandated that any individual convicted of legislatively defined violent felony offenses receive determinate sentences, rather than indeterminate sentences.

Under the Sentencing Reform Act of 1995, determinate sentencing was applied to second felony offenders being sentenced for violent felony offenses committed on or after October 1, 1995. Inmates who receive a determinate sentence are not eligible for release consideration by the Parole Board.

These individuals may be conditionally released to supervision by the Department, after completion of 6/7 (85%) of the sentence imposed, provided that they are granted the requisite good time allowances based upon their adjustment to the rules and regulations of the Department.

*Jenna's Law* (1998) mandated that determinate sentences be imposed for any violent offenses committed after September 1, 1998, whether they were first or subsequent felony offenses. Jenna's Law also established mandatory periods of post-release supervision that must be served under the jurisdiction of the Department. First time violent felony offenders received up to five years of post-release supervision, with the length determined by the felony class of the conviction. Second violent felony offenders must serve a mandatory five-year period of post-release supervision, regardless of the felony class of the present offense. In addition, they will not be eligible for conditional release, but must serve the time assessment imposed by the Parole Board for the parole violation. There is no good time off the period of post-release supervision.

The Parole Board, prior to conditional release on a determinate sentence, will establish conditions for the post-release supervision period.

## 2.   WHAT IS THE WILLARD DRUG TREATMENT CAMPUS?

Confidential

DOCCS-00007116

The Willard Drug Treatment Campus is an approximately 800-bed residential drug and alcohol treatment program operated and staffed by the Department. This program is designed to assist participants to achieve, develop and/or maintain recovery and mandates a minimum 90 days of intensive substance abuse treatment at Willard.

Willard serves two distinctive types of individuals with substance abuse histories. The first, known as Judicially-Sanctioned, was established as the result of the Sentencing Reform Act of 1995. Second felony offenders with a conviction for specific drug and/or property offenses, with no prior convictions for violent offenses, are eligible. These individuals may be judicially sentenced directly to community supervision with a requirement to complete the Willard program.

The Willard Campus also serves as an alternative to re-incarceration for certain parole violators who have been revoked and restored to this program.

All Willard graduates who successfully complete the program are returned to the community and provided with treatment services. Graduates are provided with an aftercare appointment for placement in a community-based substance abuse treatment program to ensure continuity of care and treatment.

## SECTION SIX – INTERSTATE

### 1.    WHAT IS THE INTERSTATE COMPACT FOR PAROLE?

The Interstate Compact for Adult Offender Supervision (ICAOS) is an agreement among the fifty states, Puerto Rico, Virgin Islands and the District of Columbia that allows individuals paroled by one state to be supervised in another state. The authority for the Interstate Compact is contained in section 259-mm of the Executive Law.

### 2.    CAN A PAROLEE BE PAROLED TO ANOTHER STATE?

Yes, the process is governed by the rules under ICAOS.

### 3.    WHAT IF AN INMATE IS PAROLED TO AN IMMIGRATION WARRANT?

If an inmate is paroled or conditionally released to an Immigration and Customs Enforcement (ICE) warrant and subsequently deported, the parolee is prohibited from re-entering the United States without the written permission of the appropriate United States Immigration officials, Board of Parole, and the Department (DOCCS). A parolee who is deported cannot re-enter the United States unless he or she is authorized to re-enter. If a parolee illegally re-enters the United States and is convicted of illegal re-entry, 8 U.S.C. §1326 authorizes the United States District Court to impose a period of imprisonment of up to ten (10) years and a fine. Illegal re-entry may also be the basis for a revocation of parole or conditional release. If a parolee is not subject to deportation and is released from ICE custody, he or she must report, in person, to their parole officer at the bureau (office) location listed on the DOCCS certificate of release to supervision form.

### 4.    WHAT SUPERVISION CONDITIONS WILL I BE UNDER IF MY SUPERVISION IS TRANSFERRED TO ANOTHER STATE OR I AM DEPORTED?

Confidential

A parolee is expected to comply with each of the conditions of release as listed on the certificate of release agreement. In addition, a parolee is expected to comply with any additional written conditions of release imposed by the parole officer. If the parolee's supervision is transferred under the Interstate Compact for Adult Offender Supervision (ICAOS) agreement, the parolee must comply with both the conditions imposed by New York State and any conditions imposed by the receiving state. If deported, the parolee must comply with all applicable conditions of release and must not re-enter the United States without the written permission of the United States Immigration and Customs Enforcement officials, Board of Parole, and the Department (DOCCS).

## SECTION SEVEN - RESTORATION OF RIGHTS

**1.    ARE THERE PROTECTIONS AGAINST EMPLOYMENT DISCRIMINATION BASED ON CRIMINAL CONVICTION?**

Unless a parolee has a mandatory disability imposed on them by law, the law requires employers with whom they have applied, to consider a number of factors including whether they have a Certificate of Relief from Disabilities or a Certificate of Good Conduct. Also, employers are forbidden to ask about or consider arrests that did not lead to conviction. Employers and licensing agencies are prohibited from denying an employment application because of a criminal record unless:

- There is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought; or
- The issuance of the license or the granting of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

As a result of felony and certain misdemeanor convictions, a parolee may be prohibited by law from engaging in certain types of employment and from applying for certain types of licenses. These disabilities may continue even after completion of the sentence imposed by the Court.

The Department, in its discretion, may issue a Certificate of Relief from Disabilities or Certificate of Good Conduct. A certificate may remove mandatory disabilities in general and/or those specifically indicated by the Department.

**2.    FROM WHAT LICENSES AND EMPLOYMENT ARE PAROLEES BARRED?**

Legal bars to licenses and employment are contained in various laws enacted by the State Legislature. Some examples include employment as a barber, security guard, private investigator, insurance broker, as well as licenses to sell liquor wholesale or retail, and licenses for real estate brokers and notary publics. This is not a complete list.

**3.    WHO IS ELIGIBLE FOR A CERTIFICATE OF RELIEF?**

By law, a parolee is eligible for a Certificate of Relief if they have not been convicted of more than one felony. For this purpose, two or more felony convictions stemming from the same indictment count as one felony. Two or more convictions stemming from two or more separate indictments filed in the same court, prior to conviction under any of them, also count as one felony.

Confidential

The Department may also issue a Certificate of Relief if an eligible parolee has been convicted in another jurisdiction and who now lives in New York State.

A Certificate of Relief may be issued upon an eligible inmate's release from a correctional facility or at any time thereafter.

## 4.    WHAT EFFECT DOES A CERTIFICATE OF RELIEF HAVE ON MY STATUS?

A Certificate of Relief may remove any mandatory legal bar or disability imposed as a result of conviction of the crime or crimes specified in the certificate. The Certificate of Relief does not, however, enable a parolee to retain or become eligible for public office. Note that removing mandatory legal bars restores their right to apply and be considered for employment or license, but does not guarantee it will be granted.  A Certificate of Relief also restores their right to register to vote and to actually vote.

A Certificate of Relief issued upon release, or once they are on supervision, is a temporary certificate. This certificate becomes permanent when they are discharged from supervision. During the time it is temporary, the certificate may be revoked for a violation of the conditions of release.

## 5.    WHO IS ELIGIBLE TO APPLY FOR A CERTIFICATE OF GOOD CONDUCT?

In contrast to the Certificate of Relief, a parolee is eligible for the Certificate of Good Conduct even if they have been convicted of more than one felony.  They do not become eligible for a Certificate of Good Conduct, however, until a minimum period of time has elapsed from the date of their unrevoked release from custody onto supervision or from the date their sentence ended.

If the most serious conviction in their criminal history was for a C, D or E felony, they must wait at least three years from the date of their last conviction, payment of fine, or release from prison onto community supervision, whichever is later. The individual will have to wait at least five years from their last conviction, payment of fine, or release from prison onto supervision if their most serious conviction was for an A or B felony.

## 6.    WHAT EFFECT DOES A CERTIFICATE OF GOOD CONDUCT HAVE ON A PAROLEE'S STATUS?

A Certificate of Good Conduct has the same effect as the Certificate of Relief. In addition, the Certificate of Good Conduct may restore their right to seek public office. The certificate may remove mandatory disabilities in general and/or those specifically indicated by the Department. A Certificate of Good Conduct also restores their right to register to vote and to actually vote.

The Certificate of Good Conduct issued while under supervision is a temporary certificate. The certificate will become permanent upon discharge from supervision.  During the time it is temporary, it may be revoked by for a violation of the conditions of release.

## 7.    HOW ARE CERTIFICATE APPLICATIONS SUBMITTED?

If a parolee has not completed their sentence, they cannot apply directly for a Certificate of Relief or a Certificate of Good Conduct. The application is submitted to the Department's Certificate

Confidential

Review Unit by their PO.  If they are under supervision, they should discuss their desire to apply for a Certificate with their PO.

If they have completed their sentence, they may apply directly to the Certificate Review Unit of the Department for Certificates of Relief or Good Conduct. If convicted in another state or by a federal court and live in New York State, they may apply directly upon release from custody to the Certificate Review Unit.

## 8.    HOW ARE VOTING RIGHTS RESTORED?

The right to vote is automatically restored when a parolee completes the maximum expiration of sentence or is discharged by DOCCS. While on community supervision, if a parolee has been issued a Certificate of Relief from Disabilities or a Certificate of Good Conduct, the parolee may register to vote. To register to vote they must complete a voter registration form and deliver it to the local Board of Elections. Registration forms are available at many government agencies, on the Internet at http://www.elections.ny.gov/VotingRegister.html or by calling 1-800-FOR-VOTE. There is no need to provide a Certificate of Relief from Disabilities or any other documentation about their criminal history in order to register to vote after completing their maximum sentence or having been discharged from supervision.

## 9.    WHERE MAY AN INDIVIDUAL OBTAIN INFORMATION ABOUT CERTIFICATES OF RELIEF AND GOOD CONDUCT, AND ABOUT LICENSING AND EMPLOYMENT?

Article 23 of the New York Correction Law deals with Certificates of Relief from Disabilities and Certificates of Good Conduct.  Article 23A of the Correction Law deals with licenses and employment of persons convicted of criminal offenses. Any individual on parole should consult with their PO about specific questions they may have. Certificate applications and additional information are available on the Department's website: www.doccs.ny.gov.


## SECTION EIGHT - EXECUTIVE CLEMENCY

## 1.    WHAT IS EXECUTIVE CLEMENCY?

Clemency, as defined by the State Constitution (Article IV, Section 4), provides the Governor "the power to grant reprieves, commutations and pardons after convictions for all offenses except treason and cases of impeachment, upon such conditions and with such restrictions and limitations..." Only the Governor may grant clemency, and it is only granted under the most compelling circumstances.

## 2.    WHEN ARE PARDONS CONSIDERED?

Pardons may be considered if no other adequate administrative or legal remedy is available:
- To permit a conviction to be set aside where there is overwhelming and convincing proof of innocence not available at the time of conviction
- To relieve a disability imposed upon a conviction (this is rarely used since relief may generally be obtained by means of a Certificate of Good Conduct or Certificate of Relief from Disabilities)
- To prevent deportation or to permit reentry into the United States

- 35 -

## 3.    WHEN IS COMMUTATION OF SENTENCE CONSIDERED?

Commutation (reduction) of an inmate's minimum period of imprisonment may be considered to enable them to be considered for release on community supervision at a time earlier than permitted by the court-imposed sentence.

Except in extraordinary circumstances, a case will be reviewed for possible commutation of sentence only if:
- The term or minimum period of imprisonment is more than one year
- An inmate has served at least one-half of the minimum period of imprisonment; for an inmate with a determinate sentence, this means serving at least three-sevenths of his or her period of imprisonment
- An inmate will not become eligible for release on community supervision within one year from the date of application

## 4.    WHAT IS THE FUNCTION OF THE EXECUTIVE CLEMENCY BUREAU?

The Executive Clemency Bureau within the Department serves three primary functions:
- To screen candidates for satisfaction of the Executive Clemency eligibility requirements as set by the Governor's office
- To gather materials concerning clemency applications
- To respond to letters from applicants and others regarding clemency applications

## 5.    WHERE MAY AN INMATE OBTAIN MORE INFORMATION ABOUT EXECUTIVE CLEMENCY?

A two-page document entitled "Guidelines for Review of Executive Clemency Applications" is on file in the law library of each correctional facility.

## SECTION NINE - APPEALS AND ACCESS TO PAROLE FILES

## 1.    WHO IS ELIGIBLE TO FILE AN ADMINISTRATIVE APPEAL?

An administrative appeal may be filed by an inmate who has been denied discretionary release (parole) by the Board of Parole and an inmate may also file an appeal of a decision to rescind a prior grant of parole.  A parolee who has had their parole, conditional release, presumptive release, or period of post-release supervision revoked may also file an administrative appeal.

## 2.    IS THERE A TIME LIMIT FOR THE FILING OF A NOTICE OF APPEAL?

Yes. A Notice of Appeal must be filed with the Board of Parole's Appeals Unit within thirty (30) days of the date that the inmate or parole violator receives written notice of the Board's decision. If the appeal is from a final revocation decision, the thirty (30) day filing period begins when either the inmate or their attorney (if they were represented by one at the Final Hearing) receive a copy of the revocation decision.

## 3.    WHAT QUESTIONS MAY BE RAISED ON APPEAL?

Confidential

The following questions may be raised on appeal from a minimum period of imprisonment or release proceeding:

A. Did the proceeding and/or determination violate lawful procedure, or was it affected by an error of law, was it arbitrary and capricious, or was it otherwise unlawful?
B. Did the Board member or members making the determination rely on erroneous information as shown in the record of the proceeding, or was relevant information not available for consideration?
C. Was the determination excessive?

The questions below may be raised on appeal from a parole rescission or final revocation determination, and subject to the limitation that evidentiary rulings will be considered only if a timely objection was made at the hearing:

D. Was the determination supported by a preponderance of the evidence?
E. Questions raised A through C above.

## 4. HOW DOES ONE OBTAIN LEGAL REPRESENTATION IN ORDER TO COMPLETE THE APPEAL?

An inmate may obtain private counsel to assist them in completing their appeal. If they cannot afford private counsel, they should contact the closest legal services organization that provides free legal services for indigent inmates, or the County Court in the county where they are imprisoned. They may obtain the name and address of such legal services organizations, or the appropriate court, by contacting their ORC or the Inmate Law Clerk of the law library at your correctional facility.

## 5. HOW DOES AN INMATE PERFECT AN APPEAL?

After the Notice of Appeal is filed, the appeal is perfected by filing an original and two copies of a letter or brief with the Appeals Unit of the Board of Parole in Albany. That document should state the specific questions raised on appeal, and why the appellant believes the decision was incorrect. If the inmate is relying on any documents to support their arguments, those documents should be attached to their letter or brief.

## 6. IS THERE A TIME LIMIT FOR THE PERFECTING OF AN APPEAL?

Yes. An administrative appeal must be perfected within four months of the date on which the Notice of Appeal has been received by the Appeals Unit. The Appeals Unit will reply in writing and advise them of the final date by which the brief or letter on the appeal must be received. This four-month filing period may be extended where a written request is made prior to the expiration of the time limit. Extensions may be granted at the discretion of the Appeals Unit for good reasons.

## 7. HOW IS THE APPEAL DECIDED, AND BY WHOM?

The Appeals Unit prepares findings and recommendations to the Parole Board. Three members of the Board of Parole ultimately decide an administrative appeal. Once a final decision is rendered, the Appeals Unit will send the inmate a copy of its findings and recommendations,

Confidential

together with a copy of the Board's final decision. If the Board either reverses or modifies its original decision, the Appeals Unit also instructs appropriate staff concerning what action is to be taken.

**8.    IF AN INMATE'S APPEAL IS UNSUCCESSFUL, IS THERE ANY OTHER ADMINISTRATIVE RECOURSE AVAILABLE?**

No.  All relevant issues should be submitted when the administrative appeal is filed to make review and determination easier and quicker.

## SECTION TEN – PRISON RAPE ELIMINATION ACT (PREA)

**1.    WHAT IS THE PRISON RAPE ELIMINATION ACT (PREA)?**

The United States Congress enacted the Prison Rape Elimination Act (PREA) in 2003 in an effort to address the problem of sexual abuse of persons in the custody of Federal, State, and local correctional systems.  The PREA statute mandates a zero tolerance policy regarding rape and sexual abuse in prisons, jails, police lock-ups, and other confinement facilities.  PREA requires the development of standards for detection, reduction, and punishment for rape and sexual abuse. The PREA Act applies to all correctional institutions that house adult or juvenile offenders and also applies to community-based correctional agencies.

The Department of Corrections and Community Supervision (DOCCS) employs a zero tolerance policy and any sexual abuse of an inmate or parolee committed to the care and custody or supervision of DOCCS by a staff member, contractor or contract employee, intern or volunteer will result in appropriate disciplinary or administrative action and will be prosecuted to the fullest extent allowed by law.

**2.    WHAT IS SEXUAL ABUSE?**

Inmate on inmate sexual abuse is when one or more inmates engage in coercive sexual conduct, including sexual contact, with another inmate against his or her will or by use of threats, intimidation or other coercive actions.  A sexual act committed by a parolee under community supervision who is placed in a community residential program against another parolee or resident of that program is sexual abuse when the sexual act is against the victim's will by use of force, threats, intimidation, or other coercive actions.

Staff on inmate or parolee sexual abuse is when an employee, volunteer, intern or outside contractor engages in sexual conduct, including sexual contact, with an inmate or parolee committed to the care and custody or supervision of DOCCS.

**3.    WHAT YOU SHOULD DO IF YOU HAVE BEEN SEXUALLY ABUSED OR HARASSED?**

Every inmate and parolee has the right to be safe from sexual abuse and sexual harassment.  If you are under supervision in the community and you believe you have been sexually abused or harassed, report the incident immediately to your Parole Officer (PO) or to local law enforcement. If you are being pressured, threatened or extorted to have sexual contact with anyone, you should immediately report it to your Parole Officer, the Senior Parole Officer or Bureau Chief.  DOCCS

- 38 -

staff will take the appropriate steps to protect you and also assist you with seeking proper medical attention. You may also contact the Department's Office of Special Investigations (OSI) for assistance. All reports of sexual abuse, sexual harassment or retaliation will be fully investigated. If you want to report an incident to an outside agency, you may contact the New York State Commission of Correction.

## SECTION ELEVEN – REASONABLE ACCOMMODATIONS (PAROLEES WITH DISABILITIES)

### 1.    WHAT IS THE AMERICANS WITH DISABILITIES ACT (ADA)?

Title II (Subtitle A) of the Americans with Disabilities Act (ADA) prohibits State and local entities from discriminating against any qualified individual with a disability in their programs, services, and activities. The Department (DOCCS) is required to make "reasonable accommodations" or modifications to existing policies and procedures to allow parolees with disabilities the same opportunities as non-disabled parolees, unless to do so would be an undue burden to DOCCS, cause a fundamental alteration to a program, or compromise the safety or security of a Community Supervision office or facility.

Parolees with disabilities have a right to request reasonable accommodations to make programs and services more accessible and usable. Under the ADA, an individual with a disability is a person who has:

- A physical or mental impairment that substantially limits one or more life activities, such as walking, talking, hearing, seeing, caring for oneself, learning, or working;
- A record of such impairment; or
- Is regarded as having such impairment.

### 2.    I HAVE A DISABILITY AND I AM HAVING DIFFICULTY ACCESSING THE DOCCS OFFICE, A PROGRAM, SERVICE, OR ACTIVITY, WHAT DO I DO?

The Department of Corrections and Community Supervision (DOCCS) is committed to assuring fair and equitable treatment of parolees with disabilities who are under supervision in the community and seeking access to DOCCS facilities and offices, programs, services, and activities. Under the ADA, discrimination against parolees with disabilities is prohibited. It is the policy of DOCCS that all facilities, programs, services, and activities are to be readily accessible to qualified individuals with disabilities. DOCCS requires its employees to follow policies and procedures to make the Department's facilities, programs, and services accessible to individuals with disabilities unless to do so would fundamentally alter the nature of a program, service, or activity or create an undue administrative burden on the Department (DOCCS).

### 3.    WHAT IS A REASONABLE ACCOMMODATION?

A reasonable accommodation is essentially any allowable change in the environment, policies or procedures, or the manner in which tasks are completed that enables a "qualified individual with a disability" to participate in a particular program or service. Reasonable accommodation is also any modification or adjustment to a job or the work environment that will enable a qualified applicant or employee with a disability to participate in the application process or to perform essential job functions. Reasonable accommodation also includes adjustments to assure that a

Confidential

qualified individual with a disability has rights and privileges in employment equal to those of employees without disabilities.

## 4.    HOW DO I REQUEST A REASONABLE ACCOMMODATION?

While under supervision in the community, you should request assistance from your Parole Officer (PO), the Senior Parole Officer (SPO) or Bureau Chief (BC).  All requests for reasonable accommodation will be reviewed and responded to by the PO, SPO, or BC.  The PO will document your request(s) for a reasonable accommodation in your supervision record.  Where necessary, the PO, SPO, or BC will seek the assistance of the DOCCS Statewide ADA Coordinator when responding to requests for reasonable accommodations or when assistance is needed in identifying resources or services in the community.  DOCCS has a number of resources and the ability to utilize outside resources for purposes of providing reasonable accommodations to parolees under supervision.

## 5.    WHEN CAN A REQUEST FOR A REASONABLE ACCOMMODATION BE DENIED?

A request for a reasonable accommodation can be denied if the person requesting the accommodation is not a "qualified individual with a disability" or if providing the requested accommodation would cause an undue hardship to the Department (DOCCS).

## 6.    WHAT IF MY REQUEST FOR A REASONABLE ACCOMMODATION IS DENIED?

If your request for a reasonable accommodation has been denied you have the right to file a grievance, in writing, in accordance with the DOCCS Directive 9402, "Parolee Grievance Program."  If you cannot write or you have difficulty communicating in writing, request assistance from your PO, the SPO or BC.

## EMPLOYMENT OF PAROLEES WITH DISABILITIES:

## 7.    WHO IS A "QUALIFIED INDIVIDUAL WITH A DISABILITY?"

A qualified individual with a disability is a person who has a physical or mental impairment that substantially limits a major life activity and who meets the legitimate skill, experience, education, or other requirements of an employment position that he or she holds or seeks, and who can perform the "essential functions" of the position with or without reasonable accommodation. If the individual is qualified to perform essential job functions except for limitations caused by a disability, the employer must consider whether the individual could perform these functions with a reasonable accommodation. If a written job description has been prepared in advance of advertising or interviewing applicants for a job, this will be considered as evidence, although not conclusive evidence, of the essential functions of the job.

## 8.    WHAT IS AN "ESSENTIAL FUNCTION" OF THE JOB?

Essential functions of the job are those core duties that are the reason the job exists. For example, an essential function of a typist's position is the ability to type; an essential function of a bus driver's position is the ability to drive. Requiring the ability to perform "essential" functions assures that an individual with a disability will not be considered unqualified because of his or her inability to perform marginal or incidental job functions.

Confidential
DOCCS-00007125