# EXHIBIT 31

**NEW YORK STATE OF OPPORTUNITY** | **Department of Health** | **Office of Mental Health**

ANDREW M. CUOMO
Governor

HOWARD A. ZUCKER, M.D., J.D.
Commissioner

ANN MARIE T. SULLIVAN, M.D.
Commissioner

## Health Home Plus for High-Need Individuals with Serious Mental Illness

## Program Guidance

January 24, 2019

### Description

Health Home Plus (HH+) is an intensive Health Home Care Management (HHCM) service established for defined populations with Serious Mental Illness (SMI) who are enrolled in a Health Home (HH) serving adults. To ensure the intensive needs of these individuals are met, Health Homes must assure HH+ individuals receive a level of service consistent with the requirements for caseload ratios, face-to-face visits, and minimum levels of staff experience and education outlined below. The differential monthly rate for HH+ is higher compared to the Health Home High Risk/Need Care Management and Health Home Care Management rates, and is intended to appropriately reimburse for the intense and consistent support needed for this population.

HH+ was first introduced in 2014, targeting the Assisted Outpatient Treatment (AOT) population enrolled in Health Home. In December of 2016, the HH+ population expanded to include individuals discharged from State Psychiatric Centers and those released from Central New York Psychiatric Center (CNYPC) and its corrections-based mental health units. Guidance identifying additional populations considered to have the highest care management needs within the SMI population was released in May of 2018.

This guidance document consolidates program requirements for all eligible HH+ SMI populations and includes updated staff qualifications to serve HH+ SMI as of November 2019.

### Eligible Population

HH+ services will be available for adults with SMI and who meet certain indicators for high need, such as risk for disengagement from care and/or poor outcomes (e.g., multiple hospitalizations, incarceration, and homelessness). These individuals may benefit from the enhanced support of HH+ for up to 12 consecutive months.

1) Individuals on a current AOT court order

   a. Enhanced Service Package / Voluntary Agreement:

   b. Identified by the Local Government Unit (LGU).

   c. An agreement signed by individuals otherwise considered for AOT by the LGU but agreeing that he/she will adhere to a prescribed community treatment plan rather than be subject to an AOT court order. (These agreements are most frequently used as trial periods before initiating a formal AOT order. The agreement can also be used following a period of AOT when the individual is deemed ready to transition off an AOT order.)

2) Expired AOT court order within the past year.

3) Individuals discharged from State Psychiatric Centers and those released from Central New York Psychiatric Center (CNYPC) and its corrections-based mental health units. Individuals being discharged from State PCs or CNYPC into an OMH State-operated residence[1] located on Psychiatric Center (PC) campus grounds are eligible for health home services, but not reimbursable at the HH+ rate[2]. These programs, by design, provide a high level of support reimbursed by existing residential rates.

   Later when the individual is ready for discharge from the on-campus State-operated residence, the individual will then become eligible for HH+ for 12 consecutive months post-discharge from the residence

4) Assertive Community Treatment (ACT) step down: Individuals transitioning off ACT to a lower level of service.

5) Homeless: Meeting the Housing Urban Development's (HUD) Category One (1) Literally Homeless definition. An individual who lacks a fixed, regular, and adequate nighttime residence:

   a. Has a primary nighttime residence that is a public or private place not meant for human habitation, such as a car, park, sidewalk, abandoned building, bus or train station, airport, or camping ground;

   b. Is living in a publicly- or privately-operated shelter designated to provide temporary living arrangements (including hotels and motels paid for by Federal, State or local government programs for low-income individuals or by charitable organizations, congregate shelters, and transitional housing); or

   c. Is exiting an institution where he or she resided for 90 days or less and who resided in an emergency shelter or place not meant for human habitation immediately before entering that institution.

6) High utilization of inpatient/emergency department (ED) services. This population is typically known to staff in emergency departments, inpatient units, as well as to providers of other acute and crisis services. Individuals will have had one or more of the following:

   a. Three (3) or more psychiatric inpatient hospitalizations within the past year; or

   b. Four (4) or more psychiatric ED[3] visits within the past year; or

   c. Three (3) or more medical inpatient hospitalizations within the past year and who have a diagnosis of Schizophrenia or Bipolar.

---

[1] OMH State-operated residence includes the following types: Transitional Living Residence (TLR), Transitional Placement Program (TPP), State Operated Community Residence (SOCR), and Residential Care Center for Adults (RCCA).
[2] Exception: The HH+ rate code may be billed for Individuals on AOT who receive HH+ services as outlined in this guidance.
[3] ED may also include Comprehensive Psychiatric Emergency Department (CPEP) under an observation status, or other psychiatric emergency/respite programs.

2

MG-Class00034125

7) Criminal Justice involvement: Release from incarceration (jail, prison) within the past year and requires linkage to community resources to avoid reincarceration. Eligible individuals have been incarcerated due to poor engagement in community services and supports.

8) Ineffectively engaged in care:

   a. No outpatient mental health services within the last year and two (2) or more psychiatric hospitalizations; or

   b. No outpatient mental health services within the last year and three (3) or more psychiatric ED[4] visits.

9) Clinical Discretion: SMI individuals who do not fall within at least one of the above high need categories could still be eligible for HH+ services based on the clinical discretion of the local Single Point of Access (SPOA) and/or Managed Care Organization (MCO).

   MCOs coordinate physical and behavioral health services for Medicaid Managed Care Plan enrollees. MCOs - including mainstream plans, HIV-SNPs and HARPs - have responsibility in ensuring high-need members have positive health outcomes and receive needed services.

   The LGU/SPOA has oversight and responsibility for the high-need SMI population and ensuring their access to services best able to meet their needs. SPOA is uniquely qualified to make a recommendation for HH+ eligibility based on their current work triaging referrals for ACT and AOT, as well as the non-Medicaid behavioral health population.

   The SPOA/MCO may consider social determinant factors in relation to the individual's psycho-social needs. Some examples may include but are not limited to the following:

   a. An individual who is frequently at-risk for homelessness due to psycho-social related tendencies such as hoarding.

   b. Transition-age youth: Individuals transitioning out of child/adolescent services who require intensive care coordination through this transition.

   c. Individuals experiencing initial onset of mental illness without connection to mental health treatment.

   d. An individual's substance use is a barrier to engaging in community-based treatment and services.

   e. Individuals placed on an ACT waitlist who would benefit from enhanced care coordination while awaiting placement with ACT services. LGU/SPOA and MCO should work with the assigned HH+ Care Manager (CM) to assist with planning for other care that may be needed in the interim.

Care Management Agencies (CMAs) will need to develop a protocol for safely transitioning individuals on and off HH+ care management services, based on individual need. Individuals

---

[4] ED may also include Comprehensive Psychiatric Emergency Department (CPEP) under an observation status, or other psychiatric emergency/respite programs.

3

MG-Class00034126

transitioning off from HH+ will receive the Health Home High Risk/Need Care Management rate for a period of six (6) months to support the transition to a less intensive level of care management.

**Care Management Agencies (CMAs) Eligible to Serve HH+ Individuals**

Prior to May 2018, the ability to serve and bill the HH+ rate code for individuals meeting HH+ eligibility criteria were limited to former Office of Mental Health (OMH) Targeted Case Management (TCM) providers, also known as OMH Legacy CMAs.

With the addition of other high-need individuals with SMI to the HH+ eligible population, the State acknowledged the need to increase CMA capacity for HH+. Starting May 2018, all other CMAs have the ability to serve the HH+ population. OMH has established HH+ CMA Credentials that must be met by non-OMH Legacy CMAs and non-Legacy CMAs who will serve the HH+ population and receive the HH+ reimbursement; see Health Home Care Management Agency Credentials to Serve Health Home Plus (HH+) for Members with Serious Mental Illness.

At this time, ability to serve individuals on AOT and bill HH+ will remain limited to former OMH legacy CMAs only, unless otherwise authorized by the State.

**Attestation**

Lead Health Homes are responsible for submitting written attestation to Department of Health (DOH)/OMH of all contracted CMAs who will provide HH+ and that meet the staff qualifications and credentials for HH+. Health Homes must have formal policies and procedures in place for ensuring such qualifications and credentials are current at the time of HH+ service delivery. Please visit the OMH website for more information on the attestation process.

OMH/DOH will have joint oversight of HH+ compliance, including the approval of attestation forms. Health Homes and CMAs who are approved for the HH+ rate, are subject to audit by the State and other Medicaid authorities. Agencies shall understand that failure to comply with HH+ requirements may jeopardize the agency's opportunity to bill the HH+ rate, and potentially affect a CMA's status as a downstream Health Home Care Management provider.

**Staff Qualifications**

HH+ shall always be delivered by a CMA with staff who have the education and experience appropriate to serve the high-need, behavioral health population. The following Minimum Qualifications[5] apply:

---

[5] CMA Supervisors who requested a waiver of qualifications needed to supervise HCBS Assessors and were approved prior to 11/15/16, will be considered qualified Supervisors for HH+ for that CMA. The CMA has the option to arrange for a licensed or Master's level professional within the organization to provide regular clinical supervision to the CMs, jointly with the care managers' direct program supervisor. Care managers who requested a waiver of HCBS Assessor qualifications and were approved prior to 11/15/16, will be considered qualified to serve HH+ SMI individuals for that CMA.
*NOTE: If a Supervisor or CM currently permitted to serve HH+ individuals (as described above) later leaves the agency, the CMA is required to replace them with new staff that meet the HH+ Staff qualifications.*

4

*Education and Experience*

1. A Master's degree in one of the qualifying[6] fields and one (1) year of Experience; OR
2. A Bachelor's degree in one of the qualifying fields and two (2) years of Experience; OR
3. A Credentialed Alcoholism and Substance Abuse Counselor (CASAC) and two (2) years of Experience; OR
4. A Bachelor's degree or higher in ANY field with either: three (3) years of Experience, or two (2) years of experience as a Health Home care manager serving the SMI or SED population.

Experience must consist of:

a. Providing direct services to people with Serious Mental Illness, developmental disabilities, alcoholism or substance abuse, and/or children with SED; OR
b. Linking individuals with Serious Mental Illness, children with SED, developmental disabilities, and/or alcoholism or substance abuse to a broad range of services essential to successful living in a community setting (e.g. medical, psychiatric, social, educational, legal, housing and financial services).

**AND**

*Supervision*

Supervision from someone meeting any one of the following:

1. Licensed level healthcare professional[7] with prior experience in a behavioral health setting; OR
2. Master's level professional with two (2) years prior supervisory experience in a behavioral health setting.

For more information on staff qualifications, please see "Updated HH+ and NYS EA Qualifications".

**Referral for Health Home Plus**

Referrals can come from multiple sources including community providers, shelter outreach teams, ACT teams, forensics, MCOs, hospitals, etc. The referral source can supply documentation to support that the individual meets high need indicators for HH+.

---

[6] *Qualifying fields* include education degrees featuring a major or concentration in: social work, psychology, nursing, rehabilitation, education, occupational therapy, physical therapy, recreation or recreation therapy, counseling, community mental health, child and family studies, sociology, speech and hearing or other human services field.

[7] *Licensed level healthcare professional* includes: Physicians, Psychiatrists, Physician's Assistants, Nurse Practitioners, Psychiatric Nurse Practitioners, Registered Professional Nurses, Licensed Practical Nurses, Licensed Psychologists, Licensed Clinical Social Workers, Licensed Master Social Workers, Licensed Mental Health Counselors, Licensed Marriage and Family Therapists, Licensed Psychoanalysts, Licensed Creative Arts Therapists, and Licensed Occupational Therapists.

5

If the referral goes to the Health Home, the Health Home must ensure that the individual is assigned to a CMA qualified to serve the HH+ population. The Health Home shall ensure prompt assignment is made to allow the care manager the ability to participate in the planning process for continuity of care, whenever possible.

Referrals sent through SPOA should be assigned to HH/CMA who has attested to serve the HH+ population. The SPOA is responsible to ensure that referrals are coordinated in a timely and efficient way for this high-need population to benefit from the intensive services. CMAs must have a working relationship with SPOA and ensure protocols are in place to receive referrals.

**Program Requirements**

- Program requirements for HH+ enrollees are to be carried out consistent with the existing Health Home Standards and Requirements for Health Homes, Care Management Providers and Managed Care Organizations guidance distributed by the Department of Health.

- The required caseload ratio for HH+ enrollees shall be one (1) full-time employee (FTE) to 12 HH+ recipients, but no greater than 1:15.

- A minimum of four (4) Health Home core services must be provided per month, two (2) of which must be face-to-face contacts, or more when the individual's immediate needs require additional contacts. *The HH+ rate code can be billed only when this requirement is met and clearly documented in the individual's record.*
    - For individuals with an active AOT court order, at least four (4) face-to-face contacts must be made within the month. See below for additional program requirements that must be met in order to receive the HH+ rate for individuals on AOT.

- If the minimum service requirements are not provided in a given month, but all other requirements as outlined in this guidance are met; and at least one (1) Health Home core service was provided:
    - The Health Home High Risk/Need Care Management rate code may be billed for that given month.

- The HH+ rate code can be billed for 12 consecutive months starting from the point an individual's HH+ eligibility becomes known to the CM and HH+ services have been provided.
    - For AOT individuals, the HH+ rate can be billed for as long as the court order is active.

- If a HH+ individual continues to meet eligibility at the end of the 12-month initial time frame, HH+ billing may continue for 12 more months with supporting documentation. For example, an individual began receiving HH+ services in January after stepping down from ACT. In December, the CM determines they still meet HH+ eligibility due to three (3) inpatient psychiatric stays within the last year. HH+ services may continue another 12 months.

6

- Communicating with Managed Care Plans (MCOs) regarding HH+ individuals:
    - The CMA must inform the Health Home when HH+ eligibility becomes known to the CM and HH+ services will be provided. For AOT individuals, the CMA must inform the HH when a member has been placed on court-ordered AOT, or when the court order has expired and has not been renewed.
    - The Health Home must inform the MCO of the individuals' HH+ status.

*Additional Program Requirements for Individuals On AOT*

The following program requirements apply to all individuals with a current AOT court order:

- Individuals receiving court-ordered AOT will be assigned to a CMA with behavioral health expertise or otherwise qualified to serve HH+ individuals, through the Local Governmental Unit's (LGU) AOT process.
    - In many counties, SPOA may be included in the process by which the LGU assigns AOT individuals to a CMA.
    - If an individual already receiving HH care management in the community is later ordered to AOT, the LGU must ensure that the care management agency serving that individual is eligible to serve AOT as described in this guidance. If the CMA is not eligible, the LGU must direct a transfer to a CMA with the appropriate experience. It will then be the responsibility of the CMA to promptly notify the Health Home of the CMA transfer.

- At least four (4) face-to-face contacts must be made within the month. *The HH+ rate code can be billed only when this requirement is met and clearly documented in the individual's record.*

- If the care manager made effort to provide four (4) face-to-face contacts and the individual was not home, did not show up for an appointment or was otherwise not available, the CMA must report all efforts made to follow up with the individual using notification procedures as developed by the Local Government Unit (LGU).
    - If the individual was not able to be seen, continued communication with the LGU should be made in order to determine what additional follow-up efforts may be required. All efforts must be documented in the individual's record.
    - If at least one (1) Health Home core service was provided by a qualified care manager and the above requirements have been completed:
        - The Health Home High Risk/Need Care Management rate code may be billed for that given month.

- If the individual with an AOT court order cannot be located and has had no credibly reported contact within *24 hours* of the time the care manager received either notice that the individual had an unexplained absence from a scheduled treatment appointment, or other credible evidence that the AOT individual could not be located, the individual will be deemed Missing. *A diligent search shall commence, as outlined in the OMH guidance* <u>Assisted Outpatient Treatment Program: Guidance for AOT Program Operation</u> *(reissued February 2014).*

7

- o If the care manager made effort to provide four (4) face-to-face contacts and was unable to due to Missing status, *HH+ rate can continue to be billed as long as the diligent search procedures referenced above are followed and clearly documented in the individual's care management record.* The individual's record shall also clearly indicate when the determination was made that the individual was missing. The diligent search shall continue until either the person is located, or the court order is no longer active.
    - If all activities for performing a diligent search cannot reasonably be completed within the same month the individual is deemed Missing, the HH+ rate may still be billed for that month so long as the diligent search process commenced within timeframes specified in AOT Program Operation guidance.
  - o A missing AOT individual is considered a significant event that must be reported to the LGU within 24 hours, following the LGU's protocol for reporting significant events. Continued communication with the LGU should be made in order to determine what additional follow-up efforts may be required and shall also be documented clearly in the individual's record.

- When the examining physician includes HHCM in the court-ordered treatment plan and the individual refuses to enroll in the Health Home, a copy of the AOT order shall be made available to the Health Home, which will then be able to enroll the individual and bill the HH+ rate code. However, the AOT order does not substitute for the individual's consent to share clinical information. Absent such specific consent, the HHCM may share clinical information for care coordination purposes to the extent permitted by section 33.13(d) of the Mental Hygiene law, which provides a limited treatment exception for the exchange of clinical information between mental health providers and Health Homes.

- The CM will work with the LGU to ensure timely delivery of services as listed in the court order. Such services must include coordination of all categories of service listed in the AOT treatment plan.

- All categories of service listed in the court-ordered AOT treatment plan shall also be included in the individual's integrated health home plan of care.

  - o The CMA and/or other members of the treatment team must consult with the treating physician and the LGU's Director of Community Services or County AOT coordinator, who can then petition to the court for any material change needed to be made to the AOT treatment plan. Any additions or deletions of *categories of service* are considered material changes.

  - o Changes needed to other services in the HH plan of care that are not listed in the AOT treatment plan (e.g., primary care services not listed in the AOT treatment plan), are not considered material changes and therefore do **not** require consult with the LGU.

- Health Homes and Care Management Agencies shall be familiar with the statutory basis of the AOT program, or Kendra's Law (§9.60 of NYS Mental Hygiene Law), including the requirement that care management is a mandatory service category on every court-

8

MG-Class00034131

ordered treatment plan. This guidance outlines the contact requirements for care management.

- The CMA shall comply with all reporting requirements of the AOT Program as established by the LGU. Localities may have their own requirements that are above the minimum contact standards of four times per month. Additionally, the CMA must report assessment and follow-up data to the Office of Mental Health (OMH) through the Child and Adult Integrated Reporting System (CAIRS) at 6-month intervals.

**LGU Requirements for AOT**

The LGU is responsible to operate, direct, and supervise their County's AOT program and work in collaboration with the CMA to arrange or provide for all categories of AOT services. As part of these responsibilities the LGU:

- Uses their established system to respond to and investigate all AOT referrals;
- Ensures that the services in the treatment plan are made available and monitors delivery of these services.
- Monitors the AOT individuals served;
- Follows the county-specific procedure for implementation of MHL section 9.60 removal orders;
- Follows their established system for notification regarding AOT recipients who are missing within 24 hours, diligent search, removal orders, and missing person report (see link below for detail); and
- Uses their established system to be notified of all significant events and reports them to OMH as required (see guidance Significant Event Reports: Care Manager Reporting of Significant Events Related to Assisted Outpatient Treatment (AOT) Court Orders for details); and
- Provides data to OMH as required.

Please visit the OMH website for more details on the AOT Program and reporting requirements.

**Comprehensive Transitional Care**

It is expected that the HH/CMA staff and the referral source will coordinate efforts in a way that provides for warm hand-off and/or immediate engagement working with high-need individuals. The care manager should initiate contact with the individual and/or referral source upon receiving the referral.

A warm hand-off is best practice to ensure optimal transition to HH+ services when an individual is being discharged/transitioned from either a program or facility. An introduction with the individual prior to discharge/transition can help orient the individual to HH+ services while allowing the care manager to be a participant in the discharge planning.

*For individuals transitioning from a State PC/CNYPC*

State PC Discharge planning staff or CNYPC Pre-Release Services staff should, whenever possible, *initiate referrals to a Health Home prior to discharge*. State PC/CNYPC staff shall first obtain a signed Authorization for Release of Information from the individual, providing consent

9

for a HH referral to be made. In some counties, referrals to Health Home services for individuals being discharged from State PCs/CNYPC may go through SPOA, in which case, State PC/CNYPC staff can contact the local government unit (LGU) to facilitate a referral to SPOA.

- It is imperative that State PC/CNYPC staff make referrals to SPOA in advance of discharge, in order to allow for a warm hand-off and more immediate care manager engagement, even prior to discharge.

- State PC/CNYPC staff shall verify and include the individual's Medicaid eligibility status in the referral, as well as the specific follow-up action needed post-discharge to help ensure the individual's Medicaid is activated as soon as possible.
    - See Appendix B: "Discharge Scenarios for 21 – 64-Year-Old Inpatients". For example, if the individual's Medicaid was suspended while inpatient or incarcerated and determined that the individual will need to reinstate Medicaid through the local Department of Social Services upon discharge, State PC/CNYPC staff will indicate such status and the follow up needed in the referral being made to the HH.

- For most individuals age 18 - 21 (transition age youth) who are inpatients in a State PC, OMH (Medicaid District 97) will have opened a Medicaid case to cover the inpatient stay. If the youth had coverage prior to the inpatient admission and the case remained open, upon discharge the youth would have an OMH Medicaid case for the inpatient stay as well as an open local district or NYC HRA case. Following discharge, the OMH case would close and the local district/NYC HRA would be notified to resume the youth's coverage.
    - If the youth did not have Medicaid coverage prior to admission, or the Medicaid coverage was closed or expired during the inpatient stay, the OMH Medicaid coverage would transition to the new district of responsibility upon discharge. Youth who have coverage through NYSoH may have to reapply for coverage upon discharge, or their coverage may also continue uninterrupted.

- The OMH Medicaid case generally remains open for the month of the person's discharge and the following month during the transition process. Care managers should confirm that coverage is transitioned to the new Medicaid district.

- For most adults age 65 or older who are inpatients in a State PC, OMH (Medicaid District 97) will have opened a Medicaid case. Following discharge, that coverage is transitioned to a local district or NYC HRA. The OMH Medicaid case generally remains open for the month of the person's discharge and the following month during the transition process. Care managers should confirm that coverage is transitioned to the new Medicaid district.

- For CNYPC discharges only: In NYC, most individuals being released from CNYPC will initially be referred to an OMH-dedicated forensic transitional case management team. The forensic care management team will later refer the individual to a Health Home for ongoing care management and should work with the HHCM to ensure that a warm hand-off is coordinated. The HHCM will provide HH+ for the remainder of the 12-month period that the individual is eligible for HH+.

10

- Once assigned to a CMA, the CMA shall provide immediate delivery of HHCM services, including participation in the pre-release/discharge planning process whenever possible, to support a warm hand-off.
    - For individuals already enrolled in a HH and being discharged from a State PC or CNYPC, the CMA shall participate in the discharge planning process and have a face-to-face contact with the individual within 48 hours of discharge. Current best practice indicates that face to face contact with an individual within 24 hours of release from a forensic facility is pivotal to successful engagement for this population.
    - Coordination of care will likely include the reestablishment of Medicaid benefits for this population, so that individuals have immediate access to all services on their plan of care.
    - For individuals being released from prison with Parole, the health home care manager should establish contact as soon as possible with the Parole Officer to coordinate efforts for helping the individual follow their mental health discharge plan, which will include care management.

**Care Management Models That Meet HH+ Requirements**

To meet the changing and complex needs of the HH+ population, CMAs may utilize different models of care management to affect successful transitions, continuity of care and improved outcomes. CMAs have the option to adopt any of the following models of care management offered below; see also Appendix A. To ensure HH+ individuals on a given caseload receive the required level of service, certain parameters will apply.

*HH+ Only Caseload:*

One qualified care manager serves a caseload of 12-15 HH+ individuals.

*Mixed Caseload (HH+ and non-HH+ individuals):*

For the purposes of caseload stratification and resource management; a caseload mix of HH+ and non-HH+ is allowable if and only if the HH+ ratio is less than 12 recipients to one (1) Health Home Care Manager. Caseload sizes should always allow for adequate time providing care management as outlined in this guidance to HH+ individuals while allowing for thoughtful consideration of the care coordination needs of non-HH+ recipients.

*Team Approach:*

A CMA may choose to use a team approach to serve a HH+ Only caseload or a Mixed caseload of HH+ and non-HH+ individuals. However, use of this approach mandates the following requirements are met:
- The team caseload must maintain the ratio of 12 to 15 HH+ individuals per each FTE on the team. For every 30 HH+ individuals, the team must have at least one (1) qualified HH+ care manager. For example, a team serving 40 HH+ individuals shall have two (2) qualified HH+ care managers on the team.

11

- A qualified HH+ care manager must provide at least two (2) Health Home core services per month, one (1) of which must be a face-to-face contact for HH+ individuals. The remaining contact requirements can be provided by the additional team members.
- A primary care manager meeting the staff qualifications outlined above to serve HH+ individuals shall be identified and will conduct the Comprehensive Assessment, develop the Plan of Care, and provide oversight regarding coordination of interventions in accordance with the Plan of Care.

**Billing and Tracking Guidance**

For reimbursable Health Home Care Management and HH+ services delivered, CMAs are to use either the MAPP HHTS or the Health Home's own system (which then feeds into MAPP HHTS) to attest that billable services were provided (minimum required HH+ services or HHCM core service) in a given month. The MCOs will use the MAPP HHTS billing support to pay the Health Homes. Health Homes will bill eMedNY for Health Home enrollees not in mainstream MCOs (including mainstream plans, HIV-SNPs and HARPs). The Health Homes are to send the Health Home funds for a CMA, less the contracted administrative fee, to the CMA.

- There is a unique rate code for HH+ services (1853).
- There is one HH+ payment rate for Downstate and one for Upstate:
    - For Downstate (applicable to Dutchess, Putnam, Rockland, Westchester, Nassau, and Suffolk Counties, and New York City), the monthly rate is $800
    - For Upstate (applicable to all counties other than Downstate), the monthly rate is $750
- The HH+ rates were added to lead Health Home rate profiles in eMedNY effective December 1, 2016 to allow lead Health Homes to bill on behalf of Care Management Agencies providing HH+ services.
- The Department of Health (DOH) Medicaid Analytics Performance Portal ("MAPP") will be used to identify individuals as HH+. MAPP users will be prompted in the monthly HML questionnaire with the question "Is the member in the expanded HH+ population?" If the user responds "Yes", the user is then prompted with "Were the minimum required HH+ services provided?" By responding "Yes", the CMA attests that the minimum service requirements for HH+ have been provided.

12

## Appendix A: Care Management Models that Meet HH+ Requirements

**Model 1: HH+ Caseload**
12-15 HH+ caseload served by CM

- HH+ Qualified CM
  - CM provides HH+ Level of CM (minimum 4 core services, 2 being FTF)

**Model 2: Mixed Caseload – CM**
Mix of HH+ and non-HH+

- HH+ Qualified CM: CM provides level of service applicable to each member
  - HH+: HH+ service requirements apply
  - Non-HH+: Minimum of 1 Core Service

**Model 3: HH+ Only Caseload - Team Approach**
12-15 HH+ individuals can be served by every 1 FT team member. Minimum HH+ Service Requirements met by team.

- Primary (HH+ Qualified) CM: Provides minimum of 2 core services per month, including 1 FTF. Performs assessments/develops POC. Facilitates coordination of services among CM team.
- Other team members could be: RN, MHCM, PPs, etc.

**Model 4: Mixed Caseload -- Team Approach**
Mixed HH+ and non-HH+ Caseload Served by Team

- Primary (HH+ Qualified) CM: Provides minimum of 2 core services per month, including 1 FTF. Performs assessments/develops POC. Facilitates coordination of services among CM team.
- Other team members could be: RN, MHCM, PPs, etc.
- Service Requirements met by Team, in accordance to POC
  - HH+: HH+ service requirements Apply
  - Non-HH+: Minimum of 1 core service per month

### Caseload Stratification Examples

Individuals enrolled in HH+ must receive a level of service intensity consistent with a ratio 1:12 no more than 1:15 caseload range. The State understands that for the purposes of transitions, continuity of care, and the changing needs of the individual, there are opportunities for CMAs to utilize different models of care management to formulate a caseload. Below are some models and examples CMAs may use for the purposes of caseload stratification that also adheres to the program requirements outlined in the guidance.

13

*HH+ Only Caseload:*

A traditional model of care management where services are provided by one qualified care manager and caseload capacity is determined by a fixed number of cases. Program requirements that apply to this model include:

- The required caseload ratio for HH+ enrollees shall be one (1) full-time employee (FTE) to 12 HH+ recipients, but no greater than 1:15.
- The qualified HH+ care manager must provide a minimum of four (4) Health Home core services per month, two (2) of which must be face-to-face contacts, or more when the individual's immediate needs require additional contacts.
    - If the individual is AOT, at least four (4) face-to-face contacts must be made within the month.



14

*HH+ Mixed Caseload:*

For the purposes of caseload stratification, resource management and overall flexibility, CMAs may choose to have a mixed caseload of HH+ and non-HH+ individuals when there are less than 12 HH+ individuals on a caseload.



One suggested approach for formulating a mixed caseload while factoring in varied levels of need is a weighted point system. When using this system, caseload capacity is determined by point accumulation as opposed to a traditional approach, where capacity is based on a fixed number of individuals. Each Health Home enrolled individual is assigned a point value based on the individual's category as determined by the CMA.

The table below outlines recommended categories and point values a CMA could adopt when using the weighted point system approach for caseloads that include HH+ individuals:

| Category | Description | Point Value |
|---|---|---|
| HH+ | For any individual receiving HH+ services. | 3 |
| High Touch | For individuals not receiving HH+ services but require a high level of service intensity. Some factors a CMA could consider for this category include: non-SMI Homelessness, HARP Enrollment, HH+ step down, chronic Substance Abuse etc. May include individuals that meet the Health Home High Risk/Need rate. | 2 |
| Low Touch | For individuals not receiving HH+ services and require a low level of service intensity. May include individuals that meet the Health Home Care Management rate. | 1 |

15

The CMA can take the following steps to calculate caseload capacity using the values recommended above:

1) Determine a point range for the caseload. To maintain a level of service intensity consistent with a ratio of 1:12 no more than 1:15 caseload, the recommended point range would be 36-45 points. This recommended point range is based on the following calculation:

| Ratio | Calculation (using HH+ cases only) | Points |
|---|---|---|
| 1:12 | 12 HH+ individuals x 3 (point value) = | 36 points |
| 1:15 | 15 HH+ individuals x 3 (point value) = | 45 points |

2) The point range should always allow for adequate time providing care management as outlined in this guidance to HH+ individuals while allowing for thoughtful consideration of the care coordination needs of non-HH+ recipients.

3) Using the table above, identify the individual's category and the point value.

4) Assign individuals to a caseload and add the subsequent point values to equal no more than the established point range.

Below is an example of a mixed caseload for one care manager formulated using the weighted point system:

| Category | Number of Individuals | Calculation | Points by Category |
|---|---|---|---|
| HH+ (3 points) | 7 | 7 (individuals) x 3 (points) = | 21 |
| High Touch (2 points) | 6 | 6 (individuals) x 2 (points) = | 12 |
| Low Touch (1 point) | 9 | 9 (individuals) x 1 (point) = | 9 |
| | Total: 22 Individuals | | Total: 42 points |

In this example, the caseload ratio is 1:22 composed of a mix of 7 HH+ (3 points each), 6 High Touch (2 points each) and 9 Low Touch (1 point each) totaling 42 points, which is in the recommended mixed caseload point range of 36-45 points.

16

*HH+ Team Approach:*

To best meet the needs of the individuals and to provide the necessary interventions in accordance with the person-centered Plan of Care, a team model of care management may be utilized by a CMA. Under this model, HH+ individuals can receive services by an array of staff members that is led by a primary care manager. Team members may include but not limited to Registered Nurses, peers and/or additional Health Home Care Managers.



When using a team approach, program requirements would include:

- The required team caseload shall be 12 to 15 HH+ individuals per one (1) FTE on the team. Outlined below is the number of FTEs to the possible caseload range:
    - 2 FTEs could serve a caseload range of 16-30 HH+ individuals
    - 3 FTEs could serve a caseload of 31-45 HH+ individuals
    - 4 FTEs could serve a caseload of 46-60 HH+ individuals
- A team must have at least one qualified HH+ care manager for every 30 HH+ individuals. *For example, a team serving 40 HH+ individuals must have two (2) qualified HH+ care managers on the team.*
- A primary care manager meeting the staff qualifications outlined in the guidance to serve HH+ individuals shall be identified and will conduct the Comprehensive Assessment, develop the Plan of Care, and provide oversight regarding coordination of interventions in accordance with the Plan of Care.
- A qualified HH+ care manager must provide at least two (2) Health Home core services per month, one (1) of which must be a face-to-face contact. The remaining contact requirements can be provided by the additional team members.

17

Mixed Caseload-Team Approach:

A team approach may be used to serve a mixed caseload of HH+ and non-HH+ individuals. The weighted point system as outlined above can be used to formulate the caseload capacity for the team. Program requirements outlined for mixed caseloads and team approach would apply.



- Below is an example of a HH+ Team serving a mixed caseload with three (3) FTE on the team. Staff members on this team include one (1) qualified HH+ care manager, one (1) non-qualified care manager, a part-time (.5 FTE) peer and a part-time (.5 FTE) Registered Nurse. The example uses the same recommended categories and point values as outlined above. Using the same calculation method as outlined above, the recommended point range for a team of three (3) FTE would be 108-135 points.

| Category | Number of Individuals | Calculation | Points by Category |
|---|---|---|---|
| HH+ (3 points) | 21 | 21 (individuals) x 3 (points) = | 63 |
| High Touch (2 points) | 18 | 18 (individuals) x 2 (points) = | 36 |
| Low Touch (1 point) | 35 | 35 (individuals) x 1 (point) = | 35 |
|  | Total 74 |  | Total 134 |

In this example, the caseload ratio for the team is 3:74 composed of a mix of 21 HH+ (3 points each), 18 High Touch (2 points each) and 35 Low Touch (1 point each) totaling 134 points, which is in the recommended mixed caseload point range of 108-135 points.

18

## Appendix B: Discharge Scenarios for 21-64 Year Old Inpatients



*The automated suspension process is under development and not operational at this time

19