# EXHIBIT 46

**U.S. Department of Justice**
Civil Rights Division
Disability Rights Section



# Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*

In the years since the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999), the goal of the integration mandate in title II of the Americans with Disabilities Act – to provide individuals with disabilities opportunities to live their lives like individuals without disabilities – has yet to be fully realized. Some state and local governments have begun providing more integrated community alternatives to individuals in or at risk of segregation in institutions or other segregated settings. Yet many people who could and want to live, work, and receive services in integrated settings are still waiting for the promise of *Olmstead* to be fulfilled.

In 2009, on the tenth anniversary of the Supreme Court's decision in *Olmstead*, President Obama launched "The Year of Community Living" and directed federal agencies to vigorously enforce the civil rights of Americans with disabilities. Since then, the Department of Justice has made enforcement of *Olmstead* a top priority. As we commemorate the 12th anniversary of the *Olmstead* decision, the Department of Justice reaffirms its commitment to vindicate the right of individuals with disabilities to live integrated lives under the ADA and *Olmstead*. To assist individuals in understanding their rights under title II of the ADA and its integration mandate, and to assist state and local governments in complying with the ADA, the Department of Justice has created this technical assistance guide.

## The ADA and Its Integration Mandate

In 1990, Congress enacted the landmark Americans with Disabilities Act "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."[1] In passing this groundbreaking law, Congress recognized that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."[2] For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.[3]

MG-Class00039553

As directed by Congress, the Attorney General issued regulations implementing title II, which are based on regulations issued under section 504 of the Rehabilitation Act.[4] The title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[5] The preamble discussion of the "integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ."[6]

In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the Supreme Court held that title II prohibits the unjustified segregation of individuals with disabilities. The Supreme Court held that public entities are required to provide community-based services to persons with disabilities when (a) such services are appropriate; (b) the affected persons do not oppose community-based treatment; and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of others who are receiving disability services from the entity.[7] The Supreme Court explained that this holding "reflects two evident judgments." First, "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." Second, "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."[8]

To comply with the ADA's integration mandate, public entities must reasonably modify their policies, procedures or practices when necessary to avoid discrimination.[9] The obligation to make reasonable modifications may be excused only where the public entity demonstrates that the requested modifications would "fundamentally alter" its service system.[10]

In the years since the passage of the ADA and the Supreme Court's decision in *Olmstead*, the ADA's integration mandate has been applied in a wide variety of contexts and has been the subject of substantial litigation. The Department of Justice has created this technical assistance guide to assist individuals in understanding their rights and public entities in understanding their obligations under the ADA and *Olmstead*. This guide catalogs and explains the positions the Department of Justice has taken in its Olmstead enforcement. It reflects the views of the Department of Justice only. For questions about this guide, you may contact our ADA Information Line, 800-514-0301 (voice), 833-610-1264 (TTY).

Date: June 22, 2011

### Questions and Answers on the ADA's Integration Mandate and *Olmstead* Enforcement

**1. What is the most integrated setting under the ADA and *Olmstead*?**
A: The "most integrated setting" is defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."[11] Integrated settings are those that provide individuals with disabilities opportunities to live, work, and receive services in the greater

MG-Class00039554

community, like individuals without disabilities. Integrated settings are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible. Evidence-based practices that provide scattered-site housing with supportive services are examples of integrated settings. By contrast, segregated settings often have qualities of an institutional nature. Segregated settings include, but are not limited to: (1) congregate settings populated exclusively or primarily with individuals with disabilities; (2) congregate settings characterized by regimentation in daily activities, lack of privacy or autonomy, policies limiting visitors, or limits on individuals' ability to engage freely in community activities and to manage their own activities of daily living; or (3) settings that provide for daytime activities primarily with other individuals with disabilities.

**2. When is the ADA's integration mandate implicated?**
A: The ADA's integration mandate is implicated where a public entity administers its programs in a manner that results in unjustified segregation of persons with disabilities. More specifically, a public entity may violate the ADA's integration mandate when it: (1) directly or indirectly operates facilities and or/programs that segregate individuals with disabilities; (2) finances the segregation of individuals with disabilities in private facilities; and/or (3) through its planning, service system design, funding choices, or service implementation practices, promotes or relies upon the segregation of individuals with disabilities in private facilities or programs.[12]

**3. Does a violation of the ADA's integration mandate require a showing of facial discrimination?**
A: No, in the *Olmstead* context, an individual is not required to prove facial discrimination. In *Olmstead*, the court held that the plaintiffs could make out a case under the integration mandate even if they could not prove "but for" their disability, they would have received the community-based services they sought. It was enough that the state currently provided them services in an institutional setting that was not the most integrated setting appropriate.[13] Additionally, an *Olmstead* claim is distinct from a claim of disparate treatment or disparate impact and accordingly does not require proof of those forms of discrimination.

**4. What evidence may an individual rely on to establish that an integrated setting is appropriate?**
A: An individual may rely on a variety of forms of evidence to establish that an integrated setting is appropriate. A reasonable, objective assessment by a public entity's treating professional is one, but only one, such avenue. Such assessments must identify individuals' needs and the services and supports necessary for them to succeed in an integrated setting. Professionals involved in the assessments must be knowledgeable about the range of supports and services available in the community. However, the ADA and its regulations do not require an individual to have had a state treating professional make such a determination. People with disabilities can also present their own independent evidence of the appropriateness of an integrated setting, including, for example, that individuals with similar needs are living, working and receiving services in integrated settings with appropriate supports. This evidence may come from their own treatment providers, from community-based organizations that provide

MG-Class00039555

services to people with disabilities outside of institutional settings, or from any other relevant source. Limiting the evidence on which *Olmstead* plaintiffs may rely would enable public entities to circumvent their *Olmstead* requirements by failing to require professionals to make recommendations regarding the ability of individuals to be served in more integrated settings.

**5. What factors are relevant in determining whether an individual does not oppose an integrated setting?**

A: Individuals must be provided the opportunity to make an informed decision. Individuals who have been institutionalized and segregated have often been repeatedly told that they are not capable of successful community living and have been given very little information, if any, about how they could successfully live in integrated settings. As a result, individuals' and their families' initial response when offered integrated options may be reluctance or hesitancy. Public entities must take affirmative steps to remedy this history of segregation and prejudice in order to ensure that individuals have an opportunity to make an informed choice. Such steps include providing information about the benefits of integrated settings; facilitating visits or other experiences in such settings; and offering opportunities to meet with other individuals with disabilities who are living, working and receiving services in integrated settings, with their families, and with community providers. Public entities also must make reasonable efforts to identify and addresses any concerns or objections raised by the individual or another relevant decision-maker.

**6. Do the ADA and *Olmstead* apply to persons at serious risk of institutionalization or segregation?**

A: Yes, the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings. Individuals need not wait until the harm of institutionalization or segregation occurs or is imminent. For example, a plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services or its cut to such services will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution.

**7. May the ADA and *Olmstead* require states to provide additional services, or services to additional individuals, than are provided for in their Medicaid programs?**

A: A state's obligations under the ADA are independent from the requirements of the Medicaid program.[14] Providing services beyond what a state currently provides under Medicaid may not cause a fundamental alteration, and the ADA may require states to provide those services, under certain circumstances. For example, the fact that a state is permitted to "cap" the number of individuals it serves in a particular waiver program under the Medicaid Act does not exempt the state from serving additional people in the community to comply with the ADA or other laws.[15]

**8. Do the ADA and *Olmstead* require a public entity to provide services in the community to persons with disabilities when it would otherwise provide such services in institutions?**

A: Yes. Public entities cannot avoid their obligations under the ADA and *Olmstead* by characterizing as

MG-Class00039556

a "new service" services that they currently offer only in institutional settings. The ADA regulations make clear that where a public entity operates a program or provides a service, it cannot discriminate against individuals with disabilities in the provision of those services.[16] Once public entities choose to provide certain services, they must do so in a nondiscriminatory fashion.[17]

### 9. Can budget cuts violate the ADA and *Olmstead*?

A: Yes, budget cuts can violate the ADA and *Olmstead* when significant funding cuts to community services create a risk of institutionalization or segregation. The most obvious example of such a risk is where budget cuts require the elimination or reduction of community services specifically designed for individuals who would be institutionalized without such services. In making such budget cuts, public entities have a duty to take all reasonable steps to avoid placing individuals at risk of institutionalization. For example, public entities may be required to make exceptions to the service reductions or to provide alternative services to individuals who would be forced into institutions as a result of the cuts. If providing alternative services, public entities must ensure that those services are actually available and that individuals can actually secure them to avoid institutionalization.

### 10. What is the fundamental alteration defense?

A: A public entity's obligation under *Olmstead* to provide services in the most integrated setting is not unlimited. A public entity may be excused in instances where it can prove that the requested modification would result in a "fundamental alteration" of the public entity's service system. A fundamental alteration requires the public entity to prove "that, in the allocation of available resources, immediate relief for plaintiffs would be inequitable, given the responsibility the State [or local government] has taken for the care and treatment of a large and diverse population of persons with [ ] disabilities."[18] It is the public entity's burden to establish that the requested modification would fundamentally alter its service system.

### 11. What budgetary resources and costs are relevant to determine if the relief sought would constitute a fundamental alteration?

A: The relevant resources for purposes of evaluating a fundamental alteration defense consist of all money the public entity allots, spends, receives, or could receive if it applied for available federal funding to provide services to persons with disabilities. Similarly, all relevant costs, not simply those funded by the single agency that operates or funds the segregated or integrated setting, must be considered in a fundamental alteration analysis. Moreover, cost comparisons need not be static or fixed. If the cost of the segregated setting will likely increase, for instance due to maintenance, capital expenses, environmental modifications, addressing substandard care, or providing required services that have been denied, these incremental costs should be incorporated into the calculation. Similarly, if the cost of providing integrated services is likely to decrease over time, for instance due to enhanced independence or decreased support needs, this reduction should be incorporated as well. In determining whether a service would be so expensive as to constitute a fundamental alteration, the fact that there may be transitional costs of converting from segregated to integrated settings can be considered, but it is not determinative. However, if a public entity decides to serve new individuals in segregated settings

MG-Class00039557

("backfilling"), rather than to close or downsize the segregated settings as individuals in the plaintiff class move to integrated settings, the costs associated with that decision should not be included in the fundamental alteration analysis.

### 12. What is an *Olmstead* Plan?

A: An *Olmstead* plan is a public entity's plan for implementing its obligation to provide individuals with disabilities opportunities to live, work, and be served in integrated settings. A comprehensive, effectively working plan must do more than provide vague assurances of future integrated options or describe the entity's general history of increased funding for community services and decreased institutional populations. Instead, it must reflect an analysis of the extent to which the public entity is providing services in the most integrated setting and must contain concrete and reliable commitments to expand integrated opportunities. The plan must have specific and reasonable timeframes and measurable goals for which the public entity may be held accountable, and there must be funding to support the plan, which may come from reallocating existing service dollars. The plan should include commitments for each group of persons who are unnecessarily segregated, such as individuals residing in facilities for individuals with developmental disabilities, psychiatric hospitals, nursing homes and board and care homes, or individuals spending their days in sheltered workshops or segregated day programs. To be effective, the plan must have demonstrated success in actually moving individuals to integrated settings in accordance with the plan. A public entity cannot rely on its *Olmstead* plan as part of its defense unless it can prove that its plan comprehensively and effectively addresses the needless segregation of the group at issue in the case. Any plan should be evaluated in light of the length of time that has passed since the Supreme Court's decision in *Olmstead*, including a fact-specific inquiry into what the public entity could have accomplished in the past and what it could accomplish in the future.

### 13. What must a public entity show to establish a fundamental alteration defense based on an *Olmstead* plan?

A: A public entity raising a fundamental alteration defense based on an *Olmstead* plan must show that it has developed a comprehensive, effectively working *Olmstead* plan that meets the standards described above, and that it is implementing the plan. A public entity that cannot show it has and is implementing a working plan will not be able to prove that it is already making sufficient progress in complying with the integration mandate and that the requested relief would so disrupt the implementation of the plan as to cause a fundamental alteration.

### 14. What is the relevance of budgetary shortages to a fundamental alteration defense?

A: Public entities have the burden to show that immediate relief to the plaintiffs would effect a fundamental alteration of their program. Budgetary shortages are not, in and of themselves, evidence that such relief would constitute a fundamental alteration. Even in times of budgetary constraints, public entities can often reasonably modify their programs by re-allocating funding from expensive segregated settings to cost-effective integrated settings. Whether the public entity has sought additional federal resources available to support the provision of services in integrated settings for the particular group or

MG-Class00039558

individual requesting the modification – such as Medicaid, Money Follows the Person grants, and federal housing vouchers – is also relevant to a budgetary defense.

### 15. What types of remedies address violations of the ADA's integration mandate?

A: A wide range of remedies may be appropriate to address violations of the ADA and *Olmstead*, depending on the nature of the violations. Remedies typically require the public entity to expand the capacity of community-based alternatives by a specific amount, over a set period of time. Remedies should focus on expanding the most integrated alternatives. For example, in cases involving residential segregation in institutions or large congregate facilities, remedies should provide individuals opportunities to live in their own apartments or family homes, with necessary supports. Remedies should also focus on expanding the services and supports necessary for individuals' successful community tenure. *Olmstead* remedies should include, depending on the population at issue: supported housing, Home and Community Based Services ("HCBS") waivers,[19] crisis services, Assertive Community Treatment ("ACT") teams, case management, respite, personal care services, peer support services, and supported employment. In addition, court orders and settlement agreements have typically required public entities to implement a process to ensure that currently segregated individuals are provided information about the alternatives to which they are entitled under the agreement, given opportunities that will allow them to make informed decisions about their options (such as visiting community placements or programs, speaking with community providers, and meeting with peers and other families), and that transition plans are developed and implemented when individuals choose more integrated settings.

### 16. Can the ADA's integration mandate be enforced through a private right of action?

A: Yes, private individuals may file a lawsuit for violation of the ADA's integration mandate. A private right of action lies to enforce a regulation that authoritatively construes a statute. The Supreme Court in *Olmstead* clarified that unnecessary institutionalization constitutes "discrimination" under the ADA, consistent with the Department of Justice integration regulation.

### 17. What is the role of protection and advocacy organizations in enforcing *Olmstead*?

A: By statute, Congress has created an independent protection and advocacy system (P&As) to protect the rights of and advocate for individuals with disabilities.[20] Congress gave P&As certain powers, including the authority to investigate incidents of abuse, neglect and other rights violations; access to individuals, records, and facilities; and the authority to pursue legal, administrative or other remedies on behalf of individuals with disabilities.[21] P&As have played a central role in ensuring that the rights of individuals with disabilities are protected, including individuals' rights under title II's integration mandate. The Department of Justice has supported the standing of P&As to litigate *Olmstead* cases.

### 18. Can someone file a complaint with the Department of Justice regarding a violation of the ADA and *Olmstead*?

A: Yes, individuals can file complaints about violations of title II and *Olmstead* with the Department of Justice. A title II complaint form is available on-line at archive.ada.gov and can be sent to:

MG-Class00039559

1/31/23, 10:46 AM Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Ac…

Case 7:18-cv-00639-CS-AEK Document 273-46 Filed 09/08/23 Page 9 of 10

U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Disability Rights Section - NYAV
Washington, DC 20530

Individuals may also call the Department's toll-free ADA Information Line for information about filing a complaint and to order forms and other materials that can assist you in providing information about the violation. The number for the ADA Information Line is (800) 514-0301 (voice) or (800) 514-0383(TTY).

In addition, individuals may file a complaint about violations of Olmstead with the Office for Civil Rights at the U.S. Department of Health and Human Services. Instructions on filing a complaint with OCR are available at http://www.hhs.gov/ocr/civilrights/complaints/index.html.

---

[1] 42 U.S.C. § 12101(b)(1).

[2] 42 U.S.C. § 12101(a)(2).

[3] 42 U.S.C. § 12132.

[4] *See* 42 U.S.C. § 12134(a); 28 C.F.R. § 35.190(a); Executive Order 12250, 45 Fed. Reg. 72995 (1980), *reprinted in* 42 U.S.C. § 2000d-1. Section 504 of the Rehabilitation Act of 1973 similarly prohibits disability-based discrimination. 29 U.S.C § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."). Claims under the ADA and the Rehabilitation Act are generally treated identically.

[5] 28 C.F.R. § 35.130(d) (the "integration mandate").

[6] 28 C.F.R. Pt. 35, App. A (2010) (addressing § 35.130).

[7] *Olmstead v. L.C.*, 527 U.S.at 607.

[8] *Id*. at 600-01.

[9] 28 C.F.R.§ 35.130(b)(7).

[10] *Id.*; *see also Olmstead*, 527 U.S. at 604-07.

[11] 28 C.F.R. pt. 35 app. A (2010).

[12] *See* 28 C.F.R. § 35.130(b)(1) (prohibiting a public entity from discriminating "directly or through contractual, licensing or other arrangements, on the basis of disability"); § 35.130(b)(2) (prohibiting a public entity from "directly, or through contractual or other arrangements, utilizing criteria or methods of administration" that have the effect of discriminating on the basis of disability").

MG-Class00039560

[13] *Olmstead*, 527 U.S. at 598; 28 C.F.R. 35.130(d).

[14] *See* CMS, Olmstead Update No. 4, at 4 (Jan. 10, 2001), available at https://www.cms.gov/smdl/downloads/smd011001a.pdf.

[15] *Id.*

[16] 28 C.F.R. § 35.130.

[17] *See* U.S. Dept. of Justice, ADA Title II Technical Assistance Manual § II-3.6200.

[18] *Olmstead*, 527 U.S. at 604.

[19] HCBS waivers may cover a range of services, including residential supports, supported employment, respite, personal care, skilled nursing, crisis services, assistive technology, supplies and equipment, and environmental modifications.

[20] 42 U.S.C. §§ 15001 *et seq.* (Developmental Disabilities Assistance and Bill of Rights Act, requiring the establishment of the P&A system to protect and advocate for individuals with developmental disabilities); 42 U.S.C. § 10801 *et seq.* (The Protection and Advocacy for Individuals with Mental Illness Act, expanding the mission of the P&A to include protecting and advocating for individuals with mental illness)

[21] 42 U.S.C. §§ 10805, 15043.

---

The Americans with Disabilities Act authorizes the Department of Justice (the Department) to provide technical assistance to individuals and entities that have rights or responsibilities under the Act. This document provides informal guidance to assist you in understanding the ADA and the Department's regulations.

This guidance document is not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified in the Department's complete discretion, in accordance with applicable laws. The Department's guidance documents, including this guidance, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

PDF Version | archive.ADA.gov | Civil Rights Division

last updated February 25, 2020