# EXHIBIT 65



coalition
for the
homeless

March 2022

# STATE OF THE
# HOMELESS 2022

## New York at a Crossroads



Image Description: An adult with a gray beard wears a hooded winter coat and a blue face mask pulled below their chin. They stand on the sidewalk at dusk, with other people and a van in the background.

Photo by Coalition for the Homeless

MG-Class00039562

# FOREWORD

The *State of the Homeless* report is released each year by the Coalition for the Homeless to offer a clear assessment of New York's ongoing housing and homelessness crisis and to recommend proven solutions based on an objective examination of what has worked, and what has failed, in the past.

This year's report is titled *New York at a Crossroads* because we are clearly at an inflection point in which the convergence of a global public health crisis, a national awakening to the insidious impact of racial injustice, changes in political leadership, and public outcry over the consequences of decades of systemic indifference to the unmet needs of vulnerable New Yorkers calls for a fundamental re-examination of how mass homelessness is viewed and addressed.

Looking back at the successes and failures of the de Blasio and Cuomo administrations, and those of the past 40 years, the overriding theme is that mass homelessness continues to devastate our communities because it is framed as a *homelessness* crisis, not as a *housing* crisis. The word "homelessness" implicitly places the focus on "fixing" those whose lives have been upended by a lack of housing, instead of on the fundamental reason for mass homelessness: the lack of affordable housing options for enormous swaths of our population. Painting mass homelessness as an individual failure rather than a systemic inequity has resulted in billions of dollars being spent on emergency responses, while the underlying problem remains unaddressed. And so, the human and financial costs continue to mount.

As a result, tonight nearly 50,000 New Yorkers will sleep in Department of Homeless Services (DHS) shelters, while thousands more stay in shelters operated through other City agencies. The number of people bedding down each night unsheltered on the streets and in the subway system has increased sharply, creating widespread concern throughout our city as one preventable tragedy after another unfolds. On cue, the tabloids turn up the heat on elected officials to do *something* (even if that something runs contrary to the hard-won lessons of the past).

Recent horrific incidents, like the cold-blooded shootings of homeless individuals sleeping rough on Manhattan sidewalks just days before the publication of this report, underscore the true precarity of life for those without homes. They also perhaps demonstrate the consequences of chasing unsheltered individuals from one location, such as a subway station, to a more exposed one above ground, and more generally of offering homeless New Yorkers no better option than the streets. And while the brutal nature of the shootings rightfully garnered a significant amount of media attention and public concern, the 18 homeless people who died last year due to exposure to natural cold or heat passed away quietly, without notice – invisible victims of our city's neglect.

MG-Class00039563

Also invisible to the public are the thousands of unstably housed families who have been able to temporarily stave off homelessness because of the eviction moratorium. The moratorium, which was lifted on January 15th of this year, temporarily reduced the census in the shelter system for homeless families with children – a statistic touted by the former Mayor in his final days in office. However, for the past 20 years, families with children constituted between 70 percent and 80 percent of those sleeping in DHS shelters each night. One of the primary drivers of homelessness in this population has been *eviction*, and so it is no surprise that the family shelter census dropped for a period concurrent with the eviction moratorium. But since it would be nothing more than wishful thinking to believe that the underlying conditions that have fueled family homelessness for decades magically disappeared during the moratorium, we can only assume that a surge of homelessness will occur in the months and years ahead as pandemic-era emergency resources are depleted, landlords complete their cost-benefit analyses in deciding when to pursue evictions, and housing courts again ramp up their dockets.

While the numbers look bleak, New York is indeed at a crossroads. Our elected officials have choices to make, and resources at hand. They must start by acknowledging that persistent mass homelessness in our community is created by racial and economic disinvestment that can only be cured by addressing the lack of deeply subsidized affordable and supportive housing. They must also learn from what has worked and what hasn't in the emergency shelter system: The traditional congregate shelter model for single adults is wholly inappropriate when there is the danger of airborne infectious diseases like COVID-19. It also fails to meet the needs of the most vulnerable individuals, including those with disabilities.

Elected officials must refrain from advancing policies and practices that criminalize unsheltered individuals, and understand that any person who is continually and systematically deprived of safety, privacy, respect, health, and hope will have, by necessity, developed ways of coping that may not adhere to social norms. This is not to excuse or rationalize occasional violent behavior, but it must be noted that – despite the picture painted by the media – unsheltered individuals are far more likely to be the victims of crime than the perpetrators.

Recent tragedies in the headlines, the impact of the COVID-19 pandemic, the associated dire economic fallout, and longstanding social injustices all point in the same direction: There is no health without housing. There is no safety without housing. There is no prosperity without housing. There is no justice without housing. There is no hope without housing.

**Dave Giffen**
**Executive Director**

MG-Class00039564

# STATE OF THE HOMELESS 2022

## New York at a Crossroads



**Image Description:** An adult with a blond mustache and dressed in winter clothing stands in front of brightly lit scaffolding on a city sidewalk.



**Image Description:** An adult with long brown hair wears a black coat and hat, and stands on a city sidewalk in front of brightly lit scaffolding at night.



**Image Description:** A smiling adult stands on a city sidewalk at night. They wear a black coat, a checkered scarf, and gold hoop earrings. The Coalition for the Homeless' van is parked in the background.



**Image Description:** An adult wearing a blue and red winter coat and black hat stands in front of a van that displays the Coalition for the Homeless' logo.

*Photos by Coalition for the Homeless*

MG-Class00039565

# TABLE OF CONTENTS

**STATE OF THE HOMELESS 2022**
New York at a Crossroads

**By Jacquelyn Simone**
Policy Director
Coalition for the Homeless

| | |
|---|---|
| Foreword | 1 |
| Executive Summary | 5 |
| Housing is Health Care | 6 |
| Report Card | 8 |
| Meeting the Needs of Unsheltered New Yorkers | 9 |
| Equipping Outreach Teams with Necessary Resources | 9 |
| Access to Low-Barrier Shelters | 11 |
| Access to Psychiatric Services | 13 |
| Housing for Unsheltered Individuals | 15 |
| Restroom Access for Unsheltered Individuals | 17 |
| Protecting the Rights of Unsheltered Individuals | 18 |
| The Shelter System | 19 |
| Access to Shelters | 24 |
| Shelter Conditions and Enforcement | 26 |
| Shelter Design | 27 |
| Services in Shelters | 30 |
| Housing Search Assistance | 31 |
| Housing | 32 |
| Affordable Housing for Extremely Low-Income and Homeless New Yorkers | 32 |
| Supportive Housing and Licensed Housing for Adults with Serious Mental Illnesses | 36 |
| Housing Vouchers and Stability | 38 |
| Enforcement Against Discrimination in Housing | 41 |
| Homelessness Prevention | 42 |
| Rental Assistance | 42 |
| Eviction Prevention | 44 |
| Institutional Discharge Policies | 45 |
| Recommendations | 46 |
| Appendix | 50 |

MG-Class00039566

# EXECUTIVE SUMMARY

New York entered 2022 with both fresh opportunities and daunting challenges. The new Mayor and Governor face a persistent pandemic that has exacerbated the state's ongoing housing crisis – a crisis disproportionately felt by Black and Latinx New Yorkers. The expiration of the statewide eviction moratorium in January, in the midst of a devastating surge in COVID-19 cases, could soon lead to a dramatic increase in the number of New Yorkers without homes unless robust eviction prevention measures are implemented and long-term rent subsidies are readily available. Half measures and delays will have dire consequences: Once people become homeless, they languish in shelters for well over a year on average as they struggle to find affordable housing – largely because the prior administrations failed to connect their housing plans with the reality of record homelessness. Former Mayor Bill de Blasio's refusal to calibrate his *Housing New York* affordable housing plan to create substantially more housing options for homeless New Yorkers, as well as his failure to upgrade the City's primary rent subsidy program until his last months in office, stain his legacy. The Adams administration must learn from these serious mistakes and fully embrace housing as the solution to homelessness.

Mayor Eric Adams has inherited a dysfunctional shelter system that temporarily houses a near-record number of single adults in congregate dorms, placing them at high risk of contracting airborne infectious diseases like COVID-19. His predecessor's premature and reckless decision in 2021 to order the chaotic transfer of thousands of single adults from commercial hotels, where they were safer from the virus, back to congregate shelters predictably led to many new outbreaks as more contagious variants swept through shelters in the fall and winter. As we enter the third year of a pandemic that has underscored the danger of using group settings as shelters, the City and State must redesign their temporary housing policies to ensure that people without homes are offered single-occupancy rooms that can better protect them from airborne infectious diseases and also afford them more privacy, stability, and dignity.

A crisis is also unfolding on New York City's streets, as thousands of our neighbors struggle to survive without access to critical services or housing. Although unsheltered New Yorkers need access to low-barrier shelters, permanent housing, and mental health supports, they are too often instead met with aggressive policing.

The misguided and counterproductive criminalization of people sleeping in the transit system or on the streets makes it much more difficult for trained outreach teams to gain the trust of people failed by the health and human services systems. Mayor Adams and Governor Kathy Hochul must reject the criminalization of homelessness and instead offer unsheltered New Yorkers the stable Safe Havens, single hotel rooms, permanent housing, and support services they need and want.

*State of the Homeless 2022: New York at a Crossroads* provides a summary of the key housing and homelessness issues facing Mayor Adams and Governor Hochul, along with recommendations they must adopt immediately to ensure that every New Yorker is provided the tools they need to avoid and overcome homelessness.

The report examines:

1. Meeting the Needs of Unsheltered New Yorkers

2. The Shelter System

3. Housing

4. Homelessness Prevention

MG-Class00039567

# HOUSING IS HEALTH CARE



**Deaths Among Homeless New Yorkers
Fiscal Years 2012 - 2021**

Source: NYC Department of Homeless Services, Department of Health and Mental Hygiene, Office of the Chief Medical Examiner, via Local Law 7 reports. Only reflects data reported by DHS and OCME, not HRA.

**Image Description:** A graph labeled "Deaths Among Homeless New Yorkers Fiscal Years 2012 to 2021." The vertical axis lists numbers 0 to 700 in increments of 100. The horizontal axis lists the years 2012 through 2021. Each year has a bar in three or four sections showing causes of death and corresponding numbers: A purple section shows COVID-related deaths, a green section shows drug-related deaths, a dark red section shows deaths from heart disease, and a gray section shows deaths from "other" causes. The total number of deaths for each year is listed on top of each bar, with a value of 640 for the year 2021.

Tragically, a record number of homeless New Yorkers died last year. Of the 640 deaths among homeless New Yorkers reported by the City in Fiscal Year 2021, 76 percent (489) of those who died were sheltered and 24 percent (151) were unsheltered. Drug-related deaths remained the leading cause of death among homeless New Yorkers, consistent with citywide and national trends,[1] increasing by 81 percent, from 131 in Fiscal Year 2020 to 237 in Fiscal Year 2021. This underscores the urgent need for additional harm reduction services and the expansion of overdose prevention centers to more neighborhoods. Amidst the ongoing pandemic, 31 homeless New Yorkers died due to COVID-19 in Fiscal Year 2021, 27 of whom were shelter residents.

Also notable is that 16 homeless New Yorkers died due to exposure to excessive natural cold, and two people died due to exposure to excessive natural heat. This demonstrates the increased vulnerability of unsheltered individuals, and the urgent need to remove barriers that stand in the way of their access to health care and stable housing. No New Yorker should have to live – or die – without a home.

---

1   https://www.nytimes.com/2021/11/17/health/drug-overdoses-fentanyl-deaths.html

MG-Class00039568



**Image Description:** Three people wait in line next to a parked van bearing the Coalition for the Homeless' logo. A partially concealed adult stands behind a folding table at the back of the van and hands out a plastic bag of food.



**Image Description:** Two smiling adults, both wearing dark-colored sweatshirts and one with a black balaclava, stand on a city sidewalk under scaffolding with sunlight streaming in.



**Image Description:** An adult, whose face is concealed by a gray mask, holds a dog in a sling bag across their chest. They hold a plastic bag in their left hand and stand on a snowy city sidewalk.

*Photos by Coalition for the Homeless*

MG-Class00039569

# CITY AND STATE
# REPORT CARD

|  | NEW YORK CITY | NEW YORK STATE |
|---|---|---|
| **Meeting the Needs of Unsheltered New Yorkers** | | |
| Equipping Outreach Teams with Necessary Resources | D | D- |
| Access to Low-Barrier Shelters | C+ | F |
| Access to Psychiatric Services | D | F |
| Housing for Unsheltered Individuals | D | F |
| Restroom Access for Unsheltered Individuals | F | F |
| Protecting the Rights of Unsheltered Individuals | D | F |

|  | Shelters for Single Adults | Shelters for Adult Families | Shelters for Families with Children |
|---|---|---|---|
| **The Shelter System** | | | |
| Access to Shelters | C+ | D- | D- |
| Shelter Conditions and Enforcement | D | D- | D- |
| Shelter Design | F | D | B |
| Services in Shelters | D+ | D+ | C+ |
| Housing Search Assistance | D | F | D |

|  | NEW YORK CITY | NEW YORK STATE |
|---|---|---|
| **Housing** | | |
| Affordable Housing for Extremely Low-Income and Homeless New Yorkers | F | F |
| Supportive Housing and Licensed Housing for Adults with Serious Mental Illnesses | C | D |
| Housing Vouchers and Stability | B | D+ |
| Enforcement Against Discrimination in Housing | C+ | C- |

|  | NEW YORK CITY | NEW YORK STATE |
|---|---|---|
| **Homelessness Prevention** | | |
| Rental Assistance | B+ | C+ |
| Eviction Prevention | A | C- |
| Institutional Discharge Policies | C- | F |

MG-Class00039570

# MEETING THE NEEDS OF UNSHELTERED NEW YORKERS

## EQUIPPING OUTREACH TEAMS WITH NECESSARY RESOURCES

### CITY: D    STATE: D-



**Image Description:** A group of several people stand in single file behind a van parked on a city street. There are large piles of shoveled snow on the right, and a person walking with a cane through the snow.

*Photo by Coalition for the Homeless*



*Being a womxn, one is safer blending in. Outreach workers never recognized me as being unsheltered. Every time we passed each other at the E train's World Trade Center subway stop, they always went after other people, ones who stood out as being unsheltered and were not trying to blend in. They also were not trying to go into shelter. Yet those of us trying to find safety, fleeing from abusers, and seeking help, kept being turned away from social workers who didn't have housing resources, cops because an assault happened over two hours earlier, or case workers because we didn't look like the right fit.*

– K.C., who was homeless from November 2011 to 2014 and again from 2018 to December 2019

MG-Class00039571

Despite New York City's right to shelter, thousands of people sleep on the streets, in the transit system, or in other places not meant for human habitation. The City's annual point-in-time estimate of unsheltered New Yorkers (the "HOPE survey") is a vast undercount, and no accurate census of this population has ever been achieved.[2]

The City contracts with several nonprofit agencies to conduct outreach to people staying on the streets and in the transit system, and to encourage them to move indoors to a shelter or drop-in center. These teams work day and night to speak with unsheltered New Yorkers and connect them to resources, but they are often underfunded and have large caseloads. The State has historically left the City to fund these teams, but in January 2022, Governor Hochul announced that the State would also fund new "Safe Options Support" (SOS) teams to supplement the City's outreach efforts.

However, even the best-trained outreach teams can only be effective if they are able to offer unsheltered people what they want and need. The main option outreach teams offer is transportation to a large congregate shelter, which many people on the streets already have experienced and have made a conscious decision to avoid (particularly during the pandemic). According to interviews conducted by the Coalition for the Homeless, the majority of unsheltered New Yorkers surveyed had in fact tried the municipal shelter system and reported that it did not meet their needs.[3]

Even if people are willing and ready to come in off the streets, outreach teams cannot always quickly connect them to an appropriate bed: They often encounter delays and bureaucratic hurdles that stand in the way of their access to low-barrier shelter beds or permanent housing. The lack of these resources, discussed in more detail below, is frustrating for both outreach workers and unsheltered New Yorkers, and is the main impediment to the City's and State's efforts to reduce the number of people sleeping rough in the transit system and elsewhere.

Furthermore, many unsheltered New Yorkers are understandably wary of engaging with outreach team members because they have been disappointed by prior experiences, or see them as collaborating with the police, who are often lingering nearby if not standing immediately beside outreach workers. It usually takes multiple engagements to build trust with people who have been repeatedly failed by the systems that are purportedly there to help them.

Equipping outreach teams with essential items like socks, care kits, and water can help them develop a rapport with people on the streets, who may be more willing to engage with the teams offering these small but important comforts. However, for years the City and some providers have resisted offering these items to people in need because of a misguided view that doing so would deter them from moving indoors – rather than recognizing that the lack of appropriate indoor options is the main reason people stay outside. There has been limited progress on this issue in recent years, such as the occasional distribution of socks, and some outreach teams have raised private funds to purchase essential items. Providing essential personal items to people sleeping on the streets is the more humane approach, and it enhances the ability of outreach teams to establish trust with those whom they serve.

More critical, however, is the need to remove law enforcement officers from the outreach process. Outreach must be conducted only by trained professionals and peers who are able to develop relationships with unhoused individuals, learn what they need, and connect them with the necessary resources.

---

2   For details on the HOPE survey's methodological shortcomings, see our briefing paper "Undercounting the Homeless"
https://www.coalitionforthehomeless.org/wp-content/uploads/2014/06/BriefingPaper-UndercountingtheHomeless2010.pdf

3   See our April 2021 report "View From the Street: Unsheltered New Yorkers and the Need for Safety, Dignity, and Agency"
https://www.coalitionforthehomeless.org/wp-content/uploads/2021/04/View-from-the-Street-April-21.pdf

MG-Class00039572

# ACCESS TO LOW-BARRIER SHELTERS

## CITY: C+    STATE: F

> 66
>
> *I used to sleep unsheltered on the streets, subways, and elsewhere, although not recently.
> I wish I would've had constructive outreach done to offer me access to Safe Havens and
> stabilization beds as well as restroom access rather than being criminalized as a homeless
> person in lieu of housing assistance.*
>
> – W.T., who was homeless from May 2006 to November 2021

The success of outreach teams largely depends upon the immediate availability of low-barrier shelters. For most unsheltered New Yorkers, Safe Havens and stabilization beds[4] are a welcome alternative to the main congregate shelter system because they typically have more flexible rules, do not have a strict curfew, offer more privacy, and have a higher ratio of staff to residents. People who have had negative experiences in large congregate shelters are often more willing to accept the offer of a Safe Haven or stabilization bed, but the demand for these low-barrier options exceeds the supply, particularly when an individual requires a shelter placement that is close to the location of a resource they need, like a clinic. **There are currently approximately 1,000 stabilization beds and 1,500 Safe Haven beds – nearly all of them full every night, while thousands of individuals still bed down on the streets and in the subway.**

Although the City has opened more Safe Haven and stabilization beds during the pandemic, some of those sites have recently closed or switched to other shelter types. This has caused confusion and disruption among vulnerable residents, and some have returned to the streets during these moves. Meanwhile, others who remain unsheltered on the streets are not consistently offered quick access to low-barrier shelters. **Adding outreach workers without expanding Safe Haven and stabilization bed capacity will not help people come in off the streets.**

As part of "The Subway Safety Plan," Mayor Adams promised to open nearly 500 new stabilization and Safe Haven beds in 2022 – but the Mayor has already surged police into the transit system before adding this new capacity.[5] Notably, the State has not adequately supported efforts to expand these types of shelters, leaving the City as the sole funder. The result is that people in crisis are simply pushed further into the margins of the city, unable to get the help they need.

---

4   Safe Havens offer specialized overnight beds with physical and program characteristics specifically meant to address unsheltered individuals' unique needs, including smaller physical settings, as well as more hands-on case management. Similarly, stabilization beds are private rented rooms where unsheltered New Yorkers may stay before being connected to permanent housing or a long-term transitional setting. Case management in stabilization bed facilities is provided by outreach teams. Outreach teams refer unsheltered individuals directly for placement in Safe Havens and stabilization beds.

5   https://www1.nyc.gov/assets/home/downloads/pdf/press-releases/2022/the_subway_safety_plan.pdf

MG-Class00039573

The City's own outreach data underscore the necessity of expanding the supply of low-barrier shelters. Starting in May 2020 when then-Governor Cuomo ordered the subways temporarily closed overnight, outreach teams conducted targeted engagement of homeless New Yorkers at the last stations of certain subway lines. During the next 21 months, **9,231 unique individuals** accepted offers of transportation to various types of shelters and drop-in centers. Given that this is *only* those homeless individuals who spoke to outreach teams in end-of-line subway stations, and of those, only the fraction who accepted offers of transportation to indoor accommodations, this figure suggests there is likely a much larger unsheltered population than is estimated in the City's annual point-in-time HOPE reports – the most recent of which claimed that the number of unsheltered New Yorkers dropped from 3,857 in January 2020 to 2,376 in January 2021. Furthermore, an alternate HOPE methodology used during the pandemic casts further doubt on the claims that the number of unsheltered homeless people declined during this period.[6] **After being transported from end-of-line subway stations, people were most likely to accept the offer of a stabilization bed (65 percent of people accepted placement), and were most likely to remain long-term in Safe Havens.** However, the vast majority of people were only offered placement in the main congregate shelter system, where the long-term retention rate for those accepting placements was just 24 percent, versus 63 percent for the rarely offered Safe Havens. By expanding access to Safe Havens and stabilization beds, the City could help more people move indoors to settings where they feel safer and substantially increase the effectiveness of its outreach efforts.

*Outcomes from End-of-Line Outreach May 2020-January 2022*
*Cumulative May 5, 2020, to January 31, 2022*

|  | Shelter | Safe Haven | Stabilization Bed | Drop-In Center | Total |
|---|---|---|---|---|---|
| Accepted Referral to Shelters | 7,625 | 160 | 674 | 772 | 9,231 |
| Accepted Placement After Being Transported | 2,524 | 59 | 436 | 86 | 3,105 |
| Still in Placement (as of February 15, 2022) | 595 | 37 | 164 | - | 796 |
| % Accepted Placement | 33.1% | 36.9% | 64.7% | 11.1% | 33.6% |
| % Accepted Who Are Still in Placement | 23.6% | 62.7% | 37.6% | 0.0% | 25.6% |

Source: Department of Homeless Services

6  Acknowledging that the HOPE 2021 survey did not use volunteers and took place over multiple nights, the City's own press release noted, "As a result of the adjustments due to the pandemic, comparing to prior years' estimates is not exactly apples to apples." https://www1.nyc.gov/site/dhs/about/press-releases/hope-2021-05-20.page

MG-Class00039574

# ACCESS TO PSYCHIATRIC SERVICES

## CITY: D    STATE: F

It is apparent to any New Yorker who has ridden the subways or walked the city's streets that countless neighbors are not connected to the mental health care they need. High-profile tragedies, like a fatal subway shoving incident in January, prompt renewed discussions about serious mental illness, but often fail to address the underlying barriers that prevent people from accessing care even on a voluntary basis. Instead of fixing access to mental health care, Mayor Adams and Governor Hochul are leading with an oft-repeated plan to flood the NYC transit system with police and outreach teams. But more police officers and outreach teams cannot create adequate inpatient psychiatric bed capacity, more low-barrier stabilization and Safe Haven beds, truly on-demand primary mental health care, or enough supportive housing for everyone who qualifies and wants it.

The hard truth is that thousands of New Yorkers, including many struggling to survive without housing, are not able to access the mental health care they need. Of the 93,925 adults eligible in December 2021 to receive enhanced mental health services in New York City under the State's Medicaid managed care program for those with serious mental illnesses, only 2,179 (a meager 2.3 percent) actually received such care in the prior 12 months.[7] The lack of access to outpatient mental health care is largely due to the funding of public mental health care almost exclusively through Medicaid via contracts with managed care companies that block access to care instead of fostering access to it. Although new mobile mental health treatment teams have been added over the years and more will be deployed this year, many individuals continue to fall through the cracks.

Furthermore, State inpatient psychiatric centers once served roughly 93,000 New Yorkers, but today the number of State psychiatric hospital beds has dwindled to 2,330, of which about 1,000 are in New York City.[8] Of the 3,763 acute and long-term psychiatric beds for adults in New York City, 72 percent[9] are in acute care hospitals that offer only short-term care (only a week on average). As of 2018, the city had nearly 950 fewer psychiatric inpatients on average each day than it had in 2012 (3,171 vs. 4,115).[10]

The dearth of inpatient beds has worsened during the pandemic as some psychiatric units were repurposed for COVID-19 care, and 600 beds in NYC alone have not yet returned to psychiatric service. Outpatient services have also been more difficult to access due to a shift to telemedicine, clinic closures, and the aforementioned managed care problems.

---

7    https://omh.ny.gov/omhweb/bho/hcbs_access_dashboard.pdf

8    https://omh.ny.gov/omhweb/special-projects/dsrip/rcodb.html

9    Ibid.

10   https://omh.ny.gov/omhweb/tableau/county-profiles.html

MG-Class00039575

The serious deterioration in access to mental health care has led to predictable results: As of 2019 and averaged across all inpatient facilities, one in five psychiatric inpatients was readmitted within 30 days, and nearly one in three was readmitted within 90 days.[11] Similarly bleak statistics show that too many individuals also return to Emergency Departments too frequently, undoubtedly because at least some have been discharged not to a stable home, but to a shelter or the streets.

While much of the public discourse has centered around involuntary treatment,[12] in reality many people with serious mental illnesses are not able to access care even when they seek it because of the loss of inpatient psychiatric beds, barriers related to managed care for outpatient services, and the failure to connect people to the long-term supports and stable housing they need to succeed. Proposals to divert mental health crisis calls from the police to EMTs are a step in the right direction, but further reforms must be made in order to address the underlying factors that lead to mental health crises.

---

11   https://oreh.ny.gov/omhweb/tableau/county-profiles.html

12   For more information, see our "Fact Check on Homelessness and Mental Health Care"
https://www.coalitionforthehomeless.org/wp-content/uploads/2022/02/Fact-Check-on-Homelessness-and-Mental-Health-Care.pdf

MG-Class00039576

# HOUSING FOR UNSHELTERED INDIVIDUALS

## CITY: D    STATE: F

What unsheltered homeless individuals want and need are homes, but too often, they encounter insurmountable barriers that stand in the way of their access to permanent affordable housing and housing with onsite support services. Too many housing options elude them due to arbitrary and biased assessments, exhaustive documentation requirements, onerous pre-conditions for residency such as sobriety requirements, treatment plan compliance mandates, credit score checks, and adequacy of income thresholds, as well as many forms of illegal discrimination.

One housing model that was once used in New York City to help people move directly from the streets to apartments where they could receive mobile mental health services on a voluntary basis, sometimes referred to as "housing first" or the "Pathways" model, fell out of favor due to costs and alleged malfeasance by one provider. New York State stopped funding it, but the model is proven to work, has been replicated elsewhere, and has enabled many individuals to regain housing and psychiatric stability after moving indoors.

Governor Hochul recently announced her intention to create 500 new "supported" housing beds in apartments for unsheltered people with mental illnesses engaged by new subway outreach teams set to start operations later this year. But while the State plans to provide $12.5 million per year for the beds, the units are not open yet, and they will be staffed by the same teams of workers that are supposed to be conducting outreach. In addition, this housing is apparently not intended to be permanent, but rather an interim placement while applications for traditional supportive housing with onsite services are prepared and reviewed. A more adequate supply of such housing and a more robust staffing plan are needed. The teams could easily make use of 1,000 or more beds, and they should be adequately staffed with dedicated mobile mental health teams that are not pulled in two directions at once: outreach and residential support. This would cost closer to $50 million per year.

Supportive housing has been proven to help people with serious mental illnesses, substance use disorders, or other challenges achieve long-term stability. New York pioneered this model under the principle that people need the foundation of stable housing in order to address their health and other needs. Ideally, eligible individuals would be quickly connected to housing in which they can avail themselves of voluntary onsite support services. In practice, however, government policies meant to ration the scarce resource of supportive housing have created numerous and needless obstacles that make access to this enriched type of housing nearly impossible for unsheltered New Yorkers.

MG-Class00039577

For example, people seeking supportive housing must produce documentation to prove that they are homeless, which can be difficult for those who are disconnected from City-contracted outreach workers. The eligibility process for supportive housing can take months, all while an applicant is sleeping rough on the streets. As discussed below, the interview and placement process for supportive housing poses its own vexing challenges.

**The City and State must both expand the supply of supportive housing and streamline the process for accessing it so that people can move indoors more quickly, and must adequately fund comprehensive services for those who are housed.**

Similarly, the process for obtaining housing vouchers is needlessly cumbersome for people staying on the streets. Many unsheltered New Yorkers do not have mental illnesses or other challenges that could qualify them for supportive housing, and they simply need help affording an apartment. However, they often languish for months and even years on the streets as they attempt to navigate administrative hurdles and documentation requirements in order to access Federal Section 8 vouchers or other subsidies like CityFHEPS.

In response to pressure from homeless New Yorkers and advocates, in 2021 the City eliminated a requirement that unsheltered New Yorkers be connected to outreach teams for 90 days before becoming eligible to receive a CityFHEPS voucher. This commonsense policy change will help people move off the streets and into permanent housing more quickly. However, only individuals connected to DHS-funded outreach workers can access CityFHEPS vouchers. In addition, staffing shortages in City agencies have exacerbated delays in application processing and inspections before people can move into an apartment. Further reforms are needed to ensure that all unsheltered New Yorkers can swiftly access housing. Given the risks of sleeping unsheltered, the City and State must eliminate all barriers that prolong homelessness for those who sleep rough in New York City.

MG-Class00039578

# RESTROOM ACCESS FOR UNSHELTERED INDIVIDUALS

## CITY: F     STATE: F

New Yorkers have long bemoaned the lack of access to clean restrooms open and available to the public. The issue is particularly important for those living on the streets, who are deprived of any place in which to wash, use the toilet, and attend to their personal needs.[13] The lack of public bathroom facilities in our city is unhealthy and degrading, and indicates a callous disregard for the basic humanity of those struggling for survival on our streets.

This problem was exacerbated during the pandemic, as many businesses and facilities that had previously allowed people to use their restrooms reduced their hours or closed entirely. In response to advocacy from homeless New Yorkers and advocates, the City temporarily deployed portable toilets during the first few months of the pandemic, but failed to ensure their proper maintenance and soon removed them following reports of vandalism. Non-profit organizations, including Doctors Without Borders and Shower Power (both in partnership with the Coalition for the Homeless), stepped up with their own portable showers and toilets in the face of government inaction.

There are some quick steps the City could take to mitigate the problem, such as pulling the automatic self-cleaning toilets it has out of storage and installing them in high-need areas. Similarly, the State-run MTA has been slow to reopen restrooms in subway stations closed at the start of the pandemic – even as agency leaders complain of people urinating and defecating in the transit system.

Public restrooms would benefit all people who live in or travel through the city, including those with health issues, older adults, and young children. But they would particularly benefit homeless New Yorkers who simply need a safe, clean place to fulfill basic bodily functions. Rather than vilifying people who must resort to the demeaning necessity of having to urinate or defecate in public, City and State officials should ensure that every person has a dignified, clean place to relieve themselves.

---

13   See also "'Do We Not Bleed?' Sanitation, Menstrual Management, and Homelessness in the Time of COVID," Columbia Journal of Gender and Law, Volume 41, No 1 https://journals.library.columbia.edu/index.php/cjgl/article/view/8858

MG-Class00039579

# PROTECTING THE RIGHTS OF
# UNSHELTERED INDIVIDUALS

## CITY: D    STATE: F

Unfortunately, rather than connecting people to the low-barrier shelters and permanent housing they want and need, the City and State have continued to criminalize unsheltered homeless individuals and rely heavily on policing strategies to push people out of sight. We have seen time and time again that these strategies do not work, and merely make it more difficult to engage those in the most desperate need and provide them with shelter, services, and housing.

One of Mayor Adams' first actions in office was to surge police officers into the transit system, while unconvincingly reassuring the public that NYPD would not be the primary point of contact with homeless New Yorkers. This was the latest escalation in an ongoing campaign to enforce rules against so-called "quality of life" offenses that disproportionately ensnare people who are trying to survive on the streets and in the subways, leading to arrests, fines, and incarceration.

For example, former Governor Cuomo's spring 2020 decision to temporarily close the subways overnight was a thinly veiled move to force homeless New Yorkers, whom he called "disgusting," out of the transit system. Even after former Mayor de Blasio pledged to remove police from homeless outreach in 2020, the City used wide discretion to involve NYPD in sweeps and other outreach efforts throughout the end of his administration. Mayor Adams' recently announced subway safety plan goes a step further, by pairing police officers with outreach teams and increasing enforcement of transit rules that specifically target homeless New Yorkers.

City agencies also conducted thousands of street sweeps last year, in direct violation of pandemic guidance from the Centers for Disease Control and Prevention to allow people to remain where they are unless individual housing options are available: "Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread."[14] Completely ignoring this guidance, the City regularly sends workers from the Department of Sanitation and other agencies to dispose of personal belongings and force unsheltered individuals to move somewhere else. But without offering them the low-barrier shelter beds and permanent housing they want and need, the City has often been merely moving people without homes from one street corner to the next. The City has also been repeatedly sweeping the same locations, trapping people in a cruel cycle of displacement. These sweeps can also impede the work of outreach teams: Forcing people to move away from their familiar locations can sever their ties with outreach workers who might not be able to find them again, and the trauma of sweeps can break the trust outreach teams work so hard to build.

**Policing and sweeps do not address the reasons someone is sleeping on the streets, and can actually push people further away from the help they need. Instead, City and State officials should cease all sweeps and expand access to low-barrier shelters and housing so that outreach teams can quickly connect people to a better option than the streets and subways.**

---

14   https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html#facility-encampments

MG-Class00039580

# THE SHELTER SYSTEM



Image Description: A smiling adult stands in front of a gray brick wall with two stained-glass windows. They wear a scarf, hat, and backpack.
*Photo by Coalition for the Homeless*

New York City's right to shelter guarantees that all homeless New Yorkers are offered somewhere safe and indoors to sleep. However, abiding dysfunction in this crisis response has transformed it into a permanent necessity that shelters tens of thousands of individuals and families, sometimes for years, instead of helping them to quickly move into permanent housing.



*Homelessness is overwhelming and scary. It's quite a shell-shocker. It can either make or break you.*

– M.F., who was homeless from September 2020 to September 2021



*I keep myself as busy as possible to not think about my living situation, but as I get off the train nightly I'm reminded of my living situation and my steps slow down.*

– M.B., who has been homeless since July 2020

*Shelter Census*

**In December 2021, an average of 18,704 individuals slept each night in the DHS shelter system for single adults – an increase of 91 percent in 10 years.**[15] The single adult shelter census has increased dramatically since 2007 and reached new highs during the pandemic, mirrored by a visible increase in the number of unsheltered single adults, and highlighting the scarcity of permanent housing options for this population.

While the number of families in the DHS shelter system declined in the past two years, the decrease is primarily attributable to the temporary eviction moratorium first enacted in March 2020. With the expiration of the moratorium in January 2022, it is highly likely that, without added protections, the family shelter census will reverse course and begin to climb as more families lose their housing in the coming months.

15   A note on the census data: These figures reflect only the average nightly census in shelters overseen by DHS and, to a much lesser extent, the Department of Housing Preservation and Development (HPD), which provides shelter to households displaced by fire or City-issued vacate orders. Thousands of other homeless New Yorkers reside in specialized non-DHS public shelters for runaway and homeless youth, survivors of domestic violence, or people living with HIV/AIDS. Others sleep in private or faith-based shelters, or stay overnight in drop-in centers. Even more are couch-surfing or doubled-up with family or friends. Due to reporting inconsistencies among government data sources, it is not possible to create comparable census analyses across the different systems.

The Coalition for the Homeless is the court- and City-appointed monitor of the DHS shelter system, which separately serves single adults, adult families without minor children, and families with children, and the principal focus of our analysis is therefore those shelters. However, we strongly recommend that the City and State account for the full scope of homelessness in their policies and the allocation of resources, and ensure that access to housing is based on New Yorkers' lived experience of homelessness rather than their interactions with any specific government agency. *(See Appendix.)*

MG-Class00039581

Homeless families with children now spend roughly one and a half years on average
sleeping in a shelter before finding their way out, and in Fiscal Year 2021, 1,121 babies
were born to parents in DHS shelters – meaning these newborns came "home" from the
hospital to a municipal shelter.



**Number of Homeless Single Adults Sleeping Each Night in DHS Shelters
1983 - 2021**

*Source: NYC Department of Homeless Services and Human Resources Administration; Local Law 37 Reports*

Image Description: A graph labeled
"Number of Homeless Single Adults
Sleeping Each Night in DHS Shelters
1983-2021." The vertical axis lists
numbers 0 to 22,000 in increments
of 2,000. The horizontal axis lists
the years 1983 through 2021. A
gray shaded area stretches along the
horizontal axis and shows small peaks
and troughs before a large incline
followed by a slight decline leading
to a point labeled "December 2021
18,704."



**Number of Homeless Families Sleeping Each Night in DHS and HPD Shelters
1983 - 2021**

*Source: NYC Department of Homeless Services and Human Resources Administration; Local Law 37 Reports*

Image Description: A graph labeled
"Number of Homeless Families
Sleeping Each Night in DHS and
HPD Shelters 1983-2021." The
vertical axis lists numbers 0 to
16,000 in increments of 2,000. The
horizontal axis lists the years 1983
through 2021. A gray shaded area
stretches horizontally with several
peaks and troughs and a large incline
followed by a decline leading to a point
labeled "December 2021 10,221." A
vertical red line labeled "Start of the
Eviction Moratorium March 2020"
precedes the final sharp decline.

MG-Class00039582

*Demographics*

Mass homelessness is, among other things, a symptom of systemic discrimination and oppression, as evidenced by the demographics of people sleeping in shelters. In particular, housing justice is fundamentally a racial justice issue. Due to persistent racism in housing, health care, policing, and other systems, Black and Latinx New Yorkers are disproportionately likely to experience homelessness. Particularly striking is that an estimated 56 percent of people sleeping in DHS shelters are Black, compared with 24 percent of the New York City population.

### Race and Ethnicity of Adults and Family Households Sleeping in NYC Department of Homeless Services Shelters Fiscal Year 2022 (Through Sept 2021)



■ Black (non-Hispanic)
■ Hispanic
■ White (non-Hispanic)
■ Unknown
■ Asian/Pacific Islander
■ Native American

*Source: NYC Department of Homeless Services. Due to data limitations, data for families reflect the race of the head of each household.*

Image Description: A pie graph labeled "Race and Ethnicity of Adults and Family Households Sleeping in NYC Department of Homeless Services Shelters Fiscal Year 2022 (Through Sept 2021)." There are six segments with correlating percentages: A gray segment is marked 56% for Black (non-Hispanic), a dark red segment is marked 32% for Hispanic, a green segment is marked 7% for White (non-Hispanic), a purple segment is marked 4% for Unknown, a blue segment is marked 0.6% for Asian/Pacific Islander, and an orange segment marked 0.125% for Native American. The source note at the bottom indicates that these data reflect the race of the head of each household.

### Race and Ethnicity of NYC Residents 2021



■ Black (non-Hispanic)
■ Hispanic
■ White (non-Hispanic)
■ Other
■ Asian/Pacific Islander
■ Native American

*Source: United States Census Bureau*

Image Description: A pie graph labeled "Race and Ethnicity of NYC Residents 2021." There are six segments with correlating percentages: A grey segment is marked 24% for Black (non-Hispanic), a dark red segment is marked 29% for Hispanic, a green segment is marked 32% for White (non-Hispanic), a purple segment is for "Other," a blue segment is marked 14% for Asian/Pacific Islander, and an orange segment marked 1% for Native American.

MG-Class00039583

People with disabilities are also disproportionately likely to experience homelessness. In November 2019, DHS estimated that 77 percent of adult families (families without minor children), 68 percent of single adults, and 53 percent of families with children sleeping in shelters had at least one disability. A large percentage of people sleeping in shelters report having serious mental illnesses such as depression, bipolar disorder, anxiety, schizophrenia, and post-traumatic stress disorder.[16]

Policymakers must reckon with housing-related discrimination based on race, disability, and family composition in order to reverse these pernicious disparities and ensure that all New Yorkers have safe, accessible, stable, affordable housing.

*Fiscal Responsibility*

While both the City and the State play important roles in the funding, operations, and oversight of the shelter system, former Governor Andrew Cuomo systematically shifted the State's costs for providing emergency shelters onto the City. **As the costs of DHS shelters rose by nearly $1.2 billion between Fiscal Years 2011 and 2021, New York City was left to pick up 95 percent of the increase for single adult shelters and 32 percent of the increase for family shelters,** while the State covered a mere 4 percent of the additional costs for single adult shelters and 7 percent for family shelters. Reimbursements from Federal grants covered the remainder. In Fiscal Year 2021 alone, the City spent nearly $700 million to support DHS shelters for single adults, while the State contributed only about $74 million and Federal reimbursements were a mere $16.6 million (excluding specific pandemic-related funding). Clearly, all levels of government must collaborate to reduce the need for this costly emergency shelter system by investing in homelessness prevention and permanent housing, but in the near term, the State must also contribute its fair share toward the cost of sheltering homeless New Yorkers.

Increase in Spending on NYC DHS Shelters
Between Fiscal Years 2011 and 2021
by Source and Shelter Population
$800
$700
$600
$500
$400
$300
$200
$100
$0
Millions
$408,372,699
$66,495,074
$705,705,178
Federal
State
City
Family Shelters
Single Adult Shelters

*Source: NYC Independent Budget Office. Excludes specific pandemic-related funding.*

**Image Description:** A graph labeled "Increase in Spending on NYC DHS Shelters Between Fiscal Years 2011 and 2021 by Source and Shelter Population." The vertical axis lists millions of dollars in increments of 100. The horizontal axis lists three categories: Federal, State, and City. Each category has a bar in two parts: A gray section shows the amount spent on family shelters, and a dark red section shows the amount spent on single adult shelters. The total amount is listed on top of each bar, with a value of $705,705,178 for the City.

16 https://www1.nyc.gov/assets/dhs/downloads/pdf/Local-Law-115-of-2017-Report_CY2020.pdf

The following report card matrix is informed by the Coalition's role as the independent monitor of DHS shelters and feedback from shelter residents we serve.

| | Shelters for Single Adults | Shelters for Adult Families | Shelters for Families with Children |
|---|---|---|---|
| **The Shelter System** | | | |
| Access to Shelters | **C+** | **D-** | **D-** |
| Shelter Conditions and Enforcement | **D** | **D-** | **D-** |
| Shelter Design | **F** | **D** | **B** |
| Services in Shelters | **D+** | **D+** | **C+** |
| Housing Search Assistance | **D** | **F** | **D** |

MG-Class00039585

## ACCESS TO SHELTERS



*There needs to be quicker accountability and more respect for the clients – trauma-focused care and respect for the clients in these positions.*

– K.C., who was homeless from November 2011 to 2014 and again from 2018 to December 2019

While all homeless New Yorkers have a legal right to shelter, the intake and eligibility process for homeless families and the inaccessibility of many shelter facilities for individuals with disabilities too often create de facto denials of that lifesaving right.

*Family Eligibility*

A family who becomes homeless and needs emergency shelter must undergo an onerous application and screening process to prove their eligibility. The State administrative directive setting forth the process for determining eligibility was made even stricter at the City's insistence in 2016. The eligibility determination process requires homeless families to provide documentation of every place they have stayed in the past year (for adult families), or past two years (for families with children). This is particularly challenging for families who were doubled-up or unsheltered for some period after losing their home, and in fact, the vast majority of families are rejected for bureaucratic reasons related to a lack of required documentation that is simply unavailable or impossible for them to obtain. City workers then investigate the prior addresses to assess whether the family could return to one of the past residences. Homeless families are frequently denied shelter when City intake workers incorrectly determine that the family has other options, or fail to accept that a previous host (the "primary tenant") refuses to permit the return of a homeless family. Although the City does provide families with "conditional" shelter placements during the eligibility process, repeated ineligibility determinations exacerbate stress and instability for homeless families encountering these obstacles, and the time spent in conditional shelter placements is not credited toward housing subsidy eligibility requirements.

Many families are caught in a cycle of applying and reapplying for shelter when they are incorrectly found ineligible. **The monthly average shelter eligibility rate (the percentage of applicants found eligible) has plunged in recent years, dropping to a record low 23 percent for homeless families with children in the first half of Fiscal Year 2022. Similarly, only about a quarter of homeless adult families applying for shelter each month are found eligible.**

In Fiscal Year 2021, an average of 13 percent of homeless families with children and a striking 30 percent of homeless adult families found eligible for temporary housing each month **had to submit *six or more* applications before they were finally deemed eligible** – damning proof that they were incorrectly found ineligible on multiple prior applications.

While the City has implemented some helpful changes during the pandemic, such as exempting minor children from going to the PATH intake center for homeless families with children and allowing families whose applications are denied to reapply without being forced to leave their temporary shelter placements, further reforms are needed to end the inhumane and persistent practice of "churning" eligible applicants and to reduce stress among homeless families.

MG-Class00039586



### Percentage of Families Found Eligible for DHS Shelter (Monthly Average)
### Fiscal Years 2014 - 2022 (Through Dec 2021)

*Source: NYC Department of Homeless Services*

Image Description: A graph labeled "Percentage of Families Found Eligible for DHS Shelter (Monthly Average) Fiscal Years 2014-2022 (Through Dec 2021)." The vertical axis lists percentages from 10% to 55% in increments of 5. The horizontal axis lists the years 2014 through 2022 (through December 2021). Two lines mark percentages for each year in two categories: A red line shows percentages for adult families with a value of 27.9% for 2022 (through December 2021), and a gray line shows percentages for families with children with a value of 22.8% for 2022 (through December 2021).

*Accessibility for People with Disabilities and Medical Needs*



*Homelessness by itself is horrible, but gets even worse when you have mental and physical disabilities. The conditions are horrible. While I am happy to have a place to rest my head, there are just too many things wrong with the system. People with disabilities go through hell in the system.*

– M.A., who has been homeless since the summer of 2019

While homeless single adults are not subject to a similar eligibility process, many still struggle to access shelters. This is particularly true for those with disabilities or complex medical issues, who often encounter delays in receiving an accessible shelter placement that meets their needs. The most vulnerable individuals often languish in hospitals, ready for discharge, as City officials determine whether they are medically appropriate for the shelter system – a process that is often opaque to the people seeking shelter.[17] In the absence of sufficient fully accessible shelter capacity and single rooms for those with compromised immune systems or other needs – as well as more options outside the shelter system for homeless people with disabilities or health challenges such as medical respite programs, assisted living, supportive housing, and accessible apartments – far too many homeless people are lost to the streets or remain in other unsafe situations.

---

17  According to DHS' policy related to Referral from Healthcare Facilities to DHS Single Adult Facilities, "DHS provides shelter as a last resort and as a temporary emergency residence while shelter clients are seeking permanent housing. Only medically appropriate, meaning physically and mentally independent, individuals can be admitted into the Single Adult Shelter System."
https://www1.nyc.gov/assets/dhs/downloads/pdf/DHS %20Institutional_referral_procedure_7182018.pdf

## SHELTER CONDITIONS AND ENFORCEMENT



*The conditions are a disservice instead of a service.*

– C.W., who has been homeless since August 2012

There are more than 350 buildings with shelter units in the DHS system, and conditions and maintenance issues vary widely. There are some facilities with adequate maintenance, where residents report few problems. But many shelters are in old buildings that are in dire need of capital improvements, with **frequent elevator outages, faulty plumbing, and heating or cooling problems. Others have persistent vermin infestations, with residents reporting the presence of roaches, bedbugs, lice, and rodents in their living areas.** Staffing shortages, greatly exacerbated by the pandemic, have led to infrequent cleaning in some shelters and unsanitary conditions in bathrooms and other shared spaces.

Coalition for the Homeless staff, who made 953 shelter visits in calendar year 2021 alone, regularly raise these issues with DHS administrators and, in some cases, State officials with the Office of Temporary and Disability Assistance (OTDA). Response times vary, and it sometimes takes weeks for urgent problems to be resolved.

Failure to maintain proper standards in shelter facilities endangers the health of homeless New Yorkers, deters people from accessing emergency shelter and services at their time of greatest need, and violates the law. The City and State must engage in more proactive monitoring and enforcement of minimum standards, and ensure adequate maintenance staffing to prevent these issues from arising.

MG-Class00039588

## SHELTER DESIGN

The shelter system for single adults and the shelter system for homeless families are legally subject to different standards of design and configuration.

*Shelters for Families*

Shelters for families with children typically provide individual units with self-contained bathrooms, and many, referred to as Tier II shelters, have in-unit kitchenettes. While families often report feeling cramped in small units, the design of family shelters allows more privacy from other households and greater protection from airborne infectious diseases like COVID-19.

Former Mayor de Blasio deserves praise for following through on his promise to end the use of cluster-site shelters – repurposed private apartments that the City rented from often-unscrupulous landlords, frequently well above market rates. These ad hoc shelter units were notorious for poor conditions and woefully inadequate social services. There were 3,650 cluster units in operation in 2016, and by the end of 2021 the City had succeeded in completely phasing out their use – converting 46 of the buildings (containing roughly 1,200 apartments) into permanent housing for homeless families.

The City has also made progress in phasing out the use of expensive commercial hotels for families with children, moving more of these households into Tier II shelters that have a more appropriate design and provide easier access to social services.

Adult families, which do not include minor children, can be placed in either a unit similar to those offered to families with children, or a shelter with shared bathrooms. Unlike families with children, adult families rarely have access to cooking equipment, other than microwave ovens they must share with dozens of others. The City must completely end the use of hotels as shelters for families and instead provide Tier II-type accommodations with cooking equipment for adult families, with attention to the need for accessible units given their high rate of disability.

*Shelters for Single Adults*



*Don't get me wrong, I'm not knocking the shelters because they kept me dry when it rained and kept me warm when it was cold. But the living conditions need a whole lot of changes. I was happy when I moved into a hotel because of my underlying health issues.*

– M.F., who was homeless from September 2020 to September 2021



*Living among negative energies in a congregate shelter during the COVID pandemic has impacted my blood pressure levels, and I caught COVID in the last surge. As far as psychiatric services are concerned, there are zero services.*

– C.W., who has been homeless since August 2012

MG-Class00039589

The shortcomings of the shelter system for single adults have been on full display during the pandemic. These shelters are predominantly congregate, meaning dozens of individuals share sleeping, bathroom, and dining spaces in some facilities containing hundreds of beds. For decades, homeless New Yorkers have reported that the large, dorm-style shelters fail to provide them with any sense of safety, dignity, or privacy, leaving many to instead sleep rough on the streets. Interpersonal tensions often spill over in congregate shelters when strangers are forced to share common spaces, leading to fears of, and occasionally actual, violence or theft. Residents often report that they are treated with disrespect by shelter security and staff, and complain that the institutional design of many shelters is dehumanizing and reminds them of prisons or jails.

The onset of the pandemic added a new layer of danger for those sleeping in congregate shelters, as the airborne virus that causes COVID-19 spread rapidly through the dorms. Recognizing this vulnerability, homeless New Yorkers and advocates mobilized in spring 2020 and called for DHS to offer all single homeless adults placements in single-occupancy hotel rooms where they could be better protected from the virus. The de Blasio administration eventually moved thousands of individuals from congregate shelters to hotels, although many were placed in double-occupancy rooms and about 30 percent of single adults remained in congregate shelters (albeit with fewer people staying in them). Those who slept in hotel rooms reported improvements to their physical health and mental wellbeing, thanks to the privacy afforded them in their new placements.[18]

However, in the summer of 2021, then-Mayor de Blasio prematurely reversed course and returned most single adults to congregate shelters – largely in response to a vociferous and well-funded minority of community members who objected to the presence of homeless New Yorkers sleeping in hotels in their neighborhoods. The poorly planned process of returning people to congregate shelters over the course of the summer was marked by confusion, disruption, poor communication, and, thus, litigation. Ultimately, in response to judicial intervention, DHS was forced to significantly improve its reasonable accommodation request process to ensure that new shelter assignments meet individuals' access needs. DHS was also required to assess which single adults have health conditions that place them at greater risk should they contract the virus that causes COVID-19.[19] Many of these individuals were, and continue to be, assigned to other hotels rather than congregate shelters, but the needlessly rushed transfers led to far too many people falling through the cracks.

The repercussions of de Blasio's reckless decision were soon apparent: The Delta variant, followed by the highly contagious Omicron variant, tore through shelters in the fall and winter. In December 2021, fewer than one-third of single adults remained in hotel rooms where they could be better protected from the virus, while the rest were placed at much greater risk in congregate shelter dorms.

---

18  See Project Renewal Shelter Annex Consumer Satisfaction Survey, slide 25:
https://docs.google.com/presentation/d/176EWg4DgXz-cdO6twSt6sPlynatut5sdAX4XsY6KQdK7ZI-edit#slide_id=gd235e13128_0_1201

19  In 2015, represented by The Legal Aid Society and White & Case, the Coalition for the Homeless, Center for Independence of the Disabled, New York (CIDNY), and homeless New Yorkers with disabilities filed *Butler v. City of New York*, 15 CIV 3753 (SDNY), a class action lawsuit designed to ensure that the right to shelter includes accessible accommodations and services for people with disabilities, consistent with Federal, State, and local laws. The case was settled in 2017, and monitoring of the five-year settlement phase-in period is ongoing. In 2021, the plaintiffs filed a motion in this case because the City violated Federal, State, and local laws and the 2017 settlement by not assessing class members' access needs before they began the hasty return to congregate shelters.

MG-Class00039590

**As of March 16, 2022, DHS had tracked 7,614 confirmed positive cases of COVID-19 among New Yorkers sleeping in shelters (including single adults, adult families, and families with children), and 121 shelter residents had passed away due to the virus.** Many more cases and deaths likely went unreported, and countless people who contracted the virus are living with the associated long-term health effects.

Although DHS has maintained a system of hotels for quarantine and isolation purposes, its response to the pandemic is now largely reactive – moving people to hotels once they have been exposed to or have contracted the virus, rather than protecting them from exposure in the first instance.

In order to protect against future outbreaks of COVID-19 or other infectious diseases, and to address longstanding complaints about the lack of privacy and safety in congregate shelters, **the City must reduce reliance on these group settings, and instead shift to the provision of private rooms for single adults.**

Across the systems for all three populations – families with children, adult families, and single adults – shelters too often lack accessibility features for people with disabilities. Coalition staff submitted 240 reasonable accommodation requests[20] on behalf of DHS shelter residents in calendar year 2021, and provided further assistance with appeals and resubmissions. For example, since summer 2021, the Coalition has assisted several individuals, like 43-year-old T.E., who have been placed in single adult shelters without accessible bathrooms despite their apparent physical disabilities. As a result of these improper placements, individuals have risked serious injury by using toilets without grab bars and curtailed their bathing routines due to lack of roll-in showers and shower chairs. The Coalition has also recently requested transfers for individuals, like 33-year-old N.M., placed at shelters where the elevators are too narrow for their mobility devices. Every time these individuals wanted to exit their shelters, they had to endure damage to their expensive equipment while maneuvering in and out of inaccessible elevator cars.

While DHS is in the process of surveying its facilities and creating more accessible capacity pursuant to the *Butler v. City of New York* settlement, the current shelter infrastructure and design is too often inaccessible for people with disabilities, including individuals with psychiatric disabilities who find the congregate nature of many single adult shelters challenging to manage.

---

20    According to DHS policies, "DHS must make reasonable modifications to its policies, practices, or procedures when such modifications are necessary to avoid discrimination on the basis of a disability and to ensure meaningful access to the Agency's programs, benefits, and facilities." For more information, visit https://www1.nyc.gov/site/dhs/about/applicants-and-clients-with-disabilities.page

MG-Class00039591

## SERVICES IN SHELTERS



*The food is no good. During this past year, I've been really sick. I'm better now because I buy my own food. I just want to find a place of my own. They need to do more to get us housing faster – it takes too long in the shelter. I want to be responsible and find housing so I can be at peace.*

– K.S., who has been homeless for more than two years

Services in shelters vary significantly by facility and provider, but shelter residents report common areas of concern across the system. For example, while DHS has made progress in recent years to increase harm reduction services and provide naloxone training for shelter residents, the persistently high rates of overdose underscore that more harm reduction services are required.

Meanwhile, many shelters for families with children lack sufficient on-site specialized staff to help connect homeless schoolchildren with educational resources, troubleshoot attendance issues, and ensure that parents know their rights regarding school placements and supports. This lack of support contributes to low attendance rates among schoolchildren in shelters: The average school attendance rate for children in the DHS shelter system in Fiscal Year 2021 was 78 percent, compared with a 90 percent average daily attendance rate for all NYC Department of Education students.[21]

Schoolkids in shelters experienced additional educational setbacks due to a widespread lack of internet access, which became particularly problematic in March 2020 when all schooling was conducted remotely because of the pandemic. This was largely rectified in response to a lawsuit filed by The Legal Aid Society on behalf of parents of school-age children and the Coalition for the Homeless: The City was ordered to install WiFi in all DHS and domestic violence shelters serving homeless school-age children, a process that is nearly complete.

However, single adults, adult families, and families without school-age children staying in other shelters still usually lack internet access and devices. Ensuring internet access in all shelters would help homeless New Yorkers search for housing, apply for or participate in jobs, connect to telemedicine providers, access information and resources, and maintain social supports. The time has come for the City and State to provide this basic necessity to all homeless New Yorkers.

Another frequent complaint from residents is that the food provided by shelters and to those sleeping in hotels is of poor quality, with unappetizing options and small portions.

Many of the deficiencies above stem from the City's reluctance to invest adequately in the shelter system. Shelter case managers and other staff often have large caseloads, and residents regularly report that they do not receive adequate assistance – a problem that has only been made that much worse by pandemic staffing shortages and the underfunding of vital social service roles. In fact, properly compensated and trained staff, accessible internet, educational supports, more nutritious food, and other services can better assist homeless New Yorkers as they get back on their feet, thereby saving money in the long run.

---

21  https://www1.nyc.gov/assets/operations/downloads/pdf/pmmr2023_2022_pmmr.pdf

MG-Class00039592

## HOUSING SEARCH ASSISTANCE



*The lack of qualified housing specialists and case managers makes the process harder than it has to be.*

– C.W., who has been homeless since August 2012



*My mental and physical health hasn't been easy at all. I cannot wait to leave the shelter.*

– V.W., who has been homeless since June 2020

Housing search assistance is so critical to ending a period of homelessness for a household in crisis that it is a subject meriting special attention. The ultimate goal of a shelter Housing Specialist is to help people leave their shelter placements quickly by connecting them to stable, permanent housing. However, in **Fiscal Year 2021, the average length of stay in the DHS shelter system was 483 days for single adults, 520 days for families with children, and a staggering 773 days for adult families – rates that have been trending upward in recent years.** The average length of stay for single adults and families with children has risen by about 100 days each, and for adult families it has risen by an even more alarming 223 days, since Fiscal Year 2017.

These excessive lengths of stay are due in part to staffing shortages: Housing Specialists are often overwhelmed by large caseloads, and the departments responsible for processing subsidy applications and cutting checks are similarly under-resourced. Every step of the housing search process is rife with administrative delays, and some residents even lose apartments they have managed to find because the bureaucratic processes leading to the payment of first month's rent take so long to complete. Shelter residents already contend with the serious lack of affordable housing as they search for apartments, and it is frustrating and demoralizing when they then encounter repeated administrative delays. The process of moving into housing should be made as simple as possible for shelter residents while still protecting their safety and rights. Greater investments are needed to prioritize and streamline shelter residents' access to permanent affordable and supportive housing.

MG-Class00039593

# HOUSING

## AFFORDABLE HOUSING FOR EXTREMELY LOW-INCOME AND HOMELESS NEW YORKERS

### CITY: F    STATE: F



Image Description: An adult and child embrace and stand in front of a fence. There are green bushes and two buildings in the background. *Photo by Cindy Trinh*

The very health and future of our city and state depend on our ability to boldly and comprehensively address the severe shortages of affordable housing and rent subsidies, which degrade the lives of hundreds of thousands of New Yorkers.

The population of New York City grew by a half million people following the Great Recession, but the number of housing units grew by only 100,000 over the following decade and average rents climbed 24 percent between 2009 and 2016.[22] This rate of population growth was the fastest pace set in more than 50 years, as the city's population rose to a record high of 8.8 million as of April 1, 2020.[23] Housing growth lagged population growth even prior to the pandemic: The number of housing units increased by just 7 percent in New York City in the past decade, while the adult population grew by 10 percent.[24] Due to the economic fallout of the pandemic, **nearly 600,000 NYC households were still behind on their rent as of January 2022, even after the State has obligated more than $2.3 billion in emergency rental assistance.**[25]

22  See former Comptroller Scott M. Stringer's 2018 report "NYC For All: The Housing We Need"
https://comptroller.nyc.gov/reports/nyc-for-all-the-housing-we-need/

23  https://www1.nyc.gov/site-planning/planning-level/nyc-population/nyc-population.page

24  https://www.thecity.nyc/2022/1/5/22869518/housing-trends-to-watch-for-the-future-of-nyc

25  See the Association for Neighborhood & Housing Development's report "New York's Pandemic Rent Crisis"
https://anhd.org/report/new-yorks-pandemic-rent-crisis

MG-Class00039594

The affordable housing crisis is most profound for those with the lowest incomes. Statewide, nearly one million renter households have extremely low incomes (below $32,251 for a household of three in New York City, or $25,101 for an individual), and of these households, 40 percent are seniors, 30 percent work, and 15 percent are people with disabilities.[26] Seven out of 10 pay *more than half* of their incomes for rent, placing them at very high risk of homelessness. About 500,000 extremely low-income households in NYC alone pay more than half of their incomes for rent.[27]

In 2018, 4.6 million applications for 7,587 apartments affordable to households in various low- and moderate-income groups were submitted through New York City's Housing Connect lottery portal. For every unit affordable to households with extremely low incomes, there were 650 applications.[28] A staggering 18 million applications for affordable housing were submitted through the lottery over five years, but just nine apartments were available between 2014 and 2019 for a family of three living on $18,000 per year from disability benefits plus food stamps, and nearly 10,000 applications were submitted by applicants seeking those units.[29]

As the decade ended, former Comptroller Stringer estimated that New York City had an affordable housing deficit of 581,750 units, and a grossly inadequate housing plan designed to meet less than 8 percent of the need for extremely low-income renters. As of June of 2021, former Mayor de Blasio had financed 62,557 of 120,000 planned newly constructed affordable apartments as part of his 300,000-unit plan, *Housing New York 2.0*. This included 13,849 apartments (22 percent) for extremely low-income households, which represents a tiny fraction of the unmet need for this group.[30]

Throughout his tenure, Mayor de Blasio also failed to create enough housing specifically for homeless New Yorkers. Between Fiscal Years 2015 and 2021, 1,194 single adults and 2,321 families moved from shelters into homeless set-aside apartments, and 493 single adults and 1,348 families moved from shelters into designated apartments financed with the 421-a tax exemption. Annual placements for homeless households rose above 1,000 during only one year of the de Blasio administration, when 1,922 households moved into set-asides and 421-a apartments in Fiscal Year 2021 – a year in which 65,651 different homeless households were sheltered in the DHS shelter system.

26  https://nilhc.org/housing-needs-by-state-new-york

27  Author's calculations finding 293,940 +/- NYC households with incomes below $15,000 per year pay more than half of their incomes for rent, and another 211,904 +/- such households with incomes between $15,000 and $30,000 per year pay more than half of their incomes for rent, using data from American Community Survey (2018), IPUMS USA via NYU Furman Center: https://furmancenter.org/thestoop/entry/nyc-housing-insecurity-by-the-numbers

28  https://www.usgbc.com/everything-you-need-to-know-about-affordable-housing-qualifying-getting-in-and-staying-put/

29  https://www.thecity.nyc/2020/6/28/21306583/affordable-housing-lottery-chances-worst-low-income

30  https://www.thecity.nyc/2022/3/5/22869518/housing-trends-to-watch-for-the-future-of-nyc

MG-Class00039595

The Department of Housing Preservation and Development (HPD) financed 15,757 apartments for homeless New Yorkers under the *Housing New York 2.0* plan between Fiscal Years 2014 and 2021. Roughly half of these apartments were supportive housing. The bulk of the remainder were occupied apartments requiring renovation and/or in buildings undergoing refinancing to extend their affordability agreements. These "preservation" units will only be available for one-time occupancy by households exiting homelessness when the current tenants leave, and will not be reserved for additional homeless tenants when subsequent vacancies arise. While supportive housing is a vital resource for homeless people with mental illnesses, substance use disorders, or other challenges, there is a dire need for housing for the significant number of homeless New Yorkers who do *not* require that level of service. **All told, the *Housing New York* plan produced fewer than 3,000 newly constructed apartments for homeless households, aside from supportive housing, in the span of nearly eight years.** Most of the plan's housing is "affordable" only to people with higher incomes – a glaring failure to leverage City resources to address the daunting housing crisis that causes prolonged homelessness and housing instability among extremely low-income New Yorkers.



### *Housing New York* Units and Homeless Set-Aside Units Financed Fiscal Years 2014 - 2021

Source: NYC Department of Housing Preservation and Development and Mayor's Management Reports

Image Description: A graph labeled "Housing New York Units and Homeless Set-Aside Units Financed Fiscal Years 2014 – 2021." The vertical axes list numbers 0 to 35,000 in increments of 5,000 on the left, and percentages from 0.0% to 12.0% in increments of 2 on the right. The horizontal axis lists the years 2014 through 2021. At each year are bars in two sections: A gray section shows the number of Housing New York homeless units financed, with a value of 2,788 for the year 2021, and a dark red section shows the number of Housing New York non-homeless units financed. A green line marks the percentage of homeless units financed at each year, with a value of 9.8% for 2021.

MG-Class00039596

One bright spot was Local Law 19 of 2020, which requires that the developer of any new residential building containing more than 40 units and receiving any subsidy or support from the City must set aside at least 15 percent of the new apartments for homeless households, effective July 1, 2020. In the first year, there were 1,552 new apartments created for homeless households in 26 developments subject to the law. **However, fewer than a third of these apartments – only 493 – were in new developments other than supportive housing developments.** While Local Law 19 set an important standard, it is clear that future housing plans must go above and beyond these project-level minimums in order to meet the scale of the need.

**The solution to New York's affordable housing crisis lies in a combination of strategies including new construction, preservation of occupied housing, and assistance to help tenants retain their units, as well as adequate public assistance housing allowances and rent subsidies.** The failure to provide substantial financing for the construction of new apartments for extremely low-income and homeless New Yorkers has contributed directly to the number of homeless households in New York City and the length of time individuals and families remain homeless.

After 40 years of timid and ineffective housing policies that have left hundreds of thousands of New Yorkers with no viable housing options, it is time for the City to get serious about ending mass homelessness and the devastating housing instability that perpetuates social injustice and profoundly harms our community. Mayor Adams has an opportunity to demonstrate bold and visionary leadership by doing what his predecessors failed to do: create real solutions to the city's worsening housing crisis.



*There is no affordable housing. I work every day and spend all weekend trying to find a home, but when realtors hear you have a voucher, they stop communicating with you. I've filled out applications for nearly 200 apartments and been on NYC Housing Connect for over five years.*

– M.B., who has been homeless since July 2020

MG-Class00039597

# SUPPORTIVE HOUSING AND LICENSED HOUSING FOR ADULTS WITH SERIOUS MENTAL ILLNESSES

## CITY: C     STATE: D

The City and State have also failed to adequately meet the urgent need for vastly more permanent housing with on-site support services, and have failed to address persistent bureaucratic barriers that impede the placement of eligible individuals in supportive housing, particularly for those with the greatest and most immediate needs. At the same time that the unduplicated number of single adults sleeping in DHS shelters reached an all-time *high* in Fiscal Year 2021, the City provided the *lowest* annual number of supportive housing placements since Fiscal Year 2004.



**Annual Supportive Housing Placements for Homeless Single Adults and Unduplicated Single Adults Sleeping in DHS Shelters Each Year Fiscal Years 2002 – 2021**

*Source: NYC Department of Homeless Services*

Image Description: A graph labeled "Annual Supportive Housing Placements for Homeless Single Adults and Unduplicated Single Adults Sleeping in DHS Shelters Each Year Fiscal Years 2002 – 2021." The vertical axes list numbers 0 to 4,500 in increments of 500 on the left, and numbers 15,000 to 50,000 in increments of 5,000 on the right. The horizontal axis lists the years 2002 through 2021. At each year is a gray bar that lists single adult supportive housing placements, with a value of 1,228 for the year 2021. A dark red line marks the unduplicated number of single adults sleeping in shelters, with a value of 43,831 for the year 2021.

This decline in placements is partially due to inadequate supply: **There is only one available supportive housing apartment for every five eligible applicants**, and former Governor Cuomo's needless delays in releasing supportive housing funds stalled the new development pipeline. The process for accessing supportive housing is also needlessly burdensome, making it more difficult for applicants to be found eligible by City agencies. Once applicants are found eligible, they must attend interviews with supportive housing providers, who have wide discretion to reject them. Frustrating administrative delays throughout the supportive housing application process often needlessly prolong one's homelessness.

MG-Class00039598

Persistent problems with the referral process, such as City agencies sending people to interview for housing that is not physically accessible or for which they do not meet the specific eligibility criteria, exacerbate the supply problem. This causes supportive housing apartments to sit vacant despite the record need: The supportive housing vacancy rate may be as high as 10 percent,[31] even though an estimated 8,000 shelter residents have been approved for these apartments. While City officials have promised reforms related to onerous documentation requirements and the City Council passed legislation (Local Law 3 of 2022) to require reporting on the reasons applicants for supportive housing are rejected, New York has a long way to go to improve supportive housing access for the most vulnerable homeless New Yorkers.

Once individuals finally move into supportive housing, they often do not know what their rights are or where to turn for assistance if they encounter problems with housing conditions, public benefits, access to clinical support, or supportive services. The chronic underfunding of supportive housing, along with insufficient government oversight, contributes to the low availability and sometimes poor quality of the housing and services people receive. Many advocates and supportive housing tenants supported legislation requiring supportive housing operators to provide tenants information about their rights, the regulations governing their apartments, and whom to contact for assistance with matters such as repairs or billing. Thanks to their tireless advocacy, Local Law 15 of 2022, which establishes such a supportive housing tenant bill of rights, will take effect later this year. By empowering supportive housing tenants and adequately funding supportive housing providers, New York can strengthen this vital housing and ensure long-term stability of both the residents and the buildings.

---

31  https://citylimits.org/2022/02/04/opinion-a-focus-on-efficiency-will-keep-thousands-of-new-yorkers-needlessly-homeless/

MG-Class00039599

# HOUSING VOUCHERS AND STABILITY

## CITY: B    STATE: D+

66

*I was chronically homeless from 2006 until recently. Historically, the lack of rental assistance is what kept me in that untenable situation despite working in the tech industry. Access to truly affordable housing and quality housing vouchers have a monumental impact on one's living situation.*

– W.T., who was homeless from May 2006 to November 2021

Most homeless and extremely low-income people need rent subsidies to enable them to afford apartments in the private rental market. The Federal government has for decades rationed Section 8 Housing Choice Vouchers, and as a result, **only one out of every four eligible households is able to obtain this vital assistance.** While Washington debates whether to invest more in this proven program – and to eventually follow through on President Biden's promise to make it an entitlement for all who need it – the City and the State have been left to do what they can to help homeless and low-income households afford housing with their own subsidies.

The de Blasio administration created a suite of rent subsidies and reinstated priority access to public housing that helped nearly 14,000 households avoid homelessness and 55,000 households exit DHS and HRA shelters between Fiscal Years 2015 and 2021, but the flawed design of some subsidies – such as maximum rent amounts that were unrealistically low – frustrated many homeless New Yorkers who struggled to find housing even after they were found eligible for a voucher. Staffing shortages and administrative delays, exacerbated during the pandemic, have also impeded timely move-outs as residents spend months looking for an apartment and then waiting for paperwork and checks to be processed. The number of New Yorkers who exited shelters using City-initiated vouchers fell in Fiscal Year 2021, although the decrease was driven by a large drop in exits with the short-term Special One-Time Assistance (SOTA) subsidy while exits with the longer-term CityFHEPS subsidy rose.

MG-Class00039600



**Households Exiting NYC Shelters with City-Initiated Vouchers Fiscal Years 2015 - 2021**

*Note: Includes vouchers used for shelter exits only, not prevention. Annual figures are calculated estimates based on the percentage of vouchers used for shelter exits across all years.*

Image Description: A graph labeled "Households Exiting NYC Shelters with City-Initiated Vouchers Fiscal Years 2015 – 2021." The vertical axis lists numbers 0 to 7,000 in increments of 1,000. The horizontal axis lists years 2015 to 2021. Each year has a bar in multiple sections showing the types of vouchers and corresponding shelter exit numbers: A light blue section shows "SOTA," with a value of 947 for the year 2021, a purple section shows "CityFHEPS," with a value of 4,061 for the year 2021, a green section shows "SEPS," with no value for 2021, a dark red section shows "CITYFEPS," with no value for 2021, and a gray section shows "LINC," also with no value for 2021. The total number of exits is listed on top of each bar, with a value of 5,008 for the year 2021.

Thanks to relentless advocacy from homeless New Yorkers and pressure from the City Council, the City took important steps to improve CityFHEPS in the final months of the de Blasio administration by raising the maximum rent levels to match Section 8 standards, broadening access to previously excluded populations like runaway and homeless youth, and eliminating the income cliff that caused people to lose their vouchers if their incomes rose above strict thresholds. Although households with vouchers continue to face administrative barriers, and new standards governing rent reasonableness and utilities have caused confusion and roadblocks for some people seeking housing, the positive impact of these recent CityFHEPS reforms will be seen in the coming months and years.

The State soon followed the City's lead: Governor Hochul signed legislation in December 2021 to raise the maximum rents for State FHEPS – a commonsense reform that her predecessor had stubbornly resisted. However, the State has much more work to do to ensure housing stability for homeless and at-risk New Yorkers. **The State-set public assistance shelter allowance[32] is woefully inadequate for poor individuals and families to afford actual rents and has not been raised in years: The grant for households with children has not been increased since 2003, and remarkably, the shelter allowance for adult-only households has not been raised since 1988.**

---

32  The public assistance shelter allowance pays a set amount for rent, mortgage, or property taxes, usually by issuing a two-party check to the landlord, lender, or other payee, or by paying them directly. For further explanation of Cash Assistance, visit https://www.nyclu.org/get-legal-help/article/public-benefits/new-york-state-cash-assistance-program.

MG-Class00039601

In New York City, this means that without any additional assistance, a single individual receiving welfare is allotted only $215 per month, a three-adult household (for example, two parents and a 20-year-old child) is allotted $286 per month, and a three-person household with minor children is allotted merely $400 per month for rent. As then-Governor Mario Cuomo observed in the 1990s, one cannot even rent a garage, much less an apartment with heat, lights, and running water, for these amounts. By either raising or supplementing the meager shelter allowance to cover market rents, such as through the Home Stability Support (HSS) proposal, New York State can address the shortfall between the money low-income New Yorkers have to pay rent and the rents themselves, and thereby simultaneously prevent evictions and enable many more individuals and families to exit homelessness.

Faced with a statewide housing crisis, New York State should also enact the Housing Access Voucher Program (HAVP), a proposed State-funded program that seeks to address the needs of both homeless New Yorkers and those at risk of becoming homeless. HAVP has the potential to help a broader spectrum of New Yorkers struggling with housing, such as those receiving disability benefits or who may otherwise be ineligible for public assistance, and would enable even more families and individuals to avoid the indignity and trauma of homelessness. HAVP would cap tenants' rent at 30 percent of household income to increase housing stability as their incomes rise and fall. Additionally, public housing authorities would be required to inspect apartments to ensure that public monies do not go to landlords renting unsafe housing.

Existing rent subsidies have helped many individuals and families achieve housing stability, but New York must improve and expand the tools needed to combat a historic housing crisis. Certain groups are excluded from voucher programs: Currently, undocumented New Yorkers have access to only a couple of small housing subsidy programs. Mayor Adams and Governor Hochul should ensure that subsidies are available to as broad a range of New Yorkers as possible – without restrictions based on immigration status or the specific agencies serving them.

MG-Class00039602

# ENFORCEMENT AGAINST DISCRIMINATION IN HOUSING

## CITY: C+    STATE: C-

66

*The CityFHEPS vouchers make it so hard for the homeless community to move out of the shelters into apartments because the majority of the landlords out there are not accepting it.*

– M.F., who was homeless from September 2020 to September 2021

Although New York has housing discrimination protections that extend beyond Federal laws, the agencies tasked with enforcement are perennially under-resourced. The NYC Commission on Human Rights lacks sufficient staff to conduct the wide-scale testing needed to identify housing discrimination on the basis of race, family composition, lawful source of income, disability, or other protected status. The City's Human Resources Administration, which administers rent subsidies, created its own Source of Income Discrimination Unit to further clamp down on rampant illegal discrimination, but prospective tenants continue to be wrongfully denied housing because they intend to pay their rent with a subsidy. Many people do not know their rights when it comes to housing discrimination, and this speaks to the need for broader public awareness campaigns in addition to more robust enforcement.

Meanwhile, landlords and brokers continue to lawfully reject prospective tenants on the basis of an arrest or conviction history because the prior City Council failed to pass Fair Chance for Housing legislation before the end of their term. Due to systemic racism in the criminal legal system, discrimination based on arrest or conviction history is often used as a proxy for racial discrimination. Denying people access to housing on this basis prolongs homelessness and makes reentry that much more challenging – people need housing stability in order to get back on their feet as they return to society following a period of incarceration. Governor Hochul's proposal to limit this type of discrimination does not go as far as the NYC Fair Chance for Housing bill: The latter would have ended criminal background checks for housing. Until New York passes a bill fully banning discrimination based on arrest or criminal history for housing applicants, thousands of New Yorkers – especially Black and Latinx New Yorkers – will face perpetual punishment and struggle to secure the stable housing they need.

MG-Class00039603

# HOMELESSNESS PREVENTION

## RENTAL ASSISTANCE

### CITY: B+    STATE: C+



Image Description: Two adults, one with a gray beard sitting on their walker and the other with a gray cap standing beside them, are on a city sidewalk with the Coalition for the Homeless' office door and building sign behind them.
*Photo by Coalition for the Homeless*

The pandemic has pushed even more New Yorkers to the brink of homelessness. It is much more humane and cost-effective to help people pay off their rent arrears than to allow them to become homeless – it costs more than $100,000 to provide shelter for a family that becomes homeless, given the average DHS shelter stay of nearly 18 months, which is far greater than a typical household's rent arrears. New York City has issued "One-Shot Deals" to help people pay back rent, and has also used some of its subsidy programs as homelessness prevention to help people afford their rent on an ongoing basis. In Fiscal Year 2021, the City helped an estimated 2,360 households remain in their homes using CityFHEPS vouchers, in addition to those who used this type of subsidy to move out of shelters. Strict eligibility criteria, however, limit the number of New Yorkers who can access CityFHEPS vouchers for homelessness prevention.

The City has primarily encouraged people behind on rent due to the pandemic to apply for Federal funds administered by the State Office of Temporary and Disability Assistance (OTDA). New York State and its localities were allocated almost $2.6 billion from the Federal government, of which $2.4 billion was distributed directly by the State. Despite a shaky start in the final months of the Cuomo administration, OTDA eventually ramped up rent arrears payments through the Emergency Rental Assistance Program (ERAP). However, the State prematurely closed the application portal to most new applicants in November 2021 when it became clear that the value of applications already submitted exceeded the available funds.

MG-Class00039604

The State was forced to reopen the ERAP portal on January 11, 2022, after The Legal Aid Society filed a lawsuit in which the Coalition for the Homeless is a plaintiff. Crucially, applying for ERAP offers tenants some eviction protections, as housing court cases cannot move forward while an ERAP application is pending. Governor Hochul has requested that the Federal government allocate more funds to New York to address the unmet need for rent arrears grants, but in the interim, the State could also replenish ERAP funds as part of budget negotiations. The need is staggering: As of March 1, 2022, 315,162 ERAP applications had been submitted, nearly 125,000 payments had been made, and $2 billion in assistance had been obligated or paid.[33]

Governor Hochul's Executive Budget includes $100 million for rent supplements in addition to the $100 million provided last year at the behest of the Legislature. Similar to the proposed Home Stability Support program, this rental assistance can help avert and resolve homelessness for thousands of individuals and families.

However, the Executive Budget also places certain restrictions on State reimbursements to New York City for various rent supplements, including those funded via Temporary Assistance to Needy Families, Safety Net Assistance, and General Fund appropriations and re-appropriations. **We urge the State to remove all such restrictions in order to (1) maximize the number of homeless and at-risk households that can be assisted with rent supplements, (2) ensure State financial participation in this proven remedy to address homelessness, and (3) ensure that both homeless and at-risk households are assisted simultaneously so that homeless individuals and families can exit shelters, and those at risk can also avoid the loss of their homes.**

This is the best way to maximize the impact of rent supplements without unintended consequences inherent in the short-sighted restrictions. The State also issues FHEPS vouchers to families with minor children for homelessness prevention, and the aforementioned increase to the maximum rent levels will help more New Yorkers remain in their homes. But with narrow eligibility criteria for the FHEPS subsidy and significant unmet need among ERAP applicants, it is clear the State must invest more in rent subsidies.



*I have experienced firsthand the continued trials that New York City renters face trying to retain my 'affordable' housing. Because the voucher system is subject to change at any time, it can place renters in jeopardy of maintaining their homes, especially if the family becomes employable.*

R.J., who was homeless from 2016 to February 2018

---

33   https://otda.ny.gov/programs/emergency-rental-assistance-program/reports.asp

MG-Class00039605

# EVICTION PREVENTION

## CITY: A    STATE: C-

With the January 15th expiration of the statewide eviction moratorium, many New York tenants are at risk of losing their homes. The reopening of the ERAP portal following judicial intervention offers some protection against evictions while applications are pending, but the failure of State leaders to extend the moratorium in the midst of skyrocketing COVID-19 cases left many tenants feeling helpless and confused. The State has not acted with enough urgency to connect tenants to assistance and prevent evictions.

The scale of housing instability has led to renewed calls for the State to adopt Good Cause eviction legislation, which would extend the right to a renewal lease and protection from unconscionable rent increases to all tenants in New York State, except those living in owner-occupied buildings with four or fewer units. It would protect 1.6 million tenants by requiring landlords to obtain a judicial order certifying that an eviction is for a good cause before a tenant can be removed, and stipulate that the expiration of a lease is not a good cause. Without a right to remain, it is impossible for tenants to assert their rights and call for necessary housing repairs without risking eviction. The bill also acknowledges that steep rent increases are often de facto evictions, and provides that rent increases of more than 1.5 times the annual percentage change in the consumer price index would be presumed unreasonable, unless accompanied by special conditions. As the pandemic has exposed and exacerbated housing insecurity statewide, the need for bold tenant protections is clear.

Whatever happens in Albany, New York City deserves credit for proactively creating a strong eviction prevention infrastructure. **In 2017, New York City became the first city in the nation to initiate a right to counsel in housing court and administrative termination of tenancy proceedings for all low-income tenants facing eviction.** The historic law was to be phased in over five years, but the City accelerated implementation during the pandemic to ensure that tenants citywide would have access to an attorney to help them navigate the eviction process and assert their rights. The provision of increased legal assistance for tenants has had a powerful impact: Prior to the pandemic, residential evictions by marshals declined by 41 percent between 2013 and 2019. In Fiscal Year 2021, legal organizations funded by the Office of Civil Justice provided legal assistance to more than 42,000 households facing eviction, disrepair, landlord harassment, and other problems – more than in any prior year, even as the number of eviction filings fell due to pandemic protections.[34] With the end of the eviction moratorium, the City's right to counsel is an essential bulwark that will help many New Yorkers avoid homelessness.

---

34  https://www1.nyc.gov/assets/hra/downloads/pdf/services/civiljustice/OCJ_UA_Annual_Report_2021.pdf

MG-Class00039606

# INSTITUTIONAL DISCHARGE POLICIES
## CITY: C-    STATE: F

Far too many New Yorkers are released directly from prisons, jails, nursing homes, and hospitals to the shelter system without proactive discharge planning or adequate support. In recent years, discharges from these types of institutions have contributed to record homelessness among single adults.

According to DHS data collected at shelter intake facilities in Fiscal Year 2019, **11 percent of single adults entering shelters cited release from jail or prison as the reason for their homelessness, and an additional 9 percent of single adults entered shelters after being discharged from a hospital (including both medical and psychiatric units) or other non-hospital program, including a nursing home.** While the right to shelter provides an important safety net, people need more stable settings following hospitalization or incarceration. Every effort must be made to connect people to permanent housing prior to their discharge dates.

The situation is particularly dire among people exiting State prisons. Criminal legal policy changes and the shift toward decarceration are necessary reforms, but City and State leaders must better collaborate to ensure New Yorkers have the safe, stable housing that is so vital to successful reentry. **Each year since 2015, more than 40 percent of people released from State prisons to New York City were released directly to shelters.** Other New Yorkers who have residency restrictions related to their offenses are kept in the correctional system beyond their release dates because they do not have a place to live after their incarceration. The State should invest in the creation of a robust re-entry housing program to help the thousands of New Yorkers returning from prison into a state of literal homelessness. New York can and should do better than the current prison-to-shelter trajectory for people who have served time and need to get back on their feet.



**New York State Prison Releases to NYC
Including Releases to NYC Shelters
Calendar Years 2014 - 2021 (Through Aug)**



Releases to NYC Shelters        Releases to Addresses Other than Shelters        Percent of All Releases to NYC Shelters

*Source: NYS Department of Corrections and Community Supervision*

Image Description: A graph labeled "New York State Prison Releases to NYC Including Releases to NYC Shelters Calendar Years 2014-2021 (Through Aug)." The vertical axes list numbers 0 to 10,000 in increments of 1,000 on the left, and percentages from 0% to 60% in increments of 10 on the right. The horizontal axis lists the years 2014 through 2021 (through August). At each year are bars in two sections: A gray section shows releases to NYC shelters, with a value of 1,141 for 2021 through August, and a dark red section shows releases to addresses other than shelters. A green line marks the percentage of all releases to NYC shelters at each year, with a value of 41.2% for 2021 through August.

MG-Class00039607

# RECOMMENDATIONS

## HELPING UNSHELTERED HOMELESS NEW YORKERS

**Mayor Adams must:**

- Prohibit NYPD from responding to 311 calls requesting assistance for homeless individuals and remove NYPD from all homeless outreach functions. Calls to 311 should only result in the deployment of properly trained DHS-contracted outreach workers.

- Implement the CCIT-NYC (ccitnyc.org) campaign's proposal for non-police responses to mental health crises.

- Adopt a client-centered, harm reduction approach to outreach for unsheltered homeless individuals, including trained peers on outreach teams and equipping each team with essential items such as socks, hand sanitizer, menstrual products, backpacks, clothing, and coats.

- Cease encampment-clearing operations and street sweeps and focus instead on connecting people to resources they want, including low-barrier shelters and permanent housing.

- Open at least 3,000 new Safe Haven and stabilization beds in single-occupancy rooms and offer them to all unsheltered homeless individuals, with a focus on expanding the number of these facilities for women and transgender or gender-non-conforming individuals, and increase drop-in center capacity citywide.

- Allow individuals with disabilities or chronic/severe medical issues to enter Safe Havens without first proving they have been on the streets for a certain length of time.

- Open a sufficient network of public restrooms and 24-hour warming and cooling centers throughout the city with proper air filtration and ventilation, appropriate safety protocols, and adequate personal protective equipment.

- Administratively clear all summonses for "quality of life" offenses issued to people as a result of their homeless status.

- Expand the number of overdose prevention centers and ensure that lifesaving harm reduction services are readily available to all New Yorkers.

**Governor Hochul must:**

- Immediately fund at least 1,000 units of supported housing with mobile mental health services similar to the original "housing first" or "Pathways" model for unsheltered individuals with mental illnesses at $50,000 per unit per year.

- Ensure that homeless individuals are not taken against their will to new mental health crisis centers, which must by law only serve voluntary patients.

**Mayor Adams and Governor Hochul should together:**

- Halt the deployment of additional police in response to homeless people located in transit facilities and trains.

- Reopen 600 NYC inpatient psychiatric unit beds that had been diverted to COVID-19 care, and assure that all admissions, whether for observation or inpatient care, include full care management and discharge planning services.

- Expand access to low-barrier physical and mental health care, including virtual care and street medicine.

- Ensure that any procurement of Medicaid managed care contracts includes robust requirements for the competent and timely provision of integrated health and mental health care for all Health and Recovery Plan (HARP)-eligible individuals, including those who are homeless.

- Expand integrated health clinic availability for sheltered and unsheltered homeless individuals and families, including through any alternate Medicaid payment mechanisms.

- Prevent further loss of acute care and long-term psychiatric inpatient beds and collaborate on strategies to reduce barriers to both inpatient and outpatient psychiatric care.

- Avoid characterizations of homeless people that stereotype them as mentally ill and violent.

MG-Class00039608

# RECOMMENDATIONS

## EMERGENCY SHELTERS

**Mayor Adams must:**

- Reduce the City's reliance on large congregate facilities for homeless single adults, and shift the creation of new capacity toward single-occupancy accommodations with full accessibility features for those with disabilities as well as smaller, low-barrier shelter designs such as Safe Haven shelters, which are more home-like and have better staffing for those with complex needs.

- Initiate the redesign of all shelter facilities with the expectation that possible future outbreaks of airborne infectious diseases will require the provision of private rooms and bathrooms for each individual or household, and with attention to the principles of safety, public health, accessibility, and individual autonomy.

- Ensure that shelters are sufficiently staffed and that staff are appropriately trained to help residents apply for and secure permanent housing.

**Governor Hochul must:**

- Reverse harmful cuts to New York City's emergency shelter system that have resulted in the State short-changing the City by hundreds of millions of dollars over the past decade, and share equally with the City in the non-Federal cost of sheltering homeless families and individuals.

- Replace the grossly inadequate $45 per month personal needs allowance for those living in shelters with the standard basic needs allowance provided to all public assistance recipients.

- Permanently eliminate the statewide requirement that shelter residents pay rent for shelter or enroll in a savings program as a condition of receiving shelter.

- Promptly implement regulations and funding for medical respite programs included in the State budget in order to reduce costly hospital stays and provide a setting more appropriate than shelters where homeless New Yorkers can properly recover after hospitalization.

**Mayor Adams and Governor Hochul should together:**

- Implement reforms to eliminate the unnecessary and inhumane bureaucratic barriers to shelter for homeless families with children and adult families, which force them to reapply for shelter multiple times before ultimately being found eligible; and make permanent the pandemic-era changes that allow families to reapply from their provisional shelter placements and that no longer require them to bring minor children to the PATH intake center.

- Increase the oversight of shelters so that maintenance and poor conditions are promptly identified and addressed, with adequate funding for cleaning staff and capital repairs.

- Ensure that shelter residents have adequate internet access for needs related to education, employment, housing searches, health care, and other critical issues by ensuring that i) there is WiFi access in all private and common areas of all shelters, and ii) all residents have access to computers, tablets, or other devices.

- Allow homeless individuals with residency restrictions who are currently held in Department of Corrections and Community Supervision (DOCCS) custody past their release date to access DHS shelters without delay when no other housing is available to them.

- Enable easy access to voluntary mental health treatment and crisis services in all shelters, including the opportunity to establish psychiatric advance directives with the reasonable expectation that they will be followed.

- Establish medical respite and supportive housing with on-site medical services in lieu of nursing homes for homeless people in need of nursing and personal care services who do not require inpatient care but cannot live safely in a shelter.

MG-Class00039609

# RECOMMENDATIONS

## PERMANENT HOUSING AND HOMELESSNESS PREVENTION

**Mayor Adams must:**

- Ensure full coordination between the City's housing and homeless services agencies so that housing investments are properly calibrated to meet the most urgent needs of homeless and extremely low-income New Yorkers.

- Provide $2.5 billion in additional new construction financing each year for the next five years for apartments specifically built for homeless and extremely low-income New Yorkers, by:

    ◊ Doubling the set-aside in new affordable housing developments for homeless households to 30 percent in order to produce at least 6,000 new apartments per year; and

    ◊ Building an additional 6,000 apartments per year for households with extremely low incomes.

- Accelerate the creation of 15,000 City-funded supportive housing units by scheduling their completion by 2025 rather than 2030.

- Assign homeless New Yorkers the highest priority for available NYCHA public housing apartments and other subsidized rental housing.

- Provide a sufficient number of qualified staff to help homeless and at-risk New Yorkers apply for and secure permanent housing, including dedicated staff to assist those with vouchers to search for apartments and expedite the approval process.

- Exempt agencies providing housing, homelessness prevention, and shelter services from budget cuts so as not to worsen existing staffing shortages and administrative delays.

- Eliminate bureaucratic barriers to placement in supportive housing by relaxing the standard for documenting unsheltered homelessness to establish eligibility, assigning substantial weight to the recommendations of referring providers in the application process, and ensuring that the coordinated entry system does not act as a barrier to placement in supportive housing.

- Ensure that eligibility for all rent subsidy programs is based on New Yorkers' lived experience of homelessness, and not limited to people residing in Department of Homeless Services shelters.

- Maintain robust funding for eviction prevention and implementation of the right to counsel in housing court and administrative proceedings.

**Governor Hochul must:**

- Implement the Housing Access Voucher Program (HAVP) to create a State-funded, long-term rent subsidy for homeless and extremely low-income households.

- Implement an increase to Cash Assistance grants, including raising the shelter allowance to cover market rents.

- Short of a universal increase in Cash Assistance, implement the Home Stability Support (HSS) program to create a State-funded, long-term rent subsidy for households receiving public assistance who are homeless or at risk of losing their housing due to eviction, domestic violence, or hazardous housing conditions.

- Remove all State budget appropriation restrictions on New York City's authority to claim reimbursement for all rent subsidy, rent supplement, or other rental assistance programs.

- Accelerate the pace of production of the 20,000 units of supportive housing pledged by former Governor Cuomo in 2016 by completing them by 2026 instead of 2031, fully fund the construction and operation of the remaining 14,000 units, and initiate a robust supportive housing preservation program to keep at least 6,000 units in service over the next 10 years.

- Reform punitive parole practices that allow parole officers to exercise wide discretion and deny placement at potentially viable home addresses for individuals leaving State prisons.

- Enact Good Cause eviction legislation.

- Add funding to the Emergency Rental Assistance Program, using both Federal funds and State funds as necessary to fully meet the need.

MG-Class00039610

**Mayor Adams and Governor Hochul should together:**

- Fund the production of more housing for homeless single adults, separate and apart from existing supportive housing commitments.

- Expand access to supportive housing and other permanent housing for adult families – a population with disproportionately high levels of disability and complex needs.

- Ensure effective reentry planning for individuals being released from prisons and jails in order to identify viable housing options prior to each individual's scheduled release date, fund the creation of supportive housing specifically for individuals reentering the community after incarceration, and prohibit housing discrimination on the basis of an arrest or conviction record.

- Allow undocumented New Yorkers equal access to affordable and supportive housing and eviction prevention assistance.

- Ensure that new apartments are accessible to people with disabilities, that people with disabilities are helped to secure accessible apartments suited to their individual needs, and that existing apartments are modified to achieve maximum accessibility features wherever possible and whenever a housing unit is being preserved under any City or State program.

- Fund the robust enforcement of housing discrimination laws and launch public awareness campaigns about how to identify and report discrimination.

- Advocate for the Federal government to ensure that Section 8 vouchers are provided as an entitlement for all households who meet the eligibility standards, and devote sufficient resources to administer Federal vouchers including Emergency Housing Vouchers to maximize their use without bureaucratic delays.

MG-Class00039611

# APPENDIX

## A NOTE ABOUT THE NUMBER OF HOMELESS NEW YORKERS

The most common question asked about New York City's homelessness crisis is, "How many people are homeless in our city?" Reporters commonly rely on the shelter census figures published on the Coalition for the Homeless website, which serve as reliable longitudinal metrics for measuring the dynamics of the crisis, but do not encompass the full scope of homelessness in New York City. A comprehensive estimate would need to include the number of people who sleep in the various shelter systems, who are unsheltered, and who live doubled-up with family or friends.

The number of those sleeping unsheltered is particularly challenging to ascertain, and the annual HOPE survey significantly understates the true size of this population.[35] The Department of Homeless Services (DHS) estimated that there were 2,376 unsheltered New Yorkers on January 26, 2021,[36] but the HOPE methodology is deeply flawed and the actual number is clearly much larger. Other New Yorkers who are similarly difficult to enumerate include those staying in illegal or very precarious housing, or sleeping in cars or other makeshift arrangements. For many people, blending in and avoiding detection are essential survival techniques.

Determining the total number of people sleeping in NYC shelters also poses challenges. The Coalition's charts reflect the average nightly census for shelters overseen by the Department of Homeless Services and, to a much lesser extent, the Department of Housing Preservation and Development, which serves households displaced by fires and City-issued vacate orders. These data are pulled from monthly reports published pursuant to Local Law 37 of 2011. Analyzing the DHS shelter census over time is useful because, unlike the other shelter systems, the DHS system expands as the need for shelters rises because of the legal right to shelter in New York City secured by the Coalition for the Homeless and The Legal Aid Society. Furthermore, the Coalition has been tracking these data in a consistent way for 40 years, facilitating analysis of the crisis over time.

But other City agencies also operate or fund shelters. For example, the Department of Youth and Community Development administers shelters for runaway and homeless youth, and the Human Resources Administration manages shelter systems for survivors of domestic violence and people living with HIV/AIDS. Other people without homes reside in private or faith-based shelters. Based on a point-in-time count submitted to the Federal Department of Housing and Urban Development, there were 65,975 people sleeping in shelters in New York City on a single night in January 2021.[37] Due to data reporting inconsistencies, it is difficult to estimate the equivalent average nightly census figure across these various systems.

---

35   For details on the HOPE survey's methodological shortcomings, see our briefing paper "Undercounting the Homeless"
https://www.coalitionforthehomeless.org/wp-content/uploads/2014/06/BriefingPaper-UndercountingtheHomeless2010.pdf

36   https://www1.nyc.gov/assets/dhs/downloads/pdf/hope-2021-results.pdf

37   https://www.huduser.gov/portal/sites/default/files-pdf/2021-AHAR-Part-1.pdf

MG-Class00039612

Also notable is that the number of unique individuals utilizing each system over the course of a year is much higher, and gives a more complete view of the scope of mass homelessness in our city. For example, over the course of Fiscal Year 2021, 107,510 different homeless adults and children slept in the DHS shelter system alone.

People who sleep doubled-up with family or friends are not counted by most government agencies, partly due to varying definitions of homelessness. The Department of Education is one of the few entities that counts doubled-up households. During the 2020-21 school year, more than 101,000 New York City students were identified as homeless, including 28,000 sleeping in shelters and more than 65,000 who were doubled-up.[38] These staggering statistics suggest that there are many more families and individuals who are members of doubled-up households and remain uncounted in official estimates of homelessness by other agencies.

Therefore, data limitations and reporting inconsistencies make it nearly impossible to definitively answer the question of how many New Yorkers are homeless. What is certain, however, is that the lack of affordable housing in our city has devastating consequences for the lives of hundreds of thousands of our neighbors, and those we see on the streets and in the subways, or count in the shelters on any given night, represent a mere fraction of those impacted by this ongoing tragedy.

---

38  https://www.advocatesforchildren.org/sites/default/files/library/nyc_student_homelessness_20-21.pdf?pt=1

MG-Class00039613



**COALITION FOR THE HOMELESS**
**129 FULTON STREET**
**NEW YORK, NY 10038**

TELEPHONE: (212) 776-2000
FACSIMILE: (212) 964-1303
EMAIL: INFO@CFTHOMELESS.ORG

MG-Class00039614