# EXHIBIT 82

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  -----------------------------------x

3  M.G. et al,

4                         Plaintiff,

5        -against-                    7:19-cv-00639-CS-LMS
                                      BENCH RULING
6  ANDREW CUOMO, et al,               VIA TELECONFERENCE

7                         Defendants.

8  -----------------------------------x
                                      United States Courthouse
9                                     White Plains, New York

10                                    September 25, 2020

11
   B e f o r e:
12
                                      HONORABLE JUDGE CATHY SEIBEL,
13                                    United States District Judge

14  A P P E A R A N C E S :

15  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
            Attorney for Plaintiff M.G.
16          1285 Avenue of the Americas
            New York, New York  10019
17  BY:  WALTER G. RICCIARDI
         EMILY A. VANCE
18

19  THE LEGAL AID SOCIETY
            Attorney for Plaintiff M.G.
20          199 Water Street
            New York, New York   10038
21  BY:  ELENA MARIA LANDRISCINA
         STEFEN RUSSELL SHORT
22
    DISABILITY RIGHTS NEW YORK
23          Attorney for Plaintiff M.G.
            25 Chapel Street - Suite 1005
24          Brooklyn, New York  11201
    BY:  JOSHUA MORRIS ROSENTHAL
25

            Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
              Official Court Reporter (914)390-4242

MG-Class00039455

1  T E L E C O N F E R E N C E   A P P E A R A N C E S:  (CONT'D)

2

3  NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
           Attorney for Defendant ANDREW CUOMO
4          28 Liberty Street - 15th Floor
           New York, New York 10005
5  BY:  JANE R. GOLDBERG
        ADAM SANSOLO
6        JEB HARBEN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

           Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
              Official Court Reporter (914)390-4242

MG-Class00039456

1                            PROCEEDINGS

2                    THE DEPUTY CLERK:  M.G. et al v. Cuomo, et al.

3                    THE COURT:  All right.  Good afternoon, everyone.

4              I apologize for keeping you waiting.  I just

5     extricated myself from a Zoom meeting.

6              Let me remind counsel if you're going to say

7     anything, the first word out of your mouth must be your last

8     name.  Please don't say "This is Elena Landriscina for

9     Plaintiff."  Just say "Landriscina."  Don't worry about

10    sounding brusque or impolite.  We have a court reporter and

11    it's very important that she knows right up front who is

12    speaking.  In fact, if you don't start by saying your last

13    name, she'll probably interrupt you and what you say will be

14    lost.  So please, it doesn't come naturally, I know, but please

15    try to do that.

16             I have spent quality time with the motion papers.

17    I'm going to ask a question.  If you don't ask have an answer,

18    just stay silent.  If you do, say your last name and pipe up.

19             Does anybody have anything to add that's not covered

20    by the motion papers?  Okay.

21             Let me tell you where I come out and also I want to

22    put on the record before we start, one of the lawyers on the

23    Plaintiffs' team who is a former law clerk of mine is getting

24    married imminently and I will be performing the ceremony.  I

25    just wanted everybody to be aware of that.

              Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
                 Official Court Reporter (914)390-4242

1          The motion before me is Defendants' motion to dismiss

2    the first amended class action complaint, which I'm going to

3    call the FAC.

4          Because this case has been the subject of lots of

5    briefing and argument and lots of paper, I'm -- rather than

6    taking time to summarize what's in the FAC, I'm going to assume

7    the parties' familiarity with factual record.  In summary

8    fashion, Plaintiffs are individuals with serious mental illness

9    who are indigents.  They originally brought this lawsuit to

10   challenge their institutionalization in New York's prison

11   system.

12         The defendants includes Governor Andrew Cuomo in his

13   official capacity; the New York State Office of Mental Health,

14   or OMH; Commissioner Ann Marie Sullivan in her official

15   capacity; the Department of Corrections and Community

16   Supervision, or DOCCS; Commissioner Anthony Annucci in his

17   official capacity, actually acting commissioner; and Ann Marie

18   McGrath in her official capacity as DOCCS.  Plaintiffs allege

19   that defendants held them in prison past their lawful release

20   dates due to their failure to make available the

21   community-based housing and supportive services Plaintiffs

22   require upon relief.

23         Plaintiffs purport to represent two classes.  A

24   general class of people with serious mental illness who

25   defendants hold in secure prisons past their release dates,

MG-Class00039458

1   including the end of their prison sentences, their approved

2   conditional release dates and their open dates for parole

3   release due to the inadequate capacity of community-based

4   mental health housing programs.  And a second class called the

5   RTF Subclass.  "RTF" stands for Residential Treatment Facility.

6   The RTF Subclass is general class members who have been

7   incarcerated past the maximum expiration dates of their

8   court-imposed prison sentences.  Plaintiffs allege that the

9   RTFs where they are held are prisons where they are treated

10  just like prisoners.

11          The plaintiffs filed their original complaint on

12  January 23, 2019.  We had a conference in May.  I gave

13  Plaintiffs leave to amend.  They filed the FAC on June 3rd.  On

14  August 2nd of last year I referred the case to Magistrate Judge

15  Smith for general pretrial supervision.  The parties bundled

16  their motion papers, so the defendants filed this motion, which

17  is Docket Entry 79.  Their supporting memorandum of law, which

18  is Docket Entry 80, which I'm going to call defendant's memo,

19  as well their reply memorandum, Docket Entry 90, which I'm

20  going to call Defendants' Reply, at the same time as Plaintiffs

21  filed their opposition, Docket Entry 82, which I'm going to

22  call Plaintiffs' memo.  And that was all on December 16.

23          Both parties also filed attorney declarations

24  attaching various documents.  And the named Plaintiffs also

25  filed sworn declarations which are found at Docket Entries 81,

MG-Class00039459

1  83 through 89, 114, 115, 117 and 121.  Defendants filed sworn

2  declarations from OMH and DOCCS's staff at Docket Entry 91 and

3  92.  And both parties filed sur-replies in March of this year.

4  Plaintiffs' sur-reply is 113 and Defendants is 120.

5       Then on August 10 of this year, Plaintiffs requested

6  a pre-motion conference with Judge Smith in anticipation of

7  amending the FAC, principally to add a "Discharge Class" of

8  Plaintiffs who are unnecessarily placed in segregated settings

9  or put at risk of institutionalization upon their discharge

10  from prison.

11       In their letter, which is Docket Entry 125, Plaintiff

12  explained that, quote, the proposed amendment would not impact

13  the Court's resolution of the pending motion to dismiss,

14  unquote.  That's at page 2.  After a conference, Judge Smith

15  issued an opinion and order, which is Docket Entry 133, and

16  allowed Plaintiffs to file the Second Amended Complaint, or

17  SAC, which is Docket Entry 134.

18       She noted in her decision at page 10, as follows:

19  Quote, Contrary to Plaintiffs' assertions, the new claims do

20  appear to change the tenor of the case.  For example, the

21  addition of the proposed named Plaintiffs as the Discharge

22  Class expands the focus of the dispute from persons being held

23  in prison past their release dates due to their severe mental

24  illness to persons with severe mental illness denied

25  community-based housing in the most integrated setting

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

1    appropriate to their needs and/or who face a substantial risk

2    of institutionalization.

3                Judge Smith also explained, based on her reading of

4    the SAC, that Plaintiffs also add facts to the pleadings which

5    do not specifically relate to the Discharge Class or which

6    include allegations about the previously named Plaintiffs under

7    sections nominally related to the Discharge Class which may

8    affect the Court's decision on Defendants' motion to dismiss.

9    That's also at page 10.

10                Accordingly, while this motion has been pending for

11   some time, I have to examine whether it would still be

12   appropriate for me to rule on the arguments the parties have

13   briefed or if those arguments are affected by the SAC in such a

14   way that they require more briefing and are better reserved for

15   a future motion to dismiss or for summary judgment.  So I'll

16   touch on that as we go along.

17                But let me tell you where I come out.  I assume

18   you're all going to be ordering the transcript.  If you're not,

19   you'll want to take detailed notes and do make yourself

20   comfortable because this is going to take a while.

21                The first I'm going to address is Subject Matter

22   Jurisdiction:  I have subject matter jurisdiction over cause of

23   action only when I have authority to adjudicate the cause

24   pressed in the complaint.  *Arar v. Ashcroft*, 532 F.3d 157, 168.

25   Reversed en banc on other grounds, 585 F.3d 559.

MG-Class00039461

1          Quote, Determining the existence of subject matter

2     jurisdiction is a threshold inquiry, and a claim properly

3     dismissed for lack of subject matter jurisdiction under Rule

4     12(b)(1) when district courts lacks the statutory or

5     constitutional power to adjudicate it, unquote, RR at 168.

6          That case goes on to say, quote, When jurisdiction is

7     challenged, the Plaintiff bears the burden of showing by a

8     preponderance of the evidence that subject matter jurisdiction

9     exists and the district court may examine evidence outside of

10    the pleadings to make this determination.

11         Quote, the Court must take all facts alleged in the

12    complaint as true and draw all reasonable inferences in favor

13    of Plaintiff, but jurisdiction must be shown affirmatively and

14    that showing is not made by drawing from the pleadings

15    inferences favorable to the party asserting it, unquote.

16    *Morrison v. National Australian Bank*, 547 F.3d, 160, 170.

17    Affirmed on other grounds, 561 U.S. 247.

18         When a Defendant moves to dismiss both for lack of

19    subject matter jurisdiction and on other grounds such as

20    failure to state a claim, the Court must address the issue of

21    subject matter jurisdiction first.  See *Rhulen Agency v.*

22    *Alabama Insurance*, 896 F.2d 674, 678.  I won't take the time to

23    recite the standards applicable to a motion to dismiss for

24    failure to state the claim.  Everybody is familiar with the

25    standards of *Iqbal*, 556 U.S. 662 and *Twombly* 550 U.S. 544.

MG-Class00039462

 1    Where matters outside the pleading are presented on a

 2   12(b)(6) motion and not excluded, the motion must be treated as

 3   one for summary judgment under Rule 56.  See Rule 12(d).  The

 4   requirement of conversion is mandatory and unless the

 5   additional materials are excluded, the portion of the

 6   Defendants' motion that relies on those materials in connection

 7   with Rule 12(b)(6) must be treated as a summary judgment

 8   motion.  *Global Network v. City of New York*, 458 F.3d 150, 155.

 9   The Court, obviously, only grants summary judgment when

10   resolving all ambiguities and join all permissible factual

11   inferences in favor of the party against whom summary judgment

12   is sought.  The moving party shows no genuine dispute as

13   material fact -- as to any material fact and that the moving

14   party is entitled to judgment as a matter of law.  See Rule

15   56(a) in *Holcomb v. Iona College*, 521 F.3d 130, 137.  So those

16   are the general legal standards.

17    I turn first to the issue of Governor Cuomo as

18   Defendant:  Federal courts are permitted under *Ex parte Young*,

19   209 U.S. 123, to grant prospective injunctive relief against

20   state officials "to prevent a continuing violation of federal

21   law."  *Green v. Mansour*, 474 U.S. 64, 68.  See *Verizon Maryland*

22   *v. Public Service Commission of Maryland*, 535 U.S. 635, 645 to

23   48.

24    For a specific state official to be a proper

25   Defendant for injunctive relief under the *Ex parte Young*

MG-Class00039463

1   doctrine, the state official, quote, must have some connection

2   with the enforcement of the act, unquote.  *In re Dairy Mart*

3   *Convenience Stores*, 411 F.3d 367, 372 to 373.  Plaintiffs

4   oversimplify the standard by stating that all *Ex parte Young*

5   requires is, quote, some connection, unquote, between the

6   governor and the violation of federal law.  That's in

7   Plaintiffs' memo at 22 to 23.  By omitting the phrase, quote,

8   with the enforcement, unquote, they propose a significantly

9   broader and more tenuous connection than set forth in *Dairy*

10  *Mart*.  The quote, official against whom the action is brought

11  must have a direct connection to or responsibility for the

12  alleged action, unquote.  *Davidson v. Scully*, 148 F. Supp.2d

13  249, 254, (S.D.N.Y. 2001).  See *CSX v. New York State*, 306 F.3d

14  87, 99 and *Jackson v. Connecticut*, 2019 Westlaw 2193464, at

15  page 4, (District of Connecticut May 21, 2019.)

16          Let me ask everybody to put themselves on mute,

17  because I'm getting a lot of background and beeping and things

18  like that.  And I think if it's distracting me, it's probably

19  distracting the court reporter.

20          So as I said, I'm going to be talking for a long

21  time, so if everybody else could please mute.  Continuing on

22  now.

23          A mere recitation of an official's

24  responsibilities -- does anybody know what that beeping is?

25  All right.  Let me go on.

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

1            That is really distracting.  Walter, do you know what
2   that is?
3            MR. RICCIARDI:  I have no idea.
4            THE COURT:  I'm talking to Walter Clark.  Maybe he's
5   left us.  One hundred percent of the people on this call have
6   to be on mute.  If anybody doesn't know how to mute -- hold on,
7   let me find out.
8            Maybe my law clerk knows.  Ryan, do you know?
9            THE LAW CLERK:  No, I'm not sure.  Walter usually has
10  it pulled up on his computer where he can mute everybody.
11           THE COURT:  Hold on one second.  I'm going to walk in
12  there and see if I can get him to mute it.  Hold on.
13           He's stepped out.  I think he'll be able to mute
14  everybody.  But hopefully the beeping has stopped.  When he
15  comes back, my other law clerk will let him know.
16           Somebody is not muted right now because I can hear
17  noise.  I wish I knew how to tell you how to mute.  Maybe
18  somebody who is successfully can unmute.  Ryan, my law clerk,
19  how did you mute yourself?
20           THE LAW CLERK:  I'm on my cell phone.  Just a button
21  that says "mute."
22           THE COURT:  So you did it on your phone.  You didn't
23  do it through this AT&T system like star seven or something
24  like that?
25           THE LAW CLERK:  Right.

            Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
               Official Court Reporter (914)390-4242

1            THE COURT:  All right.  I know there's way to do it,

2    but I don't know what it is.

3            All right.  I'm going to press on and it's going to

4    be -- that beeping is so annoying.  Okay.  I'm pressing on.

5            Okay.  Whoever is in the car, we really don't want to

6    listen to Waze or Google Maps or whatever that is.  You should

7    be able to mute the call via your cell phone.  Okay.

8            A mere recitation of an official's responsibilities

9    to safely execute the law is an insufficient basis to permit a

10   suit to go forward against that official because, quote, the

11   proper Defendants are the government officials charged with the

12   administration and enforcement, unquote, of the purported

13   illegal conduct.  *Curtis v Pataki*, 1997 Westlaw 614285 at page

14   6 (Northern District October 1, 1997); See *Pugh v. Goord*, 571

15   F. Supp.2d 477, 517 to 18 (S.D.N.Y. 2008).

16           When the governor of a state is named as a Defendant,

17   district courts in this circuit have often found an

18   insufficient enforcement connection between the governor and

19   the complained-of conduct, and that other state officials are

20   more appropriate Defendants.  See *Disability Rights New York v.*

21   *New York State*, 2019 Westlaw 2497907 at pages 23 to 24,

22   (Eastern District June 14, 2019).

23           Governors are usually dismissed as a Defendant when

24   they lack direct involvement in the enforcement of the alleged

25   illegal conduct.  See, for example, *Spiteri v. Russo*, 2013

MG-Class00039466

1    Westlaw 4806960 at page 18, (Eastern District September 7,

2    2013), affirmed 622 F. App. 9.  There the governor had no

3    direct involvement in Plaintiffs' classification as a sex

4    offender.  Also see *Nolan v. Cuomo*, 2013 Westlaw 168674 at page

5    9, (Eastern District January 16, 2013), which held that the

6    governor's duty to ensure that the law is enforced is not

7    sufficient to make him a proper party, and *Curtis* at page 6,

8    where in a suit against the DOCCS commissioner and the

9    governor, only the DOCCS commissioner was a proper Defendant.

10             By failing to show how Governor Cuomo has a

11   connection to the enforcement of the challenged conduct at

12   issue here, Plaintiffs have fallen short of what the law

13   requires.  They argue that they have alleged sufficient, quote,

14   active involvement, unquote, by the governor to withstand a

15   motion to dismiss by describing his efforts to, quote, address

16   the putative class's community-based housing needs, unquote.

17   That's in their memo at 23.  While Plaintiffs are correct, as

18   they say at that same page, that they need not show that the

19   governor was involved in the minutiae of Plaintiffs' discharge

20   plans, they recite only responsibilities attributed to the

21   Governor in the general discharge of his office, such as

22   appointing the leadership of and receiving reports from certain

23   agencies, commissions and cabinets that address issues

24   implicated in this case.  See the FAC in paragraph 179 to 87.

25             Plaintiffs fail to allege that the governor had a

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MG-Class00039467

1   direct enforcement role of any kind in any of the conduct that
2   forms the basis for their lawsuit.  While Plaintiffs argue that
3   access to the state's capital budget is necessary for full
4   relief in this case, that is not necessarily so.  And in any
5   event, Governor Cuomo shares the responsibility for allocating
6   funds with the assembly and the senate.  If this Court were to
7   grant injunctive relief directed at DOCCS and OMH, their
8   compliance would not be excused based on budgetary reasons.  So
9   Plaintiffs have not shown that the governor is necessary for
10  full relief, even if it might be he who needs to take the bull
11  by the horns to allocate responsibility among the two agencies
12  if this case is to settle.

13          Plaintiffs rely on out-of-circuit district court
14  cases that are not persuasive here, especially because one
15  in-circuit case they do cite, *Nassau & Suffolk County Taxi*
16  *Owners Association v. State*, 336 F.Supp. 3d 50 at 68, 69,
17  (Eastern District 2018), dismissed the governor as a Defendant
18  precisely because he had no enforcement connection to the
19  alleged ongoing violations of federal law.  While *Disability*
20  *Advocates v. Patterson*, 598 F.Supp. 289, 356, 57 (Eastern
21  District 2009), declined to dismiss the governor in a suit
22  involving claims similar to those in this action, the Court in
23  that case analyzed the governor's status as a party under the
24  far more liberal Rule 21 joinder standard.  Here, I find the *Ex*
25  *parte Young* analysis controls because Plaintiffs have failed to

MG-Class00039468

1   specify Governor Cuomo's enforcement connection to the alleged

2   violations of federal law, he is not a proper Defendant and is

3   dismissed as a party.

4          Ryan, can you do me a favor.  Can you text Walter and

5   just ask him what the instructions are for people on the call

6   to mute themselves or if he's able to come back.  If they can't

7   do it themselves, if he's able to come back and mute them for

8   me, that would be great.

9          THE LAW CLERK:  Will do, Judge.  I just want to note

10  if you're on a land line, if you hit Star 6, that should mute

11  yourself.

12         THE COURT:  Oh, that's good.  All right.  Everybody

13  do that.

14         THE LAW CLERK:  But I'll text Walter to see if he can

15  do it on his end as well.

16         THE COURT:  Maybe that's the way he would say to do

17  it.  Okay.

18         Turning now to Eleventh Amendment Immunity:  In their

19  initial memorandum of law at pages 17 to 20, Defendants argue

20  that the Eleventh Amendment bars Plaintiffs' claims against

21  DOCCS and OMH under Title II of the Americans with Disabilities

22  Act, or ADA.  After Plaintiff served their opposition, however,

23  Defendants changed their position, noting that they, quote,

24  agree with Plaintiffs that the Court need not reach the

25  constitutional argument implicated by the question of sovereign

1  immunity as Plaintiffs have asserted a claim under Section 504

2  of the Rehabilitation Act.  That's at page 12 of their reply.

3  The parties appear to be in agreement on this point and -- but

4  out of an abundance of caution, I will examine whether it is,

5  in fact, appropriate for me to put off a ruling on this issue.

6        A state is, quote, immune from suits brought in

7  federal courts by her own citizens as well as by citizens of

8  another state absent that state's consent or a valid abrogation

9  by congress, unquote.  *Employees of the Department of Public*

10 *Health & Welfare v. Department of Public Health & Welfare,* 411

11 U.S. 279, 280; see *Allen v. Cooper*, 140 Supreme Court 994,

12 1000, 1001, and *Pennhurst v. Halderman*, 465 U.S. 89, 100.

13       It is undisputed that OMH and DOCCS are both agencies

14 of New York State, and as such are, quote, entitled to assert

15 the state's Eleventh Amendment immunity where, for practical

16 purposes, the agency is the alterego of the state --

17       All right.  So somebody is in a car.  That's a car

18 door noise.  Whoever you are, mute your cell phone.  Sorry.

19       Quote, entitled to assert the state's Eleventh

20 Amendment immunity where, for practical purposes, the agency is

21 the alterego of the state and the state is the real party in

22 interest, unquote.  *Santiago v. New York State, DOCCS*, 945 F.2d

23 25, 28, Note 1.  Accordingly, the key question for analysis is

24 whether Congress validly abrogated that immunity under Title II

25 of the ADA.

MG-Class00039470

1          The Supreme Court's decision *United States versus*
2   *Georgia*, 546 U.S. 151, held that the ADA validly abrogates
3   sovereign immunity when a claim includes both a Title II
4   violation and alleged Fourteenth Amendment violation, but left
5   unresolved the question of whether Title II validly abrogates
6   sovereign immunity for a cause of action based on conduct that
7   allegedly violates Title II, but not a specific constitutional
8   provision.  See *Dean v. University of Buffalo*, 804 F.3d 178,
9   194 and *Bolmer v. Oliveira*, 594 F.3d 134, 148.  As such, it is
10  an open question whether sovereign immunity would prohibit a
11  Title II claim against DOCCS and OHM.

12          There's a well-settled policy set by the Supreme
13  Court, however, for federal courts to avoid deciding
14  constitutional questions except where necessary.  *Blair v.*
15  *United States*, 250 U.S. 273, 279.  Quote, Considerations of
16  propriety, as well as long-established practice, demand that
17  courts refrain from passing on the constitutionality of the law
18  unless obliged to do so in the proper performance of our
19  judicial function, where the question is raised by a party
20  whose interest entitles them to raise it, unquote.  That's
21  *Blair* 279.  See *Lyng v. Northwest Indian Cemetery Protective*
22  *Association*, 485 U.S. 439, 445 to 46, which discussed the
23  quote, fundamental and longstanding principal of judicial
24  restraint that requires courts to avoid reaching constitutional
25  questions in advance of the necessity of deciding them.

MG-Class00039471

1          Here, Plaintiffs also bring a Rehabilitation Act

2   claim against the state agency Defendants, and the remedies

3   available to Plaintiffs under Title II and the Rehabilitation

4   Act, or RA, are identical.  See 42 U.S. Code Section 12133.

5   Further, it's clear that Section 504 constitutes a clear

6   expression of Congress' intent to condition acceptance of

7   federal funds on a state's waiver of its Eleventh Amendment

8   immunity.  *Garcia V. S.U.N.Y* at 113.  RA claims are thus not

9   barred by the Eleventh Amendment because New York has waived

10  sovereign immunity as to such claims.  *Keitt v. New York City*,

11  882 F.Supp.2d 412, 425 (Southern District 2011). Defendants do

12  not challenge that the RA claims in this case can proceed

13  without implicating the Eleventh Amendment.

14          Finally, the Second Circuit has indicated that courts

15  should decide whether immunity applies at the pleadings stage

16  particularly where, if successful, quote, the state would be

17  exempted from participating in any pretrial procedures.  *Smith*

18  *v. Reagan*, 841 F.2d 28, 31.  Here as extensive paper discovery

19  has already occurred and as the discovery going forward will be

20  the same regardless of whether it is aimed at the ADA claim or

21  the RA claim, that is not an issue here.  See *Smith* at 30 where

22  the Courts said, quote, The purpose of an early determination

23  of -- sorry.  The purpose of early determinations of immunity

24  defenses is, after all, to lift the burdens of litigation from

25  a Defendant who should not be a party at all, unquote.

MG-Class00039472

1    Accordingly, I need not resolve the sovereign

2    immunity issue at the pleadings stage and agree with the

3    parties that it would be inappropriate to do so.  There is no

4    need to decide the constitutionality of Title II's abrogation

5    of sovereign immunity because the rights and remedies under

6    Title II are the same as under the RA, and deciding the

7    immunity question now would not prevent the state defendants

8    from being "haled into court."  *Smith* at 30.  See *Ross v. CUNY*,

9    211 F. Supp. 3d, 518, 528 (E.D.N.Y. 2016).  Deciding the issue

10   now will not change the course of this litigation or the

11   ultimate judgment to which Defendants may be subject.  *T.W. v.*

12   *New York State Board of Law Examiners*, 2019 Westlaw 6034987 at

13   page 3, (Eastern District November 14, 2019).  And accordingly,

14   the motion to dismiss the ADA claims against DOCCS and OMH on

15   sovereign immunity grounds is denied.

16       I now discuss the allegedly Redundant Claims:

17   Defendants argue that the ADA and RA claims against Defendants

18   Sullivan, Annucci and McGrath, who are sued in their official

19   capacity, should be dismissed because they're redundant with

20   the claims against the state entities themselves.

21       The Second Circuit recognizes that ADA and RA suits

22   for prospective injunctive relief may proceed against state

23   officers in their official capacities.  See *Henrietta D. v.*

24   *Bloomberg*, 331 F.3d 261, 289.  Because no matter what, quote,

25   the real party in interest in an official-capacity suit is the

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MG-Class00039473

1    government entity.  It is irrelevant whether the judgment would

2    impose individual liability on the officer sued since the suit

3    is, in effect, against the public entity, unquote.  *Harris v.*

4    *Mills* 572 F.3d 66, 72.  Plaintiffs may assert ADA claims

5    against institutional Defendants or by naming individuals as

6    Defendants in their representative or official capacities.

7    *Duprey v. Prudential*, 910 F.Supp. 879, 884 (Northern District

8    1996).  A Plaintiff might choose to sue an individual in that

9    person's official capacity rather than a state institution to

10   avoid Eleventh Amendment and sovereign immunity issues.

11   *Hallett v. New York State Department of Correctional Services*,

12   109 F. Supp.2d 190, 199 to 200 (Southern District 2000).

13          But courts in the circuit will often dismiss official

14   capacity Defendants when the Plaintiff can sue the government

15   entity directly.  *Candelaria v. Cunningham*, 2000 Westlaw 798636

16   at page 3 (Southern District June 20, 2000).  See *Loadholt v.*

17   *DOCCS,* 2009 Westlaw, 4230132 at page 3 (Western District

18   November 24, 2009).  And *Hallett* 109 F. Supp.2d at 199 to 200.

19   Courts are not required, however, to dismiss these claims

20   against official capacity Defendants as redundant with those

21   against the state agency.  See, for example, *Askins v. MTA*,

22   2020 Westlaw 1082423 at page 7 (Southern District March 5,

23   2020).  *Maioriello v. New York State OPDD*, 2015 Westlaw 5749879

24   at page 19 to 20, (Western District September 30, 2015*).

25   *Askins v. New York City,* 2013 Westlaw 142007 at pages 3 to 5

MG-Class00039474

 1   (Southern District January 8, 2013.)  And *Butterfield v.*
 2   *New York,* 1998 Westlaw 401533 at pages 16 to 17 (Southern
 3   District July 15, 1998).  Lastly, courts will typically dismiss
 4   claims against the official capacity Defendants only when there
 5   are no other separate claims pending against those individuals.
 6   See *Fox v. S.U.N.Y*, 497 F. Supp.2d 446, 451 (Eastern District
 7   2007) where the Court said, quote, Because the state is the
 8   real party in interest for the Plaintiffs' claims against the
 9   individual Defendants in official capacities, it would be
10   redundant to permit these claims to proceed when the plaintiff
11   already has a cause of action against the state and the
12   remaining claims against the individual Defendants have been
13   dismissed, unquote.

14          Here, as I will discuss shortly, other claims against
15   the official capacity Defendants survive this motion to
16   dismiss.  So by necessity, those Defendants must remain in the
17   case.  I leave unresolved the question of sovereign immunity as
18   to the Title II claims, so there is an additional reason why
19   those claims against the official capacity Defendants should
20   remain.  That is because it's unclear at this stage whether
21   Plaintiffs may or may not sue the government entity directly on
22   the ADA Title II claim as set forth in *Candelaria* at 3.  It may
23   be that the official capacity Defendants are the only valid
24   avenue through which to pursue this claim.  Lastly, dismissal
25   of the official capacity Defendants would not promote any

MG-Class00039475

1  economy of resources at this stage of the litigation and

2  because the parties don't dispute that the real party in

3  interest in an official-capacity suit is the government entity,

4  the effect of any eventual judgment will be the same on the

5  official capacity and institutional Defendants.  *Harris* at 72.

6  So Defendants' motion to dismiss the claims against the

7  official capacity Defendants as redundant is thus denied.

8        Turning now to Mootness:  That is a, quote, doctrinal

9  restriction stemming from the Article III requirement that

10 federal courts decide only live cases or controversies.  A case

11 is moot if the parties lack a legally cognizable interest in

12 the outcome of the case.  *In re Zarnel*, 619 F.3d 156, 162.  See

13 *Powell v. McCormack*, 395 U.S. 486, 496.  The Supreme Court,

14 however, has long recognized exceptions to this doctrine.  See,

15 for example, *U.S. Parole Commission v. Geraghty*, 455 U.S. 388,

16 399.  These exceptions, quote, are particularly applicable in

17 class action cases in the ... civil rights arena, unquote.

18 *Samele v. Zucker*, 324 F. Supp. 3d, 313, 328 (Eastern District

19 2018).

20        Defendants present two arguments for why this case

21 should be dismissed as moot.  The first is that, quote, the

22 transfer of ... the named Plaintiffs to residences in the

23 community constitutes an intervening circumstance that deprives

24 these Defendants of a personal stake in the outcome of the

25 litigation, unquote.  And, quote, mitigates the concern that,

MG-Class00039476

1  absent injunctive relief, they will be subject to allegedly

2  unconstitutional conduct in the future, unquote.  That's at

3  Defendants' memo at page 10.  And the second is that, quote,

4  DOCCS has issued a policy memorandum advising responsible

5  supervisory staff at statewide, that inmates within the

6  definitions of the putative classes here will not be held past

7  their respective release dates because of an unmet need for

8  mental health housing, unquote.  That's in Defendants' reply at

9  4.  Plaintiffs, conversely, argue that several exceptions to

10  mootness apply here, and the Defendants have failed to satisfy

11  their formidable burden to show mootness.

12         First I'm going to discuss the release of the

13  individual Plaintiffs and then I'll turn to the memorandum.

14         Defendants first argue that to the extent Plaintiffs

15  C.J., M.J., J.R., D.R. and M.G. seek release from RTFs or

16  prison or seek to assert claims on behalf of either putative

17  class, their claims are moot because they have been released.

18  That's in Defendants' memo at 7.  This argument also presumably

19  now includes Plaintiffs PC, according to Defendants' letter of

20  May 8, 2020, which is Docket Entry 124.  Defendants' argument

21  posits that the transfer of the named Plaintiffs to residences

22  in the community is an intervening circumstance that deprives

23  these Plaintiffs of a personal stake in the outcome of the

24  litigation and the concern that they'll be subject to

25  unconstitutional conduct in the future.  See *Shannon v.*

MG-Class00039477

1    *Venettozzi*, 749 F. App 10,13, citing *Salahuddin v. Goord*, 467

2    F.3d 263, 272.  Defendants contend that the claims asserted by

3    these named Plaintiffs in the general class and the RTF

4    Subclass, (collectively, I'm going to call these people the

5    original named Plaintiffs) are no longer alive because they now

6    lack legally cognizable interest in resolution of this matter.

7         I understand Judge Smith's concerns about the

8    potential for the new facts and allegations in the SAC to

9    change the calculus for deciding Defendants' motion on this

10   point.  To the extent the allegations in the SAC relate to the

11   claims of the original Plaintiffs, I should await full briefing

12   addressed to the SAC.  But to the extent the new facts and

13   allegations apply to the new Discharge Class and not the

14   general class and the RTF Subclass, mootness has been briefed.

15   In addition to the RTF class's claims under the Eighth and

16   Fourteenth Amendments, the general class's claim and,

17   therefore, the claim of all the original named Plaintiffs in

18   the FAC, is that under the ADA and the RA, the Defendants are

19   obligated to see to it that Plaintiffs receive services in the

20   most integrated setting appropriate to their needs and that

21   Defendants have not done so because they have caused Plaintiffs

22   to be institutionalized and segregated in state prisons, rather

23   than provided adequate residential placements in the most

24   integrated setting that's appropriate.  That's from the FAC

25   paragraph 408.  See also paragraph 419, where it's alleged that

MG-Class00039478

1   Defendants caused Plaintiffs to receive programs and services

2   in the institutionalized and segregated setting of state

3   prisons, rather than in the most integrated setting appropriate

4   to their needs.

5        The gist of the general class's claim looks to me

6   they are being held in prison too long.  While the new claims

7   for the discharged claim specifically address the conditions in

8   which those who have been discharged now find themselves, and

9   the allegedly inadequate level of integration in those

10  settings, the claims of the original named Plaintiffs in both

11  the SAC and the FAC do not seem to focus, at least not

12  primarily, on the argument that the places they were eventually

13  put are inadequate.  The claims saying that Defendants have

14  discriminated against Plaintiffs by placing them in segregated

15  settings like shelters, see SAC paragraphs 762 and 773, are

16  advanced mainly in connection with the new discharge class

17  Plaintiffs.  Accordingly, while the SAC explicitly includes new

18  facts about some of the original named Plaintiffs, see

19  paragraphs 46, 48 through 64 and 82 through 89, and expands the

20  scope of facts and allegations regarding segregated settings

21  into which Plaintiffs are discharged, see, for example,

22  paragraphs 390 to 391, 398 to 419, 457, 486 to 90, 495, 636 to

23  37, 656, 659 and 699, I do not believe this has hindered by

24  ability to rule on Defendants' motion to the extent the claim

25  is that the original Plaintiffs were held in prison too long.

MG-Class00039479

1  To the extent their claim is that the conditions into which
2  they were released are not sufficiently integrated, the new
3  allegations that facts in the SAC change the scope and nature
4  of the claims and because their effects on Defendants' mootness
5  arguments have not been briefed, Defendants' motion is denied
6  without prejudice to renewal to that extent.

7      To the extent Plaintiffs' claims relate to their being
8  held in prison too long, I'm going to address the claim.
9  Defendants say that release of a named Plaintiff has mooted
10 these claims, plaintiffs say that three exceptions to mootness
11 apply:  Voluntary cessation, picking off of the named
12 Plaintiffs, and the inherently transitory nature of the claims.
13 As I'll discuss momentarily, I find that at least the
14 inherently transitory exception applies, at least at this
15 stage.

16     The mootness doctrine has, quote, weathered a complex
17 history, unquote, in the context of class actions *Eckert v.*
18 *Equitable Life* 227, F.R.D., 60, 63 (Eastern District 2005), and
19 thus presents the court with special concerns.  Although the
20 mootness inquiry is intensely factual and situational, Eckert
21 at 63, as a general rule, if the claims of a named Plaintiff
22 are resolved before the Court certifies the class, the entire
23 action is mooted.  *Comer v. Cicneros* 37 F.3d 775, 798.  See
24 *Jobie O. v. Spitzer*, 2007 Westlaw 4302921, at page 4, (Southern
25 District December 5, 2007).  Quote, class certification acts as

MG-Class00039480

1     a lifeboat for a claim that would otherwise be moot due to the

2     resolution of Plaintiffs' claims, unquote, because the class,

3     quote, acquires a legal status separate from the interest

4     asserted by the named plaintiff, unquote, *Eckert* at 63, see

5     *Jobie O*. at 5, but where no class has been certified, generally

6     the class claims do not survive.

7        Quote, Where class claims are inherently transitory,

8     however, the termination of the class representative's claim

9     does not moot the claims of the unnamed members of the class,

10    unquote. *Robidoux v. Celani*, 987 F.2d, 931, 938 to 39.  This

11    is because, quote, some claims are so inherently transitory

12    that the trial court will not have ... enough time to rule on a

13    motion for class certification before the proposed

14    representative's individual interest expires, unquote. *Mental*

15    *Disability Law Clinic v. Hogan*, 2008 Westlaw 4104460 at page 9,

16    (Eastern District August 28, 2008).  Quote, under this mootness

17    exception, a case will not be moot, even if the controversy as

18    to the named Plaintiffs has been resolved, if:  (1), it is

19    uncertain that a claim will remain live for any individual who

20    could be named as a Plaintiff long enough for the Court to

21    certify the class; and (2), there will be a constant class of

22    persons suffering the deprivation complained of in the

23    complaint, unquote. *Salazar v. King*, 822 F.3d 61, 73.  When

24    these criteria are met, quote, courts permit the class

25    certification to relate back to filing of the complaint and

MG-Class00039481

1    hold that the Plaintiffs have properly preserved the merits of

2    the case for judicial resolution, unquote.  *Comer*, 37 F.3d at

3    799.

4         Defendants assert that for Plaintiffs to be entitled to

5    this mootness exception, Plaintiffs must have filed a motion

6    for class certification while they have live claims.  That's in

7    Defendants' reply at 2.  Several district courts in this

8    circuit, however, have concluded that Second Circuit has no

9    such requirement.  See, for example, *Bellin v. Zucker*, 2020

10   Westlaw 2086009 at pages 3 to 4, (Southern District April 30,

11   2020); *Hogan* 2008 Westlaw 4104460 at page 9; *Eckert* 227 F.R.D.

12   at 63 to 64; and *German v. Federal Home Loan Mortgage Corp.* 896

13   F.Supp. 1385, 1399 (Southern District 1995).  Instead, these

14   courts have found that the case can move forward, quote, in

15   situations where a Plaintiff has not yet had a reasonable

16   opportunity to file a motion for class certification; namely,

17   where there has been no undue delay, the Court retains subject

18   matter jurisdiction despite the Plaintiffs' failure to move for

19   class certification, unquote.  *Eckert* at 63, 64.

20        I find these cases convincing.  I don't believe that

21   Plaintiffs must file a motion for class certification with the

22   class complaint or early on in discovery, particularly where

23   any such motion would have to be bare-bones, just to avoid

24   mootness.  Requiring the motion to avoid mootness is especially

25   inappropriate here where Defendants have always maintained that

MG-Class00039482

1   Plaintiffs' status in prison was temporary until housing became
2   available.  See Defendants' reply at 10.  Plaintiffs' release
3   was entirely within Defendants' control and Defendants seem to
4   have strategically released Plaintiffs in response to the
5   lawsuit.  Additionally, discovery in this case is ongoing.
6   Plaintiffs have sought discovery on issues relevant to class
7   certification and in a case of this complexity, the delay in
8   moving for class certification is not excessive.  See *Greif v.*
9   *Wilson Elser*, 258 F. Supp.2d, 157, 161 (Eastern District 2003)
10  where the Court declined to apply the relation back doctrine
11  when after a 20-month delay, the plaintiff did not indicate
12  that she was prevented from commencing discovery or moving for
13  class certification.  In that case, Plaintiff hadn't even
14  sought discovery.  So there was undue delay.  But here,
15  discovery has been ongoing.

16      In short, although many of the cases applying the relation
17  back doctrine have done so after a motion to certify the class
18  has been previously been filed, I do not see the filing of such
19  a motion as a requirement.  As long as a, quote, justiciable
20  controversy exists some point prior to class certification,
21  unquote, and Plaintiffs have not, unquote, unduly delayed,
22  unquote, the relation back doctrine will serve to preserve the
23  action if the requirements of the inherently transitory
24  exception are met.  *Crisci v. Shalala*, 169 F.R.D. 563, 567
25  (S.D.N.Y., 1996).  I note that the second circuit is

MG-Class00039483

1  considering this issue in the Bellin case, so that decision
2  could change things sooner or later.

3      Turning now to whether the requirements of the inherently
4  transitory doctrine are met, I find the first prong is easily
5  satisfied here, as plaintiffs were held in temporary status due
6  to the unavailability of community-based mental health housing.
7  Defendants concede that this was meant to be a short-term
8  solution to a housing shortage, which meant that Plaintiffs
9  could be released at any time once housing became available.
10 See Defendants' reply at 10.  Furthermore, Plaintiffs have
11 shown that Defendants had discretion for when and where to
12 release plaintiffs, and as demonstrated by the evidence
13 provided by Plaintiffs, prioritized the release of named
14 Plaintiffs after this litigation was filed.  See evidence
15 summarized in Plaintiffs' memorandum at page 5 and notes 4
16 through 7.

17     It is clearly uncertain, therefore, that a claim could
18 remain live for any individual who could be named as a
19 Plaintiff long enough for the Court to certify a class.  See
20 *Salazar* at 73.

21     The second prong of the analysis, that there will be a
22 constant class of persons suffering the deprivation complained
23 of in the complaint, is more difficult for Plaintiffs to show
24 at this stage, in light of Defendants' policy memorandum which
25 Defendants argue in the challenge to practice.  When the action

MG-Class00039484

1  was commenced and before Defendants issued their purported
2  policy change, however, Plaintiffs clearly could show and
3  Defendants could not dispute that there were a, quote,
4  fluctuating number of people in prison past their ... release
5  dates, unquote.  Plaintiffs' memorandum at 11.  See Rosenthal
6  Declaration, Exhibit 87 at 4, 5, 8, 9 through 10 and 11.
7  Plaintiffs' ability to demonstrate this constant class or not
8  is now inextricably tied to Defendants' purported voluntary
9  cessation of the challenged conduct.  If the practice has
10  stopped, there will not be a constant class.  And if it has not
11  stopped, there will be.  As I will discuss in a moment,
12  Defendants have not sufficiently shown here that they have
13  actually stopped this practice, at least not yet.  Because, as
14  I will explain, I find that the memorandum and policy change do
15  not show that the challenged conduct has, in fact, ceased, and
16  that there may be a reasonable expectation that the challenged
17  conduct will recur, I think it is plausible that there is or
18  will be a constant class of persons suffering the deprivation.
19      Because Plaintiffs have shown that the claims at issue
20  here are inherently transitory and they have not unduly delayed
21  in bringing the motion for class certification, the motion as
22  to mootness is denied as it relates to the claims of the
23  original named Plaintiffs.
24      Turning now to the Policy Memorandum:  Defendants argue
25  that the allegations in the FAC are moot because DOCCS has,

MG-Class00039485

1    quote, committed to discontinue the practices complained of in

2    the amended complaint, unquote.  And, quote, issued a policy

3    memorandum advising responsible supervisory staff statewide

4    that inmates within the definitions of the putative classes

5    here will not be held past their respective release dates

6    because of an unmet need for mental health housing, unquote.

7    Defendants' reply at page 4.  I believe this argument has been

8    sufficiently briefed, including with the sur-replies that I may

9    rule on it.

10        A Defendant's voluntarily cessation of challenged conduct

11   will only moot a lawsuit if, quote, the challenged conduct has,

12   in fact, ceased, unquote.  Quote, there is no reasonable

13   expectation that the alleged violation will recur, unquote.

14   And, quote, interim relief or events have completely and

15   irrevocably eradicated the effects of the alleged violation,

16   unquote.  *American Freedom v. MTA*, 815 F.3d 105, 109; see

17   *Seidemann v. Bowen*, 499 F.3d 119, 128; *Ciaramella v. Zucker,*

18   2019 Westlaw 4805553, at page 5, (Southern District

19   September 30, 2019).

20        Usually, a party's, quote, voluntary cessation of

21   allegedly unlawful conduct ... does not suffice to moot a case,

22   unquote.  *N.Y. Pub v. Whitman*, 321 F.3d 316, 327, quoting

23   *Friends of the Earth v. Laidlaw,* 528 U.S.167, 174.  A party,

24   quote, claiming that its voluntary compliance moots a case

25   bears the formidable burden of showing that it is absolutely

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MG-Class00039486

1  clear that the allegedly wrongful behavior could not reasonably

2  be expected to occur, unquote.  *Seidemann* 499 F.3d at 128,

3  because, quote, a party should not be able to evade judicial

4  review ... by temporarily altering questionable behavior,

5  unquote.  *City News v City of Waukesha,* 531 U.S. 278, at 284,

6  Note 1.  This is of particular concern in cases where

7  Plaintiffs are, quote, prisoners, who are at the mercy of their

8  keepers, unquote.  *Inmates of Attica v. Rockefeller* 453 F.2d

9  12, 23 to 24.

10  DOCCS alleges that this policy change, and the half-page

11  memorandum sent to "All Superintendents and Community

12  Supervision Bureau Chiefs" -- I'm quoting that from Exhibit 1

13  of the Enright Declaration -- satisfies their burden to show

14  that the effects of their actions are completely and

15  irrevocably eradicated, that the conduct has ceased, and that

16  there's no reasonable expectation that the alleged violation

17  will recur.  I cannot agree at this stage.

18  First, Defendants have not demonstrated they have in fact

19  ceased the practice of prolonging the institutionalization of

20  members of the putative classes in prison, and in circumstances

21  such as these, this memorandum alone does not convince me that

22  the practice has in fact changed.  See *Salem versus Pompeo*, 432

23  F. Supp. 3d, 222 at 234, Eastern District, 2020.  Where

24  evidence of noncompliance with a new policy weighed against

25  mootness.  It appears from the record that the same practices

MG-Class00039487

1    could and may well continue either because Defendants obtained,

2    quote/unquote, waivers of release from seriously mentally ill

3    prisoners, see Rosenthal Declaration Exhibit 105 and Exhibit

4    103 at 119, for which there's no formal process other than

5    signing a statement, Rosenthal Declaration Exhibit 103 at 19,

6    or because of delays in release for, quote, unforeseen

7    circumstances, unquote, as referenced in the Enright

8    declaration, Document 92 paragraph 14, and Defendants'

9    interrogatory responses.  While Defendants assure the Court

10   that these, quote, unforeseen circumstances, unquote, would

11   only, quote, temporarily, unquote, delay an individual's

12   release, giving examples such as, quote, unexpected medical

13   issues, transportation problems, extreme weather, or a severe

14   psychiatric episode that requires observation, unquote, they

15   conclude this list by including, seemingly as an afterthought,

16   a, quote, temporary delay in housing availability (such as a

17   fire or other event), unquote.  That's Docket Entry 114-1 at

18   15.  The entire crux of Plaintiffs' complaint arises from

19   temporary delays in housing availability.  Defendants have not

20   shown that there is no possibility that a seriously mentally

21   ill prisoner will be kept in prison beyond his release date

22   when they have not disavowed seeking waivers and when they

23   reserve the right to prolong incarceration due to unforeseen

24   circumstances.

25       Beyond these loopholes in the new policy, Defendants have

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MG-Class00039488

 1    not -- Defendants have shown that the memorandum has been

 2    issued, but have not shown that it has, in fact, been

 3    implemented to ensure that Defendants no longer hold

 4    individuals with serious mental illness in prison past their

 5    release date or that all Defendants named in this case have

 6    foreclosed the possibility of continuing the practice.

 7        Defendant Sullivan, the OMH Commissioner, stated

 8    unequivocally in her interrogatory responses, that, quote, no

 9    OMH policies, rules, practices, procedures, systems, et cetera,

10    were changed as a result of the DOCCS implementation of its

11    policy as set forth in the DOCCS memorandum.  This memorandum

12    set forth a DOCCS policy that has not changed or required a

13    change to any OMH policy or procedure, unquote.  Rosenthal

14    Declaration Exhibit 104 at 4.  Additionally, DOCCS did not

15    require any training or other mechanisms to ensure that staff

16    actually implement the memorandum and policy change properly.

17    Rosenthal Declaration Exhibit 103 at 11 and Exhibit 116 at 6.

18    And, in fact, DOCCS decided that no new training was required

19    to implement the policy change beyond the memorandum, Rosenthal

20    Declaration Exhibit 103 at 10, despite the fact that large

21    numbers of Defendants' staff, spread out across a large and

22    diverse system throughout the state, are tasked with its

23    implementation, and it represents a significant change from

24    past practice.

25        It is also of concern that throughout the litigation,

                Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
                    Official Court Reporter (914)390-4242

1  including in their briefs on this motion, Defendants have

2  continued to justify their decision to hold indigent

3  individuals with serious mental illness past their lawful

4  release dates by reference to unspecified, quote, penological

5  justifications and safety concerns, unquote.  For example,

6  Docket Entry 80 at 2, and 21 to 22, Defendants' reply at 10,

7  Document 103 at 3, and Document 114-1 at 7 to 8.  These types

8  of arguments do not inspire confidence that the complained-of

9  conduct is completely and irrevocably eradicated, or that it

10 might not recur upon a change of administration, change of

11 policy, or change of mind, particularly because the change in

12 policy appears to be at least an intentional response to the

13 lawsuit and perhaps an effort to moot the lawsuit.  See

14 *Edelhertz v. City of Middletown*, 2013 Westlaw 4038605 at pages

15 3 to 4 (Southern District May 6, 2013) which found a case was

16 not moot where the statute was changed in response to the

17 lawsuit and nothing prevented the Defendants reenacting it if

18 the case were dismissed.

19     Defendants, to refute these concerns, point to my decision

20 in *Inside Connect v. Fischer*, 2014 Westlaw 2933221, at pages 8

21 to 9, from June 30, 2014, where I dismissed an action for

22 injunctive relief against DOCCS officials.  In that case,

23 however, the evidence presented clearly showed that the

24 challenged conduct had, in fact, ceased a year before.  The

25 underlying reason that motivated the challenged conduct in the

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MG-Class00039490

1    first place no longer existed, and the Plaintiff offered

2    nothing more than baseless speculation that DOCCS was

3    continuing the challenged conduct.

4        While Defendants are correct that there's nothing

5    suspicious about their making efforts to resolve the

6    problematic conduct on their own, see Defendants sur-reply at

7    page 7, in order to moot a claim, Defendants must demonstrate

8    both that they have ended the conduct and that the conduct will

9    not resume once the Court is no longer looking over their

10   shoulders.  I am reminded of the *NYPIRG* case where The Second

11   Circuit found that the state agency's implementation of a

12   commitment letter to halt the challenged conduct was, quote,

13   indicative of a degree of good faith, unquote, but nevertheless

14   failed to show that it was, quote, absolutely clear that the

15   allegedly wrongful behavior could not reasonably be expected to

16   recur, unquote.  321 F.3d at F27.  As both the Supreme Court

17   and The Second Circuit have stated, merely disclaiming any

18   intention to resume challenged conduct is insufficient to moot

19   a case.  *United States v. W.T. Grant*, 345 U.S. 629, 633 and

20   *Dean v. Blumenthal*, 577 F.3d 60, 65.  Here, in circulating a

21   half-page memorandum with a broad exception, while continuing

22   to justify the policy reasons behind their original practice,

23   Defendants here have failed to satisfy their burden and the

24   motion is therefore denied as to the policy memorandum.

25       That said, it is plain to me that Defendants, with the

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MG-Class00039491

1    guidance of the Attorney General's office, recognize and are

2    trying to rectify the problems this lawsuit has highlighted and

3    they may yet demonstrate to my satisfaction that the conduct

4    has, in fact, ceased as the policy change is further

5    implemented.  I hope the parties will continue to work on

6    whether a negotiated solution is possible, recognizing on the

7    one hand that Defendants may be able to show mootness in the

8    future and recognizing that the state budget is in worse shape

9    than ever, and on the other hand recognizing that the rights of

10   disabled people are at stake.

11       Turning now to Failure to Exhaust:  Defendants argue that

12   Plaintiffs' claims must be dismissed for failure to exhaust

13   their administrative remedies as required by federal law.

14   Exhaustion is an affirmative defense, not a pleading

15   requirement; thus, inmate Plaintiffs need not, quote,

16   specifically plead or demonstrate exhaustion in their

17   complaints, unquote.  *Jones v. Bock*, 549, U.S.199 at 216.

18   Instead, Defendants must demonstrate lack of exhaustion.  *Colon*

19   *v. DOCCS*, 2017 Westlaw 4157372 at page 4 (Southern District

20   September 15, 2017).  Because of the extraneous evidence

21   involved, Defendants' exhaustion requirement must be converted

22   to a motion for summary judgment under Rule 12(d).

23       Under the Prison Litigation Reform Act, or PLRA, quote, no

24   action shall be brought with respect to prison conditions under

25   ... any federal law, by a prisoner confined in any jail,

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MG-Class00039492

1   prison, or other correctional facility until such

2   administrative remedies as are available are exhausted,

3   unquote.  42 U.S. Code Section 1997e(a).  By the plain terms of

4   the statute, the administrative exhaustion requirement applies

5   only to, quote, prisoners, unquote.  See *Greig v. Goord*, 169

6   F.3d 165, 167, where the Second Circuit held that litigants who

7   file prison condition actions after their release from

8   confinement are no longer prisoners for purposes of Section

9   1997 e(a) and, therefore, need not satisfy the exhaustion

10  requirement.

11      Plaintiffs do not dispute that the general class

12  Plaintiffs are prisoners within the meaning of the PLRA and,

13  thus, are required to exhaust.  But they argue in their memo at

14  page 13 that the RTF Plaintiffs are not because their sentences

15  have fully ended.  The PRLA defines a prisoner as, quote, any

16  person incarcerated or detained in any facility who is accused

17  of, convicted of, sentenced for, or adjudicated delinquent for

18  violations of criminal law or the terms and conditions of

19  parole, probation, pretrial release, or diversionary programs,

20  unquote.  That's 42 U.S. Code Section 1997e(h).  The Second

21  Circuit has clarified that exhaustion applies only to

22  facilities in which people are, quote, held involuntarily as a

23  result of violating the criminal law, unquote.  *Ruggiero v.*

24  *County of Orange*, 467 F.3d 170 at 174 to 75.  This definition

25  applies to, quote, suits filed by all litigants who could be

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MG-Class00039493

1    characterized as prisoners regardless of the type of facility

2    in which they are imprisoned, unquote. *Ruggiero* at 175.

3        In asserting that Plaintiffs are prisoners required to

4    exhaust, Defendants incorrectly state that the PLRA's

5    exhaustion requirement applies to, quote, all facilities in

6    which individuals are held involuntarily, unquote.  That's in

7    their brief -- in their memorandum at pages 12 to 13.  But what

8    the phrase actually is, is facilities where individuals are,

9    quote, held involuntarily as a result of violating the criminal

10   law.  By Defendants' own definition, the RTF Plaintiffs were

11   not so held on the day they filed this lawsuit.  Defendants

12   concede that the RTF Plaintiffs were being held not because

13   they owed any more time on the violation of criminal law that

14   landed them in prison, but because there was, in Defendants'

15   view, no suitable place to which to release them.  Because the

16   RTF Plaintiffs were not prisoners when they filed, exhaustion

17   was not required.

18       *Ruggiero*, on which Defendants rely, is easily

19   distinguishable from this case, as the Plaintiff there was

20   confined because of a parole violation which arises from

21   failing to abide by conditions of early release from a criminal

22   sentence and is unambiguously a sentence resulting from a

23   violation of the criminal law.  See *Ruggiero* at 175.  In

24   contrast, the RTF Subclass, having completed the entirety of

25   the determinate sentences when they filed this complaint, were

MG-Class00039494

1   not confined because of a violation of the criminal law.  They

2   were explicitly held past those sentences by Defendants' own

3   admission to, quote, protect the safety and continuity of care

4   of Plaintiffs as well as the safety of the community, unquote,

5   and because there was no community-based mental health housing

6   available.  Defendants' memorandum at 21 to 22.  Therefore, I

7   find the RTF Plaintiffs are not prisoners within the meaning of

8   the PLRA.  I also note that, interestingly, when arguing

9   exhaustion, Defendants assert that Plaintiffs are prisoners for

10  purposes of the PLRA, in their memorandum at 12, but for

11  purposes of the Eighth Amendment claim, which I'll discuss

12  below, Defendants claim that conditions in the RTF are not

13  punishment for a violation of criminal law.  That's at page 21

14  of their brief.

15      Although I find the exhaustion requirement does not apply

16  to the RTF Subclass, Plaintiffs do not dispute that it does

17  apply to M.G. and P.C., who are the general class Plaintiffs.

18  Out of an abundance of caution, I will also address whether all

19  Plaintiffs, not just M.G. and P.C., did, in fact, exhaust their

20  administrative remedies before filing suits.  Defendants here

21  only challenge whether Plaintiffs adequately appealed their

22  grievances to the Central Office Review Committee, or "CORC,"

23  and whether they adequately waited until CORC rendered a

24  decision before bringing this lawsuit and they reserved their

25  rights to dispute other issues regarding administrative

MG-Class00039495

1    exhaustion at a later time.  See Defendants' Memo at 15, Note

2    7.  As such, I will confine my analysis to that issue.

3         In order to exhaust under the PLRA, a prisoner must follow

4    the administrative procedures that are available to them;

5    namely, the prison's grievance policy.  *Jones* 549 U.S. at 218.

6    The individual must, quote, use all steps that the agency holds

7    out and do so properly, unquote.  *Woodford v. Ngo*, 548 U.S.81

8    at 90.  That includes complying with an agency's deadlines and

9    other critical procedure rules.  *Woodford* at 90.

10        DOCCS's grievance regulations provide two procedural paths

11   that are relevant in this instance.  For complaints regarding

12   disability-based discrimination, which the regulations say are,

13   quote, of particular concern, unquote, to DOCCS, the agency

14   provides for an expedited two-step adjudication process found

15   at 7 NYCRR Section 701.9.  Discrimination grievances must be

16   sent directly to the facility superintendent for adjudication.

17   If the superintendent denies the grievance, the grievant may

18   appeal directly to the final level, which is CORC.  CORC must

19   render a decision within 30 days of receipt.  See 7 NYCRR

20   Section 701.9, which incorporates Section 701.5(d)(3)(ii).

21   Complaints that do not allege unlawful discrimination, on the

22   other hand, are subject to a three-step process.  These

23   complaints are adjudicated by the Inmate Grievance Resolution

24   Committee, or "IGRC."  If the IGRC denies the grievance, the

25   grievant must appeal to the superintendent.  And if the

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MG-Class00039496

1    superintendent denies the appeal, the grievant must appeal to

2    CORC, which must adjudicate the appeal within 30 days.  That's

3    all in Section 701.5.

4         Under either of these procedural paths, CORC must obtain

5    the individual's written consent if it requires more than 30

6    days to adjudicate the appeal.  See Section 701.6(g)(2), which

7    says, quote, time limit extensions may be requested at any

8    level of review, (e.g., time limits for holding an IGRC hearing

9    answering a grievance or an appeal, et cetera).  But such

10   extensions may be granted only with a written consent of the

11   grievant, unquote.  And at any level of review, quote, matters

12   not decided within the time limits may be appealed to the next

13   step, unquote.  That's all from 701.6(g)(2).

14        The regulations, quote, provide no mechanism for enforcing

15   the requirement that the CORC issue a decision in 30 days,

16   unquote.  *Couvertier v. Jackson*, 2014 Westlaw 2781011, at page

17   4, (Northern District May 22, 2014).  Indeed, courts have

18   struggled with the question of what to do in situations where

19   CORC does not comply with the 30-day deadline.  As, quote,

20   there is no clear answer as to how a court should proceed under

21   the PLRA when it appears that an inmate Plaintiff has followed

22   all the requirements of his institution's administrative

23   procedures, but the final review panel is delinquent in its

24   response to his appeal, unquote.  This is because courts try to

25   balance two competing sentiments that, quote, an inmate

MG-Class00039497

 1    Plaintiff should not be penalized for their institution's
 2    failure to follow its own administrative procedures, unquote.
 3    But, quote, in light of the PLRA's purpose, courts should
 4    hesitate to decide the underlying action, unquote, before
 5    allowing CORC to have its say. *Fuentes v. Furco*, 2014 Westlaw,
 6    4792110 at page 3 (Southern District September 25, 2014).

 7         The Second Circuit has not addressed this issue, but
 8    district courts in the Circuit have fashioned solutions that
 9    attempt to balance the PLRA's goal of allowing institutions the
10    first opportunity to address an inmate's grievances, against
11    the inmate's right to a federal forum when they have complied
12    with all of the procedural requirements.  I will attempt to do
13    so here.

14         Under the PLRA, only those administrative remedies that,
15    quote, are available, unquote, must be exhausted.  That's
16    1997e(a).  "Availability" means that the incarcerated person,
17    quote, is required to exhaust those, but only those, grievance
18    procedures that are capable of use to obtain some relief for
19    the action complained of, unquote. *Ross v. Blake*, 136 Supreme
20    Court 1850, 1859. *Ross* outlined three circumstances under
21    which a prison's administrative remedies are unavailable:
22    First, when an administrative procedure, quote, operates as a
23    the simple dead end, unquote; next, when, quote, an
24    administrative scheme might be so opaque that it becomes,
25    practically speaking, incapable of use, unquote; and finally,

MG-Class00039498

 1    when, quote, prison administrators thwart inmates from taking

 2    advantage of a grievance process through machination,

 3    misrepresentation or intimidation.  That's *Ross* at 1859 to 60.

 4        While The Second Circuit, quote, has not adopted the

 5    position ... that delay in responding to a grievance

 6    demonstrates per se unavailability, unquote, *Mateo v. O'Connor*,

 7    2012 Westlaw 1075830, at page 7 (Southern District March 29,

 8    2012), many district courts have held that a delay in some

 9    circumstances may constitute unavailability that would excuse a

10    Plaintiff from exhausting.  See, for example, *Smith v.*

11    *Lioidice*, 2020 Westlaw 1033644, at page 4 (Southern District

12    March 2nd, 2020); *Bell v. Napoli*, 2018 Westlaw 6506072, at page

13    7 (Northern District December 11, 2018); *Peoples v. Fischer*,

14    2012 Westlaw 1575302, at page 9 and Note 125 (Southern District

15    May 3, 2012).  I find these cases convincing, especially

16    because DOCCS's own regulations specify that, at every level of

17    the process, quote, matters not decided within the time limits

18    may be appealed to the next step, unquote.  That's Section

19    701.6(g)(2).  To hold otherwise would incentivize prisons to

20    ignore the deadlines in the regulations in an effort to prevent

21    prisoners from seeking redress in federal courts.  This holding

22    comports with the Supreme Court's command that an inmate

23    Plaintiff's compliance with prison grievance procedures is all

24    that's required by the PLRA to properly exhaust.  *Jones* 549

25    U.S. at 218.

MG-Class00039499

1          Considering that view of the legal question and the

2   factual record before me, Defendants have not demonstrated that

3   they are entitled to summary judgment based on failure to

4   exhaust.  Based on the factual record and exhibits submitted,

5   many of which are under seal, it's apparent that all of the

6   Plaintiffs have at least raised fact issues as to whether

7   they've adequately exhausted all available remedies.  Exhibit A

8   to the Sequin Declaration, Document 81-1, shows that CORC has

9   records of appeals from D.R. and J R.  CORC received D.R.'s

10  appeal on November 19, 2018 and informed him in writing,

11  without his consent, that his appeal would be resolved in

12  approximately one year, more than 12 times the allotted 30

13  days.  Neither D.R. nor J.R., whose appeal to CORC was received

14  on November 27, 2018, got a response from CORC by the time the

15  briefs for this motion were filed in late 2019 and early 2020.

16  CORC thus seems to be a simple dead end in their cases.  So

17  summary judgment is not warranted.

18          Defendants' allegation that C.J. did not file his CORC

19  appeal until after the filing of this lawsuit, see Sequin

20  Declaration paragraph 6, is incorrect, although it is true that

21  CORC did not receive his appeal until February 2019, after the

22  lawsuit was filed on January 23, 2019.  C.J. says he filed two

23  CORC appeals, on November 28, 2018 and again on December 3rd,

24  2018.  This is in his declaration.  When CORC failed to

25  respond, according to C.J., he wrote two separate letters to

MG-Class00039500

 1 │ the Green Haven Grievance Program Supervisor, seeking

 2 │ confirmation under Section 701.5(d)(3)(i) that his appeals were

 3 │ transmitted.  In response, the grievance clerk orally assured

 4 │ C.J. that he had personally handed the appeals to the grievance

 5 │ program supervisor for transmittal to CORC, and that the

 6 │ supervisor had done so.  Despite these assurances, the

 7 │ supervisor inexplicably waited over two months to actually

 8 │ transfer the appeal to CORC.  To me, the false reassurance and

 9 │ the unexplained and seemingly needless delay falls within the

10 │ *Ross* exception where administrative processes become

11 │ unavailable due to prison administrators thwarting inmates

12 │ through machination or misrepresentation.  Because C.J.'s

13 │ account, if true, could show that he has exhausted, summary

14 │ judgment in Defendants' favor is inappropriate.

15 │     Turning to M.J.  According to him, on October 18, 2018,

16 │ while incarcerated in the Fishkill Correctional Facility, he

17 │ filed his original grievance.  And by the way, the C.J.

18 │ declaration covers this in paragraphs 18 through 21.  The M.J.

19 │ declaration, which I'm going to refer to now, discusses this in

20 │ paragraphs 11 through 21.

21 │     M.J. was at Fishkill when he filed his initial grievance,

22 │ but before he got a response, DOCCS transferred him to Green

23 │ Haven.  Fishkill did not forward any response to M.J. there,

24 │ leaving him confused about how to exhaust because he didn't

25 │ receive the denial of his Fishkill grievance within the

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MG-Class00039501

1  regulatory time limit and did not have an appeal form on which

2  to submit his appeal.  On November 17, 2018, he mailed a letter

3  to the Fishkill grievance clerk, stating his intent to appeal

4  the constructive denial of his grievance.  On December 2nd, he

5  received the Fishkill superintendent's denial of his appeal and

6  the next day he mailed the CORC appeal to the Fishkill

7  grievance clerk.  He never received confirmation from Fishkill

8  that he they received his appeal or transferred it to CORC and

9  his letters following up went unanswered.

10        P.C. similarly says he filed a discrimination grievance at

11  the Sullivan Correctional Facility, and he got the Defendant --

12  the superintendent's denial on December 3rd, 2018.  The next

13  day he signed and submitted his CORC appeal.  Despite sending a

14  follow-up letter to the grievance staff after 30 days, he never

15  heard back.

16        Assuming the truth of M.J.'s and P.C.'s accounts as I must

17  on a motion for summary judgment, by failing to transmit their

18  appeals or even respond to their inquiries to confirm transfer,

19  the administrative processes as applied to them plainly

20  operated as a simple dead end or were so opaque that they

21  became, practically speaking, incapable of use.  As set forth

22  in *Ross* at 1859 to 60.  Thus again, summary judgment for

23  Defendants is not warranted.

24        Lastly, M.G. avers that he filed a grievance alleging

25  discrimination on November 13, 2018 and that the agency

MG-Class00039502

 1   properly forwarded it to the superintendent directly on

 2   November 26, 2018.  He got a denial, which stated that the

 3   grievance was forwarded to the OMH Unit Chief for, quote,

 4   whatever remedial action is deemed appropriate, unquote, and

 5   stated that, quote, this superintendent's response completes

 6   the grievance process and there is no further appeal available,

 7   unquote.  Quackenbush Declaration Exhibit 102; and M.G.

 8   Declaration Paragraph 14.  M.G., nevertheless, submitted a CORC

 9   appeal on the day that he received the denial.  Quackenbush

10   Declaration Exhibit 102, M.G. Declaration Paragraph 15.  By

11   telling M.G. that the superintendent's response completed the

12   grievance process and there was no further appeal available,

13   DOCCS staff told M.G., in essence, that he had exhausted the

14   administrative process.  Even if he had not, in fact, exhausted

15   all of his appeals, this letter demonstrates that any further

16   appeal would operate as a dead end or that prison officials

17   prevented him from taking advantage of the grievance process

18   through machination or misrepresentation.

19        Plaintiffs have all presented facts that, if true, would

20   constitute or excuse exhaustion.  Contrary to Defendants'

21   arguments that a grievant must outwait CORC, it is, quote, the

22   prison's requirements ... that define the boundaries of proper

23   exhaustion.  *Jones* 549 U.S. at 218.  This rule is also

24   consistent with The Second Circuit's holding that remedies are

25   unavailable in situations that the grievance regulations -- the

MG-Class00039503

1  grievant's regulations did not contemplate.  *Williams v.*
2  *Correction Officer Priatno,* 829 F.3d 118 at 124.  That is
3  exactly where all the Plaintiffs found themselves after timely
4  appealing grievances to CORC, which then failed to issue
5  decisions within its regulatory time limit.  The regulations
6  required nothing more from Plaintiffs in order to satisfy the
7  exhaustion requirement.

8      As an aside, I see this issue coming up more and more
9  frequently in my cases with DOCCS.  Because this particular
10  case has the attention of higher-level officials at the AG's
11  office and at DOCCS, maybe this is a good time to point out
12  that CORC seems to be way behind in a lot of cases and that
13  that is making more work both for the AG's office and
14  ultimately DOCCS, not to mention the Court, due to motion
15  practice and factual disputes.  I understand that resources are
16  tight, but CORC clearing that backlog would ultimately save
17  resources.  And I know we're in a pandemic, but this problem
18  has been rearing its head well before that.  So just a little
19  editorial aside there.

20      Turning now to the Eighth Amendment:  The FAC alleges that
21  Defendants have violated the Eighth Amendment rights of the RTF
22  Subclass.  The Eighth Amendment's ban on cruel and unusual
23  punishment bars punishment that is grossly disproportionate or
24  that violates evolving standards of decency that marks the
25  progress of a maturing society.  *Rhodes v. Chapman*, 452 U.S.

MG-Class00039504

1   337 at 346.  Plaintiff has alleged Eighth Amendment violations

2   under two different theories:  Prolonged incarceration and

3   criminalization of status.  I will address each in turn.

4        Starting with Prolonged Incarceration:  Courts have noted

5   that holding an offender beyond, quote, the maximum expiration

6   date of their sentence may, in some circumstances, unquote,

7   give rise to a claim under the Eighth Amendment.  *Washington v.*

8   *New York State Parole*, 2019 Westlaw 1877343, at page 2

9   (Southern District April 26, 2019).  See *Wright v. Kane*, 1997

10  Westlaw 746457 at page 4, (Southern District December 2nd,

11  1997).  Consignment that exceeds a term of imprisonment

12  violates the Eighth Amendment if (1) the alleged deprivation

13  is, in objective terms, sufficiently serious.  And (2)

14  Defendants acted with a sufficiently culpable state of mind.

15  *Francis v. Fiacco*, 942 F.3d 126, 150.  See *Calhoun v. New York*,

16  999 F.2d 647, 652, which looked at whether the length of added

17  confinement inflicted, quote, a harm of ... magnitude, unquote.

18       The requisite state of mind is deliberate indifference.

19  See, for example, *Calhoun* at 654.  In this context, it requires

20  a showing that official knows the risk of unwarranted

21  punishment, failed to act or took only ineffectual action, and

22  that there's a causal connection between the official's

23  response and the unjustified detention.  *Rivera v. Carroll*,

24  2009 Westlaw 2365240, at page 6 (Southern District August 3rd,

25  2009).

MG-Class00039505

1    Defendants placed the RTF Plaintiffs' in RTF between 246

2  and 502 days past the end of their sentences.  See FAC

3  paragraphs 54, 90, 119 and 148.  These are lengths of time that

4  I find to be sufficiently serious and a harm of magnitude.

5    See *Calhoun* at 654, and *Rivera*, 2009 Westlaw 2365240 at

6  page 3 and 7 to 8, which found a sufficiently serious harm from

7  over-detention of 47 days.

8    Defendants point out that no case has found state

9  Defendants liable, quote, where the state Defendants weighed

10  the proper course of action, acted in accordance with a

11  reasonable understanding of a complicated area of state law,

12  and relayed the legal basis for their actions, unquote, to the

13  Plaintiff.  And they're quoting *Francis*, 942 F.3d at 150.

14    I find *Francis* to be easily distinguishable.  The Court in

15  *Francis* found the individual Defendants sued in their personal

16  capacities were entitled to qualified immunity, which is not an

17  issue where the Defendants are sued only in their official

18  capacities.  In addition, Plaintiff there was challenging how

19  officials had calculated his sentence in the unique individual

20  circumstances of his case.  He was not like Plaintiffs here,

21  challenging a concerted policy decision applied intentionally

22  in case after case.  Further, Francis was decided on summary

23  judgment.  While the record here may some day show that

24  Defendants did their best to comply with the complicated

25  statutory regime, Plaintiffs have plausibly alleged that they

MG-Class00039506

1  did not.  Plaintiffs allege that Defendants were well aware of

2  their required release dates, their housing needs, and the

3  systemic deficiencies in housing, and nonetheless decided to

4  continue their incarceration past their release dates in

5  circumstances essentially indistinguishable from prison.  See,

6  for example, FAC paragraphs 230, 273 to 75, 279 to 80, 283, 354

7  to 59, 367 to 369 and 373.  While facts may certainly arise as

8  the litigation proceeds that shed further light on Defendants'

9  conduct and state of mind, I agree with the reasoning in *Murphy*

10 *v. Raoul*, 380 F. Supp. 3d, 731, 765 (Northern District of

11 Illinois 2019), that Plaintiffs have at this stage alleged

12 facts sufficient to plausibly plead deliberate indifference.

13 Plaintiffs having adequately alleged that, quote, the

14 Defendants knew of this problem and the risk that they were

15 inflicting unwarranted punishment, unquote, that, quote, they

16 failed to act or took ineffectual action, unquote, to address

17 that problem and, quote, their response caused the unjustified

18 detention, unquote, because, quote, they chose to confine these

19 individuals past their release date, unquote, which plausibly,

20 quote, amounts to reckless disregard of constitutional rights,

21 unquote.  *Murphy* at 765.  I cannot conclude on the basis of the

22 FAC that the Defendants were not deliberately indifferent.

23      While the thrust of Defendants' argument is that

24 Plaintiffs' prolonged incarceration was, quote, penologically

25 justified to protect the safety and continuity of care of

MG-Class00039507

1    Plaintiffs as well as the safety of the community, unquote,

2    that's from Defendants' brief at 21 to 22, they offer no Second

3    Circuit authority for why I should consider these supposed

4    justifications in my analysis in the context of a claim of

5    over-incarceration.  While the existence or not of a

6    penological justification makes sense in the context of

7    determining whether the imposition of a sentence or the

8    conditions of confinement amount to cruel and unusual

9    punishment, it does not make sense in the context of a claim

10   that the sentence and, therefore, any legitimate penological

11   purpose has ended, but the Plaintiff was not released.  The

12   most recent Circuit case on prolonged incarceration, *Francis*,

13   makes no mention of penological justification, and district

14   courts in the circuit have found the concepts inapplicable to a

15   claim that a prisoner's incarceration exceeded what was

16   justified by his sentence.  See *Francis*, 2018 Westlaw 1384499,

17   at page 10 (Northern District March 16, 2018), reversed and

18   remanded on other grounds, 942, F.3d 126; *Brunson v. Duffy*, 14

19   F. Supp. 3d 287, 292 (Southern District 2014).  See also

20   *Campbell v. Peters* 256 F.3d, 695, 700 (Seventh Circuit 2001),

21   which held that if a prisoner serves the correct amount of

22   time, he has not been confined without penological

23   justification; and if he serves too much time, he has been

24   confined without penological justification.  Even *Sample v.*

25   *Diecks*, 885 F.2d 1099 at 1108, (Third Circuit 1989), which

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MG-Class00039508

 1   Defendants rely in their reply at page 10, does not support

 2   application of the concept of penological justification in the

 3   context of prolonged incarceration.  It acknowledged that there

 4   is no penological justification for keeping a prisoner beyond

 5   his date of release because, quote, any deterrent and

 6   retributive purposes served by his time in jail were fulfilled

 7   as of that date, unquote.  That's Sample at 1108.  While it

 8   goes on to suggest that there might arguably be a penological

 9   justification where a prisoner is erroneously kept too long due

10   to miscalculation of his sentence, in the sense that having an

11   error-free prison system would be prohibitively costly or even

12   impossible.  See Sample at 1108 to 09.  It never began to

13   suggest that knowingly and intentionally keeping a prisoner

14   beyond his term could be penologically justified.  I find that

15   where prison officials know that a prisoner has reached the end

16   of, quote, the term established by the state, unquote, Sample

17   at 1108, any penological justification the state might have for

18   keeping him incarcerated would expire at the time.  In other

19   words, there is penological justification for holding a

20   prisoner to the date at which he is entitled to be released,

21   but not beyond it.

22       I'm realizing I was about to discuss penological

23   justification for the general class, but the general class does

24   not bring the Eighth Amendment claim.  So I think I can skip

25   over that part.

MG-Class00039509

 1    I also note, however, that I could not find at this stage

 2    on the present record that the safety of the prisoner or of the

 3    community are in fact the reasons for holding Plaintiffs too

 4    long or that these justifications would suffice.  It may be

 5    that those are the actual reasons or more likely part of the

 6    actual reasons, but I cannot so conclude from the FAC which

 7    plausibly attributes the challenged actions to the state's

 8    failure to provide sufficient community-based housing and

 9    supportive services.  Factual development and revisiting the

10    issue on summary judgment would be necessary.  And I am dubious

11    that the proffered safety rationale would suffice in any event.

12    Potentially dangerous people, and sick people, are released

13    from prison every day.  If that were enough to hold someone

14    beyond his sentence, there are many prisoners who would be

15    imprisoned indefinitely at the whim of corrections officials.

16    Further, Defendants' argument amounts to the claim that the

17    state can detain people indefinitely because the state has

18    determined that they need a type of housing that's not

19    available to them.  That would seem to create a Catch 22 that

20    would be a large enough loophole to swallow the Eighth

21    Amendment and their liberty.

22    So the motion to dismiss the Eighth Amendment claim on the

23    prolonged incarceration theory is denied.

24    The Eighth Amendment also bars punishment of a status or

25    condition and involuntary conduct that is inseparable from that

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

MG-Class00039510

 1   status or condition.  See *Robinson v. California*, 370 U.S. 660

 2   at 666 to 67, which noted that penalizing mental illness is

 3   universally thought to be cruel and unusual.  See also Justice

 4   White's concurring opinion in *Powell v. Texas*, 392 U.S. 514,

 5   551 to 52, addressing involuntary conduct.

 6       Defendants rightly point out that the majority of cases

 7   Plaintiffs cite, including *Robinson v. California*, 370 U.S.

 8   660, involve statutes that that impermissibly criminalize

 9   status or involuntary conduct related to that status, whether

10   or not the person charged otherwise engaged in substantive

11   criminal conduct.  For example, in the Fourth Circuit case

12   cited by Plaintiffs, *Manning v. Caldwell*, 930 F.3d 264 (Fourth

13   Circuit 2019), the Court found that the Plaintiffs stated an

14   Eighth Amendment claim where a Virginia statute made it a

15   criminal offense for, quote, habitual drunkards, unquote, to

16   possess, consume or purchase alcohol.  See *Manning* at 284.  The

17   Fourth Circuit in that case stressed the narrow impact of its

18   holding, noting that Plaintiffs did not challenge the

19   constitutionality of any restrictions imposed after conviction

20   of a crime, because, unquestionably, courts may restrict an

21   individual's liberty pursuant to a criminal sentence.  And in

22   some cases may do so after the formal sentence has concluded.

23   Here, by contrast, the extension of the prison term is not

24   mandated by a statute that explicitly makes status or

25   involuntary conduct a crime.  Plaintiffs allege rather that

MG-Class00039511

1   they are subject to restrictions which unconstitutionally

2   lengthen a prison sentence imposed after conviction and

3   imprisonment for an underlying crime.

4        Plaintiffs again point to *Murphy v. Raoul*, however, to

5   support their assertion that the conduct alleged here

6   nevertheless impermissibly criminalizes status and involuntary

7   conduct.  See 380 F. Supp. 3d at 765.  In *Murphy*, the state

8   prison system would not release prisoners who had no address to

9   which to go and would not approve shelters as housing, which

10  kept homeless prisoners incarcerated indefinitely, effectively

11  punishing their status as homeless.  The *Murphy* court reasoned

12  that for these Plaintiffs, the failure to secure housing was,

13  quote, not voluntary conduct merely related to or derivative of

14  the status of homelessness, but is entirely involuntary conduct

15  that is inseparable from their status of homelessness, unquote.

16  That's *Murphy* at 765.  There the Defendants also maintained

17  that criminalization of status was inapplicable because the

18  state was not charging the Plaintiffs with a crime of being

19  homeless under a statute as the other jurisdictions did in the

20  case law.  The *Murphy* court disagreed, calling the effort to

21  distinguish the cases, quote, a distinction without a

22  difference, unquote, because, quote, all the Eighth Amendment

23  calls for is punishment, unquote, not a new charged crime.

24  *Murphy* at 264.  I agree.

25       While I note that this theory likely presents a steeper

MG-Class00039512

1  climb for the Plaintiffs than the prolonged incarceration line

2  of cases, I believe they have plausibly shown that Defendants

3  have kept them locked up due to their status as seriously

4  mentally ill inmates, coupled with the fact they have no good

5  place to go, similar to *Murphy*.  For this reason, Defendants'

6  motion to dismiss the criminalization of status claims is

7  denied.

8       Finally, turning to Substantive Due Process:  Plaintiffs

9  also allege that Defendants' conduct violates -- I'm going to

10 abbreviate it SDP under the Fourteenth Amendment.  SDP exists

11 to prevent the government form infringing those immunities,

12 quote, implicit in the concept of ordered liberty, unquote,

13 and, quote, so rooted in the traditions and conscience of our

14 people as to be ranked as fundamental, unquote.  *Rochin v.*

15 *California* 342 U.S. 165, 169, 172; See *U.S. v. McLaurin*, 731

16 F.3d 258, 261.  Further, for strict scrutiny to apply, the

17 challenged conduct must, quote, shock the contemporary

18 conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 847,

19 Note 8.  But, quote, if a constitutional claim is covered by a

20 specific constitutional provision, such as the ... Eighth

21 Amendment, the claim must be analyzed under the standard

22 appropriate to that specific provision, not under the rubric of

23 substantive due process, unquote.  *Lewis* at 843.  See *Graham v.*

24 *Connor*, 490 U.S. 386, 394.  Quote, this is so because ... the

25 guideposts for responsible decision making in the unchartered

MG-Class00039513

1   area of substantive due process are scarce and open ended,

2   unquote, causing the Supreme Court to, quote, limit the

3   availability of substantive due process claims to those which

4   are not covered under other amendments, unquote. *Holland v.*

5   *City of New York*, 197 F. Supp. 3d 529, 547 (Southern District

6   2016). Quote, where another provision of the Constitution

7   provides an explicit textual source of constitutional

8   protection, a court must assess a Plaintiff's claims under that

9   explicit provision and not under the more generalized notion of

10  substantive due process. *Kia P. v. McIntyre*, 235 F.3d, 749,

11  757 to 58. See *Velez v. Levy*, 401 F.3d, 75, at 94. Where the

12  court said, quote, where a specific constitutional provision

13  prohibits government action, Plaintiffs seeking redress for

14  that prohibited conduct in a Section 1983 suit cannot make

15  reference to the broad notion of substantive due process. And

16  *Doyle v. Santiago*, 2019 Westlaw 5298147, at page 5 (District of

17  Connecticut October 18, 2019) where the Court said, quote, If

18  the plaintiff's confinement ... is conscious-shocking, it would

19  violate the Eighth Amendment. Thus his claim should be

20  considered under the Eighth Amendment, not the Substantive Due

21  Process clause, unquote. Quote, in other words, what would

22  serve to raise Defendants' actions beyond the wrongful to the

23  unconscionable and shocking are facts, which, if proven, would

24  constitute in themselves specific constitutional violations,

25  unquote. *Velez*, 401 F.3d at 94.

MG-Class00039514

1      Although I note that the allegations in the FAC likely

2  satisfy the standards for SDP, I am foreclosed from analyzing

3  these allegations through SDP because the claims are, quote,

4  subsumed in the more particular allegations, unquote, of the

5  Eighth Amendment claim.  *Velez* 94.

6      So to sum up.  Governor Cuomo is dismissed as a Defendant.

7      Defendants' motion to dismiss on mootness grounds is

8  denied without prejudice to renewal to the extent Plaintiffs

9  claim the conditions into which they were released are not

10  sufficiently integrated.

11      Defendants' motion to dismiss is granted as to the

12  Substantive Due Process claim and otherwise denied.

13      The Clerk is to terminate Docket Motion No. 79 and to

14  terminate Governor Cuomo as a party.

15      I think we have October 2nd as a date for Defendants to

16  either answer the SAC or submit another premotion letter; am I

17  right about that?  And remember to say your name before you

18  answer.

19          MR. HARBEN:  I'm sorry.  There was some yelling.  The

20  electricity just went out in my house.

21          THE COURT:  Am I right that October 2nd is the date

22  for either your answer or premotion letter addressed to the

23  SAC?

24          (Reporter interruption)

25          THE COURT:  Yes.  Mr. Harben, you've got to say --

MG-Class00039515

 1  every time you speak, you've got to say your name, the first

 2  word out of your mouth.

 3          MR. HARBEN:  I think we'd like to be able to order

 4  this decision expedited so we can read it and just parse it out

 5  a little bit.  It's very long.  There has to be -- because

 6  there was a part about possibly the additional facts dealing

 7  with some of the claims that you addressed today.

 8          So I'm just -- the current deadline is October 2nd.

 9  I'm wondering if we can get a little more time to process that

10  so we can -- at least can get -- review this transcript before

11  we finalize anything?

12          THE COURT:  What date do you propose?

13          MR. HARBEN:  Could we get another two weeks beyond

14  that?

15          THE COURT:  Any objection on Plaintiffs' side to

16  October 16?

17          MS. LANDRISCINA:  No objection, your Honor.

18          THE COURT:  All right.  So Defendants' answer or

19  pre-motion letter with respect to the Second Amended Complaint

20  will be due October 16.  And if it's a premotion letter, I'll

21  set another conference.

22          In the meantime, sad to say we're losing Judge Smith

23  next Wednesday where she, a little too happily, is going into

24  retirement.  No, I shouldn't say that.  She's not 100 percent

25  happy about it.  In fact, to the point where she volunteered to

MG-Class00039516

 1    stay on a little longer if her replacement isn't cleared in

 2    time.

 3              But you will be transitioning to the new magistrate

 4    judge and continuing to roll along with paper discovery.  So I

 5    don't think I need to -- I don't need to get involved with

 6    that.

 7              Is there anything else anybody wants to say before we

 8    ring off?

 9              MR. HARBEN:  I guess on the issue of discovery, with

10    the new claims as we've written in the past about, we haven't

11    even gotten to the point of responding on that yet.  That's

12    something we wanted to raise with the new magistrate and

13    potential stay.

14              THE COURT:  Yeah, I mean, when we -- when we met way

15    back when, we agreed, I thought, that we were going to hold off

16    on depositions but proceed on paper discovery.  And if there's

17    some reason why that's changed, you can take it up with the

18    magistrate judge.

19              But let me also -- I know this whole call is public.

20    But so I guess there's no point in going off the record, but

21    this is a good juncture, I think, in which the parties should,

22    again, try to resolve it.  You know, the state says that

23    it's -- at least the original claims, the state says it's not

24    doing it anymore.  I've just found that the record at this

25    stage is not sufficient for me to conclude that it's not

                Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
                   Official Court Reporter (914)390-4242

1   happening anymore and it won't recur, but that could change

2   sooner rather than later.  And the plaintiffs will have

3   achieved an important part of what they've asked for.  I

4   recognize that the other part of what they've asked for, which

5   is to be released not into shelters or other undesirable

6   places, but into housing that actually addresses their needs,

7   is sort of now the new part two of the case.

8          But I think Plaintiffs also have to be realistic

9   about where the money is going to come from to solve these

10  problems.  I don't doubt that OMH would be perfectly happy if

11  it had a blank check to create sufficient housing for released

12  prisoners with serious mental illness.  But I don't see any

13  likelihood that there's a pot of gold for that in the short

14  term.

15         So I hope that when you start anew with Magistrate

16  Judge Krause, and even before that, that you'll discuss amongst

17  yourselves resolving at least some of the issues.  If

18  Defendants can demonstrate to Plaintiffs that since this

19  briefing has occurred, things have changed in a way that would

20  satisfy them, maybe at least we can narrow the issues, if not

21  resolve the whole thing.

22         So I hope you'll continue to talk.  I do think

23  there's a vibe here that the Defendants were trying to pick off

24  the named Plaintiffs.  But at the same time, they did stop --

25  or they say they've stopped -- the challenged practice and

MG-Class00039518

1   that's really the gold ring here.

2          So I hope Plaintiffs, you know, don't lose the forest

3   for the trees.  And if persuaded that that change has really

4   been made, they will have accomplished what they set out to

5   accomplish, at least, with the first two complaints and should

6   be pleased with that.

7          So I hope both sides will continue to talk and that

8   when you resume with the new magistrate judge, maybe you can

9   get somewhere.  And I will await October 16, and see if we get

10  an answer or a premotion letter.

11         Anything else we should talk about?  All right.  I

12  hope everybody is healthy and remains so.  Have a good weekend,

13  all.  Take care.

14              (Proceedings concluded)

15

16

17

18

19

20

21

22

23

24

25

MG-Class00039519