UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H., individually and on behalf of all similarly situated,

                                                     Plaintiffs,

        -against-

ANDREW CUOMO, in his official capacity as the Governor of the State of New York, the NEW YORK STATE OFFICE OF MENTAL HEALTH, ANN MARIE T. SULLIVAN, in her official capacity as the Commissioner of the New York State Office of Mental Health, the NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, ANTHONY J. ANNUCCI, in his official capacity as the Acting Commissioner of the New York State Department of Corrections and Community Supervision, ANNE MARIE MCGRATH, in her official capacity as Deputy Commissioner of the New York State Department of Corrections and Community Supervision,

                                                      Defendants.

7:19-cv-0639 (CS) (AEK)

------------------------------------------------------------------------ x

**DECLARATION OF C.J. IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, C.J., being competent to make this declaration and having personal knowledge of the matters stated herein, hereby declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

    1.     I am 35 years old, and I grew up in Orange County.

    2.     I was incarcerated in New York State prison in April 2009.

    3.     I was given a maximum expiration date of September 28, 2017, with five years of post-release supervision in the community, but I was not released to the community until February 12, 2019.

1

4. I have mental health diagnoses of bipolar disorder and antisocial personality disorder. I also had these diagnoses when I was in prison. I have a history of psychiatric treatment in the community with multiple hospitalizations.

5. My current mental health treatment involves taking mental health medications. I sometimes struggle with mood swings, anxiety, flashbacks, and nightmares. I have attempted to self-harm on multiple occasions. Treatment helps me to manage symptoms of my mental illness.

6. I received mental health treatment while incarcerated. The Office of Mental Health ("OMH") classified me as "1-S," which indicated that I had serious mental illness.

7. Although I moved between facilities during the period between my maximum expiration date (2017) and ultimate release (2019), as described below, I was incarcerated at Sing Sing Correctional Facility immediately before my release.

8. When I was incarcerated I was held in multiple mental health housing units, including the Intermediate Care Program, Transitional Intermediate Care Program, and the Community Orientation and Reentry Program ("CORP").

9. When my maximum expiration date passed in 2017, I was asked to sign release papers. I was then told I was transferred to a "Residential Treatment Facility," but I was really just transferred from Sing Sing Correctional Facility to Fishkill Correctional Facility.

10. None of my living conditions changed. I was housed in a unit for people who were serving terms of incarceration, and I was subjected to all the same prison rules that I was subjected to during my incarceration.

11. I had a very hard time being incarcerated past my release date. I was very angry that the State did this to me. I had bouts of psychosis as a result of my prolonged confinement and ended up being taken to solitary confinement and mental health observation several times. I

was also recommended for a more intensive mental health program after I was released from observation.

12. Eventually, after I spent about seven months at Fishkill past my maximum expiration date, I was transferred to Green Haven. Again, nothing about my conditions changed. Even though my maximum expiration date had passed, I was still held in prison.

13. Just like at Fishkill, I had an extremely difficult time being at Green Haven after my maximum expiration date passed. And just like at Fishkill, I was placed in solitary confinement and mental health observation at Green Haven.

14. I wanted to reside in, and receive treatment in the community, near my family and friends, and to have my own supportive housing, after my maximum expiration date.

15. Prior to my maximum expiration date, I was in the Community Orientation and Reentry Program ("CORP") at Sing Sing. This is a program specifically for people with serious mental illness who are approaching their release dates. The primary purpose of the program is to prepare people like me for timely and successful release from prison.

16. When I was in CORP I spoke to OMH staff about my need for housing following my release from prison. I also spoke to OMH staff about my desire to continue my mental health treatment after my release.

17. OMH told me they submitted a Single Point of Access ("SPOA") application for housing and supportive services for me. I was told I was eligible for community-based mental health housing. But I was also told that community-based mental health housing programs had no beds available. I was told that Orange County had a very long waitlist for community-based mental health housing.

18. As a result, when I reached my maximum expiration date, I was told that I had to stay in prison. Specifically, I was told that I had to wait to be released until community-based mental health housing was available for me. I was told I was not appropriate for release to a shelter.

19. I had no idea when, if ever, I was going to be released. Nobody ever told me how long it would be until I was released. When I asked OMH, Parole, and DOCCS staff for information, I was told that I had been put on a waiting list for community-based mental health housing, and that the list was very long because I was going to be discharged to Orange County.

20. I became a Named Plaintiff in this lawsuit on January 23, 2019.

21. I was finally released from prison on February 12, 2019, over a year and five months after I was supposed to be released.

22. My release was very rushed. Sometime after January 23, 2019, DOCCS and OMH staff told me that "Albany" had taken over my discharge process. I understood that to mean that facility staff were no longer in charge of getting me released. From there, everything happened pretty quickly. I was told I was going to be released, and I was asked to sign new release papers, only days before I was actually released.

23. Despite all the times DOCCS and OMH employees told me I could only be released to community-based mental health housing, I was not released to community-based mental health housing. Instead, I was released to Middletown Transitional Residence ("Middletown"), which is on the grounds of Rockland Psychiatric Center.

24. Middletown isn't for people who are stable and eligible for community-based housing, like me. I understand that Middletown is a place for mental health patients who are low functioning. At Middletown, residents are supervised at all times.

25. I had a very difficult time at Middletown because I was higher functioning than everyone else. I had understood that DOCCS and OMH had prolonged my incarceration because they were waiting to be able to release me to a housing arrangement with some independence, not a psychiatric center. I left Middletown on March 16, 2019 because I had an altercation with another resident who was in crisis. I returned a few days later, but because of another altercation with a resident who was in crisis, I left again on March 20, 2019.

26. Because I was not supposed to leave Middletown without permission, I was picked up by the police on March 31, 2019 and taken to Orange County Jail on April 1, 2019. Shortly after that, DOCCS charged me with a parole violation for leaving Middletown. My parole was then revoked, and I was returned to State prison on January 6, 2020.

27. I thought it was unfair that DOCCS discharged me to a place it knew was inappropriate for me, then reincarcerated me for having a breakdown and leaving that place. It seemed sort of like DOCCS was penalizing me for its own mistake.

28. After I completed my reception at Downstate Correctional Facility, I was taken to Sing Sing Correctional Facility and placed back in CORP. I completed my incarceration at Sing Sing after going back through CORP programming, including programming that was designed to prepare me for a successful release.

29. When I was approaching discharge again, I met with DOCCS and OMH staff about housing options. Even though I was told OMH had put in a SPOA application for me, and that I was eligible for community-based mental health housing, DOCCS and OMH staff told me they were considering releasing me to the homeless shelter system, or to Bridges of New York ("Bridges"). This surprised me, because before I was released the first time in 2019, I DOCCS

and OMH staff told me Bridges was not appropriate for me because I needed community-based mental health housing, and Bridges is not that kind of housing.

30.     Bridges also has a bad reputation as a very dangerous place. I've heard from others that people do drugs at Bridges and that violence is common there. I am a lifelong mental health patient who needs stability to stay out of bad situations. Based on what I knew about Bridges, I agreed with DOCCS and OMH's first assessment that the program is not good for me.

31.     I told DOCCS staff that if DOCCS sent me to Bridges, I would not do well, and I would leave. I told them that Bridges would be really bad for my mental health. They did not reassure me that I would not be placed at Bridges, or address any of my concerns about how Bridges would impact my mental health. Instead, they just told me that if I left my housing placement, they would violate me and send me back to prison.

32.     After this conversation I realized that DOCCS and OMH weren't taking the steps they knew they needed to take to help me successfully integrate into the community. They were willing to release me to a place that was not suitable for my mental condition and would set me up to fail.

33.     On March 31, 2020, I was released to 44 Grand Street in Newburgh ("44 Grand"). 44 Grand is a transitional program with a very bad reputation for violence. There have been repeated incidents of theft and harassment at 44 Grand. There was even a murder there in 2017. I knew that 44 Grand was not suitable for me, not only for all these reasons, but because it wasn't the community-based mental health housing I was eligible for.

34.     I was very anxious about being at 44 Grand. 44 Grand was not mental health housing and did not have any services for me on site. It was a very violent place where people used drugs. I got overwhelmed because of the conditions at 44 Grand and left there on April 5,

2020. In my struggle to cope with the difficulties of being released to the community, I forgot to complete my intake at the Middletown Mental Health Clinic, which was scheduled for April 7, 2020.

35. Between April 7, 2020 and July 22, 2020, I was street homeless. I was moving from house to house and doing my best not to have a bad mental breakdown.

36. On July 22, 2020, the police picked me up for absconding and took me to get booked at the police department. I was feeling extremely depressed and anxious and tried to commit suicide in the police lockup. The first few days of being in a hospital, a jail, or a prison have always been really hard from me, and I've tried to self-harm many times in those situations.

37. The police took me to the emergency room, and I stayed in the hospital for a while. Eventually, I was taken to Orange County Jail, and DOCCS initiated parole revocation proceedings against me. My hearing was pushed back several times, so my stay in jail was extended.

38. I ended up staying at Orange County Jail until October 2021 for a violation. Since then, I have been trapped in a revolving door of being released to homelessness and reincarcerated, even though I have remained seriously mentally ill and eligible for services, including housing. My most recent reincarceration started on January 9, 2023. I remain in Orange County Jail today.

39. It has been hard to try to make it on the street all these years without the services I am eligible for. I have never received those services, including supportive housing, or ACT/FACT. Without these services, I have felt very vulnerable. I think these services would have helped me avoid the repeated reincarcerations I have experienced since I was released from

prison in February 2019, including my current incarceration. I am very nervous that this situation is going to repeat itself when I am released from Orange County Jail again.

40. I want to receive community based mental health housing and supportive services.

41. I understand that I am part of a class action lawsuit, and this is not only for my benefit, but for the benefit of other class members as well.

42. I understand the responsibilities of being a class representative, including that I am seeking to represent all members of a proposed class of people with serious mental illness, who are housed or will be housed in a state prison, whose open dates for parole release, approved conditional release dates, or maximum expiration dates have passed, and who are appropriate for community-based mental health housing and supportive services upon their release from prison.

43. I understand that this case is also being brought on behalf of individuals who were harmed by DOCCS and OMH's failure to provide adequate community-based mental health housing and supportive services. As a result of this failure, DOCCS and OMH discharged people to segregated and/or inappropriate settings, such as halfway houses.

44. I understand that the goal of this lawsuit is to require DOCCS and OMH to take certain actions to stop their harmful practices and to provide care and treatment in the most integrated setting appropriate to the needs of individuals with serious mental illness who are discharged from prison.

45. I do not have interests that are inconsistent with the interests of the class members I seek to represent. I will adequately represent those class members.

46. As a class representative, I will always consider the interests of class members just as I would consider my own interests, and I understand that I must put the interests of class members above my own interests.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of January, 2023 in Goshen, NY.

_C.J._

C.J.