UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H., individually and on behalf of all similarly situated,

                                    Plaintiffs,

           -against-

ANDREW CUOMO, in his official capacity as the Governor of the State of New York, the NEW YORK STATE OFFICE OF MENTAL HEALTH, ANN MARIE T. SULLIVAN, in her official capacity as the Commissioner of the New York State Office of Mental Health, the NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, ANTHONY J. ANNUCCI, in his official capacity as the Acting Commissioner of the New York State Department of Corrections and Community Supervision, ANNE MARIE MCGRATH, in her official capacity as Deputy Commissioner of the New York State Department of Corrections and Community Supervision,

                                    Defendants.

------------------------------------------------------------------------ x

7:19-cv-0639 (CS) (AEK)

## DECLARATION OF D.H. IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, D.H., being competent to make this declaration and having personal knowledge of the matters stated herein, hereby declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

    1.    I am 31 years of age, and I grew up in Newburgh, New York.

    2.    I have been homeless for most of my life. I have been homeless consistently since the New York State Department of Corrections and Community Supervision ("DOCCS") released me from prison on December 19, 2018.

    3.    I have diagnoses of schizoaffective disorder, bipolar type, and antisocial personality disorder. I've had these diagnoses for years.

4. I also have a history of using substances, including alcohol, marijuana, and spice. The New York State Office of Mental Health has classified my substance use history as a "disorder."

5. My mother used drugs when I was a child, and as a result, I was removed to foster care. I went back to live with my mother when she got clean.

6. I received special education services in school. My Individualized Education Program ("IEP") classified me as "Emotionally Disturbed" because I had difficulty processing my godmother's death. I first began experiencing symptoms of mental illness when I was about twelve years old.

7. When I was in seventh grade, I was placed in a children's home in Kingston because I was having behavioral issues at school. I remained in residential care until my first incarceration. At or around that time, I was first diagnosed with a serious mental illness. Shortly thereafter, I began taking mental health medication—including antipsychotics—and seeing therapists and doctors. I was also hospitalized several times during this period, including at Benedictine Hospital.

8. School was very difficult for me because I felt targeted and often got into fights. Eleventh grade was the highest grade I completed, although I am currently in school again studying for my High School Equivalency ("HSE") diploma.

9. I never held a job because my disabilities interfere with me getting a job on my own, and nobody ever helped me. Once I was kicked out of school, I found it hard to make ends meet, especially without a job. I started selling drugs to support myself. I felt there was no other way.

10. I've been receiving mental health services in the community since 2009, except during periods when I was incarcerated. I also received care coordination briefly in 2012. I never received enough outpatient services to really make a difference in my life. My lack of consistent and meaningful outpatient services has really set me back.

11. I was hospitalized on several occasions prior to my first incarceration, including at Arden Hill Hospital several times in 2008, and at Orange Regional Medical Center and St. Luke's Cornwall in 2009. During those hospitalizations, I was treated with several medications, including Thorazine, Zoloft, Benadryl, Depakote, Abilify, Haldol, Trazadone, and Zyprexa. In 2012, I voluntarily admitted myself to a hospital in Port Jervis when I was experiencing suicidal ideation. Later that year, after I was incarcerated pretrial, I was admitted to Rockland Psychiatric Center for an evaluation under Criminal Procedure Law § 730.50.

**Incarceration in New York State Prison**

12. I was first incarcerated in state prison in December 2012. I was sentenced to one year of incarceration.

13. My second incarceration in State prison started in August 2014. I later caught an arson charge in prison, which extended my incarceration.

14. While I first got to prison, OMH designated me a Mental Health Service Level ("MHSL") 1-S which is the highest MHSL that exists. The 1-S classification means I had a diagnosis of serious mental illness, and I needed the most intensive mental health services available in the DOCCS system. I was a 1-S for my entire second incarceration.

15. During this incarceration, I was held at various prisons, including Auburn Correctional Facility, Marcy Correctional Facility, Green Haven Correctional Facility, Attica Correctional Facility, Elmira Correctional Facility, Wende Correctional Facility, and Sullivan

3

Correctional Facility. I was also placed in several mental health programs in the prisons, including the Intermediate Care Program ("ICP") and the Residential Mental Health Unit ("RMHU"), which are for people with serious mental illness. I was in the Sullivan ICP immediately before my release from custody in 2018.

**Prolonged Confinement and Release to Bridges**

16. In March of 2018 I was informed that despite my request, I could not be paroled to my grandmother's house or my mother's house. That same month, I learned that OMH completed a Single Point of Access ("SPOA") application for me.

17. The SPOA application said that I was eligible for community-based mental health housing and certain supportive services. OMH also submitted a community mental health referral for me, specifically for services with Access – Supports for Living. I was told that OMH recommended these services to ensure I reintegrated into society well and remained emotionally stable.

18. At this time, I was anxiously awaiting my release. I expected to be paroled on my open date for parole release, which was May 1, 2018. But that didn't happen. Instead, I was incarcerated past my parole date. I later learned that I wasn't released on time because I didn't have an approved address.

19. I waited several months, wondering when I would be released. Nobody ever gave me any real updates. I was just told that the State was waiting to find suitable housing for me to be discharged to. In July, I wrote a grievance complaining about my prolonged incarceration. I wrote, "why I haven't been released from prison yet? An open date since May 1, 2018. And my parole officer is not doing his job helping me find housing or [a place to] live . . . I'm in prison

4

for more than 2 months past my date . . . Also I gave parole addresses and all of them have been denied."

20. I later learned that my release took so long because the State decided the only place it would release me was mental health housing, and there was a very long waiting list for that housing.

21. I complained about my prolonged incarceration repeatedly and told OMH and DOCCS staff they were not doing their jobs to get me released. I experienced lots of anxiety and agitation due to my delayed release from prison. I also experienced suicidal ideation and a desire to self-harm because of my delayed release. I had spent all that time in DOCCS only to remain there when I was told I would be home. It was torture.

22. I filed another grievance in October again saying that I had been held past my release date, but this time, I made clear I was being held because I needed mental health housing and services. I said that I had tried to address my issue by speaking with staff, but nobody fixed it. I was very upset, and it seemed like nobody was willing to help me.

23. Finally, on December 19, 2018—over seven months past my open date for parole release—I was released to The Bridges of New York ("Bridges"). At first, nobody told me where I was being sent. Prison staff just shackled me, put me in a van, and took me to the Peekskill Area Parole Office. Then, I found out I was going to Bridges.

24. I was shocked that the State sent me to Bridges. Bridges is in a bad part of Newburgh and has a bad reputation as a drug den. It's not mental health housing and it offers no mental health treatment, services, or supports on site. I couldn't believe it. I waited all that extra time in prison after being told I could only be released to mental health housing, only to be

released to a dangerous place without any mental health services on site. I knew Bridges wasn't a suitable place for me.

25. I later found out that my SPOA application referred me for more services than I received when I was released to Bridges. I was supposed to get intensive case management and was referred for Health Home Plus. I was also supposed to get transitional coordination services. Those services really would have helped me with my transition. But instead of actually giving me the services, the State released me to a dangerous drug den and gave me basically no outpatient mental health services. I was set up to fail.

26. Days into my stay at Bridges I was already overwhelmed. Many of the people at Bridges were on drugs. The whole place was dirty and there was drug paraphernalia everywhere. Nobody had spoken to me about permanent housing, and it was pretty clear there was no way I was going to get permanent housing any time soon. I was getting no meaningful mental health services.

27. I decided to leave Bridges for my own safety. I felt like I would be more likely to succeed and stay in the community if I at least was around family and friends, instead of drug addicts who were influencing me to relapse, so I went to live with my girlfriend. But I didn't do well outside of Bridges, either. After setting me up to fail by not giving me any of the services they knew I needed, parole sent me back to prison when I caught a dirty urine.

**Cycle of Reincarceration and Release**

28. I was sent back to prison in March 2019, and I remained at Downstate Correctional Facility for about two months. The whole situation was so strange – Downstate was primarily a "reception center" and was designed for short stays while incarcerated people wait for transfer to a more permanent placement. For that reason, Downstate didn't have any mental

health programming at all. Sure, I remained a MHLS 1-S and I had contact with therapists and doctors, but because Downstate had no actual mental health programs, I didn't get any mental health programming. After years of being in ICPs and RMHUs, I just stayed in general population at Downstate and waited for my next release.

29. On the last day I was at Downstate, the Discharge Planner came to me in a frenzy. She said OMH hadn't completed my paperwork, so she had to rush to do it that day. Again, after all the time I spent in the system, I was shocked that the State made this error in planning. My updated SPOA was submitted on May 17, 2019, the same day I was released the second time.

30. Again, nobody told me where I was going to go this time, either—the State just shackled me and put me in a van. I ended up in the same place I had been released to the first time around—Bridges. I couldn't believe it. After how poorly Bridges went the first time, why would the State release me to Bridges the second time? I came to find out that once again, I had been referred for a ton of mental health services I didn't end up receiving. And again, I was referred for housing and never received it.

31. Eventually, I got very overwhelmed about the conditions at Bridges. My roommate smoked crack in the room, and I was worried that if he got caught and arrested for it, I would be arrested too. Other people were using marijuana at Bridges. It was an unsafe environment for me, and I was worried I would relapse, so I left. Soon after that, I was arrested and charged with a parole violation for absconding.

32. I got back to Downstate again on August 8, 2019. At this point, my life felt like a never-ending cycle. I kept getting released without the services the State knew I needed, and I kept getting picked up by the police when I relapsed. I was wondering if I'd ever get a fighting chance to stay out of prison, or this would just keep happening until my supervision time ran out.

7

33. Again, I stayed at Downstate until I was released again, this time on September 25, 2019. Because there were no mental health programs at Downstate, I didn't receive any programming—just therapy and medication. I felt like OMH and DOCCS were repeating the same mistakes they made the first time around, and I explained that to staff, but nobody addressed it.

34. From meetings with OMH staff I understood that OMH had updated my SPOA application again. I found out that I was again referred for all the services I had been referred for during my first two discharge planning processes, but in my new SPOA, OMH made clear I was eligible for specific kinds of housing, including a supervised community residence and a supportive apartment treatment program. I was hopeful I would actually get mental health services and housing this time around.

35. Unfortunately, that did not happen. This time, I was released to my grandmother's house. I had requested approval to reside at my grandmother's house before my first release, so it's not that I had any issue living there. But I feared that OMH would not provide all the supportive services I needed to reintegrate into the community. And that proved to be the case.

36. I had a hard time living at my grandmother's house. When she caught me smoking spice, she kicked me out. I then spent several months couch surfing and was charged with another parole violation after I got caught using drugs.

37. I was reincarcerated at Downstate on March 3, 2020 and transferred to Clinton on March 19. I was placed in general population. Even though I was not placed in a mental health unit, I did receive mental health treatment and I remained a MHSL 1-S.

38. In May, I found out that my SPOA application was being updated again. My new SPOA application, which was completed on May 5, 2020, requested all the same services. It

stated I was eligible for supportive apartment treatment, other supported housing programs, and case management.

39.     I had a very hard time at Clinton. One day during recreation, I witnessed another incarcerated person get stabbed in the head with an ice pick. This incident aggravated my mental health symptoms and caused me nightmares and anxiety. I sought mental health assistance for my symptoms and ended up spending an extended period in the mental health dorm. Even after all of this happened, I was optimistic that when I was done serving my time, I would be discharged to community-based mental health housing and get all the services that were listed in my SPOA.

40.     This time, though, instead of releasing me to a dangerous place without mental health services on site, the State released me to Rockland Psychiatric Center. The State called the unit I was released into an "Intensive Treatment Unit." It was really just a hospital, though. Everyone there had serious mental illness, and all of them needed more intensive supports than I did.

41.     The living conditions at Rockland Psychiatric Center were more restrictive than the conditions in the housing that I understood I was eligible for. There was a curfew and there were lots of rules controlling what I could do inside the facility. We ate meals in groups and attended all our programs in groups. All the people in the groups were people with serious mental illness. We all shared a single phone.

42.     When I was discharged from Rockland Psychiatric Center, I was street homeless for a little bit. This whole time, I wasn't receiving any help from my Rehabilitation Support Services case manager, Kimberly Alwell, to find mental health supportive housing. She kept encouraging me to just focus on stabilizing and to try to get into and complete drug treatment

programs. I was frustrated by this, as I needed proper community-based mental health support and housing for me to stabilize my mental health, and still had not received it.

43. Since being discharged from Rockland Psychiatric Center, I've cycled between several drug and alcohol rehabilitation placements. I've been kicked out of some of these placements, and I've left early from others, but I was so overwhelmed by untreated mental health issues that it has been difficult for me to focus on rehab.

44. My case manager advised me to focus on my rehab before continuing to look for mental health housing. On the one hand, I feel like it's good advice for me to prioritize my rehabilitation. But on the other hand, I feel like I am not going to be fully successful unless I get all the community-based mental health services—including housing—that I am eligible for.

45. Since I got released from prison, I have never received all the services I'm eligible for and I've never received mental health supportive housing. In fact, according to my case manager, when she did find a potential apartment for me, I couldn't take it because I was in a rehab program.

46. I desperately want to stay in the community this time. With all the shortages in community-based mental health housing and services, I'm worried I'm never going to get the services I need and I'm going to keep having to fend for myself.

47. I want to reside and receive programs and services in integrated settings in the community.

48. I understand that I am a part of a class action lawsuit, and this lawsuit is not only for my benefit, but for the benefit of other class members as well.

49. I understand the responsibilities of being a class representative, including that I am seeking to represent all members of a proposed class of people with serious mental illness,

who are or will be appropriate for community-based mental health housing and supportive services upon their release from prison, who do not receive such services, and who reside in a segregated setting or who are at serious risk of being institutionalized.

50. I understand that this case is also being brought on behalf of individuals who were harmed by DOCCS's and OMH's failure to provide adequate community-based mental health housing and supportive services. As a result of this failure, DOCCS and OMH held these individuals in prison past their lawful release dates.

51. I understand that the goal of this lawsuit is to require DOCCS and OMH to take certain actions to stop their harmful practices and to provide care and treatment in the most integrated setting appropriate to the needs of individuals with serious mental illness who are discharged from prison.

52. I do not have interests that are inconsistent with the interests of the class members I seek to represent. I will adequately represent those class members.

53. As a class representative, I will always consider the interests of class members just as I would consider my own interests, and in some cases I understand I must put the interests of class members before my own interests.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5 day of January, 2023 in West Nyack, NY.

_____D H_____
D.H.