UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H., individually and on behalf of all similarly situated,

                                                Plaintiffs,

        -against-

ANDREW CUOMO, in his official capacity as the Governor of the State of New York, the NEW YORK STATE OFFICE OF MENTAL HEALTH, ANN MARIE T. SULLIVAN, in her official capacity as the Commissioner of the New York State Office of Mental Health, the NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, ANTHONY J. ANNUCCI, in his official capacity as the Acting Commissioner of the New York State Department of Corrections and Community Supervision, ANNE MARIE MCGRATH, in her official capacity as Deputy Commissioner of the New York State Department of Corrections and Community Supervision,

                                                Defendants.

7:19-cv-0639 (CS) (AEK)

------------------------------------------------------------------------ x

## DECLARATION OF W.P. IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, W.P., being competent to make this declaration and having personal knowledge of the matters stated herein, hereby declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am 52 years of age, and I grew up in the Bronx, New York.

2.     I have been homeless ever since the New York State Department of Corrections and Community Supervision (DOCCS) released me from prison on May 17, 2019.

3. I have a diagnosis of schizoaffective disorder, bipolar type. I also have a diagnosis of antisocial personality disorder.

4. I take three mental health medications before I go to bed. My doctor prescribes aripiprazole, olanzapine, and divalproex. They help stabilize me and help me with my mood. Without them, I cannot function properly.

5. I was released from prison on my conditional release date, May 17, 2019, after being incarcerated for over nineteen and a half years.

6. When I was in prison, I received mental health treatment. The Office of Mental Health (OMH) classified me as "1-S," and I was in the Intermediate Care Program (ICP), which is for people with serious mental illness. Before my release, I was placed in Sing Sing Correctional Facility's "SMI-V Discharge ICP." I understand that this is a special program for people with serious mental illness who are going to be released soon and have a conviction for a violent felony.

7. At times during my prison sentence, I became unstable and I thought about hurting or killing myself. OMH responded by placing me on suicide watch multiple times. I tried to kill myself when I could not take being in the Special Housing Unit (solitary confinement), where DOCCS placed me for about two and a half years. After this suicide attempt, I was transferred to Central New York Psychiatric Center, a hospital in Marcy, New York.

8. Months before my conditional release, I asked OMH staff about my housing options in the community. I talked to OMH staff about how I wanted to live on my own. I also wrote to mental health housing programs to find a place to live.

9. In late January 2019, the DOCCS Time Allowance Committee ("TAC") reviewed whether to release me on my conditional release date based on my good time. Around early

2

February 2019, I found out that the TAC recommended my release and that I would be released on my conditional release date.

10. Because of my serious mental illness and need for housing, OMH staff submitted a housing application for me.

11. About two weeks before my conditional release date, I had a video-conference interview with a housing provider named Project Renewal. It was the only interview that OMH arranged before my release from state prison.

12. During the interview, I learned that Project Renewal had a shared apartment with a capacity for three men. Project Renewal staff explained that people usually live in shared apartments for one or two years, possibly longer. I received little information about potential roommates. I was afraid that a roommate would have a murder conviction. I was afraid because I had read a news report about a person who killed their roommate. I stated that I would feel safer living in a single room.

13. One way my serious mental illness affects me is by making me paranoid. Being careful about who I socialize with helps me avoid conflict. I wanted to avoid problems, and I wanted to feel safe when I was released from prison.

14. I thought OMH should have continued to help me find housing after the interview with Project Renewal, but OMH arranged no more interviews for me. The Discharge Summary that DOCCS gave me shows that OMH withdrew video-teleconference interviews after the Project Renewal interview. I think this means that OMH decided to stop helping me look for housing after only one interview.

15. Soon after the Project Renewal interview, OMH staff told me I would be going to the men's homeless shelter at 30th Street in Manhattan.

16. On May 17, 2019, DOCCS transported me in handcuffs from Sing Sing Correctional Facility to Manhattan, New York. They took me to meet with my parole officer in the Bronx, and then DOCCS took me to the 30th Street shelter. There, I learned that the shelter had no mental health services. I was assigned to a dorm with six other people. The conditions were filthy.

17. On June 27, 2019, I was transferred to a mental health shelter called Delta Manor in the Bronx, and I was assigned to a dorm.

18. Months after the COVID-19 pandemic began, New York City officials began to temporarily move shelter residents to "hotel shelters." In May 2020, I was moved, along with all the residents of Delta Manor, to the Belnord hotel shelter in Manhattan. Since then, I have been transferred many times to other hotel shelters and homeless shelters, including the Days Inn hotel shelter in Queens; Laurel Hall shelter in Queens; the Wolcott hotel shelter in Manhattan; Fairfield Inn hotel shelter in Queens; and the Howard Johnson hotel shelter in Queens.

19. I am currently in the Howard Johnson hotel shelter. The building is dirty and extremely run down. There is no sign on the outside, so the building looks abandoned. No one comes to clean or maintain the building, the elevators are broken, and security is not consistent. There is no mental health doctor on site, and since I have been at the shelter, I have not seen a shelter psychiatrist.

20. I want to obtain housing in the community with the services and support I need.

21. I search for housing on my own. When I see advertisements about housing, I make phone calls to find out if I can apply. I ask my Forensic Assertive Community Treatment team for help with housing applications. I make sure to gather any documents for housing applications and I see my doctors to make sure my evaluations are up to date.

22. New York City has processed my housing application. I received a determination letter stating that I am eligible for community-based mental health housing. My FACT Team also believes that I need this housing.

23. I have had only three housing interviews since my release. The first two providers rejected me. The third provider, which interviewed me in early December 2022, told me I was required to designate them as a representative payee as a condition of receiving housing. Since I want to be independent and I am capable of managing my benefits, this housing provider was not a good fit for me.

24. I believe there is not a lot of housing available, which makes it hard to find housing.

25. It is very difficult to be a homeless person with serious mental illness and to live in the homeless shelter system. The shelters do not have adequate mental health services and staff. This is a problem because there is no one to turn to when I have a problem and want to speak with a doctor or counselor.

26. Shelter employees are unreliable when I need help. They do not seem to care about issues that are affecting me. They are slow to respond to my requests for help. Several times, they let my housing application materials expire.

27. In the shelters, I have to strictly follow many rules, including curfew, to keep my shelter bed. I am not allowed to keep a lot of personal property, so I have to limit how many possessions I keep. I am only permitted to have two bags of property, and I am only allowed to have one pair of sneakers, one pair of dress shoes, one pair of boots, and one pair of house slippers. The shelter also limits how many cosmetics I can have, and I am only allowed to have two rolls of toilet paper every two weeks. In many ways, the shelter is run like a prison.

28. I have no control over where I live. When shelter administrators order me to move from shelter to shelter, my routines are disrupted. When I was moved to a shelter in Queens, New York, it was much harder to take a train or bus to visit my elderly mother. It took me an hour and a half to reach her. The shelter moves also disrupt which neighborhood pharmacy I use. I often need a lot of help from my FACT Team to make sure I continue to get my medications. If I do not take my mental health medications on time, I become very sick, so the disruptions make me anxious.

29. In the shelter system, I also have no control over who I live with. I have been forced to share rooms with strangers who are going through their own serious issues. Many people seem to be struggling with mental illness and drug addiction. They act argumentative or difficult, and there is a lot of violence. It is stressful to deal with. The situation increases my paranoia, so I spend as much time as possible outside of the shelter. I visit my mother and help her with errands. I go for walks when the weather is good.

30. Living in homeless shelters during the COVID-19 pandemic was also stressful because I knew that being in a congregate setting with so many people around was exposing me to serious health risks.

31. In December 2021, I had a conflict with another shelter resident. DOCCS issued a parole warrant because of this incident, and I was arrested and held on Rikers Island for 63 days before my parole status was restored.

32. During my time on Rikers Island, I deteriorated badly. I was not myself because I did not take my mental health medications.

33. I believe that if I was living in community-based mental health housing, I would not have had this incident or been jailed.

34. As long as I am in the shelter system, I believe I am at risk that I will deteriorate again. I do not want to go to jail. My main goal is to avoid prison. I worry that living in the shelters, surrounded only by people with mental illnesses and criminal histories, could put me in bad situations.

35. I understand that I am a part of a class action lawsuit, and this lawsuit is not only for my benefit, but for the benefit of other class members as well.

36. I understand the responsibilities of being a class representative, including that I am seeking to represent all members of a proposed class of people with serious mental illness, who are or will be appropriate for community-based mental health housing and supportive services upon their release from prison, who do not receive such services, and who reside in a segregated setting or who are at serious risk of being institutionalized.

37. I understand that this case is also being brought on behalf of individuals who were harmed by DOCCS's and OMH's failure to provide adequate community-based mental health housing and supportive services. As a result of this failure, DOCCS and OMH held these individuals in prison past their lawful release dates.

38. I understand that the goal of this lawsuit is to require DOCCS and OMH to take certain actions to stop their harmful practices and to provide care and treatment in the most integrated setting appropriate to the needs of individuals with serious mental illness who are discharged from prison.

39. I do not have interests that are inconsistent with the interests of the class members I seek to represent. I will adequately represent those class members.

40. As a class representative, I will always consider the interests of class members just as I would consider my own interests, and in some cases I understand I must put the interests of class members before my own interests.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19 day of January 2023 in New York, NY.

*W.P.*

W.P.