# Exhibit 1 to the
# Factor Declaration

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H.,
individually and on behalf of all similarly situated,

                                        Plaintiffs,

                -against-

ANDREW CUOMO, in his official capacity as the Governor
of the State of New York, the NEW YORK STATE OFFICE
OF MENTAL HEALTH, ANN MARIE T. SULLIVAN, in
her official capacity as the Commissioner of the New York
State Office of Mental Health, the NEW YORK STATE
DEPARTMENT      OF      CORRECTIONS      AND
COMMUNITY      SUPERVISION,      ANTHONY      J.
ANNUCCI, in his official capacity as the Acting
Commissioner of the New York State Department of
Corrections and Community Supervision, ANNE MARIE
MCGRATH, in her official capacity as Deputy
Commissioner of the New York State Department of
Corrections and Community Supervision,

                                        Defendants.
------------------------------------------------------------------------ x

7:19-cv-639 (CS) (AEK)

## EXPERT REPORT OF ROBERT M. FACTOR, MD, PhD

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     EDUCATION AND PRINCIPAL AREAS OF EXPERTISE..............................................2

III.    MATERIALS CONSIDERED ...................................................................................3

IV.     LITERATURE REVIEW ..........................................................................................4

      A.      Lack of community services and housing increases the likelihood of hospitalization or incarceration among people with serious mental illness.............. 5

            1.      Assertive Community Treatment and other community-based treatment programs help people with serious mental illness remain stable in the community. ................................................................. 5

            2.      Stable housing helps people with serious mental illness remain in the community, while unstable housing and homelessness can have deleterious effects. ................................................................... 9

      B.      Lack of community services and housing increases the likelihood of hospitalization or incarceration among people released from prison with serious mental illness. ................................................................. 11

            1.      Available community-based services reduce the risk of institutionalization for previously incarcerated people with serious mental illness. ................................................................. 12

            2.      Lack of stable housing increases the risk of institutionalization for previously incarcerated people with serious mental illness. ..................... 15

      C.      New York State already has programs and structures in place that operate successfully for the populations who are able to access those services................. 17

V.      THE DISCHARGE CLASS NAMED PLAINTIFFS HAVE BEEN PLACED AT SERIOUS RISK OF INSTITUTIONALIZATION DUE TO LACK OF NECESSARY SUPPORTIVE SERVICES AND STABLE HOUSING. ........................18

      A.      W.P. ....................................................................................... 19

      B.      D.H. ....................................................................................... 21

      C.      S.D. ....................................................................................... 24

VI.     SUPPLEMENTATION ..........................................................................................26

VII.    DECLARATION ..................................................................................................26

## I.    INTRODUCTION

1.    The Plaintiffs have asked me to provide an opinion regarding the following Research Questions:

A.    Is there a relationship between the provision of community-based mental health housing and supportive services ("CBMHHSS") for people with serious mental illness upon their release from prison and a risk that those individuals will experience re-institutionalization (e.g., through incarceration or placement in a mental health facility)? Does the absence of CBMHHSS place people with serious mental illness who were formerly incarcerated at risk of re-institutionalization?

B.    For Named Plaintiffs W.P., D.H., and S.D., did New York State's Office of Mental Health ("OMH") determine that these individuals were eligible for CBMHHSS when released from prison? If so, what type of CBMHHSS did OMH provide these individuals? Was the CBMHHSS that OMH provided appropriate for the needs of the individuals upon release from prison? If not, has OMH's failure to provide appropriate CBMHHSS placed these individuals at serious risk of re-institutionalization?

2.    It is my opinion, based on my professional experience and a review of the psychiatric and criminal justice literature, that people with serious mental illness who receive CBMHHSS are much less likely to become seriously decompensated psychiatrically than those who do not receive such services. When people with serious mental illness become seriously decompensated, they often need to be psychiatrically hospitalized. They may also violate the law, become involved with the criminal justice system, and be incarcerated as a direct result of this decompensation.

3.    These same concepts apply to people with serious mental illness who are released from prison. Once released from incarceration and returned to the community, in the absence of adequate treatment for their serious mental illness and stable housing, they are much more likely to become seriously decompensated psychiatrically and be re-hospitalized or re-incarcerated. They are thus subjected to institutionalization in lieu of living in the community.

4.    Based on my review of the produced mental health records and documents of W.P., D.H., and S.D., as well as deposition transcripts and interviews, I also find that these three Named Plaintiffs were deemed eligible for CBMHHSS upon release from prison, including mental health housing and assertive community treatment ("ACT") teams. Nevertheless, the records show that these Named Plaintiffs have not received the stable housing and services they require. As a result, I find that these Named Plaintiffs have an increased risk of institutionalization, including the potential for reincarceration and/or hospitalization. Indeed, this risk was realized when all three of these Named Plaintiffs were reincarcerated and two were hospitalized in the past few years. Stable housing and accessible community treatment services would have significantly reduced that risk, and would reduce that risk moving forward.

5.    In Section II of this report, I describe my education and areas of expertise, and in Section III, I list the materials I considered in forming these opinions. In Section IV of the report, I

provide a literature review of studies related to people with serious mental illness, including people with justice-system involvement, which support my findings described above in response to Research Question A. Section IV(A) includes studies on the efficacy of community treatment programs and stable housing generally for people with serious mental illness. Section IV(B) discusses studies regarding the positive effects of community services and stable housing specifically for people with serious mental illness who were formerly incarcerated. Section IV(C) highlights studies that were conducted in New York specifically, given that research on these topics, as well as program development, have been ongoing in the state.

6.      In Section V of this report, I discuss W.P., D.H., and S.D., addressing Research Question B. It is my understanding based on documents reviewed (including the complaint and deposition transcripts) and interviews with W.P., D.H., and S.D., that they did not receive the basic elements necessary to success in the community. I conclude that the failure by the Department of Corrections and Community Supervision ("DOCCS") and OMH to provide these Named Plaintiffs with stable housing and sufficient supportive services upon release has placed them at serious risk of re-institutionalization. I believe the revolving door of incarceration and then release without access to the elements necessary to succeed in the community perpetuates a serious risk of institutionalization.

## II.    EDUCATION AND PRINCIPAL AREAS OF EXPERTISE

7.      I am a physician licensed to practice Medicine and Surgery in the State of Wisconsin, with a practice limited to psychiatry. I have been certified since 1985 in the specialty of psychiatry by the American Board of Psychiatry and Neurology.

8.      I earned an A.B. in biology from the University of Chicago in 1967, a Ph.D. in biology from the University of Pennsylvania in 1975, and an M.D., also from the University of Pennsylvania, in 1979. I did my residency in psychiatry at the University of Wisconsin Hospital and Clinics from 1979 to 1983 and did a fellowship in community psychiatry at the University of Wisconsin Medical School and the Mental Health Center of Dane County from 1983 to 1984. I am a Professor Emeritus of Psychiatry in the Department of Psychiatry at the University of Wisconsin School of Medicine and Public Health in Madison, Wisconsin, and I have been a member of that faculty since 1984 holding previous ranks of Assistant, Associate, and full Professor.

9.      From 1983 to 2019, I was the Medical Director of the Emergency Services Unit of the Journey Mental Health Center, Inc. (formerly called the Mental Health Center of Dane County, Inc.), in Madison, Wisconsin. From its inception in 1995 through 2020, I was the Medical Director of the Mental Health Intensive Case Management (MHICM) program, also known as the Community Support Program, at the W.S. Middleton Veterans Affairs Medical Center in Madison, Wisconsin. This program closely follows the ACT model for community treatment. I remain on the medical staff of the Madison VA Hospital as a senior consultant. I continue to practice general psychiatry and psychotherapy in Madison.

10.     I am an expert in providing direct care to patients with serious mental illness in community-based settings, including ACT teams, clubhouse model community programs, and community-based psychiatric emergency services. As I detailed in the previous paragraph, I

practiced in each of these settings for many years in Madison until my semi-retirement from them in 2021. In community-based settings, I have treated and continue to treat many people who exhibit psychotic thought processes, challenging behaviors, or difficult personalities.

11.     A complete list of my publications and presentations may be found in the attached Curriculum Vitae, dated December 2022 (*see* Appendix A). Among my publications, I am a co-author of two important book chapters on the treatment of persons with serious mental illness in community-based settings.[1]

12.     I have also made many presentations on the community-based treatment of persons with serious mental illness, as listed in my Curriculum Vitae.

13.     In 1984, along with my Madison colleagues Len Stein and Ron Diamond, I was among the founding members of the American Association of Community Psychiatrists. I am a Distinguished Life Fellow of the American Psychiatric Association and the Wisconsin Psychiatric Association.

14.     I am being compensated at a rate of $400 per hour and $550 per hour for deposition and trial testimony. I had assistance reviewing records from a DNP, APNP (Doctor of Nursing Practice, Advanced Practice Psychiatric Nurse Practitioner) with a different billing rate. My compensation is not dependent on the substance of my testimony or the outcome of this matter.

15.     I have not testified as an expert in any trial or deposition in the past four years.

16.     All my opinions contained in this report are based on my education, training, and experience.

## III.    MATERIALS CONSIDERED

17.     In connection with the preparation of this report, I reviewed the materials listed below. I am also generally familiar with other medical and scientific literature related to mental health and community treatment due to my experience and practice.

A       The Second Amended Complaint in *M.G.* v. *Cuomo*, United States District Court, Southern District of New York

B       The Named Plaintiffs' records that have been produced in this case with the bates stamp ranges listed in **Appendix B**

C       The transcripts of the depositions of W.P., D.H., and S.D. in this case

---

[1]    Stein, L. I., Diamond, R. J., Factor, R. M. (1990). Chapter 11: A system approach to the care of persons with schizophrenia. In M.I. Herz, S.J. Keith, & J.P. Docherty (Eds.), *Clinical handbook of schizophrenia* (Vol. 4, pp. 213–246). Elsevier Science Publishers B.V.

Factor R.M., Diamond R.J. (1996). Emergency Psychiatry and Crisis Resolution. In Vaccarro, J.V. and Clark Jr., G.H. (Eds.), *Practicing psychiatry in the community: A manual*. American Psychiatric Press.

D.    The literature cited in this report

E.    An interview with each of W.P., D.H., and S.D.

F.    All other materials listed in **Appendix B**

## IV.    LITERATURE REVIEW

18.    Based on the literature that I reviewed and my own clinical and research experience, I conclude that there are several elements that are necessary to enable persons with serious mental illness, including formerly incarcerated persons, to live stable lives in the community. In particular:

A.    High risk people need the most intense level of community support, which is **engagement with ACT**, particularly during transition periods. Formerly incarcerated persons should be connected with an assertive community treatment ("ACT") team prior to their release from incarceration so that the ACT team can begin direct services on the day of their release. These ACT teams need to be proactive and hands-on in providing these services (e.g., assist clients in pursuing stable housing; take clients shopping and to other places as needed; attend appointments with clients, including assisting with transportation as needed; assist clients to make community connections, etc.).[2] This support needs to be offered in a flexible manner so that clients can reasonably access and accept such services, even in times of crisis or instability.

B.    **Stable housing**, including community-based mental health housing, is key to helping people with serious mental illness remain in the community. Homelessness and incarceration appear to increase the risk of each other, and these factors seem to be influenced by mental illness and substance abuse. Therefore, it is essential to provide this population with stable housing to avoid them becoming homeless and sleeping in homeless shelters. This is especially important during the high-risk period immediately following an incarcerated person's release from prison.

C.    **Single occupancy residences** are often necessary for people with serious mental illness. Many people with schizophrenia and other psychotic illnesses have difficulty managing interpersonal relationships and resolving interpersonal conflicts. As a result, they do better when living by themselves with support and monitoring as needed, rather than having to share a living space with one or more other people in an environment ripe for conflicts.

D.    **Access to crisis services with outreach available 24/7** is crucial, as problem behaviors often occur on nights and weekends. When crisis services are not

---

[2]    A full description of ACT and its creation is below. *See infra* Section IV(A)(1)(a).

available, people often end up in hospital emergency departments with subsequent hospital admission, or they are arrested and taken to jail.

E.     Staff in the community (and within the prison system) should work to build **effective therapeutic relationships** with their clients. Clients who have a good therapeutic alliance with treatment providers are more likely to have an open attitude toward accepting services.

F.     There should be **effective coordination between the various systems** (housing, mental health case management, medication management, entitlement programs, etc.) in the community, and between mental health and criminal justice systems as people move between these systems.

G.     People should be **enrolled in Medicaid and SSI** *prior to release* from incarceration so that these benefits are available upon release, and individuals should not be left for months without health benefits or funds.

H.     People for whom substance use has been an issue should be **enrolled in substance abuse treatment and/or recovery support** *prior to release* from incarceration so that these important services are available immediately upon release. If these services are provided in distinct programs, substance abuse treatment should be coordinated with mental health treatment.

I.     Treatment programs should include **peer support staff** as effective members of their treatment team to enhance engagement and mentoring.

19.     Each of these elements appears in the literature laid out in this section and is applied as appropriate in Section V in terms of how their presence or absence affected the three Discharge Class Named Plaintiffs and their ability to succeed in the community after release.

**A.     Lack of community services and housing increases the likelihood of hospitalization or incarceration among people with serious mental illness.**

20.     In this section, I discuss studies showing that community-based treatment programs, in particular ACT, reduce the risk of institutionalization for people with serious mental illness. I then discuss studies showing stable housing likewise reduces the risk of institutionalization. Though these components are presented in separate sections, they are both essential, and one cannot replace the other.

**1.     Assertive Community Treatment and other community-based treatment programs help people with serious mental illness remain stable in the community.**

21.     Based on my experience treating patients with complex needs, including those experiencing serious mental illness and indigence, access to community-based treatment programs like ACT can promote stability in the community and avoid unnecessary institutionalization. The literature confirms my opinion. As discussed below, powerful and abundant evidence exists that ACT, other community-based programs, and an integrated system of community-based care can

all provide effective support for people with serious mental illness to live stable lives in the community.

### (a)    ACT is holistic community care provided directly to the client.

22.    People with serious mental illness can be treated effectively in the community where there are quality, evidence-based programs for treatment and where they have stable housing.[3] ACT is the gold-standard of community treatment. It uses multidisciplinary teams to provide clients with services directly in the community, including mental health treatment, 24/7 crisis response, and support with living skills such as shopping (Morrissey et al., 2007, p. 528). This means that a person with serious mental illness living in the community does not need to seek out services independently and proactively across different agencies. This is invaluable, particularly, for people who are experiencing a mental health crisis. They can rely on ACT teams to provide the necessary support for their mental health needs in a manner that complements their daily life.

23.    ACT emerged in the early 1970s from an innovative program that was designed to prevent the revolving door of repeated hospitalizations for persons with severe mental illness in Madison, Wisconsin (Stein, Diamond & Factor, 1990, pp. 224-43). By the mid-1980s, it was clear that when given the necessary community support, the nature of which had been developed and shown to be effective, most people with serious mental illness can and "should be treated in the community, where they can develop the skills necessary to function in society" (Okin, 1985, p. 742). In 2001, Test and Stein wrote "Assertive community treatment focuse[s] on service delivery mechanisms such as a single integrated team and use of outreach to deliver services, supports, and rehabilitation to *maximize the possibility that even the most disabled consumers would remain in the community and have a decent quality of life*" (Test & Stein, 2001, p. 1396) (emphasis added).

24.    By 2007, the effectiveness of ACT had been well established by dozens of controlled studies globally (Morrisey et al., 2007, p. 530).[4] Among the studies' findings, "ACT was found to be most effective in reducing the use and number of days in the hospital, [and] moderately effective in improving symptoms" (p. 530). For example, randomized clinical trials of long duration and large sample sizes have consistently shown strong positive effects of ACT on reducing hospital days and on increasing patient and family satisfaction (Burns & Santos, 1995, p. 669). "Assertive community treatment clearly demonstrated a greater ability than usual care services to engage and retain clients in community mental health care" (Herinckx et al., 1997, p.

---

[3]    Historically, critics of "de-institutionalization" claimed that people with serious mental illness living in the community were not doing well and because of that they needed to be returned to hospitals or other institutions. However, "it seems unreasonable to expect that treatment in the community would be effective if community treatment programs were absent or inadequate." (Stein, Diamond & Factor, 1990, p.243). In other words, it was impossible to assess the effectiveness of community treatment in the many communities that did not provide treatment in the necessary quantities or at the necessary standards. But to be sure, and as will be shown throughout this report, quality community treatment is effective.

[4]    In 2008, the U.S. Department of Health & Human Services, Substance Abuse and Mental Health Services Administration even issued a toolkit with guidance to facilitate the implementation of ACT (accessed at https://www.samhsa.gov/resource/ebp/assertive-community-treatment-act-evidence-based-practices-ebp-kit), describing it as an "Evidence-Based Practice."

1297). Indeed, Simmonds et al. (2001) wrote that "community mental health team management is superior to standard care in promoting greater acceptance of treatment," and that the ACT model has a major impact on reducing admissions and reducing drop-out from care "because one of the main functions of such teams is to maintain contact with patients and to see them in settings that are most appropriate for their care, including home treatment" (pp. 497, 501).

25.     The two most recent Cochrane reviews[5] on the effectiveness of ACT, published in 2010 and 2017, concluded that community services like ACT were effective in ameliorating many outcomes relevant to people with severe mental illnesses. The studies found that, compared to standard care, community services like ACT were shown to reduce time in hospitals and increase retention in care. They also globally improved social functioning. Those in the community-services group were significantly more likely to stay with the service, have improved general functioning, get a job, and not be homeless (Cochrane Library, Intensive case management for severe mental illness (Review), 2010, p. 2 and 2017, pp. 2-3).

> **(b)      Studies show that community treatment is effective in reducing the risk of institutionalization for people with serious mental illness.**

26.     Effective, direct, holistic community treatment programs, like ACT, maximize outcomes for clients. In a prospective study, Morse et al. (1997) compared the stability of people with serious mental illness who received broker case management to those who received ACT services. Broker case management is a common approach in which the role of the case manager is to develop an individualized service plan for the client, arrange for and purchase services from various providers, and monitor the quality of the purchased services (Morse et al., 1997, p. 499). Unlike an ACT case manager, the broker case manager typically is office-based and does not meet clients in the community, nor make home visits, nor accompany clients to interviews, medical appointments, job sites, or other service locations (Morse et al., 1997, p. 499). Compared to people who received broker case management, people who received ACT had greater satisfaction, fewer symptoms of thought disorder and unusual behavior, and increased engagement with providers and with other community services (Morse et al., 1997, p. 501). Importantly, they had more days in stable housing. Morse et al. (1997) concluded that ACT was "superior to broker case management in assisting individuals with serious mental illness who are at risk of homelessness" (p. 497).

27.     Related to the criminal justice context specifically, Heilbrun et al. (2012) reviewed the empirical evidence to support community-based alternatives to arrest, prosecution, and incarceration of persons with serious mental illness. They considered differences in cost, appropriateness of treatment, and humanitarian components between the two systems (p. 352). They presented evidence that participation in ACT programs reduced participants' number of arrests and days spent in the hospital or incarcerated year-over-year, and furthermore, "community-enhanced treatment within the ACT model was associated with better criminal justice outcomes (any booking, any conviction, mean jail time); better improvement in substance abuse

---

[5]     Cochrane reviews are internationally regarded "systematic review[s] that attempt[] to identify, appraise and synthesize all the empirical evidence that meets pre-specified eligibility criteria to answer a specific research question" in health care and health policy (Cochrane Library, 2023).

problems; and greater improvement in global functioning and economic self-sufficiency (p. 403). Finally, they found that "the available evidence does support better criminal justice outcomes (whether re-arrest or reincarceration) for participants in programs based on either the ACT or [intensive case management] model" (p. 404).

28.    Morrissey et al. (2007) also lay out evidence on the effectiveness of ACT and other community treatment programs. For example, they discuss the Substance Abuse and Mental Health Services Administration jail diversion study where detainees were diverted to forensic intensive case management services in the community (p. 536). Two years later, diverted individuals reported "more days in the community, more service use, and fewer jail days than did the non-diverted comparison groups" (p. 536).

29.    While the effectiveness of community-based treatment has been proven, it is true that certain people will choose to resist community treatment. Smith et al. (2013) interviewed people with mental illness who were recruited between July 2010 and October 2011 from the New York City Mental Health Care Monitoring Initiative, "a quality assurance project designed by New York City and State mental health oversight agencies to better understand service gaps and engagement opportunities for individuals with serious mental illness" (p. 771). They found that people with serious mental illness and providers differed in their reported reasons for disengagement (p. 770). Individuals with serious mental illness reported that the reasons for their disengagement with mental health services included that the services were not relevant to their needs, that they were unable to trust providers, there was a lack of continuity with providers, and they believed they were not ill (p. 772-73). On the other hand, providers cited other common reasons for disengagement, such as lack of insight, stigma, and language and cultural barriers (p. 773-34).

30.    Having identified these very different reasons for disengagement on the part of the recipients and providers of mental health services, Smith et al. (2013) found it was possible to administer community-based treatment programs in a way to promote participation. Smith et al. grouped strategies for increasing engagement in treatment services into a framework of acceptable, accessible, and available services. *Acceptable services* reflected a partnership model that fosters support and instills hope, and that was caring and non-critical; *accessible services* minimized barriers related to transportation and intake procedures; and *available services* addressed recovery needs in addition to treatment of general medical and psychiatric problems (p. 773). "Individuals felt engaged when they perceived that their provider was listening carefully, valued [their] overall well-being, and supported a strengths-based partnership" (p. 774). Each of these concepts is entirely consistent with the community-treatment model described by Stein, Diamond & Factor (1990) (discussed *supra* at ¶ 23).

31.    In sum, then, these studies support my conclusion that available and accessible community-based treatment services decrease the risk of institutionalization for people with serious mental illness.

      **2.**     **Stable housing helps people with serious mental illness remain in the community, while unstable housing and homelessness can have deleterious effects.**

32.    Consistent with my experience in treating patients, there is also powerful evidence from the literature that for people with serious mental illness, the lack of stable housing—and its extreme of homelessness—is a serious impediment to living a stable life in the community. I use the term "stable housing" in this report to mean adequate housing that serves as a long-term residence such that residents have confidence they will not have to move frequently or unexpectedly. Community-based mental health housing is a type of stable housing. As discussed below, the lack of stable housing is associated with the risk of hospitalization and re-hospitalization, as well as of incarceration. In contrast, evidence shows that access to stable housing and community-based services for people with serious mental illness is associated with a positive outcome through the reduction of the risk of re-institutionalization.

33.    Drake et al. (1989) concluded that residential instability and homelessness were associated with risk of rehospitalization. "Homelessness denotes both lack of adequate shelter and disaffiliation from other people and social institutions" (p. 46). "Homelessness is an extreme on a dimension of residential instability," and "patients who live in substandard housing and move frequently are especially vulnerable to homelessness." (p. 47). In a prospective one-year follow-up study, Drake et al. (1989) compared patients with serious mental illness who were homeless to similar patients who had stable housing. Homeless patients had a much higher rate of rehospitalization (p. 49). While this confirmed their hypothesis, what they found surprising was that homeless patients had a higher rate of refusing treatment but nonetheless were willing to be admitted to the hospital (p. 50). Drake et al. attributed this to these patients viewing the hospital as "a living alternative that provided basic amenities rather than as a treatment facility" (p. 50). They thus concluded that among people with serious mental illness, "residential instability is related not only to homelessness but also to hospital readmissions" (p. 47).

34.    Studies also show that homelessness and incarceration can go hand in hand. McNiel et al. (2005) reviewed data on jailed persons in San Francisco. They found that "[p]eople who were homeless and who were identified as having mental disorders, although representing only a small proportion of the total population, accounted for a substantial proportion of persons who were incarcerated in the criminal justice system" (p. 840). Moreover, Greenberg and Rosenheck (2008) found that "recent homelessness was 7.5 to 11.3 times more common among jail inmates than in the general population. *Homelessness and incarceration appear to increase the risk of each other*, and these factors seem to be mediated by mental illness and substance abuse, as well as by disadvantageous sociodemographic characteristics . . . . People with severe mental illness may be less able to cope with the stresses of homelessness or may perpetrate criminal acts that are manifestations of their illness" (p. 170) (emphasis added).

35.    Studies also show that unstable housing can affect many facets of a person's daily life. From the data set I referenced above based on interviews of participants in the New York City Mental Health Care Monitoring Initiative (Smith et al., 2013) (*see supra* ¶¶ 29-30), another researcher noted, "in describing experiences where discharge led to periods of unstable housing, clients spoke about how unstable housing situations had a rippling effect that impacted other parts of their lives; clients reported using drugs again, failing to attend mental health services (even

when mandated), and violating parole. For example, one client noted that when his brother changed his mind about allowing the client to live with him, 'I just started using [drugs]. I gave up.' A different client reflected on the conundrum of being on parole and having no place to live: 'When I left I had nowhere to go, so I just said, 'You know what, I can't do parole and have nowhere to go, you have to have a steady address on parole, I guess I'm not going to do parole no more, and I'm just going to live day to day on the streets,' and that's what I did'" (Pope et al., 2013, p. 451).

36.     Though maintaining sufficient quantities of stable housing is necessary, it is not on its own sufficient to ensure positive outcomes for individuals with serious mental illness who may need proper education and follow-up to take advantage of offered housing. Again from the data set of the New York City Mental Health Care Monitoring Initiative (Pope et al., 2013), some participants reported that they had trouble utilizing mental health services and housing even in cases where it was offered, and regretted that decision. A 24-year-old man in the study described how "he had been linked to a program that provided housing but did not go because it would have meant living apart from his family: 'They gave me a place, but I never went because I wanted to stay with my baby's mom and my daughter. But [living with them] didn't work. So I should have went. That's the one thing that I regret . . . because there was a lot of good opportunities, yeah. But I shot it down.' A 31-year-old male client sounded similarly regretful that he had not followed through on services: 'I didn't really take their offer . . . . I should have looked into it. I really should have because maybe the resources would have been good. Maybe they wanted to help me. I'm more open to it now.' In each of these cases, an initial lack of engagement (because of a concrete reason such as family or a more general admission of apathy) was later replaced by a more open attitude toward services" (p. 451).

37.     The study by Pope et al. (2013) demonstrated that clients with serious mental illness, particularly those with a criminal justice background, "may face additional barriers to treatment and housing because they are assumed not to want such services," especially if they decline it in the first instance, and "because providers admit lingering prejudice against working with them" (p. 454).[6] The fact that some participants regretted the decision not to follow up with mental health or housing services suggests that "individuals with serious mental illness may need more direct service connections and more flexible arrangements to follow through with treatment" (p. 453).

38.     In conclusion, these studies concerned people with serious mental illness who had stable housing, or the lack thereof. Consistent with my own clinical experience, the studies confirmed that having stable housing was associated with better engagement in treatment and reduced likelihood of hospitalization, incarceration, and institutionalization. Making stable housing available, and understanding the reasons why an individual might decline housing in the first instance even if it is what they ultimately want, is foundational to the success in the community of a person with serious mental illness.

---

[6]     In light of the reported prejudice of some providers and regarding the training of providers, Pope et al. (2013) noted that the reflections from three individuals who spoke about their positive interactions with mental health providers in jail and prison suggest that building therapeutic relationships while incarcerated can be a meaningful experience. (p.453). Accordingly, it is important that providers in the criminal justice system understand the role they may play in predicting future mental health and housing service utilization in the community.

**B.    Lack of community services and housing increases the likelihood of hospitalization or incarceration among people released from prison with serious mental illness.**

39.    Though there are fewer studies specifically focused on the population of persons with serious mental illness after their release from prison, the ones that do exist suggest that the same concepts described above apply. Community services, like ACT or FACT,[7] and stable housing reduce the risk of institutionalization such as hospitalization and re-incarceration. For example, formerly incarcerated participants in Seattle's FACT program "significantly decreased their amount of time institutionalized as measured by combined days in jail, prison, or inpatient psychiatric hospitals, including a 45% reduction in jail and prison bookings" (Liebowitz et al, 2014, p. 7) (internal quotations omitted).

40.    Despite the stigma that people with serious mental illness, especially those who are formerly incarcerated, are simply more prone to commit violent crimes, the studies in this section show that services and housing greatly impact the likelihood that they will be incarcerated or hospitalized. For example, Dvoskin et al. (2020) wrote, "[d]espite a great deal of rhetoric associating [persons with serious mental illness] with violent crime, this alleged association is consistently belied by research data. That being said, there are other, predictable consequences of undertreated psychosis, including homelessness, living in distressed and often violent neighborhoods, unemployment, hunger, and victimization; all of which are well known criminogenic factors . . . . A host of examples have proven that most people with SMI [serious mental illness] can live safely in the community if they have access to housing, necessities, as well as varying levels of support, structure, scrutiny, supervision, and services, but only to the degree that they are actually necessary. For example, the best community mental health care costs much less than a state hospital bed or a jail or prison bed for a person with a mental disability. One good example is Forensic Assertive Care Teams, which provide high intensity treatment and case management for people with SMI who have been involved in the criminal justice system . . . . Homelessness is especially pernicious and contributes to poor clinical outcomes and increased likelihood of crime" (pp. 642-43, 647).

41.    Without suggesting that mental health services and housing can be entirely divorced from one another, in the discussion below I first present the literature related primarily to community services for this population, and then the literature related primarily to stable housing. The sum of these studies shows that lack of community-based mental health services and stable housing can cause or increase the risk of incarceration or hospitalization for people with serious mental illness who were formerly incarcerated.

---

[7]    Forensic Assertive Community Treatment ("FACT") functions similarly to ACT, but it takes into account the needs of persons with serious mental illness who are released from prison. In 2019, the Substance Abuse and Mental Health Services Administration issued an Action Brief on FACT, in which they wrote that "the small number of evaluations conducted so far show that **FACT can favorably impact clients' functioning and criminal justice-related outcomes** (e.g., reduced hospital use and homelessness; improved quality of life; reduced    recidivism    and    probation/parole    technical    violations)"    (accessed    at https://store.samhsa.gov/sites/default/files/d7/priv/pep19-fact-br.pdf) (emphasis in original).

1.    **Available community-based services reduce the risk of institutionalization for previously incarcerated people with serious mental illness.**

42.    In this section, I summarize the literature related to whether the availability and accessibility of community treatment services for people who were formerly incarcerated impacts the risk of institutionalization. As the studies show, available and accessible community treatment services reduce the risk of institutionalization for this population.

43.    In a review article, Stewart et al. (2022) found "[e]leven of 13 studies reported a reduction in criminal justice involvement among participants exposed to community mental health services compared to a comparison group" (p. 635). The review concluded that "utilization of community mental health services after release from jail or prison can improve criminal justice outcomes for people who use illicit drugs and have mental illness . . . . [The] findings suggest addressing gaps in service coverage and facilitating acceptable and convenient pathways to access existing community mental health services could play a key role in supporting successful community transition and avoidance of reincarceration . . . . Studies analy[z]ing the effectiveness of tailored criminal justice transitional support programs and case management also demonstrated largely positive results; seven of the eight studies in this group reported a reduction in criminal justice involvement following exposure to a tailored community mental health intervention . . . . Results support the effectiveness of community mental health service contacts in reducing future criminal justice involvement among these groups" (pp. 635, 649, 651).

44.    Baillargeon et al. (2009) collected data on over 79,000 incarcerated people in the Texas prison system. They noted that "many people with serious mental illness move continuously between crisis hospitalization, homelessness, and the criminal justice system . . . . In addition to diversion strategies, the implementation or expansion of discharge planning or continuity of care programs for mentally ill inmates who are about to be released appears warranted. Ideally, such programs should link released inmates with **long-term, community-based outpatient services to help them manage their mental health problems and reduce their risk of recidivism**" (pp. 106, 108) (emphasis added). This study highlights the risks of lack of community-based services, while identifying sufficient access to such services as a solution.

45.    A comprehensive report from the ACLU of Southern California and the Bazelon Center for Mental Health Law found that individuals with serious mental illness who received ACT, supportive housing, and supported employment post-release had significant reductions in re-institutionalization (Liebowitz et al. 2014, p. 4-5). The report further found that, while recidivism rates among incarcerated people with mental illness were alarming—with one study showing that 95% of incarcerated people with a mental illness in L.A.'s jails had records of prior offenses—utilization of community services significantly reduces the likelihood of recidivism (Liebowitz et al., 2014, p. 7).

46.    Leutwyler et al. (2017) presented an insightful piece of qualitative evidence that case management is effective in reducing recidivism. They performed a case study of a 61-year-old man with previously untreated mental illness who was released from prison after serving an 18-year sentence. Effective case management helped with his successful transition out of prison and into the community. This man said that the case management program "helps get a little more

structure in my life. It helps me cope with staying clean and sober so I'm not medicating myself" (p. 169). Describing his case manager's response to his having missed his weekly appointment a few times, he said, "She asked why. I said I feel depressed. She says 'So when you feel depressed, come here and we'll work through it . . . . When you feel like you hear the voices and get paranoid or something, just come to the center. Come to the center. And socialize with people. Don't worry about it, and if you feel like you're going to act out, just call one of us'" (p. 169-70). He said, "I just thank God for [my case manager]" (p. 169).[8]

47.    Liebowitz et al (2014) included a discussion of programs in various regions, including New York, that used forms of community treatment programs and supportive housing to transition people with mental illness from prison to the community, further showing the effectiveness of community-based services for people released from prison. For example, the Nathaniel Project in New York City, which utilizes ACT, supportive housing, and supportive employment for individuals convicted of felonies, has shown "a 70[%] reduction in the mean number of arrests for participants in the two years following program admission compared to the two years before" (p. 5). Similarly, the Thresholds' Justice Program is a post-release program implemented in two Illinois' state prisons and the Cook County jail. Based on ten years of data, participants in the Thresholds program "demonstrated an 89% reduction in arrests, 86% reduction in jail time, and 76% reduction in hospitalizations among its participants. Thresholds participants live independently, reconnect with family, work, go to school, and report decreased symptoms of mental illness and decreased substance use" (p. 5). Miami-Dade County's diversion program, which has access to ACT and supportive housing, has likewise reduced recidivism among misdemeanants from 75% to 20% for program participants (p. 7).

48.    Lamberti (2007) discussed how programs to minimize recidivism should employ basic principles of comprehensive and assertive community treatment that I have discussed previously in this report. "Treatment and support services should be delivered in as comprehensive and integrated a manner as possible to minimize the fragmentation of care that is experienced by many patients in community settings . . . . [P]atients should not be prematurely discharged from necessary services because of non-adherence. Crisis services, including outreach, should be available around the clock to ensure access to care on evenings and weekends, times when problem behaviors typically emerge. Coordination of mental health and criminal justice services is also important in order to provide access to care for patients who move between systems. When patients are released from jail, access to community services can be enhanced by ensuring that patients are enrolled in Medicaid" (p. 777).

49.    Parisi et al. (2022) reviewed the literature on interventions for criminal recidivism for persons with serious mental illness and found that "[o]nce involved in the criminal justice

---

[8]    The man also described the powerful effects of a good therapeutic alliance between a client and a mental health professional: "[Working with my case manager] makes me . . . feel comfortable . . . . And by me feeling comfortable, my mental condition is better. But when I feel like I'm out here all alone, I ain't got nobody to talk to about something, I want to alienate myself more and just get more depressed. But I don't do that . . . . Every time I go out there, I see somebody talking to themselves. Why he's a nut. You know, no, he's not a nut. The man just got nobody to talk to . . . . He needs to get it out, because I did that once – he needs – they need to reach out to someone that's going to be understanding, that's going to make them feel real comfortable and cared for, I mean, there's an opening to make a better person out of that person" (Leutwyler et al., 2017, p. 170).

system, individuals with serious mental illness – and particularly those with co-occurring disorders – recidivate sooner and more frequently than do their counterparts without mental illness. Persons with serious mental illness are 1.5 times more likely to be incarcerated than to be hospitalized for treatment of their psychiatric disorder, suggesting that many are located within the criminal justice system rather than in mental health treatment settings . . . . [P]articipants who received FACT report[ed] less use of emergency mental health services after participation in the program" (pp. 897, 907). They concluded that "interventions were associated with improvements in recidivism, violence, and criminogenic risk factors" (p. 897).

50.     While community-based mental health treatment in general can create better outcomes for people with serious mental illness who are released from prison, certain types of treatment, including peer support, are particularly effective or, in some cases, necessary. In her review of community strategies to mitigate the risk of recidivism, Pinals (2015) discussed how "[t]reatment planning for this complex population" of individuals with mental health and substance use disorders who have criminal justice histories, and who may include a subset of individuals at risk of aggression or violence "should examine the key criminogenic risks and needs, as well as responsivity factors that can create barriers to positive outcomes. Trauma-informed approaches and peer support can foster engagement and ongoing connections to services and provide positive role modeling" (p. 248).

51.     Indeed, Rowe et al. (2007) studied the benefits of peer support in working with formerly incarcerated persons with serious mental illness. They assigned each participant to a peer mentor (p. 957). Each peer mentor had a serious mental illness, and half had a history of substance misuse. Some also had a criminal justice history. The work they did together included group "citizenship training" relating to "social participation and community integration" (p. 955-56). Compared to a control group without peer support, the participants who worked with peer support staff showed a reduction in alcohol use (p. 959). This is important because people are more likely to experience recidivism if the challenges of drug and alcohol use are not addressed (Malik-Kane & Visher, 2008, p. 1; Stahler et al., 2013, p. 4).

52.     Moreover, Bellamy et al. (2019) reported very substantial reduced recidivism for a group of people following release from prison who utilized a forensic peer support program (p. 196). Peer support workers helped incarcerated people navigate the discharge and reentry process (p. 191). After release, the peer mentors also helped individuals connect with their communities, access treatment and support services, and assist with common reentry difficulties such as social and financial challenges (p. 191).

53.     In sum, the studies in this section[9] support my finding that access to effective community treatment reduces the risk of institutionalization among the population of people with serious mental illness who were previously incarcerated.

---

[9]    *See also* the studies described in Section IV(C) that further support this conclusion and are based in New York.

2.    **Lack of stable housing increases the risk of institutionalization for previously incarcerated people with serious mental illness.**

54.    In this section, I summarize literature related to whether the availability and accessibility of stable housing impacts the risk of institutionalization for people who were formerly incarcerated. Stable housing is one of the key aspects of successful reentry to the community for people with serious mental illness. The flip side of that is that lack of stable housing increases the risk of institutionalization. For example, Hawthorne et al. (2012) found that the "[m]odifiable factors affecting incarceration risk include homelessness," as well as "substance abuse, lack of medical insurance, and timely receipt of outpatient or case management services after release from incarceration" (p. 26). In this section, I focus on the impact of housing for people after their release from prison, with studies demonstrating that community treatment services are needed alongside housing.

55.    Pleggenkuhle et al. (2016) noted that "[m]uch of the literature evaluating transitions from prison to the community link stable housing to decreased recidivism, improvement in employment prospects, and enhanced opportunities to build a foundation for positive social relationships" (p. 381). They explained that people require "instant housing attention" upon release from prison (p. 381). They further noted that when clients perceive housing as non-permanent, they associate this with instability, frustration, and anxiety in the parole process, and with less attachment to their housing situation (p. 387). In contrast, participants in a voluntary housing program in St. Louis, called Solid Start, felt "confident and secure in their current residence, and all but one of the Solid Start parolees expressed intent to continue living in the same residence after the program was completed" (p. 388). They noted that results from this study "suggest that the provision of housing not only facilitated feelings of stability and independence, it also influenced cognitive shifts in commitment to change and hope for the future for those in the Solid Start group" (p. 392).[10]

56.    Haimowitz (2004) discussed different reentry programs for people with mental illness. Among many elements I have already discussed, he noted that "released offenders with mental illness often quickly experience the homelessness and behavioral problems that lead to reincarceration," and that "unsuccessful reentry significantly compounds the offender's problems and is extremely costly to the community" (p. 373). He described several effective programs for formerly incarcerated people around the United States (including the *Brad H.* settlement in New York City, which requires the City to provide discharge planning services and continued mental health care after release for certain people), and further noted that successful programs feature "assertive community treatment and integrated treatment for co-occurring mental and substance use disorders" (p. 374).

---

[10]    Notably, the Solid Start program facilitated peer support groups made up of people with similar experiences (Pleggenkuhle et al., 2016, p. 389-90). The support groups focused on ways to stay out of prison. A key benefit of this program was to help individuals move away from having friendship networks that were criminogenic and create new networks of peers with the same goal of staying in the community. The connection between having criminogenic peers and criminal behavior is well documented (Warr, 1998, p. 212), which underscores how crucial these positive peer support groups can be.

57.     The literature also shows that interventions that increase stability, including adequate housing and community-based treatment services targeting, among other things, substance misuse and how the person spends time, are associated with reduced recidivism. Bonta et al. (1998) conducted a meta-analysis to examine whether the predictors of recidivism for offenders with serious mental illness were different from predictors for non-disordered offenders. They found that "an established pattern of criminal activity was one of the best predictors of criminal behavior in mentally disordered offenders, as it is for other groups of offenders," and that "[s]ocial psychological theories suggest that the most effective programs for reducing recidivism are those that target needs closely related to criminality, for example, procriminal attitudes, criminal associates, and *unstable lifestyle*" (p. 138) (emphasis added). They further reference "findings that family problems, *poor living arrangements*, and substance abuse were all related to recidivism" (p. 138) (emphasis added). Thus, when formerly incarcerated persons with serious mental illness are denied integrated housing and supportive services to address those factors, their risk of institutionalization increases.

58.     In a paper describing the state of post-incarceration management of persons with serious mental illness, Lamb and Weinberger (2014) wrote that "an important modality that enables persons with SMI [serious mental illness] to live successfully in the community is structure . . . . In our opinion, one of the most important deficiencies for those who do not respond successfully to community treatment is the failure to provide sufficient structure . . . . [W]e may very well be consigning some persons with SMI to the criminal justice system, not because they have criminal characteristics, but because of inadequate treatment" (pp. 492, 494). Foundational to the idea of "structure" is "housing that is adequate," including "24-hour supportive housing" (p. 492-93).

59.     Barrenger et al. (2017), who studied formerly incarcerated people and the idea of structural interventions, found that "individuals quickly encountered obstacles to successful community reintegration through restrictive public policies, discriminating employers, and few resources from which to draw on to build a new life. These structural factors may work in tandem with individual or interpersonal factors to heighten risk as men become thwarted by the obstacles and return to previous criminal ways" (p. 890). They commented that Pleggenkuhle et al. (2016), discussed above at ¶ 55, had found that "housing contributed to feelings of stability, a sense of agency, and a commitment to change, showing a potential link between structural interventions and community tenure for those recently released from prison. We may need just such a shift in perspective within mental health and criminal justice services research to impact reincarceration within this population" (Barrenger et al., 2017, p. 891).

60.     In a cohort study of 4,704 people released from a Canadian correctional mental health service followed for several years after release, Jones et al. (2021) found that "homelessness was associated with significantly higher rates of reincarceration and was significant in defining the high-frequency service user group while adjusting for other variables. The 2-way cycle of homelessness and jail has been well-documented. Incarceration has the effect of reducing employability and fragmenting relationships with family and social ties, while homelessness can lead to 'crimes of desperation' and exposure to aggressive policing of trespass or vagrancy offenses. " (pp. 565). They concluded that the primary targets of intervention for people who were released from prison should be: (1) effectively treating those with serious mental illness and/or

who engage in substance misuse, particularly those using stimulants, and (2) providing stable housing (p. 566).

61.    In sum, then, the available evidence clearly shows that access to stable housing and community services reduces the risk of being institutionalized, including hospitalization and reincarceration, among formerly incarcerated persons with serious mental illness. The other side of that coin is that lack of access to stable housing and community services creates a serious risk of institutionalization.

### C.    New York State already has programs and structures in place that operate successfully for the populations who are able to access those services.

62.    There have been a number of studies based in New York State that highlight the positive impact and, often, necessity of ACT and other supportive programs. Indeed, the work done by Smith et al. (2013) and by Pope et al. (2013), that I discussed above, focused on ways to maximize community treatment, including accessibility and availability (*see supra* ¶ 29-30, 35-37). Thomas E. Smith, the lead author on the Smith et al. study, is the Chief Medical Officer for OMH (OMH: "About Our Executive Team").

63.    New York has had evidence for more than 20 years that systems centered on community treatment for persons with serious mental illness upon release from prison create successful outcomes. The Gold Award is given annually by the American Psychiatric Association to a model program that has made an "outstanding contribution to the mental health field" and that has "overcome obstacles presented by limited financial or staff resources or other significant challenges" ("Project Link," 1999, p. 1480). The 1999 recipient was Project Link, "a university-led consortium of five community service agencies in Monroe County, New York, dedicated to preventing repeated incarceration and hospitalization of persons with severe mental illness and promoting their reintegration into the community." It applied the concepts of assertive community treatment and holistic, multi-team programming to prevent re-institutionalization (p. 1477).

64.    The results of Project Link were impressive. In its first year, it worked with 23 people who were on parole or probation at the time of enrollment, and charges were pending for an additional five people. Twenty people had previous felony convictions. "Compared with the year before enrollment in Project Link, the mean number of days spent in jail per month for the group of 46 dropped from 9.1 to 2.1 per person, and the mean number of hospital days per month dropped from 8.3 to 0.3. Significant reductions were also noted in the total numbers of incarcerations and hospital admissions for the group" (p. 1479).

65.    Project Link also resulted in a reduction of the "average monthly jail costs for the entire group from $30,908 to $7,235, or from $672 to $157 per person. Average monthly hospital and outpatient costs, including costs for services provided by Project Link, dropped from $197,899 to $42,247 for the group, or from $4,302 to $918 per [person]. [Participants'] ratings of their satisfaction with the program yielded a mean of 4.6, with 5 indicating the highest level of satisfaction. In addition, 35 of the 46 participants reported that Project Link helped them cut down on their use of illegal drugs and alcohol. No assaults, suicide attempts, or other reportable incidents have occurred in the group of 46 participants since their enrollment in Project Link" (pp. 1479-80).

66.    In their report on Project Link, Lamberti et al. (2001) explained how "persons with severe mental illness, addiction, and treatment non-adherence can essentially 'disappear' into a Bermuda Triangle-like void that often exists between hospitals, jails, and the streets. These domains can be understood as representing healthcare, criminal justice, and social service systems respectively. Although most urban communities offer a variety of services for such individuals within each system of care, the systems tend to operate independently of one another" (p. 65).

67.    In contrast to Project Link's successful approach to community services, Lovell et al. (2002) studied a group of mentally ill offenders released from prison in Washington State who largely did not receive clinically meaningful services after their release. For example, only "[f]ifty-two percent of the study subjects received cash assistance, and 50% received community mental health services in the first year, but only 25% received steady cash assistance – that is, during nine or more of the first 12 months after release – and [only] 16% received steady community mental health services. Only 5% received steady drug and alcohol services during this period…. Typically, however, subjects received only two to five hours per service month (58 cases)" (p. 1293). This level of service was almost certainly insufficient to support these formerly incarcerated people with serious mental illness. The result was a high rate of recidivism and re-institutionalization.

68.    As another example, Selling et al. (2015, p. 7) described a program to treat substance abuse in the New York City jail system. The program "work[ed] collaboratively with courts, security officials within the jail, and community programs to identify inmates who have substance abuse concerns and provide in-jail programming and coordination of treatment after jail. An evaluation of [the program's] participants revealed that they experienced a lower rate of reincarceration after their program participation than they did before participation" (p. 7). The engagement with effective community services following discharge contributed to that reduced rate of institutionalization.

69.    The conclusion of the sum of these studies is that when effective, evidence-based post-release treatment directed toward establishing stable housing, reducing psychiatric symptoms, and reducing substance misuse, namely CBMHHSS, is in place, people with serious mental illness experience much less hospitalization and much less criminal recidivism. That is, they experience much less re-institutionalization. Conversely, the lack of CBMHHSS results in more institutionalization.

## V.    THE DISCHARGE CLASS NAMED PLAINTIFFS HAVE BEEN PLACED AT SERIOUS RISK OF INSTITUTIONALIZATION DUE TO LACK OF NECESSARY SUPPORTIVE SERVICES AND STABLE HOUSING.

70.    In this section of my report, I answer Research Question B related to whether W.P., D.H., and S.D. have been placed at serious risk of re-institutionalization due to DOCCS and OMH failing to provide them with stable housing and/or community treatment services. I conclude that all three Discharge Class Named Plaintiffs were found to be eligible for CBMHHSS but did not receive such housing and/or services. They have therefore been placed at serious risk of re-institutionalization.

71.    I based this conclusion on the following: (1) a review of the mental health records of W.P., D.H., and S.D. produced in this litigation and provided to me by counsel; (2) the deposition transcripts of each Discharge Class Named Plaintiff; (3) my interview with each of the three Discharge Class Named Plaintiffs to discuss their experience with DOCCS and OMH services; (4) my clinical experience working with people with complex needs in the community; (5) my experience studying, publishing, and working with ACT and other community services for people with serious mental illness, and (6) my review of the literature discussed above.

72.    Each of the three Named Plaintiffs experienced failures of many of the essential elements I described at the beginning of the Literature Review in Section IV (*see supra* ¶ 18).[11] Each of these Named Plaintiffs has been denied both stable housing and the necessary community services, and as a result has been placed at a serious risk of institutionalization. Below I describe key facts and findings supporting that conclusion.

**A.    W.P.**

73.    I conclude that W.P. was placed at serious risk of re-institutionalization after each of his releases from prison due to a failure by the state to provide stable housing and necessary mental health services. This risk was realized by his 2022 incarceration and was renewed upon his release. In forming this opinion, I interviewed W.P. on November 28, 2022, over Zoom. I also reviewed relevant mental health records, identified in Appendix B, the transcript from his November 10, 2022 deposition, and other materials listed in Section III.

74.    By way of brief background, W.P.'s history of mental health treatment began at age 6 (*see e.g.*, D-00005666). He received and relied on mental health services while first incarcerated for arson and lesser charges from late 1995 to early 1998 (D-00005795; Dep. Tr. 28:15-23). Nevertheless, W.P. said in his interview that he did not receive any mental health or housing services after release following his first incarceration in early 1998. He was re-arrested twice in mid-1998 (D-00005794) and served brief sentences. He was again arrested in fall 1998 (D-00005793-94) resulting in his lengthy prison term.

75.    Before his release from DOCCS custody in 2019, OMH identified W.P. as an individual with a serious mental illness and designated him with the mental health service level of 1-S, the highest level of mental health need in the state prison system (D-00005789). OMH made this determination long before his release (D-00010379). OMH also requested community-based mental health housing and supportive services for W.P., and he was ultimately deemed eligible for both (D-00122602-08). Despite this, DOCCS and OMH failed to provide him with mental health housing and sufficient services upon his release in 2019, placing him at serious risk of re-institutionalization. In my opinion, this contributed to his incarceration in 2022.

76.    W.P. noted that the 2019 discharge process felt like a "rush job" (Dep. Tr. 77:22), including because OMH arranged for a housing interview mere weeks before his release (D-00010442). He explained in his interview that he was offered a shared apartment, but that no information was given to him about who his roommates would be, including whether they had any history of violence, drug use, or being a sex offender. (*See also* Dep. Tr. 75:5-14). W.P. said he

---

[11]    The specific elements that I identify for each Named Plaintiff in this section appear in bold font.

declined the one housing offer he received out of fear of an unknown and potentially dangerous roommate, and to avoid a conflict-rife environment, given the nature of his mental illness. Due to that one rejection, W.P. was consigned to the homeless shelter system. He has been homeless since 2019 and currently does not receive mental health services on site at the homeless shelter, according to his interview.

77.    W.P. was denied many of the elements I listed above that are essential to success in the community for people with serious mental illness released from prison. First, W.P. was not offered **stable housing**. Because W.P. was released into homelessness, he has experienced instability, lack of privacy, and lack of security. In his deposition, W.P. described his current shelter as "filthy" with "a lot of problems with safety," (Dep. Tr. 44:19, 46:21-22). He described a past shelter as having "vomit all over the floor" and "drug needles." (Dep. Tr. 36:23-24). And when he was arrested and reincarcerated in 2022, he told me it was due to an incident at a homeless shelter. And as of the day of our interview, W.P. had learned his shelter was changing ownership and he had no way to know whether he would be abruptly moved to another location. It is my opinion that denying W.P. stable housing, particularly mental health housing, has placed him at serious risk of institutionalization.

78.    As stated above, beyond stable housing, access to a **single occupancy residence** can be necessary for people with serious mental illness, particularly schizophrenia and other psychotic illnesses. In W.P.'s current shelter, he does in fact have a single room (Dep. Tr. 44:3), which he told me in the interview he likes having. Of course, that does not outweigh the effects that negative, dangerous, and unstable aspects of shelter housing have on mental health. But still, it will be important to W.P.'s success in the community to ensure he has either single-room housing or lives with people he feels comfortable with. In our interview, he said that he would be open to living in a shared apartment if he could confirm that the roommates were safe and would not cause him to return to jail, but that he "feel[s] safer in a single." This sentiment was reflected in his deposition transcript as well, where he said the reason he turned down a shared housing situation was because he was not given information on who the roommates were, and "I'm not trying to hurt nobody, I'm not trying to get hurt. It's not going to work. I don't feel safe." (Dep. Tr. 75:11-14). In our interview, he described shared living situations that involve people with serious mental illness, criminal histories, and drug abuse behaviors as a "ticking time bomb." Therefore, the fact that W.P. continues to be denied either non-shelter single occupancy residency or information on safe, productive shared living arrangements contributes to his serious risk of re-institutionalization.

79.    W.P. did not and does not have **access to crisis services with outreach available 24/7**, a necessary element for success in the community. This element is especially important to a person with W.P.'s diagnoses, which can create acute periods of crisis or conflict. W.P. is engaged with a FACT team (P-MEDICAL-0007745), which offers a 24/7 hotline. But this element for success includes that the crisis services need to have *outreach available*, that is, in-person when necessary. During his interview he explained that he would like to reside in a location with mental health staff on-site, so that should he need to vent or just talk with staff to avoid getting into an interpersonal conflict, he would know that someone would be available to him. He believed that had such a person been available to him, he would have been able to avoid the conflict that led to him being sent to Rikers in 2022. As discussed, engagement with ACT services, like FACT, is of the highest importance, but having supportive services accessible and available 24/7 is equally essential, particularly during transition periods.

80.     Pre-release **re-enrollment for SSI benefits** allows formerly incarcerated people to have money to live on once released, and having money is a necessary element to success in the community. W.P. was told that he would need to work on an SSI application with his clinician (see D-00010440). As a result, he did not receive SSI for several months following release (see P-MEDICAL-0007745, P-MEDICAL-0007785) and was forced to borrow money. Needless to say, a lack of financial resources impacts physical and mental health, as well as one's ability to secure housing on their own.

81.     There was also a lack of **effective coordination** between the shelter system and W.P.'s FACT team, even though effective coordination between systems is an essential element for helping people remain stable in the community. When W.P. was abruptly moved from a hotel in Manhattan in which he had a single room to another hotel in Queens sharing a room, his FACT team member was not consulted (P-MEDICAL-0007866-67). W.P. has fortunately utilized many services his FACT team offers, but failure of the systems to coordinate has seriously impacted his access to appropriate and stable housing.

82.     Finally, W.P. explained during his interview that he has not received **peer support**, at least for the duration of the pandemic, even though this is an important element for helping people remain stable in the community.

83.     W.P. said many times during my interview that his primary goal is to stay out of prison, and to do so he needs stable housing outside of the shelter system and sufficient mental health services. DOCCS and OMH knew or should have known about his needs, and currently know or should know about his needs. It is my opinion that because he still has not received stable housing or the on-site, community-based mental health services that he needs, he is at a serious risk of re-institutionalization.

**B.     D.H.**

84.     I conclude that D.H. was placed at serious risk of re-institutionalization after each of his releases from prison due to a failure by the state to provide stable housing and necessary mental health services. This risk was potently realized by his 2020 re-incarceration, and revived upon his release. In forming this opinion, I interviewed D.H. on December 9, 2022, over Zoom. I also reviewed relevant mental health records, identified in Section III Materials Considered, the transcript from his November 17, 2022 deposition, and other materials listed in Section III.

85.     D.H. first became involved with the criminal justice system at age 14, with multiple arrests since then (D-00006278). Most of his arrests have been for drug-related offenses, as well as for larceny; he also has an arson conviction (D-00006713-27; D-00006365). He has been diagnosed with schizoaffective disorder and substance use disorders, including for marijuana and cocaine use; he also has reported a history of heroin use. (D-00009395; D-00006291). Following at least one of his arrests in 2012, he was psychotic to the extent that two psychiatrists "found him incompetent to proceed with criminal charges," so he received treatment and was released. (D-00006282). While in DOCCS custody, OMH identified D.H. as an individual with a serious mental illness and designated him with the mental health service level of 1-S, the highest level of mental health need in the state prison system. (D-00006221).  OMH requested community-based mental

health housing and supportive services for D.H. (MG-Class00024981-82), and he was ultimately deemed eligible for both (MG-Class00024987).

86.    Despite his clear history of psychiatric disorders, DOCCS and OMH failed to provide D.H. with needed housing and services after each release. There appears to have been a preference for repeated punishment rather than treatment. For example, a pre-sentence investigation report in 2014 stated that "[t]he defendant was not successful on juvenile or adult probation and is presently in need of a punitive sanction" (D-00006283). I conclude that the failure to recognize or, more likely, heed the obvious need for mental health housing and supportive services repeatedly placed D.H. at serious risk of re-institutionalization.

87.    Again focusing on the elements I listed above, D.H. was not offered **engagement with ACT**, though this is an essential element to stability for those persons with serious mental illness who require the highest level of support in the community. Unfortunately, D.H.'s history of circulating between periods of instability in the community without adequate treatment and then becoming more stable when institutionalized in prison or psychiatric hospitals is a familiar pattern for many. This revolving-door is a standard indication that ACT engagement is necessary. On multiple occasions, OMH staff wrote that D.H. would require treatment and support in multiple modalities to be successful (see e.g., D-00006707-8), yet he did not receive these. There are multiple notes of staff trying to make "clinic appointments" for D.H. (see, e.g., D-00009819), even though what he required was direct engagement with ACT, which would have avoided care being lost to not making or keeping appointments, or bureaucratic impediments. For example, when a nurse at Sullivan Correctional Facility tried on December 17, 2018 to get even a clinic appointment, he was told there was nothing available until the following March (D-00009427).

88.    As another powerful example, when D.H. was being prepared for discharge from prison in May 2019, his clinician, a masters-level social work supervisor, wrote, "The importance of following up with his mental providers was discussed with [D.H.] and his upcoming mental health appointments in the community were reviewed" (D-00009520). In other words, the plan for his release was to simply put the burden on D.H. to manage his own care despite his history of inability to do this successfully, of instability and crises, as well as lack of resources affecting his ability to manage his own care. While education is a key aspect of care, this report has shown that people with serious mental illness, particularly those being transitioned from prison to the community, require much more. This social worker's approach is in stark contrast to the direct, hands-on care provided by ACT and what D.H. needed to avoid re-institutionalization.

89.    In addition to lack of supportive services, D.H. was not offered **stable housing**, a necessary element to success in the community. DOCCS staff acknowledged on October 22, 2018 that D.H. was "being held beyond release date due to lack of approvable address" (D-00007064). In May and in September 2019, DOCCS staff noted meetings with D.H. with plans to discharge D.H. to the Bridges Program, which is part of DOCCS's parole housing program and resembles a halfway house. This was despite D.H.'s clear statements, recorded in the notes, that he had not done well at Bridges in the past and believed he would not do well there in the future (D-00009520; D-00009819). He stated, "I don't want to go back there to live. I have violated parole twice already because of that place. I have problems with other individuals there. I am trying to do things the right way, the legal way" (D-00009819).

90.     In my interview with D.H., he expressed considerable frustration that staff were not more helpful in providing him with stable housing. This is also reflected in his therapy notes from his time in prison. For example, the notes from one session include, "He is stressed and frustrated that people keep telling him to be patient, and he feels as though staff isn't helping him. . . . Writer explained again that the pre-release coordinator cannot meet with him until he has an approved release date, which he cannot get until he has an approved address . . . . Writer asked if he's been working with his family and friends to try to get an address" (MG-Class00021457). D.H.'s frustration about not receiving the support he needed appears to be well-founded considering his release from prison was contingent on his own ability while incarcerated and experiencing serious mental illness to secure stable housing for after his release. DOCCS and OMH had done nothing to address this lack of adequate housing, which was harmful to D.H. and subjected him on several occasions to re-institutionalization.

91.     D.H. did not have **access to crisis services with outreach available 24/7**, a necessary element to success in the community. Indeed, the discharge plan he was given upon leaving Central New York Psychiatric Center on December 19, 2018 was as follows: "If you are in need of emergency mental health after release the crisis hotline phone number in your county is: Mobile Mental Health Through Occupations – 1-888-750-2266 ext. 2, Orange County Helpline – 1-800-832-1200 / (845) 294-9355. **OR you can walk into any hospital emergency room**" (boldface in original) (D-00009431). As an initial point related to the importance of continuity of care, there is no indication that any provider who would answer the phone numbers he was given, or staff in a hospital emergency room, would know anything about him. Further, there is no guarantee that these services, particularly the hotlines, would even have capacity 24/7 to assist him. This arrangement was totally inadequate and was exactly the level of service in a crisis that perpetuates the revolving door into re-institutionalization. Were he to have been served by an ACT or FACT team, staff in a crisis would be able to respond in a knowledgeable and informed manner to avoid re-institutionalization. Crisis services for this population must go beyond a mere hotline and actually provide real-time, effective support during periods when flare-ups are likely, including nights and weekend. For support to be effective in maintaining someone in the community, staff need to have knowledge of their client.

92.     As stated above, people should be **enrolled in Medicaid and SSI** *prior to release* from incarceration so that these benefits are available upon release. Yet D.H., who had received SSI and Medicaid prior to his incarceration, was left to re-apply for benefits only *following* his release from prison (D-00009517; D-00009789). As it did for W.P., this creates a gap in resources and care during the most crucial time of reintegration into the community.

93.     Further, people for whom **substance abuse is an issue**, such as D.H., should be engaged in substance abuse treatment that is integrated with or coordinated with mental health treatment. D.H. was not enrolled in substance abuse treatment prior to discharge, nor was this treatment coordinated or integrated even with his inadequate mental health treatment. In my interview with D.H., he expressed considerable frustration that staff were not more helpful in connecting him with substance abuse treatment, which he knew he needed. D.H. should have received integrated mental health and substance abuse treatment both while in prison and while in the community, and he received neither, thus placing him at risk of re-institutionalization.

94.    Finally, D.H. told me that he did not receive **peer support**, even though this is an important element for helping people remain stable in the community.

**C.    S.D.**

95.    I conclude that S.D. was placed at serious risk of re-institutionalization after each of his releases from prison due to a failure by the state to provide stable housing and necessary mental health services. This risk was ultimately realized when S.D. was arrested in 2020 and reincarcerated in state prison in August 2022. In forming this opinion, I interviewed S.D. on December 16, 2022 in person at Elmira Correctional Facility. I also reviewed relevant mental health records, identified in Section III Materials Considered, the transcript from his November 17, 2022 deposition, and other materials listed in Section III.

96.    S.D. has a history of serious mental illness, including diagnoses of schizophrenia and substance misuse of marijuana, since age 18 (D-00009837-38). He has a long history of being symptomatic but stable while institutionalized, and of intermittent adherence to medications while living in the community without adequate community support and services (D-00009837; MG-Class-00035134-35).

97.    While in DOCCS custody, OMH identified S.D. as an individual with a serious mental illness and designated him with the mental health service level of 1-S, the highest level of mental health need in the state prison system (D-00010354). OMH requested community-based mental health housing and supportive services for S.D. (D-00010311-18), and he was ultimately deemed eligible for both (D-00010323). Even so, following his multiple releases from prison, DOCCS and OMH failed to provide him with needed housing and services, repeatedly placing him at serious risk of re-institutionalization.

98.    Critically, S.D. was not offered **stable housing**, a necessary element to success in the community. To the contrary, despite his documented history of instability caused by mental illness, he was placed into the homeless shelter system with a predictable result: re-institutionalization. On September 5, 2018, his OMH therapist at Auburn Correctional Facility wrote that he would be homeless (D-00010140). OMH submitted a housing application for S.D. that specifically referred him to Mental Health Housing (D-00010318). In March 2019, the New York City Human Resources Administration notified OMH that S.D. was determined to be eligible for Level II Supportive Housing, which is a form of independent but supported living, and for supportive services (D-00010322-23). HRA determined that S.D. was in "the LOW vulnerability category based on Medicaid service utilization and/or number of system contacts and functional impairments," and it appears, based on a review of S.D.'s records, that OMH did not seek a re-determination even in light of S.D.'s significant psychiatric history and homelessness (D-00010323-24). In any case, S.D. was placed on a waitlist for a housing program and discharged to the shelter system in the meantime (MG-Class00035422). Stable housing is vital for people with serious mental illness and, as discussed above, the transitional period from prison to the community is especially important. Being placed in a homeless shelter due to being waitlisted for housing was detrimental to S.D. given his serious mental illness and substance use history, and it increased his risk of institutionalization. Mere weeks after his release from prison in May 2019, he predictably decompensated in a community shelter where he stopped taking medications and required hospitalization in June 2019 (MG-Class00035134-35).

24

99.     In my interview with S.D., he told me that his care providers in the prison system and hospital system never discussed housing options with him in detail, and never gave him reason to be excited about housing. He said they told him he was approved for housing, but not what specific types he was approved for. People who are released from prison need to be provided with both the education and the hope necessary to make the most of housing placements.

100.     Many people with serious mental illness such as schizophrenia do better when living in **single occupancy residences** with support and monitoring as needed, rather than having to share a living space with one or more other people in an environment ripe for conflicts. With his history of threatening auditory hallucinations that at times issue him commands, and his increased comfort when he can keep to himself or to very familiar surroundings, S.D. falls into the group of people for whom single-occupancy living is essential to success in the community, particularly during transition periods. The clinical notes repeatedly described how he was bothered when in the presence of too many other people, especially when they were loud or otherwise disruptive (*see, e.g.*, D-00009991). Yet, by releasing S.D. to the shelter system, DOCCS and OMH placed S.D. in a housing situation where being by himself was not possible, thus putting him at risk of decompensation and re-institutionalization.

101.     S.D. experienced a failure of **coordination between the various systems** in the community, in particular between the mental health and criminal justice systems. Prior to his discharge to the community in February 2019, S.D. was ineligible for certain community-based mental health housing because there was "No documentation of homelessness," (D-00010323), despite OMH and DOCCS staff knowing he would be homeless (D-00010140). OMH had access to his mental health records and medication history, showing a need for community-based mental health services, and knew he would be homeless unless housing was provided. Yet this information appears not to have been appropriately relied upon when planning his discharge and connecting S.D. with services and housing. The failure of coordination between systems resulted in S.D.'s experience in the shelter system without necessary stability and mental health care.

102.     As stated for each of these Named Plaintiffs, pre-release **re-enrollment for SSI benefits** allows formerly incarcerated people to have money to live on once released, and having money is a necessary element to success in the community. S.D. was released in 2019 without his SSI benefits reinstated, meaning he had no source of income or the necessary financial support (P-MEDICAL-0000304).

103.     S.D. was engaged with an ACT team upon his release from prison in 2019 (MG-Class00035112). However, people for whom **substance abuse is an issue**, such as S.D., must also be engaged in substance abuse treatment that is integrated with or coordinated with mental health treatment. S.D. was not enrolled in community-based substance abuse treatment prior to discharge, nor was this treatment coordinated or integrated with his mental health treatment (D-00010335). As discussed in the Literature Review section, management of substance abuse is a key component of success for people with serious mental illness in the community, and failure to provide services increased S.D.'s risk of institutionalization substantially.

104.     Based on the records I reviewed, the deposition transcript, and my interview with S.D., he did not receive **peer support**, even though this is an important element for helping people remain stable in the community.

105.    In sum, then, I conclude that each of these Named Plaintiffs has been placed at serious risk of re-institutionalization due to insufficient housing and supportive services.

## VI.    SUPPLEMENTATION

106.    I reserve the right to supplement this report based on any new or additional information and to respond to the testimony of others.

## VII.    DECLARATION

107.    Subject to the reservation regarding supplementation, this report contains a complete statement of all opinions I will express in relation to Plaintiffs' motion for class certification in this matter and the basis and reasons for them, as well as the facts and information I considered in forming these opinions. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Robert M. Factor, M.D., Ph.D.
Dated: February 8, 2023

**APPENDIX A**

12/2022

**ROBERT M. FACTOR**

Curriculum Vitæ

## PERSONAL DATA

Office address:

Robert M. Factor, M.D., LLC
16 N. Carroll St., Suite 450
Madison, WI  53703-2784
(608) 263-6025 (voice mail)
(608) 888-1797 (fax)

Email:  rmfactor@wisc.edu

## CURRENT POSITIONS

2002-       Professor Emeritus (CHS), University of Wisconsin School of Medicine and Public Health, Madison, Wisconsin.
2002-       Private psychotherapy and general psychiatry practice, Madison, Wisconsin.

## EDUCATION

                University of Chicago Laboratory High School, 1959-1963.
A.B.        University of Chicago (The College, Biology), 1963-1967.
Ph.D.       University of Pennsylvania, Department of Biology, 1969-1975.
                 Thesis:  Life events and minor health changes in college students (Ingrid Waldron, advisor).
M.D.        University of Pennsylvania, School of Medicine, 1975-1979.

## CLINICAL TRAINING

1979-1980   Intern in Internal Medicine and Psychiatry, University of Wisconsin Hospital and Clinics.
1980-1982   Resident in Psychiatry, University of Wisconsin Hospital and Clinics.
1982-1983   Chief Resident in Psychiatry, University of Wisconsin Hospital and Clinics.
1983-1984   Fellow in Community Psychiatry and Mental Health Services, University of Wisconsin Medical School and Mental Health Center of Dane County, Madison, Wisconsin.

## PREVIOUS POSITIONS

<u>Chicago and Philadelphia</u>
1964-1967   Consultant in data processing, computer systems, and statistics, Graduate School of Business, University of Chicago.
1967-1969   Research Specialist, Department of Pathology, University of Chicago.
1976-1978   Assistant Instructor, Department of Biology, University of Pennsylvania.

<u>Madison, WI</u>
**Academic**
1983-1984   National Institute of Mental Health Postdoctoral Fellow for Research in the Social Sciences, Department of Psychiatry, University of Wisconsin Medical School.
1983-1984   Clinical Instructor, Department of Psychiatry, University of Wisconsin Medical School.
1984-1988   Assistant Professor of Psychiatry (CHS), University of Wisconsin Medical School, Madison, Wisconsin.
1988-1992   Associate Professor of Psychiatry (CHS), University of Wisconsin Medical School, Madison, Wisconsin.
1992-2002   Professor of Psychiatry (CHS), University of Wisconsin Medical School, Madison, Wisconsin.

**ROBERT M. FACTOR, M.D., Ph.D.**    **Curriculum Vitæ**    **Page 2**

**Clinical**

| | |
|---|---|
| 1983-1986 | Medical Director, Support Network Community Day Treatment Program (Clubhouse Model program), Dane County Mental Health Center, Madison, Wisconsin. |
| 1983-2019 | Medical Director and Clinical Director, Emergency Services Unit, Journey Mental Health Center (formerly Mental Health Center of Dane County, Inc.), Madison, Wisconsin. |
| 1995-2020 | Medical Director, Community Support Program (Mental Health Intensive Case Management (MHICM) Program of Assertive Community Treatment), W.S. Middleton Veterans Affairs Medical Center, Madison, Wisconsin. |
| 1983-2002 | Psychotherapy and general psychiatry practice, University of Wisconsin Hospitals and Clinics. |
| 2002-2018 | Private psychotherapy and general psychiatry practice, Women's Psychotherapy Centre of Wisconsin, Madison, Wisconsin. |

**Administrative**

| | |
|---|---|
| 1984-1985 | Assistant Director of Psychiatric Residency Training, University of Wisconsin Hospital and Clinics and University of Wisconsin Medical School, Madison, Wisconsin. |
| 1985-1994 | Director of Psychiatric Residency Education, University of Wisconsin Hospital and Clinics and University of Wisconsin Medical School, Madison, Wisconsin. |
| 1986-1987 | Acting Director, Acute Psychiatric Service, Department of Psychiatry, University of Wisconsin Hospital and Clinics. |

**Other**

| | |
|---|---|
| 1992 | Associate Consultant, Centre for Mental Health Services Development; Institute of Health; School of Life, Basic Medical and Health Sciences, Kings College; London, England. |
| 1992 | Visiting Consultant, Department of Psychiatry, St. Thomas's Hospital; London, England. |

## FELLOWSHIPS AND GRANTS

<u>Philadelphia</u>

University of Pennsylvania Teaching Fellow, 1969-1971; 1972-1974.

National Science Foundation Summer Fellow, 1971.

National Science Foundation Pre-Doctoral Trainee, 1971-1972.

University of Pennsylvania Dissertation Year Fellow, 1974-1975.

<u>Madison, WI</u>

National Institute of Mental Health Postdoctoral Fellow for Research in the Social Sciences, 1983-1984.

University of Wisconsin Department of Psychiatry Research Grant: Survey of the Chronically Mentally Ill Population of Dane County, 1986-1988.

National Institute of Mental Health Clinical Training Grant: Chronically Mentally Ill. Associate Program Director, 1986-1989.

## AWARDS

Illinois State Honorary Scholarship, 1963-1967.

Maroon Key Society, University of Chicago, 1966.

Kenneth E. Appel Award in Psychiatry, University of Pennsylvania School of Medicine, to a student who has shown the highest devotion to the care and treatment of patients, and constructive originality in thinking about human behavior 1979.

Exemplary Training Program Award (accepted as Director of Psychiatric Residency Education, University of Wisconsin Hospital and Clinics Residency Program), National Alliance for the Mentally Ill, 1989.

Exemplary Psychiatrist Award, National Alliance for the Mentally Ill, 1992; 1993.

Inspirational Physician Award, Women Physicians Section, American Medical Association, 2015.

## PROFESSIONAL LICENSURE

Diplomate, National Board of Medical Examiners, 1980.

Wisconsin Medical License, 1980 (current).

## SPECIALTY CERTIFICATION

Certified in Psychiatry, American Board of Psychiatry and Neurology, 1985 (current).

## PROFESSIONAL ASSOCIATIONS

Distinguished Life Fellow, American Psychiatric Association and Wisconsin Psychiatric Association (1984-  ).
Charter Member, American Association of Community Psychiatrists (1984-  ).
Fellow, American Orthopsychiatric Association (1986-  ).
Member, International Mental Health Network, Birmingham, UK (1994-1999)
Member, Advisory Board, Community Psychiatry Section, Hungarian Psychiatric Association (1999-2001).
Member, American Association of Directors of Psychiatric Residency Training (1984-1995).

## TEACHING EXPERIENCE

University of Wisconsin Medical School, Department of Psychiatry

Residents

| | |
|---|---|
| 1981-1983 | Co-leader, seminar on Emergency Psychiatry for second year residents. |
| 1982-1983 | Resident coordinator, emergency call and call-review system. |
| 1982-1991 | Co-leader, Emergency Psychiatry Group Supervision seminar series. |
| 1983-2010 | Co-leader, Community Psychiatry seminar series for second-year residents. |
| 1983-2010 | Co-leader, Community Psychiatry group supervision for second-year residents. |
| 1986-1995 | Seminar leader on various topics for first-year residents. |
| 1988-1996 | Leader, seminar series on "Introduction to outpatient practice, undue familiarity in treatment, and other legal issues" for second-year residents. |
| 1993-1996 | Co-leader, Law, Ethics, and Psychiatry seminar series for third-year residents. |
| 1995-2001 | Clinic supervisor, general psychiatry residents. |
| 1982-2002 | Supervisor of psychiatry residents in general psychiatry, intensive psychotherapy, and psychiatric diagnostic assessment. |
| 1996-2021 | Presenter, Law, Ethics, and Psychiatry seminar series for first- and third year residents. |
| 2003- | Supervisor of medical students and psychiatry residents at the Madison VA Community Support Program (MHICM). |

Medical Students

| | |
|---|---|
| 1982-1984 | Co-leader, small group section on "The Socialization of the Physician" in first-year medical student course:  Introduction to Behavioral Science. |
| 1983-1985 | Lecturer (alcohol and drug abuse, interviewing, family issues in psychiatry); and Leader, small group (on techniques of interviewing); both in second-year medical student course: Introduction to Psychopathology. |
| 1983-1985 | Co-chair, second-year medical student psychiatry course: Introduction to Psychopathology. |
| 1985 | Leader, interpersonal issues ventilation group for third- and fourth-year medical students. |
| 1985 | Presenter and discussant at "Symposium on Alcoholism" for second-year medical students. |
| 1985-2000 | Leader, didactic section in second-year medical student course: Introduction to Psychopathology. |
| 1986-1995 | Seminar leader on community psychiatry for third-year medical students. |
| 1995-1997 | Leader, section of first semester second-year medical student course: Clinical Medicine and Practice-2 – Interviewing, History Taking and Physical Diagnosis. |
| 1995-2003 | Group facilitator, workshop on "Delivering Bad News to Patients."  Third-year medical student transitional clerkship. |
| 1995-2003 | Group facilitator for "Facing Death: A workshop on talking with patients and families about terminal illness."  Third-year medical student transitional clerkship. |
| 1996-1997 | Leader, section of second semester first-year medical student course: Clinical Medicine and Practice-1 – Interviewing, History Taking and Physical Diagnosis. |
| 1997-2003 | Group facilitator, workshop on "Communicating with the Patient with Unexplained Medical Problems or Somatization Disorder."  Third-year medical student transitional clerkship. |
| 1997 | Group facilitator, workshop on "Taking a Sexual History."  Second-year medical student special topic session. |

| | |
|---|---|
| 1998-2006 | Supervisor of third-year medical students on psychiatry rotation at VA CSP. |
| 1999-2003 | Group facilitator, workshop on "Managing Medical Mistakes." Third-year medical student transitional clerkship. |
| 2011-2012 | Leader, Integrated case discussion group for first-year medical students on substance abuse and mental health. |
| 1998-2016 | Leader, section of first- and second-year medical student courses: Patient, Doctor, and Society I, II and III- Interviewing, History Taking and Physical Diagnosis. |
| 1993-2018 | Supervisor of fourth-year medical students on community psychiatry elective at Journey Mental Health Center (formerly Mental Health Center of Dane County). |

University of Wisconsin-Madison, Other Departments.

| | |
|---|---|
| 1982-1989 | Lecturer on "Psychiatric Emergencies" in course, "A Team Approach to Emergency Medical Care." Emergency Medical Services Program, School of Allied Health Professions. |
| 1984 | Lecturer on "Behavioral and Psychiatric Aspects of Primary Care in Obstetrics and Gynecology," in Obstetrics and Gynecology Course for Physicians' Assistants, School of Allied Health Professions. |
| 1984 | Co-lecturer, General Psychiatry course for Physicians' Assistants, School of Allied Health Professions. |
| 1984-2007 | Lecturer on "Psychiatric Emergencies" in Paramedic training course for Wisconsin Firefighters, Emergency Medical Services Program. |
| 1984-2009 | Lecturer on "Psychosocial rehabilitation of persons with chronic mental illness" in course, "Medical Aspects of Rehabilitation," School of Education. |
| 1988-1995 | "Disability Evaluations for the Mentally Ill." Lecturer at four-day statewide annual conferences on Medical and Psychosocial Aspects of Disability for Division of Vocational Rehabilitation Counselors. University of Wisconsin Medical School, Department of Continuing Medical Education. |
| 2012-2014 | Guest seminar leader, "Drug costs, drug marketing and social policy," in Educational Psychology Course, "Psychopharmacology for Non-Physicians." |
| 1984-2017 | Lecturer and discussion leader, clinical courses for Social Work students, School of Social Work. |
| 2012-2017 | Lecturer, "Drug company/rep influences on clinicians: ethical issues in the drug industry's promotion, research and marketing of its products," in School of Nursing Course for BSN seniors, "Legal, Ethical, and Social Forces in Nursing". |

University of Colorado, Anschutz Medical Campus, Aurora, CO.

| | |
|---|---|
| 2021 | Faculty, Interprofessional Healthcare Ethics and Health Equity (IPHE) course, 1 semester course in health care ethics involving students from the schools of medicine, nursing, pharmacy, dentistry, and physical therapy. |

University of Pennsylvania, College of Arts and Sciences, Department of Biology.

| | |
|---|---|
| 1969-1973 | Section instructor: Introductory courses in molecular biology, cell biology, population biology. |
| 1970 | Lecture course: Introduction to Animal Physiology and Behavior. |
| 1972 | Lecture course: Computer Programming and Statistics for Graduate Students. |
| 1971-1973 | Seminar course: Biological Problems Associated with Urban Life. |
| 1973-1975 | Seminar course: Social and Psychological Origins of Disease. |
| 1973-1975 | Supervisor of independent study students in animal behavior. |
| 1976-1978 | One-month block of lecture course: Animal Physiology. |

## ADMINISTRATION AND SERVICE
University of Wisconsin Medical School, Department of Psychiatry.

| | |
|---|---|
| 1979-1980 | Member, Resident Selection Committee. |
| 1980-1984 | Member, Post-Graduate Education Committee. |
| 1981-1985 | Member, Curriculum Committee. |
| 1984-1985 | Member, Resident Selection Committee. |

| 1984-1986 | Member, Computer Committee. |
| 1985-1986 | Member, Outpatient Clinic Review Committee. |
| 1985-1988 | Co-Chair, Resident Selection Committee. |
| 1985-1988 | Member, Outpatient Database Committee. |
| 1987-1989 | Member, Research and Development Committee. |
| 1985-1994 | Chair, Residency Education Committee. |
| 1987-1993 | Member, Department Administrative Advisory Committee. |
| 1988-1994 | Chair, Resident Selection Committee. |
| 1993-1994 | Chair, Clinical Faculty Committee. |
| 1984-1995 | Member, Clinical Faculty Committee. |
| 1991-1996 | Member, Committee on Career Development and the Family. |

University of Wisconsin Medical School.

| 1985 | Member, Dean's Committee on Developing Interpersonal Communication Skills in the Medical School Curriculum. |
| 1987-1990 | Member, Equity Action Committee. |
| 1992-1995 | Member, Clinician-Scholar-Track Faculty Appointment and Promotions Committee. |
| 1998-1999 | Member, Medical Student Promotions Committee. |
| 1999-2002 | Chair, Medical Student Promotions Committee. |

University of Wisconsin Hospital and Clinics.

| 1988-1993 | Member, Hospital Medical Records Committee. |
| 1987-1997 | Member, Hospital Residency Review Committee. |

Professional Associations.

| 1990-1994 | Co-Chair, Members-in-Training Advisory Committee, Wisconsin Psychiatric Association. |
| 1989-1993 | Regional Coordinator for Midwest-Area Residency Programs, American Association of Directors of Psychiatric Residency Training. |
| 1993-1995 | Appointed Member, Executive Council, American Association of Directors of Psychiatric Residency Training. |

Boards of Directors of Community Service Organizations.

| 1992-1999 | Board Member, Hillel Foundation at the University of Wisconsin-Madison. |
| 1993-1997 | Board Secretary, Hillel Foundation at the University of Wisconsin-Madison. |
| 1997-1999 | Board President, Hillel Foundation at the University of Wisconsin-Madison. |
| 1997-1999 | Board Member, Madison Jewish Community Council. |
| 1992-1999 | Board Member, Friends of Yahara House (vocationally-based clubhouse program of the Mental Health Center of Dane County). |
| 2003-2006 | Member, Yonim Advisory Council, Yonim Israeli Folkdance Troupe, Madison. |
| 2004-2010 | Board Member, Beth Israel Center, Madison. |
| 2005-2007 | Recording Secretary, Beth Israel Center, Madison. |
| 2016-2018 | Vice-President, Madison Symphony Chorus |
| 2018-2020 | President, Madison Symphony Chorus |
| 2018-2020 | Board Member *ex officio*, Madison Symphony Orchestra |

## PUBLICATIONS

Coppleson LW, Factor RM, Strum SB, Graff PW, Rappaport H:  Observer disagreement in the classification and histology of Hodgkin's disease.  *Journal of the National Cancer Institute* 1970;45:731-740.

Lerner J, Mellen SA, Waldron I, Factor RM:  Neural redundancy and regularity of swimming beats in Scyphozoan medusae.  *Journal of Experimental Biology* 1971;55:177-184.

Factor RM, Meyer R:  Supernatural beliefs of graduate students: a critique.  *Nature* 1971;234:362.

Factor RM, Waldron I:  Contemporary population densities and human health.  *Nature* 1973;243:381-384.

Factor RM:  Linear discriminant analysis: a case of misuse.  *Psychosomatic Medicine* 1975;37:544-545.

Wilson WH, Diamond RJ, Factor RM:  A psychotherapeutic approach to task-oriented groups of severely ill patients.  *Yale Journal of Biology and Medicine* 1985;58:363-372.

Factor RM, Stein LI:  An empirical typology of the chronically mentally ill: a commentary.  *Community Mental Health Journal* 1986;22:25-26.

Stein LI, Factor RM, Diamond RJ:  Training psychiatrists in the treatment of chronically disabled patients.  In Meyerson AT, Fine T, eds.  *Psychiatric Disability:  Clinical, Administrative, and Legal Aspects.*  Washington:  American Psychiatric Press, 1987.

Davidson RE, Factor RM, Gundlach E, Adler K:  Roles of psychiatric nurses in a community mental health center.  *Community Mental Health Journal* 1988;24:83-86.

Factor RM, Stein LI, Diamond RJ:  A model community psychiatry curriculum for psychiatric residents.  *Community Mental Health Journal* 1988;24:310-327.

Faulkner LR, Cutler DL, Krohn DD, Factor RM, Goldfinger SM, Goldman CR, Lamb HR, Lefley H, Minkoff K, Schwartz SR, Shore JH, Tasman A:  A basic residency curriculum concerning the chronically mentally ill.  *American Journal of Psychiatry* 1989;146:1323-1327.

Stein LI, Diamond RJ, Factor RM:  A system approach to the care of persons with schizophrenia.  In Herz MI, Keith SJ, Docherty JP, eds.:  *Handbook of Schizophrenia, Volume 4: Psychosocial Treatment of Schizophrenia,* Chapter 11, pp. 213-246.  Amsterdam: Elsevier Science Publishers B.V., 1990.

Wilson WH, Diamond RJ, Factor RM:  Group treatment for individuals with schizophrenia.  *Community Mental Health Journal* 1990;26:361-372.

Factor RM:  Managing the violent patient in the emergency department.  *Emergency Care Quarterly* 1991;7:82-93.

Factor RM:  Moonlighting: What residents do in their free time is their decision.  *Hospital and Community Psychiatry* 1991;42:739-742.

Factor RM:  Moonlighting: Rebuttal of article by Dr. Keill.  *Hospital and Community Psychiatry* 1991;42:738.

Diamond RJ, Factor RM:  Don't make continuing treatment more difficult: A discussion in opposition to the proposed fifth standard for civil commitment in Wisconsin.  *Wisconsin Psychiatrist* 1991;32(2):14-19.

Diamond RJ, Stein LI, Factor RM, Greenley JR, Nehls NM:  Community psychiatry seminar syllabus.  In Pescosolido BA, Boyer CA, Dill A, Figert AE, Wright ER, eds.:  *A Handbook for Teaching Medical Sociology.*  Washington, D.C.: American Sociological Association, 1991.

Diamond RJ, Factor RM:  Training psychiatrists to care for the chronically ill [letter].  *Psychiatric News* 1992;27(1):15.

Diamond RJ, Factor RM, Stein LI:  A response to "Training residents for community psychiatric practice".  *Community Mental Health Journal* 1993;29:289-296.

Diamond RJ, Factor RM:  Treatment-resistant patients or a treatment-resistant system? [editorial].  *Hospital and Community Psychiatry* 1994;45:197.

Factor RM, Diamond RJ:  Emergency Psychiatry and Crisis Resolution. In Vaccaro JV and Clark Jr GH, eds.:  *Practicing Psychiatry in the Community: A Manual*.  Washington, DC:  American Psychiatric Press, 1996.

Reardon CL, Factor RM: Bizarre behavior in a patient treated with prazosin for PTSD symptoms. American Journal of Psychiatry 2008;165:774-775. doi: 10.1176/ appi.ajp.2008.07111710.

Reardon CL, Factor RM: Sport psychiatry:  A systematic review of diagnosis and medical treatment of mental illness in athletes.  Sports Medicine 2010;40:961-980. doi: 10.2165/11536580-000000000-00000.

Reardon CL, Factor RM: The use of psychiatric medication by athletes.  In Baron DA, Reardon CL, Baron SH, eds.: *Clinical Sports Psychiatry: An International Perspective*.  London: Wiley-Blackwell, 2013.

Reardon CL, Factor RM, Brenner CJ, Singh P, Spurgeon JA: Community psychiatry tracks for residents: A review of four programs.  Community Mental Health Journal 2014;50:10-16. doi: 10.1007/s10597-013-9661-z.

Reardon CL, Factor RM: Considerations in the use of stimulants in sport. Sports Medicine 2016;611-617. doi: 10.1007/s40279-015-0456-y.

Reardon CL, Buhr KA, Factor RM, Walaszek A, Schreiter EZ: Integrated care: Should it count as community psychiatry training for psychiatry residents? Community Mental Health Journal 2019;55:1275-1278. doi: 10.1007/s10597-019-00401-z

## POSTERS

Reardon CL, Factor RM: A case of dissociative fugue in a patient with temporal lobectomy. American Medical Association Interim Meeting, November 2008, Orlando, FL.

Lee E, Reardon CL, Factor RM, Brenner CJ, Singh P, Spurgeon JA. Community psychiatry tracks for residents: a review of four programs. Institute on Psychiatric Services Annual Meeting, October 2012, New York, NY.

Reardon CL, Buhr KA, Factor RM, Walaszek A, Zeidler Schreiter E: Integrated care: should it count as community psychiatry training for psychiatry residents? American Association of Directors of Psychiatric Residency Training Annual Meeting, March 2017, San Francisco, CA.

Hickle-Koclanes K, Reardon CL, Battaglia J, Factor RM, Radue R, Valdivia K, Walaszek AC, Zeidler Schreiter B. A public health advocacy and service in psychiatry elective for medical students. University of Wisconsin School of Medicine and Public Health Medical Education Day, May 2019, Madison, WI.

Reardon CL, Battaglia J, Factor RM, Hickle-Koclanes KN, Radue RM, Valdivia K, Walaszek AC, Zeidler-Schreiter B: A Public Health and Advocacy in Psychiatry Elective for Medical Students. American Psychiatric Association Annual Meeting, May 2019, San Francisco, CA.

## PRESENTATIONS

1981

"Working with Families in the Mental Health Center." Presentation to Youth Treatment Unit, Dutchess County Mental Health Center; Poughkeepsie, New York.

1982

Workshop faculty. "Rapid Intervention with the Acutely Psychotic Patient," University of Wisconsin Extension; Madison, Wisconsin.

Regional Conference faculty. "Nuisance, Criminal, or Mentally Ill -- The Mentally Ill Law-Breaker in the Community." University of Wisconsin Extension; Madison Wisconsin.

Regional Conference faculty. "Alcohol and Substance Abuse: It Affects You" (presentation on family therapy). Dutchess County Department of Mental Hygiene; Poughkeepsie, New York.

"Working with Survivors of Suicide." Presentation to inpatient psychiatry ward staff, Madison General Hospital; Madison, Wisconsin.

1983

"Refusal of Treatment: Approach for the Anesthesiologist and When to Call the Psychiatrist." Grand Rounds, Department of Anesthesiology, University of Wisconsin Medical School; Madison, Wisconsin.

1984

"Principles of Community Treatment." Presentation to Community Psychiatry Seminar, Department of Psychiatry, Oregon Health Sciences University; Portland, Oregon.

One day workshops on Principles of Community Treatment, Psychopharmacology for the Non-Physician, and case supervision (with N.E. Barklage, M.D.). Regional conferences for community support program workers held in Green Bay and in Hayward, Wisconsin.

"A psychotherapeutic approach to task-oriented groups of severely ill patients" (with W.H. Wilson and R.J. Diamond). Paper presented at the VIIIth International Symposium on the Psychotherapy of Schizophrenia. Yale University; New Haven, Connecticut.

1985

Panelist. Workshop on "Assessment and treatment of the alcoholic mentally ill client." Regional Conference sponsored by the Mendota Mental Health Institute; Madison, Wisconsin.

"High or Dry: Alcohol and Drug Abuse Among Persons With Chronic Mental Illness." Address to Alliance for the Mentally Ill of Dane County; Madison, Wisconsin.

"Issues in the Medicalization of Madness." Invited discussant, panel (chaired by L.A. Callahan, Ph.D.) in the Psychiatric Sociology Division, Society for the Study of Social Problems. Annual Meeting; Washington, D.C.

"Principles of Working With the Chronically Mentally Ill." Half day workshop for Income Maintenance Workers, Department of Social Services, Dane County, Wisconsin. Madison, Wisconsin.

"Outpatient Treatment of the Chronically Mentally Ill." One day regional workshop (with R.J. Diamond, M.D.) sponsored by Sheboygan County Unified Health Board. Lakeside Technical Institute; Cleveland, Wisconsin.

1986

"Changing Client Needs and Agency Responses: Working with Difficult to Treat Clients in the Community." Keynote address to the Annual meeting, New Jersey Association of Mental Health Agencies; New Brunswick, New Jersey.

"A psychotherapeutic approach to task-oriented groups, and their role in a system of community support for persons with long term severe mental illness."  Address and workshop at the Third Southeastern Conference on the Chronic Patient. University Hospital; Jacksonville, Florida.

"Hospitals? Jails? Streets? The Treatment Dilemma – Treating Patients as Responsible Citizens." Presentation at two-day national symposium: "The Criminal Justice System and the Mentally Ill: A Call for Action."  Mental Health Center of Dane County and State of Wisconsin Office of Mental Health; Madison, Wisconsin.

"The Mental Health-Police Liaison."  Workshop facilitator at two-day national symposium: "The Criminal Justice System and the Mentally Ill: A Call for Action."  Mental Health Center of Dane County and State of Wisconsin Office of Mental Health; Madison, Wisconsin.

1987

"Community alternatives that work:  How to keep 90% of your long-term mentally disabled clients along with 90% of your mental health dollars where they belong."  Two-day national workshop (with L.I. Stein, R.J. Diamond, G. Marker).  Annual meeting, American Orthopsychiatric Association; Washington, D.C.

"Community Crisis Intervention."  Consultation to F.S. Dubois Day Treatment Center Community Crisis Intervention Program, and seminar sponsored by State of Connecticut Department of Mental Health; Stamford, Connecticut.

"Crisis Intervention Techniques."  One day regional workshop (with B.I. Cesnik, A.C.S.W.) sponsored by Mendota Mental Health Institute.  The Mead Inn; Wisconsin Rapids, Wisconsin.

Discussion leader.  "Sexual Misconduct in Therapy: Recognition, Reporting, Aftermath -- Toward an Elimination of the Problem."  Symposium at fall state meeting, Wisconsin Psychiatric Association; La Crosse, Wisconsin.

"Psychogenic Head and Face Pain."  Presentation in one day regional symposium on Management of Common Problems in Oral Surgery for the General Dentist and Primary Care Practitioner.  Meriter Hospital; Madison, Wisconsin.

1988

"Outpatient Treatment of the Chronically Mentally Ill."  Keynote Address to the Annual Meeting, Montana Psychiatric Association; Warm Springs, Montana.

"An innovative systems-approach for meeting the changing medication needs of clients."  Keynote address at statewide conference on Medication Issues in New Jersey's Changing Mental Health System.  Center for Health Affairs; Princeton, New Jersey.

"'Asylum': Redirection or Misdirection?"  Workshop presentation (with J.L. Geller, M.D.) at 40th APA Institute on Hospital and Community Psychiatry; New Orleans.

"Confidentiality of clinical information."  Invited presentation at Ethics Forum, University of Wisconsin Hospital Committee on Medical Ethics, Madison, Wisconsin.

1989

Workshop leader for New Directors of Psychiatric Residency Training.  Midwinter meeting, American Association of Directors of Psychiatric Residency Training; San Diego, California.

"Sexual Misconduct."  Presentation (with Atty. J. Zwieg) for Statewide Annual Board Member Workshop, Regulatory Boards, State of Wisconsin Department of Regulation and Licensing; Madison, Wisconsin.

"Sexual Misconduct by Psychotherapists."  Presentation (with S. Hale, Ph.D.) to Annual Regional Spring Symposium, University of Wisconsin School of Social Work; Madison, Wisconsin.

"Emergency Psychiatry for the Emergency Room Physician and Nurse."  Regional presentation sponsored by Medical Emergency Service Associates; Rockford, Illinois.

"Supporting clients with long-term treatment needs."  All day state-wide pre-conference workshop sponsored by the Ohio Department of Mental Health; Columbus, Ohio.

"Practical psychopharmacology and symptom management."  All day workshop at national conference, Fourth Annual Case Management Conference sponsored by the Ohio Department of Mental Health; Columbus, Ohio.

Invited participant, national conference on "Clinical training for services to the long-term seriously mentally ill: A multidisciplinary review and assessment of the accomplishment of recent NIMH grant supported projects."  University of Cincinnati; Cincinnati, Ohio.

"Training mental health professionals to work with persons with serious, long-term mental illness."  Workshop presentation (with N.E. Nehls, R.N., Ph.D.) at 41st APA Institute on Hospital and Community Psychiatry; Philadelphia.

1990
Workshop leader for New Directors of Psychiatric Residency Training.  Midwinter meeting, American Association of Directors of Psychiatric Residency Training; New Orleans.
"Medication Strategies for the Community Patient."  Grand Rounds, Norwich Hospital; Norwich, Connecticut.
"Managing Crisis in the Community."  Two-day statewide workshop for community mental health workers (with L. Keys, A.C.S.W.) sponsored by State of Connecticut Department of Mental Health; Norwich, Connecticut.
"A Comprehensive System of Care for Persons with Long-Term Psychiatric Disabilities."  One-day Institute (with L. Stein, M.D., L. Keys, A.C.S.W., R. Backes, M.S., and B. Hennings) at 15th Annual Training Institutes and Conference of the International Association of Psychosocial Rehabilitation Services; St. Louis, Missouri.

1991
"CMHCs' Mission and Academic Values: A Workable Solution."  Paper in symposium, The Institutional Ethos and Academia: Conflict or Collaboration? J.A. Talbott, M.D., Chair.  144th Annual Meeting, American Psychiatric Association; New Orleans.
"Competence to decide: When can a patient say no to treatment?"  Presentation and discussion for Morbidity and Mortality Conference, Department of Medicine, University of Wisconsin Medical School; Madison, Wisconsin.
"Innovations in service systems and the role of treaters, consumers, and government."  Keynote address to and workshop participant during the Third Annual Montana Conference on Mental Illness Issues, co-sponsored by the Montana Alliance for the Mentally Ill, State of Montana Mental Health Division, and the National Institute of Mental Health.  Helena Montana.
"Models and applications of coerced community treatment:  Yea, nay, or maybe."  Workshop presentation (with J.L. Geller, M.D.) at 43rd APA Institute on Hospital and Community Psychiatry; Los Angeles.
"Psychogenic Head and Face Pain."  Presentation in one day regional symposium on Management of Common Problems in Oral Surgery for the General Dentist and Primary Care Practitioner.  Meriter Hospital; Madison, Wisconsin.

1992
"Psychiatric emergencies for the family physician."  Grand Rounds, Mile Bluff Medical Center; Mauston, Wisconsin (University of Wisconsin Medical School Outreach CME Program).
"Understanding serious mental illness and managing persons with it in the community."  Address to the Annual General Meeting, Winchester Trinity Centre Community Association; Winchester, England.
"The Madison System of Care:  What it is, and its application to care in Great Britain."  Special Lecture (Grand Rounds), Department of Psychiatry, St. Thomas's Hospital; London, England.
"Serving the People with Mental Disorders: A New Option."  Address to all-day workshop on Effectively Redirecting Resources to People with Severe Mental Disorders for state and county policy makers and legislators.  Sponsored by the Iowa Department of Mental Health, the Alliance for the Mentally Ill, and the National Institute of Mental Health; Cedar Rapids, Iowa.
"Philosophy and Overview of Crisis Management."  Keynote address, and co-leader (with D.V. Mays, M.D.) of all-day training workshop in crisis intervention and resolution for case managers and supervisors.  Sponsored by the Ohio Department of Mental Health; Mt. Sterling Conference Center; Mt. Sterling, Ohio.

1994
"Psychiatric Emergencies for Physicians and Other Health Professionals."  Lecture in Short-Course in Psychiatry.  The Wisconsin State Interactive Audio Network, Department of Continuing Medical Education, University of Wisconsin Extension.
"The Wisconsin Experience."  First annual Lundbeck Lecture, Royal College of Psychiatrists; Social, Community & Rehabilitation Psychiatry Section.  Residential Conference on "Assertive Outreach Teams:  A sensible investment in the UK?"  Glasgow, Scotland.

1995
"People with mental illness in a modern caring society - a better situation for the 21st century."  Invited participant in world-wide think-tank conference held in Prague, Czech Republic.  Sponsored by the International Mental Health Network Ltd., Birmingham, United Kingdom.
Two and one-half-day workshop and consultations for case managers and medical staff of three assertive community support teams associated with the Public Psychiatry Program, Oregon Health Sciences University, Portland.

"Assertive community treatment teams:  their function within the system of care in Dane County, Wisconsin."  Presentation to Community Psychiatry Seminar, Department of Psychiatry, Oregon Health Sciences University; Portland, Oregon.

"Suicide Assessment and Emergency Management."  Lecture and discussion in a series on the Wisconsin Public Psychiatry Network Teleconference for Non-Medical Providers.  Bureau of Community Mental Health, State of Wisconsin Department of Health and Social Services.

"Intensive Psychiatric Community Care:  Principles of Community Support and Making IPPC Work at the Madison VA."  Psychiatry Grand Rounds, Tomah Veterans Affairs Hospital, Tomah, WI.

1996

"Psychiatric Presentations of Medical Illness:  Anxiety and Mood Disorders."  Lecture in Medical Series for Non-Medical Mental Health Professionals, sponsored by the Mental Health Center of Dane County, Madison, WI.

"Managed Care and Mental Health."  Lead panelist in symposium on Ethics of Managed Care co-sponsored by the University of Wisconsin-Madison Medical School (Program in Medical Ethics and Wisconsin Network for Health Policy Research) and School of Business, Madison, WI.

"Principles of Crisis Intervention and Resolution."  Lecture and discussion in a series on the Wisconsin Public Psychiatry Network Teleconference for Non-Medical Providers.  Bureau of Community Mental Health, State of Wisconsin Department of Health and Social Services.

"Money Management in Community Support Programs."  Presentation with other staff of the Madison VA Community Support Program in monthly National Teleconference for VA IPCC Teams.  Organized by VA NEPCC, West Haven, Connecticut.

"Residency Training for the Real World."  Workshop presentation (with A. Morrison, M.D., M. Morgan, M.D., and M. Moran, M.D.) at 48th APA Institute on Psychiatric Services; Chicago.

"People with mental illness in a modern caring society - a better solution for the 21st century."  Invited speaker on "Crisis Homes"; and participant in world-wide think-tank conference held in Bratislava, Slovakia.  Sponsored by the International Mental Health Network Ltd., Birmingham, United Kingdom.

1997

"Emergency Psychiatry from a Community Perspective."  Grand Rounds, Dept. of Psychiatry, University of North Dakota, Fargo.

Consultation with psychiatric and with community support team leadership staff of West Human Services Center, Fargo, ND.

1998

"What the VA offers in its CSP:  the special experiences of veterans and the VA system."  Presentation (with R. Kelter, A.C.S.W., L. Hylkema, R.N., M.S., J. Radke, A.C.S.W., and A. Braus, M.D.) at the 1998 State CSP Conference, Wisconsin Office of Mental Health; Milwaukee.

"An Overview of Mood Stabilizing Medications."  Lecture and discussion in a series on the Wisconsin Public Psychiatry Network Teleconference for Non-Medical Providers.  Bureau of Community Mental Health, State of Wisconsin Department of Health and Social Services.

"Helping people with psychotic disorders to maintain employment."  Presentation to High-Impact-Grant Conference for Job Coaches, Case Managers, and Supervisors.  Sponsored by Wisconsin Division of Vocational Rehabilitation and Department of Health and Family Services; Madison.

"Work and influencing change."  Guest speaker, Annual Meeting of Friends of Yahara House, Madison, WI.

1999

"Toward a system of community treatment in Hungary – Lessons from Madison."  Invited lecture at the initial meeting of the Community Psychiatry Section of the Hungarian Psychiatric Association, Budapest.

"Working with Families in Crisis: Where do Young Adults Fit?"  Workshop (with Jackie Baldwin, Wisconsin Family Ties; and Lyn Malofsky, Peer Support Milwaukee County) at the Third Annual Crisis Intervention Conference.  Wisconsin Bureau of Community Mental Health and the Wisconsin Council on Children and Families, Wisconsin Rapids, WI.

"Mobile Crisis Team: Practical Medication Management."  Innovative Program presentation (with L.L. Kondora, R.N., Ph.D. and L.L. Blahnik, R.N., M.A.) at 51st APA Institute on Psychiatric Services; New Orleans.

2000

"The Basics of Benzodiazepines."  Lecture and discussion in a series on the Wisconsin Public Psychiatry Network Teleconference for Non-Medical Providers.  Bureau of Community Mental Health, State of Wisconsin Department of Health and Social Services.

"The Pharmaceutical Industry and Public Psychiatry Practice."  Paper in Symposium "Psychiatry and the Pharmaceutical Industry: Where is the Boundary?" (with A.C. Brodkey, M.D., F.S. Sierles, M.D., and D.M. Koziupa, M.D.) at 52nd APA Institute on Psychiatric Services; Philadelphia.

2001

"The Pharmaceutical Industry and Public Psychiatry Practice."  Grand Rounds, Dept. of Psychiatry, University of Wisconsin-Madison.

"Benzodiazepine Update – 2001."  Lecture and discussion in a series on the Wisconsin Public Psychiatry Network Teleconference for Non-Medical Providers.  Bureau of Community Mental Health, State of Wisconsin Department of Health and Social Services.

"The public sector interface with private-practice psychiatry in Dane County.  Guest speaker, Psychiatric Services, PC, Madison, Wisconsin.

2002

"Practical and Ethical Implications of Pharmaceutical Industry Sponsorship."  Presentation to the Southern Chapter, Wisconsin Psychiatric Association, Madison.

"The Pharmaceutical Industry and Public Psychiatry Practice."  Paper in Symposium "Psychiatry and the Pharmaceutical Industry: Where is the Boundary?" (with A.C. Brodkey, M.D., F.S. Sierles, M.D., and D.M. Koziupa, M.D.) at 155th Annual Meeting, American Psychiatric Association; Philadelphia.

"Consumer mental health aides: A psychiatrist's perspective."  Paper in Symposium "Consumer Mental Health Aides in a Crisis Service: Pushing the Envelope" (with E.M. Lucht, M.S.S.W., J. Koberstein, J.B. DeJong, L.L. Blahnik, R.N., M.A., and D.A. Coleman, M.S.S.W.) at 54th APA Institute on Psychiatric Services; Chicago.

2003

"Involuntary treatment: legal issues."  Lecture and discussion in a series on the Wisconsin Public Psychiatry Network Teleconference for Non-Medical Providers.  Bureau of Community Mental Health, State of Wisconsin Department of Health and Social Services.

"Paternalism and involuntary treatment: can involuntary treatment be justified ethically when dangerousness is not acute?"  Invited paper at two-day conference on *The Liberal State and Its Mental Health Power*, University of Wisconsin Law School, Madison.

"The Pharmaceutical Industry and Public Psychiatry Practice."  Paper in Symposium "Psychiatry and the Pharmaceutical Industry: Where is the Boundary?" (with A.C. Brodkey, M.D., F.S. Sierles, M.D., and D.M. Koziupa, M.D.) at 156th Annual Meeting, American Psychiatric Association; San Francisco.

"Case management: How to be creative in helping clients manage symptons"; "Working with clients who are difficult to engage"; Working with self-destructive clients: How to optimize the use of involuntary treatment"; "Recovery: How to help clients set goals and empower themselves.  Primary speaker at Brown County Conference for Providers, Professionals, and Caregivers, Green Bay Wisconsin.

2004

"How to talk to police."  Lecture and discussion in a series on the Wisconsin Public Psychiatry Network Teleconference for Non-Medical Providers.  Bureau of Community Mental Health, State of Wisconsin Department of Health and Social Services.

"Whose agent are we? and other related issues."  "The role of the counselor."  "How to think about and to document cases."  All day workshop, Region 2 VA Readjustment Counselor Training, Madison Wisconsin.

"How can you tell how much a drug costs, and other tales."  Paper in Symposium "Formularies, Pharmacies, Prescribers, and Patients: Understanding the economic, political, medical, and social pressures behind what we prescribe and what patients receive" (with G. Bishop, M.D., G.D. Schiff, M.D.).  27th Annual Meeting, Society for General Internal Medicine, Chicago.

"Recovery from serious mental illness:  how to help clients set goals and empower themselves".  Region 2 Vet Center Team Leader Training, Madison, Wisconsin.

"The Complex World of Prescription Drug Pricing and Reimbursement."  Paper in Symposium "Whither Go the Meds?" (with D.A. Moltz, M.D., C.R. Goldman, M.D., D.A. Pollack, M.D., J.J. Parks, M.D., A. Anis, Ph.D.) at 56th APA Institute on Psychiatric Services; Atlanta.

"Boundaries and Ethics in Recovery Programming (with D. Greenley, J.D.).  Half-day regional conference sponsored by the Mental Health Center of Dane County.  Promega Conference Center, Madison, Wisconsin.

2005

"The Pharmaceutical Industry, Psychiatry, and the Public Interest."  Paper in Symposium "Psychiatry and the Pharmaceutical Industry: Where is the Boundary?" (with A.C. Brodkey, M.D., F.S. Sierles, M.D., and D.M. Koziupa, M.D.) at 158th Annual Meeting, American Psychiatric Association; Atlanta.

"Impeaching and Otherwise Challenging Psychiatric Testimony."  Workshop presentation (with W.M. Brooks, J.D.) at 23rd Annual Rights Conference of the National Association for Rights Protection and Advocacy, Hartford, CT.

2006

"The basics of benzodiazepines (and other sedative hypnotics)."  Lecture and discussion in a series on the Wisconsin Public Psychiatry Network Teleconference for Non-Medical Providers.  Bureau of Community Mental Health, State of Wisconsin Department of Health and Social Services.

"Serious and persistent mental illness: An Introduction."  Workshop presentation at the Annual Conference for Adult Family Home Providers, Wisc. Association of Adult Family Care Coordinators, Green Bay, WI.

"How to talk to the police."  Lecture and discussion in a series on the Wisconsin Public Psychiatry Network Teleconference for Non-Medical Providers.  Bureau of Community Mental Health, State of Wisconsin Department of Health and Social Services.

2007

"The complex world of prescription drug pricing and reimbursement."  Presentation to the Medicaid Drug Utilization Review Board, State of Wisconsin Department of Health and Family Services, Division of Health Care Financing.

2008

"Serious and persistent mental illness: an introduction."  Presentation to human services clinicians and administrators, and local government officials from the Chernobyl area of Ukraine as part of a one-week workshop for them, Madison, WI.

"Helping clinicians to solve clinical problems:  The use of imagination."  Workshop with A.J. McLean and R.J. Diamond at 60th APA Institute on Psychiatric Services; Chicago.

2010

"The complex world of prescription drug pricing and reimbursement."  Presentation to the Wisconsin Nurses Association Advance Practice Nurse Forum: 24th Annual Pharmacology & Clinical Update, Wisconsin Dells.

"Ethical issues in the drug industry's promotion, research and marketing of its products."  All-day inservice, Ethics and Boundary Training, Mental Health Center of Dane County; Madison, WI

2011

"The boundary between the pharmaceutical industry and clinicians: Ethical issues in the pharmaceutical industry's promotion, research, and marketing of its products," parts I and II.  Two lectures and discussions in a series on the Wisconsin Public Psychiatry Network Teleconference for Non-Medical Providers.  Bureau of Community Mental Health, State of Wisconsin Department of Health Services.

2012

"People with disabilities can and should be living integrated in the community:  a very very short introduction."  Lecture at All Ukrainian Conference on Current State and Perspectives of Implementation of CRPD in Ukraine – Dedicated to International Mental Health Day.  Kyiv Expo Plaza; Kyiv, Ukraine.

2013

"Assertive community outreach in the US: a history and comparison with the UK."  Grand Rounds, St. George's Hospital; Morpeth, Northumberland, England.

"Psychiatric morbidity in sport."  Presentation in symposium: Fulfilling the Olympic Legacy: Mental Health Needs in Sport.  Royal College of Psychiatrists International Congress, Edinburgh, Scotland.

2019

"The use of psychostimulant medication to treat ADHD in elite athletes: A performance and health perspective."  Presentation in session on The Controversial Use, New Use, and Misuse of Psychostimulants; 7th World Congress on ADHD. Lisbon, Portugal.

2021
"Recovery focused language: Putting the recovery model into practice through your words (spoken and written)."  Presentation to the University of Denver School of Nursing doctoral students (DNP), Denver, Colorado.
"Understanding Mental Illness." 2-hour presentations to law enforcement, first responder, and community workers as part of the 30-hour NAMI Crisis Intervention Team (CIT) Training Program, Dane County, Wisconsin (3 presentations).
2022
"Understanding Mental Illness." 2-hour presentations to law enforcement, first responder, and community workers as part of the 30-hour NAMI Crisis Intervention Team (CIT) Training Program, Dane County, Wisconsin (8 presentations).

## LAW AND PSYCHIATRY ACTIVITIES

| | |
|---|---|
| 1981-1990 | Court appointed examiner and expert witness for civil commitment and guardianship cases, Circuit Courts of Dane and Dodge Counties, Wisconsin. |
| 1982 | Co-consultant (with R.J. Diamond, M.D.) for the plaintiffs in their class action lawsuit filed in U.S. District Court by Project Justice and Equality (Gary, Indiana) regarding housing for persons with serious long-term mental illness in Gary. |
| 1987-1993 | Consultant and expert witness (trial testimony) for the ACLU of Montana and Bazelon Center for Mental Health Law (formerly Mental Health Law Project), Washington, D.C., regarding legal, administrative, clinical, and legislative actions to improve treatment for persons with serious long-term mental illness in Montana, and specifically for the plaintiffs in the class-action lawsuit, *Ihler et al. v. Chisholm et al.* |
| 1988-2018 | Consultant and expert witness (hearing testimony) in administrative hearings regarding professional licensure actions for the Division of Enforcement, Medical and Dental Examining Boards, Department of Regulation and Licensing, State of Wisconsin. |
| 1989-1990 | Consultant to ACLU of Maine et al. regarding clinical, administrative, legal, and legislative actions to improve treatment for persons with serious long-term mental illness in Maine. |
| 1993-1994 | Consultant and expert witness for the Department of Public Instruction, State of Wisconsin in proceedings in Circuit Court regarding renewal of a teacher's certificate. |
| 1995 | Consultant and expert witness (deposition) for Protection and Advocacy, Inc. in their lawsuit in U.S. District Court for Wyoming (*Protection and Advocacy, Inc. v. Pruett et al.*) for P&A staff to have proper access to patients and medical records at Wyoming State Hospital. |
| 1995-1998 | Consultant and expert witness (deposition) for the plaintiff, represented by Legal Center for People with Disabilities, in his lawsuit in U.S. District Court (*Jurasek v. Verville et al.*) regarding his treatment at Utah State Hospital. |
| 1997-1998 | Consultant and expert witness (affidavits; trial testimony) for the plaintiffs, represented by Advocacy, Inc., in a class-action lawsuit in U.S. District Court for Eastern Texas (*Alice Doe and Barbara Doe, et al. v. Joe Bob Hall, et al.*) to improve emergency mental health services for persons with severe mental illness in Texarkana, Texas. |
| 1997-2002 | Consultant and expert witness (affidavit) for the plaintiff, represented by the ACLU Foundation of Florida, in her lawsuit (*Chris Doe v. Dr. Carlos E. Stincer, et al.*) in U.S. District Court for Southern Florida, to allow patients access to their psychiatric records. |
| 1998-1999 | Consultant and expert witness (affidavits; trial testimony) for the plaintiff in his lawsuit in U.S. District Court for the Western District of Wisconsin (*Scott A. Lawson v. Dale Trowbridge, et al.*), a civil rights claim for damages due to incarceration in the Monroe County (Wisc.) Jail. |
| 1999-2000 | Consultant and expert witness (affidavit, trial testimony) for the plaintiffs in their lawsuit in U.S. District Court for Eastern Texas (*Deborah Sue Anderson, et al. v. Gregory R. Montoya, M.D., et al.*) regarding treatment of a depressed man in the public mental health system in Texarkana, Texas. |

| | |
|---|---|
| 2000-2001 | Consultant and expert witness (affidavit; deposition) for the plaintiffs in their lawsuit in U.S. District Court for the Western District of Wisconsin (*Maria Edelstein et al. v. Wisconsin Counties Mutual Insurance Corporation et al.*), a civil rights claim for damages during incarceration in the Pepin County (Wisc.) jail. |
| 2005 | Consultant and expert witness (affidavit) for the plaintiff in her lawsuit in U.S. District Court for the Western District of Wisconsin (*Alysha Rodriguez v. Daniel J. Winewski et al.*), a civil rights claim for damages due to sexual assault by a public official. |
| 2007-2009 | Consultant and expert witness (report; deposition) for the plaintiff in her lawsuit in U.S. District Court for the District of Massachusetts (*Cassandra Sampson v. Beth Israel Deaconess Medical Center et al.*), a claim regarding appropriate treatment of psychiatric patients in emergency departments. |
| 2007-2011 | Consultant and expert witness (reports; deposition) for the plaintiffs in their lawsuit in U.S. District Court for the Eastern District of New York (*Joseph S. et al. v. Michael F. Hogan et al.*), a civil rights claim to require the State of New York to provide appropriate and integrated services and housing for persons with serious mental illness. |
| 2009 | Consultant and expert witness (report; deposition) for the plaintiff in her lawsuit in U.S. District Court for the Western District of Wisconsin (*Sherry Calhoun v. David Schaldach, Charles Amundson, and John Cram*), a civil rights claim for damages due to sexual assault by a jail lieutenant in the Monroe County (Wisc.) Jail. |
| 2014 | Consultant and expert (reports) for the United States Department of Justice regarding implantation of the 2010 Settlement Agreement in *United States v. The State of Georgia*, a civil rights action under the ADA to provide community-based treatment for persons with serious mental illness in The State of Georgia. |
| 2014 | Consultant for the United States Department of Justice regarding implantation of the 2009 Settlement Agreement in *United States v. The State of Connecticut*, a civil rights action under CRIPA regarding the discharge of psychiatric patients from Connecticut Valley Hospital. |
| 2017-2018 | Consultant for the United States Attorney for the Eastern District of New York, the Bazelon Center for Mental Health Law, and Disability Rights New York in their lawsuit in U.S. District Court for the Eastern District of New York (*The United States of America et al. v. State of New York et al.*), a civil rights claim to require the State of New York to provide appropriate and integrated services and housing for persons with serious mental illness. |
| 2017-2020 | Consultant to the CARA Family Detention Pro Bono Project, doing psychiatric evaluations of clients in the South Texas United States Immigration and Customs Enforcement (ICE) Family Residential Center in Dilley, Texas regarding credible fear and asylum status of clients. |
| 2022- | Consultant and expert witness (expert report) for the plaintiffs in their lawsuit in U.S. District Court for the Southern District of New York (*M.G. et al. v. Cuomo et al.*, No. 7:19-cv-00639-CS-AEK (S.D.N.Y.)), a civil rights claim to address the failure of the State of New York to serve prisoners with serious mental illness in appropriate and integrated settings when they reach their lawful prison release dates. |

## OTHER PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 1983-91 | Consultant for family interventions, Inpatient Oncology Unit, University of Wisconsin Hospital. |
| 1984 | Airplane pilot and therapist, Fear of Flying Group, Anxiety Disorders Clinic, Department of Psychiatry, University of Wisconsin. |
| 1985-2007 | Consultant to Vet Center, U.S. Department of Veterans Affairs, Madison, Wisconsin. |
| 1986 | Member, Special Training Review Committee, Initial Review Group, National Institute of Mental Health, Washington, D.C. |
| 1986-2004 | Examiner in Psychiatry, Part II Oral Examinations, American Board of Psychiatry and Neurology (18 examinations: Chicago-4; Philadelphia-4; Boston-2; Milwaukee-2; New York City-2; Washington, DC, Kansas City, Minneapolis, New Orleans – 1 each). |
| 1988-89 | Member, Liaison Committee (American Psychiatric Association and American Association of Directors of Psychiatric Residency Training) to Develop Standards for a Curriculum for Public Psychiatry. |

| | |
|---|---|
| 1989 | Member, National Planning Committee, NIMH Conference on "Clinical training for services to the long-term seriously mentally ill," Cincinnati, Ohio. |
| 1990-91 | Co-consultant (with S.L. Godard, M.D.) to the State of Vermont and University of Vermont for the Pew Foundation-American Psychiatric Association State/University Collaboration Project. |
| 1992-95 | Workshop facilitator and counselor for the Glaxo Pathway Evaluation Program at the UW Medical School.  This program, organized by the Dean's Office, helped medical students with the process of choosing a specialty by teaching them a personal decision-making process in a workshop, and providing them follow-up counseling as needed. |
| 1994-95 | Consultant to the Mental Disabilities Board of Visitors, Office of the Governor, State of Montana, for their triennial review of Montana State Hospital. |
| 1999-2000 | Consultant to Mental Disability Rights International (Washington, D.C.), and site visitor to Hungary, in their research and report on social care homes and treatment of persons with severe and persistent mental illness in Hungary. |
| 2003-2005 | Member, Advisory Council, Emergency Room Project, Center for Public Representation of Massachusetts. |
| 2010 | Invited member, Wisconsin Supreme Court Chief Justice's Criminal Justice Mental Health Leadership Task Force, Summit, March 11, 2010. |
| 2012 | Consultant to Disability Rights International (Washington, D.C.), and site visitor to Ukraine, in their research and report on care in psychiatric hospitals and *internats* for adults and children, and treatment of persons with severe and persistent mental illness in Ukraine. |
| 2006- | Appointed Physician Member, Medicaid Drug Utilization Review (DUR) Board, State of Wisconsin Department of Health Services, Division of Health Care Financing. |

## PROFESSIONAL INTERESTS

Community-based treatment of persons with disabling long-term mental illness; individual and family psychotherapy; emergency and consultation psychiatry; medical and psychiatric education.

**APPENDIX B**

**Bates-Stamped Documents**

1.  MG-Class00021325-536
2.  MG-Class00024980-88
3.  MG-Class00030807-13
4.  MG-Class00030825-1034
5.  MG-Class00031047-48
6.  MG-Class00035104-289
7.  MG-Class00035441
8.  MG-Class00036623-36650
9.  MG-Class00038537-39311
10. D-000005593-629
11. D-00005662-5930
12. D-00005976-6004
13. D-00006039-176
14. D-00006217-327
15. D-00006351-89
16. D-00065304-42
17. D-00006565-607
18. D-00006669-731
19. D-00006896-7138
20. D-00007444-8247
21. D-00009001-10650
22. D-00010671-10677
23. D-00038368-69
24. D-00039850-53
25. D-00042387-92
26. D-00055821-28
27. D-00122602-22
28. OMH-00068191-214

29. OMH-00070187-88

30. OMH-00070229-30

31. OMH-00074144-70

32. OMH-0018465-88

33. P-MEDICAL-0000002-4899

34. P-MEDICAL-0004902-6298

35. P-MEDICAL-0006299-7663

36. P-MEDICAL-0007664-7899


**Other Materials Considered**

Defendants' Answer to the Second Amended Complaint. (2021, Nov. 23). ECF No. 189.

Memorandum of Law in Support of Defendants' Partial Motion to Dismiss the Second Amended

    Complaint. (2021, Jan. 8). ECF No. 156.

Aldigé Hiday, V., Ray, B., & Wales, H. (2016). Longer-term impacts of mental health courts:

    Recidivism two years after exit. *Psychiatric Services*, *67*(4), 378–383.

Anestis, J. C., & Carbonell, J. L. (2014). Stopping the revolving door: Effectiveness of mental

    health court in reducing recidivism by mentally ill offenders. *Psychiatric Services*, *65*(9),

    1105–1112.

Baillargeon, J., Binswanger, I. A., Penn, J. V., Williams, B. A., & Murray, O. J. (2009).

    Psychiatric disorders and repeat incarcerations: The revolving prison door. *American

    Journal of Psychiatry*, *166*, 103–109. https://doi.org/10.1176/appi.ajp.2008.08030416

Barrenger, S. L., Draine, J., Angell, B., & Herman, D. (2017). Reincarceration risk among men

    with mental illnesses leaving prison: A risk environment analysis. *Community Mental

    Health Journal*, *53*, 883–892.

Bellamy, C., Kimmel, J., Costa, M. N., Tsai, J., Nulton, L., Nulton, E., Aguilar, N. J., Clayton, A., & O'Connell, M. (2019). Peer support on the "inside and outside": Building lives and reducing recidivism for people with mental illness returning from jail. *Journal of Public Mental Health*, *18*(3), 189–198.

Bonta, J., Law, M., & Hanson, K. (1998). The prediction of criminal and violent recidivism among mentally disordered offenders: A meta-analysis. *Psychological Bulletin*, *123*(2), 123–142.

*Brooklyn & Manhattan FACT*. (2018). CASES.

Burns, B. J., & Santos, A. B. (1995). Assertive community treatment: An update of randomized trials. *Psychiatric Services*, *46*(7), 669–675.

Canada, K. E., & Watson, A. C. (2013). "'Cause everybody likes to be treated good": Perceptions of procedural justice among mental health court participants. *American Behavioral Scientist*, *57*(2), 209–230.

Cochrane Library. (2023). *About Cochrane Reviews.* https://www.cochranelibrary.com/about/about-cochrane-reviews

Cosden, M., Ellens, J. K., Schnell, J. L., Yamini-Diouf, Y., & Wolfe, M. M. (2003). Evaluation of a mental health treatment court with assertive community treatment. *Behavioral Sciences and the Law*, *21*, 415–427.

DeMatteo, D., LaDuke, C., Locklair, B. R., & Heilbrun, K. (2013). Community-based alternatives for justice-involved individuals with severe mental illness: Diversion, problem-solving courts, and reentry. *Journal of Criminal Justice*, *41*(2), 64–71.

Dieterich, M., Irving, C. B., & Marshall, M. (2010). Intensive case management for severe mental illness (Review). *Cochrane Database of Systematic Reviews*, (10), 1–203.

Dieterich, M., Irving, C. B., Khokhar, M. A., Park, B., & Marshall, M. (2017). Intensive case management for severe mental illness (Review). *Cochrane Database of Systematic Reviews*, (1), 1–268.

Drake, R. E., Wallach, M. A., & Hoffman, J. S. (1989). Housing instability and homelessness among aftercare patients of an urban state hospital. *Hospital and Community Psychiatry*, *40*(1), 46–51. https://doi.org/10.1176/ps.40.1.46

Dvoskin, J. A., Knoll, IV, J. L., & Silva, M. (2020). A brief history of the criminalization of mental illness. *CNS Spectrums*, *25*, 638–650.

Gertner, A. K., Grabert, B., Domino, M. E., Cuddeback, G. S., & Morrissey, J. P. (2019). The effect of referral to expedited Medicaid on substance use treatment utilization among people with serious mental illness released from prison. *Journal of Substance Abuse Treatment*, *99*, 9–15. https://doi.org/10.1016/j.jsat.2019.01.010

Grecco, G. G., & Chambers, R. A. (2019). The Penrose Effect and its acceleration by the war on drugs: A Crisis of untranslated neuroscience and untreated addiction and mental illness. Translational Psychiatry, 9, 1–11.

Greenberg, G. A., & Rosenheck, R. A. (2008). Jail incarceration, homelessness, and mental health: A national study. *Psychiatric Services*, *59*(2), 170–177.

Haimowitz, S. (2004). Slowing the revolving door: Community reentry of offenders with mental illness. *Law & Psychiatry*, *55*(4), 373–375.

Hawthorne, W. B., Folsom, D. P., Sommerfeld, D. H., Lanouette, N. M., Lewis, M., Aarons, G. A., Conklin, R. M., Solorzano, E., Lindamer, L. A., & Jeste, D. V. (2012). Incarceration among adults who are in the public mental health system: Rates, risk factors, and short-term outcomes. *Psychiatric Services*, *63*(1), 26–32.

Heilbrun, K., Dematteo, D., Yasuhara, K., Brooks-Holliday, S., Shah, S., King, C., Dicarlo, A.

     B., Hamilton, D., & Laduke, C. (2012). Community-based alternatives for justice-

     involved individuals with severe mental illness: Review of the relevant research.

     *Criminal Justice and Behavior*, *39*(4), 351–419.

Herinckx, H. A., Kinney, R. F., Clarke, G. N., & Paulson, R. I. (1997). Assertive community

     treatment versus usual care in engaging and retaining clients with severe mental illness.

     *Psychiatric Services*, *48*(10), 1297–1306.

Hiday, V. A., & Ray, B. (2010). Arrests two years after exiting a well-established mental health

     court. *Psychiatric Services*, *61*(5), 463–468.

Hiday, V. A., Wales, H. W., & Ray, B. (2013). Effectiveness of a short-term mental health court:

     Criminal recidivism on year postexi. *Law and Human Behavior*, *37*(6), 401–411.

Hoge, S. K., & Kovasznay, B. M. (2009). (rep.). *Outpatient services for the mentally ill involved*

     *in the criminal justice system* (pp. 1–15).

Housing Resource Center. (2016). *Supportive housing options NYC: A guide to supportive*

     *housing models for individuals living with mental illness.* CUCS Institute.

Jacobs, L. A., Fixler, A., Labrum, T., Givens, A., & Newhill, C. (2021). Risk factors for criminal

     recidivism among persons with serious psychiatric diagnoses: Disentangling what matters

     for whom. *Frontiers in Psychiatry*, *12*, 1–8.

Jones, R. M., Manetsch, M., & F. Simpson, A. I. (2021). Patterns and predictors of

     reincarceration among prisoners with serious mental illness: A cohort study. *The*

     *Canadian Journal of Psychiatry*, *66*(6), 560–568.

     https://doi.org/10.1177/0706743720970829

Kasinathan, J. (2015). Predictors of rapid reincarceration in mentally ill young offenders. *Australasian Psychiatry*, *23*(5), 550–555.

Lamb, H. R., & Weinberger, L. E. (2014). Decarceration of U.S. jails and prisons: Where will persons with serious mental illness go? *The Journal of the American Academy of Psychiatry and the Law*, *42*, 489–494.

Lamb, H. R., Weinberger, L. E., Marsh, J. S., & Gross, B. H. (2007). Treatment prospects for persons with severe mental illness in an urban county jail. *Psychiatric Services*, *58*(6), 782–786.

Lamberti, J. S. (2007). Understanding and preventing criminal recidivism among adults with psychotic disorders. *Psychiatric Services*, *58*(6), 773–781.

Lamberti, J. S. (2016). Preventing criminal recidivism through mental health and criminal justice collaboration. *Psychiatric Services*, *67*(11), 1206–1212.

Lamberti, J. S., Weisman, R. L., Cerulli, C., Williams, G. C., Jacobowitz, D. B., Mueser, K. T., Marks, P. D., Strawderman, R. L., Harrington, D., Lamberti, T. A., & Caine, E. D. (2017). A randomized controlled trial of the Rochester Forensic Assertive Community Treatment Model. *Psychiatric Services*, *68*(10), 1016–1024.

Lamberti, J. S., Weisman, R. L., Schwarzkopf, S. B., Price, N., Ashton, R. M., & Trompeter, J. (2001). The mentally ill in jails and prisons: Towards an integrated model of prevention. *Psychiatric Quarterly*, *72*(1), 63–77.

Lebel, T. P. (2007). An examination of the impact of formerly incarcerated persons helping others. *Journal of Offender Rehabilitation*, *46*(1-2), 1–24.

Leutwyler, H., Hubbard, E., & Zahnd, E. (2017). Case management helps prevent criminal justice recidivism for people with serious mental illness. *International Journal of Prisoner Health*, *13*(3-4), 168–172.

Liebowitz, S., Eliasberg, P. J., Burnim, I. A., & Read, E. B. (2014). (rep.). (T. A. Kupers, Ed.)*A Way forward: Diverting people with mental illness from inhumane and expensive jails into community-based treatment that works* (pp. 1–20). The ACLU of Southern California and the Bazelon Center for Mental Health Law.

Loong, D., Bonato, S., Barnsley, J., & Dewa, C. S. (2019). The effectiveness of mental health courts in reducing recidivism and police contact: A systematic review. *Community Mental Health Journal*, *55*, 1073–1098. https://doi.org/10.1007/s10597-019-00421-9

Lovell, D., Gagliardi, G. J., & Peterson, P. D. (2002). Recidivism and use of services among persons with mental illness after release from prison. *Psychiatric Services*, *53*(10), 1290–1296.

McNiel, D. E., & Binder, R. L. (2007). Effectiveness of a Mental Health Court in Reducing Criminal Recidivism and Violence. *American Journal of Psychiatry*, *164*(9), 1395–1403.

McNiel, D. E., Binder, R. L., & Robinson, J. C. (2005). Incarceration associated with homelessness, mental disorder, and co-occurring substance abuse. *Psychiatric Services*, *56*(7), 840–846.

Morrissey, J., Meyer, P., & Cuddeback, G. (2007). Extending assertive community treatment to criminal justice settings: Origins, current evidence, and future directions. *Community Mental Health Journal*, *43*(5), 527–544.

Morse, G. A., Calsyn, R. J., Allen, G., Tempelhoff, B., & Smith, R. (1992). Experimental comparison of the effects of three treatment programs for homeless mentally ill people. *Hospital and Community Psychiatry*, *43*(10), 1005–1010.

Morse, G. A., Calsyn, R. J., Klinkenberg, W. D., Trusty, M. L., Gerber, F., Smith, R., Tempelhoff, B., & Ahmad, L. (1997). An experimental comparison of three types of case management for homeless mentally ill persons. *Psychiatric Services*, *48*(4), 497–503.

National Technical Assistance Center for State Mental Health Planning (NTAC). (2002). (rep.). *Criminal Justice Primer for State Mental Health Agencies* (pp. 1–19).

*NYC Standardized Vulnerability Assessment criteria fact sheet*. (2019). NYC Human Resources Administration: Department of Social Services.

Okin, R. L. (1985). Expand the community care system: Deinstitutionalization can work. *Hospital and Community Psychiatry*, *36*(7), 742–745.

Office of Mental Health. *About Our Executive Team*. https://omh.ny.gov/omhweb/about/bios.html

Office of Mental Health. *About PSYCKES*. https://omh.ny.gov/omhweb/psyckes_medicaid/about/

Office of Mental Health. (2015). *Guidelines for New York City Medicaid managed care organizations and health and recovery plans regarding utilization management for assertive community treatment.*

Osher, F., Steadman, H. J., & Barr, H. (2003). A best practice approach to community reentry from jails for inmates with co-occurring disorders: The APIC Model. *Crime & Delinquency*, *49*(1), 79–96.

Parisi, A., Wilson, A. B., Villodas, M., Phillips, J., & Dohler, E. (2022). A systematic review of interventions targeting criminogenic risk factors among persons with serious mental illness. *Psychiatric Services*, *73*(8), 897–909. https://doi.org/10.1176/appi.ps.202000928

Perry, A. E., Martyn-St James, M., Glanville, J. M., Burns, L., Hewitt, C., Aboaja, A., Thakkar, P., Kumar, K. M. S., Pearson, C., Wright, K., & Swami, S. (2019). Interventions for drug-using offenders with co-occurring mental health problems (Review). *Cochrane Database of Systematic Reviews*, (10).

Perry, A. E., Neilson, M., Martyn-St James, M., Glanville, J. M., Woodhouse, R., Godfrey, C., & Hewitt, C. (2015). Interventions for drug-using offenders with co-occurring mental illness (Review). *Cochrane Database of Systematic Reviews*, (5), 1–85.

Pinals, D. A. (2015). Crime, violence, and behavioral health: collaborative community strategies for risk mitigation. *CNS Spectrums*, *20*, 241–249.

Pleggenkuhle, B., Huebner, B. M., & Kras, K. R. (2016). Solid start: supportive housing, social support, and reentry transitions. *Journal of Crime and Justice*, *39*(3), 380–397.

Pope, L. G., Smith, T. E., Wisdom, J. P., Easter, A., & Pollock, M. (2013). Transitioning between systems of care: Missed opportunities for engaging adults with serious mental illness and criminal justice involvement. *Behavioral Sciences and the Law*, *31*, 444–456.

Project Link, Department of Psychiatry, University of Rochester. (1999). Gold Award: Prevention of jail and hospital recidivism among persons with severe mental illness. *Psychiatric Services*, *50*(11), 1477–1480.

Ray, B. (2014). Long-term recidivism of mental health court defendants. *International Journal of Law and Psychiatry*, *37*, 448–454.

Rowe, M., Bellamy, C., Baranoski, M., Wieland, M., O'Connell, M. J., Benedict, P., Davidson, L., Buchanan, J., & Sells, D. (2007). A peer-support, group intervention to reduce substance use and criminality among persons with severe mental illness. *Psychiatric Services*, *58*(7), 955–961.

Sarteschi, C. M., Vaughn, M. G., & Kim, K. (2011). Assessing the effectiveness of mental health courts: A quantitative review. *Journal of Criminal Justice*, *39*, 12–20.

Scott, D. A., McGilloway, S., Dempster, M., Browne, F., & Donnelly, M. (2013). Effectiveness of criminal justice liaison and diversion services for offenders with mental disorders: A review. *Psychiatric Services*, *64*(9), 843–849.

Selling, D., Lee, D., Solimo, A., & Venters, H. (2015). A road not taken: Substance abuse programming in the New York City jail system. *Journal of Correctional Health Care*, *21*(1), 7–11.

Simmonds, S., Coid, J., Joseph, P., Marriott, S., & Tyrer, P. (2001). Community mental health team management in severe mental illness: a systematic review. *British Journal of Psychiatry*, *178*, 497–502.

Skeem, J. L., Winter, E., Kennealy, P. J., Louden, J. E., & Tatar II, J. R. (2014). Offenders with mental illness have criminogenic needs, too: Toward recidivism reduction. *Law and Human Behavior*, *38*(3), 212–224.

Smith, T. E., Easter, A., Pollock, M., Pope, L. G., & Wisdom, J. P. (2013). Disengagement from care: Perspectives of individuals with serious mental illness and of service providers. *Psychiatric Services*, *64*(8), 770–775.

Southall, A. (2019, Jan. 23). Mentally ill prisoners are held past release dates, lawsuit claims. *The New York Times*.

Stein, L. I., Diamond, R. J., Factor, R. M., Herz, M. I., & Docherty, J. P. (1990). Chapter 11: A system approach to the care of persons with schizophrenia. In M.I. Herz, S.J. Keith, & J.P. Docherty (Eds.), *Clinical handbook of schizophrenia* (Vol. 4, pp. 213–246). Elsevier Science Publishers B.V.

Stewart, A. C., Quinn, B., Dietze, P., Romero, L., Wilkinson, A. L., Stoové, M., & Cossar, R. D. (2022). Criminal justice involvement after release from prison following exposure to community mental health services among people who use illicit drugs and have mental illness: A systematic review. *Journal of Urban Health*, *99*, 635–654. https://doi.org/10.1007/s11524-022-00635-5

Substance Abuse and Mental Health Services Administration. (n.d.). (rep.). *Forensic Assertive Community Treatment (FACT) Brief: A Service Delivery Model for Individuals With Serious Mental Illness Involved With the Criminal Justice System* (pp. 1–8).

Test, M. A., & Stein, L. I. (2001). A Critique of the Effectiveness of Assertive Community Treatment. *Psychiatric Services*, *52*(10), 1396-97.

*Understanding the New York City Standardized Vulnerability Assessment*. (2019). NYC Human Resources Administration: Department of Social Services.

Warr, M. (1998). Life-course transitions and desistance from crime. *Criminology, 36*(2), 183-216.

Wilson, D., Tien, G., & Eaves, D. (1995). Increasing the community tenure of mentally disordered offenders: An assertive case management program. *International Journal of Law and Psychiatry*, *18*(1), 61–69.

Wilson, M. (2022, September 14). Bomb scare, murder, fights: Thousands of 911 calls at one site. *New York Times*. Retrieved November 22, 2022, from

https://www.nytimes.com/2022/09/14/nyregion/nyc-911-calls-riverside-

drive.html?action=click&pgtype=Article&state=default&module=styln-great-

read&variant=show&ion=BELOW_MAIN_CONTENT&block=storyline_flex_guide_rec

ir.

Yerramsetti, A. P., Simons, D. D., Coonan, L., & Stolar, A. (2017). Veteran treatment courts: A

promising solution. *Behavioral Sciences and the Law*, *35*, 512–522.