# Exhibit 1 to the
# Peet Declaration

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H.,
individually and on behalf of all similarly situated,

                                        Plaintiffs,

               -against-

ANDREW CUOMO, in his official capacity as the
Governor of the State of New York, the NEW YORK
STATE OFFICE OF MENTAL HEALTH, ANN MARIE
T. SULLIVAN, in her official capacity as the
Commissioner of the New York State Office of Mental
Health, the NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION,
ANTHONY J. ANNUCCI, in his official capacity as the
Acting Commissioner of the New York State Department
of Corrections and Community Supervision, ANNE
MARIE MCGRATH, in her official capacity as Deputy
Commissioner of the New York State Department of
Corrections and Community Supervision,

                                        Defendants.
------------------------------------------------------------------------ x

                                        7:19-cv-0639 (CS) (AEK)

## EXPERT REPORT OF MELODIE J. PEET, M.P.H.

**TABLE OF CONTENTS**

A.  PURPOSE AND SCOPE OF REPORT                                          1
B.  SUMMARY OF OPINION                                                   1
C.  BACKGROUND AND EXPERIENCE                                            3
D.  METHODOLOGY                                                          4
E.  FINDINGS AND CONCLUSIONS                                             5
  I.    As the State Mental Health Authority for New York State, OMH is Responsible for
  Ensuring the Sufficiency of Mental Health Services for the Relevant Population.      5

    a.    OMH is Responsible for Maintaining Adequate Community Based Mental Health
    Housing and Supportive Services for the Relevant Population.            6

    b.    OMH is Responsible for Planning, Program Development, Funding, Systems
    Management, and Evaluation for New York State's Community Based Mental Health
    Housing and Supportive Services System.                                6

    c.    OMH has Developed a Public Mental Health System in New York State that Offers
    Five Major Program Categories.                                         7

    d.    OMH and DOCCS Share Responsibility for the Delivery of Services to the Relevant
    Population.                                                            12

  II.   OMH Fails to Provide Sufficient Community-Based Mental Health Housing and
  Supportive Services to the Relevant Population.                         14

    a.    OMH Fails to Define the Safety Net Services that Must Exist within its Community-
    Based Mental Health Housing And Supportive Services System to Meet the Needs of the
    Relevant Population.                                                   14

    b.    OMH Fails to Adequately Plan, Develop, and Fund Supported Housing, ACT and
    FACT, Crisis Services, and Medication Management for the Relevant Population.    21

    c.    OMH Fails to Address Counties' Reports of Inadequate Funding for Supported
    Housing, ACT and FACT, Medication Management, and Crisis Services for the Relevant
    Population.                                                            31

    d.    OMH Fails to Develop a Sufficient Management Structure to Oversee the Counties and
    Voluntary Agencies that Administer CBMHHSS to the Relevant Populations.    32

    e.    OMH Fails to Utilize DOCCS and County Data Concerning the Need for CBMHHSS
    Among the Relevant Population.                                         36

    f.    OMH Has Failed to Engage in Long-Term Planning and Data Driven Program
    Development to Ensure Sufficient Community-Based Mental Health Housing and
    Supportive Services for the Relevant Population, Instead Relying on Reactive Pilot Projects
    and Temporary Funding Streams.                                         37

    g.    The Foregoing Failures are Typified by OMH's Failure to Sufficiently Execute its
    Transformation Plan.                                                   39

III.  OMH's Failure to Fund Community-Based Mental Health Housing and Supportive Services is the Main Driver of its Failure to Maintain Housing and Services for the Relevant Population.                                                                                                          40

    a.    OMH Continues to Disproportionately Fund Institutional Care Instead of Adequately Funding Community Based Mental Health Housing and Supportive Services.                           40

    b.    OMH has Failed to Implement Well-Known Models for the Development of an Equitably Funded Community-Based Mental Health Housing and Supportive Services System.                                                                                                                            41

F.    SUMMARY OF FINDINGS                                                                                              42
G.    RECOMMENDATIONS                                                                                                44
H.    CONCLUSION                                                                                                       46

## A. <u>PURPOSE AND SCOPE OF REPORT</u>

This report summarizes my expert opinion regarding the adequacy of Community-Based Mental Health Housing and Supportive Services ("CBMHHSS") for New York State residents with serious mental illness who are homeless and/or at risk of homelessness and reach their release dates or are released from the New York State Department of Corrections and Community Supervision ("DOCCS") system (the "relevant population"). Specifically, I examine the roles and actions of the following two New York State agencies responsible for ensuring that members of the relevant population receive the CBMHHSS for which they are eligible and appropriate on their release dates:

1) The New York State Office of Mental Health ("OMH"), which is responsible for the planning, development, management, and funding of CBMHHSS for the relevant population; and

2) The New York State Department of Corrections and Community Supervision ("DOCCS"), which is responsible for working with OMH to ensure that the relevant population receives the CBMHHSS for which they are eligible and appropriate upon their release dates and ultimate release from the DOCCS system.

As an expert on the administration of state-level, community-based mental health systems (*i.e.,* "mental health systems expert"), I was asked by Plaintiffs' counsel to examine whether OMH and DOCCS adequately serve the relevant population. I was further asked to opine on whether OMH and DOCCS provide adequate CBMHHSS to this population upon their release date and release from DOCCS. Based on my conclusion, I was asked to opine on the broad causes for any failure to adequately serve the relevant population and to provide adequate CBMHHSS to this population upon their release date and release from DOCCS. I was further asked to opine on whether there are ways OMH and DOCCS can remedy any such failures for the relevant population.

## B. <u>SUMMARY OF OPINION</u>

As a mental health systems expert, it is my professional opinion that OMH and DOCCS do not adequately serve the relevant population. Although CBMHHSS exist, they do not exist in sufficient quantities to meet the needs of this population. In fact, members of the relevant population are released to settings without sufficient or appropriate CBMHHSS—such as homeless shelters or halfway houses— while others are released to inappropriate and overly restrictive settings—such as crisis residences within psychiatric hospitals or transitional living residences within psychiatric hospitals—because of this shortage of CBMHHSS.[1]

---

[1] *See, infra* Section II(b)(i).

While CBMHHSS exist, these services are inadequate because OMH has not maintained them in sufficient quantity, particularly for the relevant population. The broad cause of these agencies' failures includes OMH's failure to adequately plan, develop, and fund the necessary CBMHHSS for this population. OMH continues to fail to sufficiently allocate the significant dollars and resources to which it has access to ensure adequate CBMHHSS. It has also failed to develop a proper management structure that implements uniform standards, guidance, and assistance to counties based on data and best practices for service system management at the county level. For example, OMH does not maintain waiting lists for CBMHHSS, instead outsourcing that responsibility to the local counties without implementing strict and uniform standards to the local service districts on waitlist reporting. The failure to implement these standards has impeded OMH's ability to track the statewide need for CBMHHSS and allocate resources sufficient to meet this need, including for the relevant population.

With OMH, DOCCS is jointly responsible for "providing special programs along a continuum of care for incarcerated individuals with a mental illness,"[2] including ensuring that individuals with serious mental illness are assessed for and provided with the CBMHHSS for which they are eligible on their release date.[3] DOCCS must work with OMH to develop a proactive, data-driven strategic plan that ensures that the relevant population will be set up with the CBMHHSS for which they are eligible and appropriate at the time of their release date. Moreover, DOCCS must create an integration mandate policy, requiring people with serious mental illness to be released to an integrated setting appropriate to their needs. By failing to take these steps, DOCCS has further contributed to the state's failures to adequately serve the relevant population. Indeed, while this report largely focuses on OMH, both OMH and DOCCS are ultimately responsible for the failure to provide adequate CBMHHSS for the relevant population upon their release dates and ultimate release from prison.

I build on these findings below, and ultimately, I set forth the recommendations OMH and DOCCS should implement to rectify the failures I have identified.

---

[2] *Medical/Dental/Mental Health Services*, NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, https://doccs.ny.gov/medical-services (last visited Dec. 7, 2022).

[3] *Memorandum of Understanding between the New York State Office of Mental Health and the New York State Department of Corrections and Community Supervision* at 1 (Sept. 2016) (MG Bates No. MG-Class00023332, on file with author); Discharge Planning for Levels of Mental Illness, Policy No. 8.0, CENTRAL NEW YORK PSYCHIATRIC CENTER CORRECTIONS-BASED OPERATIONS MANUAL, (Jun. 28, 2016) (MG Bates No. MG-Class00000219, on file with author); Mental Health Specialized Supervision Standards, Directive No. 9230, NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, at 1 https://doccs.ny.gov/system/files/documents/2022/12/9230.pdf (last visited Dec. 25, 2022); *Laws, Rules, & Directive Listing Overview*, NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, https://doccs.ny.gov/laws-rules-directives-Listing?f%5B0%5D=filterterm%3A246&keyword=&cr=&created_date=&created_date_1=&page=36 (last visited Dec. 25, 2022) ("The Department of Corrections and Community Supervision maintains comprehensive directives detailing the proper management and operation of its many functions. These documents also provide general information/guidance to assist regulated parties in complying with statutes, rules and other legal requirements.").

## C.  BACKGROUND AND EXPERIENCE

In my 40-year career in mental health, I have worked both as a provider of services and as a state mental health administrator. In my practice, I have worked with and relied on the findings of qualified clinicians to determine the clinical appropriateness of services and placements for people with serious mental illness.  My resume is attached as *Appendix A*.  After completing a master's degree in Mental Health Administration at Yale, I spent ten years in Connecticut as an administrator and CEO of community mental health centers.  During that time, my focus was on developing community programming for individuals with severe and prolonged mental illness. Upon request by the State of Connecticut, I piloted the first mobile crisis, homeless outreach, and assertive treatment teams to be introduced as elements in the State's public mental health system.

While Executive Director of the Greater Bridgeport Community Mental Health Center, I was asked by the State Department of Mental Health to be the first agency to introduce the Assertive Community Treatment (ACT) team model in Connecticut. I then served as the Deputy Commissioner of the Connecticut Department of Mental Health and Addiction Services, focusing on community systems development.  In that role, I led a process to develop comprehensive systems of care in the state's nineteen (19) catchment areas, *i.e.,* the defined geographic areas to receive mental health services, by reappropriating funds from downsizing the state psychiatric hospitals. As part of that process, I oversaw the development of the ACT model in each catchment area in the state. Additionally, I led a team that expanded the programs piloted at the Greater Bridgeport Mental Health Center to service systems statewide.

From 1995 to 1999, I was the Commissioner of Mental Health, Developmental Disabilities, and Substance Abuse Administration in Maine.  As Commissioner, I oversaw a significant expansion of community service systems, linking those efforts with the establishment of Regional Management entities and a funding strategy based on state hospital downsizing.

Between 2000 and 2010, my work focused primarily on children's mental health. From 2007 to 2009, I served as the Deputy Commissioner of the Department of Children and Families in Massachusetts.  In that capacity, my efforts were targeted to integrating the work of the Departments of Mental Health and Child Welfare, using a trauma-informed practice model.[4]  Then I returned to Connecticut, as CEO of the state psychiatric hospital for children, a role in which my efforts centered on moving the hospital from a standalone institution to a partner in the state's local systems of care.

---

[4] *See Trauma-Informed Practice Framework*, COMMUNICARE: CREATING FUTURES, at 7 (Mar. 2021), https://www.communicare.org.au/Communicare/media/documents/Trauma-Informed-Practice_Framework.pdf (In order to ensure improved outcomes for individuals with mental illness, for both adults and children, a "trauma-informed" practice model avoids "institutional processes and individual practices that are likely to retraumatise individuals who already have histories of trauma, and it upholds the importance of client participation in the development, delivery, and evaluation of services."); Substance Abuse and Mental Health Services Administration's (SAMHSA) Trauma and Justice Strategic Initiative, *SAMHSA's Concept of Trauma and Guidance for a Trauma-Informed Approach*, NATIONAL CENTER ON SUBSTANCE ABUSE AND CHILD WELFARE, at 9-11 (Jul. 2014), https://ncsacw.acf.hhs.gov/userfiles/files/SAMHSA_Trauma.pdf.

From 2010 to 2019, I worked as the Director of a large nonprofit in Connecticut delivering services to adults and children with Mental Health and Developmental Disabilities. From 2018 to present, I have worked as an expert witness and mental health systems consultant for the United States Department of Justice and state disability rights non-profit organizations.  In June of 2019, I testified as an expert in a trial in the *Olmstead* case of *U.S. v. Mississippi*,[5] in which I evaluated the functioning of the state's mental health system against the integration mandate of the ADA and offered opinions regarding the adequacy of community mental health services.

The length and breadth of my career, combined with my experience managing large mental health systems, balancing multiple priorities, and developing systems of care, gives me an expert perspective from which to offer opinions on the adequacy and appropriateness of state-level administration of the CBMHHSS system for the relevant population in New York State.

In the present case, I am being compensated at the rate of $200 per hour.  My compensation is not dependent on the outcome of this litigation.

### D.  **METHODOLOGY**

To formulate my opinion in this case, I reviewed the professional literature that addresses mental health strategies for formerly incarcerated people, New York State Office of Mental Health Plans and data reports, New York County Local Services Plans,[6] and data from the New York State Department of Corrections and Community Supervision.  I reviewed Best Practices Reports from both the Substance Abuse and Mental Health Administration ("SAMHSA"), which is a branch of the United States Department of Health and Human Services, and the National Association of State Mental Health Program Directors ("NASMHPD") (the trade association for state Mental Health Commissioners).  Additionally, I examined documents prepared by organizations addressing the issue of homelessness in New York State. I also reviewed Dr. Robert Factor's report as to the manifestation of the system issues related to the lack of CBMHHSS discussed herein, and acknowledged the findings in his report.  I also reviewed the Declaration of Seth Crider in Support of Plaintiff's Motion for Class Certification.  I then analyzed the facts of this case using this data and my background and experience to arrive at my conclusions.  I have attached a list of sources I have reviewed herein as *Appendix B*.

---

[5] Civ. No. 3:16-CV-00622-CWR-FKB (S.D. Miss. 2019).

[6] N.Y. Mental Hyg. Law (MHL) § 41.16 (2022) requires the Office of Mental Health (OMH) to guide and facilitate the local planning process. As part of the local planning process, local governmental units (LGUs) develop and annually submit a combined Local Services Plan (LSP) to all three Mental Hygiene agencies through the Mental Hygiene County Planning System.  *See also 2021 Local Services Plan and Statewide Town Hall Analysis*, NEW YORK STATE OFFICE OF MENTAL HEALTH, at 1 (Jun. 2021), https://my.visme.co/view/x4ep3xdd-2020-local-services-plan-and-statewide-town-hall-analysis.

## E.  **FINDINGS AND CONCLUSIONS**

I.  <u>As the State Mental Health Authority for New York State, OMH is Responsible for Ensuring the Sufficiency of Mental Health Services for the Relevant Population.</u>

The current U.S. public mental health systems model relies on the designation of a State Mental Health Authority ("SMHA")[7] within each state. NASMHPD defines the functions and the responsibilities of the SMHAs, which are defined under four broad categories:

1.  Manage and coordinate behavioral health public policy, public safety, and public welfare;

2.  Manage and coordinate financing and insurance coverage;

3.  Prioritize funding related to non-medical services (housing and employment); and

4.  Manage, improve, and coordinate quality of care and delivery of services.[8]

In short, SMHAs are responsible for the effective and efficient operation of the public mental health systems in their jurisdictions.[9]  SMHAs may set standards, principles, issue guidance, or entrust certain roles to County or Local entities, to the extent the law permits, which then may serve as the Local Mental Health Authority ("LMHA") for their respective jurisdictions.  The SMHAs retain overall responsibility for all aspects of the state mental health system's functioning and should exercise oversight to ensure localities' adherence with SMHA policies and regulations.

---

[7] State Mental Health Authorities (SMHAs) may also be referred to as State Behavioral Health Agencies (SBHAs). *See* Joel E. Miller, *Too Significant To Fail: The Importance of State Behavioral Health Agencies in the Daily Lives of Americans with Mental Illness, for Their Families, and for Their Communities*, NATIONAL ASSOCIATION OF STATE MENTAL HEALTH PROGRAM DIRECTORS (2012), https://www.nasmhpd.org/sites/default/files/Too%20Significant%20To%20Fail(7).pdf ). The State Mental Health Authorities Directory lists state mental health authorities (SMHAs) who oversee the MHBG and mental health programs in their state. *See Community Mental Health Services Block Grant (MHBG) Contacts*, SAMHSA, https://www.samhsa.gov/grants/block-grants/mhbg/contacts (last visited Dec. 25, 2022).

[8] Miller, *supra* note 7, at ix-xiii.

[9] SAMHSA, *Funding And Characteristics of State Mental Health Agencies*, AMERICAN ASSOCIATION ON HEALTH & DISABILITY (AAHD), at xxi (2010), https://aahd.us/wp-content/uploads/2012/12/FundingStateMentalHealthAgencies2010.pdf ("State Mental Health Agencies (SMHAs) are the state governmental agencies responsible for assuring the availability and delivery of mental health services to adults with serious mental illnesses (SMI) . . . . SMHAs have evolved from operating state psychiatric hospitals to overseeing a modern safety net system. This system provides predominately community-based mental health services . . . designed to help consumers recover and live in their own communities.").

a. **OMH is Responsible for Maintaining Adequate Community Based Mental Health Housing and Supportive Services for the Relevant Population.**

OMH is New York's SMHA. OMH is subject to rules and regulations by the State, including, Sections 7.09[10] and 31.04[11] of the Mental Hygiene Law, which render OMH responsible for the functions and responsibilities articulated in the guidance above. Specifically, these sections "grant the Commissioner of Mental Health the power and responsibility to adopt regulations that are necessary and proper to implement matters . . . and to set standards of quality and adequacy of facilities, equipment, personnel, services, records and programs for the rendition of services for adults diagnosed with mental illness or children diagnosed with emotional disturbance, pursuant to an operating certificate"[12] and provide the regulatory power of the commissioner of mental health.[13] Thus, OMH has great authority over matters related to mental health, including ensuring that the relevant population's need for CBMMHSS is fully met. OMH's authority gives it the power to take proactive measures where, for example, adequacy of CBMHHSS for the relevant population is lacking. A further overview of OMH's relevant responsibilities is provided below.

b. **OMH is Responsible for Planning, Program Development, Funding, Systems Management, and Evaluation for New York State's Community Based Mental Health Housing and Supportive Services System.**

OMH is responsible for the planning, program development, funding, and evaluation of services for all people with serious mental illness throughout each of the state's counties.[14] It is responsible for ensuring "that mentally ill persons are provided with care and treatment, that such care, treatment and rehabilitation is of high quality and effectiveness, and that the personal and civil rights of persons receiving care, treatment and rehabilitation are adequately protected."[15] This care, treatment, and rehabilitation must be operationalized through the development of a comprehensive and integrated behavioral health system developed in consultation with other state departments, local governments, and community organizations and agencies.[16]

OMH is responsible for developing, implementing and overseeing New York State's CBMHHSS system. OMH is also responsible for enforcing the laws and regulations that govern

---

[10] N.Y. MHL § 7.09(a); 14 NYCRR § 501.1(a) ("Section 7.09 of the Mental Hygiene Law grants the commissioner of Mental Health the power and responsibility to adopt regulations that are necessary and proper to implement matters under his or her jurisdiction.").

[11] N.Y. MHL § 31.04 (Regulatory powers of the commissioner).

[12] 14 NYCRR § 501.1(a).

[13] N.Y. MHL § 7.09(a).

[14] *Profile of the New York State Mental Health System*, NEW YORK STATE OFFICE OF MENTAL HEALTH, at 23 (Sept. 2022), https://my.visme.co/view/6x6nk6p6-mar-2022-profile-of-the-new-york-state-public-mental-health-system; *2016-2020 Statewide Comprehensive Plan*, NEW YORK STATE OFFICE OF MENTAL HEALTH at 1 (Sept. 2022) (MG Bates No. MG-Class00000736, on file with author).

[15] MHL. §7.07(c).

[16] MHL. §7.07(a).

6

the provision of mental health treatment and services within the DOCCS system.[17]   OMH's responsibilities include ensuring that the relevant population receives appropriate and sufficient access to CBMHHSS, while avoiding the use of unnecessary institutionalization.[18]

OMH claims it is committed to individuals with mental illness "who are justice-involved or at risk for adverse incidents during critical transitions in care."[19]   As a component of this commitment, OMH's self-proclaimed objective is to "[r]educe criminal justice system involvement for individuals with serious mental illness" and "[i]mprove the continuum of care for individuals in prisons, forensic hospitals, and with forensic status in State PC's [Psychiatric Centers] as they transition back to community living."[20]

Setting these objectives, however, is just a first step.   The successful implementation of these objectives is also imperative for an SMHA to effectively treat the population of people with mental illness that it is responsible for treating and to effectively manage the system it is responsible for managing.   Implementation, in this regard, means OMH ensuring that mental health resources are not only available, but accessible for all people with serious mental illness in sufficient quantities.   This includes maintaining an array of CBMHHSS, at an adequate capacity, to meet the mental health housing and supportive service needs of the relevant population.   In other words, it is OMH's responsibility to ensure that no person from the relevant population is left at any point without access to CBMHHSS at the time of their need.   It is contrary to OMH's responsibility—and its express commitment—for these individuals to be turned away, denied, or placed on a waiting list for CBMHHSS, due to OMH's failure to ensure that these services exist in sufficient quantity.

    c.  **OMH has Developed a Public Mental Health System in New York State that Offers Five Major Program Categories.**

OMH is responsible for oversight of the state public mental health system ("PMHS"), which includes all PMHS programs that are licensed, regulated, operated, funded and approved by OMH.[21]   There are five major program categories under the PMHS, as described below.

    i.  *Emergency Programs.*

Emergency programs "provide rapid stabilization and/or medical stabilization."[22]   These programs are intended to resolve crises without the need for inpatient admission. There is a continuum of crisis services that are available in various combinations across the State of New

---

[17] *See* Discharge Planning for Levels of Mental Illness, Policy No. 8.0, CENTRAL NEW YORK PSYCHIATRIC CENTER CORRECTIONS-BASED OPERATIONS MANUAL, (Jun. 28, 2016) (MG Bates No. MG-Class00000219, on file with author).

[18]  *OMH Strategic Plan*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/planning/strategic-framework/index.html (last visited Dec. 24, 2022).

[19] *Id.*

[20] *See id.*

[21] *See Profile of the New York State Mental Health System*, *supra* note 14, at 21.

[22] *Id.* at 23.

York. Emergency program types for these services include Crisis Intervention, Crisis Residence (which is a "single site residence designed to provide 24 hours per day supervision, generally for up to 30 days"),[23] Crisis Respite, Home-Based Crisis Intervention, and Comprehensive Psychiatric Emergency Programs (CPEP).[24]

### ii. *Inpatient Care.*

Inpatient care is intended to provide stabilization, intensive treatment and rehabilitation in a 24-hour controlled setting. OMH operates at least twenty-four (24) State Psychiatric Centers[25] and licenses over one hundred (100) other inpatient programs that provide approximately ten thousand (10,000) beds in general hospitals, private hospitals, and residential treatment centers.[26]

### iii. *Outpatient Programs.*

OMH operates and regulates nearly eight hundred (800) outpatient programs.[27] Among them are Assertive Community Treatment ("ACT") and Forensic ACT ("FACT") teams, as well as mental health clinics, day treatment, and Personalized Recovery Oriented Services ("PROS").[28]

ACT is "an evidenced-based practice that offers treatment, rehabilitation, and community integration services to individuals diagnosed with serious mental illness (SMI)." [29] ACT uses a "person-centered, recovery-based approach to care." [30] It provides services through a mobile multi-disciplinary team[31] including assertive outreach, mental health treatment, vocational

---

[23] *Licensed Program Type Definitions*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/licensing/definitions.htm (last visited Dec. 24, 2022).

[24] *Id.*

[25] *See* N.Y. MHL § 7.17(b) (designates 24 hospitals "for the care, treatment, and rehabilitation of persons with mental illness and for research and teaching in the science and skills required for the care, treatment and rehabilitation of such persons with mental illness.");

[26] See *2016-2020 Statewide Comprehensive Plan*, *supra* note 14, at 10; *2017 Interim Report to the Statewide Comprehensive Plan*, NEW YORK STATE OFFICE OF MENTAL HEALTH (2017) (on file with author), at 16 ("OMH operates 24 State Psychiatric Centers, and licenses over 100 other inpatient programs that collectively operate nearly 10,000 psychiatric inpatient beds statewide.").

[27] See *2017 Interim Report to the Statewide Comprehensive Plan*, *supra* note 26, at 12.

[28] Ann Marie T. Sullivan, *OMH Statewide Town Hall*, NEW YORK STATE OFFICE OF MENTAL HEALTH, at 33 (Nov. 9, 2022), https://omh.ny.gov/omhweb/planning/507/2022-statewide-town-hall.pdf;.

[29] *Assertive Community Treatment (ACT)*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/act/ (last visited Dec. 24, 2022).

[30] *Id.*

[31] See SAMHSA, *Forensic Assertive Community Treatment (FACT), A Service Delivery Model for Individuals With Serious Mental Illness Involved With the Criminal Justice System*, at 5, https://store.samhsa.gov/sites/default/files/d7/priv/pep19-fact-br.pdf (last visited Dec. 5, 2022) (Team members may include team leader, psychiatrist/psychiatric nurse practitioner, registered nurse, licensed practical nurse, program assistant, wellness specialist, criminal justice specialist, housing specialist, peer specialist, employment specialist, family specialist, and substance use specialist); *Assertive Community Treatment (ACT) Program Guidelines Adult and Young Adult*, NEW YORK STATE OFFICE OF MENTAL HEALTH (Dec. 2022), https://omh.ny.gov/omhweb/act/act-program-guidelines.pdf (Required ACT Team members include Team leader, psychiatrist/NPP, RN, Program Assistant, Substance Use Specialist, Vocational Specialist, Family Specialist, Peer Specialist).

support, integrated dual disorder treatment, family education, wellness skills, community linkages and peer support.[32]

FACT is an adapted version of ACT and "builds on the evidence-based assertive community treatment . . . model by making adaptations based on criminal justice issues—in particular, addressing criminogenic risks and needs.  In this sense, FACT is an intervention that bridges the behavioral health and criminal justice systems."[33]  It "provides coordinated behavioral health and social support services to justice-involved individuals, including individuals with serious mental illness released from prison…"[34]

It is well acknowledged and established in the mental health community that these programs are the ideal outpatient programs for use with people with SMI being released from prison who are homeless or at risk of homelessness for several reasons.[35]  First, ACT and FACT programs simplify access to care because all needed services are provided under the umbrella of the same team.  Second, the services are tailored to the person according to the patient's need.  These services can be very intensive at the point of discharge and then transition to less dense service delivery as the person acclimates to community living.  For individuals not used to managing their own medication regimens, ACT and FACT work well because the team nurse is responsible for medication administration and is able to bring needed medications to the individual according to the prescribed plan.  The team can be present with the person as often as several times a day and 24/7 to help with the predictable bumps of the transition process.  Crises are usually managed by team members, and therefore more easily resolved by staff who know the individual and their history.[36]

    iv.  *Residential Services.*

OMH provides residential services to New York State residents with mental illness through licensed and unlicensed housing programs, directly through State-operated facilities, and indirectly through service providers, including supportive community-based mental health housing with varying levels of support, as well as congregate programs that combine housing and treatment in

---

[32] *Assertive Community Treatment (ACT) Program Guidelines Adult and Young Adult*, *supra* note 32, https://omh.ny.gov/omhweb/act/act-program-guidelines.pdf

[33] SAMHSA, *supra* at 31.

[34] See *2017 OMH Interim Report to the Statewide Comprehensive Plan*, *supra* note 26, at 20.

[35] New Hampshire-Dartmouth Psychiatric Research Center, *Building Your Program - Evidence-Based Practices: Assertive Community Treatment*, SAMHSA & U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (2008), https://store.samhsa.gov/sites/default/files/SAMHSA_Digital_Download/howtouseebpkits-act_0.pdf ("Briefly stated, extensive research (Phillips et al., 2001) shows that ACT: reduces the use of inpatient services, increases housing stability, leads to better substance-abuse outcomes (when programs include a substance-abuse treatment component), yields higher rates of competitive employment (when programs included a supported employment component), and is more satisfying to consumers and family members."); Lisa Dixon, *Assertive community treatment: Twenty-five years of gold*, 51 Psychiatr. Serv. 759, 759–779 (2000); J. Steven Lamberti et al., *Forensic assertive community treatment: Preventing incarceration of adults with severe mental illness*, 55 Psychiatr. Serv. 1285, 1285–129 (2004) ("Forensic assertive community treatment is an emerging model for preventing arrest and incarceration of adults with severe mental illness who have substantial histories of involvement with the criminal justice system.").

[36] *See id.*

one site.[37]  The Supported Housing Program is an OMH "initiative to provide stable housing to individuals who have a serious mental illness, but are able to live independently rather than in a facility."[38]  Under the Program, individuals are supposed to "receive support services and a subsidy toward their monthly rent to ensure they are able to live independently" and receive "assistance in locating and securing housing, resolving landlord or roommate disputes, and choosing and purchasing apartment furnishings."[39]

Supportive housing, (also interchangeably referenced by mental health providers as "supported" housing) began as an initiative by the state in 1990 to address longstanding lack of safe, affordable, and permanent housing for individuals with serious mental illness.[40]  Stable housing is the foundation for recovery, and a critical element for successful treatment.[41]  OMH recognizes this, as it has stated that "housing is a priority concern for all people.  For individuals with mental illness, safe and affordable housing is a cornerstone of recovery."[42]  The agency has further stated that it is "committed to maximizing access to housing opportunities for individuals with diverse service needs."[43]

OMH maintains and oversees various types of community-based mental health residences depending on the level of treatment and care needed by the individual with mental illness.  Indeed, "OMH funds and oversees a large array of adult housing resources and residential habilitation programs in New York State, including congregate treatment, licensed apartments, single room residences, and supported housing."[44]

Below is a description of some of the types of residential services overseen by OMH:

1. Apartment, Support Community Residence "provides adults an apartment in the community and staff visits as necessary to

---

[37] *See Profile of the New York State Mental Health System, supra* note 14, at 21;  *2017 Interim Report to the Statewide Comprehensive Plan, supra* note 26, at 10; *2016-2020 Statewide Comprehensive Plan*, NEW YORK STATE OFFICE OF MENTAL HEALTH, supra note 14, at 10.

[38] *Oversight of the Supported Housing Program – Rehabilitation Support Services, Inc.*, OFFICE OF THE NEW YORK STATE COMPTROLLER THOMAS P. DINAPOLI (May 4, 2017) at 5, https://www.osc.state.ny.us/state-agencies/audits/2017/05/04/oversight-supported-housing-program-rehabilitation-support-services-inc

[39] *Id.*

[40] *Supportive Housing Guidelines*, NEW YORK STATE OFFICE OF MENTAL HEALTH (Sept. 2022), https://omh.ny.gov/omhweb/adults/supportedhousing/supportive_housing_guidelines.pdf;  *Supported Housing Guidelines*, NEW YORK STATE OFFICE OF MENTAL HEALTH, at 1 (2014), https://omh.ny.gov/omhweb/adults/supportedhousing/supported-housing-guidelines.pdf ("The NYS Office of Mental Health (OMH) introduced Supported Housing in 1990 as an initiative to facilitate an increase in long-term/permanent housing options for people with mental illness coupled with individual support services designed to help them succeed in their housing.").

[41] Heidi Schultheis, *Lack of Housing and Mental Health Disabilities Exacerbate One Another*, AMERICAN PROGRESS, (Nov. 20, 2018), https://www.americanprogress.org/article/lack-housing-mental-health-disabilities-exacerbate-one-another/.

[42] *About Adult Housing,* NEW YORK STATE OFFICE OF MENTAL HEALTH, https://my.omh.ny.gov/analytics/saw.dll?dashboard (last visited Dec. 24, 2022).

[43] *Id.*

[44] *Id.*

address behavioral or environmental issues and to provide supportive services designed to improve or maintain the resident's ability to remain in the community."[45]

2. Apartment, Treatment Community Residence "provides adults an apartment, in the community with staff visits as necessary to provide rehabilitative services designed to improve functioning and develop greater independence."[46]

3. Congregate, Support Community Residence is a "single site residence that provides group living for adults, three meals a day, 24 hours per day supervision/staff, activities geared toward maintaining or improving functioning."[47]

4. Congregate, Treatment Community Residence is a "single site residence that provides group living for adults, three meals a day, 24 hours per day supervision/ staff, and rehabilitative activities."[48]

5. Service Enriched Single Room Occupancy (SRO) is "[a] program that provides adults private living units at a single site; and on-site staff and support activities to assist residents to negotiate routine challenges of living in the community."[49]

6. Scattered-Site Apartments can be transitional or permanent. In the transitional apartment program, "individuals with intensive service needs receive a significant level of visitation and support from staff, with the goal of moving people on to greater independence," whereas permanent programs require that "individuals with a mental illness live either alone or with a roommate and receive regular but less intensive support."[50]

---

[45] *Licensed Program Type Definitions*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/licensing/definitions.htm (last visited Dec. 24, 2022).
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Scattered Site Apartments*, BROOKLYN COMMUNITY HOUSING & SERVICES, https://bchands.org/scattered-site-apartments/ (last visited Dec. 24, 2022).

v. *Support Services.*

OMH also operates support programs including case management, peer-run programs, supported employment, and supported education. The goal of these services is to help people to develop the skills and experience that will help them to live fulfilling lives in their communities.[51]

The maintenance of the foregoing services is just the first step to ensuring successful outcomes for the people OMH serves. As part of the mental health systems' movement towards deinstitutionalization,[52] it is imperative that CBMHHSS are adequately funded and maintained in sufficient capacity so that people from the relevant population are not unnecessarily placed in institutional settings and/or left without necessary supports to successfully integrate into the community. If there is not enough CBMHHSS to meet the needs of the people eligible for these services—in this case people with serious mental illness, who are eligible for CBMHHSS and have reached their release date or are released from the DOCCS system—then OMH has failed in its responsibility, as the SMHA, to ensure effective operation of the public mental health system. Individuals with serious mental illness—including the relevant population—who have been separated from the community and placed into institutional settings, such as prisons, for a period of time, and who have criminal convictions, are especially vulnerable and need support upon their release.[53]  Ensuring adequate CBMHHSS for the relevant population is a minimum threshold requirement for an SMHA in providing an effective operating system for this population. In other words, it is not a mere best practice for OMH to afford the relevant population with the services for which they are eligible and appropriate. Individuals are entitled to receive the appropriate services for which they are eligible. It is imperative that OMH provide the relevant population with these services to ensure their basic well-being.  The relevant population should receive these services from the SMHA that is responsible for their care and specifically designated to provide these services, otherwise there is no guarantee this population will receive consistent and adequate services that are required.

d. **OMH and DOCCS Share Responsibility for the Delivery of Services to the Relevant Population.**

As described below, OMH and DOCCS have a shared responsibility for people with serious mental illness transitioning from prison. This includes ensuring that individuals with serious mental illness are assessed for CBMHHSS and provided such services for which they are eligible at the time of their release date.

OMH is specifically responsible for ensuring the existence of adequate availability of CBMHHSS for eligible people throughout the state, including members of the relevant population. DOCCS partners with OMH in "providing special programs along a continuum of care for

---

[51] *See Interim Report to the Statewide Comprehensive Plan*, *supra* note 26, at 13, 39.

[52] The deinstitutionalization movement aimed to move away from institution-centric systems of care and towards community integration for people with disabilities.  *See* John A. Talbott, *Deinstitutionalization: Avoiding the Disasters of the Past*, 55 Psychiatr. Serv. 1112, 1112–1115 (2004).

[53] *See* Factor Expert Report, pp. 11-18.

incarcerated individuals with a mental illness."[54] Additionally, "incarcerated individuals [in DOCCS custody] can be referred and assessed by OMH staff to determine the amount of mental health services required and are then assigned to facilities where that level of service is available."[55]

Policies and directives issued by both OMH and DOCCS reflect the interplay between the two agencies regarding their mutual responsibilities to the relevant population. Under a memorandum of understanding ("MOU") between DOCCS and OMH, the agencies work together to serve the needs of the population, recognizing that "interagency collaboration can facilitate effective discharge planning and mental health treatment in the community."[56] Pursuant to the MOU, "Pre-Release Services are provided to inmate-patients who are on the active mental health caseload in order to provide continuity of care upon release for community-based mental health care" and "OMH and DOCCS agree that discharge planning for inmate-patients leaving DOCCS custody will be a coordinated effort between both agencies."[57] Moreover, according to the MOU, "OMH and DOCCS recognize that they are strategic partners with the shared goals of ensuring that . . . inmate-patients are linked to mental health care upon entry into the community."[58]

OMH runs the Central New York Psychiatric Center ("CNYPC"), which is designated to act as "a comprehensive mental health service delivery system providing a full range of care and treatment" to persons incarcerated in the DOCCS system.[59] The mission of CNYPC is "to provide a continuum of behavioral health services for individuals with serious mental disorders and/or significant behavior disorders who reside in secure environments."[60] While OMH, through CNYPC, has the role of ensuring availability and adequacy of mental health services, DOCCS "ensures that services and resources exist to support the delivery of clinical services . . . ."[61]

Pursuant to the CNYPC Corrections-Based Operations Manual ("CBO"), OMH evaluates "all inmates who are being discharged from corrections to the community who were on the OMH caseload in the previous three years to provide mental health discharge planning, according to [New York State] Law."[62] Pursuant to DOCCS Directive 9230, DOCCS reports that it seeks to "establish a system of supervision standards for certain eligible individuals with mental illness, and to successfully manage this population's reintegration into society and transition to Community Supervision."[63] Pursuant to the directive, it is DOCCS's policy to "provide a community reintegration program to eligible persons with mental illness on parole, conditional

---

[54] *See Medical/Dental/Mental Health Services*, *supra* note 2.
[55] *Id.*
[56] *See Memorandum of Understanding between the New York State Office of Mental Health and the New York State Department of Corrections and Community Supervision*, *supra* note 3, at 2.
[57] *Id.* at 13.
[58] *Id.* at 3.
[59] *Central New York Psychiatric Center*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/facilities/cnpc/ (last visited Dec. 24, 2022).
[60] See *Memorandum of Understanding between the New York State Office of Mental Health and the New York State Department of Corrections and Community Supervision*, *supra* note 3, at 1.
[61] *Id.*
[62] *See* Discharge Planning for Levels of Mental Illness Policy No. 8.0, *supra* note 3, at 1.
[63] *Mental Health Specialized Supervision Standards, Directive No. 9230, supra* note 3, at 1.

release and post-release supervision."[64]    According to the directive, "The Mental Health Community Reintegration Program (MHCRP) will provide specialized supervision in order to enhance public safety, quickly engage releasee and connect them with appropriate services in the community so as to address case risks and needs."[65]  The directive requires Parole Officers to review "any discharge plan developed by the NYS Office of Mental Health (OMH)" and "request assistance from Re-entry Services whenever difficulties arise with obtaining a discharge plan."[66] Additionally, DOCCS Directive 9222 authorizes emergency funds for housing "for certain eligible releasees in order to assist in the releasee's reintegration and transition into the community."[67]

Thus, while this report focuses largely on the failures of OMH as the SMHA to prepare, plan, manage and provide adequate community-based mental health housing for eligible people transitioning from prison, the collaborative relationship between the State's prison agency and the State's mental health agency ultimately makes DOCCS and OMH mutually responsible for the negative impact that the failures have on the relevant population.

II.    <u>OMH Fails to Provide Sufficient Community-Based Mental Health Housing and Supportive Services to the Relevant Population</u>.

Despite OMH's role as the SMHA and its responsibility for the foregoing, OMH has failed to provide sufficient CBMHHSS for the relevant population.  This failure stems from OMH's failures to adequately define Safety Net Services that must be provided to meet the needs of the relevant population and its failure to plan, develop, and fund those services in sufficient quantities to accommodate the relevant population.

a. **OMH Fails to Define the Safety Net Services that Must Exist within its Community-Based Mental Health Housing And Supportive Services System to Meet the Needs of the Relevant Population**.

While OMH articulates an important set of "core values" that serve as "a basic set of principles to drive excellence in a modern, progressive mental health system," those principles must be met by active measures that the agency must take in order to ensure that the agency meets the relevant population's need for CBMHHSS.[68]  One important action that OMH must take is outlining a defined set of Safety Net Services that must be provided for the relevant population, and then ensuring that those services are available.  Below, I provide an overview of OMH's

---

[64] *Id.*
[65] *Id.*
[66] *Id.* page 3
[67] Emergency Housing – Community Supervision, Directive No. 9222, NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, at 1, https://doccs.ny.gov/system/files/documents/2022/04/9222.pdf (last visited Dec. 25, 2022).
[68] *Profile of the New York State Mental Health System*, *supra* note 14, at 2 (These principles includes "[p]erson-centered care and systems"; the principle that "[r]ecovery is individual, and possible for everyone"; "community inclusion and positive environments for social and emotional development and resiliency"'; "[r]espect for the worth and dignity of every person, including the prevention and rejection of stigma"; and that the agency has "a fundamental role in ensuring a safety net for all people in need.").

"Strategic Framework," which reflects the agency's stated values and principles, and an overview on the importance of defined Safety Net Services in serving the relevant population.

i. *OMH's Strategic Framework.*

As part of OMH's Strategic Framework, OMH identifies several relevant pillars including, but not limited to the following:

(1) Provide Housing for Individuals with Mental Illness: OMH acknowledges that "housing is a proven pathway to recovery for individuals with mental illness."[69]

(2) Make Community-Based Recovery a Reality: OMH claims that it is "redesigning the mental health system to better support recovery-oriented care, improve overall population health, and increase the access to quality mental health services across the state" with goals which include:  "identify and reduce unnecessary inpatient and emergency department utilization," "increase rates of successful transitions to community-based care, and decrease inpatient lengths of stay," "[o]ptimize community tenure for adults with serious mental illness," and "[i]ncrease access to the right services, at the right time, and in the right amount."[70]

(3) Improve Safety, Reentry, Recovery, and Connections to Care: OMH claims it is committed to supporting individuals with mental illness who are justice involved or at risk for adverse incidents during critical transitions in care, with goals which include: "[r]educe the likelihood of individuals being 'lost to care' and the negative events associated with disengagement from treatment," "[r]educe criminal justice system involvement for individuals with serious mental illness," and "[i]mprove the continuum of care for individuals in prisons, forensic hospitals, and with forensic status in state [Psychiatric Centers] as they transition back to community living."[71]

These pillars are important.  They reflect OMH's understanding that reentry, the creation of a community safety net, and developing a continuum of care for formerly incarcerated persons with serious mental illness are all areas of need that require significant attention by the agency. However, for an SMHA to adequately support the relevant population, which historically has been served in institutions, it must adopt and define a standard of community-based Safety Net Services, such as clinical programming, housing, rehabilitative activities, case management, and social supports, that are required to be available to them.  These services replace the functions once provided by the institutions prior to the deinstitutionalization movement.

---

[69] *OMH Strategic Framework*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/planning/strategic-framework/index.html (last visited Dec. 24, 2022).
[70] *Id.*
[71] *Id.*

ii. *Overview of the Necessary Safety Net Services.*

CBMHHSS—including Safety Net Services—are necessary for certain subpopulations of persons with serious mental illness (including people who have become institutionalized by long hospital or prison stays, such as the relevant population; elderly individuals; people with cognitive impairments; persons with severe substance use issues; people with significant medical issues and/or physical disabilities) if they are to live successfully outside of institutions. These resources must be provided by OMH in sufficient quantities for people transitioning from institutionalized settings such as prisons.

Historically, state hospitals served as the "safety nets."[72] The deinstitutionalization movement, which began in the 1960s, aimed to move away from institution-centric systems of care and towards community integration for people with disabilities, including serious mental illness.[73] Through funding policy, the federal government established a system of incentives to move mental health systems across the country toward community services as a preferable alternative to institution-based care.[74] For this policy shift to be successfully implemented, it was necessary to modernize the definition of the safety net function. As New York began downsizing the state hospitals, however, OMH skipped an essential step in the state's transformation from an institution-based mental health system to one where individuals can successfully be supported in community systems of care. To date, OMH has not adequately defined a standard of services necessary to reconstitute the concept of a "safety net" in community settings, *i.e.,* Safety Net Services, and used this construct to plan for New Yorkers leaving institutional settings.

People are at their most vulnerable when moving from institutions to the community. This reality was discussed in a recent journal article: "outcomes for released prisoners living with serious and persistent mental illness [SPMI] are significantly worse than for their peers without mental illness. Recently released prisoners living with SPMI are more likely than their peers to be homeless, unemployed, living with other former prisoners or drug users . . . and more likely to receive less support from family members when compared to recently released prisoners without mental illness. They were also at a much higher risk for suicide."[75] This vulnerable population of individuals needs a strong, but flexible, program infrastructure that can meet their changing needs as they adjust to multiple new realities and try to recover from both their illnesses and the disabling impact of institutionalization itself.

Through my experience of managing large public mental health systems, I have learned that the most effective Safety Net Services to undergird the transition from institutions to

---

[72] John A. Talbott, *Deinstitutionalization: Avoiding the Disasters of the Past*, 55 Psychiatr. Serv. 1112, 1112–1115 (2004).

[73] *Id.; see Civil Commitment and the Mental Health Care Continuum: Historical Trends and Principles for Law and Practice*, SAMHSA, at 7 https://www.samhsa.gov/sites/default/files/civil-commitment-continuum-of-care.pdf (last visited Dec. 25, 2022)

[74] *See Civil Commitment and the Mental Health Care Continuum: Historical Trends and Principles for Law and Practice*, SAMHSA, *supra* note 72.

[75] Nicola Hancock, et al., *Facilitating people living with severe and persistent mental illness to transition from prison to community: a qualitative exploration of staff experiences*, 12 Int. J. Ment. Health Syst. 1, 1-10 (2018), https://ijmhs.biomedcentral.com/articles/10.1186/s13033-018-0225-z

community are (i) supported housing, (ii) ACT/ FACT teams, (iii) a comprehensive continuum of crisis services, (iv) medication management, and (v) brief inpatient care.  The need for these programs is articulated below.



### 1.  Supported Housing.

First, a stable and safe living environment is essential for clinical and personal recovery.[76] Individuals with mental illness reentering the community from prison, including those from the relevant population, are statistically "more likely than those without mental illness to be homeless after release"[77] due to obstacles such as "lack of adequate community-based treatment programs, difficulty obtaining employment leading to financial inability to support housing, psychotic symptoms interfering with the organizational abilities required to obtain stable housing, and substance abuse resulting in allocation of financial assets to drugs over housing."[78]  As stated by the U.S. Department of Housing and Urban Development: "Housing insecurity in all its forms can negatively affect human health . . . [H]omelessness worsens mental health and exacerbates

---

[76] *See* Yu, Yu et al. The Relationship Between Clinical Recovery And Personal Recovery Among People Living With Schizophrenia: A Serial Mediation Model And The Role Of Disability And Quality Of Life. *Schizophrenia research* vol. 239 (2022): 168-175, https://pubmed.ncbi.nlm.nih.gov/34896871/ ("clinical recovery emphasizes an individual's psychiatric symptoms and functioning, whereas personal recovery emphasizes adaptation to one's illness that includes taking responsibility for one's recovery, establishing an identity apart from the illness, and finding meaning, purpose, and hope in life.").

[77] Esther Galletta et al., Societal Reentry of Prison Inmates With Mental Illness: Obstacles, Programs, and Best Practices, 27 Journal of Correctional Health Care 58, 58–65 (2021)(internal citations omitted).

[78] *Id.; see also* Dr. Factor Expert Report pp. 14-18.

symptoms of mental illness."[79]  People cannot find or receive adequate services if they are in unstable living environments.  Their priority is survival, not their mental well-being.  Most adults do better in their own apartments with flexible supports than they do in congregate residential settings.[80]  Supportive housing, as compared to congregate settings, enables individuals to live in their own homes with supports and services delivered in a manner that calibrates intensity based on individual need. In congregate living settings, when individuals show signs of improvement, they become no longer qualified to live in those settings and are forced to move.

In the 2017 Interim Report to the Statewide Comprehensive Plan, OMH reported that they had funded 696 supportive housing beds that were dedicated to individuals with serious mental illness who had been incarcerated.[81]  This includes 418 forensic supported housing beds (328 in New York City) for individuals with serious mental illness who are released from prison, 168 supported housing beds for individuals discharged from civil State Psychiatric Centers after a direct admission from prison, and an 110-bed supported housing program for individuals with serious mental illness who are on parole.[82]  In 2019, OMH issued a Request for Proposals ("RFP") for an additional 250 units of scattered site supportive housing[83] for this population for the entire state.[84]  Though Governor Cuomo proposed $250 million in his fiscal year 2022 budget for 1,300 units of supported housing,[85] and the following year, Governor Hochul added $31.5 million for an additional 332 units for "the elderly, individuals with a history of substance use disorder, individuals with developmental disabilities, young adults, and those suffering from mental illness,"[86] it is not clear whether any of these units will be set aside for formerly incarcerated persons with mental illness and there is no indication that they will be set aside in sufficient quantities to ensure that individuals from the relevant population will not be denied due to lack of adequate housing.

---

[79] *Promoting Mental Health Through Housing Stability*, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT PUBLICATION (May 31, 2022) https://www.huduser.gov/portal/pdredge/pdr-edge-trending-053122.html.
[80] *Id.*
[81] See *2017 Interim Report to the Statewide Comprehensive Plan*, *supra* note 26.
[82] *Id.* at 20.
[83] *Scattered Site Supportive Housing for Adults with Serious Mental Illness Reentering the Community from Prison: Request for Proposals*, NEW YORK STATE OF OPPORTUNITY EMPIRE STATE SUPPORTIVE HOUSING INITIATIVE (ESSHI) (2019), https://www.bidnet.com/bneattachments?/555160825.pdf; *see* Corporation for Supportive Housing (CSH), *Supportive Housing Scattered-Site Ownership,*
http://www.csh.org/wp-content/uploads/2015/12/IL_Toolkit_Model_Scattered-Site-Owned.pdf("In a Supportive Housing Scattered-Site Ownership model the supportive housing units are acquired and operated by a non-profit organization (or mission focused for profit organization) and dispersed among multiple buildings or properties in a community which may include a range of housing types from condominiums, apartments, or single family homes. This model provides a great opportunity to integrate supportive housing units in the general community, while maximizing available housing stock to achieve a range of housing types and unit sizes.").
[84] See *Scattered Site Supportive Housing for Adults with Serious Mental Illness Reentering the Community from Prison: Request for Proposals*, *supra* note 83.
[85] Michael Herzenberg, *Cuomo's Budget Includes $250 million for Supported Housing*, SPECTRUM NEWS (Jan. 22, 2021, 8:35 PM), https://www.ny1.com/nyc/bronx/housing/2021/01/23/governor-cuomo-plans-putting-up-a-quarter-billion-taxpayer-dollars-to-supportive-housing#:~:text=It%20did%20so%20with%20the,budget%20for%20about%201%2C300%20units.
[86] *Governor Hochul Announces $31.5 Million for Supportive Housing Projects*, NEW YORK STATE GOVERNOR KATHY HOCHUL (Aug. 2, 2022), https://www.governor.ny.gov/news/governor-hochul-announces-315-million-supportive-housing-projects.

## 2.    ACT/FACT.

For over 50 years, the ACT model has been the gold standard for effective support for people returning to the community from institutions.  When first developed, it was referred to as a "hospital without walls," and with good reason.  The creators of the model, Mary Ann Test, PhD, and Leonard Stein, MD, worked at a state hospital in in Madison, Wisconsin. They were familiar with all of the services and supports received by the long stay patients on their units. They built the model by intentionally replicating those services and supports within a community setting.[87] The ACT model uses interdisciplinary teams that are available in people's homes, 365 days per year, 24 hours per day.  They visit people as often as necessary and dispense medications wherever it is comfortable for the individuals.  They operationalize the "whatever it takes" ethic that helps staff move beyond rigid program boundaries to the practical forms of assistance that help people live good lives in their communities.[88]

Research over many decades has demonstrated ACT's effectiveness at reducing hospital recidivism, emergency room use, and homelessness.[89]  The one area where ACT has not demonstrated the same kind of success is in preventing re-involvement with the criminal justice system.  To address this, different sites around the country have been working on modifying the ACT model to make it more effective for formerly incarcerated populations.  They have included a focus on substance use disorders, as well as collaboration with parole, police, courts, and other parts of the criminal justice system as necessary elements of the program.  This evolving ACT adaptation is called FACT.[90]  FACT has been "associated with significant reductions in criminal convictions and time spent in jails and hospitals, along with significant improvements in engagement in outpatient care."[91]  Clinicians at the Department of Psychiatry at the University of Rochester, New York, have done much of the pioneering work on this model, which is now considered a "promising model of care" by SAMHSA.[92]  In New York State, both ACT and FACT services exist, although in insufficient quantities, as explained below.[93]

## 3.    Crisis Services.

Crisis services are a foundational element of the community safety net.  Examples of crisis services across mental health systems include but are not limited to peer support, 24-hour crisis hotlines, mobile crisis teams and crisis team interventions ("CIT"), crisis hubs and response

---

[87] CG Lim et al., *Community Psychiatry in Singapore: A Pilot Assertive Community Treatment (ACT) Programme*, 34 Ann Acad. Med. Singapore 100, 100-04 (2005), https://annals.edu.sg/pdf200502/LimCG.pdf.
[88] Sam Tsemberis et al., *Housing First, Consumer Choice, and Harm Reduction for Homeless Individuals With a Dual Diagnosis*, 94 Am. J. Public Health 651, 651-6 (2004), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1448313/.
[89] Leonard I. Stein & Mary Ann Test, *Alternative to Mental Hospital Treatment: I. Conceptual Model, Treatment Program, and Clinical Evaluation*, 37 Arch Gen. Psychiatry 392, 392-397 (1980), https://jamanetwork.com/journals/jamapsychiatry/article-abstract/492295.
[90] *See* J. Steven Lamberti et al., *supra* note 35.
[91] Ebony N. Russ et al., *Prison And Jail Reentry And Health,* Health Affairs (Oct. 28, 2021), https://www.healthaffairs.org/do/10.1377/hpb20210928.343531/.
[92] *See* J. Steven Lamberti et al., *supra* note 35.
[93] *See Assertive Community Treatment (ACT) Program Guidelines Adult and Young Adult*, *supra* note 31.

centers, psychiatric urgent care, transition or crisis stabilization units, crisis residential units, and partial or day hospitals providing community-based day mental health services.[94] The goals of a crisis response system include "reduc[ing] unnecessary emergency room visits and inpatient hospitalizations, maintain[ing] people safely in the community, reduc[ing] risk of future crises, and coordinat[ing] information sharing among clinicians, recipients, and involved family members to reflect recipients' preferences. These services are meant to be delivered in trauma-informed, recovery-oriented and culturally and linguistically competent ways."[95] Serious mental illnesses are chronic in nature, with sporadic exacerbations of symptoms. Without adequate crisis services, people in one of these periods of destabilization often end up re-hospitalized.[96] The adjustment to community living after a period of institutionalization is extremely difficult. To prevent unnecessary hospitalizations, emergency room visits, loss of housing, and other negative outcomes, it is essential to have a comprehensive array of emergency responses, including but not limited to crisis respite[97]and mobile crisis teams,[98] which can complement the work of the ACT or FACT team to keep the individual safe in the community.[99] Typically, there is a period of high demand for crisis support in the immediate period after discharge or release that diminishes as the individual learns new coping skills and builds trust with his new team. Without good crisis backup during this high demand period, recidivism can be an unfortunate outcome.[100]

### 4. Medication Management.

Medication management also is necessary for a number of individuals with serious mental illness. People with SMI who receive medication management while institutionalized and then are released to the community without continuation of this service are at risk of being reinstitutionalized, whether through hospitalization or reincarceration.[101] The sudden lack of medication management and/or the disruption in their medication regime is detrimental. If medication management is included and/or continued as part of an overall clinical plan for these individuals, these disruptions can be minimized, along with the negative outcomes that accompany them. Medication management works seamlessly when an ACT or FACT team is involved. If not, very close collaboration between prescribers and other team members is essential.[102]

---

[94] Debra A. Pinals, *Crisis Services: Meeting Needs, Saving Lives*, NASMHPD (Aug. 2020), https://store.samhsa.gov/sites/default/files/SAMHSA_Digital_Download/pep20-08-01-001.pdf.
[95] *National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit*, SAMHSA, 19 (2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf
[96] *Id.*
[97] *Crisis Residence Program Guidance*, New York State of Opportunity Office of Mental Health, https://omh.ny.gov/omhweb/bho/docs/crisis-residence-program-guidance.pdf (last visited Dec. 24, 2022).
[98] *Mobile Crisis Teams*, NYC Well, 7 (2021), https://nycwell.cityofnewyork.us/en/crisis-services/mobile-crisis-teams/ (last visited Dec. 24, 2022) ("Mobile Crisis Teams use face-to-face interventions with the identified individual in crisis, as well as their family or other support systems, to engage, assess, de-escalate and connect individuals to the most appropriate services.").
[99] See *National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit*, *supra* note 95, 18-21.
[100] *See* Dr. Factor Expert Report pp. 14-18.
[101] *Id.*
[102] John H. McGrew et al., *Case managers' perspectives on critical ingredients of assertive community treatment and on its implementation*, 54 Psychiatr. Serv. 370 (2003), https://pubmed.ncbi.nlm.nih.gov/12610246/.

5.  Brief Inpatient Stays.

Finally, for a limited set of individuals who had long stays in institutions, brief inpatient stays should only be considered when required to address immediate needs, and to assist in the transition to community living. This should not be viewed as the de facto safety net service for people with serious mental illness.  Rather, it may be offered when it is clear that the individuals' needs, such as for medication adjustments or crises, cannot be resolved in a community based outpatient setting, and where the individual presents significant challenge in adjusting to a world that is less structured than the institution they left.  Every case of hospitalization should be viewed as part of an overall clinical plan with ongoing involvement of the community treatment team.[103]

Each of these components of a Safety Net System exist within the OMH system.  In particular, inpatient treatment is already adequately funded by OMH and represents a disproportionate share of OMH's services outlay, both broadly and for the relevant population.  As discussed below, in 2014, 50% of the state mental health dollars was spent on inpatient care that served a relatively small number of the state's SMI population, while community services were significantly underfunded and serving thousands of more individuals each year.[104]  As the next section explains, however, OMH has failed to adequately plan, develop, and fund the first four components for the relevant population.

   b.  **OMH Fails to Adequately Plan, Develop, and Fund Supported Housing, ACT and FACT, Crisis Services, and Medication Management for the Relevant Population**.

CMBHHSS, including Safety Net Services—particularly supported housing, ACT and FACT, crisis services, and medication management—must be available in sufficient quantities to meet the needs of the relevant population, especially during the high-risk periods of transition from institutional to community care.  These services assist with promoting recovery in the reentry phase of the relevant population's transition into the community.

OMH's aspirational statements of support for the relevant population, as stated above, are contradicted by OMH's actions.  OMH states that it "is committed to insuring [sic] that SMI individuals leaving prison have appropriate housing in the community"[105] and that it is "committed to supporting individuals with mental illness who are justice involved or at risk for adverse incidents during critical transitions in care."[106]  OMH claims that it is "focusing on its fundamental role as a provider of safety net services for the most seriously ill and underserved..."[107]  It promises

---

[103] *Id.*

[104] *See 2014-2018 Statewide Comprehensive Plan*, NEW YORK STATE OFFICE OF MENTAL HEALTH, P. 7 (MG-Class00004021-4071) ("[W]hile New York's State-operated inpatient facilities serve approximately 1% of the total number of people served in the public mental health system, they account for 20% of gross annual system expenditures. With the inclusion of other acute inpatient facilities (Article 28 or 31 psychiatric hospitals), inpatient psychiatric costs amount to approximately half of the total spending on public mental health service.").

[105] *See 2016-2020 Statewide Comprehensive Plan*, *supra* note 14, at 61.

[106] *See OMH Strategic Framework, supra* note 69.

[107] *See id.*

to improve the "continuum" of care for the relevant population as they transition to community living.[108]  These are the appropriate steps that should be taken by an SMHA to address this issue. However, OMH has not taken the necessary actions to fulfill these commitments.  Evidence that there are any individuals with serious mental illness who are discharged without necessary CBMHHSS[109] shows OMH's failure to execute its responsibility to meet the needs of the relevant population.

The following subsections outline several counties' complaints as to the lack of CBMHHSS for their residents with serious mental illness, which include the relevant population, and the critical flaws and failures by OMH that have created a crisis for the hundreds of people with serious mental illness who find themselves ready to be discharged from the state's prisons each year without access to CBMHHSS. Instead of "warm handoff" to a community service system, the state gives them the cold shoulder.  Thereafter, I discuss some of the reasons for OMH's failure to provide adequate CBMHHSS for the relevant population.

i. *Year after Year, New York State Counties Report that OMH Does Not Provide Sufficient Funding to Operate Community-Based Mental Health Housing and Supportive Services.*

As explained above, in New York State, counties are LMHAs, also referred to as "local government units" or LGUs.[110] While OMH bears ultimate responsibility for the State's CBMHHSS system, counties operate and administer CBMHHSS within their borders.  Counties have consistently complained to OMH that the state fails to meet the needs of their populations, including those with serious mental illness, with respect to all four categories of Safety Net Services articulated above—particularly supported housing.  Local Services Plans provide insight into the counties' needs and, importantly here, OMH's knowledge of needs across the state.[111]  For this report, I reviewed Local Services Plans from 2019, 2020, 2021.  In these Local Services Plans, the majority of counties identified housing as the key unmet need in their service systems. They point to long waiting lists as evidence of this need, as well as growing numbers of people who are homeless in their communities.  The plans highlight cases of individuals living in tents, cars, and shacks because of a paucity of affordable housing, especially for people with mental illness. The counties also identify needs for additional ACT teams and more intensive case management than that provided through Medicaid Managed Care.[112]  While OMH has sporadically and reactively

---

[108] *Id.*
[109] *See*, e.g., Declaration of Seth Crider in support of Plaintiffs' Motion for Class Certification ¶¶ 27–34; Dr. Factor Expert Report § V.
[110] *Health Home Guidance: Local Government Unit/Single Point of Access of Access (LGU/SPOA)*, OFFICE OF MENTAL HEALTH AT 1, N.1 (JAN. 28, 2013), https://omh.ny.gov/omhweb/adults/health_homes/lgu_spoa_health_home_guidance.pdf ("LGUs govern the oversight of county and local not-for-profit service provider funded mental health programs that receive funding from the NYS Office of Mental Health.")
[111] *See* N.Y. MHL § 41.16, *supra* note 6.
[112] *See Behavioral Health Managed Care,* NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/bho/ (last accessed Jan. 30, 2023) ("New York State is moving Medicaid behavioral health services from a fee-for-service system into Managed Care. Medicaid Managed Care plans and Medicaid providers will work together with Medicaid enrollees to create a person-centered service system focused on recovery and on integrating physical and behavioral health to improve health outcomes.")

added some resources to these program areas, the data below shows those resources are far from sufficient to meet the need.

A review of the Local Services Plans from the home counties of the Named Plaintiffs in *M.G. v. Cuomo* shows that OMH has failed to maintain sufficient capacity to meet the CBMHHSS needs for the relevant population in these counties. A more cursory review of the Local Services Plans for the remaining counties also shows that OMH has failed to maintain sufficient capacity to meet the housing and services needs of the relevant population.

1. Dutchess County.

In 2019, Dutchess County reported that it sought OMH funding for short-term transitional living housing for individuals, including those who are homeless and in prison.[113] The County noted the same need in 2020, reporting that a proposal was submitted in 2018 to obtain funding for eight residential opportunities dedicated to individuals released from state prison.[114] In 2020, the County reported the need for "community housing and treatment strategy for individuals who are seriously mentally ill and chemically dependent which is safe, affordable and supports long term recovery."[115] It also noted that it received no OMH funding for supported housing for persons between the ages of 16 to 24 years old, including those are involved in the criminal justice system.[116] Although OMH awarded Dutchess County 24 supported housing opportunities for individuals living with mental illness, the County reported that "housing for individuals of all ability groups continues to be a concern," indicating that the amount of supported housing units provided was inadequate to meet the needs of the population.[117] In fact, in 2020, the County reported that access to mental health services in Residential Support, Treatment, and Housing decreased, even though the demand for those services, which the county had flagged were necessary in previous years, had increased.[118]

2. Nassau County.

Nassau County also reported concerns related to the lack of CBMHHSS. As of 2019, there were only two OMH-funded crisis respite/diversion programs on Long Island, which has resulted in a substantial backlog.[119] In 2016, the County reported that one of the programs received 263 applications for three available beds. Of those, only 99 were ever admitted either right away, or

---

[113] 2019 Local Services Plan for Mental Hygiene Services, Dutchess Cty. Dept. of Beh. & Com. Health, at 16 (June 6, 2018) https://www.dutchessny.gov/2019-Local-Governmental-Plan.pdf.

[114] 2020 Local Services Plan for Mental Hygiene Services, Dutchess Co. Dept. of Beh & Com Health, at 39 (Sept. 5, 2019), https://www.clmhd.org/img/pdfs/brochure_huzjc4ryxf.pdf.

[115] *Id.* at 40

[116] *Id.* at 39.

[117] *Id.* at 25.

[118] COVID-19 Pandemic Effects on Mental Hygiene Services Delivery System Local Services Plan Supplemental Survey, Dutchess Co. Dept. of Beh & Com Health, at 3 (Oct. 27, 2020), https://www.clmhd.org/img/pdfs/brochure_b0d2g43hbl.pdf.

[119] 2019 Local Services Plan for Mental Hygiene Services, Nassau Co. Office of MH, CD and DD Svcs, at 5 (Aug. 14, 2018), https://www.nassaucountyny.gov/DocumentCenter/View/36915/2019-Nassau-County-Local-Service-Plan-for-Mental-Hygiene-Services.

after being wait-listed. However, "125 individuals were lost because the crisis was too immediate and the wait was too long."[120]  Similarly, in 2017, "out of 237 intakes 92 were admitted either right away or after [being] wait-listed.  However, 103 were lost because the crisis was too immediate and the wait was too long."[121]  Nassau reported that "[t]he data collected shows there is a need to expand Crisis Respite in Nassau County."[122]  Nassau also reported in 2019 that "[o]ver 500 individuals with a serious mental illness are on the [Single Point of Access] waiting list for housing in Nassau."[123]  The County also reported a growing need for ACT: "Care coordination and ACT Team referrals remained consistent during March – July.  Starting in late July to the present, the County continues to see an increase in requests for ACT Team."[124]  Nassau County has five ACT Teams, with four of its teams ranging between 94% to 101% capacity.[125]  In practical terms, this means that there are not sufficient ACT team capacity to meet the needs of the relevant population.

3.  New York City.

In its 2020 and 2021 service plans, New York City (includes all five boroughs) indicated its priorities to include "Housing" and "Crisis Services."[126]

As to housing, the City reported in its 2021 Local Services Plan that there is a dire need for mental health housing for people with serious mental illness, noting that "[d]espite the relationship between mental health and housing, there remains a lack of affordable housing specifically for these populations."[127]  The City reported that it was seeking "a collaborative process with state partners to increase supportive housing rates in order to preserve existing supportive housing units" and noted that "[w]ithout additional funding, NYC is at risk for loss of units, as providers will terminate contracts due to insufficient funding, eliminating permanent homes for people and leading tenants with serious mental illness, substance use disorders and developmental disabilities to potentially become homeless."[128]  The City reported that "[a]ccording to data and community stakeholder input, the most pressing issue to address is the lack of accessible and affordable housing options for individuals with serious mental illness, substance use disorder, and intellectual/developmental disabilities (I/DD) who are chronically homeless." Further, the City reported, "[e]vidence has shown that more than any medical intervention, supportive housing

---

[120] *Id.*.

[121] *Id.*

[122] *Id.*

[123] *Id.* at 5.

[124] COVID-19 Pandemic Effects on Mental Hygiene Services Delivery System Local Services Plan Supplemental Survey, Nassau Co Office of MH, CD and DD Svcs at 5 (Sept. 13, 2020) https://www.clmhd.org/img/pdfs/brochure_xmngtyd9iy.pdf.

[125]  *ACT Team Map, Assertive Community Treatment (ACT): Location and Information for New York State Act Teams*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/tableau/act.html (last modified Feb. 6, 2023).

[126] 2020 Local Services Plan for Mental Hygiene Services New York City. Dept. of Health & Hygiene, NEW YORK STATE OF OPPORTUNITY OFFICE OF MENTAL HEALTH (Aug. 6, 2019), *located at* https://www.clmhd.org/img/pdfs/brochure_dodumlhenj.pdf (last visited Feb. 6, 2023); 2021 Local Services Plan for Mental Hygiene Services, NEW YORK CITY. DEPT. OF HEALTH & HYGIENE (Sept. 25, 2020), *located at* https://www.clmhd.org/img/pdfs/brochure_dodumlhenj.pdf (last visited Feb. 6, 2023).

[127] 2021 Local Services Plan for Mental Hygiene Services, *supra* note 126, at 11.

[128] *Id.* at 4.

keeps people safe and healthy, particularly individuals burdened with mental illness, substance use disorders, and/or I/DD."[129]  It explained that "[w]ithout quality, affordable housing for people with mental illness, substance use disorders, and or intellectual/developmental disabilities, we will continue to see significant homelessness and poor outcomes for this populations."[130]

As to expanding New York City's Crisis Response Services, the City reported in its 2020 Local Services Plan that it was seeking "additional state funding in order to provide expanded access to Mobile Crisis Teams and subsequently avoid psychiatric emergency room visits and hospitalizations" and requested "OMH's support in incorporating the Medicaid Managed Care Crisis Intervention benefit into the existing and developing crisis system within New York City."[131]  The City noted that "with additional funding, the NYC Health Department could begin implementing a plan to provide 24/7 telephone triage and response, two hour mobile crisis response, telephone follow-up and mobile follow-up within New York City for persons of any age who cannot manage their psychiatric or substance use related symptoms without de-escalation or intervention regardless of ability to pay."[132]

In 2021, New York City reported that it "continue[s] to see long waitlists for our enhanced services such as Assertive Community Treatment (ACT), and [has] difficulty engaging the individuals who are hardest to reach."[133]  As of 2023, New York City has 65 Teams with an enrollment of 3,913 people, operating at an 89% capacity.[134]  It appears that five of those teams are shelter-based ACT Teams.[135]  Note, there is, to some degree, an incongruity in the concept of providing necessary community-based services in a shelter setting that does not provide the necessary stability that community-based housing provides. This is not to suggest that ACT should not be available to people in shelters, but rather, that community based mental health services like ACT would be most effective in combination with supportive housing.  This could be implemented through a "Housing First" model approach, in which "people with mental illness who experience homelessness are given keys to apartments with on-site supports without having to prove they are 'ready' for permanent housing or complete onerous paperwork."[136]  Indeed, "[a] growing body of research shows that Housing First is effective for reducing homelessness and keeping people stably housed."[137]

---

[129] *Id.* at 11.

[130] *Id.*

[131] 2020 Local Services Plan for Mental Hygiene Services, *supra note* 126, at 3.

[132] *Id.*

[133] 2021 Local Services Plan for Mental Hygiene Services, *supra note* 126, at 33.

[134]  *Assertive Community Treatment (ACT)*, *supra* note 125.

[135] *Id.*

[136] David Brand, *NYC Pilots 'Housing First' Plan for Handful of Homeless Adults*, CITY LIMITS (Nov. 15, 2022), https://citylimits.org/2022/11/15/nyc-pilots-housing-first-plan-for-handful-of-homeless-adults/.

[137] *Id.*

4. Orange County.

Orange County has reported a lack of necessary community-based housing and services for people with serious mental illness.

In 2020, Orange County reported that "rising costs have made affordable housing a challenge, and near impossible for those with disabilities."[138]  It also noted that "Orange County SPOA (Single Point of Access) consistently maintains a waitlist for housing."[139] Orange County further expressed concern that "state funded positions continue to be reduced, which impacts local treatment and housing capacity" and that the "[n]eed for services such as housing and . . . adult psychiatry continue to exceed capacity."[140]

In the same year, Orange County also emphasized that "Health Home Care Management operating with large caseloads of 70 to 100 continues to leave a gap in meeting individuals' complexity of needs"[141] and that while "Health Home Plus has been beneficial, there are still many individuals who do not meet criteria for that level of service, because of diagnosis or past uses of inpatient care, who would benefit from more support than the current design allows."[142]

In 2020 Orange County reported that its "OMH operated ACT team increased capacity," but noted that the team even at increased capacity served only "up to 68 individuals," which is unlikely to be adequate.[143] As of 2023, Orange County continues to have only one ACT team; it is currently at 88% capacity. [144] The service deficits in Orange County reflect the service deficits reported throughout the state: insufficient supported housing and services to meet the needs of the relevant population.

5. Suffolk County.

Suffolk County expressed concern in 2020 that "housing options for all three disability populations"—namely, people with mental health, substance use disorders, or developmental disabilities—"are limited."[145]  According to the SPOA Long Island website, once an individual's application for housing is complete, they "will be placed on a waiting list."[146]  There is no clear indication as to how long an individual will remain on the waitlist.  The website further states,

---

[138] 2020 Local Services Plan for Mental Hygiene Services, Orange County Dept. of Mental Health, at 6 (September 6, 2019), *located at* https://www.clmhd.org/img/pdfs/brochure_ejfh41el3h.pdf (last visited Feb. 6, 2023).
[139] *Id*.
[140] *Id.* at 4.
[141] *Id.* at 3.
[142] *Id.*
[143] *Id.*
[144] *Assertive Community Treatment (ACT), supra* note 125.
[145] 2020 Local Services Plan for Mental Hygiene Services, Suffolk Co. Dept. of Health Services, at 4 (Sep. 6, 2019), *located at* https://www.clmhd.org/img/pdfs/brochure_vd28rmadlh.pdf (last visited Feb. 6, 2023).
[146] *Frequently Asked Questions,* Single Point of Access Long Island (SPA), https://www.spahousingli.org/Faq.aspx (last visited Feb. 6, 2023).

"[h]ow long you wait on the list depends on what type of [Single Point of Access] housing you are requesting."[147]

Suffolk County has 8 ACT Teams, all of which are overburdened, running at 97% to 107% capacity.[148] Based on my assessment as a mental health systems expert, ACT teams generally 93% and over are functionally equivalent to complete capacity. The percentages for Suffolk indicate overcapacity or are functionally equivalent to at capacity.[149]

### 6. Westchester County.

Westchester County reported in its 2021 Local Services Plan that "[h]ousing services continue to be a top priority, and increasing need, for individuals living with behavioral health/serious mental illness and often co-occurring issues," and that the SPOA waiting list was "over 1,120 eligible individuals," with individuals "waiting for years for housing."[150]  A waiting list of 1,120 offers no hope to persons who are in need of immediate housing assistance. Although Westchester did note an increase in Supportive Housing, the County noted "the reality that many individuals with SMI do need support/services of high-levels of care," and the County "continue[d] to struggle to meet the demand for appropriate housing."[151]

Westchester County has 5 ACT teams, running at 76% to 100% capacity, with two at the equivalent of full capacity.[152]

### 7. Additional Exemplar Counties.

Additionally, beyond the counties in which the Named Plaintiffs reside, there is evidence of pervasive and long-standing deficits in mental health services across the state of New York, particularly with regard to supported housing.  A review of the 2018, 2019, and 2020 Local Services Plans across the state revealed that for all the three years, 42 of New York's 62 counties identified the lack of housing options for people with SMI as a major barrier to their successful integration into community living.[153]  Similarly, counties were struggling with the lack of services such as ACT/FACT and multi-disciplinary case management.

---

[147] *Id.*
[148] *Assertive Community Treatment (ACT), supra* note 125.
[149] *Id.* (Percent capacities reported at 93%, 99%, 100%, 100%, 107%, 94%, 99%, 97%).
[150] 2021 Mental Hygiene Executive Summary: Westchester Co. Dept of Community Mental Health. P. 10 (2021), *located at* https://www.clmhd.org/img/pdfs/brochure_hegp6qdow2.pdf (last visited Feb. 6, 2023).
[151] *Id.*
[152] *Assertive Community Treatment (ACT), supra* note 125.
[153] *See County/New York City Directory*, NYS Conference of Local Hygiene Directors, Inc., https://www.clmhd.org/contact_local_mental_hygiene_departments/.

Quotes taken from the Local Services Plans from a geographically diverse selection of New York Counties reflect both the deficits in the OMH planning process and the resulting inadequacies in the local service systems.

a. Albany County.

According to Albany County's 2020 Local Services Plan, "There remains a high need for community-based housing placements for adult individuals with histories of high risk behaviors (e.g., violence, sex offense, arson, and forensic histories)."[154] The County reported "a shortage of transitional living facilities/programs for individuals returning to the community from incarceration;  this is regardless of whether they are involved with parole/probation or not."[155] It noted that "[p]ast programs that existed have since closed"[156] and the county "could benefit from more 'forensic' beds."[157]  The County further noted that "[t]here continues to be a high rate of homelessness among the behavioral health population within Albany County;  this is evidenced by the quantity and types of referrals being made to the various housing programs in this community."[158]

Albany County wrote that it "continues to have one ACT team, however the demand for this service remains high and the requests exceed capacity.  There is currently a wait list of over a dozen individuals."[159]

Here, Albany County identifies shortages in both supported housing and ACT services, the very programs best suited to meet the needs of people with SMI and complex needs.  The county then, consciously or not, connects these shortages to the increased rate of homelessness in Albany County.  Of course, an increased rate of homelessness is the inevitable consequence of the shortage of supported housing and intensive levels of outpatient support.

In 2021, Albany County indicated that there continued to be unmet mental health service needs related to housing, crisis services, recovery and support services, reducing stigma, and other outpatient mental health services.[160]  The level of need for those services needs was reported to have "stayed the same."[161]

When asked to "describe any unmet mental health service needs that have worsened," Albany County explained that crisis service "has worsened as it relates to the ability to manage

[154] 2020 Local Services Plan for Mental Hygiene Services, Albany Co. Dept. of Health Services, at 6 (Sep. 5, 2019), *located at* https://www.clmhd.org/img/pdfs/brochure_s1iuwv1qw0.pdf (last visited Feb. 6, 2023).
[155] *Id.*
[156] *Id.*
[157] *Id.* (internal quotations omitted).
[158] *Id.*
[159] *Id.* at 19.
[160] Local Services Plan for Mental Hygiene Services Albany Co. Dept. of Mental Health, New York State of Opportunity Office of Mental Health et al., at 4 (December 12, 2021), https://www.clmhd.org/img/pdfs/brochure_8qc94v069f.pdf
[161] *Id.*

28

high need/high utilizers/co-occurring individuals; it is not without effort from the crisis service system; however, the level of need is outweighing the available resources, time and expertise needed."[162]  The County also flagged the category of "Other Outpatient Mental Health Services," stating that "requests for AOT [Assisted Outpatient Treatment] and ACT are increasing, without an increase in resources for these programs, therefore it is emerging as [sic] area of issue."[163]

Albany County has one ACT team at 96% capacity.[164]

### b.  Niagara County.

In 2019, Niagara County reported that "[t]here remains a significant need for residential opportunities."[165]  The County reported a "waiting list of about 100 individuals for supported housing."[166]  It noted that "referrals of the homeless is the highest it has been in six (6) years.  The percentage of referrals of individuals who are homeless has risen from 8% in 2015 to 16% as of April 2018."[167]

Niagara County has one ACT team at 100% capacity.[168]

### c.  Onondaga County.

In 2019, Onondaga County reported that it surveyed 45 staff providing mental health and substance use services.[169]  The staff reported that "clients are presenting with increasingly complex service needs, including increases in the following areas: housing needs, medical concerns, co-occurring mental and physical health conditions, drug seeking (asking for high doses, refusal to taper, etc.), poly-substance use, and seeking medications with no other treatment (talk therapy, group, etc.)."[170]  In its 2020 LSP, Onondaga County informed state officials that it is forced to ignore patient need due to funding limitations attributable to state officials themselves: "Needs based vs. opportunity based planning[:] . . . Optimal planning efforts involve a primarily data driven orientation that uses data to assess needs, and develop strategies to address those needs. We continue to engage in a range of data gathering efforts, including surveys, focus groups, and queries of a number of data systems.  But practical resource limitations dictate that we engage with existing and emerging opportunities in order to effect change, rather than seeking to focus

---

[162] *Id.* at 2.
[163] *Id.*
[164] *Assertive Community Treatment (ACT), supra* note 125.
[165] 2019 Local Services Plan for Mental Hygiene Services, Niagara Co. Dept. of Mental Health Servs. at 5 (July 18, 2018) (on file with author).
[166] *Id.* at 6.
[167] *Id.*
[168] *Assertive Community Treatment (ACT), supra* note 125.
[169] 2019 Local Services Plan for Mental Hygiene Services, Onondaga Co. Dept. of Adult & LTC, at 6 (July 18, 2018) (on file with author).
[170] *Id.*

primarily on needs that emerge through data analysis.  Too often these data driven priorities lack resource support."[171]

d.  Rockland County.

In 2020, Rockland County reported that "OMH reduction in service dollars to care management and ACT providers is causing ongoing and worsening repercussions. These providers do not have the capacity to support people with serious mental illness who do not have Medicaid for extended periods of time."[172]  It further reported that "[Single Point of Access] referrals for ACT supports doubled from 2018 to 2019.  People who have not been successful with care management services, even with [Home Health Plus] supports, are seeking ACT supports to remain out of the hospital . . . It would be helpful to increase the capped case load for ACT from 68 to 106." [173]  Additionally, the County reported that, "[t]he need for safe, affordable housing opportunities for people in Rockland has generally worsened. [Single Point of Access] referrals exceed the vacancies. Provider agencies and individuals are finding it increasingly difficult to find affordable apartments with the current level of OMH funding"[174] Rockland County has one ACT team reported at 104% capacity.[175]

In addition to the identified service deficits, Rockland County's report highlighted OMH's failure to properly exercise its role as the policy setting entity in the public mental health system in New York.[176]  It appears that, in part, as a result of their sanctioned Medicaid redesign, services to people with disabilities, including mental health disabilities, have been diminished.[177]  The levels of care management offered in the new Medicaid system are not intensive enough to meet their needs.[178]  OMH has failed to remedy this major flaw in the program design.[179]  The addition of the Home Health Plus level of case management, added in response to the feedback from consumers and providers is a case of too little, too late.[180]  The 1:20 caseload ratios dictated by that model are not adequate for persons with severe mental illness, who have the complicating factor of justice system involvement.[181]

---

[171] 2020 Local Services Plan for Mental Hygiene Services, Onondaga Co. Dept. of Adult & LTC, at 4 (Sept. 6 , 2019), https://www.clmhd.org/img/pdfs/brochure_q2pr0e2lqs.pdf.

[172] 2020 Local Services Plan for Mental Hygiene Services, Rockland Co. Dept. of Mental Health, at 4 (Sept. 6 , 2019), https://www.clmhd.org/img/pdfs/brochure_n4pkmvu5pw.pdf

[173] *Id.*

[174] *Id. See also id.* at 6 (discussing the lack of supportive and affordable housing).

[175] *Assertive Community Treatment (ACT), supra* note 125.

[176] *See generally id.* at 3-6, 13-14 (describing OMH's failure to exercise its role as New York's SMHA).

[177] *See Id.* at 4, 14.

[178] *Id.* at 4.

[179] *Id.*

[180] *Id.*

[181] *See* Health Home Plus Program Guidance for High-Need Individuals with Serious Mental Illness*, Office of Mental Health (Re-Issued September 2021) at 15, https://www.health.ny.gov/health_care/medicaid/program/medicaid_health_homes/special_populations/docs/hh_plus_high_need_smi_guidance.pdf (last visited Feb. 6, 2023).

e.  Schoharie County.

In 2019, Schoharie County reported that "The loss of the targeted case management program and transition into the Medicaid Health Home Care Management has resulted in adults and children receiving less adequate services for their needs. These programs are designed to stabilize individuals and keep them in the community while decreasing costs across the board. However, the setup of the Medicaid Health Home encourages higher caseloads and fewer contacts with each individual, depending on their acuity scores.  The program focuses on coordination of services versus actual case management services."[182]

Note, as of February 6, 2023, there are no ACT teams indicated for Schoharie County.[183]

c.  **OMH Fails to Address Counties' Reports of Inadequate Funding for Supported Housing, ACT and FACT, Medication Management, and Crisis Services for the Relevant Population**.

OMH's repeated refusal to adequately address the chronic patterns of deficits in both housing and intensive levels of clinical and case management capacity identified in the County Local Services Plans shows a systemic failure to fulfill its mandate.  The reported deficits are large and pervasive across the state.  It is the responsibility of OMH as the SMHA to attend to New York State's most vulnerable citizens.  Despite reports from numerous New York State counties on the inadequacy of services, OMH has failed to respond effectively to the ever-worsening picture of need that is painted in compelling terms by the state's counties.

In failing to take the necessary steps in response to the counties' reports of the need for CBMHHSS, *i.e.,* by thorough and adequate planning, funding, management and development of these services, OMH neglects populations with serious mental illness, including the relevant population which, due to its criminal justice involvement, suffers from more stigma than its peers without such involvement. For example, studies have shown that a criminal record will often serve as a barrier, prevent, or otherwise make it more difficult for people with criminal records to receive affordable, accessible housing.[184] OMH has failed to meaningfully consider these barriers when developing its supported housing infrastructure. The lack of housing for formerly incarcerated persons with SMI forces the relevant population to compete for the same supported housing as those without justice system involvement, which is already insufficient.  It is unrealistic to expect formerly incarcerated persons with SMI to successfully compete for this housing stock.

Along with housing, counties report the need for additional supportive services. Supportive services for people with serious mental illness includes clinical support.  Persons with serious mental illness released from state prisons need intensive levels of clinical support such as ACT or FACT.  These services are not available in sufficient quantities to serve the hundreds of

---

[182] 2019 Local Services Plan for Mental Hygiene Services, Schoharie Co. Comm. Servs. Bd., at 3 (July 18, 2018) (on file with author).
[183] *See Assertive Community Treatment (ACT), supra* note 125.
[184] *See* Dr. Factor Expert Report., ¶ 37; Esther Galletta et al., *supra* note 77; J. Steven Lamberti et al., *supra* note 35;

persons with serious mental illness who are discharged from DOCCS custody every year, plus the thousands of formerly incarcerated persons who remain homeless at this time.  Unfortunately, the ACT and FACT resources currently available in New York State are not adequate to meet the needs of this population.  When considering how to develop sufficient services to serve formerly incarcerated persons with serious mental illness, OMH must account for the hundreds of people in this group who were discharged to homeless shelters in past years.  OMH data indicates that as of January 9, 2023, it funds 109 ACT teams throughout New York that are serving 6,479 enrollees.[185] This constitutes 91 percent capacity.[186]  The number of homeless persons with SMI in New York State is a strong indicator that OMH must significantly expand its ACT and FACT program capacity.

> d. **OMH Fails to Develop a Sufficient Management Structure to Oversee the Counties and Voluntary Agencies that Administer CBMHHSS to the Relevant Populations**.

New York's public mental health services are delivered through a system of state, county, and local entities.  Under the Mental Hygiene Law ("MHL"), Article 41, the local counties are given authority as the LGUs, which "govern the oversight of county and local not-for-profit service provider funded mental health programs that receive funding from the NYS Office of Mental Health."[187]  LGUs play a role in the development, expansion, improvement, and integration of CBMHHSS for the people with mental illness, including the relevant population.[188]  For the LGUs to effectively provide this level of care at the local level, and "[i]n order to prevent unnecessary fragmentation in the planning and financing of the care, treatment and rehabilitation"[189] of the relevant population as they transition from prison into the community, the LGUs require not only proper funding, but proper management and oversight from OMH. Unfortunately, OMH has failed to effectively provide this direct level of assistance to the LGUs.

> i. *OMH has Failed to Implement Uniform Standards and Guidance for Counties*.

As already noted previously, OMH has not properly defined the necessary elements of a Services Safety Net to replace the traditional state hospital role, instead leaving the counties to figure this out on their own. There is inconsistency among the approaches taken to fulfill this critical function across the state and widespread insufficiency of core services that would prevent the overuse of correctional and homeless services systems. Moreover, OMH has not responded appropriately to the local counties' reports in the Local Services Plans regarding lack of adequate

---

[185] *Assertive Community Treatment (ACT), supra* at note 125.

[186] *Id.*

[187] *Health Home Guidance, supra* note 110.

[188] N.Y. Ment. Hyg. Law § 41.04 (McKinney 2022). *See also* N.Y. Ment. Hyg. Law § 41.01 (McKinney 2022) (stating that Article 41 is "designed to enable and encourage local governments to develop in the community preventive, rehabilitative, and treatment services offering continuity of care; to improve and to expand existing community programs for persons with mental illness . . ; [and] to plan for the integration of community and state services and facilities for individuals with mental disabilities[.]").

[189] N.Y. Ment. Hyg. Law § 41.04 (McKinney 2022).

CBMHHSS.  A critical step that OMH has failed to properly take in resolving the inadequacies of CBMHHSS in New York State is creating an efficient management structure as detailed below.

While OMH funding for CBMHHSS is critical, without a proper management structure in which OMH identifies roles and reporting standards for local counties, the needs of the relevant population cannot be properly met.  A critical omission in the OMH approach to community mental health service system development is its failure to identify a uniform structure and mechanism based on data and best practices for service system management at the county level.  The implementation of Single Point of Access (SPOA), which "helps providers connect people with serious mental illness to mental health services that can accommodate them,"[190] is just the first step. To ensure the effective use of state resources and oversight of quality, OMH must set necessary standards and issue guidance to the LMHAs so that they can "develop and oversee comprehensive, integrated and cost-effective systems of care locally"[191] and effectively engage in "cross-system coordination between and among multiple services"[192] and management and prioritization of referrals to critical community-based services like ACT, in order to meet the needs of the relevant population.  There is a critical need, for example, for OMH to set standards mandating that counties maintain waiting lists for CBMHHSS and transmit those lists to OMH, thereby enabling OMH to track statewide need for CBMHHSS and allocate resources sufficient to meet this need.

    ii.   *OMH Has Failed to Maintain Sufficient Regional Field Offices with which to Oversee Counties.*

OMH's management and oversight failures can be attributed in part to the limited number of regional offices, referred to as the "field offices," funded by OMH.[193]  These regional offices are responsible for "resolving issues and concerns . . . related to improving the quality of mental health care their regions."[194]  At the moment, however, there are only five regional offices responsible for all of New York State's 62 counties.[195]  One regional office can be responsible for

---

[190] *Mental Health Services: Single Point of Access (SPOA)*, NYC HEALTH, https://www.nyc.gov/site/doh/providers/resources/mental-illness-single-point-of-access.page (last visited Dec. 24, 2022).

[191] *About Us,* NYS CONFERENCE OF LOCAL MENTAL HYGIENE DIRECTORS, INC., https://www.clmhd.org/about_us/ (last visited Dec. 24, 2022) ("The LGUs develop and oversee comprehensive, integrated and cost-effective systems of care locally while working in partnership with the NYS mental hygiene agencies," including OMH.).

[192] *Who We Are*, NYS CONFERENCE OF LOCAL MENTAL HYGIENE DIRECTORS, INC., https://www.clmhd.org/img/uploads/Who%20We%20Are-Lobby%20Piece%20-%202022.pdf (last visited Feb. 5, 2023).

[193] *Office of Mental Health (OMH) Field Offices,* NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/aboutomh/fieldoffices.html (last visited Feb. 5, 2023).

[194] *OMH Regional Liaisons,* NATIONAL ALLIANCE ON MENTAL ILLNESS NEW YORK STATE (NAMI), https://www.naminys.org/mental-health-support/navigating-details/omh-regional-liaisons/ (last visited Feb. 5, 2023).

[195] *Office of Mental Health (OMH) Field Offices, supra* note 189.

up to 20 counties.[196]  It appears there is only one director acting as regional field coordinator per field office.[197]  Duties of the OMH Director of a Mental Health Field Office include:

- "Direct the development, interpretation, and communication of OMH policies and initiatives to local governmental units, community mental health providers, and the general public;

- Formulate and recommend policies, procedures, and remedial actions to OMH executive staff on issues related to community treatment program activities and local service delivery systems; and

- Direct a multi-disciplinary team of professionals representing key mental health functional areas."[198]

The specific duties of directors include:

- Monitor[] and oversee[] field office staff, program activities, and the delivery of services to ensure compliance with the New York State Mental Hygiene Law, federal standards for Medicaid reimbursement, and other applicable laws, rules, and regulations;

- Monitor[] and oversee[] all licensed programs and services to ensure the provision of quality mental health services in accordance with OMH policies and procedures;

- Work[] collaboratively with local governmental units, providers, and Central Office staff to identify unmet needs and issues in service delivery as they arise and recommend[] appropriate solutions to OMH executive staff;

- Review[] staffing configurations to develop and establish resource allocation plans; and target[] resources to ensure funding to support OMH and field office priorities;

- Coordinate[] local and State-operated services to support proper discharge[] planning and community integration for individuals and in State and local hospitals;

- Tailor[] strategies for diverse demographic and cultural groups to improve the operation of mental health services in the local service delivery system;

---

[196] *Id.*

[197] *Organization Chart,* NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/about/omh-orgchart.pdf (last visited Feb. 5, 2023).

[198] *StateJobsNY,* NEW YORK STATE OF OPPORTUNITY,
https://statejobs.ny.gov/employees/vacancyDetailsView.cfm?id=94709 (last visited Feb. 5, 2023).

- Advise[] various Central Office programs, divisions, and bureaus on issues related to regional mental health planning;

- Respond[] to inquiries from outside consumer groups, families, the Legislature, the Division of the Budget, and other interest groups on behalf of the Governor and OMH executive staff;

- Solicit[] and facilitate[] regional stakeholder engagement, such as consumer and other citizen groups, and relevant professional and special interest groups in the development process of new initiatives and/or OMH policies;

- Work[] in partnership with other health and human service agencies to facilitate communication, improve agency collaboration, and better meet the needs of the constituencies served by multiple service systems; and

- Supervise[] Field Office staff."[199]

With all the responsibilities required of the directors and their respective field offices, an expansion of the field offices would allow better and more localized oversight. Failure to expand the field offices likely leads to overburdened regional offices that cannot meet the needs of the populations that they serve. For example, in 2017, the Office of the New York State Comptroller found that "OMH's western New York regional field office never visited [DePaul Community Services, Inc.] during the 34-month audit period and only visited [an OMH funded program site] one time (in 2015). Further, even when OMH regional office staff did make visits to providers, as in the case of the OMH NYC Field Office and Postgraduate, they did not always follow up on corrective action plans."[200]

By expanding its field offices, OMH would render it more likely that each county would receive increased attention regarding its needs related to CBMHHSS for the relevant population and would better ensure that each county satisfies any uniform standards and guidelines OMH sets. This management structure would allow OMH to efficiently track county-level data and use that data to enhance the adequacy of CBMHHSS.

---

[199] *Id.*

[200] *Office of Mental Health: Oversight of Supportive Housing Programs,* OFFICE OF THE NEW YORK STATE COMPTROLLER THOMAS P. DiNAPOLI, at 10 (May 2017), https://www.osc.state.ny.us/files/reports/special-topics/pdf/housing-mental-health-2017.pdf.

e. **OMH Fails to Utilize DOCCS and County Data Concerning the Need for CBMHHSS Among the Relevant Population**.

Given OMH's responsibilities as the SMHA, and its collaborative relationship with DOCCS,[201] OMH has access to data showing the lack of CBMHHSS for the relevant population and knowledge that its own discharge planners were struggling for years to find appropriate placements for the relevant population. Despite this knowledge, OMH has not taken effective action to remedy the problem regarding the lack of CBMHHSS.

Because OMH fails to properly track and publish data concerning the number of people with serious mental illness who are eligible and appropriate for CBMHHSS and released from New York prisons each year, it is difficult to obtain a definitive picture of this data. It is possible, however, to extrapolate from two different reports to get an estimate based on DOCCS and NYC reporting. The January 1, 2018 DOCCS *Under Custody Report* states that on that date there were 5,813 inmates who were classified as Level 1, Level 1S, 2, or 2S, which are the designations for persons with significant mental illness.[202] That group constituted 11.5% of the total number of incarcerated persons on that date. According to the Coalition for the Homeless report titled *State of the Homeless, 2020*, between 2015 and 2018, more than 15,000 persons were admitted to the New York City homeless shelter system directly from state prisons.[203] In 2018, 3,466 persons were admitted to the New York City homeless shelter system directly from state prisons.[204] Applying the 2018 percentage of mentally ill persons in the total inmate population (11.5%) to this number yields an estimate of 398 persons with significant mental illness released directly from state prisons to NYC shelters that year.[205] This estimate is likely an undercount. There are reports in the professional literature that people with mental illness are more likely than others in correctional settings to be homeless at the point of release.[206]

The estimated number of people released from prisons to shelters without housing and services is a stark measure in human terms of OMH's abdication of its responsibilities as the SMHA. While recognizing the needs of the population on paper, OMH has failed to implement a plan to address these supposed priorities. Nor has it developed and funded interventions to prevent homelessness at a significant point of origin—discharge from prison. Instead of using its resources to implement half-measures that address only symptoms of the lack of services available—as addressed in the following section—OMH must provide housing and supports that could

---

[201] *See Memorandum of Understanding between the New York State Office of Mental Health and the New York State Department of Corrections and Community Supervision*, *supra* note 3.
[202] *Under Custody Report: Profile of Under Custody Population*, NEW YORK STATE CORRECTIONS AND COMMUNITY SUPERVISION, at 25 (Jan. 1, 2018),
https://doccs.ny.gov/system/files/documents/2019/09/Under%20Custody%20Report%202018.pdf.
[203] Giselle Routhier, Coalition for the Homeless, *State of the Homeless 2020,* at 10 (2020),
https://www.coalitionforthehomeless.org/wp-content/uploads/2020/03/StateofTheHomeless2020.pdf (last visited Dec. 24, 2022).
[204] *Id.*
[205] *Id.; see supra* note 198.
[206] Patricia McKernan, *Homelessness and Prisoner Reentry: Evidence-Based Strategies That Promote Improved Outcomes*, 27 JOURNAL OF COMMUNITY CORRECTIONS 7, 7 (2017), https://www.voa.org/homelessness-and-prisoner-reentry#Pat.

significantly decrease the numbers of persons with mental illness who are unhoused in New York State.

OMH is certainly aware of the deficiencies in its system that prevent it from meeting the needs of the individuals with serious mental illness who are released from state prisons to communities across the state.  As reported previously, the Local Services Plans submitted to OMH by counties each year have persistently reported the severe shortage of housing for people with serious mental illness.  Yet, again, OMH had repeatedly failed to utilize this data to remedy this shortcoming.

Similarly, DOCCS census information captures the extent of the unmet need for housing and services among the relevant population.  Yet, based on the dramatic insufficiency of resources for people with serious mental illness transitioning out of DOCCS custody, OMH has failed to utilize existing DOCCS data to develop and allocate the housing and services necessary to meet the needs of these individuals.

f.   **OMH Has Failed to Engage in Long-Term Planning and Data Driven Program Development to Ensure Sufficient Community-Based Mental Health Housing and Supportive Services for the Relevant Population, Instead Relying on Reactive Pilot Projects and Temporary Funding Streams**.

One of the main responsibilities of managing a public mental health system is prioritizing spending decisions through long-term planning and data-driven program development to ensure that help is available to those in the greatest need.  OMH has failed to fulfill this duty for the relevant population.  Supported housing and intensive clinical services, including ACT/FACT teams, sufficient to meet the needs of people with SMI who are homeless or at risk of homelessness upon release from prison are exceedingly limited.  Despite the corrosive and well-documented outcomes associated with this resource deficit across the state, OMH has neither prioritized this issue as an agency nor taken the necessary steps to solve it.

Rather than using a data-driven master plan to govern service system development, OMH takes a reactive approach that deploys one-off pilot projects, RFPs, and grants in an attempt to resolve problems on a crisis-by-crisis basis.[207]  These short-term fixes are responsive to crises of the moment, yet often do not attend to the longer-term needs of the system.  Examples of this practice include OMH's RFP for a Forensic Homeless Intensive Case Management ("ICM") Program for New York City in August of 2019.[208]  The stated purpose of the proposal was: "In response to the New York State Legislative commitment to dedicate resources for individuals with

---

[207] *See, e.g.*, 2020 Local Services Plan for Mental Hygiene Services: Onandaga County Department of Adult & LTC 4 (2019), https://www.clmhd.org/img/pdfs/brochure_q2pr0e2lqs.pdf ("Optimal planning efforts involve a primarily data driven orientation that uses data to assess needs, and to develop strategies to address those needs…But practical resource limitations dictate that we engage with existing and emerging opportunities in order to effect change, rather than seeking to focus primarily on needs that emerge through data analysis.").

[208] N.Y.S. Off. of Mental Health, *Forensic Homeless Intensive Case Management Program New York City: Request for Proposals August 2019* (2019),
https://omh.ny.gov/omhweb/rfp/2019/forensic_homeless/forensic_homeless_icm_rfp_final.pdf.

SMI releasing from prison into the community, the [Office of Mental Health] announces the availability of funds in the amount of $338,000 annually . . . The ICM program is designed to assist mentally ill homeless individuals returning to NYC from New York prisons with accessing housing and developing skills to remain independent and in stable housing . . . Three (3) Intensive Case Managers will provide intensive case management services at a ratio of 1:12 for a period of 3 to 12 months, as clinically indicated."[209]

To add three case managers at this ratio and to a system that is overwhelmed with the numbers of formerly institutionalized people with serious mental illness is an exercise in futility. The problems ailing the case management system in New York require a comprehensive solution. Throwing initiatives like this at the problem without a larger strategic framework provides no meaningful or long-term solution.

In its last State Plan, OMH touted its "Forensic Supported Housing Initiative," saying that "OMH is committed to ensuring that SMI individuals leaving prison have appropriate housing in the community."[210] The State Fiscal Year 2015-16 budget authorized funding for the development of 400 units of OMH supported housing.[211] While the goal was the right one, even if OMH had followed through on this plan, 400 units of housing is insufficient when hundreds of people are being discharged annually from prison to New York shelters.

As another example, in 2014, OMH released its Transformation Plan, a strategy to move money historically spent on inpatient care to the community services side of their budget.[212] In announcing the initiative, OMH cited the fact that New York was still spending approximately 50% of its mental health dollars on inpatient care that served a relatively small number of the state's SMI population, while community services were significantly underfunded.[213] The stated goal of the project was to "re-balance the agency's institutional resources by further developing and enhancing community-based mental health services throughout New York State."[214]

The conceptual framework for the Transformation Plan was solid. Reallocation of dollars from inpatient care to community services is a necessary step in the movement to deinstitutionalization. In moving their mental health systems away from institutions and toward community-based care, OMH acknowledged the "rebalancing of the agency's institutional resources to further develop and enhance community-based mental health services is also consistent with the Americans with Disabilities Act."[215] However, OMH's execution of the plan has been insufficient. To safely transition a system that has been over-reliant on inpatient care rather than community services to serve high-needs individuals, the state must start by building a

---

[209] *Id.* at 3.

[210] *2016-2020 Statewide Comprehensive Plan, supra* note 14s, at 61.

[211] *See id.*; *Report on the State Fiscal Year 2015-2016 Executive Budget*, OFFICE OF THE NEW YORK STATE COMPTROLLER (2015), https://www.osc.state.ny.us/files/reports/budget/pdf/budget-executive-2015-16.pdf.

[212] *See 2014-2018 Statewide Comprehensive Plan, supra* note 104.

[213] *See id.*

[214] *Id.*

[215] *See id.* at 8.

comprehensive network of intensive community services that replace the level of care offered in inpatient settings. Instead, as described in the previous sections in this report, OMH continues to prioritize funding institutional care over the allocation of funds to ensure that adequate community based mental health housing and supportive services exist to meet the needs of the relevant population.

These systemic flaws persist because New York has failed to learn from the failures of the deinstitutionalization movement upon which the State's mental health services system is based. Indeed, the key flaw in the deinstitutionalization movement was that in many cases, frontloading of services did not occur. People were discharged from institutionalization without necessary programming in place.

In examining the deinstitutionalization crisis, some commentators have decried the loss of inpatient beds as the key causal factor and advocated for rebuilding inpatient capacity. This is a faulty analysis. Safe and effective deinstitutionalization involving the relevant population requires two equally important interlocking components: building sufficient CBMHHSS and reducing the resulting unnecessary bed capacity to fund ongoing program development efforts.

### g. The Foregoing Failures are Typified by OMH's Failure to Sufficiently Execute its Transformation Plan.

In executing its Transformation Plan, OMH has failed to:

(1) define the program elements necessary to constitute the "community safety net";

(2) develop needed capacity estimates for essential safety net service for each county;

(3) provide the requisite funding to ensure timely access to systems and services;

(4) develop a plan to move persons from institutions when they no longer clinically need that level of care and continue to move resources with them to continuously rebalance the system's resources; and

(5) conduct the requisite oversight to ensure counties and voluntary agencies are providing services consistent with OMH's mandate.

The Transformation Plan start up dollars were intended to support this kind of transition, but the upfront funding was not sufficient. To make things worse, because OMH failed to tie this initiative to the creation of a community safety net, much of the funding was spent in ways that did not impact the most severely compromised members of its service populations. Individuals with serious mental illness and with justice system involvement fared particularly badly in the Transformation Plan process. As reported in the *March 2022 Monthly Report of OMH Facility Performance Metrics and Community Service Investments*, $101,447,204 had been reallocated

from hospitals to community programming from the beginning of the process in 2014.[216]  In a stark reflection of the OMH inattention to persons with SMI released from state prisons, there is no evidence that a sufficient amount of dollars were planned to target the specific needs of these individuals.[217]  At the same time, thousands of individuals leaving state prisons and hospitals have been discharged to inappropriate settings in the community.

III.  OMH's Failure to Fund Community-Based Mental Health Housing and Supportive Services is the Main Driver of its Failure to Maintain Housing and Services for the Relevant Population.

As previously noted, OMH has developed CBMHHSS that reflect current best practices for serving formerly institutionalized persons.  The problem is not that the CBMHHSS do not exist.  It is that there is not enough CBMHHSS available to ensure that the relevant population receives these services.  This is above all because OMH does not employ effective funding and spending strategies to meet the relevant population's level of need.

a.  **OMH Continues to Disproportionately Fund Institutional Care Instead of Adequately Funding Community Based Mental Health Housing and Supportive Services**.

As an example of poor strategy and spending, "[m]ore than 50 percent of mental health expenditures in the 2018-2019 state fiscal year were for inpatient services, which totaled more than $4.3 billion."[218]  This is a stark contrast with the 24% of state mental health budgets generally used in the field on inpatient care.[219]  New York was reported to have exceeded the national inpatient utilization rate at its state operated psychiatric centers, and while its state-operated psychiatric centers used inpatient care to serve approximately 1% of the total number of people involved in the public mental health system, they accounted for 20% of the gross annual mental health budget expenditures.[220]  In practical terms, this means that the community services that are needed to prevent unnecessary inpatient utilization are being underfunded to maintain the residual of an antiquated system that serves a much smaller fraction of New York's individuals with mental illness.  OMH recognizes that this is a problem: "This situation ha[s] led to disproportionately high [s]tate-operated inpatient per capita costs as more individuals with mental illness are supported successfully with community mental health services, while the inpatient footprint has remained disproportionately large."[221]  However, the legislature continues to increase funding for inpatient beds at the cost of developing the very services that would diminish the need for those beds.  OMH

---

[216] *March 2022 Monthly Report- OMH Facility Performance Metrics and Community Service Investments,* NEW YORK STATE OFFICE OF MENTAL HEALTH, 1, 3 (2022),  https://omh.ny.gov/omhweb/transformation/docs/2022/omh-report-mar-2022.pdf.

[217] *Id.*

[218] *Profile of the New York State Mental Health System, supra* note 15, at 26.

[219] NRI Inc., *FY 2019 State Mental Health Agency Revenues and Expenditures* 1 (2022), https://www.nri-inc.org/media/rmrd2s5e/nri-2020-profiles-trends-in-smha-expenditures-and-funding-for-mental-health-services-fy-2001-to-fy-2019.pdf.

[220] *See* N.Y.S. Off. of Mental Health, 2014-2018 Statewide Comprehensive Plan, *supra* note 103, at 7.

[221] *Id.*

has failed to effectively educate the public and the state legislature regarding the fiscal logic of decreasing reliance on institutional care.

Without the availability of the necessary Safety Net Services enumerated above, the relevant population will be limited in its ability to successfully transition to community living. As the SMHA, OMH should understand that there are large numbers of SMI individuals leaving the state prisons each year with outcomes that include homelessness, recidivism, and death. [222] Yet, the actions of OMH indicate that it has not made this population a priority. One of the failures of the deinstitutionalization movement was neglecting to develop sufficient program capacity in communities prior to discharging people from institutions. It seems a simple proposition. Yet, over 50 years later, OMH has failed to successfully ensure the sufficiency of CBMHHSS.

> b. **OMH has Failed to Implement Well-Known Models for the Development of an Equitably Funded Community-Based Mental Health Housing and Supportive Services System**.

Following up on the need for uniform standards and guidance to local counties, addressed above, *supra*, OMH must use its responsibility as an SMHA to hold OMH-funded housing providers and programs accountable for properly using the OMH funding that they receive. Reviewing how the funding is being utilized by the housing providers and programs is necessary to ensure all dollars are being spent for the purpose of meeting the needs of the individuals OMH intends to serve. Any failure to set these standards and to investigate and hold housing and program providers accountable is the responsibility of OMH. For example, in 2013-2014, Office of State Comptroller auditors reviewed Supported Housing Program expenses, including direct program and administrative costs. In reviewing a sample of these expenses totaling $360,918, the OSC audit "identified $41,743 in inappropriate and/or unsupported costs charged by [two OMH funded programs] and $9,707 in expenses improperly charged to other OMH-funded programs (for a total of $51,450)."[223] Any dollar inappropriately spent is a dollar taken away from ensuring the adequacy of CBMHHSS.

Additionally, as part of its funding strategies, OMH must set uniform standards and guidance requiring that housing providers and programs receiving funding accept individuals from the relevant population, regardless of their criminal histories. It is no excuse for OMH to argue that the relevant population is difficult to place into housing. As the SMHA, OMH has the power to implement and enforce certain policies and standards over the housing providers which it funds. The implementation of a "no eject no reject" policy would resolve pushback from housing providers for placement of so-called "hard to place" individuals. This is a policy that states no person meeting the eligibility criteria for a service shall be denied service simply due to the severity and complexity of their needs and background. An effective SMHA ensures that it plans and funds its CBMHHSS to guarantee placement to all those in the relevant population who are eligible and

---

[222] Dr. Factor Expert Report, pp. 5-18.

[223] Off. of the N.Y.S. Comptroller, *Office of Mental Health- Oversight of Supported Housing Programs*, quote on p. 14, *see also* p. 1 (2017), https://www.osc.state.ny.us/files/reports/special-topics/pdf/housing-mental-health-2017.pdf;

appropriate, regardless of their criminal background. Indeed, as noted earlier, OMH recognizes this, stating that "housing is a proven pathway to recovery for individuals with mental illness."[224]

Another possible solution is for OMH to create its own housing, rather than merely funding housing created by third parties. I have seen this strategy work in Connecticut. While I was working as the Deputy Commissioner for the Connecticut Department of Mental Health and Substance Abuse Services, I was responsible for the development of local mental health authorities throughout the state. One of our challenges was the reluctance of non-profit agencies to accept referrals for individuals who were considered high risk because of symptoms, past behaviors, or criminal justice system involvement. One strategy that we used to break this impasse and to move persons into community settings was to have the State Agency (CT DMHSAS) hold leases for apartments and to provide the staffing for these units of housing with state employees. In some instances, these were former hospital staff who were retrained to work as ACT or Intensive Case Management Team members. At times, we moved hospitalized persons to the community with the same staff who had worked with them during their hospital stays. This continuity of relationship was very helpful in easing the transition from institutional settings. This strategy proved very helpful in moving some of the individuals who had been most difficult to match with non-profit community agencies. Their worries about liability were obviated because the state already held the risk for treating these individuals. We believed that creating safety net services in the community required the state in some cases to play the role of "provider of last resort," which was historically played by the state psychiatric hospitals.

## F. SUMMARY OF FINDINGS

It is my expert opinion that:

1. OMH and DOCCS do not adequately serve New York State residents with serious mental illness who are homeless and/or at risk of homelessness and reach their release dates or are released from the DOCCS system, *i.e.,* the "relevant population".

2. OMH and DOCCS do not supply adequate CBMHHSS to members of the relevant population upon their release dates and ultimate release from prison.

3. Although CBMHHSS exist, OMH has not maintained them in sufficient quantities to meet the needs of members of the relevant population upon their release dates and ultimate release from prison.

4. DOCCS releases some members of the relevant population to (i) settings without sufficient CBMHHSS, such as homeless shelters, or (ii) inappropriate and overly

---

[224] *See OMH Strategic Framework, supra* note 68.

restrictive settings, such as crisis residences within psychiatric hospitals or transitional living residences within psychiatric hospitals, because of this shortage.[225]

5. DOCCS fails in its responsibility to ensure the "continuum of care" for the relevant population, which includes ensuring that individuals with serious mental illness are provided the CBMHHSS for which they are eligible on their release date."[226] Specifically, DOCCS has failed to:

   a. Implement an integration mandate policy, requiring people with serious mental illness to be released to an integrated setting appropriate to their needs.

   b. In conjunction with OMH, plan in advance for the release of members of the relevant population to integrated settings on their release dates.

6. OMH has failed to meet its responsibilities to provide CBMHHSS to the relevant population upon their release dates. Specifically, OMH has failed to:

   a. Plan, develop, and fund the necessary CBMHHSS.

   b. Adequately respond to counties' reports in the Local Services Plans regarding inadequate funding for and availability of CBMHHSS.

   c. Allocate the significant number of dollars and resources to which it has access to ensure adequate CBMHHSS for the relevant population.

   d. Scale pilot projects and temporary funding streams into longer-term solutions for the deficiencies in CBMHHSS for the relevant population.

   e. Define and develop the bundle of community mental health Safety Net Services for the relevant population.

   f. Set necessary standards and policies and issue proper guidance to counties and voluntary agencies so they can "develop and oversee comprehensive, integrated, and cost-effective systems of care locally."[227]

---

[225] *See supra* Section II(b)(i); Giselle Routhier, *supra* note 199; N.Y.S. Dep't of Corr. and Cnty. Supervision, *supra* note 198.

[226] *See e.g., Memorandum of Understanding between the New York State Office of Mental Health and the New York State Department of Corrections and Community Supervision*, *supra* note 3; *Mental Health Specialized Supervision Standards- Directive No. 9230*, *supra* note 3; *Laws, Rules, & Directive Listing Overview*, *supra* note 3; N.Y.S. *Discharge Planning for Levels of Mental Illness- Policy No. 8.0, surpa* note 3.

[227] *See* N.Y.S Conf. of Loc. Mental Hygiene Dirs., Inc., *supra* note 187.

g. Engage in "cross system coordination between and among multiple services" to manage referrals to critical community-based services, like ACT, for the relevant population.[228]

h. Identify and implement a proper, uniform management structure—including the expansion of regional field offices—and a mechanism for service system management at the county and agency level.

i. Identify and implement a mechanism for ensuring counties meet the relevant population's need for CBMHHSS.

j. Utilize the OMH Transformation Plan effectively as a mechanism to convert the New York public mental health system from one that is institution-centric to a true community-based system of care.

## G. <u>RECOMMENDATIONS</u>

By implementing the following recommendations, OMH and DOCCS can address the foregoing systemic deficiencies and improve their prospects for meeting the needs of the relevant population.

1. OMH must review its internal plans, policies, and procedures to ensure that the rights and interests of serious mentally ill persons with justice system involvement are addressed by the agency.

2. OMH must broaden its lens to consider the needs of these individuals beyond the confines of institutional settings.

3. OMH must develop quality assurance and management strategies that target and rectify problems with access to housing and services frequently experienced by these individuals.

4. OMH must, in collaboration with DOCCS, ensure that the relevant population will be set up with the CBMHHSS for which they are eligible and appropriate at the time of their release date, by creating a proactive data-driven and comprehensive strategic plan which addresses all of the needs of the relevant population. To be a useful tool for systems change, such a plan must include a time frame for implementation and a funding strategy that assures adequacy of services across the state. Moreover, OMH must ensure that it first effectively shifts away from an institution-centric organization

---

[228] *Id.*

to a community-based system.  Although OMH has started this shift, many of its policies, structures, and operations still reflect an earlier era, as indicated in this report.

5.  OMH, along with DOCCS, must create an integration mandate policy, requiring people with serious mental illness to be released to an integrated setting appropriate to their needs. By failing to take these steps, DOCCS has further contributed to the state's failures to adequately serve the relevant population.  OMH must review its policies and procedures and revise any that are contributing to the numbers of homeless people in New York.  Additionally, OMH should work with DOCCS, community providers, and advocates to review statewide and multi-system approaches to addressing this epidemic at its points of origin.

6.  OMH must define and provide the Safety Net Services that were once provided by state hospitals as an essential step in the state's transformation from an institution-based mental health system to one where individuals can successfully be supported in community systems of care.

7.  OMH's Transformation Plan should be revamped to reflect the fact that the funding for this initiative is realized from the downsizing of state institutions and in the investment of CBMHHSS for the relevant population.  Given that, and the fact that there is no comprehensive community safety net in place to replace these institutions, the dollars yielded from this process should be dedicated to funding the community safety net.

8.  OMH must identify a uniform structure and mechanism based on data and best practices for service system management at the county level.  To ensure the effective use of state resources and oversight of quality, OMH must specifically set necessary standards and issue guidance to the LMHAs.  This includes, but is not limited to, mandating that counties maintain waiting lists for CBMHHSS, and transmit those waitlists to OMH, thereby improving OMH's ability to track statewide need for CBMHHSS and allocate resources sufficient to meet this need.

9.  OMH should reallocate some of its funding to expand its field offices in order to allow more efficient on-the-ground tracking of data and working relationships between OMH and counties to ensure the sufficiency of CBMHHSS in terms of both quantity and quality of services.

10. OMH must engage in full oversight and review of how OMH funding is being utilized by housing providers and programs to ensure all dollars are being spent for the purpose of meeting the needs of the individuals OMH intends to serve.  It must implement a "no eject no reject" policy and reallocate some of its funding to create housing owned by, rather than just funded by, OMH.

11. OMH should engage in long term planning and data-driven program development to ensure sufficient supported housing and community services.

These recommendations, as a package, are not dramatic departures from the current operations of OMH. They build on programs, structures, and procedures that are already in place. They offer a framework for bringing focus to the needs of the most severely challenged persons served by OMH, and some strategies for improving outcomes for those individuals.

## H. <u>CONCLUSION</u>

OMH and DOCCS fail to effectively serve New Yorkers with serious mental illness who are transitioning out of prison, are eligible for CBMHHSS and are homeless and/or at risk of homelessness. This group is a vulnerable subset of the target population that both state agencies are legally mandated to serve and ensure that they are provided with adequate post-release access to necessary CBMHHSS. The inadequate program development and insufficient resource allocation by OMH results in adverse consequences to lives of individuals with serious mental illness. Solving the crisis caused by the failures of OMH and DOCCS is not a complicated proposition, however. It simply requires the agencies to own their responsibility to this group of individuals by providing them the housing and services that OMH already endorses and employs. In OMH's own words, "OMH is committed to supporting individuals with mental illness who are justice involved or at risk for adverse incidents during critical transitions…ensur[ing] their safety and that of our communities" and OMH aims to "improve the continuum of care for individuals in prisons…as they transition back to community living."[229] The lives of people with serious mental illness who are transitioning out of prison can be immeasurably improved by this recalibration of the public mental health system in New York to ensure that it is operating in conformance with its own mission and mandate.

---

[229] *See OMH Strategic Plan*, *supra* note 18.

## APPENDIX A

## MELODIE J. PEET

38 Reeves Avenue, Guilford, CT 06437
(203) 689-5960
mjpeet@aol.com

## EXPERIENCE

**2018-Present**  **CONSULTANT**
Work as a mental health systems expert and expert witness for the United States Department of Justice and state Disability Rights organizations.

**2010-2019**   **CONNECTICUT STATE DIRECTOR**
*The Institute of Professional Practice, Inc.*
*Meriden, Connecticut*

Was responsible for all program and administrative operations for this large human services agency with a budget of $36 million and 600+ staff.  Services included: foster care, behavioral health; residential, vocational and trauma specific programming for individuals with intellectual disabilities; and two schools that served children with autism spectrum disorders.

**2007-2009**   **DEPUTY COMMISSIONER**
*Massachusetts Department of Children and Families*
*Boston, Massachusetts*

Managed the policy, planning and program operations for this public sector child welfare agency with a staff of 1100 and a budget of $850M.  Worked to integrate the practice approaches of the Department's child protective services and domestic violence programs; revamped the agency's staff development operations; and initiated a process to adapt the clinical practice model of the Department to conform with a trauma informed approach.

**2006-2007**   **BEHAVIORAL HEALTH MONITOR**
**2002-2004**   *DCF Court Monitor's Office*
*Wallingford, Connecticut*

Worked as a behavioral health expert on the court monitoring team that was overseeing the compliance of the Connecticut Department of Children and Families with the conditions of the court settlement in the Juan F. consent decree.

**2004-2006**    <u>**CEO**</u>
*Riverview Hospital for Children and Youth*
*Middletown, Connecticut*

Led a turnaround team that was organized to manage a major organizational change process at this 100 bed hospital that served the mental health needs of Connecticut children aged 6-18. Designed and implemented a new structure and programming in order to: improve expertise in trauma specific treatment methods and gender specific programming; better integrate the hospital with community systems of care.

**2000-2002**    <u>**COMMUNITY SERVICES ADMINISTRATOR**</u>
*City of New Haven*
*New Haven, Connecticut*

Directed the health and human services programming for an economically and culturally diverse population of 130,000 people. Worked with city, state, and non-profit entities to craft a policy agenda that supported the healthy growth and development of all city residents. Functioned as a member of the Mayor's cabinet. Supervised the following departments: Health, Children and Youth, Elderly and Human services.

**1995-2000**    <u>**COMMISSIONER**</u>
*Department of Mental Health, Developmental Disabilities and*
*Substance Abuse Services*
*Augusta, Maine*

Functioned as Chief Executive Officer for a state agency with a staff of 1310 and biennial budget of $430M. Adopted a new policy framework for the Department which emphasized community-based services for all populations. Operationalized that value system by: closing the state's sole institution for the care of people with developmental disabilities; downsizing the two state-operated psychiatric hospitals and reallocating millions of dollars to expand community services; and developing and implementing a plan to create a revamped behavioral health system for children that reduced reliance on institutional care. Other major initiatives included the integration of the state's freestanding substance abuse authority into the Department and establishing the nation's first public sector initiative to create a statewide response to the needs of trauma survivors.

**1991-1995**    <u>**DEPUTY COMMISSIONER**</u>
*Department of Mental Health and Substance Abuse Services*
*Hartford, Connecticut*

Responsible for managing the daily operations, and policy development for a state agency with an annual budget of $270M and a workforce of 3,600. Led a system-wide change process that rebalanced the emphasis from institutional to community-

2

based care. This initiative included the following critical elements; downsizing of inpatient bed capacity by 50% over a three year period; reallocating $35M to fund community services; reorganizing the governance structure from a centralized model to a network of 18 local mental health authorities. Worked with the Corporation for Supported Housing and HUD to create hundreds of new housing units and linked services for homeless people with mental illness, substance use issues, or HIV/AIDS.

**1986-1991**  **EXECUTIVE DIRECTOR**
*Greater Bridgeport Mental Health Center*
*Bridgeport, Connecticut*

In the largest city in Connecticut, directed the internal operations and managed external boundary relationships for a comprehensive community mental health center with a unionized staff of 275 and an annual budget of $15M. Was responsible for ensuring the provision of both inpatient and outpatient mental health and substance abuse services to a culturally diverse catchment area of 300,000. Piloted many of the State's first demonstration projects for new service models such as assertive community treatment teams, mobile crisis services; and homeless outreach.

**1982-1986**  **ASSISTANT DIRECTOR FOR ADMINISTRATION**
*Greater Bridgeport Community Mental Health Center*
*Bridgeport, Connecticut*

Managed and was responsible for all administrative operations, directed long-range planning; served as member of agency's policy making Executive Committee, supervised Center's non-clinical support services; directed Center's preparation for JCAHO accreditation; assumed responsibility for the agency in Director's absence.

**1979-1982**  **ASSISTANT ADMINISTRATOR**
*Yale University Department of Psychiatry*
*Connecticut Mental Health Center*
*New Haven, Connecticut*

Performed internal management functions such as budget preparation, program evaluation, fund raising, and grant writing. Supervised support departments, functioned as a liaison between the center and other community agencies.

**1978-1979**  **ASSISTANT ADMINISTRATOR**
*Rutland Mental Health Services*
*Rutland, Vermont*

Assisted Executive Director with administrative and fundraising functions for this comprehensive community mental health center that served both mental health and developmental disability program needs of a rural catchment area.

3

**EDUCATION**

| | | |
|---|---|---|
| **MPH** | **Yale University, New Haven, Connecticut** | **1978** |
| | **Concentration:  Mental Health Administration** | |
| **BA** | **Connecticut College, New London, Connecticut** | **1971** |
| | **Major: Political Science** | |

## <u>APPENDIX B – MATERIALS CONSIDERED</u>

## <u>ARTICLES & JOURNALS</u>

Leonard I. Stein & Mary Ann Test, *Alternative to Mental Hospital Treatment: I. Conceptual Model, Treatment Program, and Clinical Evaluation*, 37 Arch Gen. Psychiatry 392, 392-397 (1980), https://jamanetwork.com/journals/jamapsychiatry/article-abstract/492295.

Bryson, K. et. al., *Brief Admission Program: An Alliance of Inpatient Care and Outpatient Case Management*, Journal of Psychosocial Nursing and Mental Health Services, Vol 28, No. 18 (1990), https://pubmed.ncbi.nlm.nih.gov/2283597/.

Lisa Dixon, *Assertive community treatment: Twenty-five years of gold*, 51 Psychiatr. Serv. 759 (2000).

Guo, et.al , *Assessing the Impact of Community Based Mobile Crisis Services on Preventing Hospitalization*, Psychiatric Services' Vol 52, No 2 (Feb 2001).

John H. McGrew et al., *Case managers' perspectives on critical ingredients of assertive community treatment and on its implementation*, 54 Psychiatr. Serv. 370 (2003), https://pubmed.ncbi.nlm.nih.gov/12610246/.

J. Steven Lamberti et al., *Forensic assertive community treatment: Preventing incarceration of adults with severe mental illness*, 55 Psychiatr. Serv. 1285 (2004).

John A. Talbott, *Deinstitutionalization: Avoiding the Disasters of the Past*, 55 Psychiatr. Serv. 1112 (2004).

Sam Tsemberis et al., *Housing First, Consumer Choice, and Harm Reduction for Homeless Individuals With a Dual Diagnosis*, 94 Am. J. Public Health 651 (2004), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1448313/.

CG Lim et al., *Community Psychiatry in Singapore: A Pilot Assertive Community Treatment (ACT) Programme*, 34 Ann Acad. Med. Singapore 100 (2005), https://annals.edu.sg/pdf200502/LimCG.pdf.

Fisher, et. al, *The Changing Role of the State Psychiatric Hospital,* Health Affairs, Vol 28, No 3 (2009).

Chung, et. al, *Suicide Rates After Discharge from Psychiatric Facilities and A Systematic Review and Meta- Analysis*, JAMA Psychiatry (2017).

Patricia McKernan, *Homelessness and Prisoner Reentry: Evidence-Based Strategies That Promote Improved Outcomes*, 27 JOURNAL OF COMMUNITY CORRECTIONS (2017), https://www.voa.org/homelessness-and-prisoner-reentry#Pat.

Heidi Schultheis, *Lack of Housing and Mental Health Disabilities Exacerbate One Another*, AMERICAN PROGRESS, (Nov. 20, 2018), https://www.americanprogress.org/article/lack-housing-mental-health-disabilities-exacerbate-one-another/.

Nicola Hancock, et al., *Facilitating people living with severe and persistent mental illness to transition from prison to community: a qualitative exploration of staff experiences*, 12 Int. J. Ment. Health Syst. 1 (2018), https://ijmhs.biomedcentral.com/articles/10.1186/s13033-018-0225-z.

Deltant and Lachini, *Mental Health and Trauma Among Incarcerated Persons: Development of a Training Curriculum for Correctional Officers*, American Journal of Criminal Justice, Vol 44 (Nov. 1, 2019), https://www.ojp.gov/ncjrs/virtual-library/abstracts/mental-health-trauma-among-incarcerated-persons-development.

Balasuriya, et. al., *The Never Ending Loop: Homelessness, Psychiatric, Disorder and Mortality*', Psychiatric Times, Vol 37, Issue 5 (May 2020) https://www.psychiatrictimes.com/view/never-ending-loop-homelessness-psychiatric-disorder-and-mortality.

Debra A. Pinals, *Crisis Services: Meeting Needs, Saving Lives*, NASMHPD (Aug. 2020), https://store.samhsa.gov/sites/default/files/SAMHSA_Digital_Download/pep20-08-01-001.pdf.

Giselle Routhier, Coalition for the Homeless, *State of the Homeless 2020,* (2020), https://www.coalitionforthehomeless.org/wp-content/uploads/2020/03/StateofTheHomeless2020.pdf.

Ebony N. Russ et al., *Prison And Jail Reentry And Health,* Health Affairs (Oct. 28, 2021), https://www.healthaffairs.org/do/10.1377/hpb20210928.343531/.

Esther Galletta et al., Societal Reentry of Prison Inmates With Mental Illness: Obstacles, Programs, and Best Practices, 27 Journal of Correctional Health Care 58 (2021).

Bachrach and Lamb, *Some Perspectives on Deinstitutionalization* , Psychiatric Services, (Aug. 2022) Vol 52, No 8, 1039-1040, https://ps.psychiatryonline.org/doi/full/10.1176/appi.ps.52.8.1039.

Tom Stanley-Becker, Breaking the Cycle of Homelessness and Incarceration: Prisoner Reentry, Racial Justice, & Fair Chance Housing Policy, 7 U. Pa. J. L. & Pub. Affairs (2022), https://scholarship.law.upenn.edu/jlpa/vol7/iss2/2.

Yu, Yu et al., The Relationship Between Clinical Recovery And Personal Recovery Among People Living With Schizophrenia: A Serial Mediation Model And The Role Of Disability And Quality Of Life. *Schizophrenia research* vol. 239 (2022) https://pubmed.ncbi.nlm.nih.gov/34896871/.

Bond, G. R., & Drake, R. E, *The critical ingredients of assertive community treatment*, World psychiatry: official journal of the World Psychiatric Association (WPA), *14*(2), 240–242. https://doi.org/10.1002/wps.20234.


## FEDERAL, STATE AND CITY GOVERNMENT AGENCIES & PROGRAMS

i.    NEW YORK STATE CONFERENCE OF LOCAL MENTAL HYGIENE DIRECTORS

Local Services Plan for Mental Hygiene Services Schoharie Co. Mental Hygiene Services, New York State of Opportunity Office of Mental Health et al., (May 31, 2018).

2019 Local Services Plan for Mental Hygiene Services, Dutchess Cty. Dept. of Beh. & Com. Health (June 6, 2018), https://www.dutchessny.gov/2019-Local-Governmental-Plan.pdf.

2019 Local Services Plan for Mental Hygiene Services Niagra Co. Dept. of Mental Health, New York State of Opportunity Office of Mental Health et al.,  (July 18, 2018).

2019 Local Services Plan for Mental Hygiene Services Oondaga Co. Dept. of Adult & LTC, New York State of Opportunity Office of Mental Health et al., (July 18, 2018)

2020 Local Services Plan for Mental Hygiene Services New York City. Dept. of Health & Hygiene, NEW YORK STATE OF OPPORTUNITY OFFICE OF MENTAL HEALTH (Aug. 6, 2019), https://www.clmhd.org/img/pdfs/brochure_dodumlhenj.pdf.

2019 Local Services Plan for Mental Hygiene Services, Nassau Co. Office of MH, CD and DD Svcs, (Aug. 14, 2018), https://www.nassaucountyny.gov/DocumentCenter/View/36915/2019-Nassau-County-Local-Service-Plan-for-Mental-Hygiene-Services.

2020 Local Services Plan for Mental Hygiene Services, Dutchess Co. Dept. of Beh & Com Health, (Sept. 5, 2019), https://www.clmhd.org/img/pdfs/brochure_huzjc4ryxf.pdf.

2020 Local Services Plan for Mental Hygiene Services Orange Co. Dept. of Mental Health, New York State of Opportunity Office of Mental Health et al.,(September 6, 2019), https://www.clmhd.org/img/pdfs/brochure_ejfh41el3h.pdf.

2020 Local Services Plan for Mental Hygiene Services Suffolk Co. Dept. of Health Services, New York State of Opportunity Office of Mental Health et al. (September 6, 2019), https://www.clmhd.org/img/pdfs/brochure_ejfh41el3h.pdf.

2020 Local Services Plan for Mental Hygiene Services Oondaga Co. Dept. of Adult & LTC, New York State of Opportunity Office of Mental Health et al. (Sept. 6, 2019), https://www.clmhd.org/img/pdfs/brochure_q2pr0e2lqs.pdf

2020 Local Services Plan for Mental Hygiene Services Rockland Co. Dept. of Mental Health, New York State of Opportunity Office of Mental Health et al., (Sept. 6 , 2019), https://www.clmhd.org/img/pdfs/brochure_n4pkmvu5pw.pdf

2020 Local Services Plan for Mental Hygiene Services: Onandaga County Department of Adult & LTC 4 (2019), https://www.clmhd.org/img/pdfs/brochure_q2pr0e2lqs.pdf

COVID-19 Pandemic Effects on Mental Hygiene Services Delivery System Local Services Plan Supplemental Survey, Nassau Co Office of MH, CD and DD Svcs  (Sept. 13, 2020) https://www.clmhd.org/img/pdfs/brochure_xmngtyd9iy.pdf.

2021 Local Services Plan for Mental Hygiene Services, NEW YORK CITY. DEPT. OF HEALTH & HYGIENE (Sept. 25, 2020), https://www.clmhd.org/img/pdfs/brochure_dodumlhenj.pdf.

COVID-19 Pandemic Effects on Mental Hygiene Services Delivery System Local Services Plan Supplemental Survey, Dutchess Co. Dept. of Beh & Com Health, (Oct. 27, 2020), https://www.clmhd.org/img/pdfs/brochure_b0d2g43hbl.pdf.

Local Services Plan for Mental Hygiene Services Albany Co. Dept. of Mental Health, New York State of Opportunity Office of Mental Health et al., (December 12, 2020), https://www.clmhd.org/img/pdfs/brochure_8qc94v069f.pdf

*Who We Are*, NYS CONFERENCE OF LOCAL MENTAL HYGIENE DIRECTORS, INC., https://www.clmhd.org/img/uploads/Who%20We%20Are-Lobby%20Piece%20-%202022.pdf.

*About Us,* NYS CONFERENCE OF LOCAL MENTAL HYGIENE DIRECTORS, INC., https://www.clmhd.org/about_us/.

NYS Conference of Local Hygiene Directors, Inc., County/New York City Directory, https://www.clmhd.org/contact_local_mental_hygiene_departments/.

ii.    NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION (DOCCS)

Discharge Planning for Levels of Mental Illness, Policy No. 8.0, CENTRAL NEW YORK PSYCHIATRIC CENTER CORRECTIONS-BASED OPERATIONS MANUAL, (Jun. 28, 2016) (MG Bates No. MG-Class00000219, on file with author).

Emergency Housing – Community Supervision, Directive No. 9222, NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, https://doccs.ny.gov/system/files/documents/2022/04/9222.pdf.

*Laws, Rules, & Directive Listing Overview*, NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, https://doccs.ny.gov/laws-rules-directives-Listing?f%5B0%5D=filterterm%3A246&keyword=&cr=&created_date=&created_date_1=&page=36.

*Medical/Dental/Mental Health Services*, New York State Department Of Corrections And Community Supervision, https://doccs.ny.gov/medical-services.

*Memorandum of Understanding between the New York State Office of Mental Health and the New York State Department of Corrections and Community Supervision* (Sept. 2016) (MG Bates No. MG-Class00023332, on file with author).

Mental Health Specialized Supervision Standards, Directive No. 9230, New York State Department of Corrections and Community Supervision, https://doccs.ny.gov/system/files/documents/2022/12/9230.pdf.

*Under Custody Report: Profile of Under Custody Population*, New York State Corrections and Community Supervision (Jan. 1, 2018), https://doccs.ny.gov/system/files/documents /2019/09/Under%20Custody%20Report%202018.pdf.

   iii.   NYC HEALTH

*Mental Health Services: Single Point of Access (SPOA)*, NYC Health, https://www.nyc.gov/site/doh/providers/resources/mental-illness-single-point-of-access.page.

   iv.   NEW YORK STATE OFFICE OF MENTAL HEALTH

*2014-2018 Statewide Comprehensive Plan*, New York State Office of Mental Health, (MG-Class00004021-4071).

*2016-2020 Statewide Comprehensive Plan*, New York State Office of Mental Health (Sept. 2022)  (MG Bates No. MG-Class00000736, on file with author).

*2017 Interim Report to the Statewide Comprehensive Plan*, New York State Office of Mental Health (2017) (on file with author).

*2021 Local Services Plan and Statewide Town Hall Analysis*, New York State Office Of Mental Health, (Jun. 2021), https://my.visme.co/view/x4ep3xdd-2020-local-services-plan-and-statewide-town-hall-analysis.

*About Adult Housing,* New York State Office of Mental Health, https://my.omh.ny.gov/analytics/saw.dll?dashboard.

Ann Marie T. Sullivan, *OMH Statewide Town Hall*, New York State Office of Mental Health, (Nov. 9, 2022), https://omh.ny.gov/omhweb/planning/507/2022-statewide-town-hall.pdf.

*ACT Team Map, Assertive Community Treatment (ACT): Location and Information for New York State Act Teams*, New York State Office of Mental Health, https://omh.ny.gov/omhweb/tableau/act.html (last modified Feb. 6, 2023).

*Assertive Community Treatment (ACT) Program Guidelines Adult and Young Adult*, NEW YORK STATE OFFICE OF MENTAL HEALTH (Dec. 2022), https://omh.ny.gov/omhweb/act/act-program-guidelines.pdf.

*Assertive Community Treatment (ACT)*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/act/.

*Behavioral Health Managed Care,* NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/bho/.

*Central New York Psychiatric Center*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/facilities/cnpc/.

*Crisis Residence Program Guidance*, NEW YORK STATE OF OPPORTUNITY OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/bho/docs/crisis-residence-program-guidance.pdf.

*Forensic Homeless Intensive Case Management Program New York City: Request for Proposals August 2019*, OFFICE OF MENTAL HEALTH (2019), https://omh.ny.gov/omhweb/rfp/2019/forensic_homeless/forensic_homeless_icm_rfp_final.pdf.

*Health Home Guidance: Local Government Unit/Single Point of Access of Access (LGU/SPOA),* OFFICE OF MENTAL HEALTH (Jan. 28, 2013), https://omh.ny.gov/omhweb/adults/health_homes/lgu_spoa_health_home_guidance.pdf.

*Licensed Program Type Definitions*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/licensing/definitions.htm.

*March 2022 Monthly Report- OMH Facility Performance Metrics and Community Service Investments* (2022), NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2022/omh-report-mar-2022.pdf.

*Office of Mental Health (OMH) Field Offices,* NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/aboutomh/fieldoffices.html.

*OMH Strategic Framework*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/planning/strategic-framework/index.html.

*Organization Chart*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/about/omh-orgchart.pdf.

*OMH Strategic Plan*, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/planning/strategic-framework/index.html.

*Profile of the New York State Mental Health System*, NEW YORK STATE OFFICE OF MENTAL HEALTH, (Sept. 2022), https://my.visme.co/view/6x6nk6p6-mar-2022-profile-of-the-new-york-state-public-mental-health-system.

*Supported Housing Guidelines*, NEW YORK STATE OFFICE OF MENTAL HEALTH, (2014), https://omh.ny.gov/omhweb/adults/supportedhousing/supported-housing-guidelines.pdf.

*Supportive Housing Guidelines*, NEW YORK STATE OFFICE OF MENTAL HEALTH (Sept. 2022), https://omh.ny.gov/omhweb/adults/supportedhousing/supportive_housing_guidelines.pdf.

2015-2016 Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/monthly-report-2015.pdf

2016-2017 Report NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2016-report.pdf.

April 2018 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://www.omh.ny.gov/omhweb/transformation/docs/omh-monthly-report-april-2018.pdf.

July 2018 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/omh_monthly_report_july-2018.pdf.

January 2019 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2019/omh_monthly_report_january-2019.pdf.

February 2019 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2019/omh_monthly_report_february-2019.pdf.

March 2019 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://www.omh.ny.gov/omhweb/transformation/docs/2019/omh_monthly_report_march-2019.pdf.

April 2019  Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2019/omh_monthly_report_april_2019.pdf.

July 2019  Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2019/omh_monthly_report_july_2019-final.pdf.

October 2019  Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://www.omh.ny.gov/omhweb/transformation/docs/2019/omh_monthly_report_oct-2019_final.pdf.

January 2020 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2020/omh_monthly_report_jan-2020_final.pdf.

February 2020 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2020/omh_monthly_report_feb-2020_final.pdf.

April 2020 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2020/omh_monthly_report_2020-04.pdf.

August 2020  Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2020/omh-monthly-report-820.pdf.

December 2020 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2020/omh-monthly-report.pdf.

January 2022 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2022/omh-report-jan-2022.pdf.

February 2022 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2022/omh-report-feb-2022.pdf.

May 2021 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/omh-monthly-report.pdf.

September 2021 Monthly Report, Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2021/omh-monthly-report.pdf.

November 2021 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/omh-report-nov-2021.pdf.

December 2021 Monthly Report, NEW YORK STATE OFFICE OF MENTAL HEALTH, https://omh.ny.gov/omhweb/transformation/docs/2021/omh-report-dec-2021.pdf.

v.    NEW YORK STATE OF OPPORTUNITY EMPIRE STATE SUPPORTIVE HOUSING INITIATIVE

*Scattered Site Supportive Housing for Adults with Serious Mental Illness Reentering the Community from Prison: Request for Proposals*, NEW YORK STATE OF OPPORTUNITY EMPIRE STATE SUPPORTIVE HOUSING INITIATIVE (ESSHI) (2019), https://www.bidnet.com/bneattachments?/555160825.pdf.

vi.    OFFICE OF ADDITICTION SERVICES AND SUPPORTS

*2021 Mental Hygiene Executive Summary: Westchester Co. Dept of Community Mental Health,* OFFICE OF ADDICTION SERVICES AND SUPPORTS (2021), *https*://www.clmhd.org/img/pdfs/brochure_pqoqalpnip.pdf.

vii.    OFFICE OF THE GOVERNOR OF NEW YORK STATE

*Governor Hochul Announces $31.5 Million for Supportive Housing Projects*, NEW YORK STATE GOVERNOR KATHY HOCHUL (Aug. 2, 2022), https://www.governor.ny.gov/news/governor-hochul-announces-315-million-supportive-housing-projects.

viii.    OFFICE OF THE NEW YORK STATE COMPTROLLER

*Oversight of the Supported Housing Program – Rehabilitation Support Services, Inc.*, OFFICE OF THE NEW YORK STATE COMPTROLLER THOMAS P. DINAPOLI (May 4, 2017)

https://www.osc.state.ny.us/state-agencies/audits/2017/05/04/oversight-supported-housing-program-rehabilitation-support-services-inc.

*Office of Mental Health: Oversight of Supportive Housing Programs,* OFFICE OF THE NEW YORK STATE COMPTROLLER THOMAS P. DiNAPOLI, (May 2017), https://www.osc.state.ny.us/files/reports/special-topics/pdf/housing-mental-health-2017.pdf.

*Report on the State Fiscal Year 2015-2016 Executive Budget,* OFFICE OF THE NEW YORK STATE COMPTROLLER (2015), https://www.osc.state.ny.us/files/reports/budget/pdf/budget-executive-2015-16.pdf.

ix.    SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION (SAMHSA)

*Description of a Good and Modern Addictions and Mental Health Service System,* SAMHSA, (April 18, 2011), https://www.samhsa.gov/sites/default/files/good_and_modern_4_18_2011_508.pdf.

*Civil Commitment and the Mental Health Care Continuum: Historical Trends and Principles for Law and Practice*, SAMHSA, https://www.samhsa.gov/sites/default/files/civil-commitment-continuum-of-care.pdf
.

*Community Mental Health Services Block Grant (MHBG) Contacts*, SAMHSA, https://www.samhsa.gov/grants/block-grants/mhbg/contacts.

*National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit*, SAMHSA, (2020),  https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf.

New Hampshire-Dartmouth Psychiatric Research Center, *Building Your Program - Evidence-Based Practices: Assertive Community Treatment*, SAMHSA & U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (2008), https://store.samhsa.gov/sites/default/files/SAMHSA_Digital _Download/howtouseebpkits-act_0.pdf.

SAMHSA, *Forensic Assertive Community Treatment (FACT), A Service Delivery Model for Individuals With Serious Mental Illness Involved With the Criminal Justice System*, https://store.samhsa.gov/sites/default/files/d7/priv/pep19-fact-br.pdf.

SAMHSA, *Funding And Characteristics of State Mental Health Agencies*, AMERICAN ASSOCIATION ON HEALTH & DISABILITY (AAHD) (2010), https://aahd.us/wp-content/uploads/2012/12/FundingStateMentalHealthAgencies2010.pdf

SAMHSA Trauma and Justice Strategic Initiative, *SAMHSA's Concept of Trauma and Guidance for a Trauma-Informed Approach*, NATIONAL CENTER ON SUBSTANCE ABUSE AND CHILD WELFARE, (Jul. 2014), https://ncsacw.acf.hhs.gov/userfiles/files/SAMHSA_Trauma.pdf.

"The Evidence Based Practices Kit for Assertive Community Treatment," SAMHSA Publication No. SMA-08-4344, 2008 https://store.samhsa.gov/product/Assertive-Community-Treatment-ACT-Evidence-Based-Practices-EBP-KIT/SMA08-4344

    x.    STATE JOBS NEW YORK

*StateJobsNY*, NEW YORK STATE OF OPPORTUNITY, https://statejobs.ny.gov/employees/vacancyDetailsView.cfm?id=94709.

    xi.    UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Hammel, et.al., *Rental Housing Discrimination on the Basis of Mental Disabilities*, U.S. Department of Housing and Urban Development, (August 2017), https://www.huduser.gov/portal/sites/default/files/pdf/MentalDisabilities-FinalPaper.pdf

*Promoting Mental Health Through Housing Stability*, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT PUBLICATION (May 31, 2022) https://www.huduser.gov/portal/pdredge/pdr-edge-trending-053122.html.

## NEWS ARTICLES

David Brand, *NYC Pilots 'Housing First' Plan for Handful of Homeless Adults*, CITY LIMITS (Nov. 15, 2022), https://citylimits.org/2022/11/15/nyc-pilots-housing-first-plan-for-handful-of-homeless-adults/.

 Michael Herzenberg, *Cuomo's Budget Includes $250 million for Supported Housing*, SPECTRUM NEWS (Jan. 22, 2021, 8:35 PM), https://www.ny1.com/nyc/bronx/housing/2021/01/23/governor-cuomo-plans-putting-up-a-quarter-billion-taxpayer-dollars-to-supportive-housing#:~:text=It%20did%20so%20with%20the,budget%20for%20about%201%2C300%20units.

## STATUTES

N.Y. MHL §7.07(a)(c)

N.Y. MHL § 7.09(a)

N.Y. MHL § 7.17(b)

N.Y. MHL § 41.16

N.Y. MHL § 41.04

14 NYCRR § 501.1(a)

### _M.G. V CUOMO_, 7:19-CV-000639 (S.D.N.Y.) LITIGATION DOCUMENTS

Plaintiff's First Set Of Interrogatories On Defendant Ann Marie T. Sullivan (June 20, 2019).

Plaintiffs' First Set Of Interrogatories On Defendant Anthony J. Annucci (June 20, 2019).

Plaintiffs' First Request For The Production Of Documents (June 21, 2019).

Defendants' Rule 26(a)(1) Disclosures (June 24, 2019).

Defendants' Response To Plaintiffs' First Set Of Document Requests (Jul. 22, 2019).

Defendant Ann Mare T. Sullivan's Response to Plaintiff's First Set of Interrogatories (Jul. 22, 2019).

Defendant Anthony J. Annuci's Response to Plaintiffs' First Set of Interrogatories (Jul. 22, 2019).

Defendant Anthony J. Annuci's Supplemental Response to Plaintiff's First Set of Interrogatories Nos. 3 and 4 (Oct. 2, 2019).

Defendant Ann Marie T. Sullivan's Supplemental Response to Plaintiffs' Interrogatory No. 4 (Oct. 2019).

Defendants' Rule 26(a)(1) Supplemental Initial Disclosures (Jan. 6, 2022).

Plaintiffs' Second Set of Interrogatories On Defendant Anthony J. Annucci (Jan. 17, 2020).

Defendant Ann Mare T. Sullivan's Response to Plaintiff's Second Set of Interrogatories (Feb. 17, 2020).

Defendant Ann Mare T. Sullivan's Supplemental Response to Plaintiff's Second Set of Interrogatories (Mar. 6, 2020).

Second Amended Class Action Complaint (Aug. 27, 2020).

Defendants' Answer to the Second Amended Complaint. (Nov. 23, 2021).

Plaintiffs' Second Request For The Production Of Documents (Dec. 31, 2021).

Plaintiffs' Third Supplemental Initial Disclosures (Jan. 6, 2022).

Defendants' Supplemental Responses To Plaintiffs' First Request For The Production Of
Document (Jan. 31, 2022).

Defendants' Supplemental Responses To Plaintiffs' First Request For The Production Of
Documents (Jan 31, 2022).

Defendants' Responses To Plaintiffs' Second Request For The Production Of Documents (Jan.
31, 2022).

Defendant Anthony J. Annucci's Second Supplemental Responses To Plaintiffs' Interrogatories
(Feb. 7, 2022).

Defendant Ann Marie T. Sullivan's Second Supplemental Responses to Plaintiffs'
Interrogatories (Feb. 8, 2022).

Responses to Plaintiff's Second Set of Interrogatories on Defendant Anthonuy J. Annucci
(Feb. 18, 2022).

Robert M. Factor, MD, PhD, Expert Report

Declaration of Seth Crider in Support of Plaintiffs' Motion for Class Certification

## BATES PRODUCED DOCUMENTS

MG-Class00005378
MG-Class00005403
MG-Class00005432
MG-Class00005464
MG-Class00005480
MG-Class00005595
MG-Class00005799
MG-Class00005961
MG-Class00006148
MG-Class00006164
MG-Class00006183
MG-Class00006203
MG-Class00006220
MG-Class00006247
MG-Class00006276
MG-Class00006291
MG-Class00006304
MG-Class00006309
MG-Class00006323
MG-Class00006338
MG-Class00006355

MG-Class00006370
MG-Class00006384
MG-Class00006401
MG-Class00006418
MG-Class00006434
MG-Class00006451
MG-Class00006476
MG-Class00006493
MG-Class00006526
MG-Class00006542
MG-Class00006567
MG-Class00006605
MG-Class00006628
MG-Class00006651
MG-Class00006669
MG-Class00006686
MG-Class00006688
MG-Class00006730
MG-Class00006777
MG-Class00006831
MG-Class00006911
MG-Class00006927
MG-Class00006939
MG-Class00006953
MG-Class00006967
MG-Class00006981
MG-Class00006999
MG-Class00007013
MG-Class00007026
MG-Class00007039
MG-Class00007055
MG-Class00007067
MG-Class00007080
MG-Class00007098
MG-Class00007114
MG-Class00007130
MG-Class00007143
MG-Class00007156
MG-Class00007176
MG-Class00007199
MG-Class00007227
MG-Class00007243
MG-Class00007255
MG-Class00007267
MG-Class00007283
MG-Class00007296

**APPENDIX B**                                                                14

MG-Class00007310
MG-Class00007324
MG-Class00007335
MG-Class00007354
MG-Class00007367
MG-Class00007379
MG-Class00007394
MG-Class00007423
MG-Class00007447
MG-Class00007471
MG-Class00007484
MG-Class00007495
MG-Class00007506
MG-Class00007524
MG-Class00007540
MG-Class00007560
MG-Class00007587
MG-Class00007616
MG-Class00007647
MG-Class00007669
MG-Class00007691
MG-Class00007724
MG-Class00007739
MG-Class00007757
MG-Class00007779
MG-Class00007833
MG-Class00007979
MG-Class00008028
MG-Class00008042
MG-Class00008056
MG-Class00008073
MG-Class00008089
MG-Class00008109
MG-Class00008132
MG-Class00008151
MG-Class00008173
MG-Class00008197
MG-Class00008224
MG-Class00008239
MG-Class00008256
MG-Class00008271
MG-Class00008287
MG-Class00008306
MG-Class00008321
MG-Class00008334
MG-Class00008350

MG-Class00008396
MG-Class00008456
MG-Class00008577
MG-Class00008751
MG-Class00008769
MG-Class00008784
MG-Class00008799
MG-Class00008814
MG-Class00008829
MG-Class00008852
MG-Class00008887
MG-Class00008902
MG-Class00008916
MG-Class00008932
MG-Class00008946
MG-Class00008959
MG-Class00008972
MG-Class00009014
MG-Class00009029
MG-Class00009045
MG-Class00009059
MG-Class00009072
MG-Class00009091
MG-Class00009107
MG-Class00009119
MG-Class00009133
MG-Class00009156
MG-Class00009170
MG-Class00009185
MG-Class00009204
MG-Class00009221
MG-Class00009240
MG-Class00009256
MG-Class00009271
MG-Class00009288
MG-Class00009303
MG-Class00009320
MG-Class00009336
MG-Class00009352
MG-Class00009369
MG-Class00009387
MG-Class00009529
MG-Class00009554
MG-Class00009568
MG-Class00009582
MG-Class00009601

MG-Class00009621
MG-Class00009637
MG-Class00009655
MG-Class00009671
MG-Class00009684
MG-Class00009699
MG-Class00009713
MG-Class00009725
MG-Class00009739
MG-Class00010449
MG-Class00010450
MG-Class00010451
MG-Class00028429
MG-Class00028613
MG-Class00028655
MG-Class00028679
MG-Class00028711
MG-Class00028733
MG-Class00028779
MG-Class00028817
MG-Class00028843
MG-Class00028866
MG-Class00028890
MG-Class00028924
MG-Class00029168
MG-Class00029238
MG-Class00029273
MG-Class00029315
MG-Class00029345
MG-Class00029364
MG-Class00029388
MG-Class00029413
MG-Class00029433
MG-Class00029450
MG-Class00029475
MG-Class00029507
MG-Class00029526
MG-Class00029547
MG-Class00029565
MG-Class00029599
MG-Class00029615
MG-Class00029633
MG-Class00029650
MG-Class00029667
MG-Class00029690
MG-Class00029718

MG-Class00030016
MG-Class00030034
MG-Class00030059
MG-Class00030079
MG-Class00030112
MG-Class00030135
MG-Class00030163
MG-Class00030181
MG-Class00030232
MG-Class00030275
MG-Class00030321
MG-Class00030342
MG-Class00030367
MG-Class00030386
MG-Class00030406
MG-Class00030432
MG-Class00030463
MG-Class00030504
MG-Class00030528
MG-Class00030709
MG-Class00030730
MG-Class00030759
DOCCS-00003600
DOCCS-00007007
MG-Class00036656
MG-Class00036711
MG-Class00036942
MG-Class00036979
MG-Class00036994
MG-Class00037005
MG-Class00037018
MG-Class00037041
MG-Class00037050
MG-Class00037061
MG-Class00037072
MG-Class00037135
MG-Class00037164
MG-Class00037172
MG-Class00037188
MG-Class00037203
MG-Class00037234
MG-Class00037253
MG-Class00037266
MG-Class00037274
MG-Class00037283
MG-Class00037312

MG-Class00037327
MG-Class00037349
MG-Class00037360
MG-Class00037381
MG-Class00037421
MG-Class00037438
MG-Class00037610
MG-Class00037652
MG-Class00037677
MG-Class00037729
MG-Class00037742
MG-Class00037786
MG-Class00037821
MG-Class00037856
MG-Class00037864
MG-Class00037874
MG-Class00038206
MG-Class00038215
MG-Class00038224
MG-Class00038234
MG-Class00038242
MG-Class00038263
MG-Class00038273
MG-Class00038284
MG-Class00038296
MG-Class00038304
MG-Class00038318
MG-Class00038330
MG-Class00038447
MG-Class00038455
MG-Class00038483
MG-Class00038 504
MG-S00000972
MG-Class00024325
OMH-00065622
OMH-00065659
OMH-00065840
OMH-00066026
OMH-00066045
OMH-00066073
OMH-00066086
OMH-00066102
OMH-00066118
OMH-00066134
OMH-00066166
OMH-00066203

**APPENDIX B**                                                                    19

OMH-00066220
OMH-00066261
OMH-00066339
OMH-00066352
OMH-00066369
OMH-00066381
OMH-00066393
OMH-00066410
OMH-00066422
OMH-00066449
OMH-00066460
OMH-00066473
OMH-00066491
OMH-00066505
OMH-00066528
OMH-00066538
OMH-00066557
OMH-00066589
OMH-00066620
OMH-00066641
OMH-00066688
OMH-00066704
OMH-00066726
OMH-00066749
OMH-00066764
OMH-00066782
OMH-00066797
OMH-00066917
OMH-00066941
OMH-00066955
OMH-00066989
OMH-00067004
OMH-00067016
OMH-00067031
OMH-00067049
OMH-00067062
OMH-00067076
OMH-00067094
OMH-00067110
OMH-00067125
OMH-00067140

## <u>MISCELLANEOUS</u>

Joel E. Miller, *Too Significant To Fail: The Importance of State Behavioral Health Agencies in the Daily Lives of Americans with Mental Illness, for Their Families, and for Their Communities*, NATIONAL ASSOCIATION OF STATE MENTAL HEALTH PROGRAM DIRECTORS (2012),

*Local Law 115 of 2017 Report*, NEW YORK DEPARTMENT OF SOCIAL SERVICES, https://www1.nyc.gov/assets/dhs/downloads/pdf/Local-Law-115-of-2017-Report-CY2020.pdf.

Roger Bearden, Andrew M. Cuomo, *Report and Recommendations of the Olmstead Cabinet*, (Oct. 2013), http://www.ny.gov/sites/default/files/atoms/files/Olmstead_Final_Report_2013.pdf. *United States v. O'Toole,* 13-cv-04166*, Amended Stipulation and Order of Settlement* (Jan. 30, 2014) (on file with author).

Biess, J. and Fontaine, J., *Housing as a Platform for Formerly Incarcerated Persons*, Urban Institute (April 2012),  https://www.urban.org/sites/default/files/publication/25321/412552-Housing-as-a-Platform-for-Formerly-Incarcerated-Persons.PDF.

Braverman, et. al, *Mass Incarceration Threatens Health Equity in America* , Robert Wood Johnson Foundation, (Dec. 1, 2019), https://www.rwjf.org/content/dam/farm/reports/issue_briefs/2018/rwjf450812.

Corporation for Supported Housing, *Advancing Supported Housing Solutions to Reduce Homelessness for People Impacted by the Criminal/Legal System: A Report for New York City Leaders*, (Winter 2022) https://www.csh.org/wp-content/uploads/2022/02/Reduce-Homelessness-for-People-Impacted-by-the-Criminal-Legal-System.pdf.

*Crisis Services' Role in Reducing Avoidable Hospitalization*, National Association of State Mental Health Program Directors Assessment #3, August, 2017 https://www.nasmhpd.org/sites/default/files/TAC.Paper_.3.Crisis_Services%E2%80%99_Role_in_Reducing_Avoidable_Hospitalization_Final.pdf.

Health Home Plus Program 2021 Guidance for High-Need Individuals with Serious Mental Illness from OMH, https://www.health.ny.gov/health_care/medicaid/program/medicaid_health_homes/special_populations/docs/hh_plus_high_need_smi_guidance.pdf.

HUD 2021, Continuum of Care Homeless Assistance Programs, Homeless Populations and Subpopulations, https://files.hudexchange.info/reports/published/CoC_PopSub_State_CT_2021.pdf.

Jaboa Lake, *Preventing and Removing Barriers to Housing Security for People with Criminal Convictions*, Center for American Progress, (April 2021), https://www.americanprogress.org/article/preventing-removing-barriers-housing-security-people-criminal-convictions/.

Lamberti JS, Weisman RL, "Forensic Assertive Community Treatment: Origins, Current Practice and Future Directions," Reentry Planning for Offenders with Mental Disorders: Policy and Practice. Dlucacz H, Ed. Civic Research Institute, Kingston NY (2010).

Patricia McKernan, *Homelessness and Prisoner Re-entry: evidence Based Strategies that Promote Improved Outcomes*, Volunteers of America (2022), https://www.voa.org/homelessness-and-prisoner-reentry.

McGrew, et.al, *Case Managers' Perspectives on Critical Ingredients of Assertive Community Treatment and on its Implementatio*n, Psychiatric Services (March 2003), https://ps.psychiatryonline.org/doi/full/10.1176/appi.ps.54.3.370.

New York City Council, "Our Homelessness Crisis: The Case for Change," New York City Council Speaker Cory Johnson (January 2020), https://council.nyc.gov/data/homeless/.

Op Cit, HUD 2021 Continuum of Care Homeless Assistance Programs Point in Time data, https://files.hudexchange.info/reports/published/CoC_PopSub_CoC_NY-600-2021_NY_2021.pdf.

Parks, et.al., *Morbidity and Mortality on People with Serious Mental Illness*, , National Association Of State Mental Health Program Directors, Technical Report #13, (October 2006), https://www.nasmhpd.org/sites/default/files/Mortality%20and%20Morbidity%20Final%20Report%208.18.08_0.pdf.

*OMH Regional Liaisons,* NATIONAL ALLIANCE ON MENTAL ILLNESS NEW YORK STATE (NAMI), https://www.naminys.org/mental-health-support/navigating-details/omh-regional-liaisons/.

*Supportive Housing Scattered-Site Ownership*, CORPORATION FOR SUPPORTIVE HOUSING (CSH) (2015), http://www.csh.org/wp-content/uploads/2015/12/IL_Toolkit_Model_Scattered-Site-Owned.pdf.

*Frequently Asked Questions,* SINGLE POINT OF ACCESS LONG ISLAND (SPA), https://www.spahousingli.org/Faq.aspx.

*Mobile Crisis Teams*, NYC WELL (2021), https://nycwell.cityofnewyork.us/en/crisis-services/mobile-crisis-teams/.

NRI Inc., *FY 2019 State Mental Health Agency Revenues and Expenditures* (2022), https://www.nri-inc.org/media/rmrd2s5e/nri-2020-profiles-trends-in-smha-expenditures-and-funding-for-mental-health-services-fy-2001-to-fy-2019.pdf.

*OMH Seeks Western NY Field Office Director*, NEW YORK ASSOCIATION OF PSYCHIATRIC REHABILITATION SERVICES, INC., https://www.nyaprs.org/e-news-bulletins/2021/11/23/omh-seeks-western-ny-field-office-director.

**APPENDIX B**                                                                                          22

*Scattered Site Apartments*, Brooklyn Community Housing & Services, https://bchands.org/scattered-site-apartments/.

*Trauma-Informed Practice Framework*, Communicare: Creating Futures, (Mar. 2021), https://www.communicare.org.au/Communicare/media/documents/Trauma-Informed-Practice_Framework.pdf.