UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H., individually and on behalf of all similarly situated,

                                      Plaintiffs,

      -against-

ANDREW CUOMO, in his official capacity as the Governor of the State of New York, the NEW YORK STATE OFFICE OF MENTAL HEALTH, ANN MARIE T. SULLIVAN, in her official capacity as the Commissioner of the New York State Office of Mental Health, the NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, ANTHONY J. ANNUCCI, in his official capacity as the Acting Commissioner of the New York State Department of Corrections and Community Supervision, ANNE MARIE MCGRATH, in her official capacity as Deputy Commissioner of the New York State Department of Corrections and Community Supervision,

                                      Defendants.

7:19-cv-0639 (CS) (AEK)

-------------------------------------------------------------------- x

## **DECLARATION OF DEBORAH B. DIAMANT**

      1.      I am the director of government relations and legal affairs of Coalition for the Homeless ("Coalition"), the court-appointed monitor of the New York City Department of Homeless Services' (DHS) single adult shelter system pursuant to the consent decree in *Callahan v. Carey*, No. 42582/79, slip op. (N.Y. Sup. Ct., Aug. 26, 1981) and the City-appointed monitor of the DHS families with children and adult families shelter systems. I make this declaration in support of Plaintiffs' motion for class certification.

      2.      In my role at Coalition, I oversee the day-to-day operations of our shelter monitoring department, which is comprised of staff with extensive experience conducting

inspections of shelter facilities and performing client outreach to ensure compliance with court orders and Federal, State, and local law. I am also in regular contact with DHS' programmatic and legal staff about shelter conditions and client services, and routinely inform DHS of problems encountered by clients attempting to access DHS services. My knowledge herein is predicated on conversations with my colleagues, including staff whom I supervise; DHS and non-profit shelter operator staff; and reports generated by DHS.

3. Coalition is the nation's oldest advocacy *and* direct service organization helping homeless individuals and families. Founded in 1981, Coalition operates 11 direct-services programs that offer vital services to homeless, at-risk, and low-income people in New York City. Our Crisis Services Department assists more than 1,000 homeless and at-risk households each month with eviction prevention, individual advocacy, referrals for shelter and emergency food programs, and assistance with public benefits as well as basic necessities such as diapers, formula, work uniforms, and money for medications and groceries. In response to the COVID-19 pandemic, we are operating a special Crisis Hotline for homeless individuals who need immediate help finding shelter or meeting other critical needs.

4. Coalition regularly tracks the number of individuals who are living in the DHS shelter system, which consists of shelters for single adults, adult families without minor children, and families with minor children. DHS reported that 67,471 individuals slept in its shelters on December 8, 2022.[1]

5. The intake process is different for each DHS shelter system: Single adults can

---

[1] New York City Department of Homeless Services, *Daily Report 12/9/2022 (Data from Thursday, December 08, 2022)*, in the declarant's possession; New York City Department of Homeless Services, *Shelter Daily Statistics The night of Thursday, 12/08/2022*, in the declarant's possession; New York City Department of Homeless Services, *Safe Havens Daily Statistics The night of Thursday, 12/08/2022*, in the declarant's possession; New York City Department of Homeless Services, *Stabilization Daily Statistics The night of Thursday, 12/08/2022*, in the declarant's possession; and New York City Department of Homeless Services, *Veterans Short Term Housing (December 2022)*, in the declarant's possession.

present at an intake shelter and receive a bed without an eligibility determination while adult families without minor children and families with minor children must demonstrate to DHS that they constitute family units and do not have another viable housing option available to them. Families seeking to enter the DHS shelter system must provide their housing histories to intake staff who then investigate whether the families can return to a place where they previously slept. Adult families without minor children must document where they slept every night for the last year, and families with minor children must do the same for a two-year period.

6. The DHS single adult shelter system consists of intake, assessment, and program shelters. At an intake shelter, an individual who needs a bed will meet with multiple workers who record their demographic information and determine if they can be diverted out of the system (e.g., to family or friends, eviction prevention legal services, etc.). If the individual has no other option than to enter the DHS system, another worker will interview the individual to determine if they have any disabilities, access needs, or residency restrictions that should be accommodated in the bed assignment process. The individual is then sent to an assessment shelter for approximately 21 days to meet with additional workers to determine which type of program shelter will best meet their needs. This process is applicable to most individuals released from Department of Corrections and Community Supervision facilities and bused to DHS intake shelters.

7. DHS program shelter categories include "Employment," "General," "Mental Health," "MICA," "Special Population," "Substance Abuse," and "Young Adult." Special Population shelters include shelters for seniors, LGBTQ young adults, and the Fortune Academy, which is a new shelter for single adult men who were recently incarcerated.

8. An individual assigned to an employment shelter is not necessarily employed, but DHS' assessment has determined they are employable. Employed individuals are also assigned to

other categories of program shelters.

9. Individuals assigned to mental health, MICA ("mentally ill chemically addicted"), and substance abuse shelters are determined by DHS assessment shelter staff to benefit from additional support.

10. Mental health and MICA shelters tend to be large, congregate facilities in terms of both the physical size and census. For the night of December 8, 2022, the 42 mental health and MICA shelters in the DHS single adult system housed 4,119 people, more than 20 percent of the 19,960 who slept in a single adult shelter that night.[2] Eight mental health and MICA shelters contain 200 beds, the maximum number of beds permitted in a single adult shelter as per N.Y.C. Admin. Code § 21-312. Sixteen other mental health and MICA shelters contain between 100 and 187 beds. Several congregate shelters have dorms that can sleep more than 20 individuals. At least one "substance abuse" shelter has dorms that can sleep as many as 48 people. Of the 22,047 beds in the single adult shelter system the night of December 8, 2022, 16,936 (nearly 77 percent) were in congregate shelters where individuals must sleep among strangers.

11. Coalition has consistently advocated for the DHS shelter system to move away from a congregate model and provide more single-occupancy rooms that can better protect residents from airborne infectious diseases and also afford them more privacy, stability, dignity, safety, and, ideally, better sleep.

12. Like all DHS single adult shelters, mental health and MICA shelters have a nightly curfew of 11 p.m. and a significant security staff presence. Residents are typically prevented from bringing food they purchased in the community into the shelter. While a limited number of

---

[2] These data do not include single adults who slept in DHS' shelter for veterans nor those who slept in Safe Havens and stabilization beds, which serve individuals with a history of bedding down in the streets and transit system, the night of December 8, 2022.

belongings are allowed into the DHS system, and those belongings should be secured in a locker, staff can search clients' belongings at any time. Typically, residents can access their beds during daytime hours only if they have requested and received permission due to medical issues or late-night employment.

13. Coalition has long been concerned with the segregated nature of mental health and MICA shelters where large numbers of clients must co-exist in, primarily, older buildings with limited or no privacy and poor client-to-staff ratios, all of which can lead to exacerbation of symptoms and longer stays in the shelter system.

14. Clients who sleep in mental health and MICA shelters report chronic sleep disruption due to late night bed checks by shelter staff to determine the number of vacant beds in the system. Noise made by other clients in their dorms is also a significant issue for them.

15. Inadequate climate control measures in large, older shelters cause temperature extremes that also negatively impact sleep. During summer 2022, the extreme heat wave made sleeping in congregate doors without air conditioning – a common reality – difficult, if not impossible, for many clients. Those clients who take medications that make it difficult for them to regulate their body temperature were further impacted by the heat.

16. Staff who work in mental health and MICA shelters have also raised these issues with Coalition. In late 2021, a clinical staff member at a DHS-contracted, non-profit-operated, 200-bed single adult shelter in Brooklyn shared their concerns with Coalition and requested that we pass them onto DHS since they were concerned about retaliation should they reach out themself. They had already discussed these concerns with their supervisors who indicated there was nothing they could do to improve the system.

17. With permission, I shared portions of the clinical staff members' communication

to Coalition with DHS. This is an excerpt from my December 3, 2021, email to DHS deputy, associate, and assistant commissioners and legal staff:

> The staff member raised concerns about the inability of clients to get adequate rest at night due to the congregate nature of the shelter. They wrote, "NO ONE IS ABLE TO GET AN ADEQUATELY RESTFUL NIGHT'S SLEEP, unless heavily medicated." They described new clients complaining about the inability to sleep because their dormmates are responding to auditory hallucinations or are preoccupied by a delusion. They wrote, "clients are aware that they are residing with individuals who are not mentally stable, and who could be possibly violent. Additionally, most of our clients suffer from at least Anxiety, Depression, and PTSD; if not some form of schizophrenia or psychosis. The paranoia that exists amongst our clients is almost palpable sometimes, and congregate sleeping arrangements only exacerbate these very real and very debilitating mental health symptoms." They continued that, "[a]s a mental health professional, it is obvious to me that the environment is intentionally set up. . .to impair our client's general well-being and incentivize them to give up and leave the shelter[.] Service providers literally cannot provide clients with environments that feel safe and are then are overwhelmed with all the issues that come along." They wrote, "[c]lients see how overwhelmed staff are, and intuit that staff cannot be supportive or provide protection when an incident invariably arises. And the cycle continues to reinforce itself."

*See* December 3, 2021, email, a copy of which is attached hereto as Exhibit 1.

18. The response I received from DHS to my email was, "We will meet internally to see how best we can support our Providers given the space design of our shelters."

19. Coalition met with DHS in spring 2022 to discuss the reasonable accommodations request process for clients with psychiatric and cognitive disabilities. Following this meeting, I emailed a list of recommendations compiled by Coalition staff to DHS to improve the reasonable accommodation request process. With respect to improving services for clients with mental health disabilities, Coalition recommended that DHS "[r]educe [the] size of 200-bed mental health sites to enable better staff-to-client ratios and more intensive services, since these sites can exacerbate and trigger psychiatric symptoms; [c]onsider reducing reliance on mental health shelters, which leads to segregation of clients with mental health disabilities, and explore other options, like

creating smaller sites or providing clients with more agency to choose their placements[.]" In response to our suggestion to reduce the size of 200-bed mental health shelters, DHS wrote, "We are discussing this with DHS programs." During a September 20, 2022, meeting with DHS leadership, I asked if there were any plans to reduce capacity in 200-bed mental health shelters and, if so, when. DHS First Deputy Commissioner Molly Park said they are not in a place to reduce capacity at the moment.

20. Large capacity, congregate mental health and MICA shelters can cause clients to feel they have been institutionalized. DHS rules related to curfew, controlled access to food, mandatory meetings, and limits on personal belongings allowed into shelters negatively impact clients' autonomy and agency to make decisions for themselves.

21. New York State's shifting of its costs to provide emergency shelters to the City has prolonged DHS' dependence on large, congregate shelters rather than smaller facilities with better client-to-staff ratios. As the costs of DHS shelters rose by nearly $1.2 billion between Fiscal Years 2011 and 2021, New York City was left to pick up 95 percent of the increase for single adult shelters, while the State covered a mere 4 percent of the additional costs for single adult shelters. Reimbursements from Federal grants covered the remainder.[3]

22. Meanwhile, the State contributes to the growing shelter census through its overreliance on the DHS shelter system as part of its inadequate reentry planning for individuals leaving prisons. Each year since 2015, more than 40 percent of people released from State prisons to New York City were released directly to shelters and into a state of literal homelessness.[4] In Coalition's most recent annual report, *State of the Homeless 2022: New York at a Crossroads*, we

---

[3] Jacquelyn Simone (Coalition for the Homeless), *State of the Homeless 2022*, March 2022, at 22, https://www.coalitionforthehomeless.org/wp-content/uploads/2022/03/StateofThe-Homeless2022.pdf.
[4] *Ibid.*, at 45.

recommended that the City and the State both "[e]nsure effective reentry planning for individuals being released from prisons and jails in order to identify viable housing options prior to each individual's scheduled release date, fund the creation of supportive housing specifically for individuals reentering the community after incarceration, and prohibit housing discrimination on the basis of an arrest or conviction record."[5]

23. Individuals and families are staying longer in DHS shelters due to the lack of permanent, affordable housing in the city and the bureaucratic barriers that delay residents' ability to exit shelters when they do find housing. In Fiscal Year 2022, the average length of stay in the DHS shelter system was 509 days for single adults, 534 days for families with minor children, and 855 days for adult families – rates that have been trending upward in recent years.[6] A lack of sufficient staff at shelters to submit housing applications and too few staff in administrative offices to review housing applications can delay the move-in process for many months, causing some landlords to move on to the next applicant. Likewise, the City has also failed to enforce its anti-source-of-income-discrimination law, which has enabled landlords to continue to refuse to rent their apartments to individuals with rent subsidy vouchers.

24. Shelter residents who qualify for and want supportive housing also experience severe delays in exiting shelters into permanent housing. In Fiscal Year 2021, the City provided the *lowest* annual number of supportive housing placements since Fiscal Year 2004. This decline in placements is partially due to inadequate supply: There is only one available supportive housing apartment for every five eligible applicants, and former Governor Cuomo's delays in releasing supportive housing funds stalled the production of the 20,000 new units he promised in 2016 to

---

[5] *Ibid.*, at 49.
[6] *Mayor's Management Report*, September 2022, at 238, https://www1.nyc.gov/assets/operations/downloads/pdf/mmr2022/2022_mmr.pdf.

create by 2031. Coalition has consistently advocated for the City and the State to increase the pace of supportive housing production in order to meet their production goals earlier than promised: by 2025 for the City's 15,000-unit goal and 2026 for the State's 20,000-unit goal.[7] We have also called for the State to increase the operating funding for existing supportive housing units to ensure they remain available for those individuals who need them. The process for accessing available supportive housing units is also needlessly burdensome, making it more difficult for applicants to be found eligible by City agencies. Once applicants are found eligible, they must attend interviews with supportive housing providers, who have wide discretion to reject them. Frustrating administrative delays throughout the supportive housing application process often needlessly prolong an individual's homelessness.[8]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 12, 2022.

DEBORAH B. DIAMANT, Esq.

---

[7] *State of the Homeless 2022*, at 48.
[8] *Ibid.*, at 36.