UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H.,
individually and on behalf of all similarly situated,

                                                        Plaintiffs,

                        -against-                                        7:19-cv-00639 (CS) (AEK)

ANDREW CUOMO, in his official capacity as the            **ORAL ARGUMENT**
Governor of the State of New York, the NEW YORK          **REQUESTED**
STATE OFFICE OF MENTAL HEALTH, ANN MARIE
T. SULLIVAN, in her official capacity as the Commissioner
of the New York State Office of Mental Health, the NEW
YORK STATE DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION, ANTHONY J.
ANNUCCI, in his official capacity as the Acting
Commissioner of the New York State Department of
Corrections and Community Supervision, ANNE MARIE
MCGRATH, in her official capacity as Deputy
Commissioner of the New York State Department of
Corrections and Community Supervision,

                                                        Defendants.

------------------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*
28 Liberty Street
New York, NY 10005

GEE WON CHA
ADAM SANSOLO
CAROLINE WALLITT
OWEN T. CONROY
Assistant Attorneys General
    *of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................................1

FACTUAL BACKGROUND ..........................................................................................................1

    A.   Community Mental Health Housing and Services in New York State ........................................3

    B.   Release Planning for Incarcerated Individuals with Serious Mental Illness.................................6

    C.   DOCCS Practice Regarding Release of Certain High-Risk SMI Incarcerated Individuals, Before and After December 16, 2019...............................................................................................7

    D.   Evidence Regarding the Named Plaintiffs ..................................................................................8

STANDARD OF REVIEW ..........................................................................................................22

ARGUMENT .................................................................................................................................23

I.    THE DISCHARGE CLASS FAILS THE RULE 23 STANDARD ........................................23

    A.   The Proposed Discharge Class Lacks Commonality ................................................................23

    B.   The Discharge Class Named Plaintiffs are Not Typical of the Proposed Class .......................30

    C.   The Proposed Discharge Class is Not Ascertainable................................................................32

    D.   No Single Injunction Could Provide Relief to Each Discharge Class Member ...................34

II.    THE GENERAL CLASS AND RTF SUBCLASS FAIL RULE 23.........................................36

    A.   To the Extent Plaintiffs Seek to Enjoin the Defunct DOCCS Practice, a Class Action is Not Appropriate....................................................................................................................................36

    B.   To The Extent the General Class and RTF Subclass Seek the Same Affirmative Relief as the Discharge Class, Class Certification Fails for the Same Reasons .......................................37

CONCLUSION..............................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ansari v. N.Y. Univ.*,
  179 F.R.D. 112 (S.D.N.Y. 1998) ............................................................................................ 40

*Bellin v. Zucker*,
  No. 19-CV-5694 (AKH), 2022 WL 4592581 (S.D.N.Y. Sept. 30, 2022) .................................. 32-34

*Berni v. Barilla S.p.A.*,
  964 F.3d 141 (2d Cir. 2020) ................................................................................................... 34

*Brecher v. Republic of Argentina*,
  806 F.3d 22 (2d Cir. 2015) ..................................................................................................... 32

*Elisa W. v. City of New York*,
  No. 15-CV-5273 (KMW), 2021 WL 4027013 (S.D.N.Y. Sept. 3, 2021) ...................... 22-23, 26, 31

*Forts v. Ward*,
  621 F.2d 1210 (2d Cir. 1980) ................................................................................................. 37

*Galvan v. Levine*,
  490 F.2d 1255 (2d Cir. 1973) ................................................................................................. 3, 36

*Geiss v. Weinstein Co. Holdings LLC*,
  474 F. Supp. 3d 628 (S.D.N.Y. 2020) ..................................................................................... 39

*In re Fosamax Prods. Liab. Litig.*,
  248 F.R.D. 389 (S.D.N.Y. 2008) ............................................................................................. 39

*In re Petrobras Securities*,
  862 F.3d 250 (2d Cir. 2017) ................................................................................................... 22, 32

*In re Vitamin C Antitrust Litig.*,
  279 F.R.D. 90 (E.D.N.Y. 2012) .............................................................................................. 34

*Kenneth R. ex rel. Tri-Cnty. CAP, Inc./GS v. Hassan*,
  293 F.R.D. 254 (D.N.H. 2013) ............................................................................................... 29

*Lee v. Dudek*,
  No. 4:08-CV-0026 (N.D. Fla. Jan. 3, 2012) ............................................................................ 29

*Lisnitzer v. Zucker*,
  983 F.3d 578 (2d Cir. 2020) ................................................................................................... 36-37

*Murphy by Murphy v. Minnesota Dep't of Hum. Servs.,*
    260 F. Supp. 3d 1084 (D. Minn. 2017) ................................................................. 35

*Nnebe v. Daus,*
    No. 06-CV-4991 (RJS), 2022 WL 615039 (S.D.N.Y. Mar. 1, 2022) ...................... 37

*Nypl v. JP Morgan Chase & Co.,*
    No. 15-CV-9300 (LGS), 2022 WL 819771 (S.D.N.Y. Mar. 18, 2022) ..................... 33

*Ruggles v. WellPoint, Inc.,*
    272 F.R.D. 320 (N.D.N.Y. 2011) ............................................................................. 30

*Russell v. Forster & Garbus, LLP,*
    No. 17-CV-4274, 2020 WL 1244804 (E.D.N.Y. Mar. 16, 2020) ............................ 21

*Siino v. City of New York,*
    No. 14-CV-7217 (MKB)(LB), 2020 WL 3807451 (E.D.N.Y. Feb. 27, 2020) ........... 27

*Strouchler v. Shah,*
    286 F.R.D. 244 (S.D.N.Y. 2012) ............................................................................. 25

*T.C. v. New York State Dep't of Health,*
    No. 22-CV-5045 (MKV), 2022 WL 17689841 (S.D.N.Y. Dec. 15, 2022) ............... 35

*Taylor v. Zucker,*
    No. 14-CV-05317 CM, 2015 WL 4560739 (S.D.N.Y. July 27, 2015) ............... 24-25, 31

*Teamsters Local 445 v. Bombardier,*
    546 F.3d 196 (2d Cir. 2008) .................................................................................... 23

*Thorpe v. D.C.,*
    303 F.R.D. 120 (D.D.C. 2014) ................................................................................ 29

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) .......................................................................................... passim

*Westchester Indep. Living Ctr., Inc. v. State Univ. of New York, Purchase Coll.,*
    331 F.R.D. 279 (S.D.N.Y. 2019) ...................................................................... 34, 40

**STATE STATUTES**

New York Correction Law
    § 73 ......................................................................................................................... 18

New York Mental Hygiene Law
    § 41.16 ..................................................................................................................... 28

New York Criminal Procedure Law
    § 330.20 ..................................................................................................................... 9

New York Penal Law
  § 70.45 ..........................................................................................................................18

**RULES**

Fed. R. Civ. P. 23 ...................................................................................................... passim

Fed. R. Civ. P. 25(d) .........................................................................................................1

## PRELIMINARY STATEMENT

Plaintiffs have requested that the Court certify two classes and one subclass, each consisting of individuals with serious mental illness ("SMI") who were convicted of crimes and incarcerated in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), and who sought community-based mental health housing ("CMHH") and services in New York State upon their release from prison. Plaintiffs' submission, while voluminous, repeatedly omits material law and facts. As to the law, Plaintiffs fail to address the Supreme Court's seminal class action decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), which provides the standard that governs their motion. As to the facts, Plaintiffs fail to present any evidence, much less "significant proof," *id.* at 353, that Defendants[1] maintain a statewide policy of centralized discrimination against the proposed classes. On the contrary, the facts in evidence show that New York State is among the national leaders in this area, spending hundreds of millions of dollars per year on residential and community mental health programs. The State's investment has facilitated the development of tens of thousands of CMHH units and an expansive network of community services. And Plaintiffs' arguments are even less compelling given the latest developments: earlier this year, New York State passed a Fiscal Year 2024 budget with a historic new *billion dollar* investment in expanding CMHH and community services, an amount that Plaintiffs' own expert testified is a "massive infusion of dollars" into the system. Defts.' Ex. 70 (Peet Tr. 138:3-9).

Meanwhile, Plaintiffs' motion repeatedly misstates or omits critical details about the Named Plaintiffs, including regarding the community services and housing that have been provided or offered

---

[1] Defendants are DOCCS, the New York State Office of Mental Health ("OMH"), Ann Marie T. Sullivan in her official capacity as Commissioner of OMH, Daniel F. Martuscello III in his official capacity as Acting Commissioner of DOCCS, and Anne Marie McGrath in her official capacity as Deputy Commissioner of DOCCS (cumulatively, "Defendants"). Acting Commissioner Martuscello was automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d) upon his June 9, 2023 appointment. On September 25, 2020, the Court dismissed the Governor of the State of New York as a defendant.

to each of them, and their own independent actions and decisions that have made each of their placements uniquely challenging. This includes the unfortunate fact that each of the nine Named Plaintiffs has a history of extremely violent conduct, arson, or both. Both of Plaintiffs' experts testified that the vast majority of individuals with SMI are not violent, and that the very small percentage of individuals with a history of violence or fire-setting are *the very hardest individuals to place* in CMHH settings. Such individuals do not represent "typical" placement cases. Nevertheless, despite the challenges posed by each Named Plaintiff's case, every Named Plaintiff has received robust community mental health services, and all of the Named Plaintiffs who meaningfully participated in the CMHH placement process and have not recently assaulted others have received CMHH placements. *See* Defts.' Ex. 1 (summary of Named Plaintiffs' last known status).

Each proposed class fails Rule 23 for multiple independent reasons. The proposed Discharge Class, consisting of individuals who were released from prison and sought CMHH and services, lacks *commonality* because access to CMHH and case management services is not determined by OMH or any other centralized State decisionmaker. Rather, each individual placement is facilitated by a locally-controlled, individualized process involving independent professionals at the County and City level, along with non-profit housing providers who assess each individual applicant. Despite years of discovery, Plaintiffs have failed to present evidence supporting their allegations of centralized statewide discrimination. The class lacks *typicality* because each Named Plaintiff presents an *exceptionally* challenging housing placement case, given their histories of violent acts, arson, and their own independent decisions and actions during the placement process. The proposed Discharge Class is not *ascertainable* because its definition contains multiple subjective components. And it fails Rule 23(b)(2) because there is *no single injunction* that could provide the requested relief to all class members.

The proposed General Class and RTF Subclass consist of individuals who DOCCS previously held in prison beyond their eligible release dates until an appropriate housing placement could be

identified. DOCCS ended that practice as of December 16, 2019. To the extent the Plaintiffs ask the Court to enjoin that now-defunct practice, a class action is precluded by *Galvan v. Levine*, 490 F.2d 1255 (2d Cir. 1973), which holds that a class action is not an appropriate vehicle for injunctive relief if the government defendant has stated that it understands that a judgment will bind it with respect to all claimants. Plaintiffs attempt to evade *Galvan* by arguing, counter-intuitively, that they are *not* actually seeking an injunction prohibiting DOCCS from holding individuals in prison pursuant to the prior practice. They argue instead that the General Class and RTF Subclass suffer the same alleged harms and seek the very same relief as the Discharge Class. As a result, these classes present the very same issues as the Discharge Class and fail Rule 23 for the same reasons. In addition, the General Class and RTF Subclass fail the *numerosity* requirement, given that Plaintiffs have failed to present evidence showing that DOCCS is currently holding anyone in prison beyond their eligible release dates due to a lack of CMHH or supportive services, let alone a sufficient number to satisfy Rule 23.

## FACTUAL BACKGROUND

### A. <u>Community Mental Health Housing and Services in New York State</u>

As described more fully in the accompanying testimony and evidence,[2] OMH funds and licenses an extensive network of CMHH and services. Duncan Decl. ¶¶ 3-4. Currently there are approximately 48,000 units of CMHH statewide, with different types of housing models offering varying levels of services. *Id.* at ¶ 4. New York State also facilitates extensive community-based mental

---

[2] Defendants have attached the following materials: (1) Declaration of AAG Owen T. Conroy ("Conroy Decl.") and Defendants' Exhibits 1 through 72 and 78, attached thereto; (2) Declaration of Julie Duncan, OMH Director of Housing Development and Support ("Duncan Decl.") and Defendants' Exhibit 73 attached thereto; (3) Declaration of April Wojtkiewicz, OMH Director of Community Budget and Financial Management ("Wojtkiewicz Decl.") and Defendants' Exhibits 74 through 77 attached thereto; (4) Supplemental Declaration of Wendy Vogel, OMH Director of Pre-Release Services and Community Re-Entry for Central New York Psychiatric Center ("Vogel Supp. Decl."); (5) Declaration of Scott Wunder, an OMH social worker ("Wunder Decl."); and (6) Declaration of Marco Ricci, DOCCS Deputy Commissioner for Parole Operations and Reentry Services ("Ricci Decl.") and Defendants' Exhibit 79 attached thereto.

health services, including Assertive Community Treatment ("ACT") team services, Forensic ACT ("FACT") team services, and Clinic Treatment Programs. *Id.* at ¶ 3. New York spends many hundreds of millions of dollars per year on non-crisis residential mental health programs, and hundreds of thousands of additional dollars each year on outpatient treatment programs, crisis residential programs, community support, and related programs. Wojtkiewicz Decl. ¶¶ 6-7. As of Fiscal Year 2019, New York ranks number 2 in the nation on total State mental health authority-controlled expenditures (number 4 per capita), number 2 in the nation on community-based mental health expenditures (number 5 per capita), and number 2 in the nation on residential mental health services (number 6 per capita). Defts.' Ex. 78. Over the past several decades, the percentage of New York's State mental health authority-controlled expenditures spent on community services has expanded significantly. *Id.*[3]

New York continues to dedicate substantial new funding for additional units of CMHH each year. Most recently, Governor Hochul signed New York's FY 2024 budget into law, which includes a historic new *one billion dollar* State investment in developing new CMHH and expanding community mental health services. Wojtkiewicz Decl. ¶¶ 8-9 & Defts.' Exs. 75-77. Plaintiffs' expert Melodie Peet conceded that this new investment represents a "massive infusion of dollars" that by itself is the size of the entire Maine state budget during the time she was commissioner of mental health in Maine. Defts.' Ex. 70 (Peet Tr. 138:3-9).

The vast majority of CMHH units in New York State are owned and operated by non-profit housing providers. Duncan Decl. ¶ 6. OMH directly operates a limited number of transitional housing units located on or near the campuses of OMH psychiatric centers, but otherwise does not directly

---

[3] This comparative State spending data comes from the National Association of State Mental Health Program Directors Research Institute ("NRI"), a national organization that supports State mental health agencies. Plaintiff's expert Peet testified that NRI is a reliable source of State mental health data. Defts.' Ex. 70 (Peet Tr. 164:22-165:22).

operate CMHH units. *Id.* OMH generally does not control individual access to CMHH or make individual placement decisions. *Id.* at ¶ 7. Individual placements are facilitated by independent, locally-controlled County or City Single Point of Access ("SPOA") committees. *Id.* at ¶¶ 7-8; *see also* Defts.' Ex. 70 (Peet Tr. 195:18-22). There are dozens of County or City SPOA committees in New York State. Duncan Decl. ¶¶ 7-8. An individual seeking a CMHH or care management services placement must submit a SPOA application to their local SPOA committee. *Id.* at ¶ 9. The local SPOA committee reviews the application and determines the individual's eligibility for placement and the type of placement that is appropriate, if any. *Id.* The local SPOA committee also determines the individual's priority level for placement, given the county's assessment of resources in the region and the needs of all individuals currently seeking placement in the community. *Id.* OMH requires that certain populations receive priority for housing, including individuals released from State prisons. *Id.* The local SPOA committee then sends referrals to non-profit housing providers located in their region. *Id.* at ¶ 10. Local providers review the referral and determine if they have an available placement that might be appropriate for the individual. *Id.* If a provider believes it may have an appropriate placement, it typically meets with the applicant to determine if the potential placement is suitable and appropriate for the individual's specific needs. *Id.* Individual placement decisions are made by the local SPOA committee and housing providers on a fact-intensive, case-by-case basis. *Id.* at ¶ 11.

CMHH placements are not "one-size-fits all." *Id.* Just because a provider has an available unit, that does not mean that any individual applicant will be an appropriate match for the placement. *Id.* While providers may not exclude anyone based on general exclusionary criteria such as past involvement with the criminal justice system, they must make an individualized assessment regarding whether they can provide a safe and appropriate placement, given the residence's staffing capacity and expertise and the individual's specific needs and history. *Id.* This includes an individualized assessment by provider staff of the individual applicant's clinical presentation and history, including incidents of

violence toward others or destruction of property. *Id.* OMH does not have authority to force the SPOA committee or housing provider to place any individual applicant in a particular placement. *Id.* at ¶ 14. The provider's professional staff use their own independent judgment to determine whether they are equipped to provide a safe and appropriate placement for an individual in any given vacancy. *Id.* Importantly, each provider must also consider the safety and needs of existing clients who are already living at the residence, many of whom are themselves vulnerable individuals who face a heightened risk of becoming victims of violence. *Id.* at ¶ 12.

Finding a safe and suitable placement is more difficult if the applicant has a history of violence toward others or a history of setting fires. *Id.* at ¶ 13. Both of Plaintiffs' experts agree that a history of violence or fire-setting are two factors that make an individual uniquely difficult to place in community housing. Defts.' Ex. 70 (Peet Tr. 174:6-15; 177:10-178:4); Ex. 71 (Factor Tr. 70:4-71:20).

Individuals who have been convicted of crimes and are released from prison settings have access to the same system of CMHH and services as all other New Yorkers. Duncan Decl. ¶ 5. These individuals may apply to their local SPOA committee for a placement with the level of services that best suits their needs. *Id.* Other populations seeking CMHH and supportive services include individuals who are released from inpatient psychiatric hospitals and individuals who have SMI but who have not been convicted of crimes. *Id.* at ¶ 17. Additionally, some housing units are specifically designated to be set aside for individuals with a forensic history. *Id.* at ¶ 5.

B. **Release Planning for Incarcerated Individuals with Serious Mental Illness**

OMH and DOCCS facilitate a pre-release planning process for incarcerated individuals with SMI. In the event an incarcerated individual with SMI who has an approaching release date is determined to be stable for release to the community by OMH, but does not have a residence in the community approved by DOCCS, OMH considers that individual to be at risk of homelessness upon release. Vogel Supp. Decl. ¶ 9. For all such individuals, OMH prepares and submits a SPOA

application for CMHH to the local SPOA committee in the individual's proposed county of release, unless the individual does not consent to a SPOA application being made on their behalf. *Id.* Following the application, the local SPOA committee makes an eligibility determination. *Id.* If the applicant is eligible for a CMHH placement, the local SPOA committee refers the application to local non-profit housing providers within its region. *Id.* The local SPOA committee and providers work together to locate an appropriate placement for the individual. *Id.*

There are times when, during the pre-release review process, OMH staff may flag a particular individual as *requiring* placement in a CMHH setting upon release from prison, in order to ensure a stable release, given the individual's history and clinical presentation. *Id.* at ¶ 12. In such cases, OMH's consistent practice has been to locate a housing placement prior to the incarcerated individual's scheduled release date, in the event that the SPOA process has not yet yielded a placement. *Id.* In these cases, placement may include one of the limited number of OMH-operated residential housing units or Transitional Living Residences ("TLRs") located on or near the campus of OMH psychiatric centers. *Id.* All TLR placements are residences located outside of prison settings and provide residents the ability to interact in the community, potentially subject to house rules regarding check-in and curfew. *Id.* Since 2014, for every incarcerated individual who has been identified by OMH staff as *requiring* a community-based mental health housing placement upon release, OMH has provided the incarcerated individual with a housing placement by the time of their eligible release date. *Id.*

## C. DOCCS Practice Regarding Release of Certain High-Risk SMI Incarcerated Individuals, Before and After December 16, 2019

Prior to December 16, 2019, there were certain, relatively infrequent, instances in which DOCCS staff made an individualized assessment that, given a particular incarcerated individual's presentation or history, the incarcerated individual was likely to pose a safety risk if released to a shelter without another suitable residence in place. Ricci Decl. ¶ 3. During this time period, in these limited cases, where appropriate housing was not immediately available upon the incarcerated individual's

scheduled release date, DOCCS's practice was to retain the incarcerated individual in DOCCS custody until appropriate housing was located. *Id.* at ¶ 4. Further, during this time period, for some incarcerated individuals in the situation described above, for whom a housing placement could not be located prior to the maximum expiration date of their sentence, DOCCS would transfer the incarcerated individual from the correctional facility to a DOCCS Residential Treatment Facility ("RTF") until an appropriate housing placement could be identified. *Id.* at ¶ 5.

On December 16, 2019, DOCCS issued a memorandum to all DOCCS Superintendents and Community Supervision Bureau Chiefs, (the "Memorandum"), permanently ending this practice. Defts.' Ex. 79. The Memorandum provides that where "OMH has made the clinical determination that [an] incarcerated individual [with SMI and not subject to the Sexual Assault Reform Act ("SARA")] may be released from DOCCS custody to a shelter setting, DOCCS will allow such release on their scheduled release date." *Id.* As of this date, there are no incarcerated individuals with SMI, who are not subject to SARA housing restrictions, who are being held in DOCCS custody past their scheduled release date as a result of a determination by DOCCS that these incarcerated individuals require mental health housing and available mental health housing has not been located for them. Ricci Decl. ¶ 11.[4]

DOCCS does not intend to reinstate the pre-December 16, 2019 practice. *Id.* at ¶ 12. DOCCS further understands that, to the extent the Court issues an order enjoining DOCCS from reinstating the pre-December 16, 2019 practice, such an order would apply not just to the Named Plaintiffs in this case, but to all similarly situated individuals. *Id.*

D. **Evidence Regarding the Named Plaintiffs**

The Named Plaintiffs seek to represent two classes and one subclass, each consisting of

---

[4] Plaintiffs have alleged that DOCCS has not actually stopped this practice, based on a flawed interpretation of certain DOCCS spreadsheets by their "E-Discovery Data Science Advisor." The Ricci Declaration corrects that misimpression at ¶¶ 17-19.

individuals who have been convicted of crimes and incarcerated, and who sought CMHH and services upon their release from prison. All three proposed classes seek an injunction "requiring Defendants to . . . [p]romptly mak[e] available sufficient community-based care and treatment opportunities" to each class member, including CMHH placements. Second Am. Complaint (ECF No. 134) ("SAC") p. 99. Plaintiffs' class certification motion contains <u>many strategic omissions and misstatements of material facts</u> regarding the Named Plaintiffs' actions, as well as the supportive services and placements the Named Plaintiffs have received or been offered. In summary, every Named Plaintiff that has meaningfully participated in the housing process and not recently assaulted others received a placement—the others have either refused potential placements, declined to meaningfully participate, or lost opportunities when they assaulted patients or staff. *See* Defts.' Ex. 1 (summary of Named Plaintiffs' last known status).

       i.     <u>*Discharge Class Named Plaintiffs*</u>

Named Plaintiffs WP, DH, and SD seek to represent a purported Discharge Class, consisting of: "all persons (1) with serious mental illness, (2) who are or will be appropriate for and desire community-based mental health housing and supportive services upon their release from state prison, (3) who, upon their release, do not receive such services, and (4) who reside in segregated settings or who are at serious risk of becoming institutionalized." Pls.' Mot. at 1.[5]

**WP:** WP has been diagnosed with schizophrenia and antisocial personality disorder. Defts.' Ex. 3 (OMH Discharge Summary). On two different occasions, WP attempted to kill women by lighting their homes on fire.[6] At Elmira Correctional Facility, he lit his mattress on fire. Defts.' Ex. 3

---

[5] Each of the Named Plaintiffs was incarcerated after pleading guilty or being found guilty at trial. They are not individuals who were found not responsible for their actions by reason of mental disease or defect pursuant to New York Criminal Procedure Law § 330.20.

[6] On or around January 14, 1995, WP poured flammable liquid on his girlfriend's apartment door, then lit the door on fire. Defts.' Ex. 2 (WP Dep. Tr. 64:18-65:20); Defts.' Ex. 4 (Parole Board report). On or around October 26, 1998, WP set fire to the home of a woman who had declined to date him,

(OMH Discharge Summary at D-00010672). After he was released from prison, he assaulted a resident of a shelter. Defts.' Ex. 2 (WP Dep. Tr. 68:4-70:23; 89:3-90:17).[7]

In 2019, prior to WP's most recent release from state incarceration, OMH sent a SPOA application for CMHH and community services to New York City on WP's behalf. Defts.' Ex. 7 (OMH housing referrals). Prior to his release from prison, WP attended a CMHH placement interview with a housing provider. Defts.' Ex. 8 (OMH Progress Note); Defts.' Ex. 2 (WP Dep. Tr. 72:24-73:23). When the interview started, the housing provider stated that the placement would be in a shared apartment. WP responded by informing the provider that he was rejecting the placement, and he walked out of the interview. *Id.*[8] On or around May 17, 2019, WP was released from prison on his approved conditional release date. Defts.' Ex. 3 (OMH Discharge Summary).

Upon his release from prison, WP received extensive community mental health services, including placement with a FACT team. Defts.' Ex. 2 (WP Dep. Tr. 51:16-58:25); Defts.' Ex. 9 (FACT team letter). As Plaintiffs' own experts explain in great detail, ACT and FACT are multi-disciplinary

---

while she and her family were asleep inside. After he was arrested, WP called the victim from prison and told her: "I will kill you, bitch." Defts.' Ex. 2 (WP Dep. Tr. 66:12-67:20); Defts.' Ex. 5 (Probation report); Defts.' Ex. 6 (letter from prosecutor referring to WP as "the most troubled and one of the most dangerous individuals I have ever encountered").

[7] In prior filings, when Defendants noted certain individual decisions and actions by the Named Plaintiffs, Plaintiffs responded by accusing Defendants of engaging in "discredited 'culture of poverty' rhetoric that attributes social harm to individuals' lapsed responsibility and not system failures." ECF No. 159 at 14 n.8. To be absolutely clear, by noting the facts regarding each Plaintiff's decisions and actions, including their histories of violent conduct, Defendants do not suggest that the Plaintiffs do not deserve to receive housing or community services. Just the opposite, OMH staff often advocate with housing providers on behalf of applicants with challenging histories. *See* Vogel Supp. Decl. ¶ 10. However, the Named Plaintiffs' violent actions, and their own independent decisions during the placement process, are relevant to class certification because these facts make each of them an *extremely* challenging housing placement.

[8] WP "thanked the interviewer for her time, informed her that he would prefer a shelter and exited the room." Defts.' Ex. 8 (OMH Progress Note).

teams that provide 24/7 psychiatric treatment and services to individuals in the community—these teams are "*the gold-standard* of community treatment." Factor Report at 6 (emphasis added).[9]

On or around August 28, 2019, the New York City Human Resources Administration ("NYC HRA") conditionally approved WP for supportive housing, pending placement with a provider that has a suitable residence to accommodate his needs. Defts.' Ex. 10 (NYC HRA determination). WP's FACT Team has a Housing Specialist who assists him with his housing applications. Defts.' Ex. 2 (WP Dep. Tr. 55:14-56:4). WP's FACT Team members have explained to WP that his history of violence against others makes it uniquely challenging to find a housing provider who can provide him with an appropriate placement. Defts.' Ex. 11 (FACT treatment notes at P-MEDICAL-0007774, 7785, 7789). WP's FACT team members have also urged him to be willing to consider housing with a roommate, but WP testified that he intends to continue to decline that option. Defts.' Ex. 11 (FACT notes at P-MEDICAL-0007772); Defts.' Ex. 2 (WP Dep. Tr. 84:24-85:18).

WP testified that since his release from prison, he has had three additional interviews with housing providers about CMHH placements. Defts.' Ex. 2 (WP Dep. Tr. 79:9-13); WP Decl. ¶ 23. The first provider told WP that it could not place him because he did not meet their qualifications. Defts.' Ex. 2 (WP Dep. Tr. 79:14-81:2). At the second interview, WP "questioned" the provider's house rules on guests, telling the provider that he wanted a living situation where he could have female guests and children on site, although he does not have any children of his own. *Id.* at 81:3-83:25; 91:4-13. The interviewer said they did not have any placements available that allowed female guests or children, and WP did not receive the placement. *Id.* At the third interview, WP rejected the placement

---

[9] *See also* Factor Report at 6 (ACT and FACT "use[] multidisciplinary teams to provide clients with services directly in the community, including mental health treatment, 24/7 crisis response, and support with living skills such as shopping"); Peet Report at 19 (these services are known in the industry as a "hospital without walls"); Defts.' Ex. 9 (letter describing WP's FACT team services); Defts.' Ex. 11 (excerpted WP FACT team treatment notes). WP's FACT team is facilitated by a provider called CASES. *See* https://www.cases.org/programs/manhattan-act/ .

because he objected to the idea that the provider would be designated as a representative payee. WP Decl. ¶ 23. As of November 10, 2022, the date of his deposition, WP was living at a hotel that has been converted for use as single-unit housing, where he has his own private room and bathroom. Defts.' Ex. 2 (WP Dep. Tr. 43:15-44:10); Defts.' Ex. 11 (FACT team note from 5-9-2022 stating "how living at the hotel and having his own room and bathroom has been helping [WP] immensely").

**DH:** DH has been diagnosed with schizoaffective disorder bipolar type; cannabis use disorder, moderate; and antisocial personality disorder. Defts.' Ex. 13 (OMH Discharge Summary). DH has been convicted of various crimes, including arson. Defts.' Ex. 12 (DH Dep. Tr. 20:19-22:7). On or around December 11, 2018, in advance of DH's release from prison, OMH submitted a SPOA application for CMHH and care management services on DH's behalf to the Orange County Department of Mental Health. Defts.' Ex. 16 (SPOA Application). On or around December 28, 2018, Orange County provided notification that it had granted DH's application and assigned DH to receive Health Homes Plus care management services. *Id.* at MG-Class00024987. On or around December 19, 2018, DH was released from prison. Defts.' Ex. 15 (OMH Discharge Summary). DH's OMH Discharge Summary listed his approved community address as 154 Third Street in Newburgh, New York, which is the address of Bridges of New York ("BNY"), a transitional housing and recovery program. *Id.*; Wunder Decl. ¶ 4. Upon release from prison, DH received supportive services from multiple sources, including mental health services from OMH's Newburgh Mental Health Clinic and care management from Rehabilitation Support Services ("RSS"). Wunder Decl. ¶¶ 2-3; Defts.' Ex. 20 (RSS patient care plan as of 12-20-2021); Defts.' Ex. 12 (DH Dep. Tr. 36:19-44:3).

DH received multiple placements in transitional housing and inpatient substance abuse programs while awaiting a more permanent housing placement through the SPOA process. He repeatedly refused to participate in these programs, or was kicked out for violating house rules, getting

into fights, causing property destruction, and using drugs. Wunder Decl. ¶ 4.[10] These incidents made it more difficult to find a housing provider who could safely place DH. *Id.*

In or around August of 2022, DH successfully completed an inpatient substance abuse rehabilitation program, and his SPOA application was transferred to Rockland County. Wunder Decl. ¶ 9. The Rockland County SPOA committee placed DH in CMHH at a residence called the Lukens House. *Id.*; Defts.' Ex. 12 (DH Dep. Tr. 26:8-32:21). Lukens House is a mentally ill chemical abuse ("MICA") housing and treatment program designed to house and treat individuals with a dual diagnosis of both mental illness and substance abuse. Wunder Decl. ¶ 9. Lukens House is a 12-18 month program. If DH had successfully completed this program, he would have had the opportunity to be placed in one of the same housing provider's supported apartments. Wunder Decl. ¶ 10; Defts.' Ex. 12 (DH Dep. Tr. 33:12-34:4). Unfortunately, DH recently began using drugs in violation of the

---

[10] These incidents include the following: (1) DH was released to BNY, but he tested positive for cocaine and ran away from the residence. Defts.' Ex. 12 (DH Dep. Tr. 22:16-23:9); Defts.' Ex. 17 (Parole record at D-00008921). (2) After DH was placed at BNY a second time, BNY staff asked DH to leave the house after he began using drugs, failed to abide by the curfew, and refused to go to his mental health treatment appointments. Defts.' Ex. 12 (DH Dep. Tr. 23:10-24; 52:16-54:3); Defts.' Ex. 17 (Parole record at D-00008911-8912). (3) In January of 2020, staff at the Russell E. Blaisdell addiction treatment center asked DH to leave the program after he barricaded himself in a room in an attempt to stop the staff from taking his cell phone. Defts.' Ex. 12 (DH Dep. Tr. 54:22-57:3); Defts.' Ex. 17 (Parole record at D-00008893). (4) In or around January of 2021, DH stopped attending his mandatory mental health treatment at Newburgh Clinic and Restorative Management Services because he "didn't want to go" anymore and he "was about to get off parole in a couple of months." Defts.' Ex. 12 (DH Dep. Tr. 61:8-24). (5) In or around February of 2021, DH's grandmother kicked him out of her residence because he was using drugs in her home. Defts.' Ex. 12 (DH Dep. Tr. 61:25-62:18); Defts.' Ex. 17 (Parole record at D-00008867). (6) Throughout 2021, DH left or was kicked out of a series of inpatient rehabilitation programs at Good Samaritan, Bon Secours Community Hospital, Arms Acres, the Salvation Army, and Cornerstone Treatment Facility for violating program rules, jumping out of a window, getting into a physical fight, using drugs, and in one instance emptying the contents of a fire extinguisher in his room. Defts.' Ex. 12 (DH Dep. Tr. 63:11-69:2; 70:6-16; 72:10-73:7); Defts.' Ex. 18 (Cornerstone treatment notes at P-MEDICAL-0004977). Cornerstone staff noted that while DH had been referred for residential placement, he "appears to experience explosive verbal outburst[s] that make placement difficult." *Id.* at P-MEDICAL-0004988.

house rules. Wunder Decl. ¶ 11. Lukens House staff notes state that DH's behaviors were "continuing [to] plac[e] residents in jeopardy" and that "all [the staff] can do is hold [DH] accountable for his actions." Defts.' Ex. 19 (Lukens House treatment notes at P-MEDICAL 0008170-8171). Lukens House staff gave DH notice of a potential eviction, but DH left the residence on his own on February 9, 2023. Wunder Decl. ¶ 11. Plaintiffs' filing omits any mention of the Lukens House placement or these events. DH was subsequently hospitalized after smashing the windows of a state vehicle at Middletown Clinic, and he has recently been charged with felony criminal possession, criminal mischief, and shoplifting. *Id.* at ¶¶ 14-16.

**SD:** SD has been diagnosed with schizophrenia and cannabis use disorder, moderate. Defts.' Ex. 23 (OMH Discharge Summary). On multiple occasions, SD has grievously attacked victims at random. On or around February 13, 1996, SD shot a person who he saw walking down the street in New York City. Defts.' Ex. 22 (SD Dep. Tr. 32:3-34:12). On or around July 12, 2012, he attacked and stabbed a person on the street with an ice pick. *Id.* at 35:12-37:7.

In or around February of 2019, as SD's release date from prison was approaching, OMH sent a SPOA application for CMHH and services on SD's behalf to New York City. Defts.' Ex. 24 (SPOA materials). On or around March 1, 2019, NYC HRA sent an eligibility determination stating that SD was conditionally approved for supportive housing. *Id.* at MG-Class00035487. New York City sent referrals to eight different housing providers, of which seven were not able to provide an appropriate placement for SD, and one offered a spot on its wait list for housing. Defts.' Ex. 25 (placement notes). On May 17, 2019, SD was released from prison. His OMH-approved discharge summary noted that his approved residence was the 30th Street Men's Shelter, where he would reside while waiting for a more permanent housing placement through the SPOA process. Defts.' Ex. 23 (OMH Discharge Summary).

Upon release from prison, SD received "gold-standard" FACT team services. Defts.' Ex. 23

(OMH Discharge Summary). His FACT team included a psychiatrist, registered nurses, social worker, peer advocates, counselors, substance use specialist, family specialist, and housing specialist. Defts.' Ex. 22 (SD Dep Tr. 47:16-49:23); Defts.' Ex. 26 (FACT treatment notes). SD's FACT team helped him manage his medications, and a FACT team nurse met with SD weekly to review his medications and to ensure his medication compliance. Defts.' Ex. 22 (SD Dep. 52:6-54:18); Defts.' Ex. 26 (CASES treatment notes at P-MEDICAL-0007906 & 7908). SD's FACT team recommended that he take long-acting injectable medications instead of pills, but SD declined. Defts.' Ex. 22 (SD Dep. 56:6-57:14); Defts.' Ex. 26 (FACT treatment notes at P-MEDICAL-0007906).

Shortly after his release, SD moved from the 30th Street Shelter to the Neighborhood Association for Inter-Cultural Affairs East Tremont Transitional Housing Program, which provides temporary housing for homeless men with mental health needs. Defts.' Ex. 22 (SD Dep. Tr. 61:19-62:11; 63:16-64:17). SD's daughter and godmother each asked SD to live with them while he was awaiting a more permanent placement, but SD declined both offers. Id. at 75:20-77:24.

At some point in the two days between June 10 and June 12, 2019, SD's psychiatric symptoms quickly grew worse. On June 10, SD's FACT team psychiatrist evaluated him and noted that he was "compliant with meds" and "at his baseline." Defts.' Ex. 26 (FACT treatment notes at P-MEDICAL-0007910-7911). Two days later, SD's FACT team received a call that SD's symptoms were worsening. Id. at P-MEDICAL-0007911. SD's FACT team psychiatrist immediately evaluated him and determined that SD required inpatient treatment. Id. at P-MEDICAL-0007911-7913.[11] Subsequently, while at the hospital, SD attacked a 67-year old psychiatric patient. Defts.' Ex. 22 (SD Dep. Tr. 37:8-

---

[11] In the SAC, Plaintiffs attempted to blame Defendants for SD's symptoms in the community by alleging that Defendants failed to provide SD supportive services, leading to a situation where he "did not have a sufficient supply of mental health medications to bridge him until the next available appointment with his doctor." SAC ¶ 249. The treatment notes of SD's "gold-standard" FACT team, which include a detailed history of his regular meetings with team members, the medications he received, and the medication management services the FACT team provided, plainly shows this allegation was wrong. Defts.' Ex. 26 (FACT notes at P-MEDICAL-0007906-7913).

39:2). SD was charged with assault in the second degree. Defts.' Ex. 28 (Felony complaint). He was convicted and is currently incarcerated. Defts.' Ex. 22 (SD Dep. Tr. 38:24-39:2).

    *ii.*   *General Class*

Named Plaintiffs PC, MG, CJ, MJ, JR, and DR seek to represent a purported General Class consisting of: "all persons (1) housed or who will be housed in a state prison, (2) with serious mental illness, (3) whose open dates for parole release, approved conditional release dates, or maximum expiration dates have passed,[12] (4) who are not subject to residency restrictions under the Sexual Assault Reform Act, and (5) who are appropriate for" CMHH and supportive services. Pls.' Mot. at 1. Each of the General Class Named Plaintiffs was someone for whom DOCCS—pursuant to its pre-December 16, 2019 practice—initially made a determination that he could not be released because he was likely to pose a safety risk if released to a shelter without another suitable residence in place. Each of these Named Plaintiffs was subsequently released to community housing and received supportive services. Plaintiffs have stated that the General Class and RTF Subclass "do not seek an order requiring their release from prison." SAC ¶ 22. Rather, they seek the very same relief as the Discharge Class: "prompt[]" placements with CMHH and services. SAC p.99.

**PC:** PC has been diagnosed with schizophrenia and intellectual disability (mild). Defts.' Ex. 29 (OMH Discharge Summary). PC was sentenced to a maximum prison term of life after murdering his building's superintendent by shooting him multiple times with a high powered rifle. Defts.' Ex. 30 (OMH Core History at OMH-00072785). PC committed this act because he was angry that the victim had confronted him about kicking down a door in the building. *Id.*

The Parole Board granted PC an open date for parole release of December 19, 2017. *Id.* Prior to his open date, OMH sent a SPOA application for CMHH to the Nassau County SPOA committee. Defts.' Ex. 31 (SPOA application). Pursuant to its pre-December 16, 2019 practice, DOCCS

---

[12] Additional information about the different types of release dates can be found at Ricci Decl. ¶ 4.

determined that PC would not be approved for shelter placement and he would instead be held pending placement in an appropriate residence. Defts.' Ex. 32 (DOCCS memorandum).

OMH facilitated a pre-release housing screening interview, but PC refused the placement. OMH progress notes state that PC "declined potential housing through the FREE program at the time of his [video teleconference] on 12/20/2017, stating that he did not want mental health housing, nor did he want to live with anyone else." Defts.' Ex. 33 (OMH Progress Note). The housing provider also expressed concerns that PC stated during the interview that he does not have a mental illness, that he would not take his medication independently in the community, and that he felt the murder he committed was justified. Defts.' Ex. 34 (post-interview email from housing provider expressing "serious concern regarding [PC's] appropriateness for this independent level of housing, especially regarding his safety and likelihood of success in this program"). PC has a sister who offered to take him in, but PC refused to propose her address for vetting by DOCCS Parole. Defts.' Ex. 33 (OMH Progress Note at OMH-00010059).

On April 28, 2020, PC was released from prison to State-operated mental health housing in West Brentwood, New York. Defts.' Ex. 29 (OMH Discharge Summary). On June 17, 2020, PC received a placement in State-operated mental health community residence in ███████ New York. Defts.' Ex. 35 (OMH Disposition record).[13]

**MG:** MG has been diagnosed with borderline personality disorder, antisocial personality disorder, and cannabis use disorder. Defts.' Ex. 36 (OMH Discharge Summary). On March 19, 1987, MG murdered a female acquaintance by throwing her out of his car, running her over, beating her

---

[13] Plaintiffs claim that State-operated community residences and TLRs are unacceptable settings and that only permanent apartments from housing providers will do. Pls.' Mot. at 14-15. There is absolutely no evidence in support of that claim. State-operated TLRs are community residences that can serve as an important stepping stone for individuals who require additional support while they build the skills necessary to live in the community. Duncan Decl. ¶ 6. Moreover, other parts of Plaintiffs' own submissions argue that there should be *more* State-operated housing, Peet Report at 42, and *more* transitional residences, Condliffe Decl. ¶ 5.

unconscious with a tire jack, and leaving her body in the woods. Defts.' Ex. 37 (DOCCS Status Report). MG pled guilty to murder in the second degree and was sentenced to a prison term of 25 years to life. *Id.* The Parole Board granted MG an open date for parole release of May 10, 2017. Defts.' Ex. 38 (Parole Board Release Decision Notice). On or around May 3, 2017, OMH sent a SPOA application on MG's behalf to Dutchess County. Defts.' Ex. 39 (SPOA Application). Pursuant to its pre-December 16, 2019 practice, DOCCS determined that MG would be held in prison pending placement in an appropriate residence. Defts.' Ex. 40 (DOCCS email).

On June 18, 2019, MG was released from prison to parole housing in Poughkeepsie, NY. Defts.' Ex. 36 (OMH Discharge summary). In the Fall of 2019, he moved into supported mental health apartment housing in Dutchess County operated by housing provider PEOPLE, Inc. MG Decl. ¶ 26. On May 11, 2023, Plaintiffs filed a suggestion of MG's death. ECF No. 261.

    *iii.*    <u>RTF Subclass</u>

CJ, MJ, JR, and DR seek to represent both the General Class and a purported RTF Subclass. The purported RTF subclass consists of: "all persons (1) housed or who will be housed in a state prison pursuant to Penal Law § 70.45 [determinate sentences] or Correction Law § 73 [RTF placements], (2) who have serious mental illness, (3) whose maximum expiration dates have passed, (4) who are not subject to residency restrictions under the Sexual Assault Reform Act, and (5) who are eligible and appropriate for" CMHH and supportive services. Pls.' Mot. at 1. Each of the RTF Subclass Named Plaintiffs was someone for whom DOCCS—pursuant to its pre-December 16, 2019 practice—made a determination that he could not be released without an appropriate residence in place, and each was temporarily held in an RTF placement beyond their maximum expiration date. Each of these Named Plaintiffs was subsequently released to community housing.

**CJ**: CJ has diagnoses of bipolar II disorder; cannabis use disorder (mild, in early or sustained remission), cocaine use disorder (mild, in early or sustained remission), and unspecified personality

disorder. Defts.' Ex. 41 (OMH Discharge Summary). Over the course of several days in August 2007,

CJ forcibly stole money and items from multiple victims, and he repeatedly stabbed one victim with a

knife. Defts.' Ex. 42 (pre-sentence report). CJ pled guilty to two counts of robbery in the first degree

and he received a sentence of 10 years. Defts.' Ex. 43 (sentencing transcript). Prior to the maximum

expiration date of CJ's incarceration, DOCCS determined pursuant to its pre-December 16, 2019

practice that CJ would be transferred to an RTF placement pending the identification of a suitable

residence. Defts.' Ex. 44 (RTF designation). OMH sent a SPOA application for housing and services

to the Orange County Department of Mental Health. Defts.' Ex. 45 (SPOA application).

On February 12, 2019, DOCCS released CJ to OMH-operated mental health housing with

supportive services at the Middletown TLR. Defts.' Ex. 46 (community residence admission). Shortly

thereafter, CJ was arrested for parole violations after he went missing from the residence for over a

week, refused to participate in mental health treatment, and began using cocaine. Defts.' Ex. 47

(progress notes). On March 31, 2020, DOCCS released CJ from prison again. Defts.' Ex. 41 (OMH

Discharge Summary). Leading up to that release, CJ declined to seek housing through the SPOA

process. *Id.* at OMH-00072600. CJ expressly told his parole officers that he intended to abscond from

parole, and he did so. Defts.' Ex. 48 (DOCCS violation of release report at D-00028956). Within days

of his release, CJ again violated multiple conditions of his parole, and he refused to attend mandatory

community mental health treatment. *Id.* at D-00028952-28953. CJ evaded arrest until July 22, 2020,

when he was arrested and hospitalized. Defts.' Ex. 49 (Parole report at DOCCS-00031085). At the

hospital, CJ caused destruction to his room and threatened to rape and kill a nurse. *Id.* at DOCCS-

00031082-31084. CJ testified that he was incarcerated as of the date of Plaintiffs' motion. CJ Decl.

¶ 38.

**MJ:** MJ has diagnoses of bipolar 1 disorder, MRE manic severe with psychotic features; and

cannabis use disorder, severe. Defts.' Ex. 50 (SPOA application at OMH-00018369). Starting at age

20, he was arrested multiple times and had multiple felony and misdemeanor convictions for robbery, criminal mischief, and petit larceny. Defts.' Ex. 51 (DOCCS Program and Security Assessment Summary). He was sentenced to a maximum three year prison term after pleading guilty to Falsely Reporting an Incident in the Second Degree. *Id.* On or around April 30, 2018, OMH submitted a SPOA application on MJ's behalf to the Orange County Department of Mental Health. Defts.' Ex. 50. Pursuant to its pre-December 16, 2019 practice, DOCCS determined that MJ would be held in an RTF placement pending identification of a suitable community residence. Defts.' Ex. 52 (RTF request).

On February 19, 2019, DOCCS released MJ to OMH-operated mental health housing at the Middletown TLR. Defts.' Ex. 53 (community residence admission). While at the Middletown TLR, MJ kicked in a door, threatened staff, and failed to comply with curfew. Defts.' Ex. 54 (DOCCS violation of release report). He was also discharged from his drug treatment program after he followed other clients into the parking lot and began kicking their cars and threatening them. *Id.* at DOCCS-00006122-6123; Defts.' Ex. 55 (report from drug treatment program). MJ was subsequently admitted for inpatient treatment at Rockland Psychiatric Center ("RPC"), where he repeatedly assaulted other vulnerable patients. Defts.' Ex. 56 (excerpted RPC progress notes). After being discharged from RPC, MJ received a placement in a community residence operated by the Jewish Board. MJ Decl. ¶ 27. He also attended a substance abuse program, where on January 1, 2021, he became irate when a nurse told him that he could not have a smoke break. He followed the nurse outside, called the nurse "F____" and "N___" slurs, then punched the nurse in the face, breaking the victim's nose. Defts.' Ex. 57 (Parole report). MJ was arrested again. *Id.* He testified that he lost his place in the housing program due to these events and he is currently living in a shelter. MJ Decl. ¶ 29.

**JR:** JR has been diagnosed with major depression recurrent, with psychotic features (most recent episode unspecified); borderline intellectual functioning; alcohol use disorder mild, and post-

traumatic stress disorder. Defts.' Ex. 58 (OMH Discharge Summary). On June 10, 2014, JR assaulted his two sons, aged six and three years old, by striking the six-year old multiple times in the face with a bungee cord and striking the three-year old with his open hand, causing bruising and injuries to both children. Defts.' Ex. 59 (DOCCS Guidance File at DOCCS-00034763). JR and his wife also subjected the two sons and their third child, an 18-month-old daughter, to living conditions that included floors filled with trash, dirt, and fecal matter. *Id.* When Child Protective Services and police arrived, JR attempted to hide the children in the bathroom. *Id.* JR pled guilty to assault in the second degree and was sentenced to a maximum of four years in prison. *Id.* at DOCCS-00034756. Prior to JR's release, pursuant to its pre-December 16, 2019 practice, DOCCS determined that JR would be held in an RTF placement pending identification of a suitable community residence. Defts.' Exs. 60 & 61. OMH submitted SPOA applications to Dutchess County on JR's behalf on October 16, 2017 and again on January 31, 2019. Defts.' Ex. 58 (OMH Discharge Summary).

On March 18, 2019, DOCCS released JR to OMH-operated community housing at the Rockland Psychiatric Center Alliance House in Poughkeepsie, New York. Defts.' Ex. 58 (OMH Discharge Summary). On or around April 9, 2019, JR received a placement in apartment housing operated by PEOPLE, Inc. Duncan Decl. ¶ 18; Defts.' Ex. 62 (DOCCS Parolee Chrono). OMH received notification that JR left the residence as of September 2021, and OMH is not aware of his current location. Duncan Decl. ¶ 18. Unlike the other Named Plaintiffs, JR failed to submit a declaration affirming his commitment to representing the proposed class, and Plaintiffs' counsel has reported that he has ceased communicating with them. Pls.' Mot. at 16 n.83. JR is therefore not an adequate class representative. *See Russell v. Forster & Garbus, LLP*, No. 17-CV-4274, 2020 WL 1244804, at *3-7 (E.D.N.Y. Mar. 16, 2020).

**DR:** DR has been diagnosed with bipolar I disorder, current or most recent episode depressed, unspecified; antisocial personality disorder; and cocaine use disorder, severe. Defts.' Ex. 63 (OMH

Discharge Summary). On or around October 18, 2010, DR became angry after getting into a confrontation with a peer at the shelter he was residing in, and he responded by attempting to set the shelter on fire. *Id.* at OMH-00014165. DR was convicted of attempted arson in the second degree and sentenced to a maximum prison term of five years. Defts.' Ex. 64 (DOCCS Program and Security Assessment). After being released from prison, DR attacked his roommate in the community on or around June 18, 2016, striking the victim multiple times in the head and face with a clothes iron and with a closed fist. Defts.' Ex. 65 (arrest report); Defts.' Ex. 66 (DOCCS violation of release report). The Board of Parole revoked DR's parole and he was returned to DOCCS custody for an additional period of 18 months. Defts.' Ex. 67 (Parole revocation certificate of disposition). Prior to JR's release, pursuant to its pre-December 16, 2019 policy, DOCCS determined that DR would be held in an RTF placement pending identification of a suitable community residence. Defts.' Ex. 68 (RTF designation).

On February 13, 2019, DOCCS released DR to OMH-operated housing at the Pilgrim Crisis Residence in Brentwood, New York. Defts.' Ex. 63 (OMH Discharge Summary). On or around March 28, 2019, DR received a placement in a stand-alone house in a supportive housing program operated by Family Residences and Essential Enterprises. Defts.' Ex. 69 (OMH client progress report); DR Decl. ¶¶ 22-24.

## STANDARD OF REVIEW

To qualify for class certification, a plaintiff "must demonstrate by a preponderance of the evidence" that the requirements of Rule 23 have been met, including Rule 23(a)'s four prerequisites of numerosity, commonality, typicality, and adequacy. *Elisa W. v. City of New York*, No. 15-CV-5273 (KMW), 2021 WL 4027013, at *7 (S.D.N.Y. Sept. 3, 2021) (citing *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015)). The Second Circuit has also held that Rule 23 contains "an implied requirement" that a class be "ascertainable." *In re Petrobras Securities*, 862 F.3d 250, 260 (2d Cir. 2017). Further, the plaintiff must also demonstrate that the class falls within one of the categories identified

by Rule 23(b). Critically, the plaintiff *must go beyond the pleadings* and "affirmatively demonstrate" with evidence that the Rule 23 prerequisites "are *in fact*" satisfied. *Wal-Mart*, 564 U.S. at 350–51 (emphasis in original). *See also Teamsters Local 445 v. Bombardier*, 546 F.3d 196, 201-03 (2d Cir. 2008) ("[t]oday, we dispel any remaining confusion and hold that the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements").

## ARGUMENT

## I.    THE DISCHARGE CLASS FAILS THE RULE 23 STANDARD

### A.    The Proposed Discharge Class Lacks Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In order for the claims of all class members to be "productively [] litigated at once . . . [t]heir claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor," and that "common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. "'What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* (internal citation omitted) (emphasis in original). The plaintiff "must begin by identifying the *specific [] practice* that is challenged," and class certification is inappropriate where plaintiffs have "identified no 'specific [] practice'—much less one that ties all their [] claims together." *Id.* at 357 (emphasis added).

The commonality analysis starts with the Supreme Court's 2011 decision in *Wal-Mart*. Although *Wal-Mart* is the "seminal" class certification case, *Elisa W.*, 2021 WL 4027013, at *11 n.10, Plaintiffs' motion inexplicably fails to address it. In *Wal-Mart*, the plaintiffs were female employees who alleged that the company discriminated against them on the basis of their sex by denying them

equal pay or promotions, in violation of Title VII. 564 U.S. at 343. The plaintiffs sought to certify a class of all women employed at Wal-Mart. The plaintiffs claimed that "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal–Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice." *Id.* at 345. The Supreme Court found, however, that that the challenged employment decisions were decentralized and discretionary. *Id.* at 359-60. As a result, the plaintiffs' class certification motion represented a "wish to sue about literally millions of employment decisions at once." *Id.* at 352. But "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored.*" *Id.* (emphasis in original).

Following *Wal-Mart*, courts in this Circuit have denied motions for class certification in cases that implicate the decentralized and independent decisions of multiple State, local, and non-profit actors working within a complex system to deliver public services. Plaintiffs' motion fails to address, much less distinguish, any of these cases. In *Taylor v. Zucker*, No. 14-CV-05317 CM, 2015 WL 4560739 (S.D.N.Y. July 27, 2015), the plaintiffs were recipients of long-term Medicaid home care services who sued two New York State agencies, alleging that "Defendants' practices [] led to the reduction and termination" of their services. *Id.* at *1. To provide the services, the defendant State agencies contracted with for-profit or not-for-profit managed care organizations ("MCOs"), which in turn enrolled patients and delivered care. *Id.* at *1-2. Each of the named plaintiffs alleged that his or her home care services were reduced or terminated without adequate notice and without good cause. *Id.* at *3-6. Judge McMahon found that "[t]his case is paradigmatic of the type of case that was routinely certified as a class action prior to *Dukes v. Wal-Mart*," but which does not satisfy the *Wal-Mart* standard. *Id.* at *7. The *Taylor* court noted that "[e]ach of the named plaintiffs has a similar narrative" involving

an alleged reduction in care, and that "[t]he proposed class is defined in a way that, read literally, encompasses only those Medicaid home health care recipients who suffer the same injury as the named plaintiffs." *Id.* at *8. The court nevertheless concluded that "[a]fter *Wal–Mart,* that is not enough to meet the test of commonality or typicality." *Id.* at *9 (emphasis added).

Judge McMahon identified multiple problems with the proposed *Taylor* class that ran afoul of the *Wal-Mart* standard. Given the decentralized process involving multiple non-State actors, the named plaintiffs were seeking "to litigate hundreds of independent decisions regarding different individuals at the same time," and "fail[ed] to provide 'glue' connecting the *reason* for each enrollee's reduction or termination of care together." *Id.* at *9 (emphasis in original). They also failed "to demonstrate how Named Plaintiffs are indicative of a systematic failure in the administration of Medicaid in New York State." *Id.* Judge McMahon rejected as "foolish" the argument, asserted by plaintiffs, that "since the state is ultimately responsible for ensuring that the [MCO providers] comply with federal law, the state is responsible for any wrongful adverse terminations of a patient's care, so a single injunction running to the Commissioner of the Department of Health can right all wrongs." *Id.* Because "the state is neither making decisions to reduce or terminate care for individual patients or sending out notice of those decisions . . . [t]his is precisely the sort of 'class action' that runs afoul of *Wal–Mart.*" *Id.*[14]

---

[14] Judge McMahon contrasted the facts at hand with those addressed by Judge Scheindlin in *Strouchler v. Shah*, 286 F.R.D. 244 (S.D.N.Y. 2012), which the plaintiffs had cited as an example of a class of home care recipient plaintiffs that had been approved even after *Wal-Mart.* Comparing the two cases, Judge McMahon identified several key distinctions. Notably, the *Strouchler* class was "limited to New York City residents" whose claims were administered by a single "common administrator," whereas the *Taylor* plaintiffs sought to "certify a statewide class" even though home health care programs were administered at the local level. *Id.* at *10. Judge McMahon noted that "[h]ad the plaintiffs in *Strouchler* been seeking to certify a statewide class," there would have been no "unity of administration under the supervision of a single ultimate decisionmaker" and "[i]t is, therefore, highly unlikely that [Judge Scheindlin] would have reached the same result." *Id.*

Similarly, in *Elisa W.*, the plaintiffs were children in foster care in New York City who "alleged systemic failures in the New York City foster care system" that allegedly caused them to wait too long in foster care for a permanent placement. *Elisa W.*, 2021 WL 4027013, at *1. They sued New York City and the State of New York, and sought to certify a class of children in foster care in New York City. *Id.* at *4. Reviewing the evidence, Judge Wood found that "New York City's foster care system is a complex operation involving state, city, and private actors" in which the "system is supervised by the State but run locally." *Id.* at *2. To administer the foster care system, the State agency oversees the City, and the City in turn "delegates case management functions to voluntary . . . non-profit entities that operate independently and employ their own caseworkers" to "deliver services to meet the needs of children and families, including finding an appropriate placement for each child . . . ." *Id.* at *2. Under those facts, Judge Wood found that even though it may be true that "there are many delays in foster children's paths to permanency," *id.* at *9, a variety of independent, individualized factors affected the timing of each proposed class member's placement and deprived the class of commonality. Moreover, Judge Wood found that the proof submitted by plaintiffs was a non-representative selection of individualized "anecdotal evidence" that failed to demonstrate that the City and State defendants "operated under 'a general policy of discrimination.'" *Id.* at *10 (quoting *Wal-Mart*, 564 U.S. at 358.).

      i.    <u>The decentralized placement process deprives the proposed Statewide Discharge Class of commonality.</u>

In this case, the proposed Discharge Class fails the commonality analysis for all the reasons explained in *Wal-Mart*, *Taylor*, and *Elisa W.* Each proposed member of the Discharge Class would be asserting a claim that his rights have been violated because he did not receive the housing placement or community mental health services that he believes he requires immediately upon release from prison. But Defendants do not control decisions regarding a given individual's access to CMHH and community care management services. Rather, CMHH and care management services placements are

the result of an individualized process involving independent decisionmakers from local SPOA committees and non-profit providers. All of these decisionmakers are independent from State government, which cannot force the local committee or non-profit providers to give any particular individual a particular placement. Just as in *Taylor*, the contested decisions are administered across the State by many different County and City agencies, making Plaintiffs' attempt to certify a *statewide* class particularly inappropriate. In any given Discharge Class member's case, it would be impossible to answer the key questions—why has *this person* not received the particular CMHH or community services placement they believe they need, or what explains the timing of *this person's* placement— without holding a mini-trial examining a myriad of individualized decisions and events outside the control of Defendants, including the independent actions of the local SPOA committee that handled the individual's placement, the decisions of the non-profit providers who reviewed the individual's application, and the actions and preferences of the individual himself.[15] It is certainly not possible to answer this question *in the aggregate as to all class members*. Class certification is therefore inappropriate.

ii.     Plaintiffs have failed to provide "significant proof" of centralized Statewide discrimination.

Given the decentralized placement process, Plaintiffs must provide "significant proof" of a "specific [] practice" by the Defendants that "ties all their [] claims together." *Wal-Mart*, 564 U.S. at 353, 357. They have not done so. Plaintiffs' *allegation* is that "Defendants harm each Class by failing to adequately plan, develop, and fund sufficient capacity in an array" of CMHH and supportive services for class members. Pls.' Mot. at 27. But Plaintiffs may not rest on mere allegations to satisfy Rule 23, and they have failed to provide *significant proof* supporting this claim, despite having had years of

---

[15] For WP and the other Named Plaintiffs who rejected appropriate community placements, this fact alone defeats their claims for relief. *See Siino v. City of New York*, No. 14-CV-7217 (MKB)(LB), 2020 WL 3807451, at *17 (E.D.N.Y. Feb. 27, 2020) ("[a] defendant may rebut a prima facie case . . . by showing that the public entity offered appropriate community placements to qualified individuals and the plaintiff declined the placement").

discovery in which Defendants have produced almost 2 million pages of documents. The "proof" offered by Plaintiffs on this point can be divided into four categories:

*First*, Plaintiffs provide a selective, partial summary of the Named Plaintiffs' individual experiences. But Plaintiffs' version of these events is entirely undermined by the many material facts the Plaintiffs omitted. *See supra* at 8-22. In any event, the Named Plaintiffs' individual claims are not evidence of a common Statewide practice because "anecdotal evidence" of this sort is insufficient to establish commonality. *Wal-Mart*, 564 U.S. at 358.

*Second*, Plaintiffs cite the report of their proposed expert, Melodie Peet, which opines that no State's services are "adequate" unless the State has reallocated its mental health resources so as to *guarantee* that each person with SMI who has been convicted of a crime receives a permanent housing placement and all services on the first day of his release from prison, with no wait time for any housing placement or service. This report is unreliable, unhelpful, and should be stricken, for all the reasons explained in Defendants' accompanying motion to strike.

*Third*, Ms. Peet and Plaintiffs' legal brief cite excerpts from a selection of County Local Services Plans ("LSPs"), covering a handful of New York's 62 counties. Pls.' Mot. at 7 n.30; Peet Report at 22-31. But their interpretation of these documents is highly flawed, as more fully explained in Defendants' motion to strike. Some of the LSPs report a continuing demand for mental health community services and housing, and they request additional State funds. Based on those documents alone, Ms. Peet suggests that these local governments have submitted "complaints" about OMH, Peet Report at 22, and alleges that OMH has "repeated[ly] refus[ed] to adequately address" local requests for funding. *Id.* at 31. This conclusion lacks any support. The LSPs are not 'complaints'—they are a part of a State statutory process in which the State *solicits* local government input about goals and funding requests. *See* N.Y. Mental Hygiene Law § 41.16. At her deposition, Ms. Peet conceded that she is not aware of any jurisdiction, anywhere, in which there is *not* currently a demand for more mental health housing.

Defts.' Ex. 70 (Peet Tr. 130:16-132:22). And Ms. Peet has no support for her claim that OMH has "refused" to address the requests for funding. The reality is that in response to demand, New York State has spent hundreds of millions of dollars per year on residential mental health programs, an investment that has just been supplemented with an historic new _billion dollar_ investment in mental health community housing and services.[16]

    *Fourth*, Plaintiffs cite a hodgepodge of other sources, none of which is significant proof of a centralized, Statewide refusal to provide services, including: (1) a five-year-old email regarding attempts to place a single individual, Pls.' Mot. at 7 n. 31; (2) a declaration from a non-profit director in Syracuse who is seeking more transitional housing in his city, Pls.' Mot. at 8 n.38; and (3) spreadsheets showing the initial housing location of some individuals released from prison, Pls.' Mot. at 25 & 31 n. 145.[17], [18]

---

[16] In some cases, *Olmstead* class actions that were originally certified have been *decertified* after the State committed to new funding. *See Thorpe*, 303 F.R.D. 120, 138 n.41 (discussing *Lee v. Dudek*, No. 4:08-CV-0026 (N.D. Fla. Jan. 3, 2012), where an *Olmstead* class was decertified following new legislation that made it "no longer true that the state has refused to act on grounds that apply generally to the class"). Here, New York's latest substantial investment clearly shows at the outset that New York State has *not* 'refused to act.'

[17] These spreadsheets demonstrate only that individuals released from prison go to a variety of settings, including CMHH, family homes, transitional living residences, and shelters. While true that *some* individuals are released from prison to shelters, it is not possible to determine what led to a particular placement in any particular individual's case without examining all of the details of that case—including the individual's diagnosis, clinical needs, and his own preferences and choices.

[18] Plaintiffs also rely on an out-of-circuit case, *Kenneth R. ex rel. Tri-Cnty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254 (D.N.H. 2013), in which a district court certified an *Olmstead* class action. That case only serves to highlight the deficiencies in Plaintiffs' evidentiary presentation here. The *Kenneth R.* court found that Plaintiffs had presented substantial _evidence_ of a centralized, Statewide discriminatory policy—including the State of New Hampshire's own reports conceding that it had provided "*virtually no investment or development in community residential services*," as well as the Department of Justice's detailed findings of deficient statewide services. *Id.* at 260-61 (emphasis added). Given the lack of *any* investment, the evidence showed that class members were wholly deprived of the chance to receive a community placement. By contrast, the evidence here shows that New York has already made substantial, nation-leading investments in community services and housing. *See also Thorpe v. D.C.*, 303 F.R.D. 120 at 131, 138, 151 (D.D.C. 2014) ("plaintiffs have proffered *evidence of systemic deficiencies* in the District's system of transition assistance," including findings by the Centers for Medicare & Medicaid

**B.**    <u>**The Discharge Class Named Plaintiffs are Not Typical of the Proposed Class**</u>

For a class to be certified, the "claims or defenses of the representative parties" must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The "typicality criterion focuses on the correspondence between the claims raised by the named parties and those of the class they seek to represent." *Ruggles v. WellPoint, Inc.*, 272 F.R.D. 320, 336–37 (N.D.N.Y. 2011) (citing *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999)). Here, the three Named Discharge Class Plaintiffs are not sufficiently typical of the proposed statewide Discharge Class for four independent reasons.

*First*, the Discharge Class Named Plaintiffs are not typical of the proposed class because each of them has a history of engaging in extremely violent conduct, fire-setting, or both, which makes them <u>*uniquely*</u> difficult to place in a CMHH setting. While the fact that an applicant has past involvement with the criminal justice system, on its own, cannot be a bar to placement, housing providers must consider each individual's history and clinical presentation when evaluating whether a CMHH placement is safe and appropriate. *See supra* at 5-6. As Plaintiffs' own experts concede, the vast majority of individuals with SMI are not violent, and <u>the very small minority of SMI individuals with a history of violent acts or fire setting are the hardest individuals to place in housing</u>. Defts.' Ex. 70 (Peet Tr. 174:6-15; 177:10-178:4); Ex. 71 (Factor Tr. 70:4-71:20). All three Discharge Class Named Plaintiffs presented with *extremely* challenging community placements, given their individual histories. WP has tried to kill multiple women by lighting them on fire, and compounded the placement challenge by rejecting multiple housing opportunities. DH lit his cell on fire in prison, and has repeatedly gotten into fights or caused property damage at his substance abuse treatment programs. SD has shot and stabbed random people on the street, and he is currently incarcerated again after he

---

Services that the District's transition efforts were insufficient) (emphasis added). *Kenneth R.* and *Thorpe* are also distinguishable because neither case addressed a decentralized placement system in which independent placement decisions are made at the local level.

assaulted an elderly psychiatric patient. None of the three represents a "typical" case of an individual with SMI seeking housing and services. *See* Ex. 71 (Factor Tr. 73:2-20; 91:9-92:10; 105:4-11).

*Second*, the Named Plaintiffs are not sufficiently typical of all proposed class members because "it is not possible to determine what caused" an alleged delay in *any* given person's CMHH or services placement "without evaluating all of the other contributing facts and influences" in each case. *Elisa W.*, 2021 WL 4027013, at *11. There are numerous individualized factors that influence what CMHH and services placements each individual receives and how long each particular placement might take. Most of these factors are entirely outside of Defendants' control. Because each Named Plaintiff presents with a unique set of circumstances regarding the timing and details of their placement, they cannot be 'typical' of the proposed class.

*Third*, just as in *Taylor*, the Named Plaintiffs seek to represent a statewide class, but they do not present a representative sample of the statewide placement system. Each of the dozens of local SPOA committees independently facilitates access to CMHH and supportive services within its own region. *See supra* at 5. But the Named Discharge Class Plaintiffs cumulatively have experience with just *three* of these committees: WP and SD in New York City, and DH in Rockland and Orange counties. This presentation is no more compelling than the one that Judge McMahon found deficient in *Taylor*. *See* 2015 WL 4560739, at *9 (named plaintiffs were "all from New York City even though they seek to represent a statewide class" and "represent[ed] only three of 68" non-state MCO providers, which "is not a representative sample of all the MCOs in New York State").

*Fourth*, the proposed Discharge Class consists of individuals who allegedly "do not receive" essential "supportive services" in the community. Pls.' Mot. at 1. But all three Discharge Class Named Plaintiffs conceded in discovery that they *did receive extensive mental health services* in the community upon their release from prison. WP and SD both received FACT Team services, which Plaintiffs' own experts have declared is "the gold-standard of community treatment." Factor Report at 6; Peet Report

at 9 ("the ideal outpatient programs").[19] And DH received extensive psychiatric and care management services. They are therefore not typical representatives of the class as defined by Plaintiffs.

## C.  **The Proposed Discharge Class is Not Ascertainable**

The Second Circuit has "'recognized an implied requirement of ascertainability in Rule 23.'" *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)). The "touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher*, 806 F.3d at 24 (internal citations omitted). The Second Circuit has stated that "[a] class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Id.* at 24-25. *See also id.* at 24 ("a class must be readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling").

Applying this standard, courts in this Circuit have denied class certification when case-by-case, fact-intensive inquiries would be necessary to determine class membership. For example, in *Bellin v. Zucker*, No. 19-CV-5694 (AKH), 2022 WL 4592581 (S.D.N.Y. Sept. 30, 2022), the plaintiff was a recipient of personal care services who challenged the hours of care she was allotted. The plaintiff sought declaratory and injunctive relief and moved to certify a Rule 23(b)(2) injunctive class action. Judge Hellerstein denied the motion for class certification because the proposed class could not "be ascertained by reference to objective criteria." *Id.* at *5. The court explained that "[c]lass membership

---

[19] Plaintiffs' motion repeatedly elides the critical fact that WP and SD received "gold-standard" FACT team services upon their release from prison. *See, e.g.*, Pls.' Mot. at 15 (incorrectly claiming that WP and SD "were denied the supportive services they needed") & 18 (omitting any mention of SD's and WP's FACT teams and claiming falsely that WP was left "without supportive services, including at times without access to a doctor"). Plaintiffs also omitted this key fact from the SAC, and the Court relied on Plaintiffs' incorrect allegations in denying the motion to dismiss. *See* Order at 4 (ECF No. 185) (noting Plaintiffs alleged that they "lack[ed] the essential services [they] require," which allegedly caused a risk of institutionalization).

depends on whether the initial awar[d] of care hours was 'adequate.' But adequacy is a subjective criterion that turns on an individual's perception of her need for care—that is, whether she believed that the initial hours awarded were inadequate." *Id.* To ascertain the class, the Court would have to "undertake the cumbersome process of inquiring into and conducting a mini-hearing on the merits of every potential class member's claim. Even assuming that it would be feasible and desirable to adopt such a procedure, these 'kind of individualized mini-hearings . . . run contrary to the principle of ascertainability.'" *Id.* at *6 (quoting *Brecher*, 806 F.3d at 26). *See also Nypl v. JP Morgan Chase & Co.*, No. 15-CV-9300 (LGS), 2022 WL 819771, at *7 (S.D.N.Y. Mar. 18, 2022) (such "fact-intensive inquiries would far outweigh any economies achieved through certification of the putative class").

Here, Plaintiffs' Discharge Class definition contains multiple subjective components that would require the Court to conduct mini-hearings to determine whether each proposed member should gain the benefit of the requested injunction. The subjective elements of the definition include: (1) what type and level of CMHH and supportive services are "*appropriate for*" a given individual as a clinical matter, given that person's unique diagnosis and treatment; (2) what CMHH and services the individual "*desire[s]*," particularly if the individual has rejected placements offered to him or declined to meaningfully participate in the placement process; (3) whether the individual did "*not receive*" services because of some violation of law by the Defendants or due to other factors outside Defendants' control; and (4) whether the individual resides in a "*segregated* setting" or is at "*serious risk* of becoming institutionalized." Pls.' Mot. at 1 (emphases added). For any given proposed class member, simply presenting as an individual with SMI who was released from prison is not sufficient to gain the benefit of the injunction sought by Plaintiffs. Rather, each proposed class member must further demonstrate each of these subjective factors, which would necessarily require the Court to engage in a case-by-

case, fact intensive analysis. These are not objective measures that can be resolved in the aggregate as to the entire proposed class, and the class is therefore not ascertainable.[20]

## D.    No Single Injunction Could Provide Relief to Each Discharge Class Member

Even where a plaintiff satisfies the requirements of Rule 23(a), he or she must also demonstrate that the class falls within one of the permissible types of class actions listed in Rule 23(b). Here, Plaintiffs allege that Rule 23(b)(2) applies, which permits a class action to proceed where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). This standard is met "*only* when a single injunction or declaratory judgment would provide relief to each member of the class.'" *Berni v. Barilla S.p.A.*, 964 F.3d 141, 146 (2d Cir. 2020) (quoting *Wal-Mart*, 564 U.S. at 360) (emphasis in original).

The proposed Discharge Class does not satisfy this standard because Plaintiffs have failed to propose any single injunction that would provide the requested relief to all proposed class members. Indeed, it is entirely unclear what relief the Plaintiffs believe the Court *could* grant that would achieve Plaintiffs' demand for guaranteed on-demand CMHH and supportive services placements statewide for all members of the proposed class immediately upon their release from prison with no wait time, given the myriad case-by-case factors and multiple independent decisions involved. Even in a hypothetical world in which *unlimited* public funds could be allocated to this specific issue for this

---

[20] Some courts in this Circuit have indicated that "the ascertainability requirement is less important in a Rule 23(b)(2) class, since a chief objective of this rule is to provide broad injunctive relief to 'large and amorphous' classes . . . . *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 116 (E.D.N.Y. 2012); *see also Westchester Indep. Living Ctr., Inc. v. State Univ. of New York, Purchase Coll.*, 331 F.R.D. 279, 299 (S.D.N.Y. 2019). However, other courts have required Rule 23(b)(2) injunctive classes to meet the ascertainability standard when appropriate. *See, e.g.*, *Bellin*, 2022 WL 4592581, at *5-6. Here, enforcing the ascertainability of the proposed class is particularly important because Plaintiffs ask the Court to issue an injunction that would effectively grant class members priority access to CMHH and community services in New York State. As a result, if the Court were to issue such an order, it would be essential to determine which *particular* individuals are class members who would gain the benefit of that specialized access.

specific population, the local SPOA committees and housing providers would still need to assess each potential placement for suitability and safety, and individual applicants would still be free to reject potential placements offered to them. Plaintiffs offer no practical solutions, and instead rely solely on the unhelpful generality that the Court should simply require the Defendants to "develop and implement an effective state-wide plan" that accomplishes the "prompt[]" placement of each class member "upon reaching [their] release date." Pls.' Mot. at 27.[21]

Of course, public funds are *not* unlimited. To the extent Plaintiffs ask the Court to issue an injunction requiring Defendants to unilaterally allocate some amorphous *additional* billions of dollars of State taxpayer funds to this specific issue, for this specific population, such an order would violate principles of federalism and separation of powers. *See, e.g.*, *Murphy by Murphy v. Minnesota Dep't of Hum. Servs.*, 260 F. Supp. 3d 1084, 1120–21 (D. Minn. 2017) (in *Olmstead* case, noting that it would be "improper[]" for a federal district court to "dictate local funding priorities or direct the state's allocation of funds"). Changes to appropriations of public funding for particular programs must be implemented through duly enacted legislation, and the Defendants may not unilaterally pass legislation or appropriate funds.[22]

---

[21] *Cf. T.C. v. New York State Dep't of Health*, No. 22-CV-5045 (MKV), 2022 WL 17689841, at *6 (S.D.N.Y. Dec. 15, 2022) (in another purported class action recently brought by Disability Rights New York and presenting similar facts, the Court denied plaintiffs' motion for a preliminary injunction and noted that "an order requiring Defendants 'promptly' to provide" the plaintiffs with placements "arguably is tantamount to 'a simple command that the defendant obey the law,' which would violate the specificity and clarity requirements for injunctions").

[22] Plaintiffs have also never explained how the injunction they seek would be equitable, given the general demand for CMHH and community services among New Yorkers with mental illness. Although individuals being released from State prison are already among the priority groups for placement, *see* Duncan Decl. ¶ 9, Plaintiffs ask the Court to order Defendants to reallocate resources in order to give individuals who have been convicted of crimes an even *higher* priority for placements. Of course, OMH must also consider the needs of the many other high-priority at-risk New Yorkers who also seek CMHH and community services and who are not parties to this case, including individuals being discharged from inpatient hospital settings and individuals who have been charged with crimes but found not guilty by reason of their mental illness.

## II.    THE GENERAL CLASS AND RTF SUBCLASS FAIL RULE 23

### A.    To the Extent Plaintiffs Seek to Enjoin the Defunct DOCCS Practice, a Class Action is Not Appropriate

The General Class and RTF Subclass Plaintiffs originally brought this action in light of the pre-December 16, 2019 DOCCS practice of holding some incarcerated individuals beyond their release dates. *See* ECF No. 82 at 1 ("This case centers on a basic principle of the criminal legal system: people in prisons must be released on their lawful release dates.") To the extent the Plaintiffs seek an order prohibiting DOCCS from engaging in that practice going forward, a class action is an inappropriate vehicle for such relief. The Second Circuit has explained that this principle, sometimes called the "*Galvan* doctrine," means that where a case "brought pursuant to Rule 23(b)(2), seeks prohibitory injunctive or corresponding declaratory relief against state officials . . . [a] class action designation may be 'largely a formality' where the government 'has made clear that it understands the judgment to bind it with respect to all claimants.'" *Lisnitzer v. Zucker*, 983 F.3d 578, 588 (2d Cir. 2020) (quoting *Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir. 1973)). In *Galvan*, the government defendant "withdrew the challenged policy," "stated it did not intend to reinstate the policy," and "made clear that it understands the judgment to bind it with respect to all claimants." 490 F.2d at 1261. The Second Circuit has explained that in such a case, "a class action may not [] be needed," given that the 'prospective relief [which the court ordered] will benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment.'" *Lisnitzer*, 983 F.3d at 588 (quoting *Berger v. Heckler*, 771 F.2d 1556, 1566 (2d Cir. 1985)). Likewise in *Lisnitzer*, the Second Circuit directed the district court "to seek a commitment from state officials to abide by a declaration in a pending case. If state officials agree, there is no need to rule on the class

certification" because, the Second Circuit directed, in that event "class certification will serve no purpose." *Id.*[23]

DOCCS ended the challenged practice over three years ago and it has repeatedly expressed its commitment to that cessation. *See* ECF No. 92 (DOCCS declaration); Ricci Decl. ¶ 12. DOCCS has also submitted written testimony confirming that, to the extent the Court issues a prohibitory injunction enjoining it from resuming the prior practice, DOCCS will apply that relief to all individuals and not just the Named Plaintiffs. Ricci Decl. ¶ 12. While Plaintiffs express skepticism about DOCCS's commitment, the evidence they submitted does not show that any incarcerated individual after December 16, 2019 was held beyond their release date because of a lack of CMHH or services. *See* Ricci Decl. ¶¶ 17-22 (responding to Plaintiffs' contentions). In any event, to the extent a factual dispute exists about whether the practice did in fact end in 2019, the Court need not resolve it for purposes of this motion. *Galvan* applies so long as the State expresses its "commitment . . . to abide by a declaration," which DOCCS has done here. *Lisnitzer*, 983 F.3d at 588.[24]

## B. To The Extent the General Class and RTF Subclass Seek the Same Affirmative Relief as the Discharge Class, Class Certification Fails for the Same Reasons

The General Class and RTF Subclass Plaintiffs attempt to avoid application of the *Galvan* doctrine by arguing, counter-intuitively, that they are not actually seeking an injunction prohibiting DOCCS from holding individuals in prison pursuant to its pre-December 16, 2019 practice. *See* SAC

---

[23] *See also Forts v. Ward*, 621 F.2d 1210, 1217–18 (2d Cir. 1980) (class certification "properly denied" where "the State defendants have not appealed and have explicitly indicated a willingness to comply"); *Nnebe v. Daus*, No. 06-CV-4991 (RJS), 2022 WL 615039, at *13 (S.D.N.Y. Mar. 1, 2022) (class certification "unnecessary and unwarranted" where defendant ceased challenged action).

[24] In its September 25, 2020 bench ruling granting in part and denying in part Defendants' motion to dismiss the First Amended Complaint, the Court held that DOCCS's actions did not render Plaintiffs' claims moot "at [that] stage" of the litigation. Dec. 16, 2019 Tr. 32:10-38:10. Defendants do not ask the Court to revisit that ruling here because the *Galvan* doctrine and mootness are two distinct analyses. Under *Galvan*, the relevant question is whether class certification serves any practical purpose, given a government defendant's stated commitment to end the practice and broadly apply a court order.

¶ 22 ("For members of the General Class and RTF Subclass, Plaintiffs do not seek an order requiring their release from prison."). Instead, Plaintiffs argue that all three classes "seek the same resolution to protect them from the same harms"—all classes seek an injunction guaranteeing each class member "prompt[]" community placements upon their release from prison. Pls.' Mot. at 27.[25]

By making this strategic choice, the General Class and RTF Subclass Plaintiffs have traded a *Galvan* problem for a *Wal-Mart* problem. Because the General Class and RTF Subclass Plaintiffs argue that their own allegations and claims for relief are substantively identical to that of the Discharge Class, these proposed classes fail the class certification analysis for all of the same reasons discussed in Part I.

Most obviously, by foregoing a request for a prohibitory injunction in favor of a poorly defined and practically unachievable request for complex affirmative relief, the General Class and RTF Subclass fail the Rule 23(b)(2) hurdle for all the reasons identified in Part I.D, *supra*. Plaintiffs have not identified any single affirmative injunction that could achieve their demand for immediate, on-demand CMHH and supportive services placements for all members of the proposed classes, given the myriad case-by-case factors and multiple private and local independent decisions involved.[26]

---

[25] The General Class and RTF Subclass Plaintiffs have continued to pursue this counter-intuitive litigation strategy despite the Court's comments during the September 25, 2020 bench ruling that confirming the permanent cessation of the prior DOCCS practice would be the "gold ring" in this case and urging the Plaintiffs to not "lose the forest for the trees." Sept. 25, 2020 Tr. 64:8-65:6. To that end, the Court has encouraged the parties to seek a resolution of the General Class and RTF Subclass claims. While the parties engaged in mediation efforts with Judge Krause on this issue, they have been unable to reach a settlement.

[26] *See also* ECF No. 225 at 14 (in motion to compel briefing, Plaintiffs argued that *Galvan* does not apply to their claims because they "are seeking mandatory and complex affirmative relief" that would subject a vast assortment of public and private entities to the Court's orders, including "two government agencies, DOCCS and OMH, and third parties such as local services agencies, which operate county-level mental health programs, and private agencies"). Plaintiffs have not explained how the Court might issue an injunction that so dictates the actions of these numerous non-parties.

The other Rule 23 barriers identified in Part I, *supra*, apply as well. As to commonality, the General Class and RTF Subclass Plaintiffs seek to challenge placement decisions and timing that are the result of a decentralized, individualized process involving multiple independent decisionmakers from local SPOA committees and non-profit providers. *Wal-Mart* precludes class certification in these circumstances.

As to typicality, the General Class and RTF Subclass Named Plaintiffs also present *exceptionally* challenging placement cases, given each Plaintiff's individual history of violent acts, arson, or both. Moreover, several of the Named Plaintiffs have declined to fully participate in the placement process or have engaged in ongoing conduct that has made placements more difficult. Further, like the Discharge Class, the General Class and RTF Subclass Named Plaintiffs seek to represent statewide classes, but they only represent experience with a handful of the dozens of local SPOA committees.

As to ascertainability, the General Class and RTF Subclass as defined by Plaintiffs are overbroad. *See Geiss v. Weinstein Co. Holdings LLC*, 474 F. Supp. 3d 628, 634 (S.D.N.Y. 2020) (rejecting overbroad class definition); *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 397 (S.D.N.Y. 2008) (proposed class "uncertifiable for over-breadth alone"). Plaintiffs' General Class definition is overbroad because it is not limited to individuals who remain in prison beyond a release date *because of a lack of a CMHH or supportive services placement*. An open date for parole release is the *earliest possible* release date, and an incarcerated individual may be held beyond that date for all manner of appropriate lawful reasons. Ricci Decl. ¶ 16. If an individual was held for an appropriate reason unrelated to a CMHH and services placement, they should not be included in the General Class. Plaintiffs' proposed RTF Subclass definition likewise fails to provide a nexus to the claim in this lawsuit, which is limited to individuals who have been held *because of* a lack of a CMHH or supportive services placement.

Finally, Rule 23's numerosity bar applies to the General Class and RTF Subclasses. A proposed class must be "so numerous that joinder of all members is impracticable," Fed. R. Civ. P. 23(a)(1),

which "[g]enerally" means that "courts will find that the 'numerosity' requirement has been satisfied when the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer." *Ansari v. N.Y. Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998).[27] Here, the General Class and RTF Subclass target a DOCCS practice that ended on December 16, 2019. All of the Named Plaintiffs were released from prisons and RTF settings, and despite presenting a flawed interpretation of various spreadsheets produced by Defendants, Plaintiffs have not affirmatively demonstrated that *any* individuals are currently "housed or who will be housed" in prison beyond their release dates *because of* a lack of available CMHH or supportive services. *See* Ricci Decl. ¶¶ 17-22. As a result, there is no evidence of any current or future class members.

## CONCLUSION

For all the foregoing reasons, the Defendants respectfully request that the Court deny Plaintiffs' motion to certify the Discharge Class, General Class, and RTF Subclass.

Dated: New York, New York
       July 21, 2023

<div style="margin-left:40%">

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*

By: /s/ Owen T. Conroy
Gee Won Cha
Adam Sansolo
Caroline Wallitt
Owen T. Conroy
Assistant Attorneys General
28 Liberty Street
New York, New York 10005
Tel.: (212) 416-6382
Email: Owen.Conroy@ag.ny.gov

</div>

---

[27] *But see Westchester Indep. Living Ctr., Inc. v. State Univ. of New York, Purchase Coll.*, 331 F.R.D. 279, 288 (S.D.N.Y. 2019) (numerosity requirement is "relaxed" in context of an injunctive class).