UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H.,
individually and on behalf of all similarly situated,

                                                    Plaintiffs,

                        -against-                                        7:19-cv-00639 (CS) (AEK)

ANDREW CUOMO, in his official capacity as the            **ORAL ARGUMENT**
Governor of the State of New York, the NEW YORK          **REQUESTED**
STATE OFFICE OF MENTAL HEALTH, ANN MARIE
T. SULLIVAN, in her official capacity as the Commissioner
of the New York State Office of Mental Health, the NEW
YORK STATE DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION, ANTHONY J.
ANNUCCI, in his official capacity as the Acting
Commissioner of the New York State Department of
Corrections and Community Supervision, ANNE MARIE
MCGRATH, in her official capacity as Deputy
Commissioner of the New York State Department of
Corrections and Community Supervision,

                                                    Defendants.
------------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF PLAINTIFFS'
## CLASS CERTIFICATION EXPERTS

                              LETITIA JAMES
                              Attorney General
                              State of New York
                              *Attorney for Defendants*
                              28 Liberty Street
                              New York, NY 10005

GEE WON CHA
ADAM SANSOLO
CAROLINE WALLITT
OWEN T. CONROY
Assistant Attorneys General
    *of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT................................................................................................1

BACKGROUND ................................................................................................................2

    A.   Peet Opinions ........................................................................................................3

    B.   Factor Opinions........................................................................................................7

STANDARD OF REVIEW................................................................................................14

ARGUMENT................................................................................................................15

I.     PEET'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY ................15

II.    FACTOR'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY.......17

III.   NEITHER EXPERT'S OPINIONS ARE RELEVANT TO CLASS CERTIFICATION ..18

    A.   Peet's Opinions are Not Relevant to Class Certification................................................19

    B.   Dr. Factor's Opinions are Not Relevant to Class Certification.......................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Betances v. Fischer*,
No. 11-CV-3200 (RWL), 2021 WL 1534159 (S.D.N.Y. Feb. 23, 2021) ...........................................16

*Bocoum v. Daimler Trucks N. Am. LLC*,
No. 17-CV-7636, 2022 WL 902465 (S.D.N.Y. Mar. 28, 2022) ....................................................16

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)..................................................................................................... 14, 18

*Everybody Counts, Inc. v. N. Ind. Reg'l Plan. Comm'n*,
No. 2:98-CV-97, 2006 WL 287167 (N.D. Ind. Feb. 3, 2006)....................................................18

*Ge Dandong v. Pinnacle Performance Ltd.*,
No. 10-CV-8086 JMF, 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013)................................................15

*General Electric Company v. Joiner*,
522 U.S. 136 (1997)........................................................................................................15

*In re Zyprexa Products Liability Litigation*,
489 F. Supp. 2d 230 (E.D.N.Y. 2007)......................................................................................14

*Kuhmo Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ................................................................................................... 14, 17

*Mason v. AmTrust Fin. Servs., Inc.*,
No. 19-CV-8364 (DLC), 2020 WL 7425254 (S.D.N.Y. Dec. 18, 2020) ...........................................16

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999)................................................................................................... 19-20

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)................................................................................................... 19-20

*Westchester Indep. Living Ctr., Inc. v. State Univ. of New York, Purchase Coll.*,
331 F.R.D. 279 (S.D.N.Y. 2019) .......................................................................................19

FEDERAL STATUTES

Americans With Disabilities Act........................................................................................ 19-20

Rehabilitation Act ...........................................................................................................19

**STATE STATUTES**

N.Y. Mental Hygiene Law
§ 41.16.............................................................................................................................5

**RULES**

Fed. R. Evid. 702 ................................................................................................... 14, 16

Fed. R. Civ. P. 23 ..................................................................................................15, 18-19

Fed. R. Civ. P. 25(d) ...................................................................................................1

## PRELIMINARY STATEMENT

Defendants[1] respectfully submit this memorandum of law in support of their motion to strike the opinions and preclude the testimony of Plaintiffs' two proposed class certification experts. Plaintiffs filed this matter as a putative class action on behalf of individuals who have a serious mental illness ("SMI"), who have been convicted of crimes and incarcerated, and who, upon their release from prison, sought community-based mental health housing and supportive services in New York State (the "relevant population"). Plaintiffs have served a motion to certify two classes and one subclass, accompanied by two previously undisclosed expert reports.

Plaintiffs' first proposed class certification expert is Melodie J. Peet, M.P.H., a former mental health administrator, who states that she was asked by Plaintiffs "to opine on whether OMH and DOCCS provide *adequate*" community-based mental health housing and supportive services ("CBMHHSS") to the relevant population. Peet Report at 1 (emphasis added).[2] To answer that question, Ms. Peet applied a standard of her own invention, which holds that no State's services are "adequate" unless the State has reallocated its mental health resources in order to *guarantee* that each person with SMI who has been convicted of a crime receives a permanent housing placement and an extensive list of services on the *first day* of his release from prison, with *no wait time* for any housing placement or service. At her deposition, Ms. Peet conceded that she is not aware of *any jurisdiction in*

---

[1] Defendants are the New York State Department of Corrections and Community Supervision ("DOCCS"), the New York State Office of Mental Health ("OMH"), Ann Marie T. Sullivan in her official capacity as Commissioner of OMH, Daniel F. Martuscello III in his official capacity as Acting Commissioner of DOCCS, and Anne Marie McGrath in her official capacity as Deputy Commissioner of DOCCS (cumulatively, "Defendants"). Acting Commissioner Martuscello was automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d) upon his June 9, 2023 appointment. On September 25, 2020, the Court dismissed the Governor of the State of New York as a defendant.

[2] The Peet Report and Factor Report are attached to Plaintiffs' motion for class certification. Relevant excerpts from the depositions of Ms. Peet and Dr. Factor are attached to the Declaration of AAG Owen T. Conroy as Defendants' Exhibits 70 and 71.

*the world* that has implemented this standard, that she herself did not implement or even recommend this standard when she was in State government, and that she is not aware of any resource or study that recommends adopting this standard.

Plaintiffs' second proposed class certification expert is Dr. Robert Factor, a psychiatrist who writes that he was asked to assess "what type of CBMHHSS did OMH provide" to the three Discharge Class Named Plaintiffs. Factor Report at 1. Based on the answer to that threshold question, he was then to opine about whether "the CBMHHSS that OMH provided [was] appropriate for the needs of the individuals upon release from prison[.]" *Id.* Despite having set forth this two-part analysis, Dr. Factor *failed to consider the first question.* There is no section of his report explaining what community services and housing placements <u>*were*</u> in fact provided or offered to WP, SD, and DH upon their release from prison. Instead, his report simply skips over that threshold question, stating: "I conclude that all three Discharge Class Named Plaintiffs were found to be eligible for CBMHHSS <u>*but did not receive*</u> such housing and/or services." Factor Report at 18 (emphasis added). This is demonstrably untrue. At his deposition, Dr. Factor conceded, over and over again, that he simply has no knowledge of critically important facts and clinical records related to the housing and services actually offered to or received by the Named Plaintiffs.

The Court should not rely on either expert's opinions when considering the class certification motion. Neither expert has implemented a reliable methodology or has reliably applied their methodology to the facts of the case. Moreover, neither expert's opinions are relevant to the issues to be resolved at the class certification stage.

## BACKGROUND

Plaintiffs served a motion for class certification and accompanying materials on February 8, 2023. Included among Plaintiffs' class certification submission were two reports from previously undisclosed experts. After Defendants brought the reports to the attention of the Court, *see* ECF No.

256, the Court modified the case management plan in order to permit class certification expert discovery and to give Defendants the opportunity to prepare a motion to strike the proposed expert opinions and testimony. ECF No. 260.[3]

### A. Peet Opinions

Ms. Peet worked as a state mental health administrator in the 1990s, including as the Deputy Commissioner of the Connecticut Department of Mental Health and Addiction Services from 1991 to 1995, and as Commissioner of Maine's Mental Health, Developmental Disabilities, and Substance Abuse Administration from 1995 to 1999. Peet Report, Appendix A at 2. Since 2018, Ms. Peet has worked as a "mental health systems expert and expert witness for the United States Department of Justice and state Disability Rights organizations." *Id.* at 1.

Ms. Peet writes that she was asked by Plaintiffs "to opine on whether OMH and DOCCS provide adequate" CBMHHSS to the relevant population. Peet Report at 1. Ms. Peet's report then explains what she considers to be "adequate" services and housing for the relevant population. While Ms. Peet's report does not use this term, for ease of reference Defendants will hereinafter refer to this as the "Peet Prison Release Adequacy Standard." Under the Peet Prison Release Adequacy Standard, a State must provide formerly incarcerated SMI individuals with: (1) a permanent placement in supported housing; (2) a placement with an Assertive Community Treatment team ("ACT") or Forensic Assertive Community Treatment team ("FACT"); (3) a "comprehensive" continuum of crisis services; (4) medication management; and (5) inpatient care as needed. *Id.* at 16-21. Ms. Peet concedes that New York State does fund programs that provide each of these services to New Yorkers with mental illness. *Id.* at 7-12. However, under the Peet Prison Release Adequacy Standard, the State must

---

[3] The Court also granted Defendants' request for additional time to consider whether to designate rebuttal class certification experts. After consideration, Defendants have decided not to designate a rebuttal class certification expert, but are reserving their rights to designate experts at the merits stage pursuant to the case management plan.

reallocate its mental health resources in order to guarantee that each person with SMI who has been convicted of crimes receives each element of this array of housing and services on the first day of his release from prison, with no wait time for any housing placement or service. Ms. Peet writes that under her definition of "adequate," no individuals leaving prison may be "turned away, denied, or placed on a waiting list" for any housing or service because of demand. *Id.* at 7. She writes that "[e]vidence that there are *any* individuals with [SMI] who are discharged [from prison] without necessary CBMHHSS shows OMH's failure to execute its responsibility to meet the needs of the relevant population." *Id.* at 22 (emphasis added).

At her deposition, Ms. Peet conceded that the Peet Prison Release Adequacy Standard is not based on any industry standard. She is not aware of any jurisdiction in the United States, or in any other country, that has implemented the Peet Prison Release Adequacy Standard. Peet Tr. 38:8-25; 42:9-19; 45:9-19. She further conceded that when she was in a position to create policy in Connecticut and Maine, she did not implement the Peet Prison Release Adequacy Standard. *Id.* at 47:19-48:4; 49:11-18. In fact, when Ms. Peet was in government, she never even *recommended* that Connecticut or Maine reallocate their resources in order to achieve the Peet Prison Release Adequacy Standard. *Id.* 88:15-91:2.[4] Other than her report in this case, Ms. Peet could not identify any resource, study, or document, including in her own previous work, that recommends that any State or jurisdiction reallocate its

---

[4] The contrast between Ms. Peet's generous assessment of the services she oversaw as mental health Commissioner in Maine, and her assessment of services in New York, is striking. When Ms. Peet was Maine's Commissioner, that State did not provide the services she now argues are essential: Maine provided *no funding* for supported housing and failed to provide ACT teams statewide. Peet Tr. 40:6-19; 80:23-81:3. Ms. Peet nevertheless believes that the services she oversaw were adequate. *Id.* at 40:14-19; 81:15-20. By contrast, New York has already funded tens of thousands of units of supported housing, and has just injected a further *one billion dollar* investment in mental health community housing and services, an amount Ms. Peet described as comparable to the size of Maine's entire state budget when she was Commissioner. *Id.* at 138:3-9. Ms. Peet nevertheless holds New York to an entirely different standard.

mental health resources in order to achieve anything like the Peet Prison Release Adequacy Standard. *Id.* at 53:21-54:7; 54:24-55:9; 56:20-57:5.

Applying the Peet Prison Release Adequacy Standard to New York State, Ms. Peet opines that "it is [her] professional opinion that OMH and DOCCS do not adequately serve the relevant population." Peet Report at 1. To reach this conclusion, Ms. Peet's methodology was to review County Local Services Plans ("LSPs") from 2018 through 2020, and a selection of plans from 2021. *Id.* at 22-31; Peet Tr. 114:10-115:15; 116:19-117:13. LSPs are drafted by county and local governments throughout New York State as a part of a State statutory process in which localities submit annual reports regarding their goals, objectives, and funding requests related to the provision of mental health services. Peet Tr. 115:16-116:18; *see* N.Y. Mental Hygiene Law § 41.16. Many of the LSPs Ms. Peet reviewed contained requests for additional State funding for mental health housing or services, and information about the continuing demand for such services among the general population. Peet Report at 23-31. Ms. Peet characterizes the LSPs as making "complaints" about OMH, Peet Report at 22, but she could not identify any LSP that uses such language. Peet Tr. 120:17-122:6.

Ms. Peet goes on to assert her opinion that OMH has "repeated[ly] refus[ed] to adequately address" local requests for additional State funding for mental health housing and community services. Peet Report at 31. At her deposition, she conceded that she is not actually aware of how much funding New York State provided for community mental health services and housing in response to the LSPs she reviewed. Peet Tr. 123:10-124:8. She testified that under the standard she applied, so long as local governments continue to check off the box in their annual report indicating that mental health housing is a priority need, one can simply *infer* that means OMH is *refusing* to adequately address local requests for mental health funding. *Id.* at 122:20-123:9; 129:8-19; 130:16-131:23. However, Ms. Peet acknowledged that it is unlikely that the State could ever increase funding to an amount that would lead the local governments to simply stop asking for additional funds. *Id.* at 126:10-20. She further

acknowledged that she is not aware of any jurisdiction, anywhere, in which there is not currently a demand for more units of mental health housing. *Id.* at 131:25-132:22. And Ms. Peet also acknowledged that she is aware of New York's *one billion dollar* new investment in community mental health services and housing in the FY 2024 budget, which she noted is a "massive infusion of dollars" that by itself is likely larger than Maine's entire State budget during the time she was Commissioner. *Id.* at 135:9-138:9; *see also* Wojtkiewicz Decl. ¶¶ 8-9. The State's new investment includes a substantial expansion of ACT team services, Wojtkiewicz Decl. ¶ 9, which Ms. Peet was willing to acknowledge is a "long-term solution to a pretty intractable problem." Peet Tr. 146:13-147:16. But Ms. Peet otherwise refused to give OMH credit for this historic budget, arguing that the credit should go only to the Governor and legislature, *id.* at 138:10-21,[5] and that because the budget *also* included *some* new funding for inpatient psychiatric care ($25 million in capital and $7.3 million annually in operating funding, Wojtkiewicz Decl. ¶ 9), that means the entire budget is supposedly "a failure of policy leadership[.]" Peet Tr. 141:9-145:15.

Finally, Ms. Peet opines that "[s]olving" the problem of achieving the Peet Prison Release Adequacy Standard is "not a complicated proposition" and that OMH and DOCCS should "simply . . . own their responsibility to [the relevant population] by providing them" guaranteed permanent housing and services upon the day of their release from prison, with no wait time. Peet Report at 46. At her deposition, she testified that *she did not perform any analysis of how much this would cost*. Peet Tr. 152:2-154:6. While she opined that perhaps OMH might achieve the Peet Prison Release Adequacy Standard by reallocating some unknown amount of funding from inpatient services, *id.* at 154:8-155:14, she did not perform any analysis of how much excess funding she believes can be cut

---

[5] This is the opposite position of the one Ms. Peet took regarding prior years' budgets. As to those budgets, she argues that OMH should be blamed for any legislative shortfalls because the agency allegedly "failed to effectively educate the public and the state legislature regarding the fiscal logic of decreasing reliance on institutional care." Peet Report at 41.

from inpatient services without jeopardizing the efficacy of those services. *Id.* at 157:19-24, 158:17-159:3. And while she acknowledged that individuals leaving prison may decline a housing placement offered to them, she opined that in that circumstance the State should simply "determine if there's another available [housing] option that would also meet their needs." *Id.* at 36:18-37:15. But Ms. Peet wholly fails to consider the feasibility of that recommendation.

### B. Factor Opinions

Dr. Factor is a psychiatrist who practices in Wisconsin. Factor Report at 2. Over the last 40 years, he has often appeared as an expert witness for plaintiffs in civil lawsuits regarding mental health services. Factor Report, Appendix A at 13-14.

The first section of Dr. Factor's report opines that when CBMHHSS is provided for people with SMI in the community, that reduces their risk of re-institutionalization. Factor Report at 4-18. He concedes that New York State already funds programs that provide these services for New Yorkers with mental illness. *Id.* at 17-18. Dr. Factor writes a particularly glowing assessment ACT and FACT. According to Dr. Factor, "ACT is <u>the gold-standard of community treatment</u>." *Id.* at 6 (emphasis added). He believes ACT is so effective because it:

> uses multidisciplinary teams to provide clients with services directly in the community, including mental health treatment, 24/7 crisis response, and support with living skills such as shopping. This means that a person with serious mental illness living in the community does not need to seek out services independently and proactively across different agencies.

*Id.* (internal citations omitted). Reviewing the relevant literature, Dr. Factor confirms that "the effectiveness of ACT [has] been well established by dozens of controlled studies globally." *Id.*[6]

The second section of Dr. Factor's report discusses the three Discharge Class Named Plaintiffs: WP, SD, and DH. Dr. Factor writes that Plaintiffs asked him to assess: "what type of

---

[6] ACT and FACT provide the same "gold standard" services, with FACT services specifically directed toward individuals with a forensic history. Factor Tr. 31:12-32:19; Peet Tr. 160:24-162:16.

CBMHHSS did OMH provide these individuals?" Factor Report at 1. Based on the answer to that threshold question, he was then to opine about whether "the CBMHHSS that OMH provided [was] appropriate for the needs of the individuals upon release from prison[.]" *Id.*

In order to develop his opinions on these questions, Dr. Factor reviewed the allegations of the Plaintiffs' Second Amended Complaint in this litigation. Factor Report at 3. He also reviewed a partial selection of some (but, as discussed below, not all) of the Discharge Class Named Plaintiffs' treatment and services records that have been produced in this litigation. *Id.* He reviewed the transcripts of the depositions of WP, SD, and DH, and he also conducted one interview with each individual, each lasting approximately one hour. *Id.* at 3-4; Factor Tr. 28:8-15. Finally, he reviewed various psychiatric literature and other materials. Factor Report at 3-4. Dr. Factor did not interview any of the Plaintiffs' treatment providers. Factor Tr. 29:9-15. He did not attempt to conduct a clinical evaluation or to independently diagnose them. *Id.* at 28:16-29:8.

Dr. Factor's report contains a perplexing, glaring omission. Although he writes that he was asked to assess "what type of CBMHHSS did OMH provide these individuals," his report does not actually answer that question. There is no section of the report explaining what community services and housing placements *were* in fact provided or offered to WP, SD, and DH upon their release from prison. Instead, the report simply skips over that threshold question, stating: "I conclude that all three Discharge Class Named Plaintiffs were found to be eligible for CBMHHSS *but did not receive* such housing and/or services." Factor Report at 18 (emphasis added). That statement is not accurate, and thus cannot serve as the basis for a reliable opinion.

*WP:* Upon his release from prison in May 2019, *WP received FACT team services.* Defts.' Ex. 2 (WP Dep. Tr. 51:16-58:25); Defts.' Ex. 9 (FACT team letter). These are the very same services that Dr. Factor calls the "gold-standard of community treatment." Factor Report at 6. Inexplicably, Dr. Factor's report fails to credit this fact. His report mentions WP's FACT team just once, buried midway

through a paragraph that claims—incorrectly—that WP "does not have **access to crisis services with outreach available 24/7**[.]" *Id.* at 20 (emphasis in original). In this paragraph, Dr. Factor briefly concedes that "W.P. is engaged with a FACT team," then pivots to the confusingly written statement that "this element for success includes that the crisis services need to have *outreach available*, that is, in-person when necessary." *Id.* at 20 (emphasis in original). But as Dr. Factor had persuasively explained just pages earlier, it is a hallmark of ACT and FACT teams that they "provide clients with services directly in the community, including . . . 24/7 crisis response[.]" *Id.* at 6.[7] At his deposition, Dr. Factor testified that the sole basis for his contention that WP's FACT team failed to provide him with 24/7 crisis response services is that WP told him that there was an incident where he was involved in an altercation in the community, and when this occurred WP did not feel like he had someone to talk to. Factor Tr. 35:6-38:5. Based on this one comment by WP, Dr. Factor concluded that WP's FACT team must have failed to provide sufficient services. *Id.* at 39:16-41:16. In fact, at WP's deposition he testified exactly the opposite: "Q. Do you feel that you can reach out to your CASES [FACT] team members if you need support or assistance? A. Yes." Defts.' Ex. 2 at 59:16-19.[8] Dr. Factor never tried to speak to the members of WP's FACT team to confirm whether they did in fact provide 24/7 in-person crisis services, Factor Tr. 37:23-38:5, and WP's FACT team records show that the team routinely met with WP at his residence and other community locations, including at their own great personal risk during the peak of COVID in New York City. *Id.* at 42:14-47:9; Defts.' Ex. 11.

Dr. Factor also writes that WP "has not received **peer support**, at least for the duration of the pandemic[.]" Factor Report at 21 (emphasis in original). Dr. Factor's support for this statement is that WP told him this was so, and Dr. Factor credited the statement without verification. Factor Tr. 48:8-

---

[7] *See also* Peet Report at 18 ("The ACT model uses interdisciplinary teams that are available in people's homes, 365 days per year, 24 hours per day. They visit people as often as necessary and dispense medications wherever it is comfortable for the individuals.").

[8] CASES is the provider of WP's FACT Team services. *See* Defts.' Ex. 9 (FACT team letter).

50:3. In fact, WP's FACT team records shows that WP receives peer support services from his FACT team, and that the team routinely provided this service even during the height of the pandemic in New York City. *See* Defts.' Ex. 11 at *passim* (documenting 43 peer support contacts from WP's release from prison through May 13, 2022, including 26 peer support contacts between March and December 2020); Conroy Decl. ¶ 13. When shown these records at his deposition, Dr. Factor conceded that he had failed to make "an exhaustive search for every single peer support contact" and stated that "[i]f there are more [peer] contacts, I --- I might change my opinion." Factor Tr. 50:4-57:8.

As to WP's housing, Dr. Factor writes that "W.P. was not offered **stable housing**." Factor Report at 20 (emphasis in original). This is also plainly untrue. Prior to his release from prison, WP attended a placement interview with a housing provider. Defts.' Ex. 8 (OMH Progress Note); Defts.' Ex. 2 (WP Dep. Tr. 72:24-73:23). When the interview started, the housing provider stated that the placement would be in a shared apartment. WP responded by informing the provider that he was rejecting the placement, and he walked out of the interview. *Id.* Dr. Factor downplays these events by crediting WP's vague justification that the housing placement process "felt like a 'rush job,'" and claiming that "no information was given to [WP] about who his roommates would be, including whether they had any history of violence, drug use, or being a sex offender." Factor Report at 19. But there is no evidence that WP ever asked for information about the potential roommates before walking out of the interview, and WP's own deposition testimony was that he told the interviewer he was rejecting *any* placement in shared housing, no matter who the housemates might be. Defts.' Ex. 2 (WP Dep. Tr. 73:16-23: "I have to be alone.").

Finally, Dr. Factor claims that "[d]ue to that one rejection [of a housing placement], W.P. was consigned to the homeless shelter system." Factor Report at 20. But his opinion fails to consider that continuing efforts have been made to place WP in mental health housing, resulting in several additional interviews. Those subsequent interviews have not been successful, largely because of WP's

independent decisions about his own preferences.[9] WP's FACT team has encouraged him to broaden the scope of housing that he might be willing to accept, unfortunately to no avail. *See* Defts.' Ex. 11 (FACT team notes at P-MEDICAL-0007772); Defts.' Ex. 2 (WP Dep. Tr. 84:24-85:18). Dr. Factor testified that he has barely any knowledge of the additional housing placements that WP rejected. Factor Tr. 82:15-83:14.[10]

> *SD*: SD *also received a "gold-standard" FACT team* from CASES upon his release from prison. Defts.' Ex. 22 (SD Dep Tr. 47:16-49:23); Defts.' Ex. 26 (FACT team treatment notes). Dr. Factor's analysis of SD's FACT team services was shockingly deficient. Dr. Factor was aware that SD had a FACT team in the community, and at the conclusion of his interview with SD, Dr. Factor made a note to himself that he should find out "What [services] did [SD's FACT team] provide?" Defts.' Ex. 72 at FACTOR-000006. Incredibly, Dr. Factor testified that *he never determined the answer to that question.* Factor Tr. 133:24-134:16. In fact, Dr. Factor conceded at his deposition that he failed to review *any* of SD's FACT team records when preparing his opinion, because those records were never provided to him. *Id.* at 66:3-67:4. Dr. Factor testified that he knows nothing about the services provided to SD by his FACT team: he does not know how many team members there were, what the team members' roles were, or what services the team provided. *Id.* at 59:4-60:7. When asked to explain this failure, Dr. Factor stated that he "did not read every single word of every single record . . . [b]ecause I didn't think that was the most efficient use of my time in order to render an opinion." *Id.* at 60:14-20.

> Dr. Factor's lack of knowledge did not stop him from baldly asserting that SD's FACT team members failed to provide appropriate FACT services. *Id.* at 60:21-61:4. When asked multiple times

---

[9] At one of these interviews, WP objected to the provider's house rules regarding guests. WP Dep. Tr. at 81:3-83:25; 91:4-13. At another interview, WP rejected the placement because he objected to the idea that the provider would be designated as a representative payee. WP Decl. ¶ 23.

[10] Undaunted by his admitted lack of knowledge, Dr. Factor posited at his deposition that perhaps WP rejected these subsequent housing placements because they were all "unacceptable offers." Factor Tr. 86:17-90:15.

at his deposition to explain what support he has for this opinion, Dr. Factor refused to provide a straight answer. *Id.* at 62:23-65:22. In his report, Dr. Factor briefly conceded that "S.D. was engaged with an ACT team upon his release from prison in 2019," Factor Report at 25, but he immediately turns to an attempted critique: "However, people for whom **substance abuse is an issue**, such as S.D., must also be engaged in substance abuse treatment that is integrated with or coordinated with mental health treatment." *Id.* (emphasis in original). In fact, the records Dr. Factor failed to review show that SD met with a substance use specialist at his very first FACT team meeting and repeatedly thereafter. Defts.' Ex. 26 (FACT team records at P-MEDICAL-0007906).

As to SD's housing, Dr. Factor writes that SD "was not offered **stable housing**[.]" Factor Report at 24 (emphasis in original). However, at his deposition he conceded that the story is considerably more complicated than that. Dr. Factor testified that SD is an extremely challenging person to place in community housing, given his history of extremely violent conduct, including shooting and stabbing random people on the street. Factor Tr. 91:9-92:10. He conceded that while SD was referred to at least eight housing providers, seven providers could not offer SD a placement and one offered him a place on its wait list. *Id.* at 93:5-96:23. He conceded that SD's FACT team recommended that he take long-acting injectable medications to ensure medication compliance but SD declined, *id.* at 97:25-99:9, and he thereafter stopped taking his oral medications, resulting in a hospitalization before a housing placement could be achieved. *Id.* at 101:2-8. SD was subsequently incarcerated again after assaulting a psychiatric patient, and he is not currently eligible for community housing. *Id.* at 102:16-103:10.

*DH:* Dr. Factor also failed to acknowledge or consider the wide variety of community services DH has received since his release from prison. At his deposition, Dr. Factor testified incorrectly that the only community services DH received upon release were clinic appointments and a phone number for a hot-line. Factor Tr. 25:6-22. That is not true: upon release from prison, DH received supportive

12

services from multiple sources, including mental health services from OMH's Newburgh Mental Health Clinic and care management from Rehabilitation Support Services ("RSS"). Wunder Decl. ¶ 3; Defts.' Ex. 20 (RSS patient care plan); Defts.' Ex. 12 (DH Dep. Tr. 36:19-44:3). Dr. Factor's report omits any mention of these services. He also credits DH's allegation that provider "staff were not more helpful in providing him with stable housing," Factor Report at 23, but declined to talk to any of the providers who actually worked with DH to confirm whether this was true. Factor Tr. 104:10-12. This omission is particularly glaring when one reviews the declaration of DH's Newburgh Mental Health Clinic social worker, Scott Wunder, who describes the efforts that have been made to help DH find a housing placement and succeed in the community. *See* Wunder Decl. ¶¶ 4-16.

Likewise, Dr. Factor obligingly credits DH's claim that provider "staff were not more helpful in connecting him with substance abuse treatment, which he knew he needed." Factor Report at 23. In reality, Mr. Wunder and others have helped place DH in many, many substance abuse treatment programs over the last several years. Unfortunately, DH has repeatedly refused to participate in these programs, and at other times he has been kicked out for violating house rules, getting into fights, causing property destruction, and using drugs. Wunder Decl. ¶ 4; Defts.' Class Cert Opp. at 13 n.10. Dr. Factor testified that despite the accusation he lodged in his report, he actually has *no* knowledge of the substance abuse treatment offered to DH, or whether DH cooperated with the substance abuse programs in which he was enrolled. Factor Tr. 111:22-114:9.

Dr. Factor's opinions about DH's services contain another inexplicable omission. In or around August of 2022, Rockland County succeeded in placing DH in a community mental health residence called Lukens House. Wunder Decl. ¶ 9; Defts.' Ex. 12 (DH Dep. Tr. 26:8-32:21). Lukens House is a mentally ill chemical abuse ("MICA") housing and treatment program designed to both house and treat individuals with a dual diagnosis of both mental illness and substance abuse. Wunder Decl. ¶ 9. Lukens House is a 12-18 month program. If DH had successfully completed this program, he would

have had the opportunity to be placed in one of the same provider's supported apartments. Wunder Decl. ¶ 11; Defts.' Ex. 12 (DH Dep. Tr. 33:12-34:4). Unfortunately, DH recently began using drugs in violation of the house rules. Wunder Decl. ¶ 11. Lukens House staff notes state that DH's behaviors were "continuing to place residents in jeopardy" and that "all [the staff] can do is hold [DH] accountable for his actions." Defts.' Ex. 19 (Lukens House treatment notes at P-MEDICAL 0008170-8171). Lukens House staff gave DH notice of a potential eviction, and DH left the residence on his own on or around February 9, 2023. Wunder Decl. ¶ 11. There is *no* mention of the Lukens House placement in Dr. Factor's report. Once again, it turns out that Dr. Factor failed to review all material records. At his deposition, Dr. Factor testified that he failed to review DH's Lukens House records while preparing his opinion, and he has no knowledge of the Lukens House placement or the services DH was offered there. Factor Tr. 115:18-117:23.

## STANDARD OF REVIEW

An expert's testimony must "both rest[] on a reliable foundation and [be] relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). To be admissible, expert opinion testimony must be "based on sufficient facts or data," be "the product of reliable principles and methods," and the expert must "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702. *See also Daubert,* 509 U.S. at 593–94. The Court must confirm that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case" can serve as "grounds for rejection of expert testimony." *In re Zyprexa Products Liability Litigation*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007). The Supreme Court has emphasized "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the

expert." *General Electric Company v. Joiner*, 522 U.S. 136, 146 (1997) (citations omitted).

"When a motion to exclude expert testimony is made at the class certification stage, the *Daubert* standard applies, but the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086 JMF, 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013) (cleaned up). "In other words, the question is not . . . whether a jury at trial should be permitted to rely on the expert's report to find facts as to liability, but rather whether the Court may utilize it in deciding whether the requisites of Rule 23 have been met." *Id.*

## ARGUMENT

## I.    PEET'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

The Court should exclude Ms. Peet's opinions and report, which are the result of a series of unsupportable claims and assumptions. *First*, Ms. Peet's methodology in developing the Peet Prison Release Adequacy Standard is deeply flawed and unreliable. Ms. Peet's stated mission was to opine about whether OMH and DOCCS provide "adequate" mental health housing and services to the relevant population upon their release from prison. To answer that question, Ms. Peet has decided, without any basis, that New York State's mental health services are 'inadequate' unless the State achieves the Peet Prison Release Adequacy Standard. Pursuant to that standard, the State must reallocate its mental health resources in order to guarantee that each incarcerated individual will receive a permanent placement in supported housing and each of the services that Ms. Peet considers essential on the first day of each individual's release from prison, with *no wait time* for any housing placement or service. Ms. Peet has offered no methodology whatsoever for applying this standard, apart from her *ipse dixit*. Despite testifying that her standard is "based on [her] 40 years of practice in mental health," Peet Tr. 22:20-23:20, Ms. Peet conceded that the Peet Prison Release Adequacy Standard is not based on any industry standard, as she could not identify any jurisdiction in the world that has

15

implemented it. Peet Tr. 38:8-25; 42:9-19; 45:9-19. It is not based on reliable studies or research, as she could not identify any resource that recommends it, let alone requires it. *Id.* at 53:21-54:7; 54:24-55:9; 56:20-57:5. And it is not based on her experience in the field, as she failed to achieve or even recommend this standard when she served in state government in Connecticut and Maine. *Id.* at 47:19-48:4; 49:11-18; 88:15-91:2. Because the Peet Prison Release Adequacy Standard lacks an appropriate methodology and has no reliable foundation, Ms. Peet's opinion must be rejected.[11]

<u>Second</u>, even if Ms. Peet had some underlying reliable methodology, she has failed to reliably apply her method to the facts of the case. Ms. Peet's opinion "that OMH and DOCCS do not adequately serve the relevant population," Peet Report at 1, is based on her review of LSPs, some of which report a continuing demand for mental health community services and housing and request additional State funds. Based on those documents alone, Ms. Peet suggests that these local governments have submitted "complaints" about OMH, Peet Report at 22, and alleges that OMH has "repeated[ly] refus[ed] to adequately address" local requests for funding. *Id.* at 31. This conclusion lacks any support. The LSPs are not 'complaints'—they are a part of a State statutory process in which the State *solicits* local government input about goals and funding requests. And Ms. Peet has no support for her claim that OMH has "refused" to address the requests for funding. The reality is that New York State spends hundreds of millions of dollars per year on residential mental health programs, an investment that has just been supplemented with the historic new billion dollar investment in mental health community housing and services. Wojtkiewicz Decl. ¶¶ 6-9. Ms. Peet's report failed to consider

---

[11] *See Mason v. AmTrust Fin. Servs., Inc.*, No. 19-CV-8364 (DLC), 2020 WL 7425254, at *5 (S.D.N.Y. Dec. 18, 2020) (rejecting expert who "fail[ed] to describe any methodology, much less one recognized by the [] profession"); *Bocoum v. Daimler Trucks N. Am. LLC*, No. 17-CV-7636, 2022 WL 902465, at *12 (S.D.N.Y. Mar. 28, 2022) (rejecting expert who "offer[ed] no cognizable methodology to bridge the logical gap between [the] facts and his conclusion . . . . This is precisely the type of opinion evidence that is connected to existing data only by the *ipse dixit* of the expert, which courts have held inadmissible under Rule 702 and *Daubert*."). *See also Betances v. Fischer*, No. 11-CV-3200 (RWL), 2021 WL 1534159, at *3 (S.D.N.Y. Feb. 23, 2021) ("Even otherwise qualified experts may not simply offer conclusory opinions.").

any of this. Instead, her opinion is based on her assumption that *any* demand for new housing or services, or *any* local request for new funding, is evidence of OMH's alleged 'refusal' to act. Peet Tr. 122:20-123:9; 129:8-19; 130:16-131:23. There is no basis for that conclusion.[12]

*Third*, Ms. Peet has not applied any reliable methodology in opining about how New York State might practically achieve the Peet Prison Release Adequacy Standard. Ms. Peet does not know how much money New York would need to achieve her standard, or how many new units of permanent supported housing would need to be constructed, or how many dollars she believes can be cut from inpatient services. Peet Tr. 152:2-154:6, 157:19-24, 158:17-159:3. In the real world, no legislature, Governor, or State agency could ignore these critical questions, and Ms. Peet's decision to do so shows that she has not "employ[ed] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo*, 526 U.S. at 152.

## II.    FACTOR'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

Dr. Factor's opinions likewise suffer from severe methodological defects. The Court should exclude them. *First*, Dr. Factor's method inexplicably skips over a critical, threshold question: what housing and community services were *in fact* provided or offered to WP, SD, and DH. One can read Dr. Factor's report front to back without learning what services and housing were actually provided or offered to these three individuals. Having failed to engage with that preliminary question of fact, Dr. Factor was in no position to meaningfully opine about whether the CBMHHSS that OMH provided was "appropriate." Factor Report at 1. Rather than address his own threshold question, Dr. Factor instead rests his opinions on the plainly inaccurate statement that "all three Discharge Class

---

[12] In any event, there is a fundamental disconnect between Ms. Peet's discussion of the LSPs and the relief the Plaintiffs seek in this case. The LSPs cited by Ms. Peet request additional State funding for mental health services and housing, generally. They do not demand that New York State reallocate its resources in order to guarantee that each incarcerated individual will receive each element of this array of housing and services on the first day of his release from prison, with no wait time for any housing placement or service.

Named Plaintiffs were found to be eligible for CBMHHSS *but did not receive* such housing and/or services." Factor Report at 18 (emphasis added). This disconnect is particularly glaring when one considers Dr. Factor's discussion of ACT and FACT services. When he discusses those services in the abstract in the first part of his report, Dr. Factor opines at length that ACT team services are the "gold-standard of community treatment" because of the comprehensive nature of services provided, including "24/7 crisis response[.]" Factor Report at 6. But somehow, the fact that both WP and SD *received* "gold-standard" FACT team services rates only the barest of mentions, couched among attempted critiques of OMH. It is abundantly clear that Dr. Factor was never going to offer the Court an objective assessment of the services actually provided to the three Discharge Class Named Plaintiffs. This biased presentation is not reliable and should be rejected.

*Second*, Dr. Factor's method of determining the material facts of each Named Plaintiffs' treatment was woefully deficient. He simply relied on Plaintiffs' statements to him about their housing and services, as well as their attorneys' allegations from the SAC, without attempting to verify whether those claims were true based on the evidence produced in discovery. An expert opinion that is "little more than a regurgitation of the Plaintiffs' general allegations" is not helpful to the Court and should be rejected. *Everybody Counts, Inc. v. N. Ind. Reg'l Plan. Comm'n*, No. 2:98-CV-97, 2006 WL 287167, at *7 (N.D. Ind. Feb. 3, 2006). Over and over again at his deposition, Dr. Factor conceded that he failed to review the critically material records that contradict Plaintiffs' claims, and that he has no knowledge of the housing and services actually offered or provided to the Named Plaintiffs.

## III. NEITHER EXPERT'S OPINIONS ARE RELEVANT TO CLASS CERTIFICATION

The Court should also exclude both experts' opinions at the class certification stage for the independent reason that neither report is *relevant* to the disputed class certification issues. An expert's opinion must be "relevant to the task at hand." *Daubert*, 509 U.S. at 597. Here, that task is determining whether Plaintiffs have met their burden of establishing the Rule 23 requirements of commonality,

typicality, adequacy, and ascertainability. To resolve the class certification motion, "a district judge 'should not assess any aspect of the merits unrelated to a Rule 23 requirement.'" *Westchester Indep. Living Ctr., Inc. v. State Univ. of New York, Purchase Coll.*, 331 F.R.D. 279, 287 (S.D.N.Y. 2019) (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)).

## A. Peet's Opinions are Not Relevant to Class Certification

Even if Ms. Peet's opinions were based on reliable methodology—which they are not—they are not relevant or helpful to the Court's analysis of the class certification issues because the Peet Prison Release Adequacy Standard has *nothing* to do with the legal standards that actually apply in this case. Plaintiffs have argued that Ms. Peet's report is relevant to commonality, ECF No. 258 at 2, but that is not so. The Rule 23 commonality question to be resolved is whether Plaintiffs have provided *evidence* of a "specific practice" of centralized, statewide discrimination against all members of the proposed classes in violation of the Americans With Disabilities Act and Rehabilitation Act. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 357 (2011) ("*Wal-Mart*"). Rather than answering *that* question with evidence, Plaintiffs instead respond with Ms. Peet's opinion that New York State has not accomplished the Peet Prison Release Adequacy Standard. This is wholly non-responsive to the issue at hand. It cannot be the case that a jurisdiction's failure to achieve the Peet Prison Release Adequacy standard is evidence of centralized, specific practice of discrimination in violation of the ADA, given that no jurisdiction actually follows this standard and there is no evidence that anyone in the mental health field had ever heard of it before Ms. Peet applied it in this case. Ms. Peet conceded that her standard is not based on any legal standard governing what services the Defendants are obligated to provide. Peet Tr. 57:24-58:10; 59:3-9. One particularly glaring contradiction between Ms. Peet's standard and the legal standards that actually apply here is that the Peet Prison Release Adequacy Standard forbids all wait lists for housing and services, whereas *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), expressly contemplates that a reasonable waiting list is evidence that the State has *not*

violated the ADA. *Id.* at 605-06 (favorably citing Georgia's argument that it "is reasonable for the State to ask someone to wait until a community placement is available"). Ms. Peet's opinions are therefore unhelpful and irrelevant to the class certification analysis.

As to typicality, Ms. Peet's opinions are only relevant to the extent that they undermine Plaintiffs' arguments that the Named Plaintiffs are typical of the proposed classes. Ms. Peet testified that most individuals with SMI are far more likely to be victims of violence than to commit violent acts, and that the small minority of individuals with a history of violent conduct and fire-setting are the hardest to place in supported housing. Peet Tr. 174:6-15; 177:10-178:4. The Named Plaintiffs, all of whom have a history of violent conduct and some of whom also have a history of fire-setting, therefore do not represent typical cases.

### B. Dr. Factor's Opinions are Not Relevant to Class Certification

Dr. Factor's opinions are also not relevant to the issues at hand. Even if his opinions about the three Discharge Class Named Plaintiffs were reliable and accurate—which they are not—they would not help establish commonality or typicality. His opinions about the circumstances of these three particular individuals are at best mere "anecdotal evidence" of the type the Supreme Court has expressly held is insufficient to support a class certification motion. *Wal-Mart*, 564 U.S. at 358. Just as with Ms. Peet, Dr. Factor's opinions are relevant only to the extent that they undermine Plaintiffs' class certification arguments. At his deposition, Dr. Factor conceded that each of the three Named Plaintiffs is especially difficult to place in community housing, given their histories of violent conduct and arson. Factor Tr. 70:4-71:20; 73:2-20 (WP); 91:9-92:10 (SD); 105:4-11 (DH).

### CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court strike and exclude the opinions and testimony of Ms. Peet and Dr. Factor for purposes of resolving Plaintiffs' motion for class certification.

Dated: New York, New York
      July 21, 2023

                                     LETITIA JAMES
                                     Attorney General
                                     State of New York
                                     *Attorney for Defendants*

                                     By: /s/ Owen T. Conroy
                                     Gee Won Cha
                                     Adam Sansolo
                                     Caroline Wallitt
                                     Owen T. Conroy

                                   Assistant Attorneys General
                                   28 Liberty Street
                                   New York, New York 10005
                                   Tel.: (212) 416-6382
                                   Email: Owen.Conroy@ag.ny.gov