# DEFENDANTS'
# EXHIBIT 70

Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    Case No. 7-19-cv-0639(CS)(AEK)
     - - - - - - - - - - - - - - - - -x
4    M.G., P.C., C.J., M.J., J.R., D.R.,:
     S.D., W.P., and D.H., individually :
5    and on behalf of all similarly    :
     situated,                         :
6                                      :
                        Plaintiffs,    :
7                                      :
             - vs -                    :
8                                      :
     ANDREW CUOMO, in his official     :
9    capacity as the Governor of the   :
     State of New York, et al,         :
10                                     :
                        Defendants.    :
11   - - - - - - - - - - - - - - - - -x
12
                               June 13, 2023
13                             9:46 a.m.
                               1285 6th Avenue
14                             New York, NY
15
16
17             ***CONFIDENTIAL***
18
19
20
21           ORAL EXAMINATION OF MELODIE PEET, held
22   at the above-mentioned time and place, before
23   Randi Friedman, a Registered Professional
24   Reporter, within and for the State of New York.
25

```
 1                   M. Peet - Confidential
 2   APPEARANCES:
 3               DISABILITY RIGHTS NEW YORK
                 Attorneys for Plaintiffs
 4
                 279 Troy Road, Suite 9
 5               Rensselaer, New York 12144
 6               BY:  SABINA KHAN, ESQ.
                      CHANTALLE HANNA, ESQ.
 7
 8
                 LEGAL AID SOCIETY
 9               Attorneys for Plaintiffs
10               60 Lafayette Street
                 New York, New York 10013
11
                 BY:  STEFEN SHORT, ESQ.
12                    ELENA LANDRISCINA, ESQ.
13
14               NEW YORK STATE OFFICE OF THE ATTORNEY
                 GENERAL'S OFFICE
15               Attorneys for Defendants
16               28 Liberty Street, 18th Floor
                 New York, New York 10005
17
                 BY:  OWEN CONROY, ESQ.
18                    ADAM SANSOLO, ESQ.
                      IGNACIO VASQUEZ, ESQ.
19                           * * *
20
     ALSO PRESENT:
21
                 Matthew Williamson - Summer Associate
22               Marissa Shea - Summer Associate
23
24
25
```

Page 3

1                    M. Peet - Confidential

2                       STIPULATIONS

3              IT IS HEREBY STIPULATED AND AGREED, by

4     and among counsel for the respective parties

5     hereto, that the filing, sealing and

6     certification of the within deposition shall be

7     and the same are hereby waived;

8              IT IS FURTHER STIPULATED AND AGREED

9     that all objections, except as to form of the

10    question, shall be reserved to the time of the

11    trial;

12             IT IS FURTHER STIPULATED AND AGREED

13    that the within deposition may be signed before

14    any Notary Public with the same force and effect

15    as if signed and sworn to before the Court.

16                       *  *  *

17

18

19

20

21

22

23

24

25

```
                                          Page 4
 1                    M. Peet - Confidential
 2                         *  *  *
 3                    MELODIE PEET, the witness herein,
 4         after first having been duly sworn, was
 5         examined and testified as follows:
 6                         *  *  *
 7                       EXAMINATION
 8    BY MR. CONROY:
 9         Q     Good morning, Ms. Peet.
10         A     Good morning.
11         Q     My name is Owen Conroy and I'm an
12    assistant general attorney in the New York State
13    Office of the Attorney General.  We represent the
14    defendants in this matter.
15                    MR. CONROY:  So, counsel, I know
16         you wanted to say something about the
17         transcript before we get started?
18                    MS. KHAN:  Yes.  So for the
19         record, plaintiffs' counsels move for the
20         deposition to be designated as confidential
21         pursuant to the Protective Order in this
22         matter.  I've talked to defense counsel
23         about plaintiffs' counsels reviewing the
24         transcript, and we can confer as to whether
25         or not we are still moving for the
```

Page 22

1                    M. Peet - Confidential

2    process.

3        Q    I think my question was a little bit

4    different, which is, if the state does not meet

5    that goal, and so they're some number short of

6    the number of individuals to be served, you're

7    saying not adequate?

8        A    I'm saying that my job was really to

9    look at the systemic issues rather than the

10   experience of individuals.  I mean, as a

11   commissioner, when you make these plans, you

12   know, you do it in all good faith, believing that

13   you're making a plan that will serve everybody in

14   need on any given day.  If a person has to wait

15   for a short period of time to get the services, I

16   wouldn't say that means that the system is

17   inadequate, but that's really not what we're

18   looking at in this instance.  This was widespread

19   unavailability of resources.

20       Q    Let's turn to page -- I'm sorry,

21   before we do that, what source or sources did you

22   use to arrive at your definition of "adequate

23   housing and services for the relevant

24   population"?

25       A    That definition was really based on my

Page 23

1                    M. Peet - Confidential

2    40 years of practice in mental health.  I've

3    engaged in needs assessment and program

4    development in a number of systems, and my

5    background is in public health, you know, so I

6    use population-based methods of ascertaining, you

7    know, what the number of people is, and then

8    applied utilization data to that.  Look at the

9    two things and come up with a target as we're

10   developing service.  It's really a living,

11   breathing process if you're managing these

12   systems.  It's iterative.  You come up with a

13   target number, and then you look at utilization

14   data over periods of time and make adjustments,

15   either rising or lowering the capacity of various

16   programs.  It's not something that you do once

17   and just put on the shelf and forget about it.

18        Q    Any other sources for your definition

19   of "adequate"?

20        A    No.

21        Q    All right.  Now let's flip to Page 7

22   of your report.  I'm not going to read the whole

23   paragraph, but I want to focus on the second full

24   paragraph that begins, "Setting these

25   objectives."

                        M. Peet - Confidential

1          should have these services available to them

2          in their communities.  I'm not

3          distinguishing between the population of

4          people coming out of prison.  I'm saying

5          this is -- these are safety net services

6          that should be available in adequate

7          capacity, and each service system to meet

8          the needs of people with serious mental

9          illness, so, yes.

10    BY MR. CONROY:

11         Q     Okay.  But you understand that this

12    case is about the relevant population; correct?

13         A     I do.

14         Q     Okay.  But the answer was yes to the

15    question?

16         A     Yes.

17         Q     Okay.  And individuals coming out of

18    prison with SMI are allowed to turn down a

19    placement that's offered them; correct?

20         A     Yes.

21         Q     So if the state offers a placement in

22    housing or services to the individual, but the

23    individual declines, is that a violation of your

24    standard?

                    M. Peet - Confidential

1

2       A       It depends on the circumstance.

3   Individuals with serious mental illness often

4   have trust issues.  They have difficulty engaging

5   sometimes.  They've often times bad experiences

6   with previous settings.  So I wouldn't say that

7   just a refusal, in and of itself, is

8   justification to then revert to discharge to a

9   shelter.  I think there's a process of engagement

10  with these individuals that's really important to

11  explore why they're refusing a particular

12  placement, and to determine if there's another

13  available option that would also meet their

14  needs.  I think just a simple refusal is -- needs

15  deeper exploration to determine appropriateness.

16              Also I would say it has to do with a

17  risk analysis for both the safety of the

18  individual and the safety of the community.

19      Q       Tell me more about what you mean by

20  that.

21      A       I think these decisions really have to

22  be looked at in the circumstances of the

23  particular individual and if, for example, a

24  person is refusing a setting and saying that, you

25  know, they were exploited physically or sexually

Page 38

M. Peet - Confidential

1

2    when they were in that setting previously, and

3    the person has a history of PTSD, that's a

4    reasonable reason for a person to say, no, they

5    don't want that setting.  And then I think it's

6    incumbent on the people trying to work with him

7    or her to find an alternative.

8         Q    Are you aware of any jurisdictions

9    that guarantee a permanent supported housing

10   placement, and your full list of necessary safety

11   net services to each person with SMI leaving

12   prison on the day they get out of prison with no

13   wait time?

14        A    I'm aware of jurisdictions that have

15   developed the infrastructure for the safety net

16   services, such a crisis services, case

17   management, inpatient access for all people with

18   serious mental illness.  So those would, of

19   course, be available for the relevant population

20   here.  I can't say with certainty that I'm

21   familiar with the jurisdiction that ensures

22   access to permanent supported housing at the

23   point of discharge.

24        Q    The point of discharge from prison?

25        A    Right.

```
                                              Page 40
 1                  M. Peet - Confidential
 2    a minute, but that was back in the '90s?
 3         A      Yes.
 4         Q      For both states?
 5         A      '80s and '90s.
 6         Q      And tell me again, so you said
 7    intensive case management could be an option
 8    instead of ACT or FACT teams?
 9         A      In some parts of Maine in particular,
10    we did not have psychiatrists in the northern
11    part of the state, so in those areas we used
12    intensive case management rather than ACT in the
13    rural parts of the State.
14         Q      And you believe that was okay for
15    Maine?
16         A      We made it work, you know.  In
17    underserved work force areas, sometimes you have
18    to make modifications from the ideal to be
19    adequate.
20         Q      But your opinion here is that if New
21    York does not supply ACT or FACT teams to
22    everyone with SMI leaving prison on the day they
23    get out of prison, the services are not adequate;
24    right?
25         A      I would say that there are
```

```
                                    Page 42
 1                M. Peet - Confidential
 2   individuals in New York are served by intensive
 3   case management teams as opposed to ACT or FACT
 4   teams?
 5        A     I don't think I knew that.
 6        Q     And is it your opinion that that can
 7   be an option if resources demand that?
 8        A     Yes.
 9        Q     How about outside of the United
10   States; are you aware of any jurisdictions
11   outside of the United States that guarantee a
12   permanent supported housing placement, and your
13   full list of necessary safety net services to
14   each person with SMI leaving prison on the day
15   they get out of prison with no wait time?
16                MS. KHAN:  Objection.  You may
17        answer.
18                THE WITNESS:  I'm not aware of
19        that.
20   BY MR. CONROY:
21        Q     So would you agree with me that this
22   definition that you're applying is not an
23   industry standard in the field of mental health?
24                MS. KHAN:  Objection.  You may
25        answer.
```

1                M. Peet - Confidential

2        Q      But, again, you're not aware of any

3    jurisdiction that guarantees a permanent

4    supported housing placement for each person with

5    SMI leaving prison on the day they get out of

6    prison with no wait time?

7                    MS. KHAN:  Objection.  You may

8            answer.

9                    THE WITNESS:  No.  And in some

10           ways I feel like the intervening experience

11           for these people of being in a prison could

12           be confounding, because this is the goal for

13           people with serious mental illness, period.

14           So in that way, they're not different from

15           their peers who have not been in prison.

16                    What; however, their being in

17           prison tends to do is add risk factors to

18           their experience, so that they're more

19           likely than others to end up

20           reinstitutionalized, whether it's in prison

21           or in state hospitals, other hospitals.  So

22           am I aware of jurisdictions that provide

23           this on the day that they are discharged?

24           No.  Is it incredibly risky to send people

25           out of prisons to settings like homeless

```
 1                 M. Peet - Confidential
 2       shelters?  Yes.
 3  BY MR. CONROY:
 4       Q    I'm trying -- I'm not trying to get
 5  stuck on this, but I can't tell if you agree with
 6  me or not.
 7       A    Okay.
 8       Q    I'll try again.
 9            If no jurisdictions provide this
10  guarantee; right?
11       A    Yes.
12       Q    Of the supported --
13       A    On the day of.
14       Q    On the day of, permanent supported
15  housing placement, it can't be standard for that
16  guarantee to exist nationwide; right?
17                MS. KHAN:  Objection.  You may
18       answer.
19                THE WITNESS:  Correct.
20  BY MR. CONROY:
21       Q    Okay.  Do you need a break?
22       A    Yes.  That would be great.
23       Q    Ten minutes?
24                MS. KHAN:  That's fine.
25                (Whereupon there was a brief
```

```
                                        Page 47
 1                M. Peet - Confidential
 2        to this relevant population in particular is
 3        that the fact of their incarceration becomes
 4        the dominant variable and the lens through
 5        which people look at them, and so I think
 6        there is a lot of bias towards this
 7        population.  I think they fall to the bottom
 8        of priority lists, explicitly or implicitly.
 9        I think that's part of what goes on.
10                   Providers often avoid accepting
11        people with histories of incarceration
12        because of risk management issues.  It's
13        harder, I think, to work with a provider
14        system and get their buy-in to serve these
15        people with the same enthusiastic and
16        empathy that they do for other people with
17        serious mental illness.
18   BY MR. CONROY:
19        Q    And at some point I'll get back to
20   more specifics on your government background, but
21   tell me again, you worked in both Maine and
22   Connecticut; right?
23        A    Yeah.
24        Q    And in both of those states at the
25   time you were in government service, neither
```

```
 1                M. Peet - Confidential
 2    state guaranteed a permanent supported housing
 3    placement to everyone with SMI leaving prison?
 4         A      Correct.  And my authority as
 5    commissioner of mental health extended to the
 6    development of the infrastructure to serve all
 7    people.  But I didn't have the final say on
 8    discharges from prisons as opposed to state
 9    hospitals.
10         Q      Tell me more about what you mean by
11    that.
12         A      Part of what is necessary in this
13    case, I think, is to see people in the relevant
14    population first as people with serious mental
15    illness; and second, as people who have had
16    involvement with the correctional system.
17    Because it's their mental illness that drives
18    what their service capacity is.  So if you're
19    developing an adequate service system for all
20    people with serious mental illness, the challenge
21    isn't going to be as extreme to make sure the
22    people in this subpopulation get their needs met.
23                Is that clear?
24         Q      Well I guess you said something about
25    how you -- when you were commissioner in Maine,
```

```
                                          Page 49
 1              M. Peet - Confidential
 2   was it, that you didn't have the final say on
 3   discharges?
 4       A     Correct, from prison.  We certainly
 5   worked with the correctional system to the extent
 6   possible to try to make our sort of standard
 7   mental health services accessible and available
 8   to those persons, and took action when we felt
 9   like providers were not operating in good faith
10   to serve them.
11       Q     But; nevertheless, when you were
12   commissioner in Maine, there was no guarantee
13   that everyone with SMI leaving prison would get a
14   permanent supported housing placement; correct?
15              MS. KHAN:  Objection.  You may
16       answer.
17              THE WITNESS:  There was not a
18       guarantee.
19   BY MR. CONROY:
20       Q     Why not?
21       A     Because of jurisdictional issues.  I
22   didn't have the authority to approve discharge
23   plans for people who were leaving state prisons.
24       Q     So are you saying there was capacity
25   in Maine to provide permanent supported housing
```

                    M. Peet - Confidential

1
2      program capacity so that all individuals
3      with serious mental illness can access these
4      services that they need when they need them.
5      I think the commissioner and some of her
6      communications has pointed to this very
7      strategy and goal, that you need the right
8      services at the right time.  And so in
9      building those services, you don't
10     necessarily have to focus on the specific
11     subpopulation of people who are leaving
12     prisons, as much as you're building for the
13     whole population of people with serious
14     mental illness in the state.
15  BY MR. CONROY:
16     Q     But, again, you're aware that this
17  case is about the relevant population; right?
18     A     I am.
19     Q     So I'm going to ask the question
20  again, because it's a more specific question.
21          Are there any resources or studies or
22  any other documents you are aware of that
23  recommend that states allocate their resources in
24  order to guarantee a permanent supported housing
25  placement and your list of necessary safety net

```
                                          Page 54

 1                M. Peet - Confidential
 2   services to each person with SMI leaving prison
 3   on the day they get out of prison with no wait
 4   time?
 5                MS. KHAN:  Objection.  You may
 6        answer.
 7                THE WITNESS:  No.
 8   BY MR. CONROY:
 9        Q     In any of your own work other than the
10   report in this case, have you ever recommended
11   that states allocate their resources in order to
12   guarantee a permanent supported housing placement
13   and your list of necessary safety net services to
14   each person with SMI leaving prison on the day
15   they get out of prison with no wait time?
16        A     I have in my report recommended the
17   development of sufficient supported housing for
18   all people with serious mental illness who
19   qualify for and wish to have that level of
20   residential care.  So all people includes people
21   with criminal justice involvement.
22        Q     So, again, my question is more
23   specific.
24                In any of your own work, other than
25   the report in this case, have you recommended
```

```
                                          Page 55
 1               M. Peet - Confidential
 2    that states allocate their resources in order to
 3    guarantee a permanent supported housing placement
 4    and your list of necessary safety net services to
 5    each person with SMI leaving prison on the day
 6    they get out of prison with no wait time?
 7                    MS. KHAN:  Objection.  You may
 8         answer.
 9                    THE WITNESS:  No.
10    BY MR. CONROY:
11         Q    Earlier you mentioned reviewing best
12    practices reports from -- I'm going to mess up
13    the names.
14         A    NASMHPD.
15         Q    Tell me the two?
16         A    NASMHPD is National Association of
17    State Mental Health Program Directors, which is
18    state commissioners.
19         Q    Okay.  And SAMHSA?
20         A    Yes.
21         Q    Did any of the best practices reports
22    that you reviewed recommend that states allocate
23    their resources in order to guarantee a permanent
24    supported housing placement and your list of
25    necessary safety net services to each person with
```

```
 1                M. Peet - Confidential
 2    SMI leaving prison on the day they get out of
 3    prison with no wait time?
 4        A      The best practices reports about
 5    permanent supported housing really advocates
 6    strongly for making it an important part of the
 7    housing and residential services continuum in
 8    every state.  So that when people are ready for
 9    and desire that outcome, that it should be
10    available to them.  And I feel like having an
11    experience with the correctional justice system
12    does not obviate the fact that these individuals,
13    first and foremost, are people with serious
14    mental illness, so they need access to the same
15    array of services as do their peers without
16    criminal justice system involvement.
17        Q      So I'm going to do it again because my
18    question is more specific.  I know you know it's
19    coming.
20               Did any of the best practices reports
21    that you reviewed say that states should allocate
22    their resources in order to guarantee a permanent
23    supported housing placement and your list of
24    necessary safety net services to each person with
25    SMI leaving prison on the day they get out of
```

```
                                        Page 57
 1              M. Peet - Confidential
 2   prison with no wait time?
 3              MS. KHAN:  Objection.  You may
 4       answer.
 5              THE WITNESS:  No.
 6   BY MR. CONROY:
 7       Q    Why do you think that's not something
 8   that the reports and resources you looked at
 9   represented?
10              MS. KHAN:  Objection.  You may
11       answer.
12              THE WITNESS:  I think it's because
13       when they're talking about, you know,
14       building programs in state systems, they're
15       not distinguishing between subpopulations of
16       people with serious mental illness.  They're
17       sort of laying out what's unnecessary
18       continuum of services for all people.  So I
19       think the distinguishing of, you know, one
20       place of referral from another doesn't
21       really fall within the realm of, you know,
22       best practices publications usually.
23   BY MR. CONROY:
24       Q    Does your definition of "adequate
25   housing and services for the relevant population"
```

```
                                            Page 58
 1                  M. Peet - Confidential
 2    incorporate any legal standards?
 3                  MS. KHAN:  Objection.  You may
 4        answer.
 5                  THE WITNESS:  No.
 6    BY MR. CONROY:
 7        Q     Did you review any statutes or
 8    judicial decisions to reach your definition of
 9    "adequate housing and services"?
10        A     I did not.
11        Q     So when you talk about in your report
12    whether New York has adequate services for the
13    relevant population, is that a different question
14    from the question of whether the services being
15    provided are the ones required by the relevant
16    legal authorities?
17                  MS. KHAN:  Objection.  You may
18        answer.
19                  THE WITNESS:  Can you restate?
20    BY MR. CONROY:
21        Q     Sorry.  That got a little confusing.
22    Sorry.
23                  So you've analyzed in your report
24    whether OMH and DOCCS provided adequate services
25    using your definition; right?
```

```
                                              Page 59
  1               M. Peet - Confidential
  2        A      Yeah.
  3        Q      So you have not attempted to address
  4   whether or not OMH and DOCCS provide the services
  5   that the relevant legal authorities require them
  6   to provide; correct?
  7               MS. KHAN:  Objection.  You may
  8        answer.
  9               THE WITNESS:  Correct.
 10   BY MR. CONROY:
 11        Q      Okay.  Sitting here today, do you have
 12   any opinion about whether the housing and
 13   services being provided by OMH and DOCCS to the
 14   relevant population satisfies their obligations
 15   under the relevant legal authorities?
 16               MS. KHAN:  Objection.  You may
 17        answer.
 18               THE WITNESS:  As I said, I did
 19        not -- I didn't review the legal framework.
 20        I can say that having as a regular practice
 21        discharging vulnerable people to homeless
 22        shelters doesn't meet any standard that I'm
 23        familiar with in public sector mental
 24        health.
 25
```

```
                                      Page 80
 1              M. Peet - Confidential
 2       A      Yes.
 3       Q      Could you approve policy changes on
 4   your own?
 5       A      Depends on the scope of them.  For
 6   things that were internal to the operations of
 7   the department, I could approve them.  For other
 8   things, the governor's office was involved.
 9       Q      What was -- so you said there were two
10   consent decrees in Maine?
11       A      Uh-huh.
12       Q      He we talked about, I believe, one of
13   them.
14              What's the second consent decree?
15       A      The second one was about conditions --
16   it was originally entered into because of
17   conditions at the state facility for people with
18   intellectual disabilities.  And so there had been
19   considerable downsizing of that facility before I
20   got there.  We completed it and closed the
21   facility and placed all the individuals in the
22   community.
23       Q      During the time you were the
24   commissioner, did Maine fund housing units for
25   people with mental illness?
```

```
                                           Page 81
 1                 M. Peet - Confidential
 2       A     We had some residential programs.  We
 3   did not fund supported housing.
 4       Q     Why not?
 5       A     There was adequate housing stock in
 6   Maine that was accessible to our patient
 7   population.  It's an interesting culture in
 8   Maine.  There's also -- there's a sense of
 9   community in much of small-town Maine, where
10   people with significant disabilities can live
11   quite comfortably in their communities.  And so
12   we were able in most cases to find low cost
13   housing where people could live comfortably in
14   their communities.
15       Q     And do you believe that that
16   arrangement was adequate in Maine?
17       A     We did not have a large population of
18   homeless people with mental illness in Maine.
19   That led me to believe that our system's response
20   to the need for housing had been adequate.
21       Q     So supported housing units -- let me
22   back up.
23             What services are provided in
24   supported housing units?
25       A     Within the units themselves?
```

```
 1                    M. Peet - Confidential
 2     Connecticut, so I came home to help.
 3          Q     I'm sorry to hear that.
 4          A     Yeah, it was tough.
 5                    MR. CONROY:  Do you want to take a
 6          five-minute break?
 7                    MS. KHAN:  Sure.
 8                    THE WITNESS:  Thank you.
 9                    (Whereupon there was a brief
10          recess from 12:09 p.m. until 12:23 p.m.)
11     BY MR. CONROY:
12          Q     So, Ms. Peet, I think we covered this
13     a little bit already, but I just want to make
14     sure that I have it clear.
15                    So when you were commissioner of
16     Maine's Department of Mental Health, did Maine
17     guarantee a permanent supported housing placement
18     to each person with SMI leaving prison on the day
19     they got out of prison with no wait time?
20                    MS. KHAN:  Objection.  You may
21          answer.
22                    THE WITNESS:  No.
23     BY MR. CONROY:
24          Q     When you were commissioner of Maine's
25     Department of Mental Health, did you ever
```

```
 1              M. Peet - Confidential
 2  recommend that Maine reallocated three sources in
 3  order to guarantee a permanent supported housing
 4  placement to each person with SMI leaving prison
 5  on the day they got out of prison with no wait
 6  time?
 7              MS. KHAN:  Objection.  You may
 8     answer.
 9              THE WITNESS:  No.
10  BY MR. CONROY:
11     Q     Why not?
12     A     It was related to the issues that we
13  discussed a few minutes ago.  First of all, the
14  idea of supported housing was still in its
15  infancy, and access to housing was not a huge
16  problem in Maine, so it didn't rise to the level
17  of policy change.
18     Q     When you were deputy commissioner of
19  the Connecticut Department of Mental Health and
20  Addiction Services, did Connecticut guarantee a
21  permanent supported housing placement to each
22  person with SMI leaving prison on the day they
23  got out of prison with no wait time?
24     A     No, we did not.
25     Q     When you were deputy commissioner in
```

```
                                              Page 90

 1                   M. Peet - Confidential
 2    Connecticut, did you ever recommend that
 3    Connecticut reallocate its sources in order to
 4    guarantee a permanent supported housing placement
 5    to each person with SMI leaving person on the day
 6    they got out of prison with no wait time?
 7         A    We did engage in reallocating
 8    resources as part of building our community
 9    system, so we did move resources from inpatient
10    care to the community service continuum.  It
11    included housing vouchers for people, but our
12    focus was on building it for the entire
13    population of people with serious mental illness
14    in Connecticut.  It wasn't specific to the
15    population of people leaving prisons.
16         Q    So I'm going to ask it again with a
17    specific focus.
18              When you were deputy commissioner in
19    Connecticut, did you ever recommend that
20    Connecticut reallocate its resources in order to
21    guarantee a permanent supported housing placement
22    to each person with SMI leaving prison on the day
23    they got out of prison with no wait time?
24                   MS. KHAN:  Objection.  You may
25         answer.
```

```
                                          Page 91

 1                M. Peet - Confidential

 2                THE WITNESS:  I did not.

 3   BY MR. CONROY:

 4        Q    Ms. Peet, I'm going to hand you what's

 5   been marked as Exhibit 2.

 6                (Exhibit 2 was marked.)

 7                This is a multiple page document

 8   titled, "From Hospitals to Jails:  How Maine's

 9   Mentally Ill are Still Institutionalized."  Take

10   a second to look through it and tell me when

11   you're ready for me to ask you a question.

12        A    Okay.

13                MS. KHAN:  For the record, I will

14        object to this exhibit being placed into

15        evidence and shown to the witness and to the

16        extent that the witness will be questioned

17        by it, but we will allow for the questioning

18        at this time.

19                THE WITNESS:  I don't want to take

20        up time reading the whole thing if there's a

21        particular question --

22   BY MR. CONROY:

23        Q    Sure.

24        A    -- I should focus on.

25        Q    So if you look at the first page --
```

```
                                           Page 114

 1                M. Peet - Confidential

 2   CBMHHSS to this population upon their release

 3   date and release from DOCCS."

 4          Did I read that correctly?

 5     A     Yes.

 6     Q     Was your methodology to answer that

 7   question any different than the methodology you

 8   already testified about today?

 9     A     No, it was not.

10     Q     So as part of your report in this

11   case, you attempted to determine whether there is

12   sufficient housing and services for the relevant

13   population in New York; correct?

14     A     Correct.

15     Q     So I think you've talked about this a

16   bit already, but just so I have the full list,

17   what sources did you use to determine whether

18   right now in New York State there's sufficient

19   housing and services for the relevant population?

20     A     My primary source for that question

21   was the county LSPs.

22     Q     Anything else apart from the LSPs?

23     A     Are we talking specifically about

24   housing or all of the --

25     Q     Yeah, I'm talking about for you to
```

Page 115

                    M. Peet - Confidential

1    determine whether right now on the ground in New

2    York State there is sufficient housing and

3    services for the relevant population, what

4    sources did you consult?

5         A    Okay.  On the services side of the

6    equation, I looked primarily at the OMH data

7    tableau, they call it, for assertive community

8    treatment.

9         Q    And that's -- is that on the OMH

10   website?

11        A    It is.

12        Q    Anything else?

13        A    No.  The LSPs were a really good

14   primary data source for this piece.

15        Q    I think you've already testified about

16   what LSPs are, so let me ask you, who drafts

17   LSPs?

18        A    It seemed from the LSPs that I

19   reviewed, that most often they were done by an

20   individual with various titles, but the person

21   who was in charge of mental health care in the

22   county.

23        Q    Who, if anyone, approves LSPs?

24        A    I think they're approved by the county

```
                                    Page 116
 1              M. Peet - Confidential
 2   administrator, and then they go to the Office of
 3   Mental Health.
 4       Q     And what, if anything, does OMH do
 5   with the LSPs?
 6       A     The OMH description of this process
 7   indicates that OMH takes the needs assessment
 8   data that's included into the report -- included
 9   as part of the reports and aggregates it to look
10   at a picture of need across the state, and
11   considers it when making their budget
12   recommendations.
13       Q     Do you know where the LSP process
14   comes from?
15       A     I believe it's a statutory
16   requirement.
17       Q     Under New York State statute?
18       A     Yes.
19       Q     Tell me specifically which LSPs you
20   reviewed in order to reach your opinion in this
21   case.
22       A     For the years 2018, 2019 and 2020, I
23   reviewed all of the LSPs from each county, and
24   then I reviewed a sampling of LSPs from 2021.
25   They were not as complete a dataset.
```

Page 117

```
                      M. Peet - Confidential
 1
 2       Q     So for '18, '19 and '20, you reviewed
 3   for every county that submits an LSP, you
 4   reviewed the LSPs for each of those three years?
 5       A     Yes.
 6       Q     All -- I should know this.  62
 7   counties?
 8       A     Yes.
 9       Q     Okay.  And do you remember
10   specifically which ones you reviewed for 2021?
11       A     I don't.  I cited to some of them in
12   my report that were from 2021, but right now I
13   can't recall them all.
14       Q     For each of the LSPs you reviewed, did
15   you review the whole thing front to back?
16       A     I did.
17       Q     So if you flip to Page 23 of your
18   report, the first full paragraph at the top, so
19   it says, "A review of the local services plans
20   from the home counties of the named plaintiffs in
21   M.G. versus Cuomo shows that OMH has failed to
22   maintain sufficient capacity to meet the CBMHHSS
23   needs for the relevant population in these
24   counties.  A more cursory review of the local
25   services plans for the remaining counties also
```

Page 120

                    M. Peet - Confidential
1
2    mental health services during the COVID pandemic?

3        A    Yes, and I think the demand actually

4    increased as we got closer to the end of the

5    pandemic.  That would impact primarily I think on

6    outpatient services for the general population.

7    That was primarily anxiety disorders that were

8    reported as particularly spiking during the

9    pandemic.

10       Q    I want to direct you to Page 22 of

11   your report.  And the first full paragraph, the

12   first sentence says, "The following subsections

13   outlined several counties' complaints as to the

14   lack of CBMHHSS for their residents with serious

15   mental illness, which include the relevant

16   population," and then the sentence goes on.

17            Did any of the LSPs you reviewed use

18   the word "complaint"?

19       A    I'm not sure, but I would -- I can't

20   recollect that, the use of that particular word.

21   They certainly reported service deficiencies, and

22   sometimes, you know, the wording got a little

23   more strident when it seemed like it had been

24   several years for the same request or same

25   indication of need.

```
                                    Page 121
```

1              M. Peet - Confidential

2      Q      So which reports are you talking about

3  that used strident language?

4      A      I couldn't tell you off the top of my

5  head.

6      Q      Are they the ones that you quoted in

7  your report?

8      A      I think I quoted from some of them

9  later in the report where I included quotes from

10  some of the LSPs.

11      Q      But sitting here today, you don't

12  remember specific examples of the type of

13  strident language you're talking about?

14      A      No.  I think often, you know, they

15  would frame it as, you know, the county still has

16  a severe deficit and still has, you know -- so

17  it's the use of modifiers, I think, that

18  indicated that there was some growing

19  dissatisfaction with the fact that needs had been

20  identified and had not been met.

21      Q      Did you talk to anyone from any of the

22  counties for localities that submitted these LSPs

23  that you reviewed?

24      A      No.  I relied exclusively on the

25  documents.

```
                                        Page 122
 1                    M. Peet - Confidential
 2        Q      Do you have any basis other than what
 3    you've already testified about to believe that
 4    the people who wrote these LSPs would
 5    characterize them as complaints?
 6        A      No.
 7        Q      I'm going to direct you to Page 31 of
 8    your report.  Tell me when you're there.
 9        A      I'm here.
10        Q      Okay.  So if you look at the first
11    paragraph in Subsection (c), and the first
12    sentence says, "OMH's repeated refusal to
13    adequately address the county patterns of
14    deficits in both housing and intensive levels of
15    clinical and case management capacity identified
16    in the county local services plans shows a
17    systemic failure to fulfill its mandate."
18              Did I read that correctly?
19        A      Yes.
20        Q      What is the basis for your statement
21    that OMH has repeatedly refused to address the
22    issues identified in the LSPs?
23        A      It was based on the patterns that
24    evolved through a review over the three years of
25    the same issue being identified as a need over
```

```
                                        Page 123
```

 1                M. Peet - Confidential

 2    that period of time without indication that there

 3    had been any response from OMH to address that

 4    need.

 5        Q     If you saw the same funding request

 6    appear several years in a row, you concluded that

 7    OMH repeatedly refused to address that issue?

 8        A     Yes.  I made a conclusion that it was

 9    a failure to address the issue.

10        Q     During the years covered by the LSPs

11    you reviewed, how much funding has New York State

12    provided for community mental health services and

13    housing?

14        A     I don't know.  It was out of the scope

15    of my work to look at the financial aspects.

16        Q     Do you know how much money the State

17    of New York spends each year on community mental

18    health services?

19        A     I don't.  I know that the budget for

20    the office of Mental Health was 5.2 billion last

21    year, but I don't know how that was divided up.

22        Q     Do you know how much money the State

23    of New York spends each year on community mental

24    health housing?

25        A     I don't.

Page 124

                    M. Peet - Confidential

1

2        Q      Do you know how New York's annual

3    spending on mental health housing and community

4    services compares to other jurisdictions?

5                    MS. KHAN:  Objection.  You may

6        answer.

7                    THE WITNESS:  No, I didn't look at

8        jurisdictions for this process.

9    BY MR. CONROY:

10       Q      You don't know whether New York is at

11   the top of the list, bottom, somewhere in the

12   middle compared to other states?

13       A      I don't.

14       Q      During the years covered by the LSPs

15   you reviewed, do you know whether New York

16   increased or decreased its annual spending on

17   mental health housing and community services?

18       A      I don't think there's a uniform

19   picture.  There were references in some of the

20   counties in 2019, I believe, about cuts to the

21   budget, so I don't know how widespread those

22   were, but it seems like it wasn't just a

23   universally experienced increase in addition of

24   community services and housing during that time.

25       Q      And when you said there are references

Page 126

```
 1                 M. Peet - Confidential
 2      Q     -- until now?
 3             But you don't know how many new units
 4   of mental health housing have been made available
 5   in New York during the years covered by the LSPs?
 6                 MS. KHAN:  Objection, but you may
 7        answer.
 8                 THE WITNESS:  I don't.
 9   BY MR. CONROY:
10      Q     I want to go back to the question I
11   had about how you know that OMH has repeatedly
12   refused to address the issues.
13             Do you believe that if the state
14   increases its funding to a certain amount, that
15   the county governments will file a report saying
16   they don't need any more money?
17                 MS. KHAN:  Objection.  You may
18        answer.
19                 THE WITNESS:  I would be surprised
20        if that happened.  In this -- in the
21        instance of the LSPs, though, the requests
22        really weren't -- didn't seem abstract in
23        sort of we need more, we need more.  They
24        were often tied to very concrete variables,
25        such as a waiting list of 1,500 people for
```

```
                                                Page 129
 1                  M. Peet - Confidential

 2        claim.

 3   BY MR. CONROY:

 4        Q      Sure.  So tell me if I'm wrong about

 5   this, but is it a subset of those 42 -- some

 6   number of those 42 identified waitlists, but not

 7   all of them?

 8        A      Are you familiar with the format of

 9   the LSPs?

10        Q      Tell me about that.

11        A      A lot of it is a checklist.  The

12   format was set up to be uniform by OMH.  So in

13   it, they ask for sort of checklists of what are

14   the significant needs for the period of time

15   that's being reported on.  So the 42 reflect the

16   counties that checked housing as one of their

17   priorities in terms of need categories.  In

18   addition to that, many counties offered up

19   supplementary information about waiting lists.

20        Q      Do you know how the counties compile

21   these waiting lists?

22        A      I don't.  You know, I was looking for

23   documentation from OMH that set out their

24   requirements for that piece of information, but I

25   couldn't find it.
```

```
                                          Page 130
 1                  M. Peet - Confidential
 2        Q     So I'm going to again try to recap and
 3   you tell me what I'm getting wrong.
 4        A     Okay.
 5        Q     So I asked about whether the county
 6   just asking for more money could -- whether
 7   you're reading that as evidence of OMH's refusal,
 8   and you said that there were some concrete
 9   examples.
10        A     Repeated requests for the same thing.
11        Q     So I was going to go -- let me --
12        A     Sorry to interrupt.
13        Q     No, no.  It's okay.  It's going to be
14   a confusing question, so bear with me.
15        A     I'm ready.
16        Q     So I think you said that you agreed
17   with me that it's unlikely that counties will
18   just stop asking for more money simply because
19   the state increases its budget to a certain
20   amount; correct?
21        A     Correct.
22        Q     Okay.  And you said that the counties
23   that identified a waitlist is something you
24   looked for as evidence -- specific evidence that
25   OMH is refusing to fix the problem?
```

```
 1                 M. Peet - Confidential
 2                 MS. KHAN:  Objection.  You may
 3        answer.
 4                 MS. HANNA:  Objection.
 5                 THE WITNESS:  Well I looked at
 6        both.  I looked at the category that was
 7        either checked or not on the document, and
 8        looked for a repeated, you know, checkmark
 9        in the same place over three years.  So the
10        fact that the same thing was being noted for
11        three years indicated a continuing unmet
12        need.
13   BY MR. CONROY:
14        Q     Okay.  So if you see the same check
15   box indicating that County X has indicated that
16   housing is a significant need three years in a
17   row, you're taking that as evidence that OMH has
18   refused to -- has repeatedly refused to
19   adequately address the issue?
20                 MS. KHAN:  Objection.  You may
21        answer.
22                 THE WITNESS:  They have failed to
23        address the issue adequately.
24   BY MR. CONROY:
25        Q     Are you aware of any jurisdiction in
```

```
                                      Page 132
 1                    M. Peet - Confidential
 2   which there is not currently a demand for more
 3   units of mental health housing?
 4                    MS. KHAN:  Objection.  You may
 5        answer.
 6                    THE WITNESS:  Looking at other
 7        jurisdictions wasn't within the scope of my
 8        work, so, no.
 9   BY MR. CONROY:
10        Q     Yeah, but -- so you're an expert in
11   the field of mental health; right?
12                    MS. KHAN:  Objection.
13                    THE WITNESS:  Yeah.
14   BY MR. CONROY:
15        Q     So based on your own knowledge, are
16   you aware of any jurisdictions in which there is
17   not currently a demand for more units of mental
18   health housing?
19                    MS. KHAN:  Objection; asked and
20        answered.  You may answer.
21                    THE WITNESS:  I'm not aware of
22        any.
23   BY MR. CONROY:
24        Q     In each of the LSPs, you talked about
25   the check box system.
```

Page 135

```
 1                M. Peet - Confidential
 2   services.  So they were noting that and saying
 3   that they needed increased resources to address
 4   the needs of this changing population.
 5        Q      Which counties and which years
 6   reported that issue?
 7        A      I don't know that off the top of my
 8   head.
 9        Q      Have you been following the details of
10   New York's fiscal year 2024 budget?
11                MS. KHAN:  Objection.  You may
12        answer.
13                THE WITNESS:  Not with any detail,
14        no.
15   BY MR. CONROY:
16        Q      Are you aware of the appropriations
17   for community mental health services and housing
18   in the 2024 budget?
19        A      I'm aware that there's been an
20   increase in funding for both inpatient beds and
21   community services for the next fiscal year.
22        Q      Are you aware that it includes a new
23   one billion dollar investment in mental health
24   housing and community services?
25        A      Yes.
```

```
                                    Page 136
 1              M. Peet - Confidential
 2      Q     Are you aware that it includes
 3   890 million in new capital to develop new mental
 4   health housing units?
 5      A     Yes.
 6      Q     Are you aware that it includes
 7   120 million in new funding for annual operating
 8   costs of new housing units?
 9      A     No, I don't think I knew that.
10      Q     What is your reaction to that
11   development?
12              MS. KHAN:  Objection.  You may
13        answer.
14              THE WITNESS:  I'm glad to hear
15        that, because I think there's an enormous
16        need that up until now has been unmet in New
17        York.  I think it would be more meaningful
18        in terms of impact on the system's efficacy
19        if we could look at the pairing of new
20        housing units, along with the support
21        services that should accompany them.  It's
22        the old one about the other doesn't work
23        very well analogy.
24              But, you know, just on the face of
25        it, adding more units of housing is only a
```

```
                                        Page 137
 1                  M. Peet - Confidential
 2        good thing.  To maximize the impact of the
 3        new housing, it really should be paired with
 4        intensive clinical services.
 5   BY MR. CONROY:
 6        Q      Are you aware of whether the new
 7   investment includes new funding for community
 8   services?
 9        A      I know it does include some.
10        Q      It does?
11        A      Does.  Does, sorry.  What I reviewed
12   wasn't explicit as to the relationship between
13   those things.
14        Q      Okay.  So you're not saying you've
15   looked at the details of the budget and you think
16   services got the short shift; right?
17        A      No.
18        Q      You're saying you're not sure?
19        A      I don't know how that is playing out.
20        Q      Got it.  And that ideally the state
21   would be investing new funds in both housing and
22   community services; right?
23        A      Yes.
24                  MS. KHAN:  Objection as to form.
25        You may answer.
```

```
                                        Page 138
 1                M. Peet - Confidential
 2    BY MR. CONROY:
 3        Q     When you were in Connecticut or Maine,
 4    did those states ever make a new one billion
 5    dollar investment in funding for mental health
 6    housing and community services?
 7        A     That would have been like the budget
 8    for the State of Maine.  No, there was not a
 9    massive infusion of dollars in that way.
10        Q     Given the new investment, do you still
11    stand by your opinion that OMH is refusing to
12    fund mental health housing and services?
13                MS. KHAN:  Objection.  You may
14            answer.
15                THE WITNESS:  I don't know that I
16            could establish a causal relationship.  In
17            the reading that I've done, it seems like
18            the impetus for the infusion of dollars came
19            from the governor and the legislature.  I
20            didn't see a lot of OMH advocating for these
21            increases.
22    BY MR. CONROY:
23        Q     What is your understanding, if any, of
24    OMH's role in the state budget process?
25                MS. KHAN:  Objection.
```

```
                                        Page 141
 1              M. Peet - Confidential
 2    there specific budgets you're talking about?
 3         A      Over the last couple of years, I know
 4    there were budget submissions that addressed the
 5    issue of increasing bed capacity.  In my mind,
 6    when you're asking for beds, you're not asking
 7    for community services.  Community services is
 8    what New York is really needing more of.
 9         Q      So we just talked about the 2024
10    budget; right?
11         A      Yeah.
12         Q      There's a billion dollars for
13    community services; right?
14         A      Yes, but there's also a big request
15    for inpatient beds.
16         Q      Are you aware that the budget is
17    18 million capital and 30 million operating for
18    inpatient care?
19         A      I would imagine that's just the state
20    operated part of the request, but there's also a
21    whole push to get the general hospitals in New
22    York to reopen beds that were closed during the
23    pandemic, so that has to do with the Medicaid
24    funding for that care.  So that's probably in a
25    different section of the budget, would be my
```

Page 142

                    M. Peet - Confidential

1

2    guess.

3        Q     The next sentence going onto the next

4    page, "OMH has failed to effectively educate the

5    public and the slate legislature regarding the

6    fiscal logic of decreasing reliance on

7    institutional care."

8            Did I read that correctly?

9        A     Yes.

10       Q     Do you still think that's true given

11   the 2024 budget?

12       A     I do, because New York State is going

13   in the opposite direction from virtually every

14   other state in the country now by adding in

15   patient capacity.  It's very well known that

16   there's a very organized advocacy effort to get

17   state governments to increase state hospital beds

18   or community beds.  That effort is sort of

19   unmoored from good mental health policy.  It's

20   kind of a quick fix answer when people are upset

21   about tragedies.

22            So the fact that New York, at the same

23   time that it's experiencing a deficit of

24   appropriate community services was continuing to

25   add to the inpatient side of the equation, it's

```
                                        Page 143

 1                    M. Peet - Confidential
 2     and unusual -- let me say that.  It was an
 3     unusual happening in the world of public sector
 4     mental health these days.
 5          Q     I think I'm -- I'm having trouble
 6     following what you're saying because you've
 7     agreed with me that there's a billion new dollars
 8     for community services; right?
 9          A     Yes.
10          Q     And is it your opinion that even if
11     you get that billion dollars, if on the other
12     hand, there's even one new dollar for inpatient
13     care, that means there's some sort of failure by
14     the state; is that your opinion?
15                    MS. KHAN:  Objection.  You may
16          answer.
17                    THE WITNESS:  It's a failure of
18          policy leadership, because the -- the
19          inpatient route is not a solution to the
20          problem that New York is experiencing.  You
21          can add 300 new inpatient beds, and they'll
22          be filled up in six weeks.  Those people
23          still have to come out of those beds when
24          they're discharged and go somewhere.
25                    And so when you are spending
```

```
                                       Page 144
 1                  M. Peet - Confidential
 2        millions of dollars to increase inpatient
 3        capacity that you wouldn't need if you had
 4        an appropriate array of community services,
 5        it's a misallocation of resources, in my
 6        opinion.
 7   BY MR. CONROY:
 8        Q     And that's your opinion, even if the
 9   state is adding a billion new dollars to those
10   community services to keep folks out of
11   hospitals?
12                  MS. KHAN:  Objection.
13                  MS. HANNA:  Objection.
14                  THE WITNESS:  Yes.  Yes.  Because
15        (a) we don't know what the net effect of the
16        billion dollars is going to be.  You know,
17        how much of the service gap in New York is
18        really going to be addressed and solved by
19        that billion dollars.  But in addition,
20        adding resources to an inpatient side of the
21        equation is a waste of resources, in my
22        mind.
23                  If you look at all of healthcare
24        over the last 20 years, you don't see
25        hospitals adding beds to their orthopedic
```

```
                                              Page 145
 1                 M. Peet - Confidential
 2        units, you know.  It's a trend in healthcare
 3        that has gone by.  You know, we figured out
 4        ways to address most health and mental
 5        health issues now in the community.  And so
 6        it's a regressive direction, in my opinion,
 7        for the state to be taking at this time.
 8        When dollars are precious, as I think is the
 9        point of a lot of your questions here, in a
10        finite resource environment, it makes no
11        sense to me to be spending dollars on
12        services that have limited utility, and
13        actually go to serve a very tiny fragment of
14        the population of people who have mental
15        health needs.
16   BY MR. CONROY:
17        Q    And just tell me again, what is the
18   source you're relying on for the idea that the
19   state has been increasing the number of inpatient
20   beds?
21                 MS. KHAN:  Objection.  You may
22        answer.
23                 THE WITNESS:  That's there in
24        OMH's own documents.
25
```

1                M. Peet - Confidential

2       BY MR. CONROY:

3            Q       Which document?

4            A       I believe I found it in one of the

5       reports about the transformation grant,

6       transformation process when they point to the

7       fact that they've stopped some of the

8       reallocation because they've had to increase

9       their inpatient bed allocations.

10           Q       If you could turn to Page 32 of your

11      report.  Are you there?

12           A       Yeah.

13           Q       So at the top paragraph just above

14      Section (d) it says, "OMH data indicates that as

15      of January 9th, 2023, it funds 109 ACT teams

16      throughout New York that are serving 6,479

17      enrollees.  This constitutes 91 percent capacity.

18      The number of homeless persons with SMI in New

19      York State is a strong indicator that OMH must

20      significantly expand its ACT and FACT program

21      capacity."

22                Did I read that correctly?

23           A       Yes.

24           Q       Are you aware that the 2024 budget

25      includes funding to create 42 new ACT teams?

```
                                            Page 147

 1                M. Peet - Confidential

 2       A     I am.

 3       Q     What's your reaction to that?

 4       A     I think that's great news.

 5       Q     Do you give OMH any credit for that?

 6       A     I do.

 7       Q     You do?

 8       A     I do.  And I'm particularly happy to

 9   see it, because it's a long-term solution to a

10   pretty intractable problem.  They have up 'til

11   now and still within this budget, you know,

12   they're funding a lot of short-term transitional

13   kinds of programming that I think are not

14   particularly appropriate for use with this

15   population, but the ACT teams, I think they're on

16   target.

17       Q     Let's flip back to Page 1, and --

18       A     What else could be on Page 1?

19       Q     Wait.  There's one more we haven't

20   covered.

21       A     We've gone through every word on Page

22   1.

23       Q     There's a fourth question.  Are you

24   there?

25       A     I'm there.
```

```
                                   Page 152
 1                M. Peet - Confidential
 2        Q     Let's turn to Page 44 of your report.
 3   Tell me when you're there.
 4        A     Okay.
 5        Q     So this is your list of
 6   recommendations that you believe are needed for
 7   New York to achieve adequate housing and services
 8   for the relevant population; correct?
 9        A     Correct.
10        Q     And is it your opinion that if OMH
11   follows these recommendations, you believe New
12   York will achieve adequate housing and services
13   for the relevant population?
14        A     The recommendations are a platform and
15   a framework.  They don't really address the
16   funding piece of it, which has to go hand-in-hand
17   with the recommendations.
18        Q     So you anticipated my next question.
19              Why doesn't this address the funding
20   piece?
21        A     It wasn't part of the scope of my
22   report at this time to look at the costs
23   associated with the recommendations.
24        Q     So do you have an opinion about how
25   many new units of supported housing would be
```

Page 153

M. Peet - Confidential

1    M. Peet - Confidential

2    needed statewide in New York in order to

3    guarantee a permanent supported housing placement

4    to each person with SMI leaving prison on the day

5    they get out of prison with no wait time?

6        A    I don't, but that data -- that

7    calculation should be not hard -- not difficult

8    for OMH to make if they look at the numbers of

9    people who are being discharged to shelters from

10   state prisons or other institutional settings, as

11   well as a look at the percentage of homeless

12   individuals throughout the state who are people

13   from this population who have already been

14   discharged to homeless shelters.

15       Q    But you haven't done that analysis?

16       A    I haven't.

17       Q    Do you have an opinion about how much

18   money it would cost to develop enough new units

19   of supported housing to guarantee a permanent

20   supported housing placement to each new person

21   with SMI leaving prison on the day they get out

22   of prison with no wait time?

23       A    I did not make that calculation.

24       Q    And same question with respect to

25   community services; did you make that calculation

Page 154

                    M. Peet - Confidential

1

2    of how much that would cost?

3         A    I did not.

4         Q    But you agree it would cost something;

5    right?

6         A    It would.

7         Q    Okay.

8         A    It would.  However, to go back to

9    their original transformation plan approach, I

10   think would be a good thing.  So it's hard to say

11   exactly what the net cost might be to the system

12   if first they relied on reallocation of

13   resources.

14            The other place that states -- I

15   started looking for reallocation -- is from the

16   correctional facilities that have been downsized.

17   You know, we've historically looked primarily at

18   state psychiatric facilities, but because of the

19   increased populations of people with serious

20   mental illness, there's also been more recently

21   consideration of reallocation of costs from the

22   correctional budgets as well, and I think that's

23   something that state mental authorities should

24   pursue.

25        Q    You mentioned the transformation plan

Page 155

                        M. Peet - Confidential

1

2    approach.  I can't remember if I asked you to

3    just tell me your understanding of what that is,

4    so if you could.

5        A      Sure.  It's an approach that's been

6    used in many states as they're faced with the

7    challenge of downsizing state hospitals, which

8    historically have been really the repository of

9    big segments of state mental health budgets.  And

10   then as units are closed as the population

11   diminishes, to reallocate those dollars so

12   they're spent for community services that will

13   serve a like population than the one that

14   historically had to rely on state hospital use.

15       Q      And this transformation plan is

16   something that New York State implemented?

17       A      They started it several years ago, but

18   it seems to have ground to a halt somewhere in

19   the last year or so.  Or the reporting has gotten

20   more sporadic.

21       Q      Do you know when it started?

22       A      I don't want to guess.

23       Q      That's okay.

24       A      It's a while ago now.

25       Q      Since it started, has New York, in

Page 157

1            M. Peet - Confidential

2       Discontinuity relationship is really a

3       negative factor for people with serious

4       mental illness, and I think given the

5       severity of and complexity of need of people

6       who are homeless or near homeless,

7       programming that is defined as transitory is

8       often investment in a lot of money that

9       then -- you know, the gains are lost when

10      the programming stops, and there may not be

11      adequate resources available to pick up

12      services at a similar level of intensity.

13            So I think the choice of

14      short-term transition programming has been

15      over-relied on in a setting that really

16      needs to look at permanent supported housing

17      and services as a long-term solution.

18   BY MR. CONROY:

19      Q     And have you analyzed specifically how

20   much money you believe can be cut from the OMH

21   inpatient services budget without jeopardizing

22   the efficacy of inpatient services that are

23   needed?

24      A     I haven't made that calculation.  But

25   what I would say is there's a sequencing

Page 158

M. Peet - Confidential

1
2    opportunity, I think, for OMH in terms of using
3    the dollars that you said are allocated in the
4    next budget for community services.  Getting
5    those services billed and available is what's
6    essential for a safe downsizing and reallocating
7    project.  The mistake that was made over and over
8    and over with the institutionalization was
9    discharging people before the resources were
10   available in the community, which led to the
11   homelessness and the overuse of the criminal
12   justice system.  And to reverse that systemic
13   failure, we really need to focus on making sure
14   that there's advanced development of capacity to
15   receive people as they're going back into the
16   community.
17        Q    Am I understanding you correctly that
18   you previously testified you haven't looked at
19   the total cost of achieving the goal you set out
20   in your report; correct?
21        A    Correct.
22        Q    So even if OMH reallocated all of the
23   money it could from inpatient care, from
24   short-term programs, you don't know whether or
25   not that would cover the cost of achieving the

                    M. Peet - Confidential

1

2    goal you set out in your report; correct?

3         A    I do not.

4         Q    So it may be the case that achieving

5    that goal would require some further

6    appropriations from the state legislature?

7         A    It could possibly.

8         Q    Do you have an opinion on whether it's

9    likely?

10        A    I don't.  One thing that I would

11   consider doing if I was at OMH, it seems in some

12   ways they're being forced to add inpatient

13   capacity.  If they could at least put a time

14   limit on the existence of those beds and say,

15   we'll take them for a year, you know, while we

16   have an opportunity to build the community site

17   out more, so at least, you know, we're not faced

18   with the backups in the emergency room.  But if

19   there's a time limit on it, and then you could

20   reallocate those dollars again for the next

21   iteration of builds in the community, I think

22   that would be a positive outcome.

23        Q    And, again, tell me if I have your

24   opinion about this wrong, but in terms of the

25   transformation plan, you agree that -- let me ask

```
                                   Page 160
```

1                    M. Peet - Confidential

2    this way.

3            Do you agree that the transformation

4    plan moved things in the right direction?

5        A    I do.  I think there could have been

6    more of an impact if they had used all of the

7    dollars to build out the safety net services.

8    The fact that the dollars were reallocated in

9    some cases for populations with less need than

10   these, I think, was atypical for processes like

11   the transformation.  Typically the money is taken

12   out of state hospitals, and then used to build

13   services in the community to serve that same

14   population.

15           What OMH has done is broadened the

16   population of people that are benefiting from the

17   yielded dollars, and I think that diluted the

18   impact in terms of the state of the community

19   system.

20       Q    But in terms of moving money away from

21   inpatient care, you think that was going in the

22   right direction?

23       A    I know it was.

24       Q    Okay.  Let me just ask a couple

25   followups on ACT and FACT services.  Do ACT and

```
                                      Page 161
 1              M. Peet - Confidential
 2   FACT teams both provide equally good services?
 3        A     Yes.
 4        Q     Are they the same or are they
 5   different?
 6        A     The FACT team is built on the
 7   assertive community treatment team model with
 8   some additions.  So some of the research that has
 9   been done over the last 50 years into efficacy of
10   ACT found that sometimes the program did not work
11   as well with people who had involvement with the
12   criminal justice system as it did with folks who
13   didn't.  And so then there was some
14   experimentation with the model to add several
15   areas of focus that weren't included with the
16   original ACT programming.  It included sometimes
17   shared staffing with, like, parole officers,
18   probation officers.  Staff that are trained in
19   both community process for people who have been
20   discharged from corrections, as well as mental
21   health services.  An additional focus on
22   substance abuse among the clientele.
23              The intent was to modify the program
24   so that it focused more on the factors that were
25   likely to lead to reinstitutionalization,
```

```
                                      Page 162
 1                M. Peet - Confidential
 2   particularly with rearrest and involvement in the
 3   criminal justice system.  So it looked at things
 4   like intervening with living situations.  If
 5   people were living in environments where family
 6   or friends were involved with criminal activity,
 7   to sort of remove them from that.  So it was
 8   really trying to just make adjustments to the
 9   different populations that were being served by
10   the two different programs.
11                But fundamentally they have the same
12   approach.  All services are within an
13   interdisciplinary team so that they don't have to
14   shop for services.  Availability seven days a
15   week, 24 hours a day.  Fundamentals of the
16   program are the same.
17        Q    Let me just direct you to Page 20 of
18   your report.  And down at the very bottom there's
19   a sentence that says, "Medication management
20   works mostly when an ACT or FACT team is
21   involved."
22                Can you explain why that is?
23        A    One of the major reasons driving
24   rehospitalization or reinvolvement with the
25   criminal justice system is when people stopped
```

Page 164

                    M. Peet - Confidential

1  remind people on a daily basis to take their

2  medications and then give them to them

3  immediately.  So there are a lot of fail-safes in

4  the ACT programming that help to prevent the

5  lapses of medication that happen with more

6  traditional programs.

7      Q    Even with a good ACT or FACT team in

8  place, is it possible that someone might stop

9  taking their medications anyway?

10     A    It's possible.  The probability is

11 much lower.  Because the other thing that's

12 implicit in the ACT team model is the development

13 of really trusting relationships between staff

14 and the client.  So individuals are much more

15 likely to take advice about medications than they

16 are that they might see once a quarter or once a

17 month.

18     Q    Let me direct you to Page 40.  And

19 tell me when you're there.

20     A    I'm here.

21     Q    I'm going to jump into the footnotes

22 which is exciting.  If you look at Footnote

23 219 --

24     A    Okay.

Page 165

                    M. Peet - Confidential

1

2       Q      -- you cite a report from something

3    called NRI, Inc.?

4       A      Yeah.

5       Q      What is NRI, Inc.?

6       A      NRI is a subsidiary of the National

7    Association of State Mental Health Program

8    Directors.  They're the data-collecting and

9    report writing arm of NASMHPD.

10      Q      Is NRI considered a reliable source of

11   information about state mental health

12   expenditures?

13      A      Yeah.  They're really the source that

14   are most often referred to for state mental

15   health data.

16      Q      Did you rely on NRI data as part of

17   your work in Maine or Connecticut?

18      A      I think NRI wasn't operating yet.  I

19   did rely on NASMHPD, who used to have a section

20   before they had NRI.  They've been the collector

21   of information about state mental health

22   authorities for decades now.

23      Q      Let me show you Exhibit 5.

24              (Exhibit 5 was marked.)

25              This is a multiple page document with

Page 167

1                    M. Peet - Confidential

2     what does that indicate to you?

3         A     Let's see.  Where is there a key?  So

4     it's per capita expenditures for mental health,

5     which corrects, you know, for the size of the

6     budget, so --

7         Q     And it's listed at 217 to 463.

8         A     Yes.

9         Q     Okay.  Let me show you Exhibit 6.

10                    (Exhibit 6 was marked.)

11                    This is a multiple page document with

12     the title, "New York Fiscal Year 2019 SMHA

13     Controlled Revenues and Expenditures," and it's

14     Bates stamped D-01685029 through D-01685036.

15                    Have you seen this document before?

16        A     Yes, I have.

17        Q     You have?  And down at the bottom of

18     the first page it says, NASMHPD Research

19     Institute.

20                    Is that the NRI we've been discussing?

21        A     Yes, it is.

22        Q     What does SMHA mean?

23        A     State mental health authority.

24        Q     And on the first page, do you see that

25     there's a chart summarizing New York's SMHA

```
                                          Page 168

 1               M. Peet - Confidential
 2   controlled revenues and expenditures for fiscal
 3   year 2019?
 4        A     Yes, I do.
 5        Q     And it gives a rank for each category?
 6        A     Yes.
 7        Q     And then just below the two boxes it
 8   says, "All ranks are based on 52 states
 9   reporting, including the District of Columbia and
10   Puerto Rico"; do you see that?
11        A     Yes.
12        Q     So in the first box, last line, "New
13   York's total SMHA controlled expenditures for
14   that year were close to 7 billion"; correct?
15        A     Yes.
16        Q     And that ranked No. 2 in the country?
17        A     Yes.
18        Q     And moving up a couple lines,
19   community-based -- it says, "Community-based MH."
20               What would your understanding be of
21   what "MH" means there?
22        A     Mental health services.  Mental
23   health.
24        Q     And that's over $5 billion?
25        A     Yes.
```

```
                                        Page 169
 1              M. Peet - Confidential
 2       Q     And, again, New York's ranked No. 2 in
 3   the nation; correct?
 4       A     Uh-huh.
 5       Q     Do you have any reason to believe this
 6   data is not accurate?
 7       A     No, I don't.
 8       Q     If you could flip to the next page,
 9   and there's a chart or a graph at the bottom
10   showing expenditures over time from 1981 through
11   2019; do you see that?
12       A     I do.
13       Q     And it shows community expenditures in
14   blue; do you see that?
15       A     I do.
16       Q     And state hospital expenditures in
17   red; do you see that?
18       A     I do.
19       Q     And the blue has been steadily
20   increasing since at least 1997; does that look
21   right to you?
22       A     It does.
23       Q     And as of the last year, 2019, the
24   blue is significantly larger than the red; right?
25       A     It is.
```

```
                                    Page 170
 1            M. Peet - Confidential
 2      Q    If you flip back to the first page,
 3   there's a pie chart; do you see that?
 4      A    I do.
 5      Q    Oh, they reversed colors on us.
 6      A    Yeah.
 7      Q    So this time community-based is in
 8   red, and that's a 77.4 percent of total SMHA
 9   controlled expenditures for New York for 2019; do
10   you see that?
11      A    I do.
12      Q    And inpatient in the blue now is at
13   18.3 percent; correct?
14      A    Yes.  Now there's something confusing
15   about this data.
16      Q    Sure.
17      A    I'm trying to think if it's a semantic
18   issue.  So what's missing from the report is the
19   amount of money that OMH spends for
20   hospitalization and other settings beyond the
21   state hospitals.  So the majority of their money
22   for inpatient care is now spent not on state
23   hospitals, but on hospitals in community
24   settings.
25            So what I'm wondering is whether those
```

Page 171

1                    M. Peet - Confidential
2      community hospitals, general hospitals, have been
3      included under community-based mental health
4      services.  That could explain for why this chart
5      is -- it doesn't line up with OMH says itself
6      about their own expenditures.  In their reports
7      they quote that they're spending over 50 percent
8      of their dollars on inpatient care; thus, they
9      wanted the transformation.  So something is not
10     evident in the way the community hospital,
11     general hospital or private hospitals are being
12     factored, or maybe they're not.  You know, if
13     they're just left out altogether, then it would
14     deflate the part of the pie that's for
15     hospital-based care.
16                Normally in these kinds of charts, if
17     we have one that shows just state hospital data,
18     then there's a corollary one that shows the other
19     kinds of hospitals.  Because over time as the
20     state hospitals have downsized from 5,000 beds,
21     it spread out through the community, so it's
22     confusing.
23        Q    And your understanding would be some
24     OMH expenditures would be going toward care at
25     hospitals run by entities other than OMH?

Page 172

                    M. Peet - Confidential

1

2       A       Yes.  A significant amount of dollars

3  are spent that way.

4       Q       Okay.

5       A       The upward trajectory on community

6  services is good.

7       Q       Let me ask you about -- if I can

8  direct you to the page number if that's helpful,

9  but there was a part of your report where you

10  talked about a "No eject, no reject" concept.

11              What does that mean?

12      A       Part of the problem that arises for

13  many state mental health authorities, is they're

14  trying to build access in community services for

15  populations of people who are seen as high risk.

16  Part of the challenge is that nonprofit providers

17  are often worried about their risk in accepting

18  those people.  Sometimes their board of directors

19  don't want them to assume that risk.  So the "No

20  eject, no reject" policy is a strategy that some

21  states have developed to use in contract

22  negotiations with nonprofits which, basically

23  says if you want our business, you know, what you

24  have to agree to is accepting -- there will be a

25  process for screening referrals to make sure

Page 174

                    M. Peet - Confidential
1
2   other groups in terms of time to access or length
3   of stay, kept in programs.  So it's just a
4   management strategy to try to rebalance leverage
5   with the nonprofit providers.
6       Q    Are there certain factors that might
7   typically make someone unusually hard to place in
8   community mental health housing?
9               MS. KHAN:  Objection.  You may
10          answer.
11              THE WITNESS:  The variables that
12          are pointed to I would say frequently are
13          history of fire setting.  History of
14          violence.  History of sexual abuse.  I think
15          those are the three largest ones.
16  BY MR. CONROY:
17      Q    Which states, if any, have implemented
18  the "No eject, no reject" rule?
19              MS. KHAN:  Objection, but you may
20          answer.
21              THE WITNESS:  I don't have current
22          knowledge of that.  I know it's a fairly
23          common strategy used.  It's one I have used.
24  BY MR. CONROY:
25      Q    I was going to ask that next.

```
                                        Page 177
 1                M. Peet - Confidential
 2         with the providers and provide them with
 3         additional support and resources if it was
 4         necessary.  In some cases, we had to
 5         terminate contracts because the providers or
 6         their boards just under no circumstances
 7         would take on the risk of, say, fire
 8         setters.
 9    BY MR. CONROY:
10         Q     Would you agree that most people with
11    SMI are not violent?
12                    MS. KHAN:  Objection.  You may
13         answer.
14                    THE WITNESS:  Absolutely.
15         Absolutely.
16    BY MR. CONROY:
17         Q     And most people with SMI are much more
18    likely to be a victim of violence than to commit
19    a violent act; correct?
20         A     Correct.
21         Q     So the groups you just talked about,
22    folks with a history of violence, fire setting,
23    sexual assault, we're talking about a very small
24    minority of people with SMI; correct?
25         A     Exactly.
```

```
                                        Page 178
```

1              M. Peet - Confidential

2      Q      Those are often the hardest people to

3  place in housing?

4      A      They are.  Another thing that we did

5  in Connecticut, and I think it's a good strategy

6  for some folks who are particularly hard to

7  place, was we leased apartments through our

8  resources, and hired -- or transferred state

9  staff from downsized hospitals to be the staff

10  for the individuals at the apartment.  And it had

11  some unanticipated benefits.  When we were able

12  to move staff that had been their staff on the

13  inpatient unit, it really gave a source of

14  continuity and comfort to people moving, I think,

15  to have that kind of trust and relationship.  And

16  it's a different way, but I think an appropriate

17  way for the state to take on the role of provider

18  of last resort, which historically they played

19  through the state hospital operation.

20              And we already hold liability for the

21  population, so it wasn't -- you know, the risk

22  issue really didn't factor for us in the way that

23  it did for the private nonprofits.

24      Q      Do providers or the state have any

25  obligation to consider the safety or preferences

Page 195

                   M. Peet - Confidential

1
2      because it's such a vulnerable population
3      looking through a different lens, it's a
4      high risk population for community safety, I
5      couldn't really understand why that group of
6      individuals hadn't made it to a priority
7      list for attention by the department.
8                 Then when I saw the data that
9      showed that out of, you know, the referrals,
10     accepted referrals for supported housing,
11     that only 2.8 percent had been for this
12     population, while 48 percent of those beds
13     went to people that weren't even referred
14     from a priority setting, it really made me
15     question the commitment to serving this
16     population of people.
17  BY MR. CONROY:
18     Q     Do you know what role, if any, OMH
19  plays in individual placement decisions in
20  supported housing?
21     A     I think those decisions are largely
22  made at the county level through the SPOAs.
23     Q     What does "SPOA" stand for?
24     A     It's a single point of access.  I
25  think referrals are channeled through that