UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H.,
individually and on behalf of all similarly situated,

Plaintiffs,

-against-

ANDREW CUOMO, in his official capacity as the Governor
of the State of New York, the NEW YORK STATE OFFICE
OF MENTAL HEALTH, ANN MARIE T. SULLIVAN, in
her official capacity as the Commissioner of the New York
State Office of Mental Health, the NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION, ANTHONY J.
ANNUCCI, in his official capacity as the Acting
Commissioner of the New York State Department of
Corrections and Community Supervision, ANNE MARIE
MCGRATH, in her official capacity as Deputy
Commissioner of the New York State Department of
Corrections and Community Supervision,

Defendants.

7:19-cv-0639 (CS) (AEK)

------------------------------------------------------------------------ x


**PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................... 1

ARGUMENT ........................................................................... 1

I.  Defendants' Memorandum of Law Is Rife with Irrelevant Information and Material Misrepresentations as to the Named Plaintiffs' Histories................................................... 1

    A.  Defendants Flagrantly Rewrite the Named Plaintiffs' Histories ............................ 2

    B.  The Discharge Class Representatives Are "Difficult to Place" Because of Defendants' Failure to Maintain an Adequate CBMHHSS System ...................... 5

II.  The Discharge Class Meets the Rule 23 Requirements ...................................... 6

    A.  The Discharge Class Satisfies Commonality ........................................... 6

    B.  The Discharge Class Named Plaintiffs Are Typical of the Discharge Class .......... 9

    C.  The Proposed Discharge Class Is Easily Ascertainable........................................ 11

III.  *Galvan* Is Inapplicable to the General Class and RTF Subclass...................................... 12

IV.  The General Class and RTF Subclass Meet the Rule 23(a) Requirements...................... 14

V.  The Discharge Class, General Class, and RTF Subclass Meet 23(b)(2) Requirements ... 18

CONCLUSION.......................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bolanos v. Norwegian Cruise Lines Ltd.*,
  212 F.R.D. 144 (S.D.N.Y. 2002) ........................................................................... 11

*Casale v. Kelly*,
  257 F.R.D. 396 (S.D.N.Y. 2009) ........................................................................... 12

*Cutler v. Perales*,
  128 F.R.D. 39 (S.D.N.Y. 1989) ............................................................................. 14

*Elisa W. v. City of New York*,
  2021 WL 4027013 (S.D.N.Y. Sept. 3, 2021) ....................................................... 7, 8

*Floyd v. City of New York*,
  283 F.R.D. 153 (S.D.N.Y. 2012) ........................................................................... 12

*Forts v. Wards*,
  621 F.2d 1210 (2d Cir. 1980) ................................................................................ 14

*Galvan v. Levine*,
  490 F.2d 1255 (2d Cir. 1973) ................................................................................ 12

*Christina A. ex rel. Jennifer A. v. Bloomberg*,
  197 F.R.D. 664 (D.S.D. 2000) .............................................................................. 17

*Lisnitzer v. Zucker*,
  983 F.3d 578 (2d Cir. 2020) .................................................................................. 14

*Nnebe v Daus*,
  2022 WL 615039 (S.D.N.Y. Mar. 1, 2022) .......................................................... 14

*Spagnola v. Chubb Corp.*,
  264 F.R.D. 76 (S.D.N.Y. 2010) ............................................................................. 12

*Taylor v. Zucker*,
  2015 WL 4560739 (S.D.N.Y. July 27, 2015) ...................................................... 7, 8

*Wal-Mart Stores, Inc*. v. *Dukes*,
  546 U.S. 338 (2011) ........................................................................................... 7, 8, 9

*Westchester Indep. Living Ctr., Inc.* v. *State Univ. of New York.*,
  331 F.R.D. 279 (S.D.N.Y. 2019) ................................................................. 11, 12, 18

**PRELIMINARY STATEMENT**

Plaintiffs seek to certify two classes and one subclass involving people who have been harmed by Defendants' failure to maintain an adequate Community-Based Mental Health Housing and Supportive Services ("CBMHHSS") system for people with Serious Mental Illness ("SMI") who are released from a New York State prison. Once certified, Plaintiffs will prove that Defendants have failed to maintain an adequate system by, among other things, failing to develop capacity along the continuum of CBMHHSS and by failing to implement policies to ensure that individuals receive housing and services when they need them, thereby exposing Plaintiffs and the class to segregation and/or the risk of institutionalization. This is a classic *Olmstead* claim.

Defendants have acknowledged the stakes in this case: they purported to change a policy eleven months into the litigation, and they now invoke the State's recent mental health budget as a sign of a commitment to CBMHHSS. Yet, faced with a showing that Plaintiffs have satisfied Rule 23's requirements, Defendants resort to misrepresentations about the Class Representatives and Plaintiffs' legal theory, ignore relevant standards, and rely on inapposite cases. Defendants also invoke the specter of violence while ignoring that they released Class Representatives into dangerous situations without the services that they know keep SMI individuals and the wider community safe.

Because Plaintiffs have met their burden, this Court should certify the Discharge Class, General Class, and RTF Subclass.

**ARGUMENT**

## I.   Defendants' Memorandum of Law Is Rife with Irrelevant Information and Material Misrepresentations as to the Named Plaintiffs' Histories

Following their release from prison, the Discharge Class Named Plaintiffs have not received the bundle of CBMHHSS for which they are eligible. None received the Community-

Based Mental Health Housing for which they are eligible and D.H. has not received appropriate supportive services, such as ACT or FACT. In 2021, 135 people with SMI were released from prison to Community-Based Mental Health Housing whereas 208 were released to homeless shelters, hotels, motels, parole housing, or Departments of Social Services. *See* Ex. 81 at 5.[1] The "unifying thread" warranting class treatment is Defendants' failure to maintain an adequate CBMHHSS system, as explained in the expert report of Melodie J. Peet. Peet. Decl. Ex. 1 ("Peet Report") at 14–41.

Defendants erect and oppose a straw man to mislead the court. They create their own housing standard ("CMHH") and wrongly include any housing physically located outside of prison grounds, even housing that is segregated or places class members at serious risk of institutionalization (e.g., Transitional Living Residences and homeless shelters). And they classify services which are not intensive or at issue in this lawsuit, such as clinic visits, as "supportive services." *See* Defs.' Memo. Opp. Class Certification ("Opp.") at 12. Using these redefined terms, Defendants claim that "every Named Plaintiff has received robust community mental health services" and "all of the Named Plaintiffs who meaningfully participated in the CMHH placement process and have not recently assaulted others have received CMHH placements." *Id*. at 2. But this standard of their own creation defies *Olmstead* and has no bearing on Plaintiffs' motion for class certification.

A.    Defendants Flagrantly Rewrite the Named Plaintiffs' Histories

Defendants' narrative about the Discharge Class Representatives is deeply misleading. Defendants did not provide Discharge Class Representatives with Community-Based Mental Health Housing when released or in the years following their release from prison. And Defendants

---

[1]    Unless otherwise specified, citations to "Ex. __" refer to the exhibits to the Declaration of Crystal Parker and Supplemental Declaration of Crystal Parker filed herewith.

do not acknowledge that the ACT services W.P. and S.D. received were insufficient to forestall a serious risk of institutionalization without stable housing. *See* Factor Decl. Ex. 1 ("Factor Report") ¶¶ 22, 73, 95.

**W.P.**: Defendants assert that W.P.'s alleged "history of violence" has made W.P. "difficult to place" and that WP has failed to "meaningfully participate" in the housing search process. Opp. at 9, 11–12. The record presents a far more nuanced picture. W.P. has never been offered appropriate housing. *See* Factor Report ¶¶ 73–83. Defendants attempt to spin W.P. as rejecting a shared apartment because it had roommates, when in fact he simply asked for information about the roommates, fearful they could be detrimental to his mental health, but his request was denied.[2] After his release, two other providers interviewed W.P. but did not offer housing.[3] More recently, in late 2022, another provider conditioned a housing offer upon W.P. agreeing to fraudulently attest to the Social Security Administration that he lacks capacity to manage his own finances so the provider could control his social security benefits.[4] W.P. never lived in a hotel "converted for use" as single unit housing. The hotel functioned as a temporary reentry shelter during the pandemic. It has since closed and W.P. remains homeless.[5]

**D.H.**: D.H. remained without Community-Based Mental Health Housing for years after his release from prison in 2018, despite Defendants' mischaracterizations. For example, Defendants repeatedly released D.H. to Bridges of New York ("Bridges"), segregated parole housing which

---

[2]    *See* Ex. 99 at 75:2–76:12; *see also id.* at 77:8–12 ("Q. Do you remember saying in that video interview that you would prefer a shelter to a shared apartment? A. No, I didn't say that.").

[3]    W.P. Decl. ¶ 23.

[4]    *Id.* Under OMH policies, Facility Directors are only to act as a representative payee where a treatment team concludes an individual is "not capable of handling (or directing the handling of) their own income." Ex. 119 at 4.

[5]    *See* Ex. 99 at 44:4–7; 47:23–48:14; Ex. 120; W.P Decl. ¶ 18.

resembles a halfway house and exposes individuals to serious risk of institutionalization,[6] which Defendants refer to as a "transitional housing and recovery program." Opp. at 12. D.H. pleaded with Defendants not to be returned to Bridges because of the lack of mental health supports and rampant drug use there.[7] This is exactly the type of discharge to DOCCS parole housing that Plaintiffs now challenge. Similarly, while Defendants chastise Plaintiffs for omitting reference to Lukens House, that is a temporary housing program that D.H. did not receive until over four years after his first release from prison and over two years after D.H. filed his claims.[8]

D.H. bounced between inpatient drug treatment programs, relatives' homes, and street homelessness, which Defendants euphemistically call "multiple placements in transitional housing and inpatient substance abuse programs while awaiting a more permanent placement through the SPOA process." Opp. at 12. Defendants suggest that D.H.'s history illustrates his volatility, *see id.* at 13 n.10, and attribute his housing instability to his own misbehavior, eliding Plaintiffs' legal theory that Defendants have exposed D.H. to predictable harm by releasing him repeatedly to inappropriate settings. Finally, although D.H. was determined eligible for Health Home Plus in 2018, Opp. at 12, Defendants misleadingly omit that D.H. did not start receiving the care management services they reference until the fall of 2020.[9]

**S.D.**: Defendants concede that seven providers "were not able to provide an appropriate placement for S.D.," and an eighth "offered a spot on its wait list for housing"; consequently, S.D. was released to a homeless shelter. Opp. at 14. Defendants state that S.D. was later relocated to East Tremont, referring to it as a "transitional residence," obscuring the fact that it is a homeless

---

[6]    *See* Factor Report ¶¶ 84, 89.
[7]    D.H. Decl. ¶¶ 23–26.
[8]    Wunder Decl. ¶9.
[9]    Ex. 121 at P-MEDICAL-0008512; Ex. 122 at D-00009423 (indicating referral to transition case manager); Ex. 123 (noting transition case manager provides 30 days of services).

shelter.[10] *Id.* at 15. Defendants make much of S.D.'s FACT team during this period, but in S.D.'s case—as in most—FACT, without stable housing, is not enough to forestall a risk of institutionalization. Defendants leverage S.D.'s alleged assault of another psychiatric patient against him, but this conduct during a period of decompensation in a psychiatric hospital following a shelter stay demonstrates the risk in S.D.'s discharge to homelessness.

> B.    The Discharge Class Representatives Are "Difficult to Place" Because of Defendants' Failure to Maintain an Adequate CBMHHSS System

Defendants fail to maintain a CBMHHSS system in a manner that ensures it reliably serves people with "challenging" histories by enhancing central oversight of providers that serve high-risk/high-needs individuals exiting the prison system and tying the receipt of state dollars to serving members of this population. In their opposition, Defendants abandon their duties to this community and instead embrace "history of violence" as a *de facto* exclusionary criterion for CBMHHSS—a major driver of the very violence Defendants decry.[11] Defendants are aware that the CBMHHSS system as designed leaves scores of people with histories of SMI and violence homeless and underserved for months or years, resulting in their decompensation and jeopardizing both their safety and public safety.[12] Despite this, Defendants have not meaningfully addressed this design flaw. Now, Defendants cite Plaintiffs' "actions and decisions" as the reason Plaintiffs are unhoused and underserved. Opp. at 2.

---

[10]   Neighborhood Association for Inter-cultural Affairs, https://www.naicany.org/transitional-housing/ (last visited Aug. 16, 2023); *see also* Factor Report ¶ 98.

[11]   Factor Report ¶ 69; Ex. 81, Sullivan Third Supp. Response to Interrog. 25.

[12]   Defs. Ex. 75 at D-01685082 ("We have underinvested in mental health care for so long, and allowed the situation to become so dire, that it has become a public safety crisis, as well."); Ex. 124 at 51 ("Mental Health Housing . . . Critical for individuals with mental illness"); Ex. 125 at 230 (noting housing instability "may hold particular significance" as a predictor of recidivism for SMI prisoners).

II.    **The Discharge Class Meets the Rule 23 Requirements**

Contrary to Defendants' arguments, the Discharge Class meets Rule 23's commonality and

typicality requirements, as well as ascertainability. Defendants do not contest numerosity.

A.    The Discharge Class Satisfies Commonality

Plaintiffs have properly demonstrated that the Discharge Class satisfies commonality, as

they challenge Defendants' overall failure to maintain an adequate CBMHHSS system—a

common question that predominates across all class members. Defendants' arguments to the

contrary are unavailing.

*First*, Defendants wrongly argue that the decentralized placement infrastructure they have

created, which they describe as an "individualized process involving independent decisionmakers

from local SPOA committees and nonprofit providers," Opp. at 27, somehow deprives the

Discharge Class of commonality. But Plaintiffs challenge Defendants' failure to administer the

system so that persons with SMI who are scheduled for release from prison "may be placed in the

most integrated community setting appropriate for their needs upon their release dates." Pls.'

Memo. Supp. Class Certification ("Br.") at 27; *see also id.* at 30–32. The inadequacy of

Defendants' system has a downstream impact on the integrity of localized decisions, but those

decisions are not at issue in this lawsuit.[13] The Court need not hold "mini-trials" or examine the

decisions of local bodies allegedly "outside Defendants' control." Opp. at 27, 31. Instead, the Court

need only examine whether Defendants properly manage their system to enable the class to receive

---

[13]    Defendants incorrectly argue that Plaintiffs seek an order compelling local SPOA committees and providers to give "particular individual[s] . . . particular placement[s]." Opp. at 27. Plaintiffs seek an injunction to remedy systems planning and administrative failures at the state, not local, level.

CBMHHSS during the specific period following release from incarceration—when the risk of institutionalization is most acute.[14]

*Second*, Defendants falsely argue that Plaintiffs' motion turns on "mere allegations" rather than "significant proof" of centralized discrimination. Opp. at 27. At this stage, Plaintiffs need not produce a full analysis of OMH's expenditures or a list of every administrative failure. Plaintiffs have more than met their burden, as exemplified by the expert report of Melodie Peet, which relied predominantly on Defendants' own data and reporting in concluding that systemwide deficiencies in Defendants' CBMHHSS system are the primary cause of Plaintiffs' predicament. Defendants paint a deeply reductionist picture of Peet's report, implying that Peet determined their system was inadequate only because it does not guarantee housing and services "on the first day of his release from prison, with no wait time." *Id.* at 28. In fact, Peet's findings are based on her review of Defendants' documents and three years of Local Service Plans for every county, showing statewide deficiencies for CBMHHSS. Defendants' other arguments are addressed in Plaintiffs' opposition to Defendants' motion to exclude expert testimony, and do not undermine Peet's assessment of statewide insufficiencies.

*Third*, Plaintiffs have demonstrated system-wide discrimination, and Defendants' analogies to *Wal-Mart Stores, Inc. v. Dukes*, 546 U.S. 338 (2011), *Taylor v. Zucker*, 2015 WL 4560739 (S.D.N.Y. July 27, 2015), and *Elisa W. v. City of New York*, 2021 WL 4027013, at *7 (S.D.N.Y. Sept. 3, 2021), are inapposite. Unlike this case, those cases challenged "the decentralized and independent decisions" of multiple actors, Opp. at 24, and each failed to articulate an overarching policy of discrimination.

---

[14] For instance, Defendants fail to implement policies requiring providers to serve people with "histories of violence" as a condition precedent to the receipt of State funds—a requirement that exists in other states. *See* Ex. 97 at 172:12–25, 173:2–25, 174:2–5, 174:17–23.

For instance, in *Wal-Mart*, the Supreme Court rejected Plaintiffs' theory of discrimination that a corporate policy permitted local managers to exercise their discretion in a discriminatory fashion, instead finding "the only corporate policy . . . plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of *allowing discretion*." 546 U.S. at 344–45, 355. In *Taylor*, plaintiffs alleged that defendants, who were agency heads, had a custom and practice of reducing or terminating services without adequate notice or process, and expressly challenged those service changes, but the court denied certification because it found the defendants had no role in the reduction or termination of services. 2015 WL 4560739, at *11. And in *Elisa W.*, the court rejected an extremely broad theory of commonality focused only on the question of whether the state defendant "effectively exercises adequate oversight" over the local agencies. 2021 WL 4027013, at *8. The Court found that this question was "too broad and generalized," and that Plaintiffs' theory of discrimination did not flow from a unitary, non-discretionary policy, but departures from agency policy. *Id.* at 9.

In each case, there was no "common connection" or "glue" holding together the class allegations. In contrast, Plaintiffs have demonstrated that Defendants have a policy and practice of failing to make available adequate CBMHHSS for a specific population at a specific point in time. There is no dispute as to Defendants' role in maintaining the relevant system. Defendants exercise full control over the state dollars invested in the CBMHHSS system. Defendants' administrative responsibility is statutory and clearly defined,[15] unlike the amorphous "culture setting" in *Wal-Mart* or broad "oversight" responsibilities in *Taylor* and *Elisa W.*

Defendants' failure to maintain an adequate CBMHHSS system is thus the common question "capable of class wide resolution—which means that determination of its truth or falsity

---

[15] N.Y. Mental Hyg. Law §§ 7.01, 7.07(a), 7.15, 41.44, 41.47.

will resolve an issue that is central to each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

B.     The Discharge Class Named Plaintiffs Are Typical of the Discharge Class

Plaintiffs meet their burden for typicality by showing that the unjustified segregation and/or a serious risk of institutionalization to which Class Representatives and the class are subject derives from Defendants' policy and practice of not providing adequate CBMHHSS for people with SMI upon their release from state prison. Br. at 33–36.

The Court should reject Defendants' argument that the Discharge Class Representatives are not typical due to their "history of engaging in extremely violent conduct, fire-setting, or both, which makes them *uniquely* difficult to place in a CMHH," Opp. at 30 (emphases in original). The record plainly contradicts this argument. W.P and S.D. carried a classification of "SMI-V," which denotes a conviction for two or more violent felony offenses or one homicide.[16] But this history does not make them exceptional. Like W.P. and S.D., approximately 72% of people with SMI released to the community from January 2020 to December 2021 carried an SMI-V classification.[17] Furthermore, 36% of SMI people released from January 2020 to December 2021 had a SMI-V classification *and* were released to a setting Plaintiffs challenge.[18]

Defendants also argue that "the Named Plaintiffs are not sufficiently typical" because it is impossible to determine what caused delays with "*any* given person's" case absent a complete evaluation of all contributing factors. Opp. at 31 (emphasis in original). Unlike in *Elisa W.*, Discharge Class Members' claims arise from systemwide policies and practices, and therefore, an

---

[16]  *See* W.P. Decl. ¶ 6, S.D. Decl. ¶ 9; Ex. 100 at D-00001200 ("SMI-V is for any inmates/parolees who have committed two or more Violent Felony Offenses or one Homicide").

[17]  *See* Ex. 64 (reflecting a total of 1,049 releases for people with serious mental illness released to the community, with 757 classified as "SMI-V" and 290 as "SMI-Non-V").

[18]  *See id.* (reflecting 375 releases with SMI-V classification and released to a homeless shelter, hotel/motel, DSS, TLR/TPP/Crisis, or parole housing).

evaluation of every contributing factor is unnecessary. For example, D.H., S.D., and class members were all placed on housing waitlists and released to shelters and other inappropriate settings.[19] This demonstrates that despite providers' acceptances of them into their programs, beds were unavailable upon release from prison. Housing inadequacy is a pervasive problem, manifested by waitlists in most counties, and few eligible individuals discharged from prison receive Community-Based Mental Health Housing upon release. *See* Peet Report at 22, 24–31; Ex. 97 at 194:21–25, 195: 2–16. Defendants concede OMH's role in housing development, and previously admitted insufficiency in such housing.[20]

Defendants argue that the Class Representatives "do not present a representative sample," as their experiences are with just three SPOA committees. Opp. at 31. But Plaintiffs do not challenge individual SPOA committee decisions, such that one would be more typical than another. Regardless, over 42% of the class returns to New York City or Rockland and Orange counties, making the Class Representatives typical under Defendants' proposed standard.[21]

Finally, Defendants argue that the Discharge Class Representatives are not typical because they received supportive services (although under Plaintiffs' definition, D.H. did not). As Dr. Factor demonstrated, and Defendants did nothing to rebut, providing FACT teams without housing

---

[19]  *See* Ex. 63 (noting D.H. was "on waitlist for supportive Tx [transitional] apartment and supported housing #12" and indicating at least 37 other individuals from 8 counties were accepted or waitlisted); Ex. 121 at P-MEDICAL-0008500 (noting D.H.'s location on community residence and licensed apartment waitlists); Opp. at 14 (conceding S.D. was waitlisted); S.D. Decl. ¶ 12.

[20]  *See* Duncan Decl. ¶ 5 ("[T]here are some units of housing that have been specially designated to be set aside for individuals with a forensic history."), ¶10 ("OMH may determine the overall eligibility criteria for a given housing program or initiative."); ECF 92 at ¶ 10 (Enright Decl.). *See also* Defs. Ex. 77 at 01685078 (describing 2024 budget as "an historic shift . . . towards addressing mental health challenges, reversing *years of neglect to our system*") (emphasis added).

[21]  *See* Ex. 64 (226 out of 534 individuals released to challenged settings were released to New York, Queens, Kings, Bronx, Richmond, Orange, or Rockland counties).

does not eliminate serious risk of institutionalization. *See* Factor Report ¶¶ 18, 38, 41. Anyone who lacks either is a Discharge Class member. No Class Representative received mental health housing (as defined by Plaintiffs) and only two received FACT. Their claims share the "same essential characteristics," such that "disputed issue[s] . . . occupy the same degree of centrality." *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002) (cleaned up); *Westchester Indep. Living Ctr.*, 331 F.R.D. at 293 (cleaned up); *see also id.* at 294 ("That some Plaintiffs were able to access certain buildings that other class members were not able to access . . . does not mean that the Plaintiffs' claims are not typical."). For these reasons, Plaintiffs satisfy Rule 23's typicality requirement.

C.     The Proposed Discharge Class Is Easily Ascertainable

Defendants argue that Plaintiffs fail to meet the ascertainability standard, citing *Bellin v. Zucker*, 2022 WL 4592581 (S.D.N.Y. Sept. 30, 2022). But their reliance on *Bellin* is misplaced. The purported "subjective" criteria that Defendants try to import into Plaintiffs' definition are not needed to determine the boundaries of the class. The Court need not sit in the shoes of a discharge planner and identify the *type* of CBMHHSS each member needs or desires. With respect to the "appropriateness" and "desire" components of the definition, the issue simply is whether members are appropriate for and desire community placement (in general) as opposed to an institutional placement, which are established elements of a basic *Olmstead* claim. Defendants create discharge plans and review whether class members are "psychiatrically stable for release to the community" or require civil commitment. Vogel Supp. Decl. ¶ 6; Br. at 37–38. Defendants track this in numerous documents, including "housing referral reports," *e.g.*, Ex. 126, "care coordination reports," *e.g.*, Ex. 127, and censuses, *e.g.*, Exs. 101–102, and they record members' views during counseling and discharge planning, *e.g.*, Ex. 124 at D-00010557. The class is ascertainable based on such discovery, without determining appropriate service types or preferences. *See Spagnola v.*

11

*Chubb Corp.*, 264 F.R.D. 76, 97 (S.D.N.Y. 2010) (finding ascertainability where class could be "identified by reference to objective criteria that is, in all likelihood, contained within Defendants' own records and computer systems). With their final two "subjective" criteria, Defendants argue that the Court must decide questions related to Defendants' liability for class certification. However, as Defendants track whether members receive CBMHHSS at the time of release, *see, e.g.*, Ex. 64 (displaying release locations), here too, the Court need not engage in a case-by-case inquiry.

## III.    *Galvan* Is Inapplicable to the General Class and RTF Subclass

Defendants wrongly argue that class certification is improper for the General Class and RTF Subclass pursuant to *Galvan v. Levine*, 490 F.2d 1255 (2d Cir. 1973), because they have purportedly ended the challenged practice. Courts routinely decline such requests where affirmative relief—especially complex affirmative relief, like the affirmative *Olmstead* relief at issue here—is sought as opposed to prohibitory relief.[22] And the Southern District has limited Galvan's application and routinely rejected government defendants' reliance on *Galvan* as a means to thwart class certification.[23]

*Galvan* is inapplicable here because Defendants have not fully withdrawn the challenged policy, and a contradictory policy prevents application of a declaration to "all putative class members." The 2019 Memorandum—which is revocable at will—excludes class members who OMH deems unstable for shelter release but stable for release to CBMHHSS. This was brought to

---

[22]    Defendants mischaracterize one sentence from Plaintiffs' motion to compel briefing as asserting that Plaintiffs seek to "subject a vast assortment of public and private entities to the Court's orders." Opp. at 38 n.26. To clarify, Plaintiffs seek injunctive relief only as to DOCCS and OMH.

[23]    *See, e.g.*, *Westchester Indep. Living Ctr., Inc. v. State Univ. of New York*, 331 F.R.D. 279, 301 (S.D.N.Y. 2019); *Floyd v. City of New York*, 283 F.R.D. 153, 177, n.162 (S.D.N.Y. 2012); *Casale v. Kelly*, 257 F.R.D. 396, 414 (S.D.N.Y. 2009); *see also* ECF 225 at 8, n.7.

Defendants' attention years ago, but never remedied. *See* ECF 101 at 2 & n.3. DOCCS and OMH simply offer empty assurances that OMH will always find a placement. Ricci Decl. ¶7; Vogel Supp. Decl. ¶12. Recent data demonstrates that a General Class member was held for 21 days past his open date for parole release because CBMHHSS was not available, and OMH failed to provide another placement.[24] Since Plaintiffs commenced this litigation, OMH has not issued new policies explaining how it will mobilize its limited housing and services resources—which are always subject to waiting lists—to avoid the prolonged incarceration of putative class members. Ex. 7 at 4, 8 (Nos. 6 and 11).

Moreover, the 2019 Memorandum and Directive 8306 authorize the precise conduct Plaintiffs challenge. Directive 8306, updated in 2022, indicates Defendants have not withdrawn the challenged policy. *See* Ex. 90. The Directive's plain language authorizes prolonged incarceration—pursuant to "special conditions" of parole—of General Class members who cannot be released to a shelter. Ex. 90 at 1. The Directive requires DOCCS to consider mental illness and OMH levels and clarifies that if DOCCS seeks to hold someone beyond an open date for parole release, it need not even apply for permission. Ex. 90 at 1–2 (applies to individuals "with significant mental health needs . . . for whom the Department is unable to approve an appropriate residence").[25] Because this Directive is in effect, prolonged incarceration is not fully withdrawn, and any declaration cannot be applied to all putative class members.

---

[24]  OMH claims to have provided housing for every class member who cannot release to shelter since 2014, Vogel Supp Decl. ¶12, but Plaintiffs are not aware of any record of the General Class and RTF Named Plaintiffs being offered an OMH housing resource on their original release dates to avoid prolonged incarceration, nor do Defendants claim placements were offered to them.

[25]  Ricci asserts that Directive 8306 does not mean what it actually says. He points out that staff must consider SARA and sex offense status. He does not claim, however, that the Directive only applies to people with SARA restrictions or sex offense convictions. Ricci Decl. ¶ 22.

Galvan is also inapplicable because class certification is necessary to allow enforcement by class members who likely cannot bring individual enforcement actions due to a combination of serious mental illness, indigence, and incarceration. See Cutler v. Perales, 128 F.R.D. 39, 47 (S.D.N.Y. 1989) (rejecting Galvan defense because, among other reasons, "most putative class members are either old or infirm and could not as effectively bring separate enforcement actions"). Moreover, consideration of Galvan is premature unless Defendants concede that prolonged incarceration is illegal. None of the cases cited by Defendants, including Galvan itself, applied this doctrine prior to the court ruling on the illegality of the challenged practice.[26] It is the finality of the Court's orders, not Defendants' intentions or actions, that obviate the need for certification.

## IV.    The General Class and RTF Subclass Meet the Rule 23(a) Requirements

Defendants misunderstand the relief sought by the General Class and RTF Subclass. Plaintiffs do not seek a prisoner release order, but they do seek an injunction of Defendants' practice of prolonged incarceration. ECF 134, Second Amended Complaint ("SAC") ¶¶ 21, 710, Prayer for Relief §§ c, d.

The crux of Defendants' argument against commonality is that Plaintiffs challenge "decentralized" decisions of SPOA committees and providers. But Plaintiffs do not challenge those decisions. See supra § 2, pp. 10–11.

Regarding typicality, Defendants claim that the General Class and RTF Subclass Named Plaintiffs are "exceptionally challenging placement cases," but offer no distinguishing facts. Plaintiffs have also shown typicality by alleging that Defendants subjected them and the class to

---

[26]    See Lisnitzer v. Zucker, 983 F.3d 578, 583, 588 (2d Cir. 2020) (applied after district court judgment); Forts v. Wards, 621 F.2d 1210, 1214, 1217–18 (2d Cir. 1980) (applied after district court enjoined conduct and defendants failed to appeal); Nnebe v Daus, 2022 WL 615039, at *13 (S.D.N.Y. Mar. 1, 2022) (applied after district court enjoined conduct and defendants demonstrated compliance).

the same unlawful conduct, namely holding them in prison past their release dates when CBMHHSS was not immediately available.

Regarding ascertainability, Plaintiffs are amenable to revising the proposed General Class and RTF subclass definitions to limit the class to those held "because of the unavailability of community based mental health housing and/or supportive services," as those terms are defined by the Second Amended Complaint. Records kept by Defendants in the normal course of business, such as priority release lists and discharge planning records, can determine who meets the class definitions.[27]

Regarding numerosity, Defendants' actions, policies, and records contradict their representations that prolonged incarceration entirely ceased in December 2019 and that OMH will always find or provide housing for class members on their release dates. Defendants offer no data evidence to corroborate Ricci's assertion that none of the 273 potential General Class members identified in the Crider Declaration since December of 2019 were held for lack of CBMHHSS. The declaration does not even list the "business records" Ricci reviewed.

Defendants have not provided Plaintiffs with full records pertaining to the potential class members identified in the Crider Declaration. Information from discovery, however, demonstrates that the Ricci and the Vogel Declarations are inaccurate. One General Class member, who we will call "DH2" has SMI, is not subject to SARA, and his OMH psychologist and social worker determined that he is eligible for and needs CBMHHSS—mental health housing and FACT, or a transitional residence. *See* Ex. 108. DH2 was cooperative with mental health treatment, had good

---

[27]  Plaintiffs may require additional discovery and depositions of Defendants' declarants should the court determine that the factual dispute regarding whether and when prolonged incarceration ceased is necessary for disposition of the class certification motion, given this revised definition.

insight into his condition, did well on cognitive testing, wanted to be independent, and did not meet the criteria for civil commitment. *Id*.

Despite DH2 spending nearly four decades in prison, OMH waited until just before his release date to apply for CBMHHSS. *See* Ex. 103. OMH knew CBMHHSS was not going to be available on his release date, and OMH's Transitional Living Residence resources were unavailable. *See* Ex. 108 at 30; Ex. 109; Ex. 117 (showing "No Placement Available" for DH2). OMH Directors Karin Rohs and Wendy Vogel discussed two possible solutions: either ask DOCCS to hold DH2 past his release date, or shockingly, press his psychologists to have him civilly committed ("2PC"). Ex. 108. They settled on asking for DH2 to be held past his open date for parole release. *Id.* OMH records show mental health housing was recommended "if available," and makes clear that he was "being held past release for housing." *Id.* DH2 then appears on DOCCS priority release lists through January 11, 2022, after which he was released to parole (likely forensic housing) on January 12, 2022. *See* Exs. 106, 107, 111–116. DH2 was held for 21 days past his lawful release date due to lack of CBMHHSS. *See* Ex. 104

DH2's story—but one example—contradicts Ricci's uncorroborated declaration that prolonged incarceration entirely ceased starting in December 2019. Vogel's uncorroborated declaration that OMH always finds housing for class members ineligible for shelter is also inaccurate and is concerning, given her personal role in DH2's prolonged incarceration.

Numerosity also exists because there is a future class. Defendants can easily return to past practices at pre-filing levels, should they defeat this lawsuit. The 2019 Memorandum is revocable, ECF No. 110-2 at 11 (No. 21), and excludes class members like DH2 who are not stable for shelter release. Defendants failed to correct the deficiencies highlighted by the Court three years ago. Ex. 82 at 33:25–34:25. DOCCS updated Directive 8306 just last year, as discussed above.

Defendants admit that they hold people with other disabilities past release dates when specialized housing is unavailable. And DOCCS defended its authority to use RTF placement for "hard to place" people in over a dozen recent lawsuits, including this one, *see* Br. at 24 & n.128, and maintained that prolonged incarceration of the General and RTF Subclass is legal and penologically justified.

This case presents circumstances where Defendants have unchecked power to strategically reduce the class size to attempt to defeat class certification, while retaining the ability to revert to past practices. There are future class members, whose identities are not yet known, the volume of which should be determined based on pre-filing levels before class size was strategically reduced. Based on the numbers in the Crider Declaration, the General Class and RTF subclass are sufficiently numerous even if only based on future class members. Dozens of potential General Class members were held every year pre-filing with up to 48 at the time of filing, and 66 RTF Subclass member were held pre-filing, with 11 at the time of filing. Even if there are no currently incarcerated members, finding numerosity would not be unprecedented. In *Christina A. ex rel. Jennifer A. v. Bloomberg*, 197 F.R.D. 664, 669 (D.S.D. 2000), a subclass of female detainees in a juvenile detention facility wing that closed after litigation was filed was found sufficiently numerous because Defendants retained the ability to revert to past practices and reopen it. Despite Defendants' assurances they would not do so, the court found future class members existed because the closure was not guaranteed to be permanent. The court certified a subclass of any females who could be affected by the challenged policy in the future, despite no class members being currently incarcerated. Likewise, numerosity exists in this case.[28] Additionally, the General

---

[28]    Additionally, Defendants' impermanent, strategic alleged cessation should not defeat class certification based on the same public policy considerations underlying the voluntary cessation

Class and RTF Subclass members are disabled, indigent, incarcerated, geographically dispersed, and joinder is impracticable, regardless.

## V.   The Discharge Class, General Class, and RTF Subclass Meet 23(b)(2) Requirements

Plaintiffs offer significant evidence of actions and failures to act by Defendants that can be remedied with a single injunction. DOCCS admits they had a policy and practice of holding people with SMI in prolonged confinement when CBMHHSS was not available, and of placing those past maximum expiration dates on "RTF status," and Directive 8306 shows it is still not fully withdrawn. Plaintiffs offer significant evidence of an OMH failure to meaningfully plan for all classes, explained in-depth by the Peet report. The Crider declaration and Defendants' records show hundreds of Discharge Class members released to shelters and other inappropriate settings—a veritable prison-to-shelter pipeline. This is concrete, significant proof of a failure to act on the part of OMH and DOCCS. "Putative classes bringing such claims are properly certified under Rule 23(b)(2) where, as here, Defendants' 'failure to act is said to be institutional[,] not merely a cumulation of individual cases.'" *Westchester Independent Living Center, Inc.*, 331 F.R.D. at 300 (citing *Brown v. Giuliani*, 158 F.R.D. 251, 269 (E.D.N.Y. 1994)).

Plaintiffs articulate plausible relief—a single injunction requiring Defendants to develop an effectively working *Olmstead* plan specific to the class members. The State has long engaged in "*Olmstead* planning," with OMH's involvement. Ex. 105 (description of Most Integrated Setting Coordinating Council). OMH is well situated to design and effect Plaintiffs' requested relief. DOCCS can coordinate with OMH in this regard. Any question regarding the "attainability" of the requested relief, financially or otherwise, is for the merits stage, not at class certification.

---

exception to mootness: to do so will create a dangerous blueprint for government Defendants to evade review of potentially illegal practices.

**CONCLUSION**

For all of the above reasons, the Discharge Class, General Class, and RTF Subclass meet

the requirements of Rule 23 of the Federal Rules of Civil Procedure and should be certified.


Dated: August 18, 2023                    DISABILITY RIGHTS NEW YORK
      New York, New York              Elizabeth Woods (elizabeth.woods@drny.org)
                                  Sabina Khan (sabina.khan@drny.org)
                                  279 Troy Road, Ste 9
                                  PMB 236
                                  Rensselaer, New York 12144
                                  (518) 432-7861

                                  The LEGAL AID SOCIETY
                                  Elena Landriscina (elandriscina@legal-aid.org)
                                  Stefen R. Short (sshort@legal-aid.org)
                                  Robert M. Quackenbush (rquackenbush@legal-aid.org)
                                  Sophia A. Gebreselassie (sgebreselassie@legal-aid.org)
                                  199 Water Street, 6th Floor
                                  New York, New York 10038
                                  (212) 577-3530

                                  PAUL, WEISS, RIFKIND, WHARTON
                                  & GARRISON LLP

                                  */s/ Crystal L. Parker*
                                  Crystal L. Parker (cparker@paulweiss.com)
                                  Walter G. Ricciardi (wricciardi@paulweiss.com)
                                  Emily A. Vance (evance@paulweiss.com)
                                  Chantalle Hanna (channa@paulweiss.com)
                                  Samuel Margolis (smargolis@paulweiss.com)
                                  1285 Avenue of the Americas
                                  New York, New York 10019-6064
                                  (212) 373-3000

                                  *Attorneys for Named Plaintiffs and the Proposed*
                                  *General Class, RTF Subclass, and Discharge Class*