# EXHIBIT 97

Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    Case No. 7-19-cv-0639(CS)(AEK)
     - - - - - - - - - - - - - - - - - -x
4    M.G., P.C., C.J., M.J., J.R., D.R.,:
     S.D., W.P., and D.H., individually :
5    and on behalf of all similarly    :
     situated,                          :
6                                       :
                           Plaintiffs,  :
7                                       :
              - vs -                    :
8                                       :
     ANDREW CUOMO, in his official      :
9    capacity as the Governor of the    :
     State of New York, et al,          :
10                                      :
                           Defendants.  :
11   - - - - - - - - - - - - - - - - - -x
12
                                    June 13, 2023
13                                  9:46 a.m.
                                    1285 6th Avenue
14                                  New York, NY
15
16
17            ***CONFIDENTIAL***
18
19
20
21            ORAL EXAMINATION OF MELODIE PEET, held
22   at the above-mentioned time and place, before
23   Randi Friedman, a Registered Professional
24   Reporter, within and for the State of New York.
25

Page 2

```
 1              M. Peet - Confidential
 2   APPEARANCES:
 3           DISABILITY RIGHTS NEW YORK
             Attorneys for Plaintiffs
 4
             279 Troy Road, Suite 9
 5           Rensselaer, New York 12144
 6           BY:  SABINA KHAN, ESQ.
                  CHANTALLE HANNA, ESQ.
 7
 8
             LEGAL AID SOCIETY
 9           Attorneys for Plaintiffs
10           60 Lafayette Street
             New York, New York 10013
11
             BY:  STEFEN SHORT, ESQ.
12                ELENA LANDRISCINA, ESQ.
13
14           NEW YORK STATE OFFICE OF THE ATTORNEY
             GENERAL'S OFFICE
15           Attorneys for Defendants
16           28 Liberty Street, 18th Floor
             New York, New York 10005
17
             BY:  OWEN CONROY, ESQ.
18                ADAM SANSOLO, ESQ.
                  IGNACIO VASQUEZ, ESQ.
19                     * * *
20
     ALSO PRESENT:
21
             Matthew Williamson - Summer Associate
22           Marissa Shea - Summer Associate
23
24
25
```

Page 3

1            M. Peet - Confidential

2                STIPULATIONS

3        IT IS HEREBY STIPULATED AND AGREED, by

4    and among counsel for the respective parties

5    hereto, that the filing, sealing and

6    certification of the within deposition shall be

7    and the same are hereby waived;

8        IT IS FURTHER STIPULATED AND AGREED

9    that all objections, except as to form of the

10   question, shall be reserved to the time of the

11   trial;

12       IT IS FURTHER STIPULATED AND AGREED

13   that the within deposition may be signed before

14   any Notary Public with the same force and effect

15   as if signed and sworn to before the Court.

16                  * * *

17

18

19

20

21

22

23

24

25

Page 4

1                   M. Peet - Confidential
2                          * * *
3                   MELODIE PEET, the witness herein,
4          after first having been duly sworn, was
5          examined and testified as follows:
6                          * * *
7                       EXAMINATION
8    BY MR. CONROY:
9          Q     Good morning, Ms. Peet.
10         A     Good morning.
11         Q     My name is Owen Conroy and I'm an
12   assistant general attorney in the New York State
13   Office of the Attorney General.  We represent the
14   defendants in this matter.
15               MR. CONROY:  So, counsel, I know
16         you wanted to say something about the
17         transcript before we get started?
18               MS. KHAN:  Yes.  So for the
19         record, plaintiffs' counsels move for the
20         deposition to be designated as confidential
21         pursuant to the Protective Order in this
22         matter.  I've talked to defense counsel
23         about plaintiffs' counsels reviewing the
24         transcript, and we can confer as to whether
25         or not we are still moving for the

Page 5

```
 1              M. Peet - Confidential
 2         transcript to be confidential -- designated
 3         as confidential once we've received and
 4         reviewed the transcript.
 5    BY MR. CONROY:
 6         Q    So, Ms. Peet, you've been deposed
 7    before; correct?
 8         A    I have.
 9         Q    Let me just give you a few reminders
10    of some ground rules just to make things easier
11    for today; okay?
12         A    Okay.
13         Q    So, first of all, all of your answers
14    have to be verbal because the court reporter
15    can't take down a head shake or a head nod; okay?
16         A    Yes.
17         Q    And only one of us can speak at a
18    time, so I will do my best to let you finish your
19    answer before I ask the next question, and I
20    would ask that you similarly let me finish my
21    question before you begin your answer; okay?
22         A    I will.  Yeah.
23         Q    If you don't understand any of my
24    questions, it's definitely possible that's going
25    to happen.  Please just ask me to restate or
```

Page 6

1              M. Peet - Confidential

2   rephrase it and I will do my best; okay?

3       A    Okay.

4       Q    If you do answer my question, I'm

5   going to assume that you understood the question;

6   okay?

7       A    Okay.

8       Q    If you need a break at any time, just

9   let me know and we'll sort it out.  The only

10  request that I have is that you finish any

11  pending question before we take a break; okay?

12      A    Okay.

13      Q    What did you do to prepare for today's

14  deposition?

15      A    I reviewed my report.  I reviewed some

16  of the key materials that I had used to compile

17  the report.  I spoke with some of the lawyers on

18  the team about sort of the ground rules for

19  depositions.

20      Q    Anything else?

21      A    That's it.

22      Q    What were the key materials that you

23  reviewed?

24      A    I looked at the OMH plan.  The 2017

25  interim plan.  The transformation plan.  Some of

Page 7

1                    M. Peet - Confidential
2    the LSPs.  And some of the data reports put
3    together from the National Association of Mental
4    Health State Directors.  SAMHSA best practices
5    reports.  I think that's it.
6          Q     Do you remember which data reports you
7    looked at?
8          A     It was about -- they were about use of
9    hospitals.  Hospital versus community.  Budget
10   allocations; those kinds of things.
11         Q     And when you said "LSPs," what does
12   that stand for?
13         A     The county local services plans.
14         Q     Do you remember which LSPs you
15   reviewed to prepare for today?
16         A     Off the top of my head, I don't.
17         Q     Other than the attorneys representing
18   the plaintiffs, did you speak to anyone else to
19   prepare for the deposition?
20         A     No, I didn't.
21         Q     I'm going to show you what has been
22   marked as Exhibit 1.  I've got three copies, in
23   case.
24                (Exhibit 1 was marked.)
25                Take a second to flip through it, Ms.

Page 8

1                    M. Peet - Confidential
2    Peet, and then let me know, is this the
3    declaration and report that you submitted in this
4    case?
5         A    Yes, it is.
6         Q    Did you personally draft all of the
7    contents of the report?
8         A    Yes, I did.
9         Q    I want to ask first just about some of
10   the terms that you use in the report so we can
11   make sure we're on the same page before we get
12   going.  If you could flip to Page 1 of the
13   report --
14        A    Okay.
15        Q    -- there's a term that you use that
16   says "the relevant population."
17        A    Yes.
18        Q    How are you defining that term?
19        A    I define that term as people with
20   serious mental illness who have used the New York
21   State prison system.
22        Q    What do you mean by they "have used
23   the New York State prison system"?
24        A    They have been incarcerated.
25        Q    And there's a term, "serious mental

Page 9

1                    M. Peet - Confidential

2    illness."  I'm sorry.  Go ahead.

3         A     By that I mean the cohort of

4    individuals that are typically served by public

5    sector mental health systems.  Diagnostically

6    it's people with schizophrenia, people with major

7    bipolar illness, and people with serious major

8    depression.

9         Q     And you mentioned that they're served

10   by public providers.

11                Is that to contrast with people who

12   are served by private providers?

13        A     People with serious mental illness are

14   the individuals who are most often served by

15   public sector systems.  Medicaid recipients.

16        Q     Is that term sometimes called "SMI"?

17        A     Yes, it is.

18        Q     Does that definition that you use come

19   from a particular source?

20        A     It's a term of art in the field of

21   mental health administration.  Shorthand usually

22   for the populations and people that I indicated.

23        Q     And are you aware that New York State

24   has certain statutory definitions of SMI?

25        A     I am.

Page 10

1          M. Peet - Confidential

2     Q     And is your definition drawn from the

3   statutory definitions, or it's separate from the

4   statutory definitions?

5     A     It's drawn from the statutory

6   definitions.

7     Q     And so there's a phrase,

8   "community-based mental health housing and

9   supported services" which you've used the

10   shorthand, "CBMHHSS"?

11     A     Yes.

12     Q     How are you defining that term?

13     A     Those are the services that have been

14   developed in the era since the

15   institutionalization began that are intended to

16   serve people with serious mental illness and keep

17   them safe and stable in the community.

18     Q     What specific housing and services are

19   included?

20     A     It would be permanent supportive

21   housing.  ACT or FACT teams.  Crisis services.

22   Case management services.  Peer-operated

23   services.  And rehabilitative services.

24     Q     Anything else?

25     A     I think that's it.

Page 11

1                    M. Peet - Confidential

2        Q    So still on Page 1 of your report, I

3   want to direct your attention to the -- the

4   second full paragraph after the numbered sections

5   1 and 2.  So it's the paragraph that begins, "As

6   an expert on the administration of."

7                    MS. KHAN:  Ms. Peet, I believe

8           you're not on Page 1.

9                    THE WITNESS:  Okay.  Okay.

10          Gotcha.

11  BY MR. CONROY:

12       Q    Does this paragraph accurately list

13  the questions that the plaintiffs asked you to

14  opine about?

15                   MS. KHAN:  Mr. Conroy, could you

16          please repeat which paragraph you're

17          referring to?

18  BY MR. CONROY:

19       Q    Sure.  It's the paragraph in the

20  middle of Page 1 that begins, "As an expert on

21  the administration of state level community-based

22  mental health systems"?

23       A    Yes.

24       Q    Those are the questions the plaintiffs

25  asked you to opine about?

Page 12

                    M. Peet - Confidential

1

2        A      Yes.

3        Q      Are there any other questions that you

4   were asked to opine about that are not reflected

5   here?

6        A      No.

7        Q      I want to start with the first

8   question where you say, "I was asked by

9   plaintiffs' counsel to examine whether OMH and

10  DOCCS adequately serve the relevant population."

11             Did I read that correctly?

12       A      Yes.

13       Q      What methodology did you use to answer

14  that question?

15       A      First, I reviewed the professional

16  literature that has to do with treatment of

17  people with serious mental illness in

18  correctional systems, focused particularly on

19  discharge procedures.  I then reviewed the State

20  of New York's mental health plan and the interim

21  report on the mental health plan.  I reviewed

22  three years of local service plans from the

23  counties, and I looked at some of the data

24  reports published by the Office of Mental Health,

25  particularly regarding occupancy of supported

Page 13

1              M. Peet - Confidential

2    housing and ACT teams.

3        Q      Is there anything else that you did to

4    answer that question?

5        A      I don't believe so.

6        Q      Any other sources that you looked at

7    that you haven't mentioned?

8        A      I looked at best practices reports

9    from SAMHSA and from NASMHPD.

10       Q      Could you just for the transcript

11   spell out those initials?

12       A      SAMHSA is S-A-M-H-S-A.  Substance

13   Abuse Mental Health Services Administration.

14   NASMHPD is the National Association of State

15   Mental Health Program Directors.

16       Q      Any other sources that you haven't

17   covered already?

18       A      I think that's it.

19       Q      Did you speak to anyone or interview

20   anyone about these issues?

21       A      I did not.

22       Q      Why not?

23       A      It was not part of the scope of my

24   work.

25       Q      Why was it not part of the scope of

Page 14

1                   M. Peet - Confidential
2     your work?
3          A      I don't know.
4          Q      Is that an instruction you received or
5     that was your own decision?
6                   MS. KHAN:  Objection.  You may
7            answer.
8                   THE WITNESS:  When I asked the
9            attorneys who engaged me, you know, what I
10           should do to gather information for this
11           report, I was not instructed to interview
12           persons.  My report really has to do with
13           the systems issues involved in the case
14           rather than anything that has to do with any
15           particular individual.
16    BY MR. CONROY:
17         Q      But you could have talked to people
18    who work in those systems?
19                  MS. KHAN:  Objection.  You may
20           answer.
21                  THE WITNESS:  I assume that was a
22           matter for discussion between the attorneys
23           for both sides.  It's not a decision I could
24           have made on my own or would have made on my
25           own.

Page 15

1                    M. Peet - Confidential

2       BY MR. CONROY:

3            Q      Do you think you could have learned

4       any additional material information if you spoke

5       to people who work in these systems?

6            A      It's possible.

7            Q      What kinds of things would you want to

8       know if you talked to people who work in the

9       systems?

10           A      I think -- I would have been

11      interested in the experience of the discharge

12      planners that work in the state prison system who

13      are being asked to come up with discharge plans

14      for services that, by and large, don't exist.

15           Q      Anything else that you would be

16      interested in learning?

17           A      No.

18           Q      We'll get to in a bit your experience,

19      your prior experience consulting on cases

20      involving mental health systems, but in prior

21      cases, have you conducted interviews of people

22      involved in these systems?

23           A      In two of the cases that I have worked

24      on, I did.  On one of the cases, I did not.

25           Q      Which cases did you conduct

Page 16

1              M. Peet - Confidential

2    interviews?

3         A    U.S. versus Mississippi.  And United

4    States versus City of Phoenix.

5         Q    And which case was it that you did not

6    do interviews?

7         A    There was a report that I did for

8    disability rights, Vermont.

9         Q    Was that in connection with litigation

10   or something else?

11        A    It was with regard to potential

12   litigation.

13        Q    In the Mississippi case, who did you

14   interview?

15        A    I interviewed providers of services.

16   I interviewed state employees.  I interviewed

17   people who used services, and I interviewed

18   people from advocacy groups.

19        Q    Anyone else in the Mississippi case?

20        A    Not that I recall.

21        Q    How about in the City of Phoenix case?

22        A    In the City of Phoenix case, I

23   interviewed providers of services.  Police

24   officers from Phoenix.  911 operators in Phoenix.

25   Homeless individuals.

Page 17

1                 M. Peet - Confidential
2        Q      Was there anyone else you interviewed
3    in the Phoenix case?
4        A      Not that I recall.
5        Q      In this case, did you visit any
6    facilities?
7        A      I did not.
8        Q      Why not?
9        A      I was not asked to.
10       Q      If you could visit facilities in New
11   York State, is there anything you think you could
12   learn from that?
13       A      I think there's always a value to
14   experiencing firsthand what users of a system
15   experience.
16       Q      If you could visit facilities in New
17   York State, what facilities would you want to
18   visit?
19                 MS. KHAN:  Objection.  You may
20          answer.
21                 THE WITNESS:  I would be
22          interested in visiting the mental health
23          homeless shelters in New York.  General
24          homeless shelters and a prison site.
25

Page 18

1                M. Peet - Confidential

2    BY MR. CONROY:

3        Q      In the Mississippi case, did you visit

4    any facilities?

5        A      Yes.  I visited a state hospital.

6    Homeless shelters.  And community mental health

7    centers.

8        Q      What did you learn from those visits?

9        A      I wouldn't say I learned new

10   information through those visits.  I did -- I did

11   experience the feeling tone of people who were

12   both in the hospitals and in shelters.  It was an

13   opportunity to see if my -- the information that

14   I had gleaned from reports was validated by

15   hearing from people firsthand.

16       Q      How about in the Phoenix case; did you

17   visit any facilities?

18       A      Yes.  I visited crisis stabilization

19   units.  I visited homeless outreach programs.  I

20   spent time with an ACT team.  I spent time with

21   outreach workers in a homeless seminar.

22       Q      And what did you learn from those

23   visits?

24       A      It basically gave color to the

25   information that I had already gleaned in terms

Page 19

1                M. Peet - Confidential

2    of the state of affairs for people with mental

3    illness who have had interactions with the

4    Phoenix Police and the homeless system there.

5        Q        In the Vermont case, did you do any

6    facility visits?

7        A        I did not.

8        Q        Let me go back to Page 1 of the

9    report.  And the next sentence reads, "I was

10   further asked to opine on whether OMH and DOCCS

11   provide adequate CBMHHSS to this population upon

12   their release date and release from DOCCS."

13               Did I read that correctly?

14       A        Yes.

15       Q        Is this second question different from

16   the first question?

17       A        Yes.  The second question focuses

18   specifically on the experience of people as they

19   are being discharged, or are discharged from

20   DOCCS.  The first question is more general in

21   nature.

22       Q        So what was your methodology to answer

23   the second question?

24       A        It was the same as the first.

25       Q        So no additional sources we haven't

Page 20

1          M. Peet - Confidential

2   already covered?

3      A     I'm not sure if I mentioned DOCCS

4   reports in the first instance, but in this case,

5   it definitely included a review of DOCCS

6   discharge information, particularly the sites to

7   which people were being discharged.

8      Q     And were those reports in your list of

9   the Bates numbered documents in this case?

10     A     Yes.

11     Q     Okay.  I want to focus on your use of

12  the word "adequate."

13         How are you defining what it means to

14  provide adequate housing and services for the

15  relevant population?

16     A     When you engage in program development

17  in mental health, you rely on prevalence data for

18  the specific population you're looking at, so you

19  ascertain the number of individuals to be served,

20  and then define the services that that population

21  will need at a baseline to be safe and stable in

22  their community.  So it's really that point of

23  determining what is it that's going to allow

24  these fragile individuals to remain in their

25  communities and not have to be

Page 21

M. Peet - Confidential

1          M. Peet - Confidential

2    reinstitutionalized, because the community system

3    did not have the correct services in the correct

4    amounts to intervene at the point of a crisis.

5          Q    So let me see if I heard this

6    correctly, and tell me if I didn't.  So you said

7    you need to ascertain the number of individuals

8    to be served --

9          A    Yeah.

10          Q    -- with a certain array of services;

11    is that right?

12          A    Yes.

13          Q    And you're defining "adequate" to be

14    if the state is able to serve each one of those

15    number of individuals, then it's adequate.  If

16    they fall short of that number, it's not

17    adequate?

18          A    I think, you know, you do program

19    development based on the total group of people

20    that you believe need that service.  It makes no

21    sense to, you know, make a plan to serve

22    50 percent of the population or 80 percent.  You

23    know, the goal is to ensure that there is

24    adequacy of services, so that when people need

25    them, they're there for them.  So that's the

Page 22

1              M. Peet - Confidential

2    process.

3        Q     I think my question was a little bit

4    different, which is, if the state does not meet

5    that goal, and so they're some number short of

6    the number of individuals to be served, you're

7    saying not adequate?

8        A     I'm saying that my job was really to

9    look at the systemic issues rather than the

10   experience of individuals.  I mean, as a

11   commissioner, when you make these plans, you

12   know, you do it in all good faith, believing that

13   you're making a plan that will serve everybody in

14   need on any given day.  If a person has to wait

15   for a short period of time to get the services, I

16   wouldn't say that means that the system is

17   inadequate, but that's really not what we're

18   looking at in this instance.  This was widespread

19   unavailability of resources.

20       Q     Let's turn to page -- I'm sorry,

21   before we do that, what source or sources did you

22   use to arrive at your definition of "adequate

23   housing and services for the relevant

24   population"?

25       A     That definition was really based on my

Page 23

1                    M. Peet - Confidential

2     40 years of practice in mental health.  I've

3     engaged in needs assessment and program

4     development in a number of systems, and my

5     background is in public health, you know, so I

6     use population-based methods of ascertaining, you

7     know, what the number of people is, and then

8     applied utilization data to that.  Look at the

9     two things and come up with a target as we're

10    developing service.  It's really a living,

11    breathing process if you're managing these

12    systems.  It's iterative.  You come up with a

13    target number, and then you look at utilization

14    data over periods of time and make adjustments,

15    either rising or lowering the capacity of various

16    programs.  It's not something that you do once

17    and just put on the shelf and forget about it.

18         Q     Any other sources for your definition

19    of "adequate"?

20         A     No.

21         Q     All right.  Now let's flip to Page 7

22    of your report.  I'm not going to read the whole

23    paragraph, but I want to focus on the second full

24    paragraph that begins, "Setting these

25    objectives."

Page 24

1                    M. Peet - Confidential

2          A       Okay.

3          Q       Does this paragraph accurately state

4     your opinion?

5          A       Yes.

6          Q       Let me focus on the last sentence

7     which says, "It is contrary to OMH's

8     responsibility and its expressed commitment for

9     these individuals to be turned away, denied or

10    placed on a waiting list for CBMHHSS due to OMH's

11    failure to ensure that these services exist in

12    sufficient quantity."

13                 Did I read that correctly?

14         A       Uh-huh.

15         Q       Can you say a little bit more about

16    what that sentence means?

17         A       If you're operating a state mental

18    health authority, it's your highest

19    responsibility to make sure that you are

20    developing services that are accessible,

21    available to the target population of people that

22    you serve.  It's a constant process of adjusting

23    the resources of your system to try to meet

24    varying pictures of need.  So OMH has a number of

25    aspirational statements that I think I alluded to

Page 25

1                    M. Peet - Confidential

2       in the previous pages about serving this

3       population.

4                    But as I was doing my review, it

5       seemed to me that there were -- from a systemic

6       view, there were many occasions, repeated

7       occasions where people were being discharged from

8       prisons without adequate services.  So that

9       seemed to me an abrogation of their

10      responsibility as a statement of health

11      authority.

12           Q     And tell me, what is your source that

13      there are repeated occasions when individuals

14      were discharged without adequate services?

15           A     It's the OMH and DOCCS data that shows

16      the number of people who were discharged directly

17      to shelters from state prisons.

18           Q     And are you aware of the specific

19      details of any of those cases on the list that

20      you looked at showing people discharged from

21      DOCCS to shelters?

22           A     I did not look at individual cases.

23           Q     So do you know of those lists of

24      cases, for example, which people were offered

25      placements, but declined?

Page 26

1                    M. Peet - Confidential

2         A      No.

3         Q      And for those lists of cases, are you

4    aware of the preferences of the individuals being

5    placed?

6         A      No, I'm not.

7         Q      Turning back to the language on Page

8    7, so am I understanding your position correctly

9    to be that if a state has adequate services, then

10   no individuals leaving prison would be turned

11   away, denied or placed on a waiting list for

12   housing or services because of insufficient

13   quantity; is that correct?

14        A      I'm saying that the goal is always to

15   provide adequate amounts of services.  If on any

16   given day the unique circumstances of an

17   individual make that impossible, I would look to

18   see what efforts then went into both serving that

19   person, and ensuring that the resources available

20   were added to.  It's a -- in some ways it's a

21   quality assurance indicator when a person tries

22   to access services and they're not available.  As

23   the administrator of a state system, it's

24   important to review things, like people having to

25   be on waiting lists.  Being refused admission

Page 27

```
 1              M. Peet - Confidential
 2   because of lack capacity.  So that you can make
 3   the adjustments to your system that make it
 4   accessible to the target population.
 5        Q    Let's turn to Page 22.  And I want to
 6   direct your attention to the top partial
 7   paragraph where the last sentence says, "Evidence
 8   that there are any individuals with serious
 9   mental illness who are discharged without
10   necessary CBMHHSS shows OMH's failure to execute
11   its responsibility to meet the needs of the
12   relevant population."
13              Did I read that correctly?
14        A    You did.
15        Q    So here you say "any individuals";
16   right?
17        A    Uh-huh.
18        Q    Are you saying something different
19   today?
20        A    I don't think I am.  I think what I'm
21   saying is my task for this process was to look at
22   systems issues, so it's an aggregate of
23   experiences.  In the reality of day-to-day life,
24   occasionally because of a variety of
25   circumstances going to have individuals who don't
```

Page 28

1                    M. Peet - Confidential
2       access the correct services at the moment they
3       need them, yes, that happens, but that isn't what
4       I saw in this circumstance.  I saw a disregard
5       for this population.  Lots and lots of people
6       constantly being discharged to inappropriate
7       settings, like homeless shelters.
8            Q      Okay.  So what's your source that
9       there's a disregard for this population?
10           A      Well I think the fact that this has
11      gone on for some years, this discharging to
12      shelters says to me that there was a disregard.
13      I mean, also the fact that in one of OMH's
14      publications about supported housing, they listed
15      priority populations or priority sites for
16      referrals to housing, and prisons were added to
17      that list at some point.  However, in their own
18      report, OMH indicates that only 2.8 percent of
19      the referrals, accepted referrals for housing
20      under their jurisdiction, were from state
21      prisons.  So that's an indicator to me that this
22      is not a population that was -- that received a
23      lot of focus from the department.
24           Q      What document is it that you're
25      talking about?

Page 29

                    M. Peet - Confidential

1

2       A      It's the -- it's in the state planning

3    documents of OMH that addressed supported housing

4    in particular.

5       Q      Do you know what year this document is

6    from?

7       A      I believe it was 2021.  And -- well,

8    stipulating that there were priority referral

9    sites, the department then also indicated that

10   only 52 percent of admissions to their housing

11   resources were from the priority sites, which

12   means that while this population and the relevant

13   population only received 2.8 percent of the

14   accepted referrals, that almost 48 percent went

15   to people from settings that were not deemed

16   priority.

17      Q      I want to go back to the Page 7

18   language.  So you say here, "Evidence of any

19   individuals with SMI discharged without necessary

20   housing and services shows OMH's failure";

21   correct?

22      A      I do.

23      Q      Today you're telling me there could be

24   evidence of individuals discharged without

25   necessary housing and services due to individual

Page 30

```
 1              M. Peet - Confidential
 2    circumstances, and that would not violate your
 3    standard for adequacy; is that correct, or no?
 4              MS. KHAN:  Objection.  You may
 5         answer.
 6              THE WITNESS:  To me, it's a
 7         semantic issue.  I think I've tried to
 8         explain the process for making adaptations
 9         when you're doing program development, and
10         if you see a person who needs services and
11         isn't getting them, then the job of the
12         state mental health authority is to make the
13         adaptations so accessibility is feasible.
14    BY MR. CONROY:
15         Q    Okay.  Is it the case, yes or no, that
16    you believe that evidence of any individuals with
17    SMI discharged without necessary housing and
18    services shows OMH's failure to execute its
19    responsibility?
20              MS. KHAN:  Objection.  This has
21         been asked and answered.
22    BY MR. CONROY:
23         Q    You can answer.
24         A    With the provisos that I've added.
25         Q    So if you saw evidence of an
```

Page 31

1                M. Peet - Confidential
2    individual with SMI discharged without necessary
3    housing and services, you're telling me today you
4    wouldn't necessarily conclude that OMH has failed
5    because there could be individual factors that
6    bear on that?
7         A     They have failed with regard to that
8    individual, yes.
9         Q     They have failed; okay.
10               So evidence of an individual with SMI
11   discharged without housing and services, OMH has
12   failed?
13        A     Yes.
14        Q     Okay.  And the services are not
15   adequate; right?
16        A     At the moment in time that that
17   happens, yes.
18        Q     Okay.  Let's turn to Page 16.  Are you
19   on Page 16 with me?
20        A     I am.
21        Q     Sorry about that.  Thank you.
22               Does this section describe the housing
23   and services that you believe are required for
24   people from the relevant population when they get
25   out of prison?

Page 32

```
 1                  M. Peet - Confidential
 2        A      Yes.
 3        Q      So I've got No. 1, permanent supported
 4   housing; correct?
 5        A      Yes.
 6        Q      And does that permanent supported
 7   housing placement have to be free, or do you
 8   think it's okay if the individual has to pay some
 9   portion of rent?
10                MS. KHAN:  Objection.  You may
11        answer.
12                THE WITNESS:  Typically there's a
13        formula for rent payments that does require
14        individuals to pay a portion of their
15        income, and I think that's appropriate.
16   BY MR. CONROY:
17        Q      Okay.  Second, ACT or FACT teams;
18   correct?
19        A      Yes.
20        Q      A-C-T, F-A-C-T.  Just tell me so we
21   get it straight for the record, what does ACT
22   stand for?
23        A      Assertive community treatment team.
24        Q      What about FACT?
25        A      FACT is forensic assertive community
```

Page 33

1                M. Peet - Confidential

2    treatment team.

3         Q      Third, crisis services?

4         A      Yeah.

5         Q      Fourth, medication management;

6    correct?

7         A      Yes.

8         Q      And fifth, brief inpatient stays as

9    needed?

10        A      Yes.

11        Q      Is there anything else that you

12   believe is part of the necessary safety net

13   services for this relevant population?

14        A      No.   That's it for safety net

15   services.

16        Q      Do you agree that New York State

17   currently funds each of these types of services

18   in some amount?

19        A      Yes.

20        Q      Okay.   So let me just recap to make

21   sure I understand how you are defining what it

22   means for a state to have adequate services

23   before we look at the facts on the ground in New

24   York; okay?

25        A      Okay.

Page 34

1                    M. Peet - Confidential
2        Q        So under your definition of "adequate
3    services for the relevant population," the state
4    must provide an incarcerated individual with SMI
5    upon their release from prison with a permanent
6    placement and supported housing; correct?
7        A        Yes.
8        Q        A placement with an ACT team or a FACT
9    team?
10       A        Yes.
11       Q        A comprehensive continuum of crisis
12   services?
13       A        Yes.
14       Q        Medication management?
15       A        Yes.
16       Q        And inpatient care as needed?
17       A        Yes.
18       Q        And is it your opinion that the state
19   must allocate its resources in order to ensure
20   that those housing and services are in place for
21   each person with SMI on the day they are released
22   from prison?
23       A        More broadly, I think I was talking
24   about the necessity of creating adequate capacity
25   in each service area in the state to prevent

Page 35

1              M. Peet - Confidential

2    unnecessary institutionalization or

3    reinstitutionalization.  It's important to have

4    this cluster of services.  And since people

5    leaving state hospitals and prison are a subset

6    of the larger group of individuals that OMH is

7    charged with serving, that these services would

8    be available to them, as well as all people with

9    serious mental illness in the defined catchment

10   areas throughout the state.

11       Q    Okay.  I think I heard a yes to my

12   question, but I want to go back to my specific

13   question to make sure I'm understanding you

14   correctly.

15       A    Okay.

16       Q    So is it your opinion that the state

17   must allocate its resources in order to ensure

18   that the services we just listed are in place for

19   each person with SMI on the day they are released

20   from prison?

21              MS. KHAN:  Objection, but you may

22        answer.

23              THE WITNESS:  Yes, in so much as

24        they are part of a broader population of

25        people with serious mental illness who

Page 36

1                    M. Peet - Confidential

2          should have these services available to them

3          in their communities.  I'm not

4          distinguishing between the population of

5          people coming out of prison.  I'm saying

6          this is -- these are safety net services

7          that should be available in adequate

8          capacity, and each service system to meet

9          the needs of people with serious mental

10         illness, so, yes.

11    BY MR. CONROY:

12         Q     Okay.  But you understand that this

13    case is about the relevant population; correct?

14         A     I do.

15         Q     Okay.  But the answer was yes to the

16    question?

17         A     Yes.

18         Q     Okay.  And individuals coming out of

19    prison with SMI are allowed to turn down a

20    placement that's offered them; correct?

21         A     Yes.

22         Q     So if the state offers a placement in

23    housing or services to the individual, but the

24    individual declines, is that a violation of your

25    standard?

Page 37

1                    M. Peet - Confidential

2          A     It depends on the circumstance.

3    Individuals with serious mental illness often

4    have trust issues.  They have difficulty engaging

5    sometimes.  They've often times bad experiences

6    with previous settings.  So I wouldn't say that

7    just a refusal, in and of itself, is

8    justification to then revert to discharge to a

9    shelter.  I think there's a process of engagement

10   with these individuals that's really important to

11   explore why they're refusing a particular

12   placement, and to determine if there's another

13   available option that would also meet their

14   needs.  I think just a simple refusal is -- needs

15   deeper exploration to determine appropriateness.

16             Also I would say it has to do with a

17   risk analysis for both the safety of the

18   individual and the safety of the community.

19         Q     Tell me more about what you mean by

20   that.

21         A     I think these decisions really have to

22   be looked at in the circumstances of the

23   particular individual and if, for example, a

24   person is refusing a setting and saying that, you

25   know, they were exploited physically or sexually

Page 38

1                M. Peet - Confidential

2    when they were in that setting previously, and

3    the person has a history of PTSD, that's a

4    reasonable reason for a person to say, no, they

5    don't want that setting. And then I think it's

6    incumbent on the people trying to work with him

7    or her to find an alternative.

8         Q     Are you aware of any jurisdictions

9    that guarantee a permanent supported housing

10   placement, and your full list of necessary safety

11   net services to each person with SMI leaving

12   prison on the day they get out of prison with no

13   wait time?

14        A     I'm aware of jurisdictions that have

15   developed the infrastructure for the safety net

16   services, such a crisis services, case

17   management, inpatient access for all people with

18   serious mental illness. So those would, of

19   course, be available for the relevant population

20   here. I can't say with certainty that I'm

21   familiar with the jurisdiction that ensures

22   access to permanent supported housing at the

23   point of discharge.

24        Q     The point of discharge from prison?

25        A     Right.

Page 39

1              M. Peet - Confidential

2        Q    What are the -- just to make sure I

3   understood that, you're aware of some states that

4   have the infrastructure for the services putting

5   the permanent housing piece to the side?

6        A    Correct.

7        Q    Okay.  Which jurisdictions are those?

8        A    Maine.  Connecticut.

9        Q    Anything else?

10       A    Those are the ones that I have

11  experience personally, so I'm comfortable listing

12  those.

13       Q    Just so I understand, your testimony

14  is that in Maine and Connecticut, everyone with

15  SMI leaving prison gets ACT or FACT teams; a

16  comprehensive continuum of crisis services;

17  medication management and inpatient care as

18  needed on the day of their release from prison?

19       A    With the addition of intensive case

20  management as an option for the case management

21  services.  And I should clarify that these -- my

22  recollection about these services is from the

23  point in time when I was responsible for those

24  systems.

25       Q    And I'm going to loop back to that in

Page 40

1                    M. Peet - Confidential

2       a minute, but that was back in the '90s?

3            A      Yes.

4            Q      For both states?

5            A      '80s and '90s.

6            Q      And tell me again, so you said

7       intensive case management could be an option

8       instead of ACT or FACT teams?

9            A      In some parts of Maine in particular,

10      we did not have psychiatrists in the northern

11      part of the state, so in those areas we used

12      intensive case management rather than ACT in the

13      rural parts of the State.

14           Q      And you believe that was okay for

15      Maine?

16           A      We made it work, you know.  In

17      underserved work force areas, sometimes you have

18      to make modifications from the ideal to be

19      adequate.

20           Q      But your opinion here is that if New

21      York does not supply ACT or FACT teams to

22      everyone with SMI leaving prison on the day they

23      get out of prison, the services are not adequate;

24      right?

25           A      I would say that there are

Page 41

1              M. Peet - Confidential
2    substitutions in programming that can be made to
3    work when work force considerations don't allow
4    for a program that would be seen as the program
5    of choice, particularly for people who are
6    leaving prison.  The notion of having a program
7    like ACT where they get their medications, they
8    get all their services under the one umbrella of
9    that program, and particularly for those
10   individuals, let's say, that would be the No. 1
11   option.  Intensive case management, an
12   opportunity for psychiatrist consultation is
13   another option that can work.
14        Q    Do you say that somewhere in your
15   report in this case?
16        A    I didn't.
17        Q    Why not?
18        A    It didn't occur to me as relevant, I
19   think, because OMH has invested in ACT teams and
20   uses them throughout the State of New York, so I
21   think it's always better to build on the
22   infrastructure that a state mental health
23   authority has put in place, rather than
24   introducing a new program option.
25        Q    But are you aware that some

Page 42

1              M. Peet - Confidential

2   individuals in New York are served by intensive

3   case management teams as opposed to ACT or FACT

4   teams?

5       A      I don't think I knew that.

6       Q      And is it your opinion that that can

7   be an option if resources demand that?

8       A      Yes.

9       Q      How about outside of the United

10  States; are you aware of any jurisdictions

11  outside of the United States that guarantee a

12  permanent supported housing placement, and your

13  full list of necessary safety net services to

14  each person with SMI leaving prison on the day

15  they get out of prison with no wait time?

16              MS. KHAN:  Objection.  You may

17      answer.

18              THE WITNESS:  I'm not aware of

19      that.

20  BY MR. CONROY:

21      Q      So would you agree with me that this

22  definition that you're applying is not an

23  industry standard in the field of mental health?

24              MS. KHAN:  Objection.  You may

25      answer.

Page 43

1          M. Peet - Confidential

2          THE WITNESS:  There is -- there is

3      an industry standard in the field of mental

4      health that housing without support

5      services, and support services without

6      housing are not adequate to meet the needs

7      of people with serious mental illness.

8      After many years now of research, looking at

9      people who have an institutionalized or at

10     risk of institutionalization, it's a

11     well-researched fact that the best outcomes

12     are to people who have stable living

13     environments paired with intensive services,

14     so that is an industry standard.

15  BY MR. CONROY:

16     Q     So the industry standard is that it's

17  best for individuals to receive the full array,

18  housing and services; right?

19     A     I wouldn't use the word "best."  I

20  would use -- if we think of the task as trying to

21  keep people safe in their communities and keep

22  them from being reinstitutionalized, which is the

23  goal of most state mental health authorities,

24  that that's the combination that seems to work

25  the best for people.

Page 44

1               M. Peet - Confidential
2        Q     But, again, you're not aware of any
3    jurisdiction that guarantees a permanent
4    supported housing placement for each person with
5    SMI leaving prison on the day they get out of
6    prison with no wait time?
7                     MS. KHAN:  Objection.  You may
8            answer.
9                     THE WITNESS:  No.  And in some
10           ways I feel like the intervening experience
11           for these people of being in a prison could
12           be confounding, because this is the goal for
13           people with serious mental illness, period.
14           So in that way, they're not different from
15           their peers who have not been in prison.
16                     What; however, their being in
17           prison tends to do is add risk factors to
18           their experience, so that they're more
19           likely than others to end up
20           reinstitutionalized, whether it's in prison
21           or in state hospitals, other hospitals.  So
22           am I aware of jurisdictions that provide
23           this on the day that they are discharged?
24           No.  Is it incredibly risky to send people
25           out of prisons to settings like homeless

```
 1              M. Peet - Confidential
 2      shelters?  Yes.
 3   BY MR. CONROY:
 4      Q    I'm trying -- I'm not trying to get
 5   stuck on this, but I can't tell if you agree with
 6   me or not.
 7      A    Okay.
 8      Q    I'll try again.
 9           If no jurisdictions provide this
10   guarantee; right?
11      A    Yes.
12      Q    Of the supported --
13      A    On the day of.
14      Q    On the day of, permanent supported
15   housing placement, it can't be standard for that
16   guarantee to exist nationwide; right?
17              MS. KHAN:  Objection.  You may
18      answer.
19              THE WITNESS:  Correct.
20   BY MR. CONROY:
21      Q    Okay.  Do you need a break?
22      A    Yes.  That would be great.
23      Q    Ten minutes?
24              MS. KHAN:  That's fine.
25              (Whereupon there was a brief
```

Page 46

1                M. Peet - Confidential

2          recess from 10:51 a.m. until 11:08 a.m.)

3    BY MR. CONROY:

4          Q     Ms. Peet, why do you think it is that

5    no jurisdictions that you are aware of guarantee

6    a permanent supported housing placement to each

7    person with SMI leaving prison on the day they

8    get out of prison without no wait time?

9                    MS. KHAN:  Objection.  You may

10         answer.

11                   THE WITNESS:  I don't think I

12         could opine on that.

13   BY MR. CONROY:

14         Q     Why not?

15         A     I don't know.  I don't know.

16         Q     Well, you've worked in government;

17   right?

18         A     Yeah.

19         Q     Does that give you any perspective on

20   why jurisdictions have not been able to achieve a

21   guarantee of a permanent supported housing

22   placement on the day everyone gets out of prison?

23                   MS. KHAN:  Objection.  You may

24         answer.

25                   THE WITNESS:  I think what happens

Page 47

1              M. Peet - Confidential
2        to this relevant population in particular is
3        that the fact of their incarceration becomes
4        the dominant variable and the lens through
5        which people look at them, and so I think
6        there is a lot of bias towards this
7        population.  I think they fall to the bottom
8        of priority lists, explicitly or implicitly.
9        I think that's part of what goes on.
10              Providers often avoid accepting
11       people with histories of incarceration
12       because of risk management issues.  It's
13       harder, I think, to work with a provider
14       system and get their buy-in to serve these
15       people with the same enthusiastic and
16       empathy that they do for other people with
17       serious mental illness.
18  BY MR. CONROY:
19       Q      And at some point I'll get back to
20  more specifics on your government background, but
21  tell me again, you worked in both Maine and
22  Connecticut; right?
23       A      Yeah.
24       Q      And in both of those states at the
25  time you were in government service, neither

Page 48

1                     M. Peet - Confidential
2       state guaranteed a permanent supported housing
3       placement to everyone with SMI leaving prison?
4            A       Correct.  And my authority as
5       commissioner of mental health extended to the
6       development of the infrastructure to serve all
7       people.  But I didn't have the final say on
8       discharges from prisons as opposed to state
9       hospitals.
10           Q       Tell me more about what you mean by
11      that.
12           A       Part of what is necessary in this
13      case, I think, is to see people in the relevant
14      population first as people with serious mental
15      illness; and second, as people who have had
16      involvement with the correctional system.
17      Because it's their mental illness that drives
18      what their service capacity is.  So if you're
19      developing an adequate service system for all
20      people with serious mental illness, the challenge
21      isn't going to be as extreme to make sure the
22      people in this subpopulation get their needs met.
23                   Is that clear?
24           Q       Well I guess you said something about
25      how you -- when you were commissioner in Maine,

Page 49

1          M. Peet - Confidential

2    was it, that you didn't have the final say on

3    discharges?

4          A     Correct, from prison.  We certainly

5    worked with the correctional system to the extent

6    possible to try to make our sort of standard

7    mental health services accessible and available

8    to those persons, and took action when we felt

9    like providers were not operating in good faith

10   to serve them.

11         Q     But; nevertheless, when you were

12   commissioner in Maine, there was no guarantee

13   that everyone with SMI leaving prison would get a

14   permanent supported housing placement; correct?

15              MS. KHAN:  Objection.  You may

16        answer.

17              THE WITNESS:  There was not a

18        guarantee.

19   BY MR. CONROY:

20         Q     Why not?

21         A     Because of jurisdictional issues.  I

22   didn't have the authority to approve discharge

23   plans for people who were leaving state prisons.

24         Q     So are you saying there was capacity

25   in Maine to provide permanent supported housing

Page 50

1                M. Peet - Confidential

2    to everyone leaving prison, and the only issue

3    was getting a separate agency to approve those

4    placements?

5         A    We didn't have the challenges of

6    occupancy availability in Maine, let me say it

7    that way.  Accessing housing was not as

8    challenging in Maine as it is in New York.

9         Q    So then I'm just not following the

10   point.  So it wasn't a capacity issue, and so

11   what was the reason why everyone leaving prison

12   with SMI didn't get a permanent supported housing

13   placement?

14              MS. KHAN:  Objection.  You may

15       answer.

16              THE WITNESS:  I'm just saying that

17       there was not a policy in place that offered

18       an absolute guarantee to people.

19   BY MR. CONROY:

20        Q    Are you aware of individuals during

21   the time you were commissioner in Maine being

22   released from prison with SMI and not going to

23   supported housing placements?

24              MS. KHAN:  Objection.  You may

25       answer.

Page 51

```
 1                 M. Peet - Confidential
 2                 THE WITNESS:  I'm not.  My
 3          responsibilities as commissioner were
 4          similar to my focus in this report, which is
 5          on the systemic issues and to trends rather
 6          than on individual cases.  Typically an
 7          individual case would only rise to me if
 8          something terrible had gone wrong.
 9   BY MR. CONROY:
10          Q     So you're not saying that no one in
11   Maine went to locations other than permanent
12   supported housing.  You're just saying you're not
13   aware where they went?
14                 MS. KHAN:  Objection.  You may
15          answer.
16                 THE WITNESS:  Correct.
17   BY MR. CONROY:
18          Q     Are there any resources or studies or
19   any other documents you are aware of that
20   recommend that states allocate their resources in
21   order to guarantee a permanent supported housing
22   placement and your list of necessary safety net
23   services to each person with SMI leaving prison
24   on the day they get out of prison with no wait
25   time?
```

Page 52

                        M. Peet - Confidential

1
2        A      I'm aware of literature that focuses
3   on strategies for interfering with the sort of
4   cycle of recidivism that often accompanies people
5   leaving state hospitals and state prisons with
6   mental illness, and in that literature it points
7   to the importance of providing stable housing and
8   good support services to people as they leave
9   state hospitals as a good strategy to keep people
10  from becoming reinstitutionalized.
11       Q      So my question was a little different.
12              Are there any resources or studies or
13  any other documents you are aware of that
14  recommend that states allocate the resources in
15  order to guarantee a permanent supported housing
16  placement and your list of necessary safety net
17  services to each person with SMI leaving prison
18  on the day they get out of prison with no wait
19  time?
20              MS. KHAN:  Objection.  You may
21         answer.
22              THE WITNESS:  Only to the extent
23         that the goal -- there's a lot of literature
24         about this, for state mental health
25         authorities, is to build infrastructure and

Page 53

1           M. Peet - Confidential
2       program capacity so that all individuals
3       with serious mental illness can access these
4       services that they need when they need them.
5       I think the commissioner and some of her
6       communications has pointed to this very
7       strategy and goal, that you need the right
8       services at the right time.  And so in
9       building those services, you don't
10      necessarily have to focus on the specific
11      subpopulation of people who are leaving
12      prisons, as much as you're building for the
13      whole population of people with serious
14      mental illness in the state.
15  BY MR. CONROY:
16      Q     But, again, you're aware that this
17  case is about the relevant population; right?
18      A     I am.
19      Q     So I'm going to ask the question
20  again, because it's a more specific question.
21            Are there any resources or studies or
22  any other documents you are aware of that
23  recommend that states allocate their resources in
24  order to guarantee a permanent supported housing
25  placement and your list of necessary safety net

Page 54

1          M. Peet - Confidential
2   services to each person with SMI leaving prison
3   on the day they get out of prison with no wait
4   time?
5               MS. KHAN:  Objection.  You may
6      answer.
7               THE WITNESS:  No.
8   BY MR. CONROY:
9      Q      In any of your own work other than the
10  report in this case, have you ever recommended
11  that states allocate their resources in order to
12  guarantee a permanent supported housing placement
13  and your list of necessary safety net services to
14  each person with SMI leaving prison on the day
15  they get out of prison with no wait time?
16     A      I have in my report recommended the
17  development of sufficient supported housing for
18  all people with serious mental illness who
19  qualify for and wish to have that level of
20  residential care.  So all people includes people
21  with criminal justice involvement.
22     Q      So, again, my question is more
23  specific.
24              In any of your own work, other than
25  the report in this case, have you recommended

Page 55

1                M. Peet - Confidential

2    that states allocate their resources in order to

3    guarantee a permanent supported housing placement

4    and your list of necessary safety net services to

5    each person with SMI leaving prison on the day

6    they get out of prison with no wait time?

7                    MS. KHAN:  Objection.  You may

8        answer.

9                    THE WITNESS:  No.

10   BY MR. CONROY:

11       Q      Earlier you mentioned reviewing best

12   practices reports from -- I'm going to mess up

13   the names.

14       A      NASMHPD.

15       Q      Tell me the two?

16       A      NASMHPD is National Association of

17   State Mental Health Program Directors, which is

18   state commissioners.

19       Q      Okay.  And SAMHSA?

20       A      Yes.

21       Q      Did any of the best practices reports

22   that you reviewed recommend that states allocate

23   their resources in order to guarantee a permanent

24   supported housing placement and your list of

25   necessary safety net services to each person with

Page 56

1                  M. Peet - Confidential
2    SMI leaving prison on the day they get out of
3    prison with no wait time?
4         A     The best practices reports about
5    permanent supported housing really advocates
6    strongly for making it an important part of the
7    housing and residential services continuum in
8    every state.  So that when people are ready for
9    and desire that outcome, that it should be
10   available to them.  And I feel like having an
11   experience with the correctional justice system
12   does not obviate the fact that these individuals,
13   first and foremost, are people with serious
14   mental illness, so they need access to the same
15   array of services as do their peers without
16   criminal justice system involvement.
17        Q     So I'm going to do it again because my
18   question is more specific.  I know you know it's
19   coming.
20              Did any of the best practices reports
21   that you reviewed say that states should allocate
22   their resources in order to guarantee a permanent
23   supported housing placement and your list of
24   necessary safety net services to each person with
25   SMI leaving prison on the day they get out of

Page 57

1              M. Peet - Confidential
2    prison with no wait time?
3              MS. KHAN:  Objection.  You may
4         answer.
5              THE WITNESS:  No.
6    BY MR. CONROY:
7         Q    Why do you think that's not something
8    that the reports and resources you looked at
9    represented?
10             MS. KHAN:  Objection.  You may
11        answer.
12             THE WITNESS:  I think it's because
13        when they're talking about, you know,
14        building programs in state systems, they're
15        not distinguishing between subpopulations of
16        people with serious mental illness.  They're
17        sort of laying out what's unnecessary
18        continuum of services for all people.  So I
19        think the distinguishing of, you know, one
20        place of referral from another doesn't
21        really fall within the realm of, you know,
22        best practices publications usually.
23    BY MR. CONROY:
24        Q    Does your definition of "adequate
25    housing and services for the relevant population"

Page 58

```
 1              M. Peet - Confidential
 2    incorporate any legal standards?
 3              MS. KHAN:  Objection.  You may
 4       answer.
 5              THE WITNESS:  No.
 6    BY MR. CONROY:
 7       Q     Did you review any statutes or
 8    judicial decisions to reach your definition of
 9    "adequate housing and services"?
10       A     I did not.
11       Q     So when you talk about in your report
12    whether New York has adequate services for the
13    relevant population, is that a different question
14    from the question of whether the services being
15    provided are the ones required by the relevant
16    legal authorities?
17              MS. KHAN:  Objection.  You may
18       answer.
19              THE WITNESS:  Can you restate?
20    BY MR. CONROY:
21       Q     Sorry.  That got a little confusing.
22    Sorry.
23              So you've analyzed in your report
24    whether OMH and DOCCS provided adequate services
25    using your definition; right?
```

Page 59

1              M. Peet - Confidential

2        A      Yeah.

3        Q      So you have not attempted to address

4   whether or not OMH and DOCCS provide the services

5   that the relevant legal authorities require them

6   to provide; correct?

7                   MS. KHAN:  Objection.  You may

8        answer.

9                   THE WITNESS:  Correct.

10  BY MR. CONROY:

11       Q      Okay.  Sitting here today, do you have

12  any opinion about whether the housing and

13  services being provided by OMH and DOCCS to the

14  relevant population satisfies their obligations

15  under the relevant legal authorities?

16                  MS. KHAN:  Objection.  You may

17       answer.

18                  THE WITNESS:  As I said, I did

19       not -- I didn't review the legal framework.

20       I can say that having as a regular practice

21       discharging vulnerable people to homeless

22       shelters doesn't meet any standard that I'm

23       familiar with in public sector mental

24       health.

25

Page 60

1              M. Peet - Confidential

2    BY MR. CONROY:

3         Q      And what are the standards that you

4    are familiar with?

5         A      There's a concept of abandonment that

6    is central to a lot of work in healthcare,

7    whereas an institution, your treatment of

8    vulnerable people doesn't -- your responsibility

9    doesn't end at the door of the facility when you

10   discharge.  And if you're putting people in high

11   risk situations or environments, I think that's a

12   violation of your responsibility as a state

13   mental health authority.  I mean, you have an

14   explicit responsibility to care for this cadre of

15   very vulnerable citizens and, in my opinion,

16   discharging them to homeless shelters after long

17   periods of institutionalization is -- crosses a

18   line.

19        Q      And what is the source of -- this is a

20   legal standard you're talking about?

21        A      I'd say it's somewhere between a moral

22   and a legal standard.

23        Q      So on the legal side what's the source

24   of that?

25        A      It's the -- you know --

Page 61

1              M. Peet - Confidential

2              MS. KHAN:  Objection.

3              THE WITNESS:  -- the avoidance of

4        abandonment.

5              MS. KHAN:  I note on the record my

6        objection is all questions related to

7        questioning the witness regarding legal

8        standards.

9    BY MR. CONROY:

10       Q    So you said in Maine it was not within

11   your department's jurisdiction where individual

12   people were placed upon their release from

13   prison?

14       A    Uh-huh.  It wasn't our decision.  Our

15   staff were typically consulted in the way that

16   OMH staff are consulted around discharge

17   planning.  The authority for discharge was not

18   ours.

19       Q    And you also said that you weren't

20   aware typically of the specifics of where people

21   went after they left prison?

22       A    Correct.

23       Q    How do you square that with what you

24   just said about how the responsibility doesn't

25   end at the door, and it's legal abandonment not

Page 62

1           M. Peet - Confidential
2    to follow up?
3           MS. KHAN:  Objection.  You may
4       answer.
5           THE WITNESS:  I didn't -- I
6       certainly was not involved with every case
7       of individuals being discharged.  I did
8       meet; however, routinely with homeless
9       shelters in Maine to discuss whether they
10      were receiving what I considered to be
11      inappropriate discharges from any
12      institution in the State of Maine, whether
13      it was correctional or psychiatric.  So that
14      was one of my methods for trying to keep
15      track at a systems level of when things had
16      gone awry and people were getting what I
17      considered to be inappropriate discharges.
18   BY MR. CONROY:
19      Q    Let me ask a slightly different
20   question.
21           If the state does not allocate its
22   resources in order to guarantee a permanent
23   supported housing placement and the list of
24   necessary safety net services to each person with
25   SMI leaving prison on the day they get out of

Page 63

1              M. Peet - Confidential

2    prison with no wait time, do you have an opinion

3    about whether that would be a violation of the

4    Americans With Disabilities Act?

5              MS. KHAN:  Objection.

6              THE WITNESS:  I'm not a lawyer.

7        I'm not a lawyer.  I don't have an opinion

8        about that.

9    BY MR. CONROY:

10       Q    Okay.  Well let me loop back and cover

11   some of your background and experience.

12            Appendix A to your report is your CV;

13   is that right?

14       A    Yes.

15       Q    Does the CV accurately depict your

16   education and professional history?

17       A    Yes.

18       Q    Is there any education or work history

19   that's missing?

20       A    No.

21       Q    And it says that since 2018, you have

22   been a consultant; is that right?

23       A    2019, actually, for the -- there was

24   an overlap year when I was phasing out of my role

25   at the Institute of Professional Practice and

Page 64

1                    M. Peet - Confidential
2    started working with the Department of Justice.
3          Q      And as a consultant, do you work as
4    part of an organization or on your own?
5          A      On my own.
6          Q      And this says your clients have been
7    the Department of Justice and state disability
8    rights organizations; is that right?
9          A      Yes.
10         Q      Have you had any -- have you consulted
11   for any entities outside of those two groups?
12         A      I have consulted with provider
13   organizations around programmatic issues.
14   Nothing -- these are the ones that have to do
15   with legal or rights kinds of content.
16         Q      Sorry.  The DOJ and the disability
17   rights cases have been legal in nature?
18         A      I've consulted with provider
19   organizations around systems development.
20   Program development.
21         Q      Outside of the context of litigation?
22         A      Correct.
23         Q      Okay.  Which state disability rights
24   organizations have you consulted for?
25         A      Vermont and New York.

Page 65

1                    M. Peet - Confidential
2        Q     And have you been a consultant to any
3    state governments?
4        A     No.  I've worked for state
5    governments --
6        Q     Sure.
7        A     -- but I have not consulted with them.
8        Q     Yeah.  In your role since 2019, you
9    have not consulted for state governments.
10       A     No.
11       Q     Is there any reason why you have
12   worked only with DOJ and disability rights
13   organizations and not with governments?
14                    MS. KHAN:  Objection.  You may
15           answer.
16                    THE WITNESS:  No.  They were the
17           organizations that asked.
18   BY MR. CONROY:
19       Q     How many cases have you worked on for
20   DOJ?
21       A     Two.
22       Q     Was that the Mississippi case and the
23   Phoenix case?
24       A     Yeah.
25       Q     So let's just get the overview of both

Page 66

1                    M. Peet - Confidential
2      of those.
3                    Which one was earliest?
4          A       Mississippi.
5          Q       Okay.  What was the Mississippi case
6      about?
7          A       It was an Olmstead case.  The issue
8      that I was contracted with to look at was the --
9      to consider the adequacy of the community mental
10     health system in Mississippi, and whether there
11     were things in that system that created
12     overreliance in patient care.
13         Q       And was that analysis focused on a
14     particular population or something other than
15     that?
16         A       It was focused on all individuals with
17     serious mental illness.
18         Q       What court was that case in?
19         A       I don't know.  I don't know the -- it
20     was a Federal District Court.
21         Q       Federal Court?
22         A       Yeah.
23         Q       Okay.  What conclusions did you reach?
24         A       That the community mental health
25     system in Mississippi was significantly

Page 67

                    M. Peet - Confidential
1
2    underdeveloped and that; therefore, there was an
3    overreliance on institutional care for people who
4    didn't necessarily need that level of care in
5    Mississippi.
6        Q    Did you prepare an expert report in
7    that case?
8        A    I did.
9        Q    Did you testify at a deposition?
10       A    Yes.
11       Q    And did you testify at trial?
12       A    Yes.
13       Q    Did the Court admit your testimony as
14   an expert?
15       A    Yes.
16       Q    Did it exclude any part of your
17   testimony?
18       A    No.
19       Q    And what was the outcome in that case?
20       A    The Department of Justice prevailed.
21       Q    So let's go on to -- I'm sorry.  What
22   year was that?
23       A    I believe it was 2019.
24       Q    Okay.  And then next for DOJ is the
25   Phoenix case?

Page 68

1                    M. Peet - Confidential

2          A      Yes.

3          Q      And what was -- what year was that

4      case?

5          A      It began last year.

6          Q      Is it still ongoing?

7          A      Yes.

8          Q      What is that case about?

9          A      There are two aspects of the case.

10     The primary focus is on excessive use of force by

11     the Phoenix Police.  And the other issue is ADA

12     related regarding treatment of people with mental

13     illness and homeless people by the Phoenix

14     Police.

15         Q      And when you say treatment of those

16     individuals, is it medical treatment or just

17     general how they --

18         A      It's an ADA claim, that these

19     individuals are being discriminated against

20     because of their condition or diagnosis.

21         Q      And this is active litigation?

22         A      Yes.

23         Q      Who are the defendants?

24         A      City of Phoenix.

25         Q      And just so -- I'm just trying to

Page 69

1                    M. Peet - Confidential
2      understand the parameters of the case.
3               It's focused on the practices of the
4      Police Department or is it also about Phoenix's
5      mental health treatment system?
6          A      It's really focused on the police.
7          Q      Okay.  So are there any issues about
8      the issues we've been talking about here, housing
9      services, what's provided for individuals in the
10     community; is that an issue at all in the Phoenix
11     case?
12         A      It's not.
13         Q      Okay.  What analysis did you conduct
14     in the Phoenix case?
15         A      We're still in the
16     information-gathering phase of the case.  I
17     haven't made any judgments or reports.
18         Q      Okay.  So you haven't been deposed yet
19     in that case?
20         A      No.
21         Q      Okay.  And that one I'm guessing is
22     also in Federal Court?
23         A      Correct.
24         Q      And at this point, the Court hasn't
25     considered whether or not to admit you as an

Page 70

                    M. Peet - Confidential

1

2    expert?

3         A      Correct.

4         Q      All right.  And that's the full list

5    for DOJ?

6         A      Yes.

7         Q      So let's talk about the Vermont case.

8    What is that case about?

9         A      There is not a case.  I was asked to

10   consult the Vermont Disability Rights

11   Organization to look at a practice that the

12   Vermont Department of Mental Health was engaging

13   in that had to do with keeping people in Vermont

14   hospitals beyond the point of clinical necessity

15   because the provider community was unwilling to

16   assume the risk of taking them at the point of

17   discharge.

18        Q      And what was your role in the case?

19        A      To review the occurrence of this

20   practice in Vermont, and to make some

21   recommendations about how the mental health

22   system might develop programming to eliminate

23   this practice.  They were in a posture of really

24   wanting to work with the Department of Mental

25   Health to solve this problem.  They weren't in a

Page 71

```
 1                M. Peet - Confidential
 2   litigation stance at that point.
 3        Q    So did you ever prepare a written
 4   report?
 5        A    I did.
 6        Q    And did that go to -- who did that go
 7   to?
 8        A    It went to the director of the
 9   disability rights organization in Vermont.  He
10   shared it with the commissioner and with, I
11   think, key legislatures.
12        Q    And did you say there was never a
13   lawsuit filed in that case?
14        A    To my knowledge, no.  COVID hit
15   immediately after that, and everything sort of
16   blew up, so I don't know.
17        Q    Was there any resolution of the issues
18   being discussed?
19        A    You know, I have had no discussion
20   with them subsequent to submitting my report.
21        Q    And then you said you worked with
22   DRNY?
23        A    In this case.
24        Q    In this case.  Any other cases?
25        A    No.
```

Page 72

1                     M. Peet - Confidential

2          Q      Have you been a consultant in any

3    other litigation that we haven't addressed

4    already?

5          A      No.

6          Q      You know, I didn't ask, in Vermont,

7    what was your conclusion about the issues there?

8          A      That it was possible to add some

9    elements to the mental health system in Vermont,

10   and to consider operating some state-operated

11   community services as a counterpoint to providers

12   who were unwilling to accept these folks because

13   of risk considerations.

14         Q      When you were in government service,

15   were there any lawsuits where you were a party?

16         A      Yes.  When I became commissioner in

17   Maine, there was an ongoing consent decree which

18   had been entered into some years before I

19   arrived.  It was a suit that was brought against

20   the Department of Mental Health after a number of

21   deaths at the AMHI Mental Health Institute, which

22   was one of two state hospitals.

23         Q      Sorry.  Tell me the name again.

24         A      AMHI Mental Health Institute.

25         Q      How do you spell that?

Page 73

1          M. Peet - Confidential

2      A      Oh, it's the Augusta Mental Health

3  Institute.

4      Q      Okay.

5      A      There had been a heatwave and there

6  was no air conditioning in the hospitals, and

7  some psychotropic medications react potently when

8  people are overheated, and that's what had

9  happened in that case, so a number of individuals

10  died.  The settlement had to do with creating a

11  more robust community mental health system in

12  Maine, because one of the assumptions was that

13  there were too many people in the hospital at the

14  time of this incident, and they would have been

15  in the community if there were a better system of

16  care available to them.  So that consent decree

17  was ongoing through my tenure.  They just

18  resolved it this past year.

19          The department I was commissioner of

20  also had responsibility for services to people

21  with intellectual and developmental disabilities,

22  so there was also a lawsuit that was a state

23  lawsuit, that had to do with institutional care,

24  and drove towards setting up a more comprehensive

25  community-based system for people with IDD.

Page 74

1                    M. Peet - Confidential
2   Those were the two consent decrees that I was
3   involved with.
4        Q     Did you testify in either of those
5   matters?
6        A     I did.
7        Q     And which one?
8        A     I know I testified in the Augusta
9   Mental Health Institute.  I'm not sure if I
10  testified in the other one.  That was, you know,
11  towards the end, and we were involved in
12  settlement negotiations, but I couldn't say that
13  I actually testified.
14       Q     For the Augusta Mental Health
15  Institute case, did you testify in court or in a
16  deposition?
17       A     Both.
18       Q     Both.  What was the subject matter of
19  your testimony?
20       A     The Settlement Agreement was a pretty
21  directive document about the establishment of
22  community mental health services throughout the
23  State of Maine, so my testimony was really to
24  update the Court on the progress we had made, and
25  setting up a community mental health system in

Page 75

1                   M. Peet - Confidential

2     Maine.

3          Q      Any other times when you have

4     testified in a legal proceeding about the

5     provision of mental health services that we

6     haven't already covered?

7          A      No.

8          Q      Let me ask about Connecticut.

9                 So you were deputy commissioner of

10    Connecticut's mental health and substance abuse

11    services?

12         A      Yes.

13         Q      That was '91 through '95?

14         A      Yes.

15         Q      Is that essentially Connecticut's

16    equivalent to OMH?

17         A      Yes.

18         Q      Okay.  What were your job duties

19    there?

20         A      My primary responsibility was

21    overseeing the development of a more articulated

22    community mental health system than we had in

23    place previously.  So what I mean by that is we

24    established 17 local mental health authorities to

25    oversee services within a defined geographic

Page 76

1                 M. Peet - Confidential

2    area.  And then we stipulated which community

3    support services should be available in each of

4    those 17 local mental health authorities.  And at

5    the same time, we were downsizing three -- all

6    three of Connecticut's state psychiatric

7    hospitals.  So one of my responsibilities was to

8    orchestrate the equivalent of what New York calls

9    the transformation plan.  Sort of figuring out

10   how to close units of the state hospital and

11   transfer those resources to support community

12   operations and community programming.  Those were

13   my primary responsibilities.

14        Q    Were you in a position to recommend

15   policy changes?

16        A    Yes.  I was actually -- my role was a

17   combination of two previous deputies.  One was a

18   deputy for policy.  The other was for operations,

19   so my role was really both.

20        Q    And you said as part of that job, you

21   defined what services would be available in each

22   of the 17 regions; is that right?

23        A    Yeah.

24        Q    What's the list of services that you

25   defined as being available?

Page 77

1                    M. Peet - Confidential

2        A        Assertive community treatment.  Crisis

3    services.  Psychosocial rehabilitation services.

4    Access to inpatient care.  And residential

5    services that included supported housing.

6        Q        Was there capacity in each of those

7    services that it was provided to everyone who

8    needed it?

9        A        Yes.

10       Q        Including supported housing?

11       A        Supported housing was less prominent

12   as an option in those days.  We were sort of at

13   the beginning of -- I'd say that -- innovation.

14   What we did a lot of was using vouchers for folks

15   so that we developed a system of transitional

16   vouchers so that people could get them and use

17   them until they were approved for Section 8.  So

18   typically the vouchers would last for a year or

19   two.

20                 We started some supported housing

21   through federal support at that time, but it was

22   not as essential as it is now to what's

23   considered a good mental health system.  We still

24   had other residential options, like group homes,

25   single room occupancy hotels; those kinds of

Page 78

                    M. Peet - Confidential

1

2     things.

3         Q     Why did you leave your position as

4     deputy commissioner in Connecticut?

5         A     I left to become commissioner in

6     Maine.

7         Q     And -- so you were commissioner of

8     Maine's Department of Mental Health,

9     developmental disabilities and substance abuse

10    services?

11        A     Yes.

12        Q     '95 through 2000?

13        A     Yeah.

14        Q     Is that Maine's equivalent to OMH?

15        A     I think it's probably more analogous

16    to the Department of Health in New York, if I

17    understand the structure.  Doesn't the Department

18    of Health oversee separate units for OMH,

19    developmental disabilities and substance abuse

20    until recently?

21        Q     Well you tell -- why don't you tell me

22    what Maine's department was responsible for and

23    we'll go from there.

24        A     Okay.  So the department in Maine had

25    responsibility for services for people with

Page 79

1                    M. Peet - Confidential
2      mental illness; services for people with
3      developmental disabilities and individuals with
4      substance use issues.  So there were three
5      different bureaus within the department.
6           Q      Does Maine have state-run psychiatric
7      hospitals?
8           A      Yes.
9           Q      Did your agency operate those
10     hospitals?
11          A      Yes.
12          Q      Okay.  What were your job duties as
13     commissioner in Maine?
14          A      It was really to develop overall
15     policy for the operation of the three bureaus.
16     One of the main priorities of the governor was to
17     satisfy the two consent decrees.  So I had a lot
18     of oversight of those two sets of activities.
19                 I had a lot of responsibility for the
20     relationship of the legislature and community
21     groups that had interests in the three
22     populations.  I was very active in program
23     development across the three bureaus.
24          Q      And so as commissioner, could you
25     recommend policy changes?

Page 80

```
 1              M. Peet - Confidential
 2      A      Yes.
 3      Q      Could you approve policy changes on
 4  your own?
 5      A      Depends on the scope of them.  For
 6  things that were internal to the operations of
 7  the department, I could approve them.  For other
 8  things, the governor's office was involved.
 9      Q      What was -- so you said there were two
10  consent decrees in Maine?
11      A      Uh-huh.
12      Q      He we talked about, I believe, one of
13  them.
14             What's the second consent decree?
15      A      The second one was about conditions --
16  it was originally entered into because of
17  conditions at the state facility for people with
18  intellectual disabilities.  And so there had been
19  considerable downsizing of that facility before I
20  got there.  We completed it and closed the
21  facility and placed all the individuals in the
22  community.
23      Q      During the time you were the
24  commissioner, did Maine fund housing units for
25  people with mental illness?
```

Page 81

1                    M. Peet - Confidential

2          A     We had some residential programs.  We

3    did not fund supported housing.

4          Q     Why not?

5          A     There was adequate housing stock in

6    Maine that was accessible to our patient

7    population.  It's an interesting culture in

8    Maine.  There's also -- there's a sense of

9    community in much of small-town Maine, where

10   people with significant disabilities can live

11   quite comfortably in their communities.  And so

12   we were able in most cases to find low cost

13   housing where people could live comfortably in

14   their communities.

15         Q     And do you believe that that

16   arrangement was adequate in Maine?

17         A     We did not have a large population of

18   homeless people with mental illness in Maine.

19   That led me to believe that our system's response

20   to the need for housing had been adequate.

21         Q     So supported housing units -- let me

22   back up.

23                What services are provided in

24   supported housing units?

25         A     Within the units themselves?

Page 82

1                    M. Peet - Confidential

2          Q      Yes.

3          A      There's usually a housing support

4    coordinator that works for the provider -- where

5    are we?  Oh, the staffing.  So the provider

6    typically has a person that attends to the kind

7    of nuts and bolts issues that have to do with

8    relationships with landlords.  Access to

9    furniture.  Any complaints the individual might

10   have about the cleanliness of the unit; those

11   kinds of nuts and bolts things.  And then

12   typically there's a second provider of case

13   management or ACT services.  If it's case

14   management, the individual will work with the

15   person in the housing to set them up with

16   clinical services and whatever supports they may

17   need.  If it's the ACT team, it's sort of, you

18   know, all-in-one kind of service delivery.  So

19   the ACT team has a psychiatrist that will

20   prescribe medication.  They have a nurse that

21   will administer the medications.  They're

22   available to be on site in the living space as

23   often as necessary, and sometimes that's daily.

24   They're on call for their patients 24 hours a

25   day.

Page 83

                    M. Peet - Confidential

1

2            So it's kind of a seamless service

3    delivery system for the most vulnerable folks.

4    So they work in tandem with the housing provider

5    to pay attention to whether it's going well,

6    whether the individual needs an addition of

7    services or can be phased away from some

8    services, so it's a partnership between those two

9    providers.

10        Q      Did the low cost housing stock that

11   you mentioned a little bit ago as being available

12   in Maine provide any of those services?

13        A      They often didn't have -- so we worked

14   sometimes with, like, housing authorities in the

15   bigger communities in Maine explicitly.  And

16   sometimes they would add a staff person to attend

17   to the needs of our folks.  If not, then our case

18   managers would typically play both roles.

19        Q      Would they be on site in the housing

20   units?

21        A      Sometimes.  Not in the units

22   themselves, but sometimes in the building.

23        Q      Sometimes, but not always?

24        A      Not always.  The level of disability

25   of the individual would determine how intense the

Page 84

1                  M. Peet - Confidential
2       support services were, so, you know, the sicker
3       individuals who had more needs would be assigned
4       to the ACT teams.  If there were people who were
5       able to function more independently, then they
6       would get the less intense package of services.
7           Q     I might have missed -- I thought you
8       testified that there were no ACT services in
9       Maine.
10          A     In the rural parts of Maine we used
11      intensive case management.  In the more populous
12      areas we used ACT.
13          Q     Got it.  Thank you for clarifying
14      that.
15                So I'm just trying to understand,
16      because in your report in this case, we've talked
17      about your list of necessary safety net services
18      that you have opined New York must provide;
19      right?
20          A     Yeah.
21          Q     And that includes supported housing;
22      right?
23          A     (The witness nods head up and down.)
24          Q     It includes ACT and FACT services;
25      right?

Page 85

1                  M. Peet - Confidential

2        A        Yeah.

3        Q        But in Maine you said there was no

4    funding for supportive housing; right?

5        A        Very little.  It was really at the

6    very beginning of -- I think understanding that

7    supported housing was a really good option for

8    folks, so in terms of timing, I would say it was

9    right at the beginning of the general sort of

10   understanding and acceptance of the importance of

11   it.  So we didn't have a lot of supported housing

12   at that time.

13       Q        But I think you testified a minute ago

14   that as an alternative, there was low cost

15   housing stock that you believed was appropriate

16   for the individuals that you were serving in

17   Maine?

18       A        And that we would provide the

19   services, so that there still would be that

20   package of somebody in a stable living

21   environment with the necessary support.

22       Q        So I'm just trying to understand why

23   is it that in Maine it was appropriate to have

24   alternatives to supported housing, but that's not

25   the case in New York?

Page 86

1              M. Peet - Confidential

2              MS. KHAN:  Objection.  You may

3      answer.

4              THE WITNESS:  I would say a couple

5      things, I guess.  One is that because

6      supported housing was in its infancy at that

7      time.  It was not as widely accepted as an

8      option that many individuals with serious

9      mental illness actually prefer to other

10     options.  It wasn't as central to our

11     thinking about what was a good package of

12     services for folks.

13             Now we have many more years of

14     experience with it.  We've seen comparative

15     outcomes for people who use supported

16     housing versus people who use more

17     traditional kinds of group home, residential

18     treatment centers, and we've also seen what

19     happens when you compare people who have no

20     housing and are unstable in the community in

21     homeless shelters.  So I would say that the

22     field has evolved, and what we now think of

23     as adequate array of services has changed.

24  BY MR. CONROY:

25     Q    So knowing what you know today, do you

Page 87

1                    M. Peet - Confidential
2      believe that you provided adequate housing
3      services to individuals in Maine?
4                    MS. KHAN:  Objection.  You may
5           answer.
6                    THE WITNESS:  Oh, you know, in the
7           context of what we knew then, I think we did
8           a good job.  Do I think adding supported
9           housing as a really important piece of the
10          service array is good?  I think the Office
11          of Mental Health has certainly endorsed
12          that, and in their planning documents,
13          especially the commissioner talks
14          extensively about the importance of
15          supported housing as providing, you know,
16          the kind of platform that people need to
17          stabilize and recover.  So I think it's an
18          evolution, you know, with time.  Things have
19          changed.  We now think of things a little
20          differently than we did then.
21     BY MR. CONROY:
22          Q     Why did you leave your position as
23     commissioner in Maine?
24          A     My mother had Alzheimer's, and the
25     burden of caring for her was on my sister in

Page 88

1           M. Peet - Confidential

2    Connecticut, so I came home to help.

3        Q    I'm sorry to hear that.

4        A    Yeah, it was tough.

5             MR. CONROY:  Do you want to take a

6        five-minute break?

7             MS. KHAN:  Sure.

8             THE WITNESS:  Thank you.

9             (Whereupon there was a brief

10       recess from 12:09 p.m. until 12:23 p.m.)

11   BY MR. CONROY:

12       Q    So, Ms. Peet, I think we covered this

13   a little bit already, but I just want to make

14   sure that I have it clear.

15            So when you were commissioner of

16   Maine's Department of Mental Health, did Maine

17   guarantee a permanent supported housing placement

18   to each person with SMI leaving prison on the day

19   they got out of prison with no wait time?

20            MS. KHAN:  Objection.  You may

21       answer.

22            THE WITNESS:  No.

23   BY MR. CONROY:

24       Q    When you were commissioner of Maine's

25   Department of Mental Health, did you ever

Page 89

1                    M. Peet - Confidential

2     recommend that Maine reallocated three sources in

3     order to guarantee a permanent supported housing

4     placement to each person with SMI leaving prison

5     on the day they got out of prison with no wait

6     time?

7                    MS. KHAN:  Objection.  You may

8          answer.

9                    THE WITNESS:  No.

10    BY MR. CONROY:

11         Q     Why not?

12         A     It was related to the issues that we

13    discussed a few minutes ago.  First of all, the

14    idea of supported housing was still in its

15    infancy, and access to housing was not a huge

16    problem in Maine, so it didn't rise to the level

17    of policy change.

18         Q     When you were deputy commissioner of

19    the Connecticut Department of Mental Health and

20    Addiction Services, did Connecticut guarantee a

21    permanent supported housing placement to each

22    person with SMI leaving prison on the day they

23    got out of prison with no wait time?

24         A     No, we did not.

25         Q     When you were deputy commissioner in

Page 90

1              M. Peet - Confidential

2    Connecticut, did you ever recommend that

3    Connecticut reallocate its sources in order to

4    guarantee a permanent supported housing placement

5    to each person with SMI leaving person on the day

6    they got out of prison with no wait time?

7         A    We did engage in reallocating

8    resources as part of building our community

9    system, so we did move resources from inpatient

10   care to the community service continuum.  It

11   included housing vouchers for people, but our

12   focus was on building it for the entire

13   population of people with serious mental illness

14   in Connecticut.  It wasn't specific to the

15   population of people leaving prisons.

16        Q    So I'm going to ask it again with a

17   specific focus.

18             When you were deputy commissioner in

19   Connecticut, did you ever recommend that

20   Connecticut reallocate its resources in order to

21   guarantee a permanent supported housing placement

22   to each person with SMI leaving prison on the day

23   they got out of prison with no wait time?

24             MS. KHAN:  Objection.  You may

25        answer.

Page 91

1           M. Peet - Confidential

2           THE WITNESS:  I did not.

3    BY MR. CONROY:

4       Q    Ms. Peet, I'm going to hand you what's

5    been marked as Exhibit 2.

6           (Exhibit 2 was marked.)

7           This is a multiple page document

8    titled, "From Hospitals to Jails:  How Maine's

9    Mentally Ill are Still Institutionalized."  Take

10   a second to look through it and tell me when

11   you're ready for me to ask you a question.

12      A    Okay.

13           MS. KHAN:  For the record, I will

14      object to this exhibit being placed into

15      evidence and shown to the witness and to the

16      extent that the witness will be questioned

17      by it, but we will allow for the questioning

18      at this time.

19           THE WITNESS:  I don't want to take

20      up time reading the whole thing if there's a

21      particular question --

22   BY MR. CONROY:

23      Q    Sure.

24      A    -- I should focus on.

25      Q    So if you look at the first page --

Page 92

1                M. Peet - Confidential

2    first of all, let me say, have you ever seen this

3    article before?

4         A     I have not.  What year was it?

5         Q     If you look at the top, it looks like

6    it's dated February 22nd, 2016; do you see that?

7         A     Yeah.

8         Q     And this is from a news organization

9    called WGME; is that right?

10        A     Yes.

11        Q     Are you familiar with WGME?

12        A     Yes.

13        Q     What is that?

14        A     It's a local -- it's a television

15   station when I was there.

16        Q     I'm sorry.  I missed the last --

17        A     I think it was a television station.

18        Q     Okay.  Oh when you were there, that's

19   what you said, okay.

20              So if you look on the first page,

21   three paragraphs down it says, "These headlines

22   point to a much deeper crisis in Maine after a

23   well intentioned move decades ago to shift the

24   care of the mentally ill away from psychiatric

25   institutions.  Many Mainers can't find adequate

Page 93

1              M. Peet - Confidential
2    care in their communities.  They still end up
3    institutionalized, but now it's behind bars"; do
4    you see that part?
5        A     I do.
6        Q     What's your reaction to that?
7        A     It makes me very sad.  I have still
8    some friends and colleagues in Maine who have
9    told me that particularly under the LePage
10   Administration, that human services, mental
11   health in particular, were degraded.  And I guess
12   we see the evidence over that here, or at least
13   comments about it.
14       Q     So is it your belief that the
15   challenges described in this article did not
16   exist when you were commissioner?
17              MS. HANNA:  Objection.
18              THE WITNESS:  I think they may
19       have, you know, existed to some degree.
20       Certainly not at the rate that this article,
21       if it's accurate, is pointing to.  We had
22       established fixed points of accountability
23       in each of the states, three regions for
24       oversight of community services.  That made
25       it easier to monitor the adequacy of the

Page 94

1           M. Peet - Confidential
2      service system at any given time.  And I
3      believe that the LePage Administration did
4      away with that structure and also depleted
5      the mental health budget during his tenure,
6      so I think that things got noticeably worse.
7  BY MR. CONROY:
8      Q    What were the years of the LePage
9  Administration?
10     A    Let's see.  The current governor's
11 been governor for five years.  So he was in
12 office for eight.  So it would have been like
13 2009 to '17; somewhere around that.
14     Q    Okay.  And just so I understand, your
15 reaction to this article is that there was
16 adequate care -- mental health care in Maine
17 communities during the '90s, and the reason there
18 is no longer adequate care is because of the
19 LePage administration?
20           MS. KHAN:  Objection.
21           THE WITNESS:  You know, I'm
22     speaking from a distant perspective, but I
23     can say that, to my knowledge, the LePage
24     Administration and their lack of value for
25     mental health and human services contributed

Page 95

1          M. Peet - Confidential

2       to a degrading of the service systems in

3       Maine.

4               (Exhibit 3 was marked.)

5   BY MR. CONROY:

6       Q     Ms. Peet, I'm going to show you what

7   has been marked as Exhibit 3.

8               This is a 63-page document that on the

9   front the title is, "The Criminalization of

10  People with Mental Illnesses in Maine.  Report of

11  the Maine Advisory Committee to the U.S.

12  Commission on Civil Rights, May 2019."  I won't

13  ask you to read the whole thing.

14      A     Good.

15      Q     But have you ever seen this before?

16      A     I have not.

17      Q     Okay.

18               MS. KHAN:  For the record, I'm

19       going to object to this exhibit and the line

20       of questioning related to this exhibit;

21       however, Ms. Peet may answer.

22  BY MR. CONROY:

23      Q     Do you have any knowledge of the Maine

24  Advisory Committee to the U.S. Commission on

25  Civil Rights?

Page 96

1          M. Peet - Confidential

2               MS. KHAN:  Objection.

3               THE WITNESS:  I don't.

4     BY MR. CONROY:

5          Q     You've never -- you haven't heard of

6     this investigation or report before?

7          A     I have not.

8               MS. KHAN:  Objection.

9               THE WITNESS:  I was gone from

10          Maine for almost two decades when this

11          report was developed, so I really have --

12     BY MR. CONROY:

13          Q     Turn with me to Page 4.  And I want to

14     point your attention to the -- I guess it's the

15     second paragraph on this page where it says, "The

16     movement to deinstitutionalize people with mental

17     illnesses is explicitly coupled with the promise

18     to develop a network of community-based supports

19     and treatments that would enable such individuals

20     to thrive.  Due to underfunding and other issues;

21     however, this community-based supported network

22     was largely not created in Maine or in most

23     United States communities"; do you see that part?

24          A     I do.

25          Q     What's your reaction to that?

Page 97

1              M. Peet - Confidential

2              MS. KHAN:  Objection.  You may

3      answer.

4              THE WITNESS:  I think this is an

5      inaccurate characterization of the time I

6      was there anyway, and I would point to the

7      Settlement Agreement for the AMHI consent

8      decree.  That's a very detailed document

9      that really directed the kind of community

10     systems development that we did in Maine,

11     and so these are characterizations that I

12     think -- they've been easy to generalize

13     from because the deinstitution, particularly

14     in the early decades when it began, was done

15     without careful planning or concern for the

16     development of community services prior to

17     people being discharged.  And that's a fair

18     characterization for many places,

19     particularly during '60s, '70s, and in some

20     cases the '80s.

21              But when I was commissioner, we

22     had very careful discharge planning

23     standards, and we put in place a brand new

24     comprehensive statewide crisis system.  We

25     had the intensive case management and ACT.

Page 98

1              M. Peet - Confidential

2       Community mental health centers were

3       providing the clinical.  So it's inaccurate

4       when it describes what -- if it alludes to

5       my tenure as commissioner.  And I can take

6       some of the credit for that, but most of it

7       was due to the Court Ordered service

8       development that came as a result of the

9       consent decree.  So I'd say it's a

10      generalization that's inappropriately

11      applied.

12  BY MR. CONROY:

13      Q      And you don't know who the authors of

14  this report are?

15      A      I don't, no.

16      Q      Let's flip to Page 56.  Tell me when

17  you're there.

18      A      Yeah.

19      Q      So I want to point your attention to

20  the top of the page where it says Finding No. 1.

21  And it says, "The lack of adequate home and

22  community-based care networks in Maine for people

23  with mental illnesses have deprived them of

24  adequate mental health treatment and services and

25  denied them community integration and autonomy."

Page 99

1          M. Peet - Confidential
2     And then it goes on to say, "Overarching
3     recommendation, Maine should fund, create and
4     expand networks of home and community-based care
5     in the following ways," and then it goes on to
6     list various services.
7          What's your reaction to that?
8          MS. KHAN:  Objection.  You may
9     answer.  However, I want to instruct the
10    witness if you need time to read the
11    paragraphs on that page, please feel free to
12    do so before answering.
13          THE WITNESS:  Okay.  Again, I
14    would only say that this was not the state
15    of affairs when I was commissioner.  I think
16    the paragraph under (a) Medicaid Expansion
17    Outreach, gives a clue to that, where it
18    notes that under the LePage Administration,
19    they did not apply for Medicaid expansion,
20    which had a detrimental effect on community
21    services.
22          One of the requirements of the
23    consent decree, the consent decree was
24    structured in kind of an interesting way.
25    The class members were continuously being

Page 100

1              M. Peet - Confidential

2      added so that anybody who was ever admitted

3      to the AMHI consent decree while I was there

4      automatically became a class member.  And so

5      there were very strict requirements because

6      of that mandate about discharge planning and

7      the kinds of services that people had to

8      have access to when they were discharged

9      from the hospital.

10              So this state of affairs is

11     tragic, I think, and something that -- the

12     other thing I would say by way of context is

13     that the consent decree was winding down at

14     the time this report was published.  It was

15     just finalized, but there were lots of

16     delays due to the COVID epidemic.  But there

17     was a lot of anxiety in the (inaudible)

18     community in Maine at the thought of losing

19     the consent decree, because it had then a

20     protection in some ways for the mental

21     health budget for the years that it had been

22     in place, and people were worried that once

23     the consent decree was settled, that funding

24     for mental health and other health and human

25     services was going to plummet dramatically.

Page 101

1                 M. Peet - Confidential
2          So in some ways, this may have added to the
3          urgency of bringing this issue to the floor.
4          But I would say it's a dramatic difference
5          from when I was commissioner in Maine.
6     BY MR. CONROY:
7          Q     And when this report opines that these
8     home and community-based networks were never
9     developed in Maine sufficiently, you just
10    disagree with that?
11         A     I do.
12                   MS. KHAN:  Objection.  You may
13         answer.
14                   THE WITNESS:  I do disagree.
15    BY MR. CONROY:
16         Q     Tell me again, the consent decree
17    you've been talking about, who -- it was a class
18    action?
19         A     Yeah.
20         Q     And how is the class defined in that
21    case?
22                   MS. KHAN:  Objection.  You may
23         answer.
24                   THE WITNESS:  It was defined as
25         all persons who were inpatient at the

Page 102

1                    M. Peet - Confidential

2           Augusta Mental Health Institute at the point

3           where the deaths occurred; and going

4           forward, anybody who was admitted to the

5           Augusta Mental Health Institute.  So it was

6           a constantly moving and expanding class of

7           individuals.

8    BY MR. CONROY:

9           Q      So when you say that there were these

10   strict requirements about what services the class

11   members received, we're talking about the

12   population of people who were treated and then

13   discharged from the Augusta Mental Health

14   Institute?

15          A      Yes.  And a big issue that was

16   emerging when I got to Maine as commissioner was

17   what people were referring to as a two-class

18   system.  Because individuals were afraid that the

19   class members were going to suck up all the

20   resources, and to the detriment of people who

21   were not class members, so we together with the

22   governor's office agreed that there would be no

23   difference between class members and other

24   people.  So the people in the northern part of

25   the state, which is not the catchment area for

Page 103

1              M. Peet - Confidential
2   the Augusta Mental Health Institute did, in fact,
3   receive the same service development as the
4   people in the southern part of the state.
5        Q      And the people -- sorry -- tell me
6   again, the people in the northern half were
7   treated at a different hospital?
8        A      Yeah, at the -- it was then called the
9   Bangor Mental Health Institute.  I think it's now
10  called the Dorothea Dix Psychiatric Hospital.
11       Q      What about people who were not treated
12  at either of those hospitals?
13       A      There was really no differentiation.
14  Anybody with a serious mental illness got access
15  to the same array of services.  The fact that I
16  don't know any of these people's names tells me
17  they were not people who were involved with the
18  mental health system when I was there.  I don't
19  recognize any of these names.
20              (Exhibit 4 was marked.)
21       Q      Ms. Peet, I'm going to show you what
22  has been marked as Exhibit 4.
23              This is a multiple page document with
24  the title, "Maine Policy Review.  Volume 5, Issue
25  1.  Health Policy 1996:  An Interview with

Page 104

1                   M. Peet - Confidential

2    Commissioner Peet, Mental Health System Reform."

3          A      You took a deep dive at the history

4    here.  I had brown hair at this time.

5          Q      So you're familiar with this

6    interview?

7          A      Vaguely.  I remember it.

8          Q      You do or don't remember it?

9          A      Yes.  Not in detail, but I remember

10   doing the interview.

11         Q      Sure.  Tell me when you're ready for

12   me.

13         A      I'm going to read the whole thing.

14         Q      Read as much as you like.

15         A      And then I can go back if I haven't

16   read the right part?

17         Q      I'll direct you to the part I'd like

18   to ask you about, but take your time to

19   familiarize yourself.

20         A      Okay.  Yeah, I think I have the gist

21   of it.  Okay.

22         Q      So I want to direct you to the -- the

23   pages aren't numbered, but it's the first page

24   from the back.  The first words at the top are,

25   "Haven't thought enough."

1                    M. Peet - Confidential

2        A        Which paragraph?

3        Q        I'm looking at the question that

4    says -- the question is, "If there was one thing

5    you'd like to be able to change immediately, what

6    would it be"; do you see that?

7        A        Yes.

8        Q        And then your answer was, "I wish that

9    we could resolve all of our consent decrees so

10    that the department could get back to focusing on

11    what makes sense.  The organization of our

12    operations around our policy themes.  The

13    plaintiffs for each consent decree do a very good

14    job for advocating for their discreet

15    populations.  My job is to look out for the

16    interest of a much broader population.  So trying

17    to balance appropriate attention to the consent

18    decrees and maintain the resources and energy of

19    the department to attend to the larger set of

20    populations is a tough job.  I often end up

21    feeling that the various groups without consent

22    decrees lose in that equation."

23              Do you remember giving that statement?

24        A        I do.

25        Q        And are these the same consent decrees

Page 106

1                M. Peet - Confidential

2     we were just talking about?

3          A     Yes.

4          Q     Do you still agree with the comments

5     you made here?

6                     MS. KHAN:  Objection.  You may

7          answer.

8                     THE WITNESS:  Well, I can say that

9          it was an accurate representation of my

10         experience.  I had not had the experience of

11         working under consent decrees in

12         Connecticut, so the infringement on my

13         autonomy was chafing at that point.

14                     However, we made the adaptation

15         that I alluded to earlier, which is we

16         decided we did not disagree fundamentally

17         with the goals that were set out in the

18         consent decree.  The governor hired me

19         explicitly to try to improve community

20         systems of care in Maine.  So once we

21         decided that we didn't have any disagreement

22         with the direction that the consent decrees

23         were pushing us towards, it became a fairly

24         easy decision to then take the principles of

25         the consent decree and implant them in the

Page 107

1                     M. Peet - Confidential
2          strategic plan that I was talking about, so
3          that the goals really were elevated then to
4          overgird the operation of the whole
5          department.
6    BY MR. CONROY:
7          Q      So you said, "I often end up feeling
8    that the various groups without consent decrees
9    lose in that equation"; right?
10         A      Uh-huh.
11         Q      What did you mean by that?
12         A      This was before we had made the
13   decision to extend the framework for the consent
14   decree to all individuals with serious mental
15   illness in Maine.  So we spent a lot of time --
16   you know, I was trying to decide what -- you
17   know, we knew definitively what the people who
18   were class members got, and it was a lot of, you
19   know, sort of discussions going on all over the
20   state about what does that mean for everybody
21   else until, you know, it just became logical that
22   if we established, you know, guidelines for a
23   mental health system that embraced, you know, the
24   programs and policy agenda for a, you know, good
25   system of care, that there was no reason that it

Page 108

1          M. Peet - Confidential

2  should be limited to just class members.

3       Q     And this case that we're here about

4  today is about -- we've been talking about the

5  relevant population; right?

6       A     Yeah.

7       Q     Do you agree that OMH has the duty to

8  consider the interests of a broader population of

9  individuals with mental illness?

10      A     I do.

11      Q     What other populations does OMH have

12  to consider?

13      A     Well I would say anybody in the State

14  of New York with a serious mental illness who has

15  not had correctional system involvement.

16  Children.  And the OMH department does offer some

17  services to people who are not seriously mentally

18  ill.

19      Q     How about people who are released from

20  psychiatric hospitals?

21      A     Uh-huh.

22      Q     Is that a yes?

23      A     Yes.  They're certainly part of the

24  overall population with serious mental illness.

25      Q     Other individuals with mental illness

Page 109

1                    M. Peet - Confidential

2    who have not been convicted of crimes?

3         A      Correct.

4         Q      Individuals who have been charged with

5    crimes but found not guilty by reason of mental

6    illness?

7         A      Uh-huh.

8         Q      Is that a yes?

9         A      Yes.  Sorry.

10        Q      That's okay.

11               OMH has a duty to provide services to

12   all of those different populations; correct?

13        A      Yes.

14        Q      If you were in charge of OMH, would

15   you move funding away from any of those

16   populations in order to redirect funding toward

17   the relevant population?

18               MS. KHAN:  Objection.  You may

19         answer.

20               THE WITNESS:  There are a couple

21         things I would say.  One is when deciding on

22         resource allocation in a state mental health

23         authority, there are two variables that come

24         to play.  One is, you know, the clinical

25         well-being of the individuals that you're

Page 110

1              M. Peet - Confidential

2        serving, so that's sort of the public

3        welfare element.  And then there's public

4        safety.  And you really have to look at both

5        of those variables when deciding on resource

6        allocation.

7              And I think people get confused

8        sometimes when they're thinking about

9        providing services, you know, to people with

10       criminal histories as though it's -- you

11       know, they have -- they violated the

12       society's norms, so should they be

13       benefiting from taxpayer dollars.  And I

14       think about it a little differently, and

15       it's that if part of the responsibility is

16       to (a) provide services equally to all

17       persons with serious mental illness, that's

18       an important value.

19              The other is public safety.  And

20       this is a population of individuals that I

21       would say scrimping on services to them is

22       probably not a good decision to make when it

23       comes back to the public safety variable.

24       Primarily, though, it gets to, you know,

25       each individual with serious mental illness

Page 111

1              M. Peet - Confidential

2        is deserving of care.

3              If there was a population that I

4        would say I would look at in terms of

5        reallocation, it would be the individuals

6        who are not seriously mentally ill.  In most

7        states, in the context of resource scarcity,

8        the target population has narrowed.  So --

9        but it's very clear that the responsibility

10       of the state entity is to provide services

11       to the population that historically would

12       have been served in state hospitals, because

13       that was the state responsibility back when,

14       you know, it was first noted that care of

15       mentally ill people was a state

16       responsibility.

17   BY MR. CONROY:

18       Q    So let me make sure I heard it

19   correctly.

20             You're saying you would look at

21   reallocating funding from individuals who have a

22   mental illness but not SMI, and moving that

23   funding toward individuals from the relevant

24   population?

25       A    Correct.

Page 112

1              M. Peet - Confidential

2        Q     Do you know currently how much New

3   York State funding goes toward the population of

4   individuals who have a mental illness but not

5   SMI?

6        A     I don't.  The other piece of the

7   answer to that, I think, is the department has

8   gotten an infusion of dollars in the last couple

9   of years from the legislature.  Significant

10  amounts of money.  And I think one way of

11  approaching this would be making sure that all of

12  the new moneys went to address areas of unmet

13  need in the department to reduce the equation

14  from taking from one person or a group to

15  another.

16             In the transformation plan, I think I

17  mentioned in the report, that that was a

18  criticism I had of that process as well.  That

19  the dollars were taken from state hospital

20  downsizing, but they weren't then allocated for

21  use by populations that were much broader.

22       Q     And just so I have that clear, you're

23  saying that there has been significant infusion

24  of money from New York State legislature?

25       A     Yes.

Page 113

                        M. Peet - Confidential

1                       M. Peet - Confidential

2       Q       Recently?

3       A       In the last two budget cycles.

4       Q       It's one o'clock.  Should we take a

5   lunch break?

6       A       Yeah.  I need some protein.

7               (Whereupon there was a lunch

8       recess from 1:01 p.m. until 1:51 p.m.)

9   BY MR. CONROY:

10      Q       Ms. Peet, welcome back.

11      A       Thank you.

12      Q       Do you still have Exhibit 1, your

13  report?

14      A       I do.

15      Q       Okay.

16      A       Somewhere.

17      Q       Let's turn back to Page 1 of your

18  report, and back to the paragraph in the middle

19  of the page about the questions you were asked to

20  opine about.

21      A       Yes.

22      Q       The third question is, "Based on my

23  conclusion, I was asked to opine on the broad

24  causes for any failure to adequately serve the

25  relevant population and to provide adequate

                                        Page 114

1                M. Peet - Confidential

2    CBMHHSS to this population upon their release

3    date and release from DOCCS."

4            Did I read that correctly?

5        A    Yes.

6        Q    Was your methodology to answer that

7    question any different than the methodology you

8    already testified about today?

9        A    No, it was not.

10       Q    So as part of your report in this

11   case, you attempted to determine whether there is

12   sufficient housing and services for the relevant

13   population in New York; correct?

14       A    Correct.

15       Q    So I think you've talked about this a

16   bit already, but just so I have the full list,

17   what sources did you use to determine whether

18   right now in New York State there's sufficient

19   housing and services for the relevant population?

20       A    My primary source for that question

21   was the county LSPs.

22       Q    Anything else apart from the LSPs?

23       A    Are we talking specifically about

24   housing or all of the --

25       Q    Yeah, I'm talking about for you to

Page 115

1                 M. Peet - Confidential

2    determine whether right now on the ground in New

3    York State there is sufficient housing and

4    services for the relevant population, what

5    sources did you consult?

6         A    Okay.  On the services side of the

7    equation, I looked primarily at the OMH data

8    tableau, they call it, for assertive community

9    treatment.

10        Q    And that's -- is that on the OMH

11   website?

12        A    It is.

13        Q    Anything else?

14        A    No.  The LSPs were a really good

15   primary data source for this piece.

16        Q    I think you've already testified about

17   what LSPs are, so let me ask you, who drafts

18   LSPs?

19        A    It seemed from the LSPs that I

20   reviewed, that most often they were done by an

21   individual with various titles, but the person

22   who was in charge of mental health care in the

23   county.

24        Q    Who, if anyone, approves LSPs?

25        A    I think they're approved by the county

Page 116

1                    M. Peet - Confidential
2     administrator, and then they go to the Office of
3     Mental Health.
4          Q     And what, if anything, does OMH do
5     with the LSPs?
6          A     The OMH description of this process
7     indicates that OMH takes the needs assessment
8     data that's included into the report -- included
9     as part of the reports and aggregates it to look
10    at a picture of need across the state, and
11    considers it when making their budget
12    recommendations.
13         Q     Do you know where the LSP process
14    comes from?
15         A     I believe it's a statutory
16    requirement.
17         Q     Under New York State statute?
18         A     Yes.
19         Q     Tell me specifically which LSPs you
20    reviewed in order to reach your opinion in this
21    case.
22         A     For the years 2018, 2019 and 2020, I
23    reviewed all of the LSPs from each county, and
24    then I reviewed a sampling of LSPs from 2021.
25    They were not as complete a dataset.

1                M. Peet - Confidential

2        Q      So for '18, '19 and '20, you reviewed

3    for every county that submits an LSP, you

4    reviewed the LSPs for each of those three years?

5        A      Yes.

6        Q      All -- I should know this.  62

7    counties?

8        A      Yes.

9        Q      Okay.  And do you remember

10   specifically which ones you reviewed for 2021?

11       A      I don't.  I cited to some of them in

12   my report that were from 2021, but right now I

13   can't recall them all.

14       Q      For each of the LSPs you reviewed, did

15   you review the whole thing front to back?

16       A      I did.

17       Q      So if you flip to Page 23 of your

18   report, the first full paragraph at the top, so

19   it says, "A review of the local services plans

20   from the home counties of the named plaintiffs in

21   M.G. versus Cuomo shows that OMH has failed to

22   maintain sufficient capacity to meet the CBMHHSS

23   needs for the relevant population in these

24   counties.  A more cursory review of the local

25   services plans for the remaining counties also

Page 118

1                   M. Peet - Confidential
2     shows that OMH has failed to maintain sufficient
3     capacity to meet the housing and services needs
4     of the relevant population."
5               Did I read that correctly?
6          A     Yes.
7          Q     So what is the distinction between the
8     review of the home county LSPs and the more
9     cursory review of the other counties?
10         A     It has -- it really has to do -- for
11    all of the LSPs, I reviewed the content -- the
12    required consent.  For the county -- if there
13    were counties that were not relevant to the named
14    plaintiffs and they had a lot of supplementary
15    information; for example, some counties attach
16    voluminous kinds of community questionnaires that
17    they sent out with the results of those, so in
18    some cases I omitted a detailed review of the
19    supplementary material.
20         Q     Given the years you reviewed, many of
21    the LSPs that you looked at were from the peak of
22    the COVID pandemic; right?
23               MS. KHAN:  Objection.  You may
24         answer.
25               THE WITNESS:  Well '18 and '19

Page 119

1                M. Peet - Confidential

2        would have been prior.  '20 would have been

3            in the heat of it, yes.

4    BY MR. CONROY:

5        Q      Did you consider what effect, if any,

6    the COVID-19 crisis had on the issues discussed

7    in the LSPs you reviewed?

8        A      Not really, because the information

9    requested by the Office of Mental Health from the

10   counties is -- it's not information that I think

11   would have been markedly impacted by the

12   epidemic.  It's really about service

13   availability.

14       Q      Was there any change in demand for

15   social services during the pandemic?

16                MS. KHAN:  Objection.  You may

17       answer.

18                THE WITNESS:  By that you mean?

19   BY MR. CONROY:

20       Q      Well, which part of the question is

21   confusing?

22       A      You're talking about social services.

23   Is that apart from mental health?

24       Q      I'll be more specific.

25                Was there any change in demand for

Page 120

1                    M. Peet - Confidential
2      mental health services during the COVID pandemic?
3            A      Yes, and I think the demand actually
4      increased as we got closer to the end of the
5      pandemic.  That would impact primarily I think on
6      outpatient services for the general population.
7      That was primarily anxiety disorders that were
8      reported as particularly spiking during the
9      pandemic.
10           Q      I want to direct you to Page 22 of
11     your report.  And the first full paragraph, the
12     first sentence says, "The following subsections
13     outlined several counties' complaints as to the
14     lack of CBMHHSS for their residents with serious
15     mental illness, which include the relevant
16     population," and then the sentence goes on.
17                  Did any of the LSPs you reviewed use
18     the word "complaint"?
19           A      I'm not sure, but I would -- I can't
20     recollect that, the use of that particular word.
21     They certainly reported service deficiencies, and
22     sometimes, you know, the wording got a little
23     more strident when it seemed like it had been
24     several years for the same request or same
25     indication of need.

Page 121

M. Peet - Confidential

1

2      Q     So which reports are you talking about

3  that used strident language?

4      A     I couldn't tell you off the top of my

5  head.

6      Q     Are they the ones that you quoted in

7  your report?

8      A     I think I quoted from some of them

9  later in the report where I included quotes from

10  some of the LSPs.

11      Q     But sitting here today, you don't

12  remember specific examples of the type of

13  strident language you're talking about?

14      A     No.  I think often, you know, they

15  would frame it as, you know, the county still has

16  a severe deficit and still has, you know -- so

17  it's the use of modifiers, I think, that

18  indicated that there was some growing

19  dissatisfaction with the fact that needs had been

20  identified and had not been met.

21      Q     Did you talk to anyone from any of the

22  counties for localities that submitted these LSPs

23  that you reviewed?

24      A     No.  I relied exclusively on the

25  documents.

Page 122

1         M. Peet - Confidential

2      Q     Do you have any basis other than what

3   you've already testified about to believe that

4   the people who wrote these LSPs would

5   characterize them as complaints?

6      A     No.

7      Q     I'm going to direct you to Page 31 of

8   your report.  Tell me when you're there.

9      A     I'm here.

10      Q     Okay.  So if you look at the first

11   paragraph in Subsection (c), and the first

12   sentence says, "OMH's repeated refusal to

13   adequately address the county patterns of

14   deficits in both housing and intensive levels of

15   clinical and case management capacity identified

16   in the county local services plans shows a

17   systemic failure to fulfill its mandate."

18            Did I read that correctly?

19      A     Yes.

20      Q     What is the basis for your statement

21   that OMH has repeatedly refused to address the

22   issues identified in the LSPs?

23      A     It was based on the patterns that

24   evolved through a review over the three years of

25   the same issue being identified as a need over

Page 123

1                    M. Peet - Confidential

2    that period of time without indication that there

3    had been any response from OMH to address that

4    need.

5          Q      If you saw the same funding request

6    appear several years in a row, you concluded that

7    OMH repeatedly refused to address that issue?

8          A      Yes.  I made a conclusion that it was

9    a failure to address the issue.

10         Q      During the years covered by the LSPs

11   you reviewed, how much funding has New York State

12   provided for community mental health services and

13   housing?

14         A      I don't know.  It was out of the scope

15   of my work to look at the financial aspects.

16         Q      Do you know how much money the State

17   of New York spends each year on community mental

18   health services?

19         A      I don't.  I know that the budget for

20   the office of Mental Health was 5.2 billion last

21   year, but I don't know how that was divided up.

22         Q      Do you know how much money the State

23   of New York spends each year on community mental

24   health housing?

25         A      I don't.

Page 124

1          M. Peet - Confidential

2        Q    Do you know how New York's annual

3    spending on mental health housing and community

4    services compares to other jurisdictions?

5                MS. KHAN:  Objection.  You may

6        answer.

7                THE WITNESS:  No, I didn't look at

8        jurisdictions for this process.

9    BY MR. CONROY:

10       Q    You don't know whether New York is at

11   the top of the list, bottom, somewhere in the

12   middle compared to other states?

13       A    I don't.

14       Q    During the years covered by the LSPs

15   you reviewed, do you know whether New York

16   increased or decreased its annual spending on

17   mental health housing and community services?

18       A    I don't think there's a uniform

19   picture.  There were references in some of the

20   counties in 2019, I believe, about cuts to the

21   budget, so I don't know how widespread those

22   were, but it seems like it wasn't just a

23   universally experienced increase in addition of

24   community services and housing during that time.

25       Q    And when you said there are references

Page 125

```
 1              M. Peet - Confidential
 2    to cuts in the budget, are you talking about the
 3    state budget or a county budget or something
 4    different?
 5         A    The state funding to the counties.
 6         Q    Do you remember what particular item
 7    that was related to?
 8         A    I don't.  I'm sorry.
 9         Q    How many units of mental health
10    housing currently exist in New York State?
11         A    46,000 and change.
12         Q    How many new units of mental health
13    housing have been made available in New York
14    during the years covered by the LSPs you
15    reviewed?
16         A    I don't know.  I do know that there
17    have been less than 1,000 that have been
18    allocated for people that are leaving the
19    criminal justice system.
20         Q    Less than 1,000 for people leaving the
21    criminal justice system across the years of the
22    LSPs or something different?
23         A    Up 'til now.
24         Q    Going all the way back in time --
25         A    To now.
```

Page 126

1                M. Peet - Confidential

2       Q       -- until now?

3              But you don't know how many new units

4    of mental health housing have been made available

5    in New York during the years covered by the LSPs?

6              MS. KHAN:  Objection, but you may

7         answer.

8              THE WITNESS:  I don't.

9    BY MR. CONROY:

10      Q     I want to go back to the question I

11   had about how you know that OMH has repeatedly

12   refused to address the issues.

13             Do you believe that if the state

14   increases its funding to a certain amount, that

15   the county governments will file a report saying

16   they don't need any more money?

17             MS. KHAN:  Objection.  You may

18        answer.

19             THE WITNESS:  I would be surprised

20        if that happened.  In this -- in the

21        instance of the LSPs, though, the requests

22        really weren't -- didn't seem abstract in

23        sort of we need more, we need more.  They

24        were often tied to very concrete variables,

25        such as a waiting list of 1,500 people for

Page 127

1              M. Peet - Confidential

2       supported housing services.  That, to me,

3       seems qualitatively different than saying we

4       need more, we need more.  It seemed like a

5       very specific request tied to a very

6       specific need.

7    BY MR. CONROY:

8       Q      And let's go to Page 22 of your

9    report.  Tell me when you're there.  Okay?

10      A      Yeah.

11      Q      Okay.  So in the bottom paragraph on

12   the page about halfway down it says, "In these

13   local services plans, the majority of counties

14   identified housing as the key unmet need in their

15   service systems.  They point to long waiting

16   lists as evidence of this need," and then the

17   sentence goes on.

18             Did I read that correctly?

19      A      Yes.

20      Q      So specifically which counties

21   identified long waiting lists for mental health

22   housing?

23      A      I would have to go back to my notes as

24   I reviewed the LSPs for every specific county.  I

25   can tell you that out of all of the New York

Page 128

1              M. Peet - Confidential

2    counties, 42 reported for all three years that I

3    reviewed that housing was a significant need.

4    And in the section after -- or as part of this

5    one, I guess, I did talk about some of the

6    specific references to waiting lists on the part

7    of the counties that were the homes for the named

8    plaintiffs.

9        Q    So sitting here today, you don't

10   remember specifically which counties identified

11   long waiting lists for housing?

12              MS. KHAN:  Objection.  You may

13        answer.

14              THE WITNESS:  Correct.

15   BY MR. CONROY:

16       Q    And you had it as 42 out of 62

17   identified housing as a significant need, but

18   that's not the same as saying 42 out of 62

19   identified long waiting lists for housing?

20              MS. KHAN:  Objection.  You may

21        answer.

22              THE WITNESS:  That's correct.

23        It's not the same thing.  However, many of

24        them did offer the waiting list issue as I

25        think supporting information for their

Page 129

1                    M. Peet - Confidential

2          claim.

3     BY MR. CONROY:

4          Q      Sure.  So tell me if I'm wrong about

5     this, but is it a subset of those 42 -- some

6     number of those 42 identified waitlists, but not

7     all of them?

8          A      Are you familiar with the format of

9     the LSPs?

10         Q      Tell me about that.

11         A      A lot of it is a checklist.  The

12    format was set up to be uniform by OMH.  So in

13    it, they ask for sort of checklists of what are

14    the significant needs for the period of time

15    that's being reported on.  So the 42 reflect the

16    counties that checked housing as one of their

17    priorities in terms of need categories.  In

18    addition to that, many counties offered up

19    supplementary information about waiting lists.

20         Q      Do you know how the counties compile

21    these waiting lists?

22         A      I don't.  You know, I was looking for

23    documentation from OMH that set out their

24    requirements for that piece of information, but I

25    couldn't find it.

Page 130

1                    M. Peet - Confidential

2          Q      So I'm going to again try to recap and

3    you tell me what I'm getting wrong.

4          A      Okay.

5          Q      So I asked about whether the county

6    just asking for more money could -- whether

7    you're reading that as evidence of OMH's refusal,

8    and you said that there were some concrete

9    examples.

10         A      Repeated requests for the same thing.

11         Q      So I was going to go -- let me --

12         A      Sorry to interrupt.

13         Q      No, no.  It's okay.  It's going to be

14   a confusing question, so bear with me.

15         A      I'm ready.

16         Q      So I think you said that you agreed

17   with me that it's unlikely that counties will

18   just stop asking for more money simply because

19   the state increases its budget to a certain

20   amount; correct?

21         A      Correct.

22         Q      Okay.  And you said that the counties

23   that identified a waitlist is something you

24   looked for as evidence -- specific evidence that

25   OMH is refusing to fix the problem?

Page 131

1          M. Peet - Confidential

2                MS. KHAN:  Objection.  You may

3       answer.

4                MS. HANNA:  Objection.

5                THE WITNESS:  Well I looked at

6       both.  I looked at the category that was

7       either checked or not on the document, and

8       looked for a repeated, you know, checkmark

9       in the same place over three years.  So the

10      fact that the same thing was being noted for

11      three years indicated a continuing unmet

12      need.

13   BY MR. CONROY:

14      Q    Okay.  So if you see the same check

15   box indicating that County X has indicated that

16   housing is a significant need three years in a

17   row, you're taking that as evidence that OMH has

18   refused to -- has repeatedly refused to

19   adequately address the issue?

20                MS. KHAN:  Objection.  You may

21      answer.

22                THE WITNESS:  They have failed to

23      address the issue adequately.

24   BY MR. CONROY:

25      Q    Are you aware of any jurisdiction in

Page 132

1              M. Peet - Confidential
2    which there is not currently a demand for more
3    units of mental health housing?
4              MS. KHAN:  Objection.  You may
5         answer.
6              THE WITNESS:  Looking at other
7         jurisdictions wasn't within the scope of my
8         work, so, no.
9    BY MR. CONROY:
10        Q    Yeah, but -- so you're an expert in
11   the field of mental health; right?
12             MS. KHAN:  Objection.
13             THE WITNESS:  Yeah.
14   BY MR. CONROY:
15        Q    So based on your own knowledge, are
16   you aware of any jurisdictions in which there is
17   not currently a demand for more units of mental
18   health housing?
19             MS. KHAN:  Objection; asked and
20        answered.  You may answer.
21             THE WITNESS:  I'm not aware of
22        any.
23   BY MR. CONROY:
24        Q    In each of the LSPs, you talked about
25   the check box system.

1                    M. Peet - Confidential

2              So there's either a check box or a

3     list of their categories of priority funding

4     needs; right?

5          A     Yes.

6          Q     Sometimes they rank the priorities 1

7     through whatever; is that right?

8          A     I don't remember the numerical

9     ranking.  I think they're given up to three

10    categories to indicate are priorities for them.

11         Q     If you remember, what are some of the

12    specific priorities that were listed in the LSPs

13    you looked at?

14         A     Housing was the predominant.

15    Transportation was very predominant.  And I would

16    say a request for intensive levels of case

17    management for ACT programming above and beyond

18    the capabilities of the Medicaid case management

19    system that was put into place.

20              A number of counties seemed to be

21    struggling with the fact that Medicaid levels of

22    case management wasn't intensive enough to meet

23    the needs of people with significant mental

24    illness.

25         Q     Did you see employment programs

Page 134

1                M. Peet - Confidential

2    listed?

3        A    Not in great numbers.  There was a

4    fair amount of references to work force shortages

5    that related to problems with filling

6    psychiatrists and nurse practitioner vacancies

7    so; therefore, there was often more demand for

8    community clinic services than could be met.

9        Q    How about substance abuse programs?

10       A    I believe there was a separate --

11   there was a separate section for substance abuse

12   within this, but I did not look as carefully at

13   it.

14       Q    In any of the LSPs you reviewed, did

15   any county report that it was a priority for the

16   state to reallocate funding in order to guarantee

17   a permanent supported housing placement and your

18   list of necessary safety net services to each

19   person with SMI leaving prison on the day they

20   got out of prison with no wait time?

21       A    Not with that specificity, but a

22   number did reference the fact that they were

23   seeing an increase in numbers of persons showing

24   up in their offices or in their homeless shelters

25   having been discharged from prisons without

Page 135

```
 1              M. Peet - Confidential
 2   services.  So they were noting that and saying
 3   that they needed increased resources to address
 4   the needs of this changing population.
 5       Q      Which counties and which years
 6   reported that issue?
 7       A      I don't know that off the top of my
 8   head.
 9       Q      Have you been following the details of
10   New York's fiscal year 2024 budget?
11              MS. KHAN:  Objection.  You may
12       answer.
13              THE WITNESS:  Not with any detail,
14       no.
15   BY MR. CONROY:
16       Q      Are you aware of the appropriations
17   for community mental health services and housing
18   in the 2024 budget?
19       A      I'm aware that there's been an
20   increase in funding for both inpatient beds and
21   community services for the next fiscal year.
22       Q      Are you aware that it includes a new
23   one billion dollar investment in mental health
24   housing and community services?
25       A      Yes.
```

1                    M. Peet - Confidential
2        Q       Are you aware that it includes
3    890 million in new capital to develop new mental
4    health housing units?
5        A       Yes.
6        Q       Are you aware that it includes
7    120 million in new funding for annual operating
8    costs of new housing units?
9        A       No, I don't think I knew that.
10       Q       What is your reaction to that
11   development?
12               MS. KHAN:  Objection.  You may
13           answer.
14               THE WITNESS:  I'm glad to hear
15           that, because I think there's an enormous
16           need that up until now has been unmet in New
17           York.  I think it would be more meaningful
18           in terms of impact on the system's efficacy
19           if we could look at the pairing of new
20           housing units, along with the support
21           services that should accompany them.  It's
22           the old one about the other doesn't work
23           very well analogy.
24               But, you know, just on the face of
25           it, adding more units of housing is only a

Page 137

1                     M. Peet - Confidential

2           good thing.  To maximize the impact of the

3           new housing, it really should be paired with

4           intensive clinical services.

5    BY MR. CONROY:

6           Q      Are you aware of whether the new

7    investment includes new funding for community

8    services?

9           A      I know it does include some.

10          Q      It does?

11          A      Does.  Does, sorry.  What I reviewed

12   wasn't explicit as to the relationship between

13   those things.

14          Q      Okay.  So you're not saying you've

15   looked at the details of the budget and you think

16   services got the short shift; right?

17          A      No.

18          Q      You're saying you're not sure?

19          A      I don't know how that is playing out.

20          Q      Got it.  And that ideally the state

21   would be investing new funds in both housing and

22   community services; right?

23          A      Yes.

24                     MS. KHAN:  Objection as to form.

25          You may answer.

Page 138

1              M. Peet - Confidential

2    BY MR. CONROY:

3        Q      When you were in Connecticut or Maine,

4    did those states ever make a new one billion

5    dollar investment in funding for mental health

6    housing and community services?

7        A      That would have been like the budget

8    for the State of Maine.  No, there was not a

9    massive infusion of dollars in that way.

10       Q      Given the new investment, do you still

11   stand by your opinion that OMH is refusing to

12   fund mental health housing and services?

13              MS. KHAN:  Objection.  You may

14       answer.

15              THE WITNESS:  I don't know that I

16       could establish a causal relationship.  In

17       the reading that I've done, it seems like

18       the impetus for the infusion of dollars came

19       from the governor and the legislature.  I

20       didn't see a lot of OMH advocating for these

21       increases.

22   BY MR. CONROY:

23       Q      What is your understanding, if any, of

24   OMH's role in the state budget process?

25              MS. KHAN:  Objection.

Page 139

1            M. Peet - Confidential
2            THE WITNESS:  It's their
3     responsibility to collect needs assessment
4     data like they do in the LSP process.
5     Establish priorities, and then submit a
6     funding request to the legislature.
7   BY MR. CONROY:
8        Q    Let's turn to Page 40 of your report.
9   Are you on page 40?
10       A    Yes.
11       Q    The very, very bottom of the page it
12  says, "However, the legislature continues to
13  increase funding for inpatient beds at the cost
14  of developing the very services that would
15  diminish the need for those beds."
16            Did I read that correctly?
17       A    Yes.
18       Q    What's your source for this statement?
19       A    It's just a practical reality, you
20  know, in a finite mental health budget.  If you
21  have a lot of resources dedicated to inpatient,
22  they are not going to go to the community side of
23  your budget.
24       Q    But you wrote, "continues to increase
25  funding for inpatient"; right?

Page 140

1                M. Peet - Confidential

2       A       Where are we?  Oh, the legislature

3    continues -- it seems like for a number of years

4    here, the legislature has continued to advocate

5    for additional beds, which is, I think, a typical

6    reaction when there's bad publicity associated

7    with kind of events that have happened in New

8    York City in the last year.  So it's a response

9    to external events to look at beds as the

10   solution to the problem.

11              Typically an office of mental health

12   would work with the legislature to modify that,

13   because more beds is not -- it's not the answer

14   to the problem.  The real need is for adequate

15   community services that will keep people from

16   needing beds, and keep people from experiencing

17   the kind of crises that lead to bad outcomes.  So

18   the fact that New York seemed to be stuck on the

19   notion of more beds as a solution to the problem

20   raised for me the question of how effective the

21   Office of Mental Health was in its advocacy with

22   the legislature in the governor's office.

23      Q       What is specifically -- what events

24   have occurred that cause you to state that the

25   legislature continues to increase funding?  Are

Page 141

1                    M. Peet - Confidential
2       there specific budgets you're talking about?
3            A      Over the last couple of years, I know
4       there were budget submissions that addressed the
5       issue of increasing bed capacity.  In my mind,
6       when you're asking for beds, you're not asking
7       for community services.  Community services is
8       what New York is really needing more of.
9            Q      So we just talked about the 2024
10      budget; right?
11           A      Yeah.
12           Q      There's a billion dollars for
13      community services; right?
14           A      Yes, but there's also a big request
15      for inpatient beds.
16           Q      Are you aware that the budget is
17      18 million capital and 30 million operating for
18      inpatient care?
19           A      I would imagine that's just the state
20      operated part of the request, but there's also a
21      whole push to get the general hospitals in New
22      York to reopen beds that were closed during the
23      pandemic, so that has to do with the Medicaid
24      funding for that care.  So that's probably in a
25      different section of the budget, would be my

Page 142

1              M. Peet - Confidential

2   guess.

3        Q      The next sentence going onto the next

4   page, "OMH has failed to effectively educate the

5   public and the slate legislature regarding the

6   fiscal logic of decreasing reliance on

7   institutional care."

8              Did I read that correctly?

9        A      Yes.

10       Q      Do you still think that's true given

11   the 2024 budget?

12       A      I do, because New York State is going

13   in the opposite direction from virtually every

14   other state in the country now by adding in

15   patient capacity.  It's very well known that

16   there's a very organized advocacy effort to get

17   state governments to increase state hospital beds

18   or community beds.  That effort is sort of

19   unmoored from good mental health policy.  It's

20   kind of a quick fix answer when people are upset

21   about tragedies.

22              So the fact that New York, at the same

23   time that it's experiencing a deficit of

24   appropriate community services was continuing to

25   add to the inpatient side of the equation, it's

Page 143

1                  M. Peet - Confidential

2    and unusual -- let me say that.  It was an

3    unusual happening in the world of public sector

4    mental health these days.

5         Q     I think I'm -- I'm having trouble

6    following what you're saying because you've

7    agreed with me that there's a billion new dollars

8    for community services; right?

9         A     Yes.

10        Q     And is it your opinion that even if

11   you get that billion dollars, if on the other

12   hand, there's even one new dollar for inpatient

13   care, that means there's some sort of failure by

14   the state; is that your opinion?

15                  MS. KHAN:  Objection.  You may

16        answer.

17                  THE WITNESS:  It's a failure of

18        policy leadership, because the -- the

19        inpatient route is not a solution to the

20        problem that New York is experiencing.  You

21        can add 300 new inpatient beds, and they'll

22        be filled up in six weeks.  Those people

23        still have to come out of those beds when

24        they're discharged and go somewhere.

25                  And so when you are spending

Page 144

1                M. Peet - Confidential

2           millions of dollars to increase inpatient

3           capacity that you wouldn't need if you had

4           an appropriate array of community services,

5           it's a misallocation of resources, in my

6           opinion.

7      BY MR. CONROY:

8           Q     And that's your opinion, even if the

9      state is adding a billion new dollars to those

10     community services to keep folks out of

11     hospitals?

12                MS. KHAN:  Objection.

13                MS. HANNA:  Objection.

14                THE WITNESS:  Yes.  Yes.  Because

15          (a) we don't know what the net effect of the

16          billion dollars is going to be.  You know,

17          how much of the service gap in New York is

18          really going to be addressed and solved by

19          that billion dollars.  But in addition,

20          adding resources to an inpatient side of the

21          equation is a waste of resources, in my

22          mind.

23                     If you look at all of healthcare

24          over the last 20 years, you don't see

25          hospitals adding beds to their orthopedic

Page 145

1                    M. Peet - Confidential

2          units, you know.  It's a trend in healthcare

3          that has gone by.  You know, we figured out

4          ways to address most health and mental

5          health issues now in the community.  And so

6          it's a regressive direction, in my opinion,

7          for the state to be taking at this time.

8          When dollars are precious, as I think is the

9          point of a lot of your questions here, in a

10         finite resource environment, it makes no

11         sense to me to be spending dollars on

12         services that have limited utility, and

13         actually go to serve a very tiny fragment of

14         the population of people who have mental

15         health needs.

16    BY MR. CONROY:

17         Q    And just tell me again, what is the

18    source you're relying on for the idea that the

19    state has been increasing the number of inpatient

20    beds?

21                    MS. KHAN:  Objection.  You may

22         answer.

23                    THE WITNESS:  That's there in

24         OMH's own documents.

25

Page 146

1                    M. Peet - Confidential

2    BY MR. CONROY:

3         Q     Which document?

4         A     I believe I found it in one of the

5    reports about the transformation grant,

6    transformation process when they point to the

7    fact that they've stopped some of the

8    reallocation because they've had to increase

9    their inpatient bed allocations.

10        Q     If you could turn to Page 32 of your

11   report.  Are you there?

12        A     Yeah.

13        Q     So at the top paragraph just above

14   Section (d) it says, "OMH data indicates that as

15   of January 9th, 2023, it funds 109 ACT teams

16   throughout New York that are serving 6,479

17   enrollees.  This constitutes 91 percent capacity.

18   The number of homeless persons with SMI in New

19   York State is a strong indicator that OMH must

20   significantly expand its ACT and FACT program

21   capacity."

22              Did I read that correctly?

23        A     Yes.

24        Q     Are you aware that the 2024 budget

25   includes funding to create 42 new ACT teams?

Page 147

1                M. Peet - Confidential

2         A     I am.

3         Q     What's your reaction to that?

4         A     I think that's great news.

5         Q     Do you give OMH any credit for that?

6         A     I do.

7         Q     You do?

8         A     I do.  And I'm particularly happy to

9    see it, because it's a long-term solution to a

10   pretty intractable problem.  They have up 'til

11   now and still within this budget, you know,

12   they're funding a lot of short-term transitional

13   kinds of programming that I think are not

14   particularly appropriate for use with this

15   population, but the ACT teams, I think they're on

16   target.

17        Q     Let's flip back to Page 1, and --

18        A     What else could be on Page 1?

19        Q     Wait.  There's one more we haven't

20   covered.

21        A     We've gone through every word on Page

22   1.

23        Q     There's a fourth question.  Are you

24   there?

25        A     I'm there.

Page 148

1                      M. Peet - Confidential

2          Q      Okay.  So the last sentence in the

3    paragraph we looked at a few times says, "I was

4    further asked to opine on whether there are ways

5    OMH and DOCCS can remedy any such failures for

6    the relevant population."

7                  Was your methodology to answer this

8    question any different than what you've already

9    testified about?

10         A      It was not.

11         Q      Okay.  It's about an hour.  Do you

12   need a break?

13         A      That would be good for five minutes.

14         Q      Yeah.

15                MS. KHAN:  Thank you.

16                (Whereupon there was a brief

17        recess from 2:44 p.m. until 3:01 p.m.)

18   BY MR. CONROY:

19         Q      So briefly I want to finish up on the

20   idea that new funding for inpatient care

21   represents a failure by the state?

22         A      I think it's a missed opportunity.

23   Let's put it that way.

24         Q      Okay.  Do you think there should be

25   state psychiatric hospitals?

Page 149

1                M. Peet - Confidential

2        A      Yes.

3        Q      Do those hospitals require state

4    funding?

5        A      Yes.

6        Q      So where are you drawing the line

7    between appropriate funding and inappropriate

8    funding for inpatient care?

9        A      There's a direct cause and effect

10   between the adequacy of a community mental health

11   system and the need for inpatient capacity.  So

12   the less well developed your community system is,

13   the more you're going to have to rely on

14   inpatient care.  And the trap that's embedded in

15   all this advocacy for inpatient capacity is that

16   it doesn't solve the problem in the long term.

17   It's a short term fix.  And by allocating

18   resources to inpatient rather than building out

19   the capacity that's going to diminish demand on

20   inpatient, you're prolonging the difficulties.

21            So if OMH had the latitude to combine

22   these allocations and to invest more heavily in

23   the community side, I think it would serve them

24   better in the long term because they would impact

25   the demand for inpatient.  That's the only point.

Page 150

1                 M. Peet - Confidential
2        Q      Have you looked at whether there are
3    currently enough inpatient beds for all people
4    who want them --
5                    MS. KHAN:   Objection.   You may
6        answer.
7    BY MR. CONROY:
8        Q      -- in New York State?
9        A      It's really not a question of want.
10   It's a question of do they need them.   So
11   inpatient bed capacity is really expensive, so it
12   really -- and while the insurance now require
13   that there are no admissions except for
14   documented clinical need, so there is evidence
15   that people are backing up in emergency rooms
16   because of difficulties accessing inpatient care
17   now.
18                    However, if you open up the lens, you
19   can see that if you intervene earlier in the
20   disease progression through programs like ACT or
21   crisis intervention, then they're not going to
22   end up in the emergency room waiting days for
23   beds, and actually they're better off, because
24   having life disrupted by an inpatient stay is not
25   a positive thing for people.

Page 151

1                    M. Peet - Confidential

2              So, yes, I think there are -- there is

3     documentation that people are backed up waiting

4     for access, but I don't think -- I don't think

5     that's the only solution to that phenomenon.

6         Q     What about people in the criminal

7     justice system who are found either unfit to

8     stand trial or not guilty by reason of mental

9     disease; do they require inpatient care?

10                   MS. KHAN:  Objection.  You may

11           answer.

12                   THE WITNESS:  Lots of places in

13           the country are experimenting with

14           outpatient programming for restoration of

15           competency.  I don't know whether New York

16           is doing that or not, but it's a fairly

17           common thing now.  I think state hospitals

18           are the only logical place for NGRI

19           individuals to be housed.

20    BY MR. CONROY:

21         Q     And that service requires some state

22    funding?

23         A     Yes.

24         Q     Yes?

25         A     Yes.

Page 152

1                   M. Peet - Confidential

2          Q      Let's turn to Page 44 of your report.

3     Tell me when you're there.

4          A      Okay.

5          Q      So this is your list of

6     recommendations that you believe are needed for

7     New York to achieve adequate housing and services

8     for the relevant population; correct?

9          A      Correct.

10         Q      And is it your opinion that if OMH

11    follows these recommendations, you believe New

12    York will achieve adequate housing and services

13    for the relevant population?

14         A      The recommendations are a platform and

15    a framework.  They don't really address the

16    funding piece of it, which has to go hand-in-hand

17    with the recommendations.

18         Q      So you anticipated my next question.

19                Why doesn't this address the funding

20    piece?

21         A      It wasn't part of the scope of my

22    report at this time to look at the costs

23    associated with the recommendations.

24         Q      So do you have an opinion about how

25    many new units of supported housing would be

Page 153

1              M. Peet - Confidential

2    needed statewide in New York in order to

3    guarantee a permanent supported housing placement

4    to each person with SMI leaving prison on the day

5    they get out of prison with no wait time?

6         A    I don't, but that data -- that

7    calculation should be not hard -- not difficult

8    for OMH to make if they look at the numbers of

9    people who are being discharged to shelters from

10   state prisons or other institutional settings, as

11   well as a look at the percentage of homeless

12   individuals throughout the state who are people

13   from this population who have already been

14   discharged to homeless shelters.

15        Q    But you haven't done that analysis?

16        A    I haven't.

17        Q    Do you have an opinion about how much

18   money it would cost to develop enough new units

19   of supported housing to guarantee a permanent

20   supported housing placement to each new person

21   with SMI leaving prison on the day they get out

22   of prison with no wait time?

23        A    I did not make that calculation.

24        Q    And same question with respect to

25   community services; did you make that calculation

Page 154

1                    M. Peet - Confidential

2    of how much that would cost?

3         A      I did not.

4         Q      But you agree it would cost something;

5    right?

6         A      It would.

7         Q      Okay.

8         A      It would.  However, to go back to

9    their original transformation plan approach, I

10   think would be a good thing.  So it's hard to say

11   exactly what the net cost might be to the system

12   if first they relied on reallocation of

13   resources.

14                The other place that states -- I

15   started looking for reallocation -- is from the

16   correctional facilities that have been downsized.

17   You know, we've historically looked primarily at

18   state psychiatric facilities, but because of the

19   increased populations of people with serious

20   mental illness, there's also been more recently

21   consideration of reallocation of costs from the

22   correctional budgets as well, and I think that's

23   something that state mental authorities should

24   pursue.

25         Q      You mentioned the transformation plan

Page 155

1              M. Peet - Confidential

2    approach.  I can't remember if I asked you to

3    just tell me your understanding of what that is,

4    so if you could.

5         A     Sure.  It's an approach that's been

6    used in many states as they're faced with the

7    challenge of downsizing state hospitals, which

8    historically have been really the repository of

9    big segments of state mental health budgets.  And

10   then as units are closed as the population

11   diminishes, to reallocate those dollars so

12   they're spent for community services that will

13   serve a like population than the one that

14   historically had to rely on state hospital use.

15        Q     And this transformation plan is

16   something that New York State implemented?

17        A     They started it several years ago, but

18   it seems to have ground to a halt somewhere in

19   the last year or so.  Or the reporting has gotten

20   more sporadic.

21        Q     Do you know when it started?

22        A     I don't want to guess.

23        Q     That's okay.

24        A     It's a while ago now.

25        Q     Since it started, has New York, in

Page 156

1            M. Peet - Confidential

2    fact, downsized its state psychiatric hospitals?

3        A    Yes.

4        Q    Do you know by how much?

5        A    I don't know the exact number because

6    now it's gone back up again.  But compared to

7    other states, New York is still spending a larger

8    proportion, and they acknowledge this in their

9    own state plan that they're spending a higher

10   proportion of their budget on inpatient care than

11   most other states are, and it was part of the

12   justification for starting the transformation

13   process.

14       Q    Other than inpatient treatment and the

15   corrections budget, are there any other places

16   where you would cut funding in order to achieve

17   the goals you set out in your report?

18            MS. KHAN:  Objection.  You may

19       answer.

20            THE WITNESS:  I would consider

21       looking at some of the programming that OMH

22       has developed that are considered to be

23       short-term interventions for homeless people

24       or other populations, and reallocate those

25       dollars into something more longer term.

Page 157

                    M. Peet - Confidential

1              M. Peet - Confidential

2         Discontinuity relationship is really a

3         negative factor for people with serious

4         mental illness, and I think given the

5         severity of and complexity of need of people

6         who are homeless or near homeless,

7         programming that is defined as transitory is

8         often investment in a lot of money that

9         then -- you know, the gains are lost when

10        the programming stops, and there may not be

11        adequate resources available to pick up

12        services at a similar level of intensity.

13              So I think the choice of

14        short-term transition programming has been

15        over-relied on in a setting that really

16        needs to look at permanent supported housing

17        and services as a long-term solution.

18   BY MR. CONROY:

19        Q    And have you analyzed specifically how

20   much money you believe can be cut from the OMH

21   inpatient services budget without jeopardizing

22   the efficacy of inpatient services that are

23   needed?

24        A    I haven't made that calculation.  But

25   what I would say is there's a sequencing

Page 158

1              M. Peet - Confidential

2    opportunity, I think, for OMH in terms of using

3    the dollars that you said are allocated in the

4    next budget for community services.  Getting

5    those services billed and available is what's

6    essential for a safe downsizing and reallocating

7    project.  The mistake that was made over and over

8    and over with the institutionalization was

9    discharging people before the resources were

10   available in the community, which led to the

11   homelessness and the overuse of the criminal

12   justice system.  And to reverse that systemic

13   failure, we really need to focus on making sure

14   that there's advanced development of capacity to

15   receive people as they're going back into the

16   community.

17        Q    Am I understanding you correctly that

18   you previously testified you haven't looked at

19   the total cost of achieving the goal you set out

20   in your report; correct?

21        A    Correct.

22        Q    So even if OMH reallocated all of the

23   money it could from inpatient care, from

24   short-term programs, you don't know whether or

25   not that would cover the cost of achieving the

Page 159

1              M. Peet - Confidential
2    goal you set out in your report; correct?
3         A     I do not.
4         Q     So it may be the case that achieving
5    that goal would require some further
6    appropriations from the state legislature?
7         A     It could possibly.
8         Q     Do you have an opinion on whether it's
9    likely?
10        A     I don't.  One thing that I would
11   consider doing if I was at OMH, it seems in some
12   ways they're being forced to add inpatient
13   capacity.  If they could at least put a time
14   limit on the existence of those beds and say,
15   we'll take them for a year, you know, while we
16   have an opportunity to build the community site
17   out more, so at least, you know, we're not faced
18   with the backups in the emergency room.  But if
19   there's a time limit on it, and then you could
20   reallocate those dollars again for the next
21   iteration of builds in the community, I think
22   that would be a positive outcome.
23        Q     And, again, tell me if I have your
24   opinion about this wrong, but in terms of the
25   transformation plan, you agree that -- let me ask

Page 160

1                    M. Peet - Confidential

2    this way.

3                    Do you agree that the transformation

4    plan moved things in the right direction?

5         A      I do.  I think there could have been

6    more of an impact if they had used all of the

7    dollars to build out the safety net services.

8    The fact that the dollars were reallocated in

9    some cases for populations with less need than

10   these, I think, was atypical for processes like

11   the transformation.  Typically the money is taken

12   out of state hospitals, and then used to build

13   services in the community to serve that same

14   population.

15                   What OMH has done is broadened the

16   population of people that are benefiting from the

17   yielded dollars, and I think that diluted the

18   impact in terms of the state of the community

19   system.

20        Q      But in terms of moving money away from

21   inpatient care, you think that was going in the

22   right direction?

23        A      I know it was.

24        Q      Okay.  Let me just ask a couple

25   followups on ACT and FACT services.  Do ACT and

Page 161

1              M. Peet - Confidential

2    FACT teams both provide equally good services?

3         A    Yes.

4         Q    Are they the same or are they

5    different?

6         A    The FACT team is built on the

7    assertive community treatment team model with

8    some additions.  So some of the research that has

9    been done over the last 50 years into efficacy of

10   ACT found that sometimes the program did not work

11   as well with people who had involvement with the

12   criminal justice system as it did with folks who

13   didn't.  And so then there was some

14   experimentation with the model to add several

15   areas of focus that weren't included with the

16   original ACT programming.  It included sometimes

17   shared staffing with, like, parole officers,

18   probation officers.  Staff that are trained in

19   both community process for people who have been

20   discharged from corrections, as well as mental

21   health services.  An additional focus on

22   substance abuse among the clientele.

23              The intent was to modify the program

24   so that it focused more on the factors that were

25   likely to lead to reinstitutionalization,

Page 162

1              M. Peet - Confidential
2    particularly with rearrest and involvement in the
3    criminal justice system. So it looked at things
4    like intervening with living situations. If
5    people were living in environments where family
6    or friends were involved with criminal activity,
7    to sort of remove them from that. So it was
8    really trying to just make adjustments to the
9    different populations that were being served by
10   the two different programs.
11             But fundamentally they have the same
12   approach. All services are within an
13   interdisciplinary team so that they don't have to
14   shop for services. Availability seven days a
15   week, 24 hours a day. Fundamentals of the
16   program are the same.
17       Q    Let me just direct you to Page 20 of
18   your report. And down at the very bottom there's
19   a sentence that says, "Medication management
20   works mostly when an ACT or FACT team is
21   involved."
22             Can you explain why that is?
23       A    One of the major reasons driving
24   rehospitalization or reinvolvement with the
25   criminal justice system is when people stopped

Page 163

1                 M. Peet - Confidential
2    taking, in particular, their antipsychotic
3    medications.  And it often happens at points of
4    transition.  So that what happens frequently when
5    someone is in prison, is that their Medicaid
6    eligibility stops.  And while discharge planning
7    staff are supposed to apply to get it
8    reactivated, that doesn't always happen.  And so
9    if people come out into the community without
10   Medicaid and have to go to a community pharmacy
11   to get a prescription filled, they are not going
12   to be able to do that.
13                 ACT teams have a psychiatrist and a
14   nurse as part of the team, and access to
15   psychotropic drugs, so there's no gap in a
16   prescription or receiving necessary medications.
17   It's also true that people with specifically
18   psychotic disorders, there's often a pattern
19   where if people start feeling better, they'll
20   stop taking their medications, and that's when
21   things happen.
22                 So a big part of the work of the ACT
23   team is education for people about their
24   medications, how they work, how they feel, the
25   importance of taking them.  They are also able to

Page 164

1                    M. Peet - Confidential

2     remind people on a daily basis to take their

3     medications and then give them to them

4     immediately.  So there are a lot of fail-safes in

5     the ACT programming that help to prevent the

6     lapses of medication that happen with more

7     traditional programs.

8          Q     Even with a good ACT or FACT team in

9     place, is it possible that someone might stop

10    taking their medications anyway?

11         A     It's possible.  The probability is

12    much lower.  Because the other thing that's

13    implicit in the ACT team model is the development

14    of really trusting relationships between staff

15    and the client.  So individuals are much more

16    likely to take advice about medications than they

17    are that they might see once a quarter or once a

18    month.

19         Q     Let me direct you to Page 40.  And

20    tell me when you're there.

21         A     I'm here.

22         Q     I'm going to jump into the footnotes

23    which is exciting.  If you look at Footnote

24    219 --

25         A     Okay.

Page 165

1              M. Peet - Confidential

2        Q     -- you cite a report from something

3   called NRI, Inc.?

4        A     Yeah.

5        Q     What is NRI, Inc.?

6        A     NRI is a subsidiary of the National

7   Association of State Mental Health Program

8   Directors.  They're the data-collecting and

9   report writing arm of NASMHPD.

10       Q     Is NRI considered a reliable source of

11  information about state mental health

12  expenditures?

13       A     Yeah.  They're really the source that

14  are most often referred to for state mental

15  health data.

16       Q     Did you rely on NRI data as part of

17  your work in Maine or Connecticut?

18       A     I think NRI wasn't operating yet.  I

19  did rely on NASMHPD, who used to have a section

20  before they had NRI.  They've been the collector

21  of information about state mental health

22  authorities for decades now.

23       Q     Let me show you Exhibit 5.

24              (Exhibit 5 was marked.)

25              This is a multiple page document with

Page 166

1                    M. Peet - Confidential

2    the title, "FY 2019 State Mental Health Agency

3    Revenues and Expenditures.  NRI's 2020 through

4    2021 State MH Profile Highlights."

5              Is this the report that you cited in

6    Footnote 219?

7         A    Yes.

8         Q    And if you could turn to the second

9    page of this document, there's the map of the

10   United States; do you see that?

11        A    Yes.

12        Q    And the map is titled, "FY 2019 SMHA

13   Controlled Per Capita Expenditures for Mental

14   Health"; do you see that?

15        A    Yes.

16        Q    And it groups states into different

17   categories based on each state's expenditures;

18   correct?

19        A    Yes.

20        Q    Green is the highest category?

21        A    Uh-huh.

22        Q    And New York is in the green category;

23   right?

24        A    Yes.

25        Q    And that indicates spending of two --

Page 167

1                    M. Peet - Confidential
2    what does that indicate to you?
3         A     Let's see.  Where is there a key?  So
4    it's per capita expenditures for mental health,
5    which corrects, you know, for the size of the
6    budget, so --
7         Q     And it's listed at 217 to 463.
8         A     Yes.
9         Q     Okay.  Let me show you Exhibit 6.
10                  (Exhibit 6 was marked.)
11                  This is a multiple page document with
12    the title, "New York Fiscal Year 2019 SMHA
13    Controlled Revenues and Expenditures," and it's
14    Bates stamped D-01685029 through D-01685036.
15                  Have you seen this document before?
16         A     Yes, I have.
17         Q     You have?  And down at the bottom of
18    the first page it says, NASMHPD Research
19    Institute.
20                  Is that the NRI we've been discussing?
21         A     Yes, it is.
22         Q     What does SMHA mean?
23         A     State mental health authority.
24         Q     And on the first page, do you see that
25    there's a chart summarizing New York's SMHA

Page 168

1              M. Peet - Confidential

2    controlled revenues and expenditures for fiscal

3    year 2019?

4        A    Yes, I do.

5        Q    And it gives a rank for each category?

6        A    Yes.

7        Q    And then just below the two boxes it

8    says, "All ranks are based on 52 states

9    reporting, including the District of Columbia and

10   Puerto Rico"; do you see that?

11       A    Yes.

12       Q    So in the first box, last line, "New

13   York's total SMHA controlled expenditures for

14   that year were close to 7 billion"; correct?

15       A    Yes.

16       Q    And that ranked No. 2 in the country?

17       A    Yes.

18       Q    And moving up a couple lines,

19   community-based -- it says, "Community-based MH."

20            What would your understanding be of

21   what "MH" means there?

22       A    Mental health services.  Mental

23   health.

24       Q    And that's over $5 billion?

25       A    Yes.

Page 169

1              M. Peet - Confidential

2        Q      And, again, New York's ranked No. 2 in

3   the nation; correct?

4        A      Uh-huh.

5        Q      Do you have any reason to believe this

6   data is not accurate?

7        A      No, I don't.

8        Q      If you could flip to the next page,

9   and there's a chart or a graph at the bottom

10  showing expenditures over time from 1981 through

11  2019; do you see that?

12       A      I do.

13       Q      And it shows community expenditures in

14  blue; do you see that?

15       A      I do.

16       Q      And state hospital expenditures in

17  red; do you see that?

18       A      I do.

19       Q      And the blue has been steadily

20  increasing since at least 1997; does that look

21  right to you?

22       A      It does.

23       Q      And as of the last year, 2019, the

24  blue is significantly larger than the red; right?

25       A      It is.

Page 170

1                M. Peet - Confidential

2         Q      If you flip back to the first page,

3    there's a pie chart; do you see that?

4         A      I do.

5         Q      Oh, they reversed colors on us.

6         A      Yeah.

7         Q      So this time community-based is in

8    red, and that's a 77.4 percent of total SMHA

9    controlled expenditures for New York for 2019; do

10   you see that?

11        A      I do.

12        Q      And inpatient in the blue now is at

13   18.3 percent; correct?

14        A      Yes.  Now there's something confusing

15   about this data.

16        Q      Sure.

17        A      I'm trying to think if it's a semantic

18   issue.  So what's missing from the report is the

19   amount of money that OMH spends for

20   hospitalization and other settings beyond the

21   state hospitals.  So the majority of their money

22   for inpatient care is now spent not on state

23   hospitals, but on hospitals in community

24   settings.

25               So what I'm wondering is whether those

1                    M. Peet - Confidential

2    community hospitals, general hospitals, have been

3    included under community-based mental health

4    services.  That could explain for why this chart

5    is -- it doesn't line up with OMH says itself

6    about their own expenditures.  In their reports

7    they quote that they're spending over 50 percent

8    of their dollars on inpatient care; thus, they

9    wanted the transformation.  So something is not

10   evident in the way the community hospital,

11   general hospital or private hospitals are being

12   factored, or maybe they're not.  You know, if

13   they're just left out altogether, then it would

14   deflate the part of the pie that's for

15   hospital-based care.

16               Normally in these kinds of charts, if

17   we have one that shows just state hospital data,

18   then there's a corollary one that shows the other

19   kinds of hospitals.  Because over time as the

20   state hospitals have downsized from 5,000 beds,

21   it spread out through the community, so it's

22   confusing.

23       Q    And your understanding would be some

24   OMH expenditures would be going toward care at

25   hospitals run by entities other than OMH?

Page 172

1                      M. Peet - Confidential

2        A        Yes.  A significant amount of dollars

3    are spent that way.

4        Q        Okay.

5        A        The upward trajectory on community

6    services is good.

7        Q        Let me ask you about -- if I can

8    direct you to the page number if that's helpful,

9    but there was a part of your report where you

10   talked about a "No eject, no reject" concept.

11                What does that mean?

12       A        Part of the problem that arises for

13   many state mental health authorities, is they're

14   trying to build access in community services for

15   populations of people who are seen as high risk.

16   Part of the challenge is that nonprofit providers

17   are often worried about their risk in accepting

18   those people.  Sometimes their board of directors

19   don't want them to assume that risk.  So the "No

20   eject, no reject" policy is a strategy that some

21   states have developed to use in contract

22   negotiations with nonprofits which, basically

23   says if you want our business, you know, what you

24   have to agree to is accepting -- there will be a

25   process for screening referrals to make sure

Page 173

1               M. Peet - Confidential

2    they're appropriate given program definitions.

3    That's a role that normally the local mental

4    health authority or the regional office of the

5    state would play as a broker between the funding

6    entity and the nonprofit.  But once they're

7    determined to be meeting criteria for admission

8    to the nonprofit, if they have a vacancy, they

9    take the person.  There's no rejecting the person

10   for vague reasons, like, poor fit is a common

11   one.

12               And the same with discharge.  If one

13   of the nonprofits chooses to discharge an

14   individual, they have to go through an appeal

15   process with the regional office of the state

16   mental health authority to determine whether

17   discharge is considered appropriate.  It's just

18   one strategy to -- a number of years ago when

19   privatization was very popular, state mental

20   authorities often privatized all community

21   services, but what happened was, what I think you

22   see some of here in New York, which is the

23   so-called difficult to treat population of folks

24   are the ones who constantly get shifted to the

25   back of the line and ill served when compared to

                                    Page 174

1                M. Peet - Confidential
2    other groups in terms of time to access or length
3    of stay, kept in programs.  So it's just a
4    management strategy to try to rebalance leverage
5    with the nonprofit providers.
6         Q    Are there certain factors that might
7    typically make someone unusually hard to place in
8    community mental health housing?
9                   MS. KHAN:  Objection.  You may
10        answer.
11                  THE WITNESS:  The variables that
12        are pointed to I would say frequently are
13        history of fire setting.  History of
14        violence.  History of sexual abuse.  I think
15        those are the three largest ones.
16   BY MR. CONROY:
17        Q    Which states, if any, have implemented
18   the "No eject, no reject" rule?
19                  MS. KHAN:  Objection, but you may
20        answer.
21                  THE WITNESS:  I don't have current
22        knowledge of that.  I know it's a fairly
23        common strategy used.  It's one I have used.
24   BY MR. CONROY:
25        Q    I was going to ask that next.

Page 175

1                    M. Peet - Confidential

2              Did you have that rule in Maine or

3      Connecticut?

4         A      I did.  I can't speak to whether it's

5      still in operation, but --

6         Q      And are you saying that there's some

7      legal requirement to implement this rule, or that

8      it's your policy recommendation to do so?

9                    MS. KHAN:  Objection.  You may

10             answer.

11                   THE WITNESS:  It's a policy

12             recommendation.

13     BY MR. CONROY:

14        Q      Just so I sort of understand the

15     contours of the rule, if you were in a system

16     using this rule and you had an applicant for

17     housing who, let's say, has unusually complicated

18     psychiatric needs, service needs, and the

19     provider says, our staff is not equipped to

20     handle someone with these needs, how do you

21     handle a situation like that?

22                   MS. KHAN:  Objection.  You may

23             answer.

24                   THE WITNESS:  I think the first

25             step would be to examine the contract that

1                    M. Peet - Confidential

2        exists between the state and the provider.

3        To look at what the contours of the program

4        and the expectations of the population of

5        people to be served.  And included in those

6        contracts are usually staffing plans.  So it

7        would be to look at the contract and see

8        whether it's written in a way that makes it

9        reasonable to believe that it's an

10       appropriate referral for the provider.  The

11       second step sometimes was meeting with the

12       provider.  Offering them additional

13       training.  If the person had particularly

14       challenging needs, sometimes offering a flex

15       fund budget to go with the person, so that

16       if they needed additional staffing on

17       certain shifts, or they needed -- I don't

18       know, opportunities to make available a gym

19       membership or something that was going to be

20       a good outlet for the person, we added

21       things like that to the budget.

22                    We always tried -- I mean, we had

23       an understanding of the anxiety that I think

24       accompanies consideration of taking on some

25       folks, so we try to do it in partnership

1           M. Peet - Confidential
2      with the providers and provide them with
3      additional support and resources if it was
4      necessary.  In some cases, we had to
5      terminate contracts because the providers or
6      their boards just under no circumstances
7      would take on the risk of, say, fire
8      setters.
9  BY MR. CONROY:
10     Q     Would you agree that most people with
11  SMI are not violent?
12               MS. KHAN:  Objection.  You may
13      answer.
14               THE WITNESS:  Absolutely.
15      Absolutely.
16  BY MR. CONROY:
17     Q     And most people with SMI are much more
18  likely to be a victim of violence than to commit
19  a violent act; correct?
20     A     Correct.
21     Q     So the groups you just talked about,
22  folks with a history of violence, fire setting,
23  sexual assault, we're talking about a very small
24  minority of people with SMI; correct?
25     A     Exactly.

Page 178

1                    M. Peet - Confidential

2        Q       Those are often the hardest people to

3    place in housing?

4        A       They are.  Another thing that we did

5    in Connecticut, and I think it's a good strategy

6    for some folks who are particularly hard to

7    place, was we leased apartments through our

8    resources, and hired -- or transferred state

9    staff from downsized hospitals to be the staff

10   for the individuals at the apartment.  And it had

11   some unanticipated benefits.  When we were able

12   to move staff that had been their staff on the

13   inpatient unit, it really gave a source of

14   continuity and comfort to people moving, I think,

15   to have that kind of trust and relationship.  And

16   it's a different way, but I think an appropriate

17   way for the state to take on the role of provider

18   of last resort, which historically they played

19   through the state hospital operation.

20               And we already hold liability for the

21   population, so it wasn't -- you know, the risk

22   issue really didn't factor for us in the way that

23   it did for the private nonprofits.

24       Q       Do providers or the state have any

25   obligation to consider the safety or preferences

Page 179

1              M. Peet - Confidential

2  of people already living in a house?

3      A     Yes, I think, you know, the mix of

4  people is absolutely appropriate.  It's one of

5  the reasons why supported housing and SROs have

6  become used more, because you can have single

7  individuals in both of those settings, and you

8  don't have to worry so much about unexpected

9  impact on others.

10     Q     But if it's a situation where you have

11 multiple housemates, you think it's appropriate

12 to consider the safety and concerns of the folks

13 who are living there already?

14     A     Yeah.  I think, you know, for any

15 state mental health authority, you know, the

16 safety of community, whether it's small c

17 community in terms of a group home living

18 environment, or big C Community in terms of

19 Manhattan has to be part of the equation.  And

20 that's why, though, it's sometimes hard, you

21 know, to set these folks up with appropriate

22 programming.  The alternative of leaving them

23 without programming is so much more dangerous to

24 the public safety.

25     Q     Are you familiar with transitional

Page 180

1                     M. Peet - Confidential

2    living residences in New York State?

3          A      Yes.

4          Q      What's your understanding of what

5    those are?

6          A      Programs that are -- just what they

7    sound like.  They're step-down programs from

8    either an inpatient setting or a correctional

9    setting that are intended to be used for skill

10   building and community reacclimation.

11         Q      In your report, and I can direct you

12   to the page for the context, but you called TLRs

13   inappropriate and overly restrictive settings; is

14   that right?

15         A      Yes.

16         Q      Why do you have that opinion?

17         A      This is an evolution of programming

18   issue again.  There was a point in time when lots

19   of programs, like transitional living

20   arrangements, group homes, residential treatment

21   programs were considered as part of a whole

22   continuum of services that people should move

23   along as they improve.  But the reality is that

24   very often people didn't move on the continuum.

25   They would get stuck at various places.  And the

Page 181

1                   M. Peet - Confidential

2    reasons that they moved or didn't move often

3    didn't have to do with clinical readiness.  You

4    know, it happened because there was a bed

5    somewhere or there wasn't a bed somewhere or

6    somebody had offended a program manager.  So the

7    whole continuum approach to mental health care

8    has decreased in, I think, value over time, and

9    replaced by an approach that is really more like

10   supported housing, where a person gets into a

11   permanent living arrangement, and then the

12   support that the individual receives can be

13   intensified or titrated back, depending on the

14   level of acuity of their need at any point in

15   time.

16            So with the old residential treatment

17   alternatives, often there's the same kinds of

18   structure and institutional lifestyle in those

19   facilities as exist in inpatient units.  And at

20   the time that people are moving to them, I think

21   most often they could also be just as easily

22   moved to a community setting with appropriate

23   intensive in home support.

24        Q    Do you think there's any role for TLRs

25   to help fill the gap to the extent there's not

Page 182

1              M. Peet - Confidential

2    enough supportive housing for folks coming out of

3    institutional settings?

4         A    I think as an interim strategy -- the

5    problem that I've observed in the mental health

6    field is often we put things in that we consider

7    interim strategies, and then ten years later

8    they're still there because the resources never

9    eventuated to put in place what people really

10   need.  Is it better than shelters?  Probably in

11   some cases at least.

12        Q    Did you have anything like TLRs in

13   Maine or Connecticut?

14        A    Back at the time when I was running

15   the mental health center in Bridgeport, that was

16   the early '80s.  We did have group homes that

17   were part of our service array there.  Starting

18   in the late '80s, we were starting to divest in

19   those residential treatment programs.

20        Q    And you have not visited any TLRs in

21   New York State; correct?

22        A    I have not.

23        Q    As far as you know, can residents of

24   TLRs come and go as they please subject to the

25   house rules?

Page 183

1          M. Peet - Confidential
2      A      Subject to the house rules and
3   clinical determinations of safety and clinical
4   functioning.
5      Q      Let me push on that for a second.
6          Do you have an understanding that
7   there are people in TLRs who are not allowed to
8   leave for clinical reasons?
9      A      I think facilities like that often --
10  I'm generalizing here -- often exercise a lot of
11  prerogative around people's leaving and coming
12  and going, both for concerns about safety of the
13  house, bringing contraband in if they have
14  reasons to suspect that.  Also, if there's a
15  clinical determination made that a person is in a
16  particularly acute phase of their illness.  So
17  there's coming and going, but there is often --
18  it's not as free-flowing as you might think.
19     Q      But you said you're speaking
20  generally.
21          You're not speaking to any specific
22  examples you're aware of in New York?
23     A      Correct.
24     Q      Okay.  And in your report, you wrote
25  that "TLRs are located within psychiatric

Page 184

1                M. Peet - Confidential

2    hospitals"; do you remember that?

3        A    It's my understanding that in some

4    cases they were.

5        Q    Do you mean within -- on the grounds?

6        A    On the grounds.

7        Q    Not necessarily within the building

8    that is the hospital?

9        A    On the grounds.

10        Q    On the grounds, okay.  I'm going to

11    skip Exhibit 7, so that's good news.

12        A    Can you see my heels clicking?

13        Q    It was your report in Mississippi.

14        A    Oh, God.  In case we had a few extra

15    hours?

16                (Exhibits 8 and 9 were marked.)

17        Q    I am going to show you Exhibits 8 and

18    9 together.  I think I only have two copies of

19    each of these.  So let me give you 8 and 9.  So

20    let me start with Exhibit 8.  It is a 102-page

21    document with a case caption, United States of

22    America versus the State of Mississippi, Trial

23    Transcript Volume No. 15.  And Exhibit No. 9 is a

24    68-page document.  It's also a transcript with

25    the same case captioned, United States versus

Page 185

1                    M. Peet - Confidential

2    Mississippi.  This is Trial Transcript Volume 16.

3    So earlier today -- well, I can't remember if you

4    said this, so let me ask it.

5          A     Okay.

6          Q     During the United States versus

7    Mississippi case, did you testify at trial?

8          A     I did.

9          Q     Okay.  And I'm not going to ask you to

10   review the whole thing unless you want to, but if

11   you look a couple pages in, does this appear to

12   be a transcript of your testimony in that case?

13         A     Yes.

14         Q     I'm just going to pick a couple

15   specific points out of this, so let's start with

16   Exhibit 8.  And I'm going to use the page

17   numbering on the very top right.  So let's go to

18   Page 1354.

19         A     Okay.

20         Q     And if you look down starting at Line

21   20, there's a question, "Let's move on to

22   supported housing.  Did you determine whether

23   there was sufficient supported housing service

24   across the State of Mississippi?

25                "Answer:  It was my conclusion that

Page 186

1                    M. Peet - Confidential

2       there was not sufficient capacity in supported

3       housing.

4                    "Question:  What was the basis for

5       your conclusion?

6                    "Answer:  It was really that the

7       number of people who had been successfully placed

8       in permanent supported housing was under 400,

9       when the state's estimate of need was that 2,600

10      people could benefit from that service, so that's

11      a low penetration rate."

12                   Did I read that correctly?

13           A      Yes.

14           Q      So in the Mississippi case, was there

15      an estimate from the state that there was a need

16      for 2,600 total units of supported housing?

17           A      Yes, there was.

18           Q      Have you, in this case, seen any

19      similar analysis of the total number of supported

20      housing units needed?

21           A      No, I have not.

22           Q      Do you know how many total supported

23      housing units New York State has funded to date?

24           A      For people with serious mental

25      illness?

1                M. Peet - Confidential

2        Q        Yes.

3        A        I believe it's 46,500, thereabouts.

4        Q        Significantly more than Mississippi;

5    correct?

6        A        Yes, but less than 1,000 are earmarked

7    for the relevant population.

8        Q        So let me push on that.

9                Is it your understanding that the

10   relevant population can only apply to units that

11   are earmarked for them?

12       A        No, but we know that when competing

13   with individuals without a criminal justice

14   history for finite numbers of slots, the relevant

15   population are much less likely to gain access.

16       Q        But you don't disagree that folks with

17   SMI coming out of a prison setting are not

18   limited to applying to units designated for the

19   forensic population?

20       A        Correct.  I'm just saying that they

21   have a lower probability of being accepted.

22       Q        Let's flip to Exhibit 9, and if you

23   could turn to Page 1432.

24       A        Okay.

25       Q        And if you look at -- starting at Line

Page 188

1                M. Peet - Confidential

2    6, it says, "Question:  When you became

3    commissioner in Maine, did all those regions have

4    the key community based services that you have

5    testified about here today?

6             "Answer:  They did not.

7             "Question:  Did they when you were no

8    longer commissioner?

9             "Answer:  I would say they were not

10   completely.  We hadn't completed the job in terms

11   of filling out the service array."

12            Did I read that correctly?

13      A    Yes.

14      Q    What did you mean by that?

15      A    I meant that we had defined the

16   elements that we wanted to see in a service

17   system, and started developing those services

18   across the state, but we hadn't reached what we

19   considered to be ideal capacity in some of the

20   program categories in some parts of the state.

21   So, for example, we started with crisis services,

22   and made a determination that it was important

23   that there be crisis services all across the

24   state that could be accessed through one number,

25   no matter where you were, and we put that in

Page 189

                    M. Peet - Confidential

1

2   place statewide.  We ensured that we have the

3   short-term inpatient contracts with local

4   hospitals statewide.

5               Where we were adding capacity more

6   gradually was in the intensive case management

7   and ACT services.  Also some of the psychosocial

8   rehabilitation things like supported housing --

9   not supported housing.  Supported employment.

10  Supported education.  So those were more unevenly

11  implemented across the state.

12       Q    I guess I think maybe I misunderstood

13  your testimony earlier today.  I had thought your

14  testimony was that you didn't achieve full

15  supported housing for everyone who wanted it in

16  Maine, but you did achieve full capacity in the

17  other list of necessary safety net services you

18  identified; is that not correct?

19       A    We weren't heavily reliant on

20  supported housing in Maine because, remember, it

21  was at the beginning of the sort of program

22  development trajectory for supported housing.  So

23  supported housing in Maine wasn't really

24  considered to be one of the essential services.

25       Q    Right.  And I heard you say that

Page 190

1                    M. Peet - Confidential

2    earlier, but I -- putting aside supported

3    housing, just talking about community services --

4         A     I know where the confusion is.

5         Q     Okay.

6         A     We were still in the process of

7    downsizing both of the state hospitals at the

8    time that I left Maine, so while we had put in

9    place the infrastructure for all the services,

10   and I believe had adequate capacity for services,

11   some were state operated, some were nonprofit,

12   the rest of the program development was really

13   tied to further downsizing of the state

14   hospitals. So there were units remaining that

15   were scheduled for downsizing and closure with

16   then the resources transferred out to address the

17   needs of those individuals.

18              Under the terms of the consent decree,

19   we were not allowed to discharge people to the

20   community without appropriate services in place

21   for them.

22        Q     So let me -- I want to go through the

23   list because I think I'm still confused about it.

24   So let's -- by the time you left your position as

25   commissioner in Maine, we've already said did not

Page 191

1              M. Peet - Confidential
2  have statewide supported housing for everyone who
3  needed it; correct?
4       A    Well there wasn't an expression of a
5  significant amount of need for supported housing.
6       Q    Did not have ACT team services
7  statewide; correct?
8       A    Not in the more rural areas.  We had
9  intensive case management in the rural areas.
10      Q    How about comprehensive continuum of
11 crisis services; did you have that statewide with
12 enough capacity for everyone who wanted it?
13      A    We did.
14      Q    How about medication management?
15      A    Yes.  That was managed through
16 community mental health centers that we had
17 established in each of the catchment areas.
18      Q    And inpatient care as needed?
19      A    So we had developed contracts with
20 inpatient units throughout the state to provide
21 that.
22      Q    Okay.  So tell me again --
23      A    The question was really -- what I was
24 intending to express, and maybe I didn't do it
25 very well, was there were patients on the

Page 192

M. Peet - Confidential

1
2    inpatient units in both Maine state hospitals at
3    times that really didn't need to be there for
4    clinical need, so it was incumbent on us as we
5    were downsizing the hospitals to transfer the
6    resources with those persons as they went into
7    the community.

8             So when we looked at the -- we used a
9    chart, the number of people in the hospital that
10   needed to come out.  So while we put
11   infrastructure in place to begin with, you know,
12   laying the foundation for all of these services,
13   at that point in time we were still adding
14   capacity in a stepwise fashion as we were moving
15   people out of the hospital.  So I wouldn't have
16   said we had adequate capacity at any moment in
17   time because it was still a process.  The
18   resources we were using, we had to close units in
19   order to access those resources.  So there were
20   gaps in time, you know, between closing the unit
21   and getting the resources out.

22            There was a plan in place to manage
23   it, and we were doing our best, you know, to make
24   sure the thing didn't happen that I talked about
25   before, which is sending people out in advance of

Page 193

1                M. Peet - Confidential

2    their services.  So there were moments in time

3    when, you know, the system was very much a work

4    in progress.  I guess that's the best way of

5    putting it.

6        Q    And by the time you left your position

7    in Maine, was it still a work in progress?

8        A    It was.  At that point in time, the

9    state had made a decision to close the Augusta

10   Mental Health Institute, but to build a smaller,

11   more modern facility on the same grounds, so that

12   added another wrinkle to the calculation about

13   money.

14       Q    I guess what I'm sort of struggling

15   with is when you talk about Maine to the extent

16   that there is a gap in service, you used the

17   language that the job was not yet completed;

18   right?

19       A    (The witness nods head up and down.)

20       Q    When you talk about New York, you use

21   the language that OMH has failed, is giving a

22   cold shoulder to people who need services.

23            How do you reconcile those two

24   positions?

25                MS. KHAN:  Objection.  You may

1              M. Peet - Confidential

2     answer.

3              THE WITNESS:  First, I would

4     acknowledge that I might have used some

5     language that was probably strong and more

6     critical.  I mean, I've sat in the

7     commissioner's seat.  I understand the

8     dilemmas.  I think what worried me, what

9     worries me, is that I didn't -- I didn't see

10    a work in progress when it came to

11    developing services for the relevant

12    population.  I didn't see attention to that

13    group of individuals as they were

14    entering -- when the department talked about

15    forensic population, most often they were

16    talking about inpatient services.  It was

17    almost as though they saw responsibility for

18    this population if they were inside of an

19    institution, but at the threshold to the

20    community, I didn't see -- I didn't see a

21    work progress.  And I think when I saw the

22    numbers of individuals that over a number of

23    years were continuing to be discharged

24    directly from state hospitals to homeless

25    shelters, I had trouble understanding that,

Page 195

1              M. Peet - Confidential

2       because it's such a vulnerable population

3       looking through a different lens, it's a

4       high risk population for community safety, I

5       couldn't really understand why that group of

6       individuals hadn't made it to a priority

7       list for attention by the department.

8              Then when I saw the data that

9       showed that out of, you know, the referrals,

10      accepted referrals for supported housing,

11      that only 2.8 percent had been for this

12      population, while 48 percent of those beds

13      went to people that weren't even referred

14      from a priority setting, it really made me

15      question the commitment to serving this

16      population of people.

17   BY MR. CONROY:

18      Q     Do you know what role, if any, OMH

19   plays in individual placement decisions in

20   supported housing?

21      A     I think those decisions are largely

22   made at the county level through the SPOAs.

23      Q     What does "SPOA" stand for?

24      A     It's a single point of access.  I

25   think referrals are channeled through that

Page 196

1                    M. Peet - Confidential

2    entity.  But in my world view, that doesn't let

3    the department off the hook, because they have

4    the responsibility of oversight for the counties,

5    and if they've determined that that resource

6    should be going to individuals referred from

7    priority settings and it's not happening, then

8    they have to intervene with the county and change

9    that outcome.

10         Q     And tell me again, I'm sorry if you

11   told me this already, but the document that

12   you're citing with 2.8 percent and 48 percent,

13   what is that?

14         A     I believe it was a section done as an

15   amendment to the state plan that specifically

16   addressed supported housing.  I'm not 100 percent

17   sure, but I think that's where I saw that data.

18   I know it was in an OMH planning document.

19         Q     And do you remember what year that

20   was?

21         A     I think it was '20 or '21.

22         Q     Oh, you told me that.  '21 you said.

23   Okay.  Okay.  Let me take a break.  I want to

24   look through my notes, but we're getting pretty

25   close.

Page 197

1                    M. Peet - Confidential
2                    (Whereupon there was a brief
3        recess from 4:19 p.m. until 4:44 p.m.)
4                    MR. CONROY:  I have no other
5        questions at this time.  Ms. Peet, thank you
6        so much for your time today.
7                    MS. KHAN:  Actually, if we can
8        confer about possible redirect, if you could
9        give us just a couple minutes?
10                    MR. CONROY:  Sure.
11                    MS. KHAN:  Thank you.
12                    (Whereupon there was a brief
13        recess from 4:45 p.m. until 4:57 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25        (CONTINUED ONTO THE NEXT PAGE FOR JURAT.)

Page 198

1          M. Peet - Confidential
2               MS. KHAN:  At this time,
3     plaintiffs' counsels have decided that there
4     will be at this time no further redirect.
5               MS. FRIEDMAN:  Will you be taking
6     a copy?
7               MS. KHAN:  Yes.
8               (Time concluded:  4:56 p.m.)
9                    * * *
10
11
12
13
14
15
16
17
18
19     ----------------------------
       MELODIE PEET
20
       SUBSCRIBED AND SWORN TO
21     BEFORE ME THIS ____ DAY
       OF _____, 2023.
22
23     ----------------------
       NOTARY PUBLIC
24     MY COMMISSION EXPIRES_____
25

Page 199

1                    M. Peet - Confidential
2                    INDEX TO TESTIMONY
3                     EXAMINATION OF
4    MELODIE PEET                                   PAGE
5    BY:  Mr. Conroy                                   4
6                       *  *  *
7                    E X H I B I T S
8

Number          Description                     Page
9    Exhibit 1    Declaration of Ms. Peet          7
10   Exhibit 2    "From Hospitals to Jails:  How  91
                  Maine's Mentally Ill are Still
11                Institutionalized."
12   Exhibit 3    "The Criminalization of People  95
                  with Mental Illnesses in Maine.
13                Report of the Maine Advisory
                  Committee to the U.S. Commission on
14                Civil Rights:  May 2019"
15   Exhibit 4    "Maine Policy Review.  Volume 5  103
                  Issue 1.  Health Policy 1996:  An
16                Interview with Commissioner Peet,
                  Mental Health System Reform"
17
     Exhibit 5    "FY 2019 State Mental Health     165
18                Agency Revenues and Expenditures.
                  NRI's 2020 through 2021 State MH
19                Profile Highlights"
20   Exhibit 6    "New York Fiscal Year 2019 SMHA  167
                  Controlled Revenues and
21                Expenditures" (D-01685029)
22   Exhibit 7    --
23   Exhibit 8    Trial Transcript Volume 15       184
24   Exhibit 9    Trial Transcript Volume 16       184
25        (Exhibits were retained by reporter.)

Page 200

1              M. Peet - Confidential

2              C E R T I F I C A T I O N

3              I, Randi Friedman, Registered

4    Professional Reporter and Notary Public of the

5    State of New York, do hereby certify:

6         THAT, the witness whose testimony is herein

7    before set forth, was duly sworn by me, and

8    THAT, the within transcript is a true record of

9    the testimony given by said witness.

10        I further certify that I am not related

11   either by blood or marriage to any of the parties

12   to this action; and that I am in no way

13   interested in the outcome of this matter.

14        IN WITNESS WHEREOF, I have hereunto set my

15   hand this day, June 26, 2023.

16

17

18

19   Randi Friedman, RPR

20

21

22

23

24

25   *      *      *      *      *      *      *      *      *

Page 201

1                    M. Peet - Confidential
2                       ERRATA SHEET
            VERITEXT/NEW YORK REPORTING, LLC
3

4    CASE NAME:  M.G., et al v. ANDREW CUOMO, et al
     DATE OF DEPOSITION:  JUNE 13, 2023
5    WITNESS NAME:  MELODIE PEET
     PAGE/LINE(S)/    CHANGE      /   REASON
6    ___/_____/_____/_____
7    ___/_____/_____/_____
8    ___/_____/_____/_____
9    ___/_____/_____/_____
10   ___/_____/_____/_____
11   ___/_____/_____/_____
12   ___/_____/_____/_____
13   ___/_____/_____/_____
14   ___/_____/_____/_____
15   ___/_____/_____/_____
16   ___/_____/_____/_____
17   ___/_____/_____/_____
18   ___/_____/_____/_____
19   ___/_____/_____/_____
20   ___/_____/_____/_____
21   ___/_____/_____/_____
22   ___/_____/_____/_____
23   ___/_____/_____/_____
24

            _____
25                    MELODIE PEET

**[01685029 - 4:57]**

| 0 |
|---|

**01685029**
  167:14 199:21
**01685036**
  167:14
**0639**   1:3

| 1 |
|---|

**1**   7:22,24 8:12
  11:2,5,8,20
  19:8 32:3
  41:10 98:20
  103:25 113:12
  113:17 133:6
  147:17,18,22
  199:9,15
**1,000**   125:17,20
  187:6
**1,500**   126:25
**100**   196:16
**10005**   2:16
**10013**   2:10
**102**   184:20
**103**   199:15
**109**   146:15
**10:51**   46:2
**11:08**   46:2
**120**   136:7
**12144**   2:5
**1285**   1:13
**12:09**   88:10
**12:23**   88:10
**13**   1:12 201:4
**1354**   185:18
**1432**   187:23

**15**   184:23
  199:23
**16**   31:18,19
  185:2 199:24
**165**   199:17
**167**   199:20
**17**   75:24 76:4
  76:22 94:13
**18**   117:2
  118:25 141:17
**18.3**   170:13
**184**   199:23,24
**18th**   2:16
**19**   117:2
  118:25 119:6
**1981**   169:10
**1996**   103:25
  199:15
**1997**   169:20
**1:01**   113:8
**1:51**   113:8

| 2 |
|---|

**2**   11:5 91:5,6
  168:16 169:2
  199:10
**2,600**   186:9,16
**2.8**   28:18 29:13
  195:11 196:12
**20**   117:2 119:2
  144:24 162:17
  185:21 196:21
**2000**   78:12
**2009**   94:13
**2016**   92:6

**2017**   6:24
**2018**   63:21
  116:22
**2019**   63:23
  65:8 67:23
  95:12 116:22
  124:20 166:2
  166:12 167:12
  168:3 169:11
  169:23 170:9
  199:14,17,20
**2020**   116:22
  166:3 199:18
**2021**   29:7
  116:24 117:10
  117:12 166:4
  199:18
**2023**   1:12
  146:15 198:21
  200:15 201:4
**2024**   135:10,18
  141:9 142:11
  146:24
**21**   196:21,22
**217**   167:7
**219**   164:24
  166:6
**22**   27:5 120:10
  127:8
**22nd**   92:6
**23**   117:17
**24**   82:24
  162:15
**26**   200:15

**279**   2:4
**28**   2:16
**2:44**   148:17

| 3 |
|---|

**3**   95:4,7 199:12
**30**   141:17
**300**   143:21
**31**   122:7
**32**   146:10
**3886**   200:18
**3:01**   148:17

| 4 |
|---|

**4**   96:13 103:20
  103:22 199:5
  199:15
**40**   23:2 139:8,9
  164:19
**400**   186:8
**42**   128:2,16,18
  129:5,6,15
  146:25
**44**   152:2
**46,000**   125:11
**46,500**   187:3
**463**   167:7
**48**   29:14
  195:12 196:12
**4:19**   197:3
**4:44**   197:3
**4:45**   197:13
**4:56**   198:8
**4:57**   197:13

| 5 | |
|---|---|
| 5   103:24 | |
|    165:23,24 | |
|    168:24 199:15 | |
|    199:17 | |
| 5,000   171:20 | |
| 5.2   123:20 | |
| 50   21:22 161:9 | |
|    171:7 | |
| 52   29:10 168:8 | |
| 56   98:16 | |

| 6 | |
|---|---|
| 6   167:9,10 | |
|    188:2 199:20 | |
| 6,479   146:16 | |
| 60   2:10 | |
| 60s   97:19 | |
| 62   117:6 | |
|    128:16,18 | |
| 63   95:8 | |
| 68   184:24 | |
| 6th   1:13 | |

| 7 | |
|---|---|
| 7   23:21 26:8 | |
|    29:17 168:14 | |
|    184:11 199:9 | |
|    199:22 | |
| 7-19   1:3 | |
| 70s   97:19 | |
| 77.4   170:8 | |

| 8 | |
|---|---|
| 8   77:17 184:16 | |
|    184:17,19,20 | |
|    185:16 199:23 | |

80   21:22
80s   40:5 97:20
   182:16,18
890   136:3

**9**

9   2:4 184:16,18
   184:19,23
   187:22 199:24
90s   40:2,5
   94:17
91   75:13
   146:17 199:10
911   16:24
95   75:13 78:12
   199:12
9:46   1:13
9th   146:15

**a**

a.m.   1:13 46:2
   46:2
abandonment
   60:5 61:4,25
able   21:14
   46:20 81:12
   84:5 105:5
   163:12,25
   178:11
above   1:22
   133:17 146:13
abrogation
   25:9
absolute   50:18
absolutely
   177:14,15

179:4
abstract   126:22
abuse   13:13
   75:10 78:9,19
   134:9,11
   161:22 174:14
accept   72:12
acceptance
   85:10
accepted   28:19
   29:14 86:7
   187:21 195:10
accepting
   47:10 172:17
   172:24
access   26:22
   28:2 38:17,22
   53:3 56:14
   77:4 82:8
   89:15 100:8
   103:14 151:4
   163:14 172:14
   174:2 187:15
   192:19 195:24
accessed
   188:24
accessibility
   30:13
accessible
   24:20 27:4
   49:7 81:6
accessing   50:7
   150:16
accompanies
   52:4 176:24

accompany
   136:21
accountability
   93:22
accurate   93:21
   106:9 169:6
accurately
   11:12 24:3
   63:15
achieve   46:20
   152:7,12
   156:16 189:14
   189:16
achieving
   158:19,25
   159:4
acknowledge
   156:8 194:4
act   10:21 13:2
   18:20 32:17,21
   34:8 39:15
   40:8,12,21
   41:7,19 42:3
   63:4 82:13,17
   82:19 84:4,8
   84:12,24 97:25
   133:17 146:15
   146:20,25
   147:15 150:20
   160:25,25
   161:10,16
   162:20 163:13
   163:22 164:5,8
   164:13 177:19
   189:7 191:6

[action - agreement]                                        Page 3

action   49:8
  101:18 200:12
active   68:21
  79:22
activities   79:18
activity   162:6
actually   63:23
  74:13 76:16
  86:9 120:3
  145:13 150:23
  197:7
acuity   181:14
acute   183:16
ada   68:11,18
adam   2:18
adaptation
  106:14
adaptations
  30:8,13
add   44:17 72:8
  83:16 142:25
  143:21 159:12
  161:14
added   26:20
  28:16 30:24
  100:2 101:2
  176:20 193:12
addiction   89:20
adding   87:8
  136:25 142:14
  144:9,20,25
  189:5 192:13
addition   39:19
  83:6 124:23
  129:18 144:19

additional   15:4
  19:25 140:5
  161:21 176:12
  176:16 177:3
additions   161:8
address   59:3
  112:12 122:13
  122:21 123:3,7
  123:9 126:12
  131:19,23
  135:3 145:4
  152:15,19
  190:16
addressed   29:3
  72:3 141:4
  144:18 196:16
adequacy
  21:24 30:3
  66:9 93:25
  149:10
adequate   19:11
  20:12,14 21:13
  21:15,17 22:7
  22:22 23:19
  25:8,14 26:9
  26:15 31:15
  33:22 34:2,24
  36:7 40:19,23
  43:6 48:19
  57:24 58:9,12
  58:24 81:5,16
  81:20 86:23
  87:2 92:25
  94:16,18 98:21
  98:24 113:25

140:14 152:7
  152:12 157:11
  190:10 192:16
adequately
  12:10 113:24
  122:13 131:19
  131:23
adjusting   24:22
adjustments
  23:14 27:3
  162:8
administer
  82:21
administration
  9:21 11:6,21
  13:13 93:10
  94:3,9,19,24
  99:18
administrator
  26:23 116:2
admission
  26:25 173:7
admissions
  29:10 150:13
admit   67:13
  69:25
admitted   100:2
  102:4
advance   192:25
advanced
  158:14
advice   164:16
advisory   95:11
  95:24 199:13

advocacy   16:18
  140:21 142:16
  149:15
advocate   140:4
advocates   56:5
advocating
  105:14 138:20
aek   1:3
affairs   19:2
  99:15 100:10
afraid   102:18
agency   50:3
  79:9 166:2
  199:18
agenda   107:24
aggregate
  27:22
aggregates
  116:9
ago   83:11
  85:13 89:13
  92:23 155:17
  155:24 173:18
agree   33:16
  42:21 45:5
  106:4 108:7
  154:4 159:25
  160:3 172:24
  177:10
agreed   3:3,8,12
  102:22 130:16
  143:7
agreement
  74:20 97:7

ahead 9:2
aid 2:8
air 73:6
al 1:9 201:4,4
allocate 34:19
  35:17 51:20
  52:14 53:23
  54:11 55:2,22
  56:21 62:21
allocated
  112:20 125:18
  158:3
allocating
  149:17
allocation
  109:22 110:6
allocations
  7:10 146:9
  149:22
allow 20:23
  41:3 91:17
allowed 36:19
  183:7 190:19
alluded 24:25
  106:15
alludes 98:4
alternative
  38:7 85:14
  179:22
alternatives
  85:24 181:17
altogether
  171:13
alzheimer's
  87:24

amendment
  196:15
america 184:22
americans 63:4
amhi 72:21,24
  97:7 100:3
amount 33:18
  126:14 130:20
  134:4 170:19
  172:2 191:5
amounts 21:4
  26:15 112:10
analogous
  78:15
analogy 136:23
analysis 37:17
  66:13 69:13
  153:15 186:19
analyzed 58:23
  157:19
andrew 1:8
  201:4
annual 124:2
  124:16 136:7
answer 5:19,21
  6:4 12:13 13:4
  14:7,20 17:20
  19:22 30:5,23
  32:11 35:22
  36:15 42:17,25
  44:8 45:18
  46:10,24 49:16
  50:15,25 51:15
  52:21 54:6
  55:8 57:4,11

58:4,18 59:8
59:17 62:4
65:15 86:3
87:5 88:21
89:8 90:25
95:21 97:3
99:9 101:13,23
105:8 106:7
109:19 112:7
114:6 118:24
119:17 124:6
126:7,18
128:13,21
131:3,21 132:5
132:20 135:12
136:13 137:25
138:14 140:13
142:20 143:16
145:22 148:7
150:6 151:11
156:19 174:10
174:20 175:10
175:23 177:13
185:25 186:6
188:6,9 194:2
answered
  30:21 132:20
answering
  99:12
answers 5:13
anticipated
  152:18
antipsychotic
  163:2

anxiety 100:17
  120:7 176:23
anybody 100:2
  102:4 103:14
  108:13
anyway 97:6
  164:10
apart 114:22
  119:23
apartment
  178:10
apartments
  178:7
appeal 173:14
appear 123:6
  185:11
appearances
  2:2
appendix 63:12
applicant
  175:16
applied 23:8
  98:11
apply 99:19
  163:7 187:10
applying 42:22
  187:18
approach
  154:9 155:2,5
  162:12 181:7,9
approaching
  112:11
appropriate
  32:15 85:15,23
  105:17 142:24

144:4 147:14
149:7 173:2,17
176:10 178:16
179:4,11,21
181:22 190:20
appropriaten...
37:15
appropriations
135:16 159:6
approve 49:22
50:3 80:3,7
approved
77:17 115:25
approves
115:24
area 34:25 76:2
102:25
areas 35:10
40:11,17 84:12
112:12 161:15
191:8,9,17
arises 172:12
arm 165:9
arrangement
81:16 181:11
arrangements
180:20
array 21:10
43:17 56:15
86:23 87:10
103:15 144:4
182:17 188:11
arrive 22:22
arrived 72:19

art 9:20
article 92:3
93:15,20 94:15
articulated
75:21
ascertain 20:19
21:7
ascertaining
23:6
aside 190:2
asked 11:13,25
12:4,8 14:8
15:13 17:9
19:10 30:21
65:17 70:9
113:19,23
130:5 132:19
148:4 155:2
asking 130:6,18
141:6,6
aspects 68:9
123:15
aspirational
24:25
assault 177:23
assertive 32:23
32:25 77:2
115:8 161:7
assessment
23:3 116:7
139:3
assigned 84:3
assistant 4:12
associate 2:21
2:22

associated
140:6 152:23
association 7:3
13:14 55:16
165:7
assume 6:5
14:21 70:16
172:19
assumptions
73:12
assurance
26:21
attach 118:15
attempted 59:3
114:11
attend 83:16
105:19
attends 82:6
attention 11:3
27:6 83:5
96:14 98:19
105:17 194:12
195:7
attorney 2:14
4:12,13
attorneys 2:3,9
2:15 7:17 14:9
14:22
atypical 160:10
augusta 73:2
74:8,14 102:2
102:5,13 103:2
193:9
authorities
43:23 52:25

58:16 59:5,15
75:24 76:4
83:14 154:23
165:22 172:13
173:20
authority 24:18
25:11 30:12
41:23 48:4
49:22 60:13
61:17 109:23
167:23 173:4
173:16 179:15
authors 98:13
automatically
100:4
autonomy
98:25 106:13
availability
50:6 119:13
162:14
available 24:21
26:19,22 35:8
36:2,7 37:13
38:19 49:7
56:10 73:16
76:3,21,25
82:22 83:11
125:13 126:4
157:11 158:5
158:10 176:18
avenue 1:13
avoid 47:10
avoidance 61:3
aware 9:23
25:18 26:4

[aware - blue]                                                    Page 6

38:8,14 39:3
41:25 42:10,18
44:2,22 46:5
50:20 51:13,19
52:2,13 53:16
53:22 61:20
131:25 132:16
132:21 135:16
135:19,22
136:2,6 137:6
141:16 146:24
183:22
awry 62:16

**b**

b 199:7
back 19:8 26:7
29:17 35:12
39:25 40:2
47:19 63:10
81:22 104:15
104:24 105:10
110:23 111:13
113:10,17,18
117:15 125:24
126:10 127:23
147:17 154:8
156:6 158:15
170:2 173:25
181:13 182:14
backed 151:3
background
23:5 47:20
63:11
backing 150:15

backups
159:18
bad 37:5 140:6
140:17
balance 105:17
bangor 103:9
bars 93:3
based 10:8
11:21 21:19
22:25 23:6
73:25 96:18,21
98:22 99:4
101:8 113:22
122:23 132:15
166:17 168:8
168:19,19
170:7 171:3,15
188:4
baseline 20:21
basically 18:24
172:22
basis 122:2,20
164:2 186:4
bates 20:9
167:14
bear 31:6
130:14
becoming
52:10
bed 141:5
146:9 150:11
181:4,5
beds 135:20
139:13,15
140:5,9,13,16

140:19 141:6
141:15,22
142:17,18
143:21,23
144:25 145:20
150:3,23
159:14 171:20
195:12
began 10:15
68:5 97:14
beginning
77:13 85:6,9
189:21
begins 11:5,20
23:24
behalf 1:5
belief 93:14
believe 11:7
13:5 21:20
29:7 30:16
31:23 33:12
40:14 67:23
80:12 81:15,19
87:2 94:3
116:15 122:3
124:20 126:13
134:10 146:4
152:6,11
157:20 169:5
176:9 187:3
190:10 196:14
believed 85:15
believing 22:12
benefit 186:10

benefiting
110:13 160:16
benefits 178:11
best 5:18 6:2
7:4 13:8 43:11
43:17,19,25
55:11,21 56:4
56:20 57:22
192:23 193:4
better 41:21
73:15 149:24
150:23 163:19
182:10
beyond 70:14
133:17 170:20
bias 47:6
big 102:15
141:14 155:9
163:22 179:18
bigger 83:15
billed 158:5
billion 123:20
135:23 138:4
141:12 143:7
143:11 144:9
144:16,19
168:14,24
bipolar 9:7
bit 15:18 22:3
24:15 83:11
88:13 114:16
blew 71:16
blood 200:11
blue 169:14,19
169:24 170:12

board 172:18
boards 177:6
bolts 82:7,11
bottom 47:7
  124:11 127:11
  139:11 162:18
  167:17 169:9
box 131:15
  132:25 133:2
  168:12
boxes 168:7
brand 97:23
break 6:8,11
  45:21 88:6
  113:5 148:12
  196:23
breathing
  23:11
bridgeport
  182:15
brief 33:8
  45:25 88:9
  148:16 197:2
  197:12
briefly 148:19
bringing 101:3
  183:13
broad 113:23
broadened
  160:15
broader 35:24
  105:16 108:8
  112:21
broadly 34:23

broker 173:5
brought 72:19
brown 104:4
budget 7:9 94:5
  100:21 113:3
  116:11 123:19
  124:21 125:2,3
  125:3 130:19
  135:10,18
  137:15 138:7
  138:24 139:20
  139:23 141:4
  141:10,16,25
  142:11 146:24
  147:11 156:10
  156:15 157:21
  158:4 167:6
  176:15,21
budgets 141:2
  154:22 155:9
build 41:21
  52:25 159:16
  160:7,12
  172:14 193:10
building 53:9
  53:12 57:14
  83:22 90:8,12
  149:18 180:10
  184:7
builds 159:21
built 161:6
burden 87:25
bureaus 79:5
  79:15,23

business
  172:23
buy 47:14

c

c 32:20,20
  122:11 179:16
  179:18 200:2,2
c.j. 1:4
cadre 60:14
calculation
  153:7,23,25
  157:24 193:12
call 82:24
  115:8
called 9:16 92:9
  103:8,10 165:3
  173:23 180:12
calls 76:8
capabilities
  133:18
capacity 1:9
  23:15 27:2
  34:24 36:8
  48:18 49:24
  50:10 53:2
  77:6 117:22
  118:3 122:15
  141:5 142:15
  144:3 146:17
  146:21 149:11
  149:15,19
  150:11 158:14
  159:13 186:2
  188:19 189:5
  189:16 190:10

191:12 192:14
  192:16
capita 166:13
  167:4
capital 136:3
  141:17
caption 184:21
captioned
  184:25
care 34:16
  39:17 54:20
  60:14 66:12
  67:3,4 73:16
  73:23 77:4
  90:10 92:24
  93:2 94:16,16
  94:18 98:22
  99:4 106:20
  107:25 111:2
  111:14 115:22
  141:18,24
  142:7 143:13
  148:20 149:8
  149:14 150:16
  151:9 156:10
  158:23 160:21
  170:22 171:8
  171:15,24
  181:7 191:18
careful 97:15
  97:22
carefully
  134:12
caring 87:25

[case - civil]                                                      Page 8

case   1:3 7:23
    8:4 10:22
    14:13 16:5,13
    16:19,21,22
    17:3,5 18:3,16
    19:5 20:4,9
    30:15 36:13
    38:16 39:19,20
    40:7,12 41:11
    41:15 42:3
    48:13 51:7
    53:17 54:10,25
    62:6 65:22,23
    66:5,7,18 67:7
    67:19,25 68:4
    68:8,9 69:2,11
    69:14,16,19
    70:7,8,9,18
    71:13,23,24
    73:9 74:15
    82:12,13 83:17
    84:11,16 85:25
    97:25 101:21
    108:3 114:11
    116:21 122:15
    133:16,18,22
    159:4 184:14
    184:21,25
    185:7,12
    186:14,18
    189:6 191:9
    201:4
cases   15:19,21
    15:23,24,25
    25:19,22,24

26:3 51:6
    64:17 65:19
    71:24 81:12
    97:20 118:18
    160:9 177:4
    182:11 184:4
catchment   35:9
    102:25 191:17
categories
    129:17 133:3
    133:10 166:17
    188:20
category   131:6
    166:20,22
    168:5
causal   138:16
cause   140:24
    149:9
causes   113:24
cbmhhss   10:10
    19:11 24:10
    27:10 114:2
    117:22 120:14
center   182:15
centers   18:7
    86:18 98:2
    191:16
central   60:6
    86:10
certain   9:24
    21:10 126:14
    130:19 174:6
    176:17
certainly   49:4
    62:6 87:11

93:20 108:23
    120:21
certainty   38:20
certification
    3:6
certify   200:5,10
chafing   106:13
challenge   48:20
    155:7 172:16
challenges   50:5
    93:15
challenging
    50:8 176:14
change   89:17
    105:5 119:14
    119:25 125:11
    196:8 201:5
changed   86:23
    87:19
changes   76:15
    79:25 80:3
changing   135:4
channeled
    195:25
chantalle   2:6
characterizati...
    97:5,18
characterizati...
    97:11
characterize
    122:5
charge   109:14
    115:22
charged   35:7
    109:4

chart   167:25
    169:9 170:3
    171:4 192:9
charts   171:16
check   131:14
    132:25 133:2
checked   129:16
    131:7
checklist
    129:11
checklists
    129:13
checkmark
    131:8
children
    108:16
choice   41:5
    157:13
chooses   173:13
circumstance
    28:4 37:2
circumstances
    26:16 27:25
    30:2 37:22
    177:6
cite   165:2
cited   117:11
    166:5
citing   196:12
citizens   60:15
city   16:4,21,22
    68:24 140:8
civil   95:12,25
    199:14

claim  68:18
  129:2
clarify  39:21
clarifying
  84:13
class  99:25
  100:4 101:17
  101:20 102:6
  102:10,17,19
  102:21,23
  107:18 108:2
cleanliness
  82:10
clear  48:23
  88:14 111:9
  112:22
clicking  184:12
client  164:15
clientele  161:22
clients  64:6
clinic  134:8
clinical  70:14
  82:16 98:3
  109:24 122:15
  137:4 150:14
  181:3 183:3,3
  183:8,15 192:4
close  76:10
  168:14 192:18
  193:9 196:25
closed  80:20
  141:22 155:10
closer  120:4
closing  192:20

closure  190:15
clue  99:17
cluster  35:4
cohort  9:3
cold  193:22
colleagues  93:8
collect  139:3
collecting
  165:8
collector
  165:20
color  18:24
colors  170:5
columbia  168:9
combination
  43:24 76:17
combine
  149:21
come  9:18
  15:13 23:9,12
  109:23 143:23
  163:9 182:24
  192:10
comes  110:23
  116:14
comfort  178:14
comfortable
  39:11
comfortably
  81:11,13
coming  36:5,18
  56:19 182:2
  183:11,17
  187:17

comments
  93:13 106:4
commission
  95:12,24
  198:24 199:13
commissioner
  22:11 48:5,25
  49:12 50:21
  51:3 53:5
  71:10 72:16
  73:19 75:9
  78:4,5,7 79:13
  79:24 80:24
  87:13,23 88:15
  88:24 89:18,25
  90:18 93:16
  97:21 98:5
  99:15 101:5
  102:16 104:2
  188:3,8 190:25
  199:16
commissioner's
  194:7
commissioners
  55:18
commit  177:18
commitment
  24:8 195:15
committee
  95:11,24
  199:13
common
  151:17 173:10
  174:23

communicati...
  53:6
communities
  20:25 36:3
  43:21 81:11,14
  83:15 93:2
  94:17 96:23
community  7:9
  10:8,17 11:21
  18:6 20:22
  21:2 32:23,25
  37:18 66:9,24
  69:10 70:15
  72:11 73:11,15
  73:25 74:22,25
  75:22 76:2,11
  76:12 77:2
  79:20 80:22
  81:9 86:20
  90:8,10 93:24
  96:18,21 97:9
  97:16 98:2,22
  98:25 99:4,20
  100:18 101:8
  106:19 115:8
  118:16 123:12
  123:17,23
  124:3,17,24
  134:8 135:17
  135:21,24
  137:7,22 138:6
  139:22 140:15
  141:7,7,13
  142:18,24
  143:8 144:4,10

| | | | |
|---|---|---|---|
| 145:5 149:10 | complaints | conditioning | 73:1 74:1 75:1 |
| 149:12,23 | 82:9 120:13 | 73:6 | 76:1 77:1 78:1 |
| 153:25 155:12 | 122:5 | conditions | 79:1 80:1 81:1 |
| 158:4,10,16 | complete | 80:15,17 | 82:1 83:1 84:1 |
| 159:16,21 | 116:25 | conduct 15:25 | 85:1 86:1 87:1 |
| 160:13,18 | completed | 69:13 | 88:1 89:1 90:1 |
| 161:7,19 163:9 | 80:20 188:10 | conducted | 91:1 92:1 93:1 |
| 163:10 168:19 | 193:17 | 15:21 | 94:1 95:1 96:1 |
| 168:19 169:13 | completely | confer 4:24 | 97:1 98:1 99:1 |
| 170:7,23 171:2 | 188:10 | 197:8 | 100:1 101:1 |
| 171:3,10,21 | complexity | confidential | 102:1 103:1 |
| 172:5,14 | 157:5 | 1:17 2:1 3:1 | 104:1 105:1 |
| 173:20 174:8 | complicated | 4:1,20 5:1,2,3 | 106:1 107:1 |
| 179:16,17,18 | 175:17 | 6:1 7:1 8:1 9:1 | 108:1 109:1 |
| 180:10 181:22 | comprehensive | 10:1 11:1 12:1 | 110:1 111:1 |
| 188:4 190:3,20 | 34:11 39:16 | 13:1 14:1 15:1 | 112:1 113:1 |
| 191:16 192:7 | 73:24 97:24 | 16:1 17:1 18:1 | 114:1 115:1 |
| 194:20 195:4 | 191:10 | 19:1 20:1 21:1 | 116:1 117:1 |
| comparative | concept 60:5 | 22:1 23:1 24:1 | 118:1 119:1 |
| 86:14 | 172:10 | 25:1 26:1 27:1 | 120:1 121:1 |
| compare 86:19 | concern 97:15 | 28:1 29:1 30:1 | 122:1 123:1 |
| compared | concerns | 31:1 32:1 33:1 | 124:1 125:1 |
| 124:12 156:6 | 179:12 183:12 | 34:1 35:1 36:1 | 126:1 127:1 |
| 173:25 | conclude 31:4 | 37:1 38:1 39:1 | 128:1 129:1 |
| compares | concluded | 40:1 41:1 42:1 | 130:1 131:1 |
| 124:4 | 123:6 198:8 | 43:1 44:1 45:1 | 132:1 133:1 |
| competency | conclusion 72:7 | 46:1 47:1 48:1 | 134:1 135:1 |
| 151:15 | 113:23 123:8 | 49:1 50:1 51:1 | 136:1 137:1 |
| competing | 185:25 186:5 | 52:1 53:1 54:1 | 138:1 139:1 |
| 187:12 | conclusions | 55:1 56:1 57:1 | 140:1 141:1 |
| compile 6:16 | 66:23 | 58:1 59:1 60:1 | 142:1 143:1 |
| 129:20 | concrete | 61:1 62:1 63:1 | 144:1 145:1 |
| complaint | 126:24 130:8 | 64:1 65:1 66:1 | 146:1 147:1 |
| 120:18 | condition 68:20 | 67:1 68:1 69:1 | 148:1 149:1 |
| | | 70:1 71:1 72:1 | 150:1 151:1 |

[confidential - content]                                    Page 11

152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
confounding
   44:12
confused   110:7
   190:23
confusing
   58:21 119:21
   130:14 170:14
   171:22
confusion
   190:4

connecticut
   39:8,14 47:22
   75:8 78:4 88:2
   89:19,20 90:2
   90:3,14,19,20
   106:12 138:3
   165:17 175:3
   178:5 182:13
connecticut's
   75:10,15 76:6
connection
   16:9
conroy   2:17 4:8
   4:11,15 5:5
   11:11,15,18
   14:16 15:2
   18:2 30:14,22
   32:16 36:11
   42:20 43:15
   45:3,20 46:3
   46:13 47:18
   49:19 50:19
   51:9,17 53:15
   54:8 55:10
   57:6,23 58:6
   58:20 59:10
   60:2 61:9
   62:18 63:9
   65:18 86:24
   87:21 88:5,11
   88:23 89:10
   91:3,22 94:7
   95:5,22 96:4
   96:12 98:12
   101:6,15 102:8

107:6 111:17
113:9 119:4,19
124:9 126:9
127:7 128:15
129:3 131:13
131:24 132:9
132:14,23
135:15 137:5
138:2,22 139:7
144:7 145:16
146:2 148:18
150:7 151:20
157:18 174:16
174:24 175:13
177:9,16
195:17 197:4
197:10 199:5
consent   72:17
   73:16 74:2
   79:17 80:10,14
   97:7 98:9
   99:23,23 100:3
   100:13,19,23
   101:16 105:9
   105:13,17,21
   105:25 106:11
   106:18,22,25
   107:8,13
   118:12 190:18
consider   66:9
   72:10 108:8,12
   119:5 156:20
   159:11 178:25
   179:12 182:6

considerable
   80:19
consideration
   154:21 176:24
considerations
   41:3 72:13
considered
   62:10,17 69:25
   77:23 156:22
   165:10 173:17
   180:21 188:19
   189:24
considers
   116:11
constant   24:22
constantly   28:6
   102:6 173:24
constitutes
   146:17
consult   70:10
   115:5
consultant
   63:22 64:3
   65:2 72:2
consultation
   41:12
consulted
   61:15,16 64:10
   64:12,18,24
   65:7,9
consulting
   15:19
content   64:15
   118:11

[contents - court]  Page 12

contents 8:7
context 64:21
  87:7 100:12
  111:7 180:12
continued
  140:4 197:25
continues
  139:12,24
  140:3,25
continuing
  131:11 142:24
  194:23
continuity
  178:14
continuously
  99:25
continuum
  34:11 39:16
  56:7 57:18
  90:10 180:22
  180:24 181:7
  191:10
contours
  175:15 176:3
contraband
  183:13
contract
  172:21 175:25
  176:7
contracted
  66:8
contracts 176:6
  177:5 189:3
  191:19

contrary 24:7
contrast 9:11
contributed
  94:25
controlled
  166:13 167:13
  168:2,13 170:9
  199:20
convicted
  109:2
coordinator
  82:4
copies 7:22
  184:18
copy 198:6
corollary
  171:18
correct 5:7
  21:3,3 26:13
  28:2 29:21
  30:3 32:4,18
  33:6 34:6
  36:13,20 39:6
  45:19 48:4
  49:4,14 51:16
  59:6,9 61:22
  64:22 69:23
  70:3 109:3,12
  111:25 114:13
  114:14 128:14
  128:22 130:20
  130:21 152:8,9
  158:20,21
  159:2 166:18
  168:14 169:3

170:13 177:19
  177:20,24
  182:21 183:23
  187:5,20
  189:18 191:3,7
correctional
  12:18 48:16
  49:5 56:11
  62:13 108:15
  154:16,22
  180:8
corrections
  156:15 161:20
correctly 12:11
  19:13 21:6
  24:13 26:8
  27:13 35:14
  111:19 114:4
  118:5 122:18
  127:18 139:16
  142:8 146:22
  158:17 186:12
  188:12
corrects 167:5
cost 81:12
  83:10 85:14
  139:13 153:18
  154:2,4,11
  158:19,25
costs 136:8
  152:22 154:21
counsel 3:4
  4:15,22 12:9
counsels 4:19
  4:23 198:3

counterpoint
  72:11
counties 12:23
  117:7,20,24,25
  118:9,13,15
  119:10 120:13
  121:22 124:20
  125:5 127:13
  127:20 128:2,7
  128:10 129:16
  129:18,20
  130:17,22
  133:20 135:5
  196:4
country 142:14
  151:13 168:16
county 7:13
  114:21 115:23
  115:25 116:23
  117:3 118:8,12
  121:15 122:13
  122:16 125:3
  126:15 127:24
  130:5 131:15
  134:15 195:22
  196:8
couple 86:4
  109:20 112:8
  141:3 160:24
  168:18 185:11
  185:14 197:9
coupled 96:17
course 38:19
court 1:2 3:15
  5:14 66:18,20

66:21 67:13
69:22,24 74:15
74:24 98:7
cover 63:10
158:25
covered 13:17
20:2 75:6
88:12 123:10
124:14 125:14
126:5 147:20
covid 71:14
100:16 118:22
119:6 120:2
create 99:3
146:25
created 66:11
96:22
creating 34:24
73:10
credit 98:6
147:5
crimes 109:2,5
criminal 54:21
56:16 110:10
125:19,21
151:6 158:11
161:12 162:3,6
162:25 187:13
criminalization
95:9 199:12
crises 140:17
crisis 10:21
18:18 21:4
33:3 34:11
38:16 39:16

77:2 92:22
97:24 119:6
150:21 188:21
188:23 191:11
criteria 173:7
critical 194:6
criticism
112:18
crosses 60:17
cs 1:3
culture 81:7
cuomo 1:8
117:21 201:4
current 94:10
174:21
currently 33:17
112:2 125:10
132:2,17 150:3
cursory 117:24
118:9
cut 156:16
157:20
cuts 124:20
125:2
cv 1:3 63:12,15
cycle 52:4
cycles 113:3

**d**

d 146:14
167:14,14
199:21
d.h. 1:4
d.r. 1:4
daily 82:23
164:2

dangerous
179:23
data 7:2,6
12:23 20:17
23:8,14 25:15
115:7,15 116:8
139:4 146:14
153:6 165:8,15
165:16 169:6
170:15 171:17
195:8 196:17
dataset 116:25
date 19:12
114:3 186:23
201:4
dated 92:6
day 22:14
26:16 27:23,23
34:21 35:19
38:12 39:18
40:22 42:14
44:5,23 45:13
45:14 46:7,22
51:24 52:18
54:3,14 55:5
56:2,25 62:25
82:25 88:18
89:5,22 90:5
90:22 134:19
153:4,21
162:15 198:21
200:15
days 77:12
143:4 150:22
162:14

deaths 72:21
102:3
decades 92:23
96:10 97:14
165:22
decide 107:16
decided 106:16
106:21 198:3
deciding
109:21 110:5
decision 14:5
14:23 61:14
106:24 107:13
110:22 193:9
decisions 37:21
58:8 195:19,21
declaration 8:3
199:9
declined 25:25
declines 36:24
decreased
124:16 181:8
decreasing
142:6
decree 72:17
73:16 80:14
97:8 98:9
99:23,23 100:3
100:13,19,23
101:16 105:13
106:18,25
107:14 190:18
decrees 74:2
79:17 80:10
105:9,18,22,25

106:11,22
107:8
dedicated
139:21
deemed 29:15
deep 104:3
deeper 37:15
92:22
defendants
1:10 2:15 4:14
68:23
defense 4:22
deficiencies
120:21
deficit 121:16
142:23
deficits 122:14
define 8:19
20:20
defined 35:9
75:25 76:21,25
101:20,24
157:7 188:15
defining 8:18
10:12 20:13
21:13 33:21
definitely 5:24
20:5
definition 9:18
10:2 22:22,25
23:18 34:2
42:22 57:24
58:8,25
definitions 9:24
10:3,4,6 173:2

definitively
107:17
deflate 171:14
degraded 93:11
degrading 95:2
degree 93:19
deinstitution
97:13
deinstitutiona...
96:16
delays 100:16
delivery 82:18
83:3
demand 42:7
119:14,25
120:3 132:2,17
134:7 149:19
149:25
denied 24:9
26:11 98:25
department
28:23 29:9
64:2,7 67:20
69:4 70:12,24
72:20 73:19
78:8,16,17,22
78:24 79:5
80:7 88:16,25
89:19 105:10
105:19 107:5
108:16 112:7
112:13 194:14
195:7 196:3
department's
61:11

depending
181:13
depends 37:2
80:5
depict 63:15
depleted 94:4
deposed 5:6
69:18
deposition 3:6
3:13 4:20 6:14
7:19 67:9
74:16 201:4
depositions
6:19
depression 9:8
deprived 98:23
deputies 76:17
deputy 75:9
76:18 78:4
89:18,25 90:18
describe 31:22
described
93:15
describes 98:4
description
116:6 199:8
deserving
111:2
designated
4:20 5:2
187:18
desire 56:9
detail 104:9
135:13

detailed 97:8
118:18
details 25:19
135:9 137:15
determination
183:15 188:22
determinations
183:3
determine
37:12,15 83:25
114:11,17
115:2 173:16
185:22
determined
173:7 196:5
determining
20:23
detriment
102:20
detrimental
99:20
develop 70:22
79:14 96:18
136:3 153:18
developed
10:14 38:15
77:15 96:11
101:9 149:12
156:22 172:21
191:19
developing
23:10 24:20
48:19 139:14
188:17 194:11

development
  20:16 21:19
  23:4 30:9 48:6
  54:17 64:19,20
  75:21 79:23
  97:10,16 98:8
  103:3 136:11
  158:14 164:13
  189:22 190:12
developmental
  73:21 78:9,19
  79:3
diagnosis  68:20
diagnostically
  9:5
died  73:10
difference
  101:4 102:23
different  19:15
  22:4 27:18
  44:14 52:11
  58:13 62:19
  79:5 103:7
  109:12 114:7
  125:4,22 127:3
  141:25 148:8
  161:5 162:9,10
  166:16 178:16
  195:3
differentiation
  103:13
differently
  87:20 110:14
difficult  153:7
  173:23

difficulties
  149:20 150:16
difficulty  37:4
dilemmas
  194:8
diluted  160:17
diminish
  139:15 149:19
diminishes
  155:11
direct  11:3 27:6
  104:17,22
  120:10 122:7
  149:9 162:17
  164:19 172:8
  180:11
directed  97:9
direction
  106:22 142:13
  145:6 160:4,22
directive  74:21
directly  25:16
  194:24
director  71:8
directors  7:4
  13:15 55:17
  165:8 172:18
disabilities
  63:4 73:21
  78:9,19 79:3
  80:18 81:10
disability  2:3
  16:8 64:7,16
  64:23 65:12
  70:10 71:9

83:24
disagree
  101:10,14
  106:16 187:16
disagreement
  106:21
discharge
  12:19 15:11,13
  20:6 37:8
  38:23,24 49:22
  60:10 61:16,17
  70:17 97:22
  100:6 163:6
  173:12,13,17
  190:19
discharged
  19:19,19 20:7
  25:7,14,16,20
  27:9 28:6
  29:19,24 30:17
  31:2,11 44:23
  62:7 97:17
  100:8 102:13
  134:25 143:24
  153:9,14
  161:20 194:23
discharges  48:8
  49:3 62:11,17
discharging
  28:11 59:21
  60:16 158:9
discontinuity
  157:2
discreet  105:14

discriminated
  68:19
discuss  62:9
discussed  71:18
  89:13 119:6
discussing
  167:20
discussion
  14:22 71:19
discussions
  107:19
disease  150:20
  151:9
disorders  120:7
  163:18
disregard  28:4
  28:9,12
disrupted
  150:24
dissatisfaction
  121:19
distant  94:22
distinction
  118:7
distinguishing
  36:4 57:15,19
district  1:2,2
  66:20 168:9
dive  104:3
divest  182:18
divided  123:21
dix  103:10
doccs  12:10
  19:10,12,20
  20:3,5 25:15

25:21 58:24
59:4,13 114:3
148:5
document
28:24 29:5
74:21 91:7
95:8 97:8
103:23 131:7
146:3 165:25
166:9 167:11
167:15 184:21
184:24 196:11
196:18
documentation
129:23 151:3
documented
150:14
documents
20:9 29:3
51:19 52:13
53:22 87:12
121:25 145:24
doing 25:4 30:9
104:10 151:16
159:11 192:23
doj 64:16 65:12
65:20 67:24
70:5
dollar 135:23
138:5 143:12
dollars 110:13
112:8,19 138:9
138:18 141:12
143:7,11 144:2
144:9,16,19

145:8,11
155:11 156:25
158:3 159:20
160:7,8,17
171:8 172:2
dominant 47:4
door 60:9
61:25
dorothea
103:10
downsized
154:16 156:2
171:20 178:9
downsizing
76:5 80:19
112:20 155:7
158:6 190:7,13
190:15 192:5
draft 8:6
drafts 115:17
dramatic 101:4
dramatically
100:25
drawing 149:6
drawn 10:2,5
drives 48:17
driving 162:23
drny 71:22
drove 73:24
drugs 163:15
due 24:10
29:25 96:20
98:7 100:16
duly 4:4 200:7

duties 75:18
79:12
duty 108:7
109:11

e

e 199:7 200:2
earlier 55:11
106:15 150:19
185:3 189:13
190:2
earliest 66:3
early 97:14
182:16
earmarked
187:6,11
easier 5:10
93:25
easily 181:21
easy 97:12
106:24
educate 142:4
education
63:16,18
163:23 189:10
effect 3:14
99:20 119:5
144:15 149:9
effective
140:20
effectively
142:4
efficacy 136:18
157:22 161:9
effort 142:16
142:18

efforts 26:18
eight 94:12
either 23:15
74:4 103:12
131:7 133:2
151:7 180:8
200:11
eject 172:10,20
174:18
element 110:3
elements 72:9
188:16
elena 2:12
elevated 107:3
eligibility 163:6
eliminate 70:22
embedded
149:14
embraced
107:23
emergency
150:15,22
159:18
emerging
102:16
empathy 47:16
employees
16:16
employment
133:25 189:9
enable 96:19
endorsed 87:11
energy 105:18
engage 20:16
90:7

engaged 14:9
  23:3
engagement
  37:9
engaging 37:4
  70:12
enormous
  136:15
enrollees
  146:17
ensure 21:23
  24:11 34:19
  35:17
ensured 189:2
ensures 38:21
ensuring 26:19
entered 72:18
  80:16
entering
  194:14
enthusiastic
  47:15
entire 90:12
entities 64:11
  171:25
entity 111:10
  173:6 196:2
environment
  85:21 145:10
  179:18
environments
  43:13 60:11
  162:5
epidemic
  100:16 119:12

equally 110:16
  161:2
equation
  105:22 107:9
  112:13 115:7
  142:25 144:21
  179:19
equipped
  175:19
equivalent
  75:16 76:8
  78:14
era 10:14
errata 201:2
especially
  87:13
esq 2:6,6,11,12
  2:17,18,18
essential 77:22
  158:6 189:24
essentially
  75:15
establish
  138:16 139:5
established
  75:24 93:22
  107:22 191:17
establishment
  74:21
estimate 186:9
  186:15
et 1:9 201:4,4
events 140:7,9
  140:23

eventuated
  182:9
everybody
  22:13 107:20
evidence 27:7
  29:18,24 30:16
  30:25 31:10
  91:15 93:12
  127:16 130:7
  130:24,24
  131:17 150:14
evident 171:10
evolution 87:18
  180:17
evolved 86:22
  122:24
exact 156:5
exactly 154:11
  177:25
examination
  1:21 4:7 199:3
examine 12:9
  175:25
examined 4:5
example 25:24
  37:23 118:15
  188:21
examples
  121:12 130:9
  183:22
except 3:9
  150:13
excessive 68:10
exciting 164:23

exclude 67:16
exclusively
  121:24
execute 27:10
  30:18
exercise 183:10
exhibit 7:22,24
  91:5,6,14 95:4
  95:7,19,20
  103:20,22
  113:12 165:23
  165:24 167:9
  167:10 184:11
  184:20,23
  185:16 187:22
  199:9,10,12,15
  199:17,20,22
  199:23,24
exhibits 184:16
  184:17 199:25
exist 15:14
  24:11 45:16
  93:16 125:10
  181:19
existed 93:19
existence
  159:14
exists 176:2
expand 99:4
  146:20
expanding
  102:6
expansion
  99:16,19

expectations
  176:4
expenditures
  165:12 166:3
  166:13,17
  167:4,13 168:2
  168:13 169:10
  169:13,16
  170:9 171:6,24
  199:18,21
expensive
  150:11
experience
  15:11,18,19
  17:15 18:11
  19:18 22:10
  39:11 44:10,18
  56:11 63:11
  86:14 106:10
  106:10
experienced
  124:23
experiences
  27:23 37:5
experiencing
  17:14 140:16
  142:23 143:20
experimentat...
  161:14
experimenting
  151:13
expert  11:6,20
  67:6,14 70:2
  132:10

expires  198:24
explain  30:8
  162:22 171:4
explicit  60:14
  137:12
explicitly  47:8
  83:15 96:17
  106:19
exploited  37:25
exploration
  37:15
explore  37:11
express  191:24
expressed  24:8
expression
  191:4
extend  107:13
extended  48:5
extensively
  87:14
extent  49:5
  52:22 91:16
  181:25 193:15
external  140:9
extra  184:14
extreme  48:21

f

f  32:20 200:2
face  136:24
faced  155:6
  159:17
facilities  17:6
  17:10,16,17
  18:4,17 154:16
  154:18 181:19

183:9
facility  19:6
  60:9 80:17,19
  80:21 193:11
fact  10:21
  28:10,13 32:17
  32:24,25 34:8
  39:15 40:8,21
  42:3 43:11
  47:3 56:12
  84:24 103:2,15
  121:19 131:10
  133:21 134:22
  140:18 142:22
  146:7,20 156:2
  160:8,25 161:2
  161:6 162:20
  164:8
factor  157:3
  178:22
factored
  171:12
factors  31:5
  44:17 161:24
  174:6
facts  33:23
fail  164:4
failed  31:4,7,9
  31:12 117:21
  118:2 131:22
  142:4 193:21
failure  24:11
  27:10 29:20
  30:18 113:24
  122:17 123:9

143:13,17
  148:21 158:13
failures  148:5
fair  97:17
  134:4
fairly  106:23
  151:16 174:22
faith  22:12
  49:9
fall  21:16 47:7
  57:21
familiar  38:21
  59:23 60:4
  92:11 104:5
  129:8 179:25
familiarize
  104:19
family  162:5
far  182:23
fashion  192:14
feasible  30:13
february  92:6
federal  66:20
  66:21 69:22
  77:21
feel  44:10 56:10
  99:11 163:24
feeling  18:11
  105:21 107:7
  163:19
felt  49:8
field  9:20 42:23
  43:3 86:22
  132:11 182:6

fifth 33:8
figured 145:3
figuring 76:9
file 126:15
filed 71:13
filing 3:5
fill 181:25
filled 143:22
 163:11
filling 134:5
 188:11
final 48:7 49:2
finalized
 100:15
financial
 123:15
find 38:7 81:12
 92:25 129:25
finding 98:20
fine 45:24
finish 5:18,20
 6:10 148:19
finite 139:20
 145:10 187:14
fire 174:13
 177:7,22
first 4:4 5:13
 8:9 12:7,15
 19:16,20,24
 20:4 48:14
 56:13 89:13
 91:25 92:2,20
 104:23,24
 111:14 117:18
 120:11,12

122:10,11
 154:12 167:18
 167:24 168:12
 170:2 175:24
 194:3
firsthand 17:14
 18:15
fiscal 135:10,21
 142:6 167:12
 168:2 199:20
fit 173:10
five 88:6 94:11
 148:13
fix 130:25
 142:20 149:17
fixed 93:22
flex 176:14
flip 7:25 8:12
 23:21 98:16
 117:17 147:17
 169:8 170:2
 187:22
floor 2:16
 101:3
flowing 183:18
focus 20:11
 23:23 24:6
 28:23 51:4
 53:10 68:10
 90:12,17 91:24
 158:13 161:15
 161:21
focused 12:18
 66:13,16 69:3
 69:6 161:24

focuses 19:17
 52:2
focusing
 105:10
folks 72:12
 77:14 83:3,17
 85:8 86:12
 144:10 161:12
 173:23 176:25
 177:22 178:6
 179:12,21
 182:2 187:16
follow 62:2
following 50:9
 99:5 120:12
 135:9 143:6
follows 4:5
 152:11
followups
 160:25
footnote 164:23
 166:6
footnotes
 164:22
force 3:14
 40:17 41:3
 68:10 134:4
forced 159:12
foremost 56:13
forensic 32:25
 187:19 194:15
forget 23:17
form 3:9
 137:24

format 129:8
 129:12
formula 32:13
forth 200:7
forward 102:4
found 109:5
 146:4 151:7
 161:10
foundation
 192:12
fourth 33:5
 147:23
fragile 20:24
fragment
 145:13
frame 121:15
framework
 59:19 107:13
 152:15
free 32:7 99:11
 183:18
frequently
 163:4 174:12
friedman 1:23
 198:5 200:3,19
friends 93:8
 162:6
front 95:9
 117:15
fulfill 122:17
full 11:4 23:23
 38:10 42:13
 43:17 70:4
 114:16 117:18
 120:11 189:14

[full - good]                                                    Page 20

| | | | |
|---|---|---|---|
| 189:16 | fy  166:2,12 | 184:19 197:9 | goes  47:9 99:2 |
| function  84:5 | 199:17 | given  22:14 | 99:5 112:3 |
| functioning | **g** | 26:16 94:2 | 120:16 127:17 |
| 183:4 | | 118:20 133:9 | going  5:24 6:5 |
| fund  80:24 | gain  187:15 | 138:10 142:10 | 7:21 8:12 |
| 81:3 99:3 | gains  157:9 | 157:4 173:2 | 20:23 23:22 |
| 138:12 176:15 | gap  144:17 | 200:9 | 27:25 39:25 |
| fundamentally | 163:15 181:25 | gives  99:17 | 48:21 50:22 |
| 106:16 162:11 | 193:16 | 168:5 | 53:19 55:12 |
| fundamentals | gaps  192:20 | giving  105:23 | 56:17 83:5 |
| 162:15 | gather  14:10 | 193:21 | 90:16 91:4 |
| funded  186:23 | gathering | glad  136:14 | 95:6,19 100:25 |
| funding  85:4 | 69:16 | gleaned  18:14 | 102:3,19 |
| 100:23 109:15 | general  4:12,13 | 18:25 | 103:21 104:13 |
| 109:16 111:21 | 17:23 19:20 | go  9:2 19:8 | 107:19 122:7 |
| 111:23 112:3 | 68:17 85:9 | 29:17 35:12 | 125:24 130:2 |
| 123:5,11 125:5 | 120:6 141:21 | 67:21 71:6,6 | 130:11,13 |
| 126:14 133:3 | 171:2,11 | 78:23 104:15 | 139:22 142:3 |
| 134:16 135:20 | general's  2:14 | 116:2 126:10 | 142:12 144:16 |
| 136:7 137:7 | generalization | 127:8,23 | 144:18 149:13 |
| 138:5 139:6,13 | 98:10 | 130:11 139:22 | 149:19 150:21 |
| 139:25 140:25 | generalize | 143:24 145:13 | 158:15 160:21 |
| 141:24 146:25 | 97:12 | 152:16 154:8 | 163:11 164:22 |
| 147:12 148:20 | generalizing | 163:10 173:14 | 171:24 174:25 |
| 149:4,7,8 | 183:10 | 176:15 182:24 | 176:19 183:12 |
| 151:22 152:16 | generally | 185:17 190:22 | 183:17 184:10 |
| 152:19 156:16 | 183:20 | goal  21:23 22:5 | 184:17 185:9 |
| 173:5 | geographic | 26:14 43:23 | 185:14,16 |
| funds  33:17 | 75:25 | 44:12 52:23 | 196:6 |
| 137:21 146:15 | getting  30:11 | 53:7 158:19 | good  4:9,10 |
| furniture  82:9 | 50:3 62:16 | 159:2,5 | 22:12 49:9 |
| further  3:8,12 | 130:3 158:4 | goals  106:17 | 52:8,9 77:23 |
| 19:10 148:4 | 192:21 196:24 | 107:3 156:17 | 85:7 86:11 |
| 159:5 190:13 | gist  104:20 | god  184:14 | 87:8,10 95:14 |
| 198:4 200:10 | give  5:9 46:19 | | 105:13 107:24 |
| | 147:5 164:3 | | |

[good - health]                                                    Page 21

110:22 115:14
137:2 142:19
148:13 154:10
161:2 164:8
172:6 176:20
178:5 184:11
gotcha 11:10
gotten 112:8
155:19
government
46:16 47:20,25
72:14
governments
65:3,5,9,13
126:15 142:17
governor 1:9
79:16 94:11
106:18 138:19
governor's
80:8 94:10
102:22 140:22
gradually
189:6
grant 146:5
graph 169:9
great 45:22
134:3 147:4
green 166:20
166:22
ground 5:10
6:18 33:23
115:2 155:18
grounds 184:5
184:6,9,10
193:11

group 21:19
35:6 77:24
86:17 112:14
179:17 180:20
182:16 194:13
195:5
groups 16:18
64:11 79:21
105:21 107:8
166:16 174:2
177:21
growing 121:18
guarantee 38:9
42:11 45:10,16
46:5,21 49:12
49:18 50:18
51:21 52:15
53:24 54:12
55:3,23 56:22
62:22 88:17
89:3,20 90:4
90:21 134:16
153:3,19
guaranteed
48:2
guarantees
44:3
guess 48:24
86:5 93:11
96:14 128:5
142:2 155:22
189:12 193:4
193:14
guessing 69:21

guidelines
107:22
guilty 109:5
151:8
gym 176:18

h

h 13:12 199:7
hair 104:4
half 103:6
halfway 127:12
halt 155:18
hand 91:4
143:12 152:16
152:16 200:15
handle 175:20
175:21
hanna 2:6
93:17 131:4
144:13
happen 5:25
163:8,21 164:6
192:24
happened 73:9
126:20 140:7
173:21 181:4
happening
143:3 196:7
happens 28:3
31:17 46:25
86:19 163:3,4
happy 147:8
hard 153:7
154:10 174:7
178:6 179:20

harder 47:13
hardest 178:2
head 5:15,15
7:16 84:23
121:5 135:8
193:19
headlines 92:21
health 7:4 9:5
9:21 10:8
11:22 12:20,21
12:24 13:13,15
15:20 17:22
18:6 20:17
23:2,5 24:18
25:10 30:12
41:22 42:23
43:4,23 48:5
49:7 52:24
55:17 59:24
60:13 66:10,24
69:5 70:12,21
70:25 72:9,20
72:21,24 73:2
73:11 74:9,14
74:22,25 75:5
75:10,22,24
76:4 77:23
78:8,16,18
87:11 88:16,25
89:19 93:11
94:5,16,25
98:2,24 100:21
100:24,24
102:2,5,13
103:2,9,18,25

| | | | |
|---|---|---|---|
| 104:2 107:23 | heat  119:3 | 99:4 101:8 | 72:22 73:6 |
| 109:22 115:22 | heatwave  73:5 | 117:20 118:8 | 76:7 79:7,10 |
| 116:3 119:9,23 | heavily  149:22 | 179:17 181:23 | 91:8 103:12 |
| 120:2 123:12 | 189:19 | homeless  16:25 | 108:20 111:12 |
| 123:18,20,24 | heels  184:12 | 17:23,24 18:6 | 141:21 144:11 |
| 124:3,17 125:9 | held  1:21 | 18:19,21 19:4 | 144:25 148:25 |
| 125:12 126:4 | help  88:2 164:5 | 28:7 44:25 | 149:3 151:17 |
| 127:21 132:3 | 181:25 | 59:21 60:16 | 155:7 156:2 |
| 132:11,18 | helpful  172:8 | 62:8 68:13 | 160:12 170:21 |
| 135:17,23 | hereto  3:5 | 81:18 86:21 | 170:23,23 |
| 136:4 138:5,12 | hereunto | 134:24 146:18 | 171:2,2,11,19 |
| 139:20 140:11 | 200:14 | 153:11,14 | 171:20,25 |
| 140:21 142:19 | high  60:10 | 156:23 157:6,6 | 178:9 184:2 |
| 143:4 145:4,5 | 172:15 195:4 | 194:24 | 189:4 190:7,14 |
| 145:15 149:10 | higher  156:9 | homelessness | 192:2,5 194:24 |
| 155:9 161:21 | highest  24:18 | 158:11 | 199:10 |
| 165:7,11,15,21 | 166:20 | homes  77:24 | hotels  77:25 |
| 166:2,14 167:4 | highlights | 128:7 180:20 | hour  148:11 |
| 167:23 168:22 | 166:4 199:19 | 182:16 | hours  82:24 |
| 168:23 171:3 | hired  106:18 | hook  196:3 | 162:15 184:15 |
| 172:13 173:4 | 178:8 | hospital  7:9 | house  179:2 |
| 173:16 174:8 | historically | 18:5 73:13 | 182:25 183:2 |
| 179:15 181:7 | 111:11 154:17 | 76:10 100:9 | 183:13 |
| 182:5,15 | 155:8,14 | 103:7,10 | housed  151:19 |
| 191:16 193:10 | 178:18 | 112:19 142:17 | housemates |
| 199:15,16,17 | histories  47:11 | 155:14 169:16 | 179:11 |
| healthcare  60:6 | 110:10 | 171:10,11,15 | housing  10:8 |
| 144:23 145:2 | history  38:3 | 171:17 178:19 | 10:18,21 13:2 |
| hear  88:3 | 63:16,18 104:3 | 184:8 192:9,15 | 20:14 22:23 |
| 136:14 | 174:13,13,14 | hospitalization | 26:12 28:14,16 |
| heard  21:5 | 177:22 187:14 | 170:20 | 28:19 29:3,10 |
| 35:11 96:5 | hit  71:14 | hospitals  7:9 | 29:20,25 30:17 |
| 111:18 189:25 | hold  178:20 | 18:12 35:5 | 31:3,11,22 |
| hearing  18:15 | home  86:17 | 44:21,21 48:9 | 32:4,7 34:6,20 |
| | 88:2 98:21 | 52:5,9 70:14 | 36:23 38:9,22 |

| | | | |
|---|---|---|---|
| 39:5 42:12 | 133:14 134:17 | 122:22,25 | impact 120:5 |
| 43:4,6,18 44:4 | 135:17,24 | 127:14,21 | 136:18 137:2 |
| 45:15 46:6,21 | 136:4,8,20,25 | 128:10,17,19 | 149:24 160:6 |
| 48:2 49:14,25 | 137:3,21 138:6 | 129:6 130:23 | 160:18 179:9 |
| 50:7,12,23 | 138:12 152:7 | 189:18 | impacted |
| 51:12,21 52:7 | 152:12,25 | ignacio 2:18 | 119:11 |
| 52:15 53:24 | 153:3,19,20 | illness 8:20 9:2 | impetus 138:18 |
| 54:12,17 55:3 | 157:16 174:8 | 9:7,13 10:16 | implant 106:25 |
| 55:24 56:5,7 | 175:17 178:3 | 12:17 19:3 | implement |
| 56:23 57:25 | 179:5 181:10 | 27:9 35:9,25 | 175:7 |
| 58:9 59:12 | 182:2 185:22 | 36:10 37:3 | implemented |
| 62:23 69:8 | 185:23 186:3,8 | 38:18 43:7 | 155:16 174:17 |
| 77:5,10,11,20 | 186:16,20,23 | 44:13 47:17 | 189:11 |
| 80:24 81:3,5 | 189:8,9,15,20 | 48:15,17,20 | implicit 164:13 |
| 81:13,20,21,24 | 189:22,23 | 52:6 53:3,14 | implicitly 47:8 |
| 82:3,15 83:4 | 190:3 191:2,5 | 54:18 56:14 | importance |
| 83:10,14,19 | 195:10,20 | 57:16 66:17 | 52:7 85:10 |
| 84:21 85:4,7 | 196:16 | 68:13 79:2 | 87:14 163:25 |
| 85:11,15,24 | huge 89:15 | 80:25 81:18 | important |
| 86:6,16,20 | huh 24:14 | 86:9 90:13 | 26:24 35:3 |
| 87:2,9,15 | 27:17 61:14 | 103:14 107:15 | 37:10 56:6 |
| 88:17 89:3,14 | 80:11 107:10 | 108:9,14,24,25 | 87:9 110:18 |
| 89:15,21 90:4 | 108:21 109:7 | 109:6 110:17 | 188:22 |
| 90:11,21 | 166:21 169:4 | 110:25 111:22 | impossible |
| 114:12,19,24 | human 93:10 | 112:4 120:15 | 26:17 |
| 115:3 118:3 | 94:25 100:24 | 133:24 154:20 | improve |
| 122:14 123:13 | i | 157:4 183:16 | 106:19 180:23 |
| 123:24 124:3 | idd 73:25 | 186:25 | inaccurate 97:5 |
| 124:17,24 | idea 89:14 | illnesses 95:10 | 98:3 |
| 125:10,13 | 145:18 148:20 | 96:17 98:23 | inadequate |
| 126:4 127:2,14 | ideal 40:18 | 199:12 | 22:17 |
| 127:22 128:3 | 188:19 | imagine 141:19 | inappropriate |
| 128:11,17,19 | ideally 137:20 | immediately | 28:6 62:11,17 |
| 129:16 131:16 | identified | 71:15 105:5 | 149:7 180:13 |
| 132:3,18 | 121:20 122:15 | 164:4 | |

inappropriately
  98:10
inaudible
  100:17
incarcerated
  8:24 34:4
incarceration
  47:3,11
incident  73:14
include  120:15
  137:9
included  10:19
  20:5 77:5
  90:11 116:8,8
  121:9 161:15
  161:16 171:3
  176:5
includes  54:20
  84:21,24
  135:22 136:2,6
  137:7 146:25
including  77:10
  168:9
income  32:15
incorporate
  58:2
increase  124:23
  134:23 135:20
  139:13,24
  140:25 142:17
  144:2 146:8
increased
  120:4 124:16
  135:3 154:19

increases
  126:14 130:19
  138:21
increasing
  141:5 145:19
  169:20
incredibly
  44:24
incumbent
  38:6 192:4
independently
  84:5
index  199:2
indicate  133:10
  167:2
indicated  9:22
  29:9 121:18
  131:11,15
indicates  28:18
  116:7 146:14
  166:25
indicating
  131:15
indication
  120:25 123:2
indicator  26:21
  28:21 146:19
individual
  14:15 25:22
  26:17 29:25
  31:2,5,8,10
  32:8 34:4
  36:23,24 37:18
  37:23 51:6,7
  61:11 82:9,14

83:6,25 110:25
  115:21 173:14
  181:12 195:19
individually
  1:4
individuals  9:4
  9:14 16:25
  20:19,24 21:7
  21:15 22:6,10
  24:9 25:13
  26:4,10 27:8
  27:15,25 29:19
  29:24 30:16
  32:14 35:6
  36:18 37:3,10
  41:10 42:2
  43:17 50:20
  53:2 56:12
  62:7 66:16
  68:16,19 69:9
  73:9 79:3
  80:21 84:3
  85:16 86:8
  87:3 96:19
  102:7,18
  107:14 108:9
  108:25 109:4
  109:25 110:20
  111:5,21,23
  112:4 151:19
  153:12 164:15
  178:10 179:7
  187:13 190:17
  194:13,22
  195:6 196:6

industry  42:23
  43:3,14,16
infancy  86:6
  89:15
information
  14:10 15:4
  18:10,13,25
  20:6 69:16
  118:15 119:8
  119:10 128:25
  129:19,24
  165:11,21
infrastructure
  38:15 39:4
  41:22 48:6
  52:25 190:9
  192:11
infringement
  106:12
infusion  112:8
  112:23 138:9
  138:18
initials  13:11
innovation
  77:13
inpatient  33:8
  34:16 38:17
  39:17 77:4
  90:9 101:25
  135:20 139:13
  139:21,25
  141:15,18
  142:25 143:12
  143:19,21
  144:2,20

145:19 146:9
148:20 149:8
149:11,14,15
149:18,20,25
150:3,11,16,24
151:9 156:10
156:14 157:21
157:22 158:23
159:12 160:21
170:12,22
171:8 178:13
180:8 181:19
189:3 191:18
191:20 192:2
194:16
inside  194:18
instance  20:4
22:18 126:21
institute  63:25
72:21,24 73:3
74:9,15 102:2
102:5,14 103:2
103:9 167:19
193:10
institution  60:7
62:12 194:19
institutional
67:3 73:23
142:7 153:10
181:18 182:3
institutionali...
10:15 35:2
43:10 60:17
158:8

institutionali...
43:9 91:9 93:3
199:11
institutions
92:25
instruct  99:9
instructed
14:11
instruction
14:4
insufficient
26:12
insurance
150:12
integration
98:25
intellectual
73:21 80:18
intended  10:15
180:9
intending
191:24
intense  83:25
84:6
intensified
181:13
intensity
157:12
intensive  39:19
40:7,12 41:11
42:2 43:13
84:11 97:25
122:14 133:16
133:22 137:4
181:23 189:6

191:9
intent  161:23
intentioned
92:23
interactions
19:3
interdisciplin...
162:13
interest  105:16
interested
15:11,16 17:22
200:13
interesting
81:7 99:24
interests  79:21
108:8
interfering
52:3
interim  6:25
12:20 182:4,7
internal  80:6
interrupt
130:12
intervene  21:4
150:19 196:8
intervening
44:10 162:4
intervention
150:21
interventions
156:23
interview  13:19
14:11 16:14
103:25 104:6
104:10 199:16

interviewed
16:15,16,16,17
16:23 17:2
interviews
15:21 16:2,6
intractable
147:10
introducing
41:24
invest  149:22
invested  41:19
investigation
96:6
investing
137:21
investment
135:23 137:7
138:5,10 157:8
involved  14:13
15:22 62:6
74:3,11 80:8
103:17 162:6
162:21
involvement
48:16 54:21
56:16 108:15
161:11 162:2
involving  15:20
issue  30:7 50:2
50:10 66:7
68:11 69:10
101:3 102:15
103:24 122:25
123:7,9 128:24
131:19,23

135:6 141:5
170:18 178:22
180:18 199:15
issues 13:20
14:13 22:9
27:22 37:4
47:12 49:21
51:5 64:13
69:7,8 71:17
72:7 79:4 82:7
89:12 96:20
119:6 122:22
126:12 145:5
item 125:6
iteration
159:21
iterative 23:12

**j**

j.r. 1:4
jails 91:8
199:10
january 146:15
jeopardizing
157:21
job 22:8 30:11
75:18 76:20
79:12 87:8
105:14,15,20
188:10 193:17
judgments
69:17
judicial 58:8
jump 164:22
june 1:12
200:15 201:4

jurat 197:25
jurisdiction
28:20 38:21
44:3 61:11
131:25
jurisdictional
49:21
jurisdictions
38:8,14 39:7
42:10 44:22
45:9 46:5,20
124:4,8 132:7
132:16
justice 54:21
56:11,16 64:2
64:7 67:20
125:19,21
151:7 158:12
161:12 162:3
162:25 187:13
justification
37:8 156:12

**k**

keep 10:16
43:21,21 52:9
62:14 140:15
140:16 144:10
keeping 70:13
kept 174:3
key 6:16,22
71:11 127:14
167:3 188:4
khan 2:6 4:18
11:7,15 14:6
14:19 17:19

30:4,20 32:10
35:21 42:16,24
44:7 45:17,24
46:9,23 49:15
50:14,24 51:14
52:20 54:5
55:7 57:3,10
58:3,17 59:7
59:16 61:2,5
62:3 63:5
65:14 86:2
87:4 88:7,20
89:7 90:24
91:13 94:20
95:18 96:2,8
97:2 99:8
101:12,22
106:6 109:18
118:23 119:16
124:5 126:6,17
128:12,20
131:2,20 132:4
132:12,19
135:11 136:12
137:24 138:13
138:25 143:15
144:12 145:21
148:15 150:5
151:10 156:18
174:9,19 175:9
175:22 177:12
193:25 197:7
197:11 198:2,7
kind 82:6,18
83:2 87:16

97:9 99:24
140:7,17
142:20 178:15
kinds 7:10 15:7
64:15 77:25
82:11 86:17
100:7 118:16
147:13 171:16
171:19 181:17
knew 42:5 87:7
107:17 136:9
know 4:15 6:9
8:2 14:3,9 15:8
21:18,21,23
22:12 23:5,7
25:23 29:5
37:25 40:16
46:15,15 56:18
56:18 57:13,19
57:21 60:25
66:19,19 71:16
71:19 72:6
74:8,10 82:18
84:2 86:25
87:6,15,18
93:19 94:21
98:13 103:16
107:16,17,19
107:21,22,23
107:24 109:24
110:9,11,24
111:14 112:2
116:13 117:6
120:22 121:14
121:15,16

| | l | learned 15:3 | 138:19 139:6 |
|---|---|---|---|
| 123:14,16,19 | | 18:9 | 139:12 140:2,4 |
| 123:21,22 | lack 27:2 94:24 | learning 15:16 | 140:12,22,25 |
| 124:2,10,15,21 | 98:21 120:14 | leased 178:7 | 142:5 159:6 |
| 125:16,16 | lafayette 2:10 | leave 52:8 78:3 | legislatures |
| 126:3,11 | landlords 82:8 | 87:22 183:8 | 71:11 |
| 129:20,22 | landriscina | leaving 26:10 | length 174:2 |
| 131:8 135:7 | 2:12 | 35:5 38:11 | lens 47:4 |
| 136:24 137:9 | language 26:7 | 39:15 40:22 | 150:18 195:3 |
| 137:19 138:15 | 29:18 121:3,13 | 41:6 42:14 | lepage 93:9 |
| 139:20 141:3 | 193:17,21 | 44:5 46:7 48:3 | 94:3,8,19,23 |
| 144:15,16 | 194:5 | 49:13,23 50:2 | 99:18 |
| 145:2,3 147:11 | lapses 164:6 | 50:11 51:23 | level 11:21 |
| 151:15 154:17 | large 15:14 | 52:5,17 53:11 | 54:19 62:15 |
| 155:21 156:4,5 | 81:17 | 54:2,14 55:5 | 67:4 83:24 |
| 157:9 158:24 | largely 96:22 | 56:2,25 62:25 | 89:16 157:12 |
| 159:15,17 | 195:21 | 88:18 89:4,22 | 181:14 195:22 |
| 160:23 167:5 | larger 35:6 | 90:5,15,22 | levels 122:14 |
| 171:12 172:23 | 105:19 156:7 | 125:18,20 | 133:16,21 |
| 174:22 176:18 | 169:24 | 134:19 153:4 | leverage 174:4 |
| 178:21 179:3 | largest 174:15 | 153:21 179:22 | liability 178:20 |
| 179:14,15,21 | late 182:18 | 183:11 | liberty 2:16 |
| 181:4 182:23 | latitude 149:21 | led 81:19 | life 27:23 |
| 186:22 187:12 | lawsuit 71:13 | 158:10 | 150:24 |
| 190:4 192:11 | 73:22,23 | left 61:21 78:5 | lifestyle 181:18 |
| 192:20,23 | lawsuits 72:15 | 171:13 190:8 | likely 44:19 |
| 193:3 195:9,18 | lawyer 63:6,7 | 190:24 193:6 | 159:9 161:25 |
| 196:18 | lawyers 6:17 | legal 2:8 58:2 | 164:16 177:18 |
| knowing 86:25 | laying 57:17 | 58:16 59:5,15 | 187:15 |
| knowledge | 192:12 | 59:19 60:20,22 | limit 159:14,19 |
| 71:14 94:23 | lead 140:17 | 60:23 61:7,25 | limited 108:2 |
| 95:23 132:15 | 161:25 | 64:15,17 75:4 | 145:12 187:18 |
| 174:22 | leadership | 175:7 | line 60:18 |
| known 142:15 | 143:18 | legislature | 95:19 149:6 |
| | learn 17:12 | 79:20 112:9,24 | 168:12 171:5 |
| | 18:8,22 | | |

173:25 185:20
187:25 201:5
lines  168:18
list  11:12 20:8
24:10 25:19
26:11 28:17
38:10 42:13
51:22 52:16
53:25 54:13
55:4,24 56:23
62:23 70:4
76:24 84:17
99:6 114:16
124:11 126:25
128:24 133:3
134:18 152:5
189:17 190:23
195:7
listed  28:14
35:18 133:12
134:2 167:7
listing  39:11
lists  25:23 26:3
26:25 47:8
127:16,21
128:6,11,19
129:19,21
literature
12:16 52:2,6
52:23
litigation  16:9
16:12 64:21
68:21 71:2
72:3

little  22:3 24:15
52:11 58:21
83:11 85:5
87:19 88:13
110:14 120:22
live  81:10,13
living  23:10
43:12 82:22
85:20 162:4,5
179:2,13,17
180:2,19
181:11
llc  201:2
local  7:13
12:22 75:24
76:4 92:14
117:19,24
122:16 127:13
173:3 189:3
localities
121:22
located  183:25
locations  51:11
logic  142:6
logical  107:21
151:18
long  60:16
127:15,21
128:11,19
147:9 149:16
149:24 157:17
longer  94:18
156:25 188:8
look  22:9 23:8
23:13 25:22

26:17 27:21
33:23 47:5
66:8 70:11
91:10,25 92:5
92:20 105:15
110:4 111:4,20
116:9 122:10
123:15 124:7
134:12 136:19
140:9 144:23
152:22 153:8
153:11 157:16
164:23 169:20
176:3,7 185:11
185:20 187:25
196:24
looked  6:24 7:7
12:23 13:6,8
25:20 37:22
57:8 115:7
118:21 130:24
131:5,6,8
133:13 137:15
148:3 150:2
154:17 158:18
162:3 192:8
looking  20:18
22:18 43:8
105:3 129:22
132:6 154:15
156:21 195:3
looks  92:5
loop  39:25
63:10

lose  105:22
107:9
losing  100:18
lost  157:9
lot  28:23 47:6
52:23 60:6
77:14 79:17,19
85:11 100:17
107:15,18
118:14 129:11
138:20 139:21
145:9 147:12
157:8 164:4
183:10
lots  28:5,5
100:15 151:12
180:18
low  81:12
83:10 85:14
186:11
lower  164:12
187:21
lowering  23:15
lsp  116:13
117:3 139:4
lsps  7:2,11,14
114:21,22
115:14,17,18
115:19,24
116:5,19,23,24
117:4,14 118:8
118:11,21
119:7 120:17
121:10,22
122:4,22

[lsps - mainers]                                                        Page 29

| | | | |
|---|---|---|---|
| 123:10 124:14 | 83:1 84:1 85:1 | 158:1 159:1 | main   79:16 |
| 125:14,22 | 86:1 87:1 88:1 | 160:1 161:1 | maine   39:8,14 |
| 126:5,21 | 89:1 90:1 91:1 | 162:1 163:1 | 40:9,15 47:21 |
| 127:24 129:9 | 92:1 93:1 94:1 | 164:1 165:1 | 48:25 49:12,25 |
| 132:24 133:12 | 95:1 96:1 97:1 | 166:1 167:1 | 50:6,8,21 |
| 134:14 | 98:1 99:1 | 168:1 169:1 | 51:11 61:10 |
| lunch   113:5,7 | 100:1 101:1 | 170:1 171:1 | 62:9,12 72:17 |
| **m** | 102:1 103:1 | 172:1 173:1 | 73:12 74:23 |
| m   2:1 3:1 4:1 | 104:1 105:1 | 174:1 175:1 | 75:2 78:6,24 |
| 5:1 6:1 7:1 8:1 | 106:1 107:1 | 176:1 177:1 | 79:6,13 80:10 |
| 9:1 10:1 11:1 | 108:1 109:1 | 178:1 179:1 | 80:24 81:6,8,9 |
| 12:1 13:1,12 | 110:1 111:1 | 180:1 181:1 | 81:16,18 83:12 |
| 14:1 15:1 16:1 | 112:1 113:1 | 182:1 183:1 | 83:15 84:9,10 |
| 17:1 18:1 19:1 | 114:1 115:1 | 184:1 185:1 | 85:3,17,23 |
| 20:1 21:1 22:1 | 116:1 117:1 | 186:1 187:1 | 87:3,23 88:16 |
| 23:1 24:1 25:1 | 118:1 119:1 | 188:1 189:1 | 89:2,16 92:22 |
| 26:1 27:1 28:1 | 120:1 121:1 | 190:1 191:1 | 93:8 94:16 |
| 29:1 30:1 31:1 | 122:1 123:1 | 192:1 193:1 | 95:3,10,11,23 |
| 32:1 33:1 34:1 | 124:1 125:1 | 194:1 195:1 | 96:10,22 97:10 |
| 35:1 36:1 37:1 | 126:1 127:1 | 196:1 197:1 | 98:22 99:3 |
| 38:1 39:1 40:1 | 128:1 129:1 | 198:1 199:1 | 100:18 101:5,9 |
| 41:1 42:1 43:1 | 130:1 131:1 | 200:1 201:1 | 102:16 103:24 |
| 44:1 45:1 46:1 | 132:1 133:1 | m.g.   1:4 117:21 | 106:20 107:15 |
| 47:1 48:1 49:1 | 134:1 135:1 | 201:4 | 138:3,8 165:17 |
| 50:1 51:1 52:1 | 136:1 137:1 | m.j.   1:4 | 175:2 182:13 |
| 53:1 54:1 55:1 | 138:1 139:1 | made   14:24,24 | 188:3 189:16 |
| 56:1 57:1 58:1 | 140:1 141:1 | 40:16 41:2 | 189:20,23 |
| 59:1 60:1 61:1 | 142:1 143:1 | 69:17 74:24 | 190:8,25 192:2 |
| 62:1 63:1 64:1 | 144:1 145:1 | 93:24 106:5,14 | 193:7,15 |
| 65:1 66:1 67:1 | 146:1 147:1 | 107:12 123:8 | 199:12,13,15 |
| 68:1 69:1 70:1 | 148:1 149:1 | 125:13 126:4 | maine's   78:8,14 |
| 71:1 72:1 73:1 | 150:1 151:1 | 157:24 158:7 | 78:22 88:16,24 |
| 74:1 75:1 76:1 | 152:1 153:1 | 183:15 188:22 | 91:8 199:10 |
| 77:1 78:1 79:1 | 154:1 155:1 | 193:9 195:6,14 | mainers   92:25 |
| 80:1 81:1 82:1 | 156:1 157:1 | 195:22 | |

[maintain - mental]                                                      Page 30

maintain
  105:18 117:22
  118:2
major  9:6,7
  162:23
majority
  127:13 170:21
make  5:10 8:11
  21:21 22:11
  23:14 24:19
  26:17 27:2,3
  30:12 33:20
  35:13 39:2
  40:18 48:21
  49:6 70:20
  88:13 110:22
  111:18 138:4
  153:8,23,25
  162:8 172:25
  174:7 176:18
  192:23
makes  21:20
  93:7 105:11
  145:10 176:8
making  22:13
  30:8 56:6
  112:11 116:11
  158:13
manage  192:22
managed
  191:15
management
  10:22 33:5
  34:14 38:17
  39:17,20,20

40:7,12 41:11
42:3 47:12
82:13,14 84:11
97:25 122:15
133:17,18,22
162:19 174:4
189:6 191:9,14
manager  181:6
managers
  83:18
managing
  23:11
mandate  100:6
  122:17
manhattan
  179:19
map  166:9,12
marissa  2:22
marked  7:22
  7:24 91:5,6
  95:4,7 103:20
  103:22 165:24
  167:10 184:16
markedly
  119:11
marriage
  200:11
massive  138:9
material  15:4
  118:19
materials  6:16
  6:22
matter  4:14,22
  14:22 74:18
  188:25 200:13

matters  74:5
matthew  2:21
maximize
  137:2
mean  8:22 9:3
  22:10 28:13
  37:19 48:10
  60:13 75:23
  107:11,20
  119:18 167:22
  172:11 176:22
  184:5 188:14
  194:6
meaningful
  136:17
means  20:13
  22:16 24:16
  29:12 33:22
  143:13 168:21
meant  188:15
medicaid  9:15
  99:16,19
  133:18,21
  141:23 163:5
  163:10
medical  68:16
medication
  33:5 34:14
  39:17 82:20
  162:19 164:6
  191:14
medications
  41:7 73:7
  82:21 163:3,16
  163:20,24

164:3,10,16
meet  22:4
  24:23 27:11
  36:8 37:13
  43:6 59:22
  62:8 117:22
  118:3 133:22
meeting  173:7
  176:11
melodie  1:21
  4:3 198:19
  199:4 201:5,25
member  100:4
members  99:25
  102:11,19,21
  102:23 107:18
  108:2
membership
  176:19
mental  7:3 8:20
  8:25 9:5,13,21
  10:8,16 11:22
  12:17,20,21,24
  13:13,15 15:20
  17:22 18:6
  19:2 20:17
  23:2 24:17
  27:9 30:12
  35:9,25 36:9
  37:3 38:18
  41:22 42:23
  43:3,7,23
  44:13 47:17
  48:5,14,17,20
  49:7 52:6,24

| | | | |
|---|---|---|---|
| 53:3,14 54:18 | 127:21 132:3 | methodology | mistake 158:7 |
| 55:17 56:14 | 132:11,17 | 12:13 19:22 | misunderstood |
| 57:16 59:23 | 133:23 135:17 | 114:6,7 148:7 | 189:12 |
| 60:13 66:9,17 | 135:23 136:3 | methods 23:6 | mix 179:3 |
| 66:24 68:12 | 138:5,12 | 62:14 | model 161:7,14 |
| 69:5 70:12,21 | 139:20 140:11 | mh 166:4 | 164:13 |
| 70:24 72:9,20 | 140:21 142:19 | 168:19,21 | modern 193:11 |
| 72:21,24 73:2 | 143:4 145:4,14 | 199:18 | modifications |
| 73:11 74:9,14 | 149:10 151:8 | middle 11:20 | 40:18 |
| 74:22,25 75:5 | 154:20,23 | 113:18 124:12 | modifiers |
| 75:10,22,24 | 155:9 157:4 | million 136:3,7 | 121:17 |
| 76:4 77:23 | 161:20 165:7 | 141:17,17 | modify 140:12 |
| 78:8 79:2 | 165:11,14,21 | millions 144:2 | 161:23 |
| 80:25 81:18 | 166:2,13 167:4 | mind 141:5 | moment 28:2 |
| 86:9 87:11 | 167:23 168:22 | 144:22 | 31:16 192:16 |
| 88:16,25 89:19 | 168:22 171:3 | minority | moments 193:2 |
| 90:13 93:10 | 172:13 173:3 | 177:24 | money 112:10 |
| 94:5,16,25 | 173:16,19 | minute 40:2 | 112:24 123:16 |
| 95:10 96:16 | 174:8 179:15 | 85:13 88:6 | 123:22 126:16 |
| 98:2,23,24 | 181:7 182:5,15 | minutes 45:23 | 130:6,18 |
| 100:20,24 | 186:24 191:16 | 89:13 148:13 | 153:18 157:8 |
| 102:2,5,13 | 193:10 199:12 | 197:9 | 157:20 158:23 |
| 103:2,9,14,18 | 199:16,17 | misallocation | 160:11,20 |
| 104:2 107:14 | mentally 91:9 | 144:5 | 170:19,21 |
| 107:23 108:9 | 92:24 108:17 | missed 84:7 | 193:13 |
| 108:14,24,25 | 111:6,15 | 92:16 148:22 | moneys 112:12 |
| 109:5,22 | 199:10 | missing 63:19 | monitor 93:25 |
| 110:17,25 | mentioned 1:22 | 170:18 | month 164:18 |
| 111:22 112:4 | 9:9 13:7 20:3 | mississippi | moral 60:21 |
| 115:22 116:3 | 55:11 83:11 | 16:3,13,19 | morning 4:9,10 |
| 119:9,23 120:2 | 112:17 154:25 | 18:3 65:22 | mother 87:24 |
| 120:15 123:12 | mess 55:12 | 66:4,5,10,25 | move 4:19 90:9 |
| 123:17,20,23 | met 48:22 | 67:5 184:13,22 | 92:23 109:15 |
| 124:3,17 125:9 | 121:20 134:8 | 185:2,7,24 | 178:12 180:22 |
| 125:12 126:4 | | 186:14 187:4 | 180:24 181:2 |

185:21
moved 160:4
181:2,22
movement
96:16
moving 4:25
102:6 111:22
160:20 168:18
178:14 181:20
192:14
multiple 91:7
103:23 165:25
167:11 179:11

**n**

n 200:2
name 4:11
72:23 201:4,5
named 117:20
118:13 128:7
names 55:13
103:16,19
narrowed
111:8
nasmhpd 13:9
13:14 55:14,16
165:9,19
167:18
nation 169:3
national 7:3
13:14 55:16
165:6
nationwide
45:16
nature 19:21
64:17

near 157:6
necessarily
31:4 53:10
67:4 184:7
necessary
27:10 29:19,25
30:17 31:2
33:12 38:10
42:13 48:12
51:22 52:16
53:25 54:13
55:4,25 56:24
62:24 82:23
84:17 85:21
134:18 163:16
177:4 189:17
necessity 34:24
70:14
need 6:8 20:21
21:7,20,24
22:14 24:24
28:3 45:21
53:4,4,7 56:14
67:4 81:20
82:17 87:16
99:10 112:13
113:6 116:10
120:25 122:25
123:4 126:16
126:23,23
127:4,4,6,14,16
128:3,17
129:17 131:12
131:16 136:16
139:15 140:14

144:3 148:12
149:11 150:10
150:14 157:5
158:13 160:9
181:14 182:10
186:9,15 191:5
192:3,4 193:22
needed 33:9
34:16 39:18
77:8 135:3
152:6 153:2
157:23 176:16
176:17 186:20
191:3,18
192:10
needing 140:16
141:8
needs 23:3
27:11 30:10
36:9 37:14,14
43:6 48:22
83:6,17 84:3
116:7 117:23
118:3 121:19
129:14 133:4
133:23 135:4
139:3 145:15
157:16 175:18
175:18,20
176:14 190:17
negative 157:3
negotiations
74:12 172:22
neither 47:25

net 33:12,14
36:6 38:11,15
42:13 51:22
52:16 53:25
54:13 55:4,25
56:24 62:24
84:17 134:18
144:15 154:11
160:7 189:17
network 96:18
96:21
networks 98:22
99:4 101:8
never 71:12
96:5 101:8
182:8
nevertheless
49:11
new 1:2,9,14,24
2:3,5,10,10,14
2:16,16 4:12
8:20,23 9:23
12:20 17:10,16
17:23 18:9
33:16,23 40:20
41:20,24 42:2
50:8 58:12
64:25 76:8
78:16 84:18
85:25 97:23
108:14 112:2
112:12,24
114:13,18
115:2 116:17
123:11,17,23

[new - occupancy]                                                    Page 33

124:2,10,15
125:10,12,13
126:3,5 127:25
135:10,22
136:3,3,7,8,16
136:19 137:3,6
137:7,21 138:4
138:10 140:7
140:18 141:8
141:21 142:12
142:22 143:7
143:12,20,21
144:9,17
146:16,18,25
148:20 150:8
151:15 152:7
152:11,25
153:2,18,20
155:16,25
156:7 166:22
167:12,25
168:12 169:2
170:9 173:22
180:2 182:21
183:22 186:23
193:20 199:20
200:5 201:2
news  92:8
  147:4 184:11
ngri  151:18
nod  5:15
nods  84:23
  193:19
nonprofit
  172:16 173:6,8

174:5 190:11
nonprofits
  172:22 173:13
  178:23
normally
  171:16 173:3
norms  110:12
northern  40:10
  102:24 103:6
notary  3:14
  198:23 200:4
note  61:5
noted  111:14
  131:10
notes  99:18
  127:23 196:24
noticeably  94:6
noting  135:2
notion  41:6
  140:19
nri  165:3,5,6,10
  165:16,18,20
  167:20
nri's  166:3
  199:18
number  20:19
  21:7,15,16
  22:5,6 23:4,7
  23:13 24:24
  25:16 72:20
  73:9 129:6
  133:20 134:22
  140:3 145:19
  146:18 156:5
  172:8 173:18

186:7,19
  188:24 192:9
  194:22 199:8
numbered  11:4
  20:9 104:23
numbering
  185:17
numbers  134:3
  134:23 153:8
  187:14 194:22
numerical
  133:8
nurse  82:20
  134:6 163:14
nuts  82:7,11
ny  1:14

o

o  200:2
o'clock  113:4
object  91:14
  95:19
objection  14:6
  14:19 17:19
  30:4,20 32:10
  35:21 42:16,24
  44:7 45:17
  46:9,23 49:15
  50:14,24 51:14
  52:20 54:5
  55:7 57:3,10
  58:3,17 59:7
  59:16 61:2,6
  62:3 63:5
  65:14 86:2
  87:4 88:20

89:7 90:24
93:17 94:20
96:2,8 97:2
99:8 101:12,22
106:6 109:18
118:23 119:16
124:5 126:6,17
128:12,20
131:2,4,20
132:4,12,19
135:11 136:12
137:24 138:13
138:25 143:15
144:12,13
145:21 150:5
151:10 156:18
174:9,19 175:9
175:22 177:12
193:25
objections  3:9
objectives
  23:25
obligation
  178:25
obligations
  59:14
observed  182:5
obviate  56:12
occasionally
  27:24
occasions  25:6
  25:7,13
occupancy
  12:25 50:6
  77:25

Veritext Legal Solutions

212-267-6868                                                  516-608-2400

occur  41:18
occurred  102:3
  140:24
occurrence
  70:19
offended  181:6
offer  108:16
  128:24
offered  25:24
  36:20 50:17
  129:18
offering  176:12
  176:14
offers  36:22
office  2:14,14
  4:13 12:24
  80:8 87:10
  94:12 102:22
  116:2 119:9
  123:20 140:11
  140:21,22
  173:4,15
officers  16:24
  161:17,18
offices  134:24
official  1:8
oh  73:2 82:5
  87:6 92:18
  140:2 170:5
  184:14 196:22
okay  5:11,12
  5:15,21 6:2,3,6
  6:7,11,12 8:14
  11:9,9 20:11
  24:2 28:8

30:15 31:9,14
31:18 32:8,17
33:20,24,25
35:11,15 36:12
36:15,18 39:7
40:14 45:7,21
55:19 59:11
63:10 64:23
66:5,23 67:24
69:7,13,18,21
73:4 75:18
78:24 79:12
91:12 92:18,19
94:14 95:17
99:13 104:20
104:21 109:10
113:15 115:6
117:9 122:10
127:9,11 130:4
130:13,22
131:14 137:14
148:2,11,24
152:4 154:7
155:23 160:24
164:25 167:9
172:4 183:24
184:10 185:5,9
185:19 187:24
190:5 191:22
196:23,23
old  136:22
  181:16
olmstead  66:7
omh  6:24 12:9
  19:10 24:24

25:15 28:18
29:3 31:4,11
35:6 41:19
58:24 59:4,13
61:16 75:16
78:14,18 108:7
108:11,16
109:11,14
115:7,10 116:4
116:6,7 117:21
118:2 122:21
123:3,7 126:11
129:12,23
130:25 131:17
138:11,20
142:4 146:14
146:19 147:5
148:5 149:21
152:10 153:8
156:21 157:20
158:2,22
159:11 160:15
170:19 171:5
171:24,25
193:21 195:18
196:18
omh's  24:7,10
  27:10 28:13
  29:20 30:18
  122:12 130:7
  138:24 145:24
omitted  118:18
once  5:3 23:16
  100:22 106:20
  164:17,17

173:6
ones  39:10
  58:15 64:14
  117:10 121:6
  173:24 174:15
ongoing  68:6
  72:17 73:17
open  150:18
operate  79:9
operated  10:22
  72:10 141:20
  190:11
operating
  24:17 49:9
  72:10 136:7
  141:17 165:18
operation
  79:15 107:4
  175:5 178:19
operations
  76:12,18 80:6
  105:12
operators
  16:24
opine  11:14,25
  12:4 19:10
  46:12 113:20
  113:23 148:4
opined  84:18
opines  101:7
opinion  24:4
  34:18 35:16
  40:20 42:6
  59:12 60:15
  63:2,7 116:20

138:11 143:10
143:14 144:6,8
145:6 152:10
152:24 153:17
159:8,24
180:16
opportunities
176:18
opportunity
18:13 41:12
148:22 158:2
159:16
opposed 42:3
48:8
opposite
142:13
option 37:13
39:20 40:7
41:11,13,24
42:7 77:12
85:7 86:8
options 77:24
86:10
oral 1:21
orchestrate
76:8
order 4:21
34:19 35:17
51:21 52:15
53:24 54:11
55:2,23 56:22
62:22 89:3
90:3,20 109:16
116:20 134:16
153:2 156:16

192:19
ordered 98:7
organization
64:4 70:11
71:9 92:8
105:11
organizations
64:8,13,19,24
65:13,17
organized
142:16
original 154:9
161:16
originally
80:16
orthopedic
144:25
outcome 56:9
67:19 159:22
196:9 200:13
outcomes 43:11
86:15 140:17
outlet 176:20
outlined 120:13
outpatient
120:6 151:14
outreach 18:19
18:21 99:17
outside 42:9,11
64:11,21
overall 79:14
108:24
overarching
99:2

overgird 107:4
overheated
73:8
overlap 63:24
overly 180:13
overreliance
66:12 67:3
oversee 75:25
78:18
overseeing
75:21
oversight 79:18
93:24 196:4
overuse 158:11
overview 65:25
owen 2:17 4:11
own 14:5,24,25
28:17 54:9,24
64:4,5 80:4
132:15 145:24
156:9 171:6

**p**

p.c. 1:4
p.m. 88:10,10
113:8,8 148:17
148:17 197:3,3
197:13,13
198:8
package 84:6
85:20 86:11
page 8:11,12
11:2,8,20 19:8
22:20 23:21
26:7 27:5
29:17 31:18,19

91:7,25 92:20
95:8 96:13,15
98:16,20 99:11
103:23 104:23
113:17,19
117:17 120:10
122:7 127:8,12
139:8,9,11
142:4 146:10
147:17,18,21
152:2 162:17
164:19 165:25
166:9 167:11
167:18,24
169:8 170:2
172:8 180:12
184:20,24
185:16,18
187:23 197:25
199:4,8 201:5
pages 25:2
104:23 185:11
paired 43:13
137:3
pairing 136:19
pandemic
118:22 119:15
120:2,5,9
141:23
paragraph
11:4,5,12,16,19
23:23,24 24:3
27:7 96:15
99:16 105:2
113:18 117:18

| | | | |
|---|---|---|---|
| 120:11 122:11 | particularly | 13:1 14:1 15:1 | 108:1 109:1 |
| 127:11 146:13 | 12:18,25 20:6 | 16:1 17:1 18:1 | 110:1 111:1 |
| 148:3 | 41:5,9 93:9 | 19:1 20:1 21:1 | 112:1 113:1,10 |
| paragraphs | 97:13,19 120:8 | 22:1 23:1 24:1 | 114:1 115:1 |
| 92:21 99:11 | 147:8,14 162:2 | 25:1 26:1 27:1 | 116:1 117:1 |
| parameters | 176:13 178:6 | 28:1 29:1 30:1 | 118:1 119:1 |
| 69:2 | 183:16 | 31:1 32:1 33:1 | 120:1 121:1 |
| parole 161:17 | parties 3:4 | 34:1 35:1 36:1 | 122:1 123:1 |
| part 13:23,25 | 200:11 | 37:1 38:1 39:1 | 124:1 125:1 |
| 33:12 35:24 | partnership | 40:1 41:1 42:1 | 126:1 127:1 |
| 40:11 47:9 | 83:8 176:25 | 43:1 44:1 45:1 | 128:1 129:1 |
| 48:12 56:6 | parts 40:9,13 | 46:1,4 47:1 | 130:1 131:1 |
| 64:4 67:16 | 84:10 188:20 | 48:1 49:1 50:1 | 132:1 133:1 |
| 76:20 90:8 | party 72:15 | 51:1 52:1 53:1 | 134:1 135:1 |
| 93:4 96:23 | past 73:18 | 54:1 55:1 56:1 | 136:1 137:1 |
| 102:24 103:4 | patient 66:12 | 57:1 58:1 59:1 | 138:1 139:1 |
| 104:16,17 | 81:6 142:15 | 60:1 61:1 62:1 | 140:1 141:1 |
| 108:23 110:15 | patients 82:24 | 63:1 64:1 65:1 | 142:1 143:1 |
| 114:10 116:9 | 191:25 | 66:1 67:1 68:1 | 144:1 145:1 |
| 119:20 128:4,6 | pattern 163:18 | 69:1 70:1 71:1 | 146:1 147:1 |
| 141:20 152:21 | patterns | 72:1 73:1 74:1 | 148:1 149:1 |
| 156:11 163:14 | 122:13,23 | 75:1 76:1 77:1 | 150:1 151:1 |
| 163:22 165:16 | pay 32:8,14 | 78:1 79:1 80:1 | 152:1 153:1 |
| 171:14 172:9 | 83:5 | 81:1 82:1 83:1 | 154:1 155:1 |
| 172:12,16 | payments | 84:1 85:1 86:1 | 156:1 157:1 |
| 179:19 180:21 | 32:13 | 87:1 88:1,12 | 158:1 159:1 |
| 182:17 | peak 118:21 | 89:1 90:1 91:1 | 160:1 161:1 |
| partial 27:6 | peer 10:22 | 91:4 92:1 93:1 | 162:1 163:1 |
| particular 9:19 | peers 44:15 | 94:1 95:1,6,21 | 164:1 165:1 |
| 14:15 29:4 | 56:15 | 96:1 97:1 98:1 | 166:1 167:1 |
| 37:11,23 40:9 | peet 1:21 2:1 | 99:1 100:1 | 168:1 169:1 |
| 47:2 66:14 | 3:1 4:1,3,9 5:1 | 101:1 102:1 | 170:1 171:1 |
| 91:21 93:11 | 5:6 6:1 7:1 8:1 | 103:1,21 104:1 | 172:1 173:1 |
| 120:20 125:6 | 8:2 9:1 10:1 | 104:2 105:1 | 174:1 175:1 |
| 163:2 | 11:1,7 12:1 | 106:1 107:1 | 176:1 177:1 |

178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1,5
198:1,19 199:1
199:4,9,16
200:1 201:1,5
201:25
pending  6:11
penetration
  186:11
people  8:19 9:6
  9:6,7,11,13,22
  10:16 12:17
  14:17 15:5,8
  15:21 16:17,18
  18:11,15 19:2
  19:18 20:7
  21:19,24 23:7
  24:21 25:7,16
  25:20,24 26:24
  28:5 29:15
  31:24 35:4,8
  35:25 36:5,9
  38:6,17 41:5
  43:7,9,12,21,25
  44:11,13,24
  47:5,11,15,16
  48:7,13,14,15

48:20,22 49:23
50:18 52:4,8,9
53:11,13 54:18
54:20,20 56:8
56:13 57:16,18
59:21 60:8,10
61:12,20 62:16
67:3 68:12,13
70:13 73:8,13
73:20,25 77:16
78:25 79:2
80:17,25 81:10
81:13,18 84:4
86:15,16,19
87:16 90:11,13
90:15 95:10
96:16 97:17
98:22 100:7,22
102:12,17,20
102:24,24
103:4,5,6,11,17
107:17 108:17
108:19 110:7,9
111:15 122:4
125:18,20
126:25 133:23
140:15,16
142:20 143:22
145:14 150:3
150:15,25
151:3,6 153:9
153:12 154:19
156:23 157:3,5
158:9,15
160:16 161:11

161:19 162:5
162:25 163:9
163:17,19,23
164:2 172:15
172:18 176:5
177:10,17,24
178:2,14 179:2
179:4 180:22
180:24 181:20
182:9 183:7
186:7,10,24
190:19 192:9
192:15,25
193:22 195:13
195:16 199:12
people's  103:16
  183:11
percent  21:22
  21:22 28:18
  29:10,13,14
  146:17 170:8
  170:13 171:7
  195:11,12
  196:12,12,16
percentage
  153:11
period  22:15
  44:13 123:2
  129:14
periods  23:14
  60:17
permanent
  10:20 32:3,6
  34:5 38:9,22
  39:5 42:12

44:3 45:14
46:6,21 48:2
49:14,25 50:12
51:11,21 52:15
53:24 54:12
55:3,23 56:5
56:22 62:22
88:17 89:3,21
90:4,21 134:17
153:3,19
157:16 181:11
186:8
person  22:14
  26:19,21 30:10
  34:21 35:19
  37:24 38:3,4
  38:11 42:14
  44:4 46:7
  51:23 52:17
  54:2,14 55:5
  55:25 56:24
  62:24 82:6,15
  83:16 88:18
  89:4,22 90:5,5
  90:22 112:14
  115:21 134:19
  153:4,20 173:9
  173:9 176:13
  176:15,20
  181:10 183:15
personally  8:6
  39:11
persons  14:12
  49:8 101:25
  110:17 134:23

146:18 192:6
perspective
  46:19 94:22
pharmacy
  163:10
phase  69:16
  183:16
phased  83:7
phasing  63:24
phenomenon
  151:5
phoenix  16:4
  16:21,22,24,24
  17:3 18:16
  19:4 65:23
  67:25 68:11,13
  68:24 69:10,14
phoenix's  69:4
phrase  10:7
physically
  37:25
pick  157:11
  185:14
picture  116:10
  124:19
pictures  24:24
pie  170:3
  171:14
piece  39:5 87:9
  112:6 115:15
  129:24 152:16
  152:20
place  1:22
  34:20 35:18
  41:23 50:17

57:20 75:23
97:23 100:22
131:9 133:19
151:18 154:14
164:9 174:7
178:3,7 182:9
189:2 190:9,20
192:11,22
placed  24:10
  26:5,11 61:12
  80:21 91:14
  186:7
placement  32:7
  34:6,8 36:20
  36:22 37:12
  38:10 42:12
  44:4 45:15
  46:6,22 48:3
  49:14 50:13
  51:22 52:16
  53:25 54:12
  55:3,24 56:23
  62:23 88:17
  89:4,21 90:4
  90:21 134:17
  153:3,20
  195:19
placements
  25:25 50:4,23
places  97:18
  151:12 156:15
  180:25
plaintiffs  1:6
  2:3,9 4:19,23
  7:18 11:13,24

12:9 105:13
117:20 118:14
128:8 198:3
plan  6:24,25,25
  12:20,21 21:21
  22:13 76:9
  107:2 112:16
  154:9,25
  155:15 156:9
  159:25 160:4
  192:22 196:15
planners  15:12
planning  29:2
  61:17 87:12
  97:15,22 100:6
  163:6 196:18
plans  7:13
  12:22 15:13
  22:11 49:23
  117:19,25
  122:16 127:13
  176:6
platform  87:16
  152:14
play  83:18
  109:24 173:5
played  178:18
playing  137:19
plays  195:19
please  5:25
  11:16 99:11
  182:24
plummet
  100:25

point  20:22
  21:4 28:17
  38:23,24 39:23
  47:19 50:10
  69:24 70:14,16
  71:2 92:22
  96:14 97:6
  98:19 102:2
  106:13 127:15
  145:9 146:6
  149:25 180:18
  181:14 192:13
  193:8 195:24
pointed  53:6
  174:12
pointing  93:21
points  52:6
  93:22 163:3
  185:15
police  16:23
  19:4 68:11,14
  69:4,6
policy  50:17
  76:15,18 79:15
  79:25 80:3
  89:17 103:24
  103:25 105:12
  107:24 142:19
  143:18 172:20
  175:8,11
  199:15,15
poor  173:10
popular  173:19
population
  8:16 12:10

19:11 20:15,18
20:20 21:22
22:24 23:6
24:21 25:3
27:4,12 28:5,9
28:22 29:12,13
31:24 33:13
34:3 35:24
36:4,13 38:19
47:2,7 48:14
53:13,17 57:25
58:13 59:14
66:14 81:7,17
90:13,15
102:12 105:16
108:5,8,24
109:17 110:20
111:3,8,11,24
112:3 113:25
114:2,13,19
115:4 117:23
118:4 120:6,16
135:4 145:14
147:15 148:6
152:8,13
153:13 155:10
155:13 160:14
160:16 173:23
176:4 178:21
187:7,10,15,19
194:12,15,18
195:2,4,12,16
populations
9:22 28:15
79:22 105:15

105:20 108:11
109:12,16
112:21 154:19
156:24 160:9
162:9 172:15
populous 84:11
portion 32:9,14
position 26:8
76:14 78:3
87:22 190:24
193:6
positions
193:24
positive 150:25
159:22
possible 5:24
15:6 49:6 72:8
164:9,11 197:8
possibly 159:7
posture 70:23
potential 16:11
potently 73:7
practical
139:19
practice 23:2
59:20 63:25
70:11,20,23
practices 7:4
13:8 55:12,21
56:4,20 57:22
69:3
practitioner
134:6
precious 145:8

predominant
133:14,15
prefer 86:9
preferences
26:4 178:25
prepare 6:13
7:15,19 67:6
71:3
prerogative
183:11
prescribe 82:20
prescription
163:11,16
present 2:20
pretty 74:20
147:10 196:24
prevailed 67:20
prevalence
20:17
prevent 34:25
164:5
previous 25:2
37:6 76:17
previously 38:2
75:23 158:18
primarily
110:24 115:7
120:5,7 154:17
primary 68:10
75:20 76:13
114:20 115:15
principles
106:24
prior 15:19,20
97:16 119:2

priorities 79:16
129:17 133:6
133:10,12
139:5
priority 28:15
28:15 29:8,11
29:16 47:8
133:3 134:15
195:6,14 196:7
prison 8:21,23
15:12 17:24
26:10 31:25
34:5,22 35:5
35:20 36:5,19
38:12,12,24
39:15,18 40:22
40:23 41:6
42:14,15 44:5
44:6,11,15,17
44:20 46:7,8
46:22 48:3
49:4,13 50:2
50:11,22 51:23
51:24 52:17,18
54:2,3,14,15
55:5,6 56:2,3
56:25 57:2
61:13,21 62:25
63:2 88:18,19
89:4,5,22,23
90:6,22,23
134:19,20
153:4,5,21,22
163:5 187:17

prisons   25:8,17
  28:16,21 44:25
  48:8 49:23
  52:5 53:12
  90:15 134:25
  153:10
private   9:12
  171:11 178:23
privatization
  173:19
privatized
  173:20
probability
  164:11 187:21
probably   78:15
  110:22 141:24
  182:10 194:5
probation
  161:18
problem   70:25
  89:16 130:25
  140:10,14,19
  143:20 147:10
  149:16 172:12
  182:5
problems   134:5
procedures
  12:19
proceeding
  75:4
process   22:2
  23:11 24:22
  27:21 30:8
  37:9 112:18
  116:6,13 124:8

138:24 139:4
  146:6 156:13
  161:19 172:25
  173:15 190:6
  192:17
processes
  160:10
professional
  1:23 12:15
  63:16,25 200:4
profile   166:4
  199:19
program   13:15
  20:16 21:18
  23:3 30:9 41:4
  41:4,6,9,24
  53:2 55:17
  64:20 79:22
  146:20 161:10
  161:23 162:16
  165:7 173:2
  176:3 181:6
  188:20 189:21
  190:12
programmatic
  64:13
programming
  41:2 70:22
  76:12 133:17
  147:13 151:14
  156:21 157:7
  157:10,14
  161:16 164:5
  179:22,23
  180:17

programs
  18:19 23:16
  57:14 81:2
  107:24 133:25
  134:9 150:20
  158:24 162:10
  164:7 174:3
  180:6,7,19,21
  182:19
progress   74:24
  193:4,7 194:10
  194:21
progression
  150:20
project   158:7
prolonging
  149:20
prominent
  77:11
promise   96:17
proportion
  156:8,10
protection
  100:20
protective   4:21
protein   113:6
provide   19:11
  20:14 26:15
  34:4 44:22
  45:9 49:25
  59:4,6 83:12
  84:18 85:18
  109:11 110:16
  111:10 113:25
  161:2 177:2

191:20
provided   58:15
  58:24 59:13
  69:9 77:7
  81:23 87:2
  123:12
provider   47:13
  64:12,18 70:15
  82:4,5,12 83:4
  175:19 176:2
  176:10,12
  178:17
providers   9:10
  9:12 16:15,23
  47:10 49:9
  72:11 83:9
  172:16 174:5
  177:2,5 178:24
providing   52:7
  87:15 98:3
  110:9
provision   75:5
provisos   30:24
psychiatric
  62:13 76:6
  79:6 92:24
  103:10 108:20
  148:25 154:18
  156:2 175:18
  183:25
psychiatrist
  41:12 82:19
  163:13
psychiatrists
  40:10 134:6

| | q | questions 5:24 | 140:6 147:3 |
|---|---|---|---|
| psychosocial 77:3 189:7 | qualify 54:19 | 11:13,24 12:3 | reactivated 163:8 |
| psychotic 163:18 | qualitatively 127:3 | 61:6 113:19 145:9 197:5 | read 12:11 19:13 23:22 |
| psychotropic 73:7 163:15 | quality 26:21 | quick 142:20 | 24:13 27:13 |
| ptsd 38:3 | quantity 24:12 26:13 | quite 81:11 | 95:13 99:10 104:13,14,16 |
| public 3:14 9:4 9:10,15 23:5 | quarter 164:17 | quote 171:7 | 114:4 118:5 |
| 59:23 110:2,3 | question 3:10 | quoted 121:6,8 | 122:18 127:18 |
| 110:19,23 | 5:19,21 6:4,5 | quotes 121:9 | 139:16 142:8 |
| 142:5 143:3 | 6:11 12:8,14 | r | 146:22 186:12 |
| 179:24 198:23 | 13:4 19:15,16 | | 188:12 |
| 200:4 | 19:17,20,23 | r 200:2 | readiness 181:3 |
| publications 28:14 57:22 | 22:3 35:12,13 | raised 140:20 | reading 91:20 |
| publicity 140:6 | 36:16 52:11 | randi 1:23 | 130:7 138:17 |
| published | 53:19,20 54:22 | 200:3,19 | reads 19:9 |
| 12:24 100:14 | 56:18 58:13,14 | rank 133:6 | ready 56:8 |
| puerto 168:10 | 62:20 91:11,21 | 168:5 | 91:11 104:11 |
| pursuant 4:21 | 105:3,4 113:22 | ranked 168:16 | 130:15 |
| pursue 154:24 | 114:7,20 | 169:2 | real 140:14 |
| push 141:21 | 119:20 126:10 | ranking 133:9 | reality 27:23 |
| 183:5 187:8 | 130:14 140:20 | ranks 168:8 | 139:19 180:23 |
| pushing 106:23 | 147:23 148:8 | rate 93:20 | reallocate 90:3 |
| put 7:2 23:17 | 150:9,10 | 186:11 | 90:20 134:16 |
| 41:23 97:23 | 152:18 153:24 | rather 14:14 | 155:11 156:24 |
| 133:19 148:23 | 185:21 186:4 | 22:9 40:12 | 159:20 |
| 159:13 182:6,9 | 188:2,7 191:23 | 41:23 51:5 | reallocated |
| 188:25 190:8 | 195:15 | 149:18 | 89:2 158:22 |
| 192:10 | questioned | reacclimation | 160:8 |
| putting 39:4 | 91:16 | 180:10 | reallocating |
| 60:10 190:2 | questioning | reach 58:8 | 90:7 111:21 |
| 193:5 | 61:7 91:17 | 66:23 116:20 | 158:6 |
| | 95:20 | reached 188:18 | reallocation |
| | questionnaires | react 73:7 | 111:5 146:8 |
| | 118:16 | reaction 93:6 | |
| | | 94:15 96:25 | |
| | | 99:7 136:10 | |

154:12,15,21
really  14:12
  20:22 22:8,17
  22:25 23:10
  37:10,21 56:5
  57:21 69:6
  70:23 74:23
  76:19 79:14
  85:5,7 87:9
  96:11 97:9
  103:13 107:3
  110:4 115:14
  118:10 119:8
  119:12 126:22
  137:3 141:8
  144:18 150:9
  150:11,12
  152:15 155:8
  157:2,15
  158:13 162:8
  164:14 165:13
  178:13,22
  181:9 182:9
  186:6 189:23
  190:12 191:23
  192:3 195:5,14
realm  57:21
rearrest  162:2
reason  38:4
  50:11 65:11
  94:17 107:25
  109:5 151:8
  169:5 201:5
reasonable
  38:4 176:9

reasons  162:23
  173:10 179:5
  181:2 183:8,14
rebalance
  174:4
recall  16:20
  17:4 117:13
recap  33:20
  130:2
receive  43:17
  103:3 158:15
received  5:3
  14:4 28:22
  29:13 102:11
receives  181:12
receiving  62:10
  163:16
recently  78:20
  113:2 154:20
recess  46:2
  88:10 113:8
  148:17 197:3
  197:13
recidivism  52:4
recipients  9:15
recognize
  103:19
recollect
  120:20
recollection
  39:22
recommend
  51:20 52:14
  53:23 55:22
  76:14 79:25

89:2 90:2,19
recommendat...
  99:3 175:8,12
recommendat...
  70:21 116:12
  152:6,11,14,17
  152:23
recommended
  54:10,16,25
reconcile
  193:23
record  4:19
  32:21 61:5
  91:13 95:18
  200:8
recover  87:17
red  169:17,24
  170:8
redirect  109:16
  197:8 198:4
reduce  112:13
reference
  134:22
references
  124:19,25
  128:6 134:4
referral  29:8
  57:20 176:10
referrals  28:16
  28:19,19 29:14
  172:25 195:9
  195:10,25
referred  165:14
  195:13 196:6

referring  11:17
  102:17
reflect  129:15
reflected  12:4
reform  104:2
  199:16
refusal  37:7,14
  122:12 130:7
refused  26:25
  122:21 123:7
  126:12 131:18
  131:18
refusing  37:11
  37:24 130:25
  138:11
regard  16:11
  31:7
regarding
  12:25 61:7
  68:12 142:5
regional  173:4
  173:15
regions  76:22
  93:23 188:3
registered  1:23
  200:3
regressive
  145:6
regular  59:20
rehabilitation
  77:3 189:8
rehabilitative
  10:23
rehospitalizat...
  162:24

reinstitutiona...
  35:3 161:25
reinstitutiona...
  21:2 43:22
  44:20 52:10
reinvolvement
  162:24
reject  172:10
  172:20 174:18
rejecting  173:9
related  61:6
  68:12 89:12
  95:20 125:7
  134:5 200:10
relationship
  79:20 137:12
  138:16 157:2
  178:15
relationships
  82:8 164:14
release  19:12
  19:12 34:5
  39:18 61:12
  114:2,3
released  34:21
  35:19 50:22
  108:19
relevant  8:16
  12:10 20:15
  22:23 27:12
  29:12 31:24
  33:13 34:3
  36:13 38:19
  41:18 47:2
  48:13 53:17

57:25 58:13,15
59:5,14,15
108:5 109:17
111:23 113:25
114:12,19
115:4 117:23
118:4,13
120:15 148:6
152:8,13 187:7
187:10,14
194:11
reliable  165:10
reliance  142:6
reliant  189:19
relied  121:24
  154:12 157:15
rely  20:17
  149:13 155:14
  165:16,19
relying  145:18
remain  20:24
remaining
  117:25 190:14
remedy  148:5
remember  7:6
  7:14 104:7,8,9
  105:23 117:9
  121:12 125:6
  128:10 133:8
  133:11 155:2
  184:2 185:3
  189:20 196:19
remind  164:2
reminders  5:9

remove  162:7
rensselaer  2:5
rent  32:9,13
reopen  141:22
repeat  11:16
repeated  25:6
  25:13 122:12
  130:10 131:8
repeatedly
  122:21 123:7
  126:11 131:18
rephrase  6:2
replaced  181:9
report  6:15,17
  8:3,7,10,13
  11:2 12:21
  14:11,12 16:7
  19:9 23:22
  28:18 41:15
  51:4 54:10,16
  54:25 58:11,23
  63:12 67:6
  71:4,20 84:16
  95:10 96:6,11
  98:14 100:14
  101:7 112:17
  113:13,18
  114:10 116:8
  117:12,18
  120:11 121:7,9
  122:8 126:15
  127:9 134:15
  139:8 146:11
  152:2,22
  156:17 158:20

159:2 162:18
165:2,9 166:5
170:18 172:9
180:11 183:24
184:13 199:13
reported  120:8
  120:21 128:2
  129:15 135:6
reporter  1:24
  5:14 199:25
  200:4
reporting
  155:19 168:9
  201:2
reports  7:2,5,6
  12:24 13:8
  18:14 20:4,8
  55:12,21 56:4
  56:20 57:8
  69:17 116:9
  121:2 146:5
  171:6
repository
  155:8
represent  4:13
representation
  106:9
represented
  57:9
representing
  7:17
represents
  148:21
request  6:10
  120:24 123:5

127:5 133:16
139:6 141:14
141:20
requested
119:9
requests
126:21 130:10
require 32:13
59:5 149:3
150:12 151:9
159:5
required 31:23
58:15 118:12
requirement
116:16 175:7
requirements
99:22 100:5
102:10 129:24
requires
151:21
research 43:8
161:8 167:18
researched
43:11
reserved 3:10
residences
180:2
residential
54:20 56:7
77:4,24 81:2
86:17 180:20
181:16 182:19
residents
120:14 182:23

resolution
71:17
resolve 105:9
resolved 73:18
resort 178:18
resource
109:22 110:5
111:7 145:10
196:5
resources
22:19 24:23
26:19 29:11
34:19 35:17
42:7 51:18,20
52:12,14 53:21
53:23 54:11
55:2,23 56:22
57:8 62:22
76:11 90:8,9
90:20 102:20
105:18 135:3
139:21 144:5
144:20,21
149:18 154:13
157:11 158:9
177:3 178:8
182:8 190:16
192:6,18,19,21
respect 153:24
respective 3:4
response 81:19
123:3 140:8
responsibilities
51:3 76:7,13

responsibility
24:8,19 25:10
27:11 30:19
60:8,12,14
61:24 73:20
75:20 78:25
79:19 110:15
111:9,13,16
139:3 194:17
196:4
responsible
39:23 78:22
rest 190:12
restate 5:25
58:19
restoration
151:14
restrictive
180:13
result 98:8
results 118:17
retained
199:25
revenues 166:3
167:13 168:2
199:18,20
reverse 158:12
reversed 170:5
revert 37:8
review 20:5
25:4 26:24
58:7 59:19
70:19 103:24
117:15,19,24
118:8,9,18

122:24 185:10
199:15
reviewed 5:4
6:15,15,23
7:15 12:15,19
12:21 55:22
56:21 115:20
116:20,23,24
117:2,4,10,14
118:11,20
119:7 120:17
121:23 123:11
124:15 125:15
127:24 128:3
134:14 137:11
reviewing 4:23
55:11
rico 168:10
right 21:11
23:21 27:16
31:15 38:25
40:24 43:18
45:10,16 46:17
47:22 53:7,8
53:17 58:25
63:13,22 64:8
70:4 76:22
84:19,22,25
85:4,9 92:9
104:16 107:9
108:5 114:18
115:2 117:12
118:22 132:11
133:4,7 137:16
137:22 139:25

[right - see]                                                                                       Page 45

141:10,13
143:8 154:5
160:4,22
166:23 169:21
169:24 180:14
185:17 189:25
193:18
rights  2:3 16:8
64:8,15,17,23
65:12 70:10
71:9 95:12,25
199:14
rise  51:7 89:16
rising  23:15
risk  37:17
43:10 44:17
47:12 60:11
70:16 72:13
172:15,17,19
177:7 178:21
195:4
risky  44:24
road  2:4
robust  73:11
role  63:24 65:8
70:18 76:16,19
138:24 173:3
178:17 181:24
195:18
roles  83:18
room  77:25
150:22 159:18
rooms  150:15
route  143:19

routinely  62:8
row  123:6
131:17
rpr  200:19
rule  174:18
175:2,7,15,16
182:25 183:2
rules  5:10 6:18
182:25 183:2
run  79:6
171:25
running  182:14
rural  40:13
84:10 191:8,9

s

s  13:12,12
199:7 201:5
s.d.  1:4
sabina  2:6
sad  93:7
safe  10:17
20:21 43:21
158:6
safes  164:4
safety  33:12,14
36:6 37:17,18
38:10,15 42:13
51:22 52:16
53:25 54:13
55:4,25 56:24
62:24 84:17
110:4,19,23
134:18 160:7
178:25 179:12
179:16,24
183:3,12

189:17 195:4
samhsa  7:4
13:9,12 55:19
sampling
116:24
sansolo  2:18
sat  194:6
satisfies  59:14
satisfy  79:17
saw  28:4,4
30:25 123:5
194:17,21
195:8 196:17
saying  22:7,8
26:14 27:18,21
36:5 37:24
49:24 50:16
51:10,12
111:20 112:23
126:15 127:3
128:18 135:2
137:14,18
143:6 175:6
187:20
says  8:16 24:7
27:7 28:12
63:21 64:6
92:21 96:15
98:20,21 105:4
117:19 120:12
122:12 127:12
139:12 146:14
148:3 162:19
167:18 168:8
168:19 171:5

172:23 175:19
188:2
scarcity  111:7
scheduled
190:15
schizophrenia
9:6
scope  13:23,25
80:5 123:14
132:7 152:21
screening
172:25
scrimping
110:21
sealing  3:5
seamless  83:2
seat  194:7
second  7:25
11:4 19:15,17
19:23 23:23
32:17 48:15
80:14,15 82:12
91:10 96:15
166:8 176:11
183:5
section  31:22
77:17 128:4
134:11 141:25
146:14 165:19
196:14
sections  11:4
sector  9:5,15
59:23 143:3
see  18:13 21:5
26:18 30:10

48:13 92:6
93:4,12 94:10
96:23 105:6
131:14 133:25
138:20 144:24
147:9 150:19
164:17 166:10
166:14 167:3
167:24 168:10
169:11,14,17
170:3,10
173:22 176:7
184:12 188:16
194:9,12,20,20
seeing 134:23
seem 126:22
seemed 25:5,9
115:19 120:23
127:4 133:20
140:18
seems 43:24
124:22 127:3
138:17 140:3
155:18 159:11
seen 41:4 86:14
86:18 92:2
95:15 167:15
172:15 186:18
segments 155:9
semantic 30:7
170:17
seminar 18:21
send 44:24
sending 192:25

sense 21:21
81:8 105:11
145:11
sent 118:17
sentence 19:9
24:6,16 27:7
120:12,16
122:12 127:17
142:3 148:2
162:19
separate 10:3
50:3 78:18
134:10,11
sequencing
157:25
serious 8:20,25
9:7,13 10:16
12:17 27:8
35:9,25 36:9
37:3 38:18
43:7 44:13
47:17 48:14,20
53:3,13 54:18
56:13 57:16
66:17 86:8
90:13 103:14
107:14 108:14
108:24 110:17
110:25 120:14
154:19 157:3
186:24
seriously
108:17 111:6
serve 10:16
12:10 21:14,21

22:13 24:22
47:14 48:6
49:10 113:24
145:13 149:23
155:13 160:13
served 9:4,9,12
9:14 20:19
21:8 22:6 42:2
111:12 162:9
173:25 176:5
service 12:22
21:20 23:10
34:25 36:8
47:25 48:18,19
72:14 82:18
83:2 87:10
90:10 94:2
95:2 98:7
103:3 119:12
120:21 127:15
144:17 151:21
175:18 182:17
185:23 186:10
188:11,16
193:16
services 7:13
10:9,13,18,21
10:22,23,23
13:13 15:14
16:15,17,23
20:14,20 21:3
21:10,24 22:15
22:23 24:11,20
25:8,14 26:9
26:12,15,22

28:2 29:20,25
30:10,18 31:3
31:11,14,23
33:3,13,15,17
33:22 34:3,12
34:20 35:4,7
35:18 36:2,6
36:23 38:11,16
38:16 39:4,16
39:21,22 40:23
41:8 42:13
43:5,5,13,18
49:7 51:23
52:8,17 53:4,8
53:9 54:2,13
55:4,25 56:7
56:15,24 57:18
57:25 58:9,12
58:14,24 59:4
59:13 62:24
69:9 72:11
73:20 74:22
75:5,11,25
76:3,21,24
77:3,3,5,7
78:10,25 79:2
81:23 82:13,16
83:7,8,12 84:2
84:6,8,17,24
85:19 86:12,23
87:3 89:20
93:10,24 94:25
97:16 98:24
99:6,21 100:7
100:25 102:10

| | | | |
|---|---|---|---|
| 103:15 108:17 | 191:6,11 | several 120:13 | shortages |
| 109:11 110:9 | 192:12 193:2 | 120:24 123:6 | 134:4 |
| 110:16,21 | 193:22 194:11 | 155:17 161:14 | shorthand 9:21 |
| 111:10 114:12 | 194:16 | severe 121:16 | 10:10 |
| 114:19 115:4,6 | serving 25:2 | severity 157:5 | shoulder |
| 117:19,25 | 26:18 35:7 | sexual 174:14 | 193:22 |
| 118:3 119:15 | 85:16 110:2 | 177:23 | show 7:21 95:6 |
| 119:22 120:2,6 | 146:16 195:15 | sexually 37:25 | 103:21 165:23 |
| 122:16 123:12 | set 82:15 | shake 5:15 | 167:9 184:17 |
| 123:18 124:4 | 105:19 106:17 | shared 71:10 | showed 195:9 |
| 124:17,24 | 129:12,23 | 161:17 | showing 25:20 |
| 127:2,13 134:8 | 156:17 158:19 | shea 2:22 | 134:23 169:10 |
| 134:18 135:2 | 159:2 179:21 | sheet 201:2 | shown 91:15 |
| 135:17,21,24 | 200:7,14 | shelf 23:17 | shows 25:15 |
| 136:21 137:4,8 | sets 79:18 | shelter 37:9 | 27:10 29:20 |
| 137:16,22 | setters 177:8 | shelters 17:23 | 30:18 117:21 |
| 138:6,12 | setting 23:24 | 17:24 18:6,12 | 118:2 122:16 |
| 139:14 140:15 | 37:24 38:2,5 | 25:17,21 28:7 | 169:13 171:17 |
| 141:7,7,13 | 73:24 74:25 | 28:12 45:2 | 171:18 |
| 142:24 143:8 | 157:15 174:13 | 59:22 60:16 | sicker 84:2 |
| 144:4,10 | 177:22 180:8,9 | 62:9 86:21 | side 39:5 60:23 |
| 145:12 152:7 | 181:22 187:17 | 134:24 153:9 | 115:6 139:22 |
| 152:12 153:25 | 195:14 | 153:14 182:10 | 142:25 144:20 |
| 155:12 157:12 | settings 28:7 | 194:25 | 149:23 |
| 157:17,21,22 | 29:15 37:6 | shift 92:23 | sides 14:23 |
| 158:4,5 160:7 | 44:25 153:10 | 137:16 | signature |
| 160:13,25 | 170:20,24 | shifted 173:24 | 200:18 |
| 161:2,21 | 179:7 180:13 | shifts 176:17 | signed 3:13,15 |
| 162:12,14 | 182:3 196:7 | shop 162:14 | significant |
| 168:22 171:4 | settled 100:23 | short 2:11 | 81:10 112:9,23 |
| 172:6,14 | settlement | 21:16 22:5,15 | 128:3,17 |
| 173:21 180:22 | 73:10 74:12,20 | 137:16 147:12 | 129:14 131:16 |
| 188:4,17,21,23 | 97:7 | 149:17 156:23 | 133:23 172:2 |
| 189:7,17,24 | seven 162:14 | 157:14 158:24 | 191:5 |
| 190:3,9,10,20 | | 189:3 | |

significantly
  66:25 146:20
  169:24 187:4
similar  51:4
  157:12 186:19
similarly  1:5
  5:20
simple  37:14
simply  130:18
single  77:25
  179:6 195:24
sister  87:25
site  17:24 82:22
  83:19 159:16
sites  20:6 28:15
  29:9,11
sitting  59:11
  121:11 128:9
situated  1:5
situation
  175:21 179:10
situations
  60:11 162:4
six  143:22
size  167:5
skill  180:9
skip  184:11
slate  142:5
slightly  62:19
slots  187:14
small  81:9
  177:23 179:16
smaller  193:10
smha  166:12
  167:12,22,25

168:13 170:8
  199:20
smi  9:16,24
  29:19 30:17
  31:2,10 34:4
  34:21 35:19
  36:19 38:11
  39:15 40:22
  42:14 44:5
  46:7 48:3
  49:13 50:12,22
  51:23 52:17
  54:2,14 55:5
  56:2,25 62:25
  88:18 89:4,22
  90:5,22 111:22
  112:5 134:19
  146:18 153:4
  153:21 177:11
  177:17,24
  187:17
social  119:15
  119:22
society  2:8
society's
  110:12
solution  140:10
  140:19 143:19
  147:9 151:5
  157:17
solve  70:25
  149:16
solved  144:18
somebody
  85:20 181:6

sorry  9:2 22:20
  31:21 58:21,22
  64:16 67:21
  72:23 88:3
  92:16 103:5
  109:9 125:8
  130:12 137:11
  196:10
sort  6:9,18 49:6
  52:3 57:17
  71:15 76:9
  77:12 82:17
  85:9 107:19
  110:2 126:23
  129:13 142:18
  143:13 162:7
  175:14 189:21
  193:14
sound  180:7
source  9:19
  22:21 25:12
  28:8 60:19,23
  114:20 115:15
  139:18 145:18
  165:10,13
  178:13
sources  13:6,16
  19:25 22:21
  23:18 89:2
  90:3 114:17
  115:5
southern  1:2
  103:4
space  82:22

speak  5:17 7:18
  13:19 175:4
speaking  94:22
  183:19,21
specific  10:18
  20:18 25:18
  35:12 53:10,20
  54:23 56:18
  90:14,17
  119:24 121:12
  127:5,6,24
  128:6 130:24
  133:12 141:2
  183:21 185:15
specifically
  19:18 114:23
  116:19 117:10
  127:20 128:10
  140:23 157:19
  163:17 196:15
specificity
  134:21
specifics  47:20
  61:20
spell  13:11
  72:25
spending  124:3
  124:16 143:25
  145:11 156:7,9
  166:25 171:7
spends  123:17
  123:23 170:19
spent  18:20,20
  107:15 155:12
  170:22 172:3

| | | | |
|---|---|---|---|
| spiking  120:8 | standards  58:2 | 62:12,21 64:7 | 171:20 172:13 |
| spoa  195:23 | 60:3 61:8 | 64:23 65:3,4,9 | 173:5,15,19 |
| spoas  195:22 | 97:23 | 72:10,22 73:22 | 176:2 178:8,17 |
| spoke  6:17 15:4 | start  12:7 | 74:23 76:6,10 | 178:19,24 |
| sporadic | 163:19 184:20 | 79:6 80:17 | 179:15 180:2 |
| 155:20 | 185:15 | 99:14 100:10 | 182:21 184:22 |
| spread  171:21 | started  4:17 | 102:25 103:4 | 185:24 186:15 |
| square  61:23 | 64:2 77:20 | 107:20 108:13 | 186:23 188:18 |
| sros  179:5 | 154:15 155:17 | 109:22 111:10 | 188:20,24 |
| stabilization | 155:21,25 | 111:12,13,15 | 189:11 190:7 |
| 18:18 | 188:17,21 | 112:3,19,24 | 190:11,13 |
| stabilize  87:17 | starting  156:12 | 114:18 115:3 | 191:20 192:2 |
| stable  10:17 | 182:17,18 | 116:10,17 | 193:9 194:24 |
| 20:21 43:12 | 185:20 187:25 | 123:11,16,22 | 196:15 199:17 |
| 52:7 85:20 | state  1:9,24 | 125:3,5,10 | 199:18 200:5 |
| staff  61:15,16 | 2:14 4:12 7:4 | 126:13 130:19 | state's  166:17 |
| 83:16 161:18 | 8:21,23 9:23 | 134:16 137:20 | 186:9 |
| 163:7 164:14 | 11:21 12:19 | 138:8,24 | statement |
| 175:19 178:9,9 | 13:14 15:12 | 140:24 141:19 | 25:10 105:23 |
| 178:12,12 | 16:16 17:11,17 | 142:12,14,17 | 122:20 139:18 |
| staffing  82:5 | 18:5 19:2 | 142:17 143:14 | statements |
| 161:17 176:6 | 21:14 22:4 | 144:9 145:7,19 | 24:25 |
| 176:16 | 24:3,17 25:17 | 146:19 148:21 | states  1:2 16:4 |
| stamped | 26:9,23 28:20 | 148:25 149:3 | 39:3 40:4 |
| 167:14 | 29:2 30:12 | 150:8 151:17 | 42:10,11 47:24 |
| stance  71:2 | 33:16,22 34:3 | 151:21 153:10 | 51:20 52:14 |
| stand  7:12 | 34:18,25 35:5 | 153:12 154:18 | 53:23 54:11 |
| 32:22 138:11 | 35:10,16 36:22 | 154:23 155:7,9 | 55:2,22 56:21 |
| 151:8 195:23 | 40:11,13 41:20 | 155:14,16 | 93:23 96:23 |
| standard  30:3 | 41:22 43:23 | 156:2,9 159:6 | 111:7 124:12 |
| 36:25 42:23 | 44:21 48:2,8 | 160:12,18 | 138:4 154:14 |
| 43:3,14,16 | 49:23 52:5,5,9 | 165:7,11,14,21 | 155:6 156:7,11 |
| 45:15 49:6 | 52:24 53:14 | 166:2,4 167:23 | 166:10,16 |
| 59:22 60:20,22 | 55:17,18 56:8 | 169:16 170:21 | 168:8 172:21 |
| | 57:14 60:12 | 170:22 171:17 | 174:17 184:21 |

184:25 185:6
statewide 97:24
  153:2 189:2,4
  191:2,7,11
station 92:15
  92:17
statute 116:17
statutes 58:7
statutory 9:24
  10:3,4,5
  116:15
stay 150:24
  174:3
stays 33:8
steadily 169:19
stefen 2:11
step 175:25
  176:11 180:7
stepwise
  192:14
stipulated 3:3,8
  3:12 76:2
stipulating
  29:8
stipulations 3:2
stock 81:5
  83:10 85:15
stop 130:18
  163:20 164:9
stopped 146:7
  162:25
stops 157:10
  163:6
straight 32:21

strategic 107:2
strategies 52:3
  182:7
strategy 52:9
  53:7 172:20
  173:18 174:4
  174:23 178:5
  182:4
street 2:10,16
strict 100:5
  102:10
strident 120:23
  121:3,13
strong 146:19
  194:5
strongly 56:6
structure 78:17
  94:4 181:18
structured
  99:24
struggling
  133:21 193:14
stuck 45:5
  140:18 180:25
studies 51:18
  52:12 53:21
subject 74:18
  182:24 183:2
submissions
  141:4
submit 139:5
submits 117:3
submitted 8:3
  121:22

submitting
  71:20
subpopulation
  48:22 53:11
subpopulations
  57:15
subscribed
  198:20
subsection
  122:11
subsections
  120:12
subsequent
  71:20
subset 35:5
  129:5
subsidiary
  165:6
substance
  13:12 75:10
  78:9,19 79:4
  134:9,11
  161:22
substitutions
  41:2
successfully
  186:7
suck 102:19
sufficient 24:12
  54:17 114:12
  114:18 115:3
  117:22 118:2
  185:23 186:2
sufficiently
  101:9

suit 72:19
suite 2:4
summarizing
  167:25
summer 2:21
  2:22
supplementary
  118:14,19
  129:19
supply 40:21
support 43:4,5
  52:8 76:3,11
  77:21 82:3
  84:2 85:21
  136:20 177:3
  181:12,23
supported 10:9
  12:25 28:14
  29:3 32:3,6
  34:6 38:9,22
  42:12 44:4
  45:12,14 46:6
  46:21 48:2
  49:14,25 50:12
  50:23 51:12,21
  52:15 53:24
  54:12,17 55:3
  55:24 56:5,23
  62:23 77:5,10
  77:11,20 81:3
  81:21,24 84:21
  85:7,11,24
  86:6,15 87:8
  87:15 88:17
  89:3,14,21

[supported - teams]                                                    Page 51

90:4,21 96:21
127:2 134:17
152:25 153:3
153:19,20
157:16 179:5
181:10 185:22
185:23 186:2,8
186:16,19,22
189:8,9,9,10,15
189:20,22,23
190:2 191:2,5
195:10,20
196:16
supporting
128:25
supportive
10:20 85:4
182:2
supports 82:16
96:18
supposed 163:7
sure 8:11 11:19
20:3 24:19
33:21 35:13
39:2 48:21
65:6 74:9 88:7
88:14 91:23
104:11 111:18
112:11 120:19
129:4 137:18
155:5 158:13
170:16 172:25
192:24 196:17
197:10

surprised
126:19
suspect 183:14
sworn 3:15 4:4
198:20 200:7
system 8:21,23
15:12 17:14
19:4 21:2
22:16 24:23
26:23 27:3
36:8 47:14
48:16,19 49:5
56:11,16 66:10
66:11,25 69:5
70:22 72:9
73:11,15,25
74:25 75:22
77:15,23 83:3
90:9 94:2
97:24 102:18
103:18 104:2
107:23,25
108:15 125:19
125:21 132:25
133:19 149:11
149:12 151:7
154:11 158:12
160:19 161:12
162:3,25
175:15 188:17
193:3 199:16
system's 81:19
136:18
systemic 22:9
25:5 51:5

122:17 158:12
systems 9:5,15
11:22 12:18
14:13,18 15:5
15:9,20,22
23:4,12 27:22
39:24 57:14
62:15 64:19
95:2 97:10
106:20 127:15

**t**

t 32:20,20
199:7 200:2,2
tableau 115:8
take 5:15 6:11
7:25 88:5 91:9
91:19 98:5
104:18 106:24
113:4 159:15
164:2,16 173:9
177:7 178:17
196:23
taken 112:19
160:11
takes 116:7
talk 58:11 70:7
121:21 128:5
193:15,20
talked 4:22
14:17 15:8
80:12 84:16
114:15 132:24
141:9 172:10
177:21 192:24
194:14

talking 28:25
34:23 57:13
60:20 69:8
101:17 102:11
106:2 107:2
108:4 114:23
114:25 119:22
121:2,13 125:2
141:2 177:23
190:3 194:16
talks 87:13
tandem 83:4
target 23:9,13
24:21 27:4
111:8 147:16
task 27:21
43:20
taxpayer
110:13
team 6:18
18:20 32:23
33:2 34:8,9
82:17,19 161:6
161:7 162:13
162:20 163:14
163:23 164:8
164:13 191:6
teams 10:21
13:2 32:17
39:15 40:8,21
41:19 42:3,4
84:4 146:15,25
147:15 161:2
163:13

[television - think]                                                      Page 52

| | | | |
|---|---|---|---|
| television 92:14 | 111:4 129:17 | 151:17 154:10 | 97:4,12 99:15 |
| 92:17 | 136:18 158:2 | 159:10 164:12 | 100:11 103:9 |
| tell 21:6 25:12 | 159:24 160:18 | 178:4 185:10 | 104:20 110:7 |
| 32:20 37:19 | 160:20 174:2 | 192:24 | 110:14 112:7 |
| 40:6 45:5 | 179:17,18 | things 5:10 | 112:10,16 |
| 47:21 48:10 | 188:10 190:18 | 7:10 15:7 23:9 | 114:15 115:16 |
| 55:15 72:23 | terrible 51:8 | 26:24 62:15 | 115:25 119:10 |
| 78:21,21 91:10 | testified 4:5 | 66:11 78:2 | 120:3,5 121:8 |
| 98:16 101:16 | 74:8,10,13 | 80:6,8 82:11 | 121:14,17 |
| 103:5 104:11 | 75:4 84:8 | 86:5 87:18,19 | 124:18 128:25 |
| 116:19 121:4 | 85:13 114:8 | 94:6 109:21 | 130:16 133:9 |
| 122:8 127:9,25 | 115:16 122:3 | 137:13 160:4 | 136:9,15,17 |
| 129:4,10 130:3 | 148:9 158:18 | 162:3 163:21 | 137:15 140:5 |
| 145:17 152:3 | 188:5 | 176:21 182:6 | 142:10 143:5 |
| 155:3 159:23 | testify 67:9,11 | 189:8 | 145:8 147:4,13 |
| 164:20 191:22 | 74:4,15 185:7 | think 7:5 10:25 | 147:15 148:22 |
| 196:10 | testimony | 13:18 15:3,10 | 148:24 149:23 |
| telling 29:23 | 39:13 67:13,17 | 17:11,13 21:18 | 151:2,4,4,17 |
| 31:3 | 74:19,23 | 22:3 24:25 | 154:10,22 |
| tells 103:16 | 185:12 189:13 | 27:20,20 28:10 | 157:4,13 158:2 |
| ten 45:23 182:7 | 189:14 199:2 | 30:7 32:8,15 | 159:21 160:5 |
| tends 44:17 | 200:6,9 | 34:23 35:11 | 160:10,17,21 |
| tenure 73:17 | thank 31:21 | 37:9,14,21 | 165:18 170:17 |
| 94:5 98:5 | 84:13 88:8 | 38:5 41:19,21 | 173:21 174:14 |
| term 8:15,18,19 | 113:11 148:15 | 42:5 43:20 | 175:24 176:23 |
| 8:25 9:16,20 | 197:5,11 | 46:4,11,25 | 178:5,14,16 |
| 10:12 147:9,12 | themes 105:12 | 47:5,7,9,13 | 179:3,11,14 |
| 149:16,17,24 | thereabouts | 48:13 53:5 | 181:8,20,24 |
| 156:23,25 | 187:3 | 57:7,12,19 | 182:4 183:9,18 |
| 157:14,17 | thing 91:20 | 60:11 71:11 | 184:18 189:12 |
| 158:24 189:3 | 95:13 100:12 | 78:15 85:6,13 | 190:23 194:8 |
| terminate | 104:13 105:4 | 86:22 87:7,8 | 194:21 195:21 |
| 177:5 | 117:15 128:23 | 87:10,17,19 | 195:25 196:17 |
| terms 8:10 | 130:10 131:10 | 88:12 92:17 | 196:21 |
| 18:25 85:8 | 137:2 150:25 | 93:18 94:6 | |

[thinking - transitory]                                                Page 53

thinking   86:11
    110:8
third   33:3
    113:22
thought   84:7
    100:18 104:25
    189:13
three   7:22
    12:22 76:5,6
    79:4,15,21,23
    89:2 92:21
    93:23 117:4
    122:24 128:2
    131:9,11,16
    133:9 174:15
threshold
    194:19
thrive   96:20
tied   126:24
    127:5 190:13
time   1:22 3:10
    5:18 6:8 18:20
    18:20 22:15
    23:14 31:16
    38:13 39:23
    42:15 44:6
    46:8 47:25
    50:21 51:25
    52:19 53:8
    54:4,15 55:6
    56:3 57:2 63:2
    73:14 76:5
    77:21 80:23
    85:12 86:7
    87:18 88:19

89:6,23 90:6
90:23 91:18,20
94:2 97:5
99:10 100:14
104:4,18
107:15 123:2
124:24 125:24
129:14 134:20
142:23 145:7
152:22 153:5
153:22 159:13
159:19 169:10
170:7 171:19
174:2 180:18
181:8,15,20
182:14 190:8
190:24 192:13
192:17,20
193:2,6,8
197:5,6 198:2
198:4,8
times   37:5 75:3
    148:3 192:3
timing   85:8
tiny   145:13
title   95:9
    103:24 166:2
    167:12
titled   91:8
    166:12
titles   115:21
titrated   181:13
tlrs   180:12
    181:24 182:12
    182:20,24

183:7,25
today   5:11 7:15
    27:19 29:23
    31:3 59:11
    86:25 108:4
    114:8 121:11
    128:9 185:3
    188:5 189:13
    197:6
today's   6:13
together   7:3
    102:21 184:18
told   93:9
    196:11,22
tone   18:11
took   49:8 104:3
top   7:16 27:6
    92:5 98:20
    104:24 117:18
    121:4 124:11
    135:7 146:13
    185:17
total   21:19
    158:19 168:13
    170:8 186:16
    186:19,22
tough   88:4
    105:20
toward   109:16
    111:23 112:3
    171:24
towards   47:6
    73:24 74:11
    106:23

town   81:9
track   62:15
traditional
    86:17 164:7
tragedies
    142:21
tragic   100:11
trained   161:18
training   176:13
trajectory
    172:5 189:22
transcript   4:17
    4:24 5:2,4
    13:10 184:23
    184:24 185:2
    185:12 199:23
    199:24 200:8
transfer   76:11
    192:5
transferred
    178:8 190:16
transformation
    6:25 76:9
    112:16 146:5,6
    154:9,25
    155:15 156:12
    159:25 160:3
    160:11 171:9
transition
    157:14 163:4
transitional
    77:15 147:12
    179:25 180:19
transitory
    157:7

| | | | |
|---|---|---|---|
| transportation 133:15 | try  24:23 45:8 49:6 106:19 130:2 174:4 176:25 | typically  9:4 32:12 51:6 61:15,20 77:18 82:6,12 83:18 140:11 160:11 174:7 | 69:2 78:17 84:15 85:22 94:14 175:14 194:7 195:5 |
| trap  149:14 | | | understanding |
| treat  173:23 | trying  38:6 | | 26:8 35:13 |
| treated  102:12 103:7,11 | 43:20 45:4,4 62:14 68:25 | **u** | 85:6,10 138:23 155:3 158:17 |
| treatment 12:16 32:23 33:2 60:7 | 84:15 85:22 105:16 107:16 | u.s.  16:3 95:11 95:24 199:13 | 168:20 171:23 176:23 180:4 |
| | 162:8 170:17 172:14 | uh  24:14 27:17 | 183:6 184:3 |
| 68:12,15,16 69:5 77:2 | turn  22:20 27:5 | 61:14 80:11 107:10 108:21 | 187:9 194:25 |
| 86:18 98:24 | 31:18 36:19 | 109:7 166:21 | understood  6:5 |
| 115:9 156:14 | 96:13 113:17 | 169:4 | 39:3 |
| 161:7 180:20 | 139:8 146:10 | umbrella  41:8 | unevenly |
| 181:16 182:19 | 152:2 166:8 | unanticipated | 189:10 |
| treatments | 187:23 | 178:11 | unexpected |
| 96:19 | turned  24:9 | unavailability | 179:8 |
| trend  145:2 | 26:10 | 22:19 | unfit  151:7 |
| trends  51:5 | turning  26:7 | under  28:20 | uniform  124:18 |
| trial  3:11 67:11 | two  15:23 23:9 | 34:2 41:8 | 129:12 |
| 151:8 184:22 | 55:15 64:11 | 59:15 93:9 | unique  26:16 |
| 185:2,7 199:23 | 65:21 68:9 | 99:16,18 | unit  82:10 |
| 199:24 | 72:22 74:2 | 106:11 116:17 | 178:13 192:20 |
| tried  30:7 | 76:17 77:19 | 171:3 177:6 | united  1:2 16:3 |
| 176:22 | 79:17,18 80:9 | 186:8 190:18 | 42:9,11 96:23 |
| tries  26:21 | 83:8 96:10 | underdevelop... | 166:10 184:21 |
| trouble  143:5 | 102:17 109:23 | 67:2 | 184:25 185:6 |
| 194:25 | 113:3 162:10 | underfunding | units  18:19 |
| troy  2:4 | 166:25 168:7 | 96:20 | 76:10 78:18 |
| true  142:10 | 184:18 193:23 | underserved | 80:24 81:21,24 |
| 163:17 200:8 | type  121:12 | 40:17 | 81:25 83:20,21 |
| trust  37:4 | types  33:17 | understand | 125:9,12 126:3 |
| 178:15 | typical  140:5 | 5:23 33:21 | 132:3,17 136:4 |
| trusting  164:14 | | 36:12 39:13 | 136:8,20,25 |

145:2 152:25
153:18 155:10
181:19 186:16
186:20,23
187:10,18
190:14 191:20
192:2,18
universally
124:23
unmet 112:12
127:14 131:11
136:16
unmoored
142:19
unnecessary
35:2 57:17
unstable 86:20
unusual 143:2
143:3
unusually
174:7 175:17
unwilling 70:15
72:12
update 74:24
upset 142:20
upward 172:5
urgency 101:3
use 7:8 8:10,15
9:18 12:13
20:11 22:22
23:6 43:19,20
68:10 77:16
79:4 86:15,16
112:21 114:17
120:17,20

121:17 147:14
155:14 172:21
185:16 193:20
used 6:16 8:20
8:22 10:9
16:17 40:11
84:10,12 121:3
155:6 160:6,12
165:19 174:23
174:23 179:6
180:9 192:8
193:16 194:4
users 17:14
uses 41:20
using 58:25
77:14 158:2
175:16 192:18
usually 9:21
57:22 82:3
176:6
utility 145:12
utilization 23:8
23:13

**v**

v 201:4
vacancies
134:6
vacancy 173:8
vague 173:10
vaguely 104:7
validated 18:14
value 17:13
94:24 110:18
181:8

variable 47:4
110:23
variables
109:23 110:5
126:24 174:11
variety 27:24
various 23:15
99:6 105:21
107:8 115:21
180:25
varying 24:24
vasquez 2:18
verbal 5:14
veritext 201:2
vermont 16:8
19:5 64:25
70:7,10,12,13
70:20 71:9
72:6,9
versus 7:9 16:3
16:4 86:16
117:21 184:22
184:25 185:6
victim 177:18
view 25:6 196:2
violate 30:2
violated 110:11
violation 36:24
60:12 63:3
violence 174:14
177:18,22
violent 177:11
177:19
virtually
142:13

visit 17:5,10,16
17:18 18:3,17
visited 18:5,18
18:19 182:20
visiting 17:22
visits 18:8,10
18:23 19:6
volume 103:24
184:23 185:2
199:15,23,24
voluminous
118:16
vouchers 77:14
77:16,18 90:11
vs 1:7
vulnerable
59:21 60:8,15
83:3 195:2

**w**

w.p. 1:4
wait 22:14
38:13 42:15
44:6 46:8
51:24 52:18
54:3,15 55:6
56:3 57:2 63:2
88:19 89:5,23
90:6,23 134:20
147:19 153:5
153:22
waiting 24:10
26:11,25
126:25 127:15
127:21 128:6
128:11,19,24

129:19,21
150:22 151:3
waitlist  130:23
waitlists  129:6
waived  3:7
want  8:9 11:3
  12:7 15:7
  17:17 20:11
  23:23 27:5
  29:17 35:12
  38:5 88:5,13
  91:19 96:13
  98:19 99:9
  104:22 120:10
  126:10 148:19
  150:4,9 155:22
  172:19,23
  185:10 190:22
  196:23
wanted  4:16
  171:9 188:16
  189:15 191:12
wanting  70:24
waste  144:21
way  44:14 50:7
  61:15 99:24
  100:12 112:10
  125:24 138:9
  148:23 160:2
  171:10 172:3
  176:8 178:16
  178:17,22
  193:4 200:12
ways  26:20
  44:10 99:5

100:20 101:2
145:4 148:4
159:12
we've  5:3 69:8
  84:16 86:14,18
  108:4 147:21
  154:17 167:20
  190:25
website  115:11
week  162:15
weeks  143:22
welcome
  113:10
welfare  110:3
went  26:18
  29:14 51:11,13
  61:21 71:8
  112:12 192:6
  195:13
wgme  92:9,11
whereof  200:14
widely  86:7
widespread
  22:18 124:21
williamson
  2:21
winding  100:13
wish  54:19
  105:8
witness  4:3
  11:9 14:8,21
  17:21 30:6
  32:12 35:23
  42:18 43:2
  44:9 45:19

46:11,25 49:17
50:16 51:2,16
52:22 54:7
55:9 57:5,12
58:5,19 59:9
59:18 61:3,7
62:5 63:6
65:16 84:23
86:4 87:6 88:8
88:22 89:9
91:2,15,16,19
93:18 94:21
96:3,9 97:4
99:10,13
101:14,24
106:8 109:20
118:25 119:18
124:7 126:8,19
128:14,22
131:5,22 132:6
132:13,21
135:13 136:14
138:15 139:2
143:17 144:14
145:23 151:12
156:20 174:11
174:21 175:11
175:24 177:14
193:19 194:3
200:6,9,14
201:5
wondering
  170:25
word  20:12
  43:19 120:18

120:20 147:21
wording
  120:22
words  104:24
work  13:24
  14:2,18 15:5,8
  15:12 38:6
  40:16,17 41:3
  41:3,13 43:24
  47:13 54:9,24
  60:6 63:18
  64:3 70:24
  82:14 83:4
  123:15 132:8
  134:4 136:22
  140:12 161:10
  163:22,24
  165:17 193:3,7
  194:10,21
worked  15:23
  46:16 47:21
  49:5 65:4,12
  65:19 71:21
  83:13
workers  18:21
working  64:2
  106:11
works  82:4
  162:20
world  143:3
  196:2
worried  100:22
  172:17 194:8
worries  194:9

worry  179:8
worse  94:6
wrinkle  193:12
writing  165:9
written  71:3
  176:8
wrong  51:8
  129:4 130:3
  159:24
wrote  122:4
  139:24 183:24

### x

x  1:3,11 131:15
  199:7

### y

yeah  5:22 21:9
  33:4 46:18
  47:23 59:2
  65:8,24 66:22
  76:23 78:13
  84:20 85:2
  88:4 92:7
  98:18 101:19
  103:8 104:20
  108:6 113:6
  114:25 127:10
  132:10,13
  141:11 146:12
  148:14 165:4
  165:13 170:6
  179:14
year  29:5 63:24
  67:22 68:3,5
  73:18 77:18

92:4 123:17,21
123:23 135:10
135:21 140:8
155:19 159:15
167:12 168:3
168:14 169:23
196:19 199:20
years  12:22
  23:2 28:11
  43:8 72:18
  86:13 94:8,11
  100:21 112:9
  116:22 117:4
  118:20 120:24
  122:24 123:6
  123:10 124:14
  125:14,21
  126:5 128:2
  131:9,11,16
  135:5 140:3
  141:3 144:24
  155:17 161:9
  173:18 182:7
  194:23
yielded  160:17
york  1:2,9,14
  1:24 2:3,5,10
  2:10,14,16,16
  4:12 8:20,23
  9:23 17:11,17
  17:23 33:16,24
  40:21 41:20
  42:2 50:8
  58:12 64:25
  76:8 78:16

84:18 85:25
108:14 112:3
112:24 114:13
114:18 115:3
116:17 123:11
123:17,23
124:10,15
125:10,13
126:5 127:25
136:17 140:8
140:18 141:8
141:22 142:12
142:22 143:20
144:17 146:16
146:19 150:8
151:15 152:7
152:12 153:2
155:16,25
156:7 166:22
167:12 170:9
173:22 180:2
182:21 183:22
186:23 193:20
199:20 200:5
201:2
york's  12:20
  124:2 135:10
  167:25 168:13
  169:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# Page 1 of 2 ERRATA SHEET

### M. Peet — Confidential

### ERRATA SHEET

### VERITEXT / NEW YORK REPORTING, LLC

Case Name: M.G., et al v. ANDREW CUOMO, et al

Date of Deposition: JUNE 13, 2023

Witness Name: MELODIE PEET

| PAGE/ LINE(S)/ | CHANGE/ | REASON |
|---|---|---|
| 10/15 | Replace "institutionalization", with "deinstitutionalization" | Incorrect Transcription |
| 18/21 | Replace "seminar" with "shelter" | Incorrect Transcription |
| 25/10-11 | Replace "statement of health authority" with "State Mental Health Authority" | Incorrect Transcription |
| 26/20 | Replace "added to" with "considered" | Incorrect Transcription |
| 27/2 | Insert "of" before "capacity" | Incorrect Transcription |
| 27/25 | Insert "you're" before "going" | Incorrect Transcription |
| 36/8 | Insert "in" before "each" and delete "and" | Incorrect Transcription |
| 37/5 | Delete "bad", insert "had" | Incorrect Transcription |
| 38/21 | Delete "the", insert "any" | Incorrect Transcription |
| 40/18-19 | Should read "from the ideal to the adequate" | Incorrect Transcription |
| 43/9 | Delete "an", insert "been" | Incorrect Transcription |
| 47/15 | Delete "enthusiastic", Insert "enthusiasm" | Incorrect Transcription |
| 66/12 | Should read, "over reliance on inpatient care" | Incorrect Transcription |
| 68/12 | Delete "related", insert "claim" | Incorrect Transcription |
| 97/13 | replace "deinstitution" with "deinstitutionalization" | Incorrect Transcription |

*M. P.*

**MELODIE PEET**

Case 7:19-cv-00639-CS-AEK    Document 305-1    Filed 09/08/23    Page 263 of 263

# Page 2 of 2 ERRATA SHEET

| PAGE/ LINE(S)/ | CHANGE/ | REASON |
|---|---|---|
| 100/17 | Where it says "inaudible", insert "advocacy" | Incorrect Transcription |
| 100/19 | Delete "then", insert "been" | Incorrect Transcription |
| 112/20 | Delete "weren't", insert "were" | Incorrect Transcription |
| 136/22-23 | replace "about" with "without" | Incorrect Transcription |
| 140/22 | Delete "in", insert, "or with" | Incorrect Transcription |
| 143/2 | Delete "and" | Incorrect Transcription |
| 150/12-17 | Should read "...while insurance now requires that Admissions are determined by clinical need, there is evidence that people are backing up in emergency rooms because of difficulties accessing inpatient care now" | Incorrect Transcription |
| 157/2 | Should read "Discontinuity in relationships is really a... | Incorrect Transcription |
| 158/5 | Delete "billed", insert "built" | Incorrect Transcription |
| 158/8 | Delete "institutionalization", replace with deinstitutionalization | Incorrect Transcription |
| 158/10 | Delete "the" at end of line | Incorrect Transcription |
| 158/16 | Delete "site", replace with "system" | Incorrect Transcription |
| 161/19 | Delete "stopped" replace with "stop" | Incorrect Transcription |
| 162/25 | Delete "community process" replace with "practice areas" | Incorrect Transcription |
| 163/17-18 | Replace "people with specifically" with " specifically for people with" | Incorrect Transcription |
| 194/24 | Delete "hospitals", replace with "prisons" | Incorrect Transcription |

*M. P.*

**MELODIE PEET**

Veritext Legal Solutions

212-267-6868                                          516-608-2400