# EXHIBIT 98

## CONFIDENTIAL – FILED WITH REDACTIONS

CONFIDENTIAL

Page 1

1

2          UNITED STATES DISTRICT COURT

           SOUTHERN DISTRICT OF NEW YORK

3          -----------------------------X

           M.G., et al.,

4

                          Plaintiffs,

5

              -against-              Case No.:

6                                    7:19-cv-00639(CS)(LMS)

7          ANDREW CUOMO, in his official

           capacity as the Governor of the

8          State of New York, et al.,

9                          Defendants.

           -----------------------------X

10

11                         DATE: June 16, 2023

12                         TIME: 9:31 a.m.

13

14          * * * C O N F I D E N T I A L * * *

15

16            DEPOSITION of the ROBERT M. FACTOR,

17          taken by the Defendants pursuant to Notice

18          and the Federal Rules of Civil Procedure,

19          held at the offices of Paul Weiss Rifkind

20          Wharton & Garrison LLP, 1285 Avenue of the

21          Americas,  before Marianne Witkowski-Smith,

22          a Shorthand Reporter and Notary Public of

23          the State of New York.

24

25

CONFIDENTIAL

Page 2

```
 1
 2          A P P E A R A N C E S:
 3
            PAUL WEISS RIFKIND WHARTON & GARRISON LLP
 4          Attorneys for the Plaintiffs
                 1285 Avenue of the Americas
 5               New York, New York 10019
                 BY: MARINA MASTERSON, ESQ.
 6                    CRYSTAL L. PARKER, ESQ.
 7
            LEGAL AID SOCIETY
 8          Attorneys for the Plaintiffs
                 199 Water Street
 9               New York, New York 10038
                 BY: ELENA LANDRISCINA, ESQ.
10                    STEFEN R. SHORT, ESQ.
11
            NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
12          Attorneys for the Defendants
                 28 Liberty Street
13               New York, New York 10005
                 BY: OWEN CONROY, ESQ.
14                    CAROLINE P. WALLITT, ESQ.
15
16
            ALSO PRESENT:
17               MAEVE O'BRIEN, Paul Weiss
                 MARISSA SHEA, Legal Aid Society
18               IGNACIA VASQUEZ, Attorney General's Office
19
                      *     *     *     *
20
21
22
23
24
25
```

CONFIDENTIAL

Page 3

1

2          F E D E R A L   S T I P U L A T I O N S

3

4              IT IS HEREBY STIPULATED AND AGREED

5          by and between the counsel for the respective

6          parties herein that the sealing, filing and

7          certification of the within deposition be

8          waived; that the original of the deposition

9          may be signed and sworn to by the witness

10         before anyone authorized to administer an

11         oath, with the same effect as if signed before

12         a Judge of the Court; that an unsigned copy of

13         the deposition may be used with the same force

14         and effect as if signed by the witness thirty

15         days after service of the original & 1 copy of

16         same upon counsel for the witness.

17

18             IT IS FURTHER STIPULATED AND AGREED

19         that all objections, except as to form, are

20         reserved to the time of trial.

21

22                   *     *     *     *

23

24

25

CONFIDENTIAL

Page 4

```
 1              CONFIDENTIAL - R. FACTOR
 2         R O B E R T   M.   F A C T O R, the
 3         witness herein, was thereupon duly sworn
 4         by the Notary Public and was examined
 5         and testified as follows:
 6         EXAMINATION
 7         BY MR. CONROY:
 8              Q.   Good morning, Dr. Factor.
 9              A.   Good morning.
10              Q.   My name is Owen Conroy.  I'm an
11         Assistant Attorney General at the New York
12         State Office of the Attorney General, and
13         we represent the Defendants in this matter.
14                  THE WITNESS:  Okay.
15                  MR. CONROY:  Counsel, would you
16              like to put on the record about the
17              confidentiality of the transcripts?
18                  MS. MASTERSON:  Yes, thank you.
19                  The parties have agreed to
20              designate the entire transcript as
21              "Confidential" under the protective
22              order.
23         BY MR. CONROY:
24              Q.   Doctor, you've been deposed
25         before, correct?
```

CONFIDENTIAL

```
                                              Page 5

  1                 CONFIDENTIAL - R. FACTOR

  2              A.    I have.

  3              Q.    Okay.  So let me just give you a

  4         few reminders of some ground rules to make

  5         things go easier today, okay?

  6              A.    Okay.

  7              Q.    I need you to give all of your

  8         answers verbally, because the court

  9         reporter here can't take down a head-shake

 10         or a head-nod, okay?

 11              A.    Okay.

 12              Q.    And only one of us can speak at a

 13         time in order to have a clear record of --

 14         from the transcript, so I will do my best

 15         to let you finish your answers before I ask

 16         my next question.  Likewise, I would ask

 17         that you let me finish my question before

 18         you begin your answer, okay?

 19              A.    Okay.

 20              Q.    If you do not understand any of

 21         my questions - it's very possible that will

 22         happen - please, just let me know.  I'm be

 23         happy to restate it, okay?

 24              A.    Okay.

 25              Q.    If you do answer my question, I'm
```

CONFIDENTIAL

```
                                        Page 6

  1                 CONFIDENTIAL - R. FACTOR

  2          going to assume that you understood the

  3          question, okay?

  4                  A.    Okay.

  5                  Q.    If you need a break at any time,

  6          just let me know and we'll sort it out.  My

  7          only request is that if there's a pending

  8          question on the table, you answer that

  9          question before we take a break.

 10                  A.    Okay.

 11                  Q.    Okay.  What did you do to prepare

 12          for this deposition?

 13                  A.    I reviewed my report and I met

 14          with Plaintiffs' counsel.

 15                  Q.    Other than your report, did you

 16          review anything else?

 17                  A.    I reviewed some of the documents

 18          that I cited in the report.

 19                  Q.    Which documents did you review?

 20                  A.    Some of the medical records,

 21          portions of some of the articles that I

 22          cited, I...

 23                  Q.    Did you select particular medical

 24          records to review before the deposition?

 25                          MS. MASTERSON:  I will ask the
```

CONFIDENTIAL

Page 7

```
 1              CONFIDENTIAL - R. FACTOR
 2         witness not to disclose any -- the
 3         substance of any conversations you had
 4         with counsel.
 5         A.   I reviewed the records of the
 6    three Named Plaintiffs that I discussed in
 7    my report.
 8         Q.   Other than counsel, did you speak
 9    to anyone else to prepare for the
10    deposition?
11         A.   No.
12              MR. CONROY:  Let me show you what
13         has been be marked as Exhibit 1.
14              (Whereupon, Factor Exhibit 1,
15         Declaration/Expert Report of Robert
16         M. Factor, MD, PhD, having been
17         premarked, was identified as of this
18         date.)
19         Q.   Doctor is this the declaration
20    and report that you submitted in this case?
21         A.   It is.
22         Q.   Did you personally draft all of
23    the contents of this report?
24         A.   I did.
25         Q.   And you were retained by the
```

CONFIDENTIAL

Page 8

1              CONFIDENTIAL - R. FACTOR

2          Plaintiffs to provide an expert opinion in

3          this matter, correct?

4              A.    Correct.

5              Q.    I'm going to ask you to flip to

6          page 1 of the report.  Tell me when you're

7          ready.

8              A.    I'm ready.

9              Q.    In the top half of the page,

10         paragraph 1, does this paragraph contain an

11         accurate list of the questions that the

12         Plaintiffs asked you to opine about?

13             A.    Yes.

14             Q.    Are there any other questions you

15         were asked to opine about that are not

16         reflected here?

17             A.    No.

18             Q.    Let's focus, first, on subsection

19         A.  What methodology did use to answer the

20         subsection A questions?

21             A.    I reviewed the literature on

22         community-based housing and supportive

23         services for people with serious mental

24         illness, from my own knowledge of the

25         literature, as well as doing a search of

CONFIDENTIAL

Page 9

```
 1                  CONFIDENTIAL - R. FACTOR
 2          the literature.
 3                  Q.    Is there anything else you needed
 4          to answer the part A questions?
 5                  A.    No.
 6                  Q.    Did you speak to anyone as part
 7          of your work to answer the part A
 8          questions?
 9                  A.    No.
10                  Q.    Did you visit any facilities as
11          part of your work to answer the part A
12          questions?
13                  A.    No.
14                  Q.    And, let me ask, the first
15          question in part A, you used the phrase
16          "community-based mental health housing and
17          supportive services," and you use the
18          shorthand CBMHHSS for that.
19                        Do you see that?
20                  A.    Yes.
21                  Q.    How are you defining what's
22          included in that phrase, as you use it?
23                  A.    The community-based -- the
24          community-based treatment services and
25          housing options available to people with
```

CONFIDENTIAL

```
                                                    Page 10
 1                  CONFIDENTIAL - R. FACTOR
 2          serious mental illness.
 3                  Q.   Is there any source for how
 4          you're defining CBMHHSS?
 5                  A.   I'm not sure exactly what you
 6          mean by a source.
 7                  Q.   Is that term defined anywhere in
 8          the literature?
 9                  A.   There are -- there's quite a
10          significant literature in community
11          psychiatry describing the various
12          modalities of treatment.
13                  Q.   And is that something that you
14          relied upon --
15                  A.   Yes.
16                  Q.   -- to define CBMHHSS, as used in
17          your report?
18                  A.   Yes.
19                  Q.   Okay.  Let's move on to the part
20          B questions.
21                       What methodology did you use to
22          answer these questions?
23                  A.   I reviewed the medical records of
24          the three Named Plaintiffs and applied the
25          concepts, principles, findings from -- that
```

CONFIDENTIAL

Page 11

```
 1              CONFIDENTIAL - R. FACTOR
 2         I described in paragraph A.
 3              Q.   Did do you anything else to
 4         answer the part B questions?
 5              A.   No.
 6              Q.   Other than the medical records of
 7         the three Discharge Class Named Plaintiffs,
 8         did you consult any other sources?
 9              A.   No.
10              Q.   Did you speak to anyone to answer
11         the part B questions?
12              A.   No.
13              Q.   Did you speak to the three Named
14         Plaintiffs?
15              A.   Yes.
16              Q.   And what was the purpose of
17         speaking to the three Named Plaintiffs?
18              A.   I should also add that I -- in
19         addition to the medical record, I read
20         their depositions.
21                   The purpose of speaking to the
22         three Named Plaintiffs was to -- as is
23         typical when I render opinions about
24         patients or clients, to get to know them,
25         to confirm findings and observations that I
```

CONFIDENTIAL

Page 12

1                   CONFIDENTIAL - R. FACTOR

2            obtained from the medical record or the --

3            or their depositions and corroborate or

4            clarify issues.

5                   Q.   Other than the three Named

6            Plaintiffs, did you speak to anyone else to

7            answer the part B questions?

8                   A.   No.

9                   Q.   Did you review the pleadings in

10           this case?

11                  A.   Clarify for me what --

12                  Q.   Sure.

13                  A.   -- the pleadings are.

14                  Q.   I think in your report you said

15           you reviewed the Second Amended Complaint;

16           is that right?

17                  A.   Yes, that's right.

18                  Q.   Why did you review the Second

19           Amended Complaint?

20                  A.   To learn more about the case and

21           some of the issues involved in the case.

22                  Q.   Is there anything else that you

23           consulted in answering the part B

24           questions?

25                  A.   No.

CONFIDENTIAL

                                              Page 13

 1              CONFIDENTIAL - R. FACTOR

 2         Q.   Did you visit any facilities?

 3         A.   I visited the Elmira prison in

 4    order to interview Plaintiff S.D.

 5         Q.   Did you visit any other

 6    facilities?

 7         A.   No.

 8         Q.   Is there anything at all that you

 9    haven't testified about already about the

10    methodology you used to answer the part B

11    questions?

12         A.   I guess I would only add that

13    my -- as I stated in my report, that I also

14    used my own clinical experiences in

15    addition to reliance on the literature.

16         Q.   I want to focus your attention to

17    the second question in subsection B, and

18    this is the one that says "If so, what type

19    of CBMHHSS did OMH provide these

20    individuals?"

21              Do you see that?

22         A.   Yes.

23         Q.   Was your report intended to

24    provide the Court with an objective

25    assessment of the housing and services that

CONFIDENTIAL

Page 14

1                 CONFIDENTIAL - R. FACTOR

2          the three Named Plaintiffs were actually

3          provided?

4                A.   I'd ask you to repeat the

5          question, please.

6                Q.   Sure.

7                     Was your report intended to

8          provide the Court with an objective

9          assessment of the housing and services that

10         the three Named Plaintiffs were actually

11         provided?

12               A.   I'm not sure how to answer that.

13                    I -- I reviewed what was offered

14         to the Plaintiffs, as described in their

15         medical records, so I'm not exactly sure

16         what you mean by an objective assessment

17         of...

18               Q.   Was your report intended to offer

19         any assessment of the housing and services

20         that the three Named Plaintiffs were

21         actually provided?

22               A.   I believe that I did that in my

23         report.

24               Q.   So where in your report do you

25         explain what housing and services the three

CONFIDENTIAL

Page 15

                    CONFIDENTIAL - R. FACTOR

1

2       Named Plaintiffs were actually provided?

3              A.    For example, I noted that the

4       Plaintiffs were housed in the homeless

5       shelter system, and discussed that also

6       with them, in my interviews with them, and

7       that was also covered in the depositions.

8              Q.    Other than mentioning that they

9       were housed in the homeless shelter system,

10      where else in your report do you explain

11      what housing and services the three Named

12      Plaintiffs were actually provided?

13             A.    I talk about how one of them

14      lived with his grandmother for a time.

15             Q.    Anything else?

16             A.    There may be.  I'd have to --

17      it's all contained in my report.  I'd have

18      to...

19             Q.    Well, is there a section of your

20      report that provides a list of the housing

21      and services that each Named Plaintiff was

22      actually provided?

23             A.    The section in which I discuss

24      the Plaintiffs discusses some of the

25      housing options.

Page 16

CONFIDENTIAL - R. FACTOR

1

2          Q.   Does it discuss all of the

3     housing and services that each Named

4     Plaintiff was actually provided?

5          A.   It discusses all of the housing

6     and services that I was able to glean from

7     the records.

8          Q.   It does.

9               If you gleaned from the records

10    that a service or a housing placement was

11    offered or provided to the three Named

12    Plaintiffs, you put it down in your report?

13         A.   I can't state that I listed every

14    single one.  I believe that I described, in

15    my report, an accurate view of what -- the

16    housing and services that they were offered

17    and provided.

18         Q.   It's accurate but it might not be

19    comprehensive; is that right?

20         A.   I don't know what you mean by

21    comprehensive.

22         Q.   What does the word

23    "comprehensive" mean to you?

24         A.   Well, if you're -- if you're

25    asking is it possible that one offer of --

CONFIDENTIAL

```
                                        Page 17

  1                CONFIDENTIAL - R. FACTOR

  2           or one housing option was offered and not

  3           specifically mentioned in my report, that

  4           may be possible; I don't know.

  5                     But I do believe that I

  6           accurately summarized, as one would in a

  7           medical discharge summary, for example, the

  8           relevant offerings of housing and services.

  9                Q.   Let me direct your attention to

 10           page 18 of your report, and I want to point

 11           your attention to paragraph number 70.

 12           Tell me when you're with me.

 13                A.   I'm with you.

 14                Q.   So this is the part where your

 15           report transitions from the part A

 16           questions to the part B questions, correct?

 17                A.   Correct.

 18                Q.   And in the middle of paragraph 70

 19           it says (as read):

 20                     I conclude that all three

 21                Discharge Class Named Plaintiffs

 22                were found to be eligible for

 23                CBMHHSS but did not receive such

 24                housing and/or services.

 25                     Did I read that correctly?
```

CONFIDENTIAL

Page 18

1                CONFIDENTIAL - R. FACTOR

2          A.    You did.

3          Q.    Is it your understanding that

4     W.P., D.H. and S.D. did not receive housing

5     and services in the community?

6          A.    I think that's taking that

7     question out of context of my report,

8     because in the report I describe elements

9     of housing and services that have been

10    shown to be important to allow people to

11    live stable lives in the community.  And it

12    was my opinion, as stated in this report,

13    my conclusion, that they did not receive

14    such housing or services to meet those

15    specific needs for stability.

16         Q.    Well, this is where I'm getting a

17    little confused.  Did you mean to say that

18    they did not receive housing or services,

19    period, or did you mean to say they did not

20    receive particular types of housing and

21    services that you believe are important?

22         A.    Really neither one of those.  I

23    meant to say that they did not receive

24    housing or services sufficient to help them

25    maintain stable lives in the community.

CONFIDENTIAL

Page 19

1              CONFIDENTIAL - R. FACTOR

2          Q.    So are you saying you agree that

3     they did receive housing or services to

4     some extent, just not the particular ones

5     that you believe are sufficient to enable

6     them to lead stable lives in the community?

7          A.    I'm clearly not saying that they

8     received no services.  What I am saying is

9     that they did not receive services that

10    were necessary and sufficient to help them

11    maintain stable lives in the community and

12    to lower their risk of being

13    reinstitutionalized.

14         Q.    Okay.  So you're not saying that

15    they received no services?

16         A.    I don't think there's anything in

17    my report that implies that.

18         Q.    Well, Doctor, the sentence I just

19    read, you wrote (as read):

20                   They were found to be

21              eligible for CBMHHSS but did not

22              receive such housing and/or

23              services.

24              Do you see that?

25         A.    I do.

CONFIDENTIAL

Page 20

CONFIDENTIAL - R. FACTOR

1

2          Q.   Do you think that's an accurate

3     way to describe the situation for these

4     three individuals?

5          A.   I think you're taking that one

6     sentence out of the context of a

7     twenty-six-page report, and I clearly

8     describe what they -- some of the services

9     that they received.  So, in the context of

10    my report, I think it's a -- it's an

11    accurate statement.

12         Q.   It's accurate to say that they

13    were found eligible for CBMHHSS but did not

14    receive such housing and/or services?

15              MS. MASTERSON:  Object to form.

16         Q.   You think that's accurate?

17         A.   They did not receive the housing

18    and/or services that are necessary to

19    reduce the risk of reinstitutionalization

20    and increase the likelihood of being able

21    to live stable lives in the community,

22    which is what I believe such services are

23    intended to realize for these three

24    individuals.

25         Q.   Okay.  So the accurate version of

CONFIDENTIAL

Page 21

```
 1                CONFIDENTIAL - R. FACTOR
 2        what you're trying to say is that the three
 3        Discharge Class Named Plaintiffs were found
 4        to be eligible for CBMHHSS.  They did
 5        receive some CBMHHSS but not 100 percent of
 6        the CBMHHSS that you believe is necessary
 7        to reduce the risk of institutionalization.
 8                   Is that a more accurate version
 9        of what you're trying to say?
10                   MS. MASTERSON:  Objection, form.
11            A.    That is not a more accurate
12        version.  I, nor any clinician, would say
13        that someone needs to receive 100 percent,
14        whatever that might be.  What I am saying
15        is that what they received was far from
16        adequate.
17            Q.    Okay.  So let me try again.
18                   The more accurate way to say
19        your -- this sentence is that the three
20        Discharge Class Named Plaintiffs were found
21        to be eligible for CBMHHSS.  They did
22        receive some CBMHHSS but not all of the
23        CBMHHSS that you believe would be needed
24        for those services to be adequate?
25                   MS. MASTERSON:  Objection, form.
```

Page 22

1                CONFIDENTIAL - R. FACTOR

2          A.   I don't agree with that either.

3     Again, I would state it in a positive way.

4     This is -- as I said, this one sentence is

5     in the context of a twenty-six-page report.

6               What they did receive was far

7     from adequate to support them and to lower

8     their risk of reinstitutionalization and to

9     increase their likelihood of being able to

10    live stable lives in the community.  That's

11    the longer version of that sentence.

12         Q.   Okay.  But you agree that it's

13    not correct that they did not receive

14    housing or services?

15         A.   It's not correct to say they

16    received no housing and no services.  It is

17    correct to say, as I say in my report, that

18    when they were discharged to a -- when

19    someone is discharged to a homeless

20    shelter, that's not adequate housing and

21    services.

22         Q.   Let's -- I want to try to pin

23    down the answer to the question of what

24    type of CBMHHSS was actually provided to

25    these individuals, and let's break it down

CONFIDENTIAL

Page 23

1              CONFIDENTIAL - R. FACTOR

2         into parts.

3                   Let's start with W.P.  What

4         housing was provided or offered to W.P.?

5              A.   The housing that was provided to

6         W.P. was shelter in the homeless shelter

7         system.

8              Q.   Was any other housing provided or

9         offered to W.P.?

10             A.   He was offered a shared

11        apartment.

12             Q.   Any other housing provided or

13        offered to W.P.?

14             A.   He was housed in various

15        residences as part of the homeless shelter

16        system.

17             Q.   What do you mean by residences?

18             A.   Different buildings.

19             Q.   What kind of buildings?

20             A.   A congregate living situation, a

21        former hotel where he had a room.

22             Q.   Any other housing provided or

23        offered to W.P.?

24             A.   My understanding is he was in the

25        shelter system.  All of the options were

CONFIDENTIAL

Page 24

1                    CONFIDENTIAL - R. FACTOR

2            through that.

3                 Q.   So you're not aware of any other

4            housing that was provided or offered?

5                 A.   I'm not aware of any other

6            housing that was provided, no.

7                 Q.   Okay.  What community mental

8            health services were provided to W.P.?

9                 A.   He had the services of a FACT

10           team, F-A-C-T, all caps.

11                Q.   Any other community mental health

12           services to W.P.?

13                A.   I'm not recalling others right at

14           this moment.

15                Q.   Let's move on to D.H.  What

16           housing has been provided or offered to

17           D.H.?

18                A.   He was offered housing in the

19           Bridges program --

20                Q.   What's that?

21                A.   -- and provided -- and that was

22           provided to him.

23                Q.   What is the Bridges program?

24                A.   It's a parole housing program

25           that resembles a halfway house.

CONFIDENTIAL

Page 25

1                 CONFIDENTIAL - R. FACTOR

2          Q.   Has any other housing been

3     provided or offered to D.H.?

4          A.   I'm not recalling any at this

5     time.

6          Q.   What community mental health

7     services have been provided or offered to

8     D.H.?

9          A.   He was offered mental health

10     clinic appointments.

11          Q.   Any other community services

12     offered or provided to D.H.?

13          A.   He was told that if he was in

14     need of emergency mental health after

15     release, he had been given the crisis

16     hotline phone number that he could call or

17     was instructed to walk into any hospital

18     emergency room.

19          Q.   Any other community mental health

20     services offered or provided to D.H.?

21          A.   I'm not aware of any at this

22     time.

23          Q.   Let's move on to S.D.  What

24     housing has been provided or offered to

25     S.D.?

CONFIDENTIAL

Page 26

CONFIDENTIAL - R. FACTOR

1

2          A.   S.D. was offered and provided

3     housing in the shelter system.

4          Q.   Any other housing provided or

5     offered to S.D.?

6          A.   I'm not aware of any at this

7     time.

8          Q.   What community mental health

9     services were offered or provided to S.D.?

10         A.   He was engaged with an ACT team,

11    A-C-T, all caps.

12         Q.   Any other services offered or

13    provided to S.D.?

14         A.   I can't recall any other services

15    at this time.

16         Q.   I want to turn your attention to

17    Appendix B of your report.  Tell me when

18    you get there.

19         A.   I'm there.

20         Q.   Okay.  Is this an accurate list

21    of the Bates-Stamped documents that you

22    reviewed in preparing your report?

23         A.   Yes.

24         Q.   And you said that you intended to

25    review all of the clinical records for the

```
                                                    Page 27

 1                 CONFIDENTIAL - R. FACTOR

 2          three Named Plaintiffs; is that right?

 3              A.    Sorry, that I...

 4              Q.    You intended to review all of the

 5          clinical records for the three Named

 6          Plaintiffs; is that right?

 7                    MS. MASTERSON:  Objection, form.

 8              A.    Yes.

 9              Q.    Well, let me -- I'll ask it more

10          open-ended.

11                    What documents did you intend to

12          review in preparing your opinion in this

13          case?

14              A.    The medical records I was

15          provided by Plaintiffs' counsel on the

16          three Named Plaintiffs.

17              Q.    Is it your understanding that you

18          were provided all of the clinical records

19          for the three Named Plaintiffs?

20              A.    My understanding is that I was

21          provided all the clinical records that the

22          Plaintiffs' counsel had, all the mental

23          health records that the Plaintiffs' counsel

24          had for the three Named Plaintiffs.

25              Q.    Is there anything that you asked
```

Page 28

CONFIDENTIAL - R. FACTOR

1

2          to review that was not provided to you?

3              A.   No.

4              Q.   And you said, previously, you

5          reviewed the transcripts of the depositions

6          of the three Named Plaintiffs, correct?

7              A.   Correct.

8              Q.   And you conducted one interview

9          with each of the three Named Plaintiffs,

10         correct?

11             A.   Correct.

12             Q.   How long did each interview last?

13             A.   Approximately an hour.

14             Q.   One hour each?

15             A.   Correct.

16             Q.   Did you conduct a clinical

17         evaluation of each plaintiff?

18             A.   I'm not sure what you mean by

19         clinical evaluation.

20             Q.   You're a practicing psychiatrist,

21         correct?

22             A.   Correct.

23             Q.   So when you meet with a new

24         patient for the first time, do you conduct

25         some sort of clinical evaluation?

CONFIDENTIAL

                                          Page 29

                      CONFIDENTIAL - R. FACTOR

1

2          A.    I do.

3          Q.    And is that what you did when you

4     met with the three Named Plaintiffs?

5          A.    No.

6          Q.    Did you independently diagnose

7     them?

8          A.    I did not.

9          Q.    Did you interview any of the

10    Named Plaintiffs' treatment providers?

11         A.    No.

12         Q.    Why not?

13         A.    I didn't feel that was necessary

14    in order to answer the questions that we've

15    already discussed on page 1.

16         Q.    During your interviews of the

17    three Named Plaintiffs, did you take notes

18    of what they told you?

19         A.    Yes.

20         Q.    Did you take them by hand or on

21    the computer or some other way?

22         A.    The two interviews that were via

23    Zoom, I took notes on my computer.  The

24    interview at Elmira prison, by hand.

25         Q.    Did you bring your notes with you

CONFIDENTIAL

```
                                                Page 30
 1                  CONFIDENTIAL - R. FACTOR
 2         today?
 3              A.    I provided them to Plaintiffs'
 4         counsel.
 5                   MR. CONROY:  Okay.  So we've
 6                asked that those notes be turned over
 7                for the deposition, so can we do that
 8                at the break?
 9                   MS. MASTERSON:  Yes.
10         BY MR. CONROY:
11              Q.    Okay.  Did anyone record those
12         meetings with the Named Plaintiffs either
13         by audio or video?
14              A.    Not to my knowledge.
15              Q.    Is there any other transcript of
16         those meetings?
17              A.    Not to my knowledge.
18              Q.    Let me change course for a
19         minute.  You mentioned, earlier, something
20         called ACT services, correct?
21              A.    Correct.
22              Q.    What does that stand for?
23              A.    Assertive Community Treatment.
24              Q.    And what is Assertive Community
25         Treatment?
```

CONFIDENTIAL

1                CONFIDENTIAL - R. FACTOR

2          A.    So I described Assertive

3     Community Treatment in the paragraphs

4     beginning with number 22 in my report.

5     It's a modality of treatment employing a

6     multidisciplinary team of mental health

7     clinicians who support a fixed number of

8     people with serious mental illness to

9     maintain stable and meaningful lives in the

10    community and keep them, as much as

11    possible, out of institutions.

12          Q.    And you've also mentioned

13    something called FACT services, correct?

14          A.    Correct.

15          Q.    What does FACT stand for?

16          A.    Forensic Assertive Community

17    Treatment.

18          Q.    And what is that?

19          A.    A mode of treatment basically on

20    the ACT model, focused on working with

21    formerly incarcerated persons with serious

22    mental illness in the community.

23          Q.    So would a FACT team provide all

24    the same types of services that an ACT team

25    would provide?

CONFIDENTIAL

Page 32

```
 1              CONFIDENTIAL - R. FACTOR
 2         A.   In principle, yes.  Assuming
 3    those teams are faithful to the ACT model,
 4    they would.
 5         Q.   So if someone gets a FACT team,
 6    that's just as good as an ACT team; is that
 7    right?
 8         A.   It should be.
 9         Q.   And your report shows that many
10    studies show that ACT services are
11    effective, right?
12         A.   Right.
13         Q.   In paragraph 22, you say that ACT
14    is the gold standard of community
15    treatment; is that right?
16         A.   That's right.
17         Q.   And that applies to FACT, as
18    well?
19         A.   It would.
20         Q.   Still on paragraph 22, you write
21    (as read):
22              That ACT teams use
23         multidisciplinary teams to
24         provide clients with services
25         directly in the community,
```

CONFIDENTIAL

Page 33

1              CONFIDENTIAL - R. FACTOR
2                  including mental health
3                  treatment, 24/7 crisis response
4                  and support with living skills,
5                  such as shopping.
6                      Is that all accurate?
7          A.    Yes.
8          Q.    Let me flip ahead to paragraph 26
9      on the next page, and in the middle of the
10     paragraph you write (as read):
11                     Unlike an ACT case manager,
12                  the broker case manager typically
13                  is office-based and does not meet
14                  clients in the community nor make
15                  home visits nor accompany clients
16                  to interviews, medical
17                  appointments, job sites or other
18                  service locations.
19                     Did I read that correctly?
20         A.    You did.
21         Q.    So am I understanding it
22     correctly, that an ACT case manager does
23     meet clients in the community, make home
24     visits, accompany clients to interviews,
25     medical appointments, job sites or other

CONFIDENTIAL

Page 34

1                 CONFIDENTIAL - R. FACTOR

2        service locations?

3              A.   That's correct.

4              Q.   And you have testified, a few

5        minutes ago, that both W.P. and S.D.

6        received FACT team services upon their

7        release from prison, correct?

8              A.   They were served by such teams,

9        correct, or they were assigned to such

10       teams.

11             Q.   What does that mean?

12             A.   Well, they -- they worked with

13       such teams.

14             Q.   So you're not saying they were

15       assigned on paper but they never got them

16       in real life, right?

17             A.   I'm not saying that, no.

18             Q.   Okay.  Did you review W.P.'s FACT

19       team records?

20             A.   I reviewed notes from the -- from

21       his FACT team, yes.

22             Q.   His FACT team progress notes?

23             A.   Yes.

24             Q.   Were those progress notes

25       material to your opinion in this case?

Page 35

1                  CONFIDENTIAL - R. FACTOR

2              A.    Yes.

3              Q.    And how were they material to

4        your opinion?

5              A.    I'd have to look at the notes.

6        And, specifically, as I stated in paragraph

7        79 of my report, there were elements

8        inherent to a FACT team with a high level

9        of fidelity to the FACT model that were not

10       available to W.P.

11             Q.    What does that mean?

12             A.    Well, he did not have access to

13       crisis services that would be meeting his

14       needs, which a FACT team faithful to the --

15       to the ACT model would have provided.

16             Q.    So let me make sure I understand.

17                   You previously wrote that the ACT

18       and FACT model provides 24/7 crisis

19       services, correct?

20             A.    That's correct.

21             Q.    And you're saying that you do not

22       believe that W.P.'s FACT team provided him

23       with crisis services; is that right?

24             A.    Not the services that he needed,

25       that's correct.

1                CONFIDENTIAL - R. FACTOR
2            Q.   I don't understand what that
3       means.
4            A.   I'm not clear what it is that you
5       don't understand.
6            Q.   What are the services that a FACT
7       team should provide that W.P.'s FACT team
8       did not provide?
9            A.   24/7 crisis services that are
10      informed by the specific details of the
11      patient, or client, that the FACT team is
12      working with.
13           Q.   What is your support for the
14      conclusion that W.P.'s FACT team did not
15      provide that service?
16           A.   As I wrote in paragraph 79, when
17      W.P. was having a crisis, he believed that
18      had he had someone to talk with, he would
19      have been able to avoid getting into an
20      interpersonal conflict and...
21           Q.   So this is from your interview
22      with W.P.?
23           A.   Yes.
24           Q.   And he told you there was an
25      incident where he got into a conflict,

CONFIDENTIAL

```
                                              Page 37

    1                    CONFIDENTIAL - R. FACTOR

    2        correct?

    3              A.   Correct, that ultimately he

    4        believed that had he had someone available

    5        to him, he might have avoided the conflict

    6        that sent him to Rikers in 2022.

    7              Q.   Other than that statement to you

    8        by W.P., do you have any reason -- any

    9        other support for your conclusion that

   10        W.P.'s FACT team failed to provide 24/7

   11        crisis services?

   12              A.   I would have to review the notes

   13        to give you more specifics on that.

   14              Q.   What notes?

   15              A.   The medical records.

   16              Q.   Sitting here today, you can't

   17        think of any other source or evidence for

   18        your conclusion that W.P.'s FACT team

   19        failed to provide him with 24/7 crisis

   20        services?

   21              A.   At this very instant, I cannot

   22        come up with another example, correct.

   23              Q.   Did you ask any members of his

   24        FACT team whether they provided him with

   25        24/7 crisis services?
```

CONFIDENTIAL

1                CONFIDENTIAL - R. FACTOR

2          A.    No.

3          Q.    Do you think they might have an

4     opinion about that?

5          A.    I don't know.

6          Q.    Who provided W.P.'s FACT team

7     services?

8          A.    What do you mean by who?

9          Q.    What provider.

10         A.    The name of the FACT team?

11         Q.    Yes.

12         A.    I can't tell you that off the top

13    of my head.

14         Q.    Tell me everything you know about

15    the FACT team services that W.P. received.

16         A.    I can't do that right now.

17         Q.    Why not?

18         A.    Because I -- I don't remember all

19    the services that he received without

20    reviewing his records.

21         Q.    Doctor, you've said your report

22    is intended to tell the Court what type of

23    CBMHHSS did OMH provide these individuals,

24    right?

25         A.    Right.

CONFIDENTIAL

Page 39

```
 1              CONFIDENTIAL - R. FACTOR
 2         Q.   And you have conceded that W.P.
 3    received a gold standard FACT team,
 4    correct?
 5              MS. MASTERSON:  Objection, form.
 6         A.   I have not opined on whether the
 7    FACT team that he was enrolled in was a
 8    gold standard FACT team.  What I said was
 9    FACT or ACT was the gold standard for
10    treatment.  Very different.
11         Q.   Is it not material, to the
12    opinion you're giving the Court, whether or
13    not the FACT team services that W.P.
14    received were in FACT gold standard
15    services or not?
16         A.   Yes, and I've said that -- we've
17    only discussed the crisis -- you asked me
18    about the crisis outreach, and I said it
19    wasn't adequate to W.P.'s needs.
20         Q.   Based on the one statement he
21    made to you, that he had an incident and
22    didn't feel that he could reach someone
23    24/7?
24         A.   Correct, based on when the
25    conflict happened, there wasn't someone
```

Page 40

```
 1                 CONFIDENTIAL - R. FACTOR
 2        available to him.
 3                Q.   That's what he said?
 4                A.   That is what he said.
 5                Q.   But you didn't check with the
 6        FACT team to find out?
 7                A.   That's correct.  And as we speak
 8        now, I can't recall what was -- what might
 9        be recorded in the medical record.
10                Q.   The sentence we've been talking
11        about is in paragraph 79 of your report, so
12        you wrote (as read):
13                     But this element for
14                  success - by which I think you
15                  mean the FACT team - includes
16                  that the crisis services need to
17                  have outreach available; that is,
18                  in person when necessary.
19                     Do you see that?
20                A.   I do.
21                Q.   Are you contending that W.P.'s
22        FACT team did not provide in-person, when
23        necessary, services?
24                A.   This element for success in that
25        sentence refers to crisis services, and
```

CONFIDENTIAL

Page 41

```
 1              CONFIDENTIAL - R. FACTOR
 2         what I'm saying is that they didn't provide
 3         those services to him, including when he
 4         had the conflict that led to him being sent
 5         to Rikers.
 6              Q.   And, again, this is based on that
 7         statement that W.P. made to you, correct?
 8              A.   Yes.  I'm not recalling at this
 9         moment whether it was based on anything
10         else.  It was based, at least in part, on
11         that statement.
12              Q.   If at any point today you
13         remember something else to support that
14         point, just interrupt me and let me know,
15         okay?
16              A.   Okay.
17              Q.   Do you agree that W.P.'s FACT
18         team regularly did provide him with
19         in-person services?
20              A.   At this time, I cannot recall the
21         frequency of meetings.  So I don't know
22         about regularly, but they clearly met.
23                   MR. CONROY:  All right.  Let's
24              look at Exhibit 2.
25                   (Whereupon, Factor Exhibit 2,
```

CONFIDENTIAL

Page 42

1              CONFIDENTIAL - R. FACTOR

2              Progress Notes P-MEDICAL-0007745-7898,

3              having been premarked, was identified

4              as of this date.)

5                    MR. CONROY:  All right.

6              Doctor, this is a multiple-page

7              document.  It has Bates Stamps

8              that read P-MEDICAL-0007745 through

9              P-MEDICAL-0007898.

10                   Q.   Have you reviewed this document

11        before?

12                   A.   I believe so, but I can't tell

13        you that definitively.

14                   Q.   Does this appear to be W.P.'s

15        FACT team progress notes?

16                   A.   Yes.

17                   MR. CONROY:  You know what?  Let

18              me do Exhibit 3, as well.  This is in

19              two parts.

20                   (Whereupon, Factor Exhibit 3,

21              Progress Notes P-MEDICAL-0007667-7744,

22              having been premarked, was identified

23              as of this date.)

24                   MR. CONROY:  All right.  And

25              Exhibit 3 is also a multiple-page

CONFIDENTIAL

Page 43

```
 1              CONFIDENTIAL - R. FACTOR

 2              document.  This one is Bates-Stamped

 3              P-MEDICAL-0007667 through

 4              P-MEDICAL-0007744.

 5              Q.   And does this appear to be a

 6         second set of FACT team progress notes for

 7         W.P.?

 8              A.   Yes.

 9              Q.   Okay.  Let's just start with the

10         first page of Exhibit 2.  I promise we

11         won't do every page of this, so let's just

12         take the first page for now.

13              Does this appear to be the

14         progress note from his very first FACT team

15         visit?

16              A.   Yes.

17              Q.   And that was May 20, 2019,

18         correct?

19              A.   Correct.

20              Q.   And at the top of the note, it

21         gives you -- it lists the "Contact Method,"

22         correct --

23              A.   Yes.

24              Q.   -- top, right?

25              I'm sorry, I interrupted your
```

CONFIDENTIAL

Page 44

```
 1                CONFIDENTIAL - R. FACTOR
 2        answer.
 3              A.   Yes.
 4              Q.   Okay.  And it says "In person,"
 5        correct?
 6              A.   Correct.
 7              Q.   Next page, 7746, there's another
 8        meeting on May 21.
 9                   Do you see that?
10              A.   Yes.
11              Q.   And the "Location" is listed as
12        "This Program Site."
13                   Do you see that?
14              A.   Yes.
15              Q.   So that's in person again,
16        correct?
17              A.   Correct.
18              Q.   Next one, May 23, 2019.
19                   Do you see that?
20              A.   Yes.
21              Q.   And that one is "In person" in
22        the "Community," correct?
23              A.   Correct.
24              Q.   As I said, I won't go through all
25        of them, but it's clear that the team met
```

CONFIDENTIAL

```
                                          Page 45

  1                CONFIDENTIAL - R. FACTOR

  2         with him in person in the community,

  3         correct?

  4              A.   At least on those two occasions,

  5         yes.

  6              Q.   Okay.  And this was 2019,

  7         correct?

  8              A.   Correct.

  9              Q.   And W.P. still receives FACT team

 10         services even now, correct?

 11              A.   That's my understanding.

 12              Q.   Did something happen in or around

 13         2020 that made in-person meetings more

 14         difficult for everyone?

 15                  MS. MASTERSON:  Objection, form.

 16              A.   I believe so, but I can't recall

 17         the specifics at this moment.

 18              Q.   I don't mean something specific

 19         to W.P.  Did something happen to the whole

 20         world that caused in-person meetings to be

 21         more difficult starting in 2020?

 22              A.   I see.  Yes.

 23              Q.   And what was that?

 24              A.   The COVID pandemic.

 25              Q.   And so during the COVID pandemic,
```

CONFIDENTIAL

```
                                            Page 46

    1              CONFIDENTIAL - R. FACTOR

    2         some of W.P.'s FACT team service meetings

    3         were virtual; is that right?

    4              A.   Yes.

    5              Q.   Do you think it was reasonable

    6         that some of W.P.'s FACT team services

    7         would be provided remotely during the COVID

    8         pandemic?

    9              A.   Yes.

   10              Q.   Let's look at Exhibit 2, page

   11         7814.  Tell me when you're there.

   12              A.   Yes, I'm there.

   13              Q.   All right.  I'm looking at the

   14         bottom note on this page, and this one's

   15         dated April 22, 2020.

   16                   Do you see that?

   17              A.   I do.

   18              Q.   And it's signed by a licensed

   19         practical nurse on his FACT team.

   20                   Do you see that?

   21              A.   Yes.

   22              Q.   April 22, 2020, COVID was pretty

   23         bad in New York City at that time, correct?

   24              A.   Correct.

   25              Q.   The meeting "Location" is "In
```

CONFIDENTIAL

Page 47

```
 1                CONFIDENTIAL - R. FACTOR
 2         person" at the "Consumer Residence."
 3                   Do you see that?
 4              A.   Yes.
 5              Q.   So these records show that even
 6         during the peak of COVID, he had CASES team
 7         members traveling to his residence to meet
 8         with him in person; isn't that right?
 9              A.   That does appear to be correct.
10              Q.   Do you think it's fair for you to
11         tell the Federal Court that W.P.'s FACT
12         team members did not make themselves
13         available to meet with him in person when
14         necessary?
15              MS. MASTERSON:  Objection, form.
16              A.   I don't believe I said that.
17              Q.   So you don't -- okay.
18                   You don't contend that W.P.'s
19         FACT team members did not make themselves
20         available to meet with him in person when
21         necessary?
22              A.   What we were talking about a few
23         minutes ago was crisis services.  You've
24         highlighted a number of in-person and
25         tele-health visits, and I -- obviously,
```

CONFIDENTIAL

```
                                      Page 48

   1              CONFIDENTIAL - R. FACTOR
   2         those occurred.
   3                   MR. CONROY:  Take a break?
   4                   MS. MASTERSON:  Okay.
   5                   (Recess taken, 10:40 a.m.)
   6                   (On the record, 10:58 a.m.)
   7         BY MR. CONROY:
   8              Q.   All right.  Dr. Factor, let's
   9         turn to page 21 of your report, and I want
  10         to direct your attention to paragraph 82.
  11                   Are you there?
  12              A.   Uh-huh.
  13              Q.   Okay.  So this says (as read):
  14                       W.P. explained, during his
  15                  interview, that he has not
  16                  received peer support, at least
  17                  for the duration of the pandemic,
  18                  even though this is an important
  19                  element for helping people remain
  20                  stable in the community.
  21                   Did I read that correctly?
  22              A.   You did.
  23              Q.   What exactly did W.P. say to you
  24         about peer support services?
  25              A.   Based on what I have in front of
```

CONFIDENTIAL

Page 49

```
 1              CONFIDENTIAL - R. FACTOR
 2         me, I can't say more than what's there.
 3              Q.   Did you credit his statement to
 4         you, that he has not received peer support,
 5         at least for the duration of the pandemic?
 6              A.   Did I credit it?
 7              Q.   Yes.
 8              A.   What does that mean?
 9              Q.   Well, you put this sentence in
10         your report to the Court, right?
11              A.   Right.
12              Q.   So are you just sort of quoting
13         what he said or is it your opinion that
14         W.P. has not received peer support
15         services, at least for the duration of the
16         pandemic?
17                   MS. MASTERSON:  Objection, form.
18              A.   What I wrote was he explained,
19         during his interview -- he explained that
20         during his interview.
21              Q.   What's your opinion?
22              A.   I believed what he told me.
23              Q.   Did you do anything to determine
24         whether or not what he told you is
25         accurate?
```

CONFIDENTIAL

Page 50

1              CONFIDENTIAL - R. FACTOR

2              A.   I cannot recall now whether there

3         was discussion of that in his FACT records.

4                   MR. CONROY:  Let's look at

5              Exhibit 4.

6                   (Whereupon, Factor Exhibit 4,

7              Correspondence MG-Class00035837,

8              having been premarked, was identified

9              as of this date.)

10                  MR. CONROY:  This is a one-page

11             document, with the Bates Stamp

12             MG-Class00035837.

13             Q.   Doctor, have you seen this

14        document before?

15             A.   I can't recall.

16             Q.   At the top it says CASES.

17                  Do you know what CASES is?

18             A.   It's the Forensic ACT team -- no.

19                  Actually, no, I don't, sorry.  It

20        would appear to be that, but...

21             Q.   It's a letter from someone named

22        Lauren Delagardelle.

23                  Do you see that?

24             A.   I do.

25             Q.   And it says her title is

CONFIDENTIAL

Page 51

```
 1              CONFIDENTIAL - R. FACTOR
 2         "Criminal Justice Specialist" at "CASES -
 3         Manhattan FACT 1."
 4                   Do you see that?
 5         A.   Yes.
 6         Q.   And up at the top it says (as
 7         read):
 8                   I'm writing regarding W.P.,
 9              who is currently receiving
10              treatment with the CASES
11              Manhattan Forensic ACT 1 Team.
12                   Do you see that?
13         A.   Yes.
14         Q.   So is it fair to say that this is
15         a letter from someone on W.P.'s FACT team?
16         A.   Yes.
17         Q.   The second paragraph describes
18         the types of services provided by CASES
19         FACT teams.
20                   Do you see that?
21              MS. MASTERSON:  And I would
22              remind the witness that if you need to
23              read the document, if you haven't seen
24              it, you can take the time.
25         Q.   Are you still reading the
```

CONFIDENTIAL

Page 52

```
 1              CONFIDENTIAL - R. FACTOR
 2         document, Doctor?
 3              A.   I've finished reading it.
 4              Q.   Okay.  So the second paragraph,
 5         it describes the services provided by the
 6         CASES FACT team, correct?
 7              A.   Yes.
 8              Q.   Right in the middle of the
 9         paragraph it lists "peer support," right?
10              A.   Yes.
11              Q.   Do you have any reason to believe
12         that this description from CASES about the
13         services they provide is not accurate?
14              A.   No.
15              Q.   Let's turn back to Exhibit 2.  Do
16         you still have that one?
17              A.   Yes.
18              Q.   So now we're back to W.P.'s FACT
19         team progress notes.  Let's turn to just
20         the second page of the document, the one
21         that has the Bates Stamp 7746.  And I'm
22         looking at the bottom note that's dated May
23         23, 2019.
24                   Do you see that?
25              A.   Yes.
```

CONFIDENTIAL

```
                                            Page 53

    1              CONFIDENTIAL - R. FACTOR
    2         Q.   And it's written by someone named
    3    Manuel Reyes.
    4              Do you see that?
    5         A.   Yes.
    6         Q.   His title is "Peer Specialist
    7    III."
    8              Do you see that?
    9         A.   Yes.
   10         Q.   And if you look at the contents
   11    of the note, it says (as read):
   12                   Writer met with W.P. in
   13              front of Bellevue men's shelter
   14              to provide WSRP service.
   15              Do you know what WSRP service
   16    means?
   17         A.   No.
   18         Q.   (As read):
   19                   Writer introduced himself
   20              and role with Manhattan FACT 1
   21              Team as well as the many ways a
   22              peer specialist can help support
   23              participants with resources
   24              within the community.
   25              Do you see that?
```

CONFIDENTIAL

Page 54

```
 1              CONFIDENTIAL - R. FACTOR
 2         A.   Yes.
 3         Q.   So this is a peer support visit,
 4    isn't it?
 5         A.   Yes.
 6         Q.   And I know you wrote that maybe
 7    he didn't receive peer support during the
 8    pandemic, so let's turn to Exhibit 2, page
 9    7814.
10              MS. MASTERSON:  Objection, form.
11         Q.   Tell me when you're there.
12         A.   I'm there.
13         Q.   This time I'm on the top note of
14    this page.  This is dated April 22, 2020.
15              Do you see that?
16         A.   Yes.
17         Q.   Peak of COVID in New York City,
18    correct?
19         A.   Correct.
20         Q.   This note is by someone named
21    Pierce York.
22              Do you see that?
23         A.   Yes.
24         Q.   His title is "Peer Specialist."
25              Do you see that?
```

CONFIDENTIAL

```
1                  CONFIDENTIAL - R. FACTOR
2             A.    Yes.
3             Q.    Let's flip a few pages forward,
4        to 7821.  Tell me when you're there.
5             A.    I'm there.
6             Q.    This note is dated May 27, 2020.
7                   Do you see that?
8             A.    I do.
9             Q.    This one's by another peer
10       specialist, correct?
11            A.    Correct.
12            Q.    So do you think it's accurate to
13       say that W.P. has not received peer
14       support, at least for the duration of the
15       pandemic?
16            A.    I'm aware of these two meetings.
17       He clearly did receive peer support
18       contacts on those two occasions.
19            Q.    So my question is, would you
20       agree that it's not accurate to say that
21       W.P. has not received peer support, at
22       least for the duration of the pandemic?
23            A.    As I sit here today, I -- you've
24       shown me these two contacts.  If there are
25       more contacts, I -- I might change my
```

CONFIDENTIAL

                                              Page 56

1                CONFIDENTIAL - R. FACTOR
2          opinion.
3                Q.   And you had access to these
4          records before you wrote your report,
5          right?
6                A.   Yes.
7                Q.   Did you look to see if he had
8          peer service visits?
9                A.   I'm not sure that I was aware of
10         these two, I...
11               Q.   But my question is, did you look
12         to see if there were peer support service
13         visits?
14               A.   It was one of many things I was
15         looking at.
16               Q.   Let me ask a broader question
17         about your interviews of the Named
18         Plaintiffs.
19                    Did you make any attempt to
20         verify whether any of the things they told
21         you were true or not?
22                    MS. MASTERSON:  Objection, form.
23               A.   Many of the things that they told
24         me about I had already established from my
25         review of the record and were consistent

Page 57

CONFIDENTIAL - R. FACTOR

1

2       with what I knew.

3            Q.    What about the things that you

4       hadn't already established were consistent

5       with the record?

6            A.    I don't believe I made an

7       exhaustive search for every single peer

8       support contact, so...

9            Q.    Was there anything else that they

10      told you where you did not make an

11      exhaustive search to verify whether what

12      they told you was true?

13                 MS. MASTERSON:  Objection, form.

14           A.    I'm not certain about that.

15           Q.    Is there anything that any of the

16      three Plaintiffs told you that you

17      ultimately did not credit as being true?

18           A.    As I sit here this morning, I

19      can't point to a specific example, what

20      I...

21           Q.    And you testified you also

22      reviewed the Second Amended Complaint,

23      correct?

24           A.    Correct.

25           Q.    How did that help you form your

Page 58

```
 1                CONFIDENTIAL - R. FACTOR
 2        opinion?
 3                MS. MASTERSON:  Objection, form.
 4            Q.   How, if at all, did it help you
 5        form your opinion?
 6            A.   I'm not sure it affected my
 7        opinion at all.  The questions that I was
 8        asked to opine on stated the focus of my
 9        report, and the report was based on the
10        information that I already identified.
11            Q.   Well, the Second Amended
12        Complaint makes various allegations about
13        what housing and services the three Named
14        Plaintiffs did or did not receive in the
15        community, correct?
16            A.   Correct.
17            Q.   Did you credit those allegations
18        as part of forming your opinion in this
19        case?
20            A.   Again, could you tell me what you
21        mean by credit?
22            Q.   Did you -- did you rely on the
23        allegations in the Second Amended Complaint
24        in forming your opinion?
25            A.   The allegations highlighted the
```

CONFIDENTIAL

Page 59

```
 1                 CONFIDENTIAL - R. FACTOR
 2        issues that Plaintiffs' counsel had raised.
 3        I didn't accept them as true.
 4             Q.   Let's switch to S.D. for a few
 5        minutes.  S.D. also received a FACT team in
 6        the community, correct?
 7             A.   That's correct.
 8             Q.   Did you talk to any members of
 9        S.D.'s FACT team?
10             A.   No.
11             Q.   Why not?
12             A.   I didn't believe that it was
13        essential in forming my opinions.
14             Q.   Tell me everything you know about
15        S.D.'s FACT team services.
16                  MS. MASTERSON:  Objection, form.
17             A.   I don't know how to answer that
18        question, everything I know.
19             Q.   Well, why don't we start with,
20        how many team members did he have?
21             A.   I don't know.
22             Q.   What types of team members did he
23        have?
24             A.   I can't say, from personal
25        knowledge, about what types of team members
```

CONFIDENTIAL

```
                                            Page 60

 1              CONFIDENTIAL - R. FACTOR
 2         they have.
 3              Q.   What types of services did his
 4         FACT team provide him?
 5              A.   I would have to review the
 6         records, which I haven't -- I don't have in
 7         front of me, in order to answer that.
 8              Q.   Did you review S.D.'s FACT team
 9         records when preparing your report in this
10         case?
11              A.   I reviewed some of those records,
12         yes.
13              Q.   What do you mean by some?
14              A.   I reviewed some of the records.
15         I did not read every single word of every
16         single record.
17              Q.   Why not?
18              A.   Because I didn't think that was
19         the most efficient use of my time in order
20         to render an opinion.
21              Q.   Are you contending that S.D.'s
22         FACT team failed to provide him with
23         appropriate FACT services?
24              A.   What I've stated in my report is
25         that his FACT team and the others involved
```

```
                                          Page 61

 1              CONFIDENTIAL - R. FACTOR
 2          in his treatment planning did not provide
 3          him with the services that he needed in
 4          order to be stable in the community.
 5                  Q.   What does that mean?
 6                  A.   As I stated in my report, he
 7          didn't have stable housing, there wasn't
 8          good coordination between the mental health
 9          and criminal justice systems in terms of
10          affording him stable housing.
11                      He wasn't applying for SSI
12          benefits prior to discharge, and his
13          substance abuse and mental health
14          treatments weren't coordinated.  In fact,
15          he wasn't enrolled in a community-based
16          substance abuse treatment prior to
17          discharge.
18                  Q.   The first half of your report,
19          you talk about all of the services provided
20          by FACT and ACT teams, correct?
21                      MS. MASTERSON:  Objection, form.
22                  A.   I talk about the ones that should
23          be provided, yes.
24                  Q.   Are you contending that S.D.'s
25          FACT team failed to provide him with the
```

CONFIDENTIAL

Page 62

```
 1                  CONFIDENTIAL - R. FACTOR

 2          services a FACT team should provide?

 3               A.   A FACT team should function as a

 4          single point of responsibility for care,

 5          and for the reasons that I previously

 6          stated, his -- they either didn't provide

 7          or arrange for others to provide those

 8          services.

 9               Q.   What's your basis for that

10          conclusion?

11               A.   He didn't get them.

12               Q.   What's your basis for that

13          conclusion?

14               A.   Which conclusion?

15               Q.   That he didn't get services that

16          a FACT team should provide.

17               A.   Because there was no

18          coordination.  As I've just said, he wasn't

19          enrolled in SSI prior to release, he wasn't

20          enrolled in substance abuse treatment prior

21          to release, and he didn't have stable

22          housing.

23               Q.   So you said in your report, at

24          paragraph 22, (as read):

25                        ACT is the gold standard of
```

Page 63

                    CONFIDENTIAL - R. FACTOR

1

2                community treatment.  It uses

3                multidisciplinary teams to

4                provide clients with services

5                directly in the community,

6                including mental health

7                treatment, 24/7 crisis response

8                and support with living skills,

9                such as shopping.

10                   That's what you wrote, correct?

11          A.    Correct.

12          Q.    Do you have any reason to believe

13     that S.D.'s FACT team failed to provide him

14     with a multidisciplinary team, providing

15     services directly in the community,

16     including mental health treatment, 24/7

17     crisis response and support with living

18     skills?

19          A.    As I previously testified, he did

20     not get those services.

21          Q.    Yeah, and what's the -- what's

22     your support for that statement?

23          A.    What's my support for which

24     statement?

25          Q.    That he did not get those

1                CONFIDENTIAL - R. FACTOR

2        services.

3                A.   He didn't have stable housing.

4                Q.   I didn't ask you about housing,

5        Doctor.  I asked you about the

6        multidisciplinary teams that provide

7        clients with services directly in the

8        community, including mental health

9        treatment, 24/7 crisis response and support

10       with living skills.

11               Did S.D. get those services?

12               A.   He did not have stable housing.

13       He did not have coordination between the

14       criminal justice system and the mental

15       health system.  He was not enrolled in

16       substance abuse, as I've already testified.

17               And, as I've already testified,

18       an ACT team -- one of the ACT team

19       responsibilities is to serve as a point of

20       responsibility to coordinate the necessary

21       services for someone to live a stable life

22       in the community, and he didn't receive

23       those.

24               Q.   Is there some reason why you

25       don't want to answer my question?

```
                                          Page 65

 1              CONFIDENTIAL - R. FACTOR
 2         A.   I believe I have answered your
 3    question.
 4         Q.   Okay.  Let me try it again.
 5              Did S.D.'s FACT team provide him
 6    with a multidisciplinary team providing
 7    services directly in the community,
 8    including mental health treatment, 2/47
 9    crisis response and support with living
10    skills; yes or no, did his FACT team
11    provide those services?
12         A.   I can't answer that yes or no
13    because --
14         Q.   Why not?
15         A.   Well, I mean, if you're asking me
16    do they have multidisciplinary -- do they
17    have staff on their teams with -- that are
18    multidisciplinary, that's not what I'm
19    saying.  I'm not objecting to that.  I'm
20    saying that S.D. didn't receive the
21    services that he needed, and the ACT team
22    would be responsible for organizing that.
23              MS. MASTERSON:  And I'll just
24         remind the witness, if you could pause
25         before answering so I can lodge any
```

CONFIDENTIAL

Page 66

```
 1              CONFIDENTIAL - R. FACTOR
 2         objection needed.
 3              MR. CONROY:  Let's look at
 4         Exhibit 5.
 5              (Whereupon, Factor Exhibit 5,
 6         Progress Notes P-MEDICAL-007906-7955,
 7         having been premarked, was identified,
 8         as of this date.)
 9              MR. CONROY:  Okay.  This is a
10         multiple-page document with Bates
11         Stamps starting at P-MEDICAL-007906
12         through P-MEDICAL-0007955.
13         Q.   Have you seen this document
14    before?
15         A.   I presume it was in the list of
16    documents that I reviewed, but I'd have to
17    check on Appendix B to check.
18         Q.   Okay.  Let's check.  Let's go to
19    your report, Appendix B, and tell me if
20    this document appears on your appendix.
21         A.   I don't see it there.
22         Q.   Why do you think that is?
23         A.   Because it wasn't provided to me.
24         Q.   Do you think it would have been
25    helpful to assess S.D.'s FACT team services
```

CONFIDENTIAL

Page 67

                    CONFIDENTIAL - R. FACTOR

1

2          if you had been provided with his FACT team

3          clinical records?

4                 A.    That's possible.

5                 Q.    Let's look at your report, page

6          25, paragraph 103.  Tell me when you're

7          there.

8                 A.    I'm there.

9                 Q.    You wrote (as read):

10                       S.D. was engaged with an ACT

11                   team upon his release from prison

12                   in 2019.  However, people for

13                   whom substance abuse is an issue,

14                   such as S.D., must also be

15                   engaged in substance abuse

16                   treatment that is integrated with

17                   or coordinated with mental health

18                   treatment.

19                       Did I read that correctly?

20                 A.    You did.

21                 Q.    Are you contending that S.D.'s

22          FACT team did not offer him substance abuse

23          treatment services?

24                 A.    That was my understanding when I

25          wrote this.

CONFIDENTIAL

Page 68

1                   CONFIDENTIAL - R. FACTOR

2             Q.   Based on what?

3             A.   The documents that I was

4        presented.

5             Q.   Let's turn back to Exhibit 5, and

6        let's stay on the first page.  The very

7        first note is dated May 20, 2019.

8                  Do you see that?

9             A.   I do.

10            Q.   And this was S.D.'s first FACT

11       team meeting; is that right?

12            A.   That's right.

13            Q.   And the author of the note is

14       someone named Alexandra Cerbone.

15                 Do you see that?

16            A.   I do.

17            Q.   And her title is "Substance Use

18       Specialist."

19                 Do you see that?

20            A.   I do.

21            Q.   Is it typical for FACT or ACT

22       teams to have a substance use specialist on

23       the team?

24            A.   Yes.

25            Q.   What does a substance use

CONFIDENTIAL

```
 1                 CONFIDENTIAL - R. FACTOR
 2       specialist on a FACT team do?
 3            A.   Provide substance use treatment.
 4            Q.   Do you know what substance use
 5       services Ms. Cerbone offered or provided to
 6       S.D.?
 7            A.   Not without examining this
 8       record.
 9            Q.   Are you familiar with the
10       community mental health housing placement
11       process in New York State?
12            A.   I don't have a deep familiarity
13       with it, no.
14            Q.   Do you have any familiarity with
15       it?
16            A.   Well, I'm aware of the
17       application process.
18            Q.   And what are you aware of?
19            A.   That people get evaluated for
20       their eligibility for different types of
21       housing.  They apply, and then they get
22       evaluated for eligibility.
23            Q.   Do you know who performs that
24       eligibility determination?
25            A.   No.
```

CONFIDENTIAL

Page 70

CONFIDENTIAL - R. FACTOR

1

2     Q.    Let me talk generally, not

3     specifically about New York State.

4            Are there certain factors that

5     typically might make someone particularly

6     challenging to place in community mental

7     health housing?

8     A.    Yes.

9     Q.    What factors might make someone

10    particularly challenging to place?

11    A.    A history of dangerousness.

12    Q.    Anything else?

13    A.    A history of difficult management

14    of past housing.

15    Q.    Any other factors that might make

16    someone difficult to place?

17    A.    Well, in that last category,

18    someone who didn't take care of an

19    apartment or who failed to pay rent or

20    things like that.

21    Q.    You mentioned history of

22    dangerousness.  Would that include a

23    history of violent conduct?

24    A.    Yes.

25    Q.    Arson, does that make someone

CONFIDENTIAL

Page 71

```
 1              CONFIDENTIAL - R. FACTOR
 2         hard to place?
 3              A.   Yes.
 4              Q.   Would you agree with me that most
 5         people with -- let me back up and define a
 6         term first.
 7                   SMI, does that mean something to
 8         you?
 9              A.   Yes.
10              Q.   What does it mean?
11              A.   Serious mental illness.
12              Q.   Okay.  Would you agree with me
13         that most people with SMI do not commit
14         violent acts?
15              A.   Yes.
16              Q.   Would you agree with me, that
17         most people with SMI are much more likely
18         to be a victim of violence than to commit a
19         violent act?
20              A.   Yes.
21              Q.   As far as you know, does the
22         state or housing providers have the ability
23         to force someone to accept a housing
24         placement that has been offered to them?
25              A.   Not as far as I know.
```

CONFIDENTIAL

```
                                          Page 72

 1                 CONFIDENTIAL - R. FACTOR
 2             Q.   So individuals are typically free
 3        to reject placement offers; is that right?
 4             A.   I believe so.
 5             Q.   When someone rejects placement
 6        offers, does that make achieving a
 7        placement more challenging?
 8             A.   It may.
 9             Q.   Let's turn back to W.P., and I
10        know you said you didn't speak to members
11        of his FACT team, correct?
12             A.   Correct.
13             Q.   Did you speak to any of his other
14        providers?
15             A.   No.
16             Q.   Did you speak to anyone involved
17        in trying to place him in housing?
18             A.   No.
19             Q.   Are you familiar with the
20        circumstances of W.P.'s convictions?
21             A.   Yes.
22                  Well, I'm familiar with the
23        charges and some of the circumstances.
24             Q.   What are you familiar with?
25             A.   That he had arson convictions.
```

1              CONFIDENTIAL - R. FACTOR
2         Q.   Is there anything about W.P.'s
3    history that would make him a challenging
4    person to place in community mental health
5    housing?
6              MS. MASTERSON:  Objection, form.
7         A.   His arson convictions.
8         Q.   Why would those make him a
9    challenging person to place in community
10    mental health housing?
11              MS. MASTERSON:  Objection, form.
12         A.   I think they would be a challenge
13    for any housing, but not an insurmountable
14    one.
15         Q.   Why do you say it would be a
16    challenge for any housing?
17         A.   Landlords are reluctant to,
18    without any other information, rent to
19    people with past histories of having set
20    fires.
21         Q.   Do you have any opinion about --
22    strike that.
23              Okay.  Let's turn to page 19 of
24    your report.  And I'm looking at paragraph
25    76.  At the very, very bottom and going on

CONFIDENTIAL

Page 74

```
 1                 CONFIDENTIAL - R. FACTOR
 2          to the next page, it says (as read):
 3                      W.P. said he declined the
 4                  one housing offer he received out
 5                  of fear of an unknown and
 6                  potentially dangerous roommate
 7                  and to avoid a conflict-rife
 8                  environment, given the nature of
 9                  his mental illness.
10              Did I read that correctly?
11          A.    You did.
12          Q.    And then in the next paragraph,
13          77, you write (as read):
14                      W.P. was not offered stable
15                  housing.
16              Did I read that correctly?
17          A.    You did.
18          Q.    So explain to me what you mean,
19          that he was not offered stable housing.
20          A.    In the sentence prior to the one
21          you read, which you did not read, he -- I
22          wrote (as read):
23                      He explained in his
24                  interview that he was offered a
25                  shared apartment but that no
```

Page 75

         CONFIDENTIAL - R. FACTOR

1                 CONFIDENTIAL - R. FACTOR

2                 information was given to him

3                 about who his roommates would be,

4                 including whether they had any

5                 history of violence, drug use or

6                 being a sex offender.

7                     He was, in my opinion, exercising

8         good judgment that anyone of us would have

9         made about vetting a roommate, or not being

10        able to do that - and therefore denying the

11        offer of that housing - so that I would

12        characterize the offer that was given to

13        him as unacceptable.

14            Q.    In your report, you said that

15        that's based on W.P.'s statement to you in

16        your interview of him; is that right?

17            A.    I did, that is right.

18            Q.    Other than what W.P. said to you,

19        do you have any other support for the

20        statement that no information was given to

21        him about who his roommates would be?

22            A.    That's also confirmed in the

23        medical record.

24            Q.    Where in the medical records is

25        that confirmed?

CONFIDENTIAL

Page 76

                    CONFIDENTIAL - R. FACTOR

1

2          A.    I'd have to look.

3          Q.    Do you know whether W.P. asked

4     for any information about potential

5     roommates before he rejected the placement?

6          A.    As I recall the medical record

7     and his interview, he said he did.

8          Q.    But you don't remember which

9     specific record you're talking about?

10         A.    Which Bates page, no, I can't

11    tell you that.

12         Q.    The first sentence in your

13    paragraph 76 says (as read):

14               W.P. noted that the 2019

15            discharge process felt like a

16            "rush job," including because OMH

17            arranged for a housing interview

18            mere weeks before his release.

19               Did I read that correctly?

20         A.    You did.

21         Q.    So are you saying it's your own

22    opinion that the discharge process was a

23    rush job or are you just quoting what W.P.

24    said?

25               MS. MASTERSON:  Objection, form.

CONFIDENTIAL

Page 77

1                CONFIDENTIAL - R. FACTOR

2          A.   The first sentence in paragraph

3     76 refers to his opinion.

4          Q.   So do you have an opinion about

5     whether there was something wrong with the

6     timing of his housing interview?

7          A.   Yes.

8          Q.   What's your opinion?

9          A.   The search for housing was not

10    done in a timely way, consistent with his

11    statement of it being rushed.

12         Q.   When, in your opinion, does a

13    housing interview have to occur in order to

14    not be rushed?

15         A.   That would depend on the

16    availability of housing options in the

17    community.

18         Q.   So in the case of W.P., when do

19    you think a housing interview should have

20    occurred in order to not feel like a rush

21    job?

22         A.   If he were living in a community

23    with lots of available housing options,

24    then perhaps a short period of time.  But

25    my understanding is that is not the case

CONFIDENTIAL

Page 78

```
 1              CONFIDENTIAL - R. FACTOR
 2       here, that housing is difficult, and we've
 3       already -- I've already testified that,
 4       with his history, he has more challenging
 5       issues.  So it should have been done many,
 6       many months in advance, should have been
 7       initiated many, many months in advance.
 8            Q.   And I'm just trying to understand
 9       this opinion.
10                 Is that in order to maximize the
11       chances of finding a placement or in order
12       to prevent the individual's perception that
13       it's a rush job?
14            A.   His perception that it was a rush
15       job was a comment on the process.  No, the
16       goal is to find stable housing, and that
17       may take some significant number of months
18       to find.
19                 (Whereupon, Factor Exhibit 6,
20                 Progress Note D-00010675-10677, having
21                 been premarked, was identified, as of
22                 this date.)
23                 MR. CONROY:  Okay.  Doctor, I'm
24                 showing you what has been marked
25                 Exhibit 6.  This is a three-page
```

CONFIDENTIAL

Page 79

```
 1              CONFIDENTIAL - R. FACTOR

 2          document, with Bates Stamps D-00010675

 3          through D-00010677.

 4          Q.   Have you seen this document

 5      before?

 6          A.   Yes.

 7          Q.   Yes, you have seen this?

 8          A.   Yes.

 9          Q.   Okay.  What is it?

10          A.   It's a social work note from

11      █████████████████████████ of May █,

12      2019.

13          Q.   And as far as you know, is that

14      where W.P. was incarcerated prior to his

15      release in May 2019?

16          A.   Yes.

17          Q.   And if you flip to the last page,

18      the note is written by someone named

19      Samantha ████████.

20               Do you see that?

21          A.   Yes.

22          Q.   And her title is "Licensed Social

23      Worker" and "Supervisor"; is that right?

24          A.   Yes.

25          Q.   And if you flip back to the first
```

CONFIDENTIAL

Page 80

1                    CONFIDENTIAL - R. FACTOR

2          page, the note says (as read):

3                         This writer met with W.P.

4                    to prepare him for his VTC

5                    conference/Housing interview

6                    today.

7                         Do you see that?

8               A.    Yes.

9               Q.    Do you know what a VTC conference

10         is?

11              A.    No.

12              Q.    Then it goes on to say (as read):

13                        Prior to the session,

14                    clinician and patient reviewed

15                    housing questions for the

16                    interview.  At the beginning of

17                    the VTC conference, W.P. was

18                    informed by the housing provider

19                    that he would be placed in a

20                    shared apartment.  Patient

21                    thanked the interviewer for her

22                    time, informed her he would

23                    prefer a shelter and exited the

24                    room.

25                         Do you see that?

CONFIDENTIAL

```
                                      Page 81

 1              CONFIDENTIAL - R. FACTOR

 2         A.   Yes.

 3         Q.   Do you have any reason to believe

 4    that this progress note is not accurate?

 5         A.   No.

 6         Q.   Did you ask W.P. about this note?

 7         A.   I didn't ask him about this note

 8    specifically, no.

 9         Q.   So when you said you believed

10    W.P. asked for information about roommates,

11    is it your understanding that that happened

12    at this session, reflected in the note, or

13    on a different occasion?

14         A.   I believe it was on a different

15    occasion.

16         Q.   What do you know about the other

17    occasion?

18         A.   My recollection is that he asked

19    a staff member for information about who he

20    would be living with.

21         Q.   Do you know if that happened

22    before or after the interview described in

23    this note?

24         A.   I'm not certain.

25         Q.   In your report, on page 20,
```

CONFIDENTIAL

Page 82

```
 1              CONFIDENTIAL - R. FACTOR
 2         paragraph 76 - I'm at the very top of page
 3         20, where paragraph 76 continues over - you
 4         write (as read):
 5                    Due to that one rejection,
 6              W.P. was consigned to the
 7              homeless shelter system.
 8                    Did I read that correctly?
 9         A.    Yes.
10         Q.    What do you mean by he was
11         consigned to the homeless shelter system?
12         A.    That was the offer that he was
13         given, he declined, and he ended up living
14         in the homeless shelter system.
15         Q.    Is it your opinion that after he
16         rejected the first potential place, that
17         all efforts to place him in housing
18         stopped?
19              MS. MASTERSON:  Objection, form.
20         A.    I don't know about efforts.  I'm
21         not aware of any other offers he was given.
22         Q.    Are you aware of any additional
23         housing interviews that W.P. has received?
24         A.    I can't say at this moment.
25         Q.    Are you aware that he received a
```

CONFIDENTIAL

Page 83

1                 CONFIDENTIAL - R. FACTOR

2          housing interview and he objected to a

3          house rule, that he wouldn't be allowed to

4          have female guests or kids on site?

5               A.   I recall that situation, yes.

6               Q.   Did you ask him about that?

7               A.   In the -- I did not in the

8          interview, as I recall.

9               Q.   Are you aware that he had another

10         interview and he objected to designating

11         the provider as a representative payee?

12              A.   I don't recall that, no.  I may

13         have read it; I don't recall at this

14         moment.

15              Q.   Does W.P. have a housing

16         specialist on his FACT team?

17              A.   I don't know.

18              Q.   Do you know what advice, if any,

19         W.P.'s FACT team has given to him about his

20         housing search?

21              A.   No.

22              Q.   Do you have any reason to believe

23         that W.P.'s FACT team housing specialist is

24         doing anything incorrectly?

25              A.   I don't have an opinion about the

CONFIDENTIAL

Page 84

1                    CONFIDENTIAL - R. FACTOR

2          work of the housing specialist.

3                Q.   Has W.P. received interim housing

4          in the community while waiting for a

5          permanent placement?

6                    MS. MASTERSON:  Objection, form.

7                A.   My understanding is that he's

8          been in the shelter system since his

9          release.

10               Q.   Has he received any placements in

11         buildings that used to be hotels and now

12         offer single-occupancy shelter rooms?

13               A.   Yes.

14               Q.   Do you have any opinion about

15         whether it's a good idea or bad idea to use

16         former hotels as single-occupancy shelter

17         rooms?

18               A.   If the choice is between a

19         congregate shelter and a single-occupancy

20         room in a former hotel, the latter is

21         better than the former.  Neither one of

22         them constitute stable housing.

23               Q.   Did you ask W.P. about his

24         single-occupancy hotel room placement?

25               A.   We talked about that, yes.

CONFIDENTIAL

Page 85

```
                    CONFIDENTIAL - R. FACTOR
 1
 2          Q.    What did he tell you?
 3          A.    That it was better than the
 4    congregate shelter.
 5          Q.    Anything else about it?
 6          A.    He said it was filthy, but he
 7    could keep to himself.
 8          Q.    And as far as you know, is W.P.
 9    currently being housed in a former hotel
10    room?
11          A.    I believe that's correct.  I
12    haven't had contact with him since my
13    interview in November, but my understanding
14    is that he's still in the shelter system.
15          Q.    Let's turn to paragraph 78 of
16    your report, and the last sentence of that
17    paragraph says (as read):
18                    Therefore, the fact
19               that W.P. continues to be
20               denied either non-shelter
21               single-occupancy residency or
22               information on safe, productive
23               shared living arrangements
24               contributes to his serious risk
25               of reinstitutionalization.
```

CONFIDENTIAL

                                        Page 86

1              CONFIDENTIAL - R. FACTOR

2              Did I read that correctly?

3         A.    Yes.

4         Q.    Who is denying W.P. non-shelter

5    single-occupancy residency or information

6    on safe, productive shared living

7    arrangements?

8         A.    My best answer is that the system

9    is denying that the -- as I previously

10   testified, when people are working with an

11   ACT team, that ACT team is meant to be a

12   fixed point of responsibility; but between

13   the ACT team and the housing system, the

14   bottom line is that he is not in stable

15   housing.  He continues to live in the

16   shelter system.

17        Q.    The FACT team can't force W.P. to

18   accept a placement, right?

19        A.    That's correct.

20        Q.    And W.P.'s own decisions during

21   this process contributed to the fact that

22   he is not in a permanent housing placement?

23        A.    I believe that he's entitled to

24   make those decisions, which in fact would

25   be no different than the decisions that

CONFIDENTIAL

1              CONFIDENTIAL - R. FACTOR

2       anyone of us might make.  So the proximal

3       cause of the situation is his rejection of

4       unacceptable offers.

5              Q.   Why -- so we talked about the

6       first offer, before his release from

7       prison.  Why were the subsequent interviews

8       unacceptable placements?

9                  MS. MASTERSON:  Objection, form.

10             A.   Which subsequent interviews are

11      you --

12             Q.   We talked about the one where he

13      objected to the rule about female guests

14      and children, right?

15             A.   Right.

16             Q.   Why was that an unacceptable

17      placement?

18             A.   He felt that that was an

19      unreasonable restriction being placed on

20      him that he could not accept.

21             Q.   Is that the same thing as saying

22      that it was an unacceptable placement?

23             A.   Living in a setting with that

24      restriction for him would not constitute

25      stable housing, so it would be

CONFIDENTIAL

Page 88

1                    CONFIDENTIAL - R. FACTOR
2           unacceptable.
3                    Q.   Then there was the provider,
4           where he objected to designating them as a
5           representative payee, right?
6                    A.   You mentioned that.
7                    Q.   Why was that an unacceptable
8           placement?
9                    MS. MASTERSON:  Objection, form.
10                   A.   I don't know the details of the
11          person who was proposed to be a
12          representative payee.
13                   Q.   So your -- let me ask this.
14                   Are you telling me that your own
15          opinion is that these were unacceptable
16          placements; yes or no?
17                   A.   I don't know the details, for
18          example, about the options for appointing a
19          representative payee for W.P.
20                   Q.   So you would need to know more
21          before you reached your own conclusion
22          about whether these were unacceptable
23          placements; is that right?
24                   A.   No, that's not correct.
25                   Q.   Doctor, I can't tell whether

CONFIDENTIAL

Page 89

CONFIDENTIAL - R. FACTOR

1
2       you're telling me that your own opinion is
3       that these subsequent potential housing
4       placements were unacceptable for some
5       objective reason.  Is that what you're
6       telling me, or no?
7              A.   Well, returning to the issue of
8       the representative payee, my own clinical
9       experience is that the designation of such
10      a person is a major issue.  And I don't
11      know the details about alternatives for a
12      representative payee for W.P., but if he
13      had -- having your landlord be a
14      representative payee, I could imagine -- I
15      believe that's what you said.  I could
16      imagine that being a problematic issue for
17      anyone.
18             Q.   So any housing placement where
19      the provider is a representative payee, in
20      your opinion, is unacceptable?
21             A.   No, that's not my testimony at
22      all.
23             Q.   Okay.  Well, then why is it that
24      you think this particular placement for
25      W.P. was unacceptable?

CONFIDENTIAL

```
                                          Page 90

 1              CONFIDENTIAL - R. FACTOR

 2                   MS. MASTERSON:  Objection, form.

 3          A.   You're speaking of the particular

 4     placement where the housing provider was

 5     the represent -- was proposed to be the

 6     representative payee?

 7          Q.   Yes.

 8          A.   I don't know the details of

 9     W.P.'s specific objections.  I can

10     certainly hypothesize about what they might

11     be.  I don't know who the alternatives

12     would be or could have been to act as a

13     representative payee for him, but I could

14     presume that that would make a housing

15     situation difficult and unacceptable.

16                   MR. CONROY:  Let's take a break?

17                   MS. MASTERSON:  Sure.

18                   (Recess taken, 12:11 p.m.)

19                   (On the record, 12:28 p.m.)

20     BY MR. CONROY:

21          Q.   Dr. Factor, let's spend a few

22     more minutes talking about S.D., and I

23     think you previously testified that you did

24     not speak to any members of S.D.'s FACT

25     team; is that correct?
```

CONFIDENTIAL

```
                                              Page 91
 1               CONFIDENTIAL - R. FACTOR
 2          A.   Yes.
 3          Q.   Did you speak to any of his other
 4     providers?
 5          A.   No.
 6          Q.   Did you speak to anyone involved
 7     in trying to place him in housing?
 8          A.   No.
 9          Q.   Are you familiar with S.D.'s
10     history?
11          A.   Yes.
12          Q.   Are you familiar with the events
13     that led to each of S.D.'s convictions?
14               MS. MASTERSON:  Objection, form.
15          A.   I'm familiar with what I read in
16     his record.
17          Q.   And what are you familiar with?
18          A.   To answer that accurately, I'd
19     need to review the record.
20          Q.   Was there an occasion when S.D.
21     ██████████████████████████████████████
22     ████████?
23          A.   Yeah, yes.
24          Q.   Was there another occasion when
25     S.D. ██████████████████████████████████
```

CONFIDENTIAL

Page 92

1              CONFIDENTIAL - R. FACTOR

2    ███████████?

3              A.    Yes, I believe so.

4              Q.    Is there anything in S.D.'s

5    history that would make him a difficult

6    person to place in community housing?

7              A.    Both of those events.

8              Q.    Would make him difficult to

9    place?

10             A.    Yes.

11             Q.    What efforts were made to place

12   S.D. in mental health housing upon his

13   release from prison in 2019?

14             MS. MASTERSON:   Objection, form.

15             A.    As I described in paragraph 98,

16   he was placed on a waitlist for a housing

17   program and discharged to the shelter

18   system in the meantime in March of 2019,

19   thereabouts.

20             Q.    And are you aware of anything

21   else with respect to efforts to place him

22   in housing at that time?

23             A.    Other than what I've testified,

24   no.

25             MR. CONROY:   I'm going to, at

CONFIDENTIAL

Page 93

1              CONFIDENTIAL - R. FACTOR

2              least for now, skip Exhibits 7 and 8 -

3              because I premarked them - and go

4              right to Exhibit 9.

5                    (Whereupon, Factor Exhibit 9,

6              Progress Notes MG-Class00035441-35443,

7              having been premarked, was identified

8              as of this date.)

9                    MR. CONROY:  So, Doctor, I'm

10             showing you what has been marked as

11             Exhibit 9.  This is a three-page

12             document with Bates numbers

13             MG-Class00035441 through 35443.

14             Q.   Have you seen this document

15        before?

16             A.   According to Appendix B, I've

17        seen MG-Class00035441 only.

18             Q.   Does that mean you think you've

19        only seen the first page of this document

20        or --

21             A.   It's my understanding, yes.

22             Q.   Okay.  If you know, what is this

23        document?

24             A.   Progress notes from ████████

25        Correctional Facility, and that first page

CONFIDENTIAL

Page 94

```
 1                 CONFIDENTIAL - R. FACTOR
 2        is from 5/█/2019 to 8/█/2019.
 3              Q.    Toward the top right of that page
 4        is a note that says "CUCS Staff."
 5                   Do you see that?
 6              A.    Yes.
 7              Q.    Are you familiar with CUCS?
 8              A.    No.
 9              Q.    Do you know what entity
10        facilitates the mental health housing
11        placement process in New York City?
12              A.    I can't recall the precise name
13        of the entity, I've -- well...
14                   In paragraph 98 I refer to Mental
15        Health Housing and to New York City Human
16        Resources Administration.
17              Q.    Does this document tell you
18        anything about efforts to place S.D. in
19        community housing?
20              A.    Are you referring to all three
21        pages?
22              Q.    I'll refer -- let's look
23        specifically on the first page.  Right at
24        the -- toward the top, it says "Housing
25        Referrals."
```

CONFIDENTIAL

Page 95

1              CONFIDENTIAL - R. FACTOR

2              Do you see that?

3        A.    Yes.

4        Q.    And then there's a list that

5   follows.

6              Do you see that?

7        A.    Yes.

8        Q.    Does that list tell you anything

9   about efforts to place S.D. in community

10  housing?

11       A.    Yes.

12       Q.    What does it tell you?

13       A.    That housing referrals were sent

14  on March 8, seven of them, and an

15  additional referral on June 11, 2019.

16       Q.    And for seven of the eight

17  referrals, all the way on the right it says

18  "No Placement."

19             Do you see that?

20       A.    Yes.

21       Q.    Do you know why the -- those

22  seven referrals resulted in no placement?

23       A.    I recall reading about them in

24  the medical record; I can't describe the

25  specific reasons right now.

CONFIDENTIAL

                                              Page 96

1                CONFIDENTIAL - R. FACTOR
2          Q.   But you think you saw something
3     that explained why those seven referrals
4     resulted in no placement?
5          A.   I believe I did.
6          Q.   Do you remember anything
7     generally about what you saw?
8          A.   I don't want to speculate without
9     referring to the record.
10         Q.   And the last -- the eighth line
11    under "Housing Referrals" says "Wait
12    Listed."
13              Do you see that?
14         A.   Yes.
15         Q.   Do you know what that means?
16         A.   He was placed on a waitlist.
17         Q.   Okay.  So for S.D., fair to say
18    this document shows that seven housing
19    referrals resulted in no placement, right?
20         A.   Right.
21         Q.   And one resulted in a waitlist
22    placement, right?
23         A.   Right.
24         Q.   When S.D. was first released from
25    prison, where did he live?

CONFIDENTIAL

Page 97

1                    CONFIDENTIAL - R. FACTOR

2                    I'm sorry, let me clarify.  When

3          he was first released from prison in 2019,

4          where did he live?

5               A.   I believe he lived in a community

6          homeless shelter.

7               Q.   Did there come a time when S.D.

8          moved to something called the Neighborhood

9          Association for Intra-Cultural Affairs,

10         East Tremont Transitional Housing Program?

11              A.   That does seem familiar, yes.

12              Q.   What do you know about that

13         particular program?

14              A.   I can't tell you more specifics

15         right now.

16              Q.   Do you know what services are

17         provided at the East Tremont Transitional

18         Housing Program?

19              A.   I can't enumerate them now, no.

20              Q.   Do you know whether any of S.D.'s

21         family members or friends offered him a

22         place to live when he was released from

23         prison in 2019?

24              A.   I don't recall that right now.

25              Q.   Are you familiar with something

CONFIDENTIAL

```
 1              CONFIDENTIAL - R. FACTOR
 2        called long-acting injectable medications?
 3              A.   Yes.
 4              Q.   What are those?
 5              A.   Medications that are injectable
 6        and, due to their pharmacology, have a
 7        period of action that typically ranges
 8        anywhere from two weeks to a month to three
 9        months and, at least in one case, six
10        months.
11              Q.   Are there any reasons why a
12        doctor might recommend that someone moving
13        from an institutional setting to the
14        community should start taking long acting
15        injectable medications?
16              A.   There may be.
17              Q.   What reasons would those be?
18              A.   There are some people who are not
19        good at adhering to taking oral medications
20        on a daily basis on their own.  There are
21        other people where oral medications are
22        poorly absorbed and better absorbed when
23        injected.
24              Q.   When S.D. was released from
25        prison in 2019, are you aware of whether
```

Page 99

CONFIDENTIAL - R. FACTOR

1

2        his FACT team recommended that he start

3        taking long-acting injectable medications?

4            A.    My recollection, which is a bit

5        fuzzy, is that they did.

6            Q.    Do you know what his response

7        was?

8            A.    I believe he didn't like needles

9        and didn't agree to that.

10           Q.    Did you talk to him about that?

11           A.    I can't recall specifically

12       whether I did or did not.

13           Q.    Do you think it would have been a

14       good idea if S.D. had started taking

15       long-acting injectable medications when he

16       was released from prison in 2019?

17               MS. MASTERSON:  Objection, form.

18           A.    Given his objection to

19       injectable -- his objection to injectable

20       medications, I don't think that would have

21       been a good way to start his medication in

22       the community, given that there would be

23       other alternatives to assuring that he was

24       stable on -- or reliable in taking his

25       medications.

CONFIDENTIAL

Page 100

1                CONFIDENTIAL - R. FACTOR

2          Q.    And what would those other

3     alternatives be?

4          A.    Medication observation by

5     delivery and observation, if necessary, by

6     treatment staff.

7          Q.    Do you know if S.D.'s FACT team

8     provided that service?

9                MS. MASTERSON:  Objection, form.

10         A.    Are you asking if they provided

11    that service to him --

12         Q.    Yes.

13         A.    -- or if they offered the

14    service?

15         Q.    Well, let's start with if they

16    provided it, and to be clear, I'm talking

17    about -- so you said the alternative to

18    long-acting injectable medication would be

19    medication management.

20               Do I have that right?

21         A.    Correct.

22         Q.    Okay.  So did S.D.'s FACT team

23    provide him with medication management

24    services?

25         A.    I can't recall at this time.

```
                                        Page 101

  1                 CONFIDENTIAL - R. FACTOR
  2            Q.   Did there come a time when S.D.
  3       stopped taking his medications in the
  4       community in 2019?
  5            A.   Yes.
  6            Q.   What happened?
  7            A.   He decompensated and required
  8       hospitalization in June 2019.
  9            Q.   Did you talk to him about why he
 10       stopped taking his medications?
 11            A.   I, at this point, cannot recall
 12       that detail in the interview we did.
 13            Q.   Sitting here today, do you have
 14       any reason to believe that S.D.'s FACT team
 15       failed to provide appropriate medication
 16       management services to him?
 17            A.   Given that he, as I wrote,
 18       predictably decompensated in the community
 19       [shelter] when -- after stopping taking
 20       medications, I don't know -- I can't tell
 21       you here, today, what efforts they made to
 22       have him restart his medications.
 23            Q.   So you don't know?
 24            A.   I don't know what specific
 25       efforts they made, no.
```

CONFIDENTIAL

Page 102

1           CONFIDENTIAL - R. FACTOR

2           Q.    Okay.  So my -- again, my

3    question is, do you have any reason to

4    believe that S.D.'s FACT team failed to

5    provide appropriate medication management

6    services?

7           A.    I don't have an opinion today

8    about that.  I did not address that in my

9    report.

10          Q.    And after S.D. decompensated in

11   the community, did he go to the hospital?

12          A.    Yes.

13          Q.    In total, how long was S.D. in

14   the community in 2019?

15          A.    A few weeks.

16          Q.    Did there come a time when S.D.

17   was incarcerated again?

18          A.    Yes.

19          Q.    What happened that led to his

20   current incarceration?

21               MS. MASTERSON:  Objection, form.

22          A.    I'm drawing a blank on the

23   specific events right now.

24          Q.    Okay.  Was there an incident

25   where he assaulted another patient at

Page 103

1              CONFIDENTIAL - R. FACTOR
2         Manhattan Psychiatric Center?
3              A.    Yes.
4              Q.    Okay.  Do you know if he
5         currently has a scheduled release date?
6              A.    I don't know the details of that.
7              Q.    At this point, while he's in
8         prison, he's not eligible to move into
9         community housing right now, right?
10             A.    He can't leave the prison.
11             Q.    Okay.  When he does approach his
12        next release date, what, if anything, will
13        be the challenges to finding S.D. a
14        permanent housing placement?
15             A.    We've just discussed the
16        incidents in which he behaved in a
17        dangerous manner towards other people.
18             Q.    Why would those pose a challenge
19        for his housing placement?
20             A.    I believe I answered this before,
21        that landlords are reluctant to rent to
22        people with that kind of history.
23             MR. CONROY:  Okay.  Next I'm
24        going to switch to D.H., and it's five
25        to 1:00, so maybe we should just take

CONFIDENTIAL

Page 104

1              CONFIDENTIAL - R. FACTOR
2              the lunch break.  Is that okay?
3                   MS. MASTERSON:  Yep.
4                   (Luncheon recess, 12:55 p.m.)
5                   (On the record, 1:44 p.m.)
6         BY MR. CONROY:
7              Q.   Okay.  Dr. Factor, let's talk
8         about D.H. for a few minutes, okay?
9              A.   Okay.
10             Q.   Okay.  Did you speak to any of
11        D.H.'s providers?
12             A.   No.
13             Q.   Are you familiar with D.H.'s
14        history?
15             A.   Yes.
16             Q.   What is his history?
17             A.   I described it in paragraph 85.
18             Q.   And in paragraph 85, you explain
19        that he has had arrests for drug-related
20        offenses, larceny, and he also has an arson
21        conviction; is that correct?
22             A.   Yes.
23             Q.   Do you know what happened that
24        led to his arson conviction?
25             A.   I remember reading about it.

CONFIDENTIAL

Page 105

1              CONFIDENTIAL - R. FACTOR

2         Somewhat to my chagrin, I'm not recalling

3         the exact details right now.

4              Q.   Is there anything about D.H.'s

5         history that would make him a challenging

6         person to place in community mental health

7         housing?

8              A.   An arson conviction.

9              Q.   That would make him challenging

10        to place?

11             A.   It would.

12             Q.   Let's look at, in your report,

13        page 22, paragraph 86.  I want to direct

14        your attention to a sentence that says (as

15        read):

16                  There appears to have been a

17               preference for repeated

18               punishment rather than treatment.

19               For example, a pre-sentence

20               investigation report in 2014

21               stated that the "defendant was

22               not successful on juvenile or

23               adult probation and is presently

24               in need of a punitive sanction."

25                  Did I read that correctly?

CONFIDENTIAL

Page 106

CONFIDENTIAL - R. FACTOR

1

2          A.    You did.

3          Q.    Who do you believe had a

4     preference for repeated punishment rather

5     than treatment?

6          A.    The author of that note.

7          Q.    Who is the author that note?

8          A.    I would have to look at the note

9     to answer that.

10         Q.    And you're talking about the note

11    you cite here, with Bates Stamp D-00006283;

12    is that right?

13         A.    That's right.

14         Q.    Other than that note, do you have

15    any other support for your opinion that

16    there appears to have been a preference for

17    repeated punishment rather than treatment?

18         A.    There may be other bases for

19    that; I cannot cite any specific ones right

20    now.

21         Q.    Well, it's your opinion, right?

22         A.    Yes.

23         Q.    But sitting here today, you are

24    not aware of any other support for that

25    statement?

CONFIDENTIAL

1               CONFIDENTIAL - R. FACTOR

2          A.   That wasn't my testimony.

3          Q.   So you are aware of other support

4     for that statement?

5          A.   I cannot cite, as we're sitting

6     here today, other specific evidence for

7     that.

8          Q.   Is there other evidence you're

9     aware of but you just won't tell me?

10         A.   No.  There may be.  I do not have

11    a photographic memory of the medical

12    record, and I cited that example.  I'm not

13    prepared to say that there are no other

14    examples.

15         Q.   The example that you cited is a

16    pre-sentence investigation report, correct?

17         A.   Correct.

18         Q.   From 2014?

19         A.   Correct.

20         Q.   Do you know if anyone associated

21    with OMH had any role in drafting that

22    document?

23         A.   I do not.

24         Q.   Do you know if anyone associated

25    with D.H.'s mental health treatment had any

CONFIDENTIAL

                                              Page 108

1                   CONFIDENTIAL - R. FACTOR

2           role in drafting that document?

3                   A.   I can't answer that question

4           without looking at the document.

5                        MR. CONROY:   Okay.   Let's look at

6                   Exhibit 10.

7                        (Whereupon, Factor Exhibit 10,

8                   Probation Case Documents

9                   D-00006278-6327, having been

10                  premarked, was identified, as of

11                  this date.)

12                       MR. CONROY:   This is a

13                  multiple-page document starting with

14                  Bates Stamp D-00006278 through

15                  D-00006327.

16          Q.   There's quite a few pages to this

17          document; but, Doctor, I will represent to

18          you that the page you cited, D_6283,

19          appears about a quarter of the way in.

20                  So take a look, and let me know

21          when you're ready for my next question.

22          A.   Okay.

23          Q.   Okay.  So having now looked at

24          the document you cited, are you aware of

25          whether anyone associated with D.H.'s

CONFIDENTIAL

                                    Page 109

1              CONFIDENTIAL - R. FACTOR
2        mental health treatment had any role in
3        drafting this document?
4              A.    From what I see, I can't
5        determine who the author of the document
6        is.
7              Q.    Let me direct your attention to
8        your report, and let's turn back to page 1.
9                    It's the next page, actually.
10                   And I'm going to direct you to
11       paragraph 4.  And you wrote that, based on
12       your review, (as read):
13                      These three Named Plaintiffs
14                   were deemed eligible for CBMHHSS
15                   upon release from prison,
16                   including mental health housing
17                   and Assertive Community Treatment
18                   teams.
19                   Do you see that?
20             A.    Yes.
21             Q.    What support do you have for the
22       statement that D.H. was deemed eligible for
23       ACT team services?
24             A.    D.H. was identified -- as I wrote
25       in paragraph 85, (as read):

CONFIDENTIAL

Page 110

1              CONFIDENTIAL - R. FACTOR

2                  Identified as an individual

3              with a serious mental illness and

4              designated -- and designated him

5              with the mental health service

6              level of 1-S, the highest level

7              of mental health need in the

8              state prison system.

9                  Paragraph 87, I wrote that (as

10        read):

11                  On multiple occasions, OMH

12              staff wrote that D.H. would

13              require treatment and support in

14              multiple modalities to be

15              successful, yet he did not

16              receive these.

17                  So, as a member of the class in

18        the service level 1-S, I believed that he

19        was eligible for the highest level of

20        service, which would be ACT.

21            Q.    And is everyone designated at the

22        service level 1-S automatically deemed

23        eligible for ACT team service?

24            A.    I can't answer that.

25            Q.    Are you familiar with something

Page 111

```
 1              CONFIDENTIAL - R. FACTOR
 2         called Health [Homes] Plus Care Management?
 3              A.   No, not as -- you'd have to give
 4         me some more information.
 5              Q.   Are you aware of whether D.H.
 6         received care management services in the
 7         community?
 8              A.   I believe that once he was
 9         released, he did receive some services.
10              Q.   What do you know about the care
11         management services that he received?
12              A.   As I wrote in paragraphs 87 and
13         88, staff, prior to his discharge, were
14         setting up or attempting to set him up with
15         appointments and...
16              Q.   Other than those notes that you
17         cited about setting up clinic appointments,
18         are you aware of any other care management
19         services that D.H. received?
20              A.   At this time, I can't recall
21         specifics.
22              Q.   Let's look at page 23 of your
23         report, paragraph 93.  And here you wrote
24         (as read):
25                       In my interview with D.H.,
```

CONFIDENTIAL

                                        Page 112

                    CONFIDENTIAL - R. FACTOR

 1                     CONFIDENTIAL - R. FACTOR

 2                 he expressed considerable

 3                 frustration that staff were not

 4                 more helpful in connecting him

 5                 with substance abuse treatment,

 6                 which he knew he needed.

 7                 Do you see that?

 8          A.     Yes.

 9          Q.     What staff are you talking about

10     here?

11          A.     I can't elaborate on that

12     question at this moment.

13          Q.     What substance abuse treatment

14     has D.H. received since his release from

15     prison?

16          A.     Without referring to the records,

17     I -- right now, I can't give you more

18     information about that.

19          Q.     So when you write "that staff

20     were not more helpful in connecting him

21     with substance abuse treatment," are you

22     just relaying what D.H. said or are you

23     asserting your own opinion?

24          A.     I was asserting my own opinion.

25          Q.     So your opinion is that the staff

CONFIDENTIAL

1                    CONFIDENTIAL - R. FACTOR

2          who worked with D.H. were not helpful in

3          connecting him with substance abuse

4          treatment?

5               A.    What I wrote in the first part of

6          paragraph 93 was about the integration of

7          his mental health treatment with substance

8          abuse treatment, the integration and

9          coordination of that, so that's the basis

10         of -- or the focus of my opinion.

11              Q.    But sitting here today, you can't

12         say anything about what substance abuse

13         treatment D.H. actually was provided in the

14         community?

15              A.    That's correct.

16              Q.    Did he receive substance abuse

17         treatment at the Russell E. Blaisdell

18         Addiction Treatment Center?

19              A.    I just testified that I --

20         sitting here today, I can't give you more

21         details.  I'd have to review the record

22         again.

23              Q.    So if I go through the list, you

24         won't be familiar with the locations where

25         he received substance abuse treatment?

CONFIDENTIAL

CONFIDENTIAL - R. FACTOR

1
2          A.    Not without looking at some
3      records that support that.
4          Q.    Okay.  Do you know whether D.H.
5      cooperated with the substance abuse
6      treatment programs he was enrolled in?
7               MS. MASTERSON:  Objection, form.
8          A.    I can't give you any more
9      information, as I just said.
10         Q.    Are you familiar with something
11     called a mentally ill/chemical abuse
12     program?
13         A.    I am familiar with that term,
14     yes.
15         Q.    And what does that mean?
16         A.    A program that combines treatment
17     for people with mental illness and
18     substance abuse.
19         Q.    Do you have any opinions about
20     the efficacy of those types of programs?
21         A.    It depends on the specifics of
22     the program and what they do.
23         Q.    Are there good mentally
24     ill/chemical abuse programs?
25         A.    Yes.

CONFIDENTIAL

Page 115

1                    CONFIDENTIAL - R. FACTOR

2              Q.    And what do those programs do?

3              A.    Those programs typically provide

4         support or refer people to support to

5         maintain abstinence or, in some cases, use

6         that is not problematic, if that's

7         possible.  They do education and other

8         kinds of psychosocial support to promote

9         people living without resorting to

10        substance misuse.

11             Q.    Are you aware of whether any

12        mentally ill/chemical abuse programs

13        provide housing and treatment to

14        individuals with both mental illness and

15        substance abuse issues?

16             A.    I don't know about the housing

17        part.

18             Q.    Did there come a time when D.H.

19        received a placement in a mentally

20        ill/chemical abuse program?

21             A.    I have some recollection of that;

22        I can't give you more specifics.

23             Q.    What's your recollection?

24             A.    That he was, at some time,

25        enrolled in such a program.

CONFIDENTIAL

Page 116

1              CONFIDENTIAL - R. FACTOR

2                   (Whereupon, Factor Exhibit 11,

3              Loeb House Records P-MEDICAL-0008020 -

4              8173, having been premarked, was

5              identified, as of this date.)

6                   MR. CONROY:  Okay.  Doctor, I'm

7              going to show you what has been marked

8              as Exhibit 11.  This is a

9              multiple-page document starting at

10             Bates Stamp P-MEDICAL-0008020 and

11             going through P-MEDICAL-0008173.

12             Q.   Are you ready for me to ask my

13        next question?  You don't have to read the

14        whole thing, you can read as much as you'd

15        like.

16             A.   Okay.  Yes, I'm ready.

17             Q.   Okay.  Have you seen this

18        document before?

19             A.   No.

20             Q.   I'm going to ask you to turn to

21        Appendix B of your report, and tell me if

22        you see this document listed among the

23        materials you reviewed.

24             A.   I do not see it listed.

25             Q.   Now, the first page, up at the

CONFIDENTIAL

1                    CONFIDENTIAL - R. FACTOR

2          very top it says Loeb House.

3                    Do you see that?

4          A.    Yes.

5          Q.    Are you familiar with Loeb House?

6          A.    No.

7          Q.    Are you familiar with something

8      called the Lukens House?

9          A.    No.

10         Q.    Are you familiar with any of the

11     details of the services or housing provided

12     by Loeb House to D.H.?

13         A.    I can't recall at this time, no.

14         Q.    And there's nothing in your

15     report about the housing or services

16     provided by Loeb House to D.H., correct?

17         A.    Correct, or at least not

18     described in this exhibit.

19         Q.    Well, whether it's described in

20     the exhibit or not, is there anything in

21     your report about the services or housing

22     provided by Loeb House to D.H.?

23         A.    No.

24         Q.    If you know, where is D.H.

25     currently living?

CONFIDENTIAL

Page 118

CONFIDENTIAL - R. FACTOR

1

2          A.    I don't know where he's currently

3      living.

4          Q.    Directing your attention to page

5      23 of your report, paragraph 91, about

6      midway through the paragraph there's a

7      sentence that's referring to D.H., and it

8      says (as read):

9              Were he to have been served

10          by an ACT or FACT team, staff in

11          a crisis would have been able to

12          respond in a knowledgable and

13          informed manner to avoid

14          reinstitutionalization.

15          Do you see that?

16      A.    Yes.

17      Q.    Is that an accurate statement?

18      A.    Yes.

19      Q.    Let me loop back, for a minute,

20      to the part A questions in your report.

21              So the first sixteen or so pages

22      of the report list various mental health

23      services and housing that you believe

24      helped to prevent institutionalization,

25      correct?

CONFIDENTIAL

CONFIDENTIAL - R. FACTOR

1

2          A.    Correct.

3          Q.    And I want to direct you to page

4     17.  And in the subheading C, you wrote (as

5     read):

6                    New York State already has

7                programs and structures in place

8                that operate successfully for the

9                populations who are able to

10               access those services.

11              Do you see that?

12         A.    Yes.

13         Q.    And do you agree that that's an

14    accurate statement?

15         A.    Yes.

16         Q.    Did you have any reason to

17    conclude that OMH disagrees with your

18    opinions in part A about the efficacy of

19    the mental health community services and

20    housing that you discuss?

21         A.    I don't know what OMH agrees or

22    disagrees with.

23         Q.    Do you know how much money New

24    York State spends each year on the mental

25    health community services and housing that

Page 120

CONFIDENTIAL - R. FACTOR

1

2          you discuss in part A of your report?

3               A.   No.

4               Q.   Do you know how much new funding

5          New York State appropriated for mental

6          health community services and housing in

7          the Fiscal Year 2024 budget?

8               A.   No.

9               Q.   Let me ask, for a couple minutes,

10         about your background and experience.

11                   So Appendix A to your report is

12         your CV; is that right?

13              A.   That's correct.

14              Q.   Does this CV accurately depict

15         your education and professional history?

16              A.   It does.

17              Q.   Is there any education or work

18         history that is missing?

19              A.   No.

20              Q.   I think you said, earlier, you

21         see patients in your psychiatry practice,

22         correct?

23              A.   Correct.

24              Q.   And you said when you meet a new

25         patient, you perform a clinical analysis of

CONFIDENTIAL

1                  CONFIDENTIAL - R. FACTOR

2          them; do I have that right?

3              A.    I perform an evaluation, right.

4              Q.    When you meet with a new patient,

5          typically, how long does it take you to

6          perform that evaluation?

7              A.    It depends on the patient.

8              Q.    Give me a low end and a long end.

9              A.    When I worked in the two

10         community psychiatry teams that I list in

11         my CV, I suppose the low end could be -- as

12         a first meeting could be short, and there

13         would be subsequent meetings and other

14         members of the team would be filling me in.

15                  In my private practice, I usually

16         spend sixty to -- well, forty-five to

17         ninety minutes.

18             Q.    Moving forward in Appendix A, I

19         want to direct you to pages 13 and 14.

20                  And is this an accurate list of

21         cases where you have previously been

22         retained as an expert witness?

23             A.    It is.

24             Q.    Are there any cases where you

25         were retained as an expert witness that are

CONFIDENTIAL

Page 122

1              CONFIDENTIAL - R. FACTOR

2        missing from this list?

3              A.   Not to my knowledge.

4              Q.   And looking through this, it

5        looked like, to me, for most of these cases

6        you're providing expert opinion on behalf

7        of plaintiffs in civil lawsuits regarding

8        mental health treatment; is that correct,

9        or no?

10             A.   For most of the cases, that's

11       correct, yes.

12             Q.   Were there any cases where you

13       provided expert opinion for defendants in a

14       civil lawsuit?

15             A.   Yes.

16             Q.   Which one?

17             A.   1993-94, witness for the

18       Department of Public Instruction in the

19       State of Wisconsin.

20             Q.   Okay.  Any others where you were

21       on the defense side in a civil case?

22             A.   No.

23             Q.   Is there any reason why most of

24       your cases have been on the plaintiff's

25       side?

CONFIDENTIAL

Page 123

CONFIDENTIAL - R. FACTOR

1

2          A.    I don't solicit this work, and

3     those are the people who have contacted me

4     to retain me.

5          Q.    In any of the prior cases where

6     you were retained as an expert, did any

7     party file a motion to strike your

8     testimony in whole or in part?

9          A.    Not to my knowledge.

10          Q.    Has any court ever excluded any

11     of your testimony in whole or in part?

12          A.    Not to my knowledge.

13          Q.    Are you aware of any court

14     letting you testify but issuing any opinion

15     criticizing your testimony in any way?

16          A.    No.

17          Q.    In any of the prior cases that

18     you've been involved in, were you asked to

19     review an individual's community mental

20     health services and housing, and opine

21     about whether the services they received

22     were adequate?

23          A.    Yes.

24          Q.    Which one?

25          A.    1997-98, Alice Doe and Barbara

CONFIDENTIAL

```
                                    Page 124

  1              CONFIDENTIAL - R. FACTOR

  2         Doe, et al. v. Joe Bob Hall, et al.

  3              Q.   What was that case about?

  4              A.   To improve emergency mental

  5         health services for persons with severe

  6         mental illness in Texarkana, Texas.

  7              Q.   And what was the subject of the

  8         opinion you offered in that case?

  9              A.   This was twenty-six years ago,

 10         and it had to do with the crisis services,

 11         the emergency services, in that community.

 12         I can't give you more information than

 13         that.

 14              Q.   Okay.  Any other cases you can

 15         recall where you offered an opinion about

 16         whether the community services and housing

 17         that plaintiffs received were adequate?

 18              A.   I believe I'd give the same

 19         answer to the 1999-2000 listing, Deborah

 20         Sue Anderson, et al. v. Gregory R. Montoya,

 21         et al.

 22              Q.   Do you remember what you did in

 23         the Anderson vs. Montoya case to assess

 24         whether the services the plaintiffs

 25         received were adequate?
```

CONFIDENTIAL

Page 125

CONFIDENTIAL - R. FACTOR

1

2      A.   Again, that was twenty-four years

3   ago, and I don't.

4      Q.   Okay.  Anything else more recent,

5   where you opined about whether the services

6   someone received in the community were

7   adequate?

8      A.   Not really, no.

9      Q.   Is "not really" the same as "no"

10   or --

11      A.   Well, there were some other cases

12   having to do with behavior of emergency

13   departments or other institutions, and I'm

14   not including that in community, so no, it

15   is the same as "no."

16      Q.   Okay.  Nothing involving the

17   issues we've been talking about today,

18   placements with ACT teams, placements with

19   supportive housing, that sort of thing?

20      A.   Correct.

21      Q.   Okay.  Let me just take a couple

22   of the more recent ones.  I want to ask you

23   about 2017-2018, United States v. State of

24   New York.

25           Do you see that one?

CONFIDENTIAL

Page 126

CONFIDENTIAL - R. FACTOR

1

2          A.    Yeah.

3          Q.    What was that case about?

4          A.    It was a claim to require the

5    State of New York to provide appropriate

6    and integrated services and housing for

7    persons with serious mental illness.

8          Q.    And what was the subject matter

9    of your opinion in that case?

10         A.    As listed in my -- in the CV

11   entry, I did not write a report, I didn't

12   render an opinion.

13         Q.    You were a consultant for a DOJ?

14         A.    Correct.

15         Q.    In that case, did you interview

16   any individuals who were seeking services?

17         A.    No.

18         Q.    In that case, did you interview

19   anyone involved in service treatment in New

20   York?

21         A.    No.

22              MS. MASTERSON:  And I would just

23         remind the witness not to state

24         anything that would be subject to a

25         protective order or other

CONFIDENTIAL

Page 127

CONFIDENTIAL - R. FACTOR

1

2          confidentiality order in that case.

3          Q.    Let's go up a couple, to 2014.

4     There's a case United States v. Georgia.

5               Do you see that one?

6          A.    Yes.

7          Q.    What was that case about?

8          A.    It was about the implementation -

9     I see a typo there - of the 2010 settlement

10    agreement between United States and the

11    State of Georgia regarding their compliance

12    with the settlement to provide

13    community-based treatment for persons with

14    serious mental illness in the State of

15    Georgia.

16         Q.    And in that case you served as a

17    consultant, and you provided an expert

18    report; is that right?

19         A.    That is right.

20         Q.    Do you remember the subject

21    matter of your opinion in that case?

22         A.    I can't recall the details;

23    again, that was eight years ago.  The basis

24    was that the state was not in compliance.

25         Q.    Do you recall whether you

CONFIDENTIAL

Page 128

```
 1              CONFIDENTIAL - R. FACTOR
 2       conducted any interviews in that case?
 3              A.   No, I did not.
 4              Q.   Do you not recall or you didn't
 5       conduct --
 6              A.   I didn't conduct any.
 7              Q.   Okay.  A couple more lines up,
 8       2007, there's Joseph S. v. Hogan.
 9                   Do you see that?
10              A.   I do.
11              Q.   What was that case about the?
12              A.   A claim to require the State of
13       New York to provide appropriate and
14       integrated services and housing for persons
15       with serious mental illness.
16              Q.   What was the subject matter of
17       your report in that case?
18              A.   These were people discharged from
19       state hospitals in the State of New York
20       who were subsequently housed in nursing
21       homes, and it was my opinion that the vast
22       majority of them did not need to be in
23       nursing homes and could be treated stably
24       in the community.
25              Q.   Did you interview any of the
```

Page 129

1                    CONFIDENTIAL - R. FACTOR
2            plaintiffs in that case?
3                 A.    I did.
4                 Q.    Did you interview any providers
5            in that case?
6                 A.    I met with providers, yes.
7                 Q.    Why did you meet with providers
8            in that case?
9                 A.    Well, I visited nursing homes, to
10           interview the residents of the nursing
11           homes, and we spoke.
12                Q.    Did you learn anything from your
13           conversations from providers that wound up
14           being material to your opinion in that
15           case?
16                A.    I can't recall the specifics to
17           answer that question.
18                Q.    In any of your prior cases where
19           you served as an expert, did any of the
20           cases involve plaintiffs who were
21           incarcerated and seeking services in the
22           community upon their release?
23                A.    I don't believe so.
24                Q.    Other than what you have already
25           testified about and what is listed in your

CONFIDENTIAL

Page 130

CONFIDENTIAL - R. FACTOR

1
2          CV, have you ever been a witness or a party
3          to any other legal proceeding involving
4          mental health services?
5                    A.    Other than what's listed in this?
6                    Q.    Correct.
7                    A.    No, not to my knowledge.
8                    MR. CONROY:  Okay.  Let's take a
9          break.
10                   (Recess taken, 2:40 p.m.)
11                   (On the record, 2:50 p.m.)
12                   MR. CONROY:  So, Dr. Factor, I
13         want to just ask you a couple of
14         questions about one of the interview
15         notes that you -- that Plaintiffs'
16         attorneys produced to us today.
17                   This one is not premarked, so
18         could we please mark it as Exhibit 12.
19                   (Whereupon, Factor Exhibit 12,
20         Handwritten Notes dated 12/16/22, was
21         marked for identification as of this
22         date.)
23                   MR. CONROY:  So, Dr. Factor, I'm
24         handing you what has been marked as
25         Exhibit 12.

CONFIDENTIAL

1                  CONFIDENTIAL - R. FACTOR

2              Q.   What is that document?

3              A.   My notes from my interview of

4          S.D. on December 16, 2022.

5              Q.   Okay.  And I just want to ask

6          you -- I'm sorry, can you hand it back to

7          me?  I only have one copy; I don't know if

8          you have another one.

9              A.   I do not.

10             Q.   Okay.  I'll just hand it back.

11                  So I'm going to flip to the very

12         last page, and do you see there's a section

13         that says "Q's after interview"?

14             A.   Uh-huh.

15             Q.   Is that a yes?

16             A.   Yes.

17             Q.   Okay.  Is this something you

18         wrote during the interview or afterward?

19             A.   These were questions I wrote

20         after the interview.

21             Q.   So I wanted to ask you, the very

22         first line, it says exaggerating Sx to --

23         why don't you read it to me?

24             A.   Exaggerating symptoms to stay in

25         hospital or incarceration.

CONFIDENTIAL

Page 132

1                    CONFIDENTIAL - R. FACTOR

2           Q.    What does that refer to?

3           A.    It was a question that occurred

4      to me after the interview related to a note

5      from the prison, saying that a staff member

6      thought he was doing that.

7           Q.    Did you come to any opinion about

8      whether or not S.D. is exaggerating

9      symptoms to stay in a facility?

10          A.    I did not, because I -- I did

11     not.

12          Q.    Okay.  Can you hand it back

13     again?  Thank you.

14                A couple lines below, there's a

15     line that I believe says (as read):

16                What about your statement you

17     would kill a stranger or cut someone to

18     live rest of life in prison.

19                Do you see that?

20          A.    Yes.

21          Q.    What is that referring to?

22          A.    Another question that occurred to

23     me after the conclusion of the interview.

24          Q.    And what's the basis for that

25     statement?

CONFIDENTIAL

CONFIDENTIAL - R. FACTOR

1

2      A.   I believe somewhere in the record

3     I had read that, and these were questions I

4     would -- would have asked had I had another

5     opportunity.

6      Q.   But you didn't ask him about it

7     during the session you had with him?

8      A.   I did not.

9      Q.   Is there any reason you didn't

10    have a second meeting with him?

11      A.   Probably logistical.

12      Q.   Do you think it would have been

13    helpful to have a second meeting with him?

14      A.   I would have gathered more

15    information about him.  I don't think it

16    would have changed my opinion, my opinions

17    expressed in my report.

18      Q.   How about the other two, W.P. and

19    D.H.; would it have been helpful to you to

20    meet with either of them a second time?

21      A.   I would give the same answer.

22      Q.   Can I see that again for a

23    second?

24       There's a line a few lines down,

25    it says "CASES."

CONFIDENTIAL

Page 134

1              CONFIDENTIAL - R. FACTOR

2              Do you see that?

3         A.    Yes.

4         Q.    And it says, What did they

5    provide, question mark; and there's some

6    dots that I would read as, What did they

7    not provide?

8              Is that a fair way to read that

9    note?

10        A.    It is.

11        Q.    That's another question you had

12   after the interview?

13        A.    Yes.

14        Q.    Did you ever determine the answer

15   to those questions?

16        A.    No.

17             MR. CONROY:  I have no other

18        questions at this time.

19             MS. MASTERSON:  Thank you.  Can

20        we just have a couple minutes?

21             MR. CONROY:  Sure.

22             (Recess taken, 3:04 p.m.)

23             (On the record, 3:05 p.m.)

24             MS. MASTERSON:  We have no

25        questions, and we'll just request that

CONFIDENTIAL

Page 135

```
 1              CONFIDENTIAL - R. FACTOR
 2          the witness have an opportunity to
 3          review the transcript once the court
 4          reporter is able to provide it, but
 5          otherwise, no questions.
 6              MR. CONROY:  Thank you,
 7          Dr. Factor.  I appreciate your time.
 8              (Whereupon, at 3:05 p.m., the
 9          examination of this witness was
10          concluded.)
11
12

                    _____
13                        ROBERT M. FACTOR
14
15
16      Subscribed and sworn to before me
17      this _____ day of _____ 20___.
18
19      _____
            NOTARY PUBLIC
20
21
22
23
24
25
```

Page 136

1
2                      E X H I B I T S
3          FACTOR EXHIBITS:
4            NUMBER        DESCRIPTION                      PAGE
5         Exhibit 1       Declaration/Expert Report          7
                          Robert M. Factor, MD, PhD
6
          Exhibit 2       Progress Notes                    41
7                         P-MEDICAL-0007745-7898
8         Exhibit 3       Progress Notes                    42
                          P-MEDICAL-0007667-7744
9
          Exhibit 4       Correspondence                    50
10                        MG-Class00035837
11        Exhibit 5       Progress Notes                    66
                          P-MEDICAL-007906-7955
12
          Exhibit 6       Progress Note                     78
13                        D-00010675-10677
14        Exhibit 9       Progress Notes                    93
                          MG-Class00035441-35443
15
          Exhibit 10      Probation Case Documents         108
16                        D-00006278-6327
17        Exhibit 11      Loeb House Records               116
                          P-MEDICAL-0008020-8173
18
          Exhibit 12      Handwritten Notes                130
19                        Dated 12/16/22
20          (Exhibits 7-8 Not Identified/Provided)
21
22                      I N D E X
23
24        EXAMINATION BY                            PAGE
25        MR. CONROY                                  4

CONFIDENTIAL

Page 137

1

2                     C E R T I F I C A T E

3

4         STATE OF NEW YORK          )

5                                    )ss.:

6         COUNTY OF NEW YORK         )

7

8             I, MARIANNE WITKOWSKI-SMITH, a Notary

9         Public within and for the State of New York,

10        do hereby certify:

11             That ROBERT M. FACTOR, the witness

12        whose deposition is hereinbefore set forth,

13        was duly sworn by me and that such deposition

14        is a true record of the testimony given by

15        the witness.

16              I further certify that I am not

17        related to any of the parties to this action

18        by blood or marriage, and that I am in no way

19        interested  in the outcome of this matter.

20             IN WITNESS WHEREOF, I have hereunto

21        set my hand this 3rd day of July, 2023.

22

23

24                        *Marianne Witkowski-Smith*

25                        MARIANNE WITKOWSKI-SMITH

CONFIDENTIAL

Page 138

1    MARINA MASTERSON, ESQ.

2    mmasterson@paulweiss.com

3                         July 5, 2023

4    RE:  M.G., Et Al. v. Cuomo

5         6/16/2023, Robert M. Factor (#5941609)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   CS-NY@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

CONFIDENTIAL

Page 139

1    M.G., Et Al. v. Cuomo

2    Robert M. Factor (#5941609)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Robert M. Factor                          Date

25

CONFIDENTIAL

Page 140

1    M.G., Et Al. v. Cuomo

2    Robert M. Factor (#5941609)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Robert M. Factor, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Robert M. Factor                         Date

13    *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20____.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

CONFIDENTIAL

**[& - 3rd]**                                                    Page 1

| & |
|---|
| **&** 1:20 2:3 3:15 |

**0**

**00006278**
108:14
**00006278-63...**
108:9 136:16
**00006283**
106:11
**00006327**
108:15
**00010675** 79:2
**00010675-10...**
78:20 136:13
**00010677** 79:3
**0007667** 43:3
**0007667-7744**
42:21 136:8
**0007744** 43:4
**0007745** 42:8
**0007745-7898**
42:2 136:7
**0007898** 42:9
**0007955** 66:12
**0008020** 116:3
116:10
**0008020-8173**
136:17
**0008173** 116:11
**00639** 1:6
**007906** 66:11
**007906-7955**
66:6 136:11

| 1 |
|---|

**1** 3:15 7:13,14
8:6,10 29:15
51:3,11 53:20
109:8 110:6,18
110:22 136:5
**10** 108:6,7
136:15
**100** 21:5,13
**10005** 2:13
**10019** 2:5
**10038** 2:9
**103** 67:6
**108** 136:15
**10:40** 48:5
**10:58** 48:6
**11** 95:15 116:2
116:8 136:17
**116** 136:17
**12** 130:18,19,25
136:18
**12/16/22**
130:20 136:19
**1285** 1:20 2:4
**12:11** 90:18
**12:28** 90:19
**12:55** 104:4
**13** 121:19
**130** 136:18
**14** 121:19
**16** 1:11 131:4
**17** 119:4
**18** 17:10
**19** 73:23

**199** 2:8
**1993-94** 122:17
**1997-98** 123:25
**1999-2000**
124:19
**1:00** 103:25
**1:44** 104:5

| 2 |
|---|

**2** 41:24,25
43:10 46:10
52:15 54:8
136:6
**2/47** 65:8
**20** 43:17 68:7
81:25 82:3
135:17 140:15
**2007** 128:8
**2010** 127:9
**2014** 105:20
107:18 127:3
**2017-2018**
125:23
**2019** 43:17
44:18 45:6
52:23 67:12
68:7 76:14
79:12,15 92:13
92:18 95:15
97:3,23 98:25
99:16 101:4,8
102:14
**2020** 45:13,21
46:15,22 54:14
55:6

**2022** 37:6
131:4
**2023** 1:11
137:21 138:3
**2024** 120:7
**21** 44:8 48:9
**22** 31:4 32:13
32:20 46:15,22
54:14 62:24
105:13
**23** 44:18 52:23
111:22 118:5
**24/7** 33:3 35:18
36:9 37:10,19
37:25 39:23
63:7,16 64:9
**25** 67:6
**26** 33:8
**27** 55:6
**28** 2:12
**2:40** 130:10
**2:50** 130:11

| 3 |
|---|

**3** 42:18,20,25
79:11 136:8
**30** 138:17
**30438** 137:24
**35443** 93:13
**3:04** 134:22
**3:05** 134:23
135:8
**3rd** 137:21

| **4** | |
|---|---|
| **4** 50:5,6 109:11 136:9,25 | |
| **41** 136:6 | |
| **42** 136:8 | |

| **5** | |
|---|---|
| **5** 66:4,5 68:5 136:11 138:3 | |
| **5/30/2019** 94:2 | |
| **50** 136:9 | |
| **5941609** 138:5 139:2 140:2 | |

| **6** | |
|---|---|
| **6** 78:19,25 136:12 | |
| **6/16/2023** 138:5 | |
| **6283** 108:18 | |
| **66** 136:11 | |

| **7** | |
|---|---|
| **7** 93:2 136:5 | |
| **7-8** 136:20 | |
| **70** 17:11,18 | |
| **76** 73:25 76:13 77:3 82:2,3 | |
| **77** 74:13 | |
| **7746** 44:7 52:21 | |
| **78** 85:15 136:12 | |
| **7814** 46:11 54:9 | |
| **7821** 55:4 | |

**79** 35:7 36:16 40:11
**7:19** 1:6

| **8** | |
|---|---|
| **8** 93:2 95:14 | |
| **8/5/2019** 94:2 | |
| **8173** 116:4 | |
| **82** 48:10 | |
| **85** 104:17,18 109:25 | |
| **86** 105:13 | |
| **87** 110:9 111:12 | |
| **88** 111:13 | |

| **9** | |
|---|---|
| **9** 93:4,5,11 136:14 | |
| **91** 118:5 | |
| **93** 111:23 113:6 136:14 | |
| **98** 92:15 94:14 | |
| **9:31** 1:12 | |

| **a** | |
|---|---|
| **a.m.** 1:12 48:5 48:6 | |
| **ability** 71:22 | |
| **able** 16:6 20:20 22:9 36:19 75:10 118:11 119:9 135:4 | |
| **above** 138:6 140:7 | |
| **absorbed** 98:22 98:22 | |

**abstinence** 115:5
**abuse** 61:13,16 62:20 64:16 67:13,15,22 112:5,13,21 113:3,8,12,16 113:25 114:5 114:11,18,24 115:12,15,20
**accept** 59:3 71:23 86:18 87:20
**access** 35:12 56:3 119:10
**accompany** 33:15,24
**accuracy** 138:9
**accurate** 8:11 16:15,18 20:2 20:11,12,16,25 21:8,11,18 26:20 33:6 49:25 52:13 55:12,20 81:4 118:17 119:14 121:20
**accurately** 17:6 91:18 120:14
**achieving** 72:6
**acknowledge...** 140:3
**acknowledg...** 138:12

**act** 26:10 30:20 31:20,24 32:3 32:6,10,13,22 33:11,22 35:15 35:17 39:9 50:18 51:11 61:20 62:25 64:18,18 65:21 67:10 68:21 71:19 86:11,11 86:13 90:12 109:23 110:20 110:23 118:10 125:18
**acting** 98:2,14 99:3,15 100:18
**action** 98:7 137:17
**acts** 71:14
**actually** 14:2 14:10,21 15:2 15:12,22 16:4 22:24 50:19 109:9 113:13
**add** 11:18 13:12
**addiction** 113:18
**addition** 11:19 13:15
**additional** 82:22 95:15
**additions** 140:6
**address** 102:8

**adequate** 21:16
21:24 22:7,20
39:19 123:22
124:17,25
125:7
**adhering** 98:19
**administer**
3:10
**administration**
94:16
**adult** 105:23
**advance** 78:6,7
**advice** 83:18
**affairs** 97:9
**affected** 58:6
**affording** 61:10
**afterward**
131:18
**ago** 34:5 47:23
124:9 125:3
127:23
**agree** 19:2 22:2
22:12 41:17
55:20 71:4,12
71:16 99:9
119:13
**agreed** 3:4,18
4:19
**agreement**
127:10
**agrees** 119:21
**ahead** 33:8
**aid** 2:7,17
**al** 1:3,8 124:2,2
124:20,21

138:4 139:1
140:1
**alexandra**
68:14
**alice** 123:25
**allegations**
58:12,17,23,25
**allotted** 138:20
**allow** 18:10
**allowed** 83:3
**alternative**
100:17
**alternatives**
89:11 90:11
99:23 100:3
**amended** 12:15
12:19 57:22
58:11,23
**americas** 1:21
2:4
**analysis** 120:25
**anderson**
124:20,23
**andrew** 1:7
**answer** 5:18,25
6:8 8:19 9:4,7
9:11 10:22
11:4,10 12:7
13:10 14:12
22:23 29:14
44:2 59:17
60:7 64:25
65:12 86:8
91:18 106:9
108:3 110:24

124:19 129:17
133:21 134:14
**answered** 65:2
103:20
**answering**
12:23 65:25
**answers** 5:8,15
**apartment**
23:11 70:19
74:25 80:20
**appear** 42:14
43:5,13 47:9
50:20
**appears** 66:20
105:16 106:16
108:19
**appended**
140:7
**appendix** 26:17
66:17,19,20
93:16 116:21
120:11 121:18
**applicable**
138:8
**application**
69:17
**applied** 10:24
**applies** 32:17
**apply** 69:21
**applying** 61:11
**appointing**
88:18
**appointments**
25:10 33:17,25
111:15,17

**appreciate**
135:7
**approach**
103:11
**appropriate**
60:23 101:15
102:5 126:5
128:13
**appropriated**
120:5
**approximately**
28:13
**april** 46:15,22
54:14
**arrange** 62:7
**arranged** 76:17
**arrangements**
85:23 86:7
**arrests** 104:19
**arson** 70:25
72:25 73:7
104:20,24
105:8
**articles** 6:21
**asked** 8:12,15
27:25 30:6
39:17 58:8
64:5 76:3
81:10,18
123:18 133:4
**asking** 16:25
65:15 100:10
**assaulted**
102:25

**[asserting - bob]**                                    Page 4

| | | | |
|---|---|---|---|
| **asserting** 112:23,24 | **auburn** 93:24 | 116:21 136:2 | **behavior** 125:12 |
| **assertive** 30:23 30:24 31:2,16 109:17 | **audio** 30:13 **author** 68:13 106:6,7 109:5 | **back** 52:15,18 68:5 71:5 72:9 79:25 109:8 118:19 131:6 | **believe** 14:22 16:14 17:5 18:21 19:5 |
| **assess** 66:25 124:23 | **authorized** 3:10 | 131:10 132:12 | 20:22 21:6,23 35:22 42:12 |
| **assessment** 13:25 14:9,16 14:19 | **automatically** 110:22 | **background** 120:10 | 45:16 47:16 52:11 57:6 |
| **assigned** 34:9 34:15 | **availability** 77:16 | **bad** 46:23 84:15 | 59:12 63:12 65:2 72:4 81:3 |
| **assistant** 4:11 | **available** 9:25 35:10 37:4 | **barbara** 123:25 | 81:14 83:22 85:11 86:23 |
| **associated** 107:20,24 108:25 | 40:2,17 47:13 47:20 77:23 | **based** 8:22 9:16 9:23,24 33:13 39:20,24 41:6 | 89:15 92:3 96:5 97:5 99:8 |
| **association** 97:9 | 138:6 **avenue** 1:20 2:4 | 41:9,10 48:25 58:9 61:15 | 101:14 102:4 103:20 106:3 |
| **assume** 6:2 | **avoid** 36:19 74:7 118:13 | 68:2 75:15 109:11 127:13 | 111:8 118:23 124:18 129:23 |
| **assuming** 32:2 | **avoided** 37:5 | **bases** 106:18 | 132:15 133:2 |
| **assuring** 99:23 | **aware** 24:3,5 25:21 26:6 | **basically** 31:19 | **believed** 36:17 37:4 49:22 |
| **attached** 138:11 | 55:16 56:9 69:16,18 82:21 | **basis** 62:9,12 98:20 113:9 127:23 132:24 | 81:9 110:18 |
| **attempt** 56:19 | 82:22,25 83:9 | **bates** 26:21 | **bellevue** 53:13 |
| **attempting** 111:14 | 92:20 98:25 106:24 107:3,9 | 42:7 43:2 50:11 52:21 | **benefits** 61:12 **best** 5:14 86:8 |
| **attention** 13:16 17:9,11 26:16 | 108:24 111:5 111:18 115:11 | 66:10 76:10 79:2 93:12 | **better** 84:21 85:3 98:22 |
| 48:10 105:14 109:7 118:4 | 123:13 | 106:11 108:14 116:10 | **bit** 99:4 **blaisdell** |
| **attorney** 2:11 2:18 4:11,12 | **b** | **beginning** 31:4 80:16 | 113:17 |
| 138:13 | **b** 4:2 10:20 | **behalf** 122:6 | **blank** 102:22 |
| **attorneys** 2:4,8 2:12 130:16 | 11:4,11 12:7 12:23 13:10,17 17:16 26:17 66:17,19 93:16 | **behaved** 103:16 | **blood** 137:18 **bob** 124:2 |

**[bottom - clinic]** Page 5

| | | | |
|---|---|---|---|
| **bottom** 46:14 | 77:18,25 98:9 | **certainly** 90:10 | **cite** 106:11,19 |
| 52:22 73:25 | 108:8 122:21 | **certification** | 107:5 |
| 86:14 | 124:3,8,23 | 3:7 | **cited** 6:18,22 |
| **break** 6:5,9 | 126:3,9,15,18 | **certify** 137:10 | 107:12,15 |
| 22:25 30:8 | 127:2,4,7,16,21 | 137:16 | 108:18,24 |
| 48:3 90:16 | 128:2,11,17 | **chagrin** 105:2 | 111:17 |
| 104:2 130:9 | 129:2,5,8,15 | **challenge** 73:12 | **city** 46:23 |
| **bridges** 24:19 | 136:15 | 73:16 103:18 | 54:17 94:11,15 |
| 24:23 | **cases** 47:6 | **challenges** | **civil** 1:18 122:7 |
| **bring** 29:25 | 50:16,17 51:2 | 103:13 | 122:14,21 |
| **broader** 56:16 | 51:10,18 52:6 | **challenging** | **claim** 126:4 |
| **broker** 33:12 | 52:12 115:5 | 70:6,10 72:7 | 128:12 |
| **budget** 120:7 | 121:21,24 | 73:3,9 78:4 | **clarify** 12:4,11 |
| **buildings** 23:18 | 122:5,10,12,24 | 105:5,9 | 97:2 |
| 23:19 84:11 | 123:5,17 | **chances** 78:11 | **class** 11:7 |
| | 124:14 125:11 | **change** 30:18 | 17:21 21:3,20 |
| **c** | 129:18,20 | 55:25 139:4,7 | 110:17 |
| **c** 1:14 2:2 4:2 | 133:25 | 139:10,13,16 | **class00035441** |
| 24:10 26:11 | **category** 70:17 | 139:19 | 93:13,17 |
| 119:4 137:2,2 | **cause** 87:3 | **changed** | **class0003544...** |
| **call** 25:16 | **caused** 45:20 | 133:16 | 93:6 136:14 |
| **called** 30:20 | **cbmhhss** 9:18 | **changes** 138:10 | **class00035837** |
| 31:13 97:8 | 10:4,16 13:19 | 140:6 | 50:7,12 136:10 |
| 98:2 111:2 | 17:23 19:21 | **characterize** | **clear** 5:13 36:4 |
| 114:11 117:8 | 20:13 21:4,5,6 | 75:12 | 44:25 100:16 |
| **capacity** 1:7 | 21:21,22,23 | **charges** 72:23 | **clearly** 19:7 |
| **caps** 24:10 | 22:24 38:23 | **check** 40:5 | 20:7 41:22 |
| 26:11 | 109:14 | 66:17,17,18 | 55:17 |
| **care** 62:4 70:18 | **center** 103:2 | **chemical** | **client** 36:11 |
| 111:2,6,10,18 | 113:18 | 114:11,24 | **clients** 11:24 |
| **caroline** 2:14 | **cerbone** 68:14 | 115:12,20 | 32:24 33:14,15 |
| **case** 1:5 7:20 | 69:5 | **children** 87:14 | 33:23,24 63:4 |
| 12:10,20,21 | **certain** 57:14 | **choice** 84:18 | 64:7 |
| 27:13 33:11,12 | 70:4 81:24 | **circumstances** | **clinic** 25:10 |
| 33:22 34:25 | | 72:20,23 | 111:17 |
| 58:19 60:10 | | | |

CONFIDENTIAL

**[clinical - conflict]**                                                     Page 6

**clinical** 13:14
26:25 27:5,18
27:21 28:16,19
28:25 67:3
89:8 120:25
**clinician** 21:12
80:14
**clinicians** 31:7
**combines**
114:16
**come** 37:22
97:7 101:2
102:16 115:18
132:7
**comment** 78:15
**commit** 71:13
71:18
**community**
8:22 9:16,23
9:24 10:10
18:5,11,25
19:6,11 20:21
22:10 24:7,11
25:6,11,19
26:8 30:23,24
31:3,10,16,22
32:14,25 33:14
33:23 44:22
45:2 48:20
53:24 58:15
59:6 61:4,15
63:2,5,15 64:8
64:22 65:7
69:10 70:6
73:4,9 77:17

77:22 84:4
92:6 94:19
95:9 97:5
98:14 99:22
101:4,18
102:11,14
103:9 105:6
109:17 111:7
113:14 119:19
119:25 120:6
121:10 123:19
124:11,16
125:6,14
127:13 128:24
129:22
**complaint**
12:15,19 57:22
58:12,23
**complete** 140:8
**completed**
138:17
**compliance**
127:11,24
**comprehensive**
16:19,21,23
**computer**
29:21,23
**conceded** 39:2
**concepts** 10:25
**conclude** 17:20
119:17
**concluded**
135:10
**conclusion**
18:13 36:14

37:9,18 62:10
62:13,14 88:21
132:23
**conduct** 28:16
28:24 70:23
128:5,6
**conducted** 28:8
128:2
**conference**
80:5,9,17
**confidential**
4:1,21 5:1 6:1
7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1

76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
**confidentiality**
4:17 127:2
**confirm** 11:25
**confirmed**
75:22,25
**conflict** 36:20
36:25 37:5
39:25 41:4
74:7

confused  18:17
congregate
  23:20 84:19
  85:4
connecting
  112:4,20 113:3
conroy  2:13 4:7
  4:10,15,23
  7:12 30:5,10
  41:23 42:5,17
  42:24 48:3,7
  50:4,10 66:3,9
  78:23 90:16,20
  92:25 93:9
  103:23 104:6
  108:5,12 116:6
  130:8,12,23
  134:17,21
  135:6 136:25
considerable
  112:2
consigned  82:6
  82:11
consistent
  56:25 57:4
  77:10
constitute
  84:22 87:24
consult  11:8
consultant
  126:13 127:17
consulted
  12:23
consumer  47:2

contact  43:21
  57:8 85:12
contacted
  123:3
contacts  55:18
  55:24,25
contain  8:10
contained
  15:17
contend  47:18
contending
  40:21 60:21
  61:24 67:21
contents  7:23
  53:10
context  18:7
  20:6,9 22:5
continues  82:3
  85:19 86:15
contributed
  86:21
contributes
  85:24
conversations
  7:3 129:13
conviction
  104:21,24
  105:8
convictions
  72:20,25 73:7
  91:13
cooperated
  114:5
coordinate
  64:20

coordinated
  61:14 67:17
coordination
  61:8 62:18
  64:13 113:9
copies  138:14
copy  3:12,15
  131:7
correct  4:25
  8:3,4 17:16,17
  22:13,15,17
  28:6,7,10,11,15
  28:21,22 30:20
  30:21 31:13,14
  34:3,7,9 35:19
  35:20,25 37:2
  37:3,22 39:4
  39:24 40:7
  41:7 43:18,19
  43:22 44:5,6
  44:16,17,22,23
  45:3,7,8,10
  46:23,24 47:9
  52:6 54:18,19
  55:10,11 57:23
  57:24 58:15,16
  59:6,7 61:20
  63:10,11 72:11
  72:12 85:11
  86:19 88:24
  90:25 100:21
  104:21 107:16
  107:17,19
  113:15 117:16
  117:17 118:25

119:2 120:13
  120:22,23
  122:8,11
  125:20 126:14
  130:6 140:8
correctional
  93:25
corrections
  140:6
correctly  17:25
  33:19,22 48:21
  67:19 74:10,16
  76:19 82:8
  86:2 105:25
corresponden...
  50:7 136:9
corroborate
  12:3
counsel  3:5,16
  4:15 6:14 7:4,8
  27:15,22,23
  30:4 59:2
  138:14
county  137:6
couple  120:9
  125:21 127:3
  128:7 130:13
  132:14 134:20
course  30:18
court  1:2 3:12
  5:8 13:24 14:8
  38:22 39:12
  47:11 49:10
  123:10,13
  135:3

**covered** 15:7
**covid** 45:24,25
  46:7,22 47:6
  54:17
**credit** 49:3,6
  57:17 58:17,21
**criminal** 51:2
  61:9 64:14
**crisis** 25:15
  33:3 35:13,18
  35:23 36:9,17
  37:11,19,25
  39:17,18 40:16
  40:25 47:23
  63:7,17 64:9
  65:9 118:11
  124:10
**criticizing**
  123:15
**crystal** 2:6
**cs** 1:6 138:15
**cucs** 94:4,7
**cultural** 97:9
**cuomo** 1:7
  138:4 139:1
  140:1
**current** 102:20
**currently** 51:9
  85:9 103:5
  117:25 118:2
**cut** 132:17
**cv** 1:6 120:12
  120:14 121:11
  126:10 130:2

**d**

**d** 1:14 3:2
  78:20 79:2,3
  106:11 108:9
  108:14,15,18
  136:13,16,22
**d.h.** 18:4 24:15
  24:17 25:3,8
  25:12,20
  103:24 104:8
  109:22,24
  110:12 111:5
  111:19,25
  112:14,22
  113:2,13 114:4
  115:18 117:12
  117:16,22,24
  118:7 133:19
**d.h.'s** 104:11
  104:13 105:4
  107:25 108:25
**daily** 98:20
**dangerous** 74:6
  103:17
**dangerousness**
  70:11,22
**date** 1:11 7:18
  42:4,23 50:9
  66:8 78:22
  93:8 103:5,12
  108:11 116:5
  130:22 139:24
  140:12
**dated** 46:15
  52:22 54:14

  55:6 68:7
  130:20 136:19
**day** 135:17
  137:21 140:15
**days** 3:15
  138:17
**deborah**
  124:19
**december**
  131:4
**decisions** 86:20
  86:24,25
**declaration**
  7:15,19 136:5
**declare** 140:4
**declined** 74:3
  82:13
**decompensated**
  101:7,18
  102:10
**deemed** 109:14
  109:22 110:22
  140:6
**deep** 69:12
**defendant**
  105:21
**defendants** 1:9
  1:17 2:12 4:13
  122:13
**defense** 122:21
**define** 10:16
  71:5
**defined** 10:7
**defining** 9:21
  10:4

**definitively**
  42:13
**delagardelle**
  50:22
**delivery** 100:5
**denied** 85:20
**denying** 75:10
  86:4,9
**department**
  122:18
**departments**
  125:13
**depend** 77:15
**depends** 114:21
  121:7
**depict** 120:14
**deponent**
  138:13 140:3
**deposed** 4:24
**deposing**
  138:13
**deposition** 1:16
  3:7,8,13 6:12
  6:24 7:10 30:7
  137:12,13
**depositions**
  11:20 12:3
  15:7 28:5
**describe** 18:8
  20:3,8 95:24
**described** 11:2
  14:14 16:14
  31:2 81:22
  92:15 104:17
  117:18,19

CONFIDENTIAL

**[describes - elaborate]**                                        Page 9

| | | | |
|---|---|---|---|
| **describes** 51:17 | 121:19 | **document** 42:7 | **due** 82:5 98:6 |
| 52:5 | **directing** 118:4 | 42:10 43:2 | **duly** 4:3 137:13 |
| **describing** | **directly** 32:25 | 50:11,14 51:23 | **duration** 48:17 |
| 10:11 | 63:5,15 64:7 | 52:2,20 66:10 | 49:5,15 55:14 |
| **description** | 65:7 | 66:13,20 79:2 | 55:22 |
| 52:12 136:4 | **disagrees** | 79:4 93:12,14 | |
| **designate** 4:20 | 119:17,22 | 93:19,23 94:17 | **e** |
| **designated** | **discharge** 11:7 | 96:18 107:22 | **e** 1:14 2:2,2 3:2 |
| 110:4,4,21 | 17:7,21 21:3 | 108:2,4,13,17 | 3:2 4:2 113:17 |
| **designating** | 21:20 61:12,17 | 108:24 109:3,5 | 136:2,22 137:2 |
| 83:10 88:4 | 76:15,22 | 116:9,18,22 | 137:2 139:3,3 |
| **designation** | 111:13 | 131:2 | 139:3 |
| 89:9 | **discharged** | **documents** | **earlier** 30:19 |
| **detail** 101:12 | 22:18,19 92:17 | 6:17,19 26:21 | 120:20 |
| **details** 36:10 | 128:18 | 27:11 66:16 | **easier** 5:5 |
| 88:10,17 89:11 | **disclose** 7:2 | 68:3 108:8 | **east** 97:10,17 |
| 90:8 103:6 | **discuss** 15:23 | 136:15 | **education** |
| 105:3 113:21 | 16:2 119:20 | **doe** 123:25 | 115:7 120:15 |
| 117:11 127:22 | 120:2 | 124:2 | 120:17 |
| **determination** | **discussed** 7:6 | **doing** 8:25 | **effect** 3:11,14 |
| 69:24 | 15:5 29:15 | 83:24 132:6 | **effective** 32:11 |
| **determine** | 39:17 103:15 | **doj** 126:13 | **efficacy** 114:20 |
| 49:23 109:5 | **discusses** 15:24 | **dots** 134:6 | 119:18 |
| 134:14 | 16:5 | **dr** 4:8 48:8 | **efficient** 60:19 |
| **diagnose** 29:6 | **discussion** 50:3 | 90:21 104:7 | **efforts** 82:17,20 |
| **different** 23:18 | **district** 1:2,2 | 130:12,23 | 92:11,21 94:18 |
| 39:10 69:20 | **doctor** 4:24 | 135:7 | 95:9 101:21,25 |
| 81:13,14 86:25 | 7:19 19:18 | **draft** 7:22 | **eight** 95:16 |
| **difficult** 45:14 | 38:21 42:6 | **drafting** 107:21 | 127:23 |
| 45:21 70:13,16 | 50:13 52:2 | 108:2 109:3 | **eighth** 96:10 |
| 78:2 90:15 | 64:5 78:23 | **drawing** | **either** 22:2 |
| 92:5,8 | 88:25 93:9 | 102:22 | 30:12 62:6 |
| **direct** 17:9 | 98:12 108:17 | **drug** 75:5 | 85:20 133:20 |
| 48:10 105:13 | 116:6 | 104:19 | **elaborate** |
| 109:7,10 119:3 | | | 112:11 |

**[element - fact]** Page 10

**element** 40:13
40:24 48:19
**elements** 18:8
35:7
**elena** 2:9
**eligibility** 69:20
69:22,24
**eligible** 17:22
19:21 20:13
21:4,21 103:8
109:14,22
110:19,23
**elmira** 13:3
29:24
**emergency**
25:14,18 124:4
124:11 125:12
**employing** 31:5
**enable** 19:5
**ended** 27:10
82:13
**engaged** 26:10
67:10,15
**enrolled** 39:7
61:15 62:19,20
64:15 114:6
115:25
**entire** 4:20
**entitled** 86:23
**entity** 94:9,13
**entry** 126:11
**enumerate**
97:19
**environment**
74:8

**errata** 138:11
138:13,17
**esq** 2:5,6,9,10
2:13,14 138:1
**essential** 59:13
**established**
56:24 57:4
**et** 1:3,8 124:2,2
124:20,21
138:4 139:1
140:1
**evaluated**
69:19,22
**evaluation**
28:17,19,25
121:3,6
**events** 91:12
92:7 102:23
**evidence** 37:17
107:6,8
**exact** 105:3
**exactly** 10:5
14:15 48:23
**exaggerating**
131:22,24
132:8
**examination**
4:6 135:9
136:24
**examined** 4:4
**examining** 69:7
**example** 15:3
17:7 37:22
57:19 88:18
105:19 107:12

107:15
**examples**
107:14
**except** 3:19
**excluded**
123:10
**exercising** 75:7
**exhaustive** 57:7
57:11
**exhibit** 7:13,14
41:24,25 42:18
42:20,25 43:10
46:10 50:5,6
52:15 54:8
66:4,5 68:5
78:19,25 93:4
93:5,11 108:6
108:7 116:2,8
117:18,20
130:18,19,25
136:5,6,8,9,11
136:12,14,15
136:17,18
**exhibits** 93:2
136:3,20
**exited** 80:23
**experience** 89:9
120:10
**experiences**
13:14
**expert** 7:15 8:2
121:22,25
122:6,13 123:6
127:17 129:19
136:5

**explain** 14:25
15:10 74:18
104:18
**explained**
48:14 49:18,19
74:23 96:3
**expressed**
112:2 133:17
**extent** 19:4

**f**

**f** 1:14 3:2 4:2
24:10 137:2
**facilitates**
94:10
**facilities** 9:10
13:2,6
**facility** 93:25
132:9
**fact** 24:9 31:13
31:15,23 32:5
32:17 34:6,18
34:21,22 35:8
35:9,14,18,22
36:6,7,11,14
37:10,18,24
38:6,10,15
39:3,7,8,9,13
39:14 40:6,15
40:22 41:17
42:15 43:6,14
45:9 46:2,6,19
47:11,19 50:3
51:3,15,19
52:6,18 53:20
59:5,9,15 60:4

**[fact - focus]**                                                      Page 11

60:8,22,23,25
61:14,20,25
62:2,3,16
63:13 65:5,10
66:25 67:2,22
68:10,21 69:2
72:11 83:16,19
83:23 85:18
86:17,21,24
90:24 99:2
100:7,22
101:14 102:4
118:10
**factor** 1:16 4:1
4:8 5:1 6:1 7:1
7:14,16 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1,25
42:1,20 43:1
44:1 45:1 46:1
47:1 48:1,8
49:1 50:1,6
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1

63:1 64:1 65:1
66:1,5 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1,19
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
90:21 91:1
92:1 93:1,5
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1,7 105:1
106:1 107:1
108:1,7 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1,2 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1,12,19,23
131:1 132:1
133:1 134:1
135:1,7,13
136:3,5 137:11
138:5 139:2,24

140:2,4,12
**factors** 70:4,9
70:15
**failed** 37:10,19
60:22 61:25
63:13 70:19
101:15 102:4
**fails** 138:19
**fair** 47:10
51:14 96:17
134:8
**faithful** 32:3
35:14
**familiar** 69:9
72:19,22,24
91:9,12,15,17
94:7 97:11,25
104:13 110:25
113:24 114:10
114:13 117:5,7
117:10
**familiarity**
69:12,14
**family** 97:21
**far** 21:15 22:6
71:21,25 79:13
85:8
**fear** 74:5
**federal** 1:18
47:11
**feel** 29:13 39:22
77:20
**felt** 76:15 87:18
**female** 83:4
87:13

**fidelity** 35:9
**file** 123:7
**filing** 3:6
**filling** 121:14
**filthy** 85:6
**find** 40:6 78:16
78:18
**finding** 78:11
103:13
**findings** 10:25
11:25
**finish** 5:15,17
**finished** 52:3
**fires** 73:20
**first** 8:18 9:14
28:24 43:10,12
43:14 61:18
68:6,7,10 71:6
76:12 77:2
79:25 82:16
87:6 93:19,25
94:23 96:24
97:3 113:5
116:25 118:21
121:12 131:22
**fiscal** 120:7
**five** 103:24
121:16
**fixed** 31:7
86:12
**flip** 8:5 33:8
55:3 79:17,25
131:11
**focus** 8:18
13:16 58:8

113:10
**focused** 31:20
**follows** 4:5
95:5
**force** 3:13
71:23 86:17
**foregoing**
140:5
**forensic** 31:16
50:18 51:11
**form** 3:19
20:15 21:10,25
27:7 39:5
45:15 47:15
49:17 54:10
56:22 57:13,25
58:3,5 59:16
61:21 73:6,11
76:25 82:19
84:6 87:9 88:9
90:2 91:14
92:14 99:17
100:9 102:21
114:7
**former** 23:21
84:16,20,21
85:9
**formerly** 31:21
**forming** 58:18
58:24 59:13
**forth** 137:12
**forty** 121:16
**forward** 55:3
121:18

**found** 17:22
19:20 20:13
21:3,20
**four** 125:2
**free** 72:2
**frequency**
41:21
**friends** 97:21
**front** 48:25
53:13 60:7
**frustration**
112:3
**function** 62:3
**funding** 120:4
**further** 3:18
137:16
**fuzzy** 99:5

## g

**garrison** 1:20
2:3
**gathered**
133:14
**general** 2:11
4:11,12
**general's** 2:18
**generally** 70:2
96:7
**georgia** 127:4
127:11,15
**getting** 18:16
36:19
**give** 5:3,7 37:13
111:3 112:17
113:20 114:8
115:22 121:8

124:12,18
133:21
**given** 25:15
74:8 75:2,12
75:20 82:13,21
83:19 99:18,22
101:17 137:14
140:9
**gives** 43:21
**giving** 39:12
**glean** 16:6
**gleaned** 16:9
**go** 5:5 44:24
66:18 93:3
102:11 113:23
127:3
**goal** 78:16
**goes** 80:12
**going** 6:2 8:5
73:25 92:25
103:24 109:10
116:7,11,20
131:11
**gold** 32:14 39:3
39:8,9,14
62:25
**good** 4:8,9 32:6
61:8 75:8
84:15 98:19
99:14,21
114:23
**governor** 1:7
**grandmother**
15:14

**gregory** 124:20
**ground** 5:4
**guess** 13:12
**guests** 83:4
87:13

## h

**h** 136:2 139:3
**half** 8:9 61:18
**halfway** 24:25
**hall** 124:2
**hand** 29:20,24
131:6,10
132:12 137:21
**handing** 130:24
**handwritten**
130:20 136:18
**happen** 5:22
45:12,19
**happened**
39:25 81:11,21
101:6 102:19
104:23
**happy** 5:23
**hard** 71:2
**head** 5:9,10
38:13
**health** 9:16
24:8,11 25:6,9
25:14,19 26:8
27:23 31:6
33:2 47:25
61:8,13 63:6
63:16 64:8,15
65:8 67:17
69:10 70:7

[health - important]                                                    Page 13

73:4,10 92:12
94:10,15 105:6
107:25 109:2
109:16 110:5,7
111:2 113:7
118:22 119:19
119:25 120:6
122:8 123:20
124:5 130:4
**held** 1:19
**help** 18:24
19:10 53:22
57:25 58:4
**helped** 118:24
**helpful** 66:25
112:4,20 113:2
133:13,19
**helping** 48:19
**hereinbefore**
137:12
**hereto** 140:7
**hereunto**
137:20
**high** 35:8
**highest** 110:6
110:19
**highlighted**
47:24 58:25
**histories** 73:19
**history** 70:11
70:13,21,23
73:3 75:5 78:4
91:10 92:5
103:22 104:14
104:16 105:5

120:15,18
**hogan** 128:8
**home** 33:15,23
**homeless** 15:4
15:9 22:19
23:6,15 82:7
82:11,14 97:6
**homes** 111:2
128:21,23
129:9,11
**hospital** 25:17
102:11 131:25
**hospitalization**
101:8
**hospitals**
128:19
**hotel** 23:21
84:20,24 85:9
**hotels** 84:11,16
**hotline** 25:16
**hour** 28:13,14
**house** 24:25
83:3 116:3
117:2,5,8,12,16
117:22 136:17
**housed** 15:4,9
23:14 85:9
128:20
**housing** 8:22
9:16,25 13:25
14:9,19,25
15:11,20,25
16:3,5,10,16
17:2,8,24 18:4
18:9,14,18,20

18:24 19:3,22
20:14,17 22:14
22:16,20 23:4
23:5,8,12,22
24:4,6,16,18,24
25:2,24 26:3,4
58:13 61:7,10
62:22 64:3,4
64:12 69:10,21
70:7,14 71:22
71:23 72:17
73:5,10,13,16
74:4,15,19
75:11 76:17
77:6,9,13,16,19
77:23 78:2,16
80:5,15,18
82:17,23 83:2
83:15,20,23
84:2,3,22
86:13,15,22
87:25 89:3,18
90:4,14 91:7
92:6,12,16,22
94:10,15,19,24
95:10,13 96:11
96:18 97:10,18
103:9,14,19
105:7 109:16
115:13,16
117:11,15,21
118:23 119:20
119:25 120:6
123:20 124:16
125:19 126:6

128:14
**huh** 48:12
131:14
**human** 94:15
**hypothesize**
90:10

**i**

**icepick** 92:2
**idea** 84:15,15
99:14
**identification**
130:21
**identified** 7:17
42:3,22 50:8
58:10 66:7
78:21 93:7
108:10 109:24
110:2 116:5
136:20
**ignacia** 2:18
**iii** 53:7
**illness** 8:24
10:2 31:8,22
71:11 74:9
110:3 114:17
115:14 124:6
126:7 127:14
128:15
**imagine** 89:14
89:16
**implementati...**
127:8
**implies** 19:17
**important**
18:10,21 48:18

[improve - juvenile]                                              Page 14

improve   124:4
incarcerated
  31:21 79:14
  102:17 129:21
incarceration
  102:20 131:25
incident   36:25
  39:21 102:24
incidents
  103:16
include   70:22
included   9:22
includes   40:15
including   33:2
  41:3 63:6,16
  64:8 65:8 75:4
  76:16 109:16
  125:14
incorrectly
  83:24
increase   20:20
  22:9
independently
  29:6
individual
  110:2
individual's
  78:12 123:19
individuals
  13:20 20:4,24
  22:25 38:23
  72:2 115:14
  126:16
information
  58:10 73:18

75:2,20 76:4
81:10,19 85:22
86:5 111:4
112:18 114:9
124:12 133:15
informed   36:10
  80:18,22
  118:13
inherent   35:8
initiated   78:7
injectable   98:2
  98:5,15 99:3
  99:15,19,19
  100:18
injected   98:23
instant   37:21
institutional
  98:13
institutionali...
  21:7 118:24
institutions
  31:11 125:13
instructed
  25:17
instruction
  122:18
insurmounta...
  73:13
integrated
  67:16 126:6
  128:14
integration
  113:6,8
intend   27:11

intended   13:23
  14:7,18 20:23
  26:24 27:4
  38:22
interested
  137:19
interim   84:3
interpersonal
  36:20
interrupt   41:14
interrupted
  43:25
interview   13:4
  28:8,12 29:9
  29:24 36:21
  48:15 49:19,20
  74:24 75:16
  76:7,17 77:6
  77:13,19 80:5
  80:16 81:22
  83:2,8,10
  85:13 101:12
  111:25 126:15
  126:18 128:25
  129:4,10
  130:14 131:3
  131:13,18,20
  132:4,23
  134:12
interviewer
  80:21
interviews   15:6
  29:16,22 33:16
  33:24 56:17
  82:23 87:7,10

128:2
intra   97:9
introduced
  53:19
investigation
  105:20 107:16
involve   129:20
involved   12:21
  60:25 72:16
  91:6 123:18
  126:19
involving
  125:16 130:3
issue   67:13
  89:7,10,16
issues   12:4,21
  59:2 78:5
  115:15 125:17
issuing   123:14

j

job   33:17,25
  76:16,23 77:21
  78:13,15
joe   124:2
joseph   128:8
judge   3:12
judgment   75:8
july   137:21
  138:3
june   1:11 95:15
  101:8
justice   51:2
  61:9 64:14
juvenile   105:22

CONFIDENTIAL

| k | | | |
|---|---|---|---|
| **keep** 31:10 85:7 | **knowledgable** 118:12 | **likelihood** 20:20 22:9 | **lives** 18:11,25 19:6,11 20:21 |
| **kids** 83:4 | **knowledge** 8:24 30:14,17 | **likely** 71:17 | 22:10 31:9 |
| **kill** 132:17 | 59:25 122:3 | **likewise** 5:16 | **living** 23:20 |
| **kind** 23:19 103:22 | 123:9,12 130:7 | **line** 86:14 96:10 131:22 | 33:4 63:8,17 64:10 65:9 |
| **kinds** 115:8 | **l** | 132:15 133:24 139:4,7,10,13 | 77:22 81:20 82:13 85:23 |
| **knew** 57:2 112:6 | **l** 1:14 2:6 3:2,2 | 139:16,19 | 86:6 87:23 115:9 117:25 |
| **know** 5:22 6:6 | **landlord** 89:13 | **lines** 128:7 132:14 133:24 | 118:3 |
| 11:24 16:20 | **landlords** 73:17 103:21 | **list** 8:11 15:20 | **llp** 1:20 2:3 |
| 17:4 38:5,14 | **landriscina** 2:9 | 26:20 66:15 95:4,8 113:23 | **lms** 1:6 |
| 41:14,21 42:17 | **larceny** 104:20 | 118:22 121:10 | **location** 44:11 46:25 |
| 50:17 53:15 | **lauren** 50:22 | 121:20 122:2 | **locations** 33:18 |
| 54:6 59:14,17 | **lawsuit** 122:14 | **listed** 16:13 | 34:2 113:24 |
| 59:18,21 69:4 | **lawsuits** 122:7 | 44:11 96:12 116:22,24 | **lodge** 65:25 |
| 69:23 71:21,25 | **lead** 19:6 | 126:10 129:25 | **loeb** 116:3 |
| 72:10 76:3 | **learn** 12:20 129:12 | 130:5 | 117:2,5,12,16 117:22 136:17 |
| 79:13 80:9 | **leave** 103:10 | **listing** 124:19 | **logistical** 133:11 |
| 81:16,21 82:20 | **led** 41:4 91:13 102:19 104:24 | **lists** 43:21 52:9 | **long** 28:12 98:2 |
| 83:17,18 85:8 | **legal** 2:7,17 | **literature** 8:21 8:25 9:2 10:8 | 98:14 99:3,15 100:18 102:13 |
| 88:10,17,20 | 130:3 138:23 | 10:10 13:15 | 121:5,8 |
| 89:11 90:8,11 | **letter** 50:21 51:15 | **little** 18:17 | **longer** 22:11 |
| 93:22 94:9 | **letting** 123:14 | **live** 18:11 20:21 22:10 | **look** 35:5 41:24 46:10 50:4 |
| 95:21 96:15 | **level** 35:8 110:6 110:6,18,19,22 | 64:21 86:15 96:25 97:4,22 | 53:10 56:7,11 66:3 67:5 76:2 |
| 97:12,16,20 | **liberty** 2:12 | 132:18 | 94:22 105:12 |
| 99:6 100:7 | **licensed** 46:18 79:22 | **lived** 15:14 97:5 | 106:8 108:5,20 |
| 101:20,23,24 | **life** 34:16 64:21 132:18 | | 111:22 |
| 103:4,6 104:23 | | | |
| 107:20,24 | | | |
| 108:20 111:10 | | | |
| 114:4 115:16 | | | |
| 117:24 118:2 | | | |
| 119:21,23 | | | |
| 120:4 131:7 | | | |

**looked** 108:23
122:5
**looking** 46:13
52:22 56:15
73:24 108:4
114:2 122:4
**loop** 118:19
**lots** 77:23
**low** 121:8,11
**lower** 19:12
22:7
**lukens** 117:8
**lunch** 104:2
**luncheon** 104:4

**m**

**m** 1:16 4:2 7:16
135:13 136:5
137:11 138:5
139:2,24 140:2
140:4,12
**m.g.** 1:3 138:4
139:1 140:1
**made** 39:21
41:7 45:13
57:6 75:9
92:11 101:21
101:25 140:5
**maeve** 2:17
**maintain** 18:25
19:11 31:9
115:5
**major** 89:10
**majority**
128:22

**make** 5:4 33:14
33:23 35:16
47:12,19 56:19
57:10 70:5,9
70:15,25 72:6
73:3,8 86:24
87:2 90:14
92:5,8 105:5,9
**makes** 58:12
**management**
70:13 100:19
100:23 101:16
102:5 111:2,6
111:11,18
**manager** 33:11
33:12,22
**manhattan**
51:3,11 53:20
103:2
**manner** 103:17
118:13
**manuel** 53:3
**march** 92:18
95:14
**marianne** 1:21
137:8,25
**marina** 2:5
138:1
**marissa** 2:17
**mark** 130:18
134:5
**marked** 7:13
78:24 93:10
116:7 130:21
130:24

**marriage**
137:18
**masterson** 2:5
4:18 6:25
20:15 21:10,25
27:7 30:9 39:5
45:15 47:15
48:4 49:17
51:21 54:10
56:22 57:13
58:3 59:16
61:21 65:23
73:6,11 76:25
82:19 84:6
87:9 88:9 90:2
90:17 91:14
92:14 99:17
100:9 102:21
104:3 114:7
126:22 134:19
134:24 138:1
**material** 34:25
35:3 39:11
129:14
**materials**
116:23
**matter** 4:13 8:3
126:8 127:21
128:16 137:19
**maximize**
78:10
**md** 7:16 136:5
**mean** 10:6
14:16 16:20,23
18:17,19 23:17

28:18 34:11
35:11 38:8
40:15 45:18
49:8 58:21
60:13 61:5
65:15 71:7,10
74:18 82:10
93:18 114:15
**meaningful**
31:9
**means** 36:3
53:16 96:15
**meant** 18:23
86:11
**medical** 6:20
6:23 10:23
11:6,19 12:2
14:15 17:7
27:14 33:16,25
37:15 40:9
42:2,8,9,21
43:3,4 66:6,11
66:12 75:23,24
76:6 95:24
107:11 116:3
116:10,11
136:7,8,11,17
**medication**
99:21 100:4,18
100:19,23
101:15 102:5
**medications**
98:2,5,15,19,21
99:3,15,20,25
101:3,10,20,22

**meet** 18:14
28:23 33:13,23
47:7,13,20
120:24 121:4
129:7 133:20
**meeting** 35:13
44:8 46:25
68:11 121:12
133:10,13
**meetings** 30:12
30:16 41:21
45:13,20 46:2
55:16 121:13
**member** 81:19
110:17 132:5
**members** 37:23
47:7,12,19
59:8,20,22,25
72:10 90:24
97:21 121:14
**memory** 107:11
**men's** 53:13
**mental** 8:23
9:16 10:2 24:7
24:11 25:6,9
25:14,19 26:8
27:22 31:6,8
31:22 33:2
61:8,13 63:6
63:16 64:8,14
65:8 67:17
69:10 70:6
71:11 73:4,10
74:9 92:12
94:10,14 105:6

107:25 109:2
109:16 110:3,5
110:7 113:7
114:17 115:14
118:22 119:19
119:24 120:5
122:8 123:19
124:4,6 126:7
127:14 128:15
130:4
**mentally**
114:11,23
115:12,19
**mentioned** 17:3
30:19 31:12
70:21 88:6
**mentioning**
15:8
**mere** 76:18
**met** 6:13 29:4
41:22 44:25
53:12 80:3
129:6
**method** 43:21
**methodology**
8:19 10:21
13:10
**mg** 50:7,12
93:6,13,17
136:10,14
**middle** 17:18
33:9 52:8
**midway** 118:6
**minute** 30:19
118:19

**minutes** 34:5
47:23 59:5
90:22 104:8
120:9 121:17
134:20
**missing** 120:18
122:2
**misuse** 115:10
**mmasterson**
138:2
**modalities**
10:12 110:14
**modality** 31:5
**mode** 31:19
**model** 31:20
32:3 35:9,15
35:18
**moment** 24:14
41:9 45:17
82:24 83:14
112:12
**money** 119:23
**month** 98:8
**months** 78:6,7
78:17 98:9,10
**montoya**
124:20,23
**morning** 4:8,9
57:18
**motion** 123:7
**move** 10:19
24:15 25:23
103:8
**moved** 97:8

**moving** 98:12
121:18
**multidiscipli...**
31:6 32:23
63:3,14 64:6
65:6,16,18
**multiple** 42:6
42:25 66:10
108:13 110:11
110:14 116:9

**n**

**n** 1:14,14 2:2
3:2 136:22
**name** 4:10
38:10 94:12
**named** 7:6
10:24 11:7,13
11:17,22 12:5
14:2,10,20
15:2,11,21
16:3,11 17:21
21:3,20 27:2,5
27:16,19,24
28:6,9 29:4,10
29:17 30:12
50:21 53:2
54:20 56:17
58:13 68:14
79:18 109:13
**nature** 74:8
**necessary**
19:10 20:18
21:6 29:13
40:18,23 47:14
47:21 64:20

100:5 140:6
**need** 5:7 6:5
    25:14 40:16
    51:22 88:20
    91:19 105:24
    110:7 128:22
**needed** 9:3
    21:23 35:24
    61:3 65:21
    66:2 112:6
**needles** 99:8
**needs** 18:15
    21:13 35:14
    39:19
**neighborhood**
    97:8
**neither** 18:22
    84:21
**never** 34:15
**new** 1:2,8,23
    2:5,5,9,9,11,13
    2:13 4:11
    28:23 46:23
    54:17 69:11
    70:3 94:11,15
    119:6,23 120:4
    120:5,24 121:4
    125:24 126:5
    126:19 128:13
    128:19 137:4,6
    137:9
**ninety** 121:17
**nod** 5:10
**non** 85:20 86:4

**notary** 1:22 4:4
    135:19 137:8
    140:13,19
**note** 43:14,20
    46:14 52:22
    53:11 54:13,20
    55:6 68:7,13
    78:20 79:10,18
    80:2 81:4,6,7
    81:12,23 94:4
    106:6,7,8,10,14
    132:4 134:9
    136:12 138:10
**noted** 15:3
    76:14 140:7
**notes** 29:17,23
    29:25 30:6
    34:20,22,24
    35:5 37:12,14
    42:2,15,21
    43:6 52:19
    66:6 93:6,24
    111:16 130:15
    130:20 131:3
    136:6,8,11,14
    136:18
**notice** 1:17
**november**
    85:13
**number** 17:11
    25:16 31:4,7
    47:24 78:17
    136:4
**numbers** 93:12

**nurse** 46:19
**nursing** 128:20
    128:23 129:9
    129:10
**ny** 138:15

**o**

**o** 1:14 3:2 4:2,2
**o'brien** 2:17
**oath** 3:11
**object** 20:15
**objected** 83:2
    83:10 87:13
    88:4
**objecting** 65:19
**objection** 21:10
    21:25 27:7
    39:5 45:15
    47:15 49:17
    54:10 56:22
    57:13 58:3
    59:16 61:21
    66:2 73:6,11
    76:25 82:19
    84:6 87:9 88:9
    90:2 91:14
    92:14 99:17,18
    99:19 100:9
    102:21 114:7
**objections** 3:19
    90:9
**objective** 13:24
    14:8,16 89:5
**observation**
    100:4,5

**observations**
    11:25
**obtained** 12:2
**obviously**
    47:25
**occasion** 81:13
    81:15,17 91:20
    91:24
**occasions** 45:4
    55:18 110:11
**occupancy**
    84:12,16,19,24
    85:21 86:5
**occur** 77:13
**occurred** 48:2
    77:20 132:3,22
**offender** 75:6
**offenses** 104:20
**offer** 14:18
    16:25 67:22
    74:4 75:11,12
    82:12 84:12
    87:6
**offered** 14:13
    16:11,16 17:2
    23:4,9,10,13,23
    24:4,16,18
    25:3,7,9,12,20
    25:24 26:2,5,9
    26:12 69:5
    71:24 74:14,19
    74:24 97:21
    100:13 124:8
    124:15

[offerings - page]                                                    Page 19

| offerings 17:8 | omh 13:19 | 126:12 127:21 | **p** |
|---|---|---|---|
| offers 72:3,6 | 38:23 76:16 | 128:21 129:14 | p 2:2,2,14 3:2 |
| 82:21 87:4 | 79:11 107:21 | 132:7 133:16 | 42:2,8,9,21 |
| office 2:11,18 | 110:11 119:17 | opinions 11:23 | 43:3,4 66:6,11 |
| 4:12 33:13 | 119:21 | 59:13 114:19 | 66:12 116:3,10 |
| offices 1:19 | once 111:8 | 119:18 133:16 | 116:11 136:7,8 |
| official 1:7 | 135:3 | opportunity | 136:11,17 |
| okay 4:14 5:3,5 | one's 46:14 | 133:5 135:2 | p.m. 90:18,19 |
| 5:6,10,11,18,19 | 55:9 | option 17:2 | 104:4,5 130:10 |
| 5:23,24 6:3,4 | ones 19:4 61:22 | options 9:25 | 130:11 134:22 |
| 6:10,11 10:19 | 106:19 125:22 | 15:25 23:25 | 134:23 135:8 |
| 19:14 20:25 | open 27:10 | 77:16,23 88:18 | page 8:6,9 |
| 21:17 22:12 | operate 119:8 | oral 98:19,21 | 17:10 20:7 |
| 24:7 26:20 | opine 8:12,15 | order 4:22 5:13 | 22:5 29:15 |
| 30:5,11 34:18 | 58:8 123:20 | 13:4 29:14 | 33:9 42:6,25 |
| 41:15,16 43:9 | opined 39:6 | 60:7,19 61:4 | 43:10,11,12 |
| 44:4 45:6 | 125:5 | 77:13,20 78:10 | 44:7 46:10,14 |
| 47:17 48:4,13 | opinion 8:2 | 78:11 126:25 | 48:9 50:10 |
| 52:4 65:4 66:9 | 18:12 27:12 | 127:2 | 52:20 54:8,14 |
| 66:18 71:12 | 34:25 35:4 | organizing | 66:10 67:5 |
| 73:23 78:23 | 38:4 39:12 | 65:22 | 68:6 73:23 |
| 79:9 89:23 | 49:13,21 56:2 | original 3:8,15 | 74:2 76:10 |
| 93:22 96:17 | 58:2,5,7,18,24 | outcome | 78:25 79:17 |
| 100:22 102:2 | 60:20 73:21 | 137:19 | 80:2 81:25 |
| 102:24 103:4 | 75:7 76:22 | outreach 39:18 | 82:2 93:11,19 |
| 103:11,23 | 77:3,4,8,12 | 40:17 | 93:25 94:3,23 |
| 104:2,7,8,9,10 | 78:9 82:15 | owen 2:13 4:10 | 105:13 108:13 |
| 108:5,22,23 | 83:25 84:14 | own 8:24 13:14 | 108:18 109:8,9 |
| 114:4 116:6,16 | 88:15 89:2,20 | 76:21 86:20 | 111:22 116:9 |
| 116:17 122:20 | 102:7 106:15 | 88:14,21 89:2 | 116:25 118:4 |
| 124:14 125:4 | 106:21 112:23 | 89:8 98:20 | 119:3 131:12 |
| 125:16,21 | 112:24,25 | 112:23,24 | 136:4,24 139:4 |
| 128:7 130:8 | 113:10 122:6 | | 139:7,10,13,16 |
| 131:5,10,17 | 122:13 123:14 | | 139:19 |
| 132:12 | 124:8,15 126:9 | | |

pages 55:3
94:21 108:16
118:21 121:19
pandemic
45:24,25 46:8
48:17 49:5,16
54:8 55:15,22
paper 34:15
paragraph
8:10,10 11:2
17:11,18 32:13
32:20 33:8,10
35:6 36:16
40:11 48:10
51:17 52:4,9
62:24 67:6
73:24 74:12
76:13 77:2
82:2,3 85:15
85:17 92:15
94:14 104:17
104:18 105:13
109:11,25
110:9 111:23
113:6 118:5,6
paragraphs
31:3 111:12
parker 2:6
parole 24:24
part 9:4,6,7,11
9:11,15 10:19
11:4,11 12:7
12:23 13:10
17:14,15,16
23:15 41:10

58:18 113:5
115:17 118:20
119:18 120:2
123:8,11
participants
53:23
particular 6:23
18:20 19:4
89:24 90:3
97:13
particularly
70:5,10
parties 3:6 4:19
137:17
parts 23:2
42:19
party 123:7
130:2
past 70:14
73:19
patient 28:24
36:11 80:14,20
102:25 120:25
121:4,7
patients 11:24
120:21
paul 1:19 2:3
2:17
paulweiss.com
138:2
pause 65:24
pay 70:19
payee 83:11
88:5,12,19
89:8,12,14,19

90:6,13
peak 47:6
54:17
peer 48:16,24
49:4,14 52:9
53:6,22 54:3,7
54:24 55:9,13
55:17,21 56:8
56:12 57:7
pending 6:7
people 8:23
9:25 18:10
31:8 48:19
67:12 69:19
71:5,13,17
73:19 86:10
98:18,21
103:17,22
114:17 115:4,9
123:3 128:18
percent 21:5,13
perception
78:12,14
perform 120:25
121:3,6
performs 69:23
period 18:19
77:24 98:7
permanent
84:5 86:22
103:14
person 40:18
40:22 41:19
44:4,15,21
45:2,13,20

47:2,8,13,20,24
73:4,9 88:11
89:10 91:21,25
92:6 105:6
personal 59:24
personally 7:22
persons 31:21
124:5 126:7
127:13 128:14
pharmacology
98:6
phd 7:16 136:5
phone 25:16
photographic
107:11
phrase 9:15,22
pierce 54:21
pin 22:22
place 70:6,10
70:16 71:2
72:17 73:4,9
82:16,17 91:7
92:6,9,11,21
94:18 95:9
97:22 105:6,10
119:7
placed 80:19
87:19 92:16
96:16
placement
16:10 69:10
71:24 72:3,5,7
76:5 78:11
84:5,24 86:18
86:22 87:17,22

**[placement - program]** Page 21

88:8 89:18,24
90:4 94:11
95:18,22 96:4
96:19,22
103:14,19
115:19
**placements**
84:10 87:8
88:16,23 89:4
125:18,18
**plaintiff** 13:4
15:21 16:4
28:17
**plaintiff's**
122:24
**plaintiffs** 1:4
2:4,8 6:14 7:6
8:2,12 10:24
11:7,14,17,22
12:6 14:2,10
14:14,20 15:2
15:4,12,24
16:12 17:21
21:3,20 27:2,6
27:15,16,19,22
27:23,24 28:6
28:9 29:4,10
29:17 30:3,12
56:18 57:16
58:14 59:2
109:13 122:7
124:17,24
129:2,20
130:15

**planning** 61:2
**pleadings** 12:9
12:13
**please** 5:22
14:5 130:18
**plus** 111:2
**point** 17:10
41:12,14 57:19
62:4 64:19
86:12 101:11
103:7
**poorly** 98:22
**populations**
119:9
**portions** 6:21
**pose** 103:18
**positive** 22:3
**possible** 5:21
16:25 17:4
31:11 67:4
115:7
**potential** 76:4
82:16 89:3
**potentially**
74:6
**practical** 46:19
**practice** 120:21
121:15
**practicing**
28:20
**pre** 105:19
107:16
**precise** 94:12
**predictably**
101:18

**prefer** 80:23
**preference**
105:17 106:4
106:16
**premarked**
7:17 42:3,22
50:8 66:7
78:21 93:3,7
108:10 116:4
130:17
**prepare** 6:11
7:9 80:4
**prepared**
107:13
**preparing**
26:22 27:12
60:9
**present** 2:16
**presented** 68:4
**presently**
105:23
**presume** 66:15
90:14
**pretty** 46:22
**prevent** 78:12
118:24
**previously** 28:4
35:17 62:5
63:19 86:9
90:23 121:21
**principle** 32:2
**principles**
10:25
**prior** 61:12,16
62:19,20 74:20

79:14 80:13
111:13 123:5
123:17 129:18
**prison** 13:3
29:24 34:7
67:11 87:7
92:13 96:25
97:3,23 98:25
99:16 103:8,10
109:15 110:8
112:15 132:5
132:18
**private** 121:15
**probably**
133:11
**probation**
105:23 108:8
136:15
**problematic**
89:16 115:6
**procedure** 1:18
**proceeding**
130:3
**process** 69:11
69:17 76:15,22
78:15 86:21
94:11
**produced**
130:16
**productive**
85:22 86:6
**professional**
120:15
**program** 24:19
24:23,24 44:12

**[program - r]**    Page 22

92:17 97:10,13
97:18 114:12
114:16,22
115:20,25
**programs**
114:6,20,24
115:2,3,12
119:7
**progress**  34:22
34:24 42:2,15
42:21 43:6,14
52:19 66:6
78:20 81:4
93:6,24 136:6
136:8,11,12,14
**promise**  43:10
**promote**  115:8
**proposed**  88:11
90:5
**protective**  4:21
126:25
**provide**  8:2
13:19,24 14:8
31:23,25 32:24
36:7,8,15
37:10,19 38:23
40:22 41:2,18
52:13 53:14
60:4,22 61:2
61:25 62:2,6,7
62:16 63:4,13
64:6 65:5,11
69:3 100:23
101:15 102:5
115:3,13 126:5

127:12 128:13
134:5,7 135:4
**provided**  14:3
14:11,21 15:2
15:12,22 16:4
16:11,17 22:24
23:4,5,8,12,22
24:4,6,8,16,21
24:22 25:3,7
25:12,20,24
26:2,4,9,13
27:15,18,21
28:2 30:3
35:15,22 37:24
38:6 46:7
51:18 52:5
61:19,23 66:23
67:2 69:5
97:17 100:8,10
100:16 113:13
117:11,16,22
122:13 127:17
136:20
**provider**  38:9
80:18 83:11
88:3 89:19
90:4
**providers**
29:10 71:22
72:14 91:4
104:11 129:4,6
129:7,13
**provides**  15:20
35:18

**providing**
63:14 65:6
122:6
**proximal**  87:2
**psychiatric**
103:2
**psychiatrist**
28:20
**psychiatry**
10:11 120:21
121:10
**psychosocial**
115:8
**public**  1:22 4:4
122:18 135:19
137:9 140:19
**punishment**
105:18 106:4
106:17
**punitive**  105:24
**purpose**  11:16
11:21
**pursuant**  1:17
**put**  4:16 16:12
49:9

**q**

**q's**  131:13
**quarter**  108:19
**question**  5:16
5:17,25 6:3,8,9
9:15 13:17
14:5 18:7
22:23 55:19
56:11,16 59:18
64:25 65:3

102:3 108:3,21
112:12 116:13
129:17 132:3
132:22 134:5
134:11
**questions**  5:21
8:11,14,20 9:4
9:8,12 10:20
10:22 11:4,11
12:7,24 13:11
17:16,16 29:14
58:7 80:15
118:20 130:14
131:19 133:3
134:15,18,25
135:5
**quite**  10:9
108:16
**quoting**  49:12
76:23

**r**

**r**  2:2,10 3:2 4:1
4:2,2,2 5:1 6:1
7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1

**[r - recollection]**                                                    Page 23

| | | | |
|---|---|---|---|
| 43:1 44:1 45:1 | 132:1 133:1 | **ready**  8:7,8 | **receipt**  138:18 |
| 46:1 47:1 48:1 | 134:1 135:1 | 108:21 116:12 | **receive**  17:23 |
| 49:1 50:1 51:1 | 137:2 139:3,3 | 116:16 | 18:4,13,18,20 |
| 52:1 53:1 54:1 | **raised**  59:2 | **real**  34:16 | 18:23 19:3,9 |
| 55:1 56:1 57:1 | **ranges**  98:7 | **realize**  20:23 | 19:22 20:14,17 |
| 58:1 59:1 60:1 | **rather**  105:18 | **really**  18:22 | 21:5,13,22 |
| 61:1 62:1 63:1 | 106:4,17 | 125:8,9 | 22:6,13 54:7 |
| 64:1 65:1 66:1 | **reach**  39:22 | **reason**  37:8 | 55:17 58:14 |
| 67:1 68:1 69:1 | **reached**  88:21 | 52:11 63:12 | 64:22 65:20 |
| 70:1 71:1 72:1 | **read**  11:19 | 64:24 81:3 | 110:16 111:9 |
| 73:1 74:1 75:1 | 17:19,25 19:19 | 83:22 89:5 | 113:16 |
| 76:1 77:1 78:1 | 19:19 32:21 | 101:14 102:3 | **received**  19:8 |
| 79:1 80:1 81:1 | 33:10,19 40:12 | 119:16 122:23 | 19:15 20:9 |
| 82:1 83:1 84:1 | 42:8 48:13,21 | 133:9 138:11 | 21:15 22:16 |
| 85:1 86:1 87:1 | 51:7,23 53:11 | 139:6,9,12,15 | 34:6 38:15,19 |
| 88:1 89:1 90:1 | 53:18 60:15 | 139:18,21 | 39:3,14 48:16 |
| 91:1 92:1 93:1 | 62:24 67:9,19 | **reasonable** | 49:4,14 55:13 |
| 94:1 95:1 96:1 | 74:2,10,13,16 | 46:5 | 55:21 59:5 |
| 97:1 98:1 99:1 | 74:21,21,22 | **reasons**  62:5 | 74:4 82:23,25 |
| 100:1 101:1 | 76:13,19 80:2 | 95:25 98:11,17 | 84:3,10 111:6 |
| 102:1 103:1 | 80:12 82:4,8 | **recall**  26:14 | 111:11,19 |
| 104:1 105:1 | 83:13 85:17 | 40:8 41:20 | 112:14 113:25 |
| 106:1 107:1 | 86:2 91:15 | 45:16 50:2,15 | 115:19 123:21 |
| 108:1 109:1 | 105:15,25 | 76:6 83:5,8,12 | 124:17,25 |
| 110:1 111:1 | 109:12,25 | 83:13 94:12 | 125:6 |
| 112:1 113:1 | 110:10 111:24 | 95:23 97:24 | **receives**  45:9 |
| 114:1 115:1 | 116:13,14 | 99:11 100:25 | **receiving**  51:9 |
| 116:1 117:1 | 118:8 119:5 | 101:11 111:20 | **recent**  125:4,22 |
| 118:1 119:1 | 131:23 132:15 | 117:13 124:15 | **recess**  48:5 |
| 120:1 121:1 | 133:3 134:6,8 | 127:22,25 | 90:18 104:4 |
| 122:1 123:1 | 138:9 140:5 | 128:4 129:16 | 130:10 134:22 |
| 124:1,20 125:1 | **reading**  51:25 | **recalling**  24:13 | **recollection** |
| 126:1 127:1 | 52:3 95:23 | 25:4 41:8 | 81:18 99:4 |
| 128:1 129:1 | 104:25 | 105:2 | 115:21,23 |
| 130:1 131:1 | | | |

**recommend**
98:12
**recommended**
99:2
**record**  4:16
5:13 11:19
12:2 30:11
40:9 48:6
56:25 57:5
60:16 69:8
75:23 76:6,9
90:19 91:16,19
95:24 96:9
104:5 107:12
113:21 130:11
133:2 134:23
137:14
**recorded**  40:9
**records**  6:20,24
7:5 10:23 11:6
14:15 16:7,9
26:25 27:5,14
27:18,21,23
34:19 37:15
38:20 47:5
50:3 56:4 60:6
60:9,11,14
67:3 75:24
112:16 114:3
116:3 136:17
**reduce**  20:19
21:7
**refer**  94:14,22
115:4 132:2

**referenced**
138:6
**referral**  95:15
**referrals**  94:25
95:13,17,22
96:3,11,19
**referring**  94:20
96:9 112:16
118:7 132:21
**refers**  40:25
77:3
**reflected**  8:16
81:12
**regarding**  51:8
122:7 127:11
**regularly**  41:18
41:22
**reinstitutiona...**
20:19 22:8
85:25 118:14
**reinstitutiona...**
19:13
**reject**  72:3
**rejected**  76:5
82:16
**rejection**  82:5
87:3
**rejects**  72:5
**related**  104:19
132:4 137:17
**relaying**  112:22
**release**  25:15
34:7 62:19,21
67:11 76:18
79:15 84:9

87:6 92:13
103:5,12
109:15 112:14
129:22
**released**  96:24
97:3,22 98:24
99:16 111:9
**relevant**  17:8
**reliable**  99:24
**reliance**  13:15
**relied**  10:14
**reluctant**  73:17
103:21
**rely**  58:22
**remain**  48:19
**remember**
38:18 41:13
76:8 96:6
104:25 124:22
127:20
**remind**  51:22
65:24 126:23
**reminders**  5:4
**remotely**  46:7
**render**  11:23
60:20 126:12
**rent**  70:19
73:18 103:21
**repeat**  14:4
**repeated**
105:17 106:4
106:17
**report**  6:13,15
6:18 7:7,15,20
7:23 8:6 10:17

12:14 13:13,23
14:7,18,23,24
15:10,17,20
16:12,15 17:3
17:10,15 18:7
18:8,12 19:17
20:7,10 22:5
22:17 26:17,22
31:4 32:9 35:7
38:21 40:11
48:9 49:10
56:4 58:9,9
60:9,24 61:6
61:18 62:23
66:19 67:5
73:24 75:14
81:25 85:16
102:9 105:12
105:20 107:16
109:8 111:23
116:21 117:15
117:21 118:5
118:20,22
120:2,11
126:11 127:18
128:17 133:17
136:5
**reporter**  1:22
5:9 135:4
**represent**  4:13
90:5 108:17
**representative**
83:11 88:5,12
88:19 89:8,12
89:14,19 90:6

90:13
**request** 6:7
 134:25
**require** 110:13
 126:4 128:12
**required** 101:7
 140:13
**resembles**
 24:25
**reserved** 3:20
**residence** 47:2
 47:7
**residences**
 23:15,17
**residency**
 85:21 86:5
**residents**
 129:10
**resorting** 115:9
**resources**
 53:23 94:16
**respect** 92:21
**respective** 3:5
**respond** 118:12
**response** 33:3
 63:7,17 64:9
 65:9 99:6
**responsibilities**
 64:19
**responsibility**
 62:4 64:20
 86:12
**responsible**
 65:22

**rest** 132:18
**restart** 101:22
**restate** 5:23
**restriction**
 87:19,24
**resulted** 95:22
 96:4,19,21
**retain** 123:4
**retained** 7:25
 121:22,25
 123:6
**return** 138:13
 138:17
**returning** 89:7
**review** 6:16,19
 6:24 12:9,18
 26:25 27:4,12
 28:2 34:18
 37:12 56:25
 60:5,8 91:19
 109:12 113:21
 123:19 135:3
 138:7
**reviewed** 6:13
 6:17 7:5 8:21
 10:23 12:15
 14:13 26:22
 28:5 34:20
 42:10 57:22
 60:11,14 66:16
 80:14 116:23
**reviewing**
 38:20
**reyes** 53:3

**rife** 74:7
**rifkind** 1:19 2:3
**right** 12:16,17
 16:19 24:13
 27:2,6 32:7,11
 32:12,15,16
 34:16 35:23
 38:16,24,25
 41:23 42:5,24
 43:24 46:3,13
 47:8 48:8
 49:10,11 52:8
 52:9 56:5
 68:11,12 72:3
 75:16,17 79:23
 86:18 87:14,15
 88:5,23 93:4
 94:3,23 95:17
 95:25 96:19,20
 96:22,23 97:15
 97:24 100:20
 102:23 103:9,9
 105:3 106:12
 106:13,19,21
 112:17 120:12
 121:2,3 127:18
 127:19
**rikers** 37:6
 41:5
**risk** 19:12
 20:19 21:7
 22:8 85:24
**robert** 1:16
 7:15 135:13
 136:5 137:11

138:5 139:2,24
 140:2,4,12
**role** 53:20
 107:21 108:2
 109:2
**room** 23:21
 25:18 80:24
 84:20,24 85:10
**roommate** 74:6
 75:9
**roommates**
 75:3,21 76:5
 81:10
**rooms** 84:12,17
**rule** 83:3 87:13
**rules** 1:18 5:4
**rush** 76:16,23
 77:20 78:13,14
**rushed** 77:11
 77:14
**russell** 113:17

**s**

**s** 2:2 3:2,2
 110:6,18,22
 128:8 136:2
 139:3
**s.d.** 13:4 18:4
 25:23,25 26:2
 26:5,9,13 34:5
 59:4,5 64:11
 65:20 67:10,14
 69:6 90:22
 91:20,25 92:12
 94:18 95:9
 96:17,24 97:7

CONFIDENTIAL

**[s.d. - services]** Page 26

98:24 99:14
101:2 102:10
102:13,16
103:13 131:4
132:8
**s.d.'s** 59:9,15
60:8,21 61:24
63:13 65:5
66:25 67:21
68:10 90:24
91:9,13 92:4
97:20 100:7,22
101:14 102:4
**safe** 85:22 86:6
**samantha**
79:19
**sanction**
105:24
**satellite** 79:11
**saw** 91:21 96:2
96:7
**saying** 19:2,7,8
19:14 21:14
34:14,17 35:21
41:2 65:19,20
76:21 87:21
132:5
**says** 13:18
17:19 44:4
48:13 50:16,25
51:6 53:11
74:2 76:13
80:2 85:17
94:4,24 95:17
96:11 105:14

117:2 118:8
131:13,22
132:15 133:25
134:4
**scheduled**
103:5
**sealing** 3:6
**search** 8:25
57:7,11 77:9
83:20
**second** 12:15
12:18 13:17
43:6 51:17
52:4,20 57:22
58:11,23
133:10,13,20
133:23
**section** 15:19
15:23 131:12
**see** 9:19 13:21
19:24 40:19
44:9,13,19
45:22 46:16,20
47:3 50:23
51:4,12,20
52:24 53:4,8
53:25 54:15,22
54:25 55:7
56:7,12 66:21
68:8,15,19
79:20 80:7,25
94:5 95:2,6,19
96:13 109:4,19
112:7 116:22
116:24 117:3

118:15 119:11
120:21 125:25
127:5,9 128:9
131:12 132:19
133:22 134:2
**seeking** 126:16
129:21
**seem** 97:11
**seen** 50:13
51:23 66:13
79:4,7 93:14
93:17,19
116:17
**select** 6:23
**sent** 37:6 41:4
95:13 138:14
**sentence** 19:18
20:6 21:19
22:4,11 40:10
40:25 49:9
74:20 76:12
77:2 85:16
105:14,19
107:16 118:7
**serious** 8:23
10:2 31:8,21
71:11 85:24
110:3 126:7
127:14 128:15
**serve** 64:19
**served** 34:8
118:9 127:16
129:19
**service** 3:15
16:10 33:18

34:2 36:15
46:2 53:14,15
56:8,12 100:8
100:11,14
110:5,18,20,22
110:23 126:19
**services** 8:23
9:17,24 13:25
14:9,19,25
15:11,21 16:3
16:6,16 17:8
17:24 18:5,9
18:14,18,21,24
19:3,8,9,15,23
20:8,14,18,22
21:24 22:14,16
22:21 24:8,9
24:12 25:7,11
25:20 26:9,12
26:14 30:20
31:13,24 32:10
32:24 34:6
35:13,19,23,24
36:6,9 37:11
37:20,25 38:7
38:15,19 39:13
39:15 40:16,23
40:25 41:3,19
45:10 46:6
47:23 48:24
49:15 51:18
52:5,13 58:13
59:15 60:3,23
61:3,19 62:2,8
62:15 63:4,15

CONFIDENTIAL

**[services - specifically]**                                              Page 27

| | | | |
|---|---|---|---|
| 63:20 64:2,7 | 85:23 86:6 | **significant** | **somewhat** |
| 64:11,21 65:7 | **shea** 2:17 | 10:10 78:17 | 105:2 |
| 65:11,21 66:25 | **sheet** 138:11 | **sing** 79:11,11 | **sorry** 27:3 |
| 67:23 69:5 | **shelter** 15:5,9 | **single** 16:14 | 43:25 50:19 |
| 97:16 100:24 | 22:20 23:6,6 | 57:7 60:15,16 | 97:2 131:6 |
| 101:16 102:6 | 23:15,25 26:3 | 62:4 84:12,16 | **sort** 6:6 28:25 |
| 109:23 111:6,9 | 53:13 80:23 | 84:19,24 85:21 | 49:12 125:19 |
| 111:11,19 | 82:7,11,14 | 86:5 | **source** 10:3,6 |
| 117:11,15,21 | 84:8,12,16,19 | **sit** 55:23 57:18 | 37:17 |
| 118:23 119:10 | 85:4,14,20 | **site** 44:12 83:4 | **sources** 11:8 |
| 119:19,25 | 86:4,16 92:17 | **sites** 33:17,25 | **southern** 1:2 |
| 120:6 123:20 | 97:6 101:19 | **sitting** 37:16 | **speak** 5:12 7:8 |
| 123:21 124:5 | **shopping** 33:5 | 101:13 106:23 | 9:6 11:10,13 |
| 124:10,11,16 | 63:9 | 107:5 113:11 | 12:6 40:7 |
| 124:24 125:5 | **short** 2:10 | 113:20 | 72:10,13,16 |
| 126:6,16 | 77:24 121:12 | **situation** 20:3 | 90:24 91:3,6 |
| 128:14 129:21 | **shorthand** 1:22 | 23:20 83:5 | 104:10 |
| 130:4 | 9:18 | 87:3 90:15 | **speaking** 11:17 |
| **session** 80:13 | **shot** 91:21 | **six** 20:7 22:5 | 11:21 90:3 |
| 81:12 133:7 | **show** 7:12 | 98:9 124:9 | **specialist** 51:2 |
| **set** 43:6 73:19 | 32:10 47:5 | **sixteen** 118:21 | 53:6,22 54:24 |
| 111:14 137:12 | 116:7 | **sixty** 121:16 | 55:10 68:18,22 |
| 137:21 | **showing** 78:24 | **skills** 33:4 63:8 | 69:2 83:16,23 |
| **setting** 87:23 | 93:10 | 63:18 64:10 | 84:2 |
| 98:13 111:14 | **shown** 18:10 | 65:10 | **specific** 18:15 |
| 111:17 | 55:24 | **skip** 93:2 | 36:10 45:18 |
| **settlement** | **shows** 32:9 | **smi** 71:7,13,17 | 57:19 76:9 |
| 127:9,12 | 96:18 | **smith** 1:21 | 90:9 95:25 |
| **seven** 95:14,16 | **side** 122:21,25 | 137:8,25 | 101:24 102:23 |
| 95:22 96:3,18 | **sign** 138:12 | **social** 79:10,22 | 106:19 107:6 |
| **severe** 124:5 | **signature** | **society** 2:7,17 | **specifically** |
| **sex** 75:6 | 137:24 | **solicit** 123:2 | 17:3 35:6 70:3 |
| **shake** 5:9 | **signed** 3:9,11 | **solutions** | 81:8 94:23 |
| **shared** 23:10 | 3:14 46:18 | 138:23 | 99:11 |
| 74:25 80:20 | 138:20 | | |

[specifics - support]                                                    Page 28

| | | | |
|---|---|---|---|
| **specifics**  37:13 | **stamps**  42:7 | 106:25 107:4 | **subsequent** |
| 45:17 97:14 | 66:11 79:2 | 109:22 118:17 | 87:7,10 89:3 |
| 111:21 114:21 | **stand**  30:22 | 119:14 132:16 | 121:13 |
| 115:22 129:16 | 31:15 | 132:25 | **subsequently** |
| **speculate**  96:8 | **standard**  32:14 | **states**  1:2 | 128:20 |
| **spend**  90:21 | 39:3,8,9,14 | 125:23 127:4 | **substance**  7:3 |
| 121:16 | 62:25 | 127:10 | 61:13,16 62:20 |
| **spends**  119:24 | **start**  23:3 43:9 | **stay**  68:6 | 64:16 67:13,15 |
| **spoke**  129:11 | 59:19 98:14 | 131:24 132:9 | 67:22 68:17,22 |
| **ss**  137:5 | 99:2,21 100:15 | **stefen**  2:10 | 68:25 69:3,4 |
| **ssi**  61:11 62:19 | **started**  99:14 | **stipulated**  3:4 | 112:5,13,21 |
| **stabbed**  91:25 | **starting**  45:21 | 3:18 | 113:3,7,12,16 |
| **stability**  18:15 | 66:11 108:13 | **stopped**  82:18 | 113:25 114:5 |
| **stable**  18:11,25 | 116:9 | 101:3,10 | 114:18 115:10 |
| 19:6,11 20:21 | **state**  1:8,23 | **stopping** | 115:15 |
| 22:10 31:9 | 2:11 4:12 | 101:19 | **success**  40:14 |
| 48:20 61:4,7 | 16:13 22:3 | **stranger** | 40:24 |
| 61:10 62:21 | 69:11 70:3 | 132:17 | **successful** |
| 64:3,12,21 | 71:22 110:8 | **street**  2:8,12 | 105:22 110:15 |
| 74:14,19 78:16 | 119:6,24 120:5 | 91:22,25 | **successfully** |
| 84:22 86:14 | 122:19 125:23 | **strike**  73:22 | 119:8 |
| 87:25 99:24 | 126:5,23 | 123:7 | **sue**  124:20 |
| **stably**  128:23 | 127:11,14,24 | **structures** | **sufficient**  18:24 |
| **staff**  65:17 | 128:12,19,19 | 119:7 | 19:5,10 |
| 81:19 94:4 | 137:4,9 | **studies**  32:10 | **summarized** |
| 100:6 110:12 | **stated**  13:13 | **subheading** | 17:6 |
| 111:13 112:3,9 | 18:12 35:6 | 119:4 | **summary**  17:7 |
| 112:19,25 | 58:8 60:24 | **subject**  124:7 | **supervisor** |
| 118:10 132:5 | 61:6 62:6 | 126:8,24 | 79:23 |
| **stamp**  50:11 | 105:21 | 127:20 128:16 | **support**  22:7 |
| 52:21 106:11 | **statement** | **submitted**  7:20 | 31:7 33:4 |
| 108:14 116:10 | 20:11 37:7 | **subscribed** | 36:13 37:9 |
| **stamped**  26:21 | 39:20 41:7,11 | 135:16 140:14 | 41:13 48:16,24 |
| 43:2 | 49:3 63:22,24 | **subsection**  8:18 | 49:4,14 52:9 |
| | 75:15,20 77:11 | 8:20 13:17 | 53:22 54:3,7 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 55:14,17,21 | **t** | 37:10,18,24 | **tell**   8:6 17:12 |
| 56:12 57:8 | | 38:6,10,15 | 26:17 38:12,14 |
| 63:8,17,22,23 | **t**   1:14 3:2,2 4:2 | 39:3,7,8,13 | 38:22 42:12 |
| 64:9 65:9 | 4:2 24:10 | 40:6,15,22 | 46:11 47:11 |
| 75:19 106:15 | 26:11 136:2 | 41:18 42:15 | 54:11 55:4 |
| 106:24 107:3 | 137:2,2 139:3 | 43:6,14 44:25 | 58:20 59:14 |
| 109:21 110:13 | 139:3 | 45:9 46:2,6,19 | 66:19 67:6 |
| 114:3 115:4,4 | **table**   6:8 | 47:6,12,19 | 76:11 85:2 |
| 115:8 | **take**   5:9 6:9 | 50:18 51:11,15 | 88:25 94:17 |
| **supportive** | 29:17,20 43:12 | 52:6,19 53:21 | 95:8,12 97:14 |
| 8:22 9:17 | 48:3 51:24 | 59:5,9,15,20,22 | 101:20 107:9 |
| 125:19 | 70:18 78:17 | 59:25 60:4,8 | 116:21 |
| **suppose**   121:11 | 90:16 103:25 | 60:22,25 61:25 | **telling**   88:14 |
| **sure**   10:5 12:12 | 108:20 121:5 | 62:2,3,16 | 89:2,6 |
| 14:6,12,15 | 125:21 130:8 | 63:13,14 64:18 | **term**   10:7 71:6 |
| 28:18 35:16 | **taken**   1:17 48:5 | 64:18 65:5,6 | 114:13 |
| 56:9 58:6 | 90:18 130:10 | 65:10,21 66:25 | **terms**   61:9 |
| 90:17 134:21 | 134:22 | 67:2,11,22 | **testified**   4:5 |
| **switch**   59:4 | **talk**   15:13 | 68:11,23 69:2 | 13:9 34:4 |
| 103:24 | 36:18 59:8 | 72:11 83:16,19 | 57:21 63:19 |
| **sworn**   3:9 4:3 | 61:19,22 70:2 | 83:23 86:11,11 | 64:16,17 78:3 |
| 135:16 137:13 | 99:10 101:9 | 86:13,17 90:25 | 86:10 90:23 |
| 140:14 | 104:7 | 99:2 100:7,22 | 92:23 113:19 |
| **sx**   131:22 | **talked**   84:25 | 101:14 102:4 | 129:25 |
| **symptoms** | 87:5,12 | 109:23 110:23 | **testify**   123:14 |
| 131:24 132:9 | **talking**   40:10 | 118:10 121:14 | **testimony** |
| **system**   15:5,9 | 47:22 76:9 | **teams**   32:3,22 | 89:21 107:2 |
| 23:7,16,25 | 90:22 100:16 | 32:23 34:8,10 | 123:8,11,15 |
| 26:3 64:14,15 | 106:10 112:9 | 34:13 51:19 | 137:14 138:9 |
| 82:7,11,14 | 125:17 | 61:20 63:3 | 138:18 140:8 |
| 84:8 85:14 | **team**   24:10 | 64:6 65:17 | **texarkana** |
| 86:8,13,16 | 26:10 31:6,23 | 68:22 109:18 | 124:6 |
| 92:18 110:8 | 31:24 32:5,6 | 121:10 125:18 | **texas**   124:6 |
| **systems**   61:9 | 34:6,19,21,22 | **tele**   47:25 | **thank**   4:18 |
| | 35:8,14,22 | | 132:13 134:19 |
| | 36:7,7,11,14 | | |

Veritext Legal Solutions

**[thank - two]**                                                              Page 30

| | | | |
|---|---|---|---|
| 135:6 | 94:20 98:8 | 57:16 | 109:17 110:13 |
| **thanked** 80:21 | 109:13 | **took** 29:23 | 112:5,13,21 |
| **thereabouts** | **time** 1:12 3:20 | **top** 8:9 38:12 | 113:4,7,8,13,17 |
| 92:19 | 5:13 6:5 15:14 | 43:20,24 50:16 | 113:18,25 |
| **thing** 87:21 | 25:5,22 26:7 | 51:6 54:13 | 114:6,16 |
| 116:14 125:19 | 26:15 28:24 | 82:2 94:3,24 | 115:13 122:8 |
| **things** 5:5 | 41:20 46:23 | 117:2 | 126:19 127:13 |
| 56:14,20,23 | 51:24 54:13 | **total** 102:13 | **treatments** |
| 57:3 70:20 | 60:19 77:24 | **toward** 94:3,24 | 61:14 |
| **think** 12:14 | 80:22 92:22 | **towards** 103:17 | **tremont** 97:10 |
| 18:6 19:16 | 97:7 100:25 | **transcript** 4:20 | 97:17 |
| 20:2,5,10,16 | 101:2 102:16 | 5:14 30:15 | **trial** 3:20 |
| 37:17 38:3 | 111:20 115:18 | 135:3 138:6,20 | **true** 56:21 |
| 40:14 46:5 | 115:24 117:13 | 140:5,8 | 57:12,17 59:3 |
| 47:10 55:12 | 133:20 134:18 | **transcripts** | 137:14 140:8 |
| 60:18 66:22,24 | 135:7 138:19 | 4:17 28:5 | **try** 21:17 22:22 |
| 73:12 77:19 | **timeframe** | **transitional** | 65:4 |
| 89:24 90:23 | 138:8 | 97:10,17 | **trying** 21:2,9 |
| 93:18 96:2 | **timely** 77:10 | **transitions** | 72:17 78:8 |
| 99:13,20 | **timing** 77:6 | 17:15 | 91:7 |
| 120:20 133:12 | **title** 50:25 53:6 | **traveling** 47:7 | **turn** 26:16 48:9 |
| 133:15 | 54:24 68:17 | **treated** 128:23 | 52:15,19 54:8 |
| **thirty** 3:14 | 79:22 | **treatment** 9:24 | 68:5 72:9 |
| **thought** 132:6 | **today** 5:5 30:2 | 10:12 29:10 | 73:23 85:15 |
| **three** 7:6 10:24 | 37:16 41:12 | 30:23,25 31:3 | 109:8 116:20 |
| 11:7,13,17,22 | 55:23 80:6 | 31:5,17,19 | **turned** 30:6 |
| 12:5 14:2,10 | 101:13,21 | 32:15 33:3 | **twenty** 20:7 |
| 14:20,25 15:11 | 102:7 106:23 | 39:10 51:10 | 22:5 124:9 |
| 16:11 17:20 | 107:6 113:11 | 61:2,16 62:20 | 125:2 |
| 20:4,23 21:2 | 113:20 125:17 | 63:2,7,16 64:9 | **two** 29:22 |
| 21:19 27:2,5 | 130:16 | 65:8 67:16,18 | 42:19 45:4 |
| 27:16,19,24 | **told** 25:13 | 67:23 69:3 | 55:16,18,24 |
| 28:6,9 29:4,17 | 29:18 36:24 | 100:6 105:18 | 56:10 98:8 |
| 57:16 58:13 | 49:22,24 56:20 | 106:5,17 | 121:9 133:18 |
| 78:25 93:11 | 56:23 57:10,12 | 107:25 109:2 | |

CONFIDENTIAL

**[type - want]**                                                    Page 31

| | | | |
|---|---|---|---|
| **type** 13:18 | 93:21 | **veritext** 138:14 | 74:3,14 75:18 |
| 22:24 38:22 | **understood** 6:2 | 138:23 | 76:3,14,23 |
| **types** 18:20 | **unit** 79:11 | **veritext.com** | 77:18 79:14 |
| 31:24 51:18 | **united** 1:2 | 138:15 | 80:3,17 81:6 |
| 59:22,25 60:3 | 125:23 127:4 | **version** 20:25 | 81:10 82:6,23 |
| 69:20 114:20 | 127:10 | 21:8,12 22:11 | 83:15 84:3,23 |
| **typical** 11:23 | **unknown** 74:5 | **vetting** 75:9 | 85:8,19 86:4 |
| 68:21 | **unreasonable** | **victim** 71:18 | 86:17 88:19 |
| **typically** 33:12 | 87:19 | **video** 30:13 | 89:12,25 |
| 70:5 72:2 98:7 | **unsigned** 3:12 | **view** 16:15 | 133:18 |
| 115:3 121:5 | **use** 8:19 9:17 | **violence** 71:18 | **w.p.'s** 34:18 |
| **typo** 127:9 | 9:22 10:21 | 75:5 | 35:22 36:7,14 |

|   **u**   |
|---|

| | | | |
|---|---|---|---|
| | 32:22 60:19 | **violent** 70:23 | 37:10,18 38:6 |
| **u** 3:2 | 68:17,22,25 | 71:14,19 | 39:19 40:21 |
| **uh** 48:12 | 69:3,4 75:5 | **virtual** 46:3 | 41:17 42:14 |
| 131:14 | 84:15 115:5 | **visit** 9:10 13:2 | 46:2,6 47:11 |
| **ultimately** 37:3 | **used** 3:13 9:15 | 13:5 43:15 | 47:18 51:15 |
| 57:17 | 10:16 13:10,14 | 54:3 | 52:18 72:20 |
| **unacceptable** | 84:11 138:20 | **visited** 13:3 | 73:2 75:15 |
| 75:13 87:4,8 | **uses** 63:2 | 129:9 | 83:19,23 86:20 |
| 87:16,22 88:2 | **usually** 121:15 | **visits** 33:15,24 | 90:9 |
| 88:7,15,22 | | 47:25 56:8,13 | **wait** 96:11 |

|   **v**   |
|---|

| | | | |
|---|---|---|---|
| 89:4,20,25 | | **vs** 124:23 | **waiting** 84:4 |
| 90:15 | **v** 124:2,20 | **vtc** 80:4,9,17 | **waitlist** 92:16 |
| **under** 4:21 | 125:23 127:4 | | 96:16,21 |
| 96:11 | 128:8 138:4 | | **waived** 3:8 |

|   **w**   |
|---|

| | | | |
|---|---|---|---|
| **understand** | 139:1 140:1 | **w.p.** 18:4 23:3 | **walk** 25:17 |
| 5:20 35:16 | **various** 10:11 | 23:4,6,9,13,23 | **walking** 91:21 |
| 36:2,5 78:8 | 23:14 58:12 | 24:8,12 34:5 | **wallitt** 2:14 |
| **understanding** | 118:22 | 35:10 36:17,22 | **want** 13:16 |
| 18:3 23:24 | **vasquez** 2:18 | 37:8 38:15 | 17:10 22:22 |
| 27:17,20 33:21 | **vast** 128:21 | 39:2,13 41:7 | 26:16 48:9 |
| 45:11 67:24 | **verbally** 5:8 | 43:7 45:9,19 | 64:25 96:8 |
| 77:25 81:11 | **verify** 56:20 | 48:14,23 49:14 | 105:13 119:3 |
| 84:7 85:13 | 57:11 138:9 | 51:8 53:12 | 121:19 125:22 |
| | | 55:13,21 72:9 | |

CONFIDENTIAL

**[want - zoom]**                                                    Page 32

| | | |
|---|---|---|

130:13 131:5
**wanted**  131:21
**water**  2:8
**way**  20:3 21:18
22:3 29:21
77:10 95:17
99:21 108:19
123:15 134:8
137:18
**ways**  53:21
**we've**  29:14
30:5 39:16
40:10 78:2
103:15 125:17
**weeks**  76:18
98:8 102:15
**weiss**  1:19 2:3
2:17
**wharton**  1:20
2:3
**whereof**  137:20
**wilkinson**
79:19
**wisconsin**
122:19
**witkowski**  1:21
137:8,25
**witness**  3:9,14
3:16 4:3,14 7:2
51:22 65:24
121:22,25
122:17 126:23
130:2 135:2,9
137:11,15,20
138:8,10,12,19

**word**  16:22
60:15
**work**  9:7,11
79:10 84:2
120:17 123:2
**worked**  34:12
113:2 121:9
**worker**  79:23
**working**  31:20
36:12 86:10
**world**  45:20
**wound**  129:13
**write**  32:20
33:10 74:13
82:4 112:19
126:11
**writer**  53:12,19
80:3
**writing**  51:8
**written**  53:2
79:18
**wrong**  77:5
**wrote**  19:19
35:17 36:16
40:12 49:18
54:6 56:4
63:10 67:9,25
74:22 101:17
109:11,24
110:9,12
111:12,23
113:5 119:4
131:18,19
**wsrp**  53:14,15

| **x** |
|---|
| **x**  1:3,9 136:2 |
| 136:22 |
| **y** |
| **yeah**  63:21 |

91:23 126:2
**year**  119:24
120:7
**years**  124:9
125:2 127:23
**yep**  104:3
**york**  1:2,8,23
2:5,5,9,9,11,13
2:13 4:11
46:23 54:17,21
69:11 70:3
94:11,15 119:6
119:24 120:5
125:24 126:5
126:20 128:13
128:19 137:4,6
137:9

| **z** |
|---|
| **zoom**  29:23 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.