UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

M.G., P.C., C.J., M.J., J.R., D.R., S.D., W.P., and D.H.,
individually and on behalf of all similarly situated,

                                     Plaintiffs,

              -against-

ANDREW CUOMO, in his official capacity as the Governor
of the State of New York, the NEW YORK STATE OFFICE
OF MENTAL HEALTH, ANN MARIE T. SULLIVAN, in
her official capacity as the Commissioner of the New York
State Office of Mental Health, the NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION, ANTHONY J.
ANNUCCI, in his official capacity as the Acting
Commissioner of the New York State Department of
Corrections and Community Supervision, ANNE MARIE
MCGRATH, in her official capacity as Deputy
Commissioner of the New York State Department of
Corrections and Community Supervision,

                                   Defendants.

------------------------------------------------------------------------ x

                           7:19-cv-0639 (CS) (AEK)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS AND
TESTIMONY OF PLAINTIFFS' CLASS CERTIFICATION EXPERTS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ....................................................................................................................... 6

I.    Expert Testimony Should Be Freely Admitted Where the Court Is the Factfinder ............ 6

II.   Peet and Dr. Factor Employed Reliable Methodologies in Reaching Their Conclusions .. 7

      A.    Peet Employed Reliable Methodologies ................................................................. 8

      B.    Dr. Factor Employed Reliable Methodologies ...................................................... 15

III.  Plaintiffs' Expert Reports Are Relevant to Certifying the Proposed Classes .................. 17

      A.    Peet's Report Demonstrates the Systemic Deficiencies That Result in Prolonged
            Incarceration and Inappropriate Release Settings and Services .......................... 18

      B.    As Defendants Effectively Concede, Dr. Factor's Report Is Relevant to the
            Discharge Class Claims .................................................................................. 19

CONCLUSION .................................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)............................................................................................6

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996) .......................................................................................8, 17

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
    239 F.3d 179 (2d Cir. 2001)............................................................................................7

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)......................................................................................................17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009)............................................................................................19

*Ge Dandong v. Pinnacle Performance Ltd.*,
    2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ..............................................................18

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003)........................................................................................6

*Matter of Manhattan by Sail*,
    436 F. Supp. 3d 803 (S.D.N.Y. 2020)............................................................................7

*McCullock v. H.B. Fuller Co.*,
    61 F.3d 1038 (2d Cir. 1995)............................................................................................8

*Med. Soc'y of N.Y. v. UnitedHealth Grp. Inc.*,
    2020 WL 1489800 (S.D.N.Y. Mar. 26, 2020) ...............................................................6

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
    982 F.3d 113 (2d Cir. 2020)............................................................................................6

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)............................................................................................6

*In re NYSE Specialists Sec. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) ...................................................................................17

*Olmstead v. L. C.*,
    527 U.S. 581 (1999)..................................................................................................2, 14

*F.D.I.C. v. Suna Assoc., Inc.*,
    80 F.3d 681 (2d Cir. 1996) ............................................................................... 15

*United States v. 14.38 Acres of Land*,
    80 F.3d 1074 (5th Cir. 1996) ............................................................................ 6

*United States v. Mississippi*,
    No. 16-cv-622 (S.D. Miss. 2019) .................................................................... 10

*Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*,
    2009 WL 959775 (S.D.N.Y. Apr. 8, 2009) ..................................................... 7

*Watson v. Manhattan Luxury Automobiles, Inc.*,
    2022 WL 4586407 (S.D.N.Y. Sept. 29, 2022) ................................................ 7

**Statutes**

N.Y. Mental Hyg. Law ........................................................................................... 14

**Other Authorities**

Fed. R. Civ. P. 23 .......................................................................................... 1, 8, 17

Fed. R. Evid. 702 .................................................................................... *passim*

## PRELIMINARY STATEMENT

Defendants ask the Court to take the extraordinary step of striking and excluding the reports of Plaintiffs' two experts on a motion for class certification, where the court, not a jury, is the fact finder. Defendants' challenge is unavailing. Both reports are the product of reliable methodologies and are relevant to the Rule 23 analysis. Plaintiffs' experts Dr. Robert Factor and Melodie Peet, MPH, engaged in months of extensive document review and drew upon their decades of relevant professional expertise to analyze the facts and issues pertinent to this case. Both reports include extensive citations to show precisely what each opinion is based on. There are thus no proper grounds to exclude their expert opinions. At most, Defendants' arguments as to both experts go to the *weight*, not the *admissibility*, of the experts' opinions.

First, contrary to Defendants' argument, both experts designed and implemented reliable methodologies. Melodie Peet, MPH, a mental health systems expert with decades of experience administering state mental health systems, conducted an exhaustive review of the relevant professional literature and standards, documents concerning Defendants' conduct and operations, and data compiled on the putative class members, in concert with her 40 years of experience in the industry. Dr. Robert Factor, a psychiatrist with decades of experience in community-based care, performed an extensive literature review, considered over 12,000 pages of Plaintiffs' mental health records, interviewed all three Named Plaintiffs for the Discharge Class, read their deposition transcripts, and applied his 38 years of experience to the facts he learned. Defendants' disagreement with the conclusions of these experts does not amount to unreliable methodologies.

Second, Defendants argue that neither report is relevant to the issues at the class certification stage, but the reports address the common harms faced by the putative classes and typicality of the Named Plaintiffs' claims. Peet's report is directly tied to the central issue of this case—whether Defendants adequately provide the relevant population with community-based

mental health housing and supportive services ("CBMHHSS") upon release from prison. Peet shows that Defendants fail to administer the CBMHHSS system in a manner that ensures it can serve putative class members, leading to the common harms experienced by the Plaintiffs. Peet demonstrates that these are not the result of individualized problems, but rather systemic deficiencies. Dr. Factor's report shows common harms experienced generally when people with serious mental illness ("SMI") do not receive adequate CBMHHSS as well as the common harms experienced by the three Discharge Class Named Plaintiffs. Dr. Factor's report is also relevant to typicality because it shows that the harm suffered by these Named Plaintiffs, namely, the serious risk of institutionalization, is the same as that experienced by people with SMI released from prison without necessary CBMHHSS. The expert testimonies are based on reliable methodologies, reliably applied to the facts of this case, and are relevant to Plaintiffs' motion for class certification. Therefore, the Court should deny Defendants' motion to strike the expert reports.

Additionally, Defendants use this motion as a misguided strategic opportunity to cast Plaintiffs as inherently violent individuals whose homelessness and lack of services are due solely to their own conduct and "preferences." Memo. of L. in Supp. of Defs.' Mot. to Exclude the Opinions and Testimony of Pls.' Class Cert. Experts ("Defs.' Br.") 11; *see also id.* at 12–13. Instead, Defendants highlight the common harms that the proposed class members face and illustrate why the housing and services sought in this lawsuit are essential. Each Plaintiff served their time and should not now be warehoused in halfway houses and homeless shelters that create serious risks of re-institutionalization when the same funds could instead be allocated towards developing the CBMHHSS proven to be critical for successful reintegration into the community, as required by the Supreme Court in *Olmstead v. L.C.*, 527 U.S. 581, 605–07 (1999*)*.

## RELEVANT BACKGROUND

Plaintiffs filed this putative class action challenging Defendants' widespread and systematic failure to sufficiently fund and maintain CBMHHSS for people with SMI released from prison. Plaintiffs served their motion for class certification on February 8, 2023, along with the Peet and Factor expert reports. Defendants did not serve any expert reports in opposition.

Peet opines on the adequacy of CBMHHSS for New York State residents with SMI who are homeless and/or at risk of homelessness and reach their release dates or are released from prison (the "relevant population"). *See* Peet Decl., Ex. 1 ("Peet") at 1. She concludes that Defendants fail in their shared responsibility to ensure that individuals with SMI are adequately provided with the CBMHHSS for which they are eligible and appropriate at the time of their release. *See id.* at 2, 14, 21, 31–44. Specifically, Peet reports that DOCCS fails in its responsibility to ensure the "continuum of care" for the relevant population, which includes ensuring that the population is provided the CBMHHSS for which each individual is eligible on their release date. *Id.* at 21–22. Peet further reports that OMH ultimately fails to adequately plan, develop, and fund the necessary CBMHHSS for the relevant population. *Id.* at 2, 14, 21, 29, 43.

Dr. Factor opines on the relationship between the provision of CBMHHSS and the risk of re-institutionalization based on relevant literature and assesses each Discharge Class Named Plaintiff. Factor Decl. Ex. 1 ("Factor") ¶¶ 1–2. Dr. Factor considered 72 studies in his literature review, ultimately concluding that "people with serious mental illness who receive CBMHHSS," including those who are released from prison, "are much less likely to become seriously decompensated psychiatrically than those who do not receive such services." *Id.* ¶ 2. Dr. Factor identified nine "elements that are necessary to enable persons with [SMI] mental illness, including

formerly incarcerated persons, to live stable lives in the community." *Id.* ¶ 18.[1] Defendants do not dispute the methodologies or conclusions in Dr. Factor's Literature Review.

Based on these nine elements, Dr. Factor concluded that W.P., D.H., and S.D. "were deemed eligible for CBMHHSS upon release from prison," did not receive "the stable housing and services they require," and thus faced "an increased risk of institutionalization, including the potential for reincarceration and/or hospitalization." Factor ¶ 4. Dr. Factor did not "simply rel[y] on" Plaintiffs' allegations, Defs.' Br. 18, and in fact testified that he "didn't accept [those allegations] as true," Ex. 98 at 58:22–59:3.[2] His conclusions were based on his consideration of 12,918 pages worth of mental health records and the deposition transcript of each Discharge Class Named Plaintiff before interviewing each of them in order to reach his conclusions.

Dr. Factor's report highlights some of the necessary CBMHHSS that Plaintiffs did not receive. Most critically, none received stable housing. Factor ¶¶ 73, 76–78, 84, 86, 89, 90, 95, 97–99. He also relied on findings that Plaintiffs did not receive necessary supportive services, including reenrollment in SSI prior to release (and Medicaid for DH), crisis services with in-person outreach available 24/7 as necessary, coordination between the various systems, and even ACT services for D.H. Factor ¶¶ 79, 80, 91, 92, 87, 101, 102.

Defendants misrepresent a number of facts related to these three Discharge Class Named Plaintiffs and Dr. Factor's review. For example, Defendants state that W.P. rejected a housing placement during his discharge planning and that his "own deposition testimony" was that he

---

[1]    These elements are: engagement with ACT; stable housing; single occupancy residence for certain people; access to crisis services with outreach available 24/7; effective therapeutic relationships; effective coordination between the various systems; enrollment in Medicaid and SSI prior to release; enrollment in substance abuse treatment and/or recovery support if needed prior to release; and peer support. Factor ¶ 18.

[2]    Unless otherwise specified, citations to "Ex. __" refer to the exhibits to the Declaration of Crystal Parker and Supplemental Declaration of Crystal Parker filed herewith.

would reject "*any* placement in shared housing, no matter who the housemates might be." Defs.' Br. 10. W.P. actually testified that he asked who his roommates would be because, given his mental health needs, he was concerned about moving into shared housing without knowing anything about them. Ex. 99 at 75:8–14.[3] W.P. explained exactly this in his interview with Dr. Factor, and Dr. Factor considered the fact that W.P. "was offered a shared apartment, but that no information was given to him about who his roommates would be, including whether they had any history of violence, drug use, or being a sex offender." Factor ¶ 76. Dr. Factor concluded, based on experience and literature, that "it will be important to W.P.'s success in the community to ensure he has either single-room housing or lives with people he feels comfortable with." Factor ¶ 78. Defendants' suggestion that "there is no evidence that WP ever asked for information about the potential roommates before walking out of the interview," Defs.' Br. 10, is contrary to W.P.'s sworn testimony and his interview with Dr. Factor.

Defendants also wrongly claim that "Dr. Factor testified that S.D. is an *extremely challenging* person to place in community housing, given his history of extremely violent conduct." Defs.' Br. 12. In reality, Dr. Factor simply acknowledged that the events leading to S.D.'s convictions "would make him a difficult person to place in community housing." Ex. 98 at 91:20–92:10. The same is true of putative class members at large, given that each has been convicted of a felony-level crime. The task's difficulty does not relieve Defendants of their responsibility.

---

3   *See also* Ex. 99 at 75:8–9 ("I stated who the people who I'm living with, they refuse to tell me."); 76:3–11 ("I stated, who – where I'm going or who the roommates are, and they're all mental health, they said they need mental health. I stated on the video, like I just stated now, I don't feel safe, because of my illness I don't feel comfortable. They – and after that I was told I would be placed in [a homeless shelter].").

## LEGAL STANDARD

"It is a well-accepted principle that [Federal Rule of Evidence] 702 embodies a liberal standard of admissibility for expert opinions." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). Indeed, the "rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702 advisory committee's notes to 2000 amendment, and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system," *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996); *see also Lippe v. Bairnco Corp.*, 288 B.R. 678, 685–87 (S.D.N.Y. 2003). An expert's testimony must "both rest[] on a reliable foundation and [be] relevant to the task at hand." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 122–23 (2d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

"The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (cleaned up). And in a bench ruling such as this, "the presumption of admissibility is even stronger" because "the Court is the ultimate fact-finder," and "rather than gate-keep expert testimony from itself, the Court can take in the evidence freely and separate helpful conclusions from the ones that are not grounded in reliable methodology." *Med. Soc'y of N.Y. v. UnitedHealth Grp. Inc.*, 2020 WL 1489800, at *3 (S.D.N.Y. Mar. 26, 2020).

## ARGUMENT

## I.    Expert Testimony Should Be Freely Admitted Where the Court Is the Factfinder

Defendants ask this Court to take the exceptional step of excluding expert testimony, even though the Court is the factfinder at the class certification stage. "The Daubert and Rule 702 concepts of 'gatekeeping' and admissibility are ill suited for a class certification motion, which is determined by the Court. There is no admission or exclusion of testimony before a jury and no

'gate' requiring threshold reliability determinations. In sum, every objection goes to the weight of the testimony." *Watson v. Manhattan Luxury Automobiles, Inc.*, 2022 WL 4586407, at *2 (S.D.N.Y. Sept. 29, 2022).

Indeed, in contexts where the court is the factfinder, rather than a jury, expert testimony should be freely admitted because the concerns underlying *Daubert* do not apply. For example, "[i]n the context of a bench trial . . . there is no possibility of prejudice, and no need to protect the factfinder from being overawed by expert analysis." *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775, at *8 n.4 (S.D.N.Y. Apr. 8, 2009). For that reason, "there is no need for the Court to 'gate-keep expert testimony from [itself].'" *Matter of Manhattan by Sail*, 436 F. Supp. 3d 803, 810 (S.D.N.Y. 2020).

Here, the Court is the factfinder on the motion for class certification. There is no risk of misleading a jury, and as will be shown below, both expert reports easily satisfy *Daubert* and Rule 702 requirements. Therefore, Plaintiffs' expert reports should not be excluded.

## II.    Peet and Dr. Factor Employed Reliable Methodologies in Reaching Their Conclusions

Both of Plaintiffs' experts employed reasonably reliable methodologies, basing their opinions on extensive reviews of relevant records, materials, and information, as well as decades of experience. Defendants, in contrast, put forth no expert reports of their own to show any alternative approaches to methodology that they contend should have been taken and have ignored the rigorous review each expert employed in reaching their conclusions.

A district court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting *Daubert*, 509 U.S. at 597). Expert testimony should only be excluded if it is "speculative or conjectural," or if it is based on "assumptions that are 'so

unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges

comparison.'" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Shatkin*

*v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984)). "Disputes as to the strength of

[an expert's] credentials, faults in his . . . methodology, or lack of textual authority for his opinion,

go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co*., 61 F.3d

1038, 1044 (2d Cir. 1995). Rule 23's reliability requirement does not preclude an expert from

testifying based on experience alone or in conjunction with other knowledge, training, skill, or

education. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("an expert may

be qualified on the basis of experience").

     A.    <u>Peet Employed Reliable Methodologies</u>

     Defendants seek to discredit Melodie Peet's expert report by focusing heavily on the

strength and weight of her testimony rather than its admissibility. *See McCullock*, 61 F.3d at 1044.

Defendants inaccurately represent Peet's methodology, conclusions, and deposition statements to

contend that Peet devised her own standard underived from any existing textual source or from

established standards used by other mental health systems.

     Peet's opinions are rooted in her four decades of expertise as a mental health systems

authority. *See* Peet at 1, 3–4, App. A. Her pioneering role in deinstitutionalization, development

of community-based models, service implementation, and expansion is evident. *Id.* Defendants

nevertheless falsely assert that her views lack methodological rigor and are self-imposed. This

assertion is unfounded, as Peet conducted an exhaustive review of the relevant professional

literature and standards governing the provision of community-based mental health housing and

supportive services by State Mental Health Authorities. *See id.* at 4, App. B. Far from "apply[ing]

a standard of her own invention" regarding the scope and breadth of CBMHHSS she believes New

York should provide, Defs.' Br. 1, Peet bases her assessment on widely accepted standards memorialized in professional literature, Peet at 4, App. B.

Peet reviewed written standards, policies, directives, objectives, and goals articulated by Defendants themselves. *Id.* at 2, 4, 6–15, 21, 34–35, 38, 42, 46, App. B. Notably, several of the gaps she identifies mirror concerns initially raised by both Local Mental Health Authorities[4] under Defendants' oversight and Defendants themselves, as evident in state planning documents. Peet at 22–23, 37–38; Ex. 97 at 28:10–29:4; Ex. 118 at 4. Peet's conclusions strongly rest on the established principle of deinstitutionalization, a recognized movement away from institutionalization and towards CBMHHSS, deemed vital historically and broadly. Peet at 12, 15–17, 38–39, 41. Given the trajectory towards deinstitutionalization, sufficient funding and maintenance of CBMHHSS are crucial to prevent unnecessary institutional placements and ensure successful community integration for the relevant population. *Id.* at 31, 33 ("While OMH funding for CBMHHSS is critical, without a proper management structure in which OMH identifies roles and reporting standards for local counties, the needs of the relevant population cannot be properly met.").

Peet not only draws her conclusions from her vast experience, but also from mental health systems industry standards and best practices, including those reported by the United States Department of Health and Human Services' Substance Abuse and Mental Health Administration and the National Association of State Mental Health Program Directors. *Id.* at 4–5, App. B. On this basis, Peet opines that State Mental Health Authorities ("SMHAs") like OMH are responsible for ensuring the proper provision of CBMHHSS to individuals with SMI post-prison release. *Id.*

---

[4]     Peet at 5 ("SMHAs may set standards, principles, issue guidance, or entrust certain roles to County or Local entities, to the extent the law permits, which then may serve as the Local Mental Health Authority ("LMHA") for their respective jurisdictions.").

at 5–7. She deems this essential for effective support, stressing adequate funding and maintenance to prevent unnecessary institutionalization.[5] Peet also cites to OMH's own "core values" and emphasizes the need for active measures to meet the population's need for CBMHHSS. *Id.* at 14. She concludes that OMH fails to provide key services like supported housing, ACT/FACT teams, crisis services, and medication management. *Id.* at 14, 21–22. Based on her experience managing large public mental health systems, she states that these services, part of the Safety Net Services, are recognized across mental health systems and are critical for successful community integration of those with SMI. *Id.* at 15–22.[6]

Nevertheless, Defendants levy three major criticisms on Peet's expert report: her recommendations are not financially feasible; her standard is invented and lacks acceptance; and that she improperly relies on Local Service Plans ("LSPs"). None of Defendants' criticisms, alone or taken together, provide a ground to exclude Peet's report under Rule 702.

*First*, Defendants attack Peet's credibility by questioning the feasibility of her recommendations regarding the reallocation of funding to address inadequate CBMHHSS. Defs.' Br. 6–7. Financial feasibility is an issue for the merits stage of this matter, not class certification. Defendants specifically aim to discredit Peet's position on systemic deficiencies caused by Defendants' failures by pointing to "hundreds of millions of dollars" allegedly spent on residential

---

[5]    *Id.* at 31 ("In failing to take the necessary steps in response to the counties' reports of the need for CBMHHSS, *i.e.*, by thorough and adequate planning, funding, management and development of these services, OMH neglects populations with serious mental illness, including the relevant population which, due to its criminal justice involvement, suffers from more stigma than its peers without such involvement.").

[6]    Peet has also served as an expert for the United States Department of Justice. In *United States v. Mississippi*, No. 16-cv-622 (S.D. Miss. 2019), also an *Olmstead* case, the court accepted Peet's expert testimony evaluating the functioning of the state's mental health system against the integration mandate of the Americans with Disabilities Act and opinions regarding the adequacy of community-based mental health services. *See* Peet at 4.

mental health programs and a "billon dollar [sic]" investment[7] just recently announced to supplement mental health community housing and service. Defs.' Br. 16. Defendants fail to show that a sufficient portion of this allocation is explicitly designated for the relevant population discussed in Peet's report to ensure adequate CBMHHSS. To the contrary, Defendants continue to suggest that guaranteeing housing upon release is not attainable. Defs.' Br. 15. Defendants claim that Peet's alleged lack of knowledge about specific funding amounts undermines her expertise as a mental health systems expert and her opinion regarding the failure to provide adequate CBMHHSS. Peet is not a financial expert; her opinion on SMHA's failure stands without requiring her to delve into the weeds on funding. Moreover, Defendants' comparison of budgets between New York and Maine almost 30 years ago is irrelevant and misleading given state differences in size, budgets, and a gap of decades in understanding how SMHAs must serve people with SMI.

*Second*, Defendants argue that Peet did not employ a reliable methodology because of her supposed self-made standard that the State must immediately provide housing and services to individuals with SMI upon release from prison, without wait times. Defs.' Br. 15. But that is simply not an accurate account of the basis for Peet's opinion. Peet testified that it is the State's responsibility to ensure sufficient availability of services, citing the "abandonment" concept in health care, which provides that high-risk individuals should not be abandoned as they transition from a treatment setting. Ex. 97 at 60:5–61:4. In her opinion, releasing the relevant population to homeless shelters and placing these individuals on wait lists due to OMH's failure to ensure that

---

[7]    Additionally, "the billion dollar new investment in community mental health services and housing in the FY 2024 budget" that Defendants point to, Defs.' Br. 6, does not undermine Peet's credibility. The governor's announcement of this investment was made shortly before Peet's report was issued and includes no details regarding how OMH will adequately plan, develop, or fund the necessary services for the relevant population. Nor does this bare announcement go in any way to the reliability of her report or the admissibility of Peet's testimony.

these services exist in sufficient quantity conflicts with the State's responsibility. *Id.* at 24:17–28:7. In addition, Peet described her knowledge of other jurisdictions that had "developed the infrastructure for the safety net services . . . for all people with serious mental illness," including the relevant population. *Id.* at 38:14–20. Peet notes that OMH itself aspires to be "a provider of safety net services for the most seriously ill and underserved," Peet at 21, but fails to adequately define and then provide them, *id.* at 14–17, 21–22.

Peet's standard, which is based on guidance and standards from the National Association of State Mental Health Directors, SAMSHA, and OMH's own mandates (among other sources) is essentially "[e]nsuring adequate CBMHHSS for the relevant population is a minimum threshold requirement for an SMHA in providing an effective operating system for this population. In other words, it is not a mere best practice for OMH to afford the relevant population with the services for which they are eligible and appropriate. Individuals are entitled to receive the appropriate services for which they are eligible. It is imperative that OMH provide the relevant population with these services to ensure their basic well-being." *Id.* at 12; *see also id.* at 5–7. Peet determined that New York was not meeting this responsibility, as evidenced by self-reporting from counties indicating that there "remains significant need for housing," that "state funded positions continue to be reduced, which impacts local treatment and housing capacity," that the "[n]eed for services such as housing and . . . adult psychiatry continue to exceed capacity," and reports of waitlists for housing assistance as significant as over 1,100 individuals long with individuals "waiting for years for housing." *Id.* at 26–28. Defendants do not dispute that they do not track waitlists in each county. Peet reasonably recommends that OMH establish a standardized system at the county level, based on data and best practices, to manage services effectively by setting standards and issuing guidance to the Local Mental Health Authorities, and requiring waitlists be maintained and then shared with

OMH. Peet at 32–37, 45. This approach seeks to improve tracking of statewide needs and resource allocation.

Defendants challenge the reliability of Peet's standard, and thus her report, by arguing that she is unable to cite any other source that similarly recommends the reallocation of mental health resources. Defs.' Br. at 4–5. They argue that Peet never made such recommendations during her tenure in Connecticut or Maine. *Id.* Not only is whether Peet recommended reallocation of resources in these two states immaterial to the assessment of the reliability of Peet's expertise (Peet's recommendations stem from New York's failures, not those of other states), but as Peet notes in her deposition, notions of essential services for people with SMI have evolved from thirty years ago. *See* Ex. 97 at 86:4–23; 87:6–20; 180:17–181:23. Peet testified that the idea of supported housing as a necessity was still in its infancy and access to housing was not considered a huge problem in Maine at the time that she was Commissioner, therefore not necessitating policy changes. *Id.* at 86:4–23. Furthermore, contrary to Defendants' position, Peet led the expansion of services, in part, through the reallocation of funds and focus on funding strategies. *See* Peet at 3–4, App. A. In Connecticut, Peet helped the state to reallocate funds from downsizing the state psychiatric hospitals and expanding ACT services statewide. *See id.* As Commissioner in Maine, she specifically sought the expansion of community service systems, linking those efforts with the establishment of Regional Management entities and a funding strategy based on state hospital downsizing. *Id.* Peet's report is not about Maine nearly thirty years ago; it is about New York's mental health system today.

Another element undermining Defendants' criticism of Peet's standard is that Defendants wrongly apply the Supreme Court's instruction in *Olmstead* regarding waitlists for housing and services. The Supreme Court did not condone pervasive lengthy waiting lists that expose class

members to a serious risk of institutionalization. Whether a State has waiting lists that move "at a reasonable pace" is relevant to a fundamental alteration defense (a merits issue, not relevant to class certification). *Olmstead*, 527 U.S. at 606. Determining what is "reasonable" necessarily involves considering the vulnerability of the class and time spent on the waiting list, among other factors. *See id.* (noting Georgia's claim of a "short" waiting time). Defendants have sufficient time to plan in advance for the relevant population, but, as Peet notes, do not provide services *when people need them*. Ex. 97 at 28:10–23. This merits question is not a basis to exclude Peet's report.

*Third*, Defendants contest Peet's interpretation of County LSPs, in which counties seek additional State funding for mental health services. Defendants attempt to undermine Peet's review by attacking her characterization of counties indicating service gaps and growing dissatisfaction due to unmet needs as "complaints" or a result of a "refusal" by Defendants to address the issue is little more than an exercise in semantics, and do not touch on the reliability of her conclusions. Defs.' Br. 16. Moreover, while Defendants make much of Peet's supposed concession that counties are likely to continue to seek funding regardless of present services, they ignore her explanation that the counties' specific demands were not "abstract" but "were often tied to very concrete variables." Ex. 97 at 126:19–127: 6. Moreover, Defendants' attempts to downplay the relevance of the LSPs is at odds with their legislative mandate to determine the counties' needs based on annual county reports. N.Y. Mental Hyg. Law §§ 5.07(b)(1), 41.16.

*Finally*, Defendants take a number of potshots at Peet to undermine her credibility that have nothing to do with her reliability and provide no basis to exclude her testimony. To take one example, Defendants twist Peet's statement that if a member of the relevant population declines a housing placement, the State should "determine if there's another available [housing] option that would also meet their needs," Defs.' Br. 7, crucially omitting that she urged that when dealing

14

with people with SMI, "there is a process of engagement" to determine the cause of the refusal and whether another option is available. Ex. 97 at 37:2–18. As she explained, if "a person is refusing a setting and saying that, you know, they were exploited physically or sexually when they were in that setting previously, and the person has a history of PTSD, that's a reasonable reason for a person to say, no, they don't want that setting. And then I think it's incumbent on the people trying to work with him or her to find an alternative." *Id.* 37:21–38:7.

In short, all of Defendants' arguments to exclude Peet's expert report fail. Her decades of experience as a mental health administrator, and her review of industry best practices in the post-*Olmstead* landscape, including mental health planning materials from New York State, satisfy the requirements of Rule 702 and is "based upon reliable theories or principles." *F.D.I.C. v. Suna Assoc., Inc.*, 80 F.3d 681, 686 (2d Cir. 1996) (citing Glen Weissenberger, Federal Evidence 346 (2d Ed. 1995)).

B.    Dr. Factor Employed Reliable Methodologies

Dr. Factor's report relied on the review of 12,918 pages of mental health records of the Discharge Class Named Plaintiffs, the transcripts of the depositions of W.P., D.H., and S.D., 72 academic studies, and other materials as listed in Appendix B of his report, and interviewed each Discharge Class Named Plaintiff. Factor ¶ 17. Dr. Factor then applied the literature findings in his report and experience from his 38-year career as a licensed psychiatrist to the facts of each Discharge Class Named Plaintiff, concluding that each was placed at serious risk of institutionalization. Defendants' primary arguments—that Dr. Factor failed to consider necessary information and did not answer the questions asked by counsel—are both meritless.

*First*, Defendants argue that Dr. Factor "conceded that he failed to review critically material records." Defs.' Br. 18. Defendants point to S.D.'s FACT records as an example, but Dr. Factor considered that S.D. received FACT services when rendering his conclusions. Factor ¶ 103.

Defendants also point to the Lukens House documents, which were produced only a couple weeks before Plaintiff served their motion (and many weeks after Dr. Factor completed his document review), and which show only that D.H. finally received housing in a drug treatment program by August 2022, years after his release. Defs.' Br. 13–14. That information is consistent with Dr. Factor's findings. Defendants give no credit to the fact that Dr. Factor's report relied on the review of 12,918 pages worth of mental health records. The cherry-picked documents that Dr. Factor did not rely on in his report, given the significant universe of information he reviewed, do not establish unreliable methodology.

Similarly, Defendants state that "Dr. Factor's method of determining the material facts of Each Named Plaintiffs' treatment" was to "simply rel[y] on Plaintiffs' statements" and "their attorneys' allegations from the SAC." Defs.' Br. 18. This is untrue. Dr. Factor specifically testified that he "didn't accept [allegations in the SAC] as true." Ex. 98 at 58:22–59:3. His report lists all of the materials he reviewed. Factor ¶ 71, App. B. In fact, Dr. Factor explained that the interviews were intended to "confirm findings and observations that [he] obtained from the medical record[s] [or] their depositions and corroborate or clarify issues." Ex. 98 at 11:21–12:4. But perhaps more critically, there is no reason for Dr. Factor to discredit statements by Plaintiffs—or anyone else for that matter—where there is no contradiction between such statements and Plaintiffs' records. Defendants' suggestion that he should have done so only reinforces the historic discrimination that people with mental illness, with criminal histories, who are poor, and/or who are Black—like W.P., S.D., and D.H.—have long suffered.

*Second*, Defendants argue that Dr. Factor did not address the Question Presented: "[W]hat type of CBMHHSS did OMH provide" to W.P., S.D., and D.H. Defs.' Br. 2. However, Defendants concede that Dr. Factor did in fact consider what housing and services the Discharge Class Named

Plaintiffs received. Defs.' Br. 8–12; *see also* Factor ¶¶ 71–72. But Dr. Factor's conclusions go beyond just what was provided in assessing what needed housing and services were missing. For instance, while Dr. Factor acknowledges that W.P. and S.D. received FACT services, that does not undermine his conclusion that they were placed at serious risk of institutionalization. As Dr. Factor's report repeats several times, stable housing and supportive services, including ACT, "are both essential, and one cannot replace the other." Factor ¶ 20. Although Defendants might disagree with Dr. Factor's conclusion that receiving ACT is not sufficient on its own to avoid a risk of institutionalization, these arguments by Defendants do nothing to cast doubt on the reliability of his methodology. More importantly, Rule 23 does not require Dr. Factor to list out every service ever provided to these Plaintiffs to reach his conclusion that what was *missing* from their treatment plan put them at risk of institutionalization.

Additionally, Defendants' accusation that Dr. Factor was "never going to offer the Court an objective assessment" and instead provided a "biased presentation" simply has no basis in the record. Defs.' Br. 18. He concluded none of these Plaintiffs received stable housing upon release and lacked necessary services, which  exposed them to a serious risk of institutionalization. Indeed, all three were institutionalized in the past two years in hospitals, jails, and prisons. S.D. Decl. ¶¶ 22–26; W.P. Decl. ¶¶ 31–33; Ex. 98 at 118:4–18.

In sum, Dr. Factor's robust review of the materials, including interviews, and application of those facts to the literature and his experience meet the requirements of Rule 702. These conclusions were not "speculative or conjectural," *Boucher*, 73 F.3d at 21, but instead based on the reliable application of facts to standards and experience.

## III.    Plaintiffs' Expert Reports Are Relevant to Certifying the Proposed Classes

Peet' and Dr. Factor's expert reports are clearly relevant to the class certification motion and were relied on in Plaintiffs' brief as to commonality and typicality, among other things. *See*

Pls.' Class Cert. Br. 28, 31–35. Federal Rule of Evidence 702's "basic standard of relevance . . . is a liberal one." *Daubert*, 509 U.S. at 587; *see also In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 65 (S.D.N.Y. 2009). An expert opinion is relevant if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. To be relevant under Rule 702, expert testimony must have "a valid connection to the pertinent inquiry." *Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *14 (S.D.N.Y. Oct. 17, 2013) (citation omitted).

Both expert reports address questions that are central to Plaintiffs' commonality showing, including whether people with SMI who are homeless are exposed to a serious risk of institutionalization when they are released from prison without the CBMHHSS for which the State has deemed them eligible, Factor at 4–17, and whether there are systemic deficiencies in Defendants' CBMHHSS system, Peet at 14–44.

A.     Peet's Report Demonstrates the Systemic Deficiencies That Result in Prolonged Incarceration and Inappropriate Release Settings and Services

Peet's findings are relevant to commonality because Plaintiffs collectively seek relief related to Defendants' systemic failures in the planning and development of adequate CBMHHSS. Peet's report details how these failures universally cause prolonged incarceration beyond a release date when members of the General Class should be in the community. The General Class and RTF Subclass raise claims that question whether Defendants have a policy or practice of holding people with SMI in prison past their lawful release dates in segregated settings due to deficiencies in CBMHHSS. The Discharge Class members are all similarly harmed when the CBMHHSS necessary for them to remain in the community is unavailable on their release from prison.

Peet's conclusions go directly to these points. For instance, Peet does not forbid all waitlists as Defendants suggest, but rather recognizes that New York's waitlists are too long and result from a lack of sufficient CBMHHSS. Peet at 7, 22. Moreover, "[t]here is no clear indication as to how

18

long an individual will remain on the waitlist." *Id.* at 26. This conclusion demonstrates Defendants'

failure to adequately develop and fund CBMHHSS for the relevant population, revealing its policy

of holding people with SMI in prison past their lawful release date due to this failure.

Peet's opinions are also relevant to Plaintiffs' typicality showing. Typicality exists where

"each class member's claim arises from the same course of events and each class member makes

similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec.*

*Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citation omitted); *see also Westchester Indep.*, 331 F.R.D.

at 293. Defendants argue that the Named Plaintiffs are atypical because of their history of violence

and/or fire-setting, pointing to Peet's testimony that most individuals with SMI are far more likely

to be victims of violence than to commit violent acts, and that the small minority of individuals

with a history of violent conduct and fire-setting are the hardest to place in supported housing.

Defs.' Br. at 20, 30 (citing Defs.' Ex. 70 at 174:6–15; 177:10–178:4). However, *all* putative class

members have been convicted of a felony level crime and were either held past their release dates

and/or released to inappropriate settings without CBMHHSS due to Defendants' failure to provide

CBMHHSS. Peet opines on how the relevant population is hard to place due to their criminal

histories and the State's failure to take responsibility for them. Peet at 41–42. Peet also supports

the Named Plaintiffs' and class members' claims related to the lack of CBMHHSS through its

identification and explanation of the myriad systemic failures in the CBMHHSS system specific

to the relevant population—the same course of events (lack of CBMHHSS when needed, causing

harms) supporting all of their same legal arguments. Her report is thus relevant to typicality.

    B.    <u>As Defendants Effectively Concede, Dr. Factor's Report Is Relevant to the Discharge Class Claims</u>

Dr. Factor's report is relevant to all of Plaintiffs' claims and class certification. Defendants'

one-paragraph argument does not even attempt to argue otherwise and instead concedes relevancy.

For instance, Dr. Factor's conclusions that people with SMI who receive CBMHHSS "are much less likely to become seriously decompensated psychiatrically than those who do not receive such services," Factor ¶ 2, is directly relevant to Plaintiffs' showing of commonality. Similarly, Section IV.B of his report specifically discussing people with SMI who are released from prison, including members of the Discharge Class, supports the argument that, by failing to provide adequate CBMHHSS, Defendants have caused Discharge Class Members to experience the common harm of being placed at serious risk of institutionalization. Pls.' Class Cert. Br. 31.

Further, Dr. Factor's findings as to each Discharge Class Named Plaintiff are relevant to both commonality and typicality. His conclusion that each "has been denied both stable housing and the necessary community services, and as a result has been placed at a serious risk of institutionalization," confirms the conclusions of the literature review as applied to people within New York's systems. Factor ¶ 72. The conclusions also clearly go to typicality because they show that W.P., D.H., and S.D. experienced the same harm alleged in this case, namely, being put at serious risk of institutionalization, caused by the same course of conduct alleged in this case—namely, failure to provide adequate CBMHHSS upon release date. Pls.' Class Cert. Br. 35.

If anything, Defendants' arguments go to weight. Defendants concede that Dr. Factor's testimony is relevant but seek to exclude it as "relevant only to the extent that [it] undermine[s] Plaintiffs' class certification arguments." Defs.' Br. 20. This thus clearly passes the "liberal" standard of whether it will assist in understanding the evidence or determining a fact at issue. Dr. Factor's testimony meets that standard.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny Defendants' motion to exclude the expert reports and opinions of Melodie Peet and Dr. Robert Factor.

Dated: August 18, 2023                DISABILITY RIGHTS NEW YORK
         New York, New York           Elizabeth Woods (elizabeth.woods@drny.org)
                                       Sabina Khan (sabina.khan@drny.org)
                                       279 Troy Road, Ste 9
                                       PMB 236
                                       Rensselaer, New York 12144
                                       (518) 432-7861

                                       The LEGAL AID SOCIETY
                                       Elena Landriscina (elandriscina@legal-aid.org)
                                       Stefen R. Short (sshort@legal-aid.org)
                                       Robert M. Quackenbush (rquackenbush@legal-aid.org)
                                       Sophia A. Gebreselassie (sgebreselassie@legal-aid.org)
                                       199 Water Street, 6th Floor
                                       New York, New York 10038
                                       (212) 577-3530

                                       PAUL, WEISS, RIFKIND, WHARTON
                                       & GARRISON LLP

                                       */s/ Crystal L. Parker*
                                       Crystal L. Parker (cparker@paulweiss.com)
                                       Walter G. Ricciardi (wricciardi@paulweiss.com)
                                       Emily A. Vance (evance@paulweiss.com)
                                       Chantalle Hanna (channa@paulweiss.com)
                                       Samuel Margolis (smargolis@paulweiss.com)
                                       1285 Avenue of the Americas
                                       New York, New York 10019-6064
                                       (212) 373-3000

                                       *Attorneys for Named Plaintiffs and the Proposed*
                                       *General Class, RTF Subclass, and Discharge Class*

21