22-7-cv
*Elisa W. v. City of New York*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2022

(Argued: March 8, 2023    Decided: September 19, 2023)

No. 22-7

_____

ELISA W.; ALEXANDRIA R., by her next friend, ALISON MAX ROTHSCHILD;
THIERRY E., by his next friend, MICHAEL B. MUSHLIN; LUCAS T., XIMENA
T., JOSE T.C. and VALENTINA T.C., by their next friend, RACHEL
FRIEDMAN; AYANNA J., by her next friend, MEYGHAN MCCREA; OLIVIA
and ANA-MARIA R., by their next friend, DAWN CARDI; XAVION M., by
his next friend, MICHAEL B. MUSHLIN; DAMEON C., by his next friend,
REVEREND DOCTOR GWENDOLYN HADLEY-HALL; TYRONE M., by his next
friend, BISHOP LILLIAN ROBINSON-WILTSHIRE; BRITTNEY W., by her next
friend, SHAMARA MILLS; MIKAYLA G., by her next friend, MICHAEL B.
MUSHLIN; MYLS J. and MALIK M., by their next friend, ELIZABETH
HENDRIX; and EMMANUEL S. and MATTHEW V., by their next friend,
SAMUEL D. PERRY, individually and on behalf of a class of all others
similarly situated,

*Plaintiffs-Appellants,*

— v. —

THE CITY OF NEW YORK; SHEILA J. POOLE, COMMISSIONER OF THE NEW
YORK STATE OFFICE OF CHILDREN AND FAMILY SERVICES, in her official capacity,

*Defendants-Appellees,*

NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES; STATE OF
NEW YORK; NEW YORK STATE OFFICE OF CHILDREN AND FAMILY SERVICES;
and DAVID HANSEL, COMMISSIONER OF THE NEW YORK CITY ADMINISTRATION FOR
CHILDREN'S SERVICES, in his official capacity,

*Defendants.**

_____

Before:     CABRANES, BIANCO, *Circuit Judges*.**

Plaintiffs-appellants, nineteen children in New York City's foster care
system, filed suit alleging "systemic deficiencies" in the administration of the
City's foster care system in violation of federal and state law.  The named plaintiffs
moved to represent a class of all children who are now or will be in the foster care
custody of the Commissioner of New York City's Administration for Children's
Services and two subclasses.  As remedies, they sought injunctive and declaratory
relief to redress alleged class-wide injuries caused by deficiencies in the City's
administration—and the New York State Office of Children and Family Services'
oversight—of foster care.  The district court (Kimba M. Wood, *J*.) denied plaintiffs'
motion for class certification.  Plaintiffs appealed, arguing that the district court
erred in its analysis of the commonality and typicality requirements under Federal
Rule of Civil Procedure 23(a) and that remand is required for reconsideration of
class certification under the correct legal standard.  We agree.  Accordingly, we
**VACATE** the district court's order denying class certification and **REMAND** the
case to the district court for proceedings consistent with this opinion.

MARCIA ROBINSON LOWRY, A Better
Childhood, Inc., New York, NY;
(Antony L. Ryan, Justin C. Clarke,
Nicole M. Peles, *on the brief*, Cravath,

_____

*  The Clerk of the Court is instructed to amend the caption to conform with the above.

**  Judge Rosemary S. Pooler, originally a member of the panel, died on August 10, 2023.
The two remaining members of the panel, who are in agreement, have determined the
matter.  *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b); *United States v. Desimone*, 140 F.3d 457,
458–59 (2d Cir. 1998).

Swaine & Moore LLP, New York,
NY), *for Plaintiffs-Appellants*.

JAMISON DAVIES (Claude S. Platton &
Richard Dearing, *on the brief*),
Corporation Counsel of the City of
New York *for* Sylvia O. Hinds-Radix,
Corporation Counsel of the City of
New York, New York, NY, *for
Defendant-Appellee* City of New York.

ELIZABETH A. BRODY, Assistant
Solicitor General, (Ester
Murdukhayeva, Deputy Solicitor
General, *on the brief*) *for* Barbara D.
Underwood, Solicitor General, New
York State Office of the Attorney
General, New York, NY, *for
Defendant-Appellee* Sheila J. Poole.

JOSEPH F. BIANCO, *Circuit Judge*:

Plaintiffs-appellants are nineteen children in the foster care system of the

City of New York (the "City"). They filed suit in the United States District Court

for the Southern District of New York alleging "systemic deficiencies" in the

administration of the City's foster care system in violation of federal and state law.

The named plaintiffs moved to represent a class of all children who are now or

will be in the foster care custody of the Commissioner of New York City's

Administration for Children's Services ("ACS") and two subclasses. As remedies,

they sought injunctive and declaratory relief to redress alleged class-wide injuries

3

caused by deficiencies in the City's administration—and the New York State Office of Children and Family Services' ("OCFS") oversight—of foster care.

The district court (Kimba M. Wood, *J.*) denied plaintiffs' motion for class certification. *Elisa W. v. City of New York*, No. 15-cv-5273, 2021 WL 4027013 (S.D.N.Y. Sept. 3, 2021). Plaintiffs appealed, arguing that the district court erred in its analysis of the commonality and typicality requirements under Federal Rule of Civil Procedure 23(a) and that remand is required for reconsideration of class certification under the correct legal standard. We agree.

Accordingly, we **VACATE** the district court's order denying class certification and **REMAND** the case to the district court for proceedings consistent with this opinion.

## BACKGROUND

### I.    Overview of the City's Foster Care System

ACS is charged with protecting the safety and welfare of children in the City. The City's charter makes it responsible for ensuring that ACS complies with

4

federal and state law.  *See* N.Y. Soc. Serv. L. §§ 371(10)(a), 383-c, and 384; N.Y. City Charter ch. 24-B, §§ 615–17.

As part of its mandate, ACS is required to investigate reports of suspected child abuse or maltreatment.  *See* N.Y. Soc. Serv. L. § 415.  Under certain conditions, ACS may remove children, with pre- or post-removal review by the family court system, from the custody of their parents or legal guardians.  *See* N.Y. Fam. Ct. Act §§ 1022, 1024.  Once ACS moves a child into its custody, it seeks to provide the child with a safe permanent home (*i.e.*, "permanency").  New York law expresses a preference for achieving permanency by reunifying children with their birth parents, but permanency may also be accomplished through placement with a relative, adoptive parents, legal guardian, or another planned permanent living arrangement.  *See* N.Y. Soc. Serv. L. § 384-b(1).  Children in the City's foster care system are in the legal custody of the ACS Commissioner until a permanent home is secured.

Over a decade ago, ACS implemented an initiative called Improved Outcomes for Children ("IOC") that delegated the case management responsibilities for children in its custody to numerous contracting foster care agencies.  Under IOC, ACS's contracts with these agencies incorporate the 2011

5

Foster Care Quality Assurance Standards, as well as federal, state, and city law. The contracting agencies are responsible for, among other things, monitoring children in their foster care settings, ensuring children receive necessary services, recruiting and supporting foster parents, helping parents access services that promote safe reunification, and developing and implementing permanency plans for adoption or kinship guardianship when reunification cannot be achieved.  ACS is responsible for supporting and monitoring the contracting agencies to ensure that sound and timely decisions are made with respect to the safety, permanency, and well-being of the children.

Like all local child welfare agencies in the state, ACS is overseen at the state level by OCFS.  As a condition of receiving federal funding, OCFS is required to ensure ACS's compliance with the state plan that New York submits pursuant to federal law.  *See* 42 U.S.C. § 671(a)(3); N.Y. Soc. Serv. L. § 153-k.  In its oversight role, OCFS:  publishes regulations and guidance documents; approves and supervises the IOC; reviews and approves ACS's individual policies, corrective actions, and improvement plans; directly oversees ACS's contracting agencies to ensure compliance with statutory and regulatory standards; approves and

supervises ACS's initiatives; and collaborates with the United States Department of Health and Human Services to assess conformity with federal child welfare law.

In addition to overseeing ACS, OCFS also performs more targeted oversight of the contracting agencies. For example, the New York Regional Office of OCFS conducts Voluntary Agency Reviews to determine whether each agency is in compliance with statutory and regulatory standards. During these reviews, personnel from the Regional Office make site-visits to the contracting agencies; collect and review personnel records, agency policies, and child case records; and interview children, family, and staff members. Because of the significant resources these reviews require, they are conducted once every three years.

## II.    Procedural Background

Named plaintiffs are nineteen children who were in the City's foster care system. They commenced this action in 2015, alleging "systemic deficiencies" in the City's foster care system and OCFS's oversight of that system.

In their amended complaint, plaintiffs assert five causes of action. The first and second causes of action allege violations of plaintiffs' rights under the First Amendment's freedom of association, the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's substantive due process

7

protections. The third cause of action asserts that defendants are violating the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997. The fourth and fifth causes of action claim that the City is depriving plaintiffs of their rights under New York State Social Services Law and regulations adopted thereto, and breaching and failing to enforce the City's contracts with the contracting agencies.

Plaintiffs' initial motion for class certification was denied by the district court in 2016, "without prejudice to renewal on an evidentiary record that demonstrates satisfaction of the requirements of Rules 23(a) and 23(b)(2) as to both the broad class and appropriate subclasses." Dist. Ct. ECF No. 282 at 4 (Sept. 27, 2016). Subsequently, the parties engaged in extensive discovery, and plaintiffs again moved for class certification. In their renewed motion, plaintiffs proposed a general class of "children who are now or will be in the foster care custody of the Commissioner of New York City's Administration for Children's Services," and two subclasses of (1) "all children who have been in ACS custody for more than two years and whose cases require 'special scrutiny' pursuant to ACS policy," and (2) "all children for whom Contract Agencies failed to assess and document compelling reasons every three months to justify the decision not to file a

termination of parental rights petition after the children had been in care for 15 of the prior 22 months . . . ."  Joint App'x at 602–03.  As part of that motion, plaintiffs submitted more than one-hundred documentary exhibits, twenty-three depositions transcripts, and two expert reports.  Defendants opposed certification and moved to exclude the report of plaintiffs' expert, Dr. Caroline Long, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The district court denied defendants' *Daubert* motion and plaintiffs' motion for class certification in an omnibus order.  Addressing certification, the district court concluded that plaintiffs failed to demonstrate questions of law or fact common to the class and that the claims of the named plaintiffs were typical of the class.  *Elisa W.*, 2021 WL 4027013, at *7–12.  Thus, the court found certification to be precluded by Federal Rule of Civil Procedure 23(a).[1]

Commonality was lacking, the district court determined, for three somewhat overlapping reasons.  First, the common questions presented by plaintiffs were "too broad and generalized."  *Elisa W.*, 2021 WL 4027013, at *9.  Second, plaintiffs' allegations did not "flow from unitary, non-discretionary policies that violate the rights of all class members or cause them all injury."  *Id.*

---

[1]  Having found commonality and typicality lacking, the district court did not address the remaining requirements for class certification under Rule 23.

9

Third, the significant role of the New York State Family Court system created "dissimilarities within the proposed class that impede[d] the generation of common answers." *Id.* (internal quotation marks and citation omitted).

Typicality, the district court noted, tends to merge with commonality. Thus, the district court conducted a typicality analysis that mirrored its commonality inquiry and concluded that the "highly individualized nature of any child's case" also precluded a finding of typicality. *Id.* at *11 (pointing to differences in the length of time children remain in the foster care system and the confluence of factors that contribute to deficiencies in the foster care system).

Plaintiffs filed this interlocutory appeal.[2]

## LEGAL STANDARDS

### I. Standard of Review

We review a district court's certification determination for abuse of discretion. *Barrows v. Becerra*, 24 F.4th 116, 130 (2d Cir. 2022). "A court abuses its

---

[2] Since this action was commenced, all of the named plaintiffs have left or aged out of foster care. However, as the district court correctly concluded, class certification may relate back to the filing of the complaint, where, as here, the putative class of children in ACS's custody are "so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *Comer v. Cisneros*, 37 F.3d 775, 799 (2d Cir. 1994) (internal quotation marks and citation omitted).

discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law." *Id.* Thus, although "our review of the legal standards applied by the district court and the court's other legal conclusions is de novo," we review "the district court's application of those standards to the facts of the case" for abuse of discretion. *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Our review of district court decisions denying class certification is "noticeably less deferential" than when a class has been certified. *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (internal quotation marks and citation omitted); *accord Barrows*, 24 F.4th at 130.

## II.   Class Certification

Class actions are governed by Federal Rule of Civil Procedure 23. To maintain a class action, plaintiffs must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These requirements are known as numerosity, commonality, typicality, and adequate representation. In addition to satisfying these requirements, plaintiffs

11

must also show that one of the three conditions of Rule 23(b) is met. As relevant here, Rule 23(b)(2) allows for class treatment if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ." Fed. R. Civ. P. 23(b)(2).

## DISCUSSION

The district court erred in its analysis of commonality and typicality under Rule 23. Therefore, we remand for the district court to reconsider the motion for class certification, including the two subclasses, under the proper legal framework. *See, e.g., Dunnigan v. Metro. Life Ins.*, 277 F.3d 223, 231–32 (2d Cir. 2002) (remanding for reconsideration of denial of class certification because the district court's commonality and typicality determinations were "premised on an incorrect assumption about the governing law").

### I. Commonality

To satisfy commonality, plaintiffs must affirmatively demonstrate by a preponderance of the evidence that there are questions of law or fact common to the class. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). As the Supreme Court clarified in *Wal-Mart*, commonality turns on the ability of the

action to "generate common *answers* apt to drive the resolution of the litigation."

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation marks

and citation omitted).  Thus, commonality exists if there is a question such that

"determination of its truth or falsity will resolve an issue that is central to the

validity of each one of the claims in one stroke."  *Id.*  This is the "glue" that holds

class members' claims together.  *Id.* at 352.  Even after *Wal-Mart*, we have

emphasized:

> [C]laims for relief need not be identical for them to be common;
> rather, Rule 23(a)(2) simply requires that there be issues whose
> resolution will affect all or a significant number of the putative class
> members.  Where the same conduct or practice by the same defendant
> gives rise to the same kind of claims from all class members, there is
> a common question.

*Nextel*, 780 F.3d at 137–38 (internal quotation marks and citations omitted).

Conducting the commonality inquiry requires courts to engage in a

"rigorous analysis" that often "will entail some overlap with the merits of the

plaintiff's underlying claim."  *Wal-Mart*, 564 U.S. at 351 (internal quotation marks

and citations omitted).  Thus, "sometimes it may be necessary for the court to

probe behind the pleadings before coming to rest on the certification question."

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982); *B.K. ex rel. Tinsley v. Snyder*,

922 F.3d 957, 968 (9th Cir. 2019) (explaining that post-*Wal-Mart* commonality

13

inquiry requires "a precise understanding of the nature of the underlying claims" (internal quotation marks and citation omitted)); *Yates v. Collier*, 868 F.3d 354, 362 (5th Cir. 2017) (explaining that *Wal-Mart* requires courts to "look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues" (internal quotation marks and citations omitted)).

As explained below, the district court did not determine whether commonality and typicality exist with respect to each of plaintiffs' claims. Instead, it concluded that commonality was lacking as to all alleged harms because "Plaintiffs' allegations do not flow from unitary, non-discretionary policies . . . ." *Elisa W.*, 2021 WL 4027013, at *9. This approach was legal error requiring remand.[3]

### a. Alleged Departures from ACS Policy

The district court held that, as a matter of law, commonality could not exist because plaintiffs alleged "*departures* from ACS policy" that were "case-specific." *Elisa W.*, 2021 WL 4027013, at *9. We conclude that, in making this determination,

---

[3] The parties debate whether our decision in *Marisol A. v. Guiliani*, 126 F.3d 372 (2d Cir. 1997), affirming the certification of a class where plaintiffs alleged abuse and neglect in the New York City foster care system, survives the Supreme Court's decision in *Wal-Mart*. However, we need not reach this issue because we do not rely on the analysis in *Marisol A.* Instead, our decision rests on the district court's misapplication of *Wal-Mart* to the claims in this case.

the district court misconstrued both the nature of plaintiffs' allegations and the law governing municipal liability.

In support of their class certification motion, plaintiffs alleged, with supporting evidence, the existence of several practices by ACS that allegedly violate their constitutional and statutory rights. These common practices include:

(1) ACS's lack of "a process for matching a child's needs with a particular Contract Agency" and its failure to "ensure that its Contract Agencies have a process for matching children with appropriate families," Joint App'x at 638;

(2) ACS's failure to establish "robust training requirements for Contract Agency caseworkers" and to monitor "whatever training a Contract Agency does provide," *id.* at 634–35;

(3) ACS's failure "to ensure adequate case plans are timely developed and implemented," *id.* at 659; and

(4) ACS's failure "to ensure adequate steps were taken to ensure permanency," *id.* at 620.

In addition, plaintiffs claimed that OCFS has a longstanding practice of failing "to effectively exercise adequate and meaningful oversight over ACS and the Contract

15

Agencies," despite OCFS's knowledge of the dysfunctions. *Id.* at 660.[4] Plaintiffs contend that these practices have plagued the New York City foster care system and, as a result, "thousands of foster children in the legal custody of [ACS] can expect to spend over twice as long in care as the nationwide average; and, while in care, they are all too often retraumatized due to the one of the highest rates of maltreatment-in-care in the country." Appellants' Br. at 1.

As the district court correctly noted, plaintiffs allege that many of ACS's practices are departures from its written policies. For instance, one of plaintiffs' experts explained that ACS's lack of a matching process violates its own quality assurance standards, which require providers to "have specified procedures for obtaining admission information on children/youth . . . and integrating it into the immediate service plan, that demonstrates a direct relationship between the plan goal and the needs of the child(ren)/youth." Joint App'x at 705 (emphasis omitted) (internal quotation marks and citations omitted).

However, that ACS's practices may be a departure from its stated policies does not preclude a finding of commonality. We have explained in the foster care

---

[4] Plaintiffs raised two other common questions before the district court, but did not re-assert those questions on appeal. Thus, any arguments regarding those common questions are waived. *See, e.g., Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

context that city agencies "may be held liable under § 1983 if . . . its top supervisory personnel, exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution." *Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 145 (2d Cir. 1981). Thus, whether an agency has a practice of departing from its stated policy in a manner that exhibits deliberate indifference to a known risk or specific duty may be a common question that can be answered on a class-wide basis.

In addition, to the extent the district court categorically concluded that none of the class allegations "flow from unitary, non-discretionary policies" and that they were "too broad and generalized," as a matter of law to satisfy commonality, this too was error. *Elisa W.*, 2021 WL 4027013, at *9. The district court made these determinations without conducting the "rigorous analysis" of plaintiffs' particular claims, including the alleged unitary policies underlying those claims, that *Wal-Mart* demands. 564 U.S. at 351 (internal quotation marks and citations omitted). For example, the District Court did not address plaintiffs' argument that foster children "begin their time in care by being matched with a foster family on an essentially arbitrary basis." Appellants' Br. at 12; *see* Joint App'x at 304 (alleging

17

that "ACS makes . . . blind placement decision[s]"). Each of the nineteen named plaintiffs were, according to plaintiffs' expert, placed in a foster home without "any kind of 'matching process' that that would ensure even a minimal level of compatibility conducive to a permanent, safe stay . . . ." Joint App'x at 705. For instance, one of the named plaintiffs, Brittney, a child with special needs, was placed with a foster family that was not trained to care for children with developmental disabilities. Another two named plaintiffs, the T.C. siblings, who are Spanish-speaking children, were placed with a family that did not speak Spanish.

Importantly, in their class certification motion, plaintiffs do not allege that this lack of a matching process is based upon a breakdown of an established procedure in a particular case, but rather that it is the result of the absence of a matching procedure. In particular, plaintiffs contend:

> Once a child is placed in foster care, ACS assigns the child to one of its Contract Agencies, who is then responsible for placing the child in a foster home. Despite recognizing the importance of a child's placement, ACS does not have a process for matching a child's needs with a particular Contract Agency; nor does ACS ensure that its Contract Agencies have a process for matching children with appropriate families.

*Id*. at 638 (internal citation omitted).

18

Whether ACS indeed lacks effective criteria for placements may "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart,* 564 U.S. at 350 (internal quotation marks and citation omitted); *see also Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 498 (7th Cir. 2012) ("As the Supreme Court noted in *Wal-Mart*, an illegal *policy* might provide the 'glue' necessary to litigate otherwise highly individualized claims as a class."). Put simply, ACS either has a practice of ensuring that appropriate criteria inform placement decisions, or it does not. Indeed, the State acknowledged at oral argument that a complete lack of matching criteria would be a common policy. *See* Oral Argument at 22:53–23:14.[5]

Another alleged common question may be whether ACS has a practice of delegating care and case planning authority to caseworkers without adequate training standards. Again, in their class certification motion, plaintiffs asserted that ACS does not impose "robust" training requirements and that ACS does not maintain oversight over the Contract Agencies. *See* Joint App'x at 634. Answering that question does not involve the circumstances of any individual foster child. If ACS's training requirements are so pervasively deficient as to be unlawful, there

---

[5] Although the State conceded that plaintiffs' claim regarding the lack of matching criteria would be directed at a common policy, it maintained that plaintiffs failed to adduce sufficient evidence to support this claim. We address this evidentiary point below.

would not appear to be any impediment to addressing that unlawful practice in one stroke. *See Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 64 (3d Cir. 1994) (noting that, in granting class-wide injunctive relief, "a court could, for example, order the [agency] to develop training protocols for its prospective foster parents . . . . The district court will thus not need to make individual, case-by-case determinations in order to assess liability or order relief.").

As to the other alleged common practices—ACS's failure "to ensure adequate case plans are timely developed and implemented," Joint App'x at 659, and that "adequate steps [are] taken to ensure permanency," *id.* at 620, and OCFS's failure "to effectively exercise adequate and meaningful oversight over ACS and the Contract Agencies," *id.* at 660—the district court likewise failed to explain why these particular questions would not yield common answers.[6]

The Ninth Circuit's decision in *B.K.* is instructive. In *B.K.*, the Ninth Circuit affirmed the district court's certification of a class of "[a]ll children who are or will be in the legal custody of [the state agency] due to a report or suspicion of abuse

---

[6] To be sure, terms like "adequate," "meaningful," and "robust" are somewhat vague and left undefined in plaintiffs' renewed motion for class certification. We leave it to the district court to consider on remand whether the vagueness of the plaintiffs' allegations constitutes a barrier to class certification.

or neglect," 922 F.3d at 965, where commonality was based on nine alleged practices:

> (1) failure to provide timely access to health care, including comprehensive evaluations, timely annual visits, semi-annual preventative dental health care, adequate health assessments, and immunizations; (2) failure to coordinate physical and dental care service delivery; (3) ineffective coordination and monitoring of [agency] physical and dental services; (4) overuse of congregate care for children with unmet mental needs; (5) excessive caseworker caseloads; (6) failure to investigate reports of abuse timely; (7) failure to document "safety assessments"; (8) failure to close investigations timely; and (9) investigation delays,

*id*. at 969.  As the court explained, regardless of "whether any of these policies are ultimately found unconstitutional such that the plaintiffs prevail on the merits, their constitutionality can properly be litigated in a class setting."  *Id*.  Similarly, reviewing the certification of a 12,000-member class of foster children, where commonality was predicated on Texas's alleged policy of allowing caseworkers to carry excessive caseloads, the Fifth Circuit too affirmed.  *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 243, 246, 270–71 (5th Cir. 2018); *id*. at 271 (holding that the constitutionality of "the State's policies with respect to caseload management, monitoring, and oversight" was properly adjudicated "on a class-wide basis").

Finally, the district court's suggestion that the New York State Family Court's role in each child's case "creates 'dissimilarities within the proposed class'

21

that 'impede the generation of common answers'" is grounded on the same misunderstanding of plaintiffs' claims that permeates the rest of its analysis. *Elisa W.*, 2021 WL 4027013, at *9 (quoting *Wal-Mart*, 564 U.S. at 350). In particular, the district court's overarching reliance on the family court's contributions to delays in permanency as a dispositive factor was misplaced given plaintiffs' theory of liability. We reiterate: plaintiffs' claims turn not on the cause of permanency delays for any particular child, but on whether ACS's practices lead to permanency delays thereby placing all foster children at an unreasonable risk of harm. To prevail on their substantive due process claim, plaintiffs need not prove that ACS's policies are the sole cause of permanency delays but only that its policies are "*a proximate cause*" of those delays. *Doe*, 649 F.2d at 145 (emphasis added). Thus, answering the question of whether ACS's policies cause permanency delays may help drive the resolution of plaintiff's substantive due process claim regardless of whether other actors, such as the family court system, also contribute to those delays.

In any event, several of the alleged practices do not relate to delay at all. For example, with respect to the alleged lack of a matching process, plaintiffs focus not on any delay caused by that practice, but rather on the cognitive disruptions and

mental health issues that inappropriate placements cause. *See* Joint App'x at 638–40 (detailing the specific harms caused by inappropriate placements). It is unclear how delays due to the family court system would impede a court's ability to generate a common answer to this particular question. In short, the district court failed to anchor its analysis to each of the specific proposed common questions in order to determine whether any one of them could generate a common answer. *See Wal-Mart*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do." (alterations adopted) (internal quotation marks and citations omitted)).

Therefore, on remand, the district court should determine whether each of plaintiffs' allegations support a finding of commonality given plaintiffs' theories of liability.

### b. Evidence Supporting Alleged Practices

Defendants alternatively argue that, even if plaintiffs sufficiently alleged the existence of a policy or practice that exposed all children in foster care to a substantial risk of harm, they failed to submit sufficient evidence to support these allegations. *See* City's Br. at 37 (noting that allegations of "an *actual* policy that facially violates the law" still require "evidence that the policy was implemented

23

and injured the class" (alteration adopted) (internal quotation marks and citation omitted)); State's Br. at 27 ("[T]he proof presented by the plaintiffs below consisted of only a handful of isolated statements—many from non-OCFS personnel—that fell short of constituting proof of a particular and readily identifiable policy that has class-wide effects" (internal quotation marks and citation omitted)).

To be sure, "Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350. The party moving for class certification "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.*; *see also Nextel*, 780 F.3d at 137 ("The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met.").

Here, although the district court made some reference to weaknesses in the expert report submitted by plaintiffs, it did not examine the report's relationship to each of the plaintiffs' alleged common practices. Nor did the district court consider other evidence plaintiffs offered to support the existence and scope of certain alleged practices. For example, plaintiffs submitted internal ACS talking points, contracting agencies' testimony, and other evidence supporting ACS's

alleged lack of a matching process.  The district court, having erroneously found

other legal defects in the allegations, did not address the particular evidence

relating to each of the proposed common practices.  We decline to do so here in

the first instance and leave that analysis to the district court on remand.  *See, e.g.,*

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 103–04 (2d

Cir. 2007) ("In light of its categorical approach to Rule 23(a)(4)'s adequacy

requirement, the district court has not addressed these [remaining] questions

[about adequacy] . . . . But we are in no position, and therefore decline, to make

that determination in the first instance.").[7]

## II.    Typicality

---

[7] To the extent the defendants attempt to recast their actual injury argument as an Article III standing deficiency, we find that position similarly unpersuasive.  Defendants first maintain that plaintiffs have failed to satisfy the injury-in-fact requirement because their theory of liability depends on a future risk of harm.  However, the Supreme Court has made clear that individuals "exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021).  Here, not only have plaintiffs alleged a risk of harm that is imminent and substantial but, in certain instances, they have alleged that the harm has occurred. As to traceability, plaintiffs sufficiently allege that defendants' conduct is one cause of the substantial risk of harm to foster children.  *See Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) ("The traceability requirement for Article III standing . . . is most easily shown if there is a direct relationship between the plaintiff and the defendant with respect to the conduct at issue." (internal quotation marks and citations omitted)), *superseded by statute on other grounds as stated in Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023).

"Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Barrows*, 24 F.4th at 131 (internal quotation marks and citation omitted). Thus, where the claims of a class stem from a single course of conduct, "the commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart*, 564 U.S. at 349 n.5 (alteration adopted) (quoting *Falcon*, 457 U.S. at 157–58, n.13).

Here, the district court largely relied upon its commonality analysis to support its finding that typicality was not satisfied. Thus, the deficiencies we have identified in its commonality inquiry can also be found in its handling of typicality. To provide one example, the district court concluded that "the named [p]laintiffs' claims cannot be said to arise from the same course of events as those of other children, because it is not possible to determine what caused a permanency delay, a specific placement, an untimely or poorly-conceived case plan, or an instance of maltreatment, without evaluating all of the other contributing facts and influences." *Elisa W.*, 2021 WL 4027013, at *11 (alteration adopted) (internal quotation marks omitted). As we have discussed above, that conclusion, among

other things, fails to address certain allegations (*e.g.*, the lack of a matching process) that plaintiffs assert are typical across the class.  In short, we conclude that the flaws in the district court's commonality analysis also permeated its typicality assessment and, therefore, remand is also required for reexamination of typicality.

*   *   *

In sum, on remand, the district court should reconsider whether plaintiffs have demonstrated commonality and typicality as to the general class and subclasses, and with respect to each of plaintiffs' allegations.

## CONCLUSION

For the foregoing reasons, we **VACATE** the district court's order denying class certification and **REMAND** the case to the district court for proceedings consistent with this opinion.