PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS     NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 – 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

2029 CENTURY PARK EAST, SUITE 2000
LOS ANGELES, CALIFORNIA 90067-3006
TELEPHONE: (310) 982-4350

535 MISSION STREET, 24TH FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE (628) 432-5100

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

1313 NORTH MARKET STREET, SUITE 806
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

WRITER'S DIRECT DIAL NUMBER

(212) 373-3069

WRITER'S DIRECT FACSIMILE

(212) 492-0069

WRITER'S DIRECT E-MAIL ADDRESS

cparker@paulweiss.com

January 25, 2024

By ECF

The Honorable Andrew E. Krause
United States Magistrate Judge
United States District Court
300 Quarropas Street
White Plains, NY 10601

   Re: *M.G. v. Cuomo*, 19-cv-0639 (CS) (AEK)

Dear Judge Krause:

  Plaintiffs write to provide an update regarding outstanding discovery disputes. The parties reached agreement on 30(b)(6) topics and are conferring as to logistics; if any disputes arise ahead of the February 1, 2024 conference, the parties will file a brief joint letter outlining those issues.

  Disputes remain as to Plaintiffs' Third Requests for Production ("RFP"). Plaintiffs proposed significant cuts to their original requests and are willing to reduce the sample size from 143 to as few as 45 individuals, depending on the extent and quality of documents obtained per individual. Defendants have offered to collect only three documents per individual and refuse any in-person records review without a court order. The remaining records in Plaintiffs' revised request are critical for Plaintiffs' experts to opine on the risk of institutionalization across the class. Expert testimony based on similar samples is used in a variety of cases, and should be admissible here.

  Additionally, Defendants recently asserted that New York State Department of Health ("DOH"), not OMH, controls certain documents. Plaintiffs intend to subpoena DOH for those documents, and request an extension of the fact discovery deadline to facilitate this subpoena alongside the determination of an appropriate sample in connection with Plaintiffs' Third RFP, as well as guidance as to issuing the subpoena without violating the Protective Order in this case.

  Finally, Plaintiffs wish to inform the Court of discovery requests Plaintiffs issued before the January 19, 2024 deadline, and now request leave to seek one additional 30(b)(1) deposition.

1. **Plaintiffs' Proposed Expert Testimony Is Highly Relevant and Admissible**

  The Discharge Class challenges Defendants' failure to provide adequate community-based mental health housing and supportive services ("CBMHHSS") under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA"). As Judge Seibel

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

recognized, the Discharge Class properly stated a claim by alleging, and thus may prove their case by demonstrating, that Defendants "unnecessarily place them in segregated settings or fail to provide needed community-based housing and services, thus putting them at risk for institutionalization." *M.G.* v. *Cuomo*, 572 F. Supp. 3d 1, 14 (S.D.N.Y. 2021).

The Discharge Class claims present a common question: "whether DOCCS and OMH have a policy or pattern and practice of placing people with [serious mental illness ("SMI")] at serious risk of institutionalization, including incarceration and hospitalization, by releasing them from prison to inappropriate and segregated settings." ECF No. 272 at 29-30. Plaintiffs intend to proffer expert testimony to answer this common question by demonstrating that a representative and statistically significant sample of the Discharge Class was unnecessarily institutionalized or placed at serious risk of institutionalization because of Defendants' failure to provide community-based mental health housing and supportive services for which they were eligible and appropriate.

Demonstrating this risk through sampling is appropriate here given the unique nature and context of Plaintiffs' claim. *Davis* v. *Shah*, the leading risk of institutionalization lawsuit in this Circuit, involved a state plan to reduce "medically necessary" Medicaid services for people with certain medical conditions. 821 F.3d 231, 261 (2d Cir. 2016). There, the plaintiffs demonstrated risk through declarations from plaintiffs' treating physicians about the harm that would arise from the state's reduction of services. The state did not dispute that "at least some of the plaintiffs suffer from disabilities, which could be ameliorated by the services New York now denies to them, and that, without those services, would lead to their institutionalization." *Id.*

The present case differs significantly, as Defendants deny that their failure to provide CBMHHSS has caused unnecessary institutionalization or risk of institutionalization for the Named Plaintiffs or the putative class. Unlike in *Davis*, Plaintiffs do not challenge the loss of "medically necessary" services to a statutorily defined "categorically needy" population; Plaintiffs cannot reference a statutory definition to show risk. Plaintiffs' case is novel and significantly more complex, as they challenge Defendants' practice of failing to provide necessary CBMHHSS at a critical transitional period. Plaintiffs also cannot obtain declarations from long-time physicians affirming the risk caused by Defendants, as the physicians are Defendants' employees.

A representative sample, as Plaintiffs propose, is "a permissible method of proving classwide liability" if "each class member could have relied on that sample to establish liability if he or she had brought an individual action." *Tyson Goods, Inc.* v. *Bouaphaeko*, 577 U.S. 442, 455 (2016). While *Tyson* involved purported violations of the Fair Labor Standards Act, representative samples are used in a variety of cases. For instance, in *Rosie D.* v. *Romney*, the court found a representative sample "vividly probative" in holding, following trial, that Massachusetts had violated § 1983 by failing to provide children with serious emotional disturbances the services required by the Medicaid Act. 410 F. Supp. 2d 18, 30 (D. Mass. 2006). There, the plaintiffs offered "prodigious" evidence, including testimony regarding named plaintiffs, exemplar class members, and treatment of children throughout the state, expert testimony regarding the overall system for delivering services to these children, data on the actual utilization of services, and expert analysis of "the services received by a sample of thirty-five randomly selected seriously emotionally disturbed children who are class members." *Id.* at 29; *see also id.* at 51. The sample was "credible evidence [that] demonstrated that the vast majority of this group needed, but was not receiving" required services. *Id.* The court further recognized

that, "[s]hort of bringing to court a parent or guardian of every one of the thousands of class members, and offering testimony by an expert clinician for each child, it is hard to imagine how a more meticulously constructed case could have been offered on behalf of the plaintiff class." *Id.*

*Rosie D.* is not alone, as representative sampling is often used in similar situations involving the failure to provide adequate services, including other ADA cases. In *Braggs* v. *Dunn*, the court found that an expert's non-random sample of 29 incarcerated individuals was sufficiently reliable and admissible under *Daubert*, as well as "helpful to the court in assessing whether the mental-health care provided to prisoners in Alabama falls below the constitutional floor." 317 F.R.D. 634, 651 (M.D. Ala. 2016). In *Rolland* v. *Patrick*, the court concluded that Massachusetts failed to comply with court orders issued in connection with ADA violations by failing to provide specialized services to certain individuals in nursing homes based on an expert's survey of 20 randomly chosen class members. 483 F. Supp. 2d 107, 114-15, 118 (D. Mass. 2007).

Likewise, studies of representative samples are often used in other civil rights cases, including in cases before the Supreme Court. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977) (allowing statistical proof of intentional discrimination in pattern and practice case alongside anecdotal evidence); *Darensburg* v. *Metro. Transp. Comm'n*, 636 F.3d 511, 519 (9th Cir. 2011) (explaining that appropriate statistical evidence can provide a "reliable indicator of a disparate impact") (citing *N.Y. Urban League, Inc.* v. *New York*, 71 F.3d 1031, 1038 (2d Cir. 1995)); *see also Fant* v. *City of Ferguson, Missouri*, 2022 WL 2072647, at *12 n.12 (E.D. Mo. June 9, 2022) (indicating that a defendant would be able to use evidence of the median time an inmate was held in jail under the relevant circumstances to mount a defense). Moreover, as the Ninth Circuit has recognized, "since [*Wal-Mart Stores, Inc.* v.] *Dukes* and *Comcast* [*Corp.* v. *Behrend*] were issued, circuit courts . . . have consistently held that statistical sampling and representative testimony are acceptable ways to determine liability so long as the use of these techniques is not expanded into the realm of damages." *Jimenez* v. *Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014). In other words, where statistical sampling and representative testimony are used to show a particular pattern exists that would demonstrate liability but not the particular damages an individual suffered—as is the case here—such testimony is admissible.

2. **Plaintiffs' Narrowed Requests Are Reasonable, Proportionate, and Relevant**

Mindful of the Court's guidance at the last conference, Plaintiffs have considerably narrowed their requests after discussions with their experts. On December 22, 2023, Plaintiffs provided a revised proposal regarding their Third RFP: they withdrew RFPs 103 and 105 in their entirety, greatly limited RFPs 100 and 101 to only seek crime and sentence information, parolee chrono or progress reports, and risk assessments, and limited RFP 107 to only seek the most up-to-date contact information. *See* Ex. A. Plaintiffs maintained their requests for reports from the PSYCKES database as well as their original RFP 102. *See id*.

In response, on January 10, 2024, Defendants offered to provide just three documents for each individual in the sample: OMH discharge summaries, DOCCS community supervision parolee chrono reports, and DOCCS crime and sentence information. *See* Ex. B at 5.[1] These

---

[1] Defendants agreed to produce these documents for a random sample of 45 individuals with SMI from spreadsheet D-01685103, which Plaintiffs used to draw their initial sample. Plaintiffs' experts, including a biostatistician, recommend a stratified sample of 60 individuals with SMI who qualify as members of the Discharge Class to

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

4

documents offer an incomplete look at the circumstances of individuals prior to, and in the critical period following, release from prison. OMH discharge summaries, for instance, are often completed weeks before an individual is released from prison, and while they may show whether certain services were contemplated, they do not show actual receipt of services. For example, a discharge summary may indicate a referral to Health Home Plus services, but it does not show whether that linkage was successful. Discharge summaries also often provide only an undated, bare-bones description of one's mental status and functioning, unlike the more detailed evaluations made by an individual's psychiatrist during the pre-release period. The records listed in Requests 104 and 106 will provide this critical information. Moreover, to the extent Defendants argue that they provide the services at issue, though not immediately upon release, additional records are needed to determine how long individuals waited for those critical services.

Defendants also revealed, for the first time—months after Plaintiffs' initial requests—that they purportedly do not have control over data found in PSYCKES. They explained that DOH controls those records, and OMH only has access to them under limited circumstances pursuant to agreements that do not permit Defendants to collect and produce those documents. These records, however, contain highly relevant information about the circumstances of individuals following their discharge from prison. For instance, PSYCKES reports contain treatment notes detailing when and how often an individual receives supportive services in the community.

After consulting their experts, Plaintiffs proposed accepting the three documents Defendants offered if Defendants also agreed to produce a significantly narrowed down version of RFP 102. Plaintiffs withdrew their requests for several documents, such as mental health service level designations, admission and screening forms, diagnosis records, RCTP admission and discharge notes, transfer documents, and others. *See* Ex. C. Plaintiffs narrowed their request to the records most critical to understanding an individual's needs around the time of release, such as discharge planning documents, SMI Summary Notes, and SPOA applications and responses. Upon further discussion with Defendants regarding PSYCKES at a meet and confer this week, Plaintiffs also decided to instead pursue those records through subpoenas to DOH. *See* § 3.

Despite this reasonable counterproposal, Defendants will not budge. In a January 23, 2024 meet and confer, Defendants claimed that even at a sample of 45 individuals, they will not produce more than the three discrete documents they offered. In fact, Defendants insisted that there were no circumstances by which they would agree to physical in-person searches for the mental health records of any number of putative Discharge Class members without a court order. Since issuing their Third RFP, Plaintiffs remain willing to negotiate in good faith. While Defendants unfortunately remain obstinate, this Court should order the production of these highly relevant materials to facilitate an expert report that will demonstrate that Defendants' practices result in unnecessary institutionalization or serious risk of institutionalization across the Discharge Class.

3. **Issuance of Third-Party Subpoenas Reliant on Confidential Information**

Plaintiffs intend to subpoena DOH for the critical PSYCKES records of a sample of Discharge Class members originally sought under RFPs 104 and 106. Because Plaintiffs' expert

---

ensure a statistically significant sample, and a small "oversampling" to increase the chances of locating and interviewing the individuals, who are mostly undomiciled. However, if sufficient documents are produced per individual, Plaintiffs believe a reliable sample can be achieved with as few as 45 individuals.

report will examine Defendants' records for each individual, the same sample that the parties ultimately agree to for Plaintiffs' Third RFP should be used for the DOH subpoena so that records are obtained for the same individuals. Plaintiffs thus cannot realistically issue the subpoena unless and until an agreement is reached on, or the Court orders, production of certain records for a certain number of Discharge Class members. However, the fact discovery deadline is fast approaching. Plaintiffs thus seek an extension of the fact discovery deadline specifically as it relates to these PSYCKES records. Defendants will not be prejudiced by such an extension, considering they did not raise the lack of control issue until nearly three months after the Request was issued.

Second, because the subpoena seeks records of a sample of Discharge Class members, it requires identifying those individuals to DOH. Plaintiffs are concerned that doing so would violate the Protective Order, as it reveals the individuals' personal identifying information. *See* ECF No. 42 ¶¶ 2, 7. The information at issue, i.e., that these individuals have SMI, is already within DOH's knowledge and reflected in the records Plaintiffs seek. Plaintiffs request the Court's guidance on how to proceed. For example, Plaintiffs could issue a subpoena with a redacted appendix and only reveal the individual's identities once DOH and the parties enter into an appropriate protective order. Alternatively, the Court could issue an order holding that the subpoena does not violate the Protective Order, or, if it does, could revise the Protective Order to allow the subpoena.

### 4. Additional Discovery and Depositions

Plaintiffs issued limited additional discovery requests per the January 19, 2024 deadlines. There is only one outstanding dispute; Plaintiffs seek leave to take an additional 30(b)(1) deposition for Dr. Mary Colavita, the medical director of pre-release services at OMH. Plaintiffs initially noticed Dr. Kaplan because Defendants' Rule 26 disclosures claimed he had information concerning OMH's clinical determination of the appropriate level of care individuals with SMI need in the community upon discharge and whether mental health housing is required. *See* Ex. D at 6. But Dr. Kaplan testified that he has limited involvement in discharge planning, as OMH hired Dr. Colavita to fulfill that role and she is "more intimately involved in looking at . . . seriously mentally ill individuals who are being released to the community that have maybe some questioning in their history regarding dangerousness." Ex. E at 46:20-47:13. Defendants did not identify Dr. Colavita in their initial or supplemental disclosures. Dr. Colavita plays a central role in discharge planning and can offer firsthand testimony about what questions or concerns in a "higher risk" individual's history or presentation trigger extra review and efforts by OMH during discharge planning. *Id.* at 119:3-16; *see also id.* at 169:13-173:13.

Under Rule 26(b)(2)(C), the Court "must grant a request to exceed ten depositions" unless the excess depositions would be "unreasonably cumulative or duplicative," there was "a prior opportunity in discovery to obtain the information," or the burden outweighed any likely benefit. *In re Weatherford Int'l Sec. Litig.*, 2013 WL 5762923 (S.D.N.Y. Oct. 24, 2013). Defendants object that Plaintiffs obtained testimony on topics Dr. Colavita would testify about, including her service on the Specialized Review Committee, from multiple witnesses. However, Ms. Vogel wrongly identified Dr. Kaplan as sitting on the SRC, Dr. Kaplan disclaimed knowledge about the SRC's workings, and Dr. Lee testified that she has not served on the SRC since 2020, which makes her knowledge as to how OMH makes clinical determinations as to the necessity of CBMHHSS dated, *see* Ex. F at 88:7-22. For the foregoing reasons, Dr. Colavita's testimony, while related, would not be unreasonably duplicative. Plaintiffs request leave to depose Dr. Colavita.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

6

Respectfully submitted,

*/s/ Crystal L. Parker*

PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
Crystal L. Parker (cparker@paulweiss.com)
Walter Ricciardi (wricciardi@paulweiss.com)
Emily Vance (evance@paulweiss.com)
Samuel Margolis (smargolis@paulweiss.com)
Brian Erickson (berickson@paulweiss.com)
Michael Dauber (mdauber@paulweiss.com)
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

DISABILITY RIGHTS NEW YORK
Elizabeth Woods (elizabeth.woods@drny.org)
Sabina Khan (sabina.khan@drny.org)
279 Troy Road, Ste 9
PMB 236
Rensselaer, NY 12144
(518) 432-7861

THE LEGAL AID SOCIETY
Elena Landriscina (elandriscina@legal-aid.org)
Stefen R. Short (sshort@legal-aid.org)
Robert M. Quackenbush (rquackenbush@legal-aid.org)
Sophia A. Gebreselassie (sgebreselassie@legal-aid.org)
49 Thomas Street, 10th Floor
New York, New York 10013
(212) 577-3530

*Attorneys for Plaintiffs*