# Exhibit E

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------X
     M.G., P.C., C.J., M.J., J.R., D.R., S.D.,
 4   W.P., and D.H., individually and on behalf
     of all similarly situated,
 5
                              PLAINTIFFS,
 6
              -against-        Case No.:
 7                     7:19-cv-00639(CS)(LMS)
 8   ANDREW CUOMO, in his official capacity as
     the Governor of the State of New York, the
 9   NEW YORK STATE OFFICE OF MENTAL HEALTH, ANN
     MARIE T. SULLIVAN, in her official capacity
10   as the Commissioner of the New York State
     Office of Mental Health, the NEW YORK STATE
11   DEPARTMENT OF CORRECTIONS AND COMMUNITY
     SUPERVISION, ANTHONY J. ANNUCCI, in his
12   official capacity as the Acting
     Commissioner of the New York State
13   Department of Corrections and Community
     Supervision, ANNE MARIE MCGRATH, in her
14   official capacity as Deputy Commissioner of
     the New York State Department of
15   Corrections and Community Supervision,
16                         DEFENDANTS.
     ------------------------------------X
17
18              DATE: December 12, 2023
19              TIME: 8:32 a.m.
20       VIDEOCONFERENCE DEPOSITION of
21   the DR. JONATHAN KAPLAN, taken by the
22   Plaintiffs, held via Zoom, before Nicole
23   Veltri, RPR, CRR, a Notary Public of the
24   State of New York.
25
```

Page 2

1
2  A P P E A R A N C E S:
3
4  PAUL WEISS RIFKIND WHARTON & GARRISON LLP
     Attorneys for the Plaintiffs
5    1285 Avenue of the Americas
     New York, New York 10019
6  BY: SAM MARGOLIS, ESQ.
       SAMANTHA MERHING, ESQ.
7
8
   LEGAL AID SOCIETY
9    Attorneys for the Plaintiffs
     1285 Avenue of the Americas
10   New York, New York 10019
     BY: ELENA LANDRISCINA, ESQ.
11     SHONA HEMMADY, ESQ.
12
13 LETITIA JAMES, ESQ.
     NEW YORK STATE OFFICE OF THE ATTORNEY
14   GENERAL
     Attorneys for the Defendants
15   28 Liberty Street, 18th Floor
     New York, New York 10005
16 BY: CAROLINE WALLITT, ESQ.
       OWEN CONROY, ESQ.
17
18
19
20
         *   *   *
21
22
23
24
25

Page 3

1
2   F E D E R A L   S T I P U L A T I O N S
3
     IT IS HEREBY STIPULATED AND AGREED by and
4  between the counsel for the respective
   parties herein that the sealing, filing and
5  certification of the within deposition be
   waived; that the original of the deposition
6  may be signed and sworn to by the witness
   before anyone authorized to administer an
7  oath, with the same effect as if signed
   before a Judge of the Court; that an
8  unsigned copy of the deposition may be used
   with the same force and effect as if signed
9  by the witness, 30 days after service of
   the original & 1 copy of same upon counsel
10 for the witness.
11   IT IS FURTHER STIPULATED AND AGREED that
   all objections except as to form, are
12 reserved to the time of trial.
13        *   *   *   *
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            J. KAPLAN, M.D.
2  J O N A T H A N   K A P L A N, called as a
3  witness, having been first duly sworn by a
4  Notary Public of the State of New York, was
5  examined and testified as follows:
6  EXAMINATION BY.
7  MR. MARGOLIS:
8     Q.   Please state your name for the
9  record.
10    A.   Jonathan Kaplan.
11    Q.   What is your address?
12    A.   10 Ross Circle, Poughkeepsie,
13 New York.
14    Q.   Good morning, Dr. Kaplan.  My
15 name is Sam Margolis, and I represent the
16 plaintiffs and punitive class members in
17 this matter.
18         You were just sworn in by the
19 court reporter.  Just want to confirm, you
20 understand you're under oath and must under
21 penalty of perjury answer questions
22 truthfully just as you would as if you were
23 in court?
24    A.   I understand.
25    Q.   Great.

Page 5

1            J. KAPLAN, M.D.
2         Is there anything today that
3  would prevent you from testifying
4  truthfully and completely such as a medical
5  condition or medication?
6     A.   No.
7     Q.   Have you been deposed before?
8         MS. WALLITT:  If I may
9    interject, I just wanted to state for
10   the record that Dr. Kaplan due to a
11   back issue may need to be standing
12   and sitting at different times in the
13   deposition; but that will not be
14   affecting his ability to recall or
15   testify.
16        MR. MARGOLIS:  No problem.  Of
17   course.
18    A.   Thank you for raising that.
19    Q.   And, Dr. Kaplan, have you been
20 deposed before?
21    A.   I have.
22    Q.   When?
23    A.   Probably, let's see, early,
24 maybe within the last ten years, I would
25 say I had two depositions.  I had one

Page 42

J. KAPLAN, M.D.

(Whereupon, a short recess was taken.)

Q. We were talking about your responsibilities as clinical director for corrections based operations a little bit ago.

What, if any, role do you have in the creation of policies for correction based operations at OMH?

A. Well, I work with a medical staff executive committee to approve any changes in policies that are occurring in the organization.

Q. How do you -- in what way do you work with them?

A. Well, I'm a member of the medical staff executive committee.

Q. Does that group meet regularly or only when there are changes to consider for this, for policies?

A. It meets typically monthly. It's actually meeting -- it's today in conflict with this meeting.

Q. Sorry about that.

Page 43

J. KAPLAN, M.D.

A. No problem.

Q. Are you involved in the group that is suggesting changes, or are you more in an approval role?

MS. WALLITT: Objection. You may answer.

A. Typically approval.

Q. You said typically. Are there instances where you might be more involved in the creation?

A. In approval.

Q. Sorry. I just want to make sure I understand.

You said typically approval role?

A. Right.

Q. So are there also instances where you're not just approving but also involved in the development in changes to a policy?

A. Well, let's be clear. I don't develop a policy from A to Z. That's not my role. I'm clinically focused. Yet if I want to -- if there's a policy which I feel

Page 44

J. KAPLAN, M.D.

maybe needs to be tweaked, I can recommend some changes; and that we would -- I would bring it to the medical staff executive committee and perhaps cabinet for their approval and discussion and approval.

But I'm not involved in any -- typically in -- most mainly I'm not involved in creating a new policy from A to Z. I have enough helping manage 9,000 patients. I do not want to get into the business of writing policies.

Q. Understood.

What about the reviewer modification of policies, are you involved in that?

A. Can you explain that term, please?

Q. As policies are developed or changes to policies are developed, are you involved in reviewing those changes or suggesting modifications to policies before they are implemented?

A. Yes. As part of MSCC, I would -- I would be privy to that approval

Page 45

J. KAPLAN, M.D.

process, which means reviewing the change that has been suggested in specific policies and give comment or make suggestions as needed.

Q. What role, if any, do you play in the enforcement of policies?

A. It would be dependent on the type of policy.

Q. Are you responsible for training corrections-based operations OMH staff?

A. Psychiatric staff.

Q. On what topics?

A. Topics -- generally clinical topics that relate to, you know, effective medication management, effective diagnosing, effective treatment strategies, testifying treatment over objection, for example. Testifying appropriately new changes in the workplace like electronic prescribing, I'm responsible for making sure the psychiatric staff have the training tools and the resources needed to implement that effectively. So those are

12 (Pages 42 - 45)

| | |
|---|---|
| Page 46 | Page 48 |

Page 46

```
 1              J. KAPLAN, M.D.
 2   just some examples.
 3       Q.   Thank you.
 4            Do you interact in your role
 5   with personnel at OMH's office of planning
 6   or OMH's budget staff?
 7       A.   No.
 8       Q.   Do you have any involvement in
 9   OMH's budget?
10       A.   No.
11       Q.   Are you involved in discharge
12   planning for all individuals on the mental
13   health caseload?
14            MS. WALLITT:  Objection.  You
15       may answer.
16       A.   If we're looking at Central New
17   York Psychiatric Center patients, there's
18   a -- there are some patients that I am
19   involved with discharge planning.
20       Q.   In what capacity?
21       A.   Well, there's a Specialized
22   Review Committee.  There's a medical
23   director of pre-release services who
24   reports to me, and she's more intimately
25   involved in looking at some of those as we
```

Page 47

```
 1              J. KAPLAN, M.D.
 2   discussed previously especially some of
 3   those significantly mentally ill or
 4   seriously mentally ill individuals who are
 5   being released to the community that have
 6   maybe some questioning in their history
 7   regarding dangerousness or maybe some
 8   significant history of non -- treatment
 9   nonadherence leading them to be involved in
10   the justice system and so she would be
11   involved; and if she has questions or
12   concerns, she would raise it with me or one
13   of my other colleagues.
14       Q.   Who is the medical director of
15   pre-release services?
16       A.   Mary Colavita.
17       Q.   How long has she had that role;
18   do you know?
19       A.   Yeah.  Well, she was out on a
20   leave recently.  So let's see.  Probably
21   three-ish, around three years.
22       Q.   Who had that role before her?
23       A.   It was nonexistent.
24       Q.   Were you involved in the
25   creation of that role?
```

Page 48

```
 1              J. KAPLAN, M.D.
 2       A.   Yes.
 3       Q.   Can you describe your
 4   involvement in that process?
 5       A.   Due to my time constraints
 6   managing the large caseload, I thought it
 7   would be helpful to have an individual who
 8   can actually be more directly involved with
 9   the teams and can follow up, has time to
10   follow up with the teams, and especially
11   with the prescriber in specific cases and
12   questions that come up; so there would be
13   more time to discuss cases and have a
14   better understanding of appropriate
15   discharge plans.
16            So I thought an individual --
17   hiring an individual to do that would be
18   the best option.  The best option to
19   enhance clinical care and overall services,
20   clinical services for the organization.
21   She also sees patients though directly.
22   She has direct patient care also.
23       Q.   Thank you.
24            Does OMH provide training to
25   you in your role as clinical director for
```

Page 49

```
 1              J. KAPLAN, M.D.
 2   corrections based operations?
 3       A.   Not specifically for my role,
 4   but if there's any necessary trainings for
 5   the clinical staff or the medical staff, I
 6   would be part of that.
 7       Q.   On what topics would they
 8   provide that training?
 9       A.   For example, there's been prior
10   trainings -- well, if you look at the OMH,
11   grand rounds is a type of training.  It's
12   on a variety of topics ranging from COVID
13   and schizophrenia to I think a recent one
14   or upcoming one is cannabis and mental
15   illness.  There's been others on
16   aggression, another management of
17   aggression or violence.  There's been a
18   host of different grand rounds that OMH
19   provides on a monthly basis and those are
20   essentially -- can be also looked at as
21   trainings.
22            And every year there's
23   trainings that both CNYPC and OMH mandate
24   for more general topics whether it's
25   discrimination, workplace violence, you
```

Page 118

J. KAPLAN, M.D.

A. Well, my focus is on clinical -- again, it's continuing treatment plans and effective treatment for patients upon release to the community. So that's one aspect of community services, and then I understand the -- there's another aspect of community services which could incorporate housing.

So I think it's -- it could be housing and/or it could be treatment for the community service providers.

Q. What role do you play in the discharge planning for individuals on the OMH caseload who are being released from prison?

A. Well, like we discussed earlier, I have a medical director of pre-release services I work with; and if teams have specific questions or concerns about patients being released to the community, they would usually raise it with pre-release. And then I'm often involved, occasionally I should say, I'm involved with pre-release if concerns remain about

Page 119

J. KAPLAN, M.D.

specific patients going to a community.

Q. Can you talk about your involvement with pre-release if concerns remain about specific patients going to a community; in what way are you involved?

A. Well, usually after there's a Specialized Review Committee with Dr. Jain, he's the medical director of forensic services, and Dr. Colavita, they go over, I don't know, a handful of patients every week that are determined to be of higher risk. Sometimes those patients, Dr. Colavita continues to have some questions about it; so she would bring me into the email string with the teams.

There's also teams can raise questions on their own or bring it to my attention about patients that are being released to the community; but there's some concerns regarding the discharge plan or the most/least restrictive discharge plan so they would bring me into the equation, so it depends. It's dependent on clinical factors if I would be brought into the

Page 120

J. KAPLAN, M.D.

equation.

Keep in mind we have thousands of people being released every year to the community, so I'm not involved with the majority of the cases; but there's a handful of cases I am involved with.

Q. Are you familiar with the term discharged into the community?

A. I don't really think it's a term per se. It's just sort of a description of what happened, a process.

Q. What would you understand that to mean?

A. People being released from prison.

Q. What settings are people released to when they're released into the community?

A. Are you talking about mental health patients or anyone being released from prison?

Q. We can -- broadly speaking, what does it mean for somebody to be released into the community and what

Page 121

J. KAPLAN, M.D.

settings would constitute the community not limited solely to mental health individuals?

A. Well, I think that phrase is often used, discharge to the community, to describe anyone leaving prison regardless of where they're going.

Q. For mental health inmate patients, are there settings that they might be released to that would not be considered discharge into the community?

A. Yes. That's typically used for outpatient services, but if somebody is going to be discharged to the community and go to an inpatient setting, we would tend to use the term civilly committed or discharged to a nursing home or discharged to a skilled living facility.

It wouldn't be -- discharged to the community seems to connotate a lesser restrictive discharge plan. At least in my opinion because if people are put into more of a secure facility, we would specify the facility rather than say discharge to the

31 (Pages 118 - 121)

Page 166

1        J. KAPLAN, M.D.
2  15 years ago at least.  Probably ten to
3  fifteen years I would say.
4       Q.   Do you know if there's a
5  core-like program for other counties
6  outside of New York City?
7       A.   Well, no, that's where the
8  discharge ICDs come in.  There's one at
9  Auburn Correctional Facilities, so that's
10 for Upstate folks.  It has similar
11 strategies to try to help people give them
12 the skills needed for successful
13 reintegration.
14      Q.   When are people with serious
15 mental illness who are entering the
16 community after incarceration most likely
17 to face re-institutionalization or further
18 hospitalization?  Is it within the first
19 six months, the first year upon release; do
20 you know?
21      A.   So you're asking me when people
22 are more likely to decompensate once
23 they're released from the prison?
24      Q.   I think -- yes.  Let's try
25 answering that first.

Page 167

1        J. KAPLAN, M.D.
2       A.   I haven't looked at the data.
3  I would just -- my answer would be a
4  hypothetical based on some data that I read
5  regarding civil hospitalizations and
6  returning to their -- their vulnerable
7  period is the first few months after
8  release from a civil -- not prison
9  population, just general population being
10 released from a civil hospital.  It's
11 usually the first few months that are
12 turbulent.
13      Q.   Based on -- sorry, go ahead.
14      A.   No.  So I would hypothesize
15 within the first year is the more
16 challenging period of people probably
17 the -- what the increased risk of
18 recidivism if they don't have the
19 appropriate supports.
20      Q.   Is it important to ensure that
21 special care is given during this period of
22 heightened risk?
23      A.   You would just have to define
24 special care.
25      Q.   Because of the heightened risk

Page 168

1        J. KAPLAN, M.D.
2  of re-institutionalization and further
3  hospitalization that you hypothesized comes
4  in the first months or in the first year
5  after discharge from prison, is it
6  important that individuals with serious
7  mental illness receive appropriate
8  community-based housing and supportive
9  services in that period in order to guard
10 against the risk of decompensation and
11 ensure successful reintegration into the
12 community?
13      A.   I mean, I think the -- the --
14 yeah, I think our goal is constantly to get
15 the most efficient and effective treatment
16 plan for our patients regardless of the
17 time frame; but certainly, you know, from
18 the onset, so -- but certainly if that
19 treatment plan continues past the first
20 year, I think it's -- that would be
21 extremely helpful.
22      Q.   Are you familiar with how OMH
23 and CNYPC planned for the discharge of
24 individuals with serious mental illness?
25      A.   Well, we may have discussed

Page 169

1        J. KAPLAN, M.D.
2  this, my role in the pre-release process.
3  I think you asked me that earlier.
4       Q.   Yes, sorry.  I wanted to speak
5  a little more broadly, not just your role.
6            Do you generally have a sense
7  of how OMH plans for the discharge of these
8  individuals?
9       A.   The OMH being Central New York
10 Psychiatric Center?
11      Q.   Yes.  Let me clarify my
12 question.
13           How do you understand CNYPC's
14 process for discharge planning for
15 individuals with serious mental illness?
16      A.   I have a general understanding.
17 I'm sure you heard -- some of your
18 colleagues heard that full understanding
19 from Wendy Vogel, but I have a general
20 understanding.
21      Q.   Understood that you only have a
22 general understanding.
23           That said, can you walk us
24 through the various steps under your
25 understanding?

Page 170

1     J. KAPLAN, M.D.
2     A.  Well, I can try; but it won't
3  be as specific as the people in
4  pre-release.  So for the significantly --
5  like I said, I think I mentioned parts of
6  these earlier.
7         Several months before their
8  release, there's a pre-release team that
9  reviews cases and highlights those that are
10 SMI and/or have histories of dangerousness
11 and those cases are ultimately reviewed and
12 the data -- their histories are reviewed
13 and then a number of these cases are
14 brought before a Specialized Review
15 Committee, which consists of several
16 pre-release staff including Dr. Colavita
17 and Dr. Jain.
18        And then those are the higher
19 risk individuals where there's concerns
20 that have not -- that have either been
21 raised by the teams or raised by the
22 reviewers of -- in pre-release of those SMI
23 cases; and then there's follow up based on
24 that review with the teams regarding the
25 dis -- the community release plans.  And I

Page 171

1     J. KAPLAN, M.D.
2  am often part of those discussions if
3  there's questions remaining regarding the
4  SMI release plan.  So that's just a very
5  general overview of the process for the SMI
6  individuals.
7     Q.  Thank you.  I want to focus on
8  that Specialized Review Committee.
9         Do you currently sit on the
10 SRC?
11    A.  No.
12    Q.  Have you sat on the SRC
13 previously?
14    A.  No.
15    Q.  Does the SRC report to you at
16 times?
17    A.  No.
18    Q.  Is Dr. Grace Lee on the SRC?
19    A.  No.  She used to be in her
20 prior role, I believe.
21    Q.  You said Dr. Colavita is on the
22 SRC, correct?
23    A.  Right.  That's my
24 understanding.
25    Q.  Do you know who filled her role

Page 172

1     J. KAPLAN, M.D.
2  before she was hired?
3     A.  We didn't have anybody doing
4  that; so there were -- yeah, we didn't
5  have -- nobody was in her role previously.
6  So it was more of -- there wasn't -- that
7  person on the SRC was vacant or nonexistent
8  I should say, so we just had more cases
9  coming to review for myself and some of the
10 other staff.  It wasn't as formalized as it
11 is over the last few years.
12    Q.  So do you know when the SRC was
13 formed?
14    A.  No, I do not.
15    Q.  You said you had more cases
16 coming to -- for your review before the
17 process was as formalized over the last few
18 years.
19        Has the role of the SRC evolved
20 in recent years?
21    A.  Well, since Dr. Colavita
22 joined, she -- I think the SRC had --
23 didn't necessarily have a medical
24 representative from CNYPC.  It had a
25 central office medical representative of

Page 173

1     J. KAPLAN, M.D.
2  Dr. Lee and now Dr. Jain.  It didn't have
3  the CNYPC medical representative.  It had
4  other staff which I can't speak to but it
5  didn't have the medical representative
6  which I thought would be very helpful.
7     Q.  Do you have any sense of who
8  the other staff is who are on the SRC or
9  just what parts of the organization they
10 may be from?
11    A.  They're pre-release, mostly
12 pre-release staff, and Dr. Jain and Dr.
13 Colavita.
14    Q.  Does the SRC ever come to you
15 with questions about an assessment they are
16 making for an inmate's release?
17    A.  They asked me occasionally for
18 input about a case or they would include me
19 in an email string to the team.
20    Q.  Do you know why they would
21 include you?
22    A.  Because I'm the clinical
23 director.  I don't mean to be snarky, but
24 that's why they include me.
25    Q.  Understood.

44 (Pages 170 - 173)