


STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF STATE COUNSEL
LITIGATION BUREAU

January 30, 2024

**By ECF**
Honorable Andrew E. Krause
United States Magistrate Judge
United States District Court
300 Quarropas Street
White Plains, NY 10601

**Re: *M.G. v. Cuomo*, 19-cv-0639 (CS) (AEK)**

Dear Judge Krause:

Defendants write in response to Plaintiffs' letter dated January 25, 2024. The Court should deny Plaintiffs' request to compel production of the documents sought in their Third Requests for Production, as modified in their revised proposal, and deny the request for an eleventh deposition.

**A. Status Update**

While the parties have been able to resolve all remaining disputes regarding Plaintiffs' Rule 30(b)(6) topics, a significant dispute remains as to Plaintiffs' Third Requests for Production. Following the December 15 conference, Plaintiffs narrowed their demand in some ways, but *expanded* it in others, and they continue to demand that Defendants conduct an incredibly burdensome hunt for individual-level clinical hard copy files and other documents located in multiple locations throughout the State.

On December 22, 2023, Plaintiffs sent Defendants a revised version of the original demands. ECF No. 335-1. Plaintiffs' revised proposal eliminated some of the original 106 categories of demands, and continued to insist on a sample size of 143 individuals. On January 10, 2024, Defendants sent Plaintiffs a revised counter-proposal. ECF No. 335-2. Defendants expressed a willingness to collect and produce certain electronically available documents for up to 45 randomly selected individuals with serious mental illness. Defendants informed Plaintiffs that, for each of the 45 randomly selected individuals, Defendants are willing to collect and produce (1) OMH Discharge Summaries created upon the individual's release from prison; (2) DOCCS community supervision parolee chrono reports; and (3) DOCCS crime and sentence information.

The next material development was omitted from Plaintiffs' letter to the Court: On January 19, 2024, Plaintiffs surprised Defendants by serving *even more discovery demands related to the 143 individuals*. Plaintiffs served Fourth Requests for Production, which, among other new discovery demands, requested multiple new categories of documents related to the housing and residential programs to which each of the 143 individuals was discharged following incarceration. **Exhibit 1** at RFP Nos. 109 and 110. Defendants' response to the Fourth Requests for Production is due on February 20, 2024. These new demands are not reflected in Plaintiffs' Exhibit C summary chart.

On January 23, 2024, the parties met and conferred. During this meeting, Plaintiffs informed Defendants that their original proposed sample of 143 individuals was based on an intentional "oversampling" of the population, which was intended to account for the likelihood that some number of the individuals would not be interested in participating in Plaintiffs' survey. Plaintiffs informed Defendants that they are therefore willing to reduce the sample size to 60 individuals. Plaintiffs also expressed a willingness to delete several additional document subcategories from RFP No. 102. Following the meet and confer, Plaintiffs seem to have reduced their sample size demand to 45 and made some additional cuts to the RFPs, including withdrawing their request that OMH produce the content demanded by RFP Nos. 104 and 106, and deleting RFP No. 107. *See* Pls.' Ex. C.

Plaintiffs have continued to expand discovery in other ways. On January 19, 2024, Plaintiffs notified Defendants that they served 23 different non-party local government entities and non-profit service providers with subpoenas seeking production of various categories of documents and data regarding shelter facilities and shelter residents. On January 25, 2024, after the deadline for new requests for production, they served yet another non-party subpoena on a shelter provider.

**B. Argument**

Plaintiffs' revised document demands, while *relatively* smaller than the extraordinary original requests, remain overly burdensome and seek documents that are not proportional or relevant to the issues in dispute. The four independent reasons for denial that Defendants raised in their letter dated December 12, 2023 (ECF No. 331) continue to apply, and Defendants will not repeat those same arguments here. In addition to those reasons, Defendants wish to make five other points.

*First*, Plaintiffs' revisions do not resolve the significant burden concerns raised by Defendants. Plaintiffs have eliminated some of the original 106 categories of documents, while adding new ones. The revised volume of demands is still too many, but the more important issue is that Plaintiffs' revisions fail to address the substance of the serious burden problems identified in the Danielle Dill declaration (ECF No. 331-1). Revised RFP No. 102 continues to demand, for each one of the sampled individuals: core history documents, discharge planning documents, pre-release evaluations, SMI summary notes, SPOA applications, documents generated or relied upon in preparing SPOA applications, responses to SPOA applications from county agencies, responses to SPOA applications from service providers, including denials and acceptances, and OMH inpatient admission and discharge summaries. The process for tracking down and retrieving those categories of records, for each one of the individuals, would be the same incredibly burdensome hunt that was previously described by Ms. Dill. For each individual, some of the requested records would reside in the patient's hard copy clinical chart. Dill Decl. ¶ 3. Other records (such as SMI summary notes) would reside separately in different OMH departments. *Id.* Yet other records, such as all documents related to responses from county agencies around SPOA applications, would likely require a separate search of files and communications of Pre-Release Services staff. *See* ECF No. 299 ¶ 10 (describing the information OMH may receive during the county-run SPOA placement process).

Depending on the correctional and treatment history of each one of the individuals, the list of records in revised RFP No. 102, just like the original list, may be located in some combination of electronic storage, hard copy storage at CNYPC Inpatient, off-site archives, and other locations within CNYPC Corrections Based Operations. *Id.* ¶ 6. While there are relatively fewer total categories and fewer total individuals than in the incredibly overbroad original demand, the burden to conduct a Statewide facility-level search for each of the remaining categories of records, ***45 times over***, is still

extreme. Plaintiffs should not be rewarded for the fact that their original demand was so extraordinary that the new number, while still *extremely* large, is somewhat smaller by comparison. Defendants' proposal, by contrast, targets three categories of records that are electronically available from a central source within each agency, and which are therefore reasonably accessible.

*Second*, there is a fundamental disconnect between the information Plaintiffs argue they need, and the actual OMH records they demand in revised RFP No. 102. Plaintiffs state that, for each one of the sampled individuals, they wish to learn about "the critical period following, release from prison," including "whether [] linkage [to community services] was successful" and "how long individuals waited for those critical services[.]" ECF No. 335 at 4. But as Defendants have informed Plaintiffs, many times, including in Defendants' December 12, 2023 letter on this dispute: While OMH makes *linkages* to community housing and services, OMH itself is generally not the *provider* of such services. *See* ECF No. 331 at 3-4. OMH's treatment records from an individual's incarceration do not speak to this "critical period," including whether the individual attended community appointments or how their clinical presentation and treatment changed in the months after release. One document in Defendants' custody that might shed light on these issues is the DOCCS chrono reports, which, for individuals on parole, provide updates about their post-release activities in the community. For that reason, Defendants have offered to produce the DOCCS chrono reports.

At the December 15 conference, Plaintiffs articulated a narrower focus. That day, they informed the Court that "the critical evaluation is why [the individuals] are at a serious risk of institutionalization *at the time of discharge*." **Exhibit 2** at 23:10-19 (emphasis added). The OMH Discharge Summaries, which Defendants have offered to provide, are the best source of OMH clinical information focused on that moment in time. The Discharge Summaries are prepared by OMH staff upon an individual's release from prison. They show the individual's proposed community residence, community mental health referrals, case management plans, diagnosis, medications, treatment history, course of treatment, and discharge recommendations. Plaintiffs' unsupported gripe that these documents are "bare bones" is just not true.[1]

*Third*, Plaintiffs have failed to provide the Court with *any* support for their inflated and wildly varying demands regarding sample size. Plaintiffs originally demanded that Defendants search for the individual records of 143 previously incarcerated individuals. When Defendants reasonably expressed astonishment at that number, Plaintiffs became "dismayed" and represented that the number 143 was "the product of scientific analysis by Plaintiffs' experts Dr. Robert Factor and Dr. Todd MacKenzie regarding what sample size would be sufficiently representative of the Discharge Class to yield reliable outcomes for the experts' study." ECF No. 320 at 6 n.9. Plaintiffs insisted to Defendants and the Court that 143 was well-founded because it was the number they needed "to ensure that their experts' methodologies are reliable." *Id.* However, at the meet and confer on January 23, 2024, Plaintiffs informed Defendants that the 143 number was in fact based on an "oversampling" process, which captured excess individuals on the assumption that some number of the individuals would not be interested in speaking to Plaintiffs' counsel or their experts. Plaintiffs therefore cut their demanded sample size by more than half, to 60. Then, in their January 25 letter, they conceded that even the revised ask of 60 is *itself* the product of "oversampling" and that, in fact, "Plaintiffs believe a reliable

[1] To put this claim to rest, Defendants respectfully encourage the Court to view the sealed examples of OMH Discharge Summaries for the Named Plaintiffs attached to Defendants' class certification opposition at ECF Nos. 296-3, 296-13, and 296-23. An example of excerpts from a DOCCS chrono report can be found under seal at ECF No. 296-17.

sample can be achieved with as few as 45 individuals." ECF No. 335 at 4 n.1. Plaintiffs have provided no basis whatsoever to support any of the sample sizes they have demanded.

*Fourth*, at the December 15 conference, the Court instructed Plaintiffs to provide "specific samples of where courts have authorized that type of [individualized record review and interview] discovery at a merits stage in this type of case or something approximating this type of case." **Exhibit 2** at 20:12-16. Plaintiffs have failed to identify any cases that meet this description. Confusingly, Plaintiffs' principal citation is to *Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016) which they concede is the "leading risk of institutionalization lawsuit in this Circuit," but one in which *no such discovery was authorized*. *Davis* offers Plaintiffs no assistance here. Then, they go on to once again cite *Tyson Foods*, which the Court has already explained is clearly distinguishable. **Exhibit 2** at 12:13-13:6.

None of the remaining cases they cite provides an example of a court authorizing the type of discovery Plaintiffs have in mind at the merits stage of a comparable case. *Rosie D. v. Romney*, 410 F. Supp. 2d 18 (D. Mass. 2006) is a post-trial opinion, which notes that among the plaintiffs' trial evidence was expert testimony about the histories of 35 children who received services. But this opinion says nothing about what merits discovery led to that testimony, including whether the plaintiffs put defendants to the burden of searching facilities statewide for clinical records related to the children, or if plaintiffs' experts conducted their review with information provided by the individuals themselves with consent. *Braggs v. Dunn*, 317 F.R.D. 634 (M.D. Ala. 2016) is a class certification decision regarding commonality, not a merits stage case. And *Rolland v. Patrick*, 483 F. Supp. 2d 107 (D. Mass. 2007), was a dispute that arose about the defendants' compliance with a settlement agreement. There, the plaintiffs' expert reviewed particular cases that had been selected by the defendants themselves as part of an attempt to demonstrate defendants' compliance with the settlement. *Id.* at 115. The selected individuals had also provided consent. *Id.* Finally, Plaintiffs' other cases are merely examples of cases in which parties have cited statistical evidence. None endorses the discovery they have proposed here.

*Fifth*, under Plaintiffs' proposals, the additional discovery they demand, followed by the individualized case study and interview process they have in mind, would result in an untenable delay in bringing discovery in this longstanding matter to its reasonable conclusion. In earlier correspondence regarding this dispute, Plaintiffs informed Defendants that they believe their experts "will require *nine months* following the conclusion of production of the putative Discharge Class member records to complete" their individualized case studies. *See* **Exhibit 3** (emphasis added). The Court should not indulge Plaintiffs this lengthy, belated, and inappropriate detour.

### C. PSYCKES Data

In their cover email to the December 22, 2023 revised proposal, Plaintiffs took the position, for the first time, that RFP Nos. 104 and 106 are not burdensome because OMH should simply collect and produce all categories of records demanded therein from the New York State Psychiatric Services and Clinical Knowledge Enhancement System ("PSYCKES") database, rather than from OMH's own files. **Exhibit 4.** Defendants did not previously understand that Plaintiffs intended for all of the categories in RFP Nos. 104 and 106 to demand records from PSYCKES, rather than OMH files, and Defendants do not believe this interpretation is apparent from the text of the demands. In response to that correspondence, Defendants informed Plaintiffs that PSYCKES is not an internal OMH database. The New York State Department of Health ("DOH"), the single state agency responsible for the administration of the New York State Medicaid program in New York State, grants OMH limited, highly regulated access to PSYCKES Medicaid data pursuant to data-sharing agreements.

OMH may not collect and produce third party data from PSYCKES. Even if OMH could do so, it is not technically feasible to simply print or save all of the many categories of PSYCKES data Plaintiffs have demanded, for each of the 143 (or 60, or 45) individuals, with minimal burden.

As to Plaintiffs' request for an extension to serve another third party subpoena, the deadline to serve new requests for production expired on January 19, 2024. ECF No. 324. The current deadline for completion of all fact discovery is February 20, 2024. *Id*. While Defendants believe that some limited extension of fact discovery will be required to complete Rule 30(b)(6) depositions on the many noticed topics, as well as if the Court decides to order Defendants to provide some portion of the Third Requests for Production, a broader extension to give Plaintiffs the opportunity to serve even more new discovery is not warranted. Defendants oppose that request.

**D. <u>Plaintiffs' Request to Take an Additional Deposition Should be Denied</u>**

Defendants oppose Plaintiffs' request for leave to take the additional Rule 30(b)(1) deposition of Dr. Colavita. At the November 1, 2023 conference, the Court warned Plaintiffs that, "because of the length of time we've had here on this case, I'm going to want to see a substantial showing that . . . additional witnesses will be necessary." **Exhibit 5** at 37:20-38:1. The Court also stated that Plaintiffs should not "assume that I'm going to allow more than ten depositions to take place," and that, if during the course of depositions, Plaintiffs were to realize that they may need to modify their list of deponents, they "should think [] very carefully . . . about *substituting* them, not adding them, right?" *Id.* 36:11-21 (emphasis added). Ignoring the Court's warning, Plaintiffs declined to substitute witnesses and now seek an additional deposition.

Plaintiffs have not identified any unique information possessed by Dr. Colavita. They argue that they are interested in learning more about the OMH discharge planning process. Plaintiffs have taken multiple exhaustive depositions on this topic. Wendy Vogel, OMH's Director of CNYPC Pre-Release Services and Community Reentry, testified for a full day, just shy of the maximum seven hours. Dr. Jonathan Kaplan, the Clinical Director of Corrections-Based Operations for CNYPC, testified for close to a full day about psychiatric services provided to incarcerated individuals. Dr. Kaplan also testified that he is personally involved with discharge planning for some patients with challenging issues. ECF No. 335-5 at 46:11-47:13. And Dr. Li-Wen Lee, who is currently the Associate Commissioner for OMH's Division of Forensic Services ("DFS"), and before that served as Medical Director for DFS, also testified for a full day on a multitude of topics, including clinical considerations during the OMH discharge planning process. In particular, Dr. Lee answered all of the questions that were put to her about the work of the OMH pre-release Specialized Review Committee ("SRC"), on which she served when she was Medical Director. Moreover, still to come are the OMH Rule 30(b)(6) depositions, which will include multiple topics on the OMH pre-release planning process. In short, Plaintiffs have failed to identify any unique information possessed by Dr. Colavita that justifies an additional deposition.[2]

---

[2] Plaintiffs are mistaken when they assert (without citation and without providing the Court with the transcript) that Ms. Vogel provided inaccurate testimony about Dr. Kaplan. Plaintiffs showed Ms. Vogel a document stating that the SRC includes "the CNYPC clinical director *or designee* . . . ." **Exhibit 6** at 191:12-192:2 (emphasis added). She was then asked to name the CNYPC Clinical Director, in response to which Ms. Vogel accurately provided Dr. Kaplan's name. *Id.* 192: 8-10. Plaintiffs did not ask Ms. Vogel whether Dr. Kaplan, or his designee, sits on the SRC.

Respectfully submitted,

/s/ Owen T. Conroy
Adam Sansolo
Caroline Wallitt
Gee Won Cha
Owen T. Conroy

Assistant Attorneys General
*Counsel for Defendants*

cc: All counsel of record (by ECF)