```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  M.G., et al,

 4                          Plaintiff(s),

 5                                  19 CV 639 (CS)(AEK)
         -vs-
 6                          DISCOVERY CONFERENCE

 7
    ANDREW CUOMO, in his official capacity
 8  as the Governor of the State of New York,
    et al.,
 9
                          Defendant(s).
10  ------------------------------------x

11
        *Proceedings recorded via digital recording device*
12

13                          United States Courthouse
                            White Plains, New York
14
                            February 5, 2024
15

16  Before:  THE HONORABLE ANDREW E. KRAUSE,
                            Magistrate Judge
17

18  A P P E A R A N C E S:

19
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
20       Attorneys for Plaintiffs
    BY:  SAMUEL MARGOLIS
21       MICHAEL DAUBER

22
    NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
23       Attorneys for Defendants
    BY:  OWEN T. CONROY
24       ADAM J. SANSOLO

25
```

1          THE DEPUTY CLERK:  Good afternoon, everyone.  This is

2     the matter of M.G. v. Cuomo, docket no. 19 cv 369, the Honorable

3     Andrew Krause presiding.

4          Counsel, note your appearance for the record, starting

5     with Plaintiffs' Counsel.

6          MR. MARGOLIS:  Good afternoon, your Honor.  Sam

7     Margolis for Plaintiffs of Paul Weiss, along with my colleague,

8     Michael Dauber.

9          THE COURT:  Good afternoon, Mr. Margolis, Mr. Dauber.

10         Have we met before, Mr. Dauber?

11         MR. DAUBER:  We have not (indiscernible).

12         THE COURT:  But you have not (indiscernible).

13    Likewise.  Sometimes I just want to make sure that I'm not

14    losing my mind.

15         MR. CONROY:  Owen Conroy and Adam Sansolo from the New

16    York State Office of the Attorney General on behalf of the

17    Defendants.  Good afternoon, your Honor.

18         THE COURT:  Good afternoon, Mr. Conroy.  Good

19    afternoon, Mr. Sansolo.

20         All right, we're here, essentially, for a continuation

21    in many respects of our last hearing, which was on December

22    15th, 2023.

23         First of all, let me just thank you all for your

24    flexibility with respect to this date.  I know we were scheduled

25    to be here this past Thursday, February 1st.  That turned out to

Disc. Conf.                    M.G. v. Cuomo                    3

1  be a very eventful day with my jury that had been deliberating

2  at that point for...two and a half days, but, as I suspected

3  might occur, we did have a whole flurry of activity starting

4  that morning right when he would have been here to argue these

5  issues.

6          Unfortunately, we did end up in the afternoon having

7  to declare a mistrial and have a hung jury in a complex civil

8  case, so it would have been -- you would have been here for a

9  lengthy period of time, highly disrupted, and you would have had

10 me somewhat distracted, so I'm glad we were able to postpone,

11 and I do really appreciate your flexibility.

12         All right, I have reviewed the materials you've

13 submitted in connection with the ongoing discovery disputes,

14 those are the letters and supporting materials at ECF nos. 335

15 and 336.  I did see the application at ECF no. 338 about the

16 extension of the deadlines to complete the 30(b)(6) depositions,

17 and, as you saw, I've already granted that application.

18         So let's dig into the issues that we have here.

19         Obviously you've made some progress here in terms of

20 the scope of the negotiation, but you're still reasonably far

21 apart, it would seem, and I will say just as a preliminary

22 matter, Mr. Margolis, Mr. Dauber, I'm not sure who's going to

23 address which issues, but I do continue to have concerns about

24 the scope of the discovery that you're requesting here.

25         I appreciate that you've made efforts to limit it, I

1  appreciate that there are a number of concrete steps that you've

2  taken to scale back the proposals that had been of significant

3  concern to the Defendants, and to some extent the Court, at the

4  last conference, but I think some of the demands still really go

5  to a place that would require a substantial burden for the

6  Defendants to actually collect and produce, but I'd like to try

7  to have a holistic conversation about the different overlapping

8  categories.  Well, I shouldn't call them overlapping categories.

9  Categories that seem to be potentially overlapping.

10         First of all, this is probably a better question for

11 the defense side, what is the appropriate way to pronounce this

12 -- the name of the database that we are going to refer to?

13         MR. CONROY:  It is PSYCKES, your Honor.

14         THE COURT:  PSYCKES?  And that is P -- and for the

15 benefit of the court reporter who will ultimately transcribe

16 this proceeding, that's P-S-Y-C-K-E-S.  And that's an acronym,

17 so that should be all capitals, PSYCKES, P-S-Y-C-K-E-S, that

18 database.

19         I do understand that the Department of Health is a

20 non-party to this proceeding and so that creates certain

21 dynamics, and I understand that there's an application to have a

22 brief extension, which was filed on January 25th, to extend the

23 deadline for serving a subpoena on the Department of Health to

24 seek these records.

25         You know, there's a certain amount of back-and-forth

1 finger-pointing about whether the Plaintiff should have

2 understood that this database wasn't in the control of OMH or

3 the Defendants should have disclosed that sooner.  That doesn't

4 really matter.  I understand -- I don't think anybody was trying

5 to sandbag anybody.  I don't think the Plaintiffs were

6 deliberately...disregarding some information that they had or

7 should have had in advance.

8        And, again, I do understand that the Department of

9 Health is a non-party, which creates a little bit of a different

10 dynamic, although I strongly suspect that if I were to authorize

11 a subpoena, there are a couple of Assistant Attorneys General

12 who would be very familiar with the nature of the requests who

13 might be called upon to represent the Department of Health in

14 connection with responding to that subpoena, whether it's the

15 two of you or your colleagues who are also working on this case

16 and are signatories to the letter.

17        So, again, it's a distinction that has meaning, but I

18 think it's important to think about the requests, the

19 OMH-directed requests and these additional requests, which

20 apparently would be Department of Health-directed requests,

21 holistically, and so I'd like to think about them and talk about

22 them in that way.

23        I recognize there are a variety of issues with the

24 PSYCKES database as to how those documents might be accessed.

25 Even if I were to conclude that it would be appropriate for the

1  Plaintiffs to serve a subpoena on the Department of Health, we

2  can sort of talk about that as well, but, Mr. Margolis, I guess

3  I'd like to turn to you to start.

4          I mean, one of the points in the Defendants' response

5  that I think is well taken is, I have a difficult time

6  understanding why some of the documents that you are seeking

7  really tie to what you've indicated, both at prior conferences

8  and in your letters, are the most salient points here that your

9  experts are trying to analyze, specifically where the potential

10 class members were.  I don't mean physically necessarily.  More

11 in terms of their, their mental health and their needs and the

12 resources that might be required for their transition to the

13 community.

14         Even in the revised document demands, it seems that

15 some of those categories of information reach back in time to a

16 point that is somewhat disconnected from that period that you

17 described as the critical period for these individuals, so can

18 we start there?  And you can walk me through, to some extent,

19 why you think some of these categories of information are

20 essential?

21         I have in front of me the file at ECF no. 335-3, which

22 I take to be the sort of most recent, most paired-down version

23 of the Plaintiffs' demands.  If there's a different document I

24 should be looking at, perhaps you could point me to that.

25         MR. MARGOLIS:  No, that's the best document, your

 1  Honor.

 2          THE COURT:  Okay, very good.

 3          So if you could try to take me through some of these

 4  categories, especially in request 102, I guess, which I know in

 5  one round of the proposals had not been modified at all, and

 6  then in response to some of the meet-and-confer discussions and

 7  the concerns identified by the Defendants was...reduced in

 8  certain significant ways, but there are still some seemingly

 9  broad categories of information requested there.

10          And so if you want to start there and touch on any of

11  the other things in the other requests, I'm happy to hear from

12  you.

13          MR. MARGOLIS:  Thank you, your Honor.

14          I guess one category of documents that might be

15  helpful to start out with is the SMI summary notes.  We think

16  this is a really important category of documents that is

17  relevant to our expert's potentially opinion.

18          These are documents used by Pre-Release Services

19  during the discharge planning process, and they contain, among

20  other things, a chronology of someone's community history,

21  including psychiatric hospitalizations, with details about

22  presentation; it contains notes about prescribed medications,

23  diagnoses, past instances of assisted outpatient treatment or

24  court-supervised treatment; it lists psychiatric medications and

25  dosages prescribed while in DOCCS custody, and there are certain

 1  progress notes from treatment teams that are included there,

 2  including pre-release coordinators who meet with individuals for

 3  discharge planning.

 4          This is one of the key documents used by the

 5  Specialized Review Committee as they analyze an individual's

 6  release into the community, and it does go back a little bit in

 7  time, which -- am I understanding, is that your Honor's concern,

 8  that these documents go too far back in time?

 9          THE COURT:  Well, that's part of the concern.  It's

10  not so much that they go too far back in time, but that by going

11  far back in time, it may be challenging for the reasons set

12  forth in the Defendants' submissions, mostly in connection with

13  the December 15th conference, to track these documents down.

14          One thing that I understand about the Defendants'

15  proposal is that the categories of information that the

16  Defendants are agreeing to produce are relatively centralized

17  and therefore relatively accessible for the universe of

18  individuals in question at this point in these demands, so,

19  again, if there was a document that was centrally located that

20  went back further in time, I don't think the Defendants would

21  have the same concern, or at least it wouldn't be as compelling

22  an argument.

23          MR. MARGOLIS:  Yeah.

24          THE COURT:  And so I'm not sure how those SMI summary

25  notes fit into that framework.

1          MR. MARGOLIS:  Well, I'll say first, your Honor, I

2   think, to the extent the records go back in time, the

3   information is still helpful to the experts.

4          THE COURT:  I do understand.  I understand that, and

5   --

6          MR. MARGOLIS:  Okay.

7          THE COURT:  -- I don't think the experts are asking

8   for this just to be...thorough for no, no compelling substantive

9   purpose.  I do, I do recognize -- and I should be clear; I do

10  recognize and acknowledge that the experts could benefit from as

11  large a body of material about every individual that they're

12  seeking to analyze as...as they can have.  You know, because,

13  particularly in this realm of individuals with serious mental

14  illness, more information has a tendency to be potentially

15  illuminating and you can see trends and patterns and evolution

16  in diagnoses and various other important considerations over

17  time.

18          So I'm not -- I don't question the, the validity of

19  the experts' interest in this information, it's just that it

20  needs to be balanced here, especially at this late stage in the

21  discovery process, with the burden.

22          MR. MARGOLIS:  Understood, your Honor.

23          There's actually something that I think is very

24  relevant that we just discovered last night -- or yesterday and

25  we informed Defendants about this morning.

Disc. Conf.                    M.G. v. Cuomo                    10

1          There's documents suggesting that these SMI summary

2    notes are not the hard-copy, physical document that's following

3    a person from place to place, but they are saved during custody

4    on what is called a G-drive and then they, are at the time of

5    release, saved to a backlog, which we understand to be an

6    electronic repository of some sort.

7          You know, I don't know if Defendant's -- I don't

8    believe Defendants are in a position to respond to this yet, we

9    just informed them about our discovery of this this morning, and

10   we learned through -- about this through some of the documents

11   produced in discovery, and so maybe one broader concern that

12   Plaintiffs have is, we've really tried to narrow down our

13   requests to what are the documents we really need and what do we

14   think is available.  It's part of why we focused on PSYCKES and

15   are trying to find the best way to get that information, which

16   may be that we have to go to DOH instead because they're not in

17   OMH's or DOCCS control, but Defendants have really not been

18   engaging with us.  They offered three categories of documents.

19   They have flat out refused to do any type of in-person search

20   for records.  At our recent meet-and-confer, we asked are there

21   are any individuals where you can go look for their records and

22   they said, "no, not without a court order."

23         You know we are trying to find something that will

24   work, and it's been difficult to do that so far.

25         THE COURT:  Understood.  Okay, so that's the SMI

1  summary notes.  I understand that category.

2          Are there any other particular categories that you'd

3  want to address either from request 102 or maybe turning to the

4  requests for the PSYCKES database reports?

5          MR. MARGOLIS:  One more document before we move to

6  PSYCKES --

7          THE COURT:  Sure.

8          MR. MARGOLIS:  -- is the core history report.  This

9  contains a lot of information about an individual's treatment

10  history and their diagnosis.  You know, there are some

11  individuals for whom an SMI summary is not made, and in that

12  instance, a core history might be the better document to obtain.

13          THE COURT:  Now, you just referred to that as a core

14  history report.  You used the word 'report,' which is not the

15  way it's described exactly in request no. 102.  I'm not trying

16  to be nitpicky here; it's actually a substantive question.

17          Because when you say "core history," when I read that,

18  it says, "core history, parens, including, but not limited to,

19  history of treatment, education, and employment, close parens,"

20  that suggests to me a search for all documents -- because that

21  is the way the request is phrased, all documents in a OMH's

22  possession, custody, or control concerning all persons relating

23  to core history, which, again, if you have something narrower in

24  mind with that, that would be useful to know if there's a

25  particular report called a core history report or something like

1  that, but if you're talking about core history of an individual,

2  that seems to be almost inclusive of any document relating to

3  that individual's mental health.

4          MR. MARGOLIS:  Yes, your Honor, that -- we did not

5  mean every document relating to what could be their core

6  history.  There is a document called core history.  I don't

7  remember offhand if 'report' is at the end of that...

8          THE COURT:  Okay.

9          MR. MARGOLIS:  But it's -- core history's a document

10 that contains this type of information and is often contained in

11 an individual's file.

12         THE COURT:  Okay.  And on 102, while we're on that

13 topic or that request, the SPOA -- which is single point of

14 access?  Is that right?

15         MR. MARGOLIS:  Yes.

16         THE COURT:  Okay.  So those applications, that's

17 another group of things that you've asked for here, am I right

18 to understand that these are things that you're also now sort of

19 seeking from the county level and other non-party entities that

20 might have these types of documents?

21         MR. MARGOLIS:  We are not at this time seeking SPOA,

22 S-P-O-A, applications.

23         THE COURT:  Okay.

24         MR. MARGOLIS:  From the counties.

25         THE COURT:  Okay.

1            MR. MARGOLIS:  Yeah.

2            THE COURT:  I noticed just in the Defendants' letter

3    they had pointed out that there were a number of outstanding

4    non-party subpoenas that had recently been served on local

5    government entities and non-profit service providers.  I don't

6    have copies of those, so I didn't know exactly what was

7    included, but since this group of items here in request no. 102

8    referred to SPOA applications from county agencies and responses

9    from service providers, I wondered if there might be some

10   overlap there, but...not necessarily?

11           MR. MARGOLIS:  No, your Honor.  Those third-party

12   subpoenas are regarding the policies and practices that the

13   counties may have for discharge locations as well as some census

14   information that they may have.

15           THE COURT:  Okay.  Okay, so the core history report

16   or, quote, unquote, report.

17           What was the next one you wanted to talk about, Mr.

18   Margolis?

19           MR. MARGOLIS:  Those are the main documents from 102,

20   and I think I would just reiterate that these all are read in

21   tandem with each other, including with the discharge planning

22   documents and the other documents that Defendants said they

23   would be willing to provide for the 45 individuals.

24           THE COURT:  Right.  Understood.

25           MR. MARGOLIS:  And, and also in connection with the

1  PSYCKES data, which I -- if you would want to turn to that.

2          THE COURT:  Yeah, let's transition to that.  That's

3  not something we spent really very much time talking about last

4  time.  We might not have spent any time talking about it last

5  time because I would have asked you what that acronym was and

6  how to pronounce it then, and I don't recall doing that.  I

7  apologize if we did and I just don't remember, but can you tell

8  me a little bit more about what you're looking for there, what

9  you believe is in these reports?

10          And I guess, the first question is, do you have any

11  examples of these reports that have been produced as part of

12  individual...productions for any of the named Plaintiffs or

13  otherwise up until this point.

14          MR. MARGOLIS:  Yes, your Honor.

15          So the PSYCKES -- PSYCKES is a database that contains,

16  as we've now learned, to some degree, from Defendants, a lot of

17  information from different state agencies about Medicaid claims.

18          The key we're looking for is the five-year clinical

19  summary, which addresses what happens to an individual

20  for...it's all of their, quote, unquote, encounters from the

21  last five years, as well as any psychiatric hospitalizations

22  that would occur after release.  It also is where different

23  admissions and screening forms would be noted for different

24  community-based services, so this would allow our expert a peek

25  into what is actually happening after release, which is

1  something that he also did with our named Plaintiffs for his

2  class certification report.

3          We do have some PSYCKES records.  They were produced.

4  I don't believe that they were in relation to the named

5  Plaintiffs themselves, and I'm not sure -- we are trying to

6  evaluate whether we should have those documents in light of some

7  of Defendants' representations in the letter.  They were

8  attached to e-mails, which is how they ended up being produced,

9  and were not withheld under any privacy regulations or anything

10  else.

11          THE COURT:  I see.  That's not what I thought you were

12  going to say.

13          MR. MARGOLIS:  I --

14          THE COURT:  When I say whether you have them, I

15  thought you were going to say, in other words, you should have

16  more of them, but --

17          MR. MARGOLIS:  Right.

18          THE COURT:  -- you're actually saying you're not sure

19  whether it's appropriate that you have them at all.

20          MR. MARGOLIS:  Our position is that it's appropriate

21  for us to have them because they're protected by the

22  confidentiality order --

23          THE COURT:  Right.

24          MR. MARGOLIS:  -- submitted in this case, but our

25  understanding is that Defendants do not take that position with

1  respect to the other PSYCKES data that we were asking them to

2  produce, putting aside the fact of the control issue.

3          THE COURT:  Right.  I mean, if they were attached

4  e-mails that happened to be in the possession, custody, or

5  control of OMH, then they couldn't very well say that they

6  weren't in their possession, custody, or control, and we can

7  hear from Mr. Conroy on that at some point later, but it may be

8  that once those -- once that information has been shared or

9  there's some reason why that information could have been

10 disclosed from DOH to OMH, pursuant to whatever authority had,

11 had prompted the disclosure that -- I guess I would say the

12 interagency disclosure at that point, then maybe it was somehow

13 produceable in light of the protective order here, but Mr.

14 Conroy can educate us on that in a bit.

15         MR. MARGOLIS:  So the other categories of documents

16 which is more requested in 106, not 104, this is really related

17 to what happens upon release, so it's specific reports in

18 PSYCKES concerning release to Health Home and Health Home Plus

19 care management programs, housing programs, ACT and FACT, A-C-T

20 or F-A-C-T, AOT programs, intensive mobile treatment programs,

21 really, all of the different community-based services in the 18

22 months following a release that we are concerned with here.

23         THE COURT:  Okay.  And so the PSYCKES database, in

24 your view, Mr. Margolis, really does capture -- when you talk

25 about a five-year clinical summary, you're really talking about

1 the period after release, in a way that is not necessarily

2 contemplated in the same way in your requests for -- requests

3 for materials from DOCCS and OMH, which are largely going to

4 cover -- especially the DOCCS records, but maybe the OMH

5 records, too, largely going to cover the individuals' period of

6 incarceration.

7          MR. MARGOLIS:  The only exception might be the parolee

8 chrono reports from DOCCS, which do contain information

9 submitted after -- you know, as the individual's on parole, but

10 that information, for what it's worth, is -- it's not very

11 detailed, it's submitted from an incarceral perspective, not a

12 clinical, psychiatric perspective and it's just more of a 'this

13 is what happened.'  It's very high level.

14          THE COURT:  Okay.  I mean, I understand there's a

15 little bit of debate about whether -- I think, heh, I think you

16 referred to some document, the OMH discharge planning document,

17 as a bare-bones document.  The Defendants took exception to that

18 representation and pointed me to a few examples of the discharge

19 -- OMH discharge planning documents which are in the record as

20 part of the motion for class certification.  I did look at

21 those.  Thank you for that; it was helpful to see.

22          I can understand how different individuals might view

23 those records differently.  I would -- I've seen documents that

24 I would describe as more bare bones than that, for sure.

25 There's, there's substantive information in there about clinical

Disc. Conf.                    M.G. v. Cuomo

1 diagnoses and history and medication and other substantial

2 information.  It's not just a check-box form or something like

3 that; there's, there's meaningful narrative and, and substantive

4 information.  Still, it's a five-page document essentially.

5 It's not a, it's not a comprehensive accounting of an

6 individual's treatment history.  It's a -- it's called a

7 discharge summary, so obviously it's a summary, it is what it

8 purports to be.

9         So I'm not sure I would describe that as bare bones,

10 but I understand that it's not as robust as a full clinical file

11 either, so we can...quibble over the terminology, but I've seen

12 those documents; I understand what they are.

13         MR. MARGOLIS:  Your Honor, even just beyond -- not

14 going as far necessarily as the full case file if that would be

15 an undue burden, the SMI summary notes do contain more detailed

16 summaries compared to what I would call the parser summaries in

17 the discharge papers.

18         THE COURT:  Okay.  All right, thank you, Mr. Margolis.

19         Let me turn to you, Mr. Conroy.  Or Mr. Sansolo.

20 Whoever's going to address it.

21         So, listen, there are points that you've made in your

22 letter that I do find compelling.  That's how I started off this

23 discussion.  At the same time, the scope of the demand has been

24 reduced to something much more within the realm of reasonable,

25 though still broad, and I, I am sensitive and, I think,

1  convinced, in large measure that the idea of the Defendants

2  having to comb the state and potentially visit...two, five,

3  seven, eleven different facilities, whatever it might be, for 45

4  different individuals is, is a burdensome exercise.

5        However, what I don't have a clear sense of is whether

6  there are other records, such as some of the ones that Mr.

7  Margolis just highlighted, that might be available in a more

8  centralized format as well and -- or, you know, repository, I

9  should say, rather than format, such that the burden of

10 producing five reports or five documents per individual is not

11 appreciably greater than the burden of producing three.

12       Again, we've had enough of these conferences for you

13 to understand that my interest is often in trying to craft a

14 solution that is at least...workable enough for both sides,

15 because, again, especially in this case, as we've talked about,

16 there are compelling interests on both sides and I recognize

17 that.  One of those interests is moving the case towards

18 resolution as well, and we've talked about that, too, but some

19 of the points that Mr. Margolis made seem reasonable in

20 response, especially if some of these categories of information

21 are more centrally locatable than some of the other categories

22 that have been previously sought.

23       So, Mr. Conroy, why don't you address some of these

24 specific examples if you can, and you're welcome to address the

25 points more broadly as well.

1           MR. CONROY:  Thank you, your Honor.

2           Yeah, I -- so I would take some issue with the point

3    that Defendants have not been engaging on these issues.  I think

4    our -- the distinctions that we've drawn in our discussions is

5    the one same one we've drawn when we've been here in the court

6    and the one that, I think, your Honor put your finger on

7    earlier, which is there's a big difference between doing this

8    physical statewide search and looking for a centrally located

9    documents that may be relevant to these issues, and so I

10   appreciate the idea that if there are other documents we could

11   put into that bucket, that may be a sensible path forward.

12          As counsel stated, you know, just a few hours ago, we

13   got a note from them where they had some ideas based on

14   documents in the production that these SMI summary notes may be

15   available in a backlog.  I don't know whether that's the case.

16   We're looking into it.  We have not had time to get a definitive

17   answer on that.

18          I think I would say, if it is the case that we can get

19   these SMI summary notes for all of the folks on, on the list, on

20   the sample, that that would be more palatable, to add that to

21   the collection, so, again, I can't say for certain whether

22   that's the case, but I think if, if the SMI summary notes were

23   available for each of the individuals on this list

24   electronically and centrally, then potentially we could live

25   with that.

1        I would draw a distinction, though, with the other

2   sets of documents in RFP 102, including the core history, which,

3   as I understand it, is part of the clinical -- hard-copy

4   clinical chart, and, again, you know, there is -- the clinical

5   files for these patients are not fully electronic, and so when

6   we're getting into core history clinical files, then we're

7   talking about a physical chart located somewhere in the state.

8        And then in terms of the S-P-O-A, SPOA, documents, I

9   mean, that would require additional searches in likely both hard

10  copy and electronic files and communications of the Pre-Release

11  Services employees who are actually sending these applications

12  and potentially having further communications with the counties,

13  so that poses additional complications.

14        But -- so, again, you know, I think if we can steer

15  toward a solution where we've already offered three what we

16  believe are fairly robust categories of centrally,

17  electronically available documents, potentially if we can

18  determine that SMI summary notes could fit within that bucket as

19  well, then that may be a path forward.

20        THE COURT:  Okay.  And, and talk to me a little bit

21  about the issues with the PSYCKES database from your

22  perspective.

23        MR. CONROY:  So let me say at the outset, as defense

24  counsel here, we do not have authority to speak on behalf of the

25  DOH --

1          THE COURT:  I understand that.

2          MR. CONROY:  Right.

3          THE COURT:  And I don't -- by the way, my comments

4   earlier about how you likely would be enlisted to deal with this

5   subpoena if there were to be a subpoena, I didn't mean to gloss

6   over the fact that you have clients in this case, your clients

7   in this case are the Department of Corrections & Community

8   Supervision and the Office of Mental Health, and I understand

9   that just because you would, likely, represent other agencies

10  that are brought into this lawsuit doesn't mean that you

11  currently have authority to make any representations or that you

12  would have necessarily taken steps in advance of this conference

13  to investigate that agency's, that potentially distinct

14  clients's, perspective.  And it may be that it wouldn't even be

15  appropriate for you to represent the other client because there

16  might be conflict issues and there may be some sort of division

17  of labor that would be necessary there in order to preserve

18  appropriate boundaries.  I didn't mean to suggest otherwise with

19  my sort of glib comments at the outset, but -- so let's just

20  make that clear for the record.

21          But, nevertheless, in your role as counsel for OMH, I

22  take it that you must have some understanding, and you've

23  addressed it a little bit in the letters and in the

24  meet-and-confers, you've had to learn something about this

25  database and what it entails and how that might be pertinent to

1  this case, so from that perspective, if you would.

2          MR. CONROY:  Yes, thank you.  I appreciate that, your

3  Honor.

4          So from, from the perspective of the Defendants here,

5  you know, OMH has access to this database.  It's, it's a

6  database where other state agencies, including DOH, other

7  providers, can upload information about their patients, it can

8  be used for clinical purposes, it can be used for research

9  purposes.  OMH, as we've stated, does not have authority

10 pursuant to its agreements with DOH to pull data off of this

11 database and share it with, with third parties.

12         I don't -- you know, just to respond to Counsel's

13 statements about attachments that were in the production, I'm

14 not aware of what particular documents we're talking about.  I

15 certainly would request a list and we can take a look at that,

16 but -- so I can't really speak to whether there are individual

17 documents from that database that may have been attached to a

18 particular email, but we can certainly take a look at that.

19         But generally, OMH does not have the ability and

20 permission to simply collect from the database and, and share it

21 with, with third parties who are requesting access.

22         THE COURT:  Okay.  Well, that, I understand, and I'm

23 not really even going to challenge that position because that's

24 what you're prepared to say today and that's the scope of your

25 authority given your client relationship.  OMH not only in this

1  case, but in other cases may be confronted with requests for

2  this type of access, and if OMH's position is it doesn't have

3  the ability to access those records, then that may be a position

4  that the agency needs to take consistently not just in this

5  litigation, but in other matters, so I do understand and

6  appreciate that.

7          From my perspective, however, in trying to think about

8  what is a reasonable and appropriate path forward here in terms

9  of the scope of permissible discovery at this stage and what I

10 am willing to allow the Plaintiffs to pursue, I'm trying to

11 think of it more broadly than you are able to think of it, Mr.

12 Conroy, and I know you're able to think of it, but more than

13 you're really able to say about it, and at some level, the

14 requests in 104 and 106 are an answer to the defense that you, I

15 think persuasively, articulated in terms of what the Plaintiffs

16 are looking for.

17         Now, I understand part of your argument was what the

18 Plaintiffs have emphasized is that they are looking for

19 information about why individuals are at a serious risk of

20 institutionalization at the time of discharge, and I guess there

21 would be an argument to be made by some future attorney for DOH

22 that these records, which cover a period of time that goes well

23 beyond the immediate point of discharge, might be unnecessary

24 given those representations by the Plaintiffs.

25         However, in terms of trying to have a holistic, again,

1  that word, picture of the individuals in question here, some of

2  those records that were provided or will be provided in, in this

3  phase of discovery in terms of discharge planning, for example,

4  and the DOCCS records from parole and the other

5  crime-and-sentence information that is already on the table,

6  would seem to at least marry up with the records of what these

7  individuals actually experienced once they were discharged and

8  in the community to create a picture, again, probably more

9  relevant to some of the issues in this case than looking

10  back...again, I say this recognizing, once again, that I'm not a

11  mental health expert or professional, but, but given the core

12  issues that are before this Court, the years after release and

13  where people were receiving services and what was happening

14  during that clinical window seems relevant, especially when

15  taken together with the discharge planning information, how well

16  did the discharge plan work or how well did people connect with

17  the services that they were intending to connect with.  That

18  seems to me, in some ways, more relevant at this late stage than

19  looking back five, ten, fifteen, twenty years into an

20  individual's clinical past, no matter Mr. Margolis's earlier

21  point that that information, too, would have some bearing and

22  some relevance for expert analysis.

23          So all that said, you know, I am not going to say that

24  Plaintiffs can't pursue this PSYCKES information as a component

25  of what is at issue here.  I understand it's complicated by the

 1  fact that the Defendants in this case and their attorneys are

 2  not in an immediate position to provide that information, and I

 3  appreciate that it would have been ideal had everybody had a

 4  clearer understanding weeks ago, if not months ago, that this

 5  would have been the way that this information needed to be

 6  retrieved, but here we are.

 7          And I'm not sure -- these requests 104 and 106 were in

 8  the original set of...demands that are at issue here, Mr.

 9  Margolis, right?

10          MR. MARGOLIS:  That's correct, your Honor.

11          THE COURT:  Okay.

12          And Mr. Conroy, did you ever say in that response that

13  these documents were out -- were not within the agency's custody

14  or control?

15          MR. CONROY:  We -- that was not our objection, your

16  Honor.

17          THE COURT:  Right.

18          MR. CONROY:  Because I simply did not read it that

19  way.

20          THE COURT:  Okay.

21          MR. CONROY:  There are a number of subparts.  I, I can

22  explain my --

23          THE COURT:  I'm actually not faulting anybody for

24  this.  I, I -- it just strikes me as a miscommunication in

25  certain respects.  I don't think -- as I said earlier, I don't

Disc. Conf.                    M.G. v. Cuomo

1  think you were trying to hide that information from the

2  Plaintiffs, but at the same time, I don't think they appreciated

3  that one of the challenges to getting this information would be

4  the fact that it's not in OMH's possession, custody, or control,

5  so I don't think it's reasonable to charge the Defendants -- or,

6  excuse me, the Plaintiffs and hold it against them for not

7  having moved forward with the subpoena earlier.  Even -- again,

8  it would have been better had they done that, but I think they

9  -- it's not unreasonable, given the way this has all played out,

10  that they didn't fully appreciate and understand that those

11  documents were not OMH documents or at least documents that OMH

12  could freely accessed, especially if Mr. Margolis has

13  represented there are instances where these reports have ended

14  up in the production, whether intentionally or not.

15          So -- Mr. Conroy, Mr. Sansolo's trying to talk to you.

16          (Discussion off the record)

17          THE COURT:  Okay, did you have anything further you

18  wanted to add on that, Mr. Conroy?

19          MR. CONROY:  The only, the only additional point I

20  would make -- and, again, I don't want to step on any future

21  arguments that DOH may make if and when DOH receives a subpoena

22  for these records...

23          THE COURT:  Yeah.

24          MR. CONROY:  I...an understanding that I have come to

25  learn, that I can share, is I'm not so sure that even within

1  PSYCKES, the process would be as simple as sort of a, a

2  point-and-click.

3            THE COURT:  Right.

4            MR. CONROY:  And, you know, download -- we have

5  category A, contrary B, we save all of them.  You know, I do

6  know that within the context of OMH research staff who work with

7  this data, they spend quite a bit of time in carving up the data

8  and learning how to analyze it, to provide certain information

9  within the, you know, the work that they're authorized to do

10 with the data.

11           So, again, I think that's -- it's getting a little bit

12 outside the bounds of what we're comfortable arguing on behalf

13 of the Defendants, but it does seem to be a potentially

14 complicating factor that, even though the PSYCKES data is

15 electronically accessible, it may not be a matter of just

16 printing it off.

17           THE COURT:  Understood, and I understand the

18 constraints you're trying to balance there, Mr. Conroy, but

19 that's helpful to have as a bit of a preview of an issue that

20 may come down the line.

21           And, listen, the Plaintiffs have now heard me say

22 three different ways that I have concerns about burden here,

23 again, especially given the timing of these requests, the scope

24 of the requests, and all the other issues that we've talked

25 about, so I imagine the people who wind up responding to the

Disc. Conf.                    M.G. v. Cuomo                    29

1  subpoena from DOH will be aware of that as well because there's

2  a transcript of this proceeding and the last one, but

3  nevertheless, these are things that theoretically could be

4  negotiated, if there's a discussion to be had, with the

5  appropriate people representing DOH in response to any subpoena.

6          And, listen, Mr. Margolis, I mean, I encourage you to

7  try to be as tailored as possible in terms of whatever subpoena

8  you serve, recognizing the concerns that I've identified and the

9  issues that Mr. Conroy has flagged for your consideration.

10         Let me ask --

11         MR. SANSOLO:  Your Honor, if I could just add...

12         THE COURT:  Mr. Sansolo, yep.

13         MR. SANSOLO:  Yeah.

14         With regard to the relevance of the records, too, and

15 I know sort of it's been accepted that they may be relevant or

16 relevant, but -- so these are documents that might cover a

17 five-year summary of information that the OMH employees would

18 not have been aware of at the time they were making this

19 determination to send these individuals to certain settings.

20 And it is broad under a discrimination statute, right, the ADA's

21 discrimination statute, and so information that those people

22 would not have been aware of at the time they were making the

23 determination to put them in a setting that Plaintiffs are

24 claiming put them at risk of hospitalization or

25 institutionalization wouldn't necessarily be relevant to the

Disc. Conf.                    M.G. v. Cuomo                         30

1 claims against those parties.

2          THE COURT:  That's an interesting point.

3          Mr. Margolis, do you want to address that?

4          MR. MARGOLIS:  Your Honor, as, I think, you identified

5 earlier, this is intended to address some overlap, and with

6 respect to the five-year clinical summaries, those are likely

7 duplicative information, if not duplicative documents, about

8 what would be in an individual's case file that travels with

9 them from facility to facility, and so I'm not sure that I would

10 accept this as...not information within the Pre-Release

11 something team's control.

12          THE COURT:  Right, it's hard to say.  I mean, again,

13 it's hard to say exactly what would be covered here, and maybe

14 we need to know a little bit more about it from the people who

15 have most familiarity and most access to the information,

16 because, again, Mr. Sansolo's point, I think, is not so much

17 about what would be overlapping, but to the extent that there is

18 information that is completely non-overlapping, in other words,

19 it's only information that would have been outside the realm of

20 what the OMH staff would have known or could have known about

21 discharge planning for particular individuals, the relevance of

22 that may be a little bit more tangential.

23          MR. SANSOLO:  And I think, further to that point,

24 it's, it's --

25          THE COURT:  This is Mr. Sansolo.

1          MR. SANSOLO:  Oh, sorry, yes.

2          THE COURT:  Go ahead.

3          MR. SANSOLO:  Plaintiffs have said this -- you know,

4   this gives an idea of maybe two years down the road whether

5   those linkages were made or whether the services were working or

6   how they ended up being re-institutionalized, but I think the

7   point in this case is that, at the time when OMH was making

8   determinations or DOCCS was making the determinations during

9   pre-release planning to send certain individuals to certain

10  settings and whether those settings were sufficiently

11  appropriate for their needs, documents that would shed light on

12  what happened a year or two years down the road wouldn't

13  necessarily be relevant to that determination.

14          THE COURT:  Maybe.  I mean, I guess the question then

15  becomes what obligation, if any, does OMH have to understand the

16  utility of the recommendations it's making, and if it turns out

17  that recommendations that are being made are routinely leading

18  to re-institutionalization or problematic outcomes, does OMH

19  have an obligation to...take in that information, learn from

20  that information, process that information, and potentially make

21  different or better decisions -- when I say 'better,' I'm not

22  saying that they did anything wrong, but different decisions if

23  the outcomes are not what was, perhaps, hoped for at the time

24  that certain decisions were made.

25          Because this -- we're talking about a period

1  of...however many years are at issue here, so, you know, that,

2  that point might work in terms of whether a particular

3  individual was discriminated against, but given that there are

4  class-wide claims here, pending the motion before Judge Seibel,

5  and the, the...decision-making of OMH and DOCCS as institutions

6  sort of potentially subject to evolution and improvement or

7  refinement, I should say, based on outcomes, then having more

8  information about the outcomes may not be irrelevant.

9        I take the point, especially as to any one individual,

10  that may be salient, but in terms of the overall picture of how

11  these decisions are being made and whether they're being made

12  appropriately and with appropriate information and taking all

13  the various factors into account, from a relevance perspective,

14  under a Rule 26 standard where the relevance inquiry is a broad

15  one, I can see the argument for relevance.

16        But I appreciate the point, though, Mr. Sansolo.

17        Mr. Margolis, I -- you looked like you were trying to

18  say something.

19        MR. MARGOLIS:  You covered my point, your Honor.

20        THE COURT:  Okay.

21        MR. MARGOLIS:  Thank you.

22        THE COURT:  All right.

23        So, listen, I -- let me ask again about 104 and 106

24  since we're looking at those.

25        Is the request in 106 -- you know, when Mr. Conroy was

Disc. Conf.                    M.G. v. Cuomo

1  referring to data a moment ago, it made me think about the

2  request in 106 a bit differently than I had perhaps understood

3  it originally.

4          The request in 104 seems to be for clinical summary

5  information which pertain to specific individuals.

6          Is that correct, Mr. Margolis?

7          MR. MARGOLIS:  That's correct, your Honor.

8          THE COURT:  And is 106 also -- I mean, it does say

9  "concerning all persons identified in Appendix A and Appendix

10 B," so in that sense 106 also pertains to individuals, but I

11 guess I wasn't quite sure, upon a fresh read of it, whether the

12 information being sought there is individual-specific, in other

13 words, did Individual A receive a particular type of housing

14 program or treatment program or referral to such-and-such

15 program, or are -- is it more of a, a...what types of programs

16 theoretically might have been available to an individual.

17         MR. MARGOLIS:  Your Honor, my understanding is that it

18 would be a report for an individual that has their...it would

19 only reflect treatments or services that they actually received.

20         THE COURT:  Okay.

21         MR. MARGOLIS:  It would not reflect anything that is

22 just available at the time, and so it is an individualized

23 report.

24         My understanding, though I would need to confirm, is

25 that this is a singular report, it might not be the easiest

Disc. Conf.                    M.G. v. Cuomo

1  thing to go click and print, but it is possible, and I believe

2  it's been done in connection with other cases.

3          THE COURT:  Right.  I mean --

4          MR. MARGOLIS:  So --

5          THE COURT:  -- one can imagine a database that has,

6  you know, 52 different tabs for any number of different types of

7  information, and each tab is almost tantamount to generating its

8  own report.  It's not hard to envision that gathering all of

9  that information is not as, as simple as clicking one button for

10 Mr. Margolis, print, and we get all of the Margolis files on a

11 particular issue.  I -- maybe it works that way, but it would

12 not surprise me if it did not, because it may be that we need

13 Margolis file A, Margolis file B, all the way up to however

14 many, AA, BB, CC, DD, et cetera, right?  So...

15         MR. MARGOLIS:  And that's, again, where we would be

16 ready and willing to discuss the appropriate scope, to find a

17 reasonable compromise here.

18         THE COURT:  Right.

19         MR. MARGOLIS:  We really are not trying to bury the

20 Defendants or the Department of Health in overly burdensome

21 requests; we are trying to find something that works for all

22 parties.

23         THE COURT:  Okay.

24         Well, I think the first step will be for you to

25 actually serve the subpoena.  I am going to allow the Defendants

1  -- excuse me, I apologize, I keep doing that.  I am going to

2  allow the Plaintiffs to serve a subpoena on the New York State

3  Department of Health seeking the information set forth in

4  requests 104 and 106.  Those requests can be translated into a

5  subpoena, I would think, relatively easily?

6       I -- let me put it this way.  I will be rather

7  disappointed if the subpoena that I eventually see when there's

8  a dispute about this issue is broader than what is in 104 and

9  106.  If it can be narrower, that's always better, especially in

10 light of all of the issues, but it may be that it can't be

11 narrower until you actually have some level of engagement with

12 DOH personnel or the attorneys representing DOH, and so I'm not

13 going to insist that you narrow it at the outset, just that you

14 not expand it.

15       MR. MARGOLIS:  Understood, your Honor.  We will not

16 expand it, and to the extent we make changes, it will be only

17 intended to clarify based on things that we've learned since

18 then --

19       THE COURT:  Sure.

20       MR. MARGOLIS:  -- and will only be in the spirit of

21 narrowing it to be more particular.

22       THE COURT:  Okay.

23       And, Mr. Sansolo, Mr. Conroy, I mean, are you in a

24 position at least to accept service of the subpoena?

25       I know you're not right this second.  Can you confer

Disc. Conf.                    M.G. v. Cuomo

1  with the appropriate people to determine whether you would at

2  least be in a position to accept service of the subpoena to

3  streamline this process a little bit?

4         MR. CONROY:  We can, of course, confer, but at this

5  moment, I cannot say for certain that we will be able to accept

6  service, yes.

7         THE COURT:  Okay.  I mean, again, there is an interest

8  in moving things forward more expeditiously, which I think

9  everybody shares, but the Defendants have emphasized in

10 particular, and having...again, with all of the points I made

11 earlier, recognizing that the Department of Health is not

12 currently a client of the Assistant Attorneys General who are

13 litigating this matter, it is nevertheless the case that someone

14 from the Attorney General's Office will wind up representing the

15 Department of Health in connection to the response to the

16 subpoena, whether it's you or colleagues of yours down the hall

17 or on a different floor, almost certainly, unless you tell me

18 that the DOH has its own independent litigating authority.

19        MR. SANSOLO:  Your Honor, it may, it may not be.

20 When, when -- in times when DOH is sued in a third party, when

21 our office does not necessarily represent --

22        THE COURT:  Okay.

23        MR. SANSOLO:  -- so there are times when DOH has its

24 own in-house counsel that represents it on such matters.

25        THE COURT:  That's fine.  My considerable experience

1  in this area is more with respect to federal agencies than state

2  agencies, and so in the U.S. Attorney's Office, it would be

3  highly unlikely that a federal agency would represent itself,

4  unless it's one of the five or six federal agencies that has

5  independent litigating authority like the SEC, for example, or

6  the Department of Labor, for example, or a couple of others, so

7  I understand that that might the case.  I just don't know which

8  agencies that is true for in the state, at least not entirely,

9  so, okay.

10        Listen, I'll ask that you just confer with the

11 appropriate people.  I imagine you at least will know who to

12 speak to at the Department of Health or within your office who

13 will have the appropriate liaison relationship with the general

14 counsel of the Department of Health to figure out if you can

15 accept the subpoena just to facilitate orderly administration of

16 that process, even if you're not going to wind up having a role

17 in response to the subpoena.

18        And if the answer is no, it's no, I mean, I understand

19 that the answer may be no, and there are a whole lot of lawyers

20 on the other side who can figure out how to serve a subpoena on

21 the Department of Health, so I'm not worried about that, I'm

22 just hoping that it can be...made as efficient as possible so

23 that we don't waste any more time with...service delays, to the

24 extent that can be avoided.

25        Mr. Margolis, can you have that subpoena ready to

Disc. Conf.                    M.G. v. Cuomo

1  serve by the end the week?

2            MR. MARGOLIS:  Yes, that should be okay, your Honor.

3            THE COURT:  Okay.

4            MR. MARGOLIS:  There, there is the complication that

5  we raised in our letter about the confidential information at

6  issue.

7            THE COURT:  Yes, let's talk about that.  Before I

8  share my thoughts, Mr. Margolis, I mean, do you have a proposed

9  path forward on that?

10           MR. MARGOLIS:  Your Honor, my --

11           THE COURT:  I mean, you've laid out a proposal in your

12 --

13           MR. MARGOLIS:  Yeah --

14           THE COURT:  -- letter, so...

15           MR. MARGOLIS:  -- my proposal's the one we have in the

16 letter.

17           I'm not sure that there is a better path forward

18 unless -- it's strange because I'm not sure that it is truly

19 confidential information that we're sharing because it is

20 information that is undoubtedly within their knowledge already,

21 DOH's knowledge already, that these individuals have SMI, that's

22 why we're requesting information about them, but I, I imagine

23 that we could fairly quickly, ideally, I assume -- you know,

24 Department of Health is not here, but if we could issue the

25 subpoena and immediately work with them to join the protective

Disc. Conf.                    M.G. v. Cuomo

1  order that is already at issue in this case and which I believe

2  governs third-party productions and then we could provide the

3  unredacted appendix.

4          THE COURT:  The only -- thank you, Mr. Margolis.

5          The only issue, if I understand correctly, that you

6  can think of at the moment with respect to serving the subpoena

7  is including the list of individuals, right?

8          MR. MARGOLIS:  That's correct, your Honor.  And

9  there's one additional complication there, which is that we have

10 not yet landed on...

11         THE COURT:  A number.

12         MR. MARGOLIS:  Yeah.

13         THE COURT:  Okay.

14         MR. MARGOLIS:  I mean, I think we would be willing to

15 go down to 45, as we previewed in our letter, if these PSYCKES

16 records are on the table.

17         THE COURT:  Okay, which I think they're going to be.

18 Again, subject to --

19         MR. MARGOLIS:  Yes.

20         THE COURT:  -- appropriate objections.

21         I'm not prejudging the scope of whatever an

22 appropriate response would be or deciding that, in fact, once we

23 hear further from the Department of Health that issues of

24 relevance and burden might not make the subpoena subject to a

25 well-formulated motion to quash, so --

1           MR. MARGOLIS:  Of course.

2           THE COURT:  With all of those points made and, and

3  caveats added, I think as an initial step, just, again, to move

4  things along, there's no reason why you couldn't serve the

5  subpoena with an explanatory cover letter.  Because if the

6  number of individuals is going to be 45, which seems appropriate

7  in light of all of the discussions we've had today and

8  particularly in light of your representation that the Plaintiffs

9  are willing to go to 45, the, the response from the Department

10 of Health is not going to be materially different based on which

11 45 individuals are included.

12          It's not like they're going to see Andrew Krause on

13 that list and say, "well, if we have to produce files for that

14 guy, it's going to be much more burdensome than it is if we only

15 have to produce for Owen Conroy," right?  I mean, that's not

16 going to be the issue.  The issue is going to be the, the

17 systems at issue and, and how they can be accessed and how

18 complicated or easy it is to do this.

19          So I think, again, in the interest of getting the

20 subpoena out and getting DOH up to speed, getting counsel

21 assigned, and having the process start to work its way through

22 the system, that can be done by way of just some explanation

23 that there will be an appendix listing 45 individuals who have

24 been selected in this particular way, and that will be provided

25 once we can sort out the issues of confidentiality and adherence

1  to the protective order.

2          And...let me put it this way.  I don't think that it

3  will be a reasonable basis -- and you can communicate this to

4  whoever needs to hear it, Mr. Conroy, that I don't think it will

5  be a reasonable basis for the Department of Health to object to

6  the subpoena based on the lack of access to the list of names.

7  That would not seem like a reasonable response to me, even

8  though, obviously, the Department of Health can't respond to the

9  subpoena until it actually has the names.

10         The big-picture thinking that will need to go into the

11  scope of the response and any objections, which I'm sure there

12  will be objections, from the Department of Health, that work can

13  be done even in the absence of the list of names, and once

14  somebody is engaged on behalf of the Department of Health, I'll

15  leave it to you all to try to figure out if there is a simple

16  and straightforward path to either have the Department of Health

17  join the protective order as a non-party signatory or adherent

18  to the terms of the protective order or if absolutely necessary,

19  carve out some additional terms that would cover the Department

20  of Health's ability to receive the information that's subject to

21  the protective order and potentially produce information.

22         Now, I understand, because we talked about this issue

23  in an earlier context in this case, that there may be some

24  objections based on state law about the disclosure of certain

25  information, although I think, perhaps, the order that's already

 1   in place here should assuage the Department of Health of any

 2   concerns it might have with respect to those state law

 3   limitations.  Again, this is where the attorneys for OMH in this

 4   room will have some role to play here in, at minimum, educating

 5   your colleagues whether they're AAG colleagues or in-house

 6   counsel colleagues from the Department of Health, about some of

 7   the history, some of the objections that have been raised, some

 8   of the scope issues that have been addressed and defined, and

 9   some of the objections that I expect to see and that the

10   Plaintiffs, frankly, expect to see and how that negotiation

11   might proceed.

12          Obviously, you can't -- you'll do whatever you have to

13   do within the bounds of your ethical limitations and any

14   potential conflict issues you might have had, but talking to

15   these folks about what's on the public docket and what's been

16   said in court shouldn't violate anything, I wouldn't think.  You

17   don't have to give them legal advice, you can report to facts of

18   what happened and direct them to the appropriate places so that

19   they don't have to go fishing through the docket, which is up to

20   335 documents or 340 documents at this point, to find the

21   relevant points to think through these issues.

22          Okay.

23          MR. MARGOLIS:  Your Honor, we can also put some of

24   that information in the cover letter.

25          THE COURT:  That would be helpful.  Yes, thank you,

Disc. Conf.                    M.G. v. Cuomo

1  Mr. Margolis.  I think you may want to check with the defense
2  side.

3          MR. MARGOLIS:  Yes.

4          THE COURT:  Heh, to verify, verify whatever
5  information you provide, but providing some indication of that
6  will be useful.

7          So we'll have that subpoena served, in some fashion,
8  by Friday, and that will start the clock running on a potential
9  response from the Department of Health, and we'll figure out
10 exactly what the time table for that should be.

11         Hopefully, again, you can encourage someone from the
12 Department of Health, whether it's in-house counsel or someone
13 from the Attorney General's Office who may be representing the
14 Department of Health in this matter, to enter a notice of
15 appearance or at least tracking the docket to get any...ECF
16 updates, which, of course, can be done in a stealth manner by
17 just signing up for notifications for this case so that we can
18 trust the appropriate folks are informed of what's going on and
19 informed of the deadlines.  Okay.

20         In terms of the -- so that will cover the PSYCKES
21 issues, and we'll sort of have to defer those for another day,
22 unfortunately.

23         In terms of the documents that are at issue in request
24 no. 102, and, again, if I -- I'm reading this correctly, again,
25 looking at ECF no. 335-3, Mr. Margolis, for request 100 and 101,

Disc. Conf.                    M.G. v. Cuomo

1  you've edited them down to essentially requesting what it is

2  that Defendants have agreed to produce, right?

3          MR. MARGOLIS:  Correct, your Honor.

4          THE COURT:  Okay.  103's been withdrawn entirely.  105

5  and 107 have been withdrawn entirely.  So 104 and 106 are the

6  PSYCKES issues.

7          It's really just what's at issue in 102; yes?

8          MR. MARGOLIS:  Yes, and for 107, I should just

9  clarify, we withdrew that because Defendants maintain that that

10  information was going to be in the documents they were already

11  producing, the contact information.  Or had -- were willing to

12  produce, I should say.

13          THE COURT:  Mr. Conroy?

14          MR. CONROY:  I think our position on that is, what the

15  discharge summaries will show is the location to which

16  individuals went after they were released from DOCCS custody.

17  I, I don't think, and we certainly could not represent that

18  those documents will contain current contact information for all

19  of these individuals, the --

20          MR. MARGOLIS:  If I may, your Honor.

21          THE COURT:  Mr. Margolis.

22          MR. MARGOLIS:  The representation I thought I was

23  referring to and I -- apologies, it was in a meet-and-confer,

24  but that was the latest information that Defendants have.

25  In...the latest contact information that we have.

Disc. Conf.                    M.G. v. Cuomo

1          THE COURT:  Mr. Conroy?

2          MR. CONROY:  You know, again, this is -- it's -- when

3  we're talking about individual-level files, you'd have to really

4  look at the individual files.  I, I don't know that I could say

5  for every one of these 45 individuals that the discharge summary

6  has the last, you know, residents and that there are no other

7  files in OMH's possession related to that individual and where

8  they've been since.

9          It's certainly our point that it would be very

10  burdensome to try to find that individual record that, that may,

11  if it exists, for any one of the 45 individuals, but I -- you

12  know, again, going to the point that we're all focused on this

13  particular point in time, the discharge summaries will show

14  where that person went upon release from DOCCS custody.

15          THE COURT:  Okay.

16          Mr. Margolis?

17          MR. MARGOLIS:  I don't, I don't think that we have an

18  issue, then, your Honor.

19          THE COURT:  Okay.  I, I think that seems clear enough.

20          And I take the point, Mr. Conroy, that it is possible

21  that OMH may have come across some information through some

22  other type of contact in the weeks, months, or years since an

23  individual's release that may be more current than whatever

24  their discharge planning...document might have reflected in

25  terms of a last known address, but...but that's not going to be

1  accessible in the same centralized fashion as the discharge

2  planning summaries or any of the other documents that we're

3  talking about.

4          MR. CONROY:  That's correct, your Honor.

5          THE COURT:  Okay.  All right.

6          So, listen, I mean, there's, there's an issue -- a

7  live issue on the table here regarding the SMI summary notes and

8  whether that is a category of information that might be

9  accessible through a centralized repository.  I understand

10 that's something that has only recently come to the attention of

11 the Defendants and so that is going to require some further

12 investigation.

13         To the extent the -- so I'd like a report back on that

14 within -- how much time do you need to be able to figure that

15 out, Mr. Conroy?

16         MR. CONROY:  By the end of this week, I think, would

17 be --

18         THE COURT:  Perfect.  So you can send me a letter by

19 the end of the fact reporting on that?

20         MR. CONROY:  Yes.

21         THE COURT:  Okay.

22         And, again, you can sense that my strong inclination

23 here is that to the extent that those documents are locatable --

24 when I say a centralized file, it may not be one universal

25 database, but, rather, centralized in the more colloquial sense

1  as opposed to requiring individualized searches across a

2  potential multitude of facilities and locations.  If they are

3  retrievable from one or two databases that can be accessed

4  from...a central computer system or systems, then that, again,

5  seems to fall within the realm of things that can be produced

6  and relevant information that would not pose an undue burden on

7  the Defendants to provide.

8          So, hopefully, we'll hear some productive news on that

9  by the end of the week, but to the extent these other categories

10 of information do not lend themselves to those types of

11 searches, Mr. Margolis, I am not going to order the further

12 search and collection and production for the same reasons that I

13 made clear on the record at the December 15th conference.

14         Again, there's a certain amount of information that's

15 already on the table for production, there are additional

16 centralized type records that are going to be sought from the

17 Department of Health, certain categories of information the

18 Defendants have agreed to produce.  The hope is that there will

19 be another category of information that can be added to that,

20 and for that, for the group of 45 individuals that are under

21 contemplation here, my hope and expectation is that that will

22 provide the experts with enough information to generate a

23 meaningful analysis for purposes of the case, recognizing that,

24 you know, there are a lot of competing considerations here,

25 including the timing of these requests, the scope of them, the

Disc. Conf.                          M.G. v. Cuomo

1  overall burden, the amount of work that has gone into discovery

2  on both sides already up until this point through the five-plus

3  years of litigation, and so it's, it's time to bring that to a

4  close.

5          There's going to be some work that needs to be done

6  to, to collect and produce these documents even for these 45

7  individuals, and we'll, we'll see where we are once we hear back

8  from the Defendants at the end of the week.

9          MR. MARGOLIS:  Your Honor, one more small request if I

10 may...

11         THE COURT:  Yes.

12         MR. MARGOLIS:  While Defendants are looking into the

13 backlog regarding the SMI summary notes and --

14         THE COURT:  The term 'backlog,' by the way, I mean, we

15 keep throwing it around.  You --

16         MR. MARGOLIS:  Yes.

17         THE COURT:  -- obviously know what you --

18         MR. MARGOLIS:  Yes.

19         THE COURT:  -- mean by that, when I hear the word,

20 backlog, that's not what I think of, but that's, that's just the

21 repository that you've seen referred to as where these documents

22 might exist?

23         MR. MARGOLIS:  Yes, your Honor, and I have copies of

24 those documents if --

25         THE COURT:  That's okay.  I just want to make clear

Disc. Conf.                    M.G. v. Cuomo

1  for the record that that's not the traditional meaning of

2  'backlog' when I think of the word 'backlog.'  That's just a --

3  that's just the term of art that's been used in the documents.

4  And you've both used it now, so at least I think you both know

5  what you are talking about.  That's Mr. Margolis and Mr. Conroy.

6          MR. MARGOLIS:  Yes, and I -- over the course of the

7  week, if there are any issues, we can talk about that, and

8  we'll, of course, be available.

9          THE COURT:  Sure.

10          MR. MARGOLIS:  Just in -- if you can also -- I would

11  request that Defendants inform the Court of the other types of

12  documents that are in that repository.  To the extent some of

13  the -- without casting any blame, I know it's a complicated

14  archiving system, but if the SMI summary notes are, indeed, in

15  there I don't know what other documents might be in there as

16  well.

17          THE COURT:  Right.  In other words, is it possible

18  that there is some other core history document, for example,

19  that exists in that same repository.

20          MR. MARGOLIS:  Yes, your Honor.

21          THE COURT:  Okay.

22          Mr. Conroy.

23          MR. CONROY:  It's certainly something we can look into

24  and include in our report back.

25          THE COURT:  Okay.  And if it turns out that

1  complicating it in that way requires you to take an extra couple

2  of days to figure it out, that's fine, so you just keep me

3  posted on that.

4          MR. CONROY:  Understood.

5          THE COURT:  Okay.  In fact, why don't I just give you

6  a week from today, which gets you to what, February 12th?  To

7  report back.

8          Again, I trust that you are going to do a good-faith,

9  diligent effort to figure this out, because that's what you've

10  been doing, and so if it takes two more days than that, just let

11  me know that it's going to be -- that you need -- ask for an

12  extension until the 14th, and I will give it to you if you can

13  tell me that you've been making good progress.

14          Okay?

15          MR. CONROY:  Understood.  Thank you.

16          THE COURT:  Okay, so we'll set the date for that

17  report as February 12th, specifically to address the SMI summary

18  notes, but also to the extent that any of the other remain

19  categories of documents requested in RFP no. 102 also may be

20  locatable in this backlog, repository, the Defense will report

21  on that as well.

22          Okay, I think that leaves just the one remaining issue

23  about the deposition, which we'll turn to now, but -- and we --

24  well, before we get to that, you know, Mr. Margolis, you -- I

25  think maybe it was just optimism that you used in your letter by

Disc. Conf.                    M.G. v. Cuomo

1  referring to the fact that there are a number of additional

2  discovery requests that were served, you said there's only the

3  one outstanding dispute.  It's the one outstanding dispute that

4  we know about, frankly.

5          I mean, I understand that there are these other

6  demands.  I'm not sure what to make of them and it's premature

7  to discuss them.  There may be some further disputes to address

8  at a subsequent conference, but I note that there are additional

9  demands out there that were attached to the Defendant's

10  submission so I understand that there may be other responses to

11  come.  The Defendant's deadline to respond to those responses

12  hasn't even come due yet.  It's February 20th.  So we'll take

13  that as it comes.

14          I will also note in terms of scheduling, I'm not going

15  to set a date yet for a revised schedule.  We need to still do

16  that.

17          I was somewhat dismayed, frankly, to see

18  the...projection from the Plaintiffs that it would take nine

19  months of time from the time the documents are provided in order

20  to go through the expert analysis.  My, my hope and expectation,

21  Mr. Margolis, is that that number can be resolved -- revised

22  down dramatically, given that we're talking about a much

23  narrower universe of documents.

24          I mean, it may be that if the expert were going to

25  receive thousands of pages of materials for each of 143 people

Disc. Conf.                    M.G. v. Cuomo                              52

1    or even 45 people that it might have taken them nine months to

2    do their workups, but if they're receiving a relatively compact

3    volume of materials for 45 individuals, my sincere hope is it's

4    not going to take quite long to get it all analyzed.

5              MR. MARGOLIS:  Your Honor, I'm not in a particular

6    position to say anything on that now, but understood on your

7    concern, and we'll address that.

8              THE COURT:  Good.

9              And, again, we'll have to figure out what the full

10   scope of the production is going to be, Mr. Conroy, and then

11   you'll have to propose to me how much time you're going to need

12   to complete it, so, again...faster is better, but I also am not

13   going to set some unreasonable deadline just for the sake of

14   moving things along as quickly as we can.

15             Again, I recognize that everybody would like to move

16   things along as expeditiously as possible, so you will have some

17   control over that.  If you tell me you can get everything turned

18   around quickly, then I'll, I'll hold everybody's feet to the

19   fire on that a little bit, but if you also tell me,

20   realistically, your clients will need time to gather the

21   materials and you'll need time to review them, I'm going to be

22   reasonable about that as well.

23             So we're still waiting for a decision on the motion

24   for class certification.  I'm sure that will be coming.

25             Does anyone remember exactly when that was filed?

1           MR. MARGOLIS:  I believe it was filed in January 2020.

2  It might have been early -- or, sorry, not 2020.

3           THE COURT:  2023?

4           MR. MARGOLIS:  2023.  February?

5           MR. CONROY:  I think it was not -- we wound up...

6           THE COURT:  Bundling?

7           MR. CONROY:  Bundle-filing --

8           MR. MARGOLIS:  Oh, yes.

9           MR. CONROY:  -- that submission, and it was ultimately

10 filed on the docket spring or summer '23?

11          MR. SANSOLO:  Yep.

12          MR. MARGOLIS:  Yeah.

13          THE COURT:  Spring or summer '23?  Okay.

14          Dylan, can you see when that motion was filed?  It

15 should be down towards the latter portion of the docket.  There

16 should just be a gavel for that.

17          (Brief pause)

18          MR. CONROY:  September 8th.

19          THE COURT:  Yeah, okay.  So...September 8th, 2023?

20 Okay.

21          I mean, for those of you who clerked in federal courts

22 and understand how the CJRA list works, that may mean that that

23 will not be on the March list, it will be on the September list.

24 But Judge Seibel is ruthlessly efficient, as you have all

25 probably experienced in various ways, in this case and others,

1  so that doesn't mean it's not going to be done by September, it

2  just means it might not be done by March.  Okay, that's helpful

3  to know.

4           Okay, let's turn to the issue of the additional

5  deposition.

6           I've read what you've indicated here.  I understand

7  the Defendants' position that there have been multiple

8  depositions on related topics, but I, I've looked at the

9  excerpts that the Plaintiffs have provided and it seems that

10 there is some specialized knowledge that Dr. Colavita has that

11 some of these other witnesses may not have had, either because

12 Dr. Lee, for example, didn't serve on the SRC after 2020, Dr.

13 Kaplan in his testimony quite plainly indicated that Dr.

14 Colavita was the person who had more specific knowledge, that

15 she was actually, if I understood the testimony correctly, hired

16 specifically to address some of these more complicated cases

17 that are at the heart of this litigation.  I mean, not the

18 individual Plaintiffs, but the types of

19 challenging...circumstances that, that have given rise to this

20 lawsuit.

21           I will note, by the way, I mean, I take the point that

22 was made in the Defendants' letter in the footnote no. 2, that

23 there's no...there's no misrepresentation by Ms. Vogel in terms

24 of the testimony.  At least the testimony that was provided to

25 me, Ms. Vogel wasn't asked the specific question about whether

1 Dr. Kaplan sat on the SRC. I think that was just, perhaps, a

2 poorly chosen word there in the Plaintiffs' letter. I don't, I

3 don't think there's any misstatement.

4          I appreciate the clarification that the Defendants

5 pointed out, but nevertheless, the upshot of it, to me, seems to

6 be that Dr. Colavita does have relevant, non-duplicative

7 testimony to offer here.

8          I'll allow you to make a record on that, Mr. Conroy,

9 if you'd like to. I mean, I've read the letters, but if you

10 want to say anything more about it.

11          MR. CONROY: Thank you, your Honor. I -- just

12 briefly.

13          I mean, I think in our view, there have been many

14 lengthy OMH depositions. It is certainly the case that in an

15 agency of this size, with the number of specialized individual

16 employees working on all of these issues from different angles,

17 you can always find someone with a slightly differently angle on

18 these services and these issues.

19          In our view, given the amount of time that OMH

20 employees have sat for depositions answering questions, you

21 know, from, from Ms. Vogel answering questions about the full

22 pre-release services process, you know, Dr. Kaplan certainly did

23 testify that he's not involved in every case of individuals

24 transitioning out of prison, but the hardest cases do go to him

25 because they seek his consultation for the most challenging

1   cases, which, you know, we think this case sort of represents

2   what those issues are all about, and Dr. Lee did testify about

3   the specialized review committee, and, you know, there's really

4   no testimony that there's something materially different about

5   the way the Specialized Review Committee functions now as

6   opposed to the way it functioned when Dr. Lee was sitting opt,

7   so we understand --

8              THE COURT:  Well, who would have given that testimony?

9              MR. CONROY:  Well, I don't know that she was asked.

10             THE COURT:  But how would she have known?

11             MR. CONROY:  I mean, she, she was not asked whether

12   she's aware of how the SRC functions at -- on this -- today.  I

13   mean, she's certainly still involved in -- she's the, you know,

14   the Associate Commissioner for the Division of Forensic

15   Services, so she's still quite involved --

16             THE COURT:  Right.

17             MR. CONROY:  -- in these issues.

18             THE COURT:  That, I understand.  I'm just, I'm just

19   saying I'm not sure I would fault the deposing attorney for not

20   asking her a follow-up question about what the committee is like

21   now when it's clear that she hasn't sat on the committee for

22   three years, but I understand your point, that she would have

23   had, quite possible, more generalized knowledge because of her

24   more senior management role in the agency.

25             MR. CONROY:  And then the last point I would make,

Disc. Conf.                    M.G. v. Cuomo

1   which, you know, we've already made in the letter, is that we

2   still have five OMH 30(b)(6) depositions to come, which, you

3   know, not only in terms of the burden, but also in terms of

4   substance, there are multiple topics that cover pre-release

5   planning issues.

6           THE COURT:  Let me ask you this -- thank you, Mr.

7   Conroy.

8           Let me ask you this question, Mr. Margolis.  I mean,

9   is it possible, because it seems at least possible, that the

10  issues that you might theoretically want to address with Dr.

11  Colavita will be covered in the 30(b)(6) depositions?

12          MR. MARGOLIS:  Your Honor, I, I think it's possible

13  that there will be some overlap.  I do think that the SRC's

14  functions are something that we will ask about during the

15  30(b)(6).

16          THE COURT:  Right, and you'll cover the current

17  functioning of the SRC and the witness will presumably have been

18  prepared with knowledge about those issues.

19          MR. MARGOLIS:  Yes, your Honor.

20          You know, I think ultimately to -- at least from my

21  perspective, this came down to your Honor's comment about don't

22  add them, substitute them, and we might have done that if we

23  knew who Dr. Colavita was.

24          Defendants had their initial disclosures and they --

25  even their supplemental disclosures just...I was going to say

Disc. Conf.                    M.G. v. Cuomo                          58

1  earlier this year, but it's now 2024, in 2023, and Dr. Colavita

2  was never a person identified, we were not aware of her

3  position, and we really understood Dr. Kaplan to be the one

4  filling this role.

5          THE COURT:  Right, which he is --

6          MR. MARGOLIS:  Yeah.

7          THE COURT:  -- to an extent.  I mean, he's her

8  supervisor, if I'm understanding this dynamic correctly.

9          MR. MARGOLIS:  He is her supervisor, and he does sit

10  on what he said were, like, the very, very

11  high...most-needing-review cases when the SRC's not able to come

12  to a decision, but it's not just those that are at issue in this

13  case, you know, it's really the data of the SRC that we want to

14  ask questions about and are more interested in.

15          She's also somebody, frankly, that I think, with

16  hindsight, we would have designated as a -- or asked to be a

17  custodian.  She was never mentioned in those negotiations.

18          THE COURT:  It's certainly too late for that.

19          MR. MARGOLIS:  I, I am not reopening that today, your

20  Honor.

21          THE COURT:  No, I understand.

22          Listen, I, I -- there are a couple of things about the

23  testimony from Dr. Kaplan that are persuasive to me.  One is his

24  testimony that -- on this question, I should say.  One is his

25  testimony that Dr. Colavita is "more intimately involved in

1  looking at some of those," meaning certain patients on the

2  mental health caseload.

3          He goes on to say "especially some of those

4  significantly mentally ill or seriously mentally ill individuals

5  who are being released to the community that have maybe some

6  questioning in their history regarding dangerousness or maybe

7  some significant history of non...and then there's a dash,

8  treatment non-adherence, leading them to be involved in the

9  justice system, and so she would be involved, and if she has

10 questions or concerns, she would raise it with me or one of my

11 other colleagues."  In other words, this is a person, Dr.

12 Colavita, who has a bit more of a direct involvement in a number

13 of these types of cases.

14         And interestingly, I found this part interesting as

15 well, that she has had this role for three years, that no one

16 had the role before her, and that, in fact, Dr. Kaplan was

17 involved in the creation of that role: "Due to my time

18 constraints managing the large caseload, I thought it would be

19 helpful to have an individual who can actually be more directly

20 involved with the teams and can follow up, has time to follow up

21 with the teams, and especially with the prescriber in specific

22 cases in questions that come up, so there would be more time to

23 discuss cases and have a better understanding of appropriate

24 discharge plans."

25         So I understand why Dr. Kaplan was identified, because

1  he is somewhat more senior and has an oversight role, but I can

2  also understand why...in other words, I can understand why the

3  Defendants chose to identify Dr. Kaplan.  They couldn't identify

4  every single person in the agency and they'd have Dr. Kaplan be

5  prepared to speak about these issues.  And the way that Dr.

6  Kaplan was described and identified in the Rule 26(a) disclosure

7  seemed entirely appropriate to me.  However, what came out in

8  this deposition and what sometimes comes out in depositions is

9  that there may be somebody who has a, a slightly less senior

10 role, but who may have her finger, in this case, on the pulse of

11 some of the critical information that is at issue.

12         So in light of the fact that there has been

13 substantial testimony on almost all of the issues that are

14 identified as potential topics for Dr. Colavita, I don't think a

15 full day of her testimony is necessary.  I think a four-hour

16 deposition should be plenty for the Plaintiffs to have a

17 targeted approach.

18         I was contemplating the possibility of suggesting that

19 that take place after the Rule 30(b)(6) depositions.  I'm not

20 going to require that it happen that way.  If it does happen

21 that way, I don't think there's anything inappropriate about

22 that, but if, as Defendants might prefer, Dr. Colavita can be

23 scheduled earlier, that would be appropriate too.

24         I'm not going to micromanage that particular issue;

25 you can work on a schedule based on the witnesses' availability

1  and based on how preparing that witness fits into the overall,

2  already-complicated, plan that is in the works for preparing all

3  of the other witnesses for their 30(b)(6) depositions, so I will

4  authorize a four-hour deposition of Dr. Colavita to cover the

5  limited topics that have been identified as new for her and

6  pertinent to the issues in the case.  Okay.

7          So in terms of our next steps, we'll have a letter

8  from the Defendants by a week from today, that's February 12th,

9  regarding the SMI summary notes and any other documents that may

10  be sought in Request For Production 102 that may be available in

11  this backlog repository of materials that has been recently

12  identified.  That's one issue.

13          The Plaintiffs will serve their Rule 45 subpoena on

14  the Department of Health by no later than this Friday, so that

15  is February 9.

16          Mr. Conroy and Mr. Sansolo will be in touch with Mr.

17  Margolis and Mr. Dauber by mid week, as soon as possible, with

18  whatever update they have about whether they or someone in their

19  office will be in a position to accept service of the subpoena.

20          If they can't get an answer to that question, which

21  sometimes happens, then, Mr. Margolis, you'll just be prepared

22  to serve it on the Department of Health in whatever way you

23  would ordinarily serve it.

24          Okay?

25          MR. MARGOLIS:  Yes, your Honor.

1          THE COURT:  If it turns out that you need to move

2   mountains in order to get that answer, Mr. Conroy, Mr. Sansolo,

3   just try to let Mr. Margolis know that as well.  Again, I don't

4   think it should be that complicated to figure that out, but I've

5   also worked in government for a long time, so I understand if it

6   is.

7          And then once I have that letter from the Defendants

8   by next Monday, I think what would make most sense is for us to

9   have -- well, we could do it one of two ways.  One, you could

10  each send me a letter with your proposed schedule for completing

11  the outstanding discovery in terms of the document production or

12  we could have a short conference to just talk through the

13  issues.

14         I think it makes sense for once that letter is

15  submitted, I assume I'm going to get the letter at the same time

16  the Plaintiffs are going to get it, so the Plaintiffs are going

17  to need to digest it for a minute and then maybe we have a short

18  conference to discuss it, either at the end of next week or the

19  beginning of the following week.  I think we should be able to

20  do that by telephone.

21         It's a relatively...straightforward set of issues, but

22  what -- we may not need a conference if you can just put your

23  heads together on what a schedule would look like for the

24  completion of the document discovery along the lines -- again,

25  the subpoena issue is going to have to proceed on its own track

Disc. Conf.                    M.G. v. Cuomo

1  unfortunately, but at least the issues that are going to be

2  resolvable among the lawyers in this room.

3          So why don't we do this.  You'll send a letter by

4  Monday, that is, the Defendants will send a letter by Monday,

5  February 12th, regarding these additional potential categories

6  of documents, and then let's have you send me a joint letter by

7  the Friday, which will be the...16th of February?  With either a

8  joint proposal regarding the, the discovery schedule in terms of

9  the production and the expert's work or competing schedules.

10         I don't think we really need to have a discussion

11  about it.  You can lay it out in a relatively short letter.

12  It's not that complicated at this point.  The only thing that

13  may be, I suppose, a dispute is if there's ambiguity as to

14  what's in the repository or what's not in the repository, but

15  hopefully you can work that out in a meet-and-confer discussion

16  over the course of the week.

17         If you tell me that you really think a conference is

18  necessary, I'm happy to see you.  I mean, we can have a

19  conference.  I'm just trying to obviate the need for another

20  trip up here when we might be able to work it out just through

21  written submissions so, again, if you find yourselves at, heh,

22  at odds over some basic parameters and you need further

23  direction, then just let me know and we'll have you in for a

24  short conference, maybe even by telephone depending on how

25  straightforward the issues are.  And we'll get a schedule in

1  place, and once we do that, as part of that schedule, we'll set

2  a control date for another conference in case there are issues.

3            And, again, I think the next set of issues that we'll

4  certainly have to address substantively will be with respect to

5  the DOH subpoena, although let me not be a pessimist, maybe

6  those issues can be worked out as well.

7            All right, so, again, to summarize, Friday, service of

8  the subpoena, that's February 9; February 12th Defendants'

9  letter regarding the categories of documents that we've talked

10 about today; and then February 16th, a letter with competing or

11 joint proposals regarding the completion of this new set of

12 document issues.

13           I guess what will be useful, also, is if it can

14 encompass not only this set of documents that we've been talking

15 about, but the additional demands that are working their way

16 through the system, right?  Working their way through the

17 response process.

18           And you said, Mr. Conroy, that your -- the Defendants'

19 responses on those are due on February 20th?

20           MR. CONROY:  That, I believe, is correct, your Honor.

21           THE COURT:  So, at the risk of confusing everybody,

22 including myself, does it make sense, then, to defer that

23 February 16th letter to February 23rd?  So that we can have a

24 sense of what the Defendants' responses and objections are on

25 the current outstanding set of demands?

Disc. Conf.                    M.G. v. Cuomo

1              MR. CONROY:  That sounds like a reasonable path

2     forward.  I think your Honor --

3              THE COURT:  I'd like it to just be that we know what

4     -- I'd like, I'd like to not have to go through multiple rounds

5     of trying to schedule and reschedule and amend the schedule, so

6     if you respond on the 20th to the outstanding demands, I assume

7     it's just going to be written responses to objections, you're

8     not going to be producing documents, but whatever you agree to

9     produce...you could talk to each other about and figure out as

10    part of your overall thought process, you know, what is going to

11    be necessary to get all of that done.

12             I realize there may be some objections that may be

13    worked out there, but I'm sure the production timeline for all

14    of this is going to be such that there will be room to get those

15    resolved, if need be.

16             MR. CONROY:  That sounds reasonable to us, your Honor.

17             THE COURT:  Okay.

18             Mr. Margolis.

19             MR. MARGOLIS:  That works for us as well, your Honor.

20             THE COURT:  All right, so 2/23 for proposed schedule,

21    2/12 for status report on existing documents.

22             Okay, is there anything else that we should address

23    today from the Plaintiffs' perspective, Mr. Margolis?

24             MR. MARGOLIS:  Nothing else, your Honor.  Thank you.

25             THE COURT:  Okay.

1              And, Mr. Conroy, Mr. Sansolo, anything further we

2    should address from the Defendants' perspective?

3              MR. CONROY:  Nothing else.  Thank you, your Honor.

4              THE COURT:  All right, thanks, everybody.  We'll stand

5    adjourned.

6              MR. SANSOLO:  Thank you, your Honor.

7              THE COURT:  Take care.

8

9    Certified to be a true and accurate

10   transcript of the digital electronic

11   recording to the best of my ability.

12   _____

13   Tabitha R. Dente, RPR, RMR, CRR

14   U.S. District Court

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25