# EXHIBIT A

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------x

3    M.G., individually and on behalf
     Of all similarly situated, et al.,
4
                    Plaintiffs,
5
             v.                              19 CV 639(CS)(AEK)
6
                                             DECISION
7

8    ANDREW CUOMO, in his official
     Capacity as the Governor of the
9    State of New York, et al.,

10                  Defendants.

11   ------------------------------------x

12

13                                    United States Courthouse
                                      White Plains, N.Y.
14                                    June 24, 2024

15

16

17

18

19   Before:  THE HONORABLE CATHY SEIBEL, District Judge

20

21

22

23

24

25
```

1                             APPEARANCES

2

3    THE LEGAL AID SOCIETY
          Attorneys for Plaintiffs
     ELENA MARIA LANDRISCINA
4    STEFAN RUSSELL SHORT

5

6    DISABILITY RIGHTS NEW YORK
          Attorneys for Plaintiffs
7    ELIZABETH SUZANNE WOODS

8

9    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
          Attorneys for Plaintiffs
10   EMILY A. VANCE

11

12   LETITIA JAMES
          Attorney General for the State of New York
13   OWEN THOMAS CONROY
     ADAM JOSEPH SANSOLO
14        Assistant Attorneys General

15

16

17

18

19

20

21

22

23

24

25

1          THE DEPUTY CLERK:  The Honorable Cathy Seibel

2   presiding, M.G. v. Cuomo.

3          Good morning, Ms. Woods, Ms. Landriscina.

4          Am I saying it right?

5          MS. LANDRISCINA:  Correct.

6          THE COURT:  Ms. Vance.

7          MS. VANCE:  Good morning.

8          THE COURT:  Mr. Short, Mr. Conroy.

9          MR. CONROY:  Good morning, Judge.

10         THE COURT:  Mr. Sansolo.

11         MR. SANSOLO:  Good morning, your Honor.

12         THE COURT:  Everyone can have a seat.

13         I am prepared to rule on the pending motions.  Does

14  anybody have anything to add that's not covered by the papers?

15         All right.  I'll take that as a no.

16         Make yourselves comfortable.  It's going to be a

17  while.  I'm sure you're going to want to order the transcript.

18         Before me is plaintiffs' motion for class

19  certification and defendants' motion to exclude the opinions

20  and testimony of plaintiffs' class certification experts.  It

21  will surprise no one that neither side is getting everything

22  they want.

23         First, by way of background, I'll just very briefly

24  summarize the facts.  I assume the parties are fully familiar.

25         Plaintiffs are formerly incarcerated individuals with

1    serious mental illness, or SMI, who brought this lawsuit to

2    challenge their institutionalization in New York State's prison

3    system and the subsequent failure of the State to provide

4    community-based mental health housing and supportive services

5    upon their release.

6         I may at times abbreviate community-based mental

7    health housing and supportive services as CBMHHSS, or sometimes

8    just as Services, capital S.

9         Plaintiffs wish to represent three classes:  A

10   "General Class" of people with SMI who defendants held or hold

11   in prison past their release dates due to the inadequate

12   capacity of CBMHHSS: an "RTF Subclass" made up of General Class

13   members who defendants purport to have released to residential

14   treatment facilities, or RTFs, upon the maximum expiration

15   dates of their court-imposed prison sentences, but who in fact

16   were or are held in prisons where they are treated just like

17   prisoners; and, third, a "Discharge Class" consisting of people

18   with SMI whom defendants unnecessarily segregate or place at

19   serious risk of institutionalization upon their release from

20   prison because defendants fail to provide the community-based

21   mental health housing and supportive services that plaintiffs

22   need.  See paragraphs 5-7 and 13-15 of the Amended Complaint,

23   or AC, which is ECF number 134.

24        Plaintiffs seek certification of those two classes

25   and one subclass, appointment of class counsel, and ultimately

1    a declaration that defendants' conduct violates the Eighth

2    and/or Fourteenth Amendments, the Americans with Disabilities

3    Act and the Rehabilitation Act, and they seek a permanent

4    injunction requiring defendants to develop and implement a plan

5    to better serve individuals with SMI who are released from

6    prison and to promptly make available sufficient

7    community-based care and treatment opportunities.  They also

8    ask the Court to enjoin defendants Annucci, Sullivan and

9    McGrath, at least some of whom I think have probably been

10   succeeded by others, but in their official capacities, they ask

11   me to enjoin them from subjecting the RTF Subclass to punitive

12   conditions in state prison, and they seek an award of

13   attorneys' fees.  Paragraphs 98 and 99.

14           By way of procedural background, plaintiffs served

15   their motion for class certification last February 8th, 2023.

16   On February 15th, defendants filed a premotion letter in

17   anticipation of moving to exclude two undisclosed experts whose

18   reports plaintiffs had served with their motion.  At a

19   premotion conference at the end of February, I granted

20   defendants permission to obtain their own experts and to depose

21   plaintiffs' experts.  Defendants ultimately decided not to

22   designate a rebuttal class expert.  See ECF 294 at page 3, note

23   3.  Last summer, defendants served their opposition to the

24   Class cert. motion and their cross-motion to exclude

25   plaintiffs' experts.  Later in the summer, plaintiffs served

1    their reply and opposition.  And in September, defendants

2    served their reply and the bundled motion papers were filed.

3            I'm going to start with the motion to exclude expert

4    testimony.

5            "The Supreme Court has assigned to district courts a

6    gate-keeping role with respect to expert opinion testimony."

7    Arista Records v. Lime Group, 2011 WL 1674796, at *1 (S.D.N.Y.

8    May 2, 2011), quoting Daubert v. Merrell Dow, 509 U.S. 579,

9    597.

10           And by the way, unless otherwise indicated, any case

11    quotations in today's decision omit citations, quotation marks,

12    footnotes and alterations.

13           The admissibility of expert testimony is governed by

14    Federal Rule of Evidence 702, which says:

15           "A witness who is qualified as an expert by

16    knowledge, skill, experience, training or education may testify

17    in the form of an opinion or otherwise if the proponent

18    demonstrates to the court that it is more likely than not that,

19    (a) the expert's scientific, technical or other specialized

20    knowledge will help the trier of fact to understand the

21    evidence or to determine a fact in issue; (b) the testimony is

22    based on sufficient facts or data; (c) the testimony is the

23    product of reliable principles and methods; and (d) the

24    expert's opinion reflects a reliable application of the

25    principles and methods to the facts of the case.

1    Rejection of expert testimony is the exception rather

2    than the rule, but the proponent of expert testimony has the

3    burden of establishing by a preponderance of the evidence that

4    the requirements of Rule 702 are met.  Bernstein v. Cengage

5    Learning, 2023 WL 6303424, at *9 (S.D.N.Y. June 9, 2023); see

6    the Rule 702 advisory committee's note.

7    At the class certification stage, "the question is

8    not whether a jury at trial should be permitted to rely on the

9    expert's report to find facts as to liability, but, rather,

10   whether the court may utilize it in deciding whether the

11   requisites of Rule 23 have been met." Passman v. Peloton, 671

12   F.Supp.3d 417, 43 (S.D.N.Y. 2023).

13   "Neither the Supreme Court nor the Second Circuit has

14   definitively decided whether the Daubert standard governs the

15   admissibility of expert evidence submitted at the class

16   certification stage."  Chen-Oster v. Goldman, Sachs, 114 F.3d

17   110, 114 (S.D.N.Y. 2015), objections overruled, 325 F.R.D. 55,

18   (S.D.N.Y. 2018).  "The heavy weight of authority," however,

19   "militates toward a Daubert inquiry at class certification,

20   Passman, 671 F.Supp.3d at 431, and "courts in this district

21   have often assumed, without deciding, that Daubert and Rule 702

22   apply at the class certification stage.  Set Cap v. Credit

23   Suisse, 2023 WL 2535175, at *3 (S.D.N.Y Mar. 16, 2023),

24   reconsideration denied, 2024 WL 895084 (S.D.N.Y. Mar. 1, 2024).

25   Plaintiffs argue that the expert testimony should be

freely admitted because, in the context of a bench trial,

there's no possibility of prejudice" -- that's in ECF number

308, which I'm going to call plaintiffs' expert opposition, at

page 7, quoting Victoria's Secret v. Sexy Hair, 2009 WL 959775,

at *8, note 4 (S.D.N.Y. Apr. 8, 2009) -- and that the court

need not "gate-keep expert testimony from itself."  That's at

the same page quoting Matter of Manhattan by Sail, Inc., 436

F.Supp.3d 803, 810 (S.D.N.Y. 2020).

        I agree that the Court, as fact finder, could

allocate the appropriate probative value to dubious expert

testimony, but I am still entitled to conduct a Daubert

analysis to determine whether the expert testimony may be used

to establish the class certification requirements.  Indeed,

"Courts in the Second Circuit regularly subject expert

testimony to Daubert's rigorous standards insofar as that

testimony is relevant to the Rule 23 class certification

analysis."  In re Kirkland Lake, 2024 WL 1342800, at *2

(S.D.N.Y Mar. 29, 2024).  "A court could delay a Daubert

determination and consider all the testimony proffered, but

even if it chose to do that, that does not mean that a court

can rely on inadmissible evidence in making its ultimate

determination."  Chen-Oster, 114 F.Supp.3d 115.

        I elect to apply a Daubert analysis to the reports

here, consistent with other courts in this Circuit that have

conducted a full Daubert analysis at the class certification

stage.  Oliver v. American Express, 2024 WL 100848, at *3

(E.D.N.Y. Jan. 9, 2024), amended in part on other grounds, 2024

WL 217711 (E.D.N.Y. Jan. 19, 2024); see In re Kirkland Lake, at

*2, but I am mindful that the "analysis is cabined by its

purpose at this stage; the inquiry is limited to whether or not

the expert reports are admissible to establish the requirements

of Rule 23.  Chen-Oster at 115.  And even if I did not apply

Daubert, the concerns that animate it would drive my decision

as to what weight, if any, to give to the expert opinions.

       Defendants do not contest the experts' qualifications

and I find they are sufficiently qualified.  Defendants move to

exclude the opinions and testimony of the two experts, however,

on the grounds that their opinions are not based on a reliable

methodology and are not relevant.  "When dealing with

challenges to the reliability of scientific evidence, the court

must focus on the methodology that the experts used to draw a

conclusion and not on the conclusion itself."

Deutsch v. Novartis, 768 F.Supp.2d 420, 425 (E.D.N.Y. 2011).

       Daubert enumerated a list of factors that, although

not constituting a definitive checklist or test, a district

court might consider in evaluating whether a proffered expert

opinion has the required indicia of scientific reliability, and

they are whether a theory or technique had been or could be

tested, whether it had been subjected to peer review, its error

rate and its degree of acceptance within the relevant

scientific community.  Daubert at 593-94.  These factors "may
or may not be pertinent in assessing reliability, depending on
the nature of the issue, the expert's particular expertise and
the subject of his testimony."  Kumho Tire v. Carmichael, 526
U.S. 137, 150.

In cases like this, where the Daubert factors do not
fit easily because the testimony is based on the expert's
personal experience, it instead makes sense to assess
reliability based on how the expert's experience leads to her
conclusions, why that experience is a sufficient basis, and how
the experience reliably applies to the facts.
Abdelsayed v. NYU, 2023 WL 4705999, at *5 (S.D.N.Y. July 24,
2023); see Passman at 431.

"When an expert opinion is based on data, a
methodology, or studies that are simply inadequate to support
the conclusions reached, Daubert and Rule 702 mandate the
exclusion of that unreliable opinion testimony."  Amorgianos v.
National Railroad Passenger Corp., 303 F.3d 256, 266; see
Joiner, 522 U.S. at 146, which said, "Nothing in either Daubert
or the Federal Rules of Evidence requires a district court to
admit opinion evidence which is connected to existing data only
by the ipse dixit of the expert.  A court may conclude that
there is simply too great an analytical gap between the data
and the opinion proffered."  So "expert testimony should be
excluded if it amounts to and apples-and-oranges comparison"

1    and "otherwise qualified experts may not simply offer

2    conclusory opinions."  Abdelsayed at 5.

3          On the other hand, a minor flaw in an expert's

4    reasoning or a slight modification of an otherwise reliable

5    method will not make the opinion per se inadmissible and should

6    only be excluded if the flaw is large enough that the expert

7    lacks good grounds for the conclusions.  Amorgianos at 267.

8    But where an expert opinion is speculative or based on an

9    unsupported and inaccurate interpretation of the record

10   evidence, it may be excluded.  Houser v. Norfolk Southern, 264

11   F.Supp.3d 470, 477-78 (W.D.N.Y. 2013), collecting cases; see

12   Macaluso v. Herman Miller, 2005 WL 563169, at *8 (S.D.N.Y. Mar.

13   10, 2005), where the expert's analysis was excluded because it

14   was based on incorrect factual assumptions that rendered the

15   subsequent conclusions speculative.

16         I'm going to start with the report of Melodie Peet.

17   She has 40 years of experience in mental health, including as a

18   mental health services provider and a state mental health

19   administrator, and she was asked to examine whether the New

20   York State Office of Mental Health, or OMH, and the New York

21   Department of Corrections and Community Services, or DOCCS,

22   adequately serve New York State residents with SMI who are

23   homeless and/or at risk of homelessness and reach their release

24   dates or are released from DOCCS, which she calls the relevant

25   population, and I'll call the relevant population.  See her

1    report, which is ECF number 287-1, at pages 1-3.  She was also

2    asked to opine on whether OMH and DOCCS provide adequate

3    CBMHHSS to the relevant population upon their release.

4          To make her determinations, she reviewed professional

5    literature that addresses mental health strategies for formerly

6    incarcerated people, OMH plans and data reports, New York

7    County local services plans, or LSPs, which are developed by

8    local governments and submitted annually to OMH, and data from

9    DOCCS.  See her report at 4.  She also reviewed best practices

10    reports from the Substance Abuse and Mental Health

11    Administration, which is part of the U.S. Department of Health

12    and Human Services, and the National Association of State

13    Mental Health Program Directors, documents prepared by

14    organizations addressing homelessness in New York, the report

15    of plaintiffs' other expert, Dr. Robert Factor, and the

16    declaration of Seth Crider, an e-discovery data science advisor

17    at plaintiffs' firm, Paul Weiss, who provided findings as to

18    the population of each proposed class.

19          She concluded that OMH and DOCCS do not adequately

20    serve the relevant population and that, while Services exist,

21    they do not exist in sufficient quantities, causing members of

22    the relevant population to be released in settings without

23    sufficient or appropriate Services.  She determined that OMH

24    fails to allocate enough funding and resources to ensure

25    adequate Services and fails to develop a proper and uniform

management structure across counties based on best-practices data.  She further determined that DOCCS has contributed to this failure by failing to develop a strategic plan ensuring that the relevant population can access Services at the time of their release.  That's in her report at page 2.

She relies on several determinations to conclude that OMH has failed to maintain and provide adequate Services. First, she explains that, although OMH has a strategic framework stating that its principles are providing housing for individuals with mental illness, making community-based recovery a reality, and improving safety, re-entry, recovery and connections to care, OMH has failed to define the safety-net services necessary to meet the needs of the relevant population.  That's at page 15.  She says that, through her experience of managing large public mental health systems, she has learned that there are five safety-net services that are most effective for transition from institutions to communities: (i) supported housing, (ii) assertive community treatment, or ACT, and Forensic Act, or FACT, teams, (iii) a comprehensive continuum of crisis services, (iv) medication management, and (v) brief inpatient care.  See pages 16-17.  She further states that OMH must maintain services at an adequate capacity such that "it is OMH's responsibility to ensure that no person from the relevant population is left at any point without access to CBMHHSS at the time of their need" and that "it is contrary to

1    OMH's responsibility and its express commitment for ...

2    individuals to be turned away, denied or placed on a waiting

3    list for Services due to OMH's failure to ensure that these

4    services exist in sufficient quantity."  That's at page 7.

5            Defendants refer to Peet's opinions as the "Peet

6    Prison Release Adequacy Standard." Specifically, defendants

7    state that, under Peet's standard, "the State must reallocate

8    its mental health resources in order to guarantee that each

9    person with SMI who has been convicted of crimes receives each

10   element of this array of housing and services on the first day

11   of his release from prison with no wait time for any housing

12   placement or service."  That's in defendants' memorandum at

13   pages 3-4.  Peet evaluates the existence of the five safety-net

14   services within the OMH system by reviewing LSPs submitted by

15   several counties, including the home counties of the named

16   plaintiffs, from 2019, 2020 and 2021, in which the counties

17   identified housing, additional ACT teams and more intensive

18   case management as needs.  That's at pages 22-31.  The LSP

19   reports discuss Services for people with SMI in general and are

20   not specific to the relevant population here.  Peet describes

21   the LSPs as the counties' "complaints" of the lack of Services

22   for people with SMI, including the relevant population, and she

23   determines that, while inpatient treatment is adequately funded

24   by OMH, "OMH has failed to adequately plan, develop and fund

25   the first four components for the relevant population."  That's

1    at pages 21-22.  She opines that OMH has failed to address the

2    counties' reports and, therefore, Services are not available in

3    sufficient quantities for the relevant population -- that's at

4    pages 31-32 -- that OMH lacks a sufficient management structure

5    to oversee the counties and agencies that administers

6    Services -- that's at pages 32-35 -- that OMH has failed to use

7    data to develop and allocate adequate Services -- that's at

8    pages 36-37 -- and that OMH has failed to engage in longterm

9    planning.  That's at 37-39.  Finally, she concludes that the

10   main driver of OMH's failure to provide adequate Services is

11   its failure to effectively fund them.  That's at pages 40-41.

12            Turning now to the reliability of Peet's methodology.

13   Defendants argue that it is deeply flawed and unreliable

14   because she decided, without any basis and apart from any

15   reliable research or industry standard, that Services are

16   inadequate unless they meet the Peet Prison Release Adequacy

17   Standard and guarantee that each individual receives all needed

18   housing and Services upon release with no wait time.  That's in

19   defendants' brief at 15-16.  They go on to argue that, while

20   she testified that her standard of adequacy is based on 40

21   years of experience, it is not because she failed to achieve or

22   even recommend that such a standard be applied when she worked

23   in Connecticut and Maine State Governments.  They also argue

24   that even if she had a reliable methodology, she's failed to

25   reliably apply it to the facts here because her conclusion is

1    based on the LSPs, which report a general continuing demand for

2    Services and funds for people with mental illness, but which

3    she interprets as complaints.  And, finally, they argue that

4    Peet did not opine on how New York might financially and

5    practically achieve her standard of adequacy and that her

6    opinions are not relevant because that standard has nothing to

7    do with whether defendants have a specific practice of

8    statewide discrimination against all members of the proposed

9    classes.  See pages 15-19.

10           Plaintiffs, in opposition, argue that Peet's standard

11   is supported by guidance from the National Association of

12   Mental Health Directors and the Substance Abuse and Mental

13   Health Administration and by defendants' own mandate and that

14   whether Peet implemented or even attempted to implement the

15   standard in Maine and Connecticut is irrelevant.  That's in

16   plaintiffs' expert opposition, which is ECF 308, at page 12.

17   They also argue that financial feasibility is an issue for the

18   merits stage, not class certification, and that the LSPs show

19   the counties' specific demands based on concrete variables.

20   That's in their opposition at pages 10-14.  Plaintiffs also

21   rely on a handful of cases to argue, as discussed earlier, that

22   the expert testimony should be freely admitted where no jury is

23   involved, but, as I've mentioned above, the weight of authority

24   is that Daubert does apply at this stage.

25           Peet's report indeed reflects that her conclusions

are based on the evaluation of the five Services she identifies

as the most effective, and while there is support in her report

for the opinion that these five Services are effective for

assisting people with SMI in transitioning from institutions to

the community, the part for which there is no support is the

opinion that for every such person transitioning from prison,

each of those Services must be guaranteed in full on day one.

Plaintiffs generally argue that the standard is supported by

the guidance from the National Association of Mental Health

Directors and the Substance Abuse and Mental Health

Administration, but Peet's expert report does not cite to any

such guidance, nor does it reflect that her standard of

adequacy has been or can be tested; that it has been subject to

peer review or that it is accepted in the relevant community.

See Daubert at 593-94.  She cites to no portion of any research

or report that endorses her understanding of adequate services

of the relevant population as meaning that every releasee is

guaranteed, from the moment of release, community-based mental

health housing and every kind of support service that person

needs with no wait list or other constraint based on

insufficient quantity.  See her report at 7.  Indeed, she

states in the report that she has come up with this standard

based on her experience.  When a methodology is based on

experience, however, the expert must explain how that

experience leads to the conclusion, why it is a sufficient

1    basis for the opinion, and how the experience is reliably

2    applied to the facts.  See Passman at 431.  Here, Peet has

3    failed to explain how her experience supports that standard,

4    which is perhaps not a surprise, as she conceded in her

5    deposition that she is aware of no government in the country or

6    the world that has implemented such a standard.  See her

7    deposition, which is ECF number 305-1, at pages 38, 42 and 45.

8              Further, her evaluation of the LSPs as the basis of

9    her conclusion does not provide a sufficient methodology for

10   the conclusion that OMH has failed to adequately serve the

11   relevant population.  The LSPs report on what the counties are

12   doing and what resources they wish they had to provide Services

13   for residents of the county.  There is a disconnect between

14   Peet's report and the facts of this case because the LSPs cite

15   requests for funding generally as opposed to requests for

16   funding to serve the population that is relevant here.  It does

17   not necessarily follow from the fact that counties desire and

18   need more resources for Services for residents with SMI that

19   OMH has failed to adequately serve the relevant population of

20   released prisoners.  Peet's consideration of evidence that is

21   not specific to how OMH handles the relevant population does

22   not cast much light on the question of whether defendants have

23   discriminated against the relevant population by failing to

24   administrator Services.

25              Plaintiffs argue that defendants' arguments go to the

1    weight of Peet's report rather than its admissibility, and if I

2    agreed, I would give little weight to the opinions, but, here,

3    Peet has used a novel methodology and while standing alone,

4    novelty is not a sufficient basis for exclusion of a proposed

5    expert methodology, Davis v. Carroll, 937 F.Supp.2d 390, 415

6    (S.D.N.Y. 2013), her methodology is based on her experience

7    without an explanation of how that experience is sufficient or

8    reliably applied to the facts.  Passman at 431.  Her conclusion

9    must rest on a reliable foundation and be relevant to the task

10   at hand.  Davis at 418.  But her view that anything less than

11   one-hundred percent of all services on day one is inadequate

12   seems to be connected to existing data only by her say-so.

13   There is "simply too great an analytical gap between the data

14   and the opinion proffered."  Joiner at 146.

15           Having found that her opinions as to the adequacy of

16   OMH's provision of Services to the relevant population falls

17   short of this standard, I will not consider that opinion.  But

18   I will consider some parts of Peet's report which are supported

19   by a review of literature and documents, including the summary

20   and explanation of OMH's and DOCCS' responsibilities, the

21   description of OMH's programs and strategic framework, the

22   description of various safety-net services and the description

23   of LSPs.  See pages 6-31 of the Peet report.

24           I also consider Peet's opinion, based on statistics,

25   and apparently shared by OMH, that New York legislators direct

1    too much funding to inpatient care as compared to other states,

2    over 50 percent of its mental health expenditures compared to

3    24 in other states, leaving community services underfunded.

4    That's at pages 40-41.

5            Defendants argue that Peet's report is not relevant

6    or helpful to the Class certification issues because her

7    adequacy standard has nothing to do with the legal standards

8    that actually apply in this case.  That's in defendants' expert

9    brief at 19.  Specifically, they argue that the report is not

10   relevant to commonality because it does not help resolve

11   whether plaintiffs have provided evidence of a specific

12   practice of statewide discrimination.

13           I am disregarding Peet's adequacy standard, but her

14   description of OMH's and DOCCS' responsibilities, OMH's

15   programs, the LSPs and OMH's funding of Services are helpful to

16   the Court in understanding the roles of the two agencies and in

17   evaluating the extent to which the evidence does or does not

18   show those agencies' responsibilities for the classes not

19   getting CBMHHSS.  So I'll consider Peet's report only as

20   limited.  I'm not going to do sort of a paragraph-by-paragraph

21   analysis as I might if she would be testifying in front of a

22   jury.

23           Now turning to the Factor report.  Robert Factor is a

24   psychiatrist who's been Board certified for almost 40 years and

25   has worked in mental health services as a medical director.  He

was asked to opine on the relationship between the provision of

CBMHHSS and reinstitutionalization for people with SMI upon

their release from prison and on whether OMH provided the three

named Discharge Plaintiffs, W.P., D.H. and S.D., with adequate

Services and, if not, whether the failure to do so has put them

at serious risk of reinstitutionalization.  See the Factor

report, which is ECF 286-1, at pages 1-2.

Based on a literature review, he concluded that there

are several elements necessary to support those in the relevant

population and that a lack of Services increases the risk of

hospitalization or incarceration.  That's at pages 4 and 11-17.

He then concluded, based on a review of mental health records,

deposition transcripts, interviews and his experience, that the

named Discharge Plaintiffs -- in other words, those three whose

initials I named earlier -- were denied stable housing and

other services and, therefore, put at serious risk of

reinstitutionalization.  That's at page 18.

Defendants argue that Factor's methodology is

insufficient because he does not answer the threshold question

of what Services the plaintiffs actually received and,

therefore, cannot opine on whether they were appropriate.

Defendants further argue that Factor did not use the evidence

produced in discovery to verify the accuracy of the information

that the named Discharge Plaintiffs provided him in interviews.

And, finally, they argue that his opinions are not relevant to

1    class certification because his opinions as to the named

2    Discharge Plaintiffs are merely anecdotal and do not help to

3    establish commonality or typicality, especially because he

4    concedes that all three plaintiffs were difficult to place due

5    to their histories of violent conduct.  See pages 8-14 and

6    17-20 of defendants' brief.

7         Plaintiffs argue that Factor employed reliable

8    methodologies because he reviewed over 12,000 pages of mental

9    health records and applied them along with his experience to

10   conclude that the plaintiffs were placed at serious risk of

11   institutionalization.  They also argue he had no reason to

12   discredit the information he got in the interviews and that he

13   did not have to list every Service plaintiffs received in order

14   to conclude that the Services were inadequate.  Finally, they

15   argue that his finding that those who receive Services are less

16   likely to be hospitalized or institutionalized is relevant to

17   showing commonality and that his finding that the named

18   Discharge Plaintiffs were placed at serious risk of

19   institutionalization due to the lack of services is relevant to

20   commonality and typicality.  See plaintiffs' expert opposition

21   brief at 15, 17 and 19-20.

22        The first half of Dr. Factor's report is sufficiently

23   reliable as he combines his experience with a literature review

24   to conclude that a lack of community services and housing

25   increases the likelihood of hospitalization or incarceration

among people released from prison with SMI.  I am not sure that

that required 14 single-spaced pages as it seems like common

sense, but literature review is a recognized methodology

accepted in the medical community and I will, therefore,

consider the first half of Dr. Factor's report in the class

certification analysis to the extent it is relevant to

commonality because it opines on the relationship between the

lack of Services and the risk of reinstitutionalization.

          The second half of the report is more tenuous.

Defendants argue that Factor did not properly determine the

Services that were actually provided to each named Discharge

Plaintiff nor adequately consult the relevant records to

determine whether plaintiffs were indeed not provided with

Services they said they were not provided.  As a result,

defendants raised several inconsistencies between the report

and the reality as to the CMBHHSS plaintiffs were offered and

received.  See their brief at 8-14.

          As to W.P., Dr. Factor concluded that he is at

serious risk of reinstitutionalization because the State did

not provide stable housing, access to a single-occupancy

residence, access to crisis services with outreach available

24/7, re-enrollment for SSI benefits or peer support, at least

during the pandemic.  That's in Factor's report at 19.

Defendants contend that this conclusion is inaccurate because

W.P. received FACT team services, which are considered the gold

1    standard, and that, although Dr. Factor opines that the

2    Services were not sufficient because W.P. allegedly said he did

3    not feel he could reach them 24/7, Dr. Factor never contacted

4    the FACT team to confirm whether they provided 24/7 crisis

5    services.  That's in his deposition, ECF number 295-71, at

6    pages 37-38.  As to peer support, Dr. Factor said that W.P.

7    told him he did not receive it, but upon being shown some

8    records he had not reviewed, he conceded that W.P. appears to

9    have had meetings with peer specialists during COVID.  See

10   pages 57 and 55.  As to housing, W.P. was offered stable

11   housing, but said he would reject any housing that was shared.

12   Continuing efforts to house him failed because, at one

13   interview, he objected to the provider's rule about guests and,

14   at another, he objected as to how the provider would be listed

15   as the payee on benefit documents.  These facts are summarized

16   in defendants' expert memo at 10-11 and note 9.  Dr. Factor

17   conceded that he did not know of these instances or of the

18   continuing efforts made to house W.P.  See his transcript at

19   82-83.

20           Regarding S.D., Dr. Factor reported that S.D. was

21   placed at serious risk of reinstitutionalization because he was

22   not offered stable, single-occupancy housing and, rather, was

23   placed in a homeless shelter, he was not re-enrolled in SSI

24   benefits, he had an ACT's team upon release, but was not

25   engaged in substance abuse treatment integrated with mental

1   health treatment, and he did not receive peer support.  That's

2   the Factor report at 24-25.  Defendants argue, at pages 11-12,

3   that, to the contrary, S.D. received FACT Services and was

4   offered stable housing, but was extremely difficult to place

5   because of his history of violent conduct.  Indeed, in his

6   deposition, Factor concedes that he did not review all of the

7   records related to S.D.'s FACT Services, the first one of which

8   would have revealed that S.D. received substance abuse

9   treatment at his first FACT meeting.  See the transcript at 60

10  and 66-69.  Additionally, Factor concedes that S.D. was

11  referred to eight housing placements, but rejected from seven

12  and waitlisted at one because of violent history.  See pages

13  91-92 and 94-96.  Further, although Factor stated that S.D.'s

14  risk of reinstitutionalization was ultimately realized when he

15  was arrested in 2020 and re-incarcerated in 2022, he concedes

16  in his deposition that S.D. was ultimately re-incarcerated

17  because he was hospitalized after refusing to take injectable

18  medications and ceasing to take his oral medications and that,

19  while there, he assaulted another patient.  See pages 101-103.

20          As to D.H., Dr. Factor concluded that he was not

21  offered engagement with ACT, stable housing, access to 24/7

22  crisis services, Medicaid and SSI benefits, substance abuse

23  treatment or peer support.  See the report at 21-23.

24  Defendants point out, however, that D.H. in fact received

25  supportive services from multiple sources and was successfully

placed in community-based mental health housing, but was kicked

out because he began to use drugs in violation of the house

rules.  He was also placed in substance abuse treatment

programs, but ultimately refused to participate and was kicked

out multiple times.

In spite of these inconsistencies, plaintiffs argue

that Dr. Factor employed reliable methodologies because he

reviewed over 12,000 pages of medical records, the named

plaintiffs' depositions and his interviews of them as well as

academic studies and other materials and that defendants have

just cherry-picked documents that Factor did not rely on.

That's in their brief at 15-16.  Plaintiffs further argue, at

17, that the discrepancies do not mean that the named Discharge

Plaintiffs were provided adequate Services.  But that is not

the question at this stage.  The question is whether Dr. Factor

reliably applied the data to reach his conclusions or whether

inaccurate interpretation of the record rendered his opinions

insufficiently connected to the data.

"It is critical that an expert's analysis be reliable

at every step." Passman at 431.  "In assessing reliability,

courts should consider the indicia of reliability identified in

Rule 702; namely, (1) that the testimony is grounded on

sufficient facts or data; (2) that the testimony is the product

of reliable principles and methods; and (3) that the witness

has applied the principles and methods reliably to the facts of

the case." Lickteig v. Cerberus Capital, 589 F.Supp.3d 302, 330
(S.D.N.Y. 2022).

Here, the second half of Dr. Factor's report falls
short at the first consideration, whether the testimony is
grounded on sufficient facts or data.

As to all three named Discharge Plaintiffs, it
appears Dr. Factor did not consider the totality of the
Services they received before concluding that those Services
were not adequate.  See transcript at 22.  Nor does it appear
that selective review of available data is a reliable method.
As a result, I do not consider Dr. Factor's opinion that the
named Discharge Plaintiffs have been placed at risk of
institutionalization due to lack of Services and stable
housing.

So the motion to exclude is granted in part and
denied in part as described above.

Turning now to the class certification motion.

Class action is an exception to the usual rule that
litigation is conducted by and on behalf of the individual
named parties only.  Wal-Mart v. Dukes, 564 U.S. 338, 348.  "To
come within the exception, a party seeking to maintain a class
action must affirmatively demonstrate his compliance with Rule
23.  Comcast v. Behrend, 569 U.S. 27, 33, quoting Wal-Mart at
350.  See In re IPO, 471 F.3d 24, 41, clarified on other
grounds, 483 F.3d 70.  "Rule 23 does not set forth a mere

1    pleading standard." Wal-Mart at 350. "The party seeking class

2    certification bears the burden of establishing by a

3    preponderance of the evidence that each of Rule 23's

4    requirements has been met," Meyers v. Hertz, 624 F.3d 537, 547,

5    and must submit "enough evidence by affidavits, documents or

6    testimony to establish that each Rule 23 requirement has been

7    met." In re IPO at 41.

8         When presented with a motion for class certification,

9    "a district judge must assess all of the relevant evidence

10   admitted at the class certification stage and determine whether

11   each Rule 23 requirement has been met, just as the judge would

12   resolve a dispute about any other threshold prerequisite for

13   continuing a lawsuit." In re IPO at 42. "This assessment

14   necessarily entails the resolution of factual disputes relevant

15   to each Rule 23 requirement, an obligation that is not lessened

16   by overlap between a Rule 23 requirement and a merits issue,

17   even a merits issue that is identical with a Rule 23

18   requirement." In re LIBOR, 299 F.Supp.3d 430, 458 (S.D.N.Y.

19   2018), quoting In re IPO at 41; and Wal-Mart at 351, which

20   noted that the "rigorous analysis" of the Rule 23 requirements

21   "will entail some overlap with the merits of the plaintiff's

22   underlying claim"; see also Lapin v. Goldman Sachs, 254 F.R.D.

23   168, 174 (S.D.N.Y. 2008), noting that the Circuit in In re IPO

24   departed from the old standard where the proposed lead

25   plaintiff needed only to make "some showing" that Rule 23 was

1    met and also departed from the standard that courts, in

2    reviewing a motion for class certification, needed to accept

3    the allegations in the pleadings as true and avoid a

4    preliminary inquiry into the merits.

5            But "a district judge should not assess any aspect of

6    the merits unrelated to a Rule 23 requirement," In re IPO at

7    41, as "the question is not whether plaintiffs have stated a

8    cause of action or will prevail on the merits, but, rather,

9    whether the requirements of Rule 23 are met.  In re

10   Doria/Memon, 2017 WL 4541434, at *3 (S.D.N.Y. Oct. 10, 2013);

11   see Amgen v. Connecticut Retirement Plans, 568 U.S. 455, 463,

12   which said, "Rule 23 grants courts no license to engage in

13   free-ranging merits inquiries at the certification stage.

14   Merits questions may be considered to the extent, but only to

15   the extent, that they are relevant to determining whether the

16   Rule 23 prerequisites for class certification are satisfied."

17           Civil Rule of Procedure 23(a)(1)-(4) sets out the

18   four requirements for class certification.  Certification is

19   only appropriate where (1) the class is so numerous that

20   joinder of all members is impracticable; (2) there are

21   questions of law or fact common to the class; (3) the claims or

22   defenses of the representative parties are typical of the

23   claims or defenses of the class; and (4) the representative

24   parties will fairly and adequately protect the interests of the

25   class.

1          In addition, courts have recognized an additional

2     implied requirement that there be an identifiable or

3     ascertainable class.  See In re Petrobras, 862 F.3d 250, 264;

4     and Fears v. Wilhelmina, 2003 WL 21659373, at *2 (S.D.N.Y. July

5     15, 2003).  In other words, the class that plaintiffs seek to

6     certify must be readily identifiable so that the court can

7     determine who is in the class and, thus, who is bound by the

8     action.  See Dunnigan v. Metro. Life, 214 F.3d 125, 135; and

9     People United for Children v. City of New York, 214 F.3d 252,

10    256 (S.D.N.Y. 2003).

11         If the requirements of Rule 23 are met, the court

12    must then decide whether the class complies with one of the

13    subsections of Rule 23(b).  Here, plaintiffs submit that their

14    classes satisfy Rule 23(b)(2), which requires a plaintiff to

15    show that the party opposing the class has acted or refused to

16    act on grounds that apply generally to the class so that final

17    injunctive relief or corresponding declaratory relief is

18    appropriate respecting the class as a whole.

19         As set forth in their motion and refined in their

20    reply, the named plaintiffs move to certify three classes:

21         One:  A General Class consisting of persons (1)

22    housed or who will be housed in state prison; (2) with SMI; (3)

23    whose open dates for parole release, approved conditional

24    release dates or maximum expiration dates have passed; (4) who

25    are not subject to residency restrictions under the Sexual

1    Assault Reform Act; (5) who are eligible and appropriate for

2    CBMHHSS; and (6) who are not released because of a lack of

3    CBMHHSS.

4            Second:  A residential treatment facilities, or RTF,

5    Subclass of the General Class consisting of persons (1) housed

6    or who will be housed in state prison pursuant to Penal Law

7    Section 70.45 or Correction Law Section 73; (2) who have SMI;

8    (3) whose maximum expiration dates have passed; (4) who are not

9    subject to residency restrictions under the Sexual Assault

10   Reform Act; (5) who are eligible and appropriate for CBMHHSS;

11   and (6) who were not released because of a lack of CBMHHSS

12   community-based services.

13           And by the way, Penal Law Section 70.45 relates to

14   determinant sentences and Correction Law 73 relates to RTF

15   placement.

16           Third:  A Discharge Class consisting of all persons

17   (1) with SMI; (2) who are and will be appropriate for and

18   desire CBMHHSS upon release from state prison; (3) who, upon

19   their release, do not receive such services; and (4) who reside

20   in segregated settings or are at serious risk of becoming

21   institutionalized.

22           See plaintiffs' class certification memorandum, which

23   is ECF 272, and their reply, which is 304.  I'm sorry.  The

24   cert. memorandum at 1 and the reply, which is ECF 304 at 15.

25           Starting with numerosity, that is satisfied where the

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    class is so numerous that joinder of all members is

2    impracticable under Rule 23(a)(1).  Impracticable does not mean

3    impossible, and plaintiffs don't even have to precisely

4    quantify the class as long as they reasonably estimate the

5    number of potential class members.  Hilton v. Wright, 235

6    F.R.D. 40, 51 (N.D.N.Y 2006).  "Generally speaking, courts will

7    find that the numerosity requirement has been satisfied when

8    the class comprises 40 or more members and will find that it

9    has not been satisfied when the class comprises 21 or fewer."

10   Ansari v. NYU, 179 F.3d 112, 114 (S.D.N.Y. 1998); see

11   Siler v. Landry's Seafood, 2014 WL 2945796, at *2 (S.D.N.Y.

12   June 30, 2014), collecting cases.  But there's no magic minimum

13   number and courts have certified classes with as few as 14

14   people.  U.S. Fidelity & Guaranty v. Madison Financial, 2002 WL

15   31731020, at *6 (S.D.N.Y. Dec. 4, 2002).  The numerosity

16   inquiry is not strictly mathematical, but also takes into

17   account the context of the particular case, in particular

18   whether a class is superior to joinder based on other factors,

19   including judicial economy, geographic dispersion, financial

20   resources, the ability to sue separately, and requests for

21   injunctive relief that would involve future class members.

22   Pennsylvania Public School Employees Retirement

23   System v. Morgan Stanley, 772 F.3d 110, 120, as amended.

24   Nonetheless, although evidence of exact size or identity of

25   class members is not required, evidence of numerosity is

required, and where assertions of numerosity are based on pure

speculation or bare allegations, the motion will fail.

Zirogiannis v. National Recovery Agency, 2015 WL 13735000, at

*1 (E.D.N.Y. Dec. 11, 2015).

Where the class seeks injunctive and declaratory

relief under Rule 23(b)(2) as opposed to monetary relief under

23(b)(3), the Circuit has relaxed the numerosity requirement.

Nicholson v. Williams, 205 F.3d 92, 98 (E.D.N.Y. 2001); see

Abdi v. Duke, 323 F.3d 131, 140 (W.D.N.Y. 2017).  Further, "the

fluid composition of a prison population is particularly

well-suited for class status because, although the identity of

the individuals involved may change, the nature of the wrong

and the basic parameters of the group affected remain

constant."  Abdi v. Duke at 140.  Accordingly, numerosity is

often met in the prison context.  Raymond v. DOCCS, 539

F.Supp.3d 327, 336-37, (N.D.N.Y. 2022).

Plaintiffs argue that joinder is impracticable

because all members are people with SMI who are indigent and

homeless or at risk of homelessness and who are unlikely to be

able to initiate separate actions for injunctive relief on

their own behalf, members of the classes are geographically

dispersed in different prisons and released to many different

counties, and judicial economy favors class certification to

avoid multiple lawsuits with inconsistent holdings.  That's in

their class cert. brief at 21.  Further, they argue that even

1    if the Court finds these factors alone do not satisfy

2    numerosity, each class is sufficiently large to warrant class

3    treatment because they include those who satisfy the class

4    definitions from the time of filing to the present despite what

5    they characterize as defendants' effort to moot the prolonged

6    incarceration claims by releasing class members after the

7    complaint was filed.  That's in their brief at 22.

8            For the General Class, they provide evidence that at

9    least 393 individuals in the relevant population were held past

10    their release dates from January 2018 to September 2022.

11    That's at page 23, citing ECF number 285 at paragraph 15.  For

12    the RTF Subclass, they provide evidence that in January 2019,

13    there were 13 Subclass members with an additional 23

14    individuals being held through December 2019.  See pages 23-24.

15    Based on these assertions, the General and RTF Subclasses would

16    be sufficiently numerous.

17            By the way, plaintiffs also argue that 200 people in

18    the relevant population are in danger of prolonged

19    incarceration each year due to a lack of Services, citing ECF

20    number 274-31, which they number as Plaintiffs' Exhibits 92.

21    That's in their class cert. brief at 93 and note 125.  But I am

22    unable to understand whether this document shows as much and

23    neither side really explains it.

24            In any event, the Second Circuit has relaxed the

25    numerosity requirement in the injunctive and declaratory relief

1    contexts also weighs in plaintiffs' favor, as well as

2    considerations of judicial economy, geographic dispersion,

3    ability to sue separately and involvement of future class

4    members.

5            Defendants' arguments to the contrary are that the

6    General and RTF Subclass do not meet the numerosity requirement

7    because they target a DOCCS practice that ended on December

8    16th, 2019, all of the named plaintiffs were released from

9    prisons and RTF settings and plaintiffs have not shown that any

10   individuals are currently housed or will be housed in prison

11   beyond their release dates because of a lack of Services.

12   Thus, defendants argue in their class cert. opposition, which

13   is ECF 291, at page 40, that there's no evidence of current or

14   future class members.  Plaintiffs reply in their class cert.

15   reply, which is ECF 304 at pages 15-17, that defendants'

16   actions, policies and records contradict their representation

17   that prolonged incarceration entirely ceased in December 2019

18   and the representation that OMH will always provide housing for

19   class members upon release.

20           First, that the practice ended in December 2019 does

21   not mean that there is not a sufficient number of class members

22   who were housed past their release dates due to a lack of

23   Services.

24           Second, defendants' argument that the named

25   plaintiffs were released from prison and the RTF settings

1    alludes to an argument that class certification would be moot,

2    but courts, including the Second Circuit, have expressed

3    concern about defendants avoiding class action lawsuits by

4    mooting individual claims. See Crespo v. Carvajal, 2024 WL

5    1069888, at *4 (E.D.N.Y. Mar. 11, 2024). Relatedly, as

6    plaintiffs point out, I already ruled at the motion-to-dismiss

7    stage that the original named plaintiffs' claims are not moot

8    because plaintiffs have shown that the claims at issue are

9    inherently transitory and plaintiffs have not unduly delayed in

10    bringing the motion for class certification. See ECF 273-82 at

11    page 31.

12         Finally, there does not appear to be any impediment

13    to DOCCS changing its practice in the future. Plaintiffs argue

14    in their reply brief at pages 16-17 that the DOCCS' December

15    16, 2019 memorandum, found at ECF number 302-1, is a policy

16    that can be superseded. Indeed, the policy only states that if

17    OMH determines that an incarcerated individual with SMI may be

18    released from DOCCS custody to a shelter setting, DOCCS will

19    allow such release on the scheduled release date. Defendants

20    represent that this memorandum permanently ended the practice

21    of holding the proposed General Class and RTF Subclass members

22    beyond their eligible release dates until appropriate housing

23    could be identified -- that's at pages 2-3 and 8 of their

24    opposition -- and that DOCCS does not intend to reinstate the

25    pre-December 16, 2019 practice, also at page 8. But this

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    intention is not necessarily an impediment to DOCCS changing

2    its practice in the future for any number of reasons, including

3    if it again determines at any point that it is safer to retain

4    an incarcerated individual based on the view that, because of

5    the individual's presentation or history, the individual will

6    pose a safety risk if released to a shelter without another

7    suitable residence in place.  See their opposition at 7.

8            Accordingly, based on the evidence that plaintiffs

9    have provided, the fact that the case seeks injunctive and

10   declaratory relief, the nature, location and resources of the

11   class members and judicial economy, I find that numerosity is

12   satisfied as to the General Class and the RTF Subclass.

13           As to the Discharge Class, plaintiffs argue that it

14   is sufficiently numerous because from February 2019 to December

15   2021, hundreds of individuals eligible for Services were

16   released by DOCCS to homeless shelters, mental health shelters,

17   hotels, motels, and Department of Social Services.  For

18   support, they provide evidence that from February 2020 through

19   December 2021, 387 people in the relevant population were

20   released to such locations and that between February 2019 and

21   April 2021, the number was 686.  See their brief at 25-26 and

22   ECF number 25, which is the Crider declaration, at paragraphs

23   28 and 30-31.  They also provide evidence that the Discharge

24   Class is sufficient, including a document generated by OMH that

25   tracked housing locations upon release in 2020 and 2021.

1          By the way, plaintiffs' brief indicates that between

2     February 2020 and December 2021, 347 people were released to

3     the kinds of locations I've described, but I think that was a

4     typo because the Crider declaration, paragraph 28, says it's

5     387.  Either way, it's enough.

6          Defendants do not challenge plaintiffs' numerosity

7     argument as to the Discharge Class and, based on the evidence

8     plaintiffs have provided, I find numerosity is met as to that

9     class as well.

10         Turning now to commonality.  That requires plaintiffs

11    to affirmatively demonstrate by a preponderance of the evidence

12    that there are questions of law or fact common to the class.

13    Elisa W. v. City of New York, 82 F.4th 115, 122-23.  As the

14    Supreme Court clarified in Wal-Mart, commonality turns on the

15    ability of the action to generate common answers apt to drive

16    the resolution of the litigation.  Elisa W.  I don't have the

17    page number, but it's quoting Wal-Mart at 350.  Thus,

18    commonality exists if there is a glue that holds the claims

19    together such that the determination of the truth or falsity of

20    a question "will resolve an issue that is central to the

21    validity of each one of the claims in one stroke." Wal-Mart at

22    352.  Claims for relief don't have to be identical for them to

23    be common.  The rule simply requires that there be issues, the

24    resolution of which will affect all or a significant number of

25    the putative class members.  And where the same conduct or

1    practice by the same defendant gives rise to the same kind of

2    claim from all class members, there is a common question.

3    Johnson v. NEXTEL, 780 F.3d 128, 137-38.

4             Plaintiffs argue that defendants harm each class by

5    failing to adequately administrator Services and that the

6    common legal question is whether the ADA and Rehabilitation Act

7    require defendants to ensure that people with SMI who are

8    homeless or at risk of homelessness are released from state

9    prisons into the most integrated setting appropriate for their

10   needs upon their release.  That's in plaintiffs' class cert.

11   memo at 27.  They argue that each class' claim can be resolved

12   in one stroke because they seek a permanent injunction

13   requiring defendants to provide adequate Services to inmates

14   upon release.  Specifically, they argue that the General Class

15   and RTF Subclass suffer the common harm of being held in prison

16   or an RTF status equivalent to imprisonment past their release

17   dates due to a lack of Services and that the Discharge Class

18   suffers a common harm of unnecessary segregation and risk of

19   reinstitutionalization when Services are unavailable on their

20   release date.  See pages 28-30.

21            The commonality analysis is twofold.  First, the

22   Court must determine whether the policies or practices that

23   plaintiffs allege support a finding of commonality and, second,

24   the Court must determine whether plaintiffs have submitted

25   sufficient evidence to support those allegations.  Elisa W. at

1    127.

2         Starting with the allegations, defendants argue that

3    the commonality requirement is not met as to the Discharge

4    Class because placement is decentralized and multiple actors,

5    including county Single Point of Access Committees, or SPOAs ,

6    and local nonprofits are involved in the placement process;

7    therefore, making it impossible to determine why each member

8    has not received Services without having a mini trial on each

9    placement.  That's in defendants' class cert. opposition brief

10   at 27.  Plaintiffs have made clear, however, that they are not

11   attacking individual decisions of SPOA committees or local

12   housing nonprofits, but, rather, are attacking the alleged

13   failure by OMH to administer its programs and funds in a way

14   that provides sufficient CBMHHSS for prisoners leaving custody.

15   Plaintiffs' arguments are, therefore, similar to those advanced

16   in Elisa W., a case challenging how the New York Administration

17   of Children's Services administered the foster care program in

18   locating permanent homes for children, "where the plaintiffs'

19   claims turned not on the cause of permanency delays for any

20   particular child, but on whether ACS' practices lead to

21   permanency delays, thereby placing all foster children at an

22   unreasonable risk of harm." 82 F.4th at 126.  The allegations

23   are also, therefore, unlike Taylor, on which defendants rely,

24   because, there, individual decisions about reduction or

25   termination of Medicaid benefits were being challenged.  See

Taylor v. Zucker, 2015 WL 4560739, at *11-12 (S.D.N.Y. July 27, 2015).

Factual differences among the claims do not preclude a finding of commonality.  Shepherd v. Rhea, 2014 WL 5801415, at *4 (S.D.N.Y. Nov. 7, 2014); see MKB v. Eggleston, 445 F.Supp.2d 400, 441 (S.D.N.Y. 2006).  Even if putative class members are not all affected by systemic deficiencies in the same way, commonality can be satisfied where the action alleges acts and omissions of the defendants that are not specific to any particular plaintiff.  See Brooklyn Center for the Independence of the Disabled v. Bloomberg, 290 F.R.D. 409, 418 (S.D.N.Y. 2012).

In Elisa W., 82 F.4th at 112-24, the Second Circuit held that the district court erred in determining that the commonality allegations were insufficient because the common questions were too broad and generalized, the allegations did not flow from unitary, nondiscretionary policies, and the significant role of other actors created dissimilarities that impeded the generation of a common answer.  Defendants' arguments to the same effect fail here.

Plaintiffs allege that defendants have a policy or practice of failing to make adequate Services available at the time the Discharge Class is released and that that violates the ADA and RA.  In short, the common injury is an inappropriate placement on release and the common question is whether

defendants have a practice of putting class members in
unjustified segregated settings or putting them at risk of
reinstitutionalization by releasing them to inappropriate
settings when they could be reasonably accommodated in an
integrated setting and whether this violates the ADA or the RA.
Put another way, the theoretical glue holding the classes
together is whether defendants have failed to make sufficient
CBMHHSS available to inmates upon release and, if so, whether
that results in their being in segregated settings or being in
placement that gives rise to a serious risk of
reinstitutionalization.

        Similar allegations have been found sufficiently
common.  In Kenneth R. v. Hassan, 293 F.R.D. 254, 267 (D.N.H.
2013), the court held that commonality was met because "whether
there is a systemic deficiency in the availability of
community-based services and whether that deficiency follows
from the state's policies and practices are questions central
to plaintiffs' theory of the case."  It further found that
common questions, "such as whether there is a systemic
deficiency in a core set of community-based mental health
services and whether this deficiency has placed class members
at serious risk of unnecessary institutionalization or
continued unnecessary institutionalization, are at a low enough
level of generality (or a high enough level of specificity) to
pass muster under Wal-Mart." Kenneth R. at 268.  Defendants

1    point out, correctly, as part of their attack on plaintiffs'

2    evidence of commonality that there are factual distinctions

3    between the program under attack in Kenneth R. and the program

4    under attack here, and I will turn to that momentarily, but

5    looking just at the allegations here, they suffice to meet the

6    first prong of the commonality test.

7            Turning to the second prong, the evidence prong,

8    defendants argue, as did the defendants in Elisa W., that

9    plaintiffs have not provided sufficient proof that defendants

10   harm the Discharge Class by failing to adequately plan, develop

11   and fund Services.  See defendants' class cert. opposition

12   brief at 27 and Elisa W. at 127, where the Circuit said,

13   "defendants alternatively argue that even if plaintiffs

14   sufficiently alleged the existence of a policy or practice that

15   exposed all children in foster care to a substantial risk of

16   harm, they failed to submit sufficient evidence to support

17   these allegations."

18           Specifically, defendants here argue that because the

19   placement process involves SPOAs and nonprofits that defendants

20   do not control and is also affected by the inmate's preferences

21   and decisions, evidence that given inmates did not get CBMHHSS

22   upon release does not amount to evidence that a common practice

23   of the defendants is responsible for that result.

24   Specifically, they argue that the experiences of the named

25   Discharge Plaintiffs are merely anecdotal and insufficient to

1    establish commonality; that plaintiffs' reliance on Peet's

2    report does not suffice because her conclusion that inmates

3    with SMI should be guaranteed CBMHHSS upon release ahead of

4    other citizens with SMI fails under Daubert; that the LSPs are

5    not complaints that OMH has failed to address, but, rather, a

6    part of a state information-gathering process and, in reality,

7    the State has spent hundreds of millions of dollars on

8    residential mental health programs; and that none of the

9    additional sources plaintiffs cite, including an email about an

10   RTF inmate, an affidavit regarding the need for more

11   transitional housing, and a spreadsheet showing where inmates

12   are released, provide significant proof of a centralized,

13   statewide refusal to provide Services.  That's in their brief

14   at 28-29.

15         In response, plaintiffs argue that Peet's report

16   shows the inadequacy of the system; that they have demonstrated

17   that defendants have a policy and practice of failing to make

18   adequate Services available; and that this failure is a

19   sufficient common question, the truth or falsity of which would

20   resolve issues central to the claims.

21         In Elisa W., the Second Circuit explained that the

22   district court should have "examined the expert report's

23   relationship to each of the plaintiffs' alleged common

24   practices ... considered other evidence plaintiffs offered to

25   support the existence and scope of certain alleged practices

1    ... and addressed the particular evidence relating to each of

2    the proposed common practices."  That's 82 F.4th at 127.  The

3    Court left that analysis to the district court on remand.

4         That analysis here shows that, with respect to the

5    Discharge Class, plaintiffs have not provided sufficient

6    evidence of a common system-wide practice that could answer in

7    one stroke why inmates in the Discharge Class did not receive

8    CBMHHSS.  I have already excluded the portion of Peet's opinion

9    on which plaintiffs rely here.  That counties seek more

10   resources for residents with SMI, a situation that I expect is

11   both universal and perpetual, does not sufficiently show that

12   DOCCS and OMH have an inmate-specific practice that results in

13   violation of the ADA and RA.  The anecdotal evidence as to each

14   named plaintiff is too weak to raise the inference that there

15   is centralized, statewide discrimination against individuals in

16   a Discharge Class.  See Wal-Mart at 358.  The Condliffe

17   declaration which plaintiffs cite for the proposition that

18   class members in Syracuse do not have sufficient access to

19   transitional housing -- see plaintiffs' reply brief at 8, note

20   38 and ECF number 288 -- concludes that there is not enough

21   specialized housing in New York for people who are in re-entry

22   from incarceration.  But this does not provide evidence that

23   this results from systemic discrimination by DOCCS and OMH.

24   The same deficiency exists with the spreadsheets showing the

25   initial housing locations of some individuals released from

```
1   prison.  See ECF number 274-24, Exhibit 64.  As defendants
2   argue, there could be a myriad of reasons why individuals were
3   placed in a variety of settings.  See defendants' opposition
4   brief at 29 and note 17.
5          Considered together, the evidence on which the
6   Discharge Class relies does not suffice to show that class
7   members are in segregated settings or inappropriate settings
8   that risk reinstitutionalization because of defendants'
9   policies as opposed to any number of other issues that
10  influence the post-release housing of inmates with SMI.  "Mere
11  allegations of systemic violations of the law will not
12  automatically satisfy Rule 23(a)'s commonality requirement."
13  M.D. v. Perry, 675 F.3d 832, 844 (5th Cir. 2012).  "Here, the
14  proposed class' proffered common issues stretch the notions of
15  commonality by attempting to aggregate several amorphous claims
16  of systemic or widespread conduct into one super-claim." M.D.
17  at 844.
18         This case is, thus, unlike Kenneth R., 293 F.R.D. at
19  260-61, where plaintiffs provided evidence not only that New
20  Hampshire had deficient community-based services, but also had
21  made no investment in community-based mental health housing, in
22  contrast to New York, which has invested nine and ten-figure
23  amounts in both areas.  As in Wal-Mart, where it was impossible
24  to say that class members' claims would produce a common answer
25  to the question "Why was I disfavored?," there is no evidence
```

1    here that there will be a common answer to the question of any

2    Discharge Class members "Why did I not get CBMHHSS?"  See

3    Taylor, at *9, which found that plaintiffs did not provide

4    evidence of the glue connecting together the reason for each

5    Medicaid enrollee's reduction or termination of care.

6           The Second Circuit made clear in Elisa W. that the

7    district court must assess the evidence related to the alleged

8    common practices.  Having determined that plaintiffs have not

9    provided sufficient evidence of a common practice of

10   discrimination as to the Discharge Class, I find plaintiffs

11   have not established commonality as to that class.  There is

12   simply no common answer to the question "Why did I not get

13   CBMHHSS?"

14          With respect to the General Class and the RTF

15   Subclass, these classes raise the question of whether

16   defendants have a policy or practice of holding inmates with

17   SMI past their lawful release dates and the common harms of

18   being kept in prison past their release dates.  Defendants

19   argue that these classes do not meet the commonality

20   requirement because the process involves independent

21   decision-makers and Wal-Mart precludes class certification in

22   these circumstances.  See defendants' opposition at 39.  But,

23   here, there is glue holding the classes together:  Whether

24   DOCCS has a practice of keeping members of the relevant

25   population beyond their release date due to a lack of Services.

1          Additionally, plaintiffs provide evidence that DOCCS
2    had such a practice.  As it pertains to the RTF Subclass,
3    plaintiffs reference an internal email exchange from 2018
4    regarding the placement of an incarcerated individual in which
5    a DOCCS commissioner stated to other DOCCS personnel that this
6    person "has been in RTF as a non-SARA since August 2016.  There
7    are OMH Level 2 cases that have been awaiting SARA-compliant
8    housing even longer than that.  As an agency, we need to do
9    something to find appropriate housing.  This is a huge risk to
10   continue to hold these individuals, not to mention a disservice
11   to them, as they have earned release.  Next week I will be
12   sending, again, a list of all the MH cases waiting."  That's
13   ECF No. 274-6.

14         MH I presume stands for mental health and SARA stands
15   for Sexual Assault Reform Act.

16         At the very least, this email demonstrates DOCCS'
17   acknowledgment of a system-wide problem and it is evidence that
18   DOCCS was holding multiple people beyond their release date
19   because of a lack of appropriate housing.

20         As to the General Class, plaintiffs provide evidence
21   that since December 10, 2019, at least 273 people in the
22   relevant population were held past their release date with at
23   least two being subject to prolonged incarceration in 2022.
24   See plaintiffs' brief at page 28, note 139, the Crider
25   declaration paragraphs 15 to 20 and Plaintiff's Exhibit 42.  In

1    the Ricci declaration, ECF number 302, paragraphs 18-20,

2    defendants argue that plaintiffs are misreading Exhibit 42 and

3    it does not show that the two individuals were held past their

4    release dates in 2022.  Specifically, defendants submit that

5    the two individuals required services due to their intellectual

6    and developmental disabilities and not due to SMI diagnosis and

7    were released prior to the maximum expiration dates of their

8    sentences.  I do not have enough details on these cases to

9    resolve the factual dispute in favor of one party or the other,

10   but even if I were to resolve this factual dispute in

11   defendants' favor, there is other evidence described above

12   showing that, at some point, there were inmates who remained in

13   DOCCS custody because there was no suitable mental health

14   housing at the time of their release.  See plaintiffs' brief at

15   28, note 138, Exhibit 90 at paragraphs 8-10 and ECF No. 110-2

16   at 7.

17          Plaintiffs also provide evidence that DOCCS still

18   allows people to be held past open dates for parole and

19   conditional release dates if mental health prevents approval of

20   a residence.  See Exhibit 90.  DOCCS also conceded that there

21   were instances in which inmates remained in DOCCS custody

22   because there was no suitable mental health housing at the time

23   of their release.  See plaintiffs' brief at 28, note 138;

24   Exhibit 90, paragraphs 8-10; and ECF 110-2 at 7, which quotes

25   defendants to this effect.  "The prior determinations by DOCCS

1    personnel which resulted in this population being retained in

2    RTF status or otherwise in DOCCS custody past their maximum

3    expiration date, conditional release date or open parole date,

4    were based on public safety concerns and not based on clinical

5    determinations by OMH that release to a homeless shelter was

6    clinically inappropriate," so acknowledging the population was

7    retained past their dates.

8            "Utterly threadbare allegations that a group is

9    exposed to illegal policies and practices are not enough to

10    confer commonality."  Parsons v. Ryan, 754 F.3d 657, 683 (9th

11    Cir. 2014).  But the evidence plaintiffs have supplied here

12    show more than threadbare allegations.  As to the RTF Subclass,

13    they have provided evidence that DOCCS internally acknowledged

14    a systemic issue and, as to the General Class, they have

15    provided that there is or at least was a policy that permitted

16    inmates to be held past their release dates if no suitable

17    mental health housing could be located at the time of their

18    release.  This evidence certainly suggests a state policy and

19    practice of prolonged incarceration based on "a systemic

20    deficiency in the available community-based services.  Kenneth

21    R. at 261.  The evidence of systemic discrimination as it

22    relates to the General Class and RTF Subclass is sufficient at

23    this stage to support a finding of commonality.  In other

24    words, plaintiffs have shown sufficient evidence that there may

25    well be a common answer to the question of General Class and

1    RTF Subclass members, "Why was I not released from DOCCS on my
2    release date?"

3              Turning now to typicality.  That is satisfied "if
4    each class member's claim arises from the same course of events
5    and each class member makes similar legal arguments to prove
6    the defendant's liability." Robinson v. Metro-North, 267 F.3d
7    147, 155; abrogated on other grounds by Wal-Mart, as recognized
8    in Amara v. Cigna, 775 F.3d 510.  A named plaintiff's claim is
9    typical if it arises from the same -- sorry.  Never mind.  See
10   Jeffries, 2007 WL 2454111, at *12.  Typicality does not require
11   identical facts, Madden v. Midland Funding, 237 F.Supp.3d 130,
12   157 (S.D.N.Y. 2017), so long as the disputed issues occupy the
13   same degree of centrality between the named representatives and
14   the class.  Hill v. City of New York, 136 F.Supp.3d 304, 356
15   (E.D.N.Y. 2015), order amended and supplemented, 2019 WL
16   1900503 (Apr. 29, 2019).  Rather than focusing on the precise
17   nature of the plaintiff's injuries, the typicality may be
18   satisfied where the injuries derive from a unitary course of
19   conduct by a single system.  Ligon v. City of New York, 288
20   F.R.D. 72, 79.

21             Though courts often discuss commonality and
22   typicality together -- see In re Telik, 576 F.Supp.2d 570, 582
23   (S.D.N.Y. 2008), collecting cases; see also Marisol
24   A. v. Giuliani, 126 F.3d 372, 376 -- the typicality element is
25   distinct from commonality in that it focuses on claims or

defenses rather than questions of law or fact.

Lemire v. Wolpoff & Abramson, 256 F.R.D. 321, 326 (D. Conn. 2009).  The commonality requirement tests the definition of the class while the typicality requirement focuses on how the named plaintiff's claims compare to the claims of other class members.  Traver v. Lowe's, 2006 WL 880169, at *2 (E.D.N.Y. Mar. 1, 2016).  Like commonality, however, typicality may be assumed where the nature of the relief sought is injunctive and declaratory.  Nicholson, 205 F.R.D. at 99; Brown v. City of Barre, 2010 WL 5141783, at *6 (D. Vt. Dec. 13, 2010), which notes that there's a presumption that commonality and typicality are present when a plaintiff seeks injunctive and declaratory relief, but it's just a presumption.

        "The purpose of typicality is to ensure that class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." Ligon, 288 F.3d at 79.  "A lack of typicality may be found in cases where the named plaintiff was not harmed by the conduct he alleges to have injured the class or the named plaintiff's claim is subject to specific factual defenses atypical of the class." Wynn v. NYCHA, 314 F.R.D. 122, 126-27 (S.D.N.Y. 2016), affirmed 730 F.App'x 92.

        I have already found a commonality problem with the Discharge Class, but I address typicality for that Class in an

1    excess of caution.

2              Defendants argue that the named Discharge Plaintiffs

3    are atypical of the proposed Class because they have uniquely

4    violent histories that make them difficult to place into

5    Services, there are different facts and influences that may

6    have contributed to a delay in provision of their Services,

7    they are not a representative sample of statewide placement

8    because they cumulatively only have experience with three local

9    committees in New York, Rockland and Orange Counties, and the

10   proposed Discharge Class consists of individuals who allegedly

11   did not receive Services while the named Discharge Plaintiffs

12   received extensive Services and housing offerings upon release.

13   See defendants' cert. opposition briefing at 30-31.

14             Plaintiffs argue the Discharge Class meets typicality

15   because they've shown that defendants engaged in a single

16   course of conduct giving rise to the claims of all members;

17   that is, not providing CBMHHSS upon release.  Further, they

18   argue the named plaintiffs all experienced the same harm, share

19   identical legal theories and seek the same relief.  See

20   plaintiffs' cert. memorandum at 34 and 36.

21             Plaintiffs' argument fails for the Discharge Class.

22   Plaintiffs describe the Discharge Class as all persons with SMI

23   who desire Services upon release from state prison, but do not

24   receive such Services and reside in segregated settings or are

25   at serious risk of becoming institutionalized.  The evidence,

1    however, demonstrates that the named Discharge Plaintiffs did

2    receive some significant Services and that they did not receive

3    certain other Services either because they declined placement,

4    like W.P., were regarded as too dangerous for available

5    placements, like S.D., or were thrown out for not following

6    rules at their placements, like D.H.  The named plaintiffs want

7    to represent a class of people who did not get CBMHHSS, but

8    could have if defendants made sufficient resources available,

9    but plaintiffs have not provided sufficient evidence that

10   resources were the reasons the named plaintiffs did not get the

11   housing and the Services.

12           In other words, plaintiffs have not sufficiently

13   shown that the named Discharge Plaintiffs' experiences were a

14   result of the conduct claimed to have injured the Class and

15   their claims are subject to specific, atypical factual defenses

16   such that plaintiffs have not provided evidence that suggests

17   that their same circumstances are shared by the Class members.

18   Kenneth R., 293 F.3d at 207; see Johnson v. City of Chicago,

19   2013 WL 3844545, at *13 (N.D. Ill. July 22, 2013).  That was a

20   case in which the named plaintiffs allegedly were jailed for

21   failing to register as sex offenders in a case where they were

22   challenging the fee for registering and the Court found that

23   was atypical of the majority of the remaining class members

24   and, therefore, typicality was not met.

25           I, thus, find that the Discharge Class also fails as

1    to typicality.

2          With respect to the General Class and the RTF

3    Subclass, plaintiffs argue that typicality is met because their

4    claims arise from the same course of conduct, defendants'

5    policy and practice of institutionalizing Class members instead

6    of releasing them by their release date.  See plaintiffs' brief

7    at 35.  Defendants argue that the General and RTF Subclasses

8    are atypical because they present exceptionally challenging

9    placement cases due to a history of violence, arson or both and

10   that several of the named plaintiffs have engaged in ongoing

11   conduct that has made placements more difficult.  That's their

12   opposition at 39.  Additionally, defendants argue that the

13   General Class and the RTF Subclasses are statewide classes, but

14   the named plaintiffs only represent experience with a handful

15   of local communities.  That's also at 39.

16         As plaintiffs argue in their reply, defendants claim

17   that the General Class and RTF Subclass named plaintiffs are

18   unusually challenging, but they provide no distinguishing facts

19   or evidence of that -- see plaintiffs' class cert. reply at

20   14 -- in contrast to the evidence defendants did provide with

21   respect to the named Discharge Plaintiffs.  See defendants'

22   cert. opposition at 30-32.

23         Here, defendants' own records show that the General

24   and RTF plaintiffs were held beyond their release dates due to

25   a lack of placements and that they were harmed by the same

1    policy or practice that would be asserted by other Class

2    members and, at this stage, defendants have not provided

3    evidence from which I can conclude that the claims of the named

4    plaintiffs are subject to factual defenses that would be

5    atypical compared to other Class members.  See Wynn v. NYCHA,

6    314 F.R.D. at 126-27.

7         Furthermore, where the challenged conduct is a policy

8    or practice that affects all class members, the typicality

9    inquiry involves comparing the injury asserted in the claims

10   raised by the named plaintiffs with those of the rest of the

11   class.  Parsons v. Ryan, 754 F.3d 657, 685 (9th Cir. 2014).

12   "We do not insist that the named plaintiffs' injuries be

13   identical with those of the other class members, only that the

14   unnamed class members have injuries similar to those of the

15   named plaintiffs and that the injuries result from the same

16   injurious course of conduct."  Parsons at 685.  Such is the

17   case here.  See also Ellis v. Costco, 657 F.3d.  92011.

18        Moreover, that the named plaintiffs are from a

19   handful of local committees does not mean that their

20   experiences are necessarily atypical of what other Class

21   members in the state experience, as the challenged policies of

22   DOCCS and OMH are statewide.

23        In sum, with the Discharge Class, plaintiffs have not

24   provided evidence that the named plaintiffs are typical of the

25   Class, while defendants have provided evidence that there are

unique circumstances as to each named plaintiff that are likely
atypical of other Class members.  But with the General Class
and RTF Subclass, plaintiffs have provided adequate evidence
that the experience of the named plaintiffs in being held in
prison past their release dates due to a lack of services is
typical of the other Class members they seek to represent and
so they have satisfied typicality as to the General and RTF
Subclass.

Rule 23(a)(4) requires plaintiffs to show they will
fairly and adequately protect the interests of the class.  The
class representative must possess the same interest and suffer
the same injury as the other class members.  Amchem v. Windsor,
521 U.S. 591, 2625-26.  The proposed class representative must
have an interest in vigorously pursuing the claims of the class
and no interest antagonistic to the interest of the other class
members.  Pichardo v. Carmine's, 2016 WL 5338551, at *5.  The
conflict or potential conflict alone will not necessarily
defeat class certification; however, the conflict must be
fundamental.  Denney v. Deutsche Bank, 443 F.3d 253, 268.  In
addition, class counsel must be qualified, experienced and
generally able to conduct the litigation.  Vincent, 304 F.R.D.
at 456.

Plaintiffs argue and defendants do not contest that
there are no actual or potential conflicts of interest between
the named plaintiffs and the other Class members and that the

1  named plaintiffs and their counsel have the ability and

2  competence to pursue the action and, accordingly, I find that

3  adequacy is met.

4         Finally -- well, not quite finally, but finally with

5  respect to 23(a), I turn to ascertainability.

6         Though the Second Circuit has acknowledged that "Rule

7  23 contains an implicit threshold requirement that the members

8  of a proposed class be readily identifiable, often

9  characterized as an ascertainability requirement." In re

10  Petrobras, 862 F.3d 250, 264, some district courts have

11  suggested that that requirement is less important for Rule

12  23(b)(2) classes.  See Plaintiffs #1-21 v. Town of Suffolk,

13  2021 WL 1255011, at *16 (E.D.N.Y. Mar. 12, 2021), report and

14  recommendation adopted, 2021 WL 1254408 (E.D.N.Y. Apr. 5,

15  2021); Davis v. City of New York, 296 F.R.D. 158, 164-65; and

16  Brooklyn Center v. Bloomberg, 209 F.R.D. at 419.

17         Plaintiffs #1-21 said that ascertainability is less

18  important in a 23(b)(2) class because the objective of that

19  rule is to provide injunctive relief to large and amorphous

20  classes not capable of certification under 23(b)(3).  Davis

21  said it's not clear that the implied requirement should apply

22  to (b)(2) class actions.  And Brooklyn Center said the same

23  thing because notice is not obligatory and the relief sought is

24  injunctive.

25         But, "Second Circuit decisions in the Rule 23(b)(3)

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

context that address ascertainability do not make any

distinctions on the applicability of the ascertainability

requirement based on the type of class being certified."

DDMB v. Visa, 2021 WL 6221326, at *39 (E.D.N.Y. Sept. 27,

2021).  Furthermore, "district courts within the Second Circuit

have applied the ascertainability requirement to Rule 23(b)(2)

classes." DDMB at 39, collecting cases.  Furthermore, it makes

sense to apply ascertainability here because, to the extent

plaintiffs want an injunction that says CBMHHSS must be

promptly made available to members of a class, which, as a

practical matter, means that class members will jump the line

ahead of other members of the public, we must be able to

determine who is a member of the Class.  Therefore, I address

ascertainability.

        "For a class to be ascertainable, the definition must

be based on objective criteria and administratively feasible

such that members can be identified without conducting a mini

hearing on the merits of each case." Bellin v. Zucker, 2022 WL

4592581, at *5 (S.D.N.Y. Sept. 30, 2022).  In other words, the

criteria must readily identify those who will be bound or

benefited by the judgment.  Bellin at 5.

        I again address the Discharge Class in an excess of

caution.  Defendants argue that it is not ascertainable because

identifying the Class would require the determination of

subjective elements, such as what type and level of CBMHHSS is

1   appropriate for the individual, what services the individual

2   desires, whether the individual did not receive services

3   because of something that the individual did or for other

4   reasons, and whether the individual resides in a segregated

5   setting or is at serious risk of becoming institutionalized.

6   Defendants' opposition at 33.

7           Plaintiffs argue that the Class is ascertainable

8   because the appropriateness and desire components are to be

9   considered generally and not for individual placements and the

10  final two criteria are related to liability.  They argue that

11  defendants track whether members receive Services at the time

12  of release and that case-by-case analysis would not be required

13  and that defendants' records contain discharge plans that say

14  whether release to the community is appropriate and that Class

15  members' views are recorded during discharge planning.  See

16  plaintiffs' class cert. reply at 11-12.

17          All of these arguments considered, I conclude that

18  the Discharge Class cannot be ascertained by reference to

19  objective criteria.  Determining the members of the Discharge

20  Class would require mini hearings on whether an individual is

21  appropriate for Services, whether he wants them, whether he did

22  not get them because of defendants' policies or other factors,

23  and whether that puts him at serious risk.  This all "runs

24  contrary to the principle of ascertainability."  Bellin at 6.

25  Further, "there is no objective independent basis for

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    determining whether the Services provided were adequate."

2    Bellin at 5.  Even if there are documents that contain

3    information about whether Class members are psychiatrically

4    stable for release to the community, these documents would not

5    necessarily show whether an individual needed CBMHHSS.

6        Plus, further, the evidence to which plaintiffs point

7    as showing that Class members' views are recorded during

8    discharge planning is just one document saying one inmate said

9    he would prefer to be released to the community rather than

10   being civilly committed, which hardly shows whether the person

11   desires CBMHHSS as opposed to, say, living with family.  And

12   there is no indication that this sort of documentation is

13   memorialized for every Class member.

14       Lastly, while it is easy to determine who is in

15   segregated housing, it would be difficult to ascertain who is

16   at serious risk of becoming institutionalized.  Ascertaining a

17   Discharge Class would require fact-specific mini hearings on

18   each potential Class member and I find, therefore, that it also

19   fails as to ascertainability.

20       With respect to the General Class and RTF Subclass

21   members, defendants argue that the definitions are overbroad

22   because they are not limited to individuals who remained in

23   prison beyond their release date because of a lack of Services.

24   That's defendants' opposition at 39.  In response, in

25   plaintiffs' reply at 15, plaintiffs agreed to revise the

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    General Class and RTF Subclass definitions accordingly to

2    provide that the members of those Classes were held "because of

3    the unavailability of community-based mental health housing

4    and/or supportive services."  With that amendment, the members

5    of the General Class and RTF Subclass are ascertainable from

6    DOCCS records and the ascertainability requirement is met.

7            Turning now to Rule 23(b)(2).  That provides that a

8    class may be maintained if "the party opposing the class has

9    acted or refused to act on grounds that apply generally to the

10   class so that final injunctive relief or corresponding

11   declaratory relief is appropriate respecting the class as a

12   whole."  "The key to the (b)(2) class is the indivisible nature

13   of the injunctive or declaratory remedy warranted, the notion

14   that the conduct is such that it can be enjoined or declared

15   unlawful only as to all of the class members or as to none of

16   them."  Wal-Mart at 360.  23(b)(2) applies only when a single

17   injunction or declaratory judgment would provide relief to each

18   member of the class.  Wal-Mart at 360.  It does not authorize

19   class certification when each individual class member would be

20   entitled to a different injunction or declaratory judgment

21   against the defendant.  Civil rights cases against parties

22   charged with unlawful class-based discrimination are prime

23   examples of what (b)(2) is meant to capture.  This is all

24   Wal-Mart at 360.  See Robinson v. Metro-North, 267 F.3d 147,

25   162.

1           Putative classes bringing claims alleging systemic

2      failure of governmental bodies to properly fulfill statutory

3      requirements are properly certified under Rule 23(b)(2) where

4      the defendant's failure to act is said to be institutional, not

5      merely a cumulation of individual cases.  Westchester

6      Independent Living Center v. SUNY Purchase, 331 F.R.D. 279, 300

7      (S.D.N.Y. 2019).

8           "A district court can only properly discern whether a

9      class-wide injunction is appropriate, whether it could grant

10     relief respecting the class as a whole, if the injunction is

11     described at the certification stage in reasonably particular

12     detail." In re E.I. DuPont, 2022 WL 4149090, at *9 (6th Cir.

13     Sept. 9, 2022).  "Only then can the district court undertake an

14     intelligent analysis of whether Rule 23(b)(2) is satisfied."

15     Dupont at 9.

16          Defendants argue that the General Class and RTF

17     Subclass fail the Rule 23(b)(2) hurdle because "plaintiffs have

18     not identified any single affirmative injunction that could

19     achieve their demand for immediate on-demand CBMHHSS placements

20     for all members of the proposed classes given the myriad

21     case-by-case factors and multiple private and local independent

22     decisions involved." That's in defendants' brief at 38.

23          As relevant to the General Class and RTF Subclass, in

24     their second amended complaint, plaintiffs seek a declaration

25     that defendants' conduct as alleged in the complaint is

1    unconstitutional under the Eighth and Fourteenth Amendments,

2    the ADA and the RA and they seek a permanent injunction

3    requiring defendants to develop an Olmstead plan specific to

4    class members, to make CBMHSS in the most integrated setting

5    available to inmates who desire it promptly upon release, and

6    to stop holding RTF Class inmates in punitive conditions in

7    state prison.  See paragraphs 98-99.

8         An Olmstead plan refers to the Supreme Court's

9    finding in Olmstead v. L.C., 527 U.S. 581, 605-06 that "if the

10   state were to demonstrate that it had a comprehensive,

11   effectively working plan for placing qualified persons with

12   mental disabilities in less restrictive settings and a waiting

13   list that moved at a reasonable pace not controlled by the

14   state's endeavors to keep its institutions fully populated, the

15   reasonable-modifications standard under the ADA would be met."

16        The relief that plaintiffs request is sufficient

17   under Rule 23(b)(2).  A declaration that keeping General Class

18   and RTF Subclass members past their release dates is

19   unconstitutional and violates the ADA and RA would be

20   sufficient under 23(b)(2) because defendants' conduct would be

21   declared unlawful as to all of the Class members; in other

22   words, it would redress a group-wide injury.  See Robinson at

23   162.  The requested permanent injunction would also be

24   sufficient because such injunctive relief, if warranted and

25   feasible at the merits stage, would benefit all Class members

1    insofar as it would address institutional failures and not just

2    failures as to the individual Class members.  See Kenneth R. at

3    271.

4            Defendants' final argument is that the General and

5    RTF Subclasses fail Rule 23 because, under the Galvan doctrine,

6    a class action is inappropriate to the extent plaintiffs seek

7    an order prohibiting DOCCS from its pre-December 16th, 2019

8    practice of holding some incarcerated individuals beyond their

9    release date.  Plaintiffs say they are not seeking an order

10   requiring Class members' release from prison, but, rather, want

11   defendants to make release possible by providing plaintiffs

12   with the CBMHHSS that defendants have required as a condition

13   for discharge.  See SAC paragraph 22.  That may be a

14   distinction without a difference, but even if it is, I do not

15   think Galvan prevents certification of the General Class and

16   RTF Subclass.

17           Under Galvan, when a case "seeks prohibitory

18   injunctive or corresponding declaratory relief against state

19   officials," a "class action designation may be largely a format

20   where the government has made clear that it understands the

21   judgment to bind it with respect to all claimants."

22   Lisnitzer v. Zucker, 983 F.3d 578, 588, quoting

23   Galvan v. Levine, 490 F.2d 1255, 1261.  "The Galvan rule does

24   not require a plaintiff to prove that class certification is

25   necessary; it merely makes it permissible for a court to deny

1    certification if the class action designation is largely a

2    formality." Barfield v. Cook, 2019 WL 3562021, at *11 (D. Conn.

3    Aug. 6, 2019).  That court went on to explain that the court

4    has wide discretion in making that decision and that courts

5    have focused on the following four factors in doing so:

6              "First, notwithstanding the presumption that

7    government officials will abide by a court's decision as to

8    similarly situated individuals, an affirmative statement from

9    the government defendant that it will apply any relief across

10   the board militates against the need for class certification.

11             "Second, withdrawal of the challenged action or

12   nonenforcement of the challenged statute militates against the

13   need for class certification.

14             "Third, the type of relief sought can affect whether

15   class certification is necessary.  Courts have found that where

16   the relief sought is merely a declaration that a statute or

17   policy is unconstitutional, denial of class certification is

18   more appropriate than where plaintiffs seek complex,

19   affirmative relief.

20             "Fourth, courts also consider whether the claims

21   raised by plaintiffs are likely to become moot, making class

22   certification necessary to prevent the action from becoming

23   moot."

24             That's all Barfield at 11.

25             As to the first factor, defendants argue that DOCCS

1    ended the challenged practice in 2019 and has repeatedly

2    expressed commitment to that cessation.  That's in their

3    opposition at 37.  Plaintiffs argue to the contrary that

4    defendants have not fully withdrawn the challenged policy and

5    that "DOCCS and OMH simply offer empty assurances that OMH will

6    always find a placement."  Plaintiffs' reply at 13.

7    Specifically, they cite Directive 8306, which was updated in

8    2022, as evidence that defendants have not withdrawn the very

9    policy that plaintiffs challenge.  See ECF number 273-90 at 2,

10   which states, "where the assigned area office is unable to

11   approve a viable residence program for an incarcerated

12   individual and residency in a shelter situation is

13   inappropriate or unavailable, special conditions regarding

14   residency may be requested for the Parole Board to impose which

15   will not allow release until a suitable residence can be

16   approved."  Defendants argue that any evidence that plaintiffs

17   have submitted does not show that any incarcerated individual

18   was held beyond their release date after December 16, 2019 as a

19   result of a determination by DOCCS that the individual required

20   mental health housing, but it was not available and that, in

21   any event, any factual dispute as to whether the practice did

22   or did not end in 2019 need not be resolved for purposes of

23   this motion because the State has expressed a commitment to

24   abide by a declaration.

25            Defendants are correct that the first factor is

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    simply whether the government defendant has said it would apply

2    across the board any relief granted to the named plaintiffs.

3    Defendants have not quite said that.  Rather, defendants have

4    said that DOCCS "understands that to the extent the Court

5    issues an order enjoying DOCCS from reinstating the

6    pre-December 16, 2019 practice, such an order would apply not

7    just to the named plaintiffs in this case, but to all similarly

8    situated individuals."  That's the Ricci declaration, ECF

9    number 302, paragraph 12.  Defendants have not said that they

10   would apply across the board any relief this Court orders, but

11   I assume if that question were put directly to them, they would

12   say that and, if so, this factor militates against class

13   certification.

14        But the factual disputes over whether the challenged

15   actions have in fact been withdrawn go to the second factor.

16   Defendants argue chiefly in the Ricci declaration that

17   plaintiffs are misreading DOCCS records which plaintiffs claim

18   show inmates with SMI held beyond their release dates and Ricci

19   saying they were held because of their intellectual and

20   developmental disabilities, not because of their SMI.

21        I cannot resolve that dispute based on the record

22   before me, but I can conclude that defendants' arguments do not

23   weigh heavily enough at this stage to show that class

24   certification would just be a formality because the challenged

25   action has been withdrawn.  This is particularly so as DOCCS

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    relies on OMH assurances that it will find CBMHH for inmates

2    due to be released, but there is limited availability of such

3    housing.

4              As to the third factor, plaintiffs seek not just a

5    declaration that DOCCS' policy is unconstitutional, but also an

6    injunction preventing defendants from subjecting the RTF

7    Subclass to punitive conditions in state prison, an injunction

8    requiring defendants to develop an Olmstead plan and an

9    injunction requiring CBMHHSS to be promptly available for

10   releasees.  That is complex relief that goes beyond a mere

11   declaration.

12             Finally, the fourth factor weighs in favor of

13   certification because the transitory nature of the named

14   plaintiffs' claims raise mootness concerns.

15             On balance, I conclude that the Galvan factors weigh

16   against a conclusion that class action designation is a

17   formality and exercise my discretion to proceed with class

18   certification notwithstanding defendants' commitment not to

19   revert to holding prisoners past their release dates based on a

20   DOCCS determination that the individuals need mental health

21   housing that was not available.

22             Because the General Class and the RTF Subclass meet

23   the Rule 23 requirements, those two classes, as modified in

24   plaintiffs' reply brief, are certified and plaintiff's' counsel

25   are appointed as class counsel without objection.

1          So, for the foregoing reasons, the motion to certify

2    is granted in part and denied in part and defendants' motion to

3    exclude the experts is granted in part and denied in part.

4          I'm going to leave it to counsel for the plaintiff to

5    submit me a proposed order.

6          The Clerk of Court will terminate ECF numbers 270 and

7    293.

8          A couple of other things I want to talk about.

9          I have a premotion letter from defendants, ECF number

10   368, in which they ask to make a motion to dismiss J.R. because

11   he is seemingly in the wind and he's not been able to be

12   deposed, and defendants indicate in the letter that plaintiffs'

13   counsel have indicated that they will not have grounds to

14   oppose.  I don't see a need for formal briefing on this.  It

15   seems to me the letter makes pretty clear that that outcome is

16   appropriate, but if either side thinks formal briefing is

17   necessary, I will hear you.

18          MS. LANDRISCINA:  Plaintiffs don't believe formal

19   briefing is necessary.

20          THE COURT:  All right.  Then I will grant the motion

21   and the claims of plaintiff J.R. are dismissed for failure to

22   prosecute.

23          Now let's go off the record a second.

24          (Discussion off the record)

25          THE COURT:  What's left discovery-wise?

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1          MR. CONROY:  So in terms of the discovery, there is

2     one loose end, which is plaintiff M.G. has not yet been

3     deposed.  I understand -- we've had numerous discussions with

4     plaintiffs' counsel and with Judge Krause and I believe

5     plaintiffs will be filing a status update on his availability

6     to be deposed later this week.  So that's really the only fact

7     discovery issue.  Otherwise, we have expert deadlines set.

8     Plaintiffs' expert reports are due in August and I believe ours

9     are due in October.  And that's where we stand on discovery.

10          THE COURT:  All right.  Well, I will send you back to

11     Judge Krause' capable hands to supervise that.

12          Anything else we should do this morning?

13          All right.  Thank you all.

14          Let me compliment both sides on the briefing.  I

15     thought it was excellent.  And despite how excellent it was,

16     I'm sure there are some details and some weeds that you

17     appreciate more than I do.  And like I said, who knows what the

18     Second Circuit would think if this question ever got there, but

19     it seems to me that the Discharge Class just did not cohere, if

20     that's a word, and the other two do.  So, right or wrong, at

21     least it's some guidance for you folks going forward.

22          So thank you all.  Good luck.

23          MR. CONROY:  Thank you, Judge.

24          MS. LANDRISCINA:  Thank you.
                              ----
25

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103